# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

| | |
|---|---|
| **JOSEPH ATTARDI, et al.** | ) |
| **Plaintiffs,** | ) |
| | ) |
| | ) |
| **v.** | ) **Civil Action No.: 04-10728 WGY** |
| | ) |
| **BAYER CORPORATION and** | ) |
| **BAYER CORPORATION SEVERANCE** | ) |
| **PAY PLAN,** | ) |
| **Defendants.** | ) |

_____)

## DEFENDANTS' LOCAL RULE 56.1
## STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants Bayer Corporation and Bayer Corporation Severance Plan submit this Local Rule 56.1 Statement of Undisputed Material Facts in support of their Motion for Summary Judgment.

### A.     BACKGROUND

1.     In 1998, Bayer Corporation was headquartered in Pittsburgh, Pennsylvania.  Through its AGFA Division, Bayer operated various facilities in Wilmington, Massachusetts engaged in the manufacture of electronic pre-press systems. (D.Ex K at 30-31, 39-40; D.Ex G at 2; D.Ex N at 18, 46.)[1]

_____

[1] "D.Ex" references are to the attached exhibits.  D.Ex A is a copy of the applicable Bayer Corporation Severance Plan; D.Ex B are relevant excerpts of the applicable Bayer Summary Plan Description; D.Ex C are excerpts from the Asset Purchase Agreement between Bayer Corporation and EFTC Corporation; D.Ex D is Plaintiffs' counsel's letter to Agfa Corporation dated April 2, 2002; D.Ex E is the response letter from Agfa Corporation to Plaintiffs counsel dated June 3, 2002; D.Ex F is Plaintiffs' First Amended Complaint; D.Ex G are excerpts from the deposition of D. Marr; D.Ex H are excerpts from the deposition of R. Willis; D.Ex I is the Letter of Intent between Bayer Corporation and EFTC; D.Ex J are excerpts from the deposition of M. Leonard; D.Ex K are excerpts from the deposition of M. Paige; D.Ex L are excerpts from the deposition of E. Lascelles; D.Ex M are excerpts from the deposition of R. Brown; D.Ex N are excerpts from the deposition of R. Ramsden; D.Ex O are excerpts from the deposition of T. Ornelas; D.Ex P are excerpts from the deposition of J. Paridis; D.Ex Q are excerpts from the deposition of K. Collins; D.Ex R are excerpts from the deposition of N. Fontaine; D.Ex S are excerpts from the deposition of J. Skene; D.Ex T are excerpts from the deposition of V. Fiorella; D.Ex U are excerpts from the deposition of B. Guillimet;

2.      In 1998, at a manufacturing facility located at 80 Industrial Way, Wilmington, Massachusetts, the AGFA Division of Bayer operated a printed circuit board manufacture and assembly unit comprised of approximately 75-85 employees and managers. (D.Ex K at 34, 39-40; D.Ex N at 46-49, 75-85.)

3.      In early 1998, Bayer decided to discontinue its printed circuit board operation in Wilmington due to the company's unwillingness to make capital investments necessary to bring the machinery up to date.  Bayer contacted numerous companies to solicit interest in acquiring the printed circuit board unit. (D.Ex K at 91-92, 99-101, 364; D.Ex N at 52-53; D.Ex R at 69-70.)

4.      On July 15, 1998, Bayer signed a Letter of Intent with EFTC in which Bayer agreed to sell its printed circuit board operation to EFTC.  (D.Ex I.)

5.      Pursuant to the terms of the Letter of Intent between Bayer and EFTC, each Bayer employee in the printed circuit board operation would be offered employment by EFTC at a salary/wage rate that was equal to or greater than the base salary/wage rate each employee had with Bayer.  (D.Ex I.)

6.      Pursuant to the Letter of Intent between Bayer and EFTC, each Bayer employee would offered a position with EFTC at the same location that the employee was performing work for Bayer.  (D.Ex I.)

7.      On August 13, 1998 Bayer and EFTC signed an Asset Purchase Agreement providing for the sale of the printed circuit board shop assets. (D.Ex C.)

---

D.Ex V are excerpts from the deposition of Jack Calderon; D.Ex W are excerpts from the deposition of N. Beesley; D.Ex X are documents concerning Agfa Corporation's sale of machine shop equipment and the resultant lay-off; D.Ex Y is the press release concerning closure of the EFTC sale; D.Ex Z are Bayer memoranda concerning the EFTC "divestiture."

8.      Pursuant to Section 6.1 of the Asset Purchase Agreement, printed circuit board employees were to receive employment offers from EFTC at salary/wage levels equal or higher than provided by Bayer. (D.Ex C at p.10.)

9.      Prior to September 1, 1998, each Bayer employee of the printed circuit board operation, including each of the Plaintiffs, accepted employment with EFTC contingent on the closing of the transaction between Bayer and EFTC.  Specifically, each Bayer employee of the printed circuit board operation, including each of the Plaintiffs, accepted employment with EFTC at the same location where they were working for Bayer, and at a base salary/wage rate that was equal to or greater than the employees' salary/wage rate with Bayer. (D.Ex G at 39-40; D. Ex H at 52-53, 58, 183; D.Ex L at 23-24; D.Ex M at 42; D. Ex J at 34, 129-30, 228-229; D. Ex K at 98-99, 110; D.Ex N at 233; D.Ex O at 29-33, 42; D.Ex T at 38; D.Ex U at 9, 12; D.Ex W at 54; D.Ex at 71-73.)

10.     The sale of the printed circuit board operation by Bayer to EFTC was completed on September 1, 1998, and the former Bayer printed circuit board employees became EFTC employees without any interruption in employment.  (D.Ex Y; D.Ex J at 130, 228-229; D.Ex V at 71-73.)

11.     Upon the commencement of their employment with EFTC on September 1, 1998, each Plaintiff was assigned to work, and did work, at the same location that they had worked for Bayer, and received from EFTC a salary/wage rate that was equal to or greater than the salary/wage rate they had been receiving from immediately prior to the completion of the printed circuit board operation sale.  (D.Ex G at 39-40; D.Ex H at 52-53, 58, 183; D.Ex N at 233; D.Ex O at 29-33; D.Ex V at 71-73.)

### B.    THE BAYER SEVERANCE PAY PLAN

12.    In 1998, Bayer Corporation had in effect for its employees The Bayer Severance Pay Plan, a written ERISA, non-vested welfare benefit plan.  (D.Ex A.)

13.    A true and accurate copy of The Bayer Corporation Severance Pay Plan is attached hereto as D.Ex A.

14.    Section 3.06 of The Bayer Corporation Severance Pay Plan (D.Ex A) provides as follows:

> Ineligible Terminations of Employment.  A severed Employee will not be eligible for severance benefit under this Plan if his or her employment with an Employer terminated for one of the following reasons:
>
> (8) In connection with a divestiture of all or part of the assets of an Employer or the sale of all or part of the stock of an Employer, as a result of which as of the date of sale the Severed Employee (i) is employed by the Acquiring Entity or an affiliate of the Acquiring Entity, or (ii) is offered employment by the Acquiring Entity or an affiliate of the Acquiring Entity which offered employment (a) does not require the Severed Employee to Relocate and (b) is at a wage or salary level (determined without regard to employee benefits offered by either the Employer, the Acquiring Entity or the affiliate of the Acquiring Entity) equal to or greater than the Severed Employee's wage or salary level at the Employer on his Employment Severance date.

15.    Section 1.01 of The Bayer Corporation Severance Pay Plan (D.Ex A) provides as follows:

> Acquiring Entity.  In connection with the divesture of all or part of the assets of an Employer or the sale of all or part of the stock of an Employer, any entity

4

which acquires all or part of the assets of an Employer or the stock of an Employer.

16.     Section 4.08 of the Bayer Corporation Severance Pay Plan (D.Ex A)

provides as follows:

Claims Procedure

(a)     Denial of Claims.  If any claim for benefits under the Plan is wholly or partially denied, the claimant shall be given notice in writing within a reasonable period of time after receipt of the claim by the Plan (not to exceed 90 days after receipt of the claim or, if special circumstances require an extension of time, written notice of the extension shall be furnished to the claimant and an additional 90 days will be considered reasonable) by registered or certified mail of such denial.  The notice of denial shall be written in manner calculated to be understood by the claimant and shall set forth the following information:

(1)     the specific reasons for such denial;

(2)     specific reference to pertinent Plan provisions on which the denial is based;

(3)     a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; and

(4)     an explanation of the Plan's claim review procedure

(b)     Deemed Denial.  If a claimant does not receive a notice of denial within 180 days after receipt of the claim, the claim will be deemed to have been denied and the claimant will be able to request a review of the denial pursuant to subsection (c).

(c)     Review of Denial.  A claimant whose claim has been denied under subsection (a) or whose claim is deemed to have been denied under subsection (b) may request a review by Bayer of the decision

denying the claim. A claimant may request a review by filing with Bayer a written request for such notice of denial under subsection (a) is received, or within 60 days after a denial is deemed to have occurred under subsection (b). The claimant may review pertinent documents, and submit issues and comments in writing within the same 60-day period. If such request is so filed, such review shall be made by Bayer within 60 days after receipt of such request, unless special circumstances require an extension of time for processing, in which case the claimant shall be so notified and a decision shall be rendered as soon as possible, but not later than 120 days after receipt of the request for review. The Participant or beneficiary shall be given written notice of the decision resulting from such review, which notice shall include specific reasons for the decision, written in a manner calculated to be understood by the claimant, and specific references to the pertinent Plan provisions on which the decision is based.

17.    Bayer Corporation was the Plan Administrator of the Bayer Severance Pay

Plan. (D.Ex A at Section 1.12.)

18.    Section 4.04 of The Bayer Corporation Severance Pay Plan (D.Ex A)

provides as follows:

> Powers. Bayer, acting through the Administrative Committee, shall have complete control of the administration of the Plan, with all powers necessary to enable it properly to carry out its duties in that respect. The Administrative Committee shall be authorized and have full discretion to interpret this Plan and to determine all questions arising in the administration, construction and application of the Plan. The decision of the Administrative Committee upon all matters within the scope of its authority shall be conclusive and binding on all parties.

19.    Pursuant to Section 3.06(8) of The Bayer Corporation Severance Pay Plan (D.Ex A), Plaintiffs, former employees of Bayer's printed circuit board unit, were not entitled to severance by virtue of the sale of the printed circuit board operation from Bayer to EFTC because each had been offered, and had accepted, comparable positions at the same location by EFTC.  (D.Ex H at 42-45, 52-53, 68; D.Ex K at 172-174.)

### C.    THE BAYER SEVERANCE PLAN SUMMARY PLAN DESCRIPTION

20.    In August 1995, Bayer Corporation mailed to each of its employees, including each of the Plaintiffs, a Summary Plan Description (hereinafter, the "SPD"). (D.Ex B; D.Ex G at 31-32; D.Ex at 82-83; D.Ex L at 24-25; D.Ex M at 43-44; D.Ex O at 13-14, 50-51; D.Ex S at 17, 32; D.Ex T at 48-52; D.Ex U at 26.)

21.    A true and correct copy of applicable portions of the SPD are set forth in D.Ex B.

22.    In the portion of the SPD entitled Severance, (D.Ex B at Sev. 1 – Sev. 11), the SPD contained the following provision (D.Ex B at Sev. 4):

> **When benefits are not paid**
>
> You will not be eligible for benefits if the plan administrator determines that:
>
> [1]  You are dismissed for cause; . . .
>
> [7]    The company offers you a comparable positions(even if you choose not to accept it);
>
> [8]   The division of the company you work for or the company itself is sold or divested and you either:
> -        become an employee of the new owner, or

- the new owner offers you continuing employment in a comparable position (even if you choose not the accept it);

[9]  The premises, products, processes, or other activities of the division you work for are relocated, assigned, sold, leased, licensed, or subcontracted, and you are offered a comparable position (even if you choose not to accept it);

[10]  The plan administrator determines that you are not eligible for benefits; or

[11]  The Plan is ended or modified.

A "comparable position" is defined as employment that:
● Does not require you to commute 35 or more miles farther than you did prior to your termination; and
● Is at a wage or salary level (determined without regard to employee benefits) equal to or greater than your wage or salary level on the date of your termination.

If you accept a new position, regardless of whether it is a comparable position, you will not be eligible for severance benefits with respect to your prior position, even if that position was eliminated. Generally, you accept a new position when you agree to assume the new position."

(Numeric bullet point references provided)

23.    The SPD contained the following provision on review procedures (D.Ex B at Adm. 6):

If for some reason your claim for benefits under a company Plan is denied, formal procedures have been developed so that you can appeal the decision.

If a claim is denied in whole or in part, you will receive a written notification of the denial within 90 days after filing.  Special circumstances may require

this 90-day period to be extended to 180 days. The notice will explain:

- The reasons for the denial;
- The Plan provisions on which it is based;
- Any additional material or information needed to make the claim acceptable and the reason it is necessary; and
- The procedure for requesting a review of the claim.

If for some reason you receive no response within 90 days, or without 180 days if you have been notified of an extension, you should consider your claim denied.

If your claim is again denied, you are entitled to a review of the denial by the plan administrator. Within 60 days after receiving the denial, you or your representative may:

- Submit a written request to the plan administrator for a review of the denial;
- Look at relevant Plan documents; or
- Submit issues and comments in writing.

Within 60 days after your request for review is received, a decision on the review normally will be made. Special circumstances may require this period to be extended to 120 days. You will receive a copy of the decision in writing, including the specific reasons for it and references to the Plan provisions on which it is based.

If for some reason you receive no response within 60 days of making a request for a review, or by the end of any extension period, you should consider. . .

24.     The SPD expressly explained to employees how to obtain a copy of the Bayer Severance Pay Plan from Bayer or from the U.S. Government (D.Ex B at Adm. 1-4).

25.    The SPD fully advised employees of Bayer's right to change or end the Severance Pay Plan at any time (D.Ex B at Sev. 11):

> **The company has the right to end, suspend or amend the Severance Pay Plan.**
>
> The Company or its designee, by action of its Board of Directors, reserves the right to end, suspend, or amend the Severance Pay Plan at any time, in whole or in part.  If material changes are made in the future, you will be notified of them.

26.    The SPD informed employees of Bayer's discretionary right to determine severance eligibility or to interpret plan terms (D.Ex B at Adm. 1):

> Bayer Corporation shall have the exclusive discretionary right to interpret the terms and provisions of the Plans and to determine any and all questions arising under the Plans or in connection with the administration thereof, including, without limitation, the right to remedy or resolve possible ambiguities, by general rule or particular decision.

27.    The SPD informed employees that the plan administrator would determine whether the circumstances surrounding their termination make them eligible for severance (D.Ex B at Sev. 3).

28.    The SPD advised employees that Bayer was the plan administrator, provided Bayer's mailing address and telephone number, and gave specific information concerning acquiring plan documents (D.Ex B at Adm. 1, 3, 4):

> **Plan administrator and sponsor**
> The plan administrator and sponsor for the benefit plans described in this book is Bayer Corporation, 500 Grant Street, One Mellon Center, Pittsburgh, Pennsylvania, 15219-2507, phone 1-412-394-5500.
>
> Bayer Corporation will carry out its responsibility to administer and interpret the Plans and make the

final decision on such issues as eligibility and payment of benefits through the Benefit Administration Committee. However, most of your day-to-day questions will be answered by your local human resources or benefits representative.

**Plan Number**
Documents and reports for the Plans described in this book are filed with the U.S. Department of Labor under two numbers: the Company's Employer Identification Number (EIN) and the Plan Number (PN).

The EIN for Bayer Corporation is 25-1339219.

The Plan Numbers are listed in the "Additional administrative information" chart beginning on the next page….

Severance…Plan 501

29.    The SPD also informed employees of their ERISA rights as follows (D.Ex B at Adm. 4):

**The rights of plan participants
Under ERISA, plan participants are entitled to:**

•   Examine, without charge at the plan administrator's office and/or the local human resources or benefits representative's office, all official plan documents (including insurance contracts) and copies of all documents filed with the U.S. Department of Labor such as detailed Summary Annual Reports and Summary Plan Descriptions.

•   Obtain copies of all official plan documents and other plan information upon written request to the plan administrator. The plan administrator may charge a reasonable fee for the copies.

30.    As of September 1, 1998, each Plaintiff had access to and/or possession of the SPD and thus had available to them instructions on how to obtain copies of the Bayer

Severance Pay Plan from Bayer Corporation and/or the United States Government. (D.Ex H at 77-79, 82-84; D Ex J at 103; D.Ex L at 24-25; D.Ex M at 42-43; D.Ex O at 50; D.Ex S at 17,32; D.Ex T at 48-52; D.Ex U at 26.)

31.    Bayer officials at the Wilmington site, Bayer benefits personnel from Pittsburgh, and Bayer's outside ERISA attorney involved in the transaction, understood the SPD to mean that offers of comparable positions (defined as equal salary in same location) by EFTC to printed circuit board employees rendered such employees ineligible for benefits.  (D.Ex G at 39-40, 48-49, 52-56, 78-79, 87-88; D.Ex H at 42-46, 68, 76-78; D.Ex J at 64-68, 98-100, 146-150, 183-184; D.Ex Q at ___; D.Ex W at 84-99; D.Ex N at 92-93.)

32.    Although various employees asked that they be given severance due to their years of service, none of the Plaintiffs submitted a claim of entitlement to severance benefits based on the terms of the SPD or the Severance Plan with Bayer Corporation or The Bayer Corporation Severance Pay Plan in 1998 or 1999 (D.Ex H at 80-81.)

33.    None of the Plaintiffs submitted a written claim for severance benefits with Bayer Corporation or The Bayer Corporation Severance Pay Plan in 1998 or 1999 (D.Ex H at 80-81; D.Ex J at 74.)

34.    Bayer officials reviewed the severance pay provisions of the SPD and provided copies of the SPD to the printed circuit board employees who had questions concerning their severance pay eligibility (D.Ex J  57-62, 103-104.)

35.    None of the Plaintiffs requested a copy of The Bayer Severance Pay Plan from Bayer in 1998-2003.

36.     Bayer officials told the printed circuit board employees prior to September 1, 1998, that they were not eligible for severance benefits under The Bayer Corporation Severance Pay Plan (D.Ex H at 76-79; D.Ex J at 50-64, 74-75; D.Ex M at 42-44.)

37.     Bayer officials informed printed circuit board employees orally that they would not be receiving severance benefits because the Agreement involved the sale of assets and EFTC was offering them employment at the same or higher salaries at the same location.  As such, Plaintiffs would not receive severance benefits whether they accepted the positions with EFTC or declined the EFTC offers of employment. (D.Ex H at 76-79, 86-88, 97-104, 107, 109, 149-151, 167-171, 179-180; D.Ex J at 50-64, 74, 145-146; D.Ex K at 171; D.Ex M at 65-66; D.Ex O at 19-20; D.Ex T at 31-32.)

38.     None of the Plaintiffs have ever submitted an appeal to Bayer's ERISA Review Committee concerning the decision that they were ineligible for severance pay due to the terms of the EFTC transaction or requested review by Bayer's ERISA Review Committee of their entitlement to severance benefits under The Bayer Corporation Severance Pay Plan.

### D.     AGFA CORPORATION IS CREATED AS OF JANUARY 1, 1999

39.     Effective January 1, 1999, four months after the sale of the printed circuit board operation by Bayer to EFTC, Bayer divested its AGFA Division to create a new, independent corporation named Agfa Corporation (D.Ex G at 26; D.Ex K at 36; D.Ex W at 163-168.)

40.     By 2001, Plaintiffs had decided to pursue severance pay claims (D.Ex S at 13-15; D.Ex Z).

41.    On April 5, 2002, Plaintiffs counsel sent a letter to the President of Agfa Corporation demanding that Agfa Corporation pay severance benefits to Plaintiffs based on the sale of the printed circuit board operation to EFTC.  Plaintiffs' counsel did not send a copy of the letter to Bayer Corporation or Bayer Corporation Severance Pay Plan. (D.Ex D.)

42.    In the letter to Agfa Corporation, Plaintiffs counsel only claimed that severance pay was owed to Plaintiffs since Agfa Corporation paid severance pay to Agfa Corporation employees laid-off from its machine shop, some of whom were subsequently hired by a purchaser of some of the machinery, Olympic Engineering Company.   No other claim or rationale was advanced in support of Plaintiffs' claim for severance benefits. (D.Ex D.)

43.    Plaintiffs counsel's letter made no reference to: 1) the Bayer SPD; 2) any purported understandings of any of the Plaintiffs concerning interpretation of the SPD; 3) any misrepresentation by Bayer personnel to any of the Plaintiffs concerning the terms of the Summary Plan Description, the terms of The Bayer Corporation Severance Pay Plan, or the terms and conditions of their EFTC employment; or 4) Bayer's "voluntary" layoff practices.  (D.Ex D.)

44.    By letter dated June 3, 2002 (D.Ex E), Agfa Corporation's counsel replied to Plaintiffs counsel and stated as follows:

> You may find the following information to be helpful.  The facts set forth in your April 5th letter are incorrect, in that the Machine Shop operation was not sold.   Rather, that operation was discontinued and its assets were offered for sale to the highest bidder.   The work performed by the machine shop was then contracted out to a number of different vendors.   Olympic Engineering was one

of those vendors, and we understand that it purchased the assets at auction and may have hired five of the twelve employees who had been in the Machine Shop.

Our Severance Pay Plan provides no severance pay where, as in the EFTC case, an operation is sold and the employees' jobs are preserved. It does pay severance where, as in the Machine Shop instance, our operation is shut down, even if some of the terminated employees later work with a vendor to whom certain activities previously performed in-house have been outsourced.

(See also D.Ex H at 222-224; D.Ex R at 48-52; D.Ex S at 171-172; D.Ex T at 150-152; D.Ex U at 76-77)

45.    Agfa Corporation sold its machine shop assets in June-September 2000, and laid-off its machine shop employees with severance pay in on or about July 2000 (D.Ex L at 9-10; D.Ex N at 303-306; D.Ex X).

46.    Some or all Plaintiffs knew in mid-2000 that Agfa Corporation had paid severance to laid-off machine shop employees (D.Ex L at 9-10).

## E.    MISCELLANEOUS FACTUAL MATTERS

47.    The instant civil action was initially filed in U.S. District Court for the District of Massachusetts on April 9, 2004 against Agfa Corporation and the Agfa Corporation Severance Pay Plan.

48.    The First Amended Complaint was filed on September 10, 2004 naming for the first time Bayer Corporation and the Bayer Severance Pay Plan as Defendants (D.Ex F).

49.     Other than filing the instant suit, Plaintiffs have not submitted any claim, appeal, or request for explanation of rights concerning severance pay to Bayer Corporation or Bayer Corporation Severance Pay Plan (D.Ex T at 119).

50.     In 1998 Bayer officials used the term "divestiture" to refer to the sale of the printed circuit board business unit to EFTC (D.Ex H at 121; D.Ex W at 29-31, 166; D.Ex Z).

51.     In 1995-1998, Bayer Human Resources officials, when conducting reductions-in-force, on occasion would consider including in such staff reductions employees who had previously indicated a willingness to be laid off ("volunteers"). (D.Ex G at 231-234; D.Ex H at 195; D.Ex N at 296-277; D.Ex R at 132-133, 180-181).

52.     Bayer would not select for layoff all employees who had indicated a willingness to be laid off.  At times, Bayer would conduct layoffs without selecting volunteers.  At other times, specific volunteers would not be selected for layoff due to business considerations. (D.Ex H at 195-201; D.Ex N at 296-297, 302; D.Ex R at 132-133, 180-181.)

53.     No "volunteers" who were included in Bayer reduction-in-force and thus given severance were ever offered equal or greater salaries by Bayer or an acquiror of a Bayer business unit at the time of their layoff.

54.     Plaintiff Robert Brown admits that prior to September 1, 1998 he knew that EFTC did not offer a pension, that the EFTC 401K match was less than Bayer's and that EFTC benefits were not as generous as Bayer benefits (D.Ex M at 17-18, 20, 21-30, 34-35, 41-42, 57.)

55.    Bayer officials received a number of comments from various printed circuit board employees prior to September 1, 1999 concerning EFTC benefits being less generous than Bayer benefits (D.Ex H at 49-50, 76-79, 149-151, 167-171, 179-180; D.Ex J at 55-57, 74, 78, 98, 102-105, 106, 154-156, 159-162, 170, 192-193).

56.    Prior to September 1, 1998, EFTC held presentations and handed out benefit brochures explaining their benefit offerings (D.Ex L at 21, 27-38; D.Ex M at 57-61, 73-75; D.Ex O at 27-28, 33-38, 44, 47-48, 52; D.Ex S at 99, 107-108, 116-124; D.Ex T at 112; D.Ex U at 7-10, 29-32).

57.    Prior to September 1, 1998, Plaintiffs were aware that, during previous reductions-in-force, Bayer had selected some employees who had earlier indicated a willingness to be included in layoffs, but that Bayer would not offer an opportunity to "volunteer for layoff" to printed circuit board employees involved in the EFTC transaction (D.Ex L at 13-15, 20, 24-25, 44; D.Ex M at 17; D.Ex O at 22-23).

58.    Plaintiff Jean Skene admitted that, in 1998 based on her review of the SPD, she believed that she was entitled to severance because the EFTC transaction did not involve a division (D.Ex S at 168-171).

59.    Ms. Skene also knew that some of EFTC benefits were less generous prior to starting EFTC employment (D.Ex S at 139-141).

60.    Plaintiff Robert Brown testified to the following (D.Ex M at 67-68):

> **Q.**    Now, you indicated that you told Mary Leonard that you wanted severance; is that right?
> **A.**    Yes.
> **Q.**    Did you tell her that Bayer was required by the severance pay plan to pay severance?
> **A.**    I told her that I thought I was entitled to it, that for my entire experience with the outfit, that there had always been voluntary layoffs, and in those layoffs the older

people were the ones that received the priority and were chosen first. And I remember telling her, "I'm over 50, and I just feel I'm – this is what I want. Either I want my severance or I want to stay within the company."

**Q.**    Had you read the severance pay plan or the description in the severance pay plan in that booklet we showed you prior to talking to Mary Leonard about severance?

**A.**    No.

**Q.**    At any time prior to September 1, 1998, did you read the severance pay plan or the description of the severance pay plan in the big book we showed you?

**A.**    I remember going through a book similar to [SPD]...

. . .

**A.**    ...and seeing something about the division, unless the whole division were transferred that you'd be entitled to severance pay.

**Q.**    When did you see that?

**A.**    I can't say exactly when. This may be something I saw years before; its all part of my impression of why I thought I was entitled to severance right up until the last minute. And she told me I wasn't. I was not aware of that.

**Q.**    So in 1998, during the time you knew that the EFTC sale was pending, did you look at the severance pay plan?

**A.**    No.

61.    Plaintiff Teresa Ornelas testified as follows (D.Ex O at 49-50):

**Q.**    In 1998 did you ever go back and read the severance pay policy of Bayer?

**A.**    No, I didn't.

**Q.**    Did any of your coworkers ever tell you that they had read the severance pay policy?

**A.**    I don't recall. We just knew from past history, from everybody having it when they got terminated, that there was no need for us to go look for a book to read it.

**MR. WELSH:** Would you hand me that book.

**MR. ROACH:** Did you finish your answer?

**A.**    No, I was just trying to say, for all the layoffs that we had in the company, termination, everybody walked out with a severance pay. So nothing ever led us to believe it was not written, some kind of a document, saying that we were not entitled for it.

**Q.**    I'm going to show you a document that's been marked Willis Exhibit 52, a Summary Plan Description. Have you seen that booklet prior to today?

**A.**    Yeah, I've seen it on Vinnie's desk somewhere.

**Q.**    Do you know whether or not you received a copy o f it at your home?  Was it mailed to you in 1995?

**A.**    It well could have.

**Q.**    Have you ever read this document or any aspect of this document?

**A.**    I don't' think so. . . .

62.    Plaintiff Teresa Ornelas further testified as follows (D.Ex O at 45-48):

**Q.**     Prior to September 1, 2998, do you recall any complaints from your coworkers concerning EFTC's benefits?

. . .

**A.**    I believe, in general, there were complaints in general, security.  It was the biggest thing, security.  Knowing that a lot of them had a lot of years in service at Bayer, and they really were pushing the fact that they considered themselves being terminated.  I'm being terminated from Bayer, and I'm going to be rehired at EFTC.  Why can't they give us the same kind of package they have given in the past?

. . .

**A.**    Termination means severance pay, and I'm not getting anything.

**Q.**    You heard that was common among your coworkers?

**A.**    Oh, yeah.  It was a concern from every single person, I would say 98 percent of the people there, everybody talked about that.  They had a lot of years in service, and Bayer was a very good company.

. . .

**Q.**    Would you recall any complaints from coworkers during that same period of time that EFTC's benefits are not as good as Bayer's?

**A.**    Yes, some of the people came in.  I mean, the groups talking with each other, like in the cafeteria at lunchtime, break time.  Even where we sit, my office was right here, and the people sat right there, so I could hear the conversations going on.   And because some of them, they

had gone through already, through the insurance seminars or whatever you want to call them, and they knew the benefits, they were not the same.  At least they felt it was not the same, even though at meeting after meeting, it was discussed that it was equal or the same, and there was no loss from going from one to the next company.

Not only that, we had a – what is the word – we respect Dick Ramsden.  Dick Ramsden was a very – like a nice figure for the whole department.  He worked there before for many years, that's how he started.  He was always there, we always felt comfortable talking to him.  And we knew that he would never make any decision, him and the upper level, that would hurt any of us, because that's how we trust him.

**Q.**    Do you recall any employees on or around September 1, 1998, complaining that they have less vacation with EFTC than they had when they were at Bayer?

. . .

**A.**    When they looked at the vacation, the most they could give you was four weeks' vacation.  And they also had mentioned, we had kept our seniority going in.  So a lot of people already had six weeks' vacation, other ones were going right into the fifth week vacation, and the most you could get was four weeks' vacation.  And holidays, AGFA had discretionary days, three, three days, and plus all the holidays you can think of, we had them.  It was awesome.  Okay.  With this company we didn't have that, so right there we lost three or four days' vacation.

**Q.**    Was that a subject of discussion amongst employees around September 1, 1998?

. . .

**A.**    Yes, it was around there.

(objections omitted)

63.    Bayer management held a meeting of printed circuit board employees in July-August at which EFTC president Jack Calderon spoke.  Bayer officials were present for part of the meeting, and then left the meeting while Mr. Calderon and the employees remained.  (D.Ex K at 179; D.Ex N 237).  Thereafter, Mr. Calderon talked to printed

circuit board employees without Bayer managers present.  (D.Ex K at 179; D.Ex N at 237.)

64.    At this meeting, Mr. Calderon explained how certain EFTC benefits differed from those offered by Bayer and made clear that EFTC did not offer a pension, or "defined benefits plan," as he called it (D.Ex V at 11-12, 29, 30-33, 164).

65.    Specifically, Mr. Calderon told the assembled printed circuit board employees the following (D.Ex V at 11-12):

> A.    [Yes.]  What I said to the employees was I gave them a briefing about EFTC, what our company culture, vision, business location was.
>
> It was primarily to let them know about what our company's – what our company was all about, to let them know that they would be receiving offers of employment, to let them know that we were hopeful that they would accept those offers of employment.
>
> I also at that meeting clearly told the employees that our company is different than Bayer.  I clearly told them that we do not have a defined benefit plan, but we did have a 401 plan.
>
> I also told the employees that our medical plan was different, but that we would compensate the employees for the increased employee contribution.
>
> The amount the employee would have to contribute to their medical plan was greater, and did he tell them that we would make an adjustment in their pay for that.
>
> I told them a little bit about our incentive programs that we had at EFTC at that time.  We had several programs to incentivize employees in terms of performance and also attendance.

66.    Bayer officials did not consider the EFTC transaction a reduction-in-force (D.Ex H at 120, 128, 131, D.Ex J at 206-207, 210; D.Ex K at 145; D.Ex N at 93; D.Ex W at 59-60).

Respectfully submitted,

BAYER CORPORATION and
BAYER CORPORATION
SEVERANCE PAY PLAN,

By Their Counsel,


/s/ John F. Welsh
John F. Welsh, BBO # 522640
Bello Black & Welsh LLP
One Exeter Plaza
699 Boylston Street, 10th Floor
Boston, MA 02116
(617) 247-4100

Dated:  January 17, 2007