*Exh. 25*

ASSET PURCHASE AGREEMENT

dated as of August 13, 1998

by and between

EFTC CORPORATION

AND

BAYER CORPORATION,
through its Agfa Division

B00903

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of August 13, 1998 is entered into by and between EFTC Corporation, a Colorado corporation ("Buyer"), and Bayer Corporation, an Indiana corporation, through its Agfa Division ("Seller").

### RECITALS

WHEREAS, Seller is engaged in the manufacture of printed circuit boards ("PCBs") for use in the manufacture of certain electronic and photographic prepress and medical diagnostic equipment (the "Business");

WHEREAS, Buyer is capable of producing PCBs for various applications;

WHEREAS, Seller desires to sell and Buyer desires to purchase certain assets of Seller used in the Business such that Buyer may assume the operations of the Business;

WHEREAS, in connection with the sale of such assets, Buyer and Seller desire to enter into two Supply Agreements, each dated as of the Closing Date (as defined in Section 9.1.1 below) (collectively, the "Supply Agreements"), one of which will govern the Buyer's manufacture and sale of PCBs to the Diagnostics Division of Bayer Corporation and the other will govern the Buyer's manufacture and sale of PCBs to the Seller; and

WHEREAS, in connection with the sale of such assets, Buyer and Seller desire to enter into a Sublease Agreement, dated as of the Closing Date (the "Sublease Agreement"), whereby Buyer will sublease certain space which will be used for the manufacture of PCBs.

NOW, THEREFORE, in consideration of the mutual covenants, agreements representations and warranties contained herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

### AGREEMENT

1. ## PURCHASE AND SALE OF ASSETS

1.1    _Purchase and Sale._  Subject to the terms and conditions of this Agreement and except as otherwise provided herein, as of the Effective Time (as defined in Section 3.1 below), Seller shall sell, convey, transfer, assign and deliver to Buyer and Buyer shall purchase and accept from Seller, all of Seller's right, title and interest the following assets, together with such changes, deletions or additions as are reasonably acceptable to Buyer and occur between the date of this Agreement and the Closing Date in the ordinary course of business (the "Assets"):

B00904

1.1.1   The machinery and equipment, office equipment, tools and other tangible personal property listed in Exhibit 1.1.1 (the "Personal Property");

1.1.2   All inventory of the Business, including raw materials, parts and components, work-in-process and finished goods (the "Inventory"), such Inventory to be identified in accordance with the procedures specified in Exhibit 2.1;

1.1.3   The contracts, agreements, arrangements and/or commitments of the Business with vendors and outstanding purchase orders specified in Exhibit 1.1.3 (the "Contracts"); and

1.1.4   The defined manufacturing processes, drawings, in-circuit, functional and raw board testing software and accumulated employee know-how used by Seller in the Business together with such tangible and intangible property as may evidence such processes, drawings, software or know-how and that is maintained at the Subleased Premises (as defined in the Sublease Agreement)(the "Intellectual Property Assets").

1.2   Non-Assignable Assets; Consent to Sublease Agreement.   Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Asset if the attempted assignment thereof, without the consent of a third party thereto, would constitute a breach of any obligation of Seller or is otherwise not permitted by the terms of any agreement or instrument governing or affecting such Asset or by applicable law.   Any transfer or assignment to Buyer by Seller of any property or property rights or any agreement which shall require the consent or approval of any third party shall be made subject to such consent or approval being obtained; provided that Seller shall hold such property, property rights or agreement for the exclusive benefit of Buyer until such consent or approval is obtained. Buyer and Seller hereby acknowledge and agree that as of the Effective Time the Sublease Agreement will be binding and effective as between the Buyer and Seller even if the Landlord fails to consent to such Sublease Agreement.

1.3   Transfer of Title to the Assets.   Seller shall sell, assign, convey, transfer and deliver the Assets to Buyer as of the Effective Time by means of bills of sale, assignments, endorsements, certificates and such other instruments of transfer delivered on the Closing Date as shall be necessary or appropriate to vest good title to the Assets in Buyer, free and clear of any liens, charges and encumbrances, except as otherwise set forth in this Agreement.

1.4   Excluded Assets.   Specifically excluded from the Assets are all other assets of Seller, including without limitation any and all other assets not described in Section 1.1 or one of the above-referenced Exhibits thereto (the "Excluded Assets").

B00905

2.    PURCHASE PRICE

2.1    Purchase Price. The method of calculating the purchase price to be paid by Buyer for the Assets (the "Purchase Price") and allocation of the Purchase Price among the Assets is as set forth in Exhibit 2.1.

2.2    Additional Purchase Price. As additional Purchase Price, Buyer will also pay to Seller, within thirty (30) days after the end of each calendar quarter an amount equal to one percent (1%) of the gross revenues, less returns and allowances (as determined in accordance with generally accepted accounting principles consistently applied and on a basis consistent with the accounting principles on which Buyer's audited financial statements are prepared), received by Buyer from sales to third parties of PCBs manufactured, assembled or produced at the Subleased Premises (as such term is defined in the Sublease Agreement) through August 31, 2001, and after said initial team for each year thereafter in which Seller's aggregate purchases of PCBs under the Supply Agreements equal or exceed $20 million. Buyer agrees to maintain complete and accurate records relating to its sales to third parties of PCBs manufactured, assembled or produced at the Subleased Premises. Seller shall have the right, no more than once in any twelve (12) month period, to appoint an independent public accountant (reasonably acceptable to Buyer) to audit Buyer's books and records in order to verify Buyer's calculation of the amounts payable as additional Purchase Price hereunder. Any such audit shall be at the expense of Seller unless the audit reveals a deficiency in the amount paid to Seller as additional Purchase Price with respect to any calendar quarter in an amount equal to the greater of ten thousand dollars or five (5%) percent of the amounts paid with respect to such quarter hereunder, in which case the audit shall be at the expense of Buyer. Alternately, Seller may request that the external auditors of Buyer, as part of Buyer's annual audit, audit and report to Seller and Buyer on Buyer's compliance with the terms hereof; provided, however, that Seller shall pay Buyer for any incremental expenses incurred for such compliance report. Any payment deficiency will be promptly paid to Seller, and any excess payment will be promptly refunded to Buyer. Information from the audit identified as confidential shall be subject to the Confidentiality Agreement referred to in Section 15.3.

2.3    Purchase Price Allocation. Seller and Buyer agree to report an allocation of the Purchase Price among the Assets in a manner entirely consistent with the allocation set forth in Exhibit 2.1 (including any adjustment made pursuant to Section 14.3.2 hereof), and agree to act in accordance with such allocation in the preparation and filing of all tax returns (including, without limitation, filing Form 8594 with its Federal income tax return for the taxable year that includes the Closing Date) and in the course of any tax audit, tax review or tax litigation relating thereto.

2.4    Payments. All payments required to be made pursuant to this Article 2 and other provisions of this Agreement shall be made in United States dollars in immediately available funds by wire transfer to an account designated by Seller to Buyer in writing.

- 4 -

B00906

2.5     Transfer Taxes.  Buyer shall be responsible for all sales, transfer and similar taxes, duties or levies assessed or payable in connection with the transfer of the Assets to Buyer and shall obtain and furnish to Seller all required resale or other exemption certificates with respect to the Assets.

2.6     Repurchase of Certain Inventory.  All raw material Inventory purchased by Buyer that has not been used or consumed by Buyer within the twelve (12) month period after the Closing Date and that is not forecast for use under either of the Supply Agreements at the end of such twelve (12) month period for the subsequent twelve (12) month period shall be repurchased by Seller. Buyer shall provide Seller with written notice of such repurchase obligation, together with a description of the raw material Inventory to be repurchased and a calculation of the purchase price, within thirty (30) days after the expiration of such twelve (12) month period. Buyer shall supply to Seller such supporting documentation regarding the raw material Inventory to be repurchased and its purchase price as Seller may reasonably request.   Seller shall repurchase on the second anniversary of the Closing Date all raw material Inventory purchased by Buyer that has not been used or consumed by Buyer prior to such date.  At any time after the Closing Date and upon reasonable notice to Buyer, Seller shall be entitled to repurchase any raw material Inventory purchased by Buyer from Seller that is not reasonably expected to be used under either of the Supply Agreements.  The purchase price for all Inventory repurchased hereunder shall be equal to the amount originally paid by Buyer for such inventory plus 8.5% per annum from the Closing Date to the date of payment.  Interest shall be computed on the basis of a 365-day year and actual days elapsed.

3.     ASSUMPTION OF LIABILITIES AND OBLIGATIONS

3.1     Assumed Liabilities.  From and after 12:00 a.m., Boston time, on Tuesday, September 1, 1998, or such other date and time as the parties may agree in writing (the "Effective Time"), Buyer shall, without any further responsibility or liability of, or recourse to, Seller or any of its directors, shareholders, officers, employees, agents, consultants, representatives, parent entities, affiliates, successors or assigns, absolutely and irrevocably assume and be solely liable and responsible for any and all liabilities and obligations of any kind or nature of Seller (whether fixed or contingent, matured or unmatured, foreseen or unforeseen, known or unknown), which may arise on or after the Effective Time arising out of the following (the "Assumed Liabilities"):

3.1.1   The ownership, use, possession or condition of the Assets, or the operation or conduct of the Business on or after the Effective Time;

3.1.2   Seller's obligations to purchase goods and services under the Contracts incurred through the Effective Time, to the extent such obligations relate to goods and services to be received on or after the Effective Time by Buyer;

3.1.3   Seller's obligations under the Contracts to be performed on or after the Effective Time;

- 5 -

3.1.4   Liability for all federal, state, local and foreign taxes relating to the Assets or the Business with respect to any period or part thereof commencing immediately on or after the Effective Time; and

3.1.5   Any other liability specifically and expressly assumed by Buyer herein or in the Exhibits hereto as the responsibility of Buyer.

The assumption by Buyer of all such liabilities shall be effective upon the Effective Time, relating to the underlying Assets or portion of the Business, unless the terms hereof or of the applicable Exhibit hereto expressly state that such liability or obligation shall transfer at another time, including, but not limited to, the obligations set forth in Article 6. Nothing contained in this Section shall be deemed to limit any obligations of Seller under this Agreement, including but not limited to, the representations and warranties made by Seller in Article 4.

3.2   Retained Liabilities. Seller shall, at all times, without any responsibility or liability of, or recourse to, Buyer or any of its directors, shareholders, officers, employees, agents, consultants, representatives, parent entities, affiliates, successors or assigns, absolutely and irrevocably be and remain solely liable and responsible for any and all liabilities and obligations of any kind or nature (whether fixed or contingent, matured or unmatured, foreseen or unforeseen, known or unknown) existing or arising from or in connection with the conduct of the Business prior to the Effective Time (collectively the "Retained Liabilities") unless the terms hereof or of the applicable Exhibit hereto expressly state that such liability or obligation shall transfer to Buyer at another time, including, but not limited to, the obligations set forth in Article 6.

4.   REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer as follows with respect to itself and the Assets that, except as set forth in the Disclosure Schedule attached hereto (which Disclosure Schedule makes explicit reference to the particular representation or warranty as to which exception is taken, which in each case shall constitute the sole representation and warranty as to which such exception shall apply):

4.1   Corporate Status. Seller is a corporation duly organized and validly existing under the laws of Indiana, the jurisdiction in which it is incorporated, and has full power and authority to carry on the Business as now conducted. Seller has all requisite corporate power and authority to enter into this Agreement and to perform its obligations and consummate the transactions contemplated hereby in accordance with the terms of this Agreement. Seller is duly qualified to do business in the Commonwealth of Massachusetts.

4.2   Authorization. All corporate and other proceedings required to be taken by or on the part of Seller to authorize Seller to enter into and carry out this Agreement has been duly and properly taken. This Agreement has been duly executed and delivered by Seller and is valid and enforceable against Seller in accordance with its terms, subject to laws of general application

B00908

relating to bankruptcy, insolvency and the relief of debtors and the rules of law governing specific performance, injunctive relief and other equitable remedies.

4.3    Compliance.    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not (a) result in the material breach of any of the terms or conditions of, or constitute a default under, or violate, as the case may be, the articles of incorporation, by-laws or other organization documents of Seller or any material agreement, lease, mortgage, note, bond, indenture, license or other document or undertaking, oral or written, to which Seller is a party or by which Seller is bound or by which any of the Assets may be affected, in a manner which could materially and adversely affect the Business taken as a whole, or (b) assuming the receipt of all consents reflected in Section 10.1, result in the creation of a lien or encumbrance on Seller's interest in any of the Assets.

4.4    Contracts.    Seller is not in material default under any of the Contracts and, to the best knowledge of Seller, there does not exist any material default under any of the Contracts by any other party thereto that, in either case, would in the aggregate materially and adversely affect the Business taken as a whole.

4.5    Title.    Seller has good and marketable title to, or in the case of leased property, valid leasehold interests in, all of the Assets, free and clear of all liens, mortgages, pledges and encumbrances, other than (i) liens for taxes not yet due and payable or being contested in good faith, and (ii) encumbrances which do not materially adversely affect the marketability of any such Asset or the ability of Seller to use such Asset for its currently intended use in the conduct the Business as it is now being conducted.

4.6    Taxes.

4.6.1    General.    Except for sales, transfer and similar taxes, if any, payable by Buyer pursuant to Section 2.5, all Taxes (as hereinafter defined) with respect to the Assets that are or become due and payable prior to the Closing Date have been duly and properly computed, reported, fully paid and discharged by Seller.    As of the date hereof, Seller is registered as a Domestic Manufacturing Corporation (as defined in Section 38C of Chapter 63 of the Massachusetts General Laws) and is therefore exempt from tangible personal property taxes except as provided in Section 5, clause 16th(3), Chapter 59 of Massachusetts General Laws.    As used herein, the terms "Tax" and "Taxes" shall include all federal, state, local and foreign taxes, assessments or other governmental charges (including, without limitation, net income, gross income, excise, franchise, sales and value added taxes, taxes withheld from employees' salaries and other withholding taxes and obligations and all deposits required to be made with respect thereto), levies, assessments, deficiencies, import duties, licenses and registration fees and charges of any nature whatsoever, including any interest, penalties, additions to tax or additional amounts with respect thereto, imposed by any government or taxing authority which are levied upon the Assets.

4.6.2    Unpaid Taxes, Liens, etc.    There are no unpaid Taxes with respect to any period or portion thereof ending on or before the Closing Date that could become a lien on the

- 7 -

B00909

Assets, except for current Taxes not yet due and payable. There are no unpaid Taxes with respect to any or all "employee benefit plans" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), bonus, retirement, pension, profit-sharing, stock bonus, thrift, stock option, stock purchase, incentive, severance, deferred or other compensation or welfare benefit plans, programs, agreements or arrangements (the "Benefit Plans") of, or applicable to employees of, Seller or any entity treated as part of a controlled group of corporations or under common control with Seller pursuant to Section 414(b) or (c) of the Internal Revenue Code of 1986, as amended (the "Code") nor have any events occurred with respect to any such Benefit Plans that could, in any case, give rise to a lien on the Assets. There are no liens for Taxes on the Assets. Seller is not required to treat any Asset as owned by another person for federal income tax purposes or as tax-exempt bond financed property or tax-exempt use property within the meaning of Section 168 of the Code. None of the Assets are subject to any joint venture, partnership or other agreement or arrangement that is treated as a partnership for federal income tax purposes. The transactions contemplated herein are not subject to the tax withholding provisions of Section 3406 of the Code, or of Subchapter A of Chapter 3 of the Code or any other provision of law.

4.7    Sufficiency of Assets.    The Inventory and Personal Property represent substantially all of the Inventory and Personal Property used by Seller in the operation of the Business, and the Intellectual Property Assets represent all of the intellectual property used by Seller in the operation of the Business. To the best knowledge of Seller, the Assets are generally adequate to conduct the Business as currently conducted by Seller.

4.8    Brokers.    No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of Seller.

4.9    Financial Information.    The statements provided pursuant to the terms of Exhibit 2.1, reflect the book value of the Inventory, which has been calculated in accordance with generally accepted accounting principles as historically applied by Seller.

4.10    No Additional Representations.    NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS ARTICLE, ANY OTHER PROVISION OF THIS AGREEMENT, OR ANY OTHER COMMUNICATIONS BETWEEN THE PARTIES ORALLY OR IN WRITING, IT IS THE EXPLICIT INTENT OF EACH PARTY HERETO THAT SELLER IS MAKING NO REPRESENTATION OR WARRANTY WHATSOEVER, EXPRESS OR IMPLIED, BEYOND THOSE EXPRESSLY GIVEN IN THIS AGREEMENT OR ANY OF THE DOCUMENTS DELIVERED PURSUANT TO ARTICLE 12, INCLUDING BUT NOT LIMITED TO ANY IMPLIED WARRANTY OR REPRESENTATION AS TO CONDITION, MERCHANTABILITY OR SUITABILITY AS TO ANY OF THE PROPERTIES OR ASSETS OF SELLER. EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS AGREEMENT, OR ANY OF THE DOCUMENTS DELIVERED PURSUANT TO ARTICLE 12, THE ASSETS ARE BEING SOLD ON AN "AS IS, WHERE IS" BASIS.

- 8 -

IN CONNECTION WITH THE SUPPLY AGREEMENTS, ALTHOUGH IT IS THE PARTIES PRESENT INTENTION TO MAINTAIN PRODUCTION VOLUMES CONSISTENT WITH THE SUPPLY AGREEMENTS, SELLER MAKES NO REPRESENTATION OR WARRANTY AS TO ORDER QUANTITY, FREQUENCY OR COMPOSITION. THE PARTIES ACKNOWLEDGE THE VOLATILITY OF THE SELLER'S MARKETS AND THAT SELLER MAY ACQUIRE OR DEVELOP NEW PRODUCT LINES AND/OR DIVEST PRODUCT LINES IN ITS SOLE DISCRETION.

5.    REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows with respect to itself that, except as set forth in the Buyer Disclosure Schedule attached hereto (which Buyer Disclosure Schedule makes explicit reference to the particular representation or warranty as to which exception is taken, which in each case shall constitute the sole representative and warranty as to which such exception shall apply):

5.1    Corporate Status.  Buyer is a corporation duly organized and validly existing under the laws of the State of Colorado, the jurisdiction in which it is incorporated and has full power and authority to carry on its business and to own all of its properties and assets. Buyer has all requisite corporate power and authority to enter into, execute and deliver this Agreement and to perform its obligations and consummate the transactions contemplated hereby in accordance with the terms of this Agreement. Buyer is duly qualified to do business in the Commonwealth of Massachusetts.

5.2    Authorization.  All corporate and other proceedings required to be taken by or on the part of Buyer including, without limitation, all action required to be taken by the directors or shareholders of Buyer to authorize Buyer to enter into and carry out this Agreement, have been duly and properly taken. This Agreement has been duly executed and delivered by Buyer and is valid and enforceable against Buyer in accordance with its terms, subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors and the rules of law governing specific performance, injunctive relief and other equitable remedies.

5.3    Compliance.    The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby will not result in the breach of any of the terms or conditions of, or constitute a default under, or violate, as the case may be, the articles of incorporation, by-laws or other organization documents of Buyer or any material agreement, lease, mortgage, note, bond, indenture, license or other document or undertaking, oral or written, to which Buyer is a party or by which Buyer is bound or by which any of the Assets may be affected.

5.4    Brokers.  No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission in

- 9 -

B00911

connection with the transactions contemplated by this Agreement based on arrangements made by or on behalf of Buyer.

5.5    Governmental Authorization.  The execution, delivery and performance by Buyer of this Agreement require no action by or in respect of, or filing with, any governmental body, agency, official or authority.

5.6    Financing.  Buyer has sufficient funds available to it to purchase the Assets pursuant to the terms of this Agreement and to deliver the Purchase Price to Seller on the Closing Date.

6.    EMPLOYEES AND EMPLOYEE BENEFITS

6.1    Employment with Buyer.  Buyer shall, promptly after the date hereof, offer employment to those employees of the Business listed on Exhibit 6.1 (the "Employees") who are employed by Seller on the Closing Date, including any Employee who is on an approved leave of absence as described on each such Exhibit.  Employees shall have until the Effective Time to consider the offers made to them.  Employees who accept Buyer's offer of employment (the "Transferred Employees") shall become employees of Buyer at the Effective Time, or on their date of return to work from the approved leave of absence, as the case may be, and shall no longer be employees of Seller or its affiliated entities.  Commencing upon the applicable date of employment of each Transferred Employee, Buyer shall have sole responsibility for the payment of all wages, overtime, sick pay, taxes, withholdings, and employee benefits provided by it with respect to the Transferred Employees.  Notwithstanding the previous sentence, Transferred Employees shall continue to be covered by Seller's medical and dental plans through September 30, 1998, such cost to be shared equally by Buyer and Seller.  Nothing contained in this Agreement shall be construed as a guaranty to Buyer that any number of the Employees will accept offers of employment with Buyer or as a representation or warranty regarding the skill level or performance of any of the Transferred Employees.

6.2    Hiring Requirements.  Buyer shall offer employment to the Transferred Employees for positions comparable to the positions in which such Transferred Employees are employed by Seller immediately prior to the Closing Date.  Seller shall not provide employee personnel files to Buyer.  Buyer shall have an individual signed agreement with each Transferred Employee providing that he or she is an employee of Buyer and not the Seller.

6.3    Compensation and Benefits.

6.3.1    Compensation.  Buyer agrees to provide the Transferred Employees wage or salary compensation equal in amount to that paid to them by Seller immediately prior to the Closing Date plus an upward adjustment sufficient to compensate the Transferred Employees for the increase in costs of medical and dental insurance under Buyer's benefit plan (for coverage comparable to that carried with Seller as of the date of this Agreement) from their costs under Seller's medical and dental insurance plans.  Buyer agrees to provide the Transferred Employees

- 10 -

B00912

employee benefits and policies comparable to the employee benefits and policies provided to the other employees of Buyer, except as additionally required in this Section 6.3 or elsewhere in this Agreement.

6.3.2  Credit for Service.  Buyer agrees to credit and to continue to credit each Transferred Employee with the service credited with Seller for all purposes, including, but not limited to, Buyer's policies on vacation eligibility, savings plan participation, health care enrollment, severance benefits, seniority and any applicable eligibility, vesting or waiting periods or service credits under any benefit plan.

6.3.3  Benefits.  To the extent that Buyer's benefit plans provide medical or dental welfare benefits after coverage is transferred to Buyer's plan, Buyer shall provide that no preexisting condition exclusions shall apply to any Transferred Employees (except to the extent that a preexisting condition was applicable under Seller's plans) and that expenses incurred under Seller's medical and dental welfare plans with respect to the Transferred Employees and their covered dependents shall be credited under Buyer's medical and dental welfare benefit plans for purposes of satisfying the initial general deductible, co-insurance and maximum out-of-pocket provisions for such Transferred Employees and their covered dependents, provided, however, that no credit shall be given for purposes of satisfying specific deductible, co-insurance and maximum out-of-pocket requirements applicable to specific conditions or procedures except to the extent credit would be given to Buyer's current employees for the incurrence of similar expenditures.  Except as set forth in Section 6.1, Transferred Employee coverage under Buyer's benefit plans shall commence as of the Effective Time subject to applicable eligibility periods.

6.3.4  Tuition.  All course work of a Transferred Employee currently in progress for which Seller has approved tuition aid shall be paid for by Seller.  Course work that has been approved by Seller and paid for by the employee by the Closing Date but not yet started and is subject to reimbursement to the employee under Seller's tuition aid policy shall be reimbursed by Seller.

6.3.5  Savings Plan. As soon as practicable following the Effective Time, Buyer shall cause the trustee of the EFTC Corporation 401(k) Savings Plan (the "Transferee Savings Plan") to accept the transfer of account balances of Transferred Employees who were participants ("Savings Plan Employees") in the Bayer Corporation Employee Savings Plan (the "Seller Savings Plan"), and shall cause the Seller's Savings Plan to transfer such account balances to the Transferee Savings Plan, provided, however, that the Transferee Savings Plan shall only accept the transfer of such account balances if (a) the benefits protected by Section 411(d)(6) of the Code applicable to such transferred account balances may be provided under the provisions of the Transferee Savings Plan and (b) Seller provides such documentation and other information that as Buyer shall reasonably request and determine to be satisfactory with respect to the qualification of Seller's Savings Plan under applicable provisions of the Code.  The account balances of the Savings Plan Employees  shall be transferred in cash and, to the extent applicable, in the form of notes receivable with respect to Savings Plan Employees who have outstanding loans under the Seller's Savings Plan.  Immediately after such transfer the account balance and vested percentage of each Savings Plan Employee under the Transferee Savings

- 11 -

B00913

Plans shall be at least equal to that attributable to such Savings Plan Employee immediately prior to such transfer.

6.4    Minimum Employment Period.  Buyer shall not relocate any of the Transferred Employees for a minimum of twelve (12) months after the Closing Date.  Although Buyer does not currently anticipate any reductions-in-force ("RIFs"), if within twelve (12) months after the Closing Date the Buyer engages in a RIF, Buyer will provide to those Transferred Employees who are subject to a RIF severance pay in an amount equal to six months of the affected Transferred Employee's wage or salary compensation and continuation of coverage under Buyer's benefits for a period of six (6) months.  Such severance pay shall not apply to Buyer's termination of a Transferred Employee's employment for cause or for failure adequately to perform such employee's duties.

6.5    Hiring Process.  Buyer shall be solely responsible for any and all communications it makes to any employees of Seller during the process of making offers of employment regardless of Seller's involvement in such process or receipt of documents and materials to be distributed to any employees of Seller.  Buyer shall comply with all laws in connection with its communications to Seller's employees, the process of offering employment to them, and the hiring and transition of such employees.  Between the date hereof and the date of the Effective Time, Buyer shall make available sufficient trained human resources staff who shall be responsible for the offer process and the transition of the Transferred Employees from Seller to Buyer.

6.6    Nonsolicitation.  For a period of twelve (12) months from and after the Closing Date, Buyer shall not directly or indirectly, or by action in concert with others, solicit or attempt to solicit any employee of the Seller without the prior written authorization of Seller, other than the Employees listed on Exhibit 6.1.  Buyer acknowledges that any violation of the restriction contained in this Section will result in irreparable injury to Seller for which monetary damages will not be an adequate remedy.  Buyer therefore acknowledges that, if such restriction is violated, Seller shall be entitled to equitable relief, including, but not limited to a temporary restraining order and preliminary or permanent injunctive relief, in addition to any other remedies which it may have.  For a period of twelve (12) months from and after the Closing Date, Seller shall not directly or indirectly, or by action in concert with others, solicit or attempt to solicit any employee of Buyer without the prior written authorization of Buyer.  Seller acknowledges that any violation of the restriction contained in this Section will result in irreparable injury to Buyer for which monetary damages will not be an adequate remedy.  Seller therefore acknowledges that, if such restriction is violated, Buyer shall be entitled to equitable relief, including, but not limited to a temporary restraining order and preliminary or permanent injunctive relief, in addition to any other remedies which it may have.

6.7    Control.  Buyer shall have and maintain complete control over its employees, including but not limited to the Transferred Employees, including the right to hire, discharge, replace, evaluate and direct their activities.

- 12 -

B00914

6.8    Health Care Continuation Liability.  Buyer agrees to pay and be responsible for all liability, cost, expense, taxes and sanctions under Section 4980B of the Code, interest and penalties imposed upon, incurred by, or assessed against Buyer or Seller that arise by reason of or relate to any failure to comply with the health care continuation coverage requirements of Section 4980B of the Code and Sections 601 through 608 of ERISA, which failure occurs with respect to a qualifying event (as defined in Section 4980B(f)(3) of the Code) after September 30, 1998 with respect to a Transferred Employee or  any qualified beneficiary (as defined in Section 4980B(g)(1) of the Code) of such Transferred Employee.

6.9    Indemnification.

6.9.1    By Buyer.  Seller shall not, in any manner, be responsible for any liability, claim or obligation which in any way arises out of Buyer's employment of the Transferred Employees, except as may arise from or relate to Seller's communications with or treatment of the Employees prior to the Effective Time.  Buyer agrees to indemnify and hold Seller harmless from any liability, claim or obligation arising from or relating to the Transferred Employees or beneficiaries of Transferred Employees which in any way arises from or relates to Buyer's employment of the Transferred Employees, except as may arise from or relate to Seller's communications with or treatment of the Employees prior to the Effective Time.

6.9.2    By Seller.  Except as otherwise provided in Section 6.5, Buyer shall not in any manner be responsible for any liability, claim or obligation which in any way arises out of Seller's employment of the Transferred Employees prior to the Effective Time, except as may arise from or relate to Buyer's communications with or treatment of the Employees prior to the Effective Time.  Seller agrees to indemnify and hold Buyer harmless from any liability, claim or obligation arising from or relating to the Transferred Employees or beneficiaries of Transferred Employees which in any way arises from or relates to Seller's employment of the Transferred Employees prior to the Effective Time, except as may arise from or relate to Buyer's communications with or treatment of the Employees prior to the Effective Time.

7.    REAL PROPERTY

7.1    Sublease Agreement.  Buyer and Seller shall execute the Sublease Agreement attached hereto as Exhibit 7.1, pursuant to which Buyer will sublease a portion of Seller's facility located at 80 Industrial Way, Wilmington, MA (the "Facility") which sublease will commence on the Effective Time.  The Sublease Agreement will also provide for the allocation of cost and responsibility of certain shared services and space during the term of the Sublease Agreement.

8.    PRE-CLOSING COVENANTS

8.1    Access to Records and Properties.  From the date hereof until the Effective Time or earlier termination of this Agreement:

- 13 -

B00915

8.1.1  Business.  Seller shall provide Buyer, its officers, counsel and other representatives with reasonable access to the Assets, the principal personnel and representatives of Seller, and such books and records pertaining to the Business as Buyer may reasonably request, during Seller's regular business hours, provided that Buyer has provided Seller with reasonable prior notice, and provided further that Buyer agrees that such access will be requested and exercised with due regard to minimizing interference with the operations of the Business and provided that disclosure would not violate the terms of any agreement to which Seller is bound or any applicable law or regulation.  Any information obtained by Buyer or its representatives pursuant to such access shall be subject to the Confidentiality Agreement; and

8.1.2  Exhibits.  Seller shall make available to Buyer for inspection and review all documents, or copies thereof, listed in the Disclosure Schedule or Exhibits hereto, and all files, records and papers of any and all proceedings and matters listed in the Disclosure Schedule or Exhibits hereto, except to the extent prohibited or restricted by law, regulation, contract with a third party or where the documents are subject to the attorney-client or work product privilege. Any documents (and information contained therein) obtained by Buyer or its representatives pursuant to such access shall be subject to the Confidentiality Agreement.

8.2    Public Announcements.  On and after the date hereof and through the Closing Date, neither of the parties shall issue any press release or make any public statement relating to the subject matter of this Agreement (other than communications with persons in the ordinary course of business relating to a press release previously issued or otherwise permitted by this Agreement) prior to obtaining the other party's approval, which approval shall not be unreasonably withheld, except that no such approval shall be necessary to the extent that counsel to the party proposing to make such disclosure advises such party that such disclosure is required by law or a listing agreement or such disclosure is reasonably prudent to avoid potential liability on the part of any person under the federal securities laws.  Any advice of counsel shall be confirmed in writing and promptly delivered to the other party.

8.3    Consents.  Prior to the Closing Date: (i) Buyer, at its sole cost and expense, shall use its commercially reasonable best efforts to obtain any and all material governmental permits, licenses approvals, certifications of inspection, filings, franchise and other authorizations or shall have received such other concurrences as may be required in order for it to conduct the Business and use and operate the Assets as of the Effective Time; and (ii) Seller, at its sole cost and expense, shall obtain any third party consents required for the assignment of the Contracts and transfer of the Assets to Buyer, provided that Seller shall only be required to use reasonable efforts to obtain the required consent to enter into the Sublease Agreement.

8.4    Operation of the Business.  From and after the date of this Agreement and until the close of business on the Closing Date or as otherwise contemplated by this Agreement or as Buyer shall otherwise consent in writing, Seller:

8.4.1  will carry on the Business in the ordinary course and in substantially the same manner as heretofore, including without limitation keeping in full force and effect insurance comparable in amount and scope to the coverage maintained by it (or on behalf of it)

- 14 -

B00916

on the date hereof, and will not acquire any assets or properties, or enter into any other transaction, other than in the ordinary course of business consistent with past practice;

8.4.2  will not permit all or any of the Assets (real or personal, tangible or intangible) to be sold, licensed or subjected to any lien or other encumbrance except in dispositions of inventory or of worn-out or obsolete equipment for fair value in the ordinary course of business consistent with past practices;

8.4.3  will operate the Business in compliance in all material respects with all applicable federal, state and local laws and regulations;

8.4.4  will not grant any general increase in the compensation of Transferred Employees (including any such increase pursuant to any bonus, pension, profit-sharing, vacation or other plan or commitment) or grant any increase in the compensation payable or to become payable to any Transferred Employee, except with the prior consent of Buyer;

8.4.5  will not take any action that would cause any of the representations and warranties made by Seller in this Agreement not to remain true and correct;

8.4.6  will not modify, amend in any material respect or terminate any Contract except in the ordinary course of business; and

8.4.7  will continue to maintain, in all material respects, the Assets in accordance with present practice in a condition suitable for their current use.


9.    CLOSING

9.1    Closing and Closing Dates; Risk of Loss.

9.1.1  Closing and Closing Date.  The consummation of the transactions contemplated hereby will take place at the offices of Holme Roberts & Owen LLP, 1700 Lincoln, Suite 4100, Denver, Colorado 80203 (the "Closing") on August 31, 1998 or on such other date and time as may be mutually agreed upon by the parties in writing (the "Closing Date"). The Closing shall be effective as of the Effective Time.

9.1.2  Risk of Loss.  Any contrary statement or provision herein or in any Exhibit or Schedule hereto or any other document or instrument delivered in connection with the transactions contemplated hereby notwithstanding, risk of loss with respect to the Assets shall remain with and be borne by Seller until the Effective Time.

- 15 -

B00917

10. <u>CONDITIONS TO CLOSING</u>

10.1   <u>Conditions to the Obligations of Buyer</u>.  The obligations of Buyer under this Agreement are subject to the fulfillment prior to or on the Closing Date of each of the following conditions, any one or more of which may be waived by Buyer in its sole discretion:

10.1.1  No injunction or restraining order shall be in effect to forbid or enjoin, and no suit, action or proceeding shall be pending or, to the best knowledge of Buyer, threatened to prohibit, nullify or otherwise adversely affect the consummation of the transactions contemplated by this Agreement and the Exhibits hereto or Buyer's ownership, use or enjoyment of the Business.

10.1.2  The representations and warranties of Seller contained in this Agreement or in any Exhibit hereto or certificate, document or other instrument delivered pursuant hereto shall be complete, true and correct in all respects, without regard to materiality limitations contained in such representations and warranties, on the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except (a) to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be complete, true and correct in all material respects as of the date specified and (b) where the failure to be true and correct would not have a material adverse effect on the Business.

10.1.3  Seller shall have performed all of its material covenants, obligations and agreements contained in this Agreement to be performed and complied with by it prior to the Closing Date.

10.1.4  Buyer shall have received all certificates, instruments, agreements, and other documents to be delivered pursuant to Section 12.1.

10.1.5  Buyer shall have obtained any and all material governmental permits, licenses approvals, certifications of inspection, filings, franchise and other authorizations or shall have received such other concurrences as may be required in order for it to conduct the Business and use and operate the Assets as of the Effective Time.

10.1.6  Seller shall have obtained any third party consents required for the assignment of the Contracts and transfer of the Assets to Buyer, provided that Seller shall not be required to obtain the required consent to enter into the Sublease Agreement.

10.1.7   Buyer shall have received an appropriate waiver with respect to the transactions contemplated by this Agreement from the banks who are a party to its Credit Agreement dated as of September 30, 1997, as amended.

- 16 -

B00918

10.2  Conditions to the Obligations of Seller.  The obligations of Seller under this Agreement are subject to the fulfillment, prior to the Closing Date, of each of the following conditions, any one or more of which may be waived by Seller in its sole discretion:

10.2.1  No injunction or restraining order shall be in effect to forbid or enjoin, and no suit, action or proceeding shall be pending or, to the best knowledge or Seller, threatened to prohibit, nullify or otherwise adversely affect, the consummation of the transactions contemplated by this Agreement.

10.2.2  The representations and warranties of Buyer contained in this Agreement or in any Exhibit hereto or certificate, document or other instrument delivered pursuant hereto shall be complete, true and correct in all respects, without regard to materiality limitations contained in such representations and warranties, on the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date, except (a) to the extent any such representation or warranty is made as of a specified date, in which case such representation or warranty shall be complete, true and correct in all material respects as of the date specified and (b) where the failure to be true and correct would not have a material adverse effect on the Buyer.

10.2.3  Buyer shall have performed all of its material covenants, obligations and agreements contained in this Agreement to be performed and complied with by the Closing Date.

10.2.4  Seller shall have received all certificates, instruments, agreements and other documents to be delivered pursuant to Section 12.2.

10.2.5  Seller shall have received payment of that portion of the Purchase Price payable at Closing.

10.2.6  Buyer shall have obtained any and all material governmental permits, licenses approvals, certifications of inspection, filings, franchise and other authorizations or shall have received such other concurrences as may be required in order for it to conduct the Business and use and operate the Assets as of the Effective Time.

10.2.7  Buyer shall have in effect, such insurance on the Business and the Facility as is required pursuant to the Sublease Agreement.

10.2.8  Seller shall have obtained any third party consents required for the assignment of the Contracts, the transfer of the Assets and the entering into of the Sublease Agreement.

11.  TERMINATION AND SURVIVAL

11.1  Termination.  Both of the parties hereto shall use reasonable efforts to bring about the satisfaction of the conditions hereunder prior to and on the Closing Date.  Notwithstanding

- 17 -

B00919

anything to the contrary set forth herein, this Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing Date:

11.1.1 by mutual written consent of Buyer and Seller; or

11.1.2 by Buyer or Seller, upon written notice to the other, if such other party or its affiliate has breached any material representation, warranty or covenant contained in this Agreement in any material respect, if the non-breaching party has notified the breaching party of the breach in writing and the breach has continued without cure for a period of 30 days after notice of the breach; or

11.1.3 by Buyer or Seller, upon the earlier of September 30, 1998 or the issuance of a preliminary injunction enjoining the Closing of the transactions contemplated herein with an outcome adverse to the parties.

11.2    Effect of Termination.  If this Agreement is terminated pursuant to Section 11.1, this Agreement shall become void and of no further force and effect, and neither of the parties hereto (nor their respective affiliates, directors, shareholders, officers, employees, agents, consultants, attorneys-in-fact or other representatives) shall have any liability in respect of such termination; provided, however, that if such termination is effected pursuant to Section 11.1.2 and the failure to consummate the transactions contemplated hereby was the result of any of the conditions to the Closing having not been fulfilled by reason of the breach by either of the parties of its covenants, representations and/or warranties set forth in this Agreement or in any agreement, document or instrument ancillary hereto, the party having so breached shall remain liable to the other party.  Notwithstanding the foregoing, the provisions of Sections 15.1 and 15.3 shall survive any termination of this Agreement pursuant to Section 11.1.

12.    CLOSING DOCUMENTS

12.1    Documents to be Delivered by Seller.  On the Closing Date (except as otherwise specified in this Section 12.1), Seller shall deliver to Buyer the following documents as appropriate:

12.1.1 An Assistant Secretary's Certificate attaching copies of Seller's corporate action authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby, certifying as to the signatures and incumbency of each person signing any document or instrument delivered by Seller to Buyer in connection with the transactions contemplated hereby, and such other information and certifications relevant to the due authorization, execution and delivery of this Agreement as Buyer may reasonably request, all certified by a Secretary, Assistant Secretary or other appropriate officer of Seller;

12.1.2 Executed bills of sale or other appropriate instruments of transfer with respect to all of the Assets not transferred or assigned by any other documents or instruments described in this Section in the form of Exhibit 12.1.2;

- 18 -

B00920

12.1.3 Executed assignment and assumption agreements with respect to the Contracts in the form of Exhibit 12.1.3;

12.1.4 An executed Transition Services Agreement in the form of Exhibit 12.1.4;

12.1.5 An executed Intellectual Property License Agreement in the form of Exhibit 12.1.5.

12.1.6 An executed Environmental Agreement in form and substance as the Buyer and Seller shall mutually agree.

12.1.7 A certificate of an appropriate officer of Seller relating to the representations, warranties and covenants of Seller made herein;

12.1.8 An executed Sublease Agreement in the form attached hereto as Exhibit 7.1;

12.1.9 Executed Supply Agreements in the forms of Exhibit 12.1.9A and Exhibit 12.1.9B; and

12.1.10    Any other document reasonably necessary to effectuate the transactions contemplated hereby.

12.2    Documents to be Delivered by Buyer.  On the Closing Date, Buyer shall pay the Purchase Price to Seller by wire transfer as directed in writing by Seller and shall execute where applicable and deliver to Seller the following documents (except as otherwise specified in this Section 12.2):

12.2.1    A Secretary's Certificate attaching copies of resolutions of Buyer authorizing the execution, delivery and performance of this Agreement and the transactions contemplated hereby, certifying as to the signatures and incumbency of each person signing any document or instrument delivered by Buyer to Seller in connection with the transactions contemplated hereby and such other information and certifications relevant to the due authorization, execution and delivery of this Agreement as Seller may reasonably request, all certified by a Secretary, Assistant Secretary or other appropriate officer of Buyer;

12.2.2 Executed assignment and assumption agreements with respect to the Contracts in the form of Exhibit 12.1.3;

12.2.3 An executed Transition Services Agreement Exhibit 12.1.4;

12.2.4 An executed Intellectual Property License Agreement in the form of Exhibit 12.1.5.

- 19 -

B00921

12.2.5 An executed Environmental Agreement in form and substance as the Buyer and Seller shall mutually agree.

12.2.6 A certificate of an appropriate officer of Buyer relating to the representations, warranties and covenants of Buyer made herein.

12.2.7 An executed Sublease Agreement in the form attached hereto as Exhibit 7.1;

12.2.8 Executed Supply Agreements in the forms of Exhibit 12.1.9A and Exhibit 12.1.9B;

12.2.9 A copy of the Buyer's Resale Certificate as issued by the Massachusetts Department of Revenue;

12.2.10    Evidence of insurance being in effect with respect to the Facility as provided in Section 10.2.7; and

12.2.11    Any other document reasonably necessary to effectuate the transactions contemplated hereby.

13.    POST CLOSING OBLIGATIONS

13.1    Further Assurances.  From time to time after the Effective Time, without further consideration, the parties shall cooperate with each other and shall execute and deliver instruments of transfer or assignment, or such other documents to the other party as such other party reasonably may request to evidence or perfect Buyer's right, title and interest to the Assets, and otherwise carry out the transactions contemplated by this Agreement.

13.2    Access to Books and Records.  After the Effective Time, Buyer shall permit Seller to have access to and the right to make copies of such of Seller's books, records and files as constitute part of the Assets for any reasonable purpose at any time during regular business hours, such as for use in litigation or financial reporting, tax return preparation, or tax compliance matters.  Prior to disposing of or destroying any such information or records, Buyer shall afford Seller a reasonable opportunity to segregate, remove or copy such books, records and files as Seller may specify.

13.3    Cooperation.

13.3.1    Litigation.  The parties shall reasonably cooperate with each other at the requesting party's expense in the prosecution or defense of any third party litigation or other proceeding arising from their respective operation of the Business.

- 20 -

B00922

13.3.2 <u>Taxes</u>. Seller shall cooperate with Buyer and shall provide Buyer with such assistance as may reasonably be requested by Buyer in connection with the preparation of any tax return and the conduct of any audit or other examination by any taxing authority or judicial or administrative proceedings relating to the Assets. Buyer shall reimburse Seller for all reasonable out of pocket costs and expenses incurred in providing such assistance.

13.4    <u>Warranty Claims Assistance</u>. Buyer shall provide Seller and its affiliated entities, with such reasonable assistance as they may require with respect to warranty and products liability claims relating to the period prior to the Effective Time and arising from Seller's use, sale or distribution of PCBs prior to the Effective Time.

14.    <u>INDEMNIFICATION</u>

14.1    <u>Indemnification by Seller</u>. Seller shall defend, indemnify and hold harmless Buyer and Buyer's directors, shareholders, officers, employees, agents, affiliates, successors and assigns from and against any and all claims, liabilities, obligations, losses, costs, expenses (including, without limitation, reasonable legal, accounting and similar expenses), fines, damages (individually a "Loss" and collectively "Losses"), arising out of:

14.1.1 any breach or violation of any of the covenants made by Seller in this Agreement;

14.1.2 any breach of, or any inaccuracy or misrepresentation in, any of the representations or warranties made by Seller in this Agreement;

14.1.3 any Retained Liability; or

14.1.4 any warranty or product liability claims with respect to PCBs produced by Seller prior to the Effective Time.

14.2    <u>Indemnification by Buyer</u>. Buyer shall defend, indemnify and hold harmless Seller and Seller's directors, shareholders, officers, employees, agents, representatives, affiliates, successors and assigns from and against any and all Losses arising out of:

14.2.1 any breach or violation of any of the covenants made by Buyer in this Agreement;

14.2.2 any breach of, or any inaccuracy in any of the representations or warranties made by Buyer in this Agreement;

14.2.3 any Assumed Liability;

B00923

14.2.4 any breach of the terms of Article 6 and any communications with the Employees by Buyer during the hiring process and the manner Buyer conducts the hiring process; and

14.2.5 the hiring of the Transferred Employees by Buyer, Buyer's employment practices post-Closing, including but not limited to, hiring and firing of employees, the compensation, benefits, employment taxes, and treatment of the Transferred Employees by Buyer and any failure of Buyer to comply with all applicable laws in connection with its employees (including the Transferred Employees).

14.3   Indemnification Procedure.

14.3.1 Any party seeking indemnification hereunder (the "Indemnitee") shall notify the party liable for such indemnification (the "Indemnitor") in writing of any event, omission or occurrence which the Indemnitee has determined has given or could give rise to Losses which are indemnifiable hereunder (such written notice being hereinafter referred to as a "Notice of Claim"). Any Notice of Claim shall be given promptly after the Indemnitee becomes aware of such third party claim; provided, that the failure of any Indemnitee to give notice as provided in this Section 14.3 shall not relieve the Indemnitor of its obligations under this Section 14.3, except to the extent that the Indemnitor is actually prejudiced by such failure to give notice. A Notice of Claim shall specify in reasonable detail the nature and any particulars of the event, omission or occurrence giving rise to a right of indemnification. The Indemnitor shall satisfy its obligations hereunder, as the case may be, within 30 days of its receipt of a Notice of Claim; provided, however, that so long as the Indemnitor is in good faith defending a claim pursuant to Section 14.3.2 below, its obligation to indemnify the Indemnitee with respect thereto shall be suspended.

14.3.2 With respect to any third party claim, demand, suit, action or proceeding which is the subject of a Notice of Claim, the Indemnitor shall, in good faith and at its own expense, defend, contest or otherwise protect against any such claim, demand, suit, action or proceeding with legal counsel of its own selection. The Indemnitee shall have the right, but not the obligation, to participate, at its own expense, in the defense thereof through counsel of its own choice and shall have the right, but not the obligation, to assert any and all cross claims or counterclaims it may have. So long as the Indemnitor is defending in good faith any such third party claim, demand, suit, action or proceeding, the Indemnitee shall at all times cooperate, at its own expense, in all reasonable ways with, make its relevant files and records available for inspection and copying by, and make its employees available or otherwise render reasonable assistance to, the Indemnitor. In the event that the Indemnitor fails to timely defend, contest or otherwise protect against any such third party claim, demand, suit, action or proceeding, the Indemnitee shall have the right, but not the obligation, to defend, contest, assert cross claims or counterclaims, or otherwise protect against, the same and may make any compromise or settlement thereof and be entitled to all amounts paid as a result of such third party claim, demand, suit or action or any compromise or settlement thereof. Neither Seller nor Buyer shall make any compromise of asserted liability for which indemnification is or may be sought pursuant to this Section 14.3.2 if such compromise includes the payment of money or creates any

- 22 -

B00924

obligation of the other party hereto, unless such other party shall have given its prior written consent to such compromise. For tax purposes, Buyer and Seller agree to account for any payments made under this Article 14 as adjustments to the Purchase Price paid to Seller by Buyer pursuant to Article 2.

14.4   Reduction for Insurance. The amount (an "Indemnity Payment") which an Indemnitor is required to pay on behalf of any Indemnitee pursuant to this Article 14 shall be reduced by the amount of any insurance proceeds actually received by or on behalf of the Indemnitee in reduction of the related idemnifiable loss. An Indemnitee which shall have received by or on behalf of which there shall be paid an Indemnity Payment and which shall subsequently receive, directly or indirectly, insurance proceeds in respect to the related indemnifiable loss, shall pay to the Indemnitor the amount of such insurance proceeds or, if lesser, the amount of the Indemnity Payment.

14.5   Survival and Limitations. The provisions of this Article 14 shall survive the Closing Date. The warranties and representations contained in this Agreement will survive the Closing Date and will remain in full force and effect thereafter for a period of one year after the Closing Date and shall be effective with respect to any inaccuracy therein or breach thereof, notice of which shall have been duly given within such one year period, in accordance with Section 14.3 hereof. Anything in this Agreement to the contrary notwithstanding (i) Seller shall have no liability to Buyer pursuant to this Article 14 with respect to indemnifiable Losses unless and until the aggregate amount of all indemnifiable Losses exceeds $80,000, in which event Seller shall be liable to Buyer for all indemnifiable Losses in excess of $80,000; and (ii) Buyer shall not be entitled to recover from the Seller more than an aggregate of any amount equal to 25% of the total Purchase Price with respect to claims of indemnity or damages whether such claims are brought under this Article 14 or otherwise. The foregoing provisions of this Section 14.5 shall not apply to Seller's obligation to provide indemnification to Buyer with respect to the matters set forth in Section 3.2 (Retained Liabilities), Article 6 (Employees and Employee Benefits) and any covenants to be performed by Seller subsequent to the Effective Time pursuant to this Agreement.

15.   MISCELLANEOUS

15.1   Expenses. Except as specifically set forth elsewhere herein each of the parties hereto shall pay its own expenses and costs incurred or to be incurred by it in negotiating, closing and carrying out this Agreement.

15.2   Notices. Any notice or communication shall be effective upon receipt and shall be given pursuant to this Agreement by a party hereto to the other party in writing and hand delivered, or transmitted by overnight delivery service, or sent via facsimile (with receipt confirmed and an original mailed) as follows:

B00925

If to Seller:                          Agfa Division of Bayer Corporation
                                       200 Ballardvale Street
                                       Wilmington, Massachusetts 01887
                                       Attn: Robert K. Sarafian, Counsel
                                       Fax: (978) 658-5168

                                       with a copy to:

                                       Testa, Hurwitz & Thibeault, LLP
                                       125 High Street
                                       Boston, Massachusetts 02110
                                       Attn: Mitchell S. Bloom, Esq.
                                       Fax: (617) 248-7100

If to Buyer:                           EFTC Corporation
                                       9351 Grant Street, Sixth Floor
                                       Denver, Colorado 80229
                                       Attn: Chief Financial Officer
                                       Fax:  (303) 451-8210

                                       with a copy to:

                                       Holme Roberts & Owen LLP
                                       1700 Lincoln Street, Suite 4100
                                       Denver, Colorado 80203
                                       Attn: Francis R. Wheeler, Esq.
                                       Fax: (303) 866-0200

15.3   Confidentiality.  Seller and Buyer have entered into a confidentiality agreement dated March 4, 1998 (the "Confidentiality Agreement").  Notwithstanding any provision herein to the contrary, the Confidentiality Agreement shall survive the execution and delivery or termination of this Agreement.  The Confidentiality Agreement shall terminate at the Effective Time with respect to information pertaining to the Assets acquired by Buyer and matters relating thereto, but shall otherwise survive the Closing.

15.4   Counterparts.  This Agreement may be executed simultaneously in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

15.5   Entire Agreement.   Except for the Confidentiality Agreement, the Supply Agreements, the Environmental Agreement, the Transition Services Agreement, the Intellectual Property License Agreement and the Sublease Agreement, this Agreement is the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes all

- 24 -

B00926

prior communications, representations, agreements and understandings between the parties hereto, whether oral or written, including, without limitation, any financial or other projections or predictions regarding Seller or the Business.

15.6    Construction.  When the context so requires, references herein to the singular number include the plural and vice versa and pronouns in the masculine or neuter gender include the feminine. The headings contained in this Agreement and the tables of contents, exhibits and schedules are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

15.7    Assignment.  This Agreement may not be assigned without the prior written consent of the other party hereto, which consent shall not unreasonably be withheld.

15.8    Amendment.  This Agreement may be amended only by written agreement duly executed by representatives of all parties hereto.

15.9    Applicable Law.  This Agreement shall be construed in accordance with the laws of the Commonwealth of Massachusetts, disregarding its conflicts of laws principles which may require the application of the laws of another jurisdiction.

15.10    Failure to Close.  If for any reason this Agreement is terminated prior to the Closing Date, each party shall promptly upon the request of any other party return to such other party all documents and other information (or notes made therefrom), including all originals and all copies thereof, theretofore delivered by or on behalf of such other party.  Buyer and Seller shall, in any case, comply with the terms of the Confidentiality Agreement referred to in Section 15.3.

15.11    No Third Party Rights. This Agreement is not intended and shall not be construed to create any rights in any parties other than Seller and Buyer and no other person shall assert any rights as a third party beneficiary hereunder.

15.12    Exhibits.  The Exhibits and Schedules attached hereto are incorporated into this Agreement and shall be deemed a part hereof as if set forth herein in full. References herein to this "Agreement" and the words "herein," "hereof" and words of similar import refer to this Agreement (including Exhibits and Schedules) as an entirety. In the event of any conflict between the provisions of this Agreement and any such Exhibit, the provisions of this Agreement shall control.

15.13    Waivers.  Any waiver of rights hereunder must be set forth in writing.  A waiver of any breach or failure to enforce any of the terms or conditions of this Agreement shall not in any way affect, limit or waive either party's rights at any time to enforce strict compliance thereafter with every term or condition of this Agreement.

- 25 -

B00927

15.14  Severability.  If and to the extent that any court of competent jurisdiction holds any provisions (or any part thereof) of this Agreement to be invalid or unenforceable, such holding shall in no way affect the validity of the remainder of this Agreement.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 26 -

B00928

IN WITNESS WHEREOF, Buyer and Seller duly executed and delivered this Agreement as of the day and year first above written.

EFTC CORPORATION, a Colorado corporation

By:

Title: CFO

BAYER CORPORATION, an Indiana corporation, through its Agfa Division

By:

Title: Sr. Vice President

**B00929**