11/14/2006

David Marr

Page 2

```
1   APPEARANCES:
2   *** ROACH & WISE
3        (BY STEPHEN A. ROACH, ESQ.)
4        31 State Street - 8th Floor
5        Boston, Massachusetts  02109
6        (617) 723-2800
7        Counsel for the Plaintiffs
8
9   *** BELLO, BLACK & WELSH, LLP
10       (BY JOHN F. WELSH, ESQ.)
11       535 Boylston Street - Suite 1102
12       Boston, Massachusetts  02116
13       (617) 247-4100
14       Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24
```

Page 4

```
1            PROCEEDINGS
2           STIPULATIONS
3        It is stipulated and agreed by and
4   between attorneys for the respective parties that
5   the deponent will read and sign the deposition
6   transcript within 30 days, but filing of the
7   deposition is waived.  If not signed within 30 days,
8   the deposition transcript will be deemed waived;
9        That all objections, except as to form,
10  and motions to strike are reserved to the time of
11  trial.
12        DAVID MARR, having been satisfactorily
13  identified by the production of his New York
14  driver's license, and duly sworn by the Notary
15  Public, was examined and testified as follows:
16         DIRECT EXAMINATION
17  BY MR. ROACH:
18       Q.  Could you state your name, please?
19       A.  Sure.
20       Q.  David R. Marr.  Is that M A R R?
21       A.  Yes, it is.
22       Q.  Where do you live?
23       A.  10 Deer Path way, three words, Monroe, New
24  York 10950.
```

Page 3

```
1            INDEX
2   DAVID MARR
3   BY MR. ROACH          4, 253
4   BY MR. WELSH          248
5
6
7
8
9         EXHIBITS
10  Exhibit 58, Plaintiffs' Second Notice of
11  Taking Deposition of Defendant Bayer
12  Corporation................................ 6
13  Exhibit 59, Benefit eligibility page SEV 4. 50
14  Exhibit 60, organizational chart.......... 190
15  Exhibit 61, letter dated April 5, 2002 with
16  attachments............................... 191
17  Exhibit 62, page SEV 7.................... 200
18  Exhibit 63, page 8-5..................... 215
19
20
21
22
23
24  *Original exhibits retained by Attorney Roach.
```

Page 5

```
1       Q.  Date of birth.
2       A.  6/9/58.
3       Q.  And Mr. Welsh is representing you today?
4       A.  Yes.
5        MR. WELSH:  I'm representing him in his
6   capacity as a 30(b)(6) witness for that.
7       Q.  So you are here, Mr. Marr, as the authorized
8   representative for the defendant in this case Bayer
9   Corporation; is that correct?
10      A.  Correct.
11      Q.  And you're here pursuant to Plaintiffs'
12  Second Notice of Taking Deposition of Defendant
13  Bayer Corporation which I show you here, copy of
14  which I show you?
15      A.  I'm not sure I understand what you mean by
16  second notice.
17      Q.  We sent a first notice and then I revised it
18  and sent a second notice.
19      A.  Okay. Fine.
20      Q.  And you have that document in front of you,
21  correct?
22      A.  Yes. Um-hmm.
23      Q.  Is that a yes?
24      A.  Yes.
```

(Pages 2 to 5)

David Marr

Page 26

1    Q. How long were you with the Agfa Division of
2   Bayer Corporation after you went there in September
3   of '94?
4    A. I was with the Agfa Division of Bayer until
5   it spun off from Bayer Corporation January 1, 1999.
6    Q. When you say it spun off, what does that
7   mean?
8    A. Bayer no longer wanted Agfa Division as part
9   of its holding. So we became an independent
10  publicly-traded in Belgium company.
11   Q. Who's "we"?
12   A. Agfa Corporation.
13   Q. So you became an employee of Agfa
14  Corporation?
15   A. Yes.
16   Q. And that happened on January 1, 1999?
17   A. Correct.
18   Q. What was your position with Agfa
19  Corporation?
20   A. At that time I was promoted to director of
21  Compensation and Benefits.
22   Q. Where was your office?
23   A. Ridgefield Park, New Jersey.
24   Q. Before you got the promotion, what was your

Page 27

1   salary with Bayer?
2    A. I can give you an approximation.
3    Q. Sure.
4    A. I think it was in the 90s or low hundreds.
5    Q. When Bayer spun off, is it fair to say that
6   Agfa Corporation purchased the Agfa Division from
7   Bayer?
8        MR. WELSH: Objection. You may answer
9   to your knowledge.
10   A. Agfa Corporation became a subsidiary of Agfa
11  NV, the Belgium parent.
12   Q. Belgium parent of who?
13   A. Agfa NV was the corporate entity that was
14  formed as a result of the separation from Bayer
15  Corporation, and Agfa Corporation was the U.S.
16  subsidiary of Agfa NV.
17   Q. So Bayer Corporation owned the Agfa Division
18  up till January 1, 1999, correct?
19   A. Yes.
20   Q. My question is. How did Agfa Corporation
21  come to own the Agfa Division assets of the Bayer
22  Corporation?
23       MR. WELSH: Objection. You may answer
24  within your knowledge.

Page 28

1    A. I don't know.
2    Q. Were you terminated from Bayer Corporation?
3    A. I suppose so, yes.
4    Q. And did you get severance benefits?
5    A. No, I did not.
6    Q. Did you ask for them?
7    A. No.
8    Q. How were you notified that you would be
9   terminated from Bayer?
10   A. We knew that as a result of the separation,
11  we would no longer be affiliated with Bayer
12  Corporation and we would have positions with Agfa
13  Corporation.
14   Q. Did you have a new person to report to when
15  you moved to Agfa Corporation?
16   A. No, I did not.
17   Q. Who did you report to before you moved to
18  Agfa Corporation?
19   A. Teresa Oakley.
20   Q. And then did you report to Teresa Oakley
21  afterwards?
22   A. Yes.
23   Q. And where is Teresa Oakley located?
24   A. Ridgefield Park, New Jersey.

Page 29

1    Q. What's her position?
2    A. Vice President of Human Resources.
3    Q. So the Agfa Division that you talked about
4   in Bushy Park, South Carolina; Teterboro, New
5   Jersey; Wilmington, Massachusetts and perhaps others
6   all became owned by Agfa Corporation; is that
7   correct?
8    A. Yes.
9    Q. Do you know whether Agfa Corporation assumed
10  the liabilities of the divisions that they acquired
11  from Bayer?
12       MR. WELSH: Objection. You may answer.
13   A. I really don't know. I mean, it could be in
14  some cases liabilities were assumed and others they
15  weren't.
16   Q. What was your title prior to the -- strike
17  that. I believe you said in September of '94 you
18  became the administrator of the Bayer Corporation
19  benefits program. Was that your title?
20       MR. WELSH: Objection. You may answer.
21   A. In 1994 my title was manager of Compensation
22  and Benefits.
23   Q. I'm sorry. Manager of Compensation and
24  Benefits. And did your title change at all until

8 (Pages 26 to 29)

David Marr

## Page 30

1  you became an employee of Agfa Corporation?
2      A.  I don't believe my title changed.  I was
3  promoted at one point.  My job had been reevaluated
4  and was given bonus eligibility.
5      Q.  When you say you were promoted, promoted to
6  what?
7      A.  A bonus eligible level position.
8      Q.  Did you have stock options?
9      A.  No.
10      Q.  What was your title when you went to Agfa
11  Corporation in January 1?  I think you said you were
12  something to the director.
13      A.  I can't be certain as of 1/1/99 if I was
14  director or if it occurred sometime shortly
15  thereafter.  But I was moved into a director role
16  under the new Agfa Corporation.
17      Q.  What was your title?
18      A.  Director of Compensation and Benefits.
19      Q.  And how long were you with Agfa Corporation?
20      A.  I'm still with Agfa Corporation.
21      Q.  So even though you're speaking for Bayer
22  today, you're actually employed by a different
23  company Agfa Corporation; is that correct?
24      A.  That's correct.

## Page 31

1      Q.  With respect to this claim for benefits, for
2  severance benefits by the plaintiffs, do you know
3  whether Agfa has an agreement with Bayer where Agfa
4  will indemnify or pay if Bayer is required to by the
5  court or otherwise to pay in this case?
6      A.  I believe I saw something to that effect in
7  the documents that I was looking at, but I can't be
8  certain.
9      Q.  Can you tell me, in 1994 what happened --
10  strike that.  In 1994 I believe you said there was a
11  Summary Plan Description that contained severance
12  benefits, rights for employees, correct?
13      MR. WELSH:  Objection.  You may answer.
14      Q.  We just talked about it a few minutes ago.
15      A.  Yeah.  I don't know for certain if one
16  existed.  But it was my understanding that there was
17  a Summary Plan Description.
18      Q.  But at a minimum, there were severance
19  benefits and what you just described before?
20      A.  Yes.
21      Q.  And can you tell me how long that had been
22  in effect when you joined?
23      A.  No, I can't.
24      Q.  At some point did this document, Willis

## Page 32

1  Exhibit 52, the Summary Plan Description that's at
2  issue in this case, 1995 come into existence?
3      A.  I believe that was the correct timeline,
4  yes.
5      Q.  Can you tell me how that occurred, please?
6      A.  That was mailed to all employees' homes.
7      Q.  And where was it mailed from?
8      A.  It was from the Bayer Corporation offices,
9  however they handled their fulfillment.
10      Q.  Was it out of your office?
11      A.  No.
12      Q.  Out of whose office was it mailed?
13      A.  Bayer Corporation.
14      Q.  Where was that?
15      A.  Pittsburgh.
16      Q.  Do you have any knowledge as to how Willis
17  Exhibit 52, the Summary Plan Description, came into
18  being?
19      A.  I believe it was prepared by the Bayer
20  Corporation Benefits Group.
21      MR. WELSH:  Steve, just for clarity.  On
22  paragraph one or two with respect to your inquiries
23  concerning the creation of the document, he is not
24  being put forward on that.  That is why I'm trying

## Page 33

1  to getting someone from Pittsburgh to talk on.
2      MR. ROACH:  You're looking at Exhibit
3  58, John?
4      MR. WELSH:  Yes.  With respect to this
5  witness, he's here, if you will, on the local stuff
6  and stuff that happened on Agfa Division.  With
7  respect to the creation of the SPD and the creation
8  of the Plan, that was done out of Pittsburgh.  So
9  I'm still trying to get a Pittsburgh witness to
10  speak on those.  You're free to ask him what he
11  knows on it.  I'm not trying to cut that off.  I'm
12  just letting you know.
13      MR. ROACH:  Can you tell me what areas
14  he is designated for today, John --
15      MR. WELSH:  Yeah.
16      MR. ROACH:  -- from Exhibit 58?
17      MR. WELSH:  Yes, one second.  Paragraph
18  3, all facts relative to the decision to deny
19  severance pay to the plaintiffs; No. 5, the
20  identities of persons involved in the decision; No.
21  6, the statements made to plaintiffs in '98
22  concerning entitlement to severance benefits; No. 7,
23  statements made to plaintiff in '98 concerning the
24  sale of the Board Shop; No. 9, all meetings,

David Marr

Page 38

1      MR. WELSH: Yes.
2      Q. Back to my questions, Mr. Marr. Can you
3  tell me how Exhibit 52 from the Willis deposition,
4  the Summary Plan Description, came into being in
5  terms of any decisions to draft it or to issue it to
6  the employees?
7      MR. WELSH: Again, objection subject to
8  my earlier comment about designation you may answer
9  within your knowledge.
10      A. No, I don't know how it came into being. I
11  know it was distributed to all employees.
12      Q. Did you go to any seminars or training or
13  meetings about the Summary Plan Description to
14  familiarize yourself with it?
15      A. No, I did not.
16      Q. Did you read it when you got it?
17      A. Yes.
18      Q. And why did you read it?
19      A. It's part of my role.
20      MR. ROACH: Can we just take a two
21  minute break, please?
22      MR. WELSH: Sure.
23      (Recess held.)
24      Q. Do you recall whether there was any

Page 39

1  severance plans -- strike that. With respect to the
2  Severance Plan you said that was in place for you
3  when you arrived in 1994, September of '94, do you
4  know how long that had been in place?
5      A. I do not.
6      Q. Now, you've been designated on Exhibit 58 as
7  the person designated relative to the decision of
8  Bayer and the Bayer Severance Pay Plan to deny
9  severance pay to the plaintiffs, correct?
10      A. I'm sorry. Could you repeat that, please?
11  Which number?
12      Q. No. 3 on Exhibit 58 asks for someone from
13  the defendants, from the defendant Bayer Corporation
14  to testify on all facts relative to the decision of
15  Bayer Corporation and/or the Bayer Severance Pay
16  Plan to deny severance pay to the plaintiffs. Do
17  you see that?
18      A. Yes, I do.
19      Q. And you are the authorized representative
20  here today to testify on that area, correct?
21      A. Yes, I am.
22      Q. Can you tell me, please, what the basis is
23  for the defendants to deny severance pay to the
24  plaintiffs in this case, the Board Shop employees?

Page 40

1      A. All of the employees were given new jobs
2  with the new corporation at a salary equal to or
3  higher than their current pay, and they were not
4  forced to relocate more than 35 miles away from
5  their current place of employment.
6      Q. Can you tell me what facts are that you base
7  that on? Let's start with relocation or location.
8      A. The Board Shop remained in the same location
9  on the same site as it was previously.
10      Q. Where was that site?
11      A. In Wilmington.
12      Q. Do you know the address?
13      A. I'm not sure if it was 200 Ballardvale or if
14  it was one of the other sites, 80 Industrial Way or
15  something. But it was in one of those two
16  facilities I believe.
17      Q. And on what basis do you make your statement
18  that they receive the same pay from the EFTC
19  corporation?
20      A. They actually received higher pay to my
21  understanding.
22      Q. On what do you base your understanding?
23      A. Based on my recollection of events at the
24  time, as well as the documents that I reviewed in

Page 41

1  the course of preparing for this deposition.
2      Q. What events do you recollect at the time
3  with respect to the pay?
4      A. Meetings, one meeting in particular.
5      Q. With who?
6      A. I believe it was Michael Paige, Dick
7  Ramsden, Norm Fontaine, Norm Beasley.
8      Q. Who's Norm Beasley?
9      A. He was the director of benefits for Bayer
10  Corporation.
11      Q. And where was he located?
12      A. Pittsburgh.
13      Q. Was he your superior?
14      A. Not directly, no. He was at a higher
15  position level than I was and he was from the
16  corporate office, but he was not my supervisor.
17      Q. When did that meeting take place?
18      A. On July 28th I believe.
19      Q. Of 1998?
20      A. Yes.
21      Q. Now, that's the document you reviewed
22  earlier, that you told us you reviewed before, and
23  that's Exhibit 17, correct?
24      A. Yes.

Page 46

1    A. It says, "payroll advise close August 14th
2  final list of employees."
3    Q. What does that mean?
4    A. My recollection is that at that time we
5  needed to advise our payroll department that the
6  closing was going to occur on August 14th and we
7  needed to identify the final list of the EFTC
8  employees, the employees that would be transferred
9  over to EFTC.
10   Q. Why did you need to do that?
11   A. Because we would need to take them off of
12 Agfa Division's payroll.
13   Q. They were Bayer Corporation employees,
14 correct?
15   A. They were Agfa Division of Bayer Corporation
16 employees, correct.
17   Q. But their paycheck was from Bayer
18 Corporation, correct?
19       MR. WELSH: You may answer.
20   A. Actually our paychecks said Agfa. It may
21 have said Agfa Division of Bayer.
22   Q. Do you recall any discussions of trying to
23 make sure everybody agrees to go to EFTC, Board Shop
24 employees?

Page 47

1    A. Only to the extent that I read in the
2  documentation, in the transcripts, the depositions
3  and so forth.
4    Q. The depositions you talked about earlier?
5    A. Correct.
6    Q. Do you recall yourself from any meetings or
7  any conversations you had that Bayer wanted to be
8  sure that the employees were moving to EFTC, were
9  going to take a job with EFTC?
10   A. No, I don't recall any conversations.
11   Q. I'll probably come back to Exhibit 17 in a
12 minute.
13       I'd like to go back to my question under
14 No. -- strike that. I'd like to go back to my
15 question about -- strike that. Did someone in Bayer
16 Corporation ask you to make a determination as to
17 whether the benefits, severance benefits will be
18 paid to the Board Shop employees?
19   A. No, I was not asked to do that.
20   Q. Do you know if anybody was asked to do that
21 at any time?
22   A. To the best of my understanding, again going
23 back to the transcripts of the depositions, Michael
24 Paige had requested that of Rod Willis.

Page 48

1    Q. Can you tell me, please, where in the
2  Summary Plan Description, if anywhere, you were
3  relying upon your statement that Bayer properly
4  denied severance benefits to the plaintiffs in this
5  case? And I point to page SEV 4 of the Summary Plan
6  Description, Willis Exhibit 52.
7       MR. WELSH: Objection. You may answer.
8    Q. Well, actually let me strike the question.
9  You said that the basis for Bayer's position that
10 the plaintiffs were not due benefits, severance
11 benefits was because they got a new job for the same
12 pay at the same location, correct?
13   A. Correct.
14   Q. Anything else that Bayer relied upon in its
15 position that the employees, plaintiff employees in
16 this case, Board Shop employees were not entitled to
17 benefits, severance benefits?
18   A. No. It's based on the fact that there was
19 continued employment at a higher wage at the same
20 location without requiring them to commute more than
21 35 miles.
22   Q. And I'd like to ask you to point to the part
23 of the, either the Bayer Corporation Severance Pay
24 Plan, Fiorilla Exhibit 9, or the Summary Plan

Page 49

1  Description, Willis Exhibit 52, and ask you if
2  there's anything in there that supports what you
3  just said about same pay and location.
4    A. On page SEV 4 When benefits are not paid,
5  there are a number of different bullet points.
6  There's a reference to "Is at a wage or salary level
7  (determined without regard to employee benefits)
8  equal to or greater than your wage or salary level
9  on the date of your termination. A "comparable
10 position" is defined -- and this is under a section
11 "comparable position" "does not require you to
12 commute 35 or more miles farther than you did prior
13 to your termination." And then the main section is,
14 "The premises, products, processes, or other
15 activities of the division you work for are
16 relocated, assigned, sold, leased, licensed, or
17 subcontracted, and you are offered a comparable
18 position (even if you choose not to accept it)."
19   Q. Now, that last section you just read, that's
20 in the middle column of SEV 4 of Willis Exhibit 52
21 and it's the third bullet point from the bottom, is
22 that a fair statement?
23   A. Yes.
24   Q. Perhaps maybe to make this easier I'm going

David Marr                                                           11/14/2006

Page 50

1  to show you Willis Exhibit 51 and I'd like to direct
2  your attention to Exhibit 51. Other than the
3  circles, the circling and the handwritten numbers,
4  is the document you just read from from the Summary
5  Plan Description the same as Willis Exhibit 51?
6      MR. WELSH: We'll stipulate to it, Dave.
7      A. Okay. Yes.
8      Q. Now, what you just read to me was the
9  handwritten circled numbers 3, 4 and 2 on Exhibit
10 51; is that correct?
11     A. Correct.
12     Q. Just for the sake of clarity. I'd like to
13 double mark this exhibit, Willis Exhibit 51 as Marr
14 Exhibit 59, please.
15     (Marked, Exhibit 59, Benefit eligibility
16 page SEV 4.)
17     Q. What we marked now as Willis 51 Marr 59, I
18 think we already talked about numbers 3 and 4
19 earlier in terms of their pay and the location,
20 correct?
21     A. Yes.
22     Q. And then you went to No. 2 I believe,
23 circled No. 2 on Exhibit 51, Willis 51 Marr 59,
24 correct?

Page 51

1      A. Correct.
2      Q. Was there any other provisions on this page
3  upon which Bayer relies in its position in this case
4  that the plaintiffs are not entitled to severance
5  benefits?
6      MR. WELSH: Can you just repeat the
7  question.
8      (Question read back.)
9      A. I think No. 2 basically covers this
10 particular situation. But looking at this document
11 in its entirety -- I'd say No. 2.
12     Q. And on what facts do you base -- strike
13 that. On what facts does Bayer base its contention
14 that No. 2 precludes the plaintiffs from receiving
15 severance when read in connection with 3 and 4,
16 numbers 3 and 4 on this exhibit?
17     A. It talks about the transaction or the sale
18 of a business.
19     Q. And what business was sold?
20     A. The printed circuit board.
21     Q. That's called the Board Shop, right?
22     A. I believe so from the documents I read.
23     Q. Before you testified today, other than the
24 documents that you read, did you talk to anybody?

Page 52

1      MR. WELSH: Objection.
2      Q. Other than Mr. Welsh your attorney.
3      MR. WELSH: You mean in preparation for
4  the deposition.
5      Q. Yes. In preparation for the deposition
6  today, did you talk to anyone other than Mr. Welsh
7  your attorney?
8      A. Yes.
9      Q. Who did you talk to?
10     A. Susan Murphy at Bayer Corporation.
11     Q. And who was she?
12     A. She is the Director of Employee Benefits. I
13 think the official title is Benefits Delivery. It
14 could have changed because Bayer has gone through
15 some different organizational changes.
16     Q. She's the Director of Benefits Delivery?
17     A. That used to be her title. I don't know if
18 it still is.
19     Q. Where is she located?
20     A. Pittsburgh.
21     Q. And what did you talk about with her?
22     A. We talked to her about the Summary Plan
23 Description and whether or not Bayer would provide
24 these severance benefits in similar transactions.

Page 53

1      Q. And what did she say to you?
2      A. No.
3      Q. Did you talk about the Summary Plan
4  Description, the terms of it as we're discussing it
5  today?
6      A. Not in -- I did not have it in front of me.
7  It was in general terms.
8      Q. And when you say whether Bayer would provide
9  benefits in similar situations, what did you mean by
10 that?
11     A. The sale of a business to another company
12 where people were provided a position of comparable
13 means as defined by the Plan and not requiring any
14 type of a relocation.
15     Q. If people had chosen not to go to EFTC, to
16 accept a job with EFTC, would they have been
17 entitled to severance benefits?
18     A. No, they would not.
19     Q. Why not?
20     A. Because we would consider that a voluntary
21 termination at that point.
22     Q. What did Bayer tell them with respect to
23 what their choices were when Bayer announced that
24 there's going to be a sale of the Board Shop to

14 (Pages 50 to 53)

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

David Marr                                                11/14/2006

Page 54

1  EFTC?
2      A. I can only rely on the documentation that I
3  saw in the depositions. I understand that some
4  employees may have raised the issue, raised the
5  question about severance and they were told they
6  were not eligible.
7      Q. I understand that. But what if a person had
8  decided they weren't going to accept a job at EFTC,
9  what would have happened with their employment with
10 Bayer?
11     A. Their employment with Bayer would have been
12 terminated.
13     Q. But it would have been terminated by Bayer
14 not by the employee, correct?
15     A. Well, it's what we would consider a
16 voluntary termination.
17     Q. Why?
18     A. Because they had a job. They had the
19 ability to go to the other organization and they
20 chose not to do so so they resigned their position.
21     Q. Well, Bayer actually resigned the position
22 for them, didn't they, by selling the Board Shop so
23 there is no longer a job for them, correct?
24     A. Correct.

Page 55

1      Q. So they didn't resign, they voluntarily
2  resign, it was forced important them because Bayer
3  sold the Board Shop and there was no job for them?
4      A. Right.
5      Q. So that was an involuntary termination, they
6  didn't want to be terminated, correct?
7          MR. WELSH: Objection.
8      A. They may not have wanted to be terminated;
9  that's correct.
10     Q. So if the employees did not want to be
11 terminated, that would be an involuntary
12 termination, correct?
13     A. Not under that scenario, no. That would be
14 considered a voluntary resignation. They had a
15 position that met everything that we see here and
16 they chose not to accept it.
17     Q. Where does it say that this scenario would
18 be a voluntary termination by the employees?
19     A. The last statement says "even if you choose
20 not to accept it."
21     Q. Accept what?
22     A. A new position.
23     Q. A new position where?
24     A. A new comparable position with the new

Page 56

1  employer.
2      Q. Does it say anything about a new employer in
3  No. 2?
4      A. No.
5      Q. Does it say anything about a new owner up in
6  No. 5 right above it, the bullet point above it No.
7  5?
8      A. Yes.
9      Q. And it doesn't say anything about a new
10 owner in No. 2, right, or a new employer, right?
11     A. No.
12     Q. So couldn't that also be read to say offered
13 a comparable position within Bayer?
14     A. It could, but it doesn't exclude either of
15 the other two, an employee or a new owner.
16     Q. But it doesn't say it either, right?
17     A. No, but it doesn't say Bayer Corporation
18 either.
19     Q. But by implication if you read No. 5 and No.
20 2 together, No. 5 says a new owner, No. 2 does not.
21 So wouldn't No. 2 contemplate a new position within
22 Bayer?
23     A. I don't read it that way.
24     Q. Is there any other document that you rely

Page 57

1  upon in support of your position that you don't read
2  the way I just suggested, that it means another
3  position within Bayer?
4      A. The next thing that we would look at would
5  be the Plan document.
6      Q. Oh, the Plan document. That will be Bayer
7  Corporation Severance Pay Plan, that would be
8  Fiorilla Exhibit 9?
9      A. Correct.
10     Q. Was this provided to the employees, Fiorilla
11 Exhibit 9?
12     A. I can't answer that. I don't know.
13     Q. You don't know one way or the other?
14     A. It would have been had they requested it.
15     Q. And how would they have known about it?
16     A. I believe the Summary Plan Description has
17 an administrative section included in it. I believe
18 there's a reference by John Schulz early on that in
19 the event there's a discrepancy with the Summary
20 Plan Descriptions, the Plan documents would be used.
21     Q. That's what Bayer says, right?
22     A. Correct.
23     Q. Was he basing it on some kind of legal
24 position or was it --

15 (Pages 54 to 57)

David Marr

Page 62

1    A.  We were on a different payroll system than
2  other units within Bayer.
3    Q.  You mean the Agfa Division was within a
4  different payroll system?
5    A.  Correct.  We used a system at the time
6  called McCormack and Dodge and the rest of Bayer was
7  on I think it was called Tesarac.  I can try to
8  spell it for you but --
9    Q.  But you used McCormack and Dodge.  Is that a
10  term of art within the Human Resources industry in
11  terms of the kind of forms that you used?
12    A.  No.  It was a payroll system.  It was an
13  internal payroll system.
14    Q.  So my question is.  If someone was
15  transferred to a comparable position within the Agfa
16  Division of Bayer what, if anything, would appear on
17  this Change Form?  I'm not talking about another
18  division.  I'm talking about the Agfa Division.
19  What, if anything, would show up on a Change Form
20  like this, Exhibit 24?
21    A.  Probably just the transfer box.
22    Q.  Where it says transfer-HOBU1?
23    A.  It would be a transfer within a cross
24  center.

Page 63

1    Q.  Now, you said that you would have to go to
2  the Bayer plan -- pardon me if I misstated.  I still
3  want to make sure I accurately reflect what you
4  said.  Earlier I believe you said that in looking at
5  the transfer to a comparable position, you'd have to
6  look at the Bayer plan for something, correct, in
7  interpreting the Summary Plan Description?
8    A.  If something were unclear, yes, we could go
9  to the Bayer plan document.
10    Q.  And I believe I asked you -- can you just
11  read back what I asked him before we move on.
12        (Questions and Answers appearing on Page
13    56 Line 20 to Page 57 Line 6 read back.)
14    Q.  Now, picking up the questions before that
15  you would look at the Plan document for
16  clarification as to whether somebody's moving to a
17  comparable position within Bayer or outside of Bayer
18  when you're looking at the Summary Plan Description,
19  where in the Plan document would you look?  I show
20  you Fiorilla Exhibit 9.
21    A.  Section 3.068.
22    Q.  And that's on page 7 of Fiorilla Exhibit 9?
23    A.  Yes.
24    Q.  That's what you would look at for further

Page 64

1  clarification though, correct?
2    A.  Correct.
3    Q.  Tell me what you would look at in section --
4    A.  You want me to read it --
5    Q.  Tell me what you would look at in section
6  3.068 that would clarify any question you might have
7  as to whether moving to a comparable position means
8  within Bayer or to a company outside of Bayer.
9    A.  This section, it relates to Ineligible
10  Terminations of Employment "In connection with a
11  divestiture of all or part of the assets of an
12  Employer or the sale of all or part of the stock of
13  an Employer, as a result of which as of the date of
14  sale the Severed Employee (i) is employed by the
15  Acquiring Entity or an affiliate of the Acquiring
16  Entity, or (ii) is offered employment by the
17  Acquiring Entity or an affiliate of the Acquiring
18  Entity which offered employment (a) does not require
19  the Severed Employee to relocate and (b) is at a
20  wage or salary level (determined without regard to
21  employee benefits offered by either the Employer,
22  the Acquiring Entity or the affiliate of the
23  Acquiring Entity) equal to or greater than the
24  Severed Employee's wage or salary level at the

Page 65

1  Employer on his Employment Severance Date."
2    Q.  Does it say anything in the Summary Plan
3  Description, looking at Willis Exhibit 51 and Marr
4  59, anything about an acquiring entity?  And I
5  specifically point you to circled No. 2.
6    A.  It doesn't say it in No. 2.
7    Q.  Does it say it anywhere on that page?
8    A.  Not that I can see, no.
9    Q.  So if somebody looking at this page, Willis
10  51 Marr Exhibit 59, they could interpret that
11  perhaps to mean that if they leave the company,
12  they're entitled to severance benefits; but if they
13  are offered a comparable position within Bayer,
14  they're not entitled to severance benefits, just
15  looking at this Summary Plan Description page?
16        (Question read back.)
17    A.  Just looking at this document?
18    Q.  Yes.
19    A.  Just looking at that document?
20    Q.  Yes.
21        MR. WELSH:  Objection.  You may answer.
22    A.  Could you please repeat the question?
23    Q.  Just read it back.
24        (Question read back.)

17 (Pages 62 to 65)

David Marr                                                    11/14/2006

Page 78

1  they're not Human Resources experts, correct?
2      A. Correct.
3      Q. So if a layperson picks up the Summary Plan
4  Description and looks at it, it would be a little
5  confusing to them, wouldn't it, in terms of what
6  would be payable and what wouldn't be?
7          MR. WELSH: Objection. You may answer
8  based on your personal knowledge and belief.
9      A. I think it's clear.
10     Q. But you're a Human Resources person,
11 correct, and you work with these plans, correct?
12     A. That's right.
13     Q. I'm asking about a layperson, somebody who
14 doesn't work in Human Resources and has a Summary
15 Plan Description in front of them. It would be
16 unclear to them, wouldn't it?
17         MR. WELSH: Objection. It calls for
18 speculation. You can answer within your knowledge
19 and belief.
20     A. It's the same comment as before. I think
21 it's clear.
22     Q. You think it would be clear to even a
23 layperson who didn't work in Human Resources?
24     A. Yes.

Page 79

1      Q. What's the difference on Willis Exhibit 51
2  Marr Exhibit 59 between circled No. 1 and circled
3  No. 2, what's the difference as a practical matter?
4          MR. WELSH: Objection. You can answer
5  based on any personal knowledge and belief you have.
6      A. Between No. 1 and No. 5?
7      Q. No. 1 and No. 2.
8      A. No. 1 and No. 2. No. 1 appears to be more
9  of the company offering you another position which
10 could reflect, you know, a different location.
11     Q. But it has to be a comparable position,
12 right?
13     A. Again, this is when benefits are not paid.
14     Q. Right.
15     A. So, yes, the company offers you a comparable
16 position. But if you choose not to accept it, the
17 company will not pay severance benefits in that
18 circumstance.
19     Q. So what's the difference between No. 1 and
20 No. 2, why are they both in there?
21         MR. WELSH: Objection. Subject to the
22 prior objections, you can answer within your
23 personal knowledge.
24     A. In the second, the second section that's

Page 80

1  circled labeled No. 2, it really talks about
2  movement of your activities which could be either
3  relocated, assigned, sold, leased, licensed, or
4  subcontracted.
5      Q. And you're offered a comparable position
6  just like No. 1 states, right?
7      A. Correct.
8      Q. Doesn't No. 1 where the company offers you a
9  comparable position encompass the same scenario as
10 No. 2?
11     A. It could.
12         MR. WELSH: One moment, please.
13         (Attorney Welsh conferring with the
14 witness.)
15     Q. Now, looking at No. 5 -- strike that. No. 5
16 talks about a new owner, correct?
17     A. Yes.
18     Q. And No. 1 and No. 2 do not, right?
19         MR. WELSH: Objection. You may answer
20 based on your personal knowledge and belief.
21     A. No. 2 could.
22     Q. But it doesn't say it, right?
23     A. It doesn't say it, no.
24     Q. Now, in your position from 1991 -- I'm

Page 81

1  sorry. In your position from 1994 through the sale
2  to EFTC of the Board Shop, did anyone ever ask you
3  or your department for a copy of the Bayer plan,
4  Fiorilla Exhibit 9?
5      A. I don't recall. It could have been a -- a
6  request could have been made.
7      Q. Can you recall any?
8      A. Not that I recall, no.
9      Q. Did your department ever send out a notice
10 to all the Agfa Division employees anywhere from
11 January 1, 1995 through September '98 saying that
12 this is to remind you or to advise you that there is
13 a Bayer Severance Pay Plan available to you to look
14 at which controls over the Summary Plan Description
15 which you've already been given?
16     A. No, we would not have sent that out from my
17 department.
18     Q. Why not?
19     A. It would have been the responsibility of
20 Bayer Corporation.
21         MR. WELSH: One moment, please.
22         (Attorney Welsh conferring with the
23 witness.)
24     Q. Well, didn't you work for Bayer Corporation?

21 (Pages 78 to 81)

David Marr                                                11/14/2006

Page 86

1    Q. Let me finish the question.
2    A. Sorry.
3    Q. This encompasses a situation where if
4  somebody is involuntarily terminated by Bayer but
5  Bayer offers them another job which is the same wage
6  and less than 35 miles away from where their
7  previous location was, they're not entitled to
8  severance; is that correct?
9        MR. WELSH: Objection. You may answer
10 within your personal knowledge and belief.
11   A. Correct.
12   Q. And where on the Summary Plan Description,
13 Willis 51 Marr 59, would that be covered?
14       MR. WELSH: Objection. You may answer
15 within your personal knowledge and belief.
16   A. The specific condition of involuntary
17 termination, I do not have in the Summary Plan
18 Description, but it could be covered under the
19 second bullet which you've identified as No. 1.
20   Q. Let me show you another document. I'd like
21 to show you Exhibit 27 and ask you if you recognize
22 that, Ramsden 27, please. And it's entitled
23 Defendants' Objections and Responses to Plaintiffs'
24 First Set of Interrogatories.

Page 87

1    A. Okay. This document was a document that I
2  signed providing answers to various Interrogatories
3  without going through each one of them now.
4    Q. And that's your signature on page 10?
5    A. That's correct.
6    Q. This was signed on August 12, 2005?
7    A. Yeah.
8    Q. Is that a yes?
9    A. Yes.
10   Q. In looking at Interrogatory No. 13 on No.
11 9 —
12       MR. WELSH: You mean on page 9?
13       MR. ROACH: I'm sorry.
14   Q. Before we get to that. Did you in answering
15 these Interrogatories and in signing these, did you
16 review any records?
17   A. I'd have to go through it and read them. I
18 don't recall at this point.
19   Q. But you did read them and then sign this
20 under the pains and penalties of perjury, correct?
21   A. I did, yes.
22   Q. Looking at page 8 Interrogatory No. 9, it
23 says, "State the reasons on which Bayer relies in
24 denying severance pay to the plaintiffs." Did I

Page 88

1  read that correctly?
2    A. Yes, you did.
3    Q. And then your answer was, "EFTC Corporation
4  transaction was a type of event expressly excluded
5  from eligibility under the terms of the Severance
6  Pay Plan." Did I read that correctly?
7    A. Yes, you did.
8    Q. Can you show me where it says that it was
9  expressly excluded in any of the documents that you
10 have?
11   A. 3.068.
12   Q. Anything else?
13   A. No.
14   Q. So when you say Severance Pay Plan, that's
15 what you were referring to, the Bayer Severance Pay
16 Plan, Fiorilla Exhibit 9, correct?
17   A. Correct.
18   Q. Interrogatory No. 8 which starts on page 7
19 and goes to page 8, I asked you to identify, the
20 plaintiffs asked you to identify the persons that
21 drafted SEV 4 which is Willis Exhibit 51 and Marr
22 59, correct?
23   A. Yes.
24   Q. And you said that your answer was, "Bayer's

Page 89

1  Central Benefits Department in Pittsburgh, PA in
2  conjunction with counsel drafted the Summary Plan
3  Description." Is that your answer?
4    A. Yes, it is.
5    Q. On what basis did you base that statement?
6    A. I have knowledge of a gentleman by the name
7  of Paul Yenneral who was counsel for Bayer
8  Corporation at the time, and I know he was involved
9  with the Central Benefits Group in preparing all
10 Plan documents. How I came to that knowledge, I
11 don't know.
12   Q. How do you spell Yenneral?
13   A. Y E N N E R A L.
14   Q. And where is he located today?
15   A. I believe he is in Pittsburgh with a law
16 firm Eckardt Siemens I think.
17   Q. Was he a Bayer employee at the time that he
18 drafted the document?
19   A. No. He's outside counsel.
20   Q. Who in the Bayer Central Benefits Department
21 was involved?
22       MR. WELSH: Objection. You may answer
23 within your knowledge.
24   A. John Schulz.

23 (Pages 86 to 89)

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

David Marr

Page 102

1  circuit board employees at comparable compensation
2  by the purchaser as part of the transaction base."
3  Do you see that?
4      A. That's correct.
5      Q. Now, when you say the purchaser, is there
6  any designation or mention of a purchaser under the
7  Summary Plan Description, SEV 4, Willis 51 or Marr
8  Exhibit 59?
9      A. Under 2 it talks about a business being sold
10 which implies there's a purchaser.
11     Q. And what about on the Plan itself, Fiorilla
12 Exhibit 9. Does it talk about a purchaser there?
13     A. No. Again, it talks about the sale of a
14 part of the business or all or part of the business.
15     Q. I'm talking about the word purchaser. Does
16 the word purchaser appear anywhere there?
17     A. The word purchaser does not appear -- in
18 section 3.068 it does not appear.
19     Q. It does talk about an acquiring entity,
20 correct?
21     A. Yes, it does.
22     Q. Did you mean when you said purchaser to mean
23 the same as an acquiring entity when you answered
24 this interrogatory?

Page 103

1      A. I honestly don't recall what my reason was
2  for using that term.
3      Q. Can you tell me. In that same sentence you
4  talked about "The defendants state that the sale of
5  the printed circuit board business at all relevant
6  times contemplated the retention of printed circuit
7  board employees." Just cutting off the sentence at
8  that point. Do you see the word retention in there,
9  in Exhibit 27?
10     A. Yeah, I read that. I was looking over at --
11     Q. You're looking at the Bayer plan?
12     A. I'm looking at the Bayer plan document.
13     Q. Sure.
14     A. It does not say the word "retention."
15     Q. But what I'm asking you. The Bayer plan
16 does not say anything about retention, correct?
17     A. The Bayer plan does not.
18     Q. And neither does the Summary Plan
19 Description, Willis 51 Marr 59, right?
20         MR. WELSH: Take a look at it.
21     A. I don't see the word "retention" here.
22     Q. What did you mean by the word "retention"
23 when you answered these Answers to Interrogatories?
24     A. I know that we wanted EFTC to retain our

Page 104

1  employees when we sold the business to them and not
2  turn around and separate them.
3      Q. This is after they were employed?
4      A. After they were employed, correct.
5      Q. Then the next sentence says, "Currently the
6  defendants are not aware of communications with
7  individual employees at which the inapplicability of
8  the Bayer Severance Pay Plan to the acquisition of
9  the printed circuit board business by EFTC
10 Corporation was discussed." Did I read that
11 correctly?
12     A. You read that correctly.
13     Q. Now, having read the transcripts of the
14 depositions of Volume II Leonard, Fontaine and
15 Ramsden, do you wish to amend that answer in any
16 way?
17         MR. WELSH: Objection. You may answer.
18     A. I'm aware of based on those transcripts that
19 there were certain employees that asked questions at
20 that time relating to their eligibility for Bayer
21 severance and they were advised no.
22     Q. So, in other words, the plaintiffs did speak
23 the benefits at that time and they were told no?
24         MR. WELSH: Objection. You may answer.

Page 105

1      A. My understanding was they inquired about
2  whether they were eligible or not and were told no.
3      Q. Told no by Bayer?
4      A. Told no by someone. I believe it would have
5  -- I don't know who initially denied the claim. I
6  don't recall who said it.
7      Q. It would have been somebody in Bayer
8  management?
9      A. Someone within the Agfa Division Bayer
10 Corporation.
11     Q. Let's break for lunch.
12         (Lunch recess.)
13         AFTERNOON SESSION
14     Q. Now, I think we left off you were talking
15 about the denial of benefits when the plaintiffs in
16 this case inquired about them, correct?
17     A. Yes, we talked about that there was an
18 initial -- someone told them they weren't eligible
19 for benefits.
20     Q. With your understanding of the Summary Plan
21 Description, were the plaintiffs in this case
22 required to request their severance benefits in
23 writing?
24         MR. WELSH: Objection. You may answer

David Marr                                                                    11/14/2006

Page 106

1   within your knowledge and belief.
2       A.  If they were eligible for severance
3   benefits, they would not be required to request it
4   in writing.  If there was a question as to whether
5   they were eligible, they would appeal through the
6   various avenues to receive those severance benefits.
7       Q.  And to your knowledge, did anybody tell them
8   that they could appeal from your understanding?
9       A.  From my understanding, no.
10      Q.  And if a plaintiff in this case under the
11  Summary Plan Description or the Bayer Severance Pay
12  Plan asks for severance and is denied, is there any
13  requirement that Bayer send the denial in writing?
14          MR. WELSH:  Objection.  You can answer
15  within your personal knowledge and belief.
16      A.  If they had filed a formal ERISA appeal,
17  then, yes, Bayer would respond in writing to the
18  claimants either overturning the original denial or
19  leaving the original decision in place.
20      Q.  I'm talking about the original denial.  Is
21  there any requirement that Bayer provide the
22  original denial in writing?
23          MR. WELSH:  Objection. Subject to prior
24  objection, go ahead, you may answer.

Page 107

1       A.  Not that I'm aware of, no.
2       Q.  Now, we talked earlier about whether the
3   Bayer Severance Pay Plan, Fiorilla Exhibit 9, was
4   referenced anywhere in the Summary Plan Description,
5   correct, we talked about that?
6       A.  We talked about one page of that.
7       Q.  Right.  I'd like to show you and go through
8   the Summary Plan Description with you.  This is
9   Willis Exhibit 52.  Do you see that?
10      A.  Yes, I do.
11          MR. WELSH:  If I could.  Could the
12  record note a continuing objection with respect to
13  this inquiry based on the fact that this witness is
14  not designated for that.  Subject to that you may
15  answer within your personal knowledge and belief.
16      Q.  Now, looking at the introduction INT 1.  We
17  looked at this before.
18          MR. WELSH:  Can you read it that way?
19      A.  I can read the introduction INT 1.
20          MR. WELSH:  Steve, do you want to come
21  over here?
22      Q.  Now, Mr. Schulz signed this document,
23  correct?
24      A.  His signature appears on this, yes.

Page 108

1       Q.  And he said that "we hope that you use the
2   Summary Plan Description."  There's a reference to
3   it, right?
4       A.  Correct.
5       Q.  But he doesn't mention anything about the
6   Bayer Corporation Severance Pay Plan, Fiorilla
7   Exhibit 9, there, does he?
8       A.  Not on this page, no.
9       Q.  Now, the next page he talks about how they
10  should use this book, correct?
11      A.  That's correct.
12      Q.  And there's nothing in there that talks
13  about the Bayer Corporation Severance Pay Plan,
14  correct?
15      A.  Not on this page, correct.
16      Q.  And it's not referenced anywhere in there,
17  is it?
18      A.  The Plan documents are referenced as we
19  talked before.
20      Q.  So on INT 2 it says, "If there are any
21  discrepancies between this book and the official
22  written Plan Documents, the plan documents will
23  govern."
24      A.  That's stated there, yes.

Page 109

1       Q.  But he doesn't say anything about what the
2   Plan documents are or what their titles are, does
3   he?
4       A.  No.  But this book is a summary of all those
5   Plan documents.
6       Q.  I understand that.  But it doesn't say
7   anywhere that there is a Bayer Corporation Severance
8   Pay Plan document?
9           MR. WELSH:  On this page.
10      Q.  On this page.
11      A.  On this page.
12      Q.  And it doesn't say it anywhere in this book,
13  does it?
14      A.  I don't know that.  I'd need to look.
15      Q.  Let's look.
16          MR. WELSH:  Do you want me to turn to
17  the page where it does?
18          MR. ROACH:  Sure.  To save some time,
19  I'll let your lawyer do that.
20          MR. WELSH:  Thank you.  ADM 3, the
21  bottom of the page.
22      Q.  So on page ADM 3 it talks about official
23  plan name.  It's called the Bayer Corporation
24  Severance Pay Plan, right?

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

David Marr                                                    11/14/2006

---

**Page 110**

1    A. Correct.
2    Q. Does it say there's a document called the
3 Bayer Corporation Severance Pay Plan on that page?
4    A. I don't see the word document.
5    Q. All it talks about is that there is a Bayer
6 Corporation Severance Pay Plan, right?
7    A. Correct.
8       MR. WELSH: So the record is clear. It
9 has a plan number, and if you look at the prior
10 pages, it talked about the Plans and we had that
11 pursuant to the Plans.
12    Q. Do you adopt your lawyer's statement in that
13 regard?
14    A. I will look. It references Plans, yes.
15    Q. But it doesn't say anything in there that
16 there's a document entitled Bayer Corporation
17 Severance Pay Plan (Restated effective as of January
18 1, 1995), does it?
19    A. Just the reference we already quoted.
20    Q. The reference we quoted says Bayer
21 Corporation Severance Pay Plan. But there's no
22 document that says exists. They say that's the
23 official Plan name, right?
24    A. Correct.

---

**Page 111**

1    Q. They don't say on ADM 3 that there's a
2 document called Bayer Corporation Severance Pay Plan
3 (Restated effective as of January 1, 1995) that's on
4 file in Pittsburgh, Pennsylvania or anywhere else,
5 does it?
6       MR. WELSH: On this page?
7       MR. ROACH: On this page.
8       MR. WELSH: Subject to my continuing
9 objection.
10    A. Not on this page.
11    Q. And your lawyer says there's a Plan number
12 called 501?
13    A. Yes.
14    Q. Fiorilla Exhibit 9, is that entitled Plan
15 No. 501?
16    A. I do not know without going through --
17    Q. Go ahead and look for it.
18    A. It doesn't mention 501. It starts out that
19 it amends the former Miles, Inc. Severance Pay Plan.
20    Q. So there's nowhere in here that talks about
21 it being Plan 501, right?
22    A. I'll have to go through all the pages of the
23 document.
24    Q. Take a look at the document. Go slowly,

---

**Page 112**

1 however you want to do it.
2       MR. WELSH: I'll stipulate that it's not
3 in the Severance Pay Plan and that it's a reference
4 to a filing number.
5       MR. ROACH: Okay. Fine.
6    Q. Now, let's go to the first page of the
7 severance section which is saying your severance pay
8 benefits, correct?
9    A. Yes.
10    Q. That's the beginning of it. And then it has
11 a Table of Contents, correct?
12    A. Correct.
13    Q. And then it has SEV 1, correct?
14    A. Um-humm. Yes.
15    Q. And if you look at SEV 1, it talks about the
16 Severance Pay Plan, correct?
17    A. Correct.
18    Q. It doesn't say anything about Bayer
19 Corporation Severance Pay Plan (Restated effective
20 as of January 1, 1995), does it?
21    A. No, it doesn't.
22    Q. It doesn't mention document 501 anywhere on
23 SEV 1 either, does it?
24    A. Not on this page.

---

**Page 113**

1    Q. And it doesn't say anywhere that the Bayer
2 Corporation Severance Pay Plan can be found in the
3 Resources Division or in Pittsburgh or anywhere
4 else?
5       MR. WELSH: On this page?
6       MR. ROACH: On this page.
7    A. Correct, it doesn't indicate on this page.
8    Q. In fact, it doesn't say anywhere under any
9 of the provisions of severance, does it under,
10 Exhibit 52 Willis? You can take your time and look.
11    A. No, I have no reason to doubt that.
12 However --
13    Q. I want your --
14       MR. WELSH: He's not done answering.
15    Q. I'm sorry. Go ahead.
16    A. However, I believe there is an
17 administrative section --
18    Q. We'll get to that.
19       MR. WELSH: He's answering. Finish your
20 answer.
21    Q. Go ahead.
22    A. There's an administrative section which may
23 provide information that would address that issue.
24    Q. Have you finished your answer?

David Marr

Page 114

1    A. Yes.
2    Q. We'll get to the administration in a minute.
3  Right now my question is. Under the Severance Plan
4  provision of the Summary Plan Description, Exhibit
5  52, it doesn't say anything in there about a Bayer
6  Corporation Severance Pay Plan (Restated effective
7  as of January 1, 1995) --
8         MR. WELSH: Is that quote unquote?
9         MR. ROACH: Yes.
10   Q. -- or document 501 at all, right?
11   A. No, no, no. I just wanted to make sure
12  because -- what's missing, it does reference a
13  Severance Pay Plan, and it is a Bayer Corporation
14  Summary Plan Description.
15   Q. My question is very simple. Nowhere in this
16  section called Severance in the Summary Plan
17  Description, Willis Exhibit 52, does it say that
18  there is a document called the Bayer Corporation
19  Severance Pay Plan either with the words restated
20  effective as of January 1, 1995 in parens or not,
21  right?
22   A. Not on this page, and I can look through
23  the --
24   Q. I'd like you to look through the severance

Page 115

1  provision. Is that what you're doing, sir?
2    A. Yes. The word "document" is not there. But
3  it does -- there is a section which references the
4  conditions and requirements specified in the
5  Severance Pay Plan.
6    Q. And that's on SEV 10, correct?
7    A. That shows up on SEV 10.
8    Q. Now, you have the same words that talks
9  about in SEV 1 the Severance Pay Plan, correct?
10   A. Correct.
11   Q. But nowhere in this section on severance
12  does it say there's a document entitled Bayer
13  Corporation Severance Pay Plan, correct?
14   A. That's correct.
15   Q. And there's nowhere in this document that
16  says there's a Bayer Corporation Severance Pay Plan
17  either with the words restated effective January 1,
18  1995 or otherwise in there either, is there?
19        MR. WELSH: Objection. You can may
20  answer.
21   Q. Go ahead.
22        MR. WELSH: Can you please restate the
23  question?
24   Q. I'll restate the question. And there's

Page 116

1  nowhere in here any reference to a document called
2  Bayer Corporation Severance Pay Plan with the parens
3  underneath (restated effective January 1, 1995),
4  correct?
5    A. Correct.
6    Q. And there's nowhere in here anything
7  referencing a Code 501 or otherwise with respect
8  to --
9    A. Not in this section.
10   Q. Now, let's go to the administrative section
11  that you referenced before in the Summary Plan
12  Description. We'll go to ADM 1. Is there any
13  indication in there that the -- strike that. Before
14  we get to that. Back on the severance. Is there
15  anywhere under the severance section, SEV 1 through
16  SEV 11, that if you want to get a copy of the
17  Severance Pay Plan, it can be found in Pittsburgh,
18  Pennsylvania at the local Human Resources or
19  anywhere else?
20   A. No.
21   Q. Let's go to Administration 1, ADM 1 of the
22  Summary Plan Description. Is there anything in
23  there that references the fact that there is a Bayer
24  Corporation Severance Pay Plan either at the Human

Page 117

1  Resources Department in Wilmington, Massachusetts or
2  anywhere else, Pittsburgh or anywhere else?
3    A. It identifies the Plan Administrator and the
4  Plan sponsor is Bayer Corporation in Pittsburgh.
5    Q. That's the Plan Administrator --
6         MR. WELSH: Are you done with your
7  answer?
8    Q. I'm sorry. Are you done with your answer?
9    A. It also gives Bayer the discretion to
10  interpret the Plans and make the final decision if
11  such issue is eligibility and payment of benefits
12  through their Benefit Administrative Committee,
13  their ERISA committee. It also spells out
14  documents, and reports for the Plans in this book
15  are filed with the United States Department of Labor
16  under two numbers. It references the administrative
17  chart that we looked at before.
18   Q. Does it say which page the administrative
19  chart is on?
20   A. No, it does not.
21   Q. So how would they know where it is?
22        MR. WELSH: Objection. You may answer
23  to your knowledge.
24   A. It's in the administrative section. I'd

David Marr

Page 118

1  have to look for that information.
2      MR. WELSH: I'd just point out to you,
3  Steve, in the prior paragraph chart beginning on the
4  next page.
5      A. And there's a statement where they --
6      Q. Let's try to shorten this. My question is
7  very simple, sir. Is there anything on
8  Administrative 1 that says there is a document
9  called Bayer Corporation Severance Pay Plan?
10     A. Not Bayer Corporation Severance Pay Plan,
11  no.
12     Q. Is there anything on there that says there's
13  a document called Bayer Corporation Severance Pay
14  Plan and in parens restated effective as of January
15  1, 1995?
16     A. No.
17     Q. Is there anything in there that says -- in
18  fact, it says in here that the Plan Administrator
19  and the sponsor for the benefit plan described in
20  this book is in Pittsburgh, Pennsylvania, right?
21     A. Yes.
22     Q. It doesn't say sponsor and benefit plans
23  described in any other document such as the Bayer
24  Corporation Severance Pay Plan, does it?

Page 119

1      MR. WELSH: Objection.
2      Q. You can answer.
3      A. There's a difference -- I mean, if you'll
4  note, the Plans is capitalized. That would refer to
5  Plan documents. This is smaller case.
6      Q. So you think somebody could figure out by
7  seeing that there's a smaller case "p" on that first
8  paragraph versus a large "P" for Plans on ADM 1 the
9  first column, could figure out from that that there
10  is a separate document called the Bayer Corporation
11  Severance Pay Plan, is that your testimony?
12     MR. WELSH: Objection. You may answer
13  within your understanding.
14     A. I'm just advising you of my knowledge when I
15  see capital P with Plans, it means a Plan document.
16     Q. And is it your testimony that one of these
17  lay people who are not Human Resources people who
18  are plaintiffs in this case, could have figured that
19  out?
20     MR. WELSH: Objection. You may answer
21  within your personal knowledge.
22     A. Within my personal knowledge, no.
23     Q. In fact, in your experience as a Human
24  Resources person, it's very unlikely anybody will be

Page 120

1  able to see that distinction, figure out there's a
2  separate document; isn't that true, sir?
3      MR. WELSH: Objection. You may answer.
4      A. I would agree. I don't know whether Plans
5  are defined in the Plan document.
6      Q. Plan document meaning the Bayer Corporation
7  Severance Pay Plan?
8      A. Yes.
9      Q. Now, turning over to Your Rights Under ERISA
10  on ADM 4. Do you see that?
11     A. I do.
12     Q. They mention in the first paragraph here
13  under ADM 4 some other plans, don't they?
14     A. Yes, they do.
15     Q. They mention the dependent day-care spending
16  account, the short-term disability plan, the
17  adoption benefit plan, the educational loan
18  programs, the merit scholarship program, the student
19  exchange program, an employee hospital audit reward
20  program, correct?
21     A. That's correct.
22     Q. They don't mention --
23     MR. WELSH: Steve, read the sentence.
24  It says benefits not listed.

Page 121

1      MR. ROACH: I understand. I understand.
2      Q. But they don't mention the Bayer Corporation
3  Severance Pay Plan there, do they, or any other plan
4  that's covered under ERISA, right?
5      MR. WELSH: Objection. You may answer
6  within your understanding.
7      A. The Bayer Corporation Plan is not listed
8  there, yes.
9      Q. Is the Bayer Corporation Severance Pay Plan
10  listed anywhere under ADM 4, 5 or 6?
11     A. Not specifically by reference, but it does
12  identify that employees may obtain copies of all
13  official plan documents and other plan information
14  on written request to the Plan Administrator.
15     Q. Is there a list there of what the official
16  plan documents are?
17     A. No, there's not.
18     Q. In fact, there's no listing -- and an
19  official plan document would include the Bayer
20  Corporation Severance Pay Plan, Fiorilla 9?
21     A. Yes.
22     Q. So is it listed anywhere under the
23  administrative section of the Summary Plan
24  Description as a Bayer Corporation Severance Pay

31 (Pages 118 to 121)

David Marr                                                        11/14/2006

| Page 122 | Page 124 |

**Page 122**

1    Plan other than the word Bayer Corporation Severance
2    Pay Plan we already discussed under ADM 3 in the
3    chart?
4      A. No.
5      Q. So wouldn't it be fair to say, sir, that
6    plaintiffs -- strike that. Do you understand that
7    the plaintiffs in this case are alleging that Bayer
8    deliberately concealed the existence of the Bayer
9    Corporation Severance Pay Plan from them when they
10   denied the benefits?
11     A. I'm not aware of that, no.
12     Q. In reading the Summary Plan Description,
13   would it be fair to say they could make that claim
14   just based on what we read on the Summary Plan
15   Description --
16          MR. WELSH: Objection.
17     Q. — assuming no one else told them it
18   existed?
19          MR. WELSH: Objection. You may answer
20   within your own personal knowledge and belief.
21     A. My belief is that an employee would know
22   that there were Plan documents to support the
23   Summary Plan Description.
24     Q. They would know?

**Page 123**

1      A. They would.
2      Q. And that's based on the testimony you've
3    just given?
4          MR. WELSH: Objection. You may answer.
5      A. Yes.
6      Q. Now, Fiorilla Exhibit 9, the Bayer
7    Corporation Severance Pay Plan. It says that it
8    amends and restates the Miles, Inc. Severance Pay
9    Plan. Do you see that, effective January 1, 1995?
10   It says it on page 1.
11     A. Yes, I see that.
12     Q. Do you know whether you have a copy of that?
13     A. The Miles Plan?
14     Q. Yes.
15     A. I don't know if I do or not.
16     Q. Do you know whether the terms of the Miles
17   Plan were the same as set forth in Fiorilla Exhibit
18   9, the Bayer Corporation Severance Pay Plan?
19          MR. WELSH: Objection. You may answer
20   within your personal knowledge and belief.
21     A. I think earlier when I was asked when I was
22   hired in 1994 whether or not the Miles Plan was the
23   same as the restated Plan, I indicated that I could
24   not make that judgment. I don't know what the

**Page 124**

1    changes were and what the amendments were.
2      Q. Do you know whether the areas that we
3    discussed earlier today under section 3.06
4    subsections 8, 9 and 10 were changed when it went
5    from the Miles, Inc. plan to the Bayer plan?
6          MR. WELSH: Objection. You may answer
7    within your personal knowledge and belief.
8      Q. If you know.
9      A. I don't know.
10         MR. ROACH: John, could I have a copy of
11   that?
12         MR. WELSH: Of what?
13         MR. ROACH: The Miles Plan.
14         MR. WELSH: Why is it relevant?
15         MR. ROACH: Can we go off the record for
16   a moment and I'll tell you?
17         MR. WELSH: Sure.
18         (Off the record.)
19         MR. ROACH: Mr. Welsh and I have agreed
20   to disagree I believe that the Miles, Inc. Plan
21   that's referenced in the Bayer Severance Pay Plan
22   could be relevant in this case. Mr. Welsh does not
23   and we'll reserve our rights.
24         MR. WELSH: It is specifically what I

**Page 125**

1    indicated to as paragraph 3.068 I believe of the
2    pension plan. The Severance Plan document is
3    explicit and not ambiguous and that prior drafts are
4    not relevant since the severance pay right the
5    employees may have enjoyed is determined at the time
6    of the event and not at subsequent drafts. With
7    respect to the SPD. If the SPD is seemed to be
8    ambiguous, then you look at the Plan. In both
9    circumstances, however, it goes to the Benefit
10   Review Committee which has full discretion to make
11   the decision about whether it's ambiguous or not.
12   And as I sit here respectfully, Steve, I just do not
13   understand the relevance of Miles Plans or any other
14   plans of predecessors or successors. I believe the
15   law is that you take a snapshot at the time of the
16   quote qualified event or the event which is claiming
17   to be qualified, and is the plan that an SPD in
18   effect at that time which determines the right.
19         MR. ROACH: I'm not going to put my full
20   legal view in the case in this regard on the record.
21   I'd rather take my time deposing the witness. I'm
22   not in agreement with Mr. Welsh's explanation.
23   We'll both reserve our rights.
24         MR. WELSH: Okay.

32 (Pages 122 to 125)

David Marr

11/14/2006

Page 126

1    MR. ROACH: Not to say you couldn't be
2  right, but I don't believe you are.
3    MR. WELSH: I understand that we've
4  reserved our rights and we'll have this debate
5  later.
6    MR. ROACH: Let's move on.
7    Q. Do you know, sir, whether anyone from Bayer
8  in 1998 told any of the plaintiffs in this case, the
9  Board Shop employees that there existed a Bayer
10  Corporation Severance Pay Plan either at Human
11  Resources in Wilmington, Massachusetts or down
12  Pittsburgh, Pennsylvania?
13    A. When you say Bayer Corporation, do you mean
14  Agfa Division of Bayer or Bayer Corporation?
15    Q. This lawsuit is against Bayer Corporation.
16  It includes all divisions, subsections, management,
17  any division or department or anything within the
18  corporate entity of Bayer Corporation.
19    A. Okay. I am not aware.
20    Q. So you're not aware of anybody within Bayer
21  Corporation, Agfa Division or otherwise who told the
22  plaintiffs that there existed a Bayer Corporation
23  Severance Pay Plan, either Human Resources or in
24  Pittsburgh; is that correct?

Page 127

1    A. That's correct.
2    Q. Do you believe that Bayer and anybody within
3  Bayer, including Human Resources, had an obligation
4  to tell people they should look at the Bayer
5  Corporation Severance Pay Plan because that's what
6  controls?
7    MR. WELSH: Objection. You may answer
8  this question within your personal knowledge and
9  belief.
10    Q. Go ahead.
11    A. The obligation I believe is addressed in the
12  Summary Plan Description.
13    Q. So you think the Summary Plan Description is
14  sufficiently clear so that people would know that
15  there was a Bayer Corporation Severance Pay Plan
16  such that when the plaintiffs were told they were
17  not entitled to benefits, that Bayer did not have to
18  tell them about the existence, otherwise tell them
19  about the existence of the Plan?
20    MR. WELSH: Objection. Subject to my
21  earlier objection, you may answer.
22    Q. Go ahead.
23    A. Other than what's in the Summary Plan
24  Description, if the only other obligation will be if

Page 128

1  somebody came forward and requested a copy of the
2  Plan document, then we would be obligated to provide
3  a copy of the document.
4    Q. No, I understand that. My question is
5  different. Do you believe that once Bayer advised
6  the plaintiffs that were not entitled to benefits,
7  Bayer had any obligation to say there exists in
8  addition to the Summary Plan Description, which is
9  Willis Exhibit 52, another document called the Bayer
10  Corporation Severance Pay Plan on which we are
11  partially relying or completely relying in denying
12  your severance and you should look at that, too?
13    MR. WELSH: Objection. You may answer
14  within your personal knowledge and belief.
15    A. I don't know whether -- I don't believe
16  there was a legal requirement to do that other than
17  the description in the Summary Plan Description.
18    Q. I'm not necessarily talking about a legal --
19  you're not an attorney I assume, right?
20    A. No.
21    Q. In your practices as a Human Resources
22  professional, isn't it sound practices within your
23  industry that when you deny benefits to an employee,
24  you steer them to all the documentation upon which

Page 129

1  you're relying?
2    MR. WELSH: Objection. Subject to the
3  earlier objection, you may answer.
4    Q. Go ahead.
5    A. In the event there were a formal appeal.
6    Q. I'm not talking about a formal appeal here,
7  sir. We're not talking about an appeal.
8    A. Okay.
9    Q. I'm not talking about an appeal. I'm
10  talking about a denial in the first instance which
11  occurred in this case.
12    MR. WELSH: Objection. No foundation.
13    Q. Do you understand that? Go ahead, you can
14  answer.
15    THE WITNESS: I can answer the question?
16    MR. WELSH: Objection. You may answer
17  subject to my earlier objection there's no of
18  foundation.
19    Q. I haven't asked the question yet. Here's my
20  question. In the circumstances of this case, did
21  anybody file an appeal?
22    A. Not that I'm aware of, no.
23    Q. In the circumstances of this case as you
24  understand it from deposition transcripts and

33 (Pages 126 to 129)

David Marr

11/14/2006

Page 130

1  everything you've read and your Answers to
2  Interrogatories that you've signed, your
3  understanding is that the plaintiffs verbally asked
4  for severance, correct?
5      A.  They asked whether they were eligible for
6  severance based on my understanding of what I read.
7      Q.  And verbally they were told by people at
8  Bayer that, no, they're not entitled to severance,
9  correct?
10     A.  That's correct, based on my understanding.
11     Q.  And based upon your background, knowledge
12 and experience and education in the Human Resources
13 field, do you think that it would have been sound
14 practice at that point for somebody at Bayer, either
15 at Human Resources or otherwise, to say, and the
16 reason that we're denying you the severance is based
17 upon the Summary Plan Description and also another
18 document called the Bayer Severance Pay Plan, Bayer
19 Corporation Severance Pay Plan?
20          MR. WELSH:  Objection.  You may answer.
21     A.  It wouldn't have -- there was no reason not
22 to provide it.
23     Q.  I'm not asking about whether they should
24 provide it.  I'm asking about whether somebody at

Page 131

1  Bayer should have told the employees about the
2  existence of a document called the Bayer Corporation
3  Severance Pay Plan when they were told they were not
4  going to get severance.
5          MR. WELSH:  Objection.  You may answer.
6      A.  I don't know how to answer that question.
7  Would it have been sound practice?  I don't know
8  that -- it's a sound practice.  As I said, I think
9  it would have helped clarify perhaps any questions
10 that they may have had.
11     Q.  I want to go to No. 5 on Exhibit 58, the
12 area which you've been designated to testify in this
13 case on behalf of Bayer.  If you look at area 5,
14 please, on Schedule A.  Directing your attention to
15 paragraph 5 on Schedule A of Exhibit 58.  You were
16 here to testify about the identities of all persons
17 involved in the decision to deny the severance, the
18 plaintiffs' severance pay and the discussions and
19 decision of the defendants, correct?
20     A.  Yes.
21     Q.  Can you tell me who the identities of the
22 persons who were involved in the decision to deny
23 severance pay?
24     A.  Based on the transcripts that I reviewed,

Page 132

1  they were advised by various parties.  My
2  recollection was that they were advised by Dick
3  Ramsden, if memory is correct, that they were not
4  eligible for severance pay under the Plan.
5      Q.  Anyone else?
6      A.  Not that I recall.
7      Q.  What about Rodney Willis, Michael Paige or
8  Mary Leonard?
9      A.  I don't know whether they spoke to the
10 employees or whether they just advised management.
11     Q.  Do you remember reading the Mary Leonard
12 transcript in which she said that employees came
13 into her office, many of them came in and asked
14 about severance?  Do you remember that?
15     A.  I read her transcript, yes, and I remember.
16     Q.  Does that refresh your memory as to whether
17 she was one of the people who was involved in
18 denying plaintiffs' severance?
19     A.  I prefer to read it again to be sure.  But I
20 believe it's in there.
21     Q.  And what about Rodney Willis?
22     A.  I don't recall about Rodney.  I did not read
23 his deposition.
24     Q.  Anybody else that was involved in the

Page 133

1  decision to deny plaintiff severance pay other than
2  Mr. Ramsden and Ms. Leonard?
3      A.  Not that I recall.
4          MR. WELSH:  Just so it's clear.  You're
5  asking about involving the decision?  You're talking
6  about communicating with employees or internal
7  communications?
8          MR. ROACH:  Both.  I'm talking about
9  internally who was involved in the decision in
10 looking at, analyzing it, reviewing it, parsing the
11 language, and then saying to the employees you're
12 not entitled to it.
13         MR. WELSH:  I'm just looking at the
14 notice.  That seems to be No. 6 and I just want
15 clarity.
16         MR. ROACH:  Okay.
17         MR. WELSH:  Go ahead.  You can answer.
18     A.  My --
19     Q.  The testimony you just gave about Ramsden
20 and Leonard probably is more applicable to No. 6,
21 correct, where it says as your lawyer just pointed
22 out, all statements made to the plaintiffs made in
23 1998 in regard to Bayer severance benefits; is that
24 correct?

34 (Pages 130 to 133)

David Marr

Page 134

1    A. Correct.

2    Q. So let's talk about No. 5 on Exhibit 58.
3  Who were the entities of all the persons involved in
4  the decision to deny the plaintiffs severance pay?

5        MR. WELSH: Objection. You may answer.

6    Q. And I also want to talk about the
7  discussions and decisions made within the Bayer
8  Severance Pay Plan.

9    A. My understanding from the documents that I
10  read, there were discussions by Michael Paige,
11  Rodney Willis, Bob Serafian, and in terms of whether
12  or not eligibility for severance was appropriate.

13    Q. Was Mary Leonard involved in those
14  discussions as well?

15    A. I do not know if she was involved in the
16  initial discussions.

17    Q. Was she involved in any discussions if you
18  recall from her deposition?

19    A. Other than what I discussed earlier in
20  talking to the employees about their ineligibility
21  for severance benefits, I have no recollection.

22    Q. In other words, she could have been, you
23  just don't know at this time?

24    A. It's possible.

Page 135

1    Q. And can you tell me what the discussions
2  were within Bayer about whether benefits were
3  eligible?

4    A. I'm trying to recall the testimony that I
5  read. I don't know that it got into the specific
6  discussions that took place other than -- I really
7  can't recall. I don't want to guess.

8    Q. I want Bayer's position in this case.
9  You're representing Bayer in this case --

10    A. Correct.

11    Q. -- in this deposition, correct?

12    A. Yes.

13    Q. I want to know what Bayer's facts are about
14  any discussions within Bayer or the Bayer Severance
15  Pay Plan about whether or not the plaintiffs were
16  entitled to severance.

17    A. The discussions that occurred between Rod
18  Willis and Bob Serafian.

19    Q. What were they? What were those
20  discussions?

21    A. I was not privy to those discussions other
22  than through what I read in the transcripts. I'm
23  having a hard time at the moment recalling what
24  specifically I read, if anything, that described

Page 136

1    that decision-making process.

2    Q. So you are adopting in this regard, you are
3  adopting the testimony of Mr. Ramsden and what he
4  and Mr. Serafian discussed as he described it in his
5  deposition, is that your testimony?

6        MR. WELSH: Objection. I think he said
7  Willis.

8    Q. Oh, okay. Then I'm sorry. Let me rephrase
9  it. So you are adopting then as Bayer's position in
10  this case the testimony of Mr. Willis as he
11  described his conversation with Mr. Serafian in this
12  case, correct?

13    A. I did not read Rod Willis's deposition.

14    Q. Let me start again. You are here to
15  represent Bayer, and I want Bayer's position on this
16  case as to what discussions you've had --

17        MR. WELSH: The witness will give you
18  his best answer.

19        MR. ROACH: I understand.

20        MR. WELSH: The lecture is not
21  necessary. Ask him a question, he'll give you his
22  best answer.

23    Q. The witness is Bayer.

24    A. Correct.

Page 137

1        MR. WELSH: The witness is Mr. Marr
2  representing Bayer.

3    Q. And you are here representing the position
4  of Bayer in this case, you understand that, correct?

5    A. Correct.

6    Q. So I want to know, Mr. Marr, is what the
7  discussions were within the defendants Bayer and the
8  Bayer Corporation Severance Pay Plan about whether
9  or not the plaintiffs were entitled to severance.

10    A. I can't comment on a discussion. I could
11  comment on the position that Bayer would take with
12  respect to this particular situation, and that is
13  that based on the fact that the business was being
14  sold and based on the fact that the employees were
15  given comparable jobs, that were equal or greater in
16  pay than what they were currently paid, and given
17  the fact that they did not have to relocate as
18  coincident with this new assignment, that they were
19  not eligible for severance.

20    Q. We've already talked about that earlier in
21  quite some length, correct?

22    A. Correct.

23    Q. I understand that's your position and you've
24  talked about it. We've gone back and forth about

David Marr

Page 138

1  it, correct?
2      A. Correct.
3      Q. What I want to know is what was the
4  discussion within Bayer that led up to that decision
5  that Bayer made, if you know?
6      A. I don't know.
7      Q. Did you talk to Mr. Willis at all about it?
8      A. No, I have not.
9      Q. I believe your lawyer corrected me. I said
10  it was Mr. Ramsden and Mr. Serafian. Is that what
11  you meant to say or did you mean to say that there
12  was a discussion between Mr. Willis and Mr.
13  Serafian?
14      A. My understanding from different things that
15  I've heard is that there was a discussion between
16  Rodney Willis and Bob Serafian. I don't know
17  whether this was incorporated in the documents or it
18  came out at other times, but my understanding there
19  was a discussion that occurred.
20      Q. And what is that based upon? What's your
21  understanding based upon?
22          MR. WELSH: Objection. You may answer.
23      A. I don't understand the question.
24      Q. Well, how do you know that Mr. Willis and

Page 139

1  Mr. Serafian spoke?
2      A. I don't know whether it's something that I
3  read in the course of the depositions and other
4  documents or not.
5      Q. Can you tell me what you remember they
6  discussed?
7      A. Just the eligibility for severance benefits.
8      Q. Can you tell me specifically what the
9  discussion involved?
10      A. No, I can't.
11      Q. Is there anything else you can tell me about
12  what you can remember about category 5 about the
13  identities of people involved in the decision and
14  the discussions within the defendants?
15      A. Not that I recall at this point.
16      Q. Now, let's go to No. 6. "All statements
17  made to the plaintiffs in '98 regarding entitlement
18  to any Bayer severance benefits." I believe you've
19  already testified to that, correct?
20      A. Yes.
21      Q. Is there anything else you can recall with
22  regard to any statements made to the plaintiffs
23  regarding entitlement to any Bayer severance
24  benefits?

Page 140

1      A. Not at the moment, no.
2      Q. Let's go to No. 7. No. 7 on Exhibit 58 is
3  all statements Bayer made to the plaintiffs in 1998
4  regarding the sale of the printed circuit board
5  area, the Board Shop from Bayer to Electronic
6  Fabrication Technology Corporation, EFTC, the EFTC
7  sale and plaintiffs entitled compensation benefits
8  of EFTC. Can you tell me what Bayer said to the
9  plaintiffs about the sale?
10      A. I recall from, I believe it was Ramsden's
11  deposition that there were comments made by him that
12  it was a good win I believe was the term used, that
13  the employees would be able to keep -- continue
14  their employment, and that from a company standpoint
15  we were going to get a quality product in return.
16      Q. That Bayer was going to get a quality
17  product in return?
18      A. Yes.
19          MR. WELSH: One second, please.
20          (Attorney Welsh conferring with the
21  witness.)
22      Q. Other than Mr. Ramsden, did anybody else say
23  anything that you can recall from any of the
24  transcripts you read or in any documents you've seen

Page 141

1  to the plaintiffs about the sale?
2      A. No, I can't.
3      Q. Do you remember anything Mr. Paige, Mr.
4  Willis, Ms. Leonard or anybody else said?
5      A. None other than what they've already
6  testified to.
7      Q. Would you accept that they also made some
8  statements though on behalf of Bayer to the
9  plaintiffs about the sale?
10      A. Yes, I would say.
11      Q. And can you tell me what Bayer meant by it
12  was a win-win situation for the employees?
13          MR. WELSH: Objection. You may answer.
14      A. Just as I described before.
15      Q. That they would continue with their
16  employment?
17      A. They would have jobs and that the company,
18  Bayer, would continue to get product by trained
19  personnel.
20      Q. Did Bayer tell the plaintiffs that they were
21  being terminated from Bayer and then were going to
22  be offered a job with EFTC?
23      A. My recollection is they were -- I don't know
24  whether they were told they were going to be

36 (Pages 138 to 141)

David Marr

---

Page 142

1  terminated from Bayer or not. The documents that
2  I've seen indicated a transfer.
3      Q. A transfer?
4      A. Yes. The documents that I read referenced
5  that they would be transferred to EFTC.
6      Q. In your experience as a Human Resources
7  professional, have you ever heard of anybody being
8  transferred from one company to another, two totally
9  independent companies whereby that transfer did not
10 involve they were terminated from Company 1 and then
11 took a job from Company 2?
12     MR. WELSH: Objection.
13     Q. Have you ever heard of such a thing?
14     MR. WELSH: Objection. You may answer.
15     A. Not in a sense that their employment was
16 transferred. However, in the case of EFTC, their
17 service was transferred so that their length of
18 service was transferred such that I recall a comment
19 made that employees that were coming over to EFTC
20 had higher length of service than the company was in
21 existence. So I think at the time EFTC might have
22 been in existence ten years. I don't know exactly.
23     Q. The deal that EFTC struck with the
24 plaintiffs in offering them a job is that they said

---

Page 143

1  they would credit their lengths of service; is that
2  correct?
3      A. That's my understanding, yes.
4      Q. But they were not transferred, they were
5  terminated from Bayer and then accepted a new job
6  with EFTC, correct?
7      MR. WELSH: Objection. You may answer.
8      A. Correct.
9      Q. Now, with respect to —
10     (Attorney Welsh conferring with the
11  witness.)
12     MR. WELSH: Go ahead.
13     Q. Now, with respect to the plaintiffs'
14 anticipated compensation and benefits with respect
15 to statements made to them, what did Bayer say to
16 them about the benefits at EFTC as compared to what
17 they were at Bayer?
18     A. My recollection is we did not draw any
19 comparisons with the employees relative to what they
20 were entitled to from EFTC. My understanding is
21 that there were other meetings by EFTC employees to
22 our employees which describe what they would receive
23 from EFTC.
24     Q. So your position is Bayer didn't make any

---

Page 144

1  statements to the plaintiff Board Shop employees as
2  to what EFTC benefits were, is that your position?
3      A. To the best of my knowledge, yes.
4      Q. And what are you relying upon in making that
5  statement, sir?
6      A. Again, there were documents about a
7  presentation that was put together by Julie Haley
8  which outlined how certain things were going to be
9  handled on a go forward basis on Bayer's benefits.
10     Q. I'm not sure what you mean by as things
11 would go forward on Bayer's benefits. What's that
12 mean?
13     A. Well, for example, on the 401K plan,
14 apparently EFTC did not agree to accept an asset
15 transfer from the 401K plan. So the presentation
16 was intended to advise them what would happen with
17 respect to loans that they may have taken out with
18 respect to what distribution options they would
19 have.
20     Q. Anything else other than the 401K?
21     A. There were a number of things. Medical I
22 believe may have been covered in the second meeting.
23 I'd have to look at a document comment further.
24     Q. Was there any discussion of pension

---

Page 145

1  benefits?
2      A. There may have been a slight on pension.
3      Q. Was there a slight on anything else?
4      A. I believe we addressed most, if not all, of
5  the Bayer benefits.
6      Q. When you say we addressed most if not all of
7  the Bayer benefits, my question is, did you tell
8  them how they would compare to the EFTC benefits in
9  the presentation?
10     MR. WELSH: Did Bayer tell them?
11     Q. Yes, did Bayer tell them.
12     A. No, not to my knowledge.
13     Q. When Mr. Ramsden and others told the
14 plaintiffs that this was a win-win situation for
15 them, did he tell them it was a win-win situation
16 because their benefits were going to be the same or
17 better when they went to EFTC?
18     A. I can't comment anything other than what is
19 already in testimony. I don't know.
20     Q. Did you ever speak to Mr. Ramsden before you
21 came here today?
22     MR. WELSH: You mean after Mr. Ramsden
23 left the corporation?
24     Q. Let's start with that. Did you ever speak

---

37 (Pages 142 to 145)

David Marr

Page 166

1  that rule was in effect at that time. But Bushy
2  Park has a sick day policy where, you know, they're
3  allowed so many set number of days.
4      Q. But the one where I described to you you
5  would get it indefinitely as long as it wasn't
6  abused applied to the Agfa Division in Wilmington,
7  correct?
8      A. Yes, to the extent that you'd also tie into
9  short-term disability benefits after eight
10 consecutive days of absence.
11     Q. Now, on B00772 on Exhibit 17 toward the
12 bottom third it has the words it looks like "due
13 diligence."
14     A. Yes, I see it.
15     Q. Can you read that line, please?
16     A. "Due diligence started, sharing employee
17 lists, employee meetings July 22nd."
18     Q. What's that mean?
19     A. I think it was a comment that just the due
20 diligence process had already started. I don't know
21 what more I can add to that.
22     Q. What's due diligence process mean?
23     A. Oh, it's the process where the business
24 leaders get together and go through to make sure

Page 167

1  that the deal is, you know, financially a sound deal
2  and evaluates records and documents and so forth.
3      Q. What was the purpose of this meeting of July
4  22nd, '98 in which you took notes?
5      A. The purpose of this meeting was really for
6  the benefit of Norm Beasley. Norm as I said had
7  caught wind that something was going on on the EFTC
8  transaction and had thoughts and questions in terms
9  of what was going to happen relative to the pension,
10 the savings plan and so on and so forth and wanted
11 to discuss with representatives of Wilmington
12 management, Bayer Corporation Wilmington management
13 as well as EFTC Auggie Breuhlman I believe to work
14 out what the best way to handle the transition of
15 benefits was.
16     Q. Now, Breuhlman was with EFTC, correct?
17     A. Yes.
18     Q. Where did this meeting take place?
19     A. This meeting took place in Wilmington.
20     Q. So you flew up or drove up for it?
21     A. I can't remember. At the time I probably
22 flew.
23     Q. Was Rodney Willis at this meeting?
24     A. To the best of my recollection, yes.

Page 168

1      Q. And Mr. Ramsden and Mr. Paige, they were at
2  this meeting, too?
3      A. Yes. That's what my notes reflect.
4      Q. Let's go back to Exhibit 58. I think I've
5  asked you about paragraph No. 8, all meetings,
6  strategic and otherwise and communications within
7  Bayer about what they were going to say to the
8  plaintiffs, correct?
9      A. Yeah, to the ex -- yes.
10     Q. Anything you can recall that you haven't
11 told me about that covers that topic?
12     A. Not at this time.
13     Q. Why didn't Bayer put in writing to the
14 plaintiffs some type of description or announcement
15 in writing as to what was going on? Why was it not
16 put in writing?
17         MR. WELSH: Objection, what's going on.
18     Q. Let me rephrase the question. Why didn't
19 Bayer put in writing to the plaintiff Board Shop
20 employees in this case that the Board Shop was going
21 to be sold?
22         MR. WELSH: Objection. You may answer.
23     A. I don't know whether there was anything in
24 writing. I can't speak to whether anything came out

Page 169

1  from the meetings that were held. But certainly
2  there were discussions based on my understanding of
3  the documents that employees were advised it would
4  be sold.
5      Q. I understand there were verbal discussions,
6  there were meetings. Are you aware of any written
7  communications to the plaintiffs saying that the
8  Board Shop was going to be sold and that they would
9  have an opportunity to accept a new job at EFTC?
10     A. I'm not aware of any written communications.
11     Q. Can you tell me why Bayer did not send a
12 written communication to the plaintiffs in that
13 regard?
14     A. I can't --
15         MR. WELSH: Objection. You may answer.
16     A. I can't say. I don't know.
17     Q. Did Bayer ever say to any of the plaintiffs
18 in writing, give them in writing a comparison of the
19 benefits of EFTC and Bayer to help them make their
20 decision as to whether to accept a job with EFTC?
21     A. No information other than the benefit
22 presentation that I'm aware of were they given a
23 comparison of EFTC benefits to Bayer benefits.
24     Q. This is Fiorilla Exhibit 2 which we talked

43 (Pages 166 to 169)

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

David Marr

Page 170

1  about with Julie Haley?
2      A. That's correct.
3      Q. But that doesn't say anything about EFTC's
4  benefits, it only talks about Bayer's?
5      A. That's correct.
6      Q. Would it have been sound Human Resources
7  practices to enable people to make an informed
8  decision to put something in writing to the
9  employees saying, here's a comparison of benefits to
10  help you decide?
11      MR. WELSH: Objection. You may answer.
12      A. From my experience when we've had other
13  acquisitions, and I can speak on the acquisition
14  side, we have never tried to go down and do a
15  comparison of what one company's benefits were
16  relative to the new company or Agfa in that case.
17  It doesn't serve any purpose. The new benefit is
18  what it is, and that's what you're entitled to. As
19  it relates to the Severance Plan, it's not relevant.
20  And the only part that's relevant is the wage. But
21  we were typically in these meetings looking to try
22  to as best we could within the parameters of the
23  EFTC plan try to do what we could do for our
24  employees.

Page 171

1      Q. When you say it doesn't serve any purpose,
2  did you mean it doesn't serve any purpose for the
3  benefit of Bayer?
4      A. In explaining to the employee what it is
5  that they had versus what they have today.
6  Employees can figure that out. They don't need us
7  to point that out to them.
8      Q. On what basis do you say they can figure
9  that out?
10      A. They were going to be having EFTC meetings
11  and they would be advised what EFTC would provide.
12      Q. Well, then, if they didn't need to have
13  anybody explain to them to figure it out, why did
14  Ms. Haley show them the Benefits Highlights package
15  in the meeting that we marked as Fiorilla Exhibit 2?
16      MR. WELSH: Objection. You may answer.
17      A. Because certain people were entitled to
18  certain benefits from Bayer even after the move to
19  EFTC.
20      Q. Oh. So this only covered people, this
21  Fiorilla 2 only covered people who would have been
22  entitled to benefits after they left?
23      A. That's my recollection, yes.
24      Q. From Bayer?

Page 172

1      A. From Bayer.
2      Q. Did you come to believe this was a big event
3  in the employment lives of these people with the
4  Board Shop especially people who have been there for
5  more than ten years?
6      MR. WELSH: Objection. You may answer.
7      A. It's a change.
8      Q. It was a very significant change in their
9  lives, wouldn't you agree?
10      A. Yes, it is.
11      Q. And these people were lay people when it
12  came to benefits and Human Resources people,
13  correct?
14      MR. WELSH: Objection. You may answer.
15      A. Yes.
16      Q. And they didn't have any knowledge like you,
17  somebody like you might have in terms of the
18  intricacies and the workings of 401K plans, pension
19  plans, loans against plan, tax consequences, medical
20  retirement benefits and the math and the nuances of
21  the language, would you agree with that?
22      MR. WELSH: Objection. You may answer.
23      A. Yes; that's correct.
24      Q. So then why wouldn't it have been a good

Page 173

1  idea -- strike that. And you in the Human Resources
2  were to serve the employees; is that true?
3      MR. WELSH: Objection. You may answer.
4      A. Yes, we were there.
5      Q. Or were you there to serve the employees or
6  were you to serve the interest of Bayer?
7      MR. WELSH: Objection. You may answer.
8      A. I think it's a combination of both. I mean,
9  it's the employee and management.
10      Q. Equally?
11      MR. WELSH: Objection. You may answer.
12      A. I think it depends on the situation.
13      Q. Well, let's talk about this situation. In
14  this situation where there was a sale to EFTC, was
15  Human Resources looking out more for the interest of
16  the plaintiff employees or were they more looking
17  out for the interest of Bayer Corporation?
18      MR. WELSH: Objection. You may answer.
19      A. I think that both interests were being
20  looked at. I think one of the reasons that Norm
21  Beasley came was to evaluate all of the various
22  benefit programs to try to work out a deal that
23  would be more palatable, for lack of a better word.
24  I know that we evaluated things like the difference

44 (Pages 170 to 173)

David Marr

---

Page 174

1  in medical costs and recognized it would be
2  out-of-pocket expenses employees did not have today
3  and that those were discussed. I don't recall, I
4  believe those numbers were built into the pay for
5  the Board Shop employees.
6      Q. I understand there was a lot of discussion
7  about it and a lot of inquiry and Norm Beasley was
8  very interested in this. But my question is very
9  simple. Was the Human Resources Department in which
10 you were serving looking out more for the interest
11 of Bayer or were they looking out more for the
12 interest of the plaintiff employees who were going
13 to be terminated from Bayer and offered a job with
14 EFTC?
15     MR. WELSH: Objection. Asked and
16 answered, and it's a compound question. You may
17 answer.
18     Q. You can answer.
19     A. I believe both interests were looked at.
20     Q. Equally?
21     A. I couldn't --
22     MR. WELSH: Objection.
23     A. -- begin to balance the two.
24     Q. You don't know one way or the other?

---

Page 175

1      A. I do not know.
2      MR. WELSH: Is it a good time for a
3  break?
4      MR. ROACH: Sure.
5      (Recess held.)
6      (Matthew Guamci, Law Clerk present.)
7      Q. You use the word more palatable in talking
8  about whether to tell the employees the differences
9  in the benefits between EFTC and Bayer. Do you
10 remember that?
11     A. Yes. If I could have my response.
12     (Requested answer read back.)
13     Q. In use of your term in response to a prior
14 question about more palatable, do you mean more
15 palatable for Bayer or more palatable for the
16 employees?
17     MR. WELSH: Objection. You may answer.
18     A. No, I meant more palatable for the employees
19 in the sense we were looking out for their
20 interests.
21     Q. "We" meaning Bayer?
22     A. Yes.
23     Q. And in looking out for their interest,
24 wouldn't it have been a good idea then being the

---

Page 176

1      layperson they were and not understanding all of the
2  different nuances of the plans, to put something in
3  writing to them spelling out the differences between
4  EFTC on one side and Bayer on the other side?
5      MR. WELSH: Objection. Asked and
6  answered. Objecting on the grounds. You may
7  answer.
8      Q. You may answer.
9      A. As I said, we have not in other acquisitions
10 put up comparisons and I didn't -- you know, I don't
11 think there's a need to put the comparisons up. The
12 EFTC people were better equipped to address the
13 benefits that they offer, and we presented those
14 benefits that related to what employees were
15 entitled to from Bayer.
16     Q. If you had been an employee of the Board
17 Shop, would you have wanted a comparison, somebody
18 to have put it together for you in Human Resources
19 and advise you as to which benefits are better?
20     MR. WELSH: Objection. You may answer.
21     Q. You can answer.
22     A. If I were an employee, maybe. I don't know.
23     Q. In looking at your Answers to
24 Interrogatories, Exhibit No. 27, in answer to No. 7

---

Page 177

1  on page 7 you said, "At the time of the acquisition
2  of the print circuit board business by EFTC, local
3  Human Resources officials would have made the
4  initial determination of severance pay eligibility."
5  Did I read that correct?
6      A. Yes.
7      Q. Who were the local Human Resources officials
8  who made the initial determination of severance pay
9  eligibility?
10     A. The local Human Resource official Rod
11 Willis.
12     Q. Well, it says officials. Is there anybody
13 else other than him and Human Resources?
14     A. He was the top HR person.
15     Q. But you said officials meaning more than
16 one, right, Human Resource officials, right?
17     A. Local could -- I don't know. I don't know
18 why the "s" is there.
19     Q. And on what basis do you say that Mr. Willis
20 made the initial determination?
21     A. That was the normal practice.
22     Q. Was it the practice in this case?
23     A. To the best of my knowledge, yes.
24     Q. And was Mary Leonard one of the other

---

45 (Pages 174 to 177)

11/14/2006

David Marr

Page 178

1    officials that would have made the initial
2    determination?
3    A. She may have been involved. I do not know.
4    Q. You don't know one way or the other?
5    A. No.
6    Q. In looking at her deposition transcript that
7    you said you reviewed, do you know whether from
8    reviewing that that she was involved in that
9    process?
10   A. She was involved in as we discussed earlier
11   meetings with employees and advising them that they
12   were not eligible for severance. I don't know
13   whether she was part of the initial determination.
14   Q. And what was Rod Willis's initial
15   determination?
16   A. To the best of my knowledge, it was that
17   these employees were not entitled to severance
18   benefits under the Plan.
19   Q. And on what do you base that statement that
20   he made that determination?
21   A. General understanding. I don't have
22   anything that comes to mind that I can support other
23   than just my general recollection.
24   Q. Well, what I want to know is what your

Page 179

1    general recollection is based upon. That's all.
2    MR. WELSH: Asked and answered. You can
3    answer again.
4    Q. What is your general recollection based on?
5    A. General recollection of the event.
6    Q. Well, did you read Mr. Willis's deposition
7    transcript?
8    A. I did not.
9    MR. WELSH: Asked and answered.
10   Q. You did not; is that correct?
11   A. I did not.
12   Q. And you didn't speak to Mr. Willis; is that
13   right?
14   A. That's correct.
15   Q. So I guess what I'm getting to is. What
16   specifically did you rely upon in saying here under
17   the pains and penalties of perjury that Mr. Willis
18   made the initial determination?
19   MR. WELSH: Asked and answered for the
20   third time. You may answer again.
21   Q. Go ahead.
22   A. Mr. Willis was the local Human Resources
23   official at Wilmington.
24   Q. So you're just assuming he made the initial

Page 180

1    determination?
2    MR. WELSH: Objection.
3    Q. Is that right?
4    A. To the best of my recollection he made the
5    initial determination.
6    Q. Again, I don't want to be redundant in my
7    questioning, however, I would like some specifics --
8    MR. WELSH: You asked the same question
9    four times. He gave you all the specifics he has.
10   Asking it a fifth time doesn't help.
11   Q. Is all the specifics you have, sir, what you
12   just testified to?
13   A. Yes, to the best of my knowledge.
14   Q. And then the next sentence says, "Such
15   decision was subject to review by Mr. Romps and
16   ultimately by the Bayer ERISA Review Committee in
17   Pittsburgh, Pennsylvania." Did I read that
18   correctly?
19   A. That's correct.
20   Q. And did you know whether Mr. Romps looked at
21   a decision by Mr. Willis?
22   A. I do not have any specific knowledge on that
23   point. But again, from a procedural standpoint, Mr.
24   Romps was Mr. Willis's immediate supervisor.

Page 181

1    Q. So you don't have any specific facts where
2    you stated under oath that Mr. Romps looked at Mr.
3    Willis's decision, but what you're saying is that
4    that normally would have been procedure so you're
5    making an assumption?
6    MR. WELSH: No. Your interrogatory says
7    identify the persons who had final authority. It
8    doesn't say who made the decision. So your
9    characterization of your interrogatory, Steve, is
10   inaccurate.
11   MR. ROACH: That's my question. This is
12   how he answered it.
13   MR. WELSH: You're asking him under oath
14   you said this. What your quotation to him of what
15   he said under oath is a mischaracterization of the
16   interrogatory.
17   MR. ROACH: Do you want to argue about
18   it later in court?
19   MR. WELSH: I want you to be straight
20   with him on the questions and not represent to him
21   that the interrogatory is something other than what
22   he said.
23   MR. ROACH: John, this is what he said.
24   MR. WELSH: No. This is something which

David Marr

Page 186

```
 1      A. Not a procedure, no.  Not for a procedure
 2  from Mr. Romps.  If there were separate procedures
 3  for filing claims through the ERISA Review
 4  Committee.
 5      Q. I'm not talking about filing claims by
 6  employees.  I'm talking about once Mr. Willis makes
 7  a decision, was there a requirement that he then
 8  tell Mr. Romps and the Bayer ERISA Review Committee
 9  as to what his decision was with respect to
10  severance?
11      A. No, there was not a requirement.
12      Q. On the next page, page 8 I think that was in
13  response to a question about who was responsible for
14  drafting.  And I think we went through this already.
15  Pardon me if I ask you this.  Who was in the Bayer
16  Central Benefits Department.  I think you mentioned
17  Mr. Paul Yenneral.  Was there anybody else?
18      A. Paul Yenneral was not part of the Central
19  Benefits Group.  He was outside counsel that they
20  would use for drafting plan documents, Summary Plan
21  Descriptions, et cetera.
22      Q. Who was in the Central Benefits Department
23  unless you've already testified to that?  I can't
24  remember if you did.
```

Page 187

```
 1          MR. WELSH:  You may testify to it again.
 2      A. John Schulz was the Vice President of
 3  Compensation and Benefits, Joyce Fletcher and Sue
 4  Murphy.
 5      Q. So the people who are on the Bayer ERISA
 6  Review Committee also comprised the Bayer Central
 7  Benefits Department, the same individuals?
 8      A. They were Central Benefits.  I believe they
 9  were on the ERISA Review Committee, but I am not
10  100% certain.
11      Q. What was the purpose of the ERISA Review
12  Committee?
13          MR. WELSH:  Objection.  You may answer
14  within your personal knowledge and belief.
15      A. The ERISA Review Committee is established to
16  look at employee claims and evaluate whether the
17  terms and the conditions of the Plan were followed
18  in how a benefit was provided or not provided.
19      Q. Is that basic claims as well as appeals or
20  just appeals?
21      A. Initial claims were typically at the local
22  level, and then the employee would have the right to
23  appeal through the ERISA committee by completing a
24  form, including any references to Plan documents,
```

Page 188

```
 1  Summary Plan Descriptions or other relevant
 2  documents to the committee for their review.
 3      Q. So the Bayer ERISA Review Committee only
 4  dealt with claims, I'm sorry, appeals of denials of
 5  claims not initial claim determinations, correct?
 6      A. That is when the employee would be advised
 7  in writing of the denial.
 8          MR. WELSH:  That was not his question.
 9      A. I'm sorry.
10      Q. That's not my question, sir.  My question is
11  this.  Did the Bayer ERISA Review Committee only
12  deal with appeals of a denial?
13      A. Yes.
14      Q. They did not deal with situations such as
15  here where the employees were told that they were
16  not entitled to benefits and there was no written
17  appeal, correct?
18      A. Correct.
19      Q. Because there was no written appeal in this
20  case that you know of?
21      A. To the best of my knowledge; that's correct.
22      Q. And when I say there was no written appeal,
23  I'm talking about before they hired an attorney,
24  meaning me, to advocate for them, correct?
```

Page 189

```
 1          MR. WELSH:  Pardon me.  What's the
 2  question?
 3      Q. There was no written appeal by the employees
 4  before they hired an attorney?
 5      A. That's my understanding, yes.
 6      Q. I'm going to show you a document that was
 7  drafted by Ms. Leonard marked as Leonard Exhibit 46.
 8  She did a chart with your name on it.  Does that
 9  accurately reflect the hierarchy?
10          MR. WELSH:  As of January through
11  September 1998?
12          MR. ROACH:  Correct.
13      A. No, not exactly.
14      Q. What in it is incorrect, sir?
15      A. Julie Haley and Terry Mahoney didn't report
16  to me until, directly report to me until after the
17  Agfa Corporation was formed.
18      Q. What I'd like you to do is for 1998 for the
19  same period of time January through --
20          MR. WELSH:  I assume that's September
21  1st?
22      Q. Yes. -- September 1st of 1998 draw a chart
23  to your understanding of what the lines of report
24  were within Bayer and Human Resources.
```

48 (Pages 186 to 189)

David Marr                                                    11/14/2006

Page 190

1    A. Okay. So this would be for Agfa Division?
2    Q. Agfa Division of Bayer. That's where you
3  worked, right?
4    A. Correct.
5    Q. Agfa Division of Bayer.
6    A. Where we all worked.
7        (Marked, Exhibit 60, organizational
8  chart.)
9        (Marked, Exhibit 61, letter dated April
10  5, 2002 with attachments.)
11    Q. What we've now marked as Exhibit 60 is the
12  flow chart as you recall of the Human Resources
13  Department that existed in '98 for the Bayer/Agfa;
14  is that correct?
15        MR. WELSH: Objection. You may answer.
16    A. To the best of my knowledge. I don't have
17  all the administrative people in here. And like I
18  said, there were a number of people that came and
19  went during, you know, the last several years.
20    Q. So when you said Ms. Leonard's chart was a
21  little bit off, you've now drawn what your memory is
22  of what the lines of communication were; is that
23  correct?
24    A. That's correct. There was a dotted line

Page 191

1  relationship with Julie and myself.
2    Q. Julie Haley?
3    A. Julie Haley I believe at that time, she was
4  more of an HR manager.
5    Q. Where do you fit in on Exhibit 60, please?
6    A. Manager CMB.
7    Q. Can you put your name next to that, please?
8        (Witness complied.)
9    Q. Now, I'd like to show you what we marked as
10  Exhibit 61 and also what we marked as Exhibit 54.
11  Did you ever see those before, those documents? And
12  54 is Willis 54 and 61 is Marr 61.
13    A. I've seen this document at some point.
14    Q. Exhibit 54 you've seen, Willis 54?
15    A. Yes.
16    Q. Have you ever seen Marr Exhibit 61? And for
17  the record it's a four-page document. The first two
18  pages are a letter from me dated April 5th, 2002 to
19  Mr. Heikke Koskimies, K O S K I M I E S, and
20  attached to it are the names of the plaintiffs in
21  this case, a list. Have you had an opportunity to
22  look at Exhibit 61, please, Mr. Marr?
23    A. I'm almost through, yes.
24    Q. Okay. Go ahead.

Page 192

1    A. I can't swear that I saw this document.
2    Q. And what is that document.
3    A. This is Exhibit No. 61.
4        MR. WELSH: Just for the record it's
5  clear, I want to put a continuing objection on the
6  record concerning inquiries of this document by this
7  witness. But, sir, you are able to answer any
8  questions Mr. Roach asks you based on your personal
9  knowledge and belief.
10    Q. Does that appear as though the plaintiffs'
11  lawyer in this case, meaning myself, is seeking
12  benefits, severance benefits on their behalf in this
13  case?
14    A. From what I can tell, yes.
15    Q. Would that constitute an appeal for their
16  benefits in this case?
17        MR. WELSH: Objection. You may answer.
18    A. No, it would not.
19    Q. Why not?
20    A. Mr. Koskimies is not part of the ERISA
21  committee.
22    Q. If someone is going to appeal a denial of
23  severance, who would it be sent to?
24    A. The ERISA committee. I think it was called

Page 193

1  the Benefit Administrative Committee in Pittsburgh.
2    Q. And if you look at Exhibit 54, the Willis
3  deposition ADM 6, does it say in there that the
4  appeal should go to the committee and what their
5  address is?
6    A. It does not.
7    Q. Now, with respect to Exhibit 54 from Mr.
8  Salek, did Mr. Salek respond to this letter of April
9  5th from me?
10    A. Yes, he did.
11    Q. And in there he said the time to appeal the
12  decision expired a long time ago and that they would
13  not consider the matter again; is that correct?
14    A. Yes, I believe I read that in here.
15    Q. And can you tell me. Did anybody bring this
16  letter, these two letters to your attention at any
17  time during this process after say January 2001?
18        MR. WELSH: Objection. You may answer.
19    Q. Either of these letters.
20    A. I may have seen this letter. I don't recall
21  seeing this letter.
22    Q. When you say you may have seen this letter,
23  you mean Exhibit 54?
24    A. Exhibit 54.

49 (Pages 190 to 193)

David Marr                                                                11/14/2006

Page 230

1   I think he's referring to an attachment of Salek's
2   letter to you, if I'm not mistaken. Either that or
3   a letter that we sent to you earlier when you were
4   suing Agfa for the benefits. I think at that time
5   we transmitted to you a document that had
6   information on that. That's my memory.
7        MR. ROACH: We can get into it later
8   when you designate somebody. I don't need to ask
9   him about it.
10       MR. WELSH: Okay.
11       MR. ROACH: No. 27. Was that something
12  he was not designated for, John? I can't remember.
13       MR. WELSH: Yes.
14       MR. ROACH: Not designated for.
15   Q. Anything else that you can recall that I
16  haven't asked you, Mr. Marr, about the areas in
17  which you've been designated to speak on behalf of
18  Bayer today? Anything else that comes to mind?
19   A. No, nothing comes to mind.
20       MR. WELSH: Just so the record is clear
21  with respect to 27. We will not be designating
22  anyone on that because again Bayer Corporation does
23  not have any information that can testify to
24  concerning the Agfa Corporation. I think that

Page 231

1   objection is similar to the one we made with respect
2   to No. 11.
3        MR. ROACH: We can argue about that
4   later.
5        MR. WELSH: Right. I'm just making
6   clear I say what my position is.
7        MR. ROACH: It was produced to us in
8   this case.
9        MR. WELSH: There's a lot of stuff that
10  was produced to you that was not relevant
11  whatsoever.
12   Q. Can you tell me, sir, whether you ever heard
13  of a process or program within the Bayer/Agfa
14  Division either in Wilmington or otherwise of a
15  voluntary layoff option where people once they
16  learned that there was going to be a reduction in
17  force, they could volunteer and to get severance to
18  volunteer for it?
19   A. I wouldn't say it's a program. I mean, from
20  time to time employees might, you know, raise their
21  hand and say if there is going to be any type of a
22  reduction in the near future, please, you know, keep
23  me in mind if that's going to happen.
24   Q. And did that happen from time to time?

Page 232

1   A. Yes, it's happened from time to time.
2   Q. When did that process -- I know you don't
3   want to call it a program. But when did that
4   process, for lack of a better term, begin in the
5   time that you've been with Bayer or its
6   predecessors, Compugraphic or whoever?
7   A. Yeah, I don't know. I don't know when it
8   began.
9   Q. I believe your first job was with
10  Technicon --
11   A. Technicon Instruments Corp.
12   Q. Technicon Instruments and then it became
13  Miles, Inc.?
14   A. Correct.
15   Q. Did you hear of it back then when you were
16  working with Miles, Inc. and Technicon Instruments?
17  Is it Instruments?
18   A. Yes, it's Instruments. I know that
19  Technicon had a similar process where occasionally
20  people would, you know, raise their hands. I don't
21  recall if at that time when Miles purchased us, if
22  that process, if you will, continued.
23   Q. And then did that process come into
24  existence or continue to be in existence as of

Page 233

1   September of 1994 when you were working for the Agfa
2   Division of Bayer?
3   A. To the best of my knowledge, yeah, it was --
4   Q. Is that a yes?
5   A. Yes.
6   Q. It was what?
7   A. It was a practice that occurred.
8   Q. And did it cover all of the Agfa Divisions
9   throughout the country where they existed or was it
10  just Agfa in Wilmington?
11   A. No. It was a practice that, you know, any
12  Agfa employee could raise their hand. But to be
13  considered, you would have to raise your hand and
14  there would have to be a reduction that occurs, and
15  then you would have to be chosen to leave the
16  organization during that reduction.
17   Q. So this would include the employees that
18  were in Bushy Park, South Carolina; Teterboro, New
19  Jersey and Wilmington, Massachusetts, correct?
20   A. Yes, it could.
21   Q. Any other Agfa Division areas where this
22  applied?
23   A. In what year, 1998?
24   Q. Say from 1994, September of '94 when you

59 (Pages 230 to 233)

11/14/2006

David Marr

Page 234

1  came to work for the Agfa Division of Bayer.
2      A. You mentioned Bushy Park?
3      Q. South Carolina; Teterboro, New Jersey and
4  Wilmington, Massachusetts. Any other areas?
5      A. In 1998 we did have another facility in
6  Ranchburg, New Jersey. Ranchburg, New Jersey was a
7  manufacturing facility.
8      Q. And that process would have been part of
9  that branch as well, correct?
10     A. Yes.
11     Q. What about where you were in your office in
12  Ridgefield, New Jersey?
13     A. Ridgefield Park, New Jersey.
14     Q. Did the practice take place there, too?
15     A. Yes. An employee could raise their hand and
16  say, please consider me for termination in the event
17  there's a reduction in force coming up.
18     Q. Was there a process where the management
19  from Bayer/Agfa Division would let people know that
20  there was a reduction in force coming up and then
21  people could volunteer for the layoff?
22     A. No. It's not something that we would
23  typically announce. Employees sometimes might get
24  wind of things through the grapevine, if you will.

Page 235

1  But there was no we're actively looking for
2  volunteers.
3      Q. Do you know about how many — strike that.
4  Do you know whether there was a particular form that
5  was in force and effect or that was commonly used by
6  Bayer/Agfa for this process?
7      A. No, I'm not aware of any form.
8      Q. Did you read the Mary Leonard deposition
9  where she said there's an Expression of Interest
10  Form?
11     A. I did.
12     Q. Would that have been just been particular to
13  the Agfa Division in Wilmington?
14     A. No. I think from a timing standpoint there
15  might be some discrepancies in terms of what she had
16  said. My understanding is that we began using the
17  Expression of Interest Form at a later date than
18  1998. I don't believe it was in effect at that
19  time.
20     Q. Are you familiar with a form called a
21  Voluntary Reduction in Force Selection Form?
22     A. No, I can't say I am.
23     Q. Before the Expression of Interest Form that
24  Ms. Leonard testified about, was there another type

Page 236

1  of form that was used for this process that you
2  described?
3      A. Not that I'm aware of, no.
4      Q. On Exhibit 24, Ramsden Exhibit 24, where, if
5  anywhere, would there be a designation for somebody
6  that would have participated in this process,
7  volunteer for a layoff and receive severance?
8          MR. WELSH: Objection. You may answer
9  within your personal knowledge and belief.
10     A. I believe it would just indicate involuntary
11  termination.
12     Q. Where would that be, under termination date
13  and date last worked?
14     A. Yeah. It could be in the comment section or
15  it could be one of the codes which would, as I said
16  which would relate back to the different types of
17  separation. I just don't know what that code might
18  be.
19     Q. Is there anything on this Change Form which
20  would indicate whether anybody is getting paid
21  severance?
22     A. Yes.
23     Q. Where is that?
24     A. It would be in the comment section.

Page 237

1      Q. Comment section where it says to EFTC here?
2      A. That's correct.
3      Q. What would it commonly say if someone were
4  entitled to severance, how would it —
5      A. It would be a direction to our payroll
6  department to please pay severance for X number of
7  weeks.
8      Q. And for those people who participated in
9  this process, that's what it would say on this
10  Change Form?
11     A. Correct.
12     Q. Do you know how many people over the course
13  of the years since you've been with Bayer and its
14  predecessors who participated in this voluntary
15  process of receiving severance voluntary for layoff?
16         MR. WELSH: Objection. You may answer
17  within your personal knowledge and belief.
18     A. I really don't have a precise number of how
19  many people may have volunteered.
20     Q. Can you give me a rough number?
21     A. I really don't feel comfortable doing that.
22     Q. Well, I know you don't know the precise
23  number. All I'm looking for is your best memory as
24  to a ballpark as to how many people you think may

60 (Pages 234 to 237)