Rodney Willis

10/17/2006

1

Volume:  I

Pages:  1-228

Exhibits: 50-54


UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS


C.A. No. 04-10728-REK


- - - - - - - - - - - - - - - - - - - x

JOSEPH ATTARDI, et al,

        Plaintiffs

vs.

BAYER CORPORATION, BAYER CORPORATION SEVERANCE

PAY PLAN,

        Defendants

- - - - - - - - - - - - - - - - - - - x

DEPOSITION OF RODNEY WILLIS

Tuesday, October 17, 2006 - 10:10 a.m.

Roach & Wise

31 State Street - 8th Floor

Boston, Massachusetts

- - - - - - - - - -

Reporter:  Maureen J. Manzi, CSR, CLR

Rodney Willis

10/17/2006

**2**

```
1    APPEARANCES:
2    *** ROACH & WISE
3        (BY STEPHEN A. ROACH, ESQ.)
4        31 State Street - 8th Floor
5        Boston, Massachusetts 02109
6        (617) 723-2800
7        Counsel for the Plaintiffs
8
9    *** BELLO, BLACK & WELSH, LLP
10       (BY JOHN F. WELSH, ESQ.)
11       535 Boylston Street - Suite 1102
12       Boston, Massachusetts 02116
13       (617) 247-4100
14       Counsel for the Defendants
15
16
17
18
19
20
21
22
23
24
```

**3**

```
1           I N D E X
2    RODNEY WILLIS
3    BY MR. ROACH          4
4
5
6
7
8           E X H I B I T S
9    Exhibit 50. Subpoena.................. 11
10   Exhibit 51, Benefit Eligibility from
11   SEV 4 of the Summary Plan Description... 47
12   Exhibit 52, Summary Plan Description.... 83
13   Exhibit 53, pages 6 and 7 of the Bayer
14   Corporation Severance Pay Plan of Fiorilla
15   9.................................. 94
16   Exhibit 54, letter dated June 3, 2002.. 224
17
18
19
20
21
22
23
24   *Original exhibits retained by Attorney Roach.
```

**4**

```
1           P R O C E E D I N G S
2        RODNEY WILLIS, having been
3    satisfactorily identified by the production of his
4    Massachusetts drivers license, and duly sworn by the
5    Notary Public, was examined and testified as
6    follows:
7        MR. ROACH: The parties have stipulated
8    that all objections, except as to form, will be
9    reserved to the time of trial; motions to strike
10   will be reserved to the time of trial. The witness
11   will read and sign but he need not do so before a
12   notary. And he will sign within 30 days of receipt
13   from copy of the transcript to Mr. Welsh. Mr.
14   Welsh, are you representing Mr. Willis today?
15       MR. WELSH: In his capacity as an agent
16   of Bayer.
17          DIRECT EXAMINATION
18   BY MR. ROACH:
19       Q. Can you state your name, please?
20       A. Rodney Edward Willis.
21       Q. Mr. Willis, what we just stipulated to, your
22   counsel Mr. Welsh and I is that after the deposition
23   is completed, you'll get a copy of the transcript
24   and then on a separate sheet called an errata sheet
```

**5**

```
1    you must sign it after you read the transcript. If
2    you don't read it -- I'm sorry. If you don't sign
3    it, that means your statements stand as stated today
4    on the transcript, but you do have an opportunity to
5    make any corrections or changes if you think they
6    are needed. I will tell you though, however, if
7    there are substantial changes or anything
8    significant or material, I might reserve the right
9    to come back and ask you more questions to clarify
10   what you've changed.
11       MR. ROACH: I think that's it. Right,
12   John?
13       MR. WELSH: Yes, that's fine.
14       Q. Where do you live, sir?
15       A. I live in Marlboro.
16       Q. What's your address?
17       A. 26 Country Club Circle.
18       Q. Date of birth.
19       A. July 6, 1951.
20       Q. Social Security number?
21       A. Why do you need my Social Security number?
22       Q. I'm asking the questions, sir.
23       MR. WELSH: Can we have a stipulation
24   that his Social Security number will be reserved on
```

2 (Pages 2 to 5)

Rodney Willis

**38**

1  his termination. I just wanted to note that. If
2  you don't want to act on that, that's fine.
3      Q. So under this you would have been entitled
4  to 32 weeks of compensation, correct?
5      A. Yes.
6      Q. And instead you opted for 26 weeks roughly,
7  right?
8      A. Um-hmm.
9          MR. WELSH: Objection. No foundation.
10  You may answer.
11      Q. I believe that's what you testified to,
12  correct?
13          MR. WELSH: No, it's not what he
14  testified to.
15      Q. You received about six months of pay, right,
16  half your salary?
17      A. I had about six months of pay, yes.
18      Q. And that would have been about 26 weeks,
19  correct?
20      A. Twenty-six weeks.
21      Q. Is there some reason you chose to accept
22  that as opposed to the 32 weeks which --
23      A. Well, you need to understand as I said
24  before, I didn't take the severance agreement.

**39**

1  Okay. So this doesn't really matter. I asked for
2  some things that were beyond what's in there, and
3  after all was said and done I agreed with the
4  trade-offs.
5      Q. Back to page 9 of Exhibit 47. Can you tell
6  me, were you familiar with pages 9 and 10 when you
7  were director of Human Resources at Agfa?
8      A. Um-hmm.
9      Q. Is that a yes?
10      A. Yes.
11      Q. Pages 9 and 10 over into 11 talk about or
12  discuss when employees are not entitled to benefits,
13  correct, severance benefits? Is that correct?
14      A. I'm reading. Correct.
15      Q. Having looked at this, is this provision of
16  the Severance Pay Plan of Agfa Corporation different
17  in any material way to the Summary Plan Description
18  that was in effect at Bayer Corporation before Bayer
19  divested Agfa?
20          MR. WELSH: Objection. You may answer.
21      A. I don't know if it's different in any
22  material way. The Summary Plan Description would
23  have paralleled the plan document. Whether that's
24  material or not, I'll leave it to others to

**40**

1  determine.
2      Q. Let me show you what's been marked as
3  Fiorilla Exhibit 4. This is the Summary Plan
4  Description, and it contains the severance
5  provisions of the Summary Plan Description. It's
6  not the full book but just for purposes of
7  housekeeping we kept it to just the severance. Does
8  Fiorilla 4 constitute the Summary Plan Description
9  in effect in 1998 to your knowledge with respect to
10  the severance plan? And I direct your attention to
11  SEV 1 through 4 in particular.
12      A. Yes. This appears to be the document.
13      Q. Now, comparing that to the Agfa Corporation
14  Severance Pay Plan, pages 9 through 11, do you see
15  any material differences between the two of them?
16          MR. WELSH: Objection. You want him to
17  compare what on page 9 to 11?
18          MR. ROACH: Right, with page 4, SEV 4 of
19  the Summary Plan Description.
20      Q. Let me back up. That's a good question. As
21  the director of Human Resources I assume you were
22  familiar with the Summary Plan Description when you
23  were with Bayer/Agfa of the Bayer Severance Pay
24  Plan; is that correct?

**41**

1      A. That's correct.
2      Q. And you were also familiar with the Agfa
3  Corporation Severance Pay Plan; is that correct,
4  when you were with Agfa?
5      A. That's correct.
6      Q. Comparing pages 9, 10 and 11 of 47 to SEV 4
7  of Fiorilla Exhibit 4, my question is. Are there
8  any differences, material differences that you see
9  between the two of them?
10          MR. WELSH: Off the record. Take your
11  time. Take five or ten minutes if necessary.
12      Q. Well, take whatever time you need.
13          (Witness reading.)
14      Q. You've now had an opportunity to look at
15  them?
16      A. I'm still reading.
17      Q. Okay. Go ahead. Just for the record I'm
18  just looking at -- I just wanted you to focus on the
19  area of this Bayer Severance Pay Plan which talks
20  about where employees are not eligible for benefits.
21      A. Okay.
22      Q. Have you now looked at them and compared
23  them to Agfa?
24      A. No.

11 (Pages 38 to 41)

Rodney Willis

42

```
 1        Q. Maybe we can make this a little shorter.
 2   Let me ask you to just focus on a couple of
 3   questions in these two documents. Is that fair
 4   enough?
 5        A. That's fair enough.
 6        Q. I need you to focus on the bullet points 2
 7   and 3 on the middle page of SEV 4. Middle of the
 8   page of SEV 4 of Fiorilla Exhibit 4. Those two bullet
 9   points. As compared to --
10        A. I'm sorry. You said the middle?
11        Q. The third and fourth bullet points of SEV 4
12   of Fiorilla Exhibit 4. I'd like you to compare
13   those to the Agfa plan which is Leonard Exhibit 4?
14   sections (h), (i), (j) and (k), subsections (h),
15   (i), (j) and (k). Those are small letters by the
16   way in parens.
17        A. Okay.
18        Q. Do you see any difference between them?
19        A. No.
20        Q. Were you involved in the sale in any way in
21   terms of -- when I say involved, involved in dealing
22   with employment issues, employee issues of the sale
23   of the Board Shop to EFTC by Bayer in 1998?
24        A. My involvement -- yes. My involvement would
```

43

```
 1   have sprung from my role as director of HR.
 2        Q. And can you tell me, is it fair to say that
 3   the employees, the plaintiffs in this case were
 4   members of what was called the Board Shop within the
 5   Agfa Division of Bayer in Wilmington?
 6        A. I don't know that I can attest to that. The
 7   names, some of those names I recognize. But whether
 8   I can place them at the Board Shop or not, I don't
 9   know that.
10        Q. Well, is it fair to say that what was known
11   as the Board Shop was sold to EFTC?
12        A. Correct.
13        Q. And can you tell us whether you ever made
14   any determination under the Bayer Severance Pay Plan
15   as to whether those employees who are the plaintiffs
16   in this case were entitled to severance benefits
17   under the Summary Plan Description?
18        MR. WELSH: Under the plan or the
19   Summary Plan Description?
20        MR. ROACH: Under the Summary Plan
21   Description, Fiorilla Exhibit 4.
22        A. Yes, I can.
23        Q. And what did you determine?
24        A. That they were not eligible.
```

44

```
 1        Q. And on what did you base your determination?
 2        A. The second point, the company offers you a
 3   comparable position.
 4        Q. In looking at what we --
 5        A. Wait, wait.
 6        Q. Oh, I'm sorry.
 7        A. Offer you a comparable position. I've done
 8   a number of these kinds of activities, and each time
 9   to make sure that my understanding is correct I
10   usually refer to counsel as I did in this case. So
11   my interpretation alone is not what I rely on. I go
12   to counsel for their review and agreement or not
13   with regard to my interpretation.
14        Q. Who was the counsel with whom you conferred?
15        A. Bob Serafian.
16        Q. And did he confer with anybody?
17        MR. WELSH: Objection. You may answer.
18        Q. Outside counsel or any other attorney.
19        A. Presumably he did. My assumption would have
20   done both within the legal of Agfa or Bayer or
21   outside counsel, but I don't know where he went.
22        Q. But you conferred with Bob Serafian?
23        A. I did.
24        Q. And after having conferred with Bob Serafian
```

45

```
 1   and having reviewed the Summary Plan Description
 2   yourself which is Fiorilla Exhibit 4, what specific
 3   language in this Summary Plan Description did you
 4   determine that the plaintiffs in this case, the
 5   Board Shop employees were not entitled to severance
 6   benefits when they went to EFTC, were terminated
 7   from Bayer and went to EFTC?
 8        MR. WELSH: Objection. You may answer.
 9        Q. Let me rephrase the question. That was kind
10   of a long question. After conferring with Bob
11   Serafian and after looking at the Summary Plan
12   Description which is marked as Fiorilla Exhibit 4,
13   what language in the Summary Plan Description did
14   you base your conclusion that the plaintiffs were
15   not entitled to severance?
16        MR. WELSH: Objection. You may answer.
17        Q. Go ahead.
18        A. We offered comparable position. There was
19   no change in pay, and there was no need to relocate
20   beyond the distances spelled out in the plans. So
21   they met both of those conditions. It was a
22   transfer of assets, if you will. They were not
23   eligible for severance under the provisions of the
24   plan.
```

12 (Pages 42 to 45)

Rodney Willis

**46**

1    Q. And can you point to the language in the
2    Summary Plan Description that's part --
3    A. "The company offers you a comparable
4    position even if you choose not to accept it. Does
5    not require you to commute 35 miles or more further
6    than you did prior to your termination."
7    Q. Can you just point to where you were
8    reading, sir?
9    A. Here. (Indicating.)
10    Q. What I'd like you to do is take a red pen
11    and circle the bullet points on Fiorilla Exhibit 4.
12    If you don't have any objection, I can make
13    another --
14    MR. WELSH: No, no need to make another
15    copy.
16    Q. Why don't we do this.
17    MR. WELSH: I think you probably should.
18    MR. ROACH: Yeah, let's make another
19    copy of this and we'll mark it as a separate
20    exhibit.
21    Q. For the record we are going to mark as
22    Exhibit 51 a page SEV 4 of the Summary Plan
23    Description at issue in this case and it is taken as
24    well as from Fiorilla Exhibit 4. Mark that as

**47**

1    Exhibit 51.
2    (Marked, Exhibit 51, Benefit Eligibility
3    from SEV 4 of the Summary Plan Description.)
4    Q. Looking at what we've now marked as Willis
5    Exhibit 51, could you now circle, sir, on this page
6    the specific bullet points which you believe and on
7    which you based your decision that the plaintiffs
8    were not entitled to severance benefits, and try not
9    to hit the wording so it can be clear.
10    (Witness complied.)
11    Q. Have you now circled the wording on Exhibit
12    51 on which you relied?
13    A. I have.
14    Q. Why don't we just for the sake of clarity,
15    why don't we put a number, just put a number with a
16    circle around it so we can talk about bullets 1, 2,
17    3 and 4. Is it fair to say that you've circled four
18    paragraphs?
19    A. I have.
20    Q. Four bullet points; is that correct?
21    A. I have.
22    Q. Why don't we number them 1, 2, 3 and 4, if
23    you wouldn't mind, on Exhibit 51.
24    (Witness complied.)

**48**

1    Q. So if you can just take us through, please,
2    and explain referring to numbers 1, 2, 3 and 4 what
3    the basis of your decision was referring to those
4    paragraphs, please.
5    MR. WELSH: Objection. You may answer.
6    A. With regard to No. 1, we offered a
7    comparable position.
8    Q. When you say "we offered a comparable
9    position," who is "we"?
10    A. "We" represents Agfa.
11    Q. Were these Bayer employees under the Bayer
12    Severance Pay Plan? And I refer to Exhibit 4 of
13    Fiorilla.
14    A. Again, the severance plan that we relied on
15    was this one.
16    Q. Was the Bayer Severance Pay Plan which is
17    Fiorilla Exhibit 4?
18    MR. WELSH: Objection.
19    Q. I'm sorry. The Summary Plan Description.
20    A. Yes.
21    Q. So in light of Mr. Welsh's objection, I just
22    want to make sure we're clear what you're talking
23    about. So the language you relied upon was the
24    language in the Summary Plan Description from Bayer

**49**

1    that's been marked as Fiorilla Exhibit 4
2    specifically page SEV 4; is that correct?
3    MR. WELSH: Objection.
4    A. Yes.
5    Q. Now, when you said we offered the employees
6    another job, who was "we"?
7    A. Agfa.
8    Q. Agfa Corporation?
9    A. Agfa Corporation.
10    Q. And what job did Agfa Corporation offer to
11    the employees?
12    A. The one they had. The job they had.
13    Q. What was the job they had?
14    MR. WELSH: Objection. You may answer.
15    A. Whatever job they occupied at the time that
16    the transaction took place.
17    Q. In 1998 you were the director of Human
18    Resources --
19    A. That's correct.
20    Q. Let me finish. In 1998 you were the
21    director of Human Resources up in Wilmington for
22    Bayer/Agfa Division, correct?
23    A. Correct.
24    Q. And you were familiar with the employees

13 (Pages 46 to 49)

Rodney Willis

50

1 handling their personnel matters for the Board
2 Shop, correct?
3        MR. WELSH: Objection. You may answer.
4    A. I didn't handle their personnel matters for
5 the Board Shop.
6    Q. Who did?
7    A. Mary, Mary Leonard.
8    Q. Was she under you?
9    A. I guess one of my reports.
10    Q. So she was handling them on a day-to-day
11 basis but she worked under your direction?
12    A. Correct.
13    Q. So you had overall authority with respect to
14 Human Resources matters concerning these employees,
15 correct?
16    A. Correct.
17        MR. WELSH: Objection. You may answer.
18    Q. And these employees --
19        MR. WELSH: I'm going to ask you if you
20 can please slow it down so I can get my objections
21 in.
22        MR. ROACH: Just off the record.
23        (Off the record.)
24        MR. ROACH: We're going to stipulate

51

1 just for the sake of expediency that if Mr. Welsh
2 misses an objection between my question and Mr.
3 Willis's answer as long as the objection comes at
4 least right after the answer, I will allow it to
5 stand as an objection to that question. Is that
6 fair enough, Mr. Welsh?
7        MR. WELSH: That's fine.
8    Q. Looking at Exhibit 50, these people who are
9 plaintiffs here were Board Shop employees in 1998,
10 correct?
11        MR. WELSH: You may answer.
12    A. Correct.
13    Q. And they worked in the Board Shop area at
14 Agfa Division of Bayer up in Wilmington, Mass.,
15 correct?
16    A. Correct.
17    Q. And those are the people over which Mary
18 Leonard dealt with on Human Resources issues and
19 over which you ultimately had authority over Mary
20 Leonard; is that correct?
21    A. That's correct.
22    Q. And looking at Ramsden Exhibit 3, the Board
23 Shop employees worked in this organizational chart
24 in 1998 that is called the Printed Circuit

52

1 Manufacturing and also under the Fabrication
2 Assembly Test Chemical Lab Water Treatment boxes; is
3 that correct?
4    A. That's correct.
5    Q. In 1998 did the plaintiffs in this case have
6 a job before the sale of the Board Shop to EFTC?
7        MR. WELSH: Objection.
8    Q. Were they employed?
9    A. Yes.
10    Q. With whom?
11    A. With Agfa.
12    Q. Agfa Division of Bayer?
13    A. Agfa Division of Bayer.
14    Q. And the Summary Plan Description, Fiorilla
15 Exhibit 4, applied to them, correct?
16    A. It did.
17    Q. Were they eventually terminated from their
18 jobs with Agfa Division of Bayer in 1998?
19    A. No, they were not.
20    Q. What was their employment status at some
21 point in 1998?
22    A. I don't understand that question.
23    Q. Well, did they change employers in 1998?
24    A. As a result of the transaction, yes, they

53

1 did.
2    Q. What transaction are you talking about?
3    A. The sale of the business and the transfer of
4 the employees to EFTC.
5    Q. So EFTC purchased the Board Shop area that
6 you've shown on Ramsden Exhibit 3, those two boxes,
7 correct?
8    A. Correct.
9    Q. And what was it that EFTC purchased?
10        MR. WELSH: Objection. You may answer.
11    A. They purchased that entire operation, the
12 boards, the intellectual property, and with that the
13 employees as well.
14    Q. They purchased the employees?
15    A. I said with that transaction the employees
16 moved as well.
17    Q. Were the employees purchased?
18    A. No, they were not purchased.
19    Q. How did they move?
20    A. They were transferred.
21    Q. Transferred by whom?
22    A. By Agfa.
23    Q. And who hired them, if anyone? Did anyone
24 hire them?

14 (Pages 50 to 53)

Rodney Willis

---

54

1    A. EFTC.

2    Q. So, in fact, Agfa/Bayer did not offer them a

3    job, EFTC offered them a job; is that a fair

4    statement?

5        MR. WELSH: Objection. You may answer.

6    A. That's correct.

7    Q. So when you say we offered them a job, it

8    was actually EFTC that offered them a job; is that

9    correct?

10    A. That's fair.

11    Q. And when you say they were transferred, is

12    there some designation, was there some designation

13    within Bayer/Agfa Division called a transferred

14    employee?

15    A. That's true, yes, there is.

16    Q. And what is a transferred employer? What's

17    the definition of a transferred employee to your

18    understanding?

19    A. To move from point A to point B, position A

20    to position B. We used the term transferred in this

21    context in a very generic sense.

22    Q. In this context?

23    A. Yes.

24    Q. Have you used it in any other context?

---

55

1    A. Yes.

2    Q. How?

3    A. To move an employee from job A to job B or

4    department A to department B.

5    Q. Within Bayer?

6    A. Within Agfa.

7    Q. Within Agfa/Bayer. Had you ever used the

8    term transferred employee to apply to an employee

9    who no longer was getting their paycheck from

10    Agfa/Bayer or any other companies but a totally

11    separate company such as EFTC?

12    A. Yes.

13    Q. Who?

14    A. I can't tell you who, but we have done

15    transfers outside of Agfa to other Bayer divisions.

16    Q. No, I'm not talking about within Bayer. I'm

17    talking -- was EFTC part of Bayer?

18    A. No.

19    Q. I'm talking about a company that's not part

20    of any of the Bayer companies. I'm talking about a

21    totally separate company that's not owned,

22    subsidiary or affiliate of Bayer. I'm talking about

23    a totally different company.

24    A. No.

---

56

1    Q. My question is. Have you ever heard of a

2    transferred employee going to a company outside the

3    Bayer companies called a transferred employee?

4    A. No, we don't refer to them that way outside

5    of Bayer.

6    Q. But this time you did refer to them as a

7    transferred employee even though they were going

8    outside Bayer to EFTC; is that correct?

9    A. That's right.

10    Q. Why did you do that?

11    A. During this exchange we used that term

12    interchangeably. We refer to them as transfers

13    because we were simply moving them from point A to

14    point B in this case.

15    Q. Well, you weren't moving them. Didn't EFTC

16    have some say in that?

17        MR. WELSH: Objection. You may answer.

18    A. Yes.

19    Q. So it wasn't -- so it wasn't Bayer/Agfa --

20        MR. WELSH: Are you done with your

21    answer?

22    Q. I'm sorry. Are you done with your answer?

23    Go ahead.

24    A. I was simply going to say. If we is

---

57

1    confusing, then I will be mindful of that and not

2    refer to as we.

3    Q. When you said we transferred the employees,

4    who is "we"?

5    A. The action to move them was Agfa's

6    acceptance was EFTC.

7    Q. So it wasn't just Agfa/Bayer's decision,

8    EFTC also had to decide, correct?

9    A. Correct.

10    Q. And Bayer/Agfa had no control over what EFTC

11    decides, right, because it's a separate total

12    company, correct?

13        MR. WELSH: Objection. You may answer.

14    A. In the context of the dialog we're having

15    here, it was Agfa who made the transaction. EFTC

16    accepted them.

17    Q. And EFTC could have chosen not to accept

18    them, right?

19    A. The transfers?

20    Q. Yes.

21    A. Yes.

22    Q. That's a yes?

23    A. Yes, that's true.

24    Q. What were the categories of employees within

---

15 (Pages 54 to 57)

Rodney Willis

---

**58**

1    -- strike that. So is it fair to say then that EFTC

2    -- strike that. So is it fair to say then that the

3    employment of the plaintiffs with Bayer/Agfa

4    Division terminated and they now had a new employer

5    EFTC in or around September of 1998 when the sale

6    took place?

7         MR. WELSH: Objection. You may answer.

8    A. It's fair to say that they have a new

9    employer.

10   Q. And what happened to their employment with

11   Bayer, what were they considered?

12   A. Their employment with Bayer ended.

13   Q. Terminated?

14   A. If that's the term you choose to use, sure.

15   Q. What's the term you use?

16   A. We transferred them to EFTC.

17   Q. You transferred them?

18   A. Yes, we did.

19   Q. So when they were terminated, when their

20   employment ended, they were off the payroll?

21   A. Um-hmm.

22   Q. Is that correct?

23   A. Yes, that's correct, they were off the

24   payroll.

---

**59**

1    Q. They were a transferred employee not a

2    terminated employee?

3    A. We moved them to EFTC.

4    Q. When you said you moved them, how did you --

5         MR. WELSH: Objection. It's asked and

6    answered about 12 times.

7    Q. Let me ask you this. Was there any other

8    company similar to EFTC around the country that you

9    were looking at to sell the Board Shop to?

10        MR. WELSH: Objection. You may answer.

11   A. Probably.

12   Q. Let's just pick Company X. Could you have

13   taken those employees and transferred them to

14   Company X without Company X's permission?

15   A. In your example, Company X isn't in the same

16   scenario we're talking about. If we --

17   Q. So you can't --

18        MR. WELSH: Are you done with your

19   answer?

20        THE WITNESS: Yeah, I am.

21   Q. You just can't transfer an employee to

22   another company without their permission, right?

23   A. Correct.

24   Q. So their employment with -- so let's go back

---

**60**

1    to Exhibit 51. You were talking about what you've

2    numbered as paragraph No. 1. It's the second bullet

3    point on SEV 4.

4    A. Okay.

5    Q. And it says, "The company offers you a

6    comparable position even if you choose not to accept

7    it." Is that a fair reading of that?

8    A. Correct.

9    Q. Now, which company are you talking about

10   here?

11        MR. WELSH: Objection. You may answer.

12   A. We're talking about both. This was a

13   transaction between Agfa and EFTC. There were some

14   agreements between Agfa and EFTC, and part of that

15   included acceptance of the employees as this sale

16   was consummated.

17   Q. So you're talking about both Bayer and

18   EFTC?

19   A. I'm talking about Agfa and EFTC.

20   Q. And is EFTC mentioned anywhere in the

21   Summary Plan Description?

22        MR. WELSH: I'll stipulate that it's not

23   mentioned anywhere.

24        MR. ROACH: I'd just like him to answer

---

**61**

1    it, please.

2         MR. WELSH: Well, okay then. Will you

3    give him the entire Summary Plan Description to read

4    because he can't be answering that question without

5    seeing it.

6    Q. To your knowledge, do you recall whether

7    EFTC was ever mentioned in the Summary Plan

8    Description?

9    A. To the best of my knowledge, no, it's not

10   mentioned.

11   Q. So looking at the Summary Plan Description,

12   Exhibit 51, when you say the company --

13   A. You're referring to this. Okay.

14   Q. -- company --

15        MR. WELSH: He's referring on page SEV 4

16   of the Summary Plan Description.

17   Q. The company means Bayer, the employer of the

18   employees, right?

19   A. Agfa.

20   Q. Agfa/Bayer, that's what it refers to,

21   correct?

22   A. Correct.

23   Q. So when it says "The company offers you a

24   comparable position," it means Agfa/Bayer, correct?

---

16 (Pages 58 to 61)

Rodney Willis

62

1    A. Yes.

2    Q. Not EFTC?

3    A. Yes.

4    Q. And because EFTC was the one hiring these

5    employees, the company couldn't offer that position,

6    only EFTC could offer that position, correct?

7        MR. WELSH: Objection.

8    A. Again, the agreement was that with the

9    transfer of the sale of the business, we would

10   indeed, EFTC, would offer employment to the

11   employees that were in that Board Shop. That was

12   the agreement.

13   Q. I understand that was the agreement. But

14   the employees were not signatories to that

15   agreement, were they, they didn't sign it, right?

16   A. Of course not.

17   Q. What's the next bullet point looking at

18   Exhibit 51 upon which you relied in making the

19   decision or determination that the employees,

20   plaintiffs in this case were not entitled to

21   severance benefits.

22   A. In point 2 specifically where we talk about

23   comparable position.

24   Q. Is this the No. 2 that you've --

63

1    A. No. 2.

2    Q. And this for the record is the fourth bullet

3    point on SEV 4 of Exhibit 51, correct?

4    A. Correct.

5        MR. WELSH: In the middle column.

6    Q. In the middle column. Thank you. Is that

7    correct, the middle column?

8    A. That's correct.

9    Q. And so what language are you looking at

10   there in the determination that you made?

11   A. The last portion of that paragraph where it

12   says you are offered a comparable position.

13   Q. And --

14       MR. WELSH: Steve, I need a break.

15       (Recess held.)

16   Q. Looking at what you've numbered 2 on Exhibit

17   51, you mentioned the comparable position. What was

18   the comparable position, the job at EFTC?

19   A. The role with EFTC, whatever position they

20   had at the time.

21   Q. And this language is you are offered a

22   comparable position, correct?

23   A. Correct.

24   Q. Even if you choose not to accept it,

64

1    correct?

2    A. Correct.

3    Q. But EFTC is the one who offered them the

4    job, right?

5    A. And in the context of this transaction,

6    there was an agreement between both companies.

7    Q. But it wasn't an agreement between the

8    employees and EFTC, right?

9    A. The employees didn't have any say in this.

10   This was an agreement between both companies.

11   Q. And EFTC is the one that offered the job to

12   them?

13   A. We offered the position, we.

14   Q. On behalf of EFTC?

15   A. This agreement was between the company and

16   EFTC, Agfa and EFTC. There was an understanding in

17   this transaction that there would be comparable

18   positions offered in the EFTC organization once this

19   deal was consummated. So when I say "we," if it's

20   confusing, sorry. But it was a joint -- it was a

21   joint effort here.

22   Q. So when you say "we," you mean Bayer/Agfa

23   Division and EFTC is "we," is that a fair statement?

24   A. That's true. That's true.

65

1    Q. So let me ask you the difference between 2

2    which is No. 2 --

3    A. My 2.

4    Q. -- and the bullet point right above it. The

5    bullet point between 1 and 2, do you see that?

6    A. This point or this one?

7    Q. The bullet point --

8    A. Oh, between the 1. I'm sorry. Yes.

9    Q. In fact, why don't we circle the one between

10   1 and 2 and call that --

11       MR. WELSH: 5.

12   Q. Let's call that 5.

13   A. Okay. Starting here?

14   Q. Just circle the entire bullet point. Yes,

15   please?

16       (Witness complied.)

17   Q. If you can just number that 5, please, on

18   Exhibit 51?

19       (Witness complied.)

20   Q. What is the difference between 5 and 2?

21   A. I don't see any difference between 5 and 2.

22   Q. Then why are they both in there?

23       MR. WELSH: Objection. You may answer

24   to your knowledge.

17 (Pages 62 to 65)

Rodney Willis

66

1    Q. If you know.
2    A. Again, I didn't write the plan. I don't
3    know why they're there, but I don't see any
4    fundamental difference between 5 and 2.
5    Q. Do you know who wrote the plan, who drafted
6    the plan?
7    A. No, I have no idea who drafted the plan.
8    Q. Let me suggest to you the difference between
9    5 and 2 and see if you agree with me. No. 5 on the
10   first dash under the bullet point talks about
11   becoming an employee of the new owner. Do you see
12   that?
13   A. I see that.
14   Q. And then the next dash under that talks
15   about the new owner offers you continuing employment
16   and a comparable position. Do you see that?
17   A. I do.
18   Q. So is the difference between 5 and 2 in No.
19   5 there's a new owner of the division and in No.
20   and in No. 2 you were just transferred to another
21   area within the Bayer companies, Agfa/Bayer
22   companies?
23       MR. WELSH: Objection.
24   A. I don't see where No.. if I follow your

67

1    example here. No. 2 is any different. No. 2 doesn't
2    exclude No. 5.
3    Q. That's not my question. My question is No.
4    5 talks about new owners of the division and No. 2
5    does not, correct?
6        MR. WELSH: Objection.
7    A. No. 2 doesn't use the term new owner.
8    Q. And also No. 5 talks about the division of
9    the company is solely divested whereas No. 2 talks
10   about the premises, products, processes or other
11   activity of the division, right?
12   A. That's true, but not exclusively. It
13   implies No. 5 hence I don't see any difference
14   between the two.
15   Q. And you can't explain why they're both in
16   there then?
17   A. I didn't write this.
18   Q. Did you ever look at No. 5 in considering
19   whether or not the Board Shop employees were
20   entitled to severance benefits or did you just look
21   at 1, 2, 3 and 4?
22   A. Again, to the best of my recollection I
23   would assume that at some point I reviewed 5 as
24   well. Your earlier question was what did I really

68

1    rely upon to make that interpretation. And I listed
2    them 1 through 4. Of course in reviewing this, I'm
3    sure I would have considered that, too. And again,
4    I don't see any difference between 2 and 5.
5    Q. So you're now saying you also considered No.
6    5 as well as numbers 1, 2, 3, and 4?
7        MR. WELSH: Objection. You may answer.
8    A. You asked if I reviewed No. 5.
9    Q. Right.
10   A. I'm saying in the course of this
11   transaction, I'm sure I went through this multiple
12   times. You asked earlier this morning what I relied
13   upon, and I told you the ones that were prominent in
14   my thought, on the top of my thought that I would
15   have relied on. Those were the key points. 5
16   didn't seem any different to me than 2. This issue
17   was always around comparable position.
18   Q. And Nos. 3 and 4 were the other areas that
19   you relied upon, and No. 3 didn't require them to go
20   more than 35 miles because they were still working
21   at the same location, right?
22   A. That's correct, they were at the same work
23   station.
24   Q. And No. 4, they were at the same salary or

69

1    wage level when they worked for EFTC, correct?
2    A. No. In fact, they got a higher salary.
3    Q. So if they got a higher salary, wouldn't
4    that mean that they were entitled to benefits, for
5    severance benefits if it wasn't the same salary?
6        MR. WELSH: Objection.
7    A. No.
8    Q. Why not?
9    A. There's nothing that would preclude higher
10   salary. The language talked about comparable wages
11   or comparable position equal to or higher, and it
12   was defined as to what comparable meant.
13   Q. I just show you what's been marked in this
14   case as Exhibit 24 from Ramsden. Do you recognize
15   that document?
16   A. The document, yes. It is a Change Form.
17   Q. And that's something you worked with when
18   you were at Bayer/Agfa?
19   A. It is a form that we used for processing
20   transactions, correct.
21   Q. With respect to employees, right?
22   A. Yes.
23   Q. And Janet Lanoue is the person that's on
24   this Exhibit 24, correct?

18 (Pages 66 to 69)

Rodney Willis

74

```
 1      A.  Yeah.  Probably the exception, but, yeah.
 2      Q.  Is that a yes?
 3      A.  Yes.
 4      Q.  So according to this one under this box it
 5   says termination date 8/31/98, it appears as though
 6   as of 8/31/98 Ms. Lanoue was terminated from
 7   Bayer/Agfa; is that correct?
 8      A.  It appears he was removed from our payroll,
 9   yes.  The only way to do that is to terminate the
10   employee.
11      Q.  When you say "he," I think you meant to say
12   "she"?
13      A.  No.  I said the only way to do that is to
14   terminate the employee.
15      Q.  Now, back to Exhibit 51 and the severance
16   plan.  How, if at all, did you communicate to the --
17   strike that.  Did you or anybody else working for
18   Bayer/Agfa advise the employees in this case, the
19   Board Shop employees that they were not going to be
20   eligible for severance, were not going to be paid
21   severance?
22          MR. WELSH:  Objection.  You may answer.
23      A.  At some point, yes, I'm sure that
24   communication took place.
```

75

```
 1      Q.  Do you remember how that took place?
 2      A.  No, frankly.  It may have happened any
 3   number of ways either with general employee
 4   meetings, perhaps meetings with Mary, perhaps in
 5   some of the meetings that Ramsden held.  There was a
 6   benefits meeting.  It may have unfolded in any
 7   number of ways.
 8      Q.  Was it ever in writing, put in writing?
 9      A.  That I don't recall other than what's in the
10   plan.
11      Q.  Can you tell me any more specifically how it
12   was communicated that they were not entitled to
13   severance?
14      A.  Aside from what I've already said?
15      Q.  Yes.
16      A.  Yeah.  As I recall, it could have been any
17   of these methods that I just cited.  They had copies
18   of the SPDs.  People asked for copies of SPDs and
19   given copies of SPDs.
20      Q.  SPDs meaning --
21      A.  Summary Plan Description.  But I don't
22   recall any other methods that there may have been,
23   but I don't recall them.
24      Q.  Do you recall them asking, any of them
```

76

```
 1   asking for severance benefits?
 2      A.  Asking for benefits or asking for the
 3   information?
 4      Q.  Asking for severance benefits saying we
 5   believe we're entitled to severance benefits or at
 6   least inquiring whether they were entitled to
 7   severance benefits.
 8      A.  Again, not specifically.  But I do recall in
 9   general some number of employees asking Mary in
10   particular and maybe I'm going to say perhaps me at
11   some point am I going to get severance.  Again, I
12   don't have specifics or dates or who, but it was a
13   question that was asked with some regularity.
14      Q.  And what did you say when you were asked
15   that question?
16      A.  No, you're not eligible for severance.
17      Q.  And did you explain why?
18      A.  Again, I would image those cases where
19   people came to me, yes, me directly.
20      Q.  What do you recall, if anything, saying to
21   them in that regard?
22      A.  Capturing the first points that we've listed
23   here under the SPD.  We've offered you a comparable
24   position.
```

77

```
 1      Q.  This is under Exhibit 51?
 2      A.  Under Exhibit 51 we offered you a comparable
 3   position with the new employer, if you will, and
 4   hence you're not eligible for severance.
 5      Q.  When you said we have offered you a new
 6   position, did you mean Bayer/Agfa and EFTC combined?
 7      A.  I meant Bayer-Agfa and EFTC.
 8      Q.  And did you point to the language in the
 9   Summary Plan Description, Exhibit 51, in explaining
10   this to them?
11      A.  I would doubt I did.  I don't recall that,
12   but I would doubt I would have.  The reason because
13   all -- I shouldn't say all.  Many people were asking
14   for copies of the SPDs and they were given freely.
15   So, no, I would doubt I would have given any
16   explanation other than to refer them to this section
17   in the SPD.
18      Q.  This section meaning Exhibit 51?
19      A.  Yeah.
20      Q.  Is that a yes?
21      A.  That's correct, yes.
22      Q.  Did you tell them that they had the right to
23   appeal the decision not to provide them severance
24   benefits?
```

20 (Pages 74 to 77)

Rodney Willis

78

1　A. I don't recall anyone ever asking me about
2　appeals. Nonetheless, they all did receive the
3　SPDs. Those who wanted them received them, and that
4　administration matters are explained in the back
5　portion of the Summary Plan Descriptions. But I
6　don't recall anyone specifically asking me how an
7　appeal, should I appeal or anything of that ilk.
8　Q. Did you ever say to them that they had the
9　right to appeal and point to the particular areas of
10　the Summary Plan Description that gives them the
11　right to appeal?
12　A. Not that I recall.
13　Q. Why not?
14　A. It was never asked of me.
15　Q. But isn't your job as a director of Human
16　Resources -- isn't it part of your responsibilities
17　to point out to the employees the rights of those
18　employees with respect to Bayer/Agfa when you were
19　in a position to be explaining to them what their
20　rights and benefits are?
21　MR. WELSH: Objection. You may answer.
22　A. Your question to me, as I understood it, was
23　whether or not anyone came to me and asked whether
24　or not I should get benefits. Those are based in my

79

1　response. No one said to me in essence this isn't
2　right, how do I appeal. We gave them the entire
3　document, and then in that document it explains how
4　to go about processing appeals.
5　Q. So your memory nobody said to you this isn't
6　right, we believe we're entitled to severance?
7　A. My memory is no one came to me and said this
8　is unfair, how do I go about appealing your
9　decision.
10　Q. Did anybody say in any way that they
11　disagreed with your position or that they wished to
12　look into it further, any words to that effect?
13　MR. WELSH: Objection. You may answer.
14　A. I recall discussions, comments to either
15　directly -- mostly to Mary, to others within my HR
16　community, others within the operations group of
17　concerns that it's not right. I want my severance. I
18　recall those sorts of things. I do not recall
19　anyone coming to me and asking how I go about
20　appealing.
21　Q. So you were aware from comments in talking
22　to Mary Leonard and others within HR that people
23　thought it was unfair?
24　A. I'm aware that some folks did, yes.

80

1　Q. And my question is very simple. Wasn't it
2　your responsibility at that point as the director of
3　Human Resources when you knew that people thought it
4　was unfair to direct them and advise them and
5　counsel them as to how they can go about appealing
6　the decision not to provide them with benefits and
7　point to the language in the Summary Plan
8　Description?
9　MR. WELSH: Objection. You may answer.
10　A. I exercised my responsibilities. We
11　provided the SPDs. The concern was well-known.
12　Even after the deal was consummated, folks still had
13　an opportunity to apply and appeal the decision. No
14　one came to me and said how do I do this. We
15　provided freely this information, including appeals
16　procedure.
17　Q. Were you familiar with the educational level
18　of the Board Shop generally speaking?
19　A. Yes.
20　Q. And what was that in general?
21　A. Most had high school degrees or diplomas.
22　Q. So these people weren't attorneys or highly
23　educated people, correct?
24　A. To my knowledge, they were not highly

81

1　educated.
2　Q. And so those are the kind of people that
3　need a Human Resources Department to advise them and
4　help them in processing their request for benefits
5　or a claim for benefits, correct?
6　MR. WELSH: Objection. You may answer.
7　Q. You can answer.
8　A. They had ample access to folks who could
9　help them process claims for benefits.
10　Q. Who?
11　A. Mary. And the benefits department.
12　Q. And did you ever --
13　A. Your earlier question with me was did anyone
14　come to me.
15　Q. Right.
16　A. No.
17　Q. Well, I thought you --
18　A. No one came to me and said I don't like what
19　you're doing, how do I appeal. That's what I said.
20　Q. Well, this is a similar question, different
21　question but similar. Wouldn't it have been the job
22　of the Human Resources Department when you learned
23　that people were unhappy to instruct Mary and others
24　perhaps who were dealing with the employees to say,

21 (Pages 78 to 81)

Rodney Willis

82

1   if people are unhappy, you should direct them to the
2   procedures in the Summary Plan Description on how to
3   appeal, these are people with high school
4   educations, you should show them the language and
5   guide them as to how to appeal the decision?
6       MR. WELSH: Objection.
7   A. My response is the same. We did do that.
8   We provided the documents. We've had numerous
9   meetings. Any place at any time, and again I don't
10  know that this didn't happen, but any time someone
11  could have come to Mary or to me and said I want to
12  know more about how I appeal. But we provided that
13  information. In the document it talks about how to
14  go about appealing these decisions.
15  Q. Just give me a moment.
16  A. Sure.
17      MR. ROACH: The parties in this case
18  have stipulated that this document, this pamphlet is
19  the Summary Plan Description.
20      MR. WELSH: Yes. The 1995 Summary Plan
21  Description.
22      MR. ROACH: I'd like to mark this
23  Summary Plan Description, we've stipulated as the
24  Summary Plan Description at issue in this case to

83

1   which Mr. Willis has been referring as Exhibit 52,
2   please.
3       (Marked, Exhibit 52, Summary Plan
4   Description.)
5   Q. Now, looking at Exhibit 52, the Summary Plan
6   Description, is this the document you provided to
7   them?
8   A. Yes.
9   Q. And when you gave that to them, did you
10  expect that the employees would then be able to
11  figure out in looking through that document what the
12  appeal procedure was?
13  A. Absolutely.
14  Q. And for the record, this document is about
15  an inch think, correct?
16  A. Approximately.
17  Q. And the right to appeal is set forth in this
18  document. Can you show me where it is the right to
19  appeal?
20  A. I haven't seen this book in a while. Your
21  Rights Under ERISA.
22  Q. Your Rights Under ERISA?
23  A. Your Rights Under ERISA.
24      MR. WELSH: Can we just have the bottom

84

1   page numbers for the record?
2       MR. ROACH: I'm going to.
3   Q. And then Admin 4 through Admin 6.
4   A. Yes.
5   Q. So you anticipated that they would find
6   their way to that page saying Rights Under ERISA,
7   correct, and be able to figure out what they should
8   do if their claim's been denied, correct?
9   A. I anticipated that employees would take
10  those documents given the attention that this had
11  and go through and identify whatever they felt they
12  needed to know. It was not a practice that was
13  uncommon to them. It was not a new practice. We've
14  had a fields of medical claims before and they found
15  those sections. The appeals process was not hidden.
16  It was employed.
17  Q. But you didn't do anything to bring it to
18  their attention specifically, correct?
19      MR. WELSH: Objection.
20  A. No one came to me and said how do I file an
21  appeal. This was not an unknown practice.
22  Q. That's not what I asked. This is my
23  question. My question is. You or anybody in your
24  office never specifically went to them or any of

85

1   them and said this is how you appeal?
2       MR. WELSH: Objection.
3   A. I didn't. I can't speak for anybody in my
4   office.
5   Q. You don't know one way or the other about
6   the rest of the people in your office?
7   A. No, I don't.
8   Q. And you never gave a directive to anybody in
9   your office to say, explain to the people who were
10  unfair how to appeal the decision?
11      MR. WELSH: Objection.
12  Q. Is that correct?
13  A. I did not issue any specific direction to
14  anybody to go to any employee and say here is how
15  you do it.
16  Q. I show you another document that's been
17  marked as Fiorilla Exhibit 9 in this case. It's
18  entitled Bayer Corporation Severance Pay Plan
19  January 1, 1995 and ask you if you've ever seen that
20  before.
21  A. Yes, I've seen this before.
22  Q. When's the first time you saw it?
23  A. I don't recall the first time I saw this,
24  but I have seen it before.

22 (Pages 82 to 85)

Rodney Willis

86

1    Q. Have you seen it before the year 2006?
2    A. Yes.
3    Q. Did you see it in your capacity as the
4  director of Human Resources at Bayer/Agfa in
5  Wilmington when you were serving up there in 1998?
6    A. Yes.
7    Q. Did you have a copy of it in your office?
8    A. In all likelihood, yes.
9    Q. When you say in all likelihood, why do you
10  say in all likelihood?
11    A. It's a document that I typically would have
12  had as a reference source along with many others,
13  and this probably would have been in there.
14    Q. When you say probably, I want to know
15  whether you know or whether you recall seeing it and
16  having it in your office in 1998 before the sale to
17  EFTC.
18    A. Yes.
19    Q. You do remember seeing it?
20    A. This document would have been in my office
21  in 1998.
22    Q. Where did you keep it?
23    A. Probably in a bookcase.
24    Q. Did you refer to this document in making

87

1  your determination as to whether the employees were
2  eligible for severance benefits with regard to the
3  sale to EFTC?
4    A. As I recall, my first take would have been
5  the SPD. My second review is probably the more
6  detailed document which was this.
7    Q. This being Fiorilla Exhibit 9 the Bayer
8  Corporation Severance Pay Plan?
9    A. Correct. Yes.
10    Q. And you ultimately made the decision based
11  on the SEV 4, Exhibit 51, correct?
12    MR. WELSH: Objection.
13    A. I reviewed all the documents in terms of my
14  initial assessments, and then as I mentioned earlier
15  I talked with the attorneys, legal group there and
16  asked if my interpretation was correct.
17    Q. And in talking to the attorneys, did you
18  discuss Exhibit 9, the Bayer Corporation Severance
19  Pay Plan provisions as well as the Summary Plan
20  Description?
21    A. I don't recall whether I went to them with
22  both or whether I simply said, guys, I've reviewed
23  the materials. You tell me if my interpretation is
24  correct. I really don't recall how that unfolded.

88

1  I do know that I had dialog with the legal group.
2    Q. Did you give any of the Board Shop
3  employees, the plaintiffs in this case, a copy of
4  the Bayer Corporation Severance Pay Plan, Fiorilla
5  Exhibit 9 in addition to the Summary Plan
6  Description?
7    A. Not that I recall.
8    Q. Why didn't you give them the Bayer
9  Corporation Severance Pay Plan, Fiorilla Exhibit 9,
10  in addition to the Summary Plan Description which we
11  marked as well as Exhibit 52?
12    A. Our practice was to provide the SPD.
13    Q. Why didn't you make it your practice to give
14  the employees a copy of Fiorilla Exhibit 9, the
15  Bayer Corporation Severance Pay Plan as well as the
16  Summary Plan Description?
17    A. The practice was to provide the SPD. I
18  don't know what the thought and rationale was behind
19  the practice that evolved, you know, within Agfa.
20  As simple as that. We provided SPDs.
21    Q. How did you become aware of this practice
22  within Agfa/Bayer?
23    A. In dialog with the benefits group, with the
24  attorneys over time not just for this event but over

89

1  time.
2    Q. Do you know what the rationale was behind
3  not providing the Bayer Corporation Severance Pay
4  Plan?
5    A. I do not.
6    Q. Did you ever bring it to anybody's attention
7  when they came to you that there was a Bayer
8  Corporation Severance Pay Plan, Fiorilla Exhibit 9?
9    A. No, not that I recall.
10    Q. Why not?
11    A. Our practice was to provide the SPD. I
12  followed the procedures. Our practice was to give
13  this and not the full document.
14    Q. Give this meaning the Summary Plan
15  Description?
16    A. The SPDs, yes.
17    Q. Can you tell me. Did Mary Leonard follow
18  the same practice that you followed --
19    MR. WELSH: Objection. You may answer.
20    Q. -- in that regard?
21    A. I don't know that. I presume she did, but I
22  don't know.
23    Q. Was there anybody else other than you and
24  Mary Leonard who were dealing with the employees in

23 (Pages 86 to 89)

Rodney Willis

90

1  the Board Shop with respect to their leaving
2  Bayer/Agfa and going to EFTC?
3          MR. WELSH: Objection. You may answer.
4     A.  Probably.
5     Q.  Can you tell me who they were?
6     A.  I can give you some names. It won't be an
7  exclusive list.
8     Q.  Sure.
9     A.  But certainly Mary, myself, maybe Dave
10 Maher, Michael Paige, Russ Spencer, Dick Ramsden,
11 Norm Fontaine. Who am I missing? I don't know.
12 There are probably others but those are the ones
13 that come to mind.
14    Q.  Can you tell me in looking at Leonard
15 Exhibit 46 -- and just for the record it's a chart
16 that Mary Leonard did in her deposition.
17    A.  Okay.
18    Q.  Is that chart accurate in terms of the
19 hierarchy within the Human Resources when you were
20 there?
21         MR. WELSH: In?
22    Q.  In 1998.
23         MR. WELSH: Thank you.
24    A.  As best I recall, it's accurate.

91

1     Q.  Any other people or any other individuals
2  that aren't there or any individuals missing?
3     A.  Again, I'm trying to recall the
4  organizational structure in place at that time.
5  We've had several. So I don't know. I think it's
6  correct.
7     Q.  Do you know if Julie Haley was involved in
8  discussing any issues with the plaintiffs in this
9  case, the Board Shop employees about benefits,
10 severance or otherwise?
11    A.  I don't know that. But Julie at that time
12 was working in conjunction with Dave Maher, and it's
13 certainly conceivable that she may have been but I
14 don't know that for a fact.
15    Q.  Did you ever talk to Dave Maher or Tim Romps
16 about whether the employees would be entitled to
17 severance benefits in this sale of the Board Shop to
18 EFTC?
19    A.  I don't recall specific instances. I would
20 imagine that I did over the course of time. Dave is
21 responsible for the benefits, Tim responsible for
22 HR. So I suspect there would have been some
23 discussion, but I can't tell you that I recall a
24 specific date or time or content of the discussions.

92

1     Q.  I'm sorry. Maher was the head of HR?
2     A.  No. David was benefits director.
3     Q.  Dave Maher was director of benefits?
4     A.  And compensation for that matter.
5     Q.  And Tim Romps was what?
6     A.  VP Human Resources.
7     Q.  And which one of them was over the other, if
8  at all?
9     A.  Tim was responsible for all of Human
10 Resources.
11    Q.  So Mr. Maher reported to Tim Romps?
12    A.  As did I, correct.
13    Q.  And so you reported directly to Tim Romps?
14    A.  Correct.
15    Q.  Was Mr. Maher over you as well?
16    A.  No.
17    Q.  He was a peer?
18    A.  Correct.
19    Q.  Looking at the Bayer Corporation Severance
20 Pay Plan, can you direct me to the page or pages in
21 there of Fiorilla Exhibit 9 which reflect language
22 similar or the same as what we talked about on
23 Exhibit 51 from the SPD?
24         MR. WELSH: Objection. You may answer.

93

1     Q.  While he's looking at that, let's take a two
2  minute break.
3          (Recess held.)
4     Q.  Have you now had an opportunity to review
5  and compare Exhibit 51 to the like provisions in the
6  Bayer Corporation Severance Pay Plan?
7     A.  I have.
8     Q.  Can you direct me, please, on Fiorilla
9  Exhibit 9 to the specific provisions that are the
10 same as the summary plan, same or similar to the
11 Summary Plan Description, Exhibit 51 on page SEV 4?
12    A.  That would be page 7 which seems to be a
13 part of Section 3.06 subparagraph 8, 9 and 10.
14    Q.  So that's on page 7, correct?
15    A.  Correct.
16    Q.  Starting with page 6 would be Section 3.06
17 and then going over on to page 7 would be subparts
18 8, 9 and 10?
19    A.  Correct.
20    Q.  I'd like to make a copy of that if I could.
21 Off the record for a moment.
22         (Off the record.)
23    Q.  I'd like to mark pages 6 and 7 of the Bayer
24 Corporation Severance Pay Plan of Fiorilla 9 Exhibit

24 (Pages 90 to 93)

10/17/2006

Rodney Willis

94

1　53, please, Willis 53.
2　　(Marked, Exhibit 53, pages 6 and 7 of
3　the Bayer Corporation Severance Pay Plan of Fiorilla
4　9.)
5　　Q. Now, can you tell me looking at Exhibit 51
6　putting it beside what we marked now as Exhibit 53
7　and tell me which sections match up to which other
8　sections.
9　　MR. WELSH: Objection. No foundation.
10　You may answer.
11　　A. I believe your earlier question to me or
12　comment was which ones are similar.
13　　Q. Okay. Then let me rephrase the question.
14　Which provisions on Exhibit 51 are similar, if at
15　all, in your view to Exhibit 53?
16　　A. May I mark this?
17　　Q. You may mark Exhibit 53 and you can circle
18　it and number it as we did on Exhibit 51 if you
19　wish. Are you underlining or circling?
20　　A. Underlining.
21　　Q. Underlining is fine if you wish to do that.
22　　A. But I can certainly connect the dots. It's
23　okay.
24　　Q. Just for the record try not to cover the

95

1　wording if you can.
2　　MR. WELSH: Just so it's clear. If you
3　intended to underline it, to include everything
4　under the small i in paragraph 8 where it is
5　offered, you should put the line over it so it's in
6　the --
7　　A. I'm sorry. I missed that. Okay.
8　　Q. Have you now circled the provisions?
9　　A. I have.
10　　Q. Can you please number them sequentially.
11　And if you would, if you could number them
12　consistently with the numbers on Exhibit 51 which
13　you think are the same.
14　　MR. WELSH: Objection. What are you
15　asking him to do here, consistently the whole
16　paragraph? Are you asking him to tell what
17　paragraphs in this Exhibit 53 correspond to SPD
18　provisions?
19　　MR. ROACH: Yes, I am.
20　　MR. WELSH: I object to that. You can
21　do it if you are able.
22　　Q. This is what we'll do first. Why don't you
23　just number each area that you've circled, please,
24　starting with 1.

96

1　　A. You want sequentially?
2　　Q. Yes. Off the record. Let me just make a
3　copy of this so I can read along with you.
4　　(Off the record.)
5　　Q. Looking at Exhibit 53 you circled and
6　numbered four areas 1, 2, 3 and 4, correct?
7　　A. Correct.
8　　Q. Now, let's start with No. 1. How does that
9　apply to the employees, the plaintiffs in this case
10　in terms of denial of severance?
11　　A. Well, the group in question was clearly
12　employed by Agfa and were part of the acquisition,
13　if you will, the sale of that piece of the business.
14　　Q. So it's your position that the acquiring
15　entity here would be EFTC, what's called the
16　acquiring entity under Exhibit 53?
17　　A. That's correct.
18　　Q. Now, what about No. 2? Before we move to
19　No. 2, let's stay on No. 1, what you numbered as No.
20　1. Where on Exhibit 51 does it refer to or where is
21　it similar to No. 1 on Exhibit 53?
22　　A. No. 2.
23　　Q. So No. 2 on Exhibit 51 you say corresponds
24　or is similar to the one that you've numbered as No.

97

1　1 on Exhibit --
2　　A. There are --
3　　Q. Let me finish the question, please. It's
4　going to mess up the transcript if you talk over me.
5　　So is it your testimony that No. 2 on
6　Exhibit 51 corresponds in whole or in part to the
7　language on what you've numbered as No. 1 on Exhibit
8　53?
9　　A. It's my testimony that there are pieces or
10　portions of this that apply.
11　　Q. And what pieces or portions of Exhibit 53
12　apply to 51?
13　　A. 53 is which one? This is 53; is that right?
14　　Q. Off the record.
15　　(Off the record.)
16　　Q. So Exhibit 53 No. 1 that you've circled the
17　language on there you say comes within what you've
18　numbered as No. 2 in No. 51; is that correct?
19　　A. Not exclusively, but, yes.
20　　Q. And what part of No. 2 on Exhibit 51 covers
21　what you've circled on Exhibit 53 and labeled No. 1?
22　　MR. WELSH: Objection. You may answer.
23　　A. The language on 53 under No. 1 alludes to an
24　acquiring entity, and the language in here in 2

25 (Pages 94 to 97)

Rodney Willis

**98**

1  talks to specifically premises, products, processes,
2  or other activities of the division you work for are
3  relocated, assigned, sold, leased, licensed, or
4  subcontracted, and you are offered a comparable
5  position. We sold that business which the acquiring
6  entity picked up. Hence, I see a connection between
7  1 and 2.
8      Q.  When you say 2, you're talking about Exhibit
9  51?
10     A.  2 of Exhibit 51. There is another
11  connection as well in terms of the company offering
12  you a comparable position. In this case the
13  acquiring entity is the company that offered the
14  comparable position.
15     Q.  Does No. 2 on Exhibit 51, what you've
16  labeled as 2, does that talk anywhere about an
17  acquiring entity?
18     A.  It is implied in the language.
19     Q.  How is it implied in the language?
20     A.  It's mentioned above.
21     Q.  Above --
22     A.  The company offers you a comparable
23  position.
24     Q.  Is that the acquiring company or does that

**99**

1  mean Bayer?
2      MR. WELSH:  Objection. You may answer
3  to your understanding.
4      A.  Again, to my understanding that means both.
5      MR. WELSH:  Steve, it's 12:30 now. It's
6  time to take a break for lunch.
7      MR. ROACH:  Okay. Let me finish this
8  questioning and then we'll break.
9      Q.  I'd like to show you what we've marked as
10  Fiorilla Exhibit 4. Does Fiorilla Exhibit 4, sir,
11  talk anywhere about an acquiring entity? You can
12  take a look at it.
13     MR. WELSH:  Are you asking other than
14  what's on Exhibit 51?
15     MR. ROACH:  Yes.
16     MR. WELSH:  Read the entire thing. If
17  he's going to ask you a question, read the entire
18  document. Just so the record is clear. This has
19  portions of this Summary Plan Description but is not
20  the entire thing.
21     Q.  With that statement, let me show you what
22  we've marked as Willis Exhibit 52.
23     MR. WELSH:  If you're going to give him
24  that and it's anywhere within that, we'll take a

**100**

1  break and take it to lunch because right now that
2  appears to me to be about a 50 page document.
3      MR. ROACH:  Let's do that. So we're
4  going to break for lunch.
5      (Lunch recess.)
6      AFTERNOON SESSION
7      Q.  Have you now had a chance to look at what we
8  marked as Willis 52?
9      A.  I have.
10     Q.  And is there anything in there talking about
11  an acquiring entity?
12     A.  None that I saw.
13     Q.  So going back to comparing Willis 53 to
14  Willis Exhibit 51, you're making the assumption that
15  the bullet point you labeled as No. 1 on Exhibit 51,
16  you're saying that includes an acquiring entity,
17  correct?
18     A.  Correct.
19     Q.  On what is your assumption based if it's not
20  within the Summary Plan Description, Exhibit 52?
21     A.  The bullet points taken in their totality,
22  as well as I said before ultimately decisions,
23  interpretations by counsel. I mentioned in my
24  earlier testimony to you I do not presume that I

**101**

1  understood or knew all the ins and outs and the whys
2  and wherefores of writing these policies. I did not
3  write this. So at the end of the day I went to
4  counsel and said, is my interpretation correct.
5      Q.  Who do you understand knows the ins and outs
6  and the whys and wherefores of the Summary Plan
7  Description and the Bayer Corporation Severance Pay
8  Plan?
9      A.  Those who wrote it or had to interpret it
10  either Mr. Serafian and others within the legal
11  community and/or at Bayer.
12     Q.  But wasn't it part of your job to interpret
13  and apply?
14     A.  Which I did.
15     Q.  Back to my question. When you say other
16  provisions within Exhibit 51 also assume that
17  there's an acquiring entity, where would that be?
18     MR. WELSH:  Objection. You can answer.
19     A.  Section 1 as I listed them in Exhibit 51.
20     Q.  Any others?
21     A.  Section 2.
22     Q.  What about No. 5, what you labeled as No. 5
23  where it refers to a new owner?
24     A.  That could be applied across the board. As

26 (Pages 98 to 101)

Rodney Willis

102

1    I said earlier, I think they looked at it in its
2    entirety.
3        Q. So reading 1, 2 and 5 in it's entirety, you
4    believe that it all applies to an acquiring entity?
5        A. Acquiring entity. It can well be the
6    existing organization.
7        Q. And 5 talks about a new owner, correct?
8        A. 5 mentions a new owner.
9        Q. And 2 on Exhibit 51 does not, right?
10       A. There is no mention of new owner, true.
11       Q. And would it be an equally fair
12    interpretation that only No. 5 which talks about a
13    new owner could also be considered the only section
14    that talks about an acquiring entity?
15           MR. WELSH: Objection.
16       Q. You can answer.
17       A. Not in my view.
18       Q. Not in your view?
19       A. No.
20       Q. Now, in Exhibit 53, an acquiring entity is
21    an entity other than a Bayer Corporation or an Agfa
22    Corporation company, correct?
23       A. That would be my understanding.
24       Q. And an employer, when it talks about the

103

1    word employer under where you've circled No. 2 --
2        A. On 53?
3        Q. Yes. -- that would be Bayer or a Bayer
4    Company, correct?
5           MR. WELSH: You're referring to where it
6    says the employer?
7           MR. ROACH: Yes.
8        Q. That would mean Bayer or a Bayer owned
9    company, correct?
10       A. It may, but not exclusively. Again, I don't
11    propose to be the expert in writing these documents.
12    I didn't draft this.
13       Q. Well, I'm not --
14       A. So if that's what was meant, it may well be,
15    but I'm not the person to ask that question of.
16       Q. How many years did you serve in the Human
17    Resources field up to this date, how many years?
18       A. From about '78, '79 to present.
19       Q. So that's about 26 years, right; 25, 26
20    years?
21       A. Okay.
22       Q. Is that right?
23       A. That's correct.
24       Q. You don't consider yourself someone who is

104

1    an expert in Human Resources in general?
2           MR. WELSH: Objection. If you can
3    answer.
4        A. What we're talking about isn't Human
5    Resources in general. It's this document, an
6    interpretation of a language. And as I said before,
7    I don't presume that I have the requisite knowledge
8    to reach a conclusion without some corroboration on
9    the part of legal counsel, and that's how we did
10    this.
11       Q. In corroborating with Mr. Serafian, did you
12    talk about the language in Exhibit 53 when you met
13    with him or conversed with him?
14       A. Again, what I said, my dialogs with Bob were
15    if I have my interpretation correct. Whether Bob
16    went to Agfa, the legal community in Agfa, the
17    benefits group in Agfa, the benefits and legal in
18    Bayer, I don't know. I simply said is my
19    interpretation correct.
20       Q. And what did you tell him was your
21    interpretation?
22       A. That the employees were not eligible on
23    severance based on my reading of the document.
24       Q. Which document were you referring to?

105

1        A. Both. I would have done them in tandem. I
2    think as I mentioned in my earlier testimony to you,
3    I did not make the final decision. I said am I
4    correct.
5        Q. Who made the final decision, if you know?
6        A. I can't tell you if that was Bob or someone
7    in the legal community. I don't know.
8        Q. So when looking at what you labeled as No. 2
9    on Exhibit 53, you look at the words the employer,
10    do you see that?
11       A. In paragraph -- in section -- part 2, yes.
12       Q. What you've circled as No. 2 which is under
13    subsection 8 by the way, correct?
14       A. Correct.
15       Q. The employer means Bayer or a Bayer owned
16    company, correct, to your understanding?
17       A. It could.
18       Q. Does it include --
19       A. But not exclusively.
20       Q. Could it include a company that's not a
21    Bayer or Bayer owned company?
22           MR. WELSH: Objection. You may answer.
23       A. In this case, yes.
24       Q. What do you mean in this case?

27 (Pages 102 to 105)

Rodney Willis

106

1    A. We were talking about a transfer of assets,
2  if you will, from their divestiture from Agfa to
3  EFTC. In this case we're talking about EFTC. So
4  when you ask could it be something than Bayer, yes.
5    Q. So EFTC would be considered the employer
6  under your interpretation of this?
7    A. EFTC was a part of this transaction I keep
8  alluding to. In this case we're talking about
9  eligibility for severance. Who offered the
10  positions, if you will, at comparable pay. And as
11  I've been saying all along all morning, we
12  considered that a collaboration what us and EFTC.
13  So whether we offered the position or they offered
14  the position, it didn't matter. They received an
15  offer of comparable position.
16    Q. I understand that.
17    A. That is what I've been attempting to
18  explain.
19    Q. I have a different question. In the context
20  of the Bayer Corporation Severance Pay Plan, part of
21  which we've marked as Exhibit 53 and part of what
22  you've circled should include under subsection 8 on
23  page 7 on No. 2, did you consider EFTC under this
24  plan the employer?

107

1    A. Again, I'd go back to counsel and I asked
2  whether or not it applied. I didn't consider
3  anything. I went to them and asked whether or not
4  this was applicable and was my conclusion correct.
5  So in reviewing these pieces in their totality, I
6  drew the conclusion that they were not eligible.
7    Q. I understand that but I'm asking you --
8    A. And I'm trying to answer it. I relied on
9  counsel for interpretation of what that meant.
10    Q. I understand that. But did you ask him the
11  question I'm just asking, what's the difference
12  between the employer and the acquiring entity?
13    A. Not that I recall.
14    Q. Do you remember trying to determine whether
15  the employer applied to EFTC or whether the words
16  the acquiring entity applied to EFTC in reviewing
17  Exhibit 53?
18    A. Do I remember -- could you restate the
19  question for me?
20    Q. Could you read it back to him, please.
21    (Question read back.)
22    A. I recall as I read the pieces in their
23  totality that it was applicable. The conditions
24  explained in the SPD and in the other document were

108

1  consistent with the activity that was going on
2  around EFTC.
3    Q. That's not my question.
4    A. I am trying to answer your question.
5    MR. WELSH: Don't debate with the
6  witness. Ask another question. I think he's asked
7  your question five times and you're trying to --
8    MR. ROACH: No. I'm asking him a very
9  specific question.
10    MR. WELSH: Well, I know what you're
11  asking him. We can look at the transcript if you
12  want. We can go and see the judge. You keep asking
13  the same question.
14    MR. ROACH: No, I just wanted him to
15  answer whether he considered -- my question is very
16  specific. I'm not asking what --
17    MR. WELSH: He's answered your question
18  about 12 times. You can identify your question as
19  specific as you want. When you ask the same
20  question at nauseam, you get the same answer and
21  then you get upset by that. It's not too surprising
22  he's going to answer the question the same every
23  time you ask it.
24    MR. ROACH: He's evading it.

109

1    MR. WELSH: He's not evading it. Your
2  question is not being capable answered that way.
3    MR. ROACH: There's no question, sir.
4    Q. Did you ever look at the words in your
5  analysis back in 1998 and try to determine whether
6  there was a difference between the words the
7  employer and the words the acquiring entity as they
8  appear on Exhibit 53? It's a simple question. Yes
9  or no, sir.
10    A. I don't know. I have a different answer for
11  you than what I've already offered.
12    Q. You don't remember doing that?
13    A. That's not what I said. You're asking me to
14  hone in on two words and tell you if I specifically
15  remember debating the meaning of the two.
16    Q. Right.
17    A. I can pick any two. What I said to you and
18  again I'll say again, I read this in its totality
19  and the circumstances we're living with are
20  considering apply as explained and documented here
21  in the exhibits. I said I think they do. I then
22  went to counsel and I said, guys, am I right or not,
23  tell me if I'm off base and if there's a different
24  interpretation. I did not engage in a discussion

28 (Pages 106 to 109)

Rodney Willis

110

1  about meanings of every word in here.
2      Q. Looking at what we've marked as Exhibit 47
3  in the Leonard deposition. Is there a definition of
4  employer? And I direct you to page 2 Section 1.09.
5  I'm sorry. Section 1.08 I believe it is on page 2.
6  I'm sorry. 1.09.
7      A. There is -- yes.
8      Q. And that applies to the Bayer Corporation
9  Severance Pay Plan, right?
10     MR. WELSH: Objection.
11     A. It applies to the Exhibit 47.
12     Q. Leonard 47, right?
13     A. Correct.
14     Q. And what's the definition of employer under
15  that?
16     A. I'll read what it says. "The company and
17  its affiliates."
18     MR. WELSH: Just let the record reflect
19  it doesn't have a definition of an employer as
20  opposed to the employer. That definition only says
21  employer without any article in front of it.
22     MR. ROACH: Thank you.
23     Q. And the company is defined as Agfa
24  Corporation -- I'm sorry. I was showing you the

111

1  wrong plan. Let me show you the Bayer Severance Pay
2  Plan Fiorilla Exhibit 9 page 2 Section 1.08. Does
3  it have a definition of employer in there?
4      A. Section 2?
5      Q. 1.08 on page 2 of Exhibit 9 Fiorilla. Does
6  it have a definition of an employer?
7      A. It does.
8      Q. What is that?
9      A. It says Bayer and its affiliates.
10     Q. And what do you understand that to mean?
11     A. Bayer and its affiliates.
12     Q. Who is Bayer?
13     MR. WELSH: Objection. You know, this
14  is a maze, Steve. This is really a maze. Who is
15  Bayer?
16     Q. What do you understand Bayer to be, is it
17  Bayer Corporation?
18     A. The parent organization.
19     Q. And what is an affiliate?
20     A. A group associated with the parent
21  organization.
22     Q. And, in fact, on page 1 under 1.03, an
23  affiliate is an entity whose participation whose
24  plan is approved by the Executive Committee of the

112

1  Board of Directors of Bayer, correct?
2      A. That's what you read, yes.
3      Q. And do you have any knowledge that EFTC
4  became an entity which participated in this plan
5  approved by the executive directors, Executive
6  Committee of the Board of Directors of Bayer?
7      A. I have no knowledge of that.
8      Q. What else on page -- I'm sorry -- on Exhibit
9  53 corresponded with any of the language on Exhibit
10  51 in your interpretation of whether the employees,
11  plaintiffs were entitled to severance pay?
12     MR. WELSH: So you're talking at the
13  time --
14     MR. ROACH: Yes.
15     MR. WELSH: -- in 1998 what he remembers
16  about doing this analysis?
17     MR. ROACH: Go ahead. You can answer,
18  sir.
19     MR. WELSH: Objection. This is not now.
20  This is your memory about what happened in 1998.
21     MR. ROACH: No, sir. Let me ask the
22  questions.
23     MR. WELSH: Well, you did ask the
24  question I got clarified. It's a confusing

113

1  question.
2      Q. Can you read the question back.
3      MR. WELSH: You asked his analysis in
4  1998, what did he consider similar in the language
5  of the two matters, right?
6      MR. ROACH: Can you read the question
7  back, please.
8      (Question read back.)
9      Q. Go ahead.
10     MR. WELSH: And I clarified it's your
11  interpretation in 1998.
12     Q. You can answer. Go ahead.
13     A. I can answer now?
14     Q. Go ahead.
15     A. Okay. Paragraph what I labeled 3 in 53
16  corresponds to 3 in Exhibit 51.
17     Q. And any others where there is corresponding
18  language between Exhibits 51 and 53?
19     A. Section 3 also corresponds, the section we
20  are referring to wages and salaries also corresponds
21  to Section 4 of 51.
22     Q. So 3 on Exhibit 53 corresponds to 4 on
23  Exhibit 51?
24     A. Yes.

29 (Pages 110 to 113)

Rodney Willis

114

1    Q. Any others? Any other similarities?
2    A. I'm just looking to compare.
3    Q. Take your time.
4    A. Section 4 also tags to No. 4 on 53 also is a
5    line with No. 4 on 51.
6    Q. Anything else?
7    A. Yeah, in that I think I've pretty much
8    covered all of the points. There's overlap in the
9    documents. One's more specific than the other, but
10   there's clearly overlap.
11   Q. Show me where there's overlap?
12   A. In everything I just read to you.
13   Q. Let me ask you this question. On Exhibit 53
14   it talks about where you circled it under No. 4
15   which is under subparagraph 10. Do you see that?
16   A. I see No. 4.
17   Q. It talks about the employer offers the
18   severed employee a position. Do you see that?
19   A. I see if the employer -- if the severed
20   employee, second line, that's where I am.
21   Q. Yes. It says, "If the severed employee is
22   offered a position with the employer." Do you see
23   that?
24   A. I do.

115

1    Q. What is your understanding of what that
2    means as to the employer?
3    A. EFTC.
4    Q. Is EFTC anywhere defined in the Bayer
5    Corporation Severance Pay Plan in Fiorilla Exhibit
6    9? Let me show you the definitions section that we
7    just discussed briefly. Anywhere in the definition
8    section on pages 1 and 2, would EFTC fall within any
9    of those definitions to your knowledge?
10   A. EFTC could be the acquiring entity. EFTC
11   could be the employer in this case.
12   Q. Could be the employer?
13   A. Um-hmm.
14   Q. Well, the definition of employer on Fiorilla
15   Exhibit 9 is Bayer and its affiliates, correct?
16   A. That's what it says here.
17   Q. And its affiliates is defined as an entity
18   whose participation in this plan is approved by the
19   Executive Committee of the Board of Directors of
20   Bayer, correct?
21   A. I didn't see anything about affiliates. I
22   said acquiring entity.
23   Q. Well, you also said it could also be the
24   employer, correct?

116

1    A. The question you asked, I said it could be
2    the acquiring entity, and I went over to employer.
3    I didn't say anything about affiliates in that last
4    statement.
5    Q. Well, you also said it could be the employer
6    which is Section 1.08 on page 2, right?
7    A. Correct.
8    Q. And under the definition of employer, the
9    definition of employer is Bayer and its affiliates?
10   A. Yes.
11   Q. So you did say something about affiliates
12   because that's considered an employer, right?
13       MR. WELSH: Objection.
14   A. True.
15   Q. And an affiliate would not be EFTC unless
16   EFTC was an entity whose participation in this plan
17   is approved by the Executive Committee of the Board
18   of Directors of Bayer as set forth in Section 1.08,
19   right?
20   A. No, I disagree.
21   Q. Is there anywhere else that an affiliate is
22   defined other than in Section 1.08 under the
23   definitions in Fiorilla Exhibit 9?
24   A. Again, let me look through this again. The

117

1    definitions that you've outlined, acquiring entity,
2    affiliate and employer are specified and defined
3    here.
4    Q. I understand that. Go ahead.
5    A. The EFTC arrangement as I mentioned before
6    in terms of whether or not they have applied,
7    whether these provisions applied was determined
8    after much consultation with all the appropriate
9    parties, legal, et cetera, the compensation group --
10   I'm sorry -- the benefits group, and a decision was
11   made that this is applicable to this current
12   transaction. That's why I told you earlier there
13   was a collaborative arrangement or collaborative
14   deal where we offered, we, either Agfa or EFTC
15   offered comparable employment. That's why I've used
16   them interchangeably. I've been saying that all
17   along.
18   Q. And that's your answer to my question as to
19   whether EFTC falls within the definition of an
20   employer or an affiliate on Fiorilla Exhibit 9,
21   that's your answer to that question?
22   A. Yeah, that's my answer.
23   Q. I show you what's been marked as Exhibit 32
24   in Paige. Have you ever seen Exhibit 32 from Paige

Rodney Willis

---

**118**

1 before?

2 A. Yes, I have.

3 Q. What is it?

4 A. It's an excerpt from the Employee Practices

5 Book.

6 Q. And what is the Employee Practices Book?

7 A. It was, maybe still is, I'm not sure, a

8 summary of policies that Bayer put together largely

9 for the management group as a reference document.

10 Q. And this was in effect in 1998, correct?

11 A. To the best of my recollection, yes.

12 Q. And did you refer to any portion of this

13 book, Exhibit 32, when you were trying to determine

14 whether or not the plaintiffs in this case were

15 entitled to severance benefits?

16 A. I don't recall specifically. I don't recall

17 specifically. I would hazard to suggest that I

18 probably didn't.

19 Q. I'd like to have you turn to page 8/5 under

20 Section 8.3. It's three pages --

21 A. I'm sorry. 8 what?

22 MR. WELSH: Slash 5.

23 Q. 8/5. It's three pages back. This is under

24 the section called Staff Reductions, correct?

---

**119**

1 A. Yes, it is.

2 Q. And it applies to exempt and non-exempt

3 employees, correct?

4 A. It does.

5 Q. And the Board Shop employee or, the

6 plaintiffs in the case would be one or the other of

7 those, correct?

8 A. Correct.

9 Q. Do you remember which ones they were?

10 A. Exempt.

11 Q. Most were hourly?

12 A. Most were hourly non-exempt employees.

13 Q. Who were exempt salaried, if you know?

14 A. Typically supervisors and managers.

15 Q. Would that include Mr. Fiorilla?

16 A. I don't recall whether he did to tell you

17 the truth.

18 Q. Let's look at this page 8/5.

19 A. Okay.

20 Q. And, in fact, what I'd like to do is make a

21 copy of that again and mark it as a separate

22 exhibit. Just give me a moment. On the record.

23 We'll just keep it within Exhibit 32 for now.

24 Looking at the bullet point on the far

---

**120**

1 right-hand side on the top it talks about review and

2 reassignment opportunities for affected employees.

3 Do you see that?

4 A. I do.

5 Q. Who does that apply to when it talks about

6 reassigned opportunities for affected employees?

7 A. It's a little difficult to answer that given

8 the context in which the EFTC transaction took

9 place. This is a classic or traditional activities

10 procedures were followed for a classic RIF,

11 reduction in force. The EFTC arrangement

12 transaction was not a typical reduction in force.

13 It was not a reduction in force.

14 Q. What was the EFTC transaction if it was not

15 a reduction in force?

16 A. We divested the business. We did not lay

17 off any individuals and retain the entity in which

18 they were a part. We divested the business.

19 Q. And you didn't retain the business, right?

20 A. No, we didn't retain the business.

21 Q. Had you ever, you meaning Bayer/Agfa, done

22 something like this before that you did with EFTC?

23 MR. WELSH: Objection. You may answer.

24 Q. Either before or after.

---

**121**

1 A. I don't recall any deal like EFTC. We had

2 layoffs but not a divesture of the whole business.

3 An acquiring organization that, in fact, accepted

4 all of the employees too, there was nothing like

5 that as I recall.

6 Q. When you talk about the whole business,

7 you're talking about the Board Shop?

8 A. Absolutely.

9 Q. That wasn't the entire the entire Agfa

10 Division?

11 A. That wasn't the graphics group, no.

12 Q. So it wasn't the entire Agfa Division that

13 was being sold, correct?

14 A. Correct.

15 Q. It was just the group within the Agfa

16 Division, right?

17 A. It was a piece of business, yes.

18 Q. And what would you define the piece of

19 business; how would you define it?

20 A. It's been referred to a few times as the

21 Board Shop and that's how I would define it.

22 Q. So is it your testimony that back on page

23 8/5 of Exhibit 32, that this section regarding the

24 reassignments didn't apply to the situation?

---

31 (Pages 118 to 121)

Rodney Willis

126

1  but this was a reference document again at the
2  disposal of managers and supervisors.
3      Q. Did employees have access to this?
4      A. No.
5      Q. Was it provided to employees at any time
6  that you know of?
7      A. Not that I know of. It would have been
8  unorthodox. This was a management document. Not to
9  say some got it, but it wouldn't have been part of
10 the normal process to give these to employees.
11     Q. When an employee was denied severance, was
12 there any procedure within Bayer that was typically
13 followed in denying severance? And this is let's
14 say for the period 1995 through 1998.
15         MR. WELSH: Objection. Answer.
16     A. The procedure was the policy, if you will.
17 We would certainly refer to the documents to guide
18 us in terms of what someone should or shouldn't have
19 done with severance.
20     Q. Maybe my question wasn't clear. The
21 documents we've already talked about is the Summary
22 Plan Description?
23     A. Right.
24     Q. And the Bayer Severance Pay Plan, right?

127

1      A. Correct.
2      Q. Was there any procedure for the time that
3  you were with Bayer up through 1998 to communicate
4  to an employee that they were not getting severance,
5  that they were being denied severance?
6      A. Under normal circumstances, and I'm
7  excluding EFTC from my comment here, if you were not
8  eligible, the HR manager who's involved in the
9  activity typically would have said you are not
10 eligible for the following reasons.
11     Q. And how would that have come up?
12         MR. WELSH: Objection. You may answer.
13     Q. Typically when somebody's being terminated
14 let's say.
15         MR. WELSH: Again, objection. You may
16 answer.
17     A. It would usually come up in the course of
18 termination for cause. I punched out my supervisor.
19 No, you're not getting severance. That would happen
20 from time to time. Fraud on a timecard or some
21 other action for cause would not be entitled to
22 severance. And that would be communicated through
23 the HR person to the person affected.
24     Q. What if there was a reduction in force, how

128

1  would it be communicated to an employee that they
2  were not getting severance?
3      A. Again, let me exclude EFTC for the moment.
4  I don't recall circumstances in which a traditional
5  classic reduction in force would not have resulted
6  in severance.
7      Q. So in every case you know of, whether it's a
8  reduction in force, the employee would have gotten
9  severance?
10     A. Barring the exclusions I just offered, yeah.
11     Q. If an employee is denied severance, how is
12 it communicated to them that they're being denied
13 severance?
14         MR. WELSH: Objection.
15     A. Maybe --
16     Q. I remember you --
17     A. I thought I answered that.
18     Q. I apologize if you did. And just correct me
19 if I misstate it. Am I to understand in the
20 instances where an employee is denied severance, it
21 is communicated in writing to them?
22     A. No. Typically it would not have been.
23 Again, rising from the reasons that I said
24 termination for cause, if there was even a question

129

1  about it because frankly there wouldn't have been,
2  but they would have told them they're not eligible
3  for the following reasons, and if the employee had
4  said why, I could image those on the HR staff,
5  either Mary or somebody else who would have said,
6  here's the section in the SPD that tells you why
7  you're not eligible, it's excluded.
8      Q. Mary?
9      A. Mary Leonard.
10     Q. And when you say not including EFTC, you're
11 talking about the sale of the Board Shop to EFTC?
12     A. Correct. That transaction, yes.
13     Q. Why did you exclude that from your
14 testimony?
15     A. Because they were not eligible for
16 severance. I gave you an example that represented a
17 typical occasion given the way you've set it up
18 where it would have applied the severance policy or
19 not and the circumstances and procedures under which
20 they would have communicated whether they were or
21 were not eligible for severance. EFTC did not fall
22 under that domain at all. That's why I excluded
23 them.
24     Q. When you were with the Bayer/Agfa group of

33 (Pages 126 to 129)

10/17/2006

Rodney Willis

130

1   companies up through 1998 and there were reductions
2   in force, can you recall the circumstances of where
3   there were a reduction in force where employees get
4   severance?
5         MR. WELSH: Objection. You may answer.
6      A. Yeah. Typically business isn't as strong as
7   we planned and budgeted. We're not meeting our
8   financials and sales targets. We are going to
9   reduce the workforce. We may well outsource -- some
10  other activities or actions might have been planned.
11  But in the aggregate we're trying to save some
12  dollars, and hence where we had to make reductions
13  in staff this policy would have applied. Not the
14  only scenario but a typical one.
15     Q. And the employees would have received
16  severance in that scenario?
17     A. Unless it was specifically excluded given
18  the terms of the policy, yes.
19     Q. Can you think of any operations where an
20  entire operation or a department similar to the
21  Board Shop was discontinued because of declining
22  business or some of the reasons you just mentioned
23  where the operation or the department was
24  discontinued and people were laid off and provided

131

1   severance, can you think of any areas?
2      A. You're asking questions about, a clarifying
3   question over the span of my tenure?
4      Q. Yes. From the beginning of your tenure
5   through 1998, let's take it up through there.
6      A. Sure. Where do I start. Yes, the short
7   answer is, we reduced operations and field service
8   when I was in Ridgefield Park because we changed the
9   sales territories and we had fewer and so we reduced
10  the field service staff. And that had obviously
11  nothing to do with graphics. There are multiple
12  occasions where we reduced staff. If I can stick to
13  Wilmington for the graphics organization for a
14  moment, we certainly had reductions in marketing.
15  We've had reductions or they had reductions in their
16  field service organization. There were reductions
17  in operations, various pieces of operations.
18     Q. Any others that you can think of? What
19  about the paint shop?
20     A. Yeah. That was operations. That would have
21  been part of operations.
22     Q. How many people were laid off and received
23  severance in the I think you said in the marketing
24  area in Wilmington?

132

1      A. I don't know. I really don't recall.
2      Q. Do you remember how many people in field
3   services in the Wilmington area were laid off --
4      A. No.
5      Q. -- and received severance? What about
6   operations, the paint shop and other areas. Can you
7   give me an estimate as to a number? I'm not looking
8   for a precise number, just your best memory.
9      A. I don't remember how big the paint shop was.
10     Q. Any other areas, departments, operations
11  that were discontinued up through 1998 that received
12  severance?
13     A. Well, let me qualify. I didn't say
14  discontinued. You asked if we had reductions. We
15  have. Probably within the finance organization, you
16  know, the finance group. I don't -- I was there
17  from '95 to 2002. There probably was not an area
18  that we didn't touch somehow in those seven years.
19     Q. In 1995 or before, do you remember any
20  discussion about a drafting of the Summary Plan
21  Description marked as Exhibit 52?
22     A. No.
23     Q. Do you remember when you first saw it or
24  when it was first given to you?

133

1         MR. WELSH: Objection. You may answer.
2      Q. And I do recognize we're talking about ten
3   years ago but I just want your best memory.
4      A. When I first saw it. I would certainly
5   think it was sometime around -- this one? I'm
6   sorry.
7      Q. Yes. Exhibit 52, the Summary Plan
8   Description.
9      A. At the point that we became Bayer, and I'm
10  trying to recall the date and I don't remember, that
11  may have been sometime after that I'm going to say,
12  but I don't know.
13     Q. What about the Bayer Corporation Severance
14  Pay Plan that's Fiorilla Exhibit 9. Do you remember
15  when you first saw that?
16     A. No, I don't.
17     Q. Can you tell me whether you remember seeing
18  any drafts of either of those two documents at any
19  time before they were actually issued and were sent
20  to you?
21     A. No, I don't.
22     Q. Who sent them to you?
23     A. They would have been received via the
24  benefits organization.

34 (Pages 130 to 133)

Rodney Willis

138

1      Q. And can you tell me if you had any
2  conversations with Mr. Paige about employee benefits
3  of any type?
4      MR. WELSH: At any time in '98?
5      Q. At any time, yeah, in 1998, either in the
6  first conversation or later.
7      A. At some point all of the conversations
8  obviously benefits was a discussion, yes.
9      Q. Can you tell me what you recall?
10     A. Just what are they offering. What the
11  benefit package that EFTC offers. What the salary
12  package that they offer. Just general discussions
13  around that, sure.
14     Q. Did you have any discussions about severance
15  benefits with anyone within Bayer not with EFTC but
16  just within the management, Michael Paige or any of
17  his staff?
18     A. Other than -- again, the things that I've
19  already said. I remember telling Michael that given
20  the circumstances as I understood them and in my
21  reading of the documents and the input received from
22  counsel, that the employees of EFTC i.e. the folks
23  in the Board Shop would not be eligible for
24  severance.

139

1      Q. I'd like to show you what's been marked as
2  Exhibit 15. We're up to Ramsden 15. Do you
3  recognize the handwriting on that?
4      A. No, I don't recognize the handwriting.
5      Q. It says 7/7 conference call. Do you see
6  that?
7      A. I do.
8      Q. And do you see your name on this document?
9      A. I do.
10     Q. Over on the next page, page No. 2 starting
11  with the third line down it says --
12     A. Third line or third bullet?
13     Q. Third line second bullet I guess it would
14  be. Actually there's no bullet.
15     A. Well, whatever that is.
16     Q. The third line, it says, "Agfa looking for"
17  and in the box "$2 million premium to deal with
18  employee severance issues," and then there's an
19  arrow from the box to the plus 10% inventory
20  reduction. Do you see where I read that?
21     A. I do.
22     Q. Does that refresh your memory as to --
23  strike that. Do you have any understanding of what
24  that means?

140

1      A. These are not my notes and I don't know what
2  they meant.
3      Q. Does it refresh your memory as to whether
4  there was any discussion about $2 million in
5  premiums to deal with employee severance issues with
6  respect to the EFTC sale?
7      A. No, it does not. What I said earlier was
8  that there were multiple discussions, I can remember
9  discussions and I tried to characterize the tenor of
10  those discussions, but, no, I don't recall $2
11  million in premiums, 10% inventory reductions, no.
12     Q. Next page Exhibit 15 page 3. And about
13  halfway down it says, "Bayer going to buy out
14  employees from post retirement and medical benefits,
15  unused vacation, severance payments, et cetera." Do
16  you see that?
17     A. I do.
18     Q. Do you have any understanding as to what
19  that means?
20     A. Again, these were not my notes. I was not
21  engaged in a discussion of post retirement and
22  buyout medical benefits.
23     Q. Well, you said you weren't engaged in any
24  discussion. Your name appears on the front page of

141

1  this document and it's called conference call,
2  correct?
3      A. That's correct.
4      Q. And so is it your memory that you don't
5  remember any discussion in any conference call about
6  Bayer buying out the employees with regard to
7  severance or other benefits?
8      A. I don't recall any discussion with me or a
9  conference call in which there was the action that
10  you alluded to, buying out of medical benefits. I
11  just don't recall that.
12     Q. The question is about severance benefits.
13     MR. WELSH: Post retirement, medical.
14     A. That's what it says, post retirement.
15     Q. Unused vacation, severance payments, et
16  cetera.
17     A. Yes, I did not.
18     Q. It includes severance payments; is that
19  right?
20     A. Yes, that's true.
21     Q. And then underneath that -- please stay on
22  page 3. It says, "Is big checks to employees." Do
23  you see that?
24     A. Yes, I do.

36 (Pages 138 to 141)

Rodney Willis

142

1    Q. Do you have any memory of any discussion
2    about potentially having to pay some big checks to
3    employees with respect to the EFTC sale?
4    A. Again, these are not my notes. I don't know
5    what that means.
6    Q. I'm not asking you that. I'm just asking if
7    it refreshes your memory, sir?
8    A. No, it doesn't.
9    Q. Did you ever come to a calculation about how
10   much the Board Shop employees would have been paid
11   in severance had they been allowed severance, if
12   Bayer had paid them severance, approved them for
13   severance?
14   A. I don't recall any calculation that I did,
15   but I'm sure -- in fact, I know there had to have
16   been calculations in terms of the cost of this deal,
17   and that would have to certainly include potential
18   severance costs.
19   Q. Do you remember what the number was for
20   potential severance costs?
21   A. No, I do not.
22   Q. Do you know who would have done that
23   calculation?
24   A. Yes.

143

1    Q. Who?
2    A. Don Barieau.
3    Q. B A R I E A U. Does that sound right?
4    A. Close enough.
5    Q. Now was Don Barieau in the Human Resources
6    Department?
7    A. No.
8    Q. What department was he in?
9    A. Don was controller for graphics.
10   Q. Why was he doing the calculation as opposed
11   to someone else in Human Resources?
12   MR. WELSH: Objection. You may answer.
13   A. Because that's his task, to ultimately
14   assess impact financial decisions for the business.
15   Q. Did he ever tell you what the number was or
16   communicate it in any way to you or anyone else that
17   you know of?
18   A. He said to me or to anyone else that I know
19   of. I don't recall to me. He may have but I just
20   don't recall that. And I don't know who else he
21   would have communicated to. Probably, but I don't
22   know that.
23   Q. You don't remember any number being
24   communicated to you?

144

1    A. To me, no.
2    Q. What was the benefit, severance benefit if
3    the Board Shop people had been eligible for it in
4    your view, what would they have received in terms of
5    how it was calculated?
6    A. As I recall, it was two weeks for every full
7    year of service.
8    Q. Was it two weeks for every four years or --
9    A. Full year.
10   Q. Sorry.
11   A. Full year.
12   Q. Looking at page 4 on Exhibit 15. It talks
13   about on the third section down schedule of total
14   payouts per employee. Do you see that?
15   A. I do.
16   Q. Do you have any memory as to what that might
17   refer to, you're referring to?
18   A. Possibly vacation.
19   Q. Why do you say vacation?
20   A. Because we would have paid them up for their
21   vacation. I believe that was part of what we agreed
22   to do I think.
23   Q. Did you ever have a discussion with anyone
24   within Bayer, Michael Paige or anybody in the Bayer

145

1    management where you and others or others were
2    sitting there and someone said, gee, if we have to
3    pay these people severance, that's a lot of money?
4    A. No. What I recall -- in fact, just the
5    opposite in a sense. What we said was, wouldn't --
6    we're not going to be in this business. That was
7    really the driver here. We need the intellectual
8    prowess that we have vested, if you will, in those
9    employees but we're not going to make the investment
10   to upgrade this business. Wouldn't it be great if
11   we found a way if we could outsource this business
12   and employees could go with it. The driver was to
13   keep folks employed. It wasn't so much what is the
14   severance is going to cost us if we do it. I'm sure
15   that question was asked. I'm sure somebody may have
16   done that in terms of the number, whatever that
17   number is. But that wasn't the motivator for this.
18   It was how we keep the intellectual property, if you
19   will, get out of this business and keep our
20   employees gainfully employed.
21   Q. Was the fact that they had this knowledge a
22   key to EFTC agreeing to purchase the Board Shop?
23   MR. WELSH: Objection. You may answer.
24   A. The fact -- I don't understand the question.

37 (Pages 142 to 145)

10/17/2006

Rodney Willis

146

1    Q. Let me rephrase the question. Did you ever
2  hear any discussion that EFTC would only purchase
3  the Board Shop assets or the business if the
4  employees agreed to accept a job with EFTC?
5    A. No. The discussions I recall were around
6  would EFTC take the business with our employees. It
7  wasn't so much a deal breaker but would you do it.
8  If we want to sell you our business, would you take
9  the employees that go with it and hence preserve our
10  intellectual prowess, if you will, in this
11  transaction. That is what the discussion was about.
12    Q. Did you ever hear any discussion as to what
13  Bayer would do if EFTC said, we will purchase the
14  assets, we'll purchase the business but we will not
15  offer jobs to the employees?
16    A. I don't recall specific discussions or
17  alternatives if they didn't because early on in this
18  game that was always the premise. We go into this
19  with an understanding that we can preserve this
20  intellectual capital. So the discussions that we
21  had with EFTC and others I presume would have been
22  all around the same issues, would you bring the
23  employees with you.
24    Q. And the intellectual capital is the

147

1  knowledge --
2    A. In place of the boards.
3    Q. Let me finish the question. Intellectual
4  capital was the knowledge of the employees in the
5  Board Shop?
6    A. Correct.
7    Q. But, if you know, what would have happened
8  if EFTC had said, we don't want to hire those
9  employees, we just want the hardware, and the
10  goodwill, and the customer list, and the other
11  assets other than employees?
12    MR. WELSH: Objection. You may answer.
13    A. I don't know what would have happened. As I
14  said, the scenario was that they were part of the
15  deal from the beginning. But you're asking me to
16  speculate.
17    Q. I'm not asking you to speculate. I'm just
18  asking your understanding based upon your knowledge
19  of the transaction as it transpired.
20    MR. WELSH: Is there a question pending?
21    Q. The question is. What would have happened
22  to the employees if EFTC had not agreed to hire
23  them?
24    MR. WELSH: Objection. You can answer.

148

1    A. No. I think the deal would have gone forth
2  anyway.
3    Q. And then what would have happened to the
4  employees?
5    A. If EFTC had decided not to take the
6  employees aboard, that is the deal never did include
7  the employees, I'm not sure what we would have done.
8  We might have taken a different course of action.
9    Q. Such as what?
10    MR. WELSH: Objection. You may answer.
11    A. We might have continued to look for a better
12  suitor, if you will. We might have decided to lay
13  everybody off and just get out of the business. We
14  might have decided to retain the business for some
15  period of time or maybe indefinitely until we could
16  find something that was palatable.
17    Q. And if you had laid everybody off, would
18  they have received severance?
19    A. If we simply closed the business, yes.
20    Q. And that's under the Summary Plan
21  Description in Bayer?
22    A. It would have been consistent with the plan.
23    Q. And can you tell me. Was there a certain
24  percentage of people who had to accept a job with

149

1  EFTC before the deal would go through?
2    A. Again, it wasn't all or nothing. EFTC
3  agreed to take the employees. We offered everybody
4  jobs, comparable jobs.
5    Q. You offered them or EFTC offered them?
6    A. We offered everybody comparable jobs.
7    Q. But you weren't -- when you say we --
8    MR. WELSH: Objection. We've had this
9  debate for maybe three different occasions today for
10  periods of ten minutes each.
11    MR. ROACH: Great.
12    Q. So when you say "we," do you mean Bayer,
13  Agfa and EFTC together?
14    A. Correct.
15    Q. But EFTC was going to be paying them after
16  September 1, right?
17    MR. WELSH: Objection. Asked and
18  answered. You may answer again.
19    A. At the end of the day, they're on the EFTC
20  payroll.
21    Q. And they'd be EFTC employees?
22    A. Correct.
23    Q. What if some people had not taken the job
24  and others had with EFTC? Let's say one or two

38 (Pages 146 to 149)

10/17/2006

Rodney Willis

---

150

1  people decided they did not want to go to EFTC, what
2  would have happened to them?
3      MR. WELSH: Objection. You may answer.
4      A. They would have been let out without
5  severance.
6      Q. Why?
7      A. Because we offered a comparable salary. We
8  offered a comparable position. It was consistent
9  with the terms of our agreement, that is our
10 Separation Agreement, I'm sorry, our SPDs.
11     Q. Did you tell any of the employees in any of
12 the meetings either individually yourself or any of
13 the group meetings that that's what would occur if
14 they didn't accept a job with EFTC, that they'd be
15 laid off and they wouldn't get severance?
16     A. Again, I answered this already. But again,
17 yes, there were multiple meetings on multiple levels
18 with Dick or Mary, general meetings in the
19 cafeteria. There were questions that would come up,
20 am I going to get severance if I don't take this.
21 And the answer has always been consistently been,
22 no, you won't get severance. We offered you a
23 comparable position. We offered you a comparable
24 wage. You will not be eligible for severance under

---

151

1  the terms of our severance policy.
2      Q. Can you remember who specifically made that
3  statement to the employees?
4      A. No.
5      Q. You mentioned Ramsden and Mary Leonard, the
6  two who were there, correct?
7      A. Correct.
8      Q. And did either of them make that statement
9  to them?
10     A. What I said was, there were multiple
11 meetings, multiple communication forms. What I just
12 articulated in terms of eligibility for severance
13 was standard. Everybody knew that. So I can
14 envision that it may have been echoed multiple times
15 on multiple occasions by just about everybody
16 involved in this deal.
17     Q. And that would have been --
18     A. Me, Dick, Michael, Mary. It could have been
19 any of us that mentioned it.
20     Q. Michael Paige?
21     A. Michael Paige.
22     Q. Mr. Ramsden, Ms. Leonard?
23     A. It could have been Mr. Ramsden. It could
24 have been Mary.

---

152

1      Q. Yourself?
2      A. It could have been me if anybody asked me,
3  yes.
4      Q. Now, I'm going to show you what's been
5  marked as Exhibit 4 in Mr. Ramsden's deposition.
6  It's a letter of April 20 from Ty Griffin of EFTC.
7  Have you ever seen that before?
8      A. Aside from the review of exhibits yesterday,
9  I have not seen this.
10     Q. And I'm also going to show you what's been
11 marked as Calderon Exhibit 5 -- I'm sorry. I'm
12 going to show you what's also been marked as
13 Calderon Exhibit 2 and Ramsden Exhibit 5. I'm going
14 to direct your attention to page Bate stamped
15 B01358. Have you ever seen that before? Have you
16 ever seen what we marked as Calderon Exhibit 2 and
17 Ramsden Exhibit 5?
18     A. No, unless it was something we reviewed
19 yesterday with exhibits. I have not seen this
20 before. I don't remember it from yesterday.
21     Q. What about Calderon Exhibit 5, a proposal
22 dated April 1998. Did you ever see anything like
23 that before? And I'll just state for the record I
24 think we've agreed that Ramsden Exhibit 5 and

---

153

1  Calderon Exhibit 2 is part of Calderon Exhibit 5.
2      MR. WELSH: We've agreed.
3      Q. Have you ever seen that before?
4      A. Not that I recall, no.
5      Q. Back to page B01358 on Ramsden Exhibit 5.
6  You see Section 3.5 Transition of Bayer/Agfa
7  Division Employees?
8      A. I do.
9      Q. The first sentence says. "It is the
10 intention of EFTC to extend offers to all current,
11 full-time Agfa employees associated with CCAs to
12 EFTC's payroll." Do you see that?
13     A. I do.
14     Q. And that was part of the process that was
15 being discussed eventually with EFTC. correct?
16     A. I don't know. In the context of -- what's a
17 CCA. I don't know. Well. I didn't write this
18 document. That's what I'm trying to get to you.
19 I'm not sure what context this was written in.
20     Q. Have you ever heard the expression circuit
21 card assembly as it relates to the Board Shop?
22     A. No. Not that I recall, no.
23     Q. The next sentence says. "This transfer will
24 allow Bayer, Agfa Division to avoid any severance

---

39 (Pages 150 to 153)

Rodney Willis

154

1   cost and provide EFTC an initially trained
2   workforce." Did I read that correctly?
3       A. Yes.
4       Q. Does that refresh your memory as to whether
5   there were any discussions between Bayer and EFTC to
6   offer the employees a job to avoid severance costs?
7       A. No, it doesn't. As I said earlier, the
8   driver here wasn't severance costs. Again, this is
9   not my document. It's not -- I guess it's not an
10  Agfa document. It's not mine. So I don't know why
11  it's there. But the driver for this transaction for
12  this divestiture wasn't do we avoid severance cost.
13  It was how do we retain our intellectual capital
14  and, by the way, can we keep our folks employed,
15  wouldn't that be great?
16      Q. So at least half of the consideration was to
17  keep the employees employed, is that a fair
18  statement?
19      MR. WELSH: Objection.
20      A. Yeah.
21      Q. Did you ever do any studies or research to
22  determine that the employees wouldn't be able to get
23  a job if you simply gave them severance and laid
24  them off?

155

1       A. Not that I know of.
2       Q. So why were you so concerned about making
3   sure that the employees continued employment with
4   EFTC?
5       A. Because if you -- in the mid '90s high-tech
6   town, we were laying folks off. And you know what.
7   So were a lot of other folks. Getting a job wasn't
8   necessarily going to be an easy task. The other
9   driver here was retaining the intellectual capital
10  to help us run our business. So it just seemed like
11  a pretty good thing to do.
12      Q. To help you run your business meaning Bayer
13  was going to purchase printed circuit boards from
14  EFTC after the sale took place?
15      A. It means to maintain the intellectual
16  capital needed to produce the boards which were an
17  integral part of our systems equipment. That's what
18  that means.
19      Q. And part of the deal was Bayer had an
20  agreement with EFTC to purchase the boards?
21      A. Yes.
22      Q. So Bayer was going to purchase the boards
23  from EFTC, correct?
24      A. Correct.

156

1       Q. So part of the motivation of these employees
2   going to EFTC was not Bayer making sure they had a
3   job for their sake but it was also for Bayer's sake
4   so that they knew they would be able to get printed
5   circuit boards from EFTC, correct?
6       MR. WELSH: Objection. You may answer.
7       A. What I said was it was twofold. Retaining
8   intellectual property and maintaining employment for
9   the employees. It wasn't one or the other. It was
10  both.
11      Q. But one of the factors was making sure that
12  Bayer was going to have a trained workforce that
13  would help produce printed circuit boards?
14      A. Certainly a consideration, yes.
15      Q. Were you involved with any of the
16  negotiations of the sale with anybody from EFTC?
17      A. No, was not.
18      Q. Were you involved in any discussions when
19  the sale was being negotiated when you were sitting
20  with Bayer management people like Mr. Paige, Mr.
21  Ramsden or others?
22      A. Involved, no. Were there meetings where I
23  was part of discussions about it, sure, the ones
24  I've already alluded to.

157

1       Q. I'm going to show you what was marked as
2   Exhibit 18 in this case. And directing your
3   attention to the bottom section of the page it talks
4   in there about a buyout of the employees. Do you
5   see that?
6       A. Yes.
7       Q. And it talks about a buyout of employees for
8   post retirement, medical, unused vacation, severance
9   payments being No. 3 on there. Do you see that?
10      A. I do.
11      Q. Do you remember any discussion with buying
12  out the employees of their severance?
13      A. Again, as I've said, I do not remember any
14  discussion about buying out severance.
15      Q. Does this refresh your memory in that regard
16  at all?
17      A. No, it does not.
18      Q. Do you have any knowledge as to why this
19  would be in here, buying out employees with respect
20  to severance and other benefits?
21      A. Again, I don't know whose notes these are.
22  I don't know why it's there.
23      Q. Do you recall making a deal -- strike that.
24  Do you recall where Bayer was talking to EFTC about

40 (Pages 154 to 157)

Rodney Willis

162

1  the Bayer Corporation Severance Pay Plan?
2      A.  Not that I know about.
3      Q.  Do you recall a process or program within --
4  strike that.  Can you tell me what you can recall
5  about any of the group meetings with any of the
6  employees where Bayer advised them that the EFTC
7  sale may take place or has taken place?
8      A.  Yes, I do recall meetings of that sort.  I
9  can't -- what I don't recall is a specific date.
10  But, yes, I believe would have gathered them in the
11  caf probably and Michael would have told them that,
12  but I don't recall when that happened.
13      Q.  The meetings were in the cafeteria --
14      A.  Typically --
15      Q.  Let me finish the question.  The meetings
16  were in the cafeteria at 80 Industrial Way?
17      A.  Typically they were in the cafeteria.
18      Q.  Anywhere elsewhere they were held?
19      A.  The large employee meetings given that it
20  was EFTC, I'm going to say were probably always in
21  the cafeteria because that's where the work group
22  was and that was the easiest place to assemble them.
23      Q.  Do you remember whether there were any
24  smaller formal or informal meetings for lack of a

163

1  better term with any of the employees of the Board
2  Shop and then the members of the Bayer management
3  about the EFTC sale?
4      A.  I don't know that.  There were a number of
5  meetings that took place sometimes with Dick.  If
6  there was a new development, he would gather them
7  together in small groups or large groups.
8      Q.  Dick Ramsden?
9      A.  Dick Ramsden.  So, yes, those kinds of
10  meetings took place, but I don't know how many, what
11  was said.  Dick's philosophy was to keep folks
12  informed.  And so he could do that at the drop of a
13  dime and something new developed, he would gather
14  them and tell them that.  Whether he did or whether
15  he asked Norm did it or whether he did it in small
16  groups, it unfolded in any number of ways.
17      Q.  Do you remember any small group meetings
18  that Mr. Ramsden held with any of the employees?
19      A.  Again, I can't point to a specific meeting.
20      Q.  How do you know that he had some meetings
21  with people as things developed about the EFTC sale?
22      A.  You'd hear about it.  Mary would tell me
23  about it or Dick would tell me about it.  It wasn't
24  all that unusual to know that they had happened.

164

1      Q.  The first meeting you were at, can you
2  recall what occurred and who was there?
3      A.  Again, if I understand the question, the
4  first meeting I attended with all of the Board Shop
5  employees was probably the one that announced the
6  sale.
7      Q.  Do you recall when that took place?
8      A.  I do not.
9      Q.  Would July of 1998 refresh your memory?
10      A.  Probably within that time frame, yes, but
11  again, I can't tell you which date.
12      Q.  I just want a general time frame.  Is it
13  fair to say it was July 1998?
14      A.  That's correct.  That's fair.
15      Q.  And can you tell me who was there the first
16  meeting at the Board Shop where the sale was
17  announced?
18      A.  Again, the best as I recall it certainly
19  would have been Michael.
20      Q.  Michael Paige?
21      A.  Michael Paige.
22      Q.  If you could use last names, it would be
23  easier for us if you don't mind.
24      A.  Mary Leonard, myself, Norm Fontaine, and

165

1  probably Joe Costanzo.  I'm sure there were others,
2  but those are the folks either I remember
3  specifically or likely would have been there because
4  of the nature of the action.
5      Q.  What was Joe Costanzo's job?
6      A.  Joe had a piece of operations and I don't
7  recall which portion.  But Norm ran a portion and
8  Joe Calderon ran another.
9      Q.  This is just with Board Shop employees?
10      A.  The meeting?
11      Q.  Yes.
12      MR. WELSH:  Answer if you know.
13      A.  As I recall, it was just the Board Shop.
14      Q.  And it was in the cafeteria?
15      A.  Yeah, it would have been in the caf.
16      Q.  And can you tell me what was said by anybody
17  on the management side, Mr. Ramsden, Mr. Paige or
18  anyone else?
19      A.  I again recall generally what was said.
20      Q.  Go ahead.
21      A.  There would have been some discussion
22  around here's what we're doing, here's the decision
23  we made, let me talk about the reasons why we did
24  that, here's what's going to happen in terms of the

42 (Pages 162 to 165)

Rodney Willis

166

1   timeline, if you will, for activity. And probably
2   not a whole lot more than that because the initial
3   meeting we didn't know a whole lot more than that.
4       Q. Do you remember anybody from the Bayer
5   management saying this was a win-win proposition or
6   win-win opportunity for both management and the
7   Board Shop employees?
8       A. You mean Agfa when you say Bayer management?
9       Q. These were Bayer employees, correct?
10      A. Bayer was the parent organization, yes. I'm
11  getting confused sometimes because -- never mind.
12  Because there was clearly an overlap between Bayer
13  and Agfa, Agfa management.
14      MR. ROACH: We've been talking -- John,
15  if you would just clarify.
16      MR. WELSH: You want me to talk now?
17      MR. ROACH: Well, when I say you can,
18  yes. Just kidding. We've been talking about
19  stipulating that these people were Bayer employees
20  in the Agfa Division.
21      MR. WELSH: Okay. Just so we're clear.
22  We've been using the period before 1995 until
23  January 1st, 1999. These are employees in the Agfa
24  Division of Bayer and then post January '99 they're

167

1   Agfa Corporation employees. I think that's the
2   working stipulation we've been under during these
3   depositions.
4       Q. With that in mind, the management told the
5   Board Shop employees who are employed by Bayer/Agfa
6   Division about the impending sale, correct?
7       A. Correct.
8       Q. And did anybody from Bayer management tell
9   them that this would be a win-win proposition for
10  the Board Shop employees as well as for Bayer?
11      A. Again, I don't know per se specifically who
12  would have used those terms, but I think it
13  certainly accurately captures the sentiment, view
14  that this a good deal for everybody. So if win-win
15  was used by somebody, it is certainly possible.
16      Q. Do you remember that being said?
17      A. I don't.
18      Q. I believe you testified earlier, correct me
19  if I'm wrong, the management also told the employees
20  in this meeting and others that they had no choice,
21  that they would not be paid severance, that they
22  could either go to EFTC and accept a job or they
23  would be terminated and not get severance, is that a
24  fair statement?

168

1       MR. WELSH: Objection.
2       A. No.
3       Q. What was told?
4       A. The statement -- well, not being told they
5   had no choice, they had choices. Maybe some more
6   palatable than others, but they were never to my
7   knowledge, no one said you have no choice. They had
8   choices.
9       Q. What were the choices?
10      A. As you just articulated. They can accept
11  the arrangement the new role with EFTC and move on
12  to that job or they could decline and they would not
13  receive severance. Not palatable choices but they
14  had choices.
15      Q. And so the choices were they could accept a
16  job with EFTC or they could get laid off and not
17  receive severance; is that true?
18      A. That's correct.
19      Q. Did anybody ask whether they would receive
20  unemployment benefits if they chose not to go to
21  EFTC and were laid off?
22      A. I don't recall that question of me. Whether
23  it was asked of others, I don't know. Typically we
24  would not comment on unemployment decisions because

169

1   that's obviously not our purview.
2       Q. And I believe you testified to this. But
3   did the Board Shop employees ask whether they would
4   get severance if they chose not to go to EFTC?
5       MR. WELSH: This is at the first
6   meeting, the first meeting?
7       A. The first meeting, I don't recall that
8   question coming up.
9       Q. What about a subsequent meeting?
10      A. Again, it might well have come up. I don't
11  recall any specific question of me or meetings I can
12  remember anyway where somebody said will I get
13  unemployment.
14      Q. Severance I'm talking about.
15      A. I'm sorry. I thought you said unemployment.
16      Q. Did any questions come up -- I think you
17  already testified to this. I just want to make sure
18  it's clear. But either in this or any subsequent
19  meetings between the Bayer management and the Board
20  Shop employees, did any of the Board Shop employees
21  ask whether they could receive severance if they
22  chose not to go to EFTC?
23      A. Yes.
24      Q. And do you remember who asked the question?

43 (Pages 166 to 169)

Rodney Willis

170

1  A. No, I do not.
2  Q. Do you remember what was told them?
3  A. Yeah. I don't know who asked the question
4  or who it was asked of, but the answer would have
5  been, no, you're not eligible under the plan, terms
6  of the plan.
7  Q. And that if you chose not to go to EFTC,
8  you'll be laid off and not paid severance?
9  A. Depending on how the question was phrased,
10  it may have been some or all of what you just said.
11  Q. Can you tell me when the decision was made
12  to purchase -- I'm sorry -- to sell the Board Shop
13  to EFTC; do you remember when the decision was
14  actually made?
15  A. I do not.
16  Q. Have you now told me everything that you can
17  recall happened in the first meeting of the
18  employees of the Board Shop in the cafeteria?
19  A. Yes.
20  Q. Can you remember what happened in the next
21  meeting?
22  A. Again, at the risk of being needlessly and
23  painfully redundant, the meetings after a while
24  became a series of discussions and ongoing dialogs.

171

1  So whether it was the second meeting or the third
2  meeting, I've tried to capture the tenor and tone of
3  what happened and took place.
4  Q. So is it your testimony, Mr. Willis, that
5  you can't really distinguish between specifically
6  what was said in the first meeting as opposed to the
7  last meeting of all the meetings between the Bayer
8  management and the Board Shop employees other than
9  what you've told us already?
10  A. I think it's fair to say that given again
11  the time that has elapsed and the number of
12  meetings, I'm trying to recall as much as I can with
13  as much as specificity and where I can't, I'm not
14  offering it to you. So that's probably fair.
15  Q. So my question then is, Have you now told
16  us everything you can recall about what occurred in
17  those meetings?
18  A. Yes, I have.
19  Q. And I believe you testified earlier that
20  individuals came up and asked you if they could be
21  paid severance if they chose not to go to EFTC and
22  you told them they would not; is that correct?
23  A. I believe I said words to the effect that if
24  someone came to me, I don't remember any individual,

172

1  but if anyone had asked me that question, I would
2  have said you're not eligible for severance given
3  the terms and conditions of our severance SPD.
4  Q. And did you tell them that if they chose not
5  to go to EFTC, they would be laid off and terminated
6  and not paid severance?
7  A. Again, I don't recall any specific instance
8  where I would have said that, but that is certainly
9  consistent with an answer that I would have given.
10  Q. Do you remember talking to any individuals
11  at all about the choice that was given to them?
12  A. Again, outside -- other than the context in
13  which I've already framed it, no.
14  Q. Do you remember in general that you did have
15  conversations with employees maybe not, you don't
16  remember specific conversations or specific people,
17  but do you remember having conversations with
18  people?
19  A. I recall the question being posed to me
20  either by Mary, Mary Leonard or in general by
21  perhaps somebody in the operations group, you know,
22  the employees said the following. And, yes, do I
23  recall any specific instance where an employee came
24  to me and said that and asked that question, no.

173

1  MR. WELSH: Can we take a break?
2  MR. ROACH: Sure.
3  (Recess held.)
4  Q. Was Mr. Barieau at all involved in any
5  discussions about whether the employees would be
6  entitled to severance benefits with you or anyone
7  else?
8  A. With me, no.
9  Q. What about with Mr. Serafian?
10  A. I don't know if he had any discussions with
11  Mr. Serafian.
12  Q. Do you know when Mr. Barieau made his
13  calculation as to what the severance benefits would
14  have been to the employees had they been paid, Board
15  Shop employees?
16  A. No, I don't know what time frame that would
17  have been.
18  Q. If Bayer made the determination that the
19  Board shop employees were not entitled to severance,
20  why did Mr. Barieau even calculate what would have
21  been due them had it been paid?
22  MR. WELSH: Objection. You may answer.
23  A. Again, Don's job was to look at all aspects
24  of the deal start to finish. Other than that I

44 (Pages 170 to 173)

Rodney Willis

10/17/2006

178

```
 1    was a meeting where what's his name, the head of
 2    EFTC --
 3        Q. Jack Calderon.
 4        A. -- talked to the Board Shop folks about --
 5        Q. Was that Jack Calderon?
 6        A. Yes. I'm sorry.
 7        Q. What did Mr. Calderon say at the meeting?
 8        A. It was -- again, I'm lacking specifics here.
 9    But generally it was, here's my business. Here's
10    what I do. Here's how we operate. Here's how
11    things that we get involved in. I recall it's
12    interesting one case about a program they had for
13    attendance, and if you weren't out for a certain
14    period of time, your name went into a hat and you
15    got this wonderful trip, an all-expense paid
16    vacation. I mean, it was that sort of welcome to
17    EFTC sort of speech, if you will. I don't know the
18    date. I don't recall what he really said other than
19    the kind of things I've alluded to here.
20        Q. Do you ever remember him saying that he
21    wanted the people not the equipment as part of the
22    transaction?
23        A. Not specifically. May have but not
24    specifically, no.
```

179

```
 1        Q. Do you remember him saying anything about
 2    that it was a win-win situation for everybody?
 3        A. Those words, no. Does it accurately capture
 4    the tone and tenor, yes, it does.
 5        Q. Do you recall after the sale took place any
 6    employees coming back and complaining to anyone at
 7    Bayer that the benefits weren't as good at EFTC?
 8        A. I recall, again not specifically, because
 9    Mary was still there and folks would walk in and
10    just unload on what they thought of EFTC in general,
11    and sometimes I would be aware of that because Mary
12    would tell me. So, yeah, how many, who, what, when,
13    I don't know.
14        Q. When you say unload, what did they unload
15    about?
16        A. Whether it's how they do business. Whether
17    it was benefits. Whatever they may have been
18    unhappy about. Mary was somehow in that loop.
19    Whether she wanted to be or not, they went to her.
20        Q. And did any of them ever go to you?
21        A. No.
22        Q. Did Mary tell you what they were saying to
23    her?
24        A. Again, as I just said, Mary would sometimes
```

180

```
 1    give me a flavor for what was being communicated and
 2    what they were sharing with her in terms of their
 3    experiences at EFTC. But nobody came to me.
 4        Q. Do you remember whether anybody said to her
 5    and that she then told you that the benefits weren't
 6    as good at EFTC as they were at Bayer?
 7        A. I recall comments from Mary that there was
 8    some level of discontent about benefits. Again, I
 9    don't know who went to her. Again, I don't have a
10    name or names to associate with the comment, but I'm
11    aware that there was some that were dissatisfied
12    with the benefits.
13        Q. And do you remember which benefits they
14    expressed dissatisfaction on?
15        A. I don't.
16        Q. Did you ever do a calculation, a comparison
17    as to the benefits that EFTC provided in 1998 and
18    what Bayer provided in 1998?
19        A. I recall early on upfront doing, I didn't
20    but Mary did, a comparison of benefits, at least as
21    we understood the benefits at the time.
22        Q. And what was the conclusion that Mary came
23    to?
24        A. There were some things that were pretty good
```

181

```
 1    about their benefits. There were some things that
 2    were less than what they had.
 3        Q. In general were the benefits better or not
 4    as good when you compared Bayer with EFTC?
 5        A. What I remember really had to do with what
 6    they were losing and the cost of the package of the
 7    benefits.
 8        Q. Cost to the employees?
 9        A. Cost to the employees, yes.
10        Q. And what do you remember in that regard?
11        A. There were differences depending on which
12    feature we honed in on. That's what I remember.
13        Q. Do you remember Mary or anyone saying to you
14    that in general the EFTC benefits were not as good
15    as the Bayer benefits?
16        A. No. What I recall was that we found some
17    pluses and minuses as we looked down the
18    comparisons.
19        Q. Let me show you Leonard 48. Do you
20    recognize that at all?
21        A. I do.
22        Q. What is it?
23        A. It's a comparison of benefits.
24        Q. And is that something that Mary Leonard put
```

46 (Pages 178 to 181)

182

1  together, to your knowledge?
2      A. As I recall, yes, at my direction.
3      Q. Let's go through that for just a moment.
4  Can you tell me looking at the first item Life
5  Insurance. Was the Bayer plan better than the EFTC
6  plan?
7      A. It depends. Depends on the circumstances.
8  Depends on the dependents. Depends on what level of
9  the benefit you elected. Again, as I said, there
10  were pros and cons, pluses and minuses to each. At
11  the end of the day we simply looked at this and
12  said, you know what, it's not equal but it's a nice
13  package and left it at that.
14      Q. Not equal meaning --
15      A. Meaning it's not identical to Bayer's.
16      Q. Which one was better for the employee in
17  general between Bayer and EFTC?
18      A. We didn't have discussions about which was
19  better. We looked at what was offered pluses and
20  minuses. The concern and consideration we took into
21  what it was going to cost them to do this, and if
22  they were going to have the EFTC benefits, is there
23  an additional cost they are going to incur because
24  of it and if so, what are we going to do about it.

183

1  That's what this was about.
2      Q. There was a difference or you were going to
3  decide to do something about it?
4      A. We did.
5      Q. What was that?
6      A. We simply increased pay, base pay to offset
7  those areas that would represent some additional
8  cost for folks depending on which options they chose
9  in their personal family decisions.
10      Q. So certain base pay of certain employees
11  were --
12      A. All employees.
13      Q. So the base pay of all employees was
14  increased?
15      A. Was increased.
16      Q. And was that to compensate for deficiency in
17  certain benefits?
18      A. It was designed to offset the additional
19  costs they were to incur for the EFTC benefits.
20      Q. Which benefits?
21      A. All of them in the aggregate.
22      Q. Do you remember how much?
23      A. I do not remember how much.
24      Q. Do you remember their percentage of pay

184

1  increase?
2      A. No, I do not.
3      Q. Do you remember anything about a thousand
4  dollars being paid to each employee for any reason?
5      A. I don't recall that. Maybe but I don't
6  recall that.
7      Q. On Exhibit 48, Leonard Exhibit 48 why is
8  severance not on there?
9          MR. WELSH: Objection.
10      Q. Let me rephrase the question. Do you see
11  Exhibit 48, Leonard 48?
12      A. I do.
13      Q. Is severance addressed anywhere on Exhibit
14  48?
15      A. It is not.
16      Q. Do you have any knowledge as to why not?
17      A. Yes.
18          MR. WELSH: Very good.
19      Q. Why?
20      A. Severance was never a part of the scenario.
21  We offered severance, that is the organization
22  offered severance to folks who were losing positions
23  or losing their jobs. These folks didn't lose jobs.
24  We weren't comparing their severance plans. We were

185

1  looking at those benefits that they would need to
2  consider as part of that transition to EFTC.
3      Q. What about --
4      A. We never considered severance part of that.
5      Q. What about when they went to EFTC. Weren't
6  you concerned about the fact that once they got to
7  EFTC, they might be laid off or there might be a
8  reduction in force when they were working for EFTC
9  that might bring into place severance?
10      A. Where there was concern, I think I already
11  talked about that. We had again an arrangement.
12  The agreement simply said they will retain the
13  intellectual property for one year. There are
14  conversations that I recall, those meetings that I
15  already alluded to there was no real concern on the
16  part of EFTC that anybody would go anywhere with
17  less than a year. They didn't have a base of
18  employees in Wilmington in the Northeast. They were
19  dying to establish a base. They weren't concerned
20  at all about letting anybody go because they weren't
21  planning to.
22      Q. That's what they told you?
23      A. Absolutely.
24      Q. But what about after one year. What about

47 (Pages 182 to 185)

Rodney Willis

186

1  severance after one year. Wouldn't there be a
2  concern that after one year that the employees may
3  not have severance available to them if they didn't
4  work for EFTC?
5      MR. WELSH: Objection. You may answer.
6  Q. Go ahead.
7  A. The window was one year. To stable off the
8  business to bring about an effective transition.
9  That's what our consideration was.
10  Q. No, but I mean. If you were an employee and
11  you're going to a new job, wouldn't it be reasonable
12  to assume you'd want to know what was going to
13  happen after one year with respect to severance?
14  A. That our window of consideration was the
15  first 12 months. That's what we honed in. That's
16  the continuity stability period that we were looking
17  for.
18  Q. Why?
19  A. Whatever else EFTC did was their business.
20  They were running the shop. That was their
21  business.
22  Q. So is it fair to say Bayer was only
23  concerned about these employees and their benefits
24  and their welfare for one year and after that --

187

1  A. It's fair to say we had concerns around
2  stability of the workforce, and that ultimately this
3  was an EFTC organization operation and how they
4  managed their workforce was their call.
5  Q. And after one year the employees could be
6  left without a job and no severance possibly?
7  A. After one year it was up to EFTC to manage
8  its business.
9  Q. So Bayer's concern to the employees in terms
10  of their jobs only extended to one year, is that
11  what you're saying?
12      MR. WELSH: Objection. That's not what
13  he's saying.
14  Q. Go ahead.
15  A. What I said was our concern had to do with
16  maintaining a stable workforce and keeping folks
17  employed during a period of transition which in
18  essence was one year. That's what I said.
19  Q. Did you ever give any thought to what would
20  happen after one year?
21  A. Yes, we did.
22  Q. What was that?
23  A. That EFTC would manage its business.
24  Q. And that could include laying off some or

188

1  all of these people, right?
2      MR. WELSH: Objection. Asked and
3  answered twice.
4  Q. You can answer. Go ahead.
5  A. That would include any range of options
6  relative to running their business.
7  Q. Including laying them off?
8  A. Any range of options relative to running
9  their business.
10  Q. And does that range of business include,
11  sir, laying them off?
12      MR. WELSH: Objection. Asked and
13  answered --
14  Q. Go ahead. You can answer.
15      MR. WELSH: -- five times now.
16  Q. You can answer.
17  A. If that's what they chose to do, absolutely.
18  Q. Now, looking at Fiorilla Exhibit 2 which I
19  think I showed you earlier today. Do you remember
20  being at a meeting where that was shown to the
21  employees?
22      MR. WELSH: Objection. Asked and
23  answered. Answer again.
24  A. I recall an employee meeting with the EFTC

189

1  folks where those documents were presented.
2  Q. Do you remember any questions about it or
3  any statements about it either by EFTC or Bayer or
4  any of the Board Shop employees?
5      MR. ROACH: Objection. You may answer.
6  A. Again, I don't remember any specific
7  questions about it, no.
8  Q. Do you remember any general questions about
9  it?
10  A. Kinds of questions I recall were usually
11  around how does it apply. How does it work? What
12  do I do to file for medical benefits? What's going
13  to happen to my 401K? Those kinds of questions.
14  Q. Do you remember anybody from the Board Shop
15  complaining to you, Mary Leonard or anyone at Bayer
16  after the sale to EFTC about the fact that they
17  believed they were entitled to severance and Bayer
18  should have paid them severance?
19  A. No more than what I've already said.
20  Q. When's the first time you heard about this
21  lawsuit?
22  A. This one?
23  Q. Yes.
24  A. Maybe early summer.

48 (Pages 186 to 189)

Rodney Willis

194

1    Q. And that tag is my own sticky which I've
2    removed. Anggie Bruchlman, Dick Ramsden, Rod
3    Willis, N. Beasley, M. Paige and D. Maher, do you
4    see that?
5    A. I do.
6    Q. Do you remember a meeting on or about July
7    of 1998 with those people?
8    A. Not specifically, no, I do not.
9    Q. Do you remember any discussions in that
10   meeting about anything concerning comparison of the
11   benefits between EFTC and Bayer?
12   A. Again, I don't remember the meeting. I'm at
13   a lost to recall what was said. I don't know again
14   whose notes these are. I just don't recall the
15   meeting.
16   Q. I understand. I'm just asking if these
17   notes in looking at them if it refreshes your memory
18   as to any meeting and what might have been said.
19   A. No. It's a short answer. There are some
20   themes here that resonate with the things that I
21   have said to you already, and there are some things
22   here that aren't resonating with me at all.
23   Q. What part resonates with you?
24   A. Well, in terms of the themes that I've heard

195

1    I talked about already. There was something here
2    about vacation pay. As I think I said earlier, one
3    portion of my comment, we paid out vacation. So
4    there is some comment here. There was discussion
5    here in general about benefits. And as I've said
6    earlier, we had discussion around benefits in terms
7    of that chart that you mentioned and why it was
8    done, and Barieau's role in costing it all out. So
9    there are obviously themes here, but I don't recall
10   this meeting.
11   Q. Can you tell me if you recall a program or
12   process within Bayer for the time you were there
13   where people could volunteer for reduction in force
14   and receive severance?
15   A. We -- again, let me exclude EFTC here for a
16   minute. Given the layoffs that I had mentioned in
17   my earlier comment during my tenure there, on
18   occasion someone would say to us, I sure would like
19   to volunteer for this layoff. There was no program,
20   if you will. In fact, there wasn't even any policy
21   around it. Folks would simply raise their hand and
22   say would you consider me. So during those
23   conversations what we would do is if they were part
24   of the route that was being reduced in size, we

196

1    would ask them to put it in writing that you want to
2    be considered, and as part of that we would tell
3    them upfront that the ultimate decision is ours. We
4    would be making no guarantees. You may or may not
5    be selected or included in this layoff. That's
6    about the extent of the procedure.
7    Q. And how did it work beyond that? In other
8    words, did people actually receive severance if they
9    volunteered to be laid off?
10   MR. WELSH: Objection. You may answer.
11   A. If they were selected which was part of the
12   normal reduction process, if you will, we would put
13   their name in a hat and if they were selected, they
14   received severance pay just like anyone else who
15   would have been laid off.
16   Q. You said put it in writing. Was there a
17   form that was used?
18   A. Yeah, there was a document. In fact, I
19   think Bob Serafian drafted for us that we used when
20   folks would raise their hand.
21   Q. And what was the document called?
22   A. At the risk of being terribly complex here,
23   I think it was called Voluntary RIF Selection Form
24   or something like that.

197

1    Q. Voluntary --
2    A. RIF Selection Form. I'm not sure what the
3    heck it was really called. It was probably a one
4    page as I remember.
5    Q. That's what it was commonly called?
6    A. Yeah. It was just a voluntary form,
7    voluntary reduction in force form.
8    Q. I think Ms. Leonard and, John, correct me if
9    I'm wrong, but I think she called it an Expression
10   of Interest Form in her deposition. Does that
11   refresh your memory at all?
12   A. That could well be true.
13   Q. What was on that form?
14   A. As I remember it, it was essentially
15   acknowledgment that you wished to be included for
16   consideration in the pending reduction in staff,
17   that you understood that this was pretty much the
18   company's decision as to whether you would or
19   wouldn't be. That there was no guarantee that you
20   would or wouldn't be selected. That we would
21   consider, you know, the needs of the department a
22   certainly a factor in making that decision. And
23   that was about it.
24   Q. How did people know that they could

50 (Pages 194 to 197)

Rodney Willis

198

1    volunteer for this reduction in force and receive
2    severance?
3        MR. WELSH: Objection. You may answer.
4    Q. How was it communicated to you?
5    A. It was never communicated in any formal way.
6    As we began to do activity for reductions, it was
7    always known. There are no secrets in Corporate
8    America. And so folks would raise their hands.
9    Q. Well, how would people know when to raise
10   their hands is my question?
11   A. As soon as they heard that there was going
12   to be a reduction of some sort even if it was a
13   rumor.
14   Q. How was the rumor or the information
15   communicated, if you will, within the Bayer/Agfa
16   Division?
17       MR. WELSH: Objection. You may answer.
18   A. There again, there was no process by which
19   anything was communicating in terms of voluntary for
20   reduction. It was always they heard about it,
21   somebody told them. If that's true, I want to fill
22   out a form and be considered. Those were not -- in
23   fact, they were very much the exception rather than
24   the norm, but it did happen and because of the

199

1    counsel we received from the legal community, Mr.
2    Serafian put this form together simply to document,
3    if you will, the circumstances around which it would
4    be done. That's all.
5    Q. Do you remember when that process began from
6    your tenure working for the Bayer/Agfa companies?
7    A. I do not. I do not.
8    Q. I'm showing you Fiorilla Exhibit 4, Summary
9    Plan Description. Can you tell me where in there,
10   if anywhere, this process that you've just described
11   is included?
12   A. One of two things. I can sit here and go
13   page by page or I can simply tell you that as I
14   recall, and this was not policy, it wasn't a
15   program, it was folks would volunteer and we simply
16   gave them a form.
17   Q. So it wasn't part of the Summary Plan
18   Description; is that correct?
19   A. No.
20       MR. WELSH: The Summary Plan Description
21   for severance pay?
22   Q. Right. It wasn't part of the Summary Plan
23   Description for severance pay; is that correct?
24   A. Correct.

200

1    Q. And it wasn't part of the Bayer Corporation
2    Severance Pay Plan either, was it?
3    A. It was not; that's correct.
4    Q. What about the Board Shop employees. Were
5    they given an opportunity to participate in this
6    process through filling out an Expression of
7    Interest Form or a Voluntary RIF Selection Form?
8    A. They were not.
9    Q. Why not?
10   A. The EFTC deal was not a normal reduction
11   activity. It was a divestiture of the business.
12   Along with that divestiture, the employee base, the
13   intellectual capital went with it.
14   Q. Is it fair to say that the employees jobs
15   were eliminated within the company, within Bayer?
16       MR. WELSH: Objection.
17   Q. The Board Shop employees.
18   A. It's fair to say that the business group of
19   the board group -- I'm sorry -- the entity that we
20   call the board group was removed from the
21   organization, yes.
22   Q. It was discontinued?
23   A. It was sold. We got out of that business.
24   Q. So it was discontinued, right?

201

1    A. Yes.
2        MR. WELSH: Objection.
3    Q. Is that a yes?
4    A. That's right.
5    Q. Do you know in your tenure with Bayer/Agfa
6    up through 1998, do you know approximately how many
7    people participated in the process you just
8    described as the volunteering for severance
9    voluntary layoff?
10   A. Through '98?
11   Q. Yes.
12   A. I don't have an exact number that I can give
13   you. Ballpark, if it's more than 15, I'd be
14   surprised.
15   Q. Do you remember any of the names of people
16   who participated in this process?
17   A. I do not.
18   Q. I show you a document, Ramsden Exhibit 26
19   and show you there's a list of names on there. Are
20   any of the names of the people on that list, does
21   that refresh your memory as to whether any of them
22   received severance under this process we just
23   discussed? Focus on the ones from '96 and '97 that
24   are on there.

51 (Pages 198 to 201)

Rodney Willis

---

**222**

1  you if you agree with what he says here.
2     A.  Okay.
3     Q.  Do you agree with the statements made in
4  this letter from Mr. Salek?
5     A.  I'm not sure how to answer your question.
6     Q.  Do you agree with the first statement?
7        MR. WELSH:  That this letter was
8  referred to whom?
9     Q.  I'm sorry.  The second paragraph that the
10 Board Shop employees were informed in advance that
11 they would not be entitled to severance benefits in
12 connection with the sale of the Board Shop to EFTC.
13 Do you agree with that?
14    A.  I do.
15    Q.  In the next paragraph down he says that the
16 machine operation was not sold, rather the operation
17 was discontinued and the assets were offered for
18 sale to the highest bidder.  Do you see that?
19    A.  I do.
20    Q.  Does that refresh your memory as to what
21 happened with the Machine Shop?
22    A.  It does I believe as I said my earlier
23 comments.
24    Q.  So the assets were sold off; is that

---

**223**

1  correct?
2     A.  Shall be sold, yes.
3     Q.  And it was sold to Olympic Engineering?
4     A.  There it is.  Yes.
5     Q.  And also in the last sentence of that
6  paragraph, third paragraph down, "Olympic hired 5 of
7  the 12 employees who have been in the Machine Shop."
8  Do you see that?
9     A.  I do.
10    Q.  Does that comport with your memory or
11 refresh your memory in that regard?
12    A.  I recall -- yes, there were some folks,
13 employees that they hired.
14    Q.  Were those people also given severance
15 benefits by Agfa?
16    A.  Yes.
17    Q.  Why were they given benefits, severance
18 benefits but the Board Shop employees were not given
19 benefits?  Were they offered jobs with Olympic as
20 well just like the Board Shop employees were offered
21 jobs with EFTC?
22       MR. WELSH:  Objection.  You may answer.
23    Q.  You can answer.
24    A.  The cessation of operation, if you will, was

---

**224**

1  simply we got out of that business, we closed the
2  Machine Shop.  We didn't sell the business to
3  another company.  We simply closed operations hence
4  they were eligible under the terms of the severance
5  agreement.
6     Q.  The next to the last sentence in this
7  letter, Mr. Salek says, "The Severance Pay Plan does
8  pay severance whereas in the Machine Shop instance
9  our operation shut down even if some of the
10 terminated employees later work with a vendor to
11 whom certain activities previously performed
12 in-house have been outsourced."  Do you see that?
13    A.  I do.
14    Q.  Do you agree with that?
15    A.  Yes.
16    Q.  Did you in June of 2002 learn somehow that
17 from any source that the Board Shop employees were
18 making a claim for severance benefits to Agfa or
19 Bayer from any source?
20    A.  Make any claim.  The Board Shop?
21    Q.  Yes, the Board Shop employees.
22    A.  Other than what I've already said, no.  I'm
23 sorry.  I was still back here at the Machine Shop.
24    Q.  When you were with Bayer in 1998 and into

---

**225**

1  1999, were you in the same building where the Board
2  Shop employees were working?
3        MR. WELSH:  Objection.  Just so you're
4  clear.  When you say into 1999, you mean when he was
5  in Agfa into 1999?
6        MR. ROACH:  Right.
7     Q.  When you were with Bayer and then later with
8  Agfa going from '98 into '99 and up through the time
9  that you left Agfa in 2002 I believe you said.
10    A.  Correct.
11    Q.  Were you in the same building where the
12 Board Shop employees were working?
13    A.  I was not.
14    Q.  Which building were you in?
15    A.  The 200 Ballardvale facility.
16    Q.  Where was Mary Leonard?
17    A.  During the EFTC tenor or time, she was in
18 Building 80.  She also had -- that was her primary
19 location.  She also had her office at 200
20 Ballardvale.
21    Q.  And 80 Industrial Way is 80 --
22    A.  80 Industrial Way.
23    Q.  And that's where the Board Shop was located?
24    A.  Correct.

---

57 (Pages 222 to 225)