

EFTC Corporation
9351 Grant Street, Sixth Floor
Denver, Colorado 80229

July 15, 1998

Agfa Division
Bayer Corporation
200 Ballardvale Street
Wilmington, MA 01887-1069

> Re:    Acquisition by EFTC Corporation of Certain Assets Used in the
> Production of Printed Circuit Boards at 80 Industrial Way, Wilmington,
> Massachusetts

Dear Sir or Madam:

The purpose of this letter is to set forth the principal terms pursuant to which EFTC Corporation, a Colorado corporation ("Buyer"), proposes (i) to acquire from the Agfa Division of Bayer Corporation, an Indiana corporation ("Seller"), substantially all of the assets of Seller used in the production of printed circuit boards ("PCBs"), including the purchase of inventory, intellectual property and equipment, the leasing of certain real property and the hiring of certain employees currently employed by Seller in the production of PCBs, (ii) to assume certain related obligations of Seller to be agreed and (iii) to contract with Seller for the manufacture of PCBs.

1. Background.  Seller is currently engaged in the manufacture of PCBs in a portion of its facility located in Wilmington, Massachusetts (such portion, the "Facility"). Buyer is experienced in the manufacture of PCBs of the type needed by Seller, and Seller desires to out source the manufacture of those PCBs to Buyer.  To effect that arrangement, Buyer will acquire substantially all of the assets of Seller used in the production of PCBs and will assume certain related obligations of Seller to be agreed by Seller and Buyer, and Seller and Buyer will enter into a long term supply agreement whereby Buyer will manufacture and sell PCBs to Seller.

2. Assets to be Acquired and Obligations to be Assumed by Buyer.  The assets to be acquired by Buyer from Seller (the "Assets") will be those currently used by Seller in the manufacture of the PCBs and will consist of the following:

a. *Equipment*.  All machinery, office equipment, tools and other tangible personal property currently used by Seller in the manufacture of the PCBs at the Facility (the "Tangible Property").

Agfa Division
Bayer Corporation
July 15, 1998
Page 2

      b. *Intellectual Property*. Certain intellectual property of Seller used in the manufacture of the PCBs, including defined manufacturing processes, drawings, in circuit, functional and raw board testing software, accumulated employee know-how and other proprietary information and know-how (the "Intellectual Property").

      c. *Inventory*. All inventory maintained by Seller at the Facility for the manufacture of PCBs, including raw materials, parts and components, work-in-process and finished goods (the "Inventory").

      d. *Contracts*. Certain contracts, agreements, arrangements and commitments of Seller related to the manufacture of PCBs that are identified by Buyer and Seller as of the date of the Closing, including open purchase orders to which Buyer has consented (the "Contracts").

      The purchase of the Assets and assumption of the Contracts will occur at a closing (the "Closing") anticipated to occur on or about August 14, 1998 (the "Closing Date"), unless otherwise agreed by the parties. The purchase price for the Assets (the "Purchase Price") will be paid in cash at Closing and will be in an amount equal to $2.35 million plus 90% of the aggregate book value of the Inventory, calculated as of the Closing Date. The sum of the portion of the Purchase Price attributable to the Inventory and the amount payable under any open purchase orders that are assigned to Buyer is not expected to exceed $4.0 million. Buyer will also agree at the Closing to pay to Seller as additional Purchase Price an amount equal to 1% of the gross revenues received by the Company from sales to third parties of PCBs produced by the Facility through the end of the initial term of the supply agreement specified in Section 6 (the "Supply Agreement") and for each year thereafter in which Seller's aggregate purchases of PCB's under the Supply Agreement equal or exceed $20 million.

      The portion of the Purchase Price attributable to the Inventory to be paid at the Closing will be determined by physical inventory conducted by representatives of Seller and Buyer within 14 days prior to the Closing Date, as adjusted based upon estimated changes through the Closing Date (the "Estimated Inventory Value"). Within 30 days after the Closing Date, representatives of Buyer and Seller will conduct a physical inventory to determine the actual amount of the Inventory as of the Closing Date (the "Final Inventory Value"). The Purchase Price shall be adjusted (up or down) for any difference between the Estimated Inventory Value and the Final Inventory Value. Such adjustment shall be paid in cash to the party to whom it is due within 10 days after it is determined.

Agfa Division
Bayer Corporation
July 15, 1998
Page 3

Seller will repurchase from Buyer on the first anniversary of the Closing all raw material inventory purchased by Buyer that has not been used or consumed by Buyer by that date in manufacturing PCBs for Seller under the Supply Agreement and is not forecast pursuant to the Supply Agreement for use during the next succeeding year ("Obsolete Inventory"). The purchase price shall be equal to the amount originally paid by Buyer for such Obsolete Inventory plus 8.5% per annum through the date of payment. At any time during the first year following the Closing Date and upon reasonable notice to Buyer, Seller shall be entitled to deem any raw material inventory purchased by Buyer from Seller to be Obsolete Inventory and to repurchase such Obsolete Inventory from Buyer at such time for the purchase price determined in accordance with the immediately preceding sentence. Seller will purchase from Buyer on the second anniversary of the Closing, at a price so determined, all raw material inventory purchased by Buyer that has not been used or consumed by Buyer by that date in manufacturing PCBs for Seller under the Supply Agreement.

3. Facility Lease. Simultaneous with the acquisition of the Assets by Buyer from Seller, Seller shall sublease to Buyer certain portions the production facility located at 80 Industrial Way, Wilmington, Massachusetts, currently used by Seller in the production of PCBs. The sublease will be for a term through March 31, 2003, subject to early termination as specified below, and the rental will be equal to Seller's actual costs of leasing and otherwise providing the space to Buyer. Seller and Buyer will agree on certain ancillary facilities and services to be provided to Buyer, including common areas such as lunch room and telephone system, and Seller will be reimbursed for the cost of such facilities and services. Provision will be made at Buyer's cost for separating Buyer's portion of the facilities from that of Seller and for making Buyer's portion secure. Either party may terminate the sublease by giving at least 12 months notice thereof to the other party.

4. Employees. Buyer will offer employment to all persons identified by Seller and Buyer who are currently employed by Seller in the production of PCBs at the Facility. Cash compensation offered to such persons shall be equal to their current compensation paid by Seller with an appropriate adjustment on a per employee basis to compensate for increased cost to the employee of medical insurance. Benefits provided shall be those currently provided to Buyer's employees generally. Buyer agrees to credit each such person who accepts employment with the service credited with Seller for all purposes, including health care enrollment, seniority and applicable vesting or waiting periods under benefit plans. Seller will be responsible for all costs associated with the employment or termination of employment of such persons by Seller, including the payment of accrued vacation and any severance payments or retention bonuses, and will agree to indemnify Buyer from and against any and all liabilities and claims relating to the employment of such persons by Seller prior to the Closing. Buyer will agree to

Agfa Division
Bayer Corporation
July 15, 1998
Page 4

indemnify Seller from and against any and all liabilities and claims relating to persons
employed by it for the period after the Closing.

5. Environmental Matters. Buyer will be responsible for compliance with
environmental laws applicable to its equipment and operations at the Facility and to other
property at the Facility to the extent controlled by it beginning on the date of the Closing,
except for matters existing at the Closing for which Seller will remain fully responsible.
Seller will be responsible for compliance with environmental laws for matters existing on
the date of the Closing and for matters arising from property under its control that arise
after the Closing. Each shall indemnify the other for liabilities and claims relating to
environmental matters for which it is responsible.

6. Supply Agreement. At the Closing, Seller and Buyer will enter into a long
term supply agreement pursuant to which Buyer will supply to Seller PCBs of the type
currently produced by Seller at the Facility and such other products as Seller and Buyer
may agree. Pricing under that agreement will be targeted to provide Seller with PCBs at
a cost not exceeding its current cost for the first year of the agreement, with reductions in
Seller's cost of at least 6% per annum in subsequent periods. The supply agreement will
have an initial term of four years and will automatically extend for one year periods
thereafter unless terminated by either party upon six months notice to the other.

7. Transition Plan. Seller and Buyer will promptly develop a joint transaction
plan to facilitate commencement of manufacturing operations at the Facility by Buyer and
transfer of the employees at the Facility to Buyer. Seller recognizes that it will be
necessary for Buyer to proceed with the matters contemplated by paragraph 4 prior to
execution of the definitive agreements contemplated by paragraph 8 and hereby consents
to Buyer's doing so in cooperation with Seller.

8. Definitive Agreements. The parties will begin promptly to negotiate mutually
agreeable definitive agreements to reflect the transactions contemplated by this letter,
subject to appropriate corporate approvals of each party. Such agreements shall contain
customary representations, warranties, covenants, conditions, indemnifications and
undertakings appropriate to the circumstances.

9. Due Diligence and Access. Seller will provide to Buyer and its representatives
and advisors reasonable access to the Facility and to such of Seller's books and records
reasonably related to the proposed transactions as Buyer may reasonably request in order
to conduct an appropriate due diligence investigation with respect to the transactions
contemplated hereby.

10. Announcements. Neither party will issue any press release or make any
public statement relating to the transactions contemplated by this letter(other than

Agfa Division
Bayer Corporation
July 15, 1998
Page 5

communications with persons in the ordinary course of business relating to a press release or public statement otherwise permitted hereunder) without the other party's prior written approval, except as otherwise required by law or the rules of the Nasdaq Stock Market or as may be reasonably prudent to avoid potential liability on the part of any person under the federal securities laws.

11.  Intent.  This letter constitutes a statement of the mutual intention of the parties only and does not specify all matters on which agreement must be reached for the proposed transactions to be consummated and therefore does not create or constitute any legally binding or enforceable obligation between the parties with respect to the proposed transactions.  A binding obligation with respect to the proposed transactions will result only from execution of the mutually agreeable definitive agreements concerning the proposed transactions contemplated by paragraph 8, subject to the conditions as may be expressed in such agreements.  Notwithstanding the preceding sentence, upon acceptance as described below, the provisions of paragraphs 9, 10 and 12 of this letter will be legally binding obligations of the parties.

12.  Costs.  Buyer and Seller shall each bear its own cost relating to the proposed transactions, including the fees and expenses of its lawyers, accountants and other advisors.

13.  Miscellaneous.  This letter will be governed by and construed in accordance with the internal laws of the State of Massachusetts.  This letter supersedes all prior agreements or understandings with respect to the subject matter hereof other than the Confidentiality Agreement between the parties dated as of March 4, 1998.

Agfa Division
Bayer Corporation
July 15, 1998
Page 6

      If you are agreeable to proceeding on the foregoing basis, please sign this letter in the space provided below and return a signed copy to the undersigned.

Very truly yours,

EFTC CORPORATION, a Colorado
corporation

By: _____
     Name: JACK CALCOGREON
     Title: Chairman & CEO

Accepted and agreed:

BAYER CORPORATION, an Indiana
corporation, through its Agfa Division

By: _____
     Name: MICHAEL R. PAIGE
     Title: SR. VP AGFA DIVISION, BAYER CORP.