Mary Leonard

10/13/2006

1

Volume: 1
Pages: 1-249
Exhibits: 45-49

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
CIVIL ACTION NO. 04-10728-WGY

- - - - - - - - - - - - - - - - - - - - - - - -x

JOSEPH ATTARDI, MICHELINE AUGUSTA, FARAHILDA
BET-EIVAZI, MARY B. BOGDAN, MARK BOWDIDGE, KAREN
BROWN, MARIE BROWN, ROBERT BROWN, LARRY CELLAMARE,
WAI NGAN CHAN, CAROL CHRISTIANSON, MARY JO CORCORAN,
RICHARD COTE, CORRIE COTTRELL, CLARENCE COUPE,
AROUSSIAK DAKESSAIN, RICHARD DEFRANCESCO, MARIA
DEFRANCESCO, DAVID J. DOLAN, LISE DUPUIS, SANDRA
COMEAU DUTCHER, KATHY ELY, VINNIE FIORILLA, STEVE
FOURNIER, JEAN FRASER, GARY FRIZZELL, DIANA GLASSETT,
FRED GLASSETT, BOONCHOO GRASSO, PHILLIP GREENE,
BERTRAND GUILMETTE, PAULINE GUILMETTE, ALBERTA
HEALEY, JEANNE HUFF, RICK JAKLE, ANITA KOPACZ, ALFRED
LANGUIRAND, JANET E. LANOUE, JUDITH LA ROSA, EDMUND
J. LASCELLES, JR., CLIFF LORD, III, PAT MABEY, TERESA
C. ORNELAS, JANIS PARADIS, LINDA PARADIS, NORMAN
PARENT, LONG T. PECK, DIANA PERREAULT, OUDOMPHONE
PHOMMAHAXAY, RICHARD PICARD, NORMAN POULIN, MARIA
REIS, MARK ROBERT, JOHN SABLOCK, BARBARA SANBORN,
JOANNE SANZO, LINDA SAULNIER, JEANNE SKENE, ROBERT
STIER, CATHERINE SWEENEY, PHAM VAN, DIANE WILLETTE,
and EDWARD WRIGHT,

                    Plaintiffs,

        v.

BAYER CORPORATION, BAYER CORPORATION SEVERANCE
PAY PLAN,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - -x

        DEPOSITION OF MARY LEONARD
        Friday, October 13, 2006
            10:07 a.m.
        Roach & Wise LLP
        31 State Street
        Boston, Massachusetts  02109

Reporter:  Carol A. Pagliaro, CSR/RPR/RMR

Mary Leonard                                                                    10/13/2006

**2**

APPEARANCES:

ROACH & WISE LLP
By Stephen A. Roach, Esq.
31 State Street
Boston, Massachusetts 02109
(617)723-2800
roach@roachwise.com
Counsel for the Plaintiffs

BELLO BLACK & WELSH LLP
By John F. Welsh, Esq.
535 Boylston Street, Suite 1102
Boston, Massachusetts 02116
(617)247-8476
jwelsh@belloblack.com
Counsel for the Defendant

**3**

INDEX

EXAMINATION OF:                 PAGE

MARY LEONARD

By Atty. Roach                         4


EXHIBITS

NO.                    PAGE

45  Subpoena                   27

46  Drawing of Human Resources Department
    at the Wilmington Division of Bayer
    between January 1 and through September
    of 1998                    40

47  Agfa Corporation Severance Pay Plan
    effective January 1, 1999        141

48  Report prepared by Ms. Leonard headed
    Company Confidential        163

49  Letter to Mr. Dolan, dated March 25,
    1998, from Mr. Ramsden        240


*Original exhibits retained by Atty. Roach

**4**

PROCEEDINGS

ATTY. ROACH:  Usual stipulations; all objections reserved until the time of trial, except as to form objections, Motions to Strike reserved until the time of trial, and we would like the witness to read and sign, read and sign within 30 days of receipt of the transcript and need not do so before a notary, and that means that -- is Mr. Welsh representing you today?

ATTY. WELSH:  I'm representing her as an agent of the company.

MARY LEONARD

a witness called for examination by counsel for the Plaintiffs, being first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY ATTY. ROACH:

Q.  What is your name, please?

A.  Mary Leonard.

Q.  Ms. Leonard, my name is Stephen Roach and I represent the plaintiffs in this case --

ATTY. ROACH:  Can we go off the record just for a minute?

(Discussion off the record.)

**5**

Q.  -- the former members of the Board Shop of Bayer; do you understand that?

ATTY. WELSH:  Excuse me?

ATTY. ROACH:  The former employees of Bayer Corporation, members of the Board Shop.

THE WITNESS:  Members of the Board?

ATTY. ROACH:  I'm just telling her who I represent, the plaintiffs.

ATTY. WELSH:  I didn't hear the "I represent," all I heard was that.

ATTY. ROACH:  I'll start again.

Q.  You are represented today by Mr. Welsh?

A.  Yes.

Q.  My name is Stephen Roach and I represent some plaintiffs in this case who are former members of Bayer Corporation, you understand that?

A.  Yes.

Q.  And when you get a copy of the transcript from Mr. Welsh, you will have 30 days to read it and then sign a sheet saying that you have read it, and it gives you an opportunity if there is anything that is transcribed that you think is incorrect you can change it, or if you think that you want to change something, you can do that.  Mr. Welsh will

2 (Pages 2 to 5)

Mary Leonard                                                    10/13/2006

**Page 50**

1  meetings.
2  Q. What about Michael Paige?
3  A. He was involved, I recall, at one of the
4  meetings.
5  Q. Anybody from EFTC?
6  ATTY. WELSH: Objection. You may
7  answer.
8  A. There was one meeting that I recall where
9  there was a person from EFTC present.
10  Q. What is that person's name?
11  A. Jack Calderon.
12  Q. Anyone else from EFTC you can recall?
13  A. I can't recall if there was other
14  representatives from EFTC present at some meetings.
15  Q. Did you ever meet individually with any
16  employees to answer any questions?
17  A. Employees in the Printed Circuit Board Shop?
18  Q. When I say employees, I'm talking about --
19  unless I say otherwise, when I say employees, I'm
20  talking about the Board Shop employees who are
21  plaintiffs in this case.
22  ATTY. WELSH: I have a problem with that
23  instruction, because she could have met with other
24  Printed Circuit Board employees who are not

**Page 51**

1  plaintiffs, so that she has to go and basically
2  memorize it, so if we can just say the Printed
3  Circuit Board employees.
4  ATTY. ROACH: Fair enough. Fair enough.
5  ATTY. WELSH: That will work better.
6  Q. I'm sorry, go ahead.
7  A. So your question was, once again?
8  Q. Did you meet with any of the Printed Circuit
9  Board employees about the sale that was being
10  planned to EFTC?
11  A. The employees would come and approach me
12  individually, I'd see them in the hallways,
13  wherever, and ask questions about the sale of the
14  business.
15  Q. Can you tell me what questions were asked?
16  A. I can't recall what questions were asked.
17  Q. Can you recall who spoke to you
18  individually, either in the hallways or in your
19  office?
20  A. No, I can't recall the names of the
21  employees that spoke with me, but certainly a number
22  of employees talked with me. I saw -- I walked by
23  their area every day.
24  Q. And some of them would have included the

**Page 52**

1  people who are listed on Exhibit 45, plaintiffs in
2  this case?
3  A. Yes, some of those would include those
4  individuals.
5  Q. I would like you to just take a moment and
6  look at the names and see if you can recall any
7  conversations you had with any of the people that
8  are listed on there that are plaintiffs in this
9  case.
10  ATTY. ROACH: Off the record.
11  (Off the Record.)
12  ATTY. ROACH: Back on the record.
13  A. I have talked with some of these employees;
14  what I spoke with them about, I don't remember, but
15  certainly, you know, had conversations with various
16  members.
17  Q. Can you tell me, in looking at Exhibit 45
18  and the list of names, anybody that comes to mind
19  that you remember speaking to specifically, if that
20  refreshes your memory?
21  A. I had conversations with folks almost every
22  day, so I could say, yes. Did I speak with Vinnie
23  Fiorilia; yes. Do I recall what I said with Vinnie;
24  I can't.

**Page 53**

1  Q. Anyone else?
2  A. Did I speak with Cliff Lord, yes; Jeanne
3  Skene, yes; Mary Bogdan, Mollie Bogdan, yes.
4  Q. I'm sorry, Mary Bowden (sic), and who was
5  the other person?
6  A. She goes by Molly.
7  Q. Molly?
8  A. Bogdan, B-o-g-d-a-n.
9  Q. Okay. Anyone else there that you can --
10  A. Oh, I'm sure I have talked with the others
11  as well, but I -- I'm sure I have talked with them
12  all; Diana Glassett, Boonchoo, Phil Greene, Bert --
13  Q. Bert Guilmette?
14  A. Bert Guilmette. Oudi --
15  Q. When you say Oudi --
16  A. Oudi Phommahaxay, Richard Picard. Certainly
17  all the names are very familiar to me -- not all,
18  most of the names are very familiar to me.
19  Q. Do you remember when you first started
20  talking to them in the hallway or in your office?
21  A. Do I remember when I first spoke with them?
22  Q. Yes.
23  A. I speak with employees on a regular basis as
24  part of my job.

14 (Pages 50 to 53)

Mary Leonard

10/13/2006

54

1   Q. No, I didn't mean that. I'm talking about
2   with respect to the sale of EFTC, that it was
3   pending. Do you remember when you first started
4   speaking with any of them individually?
5   A. I can't recall when I first spoke with them
6   individually about the sale of the business.
7   Q. I'm not looking for a precise date; I just
8   want to know from an event point of view, if that is
9   easier for you, from the time that you first learned
10  that it was being contemplated, from that point when
11  you first started, roughly, started talking to them,
12  a month later, 3 months later, after your first
13  meeting in the cafeteria, or whenever.
14  A. Related to the event of EFTC I talked with
15  these folks every day, so I don't know exactly when
16  I first spoke with them about it.
17  Q. I know you don't know exactly; can you tell
18  me approximately? For example, let me ask you this,
19  there was an initial meeting, a large meeting, in
20  the cafeteria with everybody there, correct?
21  A. Right.
22  Q. Did you start talking with them before that
23  meeting individually about the sale to EFTC or
24  after?

55

1   A. I can't recall.
2   Q. Did any of them ask you anything about
3   whether they would be paid severance if they went to
4   EFTC once they were terminated?
5   A. At some point individuals did inquire about
6   severance.
7   Q. Can you tell me what they asked you and what
8   you said to them?
9   A. Certainly individuals, you know, expressed
10  interest in wanting to receive severance benefits;
11  the plan did provide for severance benefits.
12  Q. What did you say to them when they asked you
13  about being paid severance benefits?
14  A. That they would not be eligible for
15  severance benefits.
16  Q. How many of them --
17  A. At some point they said that they would not
18  be eligible for severance benefits.
19  Q. Did you tell them they wouldn't be
20  eligible -- whether they went to EFTC or just were
21  terminated and didn't go to EFTC, did you tell them
22  they would not able to get severance in either
23  event?
24  ATTY. WELSH: Objection. You may

56

1   answer.
2   A. The nature of the transaction that Agfa was
3   having with EFTC, as a result of that, they were not
4   eligible for severance benefits, according to the
5   plan.
6   Q. I'm going to get to that in a minute, but
7   what I'm asking you is what they said to you and
8   what you said to them when you met with them. Did
9   any of them say, If I choose not go to EFTC and
10  choose just to be terminated, can I receive my
11  severance benefits?
12  A. According to the plan they still would not
13  be --
14  ATTY. WELSH: No, he is asking you not
15  what the plan said, but did anyone ask you that
16  question.
17  A. I don't remember if they asked me
18  specifically that question.
19  Q. Do you know whether they -- and I believe
20  you have already answered this, but my understanding
21  is that they did ask you if they were going to get
22  the severance benefits if they went to EFTC after
23  being terminated; is that correct?
24  A. They asked whether or not they would be

57

1   eligible to receive severance benefits. The
2   qualifying reason as to whether they were going to
3   go to EFTC or not I don't recall, but the question
4   about severance benefits did come up, and I did
5   indicate to them that they would not be eligible for
6   severance benefits.
7   Q. Did you tell them why?
8   A. I told them that the plan didn't provide for
9   that, that the severance plan did not provide for
10  them to be eligible.
11  Q. Did not provide?
12  A. Did not provide.
13  Q. Did you explain specifically how that worked
14  in terms of the plan language?
15  A. I believe in some cases I actually showed
16  them the Summary Plan Description.
17  Q. And that's the document that we already
18  marked as Exhibit 4 in Mr. Fiorilla's deposition,
19  correct, which we --
20  A. That's correct.
21  Q. Did you ever show them the language in the
22  Bayer Severance Pay Plan itself, other than the
23  Summary Plan Description, when you met with them?
24  A. I don't recall doing that.

15 (Pages 54 to 57)

Mary Leonard                                               10/13/2006

**Page 58**

1   Q. And when I say the Bayer Severance Pay Plan,
2 I show you Fiorilla Exhibit 9. Is that the Bayer
3 Severance Pay Plan that was in effect at that time?
4   A. It appears to be, yes.
5   Q. And did you have the Bayer Corporation
6 Severance Pay Plan in your office we have marked as
7 Exhibit 9 in Fiorilla's deposition.
8   A. I would have the a Summary Plan Description
9 in my office; I wouldn't have this Severance Pay
10 Plan.
11   Q. Did you ever receive a copy of it at any
12 time, the Bayer Corporation Severance Pay Plan,
13 Exhibit 9 of Fiorilla?
14   A. I don't recall receiving that.
15   Q. Were you familiar with it at all? Had you
16 ever read it?
17   A. I was very familiar with the Summary Plan
18 Description.
19   Q. I'm not asking you about the Summary Plan,
20 I'm talking about the Bayer Corporation Severance
21 Pay Plan; were you familiar with that?
22   A. No.
23   Q. Had anybody told you that it existed?
24   ATTY. WELSH: At any time?

**Page 59**

1   ATTY. ROACH: At any time in 1998.
2   A. I can't recall.
3   Q. Did you know there was a Bayer Severance Pay
4 Plan beyond the Summary Plan Description in 1998?
5   A. I don't know.
6   Q. And on Exhibit 4, Fiorilla Exhibit 4, what
7 specific pages did you point out to the employees
8 that asked you about whether they would be paid
9 severance pay, if any, any specific language?
10   A. In the section that says, When benefits are
11 not paid.
12   Q. And what specific wording did you point to
13 to show them that they were not to be entitled to
14 benefits, severance benefits?
15   A. Well, there are bullets here that indicate,
16 The company offers you a comparable position.
17   Q. This is on Page SEV 4 on Fiorilla Exhibit 4,
18 correct?
19   A. Correct.
20   Q. Can you please tell me what bullet points on
21 page 4 you pointed to, if you could just identify it
22 for the record?
23   A. I can't recall exactly what bullet points I
24 pointed to, but certainly in this section here it

**Page 60**

1 outlines that the company offers you a position,
2 even if you choose not to accept it, and all these
3 other bulleted points. It also speaks to that does
4 not require you to commute 35 miles or farther,
5 because they would consent to be working at the
6 same site, that the wage or salary level, without
7 regard to benefits, would be equal to or greater
8 than the wage, and they were offered compensation
9 that was, in fact, greater than what they were
10 receiving at Bayer. It also talks about the
11 premises and the products the division sold, so...
12   Q. And that premises and products that division
13 sold, is that the 4th bullet point from the middle
14 column of SEV 4 of Exhibit 4?
15   A. That's the 4th bullet point.
16   Q. And then the other bullet point about the
17 comparable position, I believe you were pointing to
18 as you were talking about the comparable position,
19 was the bullet point -- the first 2 bullet points on
20 the right-hand column of SEV 4; is that correct?
21   A. Well, the section about the wage and salary
22 level is the second bullet point, yes.
23   Q. Did you talk to them about the first bullet
24 point on the right-hand column of SEV 4 about the 35

**Page 61**

1 miles?
2   A. I talked about different bullet points that
3 were here.
4   Q. I understand. I'm just trying to get your
5 best memory as to which ones you remember pointing
6 to when you were speaking to them.
7   A. Certainly we talked about the section When
8 benefits are not paid.
9   Q. I understand that, and I'm just trying to --
10   A. There are different bullet points. There
11 are certainly a number of different bullet points
12 that apply, but certainly these were the reasons why
13 they would not be eligible --
14   Q. I understand that.
15   A. And at least here it talks about if you
16 accept a new position, regardless of whether it's a
17 comparable position, you would not be eligible for
18 severance benefits with respect to -- yes. There
19 are a lot of them.
20   Q. So that's the second bullet point on the
21 right-hand column of SEV 4, correct?
22   A. That's not a bullet point; this is a bullet
23 point, right?
24   Q. It's underneath the second bullet point on

16 (Pages 58 to 61)

Mary Leonard

**62**

1  SEV 4, correct?
2     A. It's a paragraph that is under that bullet
3  point, yes.
4       ATTY. ROACH: Off the record.
5       (Discussion off the record.)
6       ATTY. ROACH: Back on the record.
7     Q. So it's fair to say that when you met with
8  some of the individuals who asked you about
9  severance, on Exhibit 4 of Fiorilla, on page SEV 4,
10 you directed their attention to the third bullet
11 point down on the middle column, and 4th bullet
12 point down on the middle column, and also the first
13 2 bullet points on the right-hand column, and also
14 the last paragraph of the right-hand column; is that
15 fair?
16    A. It's fair to say that I spoke about this
17 page with folks, that I did talk about different
18 bullet points that were identified in the section
19 that says When benefits are not paid.
20    Q. What I want to know is which bullet points
21 you remember pointing to.
22    A. Certainly the ones that we spoke about.
23    Q. The ones I just identified?
24    A. Those were some of the bullet points, yes.

**63**

1     Q. Any others?
2     A. You know, I can't recall all the specifics.
3     Q. You recall those, you just don't recall
4  whether there were others? There may have been, you
5  just don't recall?
6     A. There may have been others that we spoke
7  about, but certainly that was the section that we
8  talked about.
9       ATTY. WELSH: We don't need to do it
10 right now, Steve, it looks like you might be in the
11 middle of an area, but in the next five minutes or
12 so --
13      ATTY. ROACH: You need to take a break?
14      ATTY. WELSH: Yes.
15      ATTY. ROACH: That's fine.
16      ATTY. WELSH: If you are in the middle
17 of a subject, keep going. Just keep that in mind.
18 Just tell me when it's a good time.
19      ATTY. ROACH: Do you want to take a
20 break?
21      THE COURT REPORTER: I'm all set. When
22 you are ready.
23      ATTY. ROACH: By the way, you can take a
24 break any time you want. This is not a marathon --

**64**

1       THE WITNESS: Okay.
2       ATTY. ROACH: -- or endurance test, so
3  if you are tired and want to take a break, that's
4  fine.
5     Q. When you met with the individuals and
6  discussed with them the severance, did you meet in
7  your office, as well as in the hallway, from time to
8  time?
9     A. Employees would come to my office, yes.
10    Q. Where was your office located relative to
11 the Board Shop?
12    A. It was in close proximity to the Board Shop.
13    Q. Who, if anyone, told you that the severance
14 benefits were not payable to the Board Shop
15 employees with regard to the EFTC transaction?
16      ATTY. WELSH: Objection. You may
17 answer.
18    A. Certainly my manager Rodney Willis spoke
19 with me about the Board Shop employees not being
20 eligible for severance.
21    Q. Anyone else?
22    A. None that I can recall.
23    Q. Did you ever speak to David Marr, Julie
24 Haley, or Terri Mahoney about it?

**65**

1     A. I don't recall speaking with them about
2  whether they would be eligible or not eligible.
3  Certainly we talked about the Board Shop from time
4  to time and certainly that they would not be
5  eligible for severance benefits.
6     Q. When you say from time to time you spoke to
7  them, that would include Mr. Marr, Ms. Haley, and
8  Ms. Mahoney, as well as Rodney Willis?
9     A. David Marr's office is not located at the
10 Wilmington site, but certainly Julie Haley's and
11 Terri's offices were located at the Wilmington site.
12    Q. Where was David Marr's office?
13    A. In Richfield Park, New Jersey.
14    Q. What did Rodney Willis say to you when you
15 spoke to him whether the Board Shop employees were
16 entitled to severance?
17    A. Again, the plan didn't provide for them to
18 be eligible for severance.
19    Q. That is what he said to you?
20    A. I don't know the exact words that he said to
21 me, but certainly he told me they would not be
22 eligible for severance.
23    Q. Can you tell me how has discussion came up?
24    A. I don't recall the nature of when that came

17 (Pages 62 to 65)

Mary Leonard                                                    10/13/2006

---

**66**

1  up, or how that came up.
2      Q. Do you remember where you were when you
3  spoke to him about it?
4      A. I don't remember where I was.
5      Q. Where was his office in relation to your
6  office?
7      A. He was located at 200 Ballardvale Street.
8      Q. Is that a building that is nearby where you
9  worked?
10     A. It's about 5 miles away.
11     Q. When you talked to him about whether the
12 Board Shop employees would be entitled to severance,
13 did you talk to him in person or on the phone?
14     A. I can't recall.
15     Q. Do you remember how many times you spoke to
16 him about it?
17     A. About the Board Shop employees not being
18 eligible for severance?
19     Q. Correct.
20     A. I can't recall how many times I spoke with
21 him about that.
22     Q. Can you give me a rough number?
23     A. I can't even give you a rough number.
24     Q. Can you tell me specifically whether you

---

**67**

1  went through the bullet points you just discussed
2  with us on Fiorilla Exhibit 4, the Summary Plan
3  Description, about the severance benefits when you
4  spoke to Mr. Willis?
5      ATTY. WELSH: Objection. You may
6  answer.
7      THE WITNESS: Can you ask that question
8  again.
9      ATTY. ROACH: You can read it back.
10     (Question read.)
11     A. I can't recall.
12     (Recess taken.)
13     Q. Can you tell me whether, before you spoke to
14 Mr. Willis, you knew or believed that the -- whether
15 severance payments would be due to the plaintiffs in
16 this case, Board Shop employees?
17     A. Before I spoke to Mr. Willis whether I knew
18 that they wouldn't be eligible for that? Certainly
19 I'm familiar with the plan and that they would not
20 we eligible for the benefits.
21     Q. That was your belief before you spoke to Mr.
22 Willis?
23     A. That certainly I'm familiar with the Summary
24 Plan Description, so, yes, I understood what the

---

**68**

1  Severance Plan provided for.
2      Q. Did anybody ask you to look at the Summary
3  Plan Description, the severance portion of it, on
4  Fiorilla Exhibit 4 to make an analysis or determine
5  whether you believed the Summary Plan Description
6  provided for severance benefits to them?
7      A. Did anyone ask me about that?
8      Q. Yes.
9      ATTY. WELSH: No, no. Listen to his
10 questions. He asked --
11     ATTY. ROACH: That is what I asked. Go
12 ahead.
13     ATTY. WELSH: Did you hear the question?
14     THE WITNESS: Can you repeat the
15 question, please.
16     (Question read.)
17     A. No, not that I recall that anyone asked me
18 to make an analysis of that.
19     Q. Did anybody ask you to look at it and give
20 them your view as to whether you believed the
21 severance benefits were payable to the plaintiffs in
22 this case?
23     A. I can't recall if anyone -- did anyone ask
24 me to look at the severance plan?

---

**69**

1      ATTY. WELSH: And give your opinion.
2      A. And give my opinion of that?
3      Q. Yes, anyone other than the plaintiffs. I'm
4  talking about anybody in Bayer management or in the
5  Human Resources Department.
6      A. I can't recall that anyone in the Human
7  Resources asked me for an analysis of that.
8      Q. What about anyone else in Bayer other than
9  the plaintiff?
10     A. I can't recall anyone else.
11     Q. What about Mr. Ramsden? Did he ever ask you
12 to look at it and get back to him as to whether you
13 felt the severance benefits would be payable to the
14 plaintiffs in this case?
15     A. I don't recall Dick Ramsden asking me to
16 look at that.
17     Q. What about Mr. Paige?
18     A. I can't recall Mr. Paige doing that.
19     Q. What about Mr. Sarafian? Do you know Mr.
20 Sarafian?
21     A. Yes, I do know Mr. Sarafian.
22     Q. What about him? Did he ask you?
23     A. I don't recall him doing that.
24     Q. So your memory is you don't recall anybody

---

18 (Pages 66 to 69)

Mary Leonard                                                    10/13/2006

---

**74**

1    A. There were employees that weren't happy that
2  they would not be eligible for severance benefits.
3    Q. Can you remember what they said, how they
4  expressed their unhappiness?
5    A. Employees were disappointed that they would
6  not be eligible for severance benefits.
7    Q. Can you remember any words that were said?
8    A. Different individuals have strong feelings
9  about the eligibility for severance, you know, so
10 each person was different.
11   Q. Can you tell me any words that were spoken,
12 or gestures that were made, when the plaintiff
13 employees, Board Shop employees, expressed their
14 disappointment?
15      ATTY. WELSH: Objection. You may
16 answer.
17   Q. You can answer.
18   A. I can't recall any gestures.
19   Q. Can you recall any words that were said,
20 like this is wrong, this is unfair, I believe we are
21 due the severance, any words of that nature?
22   A. I can't recall any words other than the fact
23 that certainly I was -- employees were unhappy that
24 they were not eligible for severance benefits.

---

**75**

1    Q. Did you tell the employees, the Board Shop
2  employees, that there was an appeal process if they
3  disagreed with what you had told them about the
4  severance?
5    A. I don't recall speaking with them about an
6  appeal process.
7    Q. Was there an appeal process if they
8  disagreed with your decision?
9    A. In the Summary Plan Description there is
10 section in there that talks about appeal process,
11 yes.
12   Q. Did you discuss that with any of them,
13 mention it to them at all?
14   A. I don't recall.
15   Q. What's the procedure if someone doesn't
16 agree with your decision with respect to severance
17 benefits?
18      ATTY. WELSH: Objection. You may
19 answer.
20   A. There is no procedure in terms of someone
21 objecting. I don't know what you mean by a --
22 written procedure?
23   Q. Written or verbal procedure. What's the
24 procedure, if any, that someone may follow if they

---

**76**

1  disagreed with what you told them about the
2  severance benefits?
3    A. Employees could certainly talk with my
4  manager Rodney Willis.
5    Q. Do you know whether anyone did speak to
6  Rodney Willis?
7    A. I don't recall.
8    Q. Do you know whether employees talked to
9  anyone else about the severance benefits, Mr.
10 Ramsden, Mr. Paige, Mr. Marr, Ms. Haley, Ms.
11 Mahoney, anybody else at Bayer Human Resources or
12 management?
13   A. I know that the question was asked at the
14 Benefits meeting with Julie about severance.
15   Q. Julie Haley was at the meeting?
16   A. Julie Haley, yes, who presented at Benefits
17 Highlight.
18      ATTY. ROACH: Can we go off the record
19 for just a moment, please.
20      (Discussion off the record.)
21   Q. We are going to get to the meetings in a
22 minute. I just want to know whether there were any
23 individual conversations in offices, hallways, or
24 otherwise that you are aware of that any Board Shop

---

**77**

1  employees had with anyone in Bayer Management or
2  Human Resources, other than what you already told me
3  about.
4    A. The employees talked with all of them, Dick
5  Ramsden, myself, Norm Fontaine. The nature of their
6  conversation I don't know.
7    Q. I just want to know if you know of anybody
8  that came and spoke to them about severance benefits
9  and whether they would be getting -- whether you had
10 any knowledge of anybody coming up to them
11 individually, any of those people.
12   A. I don't know.
13   Q. Did you have any conversations with Mr.
14 Willis about the fact that people were coming to you
15 asking about severance and were disappointed or
16 unhappy that you had told them that they weren't
17 eligible for severance?
18   A. Certainly I had a talk with Rodney about
19 employees being disappointed that they would not be
20 eligible.
21   Q. What did he say to you and what did you say
22 to him when you spoke to him?
23   A. I don't remember the exact details of that
24 conversation.

---

20 (Pages 74 to 77)

Mary Leonard                                                                    10/13/2006

98

1    presentation delivered. I wasn't there. I don't
2    remember being there at the meetings, but I do know
3    that employees went to these meetings.
4        Q. Did you ever talk to Julie about any
5    questions that were raised at the meetings that she
6    had with Board Shop employees?
7        A. Yes, I did.
8        Q. What did she say to you?
9        A. She did indicate to me that the employees
10   raised questions about severance.
11       Q. What else did she tell you in that regard?
12       A. That's all I can recall.
13       Q. Did she tell you what she said to them?
14       A. She did indicate to me that she told them
15   that they would not be eligible for the benefit.
16       Q. Did she tell you what basis she had for
17   telling them that, what the reasons were?
18       A. We didn't discuss what the basis was for
19   that.
20       Q. What prompted her to tell you that the
21   employees were asking about severance?
22           ATTY. WELSH: Objection. You can answer
23   if able.
24       A. This is just typical colleagues talking

99

1    about meetings and what transpired in meetings.
2        Q. Did she tell you that any of the employees
3    were unhappy, expressed unhappiness about not being
4    provided severance, similar to what they had
5    expressed to you?
6        A. Yes, she did indicate employees were
7    disappointed.
8        Q. Did she say how that was expressed or what
9    they said?
10       A. No. No detail, no.
11       Q. Can you remember in general, if not in
12   detail?
13       A. Other than the question being raised and her
14   response to folks, that's all I can remember.
15       Q. Did she tell you whether they had said or
16   asked her whether they could choose not to go to
17   EFTC and take severance?
18       A. I don't remember that.
19       Q. Do you remember whether she mentioned any
20   names of who asked her about whether they would get
21   severance or being unhappy about it?
22       A. I don't remember any names.
23       Q. Anything else you can recall in your
24   discussions with Ms. Haley about what was said at

100

1    the meetings between her and the employees?
2        A. Not that I can recall.
3        Q. Did you ever sit down or otherwise discuss,
4    telephone, e-mail, or otherwise, with Ms. Haley
5    about the unhappiness of the employees about not
6    getting severance?
7        A. Certainly we have talked -- the questions
8    about -- because employees had come and said that
9    they were unhappy about not receiving severance. It
10   was a conversation within the HR Group, yes.
11       Q. Can you tell me what the HR Group discussed
12   in that regard?
13       A. That the employees wouldn't be eligible for
14   severance and that they were disappointed.
15       Q. Who participated in those discussions within
16   HR?
17       A. Those would be discussions we would have
18   amongst the colleagues, with Julie, with Rodney.
19       Q. Rodney Willis?
20       A. Rodney Willis, yes.
21       Q. Who else?
22       A. I would expect that certainly others might
23   hear about it within the Human Resources Department.
24       Q. Like who?

101

1        A. Like other folks that are listed there on
2    the org. chart, like Dave Kourtz, who would know
3    that is what we had shared with the employees.
4        Q. Leonard Exhibit 46 that is on?
5        A. Mm-mm.
6        Q. Is that a yes?
7        A. Yes.
8        Q. That's K-o-u-r-t-z?
9        A. That's correct.
10       Q. What was David Kourtz's role in working with
11   you on the termination of the Board Shop employees
12   before they went to the EFTC?
13       A. He had no role in that.
14       Q. What did you, and Mr. Willis, and Julie
15   Haley discuss when you were talking about the
16   expression of unhappiness by the employees about not
17   getting severance?
18       A. Other than discussing that the folks were
19   unhappy, I can't recall any other.
20       Q. Were any names mentioned of particular Board
21   Shop employees who expressed unhappiness?
22       A. There may have been.
23       Q. Can you think of any?
24       A. Well, I know that Jeanne Skene was unhappy.

26 (Pages 98 to 101)

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

Mary Leonard

102

1     Q. Anyone else?

2     A. I can't recall the specifics.

3     Q. What about Mr. Fiorilla?

4     A. I don't remember.

5     Q. What about Mr. Brown, Robert Brown?

6     A. I don't remember.

7     Q. What do you remember about Jeanne Skene

8 being unhappy?

9     A. I remember Jeanne being unhappy to the

10 extent she was in my office a number of times.

11     Q. You discussed that with Rodney Willis and/or

12 Julie Haley?

13     A. I would have talked with Rodney about Jeanne

14 Skene.

15     Q. And what did you say to him about her and

16 what did he say to you?

17     A. I would have said to him that she had been

18 in my office talking about severance.

19     Q. Other than that what did you say about

20 Jeanne Skene to Mr. Willis and what did he say to

21 you?

22     A. I don't recall.

23     Q. Other than she had been there a number of

24 times?

103

1     A. Mm-mm.

2     Q. Is that a yes?

3     A. Yes.

4     Q. Did you say anything about how she might be

5 someone who was being disruptive, or obnoxious, or

6 persistent, or unnecessarily persistent, or any

7 negative things about her at any time?

8     A. I can't recall talking negatively about

9 anyone, other than she was in my office a number of

10 times asking about severance benefits, inquiring

11 about severance benefits.

12     Q. How many times did she come in your office?

13     A. I don't know how many times.

14     Q. What did she say to you on those occasions?

15     A. I do recall at one point she asked for the

16 Summary Plan Description and I gave her a copy of

17 such.

18     Q. Who else?

19     A. I can't recall any other.

20     Q. Did you go through the bullet points we

21 discussed earlier on SEV 4 of Fiorilla Exhibit 4,

22 with Ms. Skene?

23     A. You know, I talked about the Summary Plan

24 Description with a number of employees; I can't say

104

1 for sure whether or not I did that with Jeanne or

2 not.

3     Q. What do you think -- strike that. Why, if

4 you know, did she come in on more than one occasion

5 to discuss severance benefits with you?

6     A. Excuse me, why?

7     Q. Why.

8     A. I don't know why she would be in my office

9 so many times, but she was in my office a number of

10 times.

11     Q. Was it always the same discussion, or did

12 she come in with different questions?

13     A. I don't recall what other questions she may

14 have come in with.

15     Q. Did she argue with you about whether

16 severance was available to the Board Shop employees?

17     A. I know that Jeanne can be vocal, but I

18 wouldn't consider it argumentative.

19     Q. Did she have a discussion with you about the

20 terms of the Summary Plan Description and as to why

21 the employees, in her view, would be entitled to

22 severance?

23     A. I spoke with Jeanne about severance and the

24 ineligibility of the benefit. That is really to the

105

1 best of my recollection.

2     Q. I understand that is generally what you

3 talked about, but what I want to know is whether she

4 disagreed with you and you had a discussion as to

5 your disagreeing with each other and she bringing up

6 some points and you bringing up some points; do you

7 remember that?

8       ATTY. WELSH: Objection.

9     A. Certainly Jeanne had her opinion in terms of

10 being eligible for the benefit, yes.

11     Q. And hers was different than yours?

12     A. Hers differed from mine, yes.

13     Q. What did she say to you that made her

14 opinion different than yours, if you remember?

15     A. I don't remember, but I know she felt that,

16 you know, they were entitled to the benefit.

17     Q. Did she say why?

18     A. I don't remember. I don't remember.

19     Q. You don't remember her pointing to any

20 specific language in the plan?

21     A. You know, I just don't remember.

22     Q. What about anybody else? Do you remember

23 arguing with anybody else or having a discussion

24 with anybody else that had a different point of view

27 (Pages 102 to 105)

Mary Leonard                                                          10/13/2006

106

1    than you did about whether benefits were available?
2        A. There were a number of employees that were
3    disappointed that they wouldn't be eligible for the
4    benefit, and were unhappy about that. You know, to
5    the extent that -- you know, whether or not I went
6    through the plan with them, and who I did that with,
7    I don't remember, but I do remember talking with a
8    number of employees.
9        Q. Can you tell me whether Mr. Willis or Ms.
10   Haley, in your discussions with them about the
11   employees' inquiries about severance, ever said to
12   you, We should provide them with the appeal
13   procedure if they disagree with our decision about
14   severance?
15       A. I don't remember that. I don't remember.
16       Q. You don't remember one way or the other
17   whether that was said?
18       A. No.
19       Q. Do you remember providing anybody with, or
20   pointing anybody to, the written appeal procedure?
21       A. I don't remember doing that.
22       Q. Do you remember any discussions with anybody
23   in Bayer saying that with this sale to EFTC, if
24   everybody accepts a job with EFTC, we won't have to

107

1    pay severance?
2        A. Absolutely not did we ever talk about with
3    Bayer that if they didn't accept jobs we wouldn't
4    have to pay severance.
5        Q. So you can't remember any discussions within
6    Bayer about a concern that if people didn't accept
7    the job with EFTC that Bayer might have to pay the
8    severance?
9        A. I don't remember any discussions that I had
10   with anybody with Bayer about severance.
11       Q. Did you ever hear anybody discussing that
12   point in Bayer in meetings you attended or any
13   conversations you had with anyone?
14       A. Can we go back to what you wanted to know
15   about?
16       Q. What I want to know is whether you heard
17   anybody within Bayer express a concern that if
18   people didn't accept the job with EFTC we might have
19   to pay severance.
20       A. No.
21       Q. Never heard anybody say that?
22       A. No.
23       Q. Never heard that question coming up in any
24   meetings or discussion; is that correct?

108

1        A. That's correct.
2            ATTY. ROACH: Just off the record for a
3    minute.
4            (Discussion off the record.)
5            (Whereupon, the luncheon recess was
6            taken from 12:33 p.m. to 1:15 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

109

1            AFTERNOON SESSION
2            DIRECT EXAMINATION, cont'd
3        BY ATTORNEY ROACH:
4        Q. Did you ever have any discussions with EFTC
5    about the sale?
6        A. I don't remember talking with any
7    individuals that worked at EFTC.
8        Q. Were you ever at any meetings, small
9    meetings, either one on one or with other people
10   from Bayer, with representatives from EFTC at any
11   time?
12       A. With representatives of Bayer?
13       Q. Representatives of Bayer, and EFTC, and you
14   at a meeting.
15       A. No, I don't recall being at any.
16       Q. Ever been involved in any e-mail discussions
17   with anybody within Bayer regarding the sale, the
18   EFTC sale?
19       A. You mean the headquarters Bayer Corporation,
20   and the answer is no.
21       Q. What about within Wilmington, the Agfa
22   Division at Wilmington, how about involved in any
23   e-mail correspondence?
24       A. E-mail correspondence regarding the sale?

28 (Pages 106 to 109)

Mary Leonard                                                                10/13/2006

126

1  know that that is an expression that I have heard.
2      Q. In the context of the EFTC sale?
3      A. I don't think it's necessarily in the
4  context of the EFTC sale, but...
5      Q. Did you ever hear it in the context of the
6  EFTC sale?
7      A. I don't remember.
8      Q. Do you remember speaking yourself to the
9  group as a whole at any of these meetings?
10     A. No, I did not speak to the group.
11     Q. Did you answer any questions?
12     A. I don't recall answering any questions.
13     Q. What about Mr. Paige, Mr. Willis, Mr.
14 Fontaine, or Mr. Baribeau; do you remember them
15 saying anything to the group or answering any
16 questions?
17     A. I don't remember.
18     Q. Have you now told me everything you can
19 remember about what anybody from the Bayer
20 management or EFTC said to the employees, the Board
21 Shop employees, at these meetings?
22     A. I don't remember.
23     Q. I'm just asking you.
24     A. It's a number of years ago. Do I know that

127

1  they had meetings; yes. Do I recall Dick Ramsden
2  speaking at the meetings, yes. Do I recall that
3  some employees from the Board Shop may have asked
4  questions, yes. Do I recall the nature of the
5  discussions; I just don't remember.
6      Q. But you have told us everything you can
7  recall?
8      A. Yes.
9      Q. Can you recall any specific questions of the
10 Board Shop employees to either Mr. Calderon or the
11 others from Bayer that were there?
12     A. I can't recall the specific questions.
13     Q. What was the purpose of the meetings?
14         ATTY. WELSH: Objection. You may
15 answer.
16     Q. If you know. Let me back up. Did anyone
17 tell you, from Bayer, what the purpose of the
18 meetings would be with the Board Shop employees?
19     A. Did the members that I just mentioned to
20 you, Dick Ramsden and others, tell me what the
21 purpose of the meetings were?
22     Q. Yes.
23     A. I don't recall anyone saying that there was
24 a purpose for the meetings, other than certainly we

128

1  had meetings. The intent of our meetings was to
2  keep the employees in the Board Shop aware of the
3  status of what was happening relative to the Printed
4  Circuit Board Shop, and I do believe that those
5  meetings began even before, you know, EFTC came into
6  the picture. It was at the time that they made a
7  decision that they weren't going to be in the
8  printed circuit board business any longer.
9      Q. Do you remember some kind of announcement
10 that was made to Board Shop employees before EFTC
11 and Bayer were negotiating or discussing a potential
12 sale; is that what you are saying?
13     A. There was some sort of announcement.
14 Whether it was at a meeting, I don't recall, but
15 certainly the employees were told that, you know,
16 the business -- that we weren't going to continue in
17 the printed circuit board business.
18     Q. Do you remember when they were told that?
19     A. I don't remember when.
20     Q. Do you remember how they were told?
21     A. I don't remember.
22     Q. Do you remember who told them?
23     A. I don't remember who told them either.
24     Q. When the Board Shop employees were

129

1  terminated from Bayer before they went to EFTC, were
2  they given a written notice of termination or was it
3  verbal?
4          ATTY. WELSH: Objection. You can
5  answer.
6      Q. You can answer.
7      A. I don't believe we gave any written notice
8  of termination to the employees.
9      Q. How was their termination communicated to
10 them?
11         ATTY. WELSH: Objection. You may
12 answer.
13     A. Basically that they accepted employment with
14 EFTC and so that we were terminating their
15 employment.
16     Q. So they weren't voluntarily resigning; you
17 told them that they were being terminated and they
18 had a choice to go to EFTC; is that a fair
19 statement?
20         ATTY. WELSH: Objection.
21         ATTY. ROACH: You can answer.
22         ATTY. WELSH: Yes, you can answer.
23     A. The employees were all given an opportunity
24 to accept an offer with EFTC. To the extent that

33 (Pages 126 to 129)

Mary Leonard                                                    10/13/2006

130

1  all those employees that were extended offers with
2  EFTC had accepted employment, we terminated their
3  employment with, at that time, Agfa Division Bayer
4  Corporation.
5      Q. So is it your statement, then, that they
6  were terminated after they accepted a job with EFTC
7  or that they were told they were being terminated
8  and had a choice to accept a job with EFTC? Which
9  one is it?
10     ATTY. WELSH: Objection. You may
11 answer.
12     A. They accepted employment with EFTC; their
13 employment was terminated their last day worked with
14 Agfa Corporation -- not Agfa Corporation, Agfa
15 Division of Bayer Corporation.
16     Q. What day is that?
17     A. The effective date is September first.
18     Q. Were they told if they didn't accept the job
19 with EFTC that they would be terminated?
20     A. Their employment with Agfa would also be
21 terminated, yes -- no, they were not told that,
22 because everybody accepted employment with EFTC;
23 there was no reason to say that.
24     Q. Did anybody say to you, Gee, if we don't

131

1  accept this job with EFTC, what will happen to us?
2      A. I don't recall.
3      Q. You don't recall whether anybody said, If we
4  don't accept the job with EFTC what will happen to
5  us?
6      A. I don't remember.
7      Q. You don't remember that?
8      A. I don't remember someone saying that to me.
9      Q. Do you remember anybody saying it to
10 anybody?
11     ATTY. WELSH: Objection. You may
12 answer.
13     A. I don't remember.
14     Q. Now, when you said that at some point people
15 were told that there would be termination or closing
16 down of the Board Shop, and I think you said you
17 couldn't remember how it was communicated, I want to
18 show you Ramsden Exhibit 9. It's a memo from
19 Erhard Rittinghaus. Have you ever seen that
20 before?
21     A. I don't remember seeing this.
22     Q. Is there something that causes you to recall
23 that the Board Shop employees were told that the
24 Board Shop was going to be closed or sold before

132

1  EFTC came into the picture, as you had stated?
2      (Witness inaudible. Reporter changes
3      position.)
4      (Discussion off the record.)
5      (Question read.)
6      A. Yes, I recall that before EFTC came into the
7  picture that there was a decision to not be in the
8  printed circuit board business, and I recall that
9  the company at that time was looking at
10 alternatives.
11     Q. What would happen to the Board Shop
12 employees?
13     A. That would be dependent on the alternative
14 that was decided upon.
15     Q. And if you hadn't been able to find somebody
16 to buy the Board Shop, what would have happened to
17 the employees?
18     ATTY. WELSH: Objection. You may
19 answer.
20     ATTY. ROACH: When he objects you can
21 still answer.
22     ATTY. WELSH: I will grab your arm if I
23 don't want you to answer.
24     ATTY. ROACH: You can answer when he

133

1  objects.
2      THE WITNESS: All right. Once again,
3  the question was?
4      (Question read.)
5      A. Again, it would have been dependent on the
6  nature of whatever decision was made.
7      Q. If no one had bought the Printed Circuit
8  Board, Board Shop, would they have been reduced in
9  force, laid off?
10     ATTY. WELSH: Objection. You may
11 answer.
12     A. I don't know.
13     Q. What is your first memory as to when they
14 found out that Bayer wanted to discontinue with the
15 Board Shop, whether either by sale or otherwise?
16     A. I don't remember when that came up, the
17 discussion.
18     Q. Do you remember how you found out?
19     A. I don't know how I found out. I don't
20 remember.
21     Q. Somebody from Bayer management told you I
22 assume; is that correct?
23     ATTY. WELSH: Objection. You may
24 answer.

34 (Pages 130 to 133)

Mary Leonard                                                           10/13/2006

134

1    A. Yes, someone told me.

2    Q. Was there anybody from the Board Shop in the

3    area that we have designated, or identified on

4    Ramsden Exhibit 3, that stayed with Bayer and didn't

5    leave?

6    A. All the people that accepted the positions

7    went. I don't know what you are --

8    Q. My question is was there anybody who didn't

9    accept positions and stayed there?

10   A. Not that I recall.

11   ATTY. WELSH: Can I tell you something

12   of the record?

13   ATTY. ROACH: Sure.

14   (Discussion off the record.)

15   Q. Let me ask you this, Was there anybody that

16   was offered a position with EFTC who rejected it and

17   stayed at Bayer?

18   A. No.

19   Q. Was there anybody who was not offered a

20   position at EFTC and was moved to somewhere else

21   within Bayer?

22   A. Were not offered the position with EFTC.

23   EFTC offered employment to all the employees in the

24   Printed Circuit Board Manufacturing Group, and I

135

1    indicated to you that all those employees who were

2    extended offers accepted offers.

3    Q. Let me ask you about a few people, and I'd

4    like to know if they stayed with Bayer, rather than

5    go to EFTC; Donna Rhynd, R-h-y-n-d, and I'm talking

6    about as of September 1, 1998 initially.

7    A. Donna Rhynd wasn't extended an offer to go

8    to work at EFTC.

9    Q. And she worked in the Board Shop?

10   A. She worked in this other organization. Her

11   name shows up over here.

12   Q. So on Ramsden Exhibit 3 she worked over in

13   the engineering area?

14   A. Well, I know that her work was associated

15   with the Printed Circuit Board Manufacturing Area,

16   but in context of what we have been talking about,

17   you have been referring to these 2 blocks on the

18   organization chart, so I didn't consider her part of

19   our discussions.

20   Q. What about John Napper, N-a-p-p-e-r; was he

21   ever with the Board Shop?

22   A. John did Quality Engineering work associated

23   with the Printed Circuit Board Group.

24   Q. Was he offered a job at EFTC?

136

1    A. He was not extended an offer.

2    Q. So he stayed within Bayer?

3    A. He stayed within Bayer.

4    Q. Did he go to some area within Bayer?

5    A. He stayed within Bayer; I don't remember any

6    area different than where he was at.

7    Q. Do you know which area he was in within

8    Bayer?

9    A. John was a Quality Engineer.

10   Q. Where would that show up on Ramsden Exhibit

11   3, if anywhere?

12   A. I would expect that would show up in the

13   Engineering Group.

14   Q. Was the Engineering Group ever downsized or

15   reduced in force?

16   A. I don't recall.

17   Q. What about Mohammed Hassini, H-a-s-s-i-n-i?

18   A. Mohammed was a Test Engineer.

19   Q. Was he within the Board Shop?

20   A. He would be in the Engineering Group, but

21   his work was associated with the boards.

22   Q. Was he offered a job with the EFTC?

23   A. No, he was not.

24   Q. Did he move anywhere else within Bayer?

137

1    A. He was a Test Engineer, so he was in the

2    Engineering Group.

3    Q. He stayed with Bayer?

4    A. He stayed with Bayer.

5    Q. What about Steven Kalucki, K-a-l-u-c-k-i?

6    A. Steve was an engineer.

7    Q. He was in the Engineering Group?

8    A. Yes, he was.

9    Q. Was he associated with the Board Shop?

10   A. His work related to the Board Shop, yes.

11   Q. Did he stay with Bayer or was he offered a

12   job at EFTC?

13   A. He was not offered a job at EFTC.

14   Q. Why were those other people that we just

15   discussed not offered a job at EFTC?

16   ATTY. WELSH: Objection. You may

17   answer.

18   Q. If you know.

19   A. These other people being John Napper, Steve

20   Kalucki as such?

21   Q. Right.

22   A. My recollection is that we needed

23   individuals within the Bayer organization to be, I

24   guess I could consider them, a technical resource or

35 (Pages 134 to 137)

Mary Leonard                                                            10/13/2006

138

1   in looking at the quality of the work that is coming
2   from the Board Shop. That's just to my
3   recollection. They were expertise that needed to be
4   continued within the Bayer organization.
5       Q. I'd like to show you what has been marked as
6   Exhibit 26 in this case. It's a list of some
7   employees, Ramsden Exhibit 26, and do you recognize
8   any of the names on there?
9       A. I recognize some of the names on here, yes.
10      Q. Were any of them given severance at any time
11  that you know of?
12      A. I don't remember. We have provided
13  severance benefits for so many employees over the
14  years I just don't remember.
15      Q. And that's under the Summary Plan
16  Description we have talked about where they have
17  been given severance benefits?
18          ATTY. WELSH: Objection. You may
19  answer.
20      Q. You can answer.
21      A. You know, the time frame is different, so I
22  don't know to the extent that the severance benefits
23  would have been under the Summary Plan Description.
24  One of these dates is 1993 to '94, so...

139

1       Q. Well, the Summary Plan Description was 1995,
2   correct?
3       A. I'd have to look at it to get the exact
4   date, but if that is what it says...
5          ATTY. WELSH: I'll stipulate to that,
6   Steve.
7       Q. So assuming that that is the date, the
8   people that are listed here under 1996 to 1997 would
9   have been under the Summary Plan Description,
10  correct?
11      A. Except for one that says Rose Sweeney, 1993
12  to '94.
13      Q. Except for her they would have been under
14  the Summary Plan Description, correct?
15          ATTY. WELSH: Objection.
16      Q. You can answer.
17      A. Their dates that show here, 1997 -- I don't
18  know what those dates mean. If that means the date
19  they were terminated from Agfa, yes.
20      Q. Do you recognize any of them as having
21  received a severance, any of the names?
22      A. I don't know if they have received severance
23  benefits or not.
24      Q. How about Linda Kawa? K-a-w-a is the way

140

1   she spells her name.
2          ATTY. WELSH: She is not there, I don't
3   think.
4       Q. She is not on this list.
5       A. Linda Kawa, K-a-w-a?
6       Q. Right.
7       A. Linda, I remember, was laid off from the
8   company.
9       Q. Did she receive severance?
10      A. I don't recall that she was laid off under
11  the Bayer Corporation Plan.
12      Q. You don't recall?
13      A. I don't recall that. My recollection is
14  that Linda left more recently.
15      Q. So would it be covered by the Agfa Plan?
16      A. Yes.
17      Q. The Agfa Plan, with regard to severance
18  benefits and eligibility, is it the same as the
19  Bayer Plan?
20      A. You would have to compare, but I think there
21  might be some differences.
22      Q. What differences do you recall?
23      A. I can't recall any.
24      Q. Any differences that you can recall with

141

1   respect to the bullet points that you were going
2   over on Fiorilla Exhibit 4 on Page SEV 4 come to
3   mind?
4       A. I'd have to see the Agfa Plan to look at
5   comparing the 2. Without having that, it makes it
6   difficult for me to say one versus the other.
7          ATTY. ROACH: Let's just take a quick
8   break.
9          (Recess taken.)
10      Q. I show you what has been produced in this
11  case as Agfa Corporation Severance Pay Plan,
12  effective January 1, 1999, as well as Fiorilla
13  Exhibit 4, and show you page 9 and 10, ask you if
14  you can just quickly compare it to see if there is
15  any significant difference between the Agfa
16  Severance Plan in effect in January of '99 and
17  Fiorilla Exhibit 4.
18          ATTY. ROACH: Before you do that, why
19  don't we mark the Agfa Plan as the next exhibit,
20  which will be Leonard 47.
21          (Document marked as Exhibit 47
22  for identification.)
23      Q. And specifically addressing your attention
24  to subsections H, I, J, and K, 10 and 11.

36 (Pages 138 to 141)

Mary Leonard                                                                    10/13/2006

142

1    ATTY. WELSH: Let the record note my
2    objection, and also we have a limited amount of time
3    for this deposition, Steve. If you want the witness
4    to do this, she can, but she is going to be using up
5    your time. Go ahead, read it carefully, and do the
6    comparison, if you are able.
7    A. So this is the actual Severance Pay Plan and
8    not the Summary Plans that we are comparing it
9    against in terms of Bayer, right?
10    Q. Right.
11    A. And the sections you want me to read are H,
12    I, and J?
13    Q. Mm-mm, and K.
14    ATTY. ROACH: Can I just go off the
15    record for a minute while she looks at it.
16    ATTY. WELSH: Of course.
17    (Discussion off the record.)
18    ATTY. ROACH: We have stipulated rather
19    than have Ms. Leonard look at it and compare it, we
20    will do it pursuant to the 30(b)(6) deposition that
21    we will be taking later.
22    Q. One other question is, Does this appear to
23    be the Agfa Corporation Severance Pay Plan that was
24    in effect in January of 1999?

144

1    who went from Bayer to EFTC as part of the sale?
2    ATTY. WELSH: Can you give her a list of
3    the Board Shop employees to compare? You are using
4    the term plaintiff, but I believe the Board Shop
5    employees --
6    Q. The Board Shop employees that were listed on
7    Exhibit 45 in the caption.
8    ATTY. WELSH: Again, I'm asking you if
9    you can then give her a roster of the Board Shop so
10    she can compare the caption of this case to the
11    Board Shop.
12    Q. I don't have roster in front of me, but can
13    you think of anybody, other than what was listed on
14    here, Mr. Baribeau and Mr. Christianson, that went
15    to EFTC as part of the sale, if you can think of
16    anyone else.
17    A. Well, Mr. Christianson and Mr. Baribeau I
18    wouldn't -- accepted employment with EFTC, certainly
19    the individuals here indicated accepted employment
20    with EFTC, and at the time that the transaction took
21    place that their employment was terminated on
22    September first with Agfa -- or with Bayer
23    corporation, excuse me.
24    Q. What about Steve Maddox, do you know who he

143

1    A. It states that it is the Agfa Corporation
2    Severance Pay Plan effective January 1, 1999.
3    Q. Do you recognize it as such?
4    A. Yes.
5    Q. Can you tell me whether Mr. Baribeau and Mr.
6    Christianson went over to EFTC as part of the sale
7    to EFTC?
8    A. They were extended offers to work with EFTC.
9    Q. Did they receive severance from Bayer?
10    A. No, they did not.
11    Q. Were they terminated from Bayer?
12    A. Yes, they were.
13    Q. Were they terminated before they accepted
14    the offer from EFTC or after?
15    ATTY. WELSH: Objection. You may
16    answer.
17    A. I don't recall the exact dates that they
18    were terminated.
19    Q. I'm not looking for an exact date, I'm just
20    looking for the process.
21    A. That would be the same date as the others
22    that went to EFTC.
23    Q. Anyone else, other than Mr. Baribeau, and
24    Mr. Christianson, and the plaintiffs in this case

145

1    is?
2    A. Yes, I do.
3    Q. Did he go to EFTC?
4    A. Yes, he did.
5    Q. Did he go as part of this sale to EFTC?
6    A. Yes, he did.
7    Q. What would have happened to the Board Shop
8    employees if they had not accepted a position at
9    EFTC? What would have happened to them?
10    ATTY. WELSH: Objection. You may
11    answer.
12    A. Their employment with the company would have
13    been terminated.
14    Q. Would they have received severance?
15    A. No, they would not be eligible for
16    severance.
17    Q. Why not?
18    A. The plan doesn't provide them being eligible
19    for severance.
20    Q. Let me ask you, in looking at Exhibit 4,
21    Fiorilla Exhibit 4, what part of the plan would not
22    have made them eligible for benefits if they had
23    rejected the offer from EFTC?
24    A. What would they have been eligible for?

37 (Pages 142 to 145)

Mary Leonard                                                          10/13/2006

146

1    Q. No, tell me --
2    A. They would not have been eligible for any
3    severance benefits. To the extent that they
4    accepted employment with EFTC or to the extent that
5    they did not accept employment with EFTC, the
6    eligibility for benefits, they wouldn't be eligible.
7    Q. In looking at page SEV 4 of Fiorilla Exhibit
8    4, can you show me what provisions under that page
9    you are relying upon for your statement?
10   A. In one of these bulleted points it says in
11   the parentheses, even if you choose not to accept
12   it, so even to the extent that they were offered a
13   position with EFTC, to the extent that they chose
14   not to accept the offer with EFTC, that they would
15   not be eligible for benefits.
16   Q. And that's in the third bullet point down in
17   the middle of SEV 4 of Exhibit 4; is that correct?
18   A. No, that's in the 4th bullet point down in
19   this column here, the second column. It's the 4th
20   bullet.
21   ATTY. WELSH: I think it's in the 3rd
22   and 4th.
23   Q. Do you see it in both the 3rd and 4th bullet
24   points?

147

1    A. Oh, yes, it's in both sections.
2    Q. Okay, but the one you were looking at was
3    the 4th bullet point?
4    A. I was looking at the 4th bullet point, but
5    it is also in this point as well.
6    Q. So it was your understanding, then, that,
7    looking at the 4th bullet point for a moment, that
8    because EFTC had offered the employees a job and
9    they didn't accept it, then they weren't eligible
10   for severance; is that correct?
11   A. To the extent that they were offered
12   employment with EFTC, and to the extent that if
13   anyone had chosen not to accept it, they would not
14   have been eligible for the benefit, correct.
15   Q. So now can you tell me what the difference
16   is between the 3rd bullet point and the 4th bullet
17   point with respect to what happened with respect to
18   the Board Shop employees?
19   ATTY. WELSH: Objection. You may
20   answer.
21   A. I think it's indicating in the third bullet
22   point that if the division of the company you work
23   for or the company itself is sold or divested --
24   either become an employee of the new owner, or the

148

1    new owner offers you continuing employment in a
2    comparable position (even if you choose not to
3    accept it), that is what that bullet point says, and
4    the 4th bullet says, The premises, products,
5    processes, or other activities of the division you
6    work for are relocated, assigned, sold, leased,
7    licensed, or subcontracted, and you are offered a
8    comparable position (even if you choose not to
9    accept it).
10   Q. So what is the difference between the --
11   strike that. Does the third bullet point talk at
12   all about a new employer?
13   A. It doesn't say anything in this bullet point
14   about a new employer.
15   Q. So isn't it fair to say that because the
16   third bullet point talks about a new employer and
17   the 4th one doesn't, what the 4th bullet point is
18   referring to is another job within Bayer, somewhere
19   within Bayer?
20   A. That doesn't say that, though.
21   Q. It doesn't say that specifically, but isn't
22   it reasonable to assume that because the third one
23   talks about a job with the new employer and the 4th
24   bullet point doesn't, that the 4th bullet point

149

1    means a new job within Bayer if their premises,
2    products, processes, or other activities of the
3    division they have worked for are relocated,
4    assigned, sold, leased, licensed, or subcontracted?
5    A. That is not my interpretation.
6    Q. What is your interpretation?
7    A. It's indicating that in the -- it says you
8    work for, are relocated, assigned, or sold. In this
9    case it was sold, right, to EFTC, and they were
10   offered a comparable position; they chose not to
11   accept it. The fact that there is -- the other
12   bulleted point talks about a new offer -- a new
13   owner, I don't consider them that much different.
14   Q. When you say that much different, but they
15   are different, right?
16   A. Only to the extent that it says new owner in
17   the wording, the division of the company you work
18   for or the company itself is sold or divested. The
19   second bullet point talks about the premises or
20   products are sold and you are offered a comparable
21   position, so, you know, they were offered a position
22   that was comparable, at a wage or salary level that
23   was, in fact, greater than what they had at Agfa or
24   Bayer.

38 (Pages 146 to 149)

Mary Leonard

150

1    Q. But it doesn't talk about them becoming an
2    employee of new owner in the 4th bullet point,
3    right?
4    A. There is nothing in the 4th bull point that
5    mentions new owner.
6    Q. So wouldn't it be reasonable to assume that
7    the third bullet point is talking about situations,
8    such as, perhaps, with EFTC where there is new
9    employer and the 4th bullet point talks about where
10   the processes are sold, or discontinued, or
11   otherwise are offered another job within Bayer,
12   comparable job, same salary, and the same location,
13   within 35 miles?
14   A. That's not what I read here.
15   Q. I'm not asking you whether it says that
16   exactly the way I said it, but isn't it reasonable
17   to infer, isn't it a reasonable interpretation, that
18   the third bullet point covers a new employer, new
19   owner, and the 4th bullet point covers a new job
20   within Bayer?
21   A. I can't answer that for you.
22   Q. You don't know one way or the other?
23   A. I don't know.
24       ATTY. WELSH: One second.

151

1        (Attorney and client confer.)
2    Q. Can you tell me whether you were assigned to
3    tell the Board Shop employees that they weren't
4    eligible for severance?
5    A. No one assigned me to tell the employees
6    that they were not eligible for severance.
7    Q. Did anyone have responsibility to advise
8    them about their not being eligible for severance?
9    A. I don't know if any one individual had
10   responsibility to tell them.
11   Q. But part of your job, of course, was to be
12   familiar with the Severance Benefit Plan -- Summary
13   Plan Description; is that correct?
14   A. That's correct.
15   Q. When did you first become familiar with the
16   Summary Plan Description and the severance provision
17   of it?
18   A. I don't know.
19   Q. Can you tell me whether you ever got any
20   training when you first started in the Human
21   Resources field in benefits, ever went to any
22   training seminars or workshops of any sort?
23   A. I've gone to workshops and seminars.
24   Q. And who sent you there, Bayer or its

152

1    predecessors or successors?
2    A. Not necessarily always with Bayer.
3    Q. Did Bayer send you to workshops, seminars,
4    workshops, and training?
5    A. Again it's not necessarily with Bayer
6    Corporation that I would have attended.
7    Q. I'm just asking you if Bayer did.
8    A. I can't recall.
9    Q. How many have you been to, if you know?
10   A. I don't know.
11   Q. Have you ever been to any that involved
12   severance benefits?
13   A. A seminar or workshop on severance benefits?
14   Q. Yes, or that included severance benefits.
15   A. I can't recall.
16   Q. Do you know who drafted the Summary Plan
17   Description, Fiorilla Exhibit 4, specifically the
18   severance part of it?
19   A. No.
20   Q. Did you ever discuss with Mr. Willis, or
21   anybody else within Bayer, the potential differences
22   between bullet points 3 and 4 as you and I just
23   discussed them?
24   A. No.

153

1    Q. Did you ever hear anybody discussing them
2    with you or among themselves before today?
3    A. Yes.
4    Q. Who did you discuss them with?
5    A. I discussed it with John Welsh.
6    Q. Well, other than your attorney. I don't
7    want to know anything you talked to your attorney
8    about, but just anyone else.
9    A. No.
10   Q. Do you remember discussing with any of the
11   Board Shop employees, the plaintiffs in this case,
12   the types of benefits they would receive if they
13   went to EFTC and accepted a job with EFTC?
14       ATTY. WELSH: For clarity, you mean EFTC
15   benefits?
16       ATTY. ROACH: Right.
17   Q. In other words, did you ever discuss with --
18   let me strike the question. Did you ever discuss
19   with the Bayer Board Shop employees at Bayer in 1998
20   a comparison between the benefits at EFTC and the
21   benefits they were getting at Bayer?
22       ATTY. WELSH: One second.
23       (Attorney and client confer.)
24   Q. So do you remember any discussions coming up

39 (Pages 150 to 153)

Mary Leonard                                                                    10/13/2006

154

1  about comparison of the benefits between EFTC and
2  Bayer at all?
3      A. I know that the employees indicated to me
4  that the benefits that were part of EFTC and those
5  that are Bayer were different.
6      Q. When did they tell you that?
7      A. I don't know when.
8      Q. Did they tell you after they had left and
9  gone to EFTC or before they left?
10     ATTY. WELSH: Objection. You may
11 answer.
12     Q. If you know.
13     A. We spoke about it before, as well as after.
14     Q. I'm sorry if I misunderstood what you said.
15 I thought you had told us everything you can recall
16 about what you discussed with the employees.
17     ATTY. WELSH: Objection.
18     Q. You now remember discussing with them
19 something further about benefits between EFTC and
20 Bayer?
21     ATTY. WELSH: I don't think your summary
22 is fair, Steven. I don't think that's the question
23 she answered. You may answer this question.
24     Q. Go ahead.

155

1      A. I see the employees on a regular basis,
2  whether they were employees prior to going to EFTC
3  or after they went to EFTC, because those employees
4  continued to work at the same facility and were in
5  close proximity to my office, so I would see them on
6  a regular basis. To the extent that we would talk
7  about a lot of different things, absolutely. Did we
8  talk about the benefits that you are asking about,
9  yes, we did talk about the benefits being different
10 between EFTC and Bayer.
11     Q. Let's talk about that. When do you first
12 remember talking to any Board Shop employees about
13 the differences in benefits between EFTC and Bayer?
14     A. I can't recall when.
15     Q. Well, was it in 1998 during the time that
16 EFTC was being in the process of purchasing the
17 Board Shop?
18     A. Yes.
19     Q. So in 1998, in the summer, let's say, you
20 had meetings with individual Board Shop employees
21 and you discussed the difference between EFTC
22 benefits and Bayer benefits?
23     A. Only to the extent they were aware about it,
24 so it was after their discussions with EFTC that we

156

1  would have those discussions.
2      Q. This was after Mr. Calderon came to the
3  meeting and met with everybody?
4      A. I don't remember the time frame.
5      Q. When you say after the discussions with
6  EFTC, what are you talking about?
7      A. It means that the employees would have had
8  to have known about the benefits EFTC offered them.
9      Q. On what facts are you basing that statement?
10     A. Excuse me?
11     Q. On what facts are you basing the statement
12 that they would have had to have known what the EFTC
13 benefits were?
14     A. Well, the EFTC, when they were -- they
15 were -- the EFTC management were the ones who talked
16 to the employees at the Printed Circuit Board Shop
17 and discussed the benefits that were part of EFTC.
18     Q. Were you there when that happened?
19     A. No, I was not.
20     Q. So how do you know it happened?
21     A. I know that those meetings were held.
22     Q. How do you know that?
23     A. Because the EFTC personnel had used one of
24 my empty offices in the Human Resources area.

157

1      Q. Who was that?
2      A. The Human Resource representative from EFTC.
3      Q. You let that person use your office?
4      A. Not my office, one of my empty offices.
5      Q. Who was that person by name, if you know?
6      A. I don't remember the name.
7      Q. And that person met with each of the Board
8  Shop employees individually?
9      A. Yes, they did.
10     (Court Reporter changes paper.)
11     Q. I show you what has been marked as Exhibit
12 21, Ramsden 21; do you recognize that?
13     ATTY. ROACH: For the record, it's a
14 chart.
15     A. It looks like the Benefits Highlights
16 presentation.
17     Q. Okay.
18     ATTY. WELSH: If he wants you to compare
19 it, he will -- he just asked you if you recognize
20 it.
21     A. Yes.
22     Q. You are saying it's similar with Fiorilla
23 Exhibit 2, correct?
24     A. Correct.

40 (Pages 154 to 157)

Mary Leonard

158

1    Q. Can you tell me -- on there, which is not on
2    Fiorilla Exhibit 2, there is a box that says
3    Transfer from Agfa to EFTC; do you see that?
4    A. Yes.
5    Q. Was that part of the original Benefits
6    Highlights, Fiorilla Exhibit 2, that Ms. Haley made
7    up?
8    A. I wouldn't know. I don't know.
9    Q. But it appears to be part of the slides; is
10   that correct?
11   A. Well, it appears to be part of these slides,
12   yes.
13       ATTY. WELSH: You said "these"; you are
14   pointing to Ramsden 21?
15       THE WITNESS: These in Exhibit 21.
16   Q. And it appears to be part of the slides in
17   Ramsden 21?
18   A. Yes.
19   Q. Do you remember going through with the
20   employees individually, or in a meeting, or in any
21   other way, Board Shop employees, the differences
22   between EFTC and Bayer benefits?
23   A. I would not sit down -- I did not
24   individually review the differences between Agfa

159

1    benefits and EFTC benefits.
2    Q. Do you know if anyone did?
3       ATTY. WELSH: With employees?
4    A. With employees?
5    Q. Yes.
6    A. No.
7    Q. Do you know whether anybody did without
8    employees around, just Bayer doing its own
9    comparison?
10   A. Yes, we did.
11   Q. Who did that?
12   A. I did a summary comparison.
13   Q. And who did you prepare it for?
14   A. I prepared it for the folks involved with
15   the transaction of the business.
16   Q. Let me show you -- strike that. And what
17   was the reason given to you to do the comparison?
18   A. That we wanted to see the differences.
19   Q. Who ordered you to make the benefits
20   comparison analysis?
21   A. I don't remember.
22   Q. Did anybody tell you why they wanted you to
23   do the comparison?
24   A. They are looking at the differences between

160

1    the benefits that EFTC provided and those which Agfa
2    had available for employees.
3    Q. My question is why was Bayer looking at the
4    differences.
5       ATTY. WELSH: Objection. You can
6    answer.
7    A. I don't know.
8    Q. Having done the benefits comparison, did you
9    come to a conclusion whether the benefits with EFTC
10   were better, the same, or not as good as they were
11   with Bayer?
12   A. Certainly recognized that the differences --
13   that the Bayer benefits were richer.
14   Q. Did you, or anyone else, communicate that to
15   the Board Shop employees before they accepted the
16   job with EFTC?
17   A. The employees in the Board Shop knew there
18   were differences between the Bayer benefits and
19   EFTC.
20   Q. Did they know EFTC benefits were not as rich
21   as the Bayer benefits?
22   A. Yes, they did.
23   Q. How do you know that?
24   A. When they came out of meetings with EFTC,

161

1    talks, and other hallway discussions, they shared
2    that with me.
3    Q. What did they say to you?
4    A. They told me the benefits weren't as good as
5    Bayer benefits.
6    Q. And did they give their opinion as to what
7    they thought about that, whether they were happy or
8    unhappy with that?
9    A. Different individuals had different ways of
10   expressing their opinions about the differences in
11   the benefits.
12   Q. But I want to know if there is anybody that
13   said they were not happy, that it was not as good
14   as --
15   A. Certainly there were folks that told me they
16   weren't -- unhappy with the benefits in EFTC, and
17   they said -- they had different degrees of
18   expressing that to me.
19       ATTY. WELSH: Could I just get clarity
20   of what you just said, because you said they were
21   unhappy?
22       THE WITNESS: They were unhappy.
23   Q. So it's your understanding that some
24   individuals said that they were unhappy that the

41 (Pages 158 to 161)

Mary Leonard                                                                10/13/2006

162

1  EFTC benefits were not as good as the Bayer
2  benefits?
3      A. That's correct.
4      Q. Who specifically said that to you, if you
5  can recall?
6      A. I don't recall any individual. There were a
7  number of employees that worked in the Board Shop
8  that expressed that to me.
9      Q. Do you remember Jeanne Skene saying anything
10 of that nature to you?
11     A. I can't recall for sure if she did or not.
12     Q. I'm going to show you what has been marked
13 in this case as Ramsden Exhibit 19. It's a form
14 dated June 16, 1998, and behind that is a document
15 called Company Confidential. It has underneath that
16 what appears to be a Bayer and EFTC comparison of
17 benefits; do you see that?
18     A. Yes.
19     Q. Is that the document that you prepared, the
20 comparison?
21     A. It appears to be.
22     Q. And down below it says, "c\data\word\mary";
23 does that refer to you, to Mary Leonard?
24     A. Yes.

163

1      Q. And this is on your computer?
2      A. This would have been on my computer.
3      Q. Attached to that, the next page over, is a
4  document that is from the Summary Plan Description,
5  SEV 4, that we have talked about earlier today,
6  correct?
7      A. Yes.
8      Q. Was that part of the report you put
9  together, or was that just attached to the report
10 you prepared?
11         ATTY. WELSH: You may answer.
12     A. This is the report I prepared. I don't know
13 of any other attachments.
14     Q. So the report you prepared was the second
15 page in of Exhibit 19, which is called Company
16 Confidential, with Bayer and EFTC being compared; is
17 that correct?
18     A. This sheet here, this one page.
19         ATTY. ROACH: What I would like to do, I
20 think, is I would like to mark that page as the next
21 exhibit, which would be Exhibit 48.
22         (Document marked as Exhibit 48
23         for identification.)
24         ATTY. WELSH: Before we go further, can

164

1  I see what 47 is to make sure I haven't missed
2  anything here?
3         ATTY. ROACH: 47 was the Agfa --
4         ATTY. WELSH: We don't have a copy of
5  that.
6      Q. Is it fair to say 48 is a clean copy without
7  the highlighting and writing, handwriting, on it?
8      A. Yes.
9      Q. Now, did you, as part of drafting what we
10 have now marked as Exhibit 48, include any
11 indication about severance difference in the
12 severance plans between EFTC and Bayer?
13     A. There is nothing here in the sheet that
14 talks about severance.
15     Q. Why not?
16     A. You know, this was focused on the benefits
17 that folks would receive when they went to EFTC.
18 Severance is only to the extent that someone loses
19 their job.
20     Q. Well, it's part of the Summary Plan
21 Description that Bayer provided employees, correct?
22     A. Right.
23     Q. So it's considered a benefit of employment,
24 correct?

165

1      A. But in here we talk about holidays that
2  aren't in the Summary Plan Description, or vacation,
3  or education assistance, so these are the types of
4  benefits that one would look at if they were to be
5  extended an offer of employment, that they would
6  look at considering. Severance wasn't a factor in
7  putting this together.
8      Q. I guess my question is why wasn't it a
9  factor.
10     A. I looked at these benefits, didn't look at
11 severance.
12     Q. Severance is an employee benefit, correct?
13         ATTY. WELSH: Asked and answered.
14     A. It is a benefit that is extended to
15 employees.
16     Q. And, in fact, it's in the Summary Plan
17 Description, right?
18         ATTY. WELSH: Asked and answered.
19     A. Yes, it is.
20     Q. Did anybody from Bayer tell you, when you
21 drafted what we now marked as Exhibit 48, not to put
22 anything in there about severance?
23     A. No, no one from Bayer told me not to put
24 anything in here about severance.

42 (Pages 162 to 165)

Mary Leonard                                                                    10/13/2006

170

1    talk to Bob Sarafian about the payment of severance,
2    whether it's payable, due or payable?
3        ATTY. WELSH:  With respect to this
4    transaction?
5        ATTY. ROACH:  Yes, with respect to the
6    EFTC Board Shop.
7        ATTY. WELSH:  You should answer yes or
8    no.
9    A.  So the question being?
10       (Question read.)
11   A.  I don't recall.
12   Q.  In talking to the individual employees about
13   their complaints about EFTC benefits not being as
14   good, did they focus on any particular benefits they
15   didn't like in terms of EFTC benefits?
16   A.  Talked about a lot of different benefits
17   that were different, I can't recall specifically any
18   particular benefits, a number of benefits that were
19   different.
20   Q.  Now I'd like to show you what has been
21   marked as Exhibit 42 in this case, and I'd like to
22   direct you to the 4th to the last page.
23       ATTY. WELSH:  The one with the flag on
24   it?

171

1        ATTY. ROACH:  Page 6, you are right, the
2    one with the flag on it; yes, page 6.
3    Q.  Do you know who drafted this document?
4    A.  No, I do not.
5    Q.  Do you see over in the right it says
6    Responsible and then Date Sent?
7    A.  Yes.
8    Q.  And it's got under Employee Matters,
9    Personnel manuals and policies, policies regarding
10   vacation, severance, disability benefits, and so
11   forth?
12   A.  Yes.
13   Q.  And then under Responsible it has got your
14   name?
15   A.  Yes.
16   Q.  Can you tell me what this concerned, what
17   this was about?
18   A.  To produce documents relative to personnel
19   manuals and policies.
20   Q.  To whom?
21   A.  To the law firm that was working with
22   putting together, you know, the paper work as far as
23   the transaction and the sale.
24   Q.  Was that Testa Hurwitz?

172

1    A.  Yes, it was.
2    Q.  Did you pull together the material under No.
3    6 on Page 6 for the lawyers?
4    A.  Yes, I did.
5    Q.  You sent it to them on July 9, 1998
6    according to this?
7    A.  Yes, according to that.
8    Q.  That comports with your memory?
9    A.  I don't remember when I sent it, but I know
10   that I pulled it together.
11   Q.  You pulled this information together and
12   sent it?
13   A.  I don't know what I did on July 9, but it
14   says I did that, so...
15   Q.  I just want to know if you remember doing
16   this?
17   A.  I remember doing it, yes.
18   Q.  With respect to the policies regarding
19   severance, what did you send to the lawyers?
20   A.  Whatever documentation we had relative to
21   severance.
22   Q.  I understand that, but did you send them
23   the Summary Plan Description?
24   A.  I don't know what I sent them. I would have

173

1    sent them the Summary Plan Description.
2    Q.  You wouldn't have sent them the Bayer
3    Corporation Severance Pay Plan, Fiorilla Exhibit 9,
4    because you didn't have it, right?
5    A.  I did not have that.
6    Q.  Anything else you sent to them with respect
7    to the severance plan?
8    A.  I don't know.
9    Q.  Did you send them the format we discussed
10   earlier called the Expression of Interest Form?  Did
11   you send that to them?
12   A.  I don't know.
13   Q.  You see on the bottom of the page, No. 10?
14   A.  Yes.
15   Q.  It says, List of employees currently
16   charging more than 25 percent of their time to the
17   Division who will not be transferred; do you see
18   that?
19   A.  Yes.
20   Q.  What does that mean, if you know?
21   A.  Don't know.
22   Q.  When you see the word transferred, what does
23   that mean to you?
24   A.  The individuals going to EFTC.

44 (Pages 170 to 173)

Mary Leonard                                                                10/13/2006

174

1    Q. In your work in the Human Resources
2    Department for Bayer and its predecessors, up
3    through 1998, before and up through 1998, had you
4    ever heard of a category of employees before this
5    who were called transferred employees, meaning
6    employees who would go to another company?
7    A. To another company like EFTC?
8    Q. Any company.
9    A. We would use transfer when people
10   transferred from one department to another.
11   Q. That is within Bayer, right?
12   A. Within the company.
13   Q. Within Bayer?
14   A. Within Bayer.
15   Q. Have you ever heard of the word transferred
16   being used for an employee who left Bayer, was
17   terminated, and took a job with another company as
18   being a transferred employee?
19   A. We used that relative to EFTC.
20   Q. Other than EFTC had you ever heard that term
21   being used for somebody who took a job with another
22   company outside of Bayer?
23   A. I can't recall.
24   Q. What were the different types of employment

176

1    Q. What else?
2    A. We would use categories such to describe
3    employees being in indirect positions.
4    Q. Indirect?
5    A. Indirect.
6    Q. What does that mean?
7    A. That their work wasn't tied to production or
8    labor.
9    Q. What else?
10   A. Direct. There are a number of different
11   categories that we would use to --
12   Q. What about exempt and nonexempt?
13   A. We would use exempt and non-exempt.
14   Q. And exempt being people who were salaried
15   and non-exempt being people who were hourly wage
16   employees, right?
17   A. Some employees would say that, but exempt
18   being exempt from the overtime -- the provisions
19   under FLSA.
20   Q. Fair Labor Standards acts?
21   A. Yes.
22   Q. Any other categories? What about terminated
23   employees?
24   A. Yes, terminated is a category.

175

1    categories in 1998 and before with respect to an
2    employee's status?
3    ATTY. WELSH: Objection. You may
4    answer.
5    Q. Do you understand what I mean?
6    A. What do you mean by -- like, every company
7    considers employment categories to be different.
8    Active, inactive categories or --
9    Q. I'm talking about Bayer. Did you have a
10   category of full-time permanent employees?
11   A. We have a category of full-time. We use
12   full-time.
13   Q. What other categories do you use?
14   A. We use part-time.
15   Q. What other categories do you use?
16   A. To describe employees?
17   Q. Yes.
18   A. Active, inactive.
19   Q. Any others?
20   A. Expatriates.
21   Q. What's does expatriate mean?
22   ATTY. WELSH: Traded from the Patriots.
23   A. Someone that is on an international
24   assignment.

177

1    Q. And that is someone who is involuntarily
2    fired or laid off; is that correct?
3    ATTY. WELSH: Objection.
4    A. Terminated considers a number of employees
5    that are considered terminated. Anyone that -- you
6    would have -- folks that voluntarily terminated fall
7    in that category, as well as involuntary
8    terminations.
9    Q. Any other kind of terminated employee?
10   A. Death.
11   Q. Any others?
12   A. None come to mind right now.
13   Q. With respect to the voluntary versus
14   involuntary, were the people who put in the
15   expression of interest form to obtain severance,
16   were they voluntary or were they involuntary
17   terminated employees?
18   A. The classification we would have put in our
19   system would have been involuntary termination.
20   Q. Involuntary termination?
21   A. Involuntary.
22   Q. Even though they volunteered with the
23   Expression of Interest Form?
24   A. They volunteered to be considered part of a

45 (Pages 174 to 177)

Mary Leonard

182

1   Q. And I apologize if I asked you. Was it your
2   job, then, to look over it to make sure it was
3   accurate and properly completed?
4   A. I would review the change form to sign, yes.
5   Q. And then where would it go after that? Who
6   would it go to?
7   A. I don't remember who it went to at that
8   time.
9   Q. Who would do the input into the HRIS system?
10  A. I don't remember who would do that at that
11  time.
12  Q. I show you a document that is -- strike
13  that. I'd like to show you Ramsden Exhibit 27.
14  This is the Defendants' Objections and Responses to
15  Plaintiffs' First Set of Interrogatories, and I'd
16  like to direct your attention to page 7, Objections
17  and Response Interrogatory No. 7; do you see that?
18  A. Yes.
19  Q. It says, At the time of the acquisition of
20  the Printed Circuit Board business by EFTC, local
21  Human Resource officials would have made the initial
22  determination of severance pay eligibility. Did I
23  read that correctly?
24  A. That is what it says.

183

1   Q. And do you understand that this document was
2   signed as answers by Bayer in this lawsuit by Mr.
3   Marr whose signature appears on the 10th page; do
4   you see that?
5   A. Yes, I do.
6   Q. You recognize Mr. Marr's signature?
7   A. Yes, I do.
8   Q. So Mr. Marr made this statement in response
9   to Interrogatory No. 7, and my question is, Who were
10  the local Human Resource officials who made the
11  initial determination of severance pay eligibility
12  in this case?
13     ATTY. ROACH: Do you have an objection?
14     ATTY. WELSH: No. Go ahead.
15  Q. You can answer.
16  A. Local Human Resource officials would have
17  been Rodney Willis.
18  Q. Who else?
19  A. And myself as a local Human Resource
20  official associated with EFTC.
21  Q. So according to Mr. Marr and according to
22  your testimony, you and Mr. Willis made the initial
23  determination of severance pay eligibility, correct?
24  A. According to what this says here, that is

184

1   what it says, yes.
2   Q. What did you do in making the initial
3   determination?
4   A. The Severance Plan documents indicated that
5   they would not be eligible for severance pay
6   benefits and that was something that was also
7   indicated by my manager Rodney Willis.
8   Q. He indicated that to you?
9   A. Yes, he did.
10  Q. And what did he say to you?
11  A. He indicated that they would not be eligible
12  for severance pay benefits.
13  Q. Did you sit down and have a discussion with
14  him about it?
15  A. I don't know how I had that discussion with
16  Rodney.
17  Q. But you did have a discussion with him?
18  A. I did have a discussion with him.
19  Q. Did you have to report back to somebody
20  about what your initial determination was?
21  A. I don't remember reporting back to anyone.
22  Q. And what you have looked at was Fiorilla
23  Exhibit 4, SEV 4, that we have talked about already
24  today, right?

185

1   A. The section where it says, When benefits are
2   not paid, correct.
3   Q. So you looked at that, right?
4   A. Yes.
5   Q. And did you look at anything else?
6   A. I don't recall.
7   Q. Did somebody tell you to make an initial
8   determination; Mr. Willis, Mr. Marr, or anyone else?
9   A. No.
10  Q. Do you remember being assigned to sit down
11  and make the initial determination?
12  A. No, I don't recall.
13  Q. Anybody else other than you and Mr. Willis
14  involved in that decision-making process?
15  A. I don't remember.
16  Q. Anything in writing given to anybody about
17  what your initial determination was?
18  A. No, not that I recall.
19  Q. Can you recall anything else you said to Mr.
20  Willis, or he said to you, in your discussion with
21  him in this regard, other than his opinion was the
22  Board Shop employees weren't entitled to severance?
23  A. I don't remember.
24  Q. You don't remember one way or the other?

47 (Pages 182 to 185)

190

1  had a conversation with me on or around the date of
2  these things, August '05, I think that's fair.
3       ATTY. ROACH: That's all I want to ask
4  here.
5       Q. Did you have a conversation with Mr. Welsh,
6  or anybody in his office, in or around August of
7  '05?
8       A. I have had conversations with Mr. Welsh, but
9  I don't recall around August of 2005. That was last
10 year.
11      Q. Did you have conversations with Mr. Welsh
12 last year at any time that you know. I don't need a
13 specific date, but...
14      A. I don't know for certain.
15      Q. The prior page, page 6, the end of the
16 Answer to Interrogatory No. 4, right before
17 Interrogatory No. 5, it says, The following
18 individuals, among others, participated in the EFTC
19 transaction on behalf of the Agfa Division of Bayer
20 Corporation; do you see that?
21      A. Yes, I do.
22      Q. I see your name in there, right?
23      A. Yes.
24      Q. And you see Norman Beasley's name?

191

1       A. Yes.
2       Q. What was his role?
3       A. Norm worked in the Human Resources
4  Department of Bayer Corporation in Pittsburg.
5       Q. Did you ever have any conversations with
6  him?
7       A. About?
8       Q. About anything regarding the EFTC
9  transaction.
10      A. I don't recall any conversations with him.
11      Q. Was he above or below Mr. Marr?
12      A. I don't believe Dave Marr reported to Norm
13 Beasley.
14      Q. Did you ever hear anything or see anything
15 from him regarding severance benefits to the Board
16 Shop employees, whether they were entitled to them?
17      A. I don't recall seeing any communication from
18 Norm Beasley to the Board Shop employees about that.
19      Q. Did you ever hear back --
20      THE COURT REPORTER: I'm sorry.
21      THE WITNESS: I don't recall seeing any
22 communication from Norm Beasley to the Board Shop
23 employees regarding --
24      Q. Did you ever --

192

1       THE COURT REPORTER: To the Board Shop
2  employees --
3       THE WITNESS: To the Board shop
4  employees.
5       ATTY. WELSH: You also said regarding
6  severance.
7       THE WITNESS: Regarding severance.
8       THE COURT REPORTER: Thank you.
9       ATTY. WELSH: You kept on starting your
10 question before she was done.
11      ATTY. ROACH: Fair enough. Thank you.
12      Q. Do you remember, did you ever talk to Auggie
13 Bruehlman? His name is on a document, Exhibit 27?
14      A. Yes, I have had conversations with Auggie.
15      Q. Can you tell me what you talked about?
16      A. Auggie was involved in Human Resources with
17 EFTC and we talked about benefits.
18      Q. Did you talk about severance benefits?
19      A. I don't recall talking with him about
20 severance benefits.
21      Q. What did you talk about with regard to the
22 benefits?
23      A. We talked about differences between Agfa and
24 EFTC benefits and that the employees were unhappy

193

1  with the benefits that EFTC had.
2       Q. Did he say that to you or did you say that
3  to him, that the employees were unhappy?
4       A. I don't recall who said what to whom, but
5  certainly we did talk about the differences about
6  the benefits.
7       Q. Did anybody from EFTC ever say to you,
8  Let's not emphasize the differences in the benefits,
9  let's try to sell this to them so that they will
10 accept the jobs and the sale will get done?
11      A. Absolutely not.
12      Q. Did anybody ever say to them let's try to do
13 this in a way so we don't have to pay severance
14 benefits?
15      A. Absolutely not.
16      Q. I show you what has been marked as Ramsden
17 Exhibit 5 and Calderon Exhibit 2, and I'd like to
18 direct your attention to Bates stamp page B01358 and
19 specifically section 3.5, Transition of Bayer, Agfa
20 Division employees. Are you there?
21      A. Yes, I am.
22      Q. It says, It's the intention of EFTC to
23 extend offers to all current, full-time Agfa
24 employees associated with CCA to EFTC's payroll.

49 (Pages 190 to 193)

Mary Leonard                                                                      10/13/2006

194

1     Did I read that correctly?
2       A. Yes, you did.
3       Q. And CCAs refer to the Board Shop, right?
4       A. I don't know what CCA stands for.
5       Q. You have never seen that expression before?
6       A. I have never seen that expression before.
7       Q. It says, This transfer will allow Bayer Agfa
8     Division to avoid any severance costs and provide
9     EFTC an initially trained work force; did I read
10    that correctly?
11      A. Yes, you did.
12      Q. Does that refresh your memory as to whether
13    you heard anybody from EFTC or Bayer say, Let's
14    extend offers to everybody, keep the salaries the
15    same, they are going to be facing unemployment and
16    no other options, and we can do this and save money
17    by avoiding having to pay them any severance if we
18    get rid of the Board Shop otherwise?
19      A. Never have I heard any discussions
20    whatsoever about, you know, we would do this to
21    avoid severance costs.
22      Q. I want to show you a document entitled EFTC
23    Agfa Division Providing Leadership in High Mix
24    Electronics Manufacturing Services Proposal, April

195

1     1998. It's Calderon Exhibit 5, and on the front of
2     it it has a letter to Dick Ramsden from Ty Griffin.
3     Do you see that, second page in?
4       A. I see a letter Dear Dick and signed by Ty
5     Griffin, yes.
6       Q. And Mr. Griffin is with EFTC, correct?
7       A. It would appear so, yes.
8       Q. Did you ever speak with him?
9       A. I don't recall talking with Ty Griffin.
10      Q. And what he did was he attached a proposal
11    for Mr. Ramsden to look at for the sale of the Board
12    Shop, correct?
13      A. It says he has enclosed a proposal.
14      Q. Again, if you look at page BO1358, section
15    3.5 --
16          ATTY. WELSH: One second, one second.
17    This is not a Bates stamped copy, so that's not
18    helping.
19          ATTY. ROACH: I apologize.
20      Q. If you look at section 3.5, Transition of
21    Bayer Agfa employees, which is -- that's the same
22    document we just read where it says, as we had on
23    Ramsden Exhibit 5, the same language, This transfer
24    will allow Bayer Agfa Division to avoid any

196

1     severance costs and to provide EFTC initially
2     trained work force; do you see that?
3       A. Yes, I do.
4       Q. Did it appear as though EFTC was trying to
5     induce Bayer to go along and work with them to make
6     the sale happen in this part of it to save severance
7     costs by having employees transfer over to EFTC?
8           ATTY. WELSH: Objection. Does it
9     appear?
10          ATTY. ROACH: Yes.
11          ATTY. WELSH: What does that mean?
12          ATTY. ROACH: I'm just asking her if
13    that's her interpretation of it.
14          ATTY. WELSH: Of this document?
15          ATTY. ROACH: Sure. Go ahead.
16      A. I have no idea what EFTC's intention was in
17    putting that in there, this transfer allowed Bayer
18    Agfa Division to avoid any severance costs.
19    Certainly that was -- I don't recall that ever being
20    a discussion, ever, to avoid any severance costs in
21    terms of a business transaction, absolutely not.
22      Q. I think you have answered the question I was
23    going to ask you, and that is, Did you ever have any
24    discussion with anybody, with EFTC or Bayer, saying

197

1     if we do this we can avoid severance?
2       A. I have never heard any conversation within
3     the Bayer world that said if we did this that we
4     would avoid severance costs and that is what we
5     would want to do, absolutely not.
6       Q. Did you ever make a determination as to how
7     much Bayer would have had to have paid severance if
8     it had been paid to the Board Shop employees?
9       A. No, I never made any calculation or
10    determination.
11      Q. Did anybody ask you for an estimate in that
12    regard?
13      A. No one asked me for that information.
14      Q. I'd like to show you another document,
15    Exhibit 32.
16          THE WITNESS: Can we just take a brief
17    break then.
18          ATTY. ROACH: Absolutely.
19          (Recess taken).
20      Q. I show you what has been marked as Exhibit
21    32 and ask you if you recognize that document.
22      A. Yes, I do.
23      Q. What is it?
24      A. It's the Human Resources Department Employee

50 (Pages 194 to 197)

Mary Leonard

10/13/2006

206

1    A. Yes.

2    Q. Are you familiar with that section?

3    A. I'm aware of that section, yes.

4    Q. You have used it before in doing your job as

5  a Human Resources person at Bayer?

6    A. I've used that section, yes.

7    Q. When they say reassignment, does this refer

8  to reassignments within Bayer?

9    A. Yes, it does.

10    Q. And then the next page over talks about

11  Human Resources responsibilities, page 8-6?

12    A. Yes.

13    Q. It appears over on the right-hand -- I'm

14  sorry, in the second half it says Human Resources

15  Responsibilities, and it says a Human Resources

16  representative counsels each employee affected by

17  the reduction in staff to explain, and then one of

18  the categories is Severance Pay; do you see that?

19    A. Yes.

20    Q. Do you remember whether there was anybody

21  that counseled the Board Shop employees before they

22  went to EFTC about severance pay?

23    A. Well, this says Employees affected by

24  reduction in staff. They weren't affected by a

207

1  reduction in staff. The nature of that was that the

2  business was being transitioned to EFTC, so it's not

3  reduction in staff.

4    Q. Why was the business transferred to EFTC, if

5  you know, the Board Shop?

6    A. The Bayer Group decided they were no longer

7  going to continue in the Printed Circuit Board

8  business. They made a decision to sell the business

9  to EFTC.

10    Q. Do you know why they decided to do that?

11    A. One of the major reasons for doing that was

12  that EFTC -- one of the advantages of doing that was

13  EFTC had indicated they would take all the employees

14  and they would certainly continue their employment

15  in terms of being able to offer them the wages, as

16  they were at Agfa, that they would be able to

17  continue to work on the same premises, and those

18  were all advantageous to Agfa, because it was a work

19  force that had a great deal of tenure with the

20  organization, and they knew about how to build

21  boards, and that type of knowledge was valuable to

22  us in terms of being able to have the products that

23  we needed.

24    Q. But do you know why Bayer initially reached

208

1  out to EFTC to explore selling the Board Shop to

2  them in the first place?

3    A. I don't necessarily know if Bayer reached

4  out to EFTC; EFTC approached Bayer.

5    Q. Whoever approached whom, can you tell me why

6  Bayer made the decision to sell the Board Shop?  Why

7  didn't they keep the Board Shop?

8    A. They had made a decision that it wasn't

9  something they wanted to continue to be in, bec- --

10    Q. Why?

11    A. That I don't know all the specifics of.  I

12  don't know.

13    Q. Do you know in general why?

14    A. Certainly Bayer was continuing looking at

15  different operations of the company, and the

16  profitability of certain groups, and certainly that

17  was an area that was constantly under scrutiny.

18    Q. Not as profitable as other areas?

19    A. Yes, the volumes of the boards had gone down

20  significantly, so it was an area that was

21  continually being looked at.

22    Q. Was consideration of the employees going to

23  EFTC, being offered jobs, was there any factor in

24  there that some of the employees were disabled or

209

1  people who were not able to function and Bayer was

2  concerned they wouldn't be able to get jobs

3  elsewhere because of their disability?

4    A. There were disabled employees that were part

5  of the Printed Circuit Board Shop, and to the extent

6  that EFTC was going to offer employment to all of

7  them was very attractive.  We knew that those

8  individuals would have a great deal of difficulty in

9  finding employment elsewhere and at the wages that

10  they were at, so absolutely.

11    Q. When we say disabled, I don't mean to say

12  that they were disabled; they had handicaps,

13  correct?

14    A. They had disabilities.

15    Q. Some limitations?

16    A. They had disabilities, physical --

17    Q. Was there any reluctance on EFTC to hire any

18  specific individuals, including the handicapped

19  individuals or had disabilities?

20    A. I don't recall any reluctance on their part.

21    Q. Now, if the sale had not occurred to EFTC or

22  anyone else, would these employees have been laid

23  off?

24    ATTY. WELSH: Objection. Asked and

53 (Pages 206 to 209)

Mary Leonard

10/13/2006

210

1  answered 3 times this morning. You can answer it
2  again.
3      A. It all depended on what the decision was
4  that the company was going to do at that time.
5      Q. Let me ask it this way, Was this a reduction
6  in staff that take took place?
7      A. It was not a reduction in staff.
8      Q. What is the difference between what happened
9  here and what you would call a reduction in staff?
10     A. When the Printed Circuit Board Shop was sold
11 to EFTC, the reduction in staff -- that that was not
12 a reduction in staff. Reduction in staff due to
13 business conditions where we needed to look at
14 reducing staff, that is what this section applies
15 to.
16     Q. I'm going to show you another document,
17 Salaried Employee Handbook, Exhibit 31 from Paige?
18         ATTY. ROACH: Off the record.
19         (Discussion off the record.)
20     Q. Do you recognize this document?
21     A. I've seen a lot of employee handbooks over
22 my years at Compugraphic, Bayer, Agfa.
23     Q. I would like to show you --
24         ATTY. WELSH: Do you remember this one?

211

1      A. I don't remember this one in particular, but
2  it appears to be an Employee Handbook that Bayer
3  had.
4      Q. I would like to refer you to the 5th page
5  in. It's dated August 1,1995, bottom.
6      A. Yes.
7      Q. To your knowledge is it likely -- (does)
8  looking at this now, refresh your memory that this
9  would have been an employee handbook in effect
10 beginning August 1, 1995?
11     A. It appears to be the case.
12     Q. Do you know of any handbooks that replaced
13 this handbook between August 1, 1995 and when the
14 sale was made to EFTC?
15     A. I don't know. Again, it's a Salaried
16 Employee Handbook, which -- salaried employee. The
17 date here is, as you have said, on the section that
18 says About Your Employee Handbook, says August 1 --
19 or 8.1-1995, so...
20     Q. Is this Salaried Employee Handbook
21 applicable to non-salaried hourly wage employees?
22     A. I'd have to look this over.
23     Q. Go ahead.
24     A. More thoroughly.

212

1      Q. Sure.
2      A. You want me to read over the whole handbook?
3      Q. I'm not asking you to read over the whole
4  handbook; what I'm asking you to do is tell me if
5  you can look at it and tell me whether this handbook
6  was also given to non-salaried people, such as
7  people who were non-salaried in the Board Shop.
8      A. I don't know.
9      Q. Do you know whether there was a different
10 handbook given to non-salaried hourly wage
11 employees?
12     A. I don't know. I don't recall.
13     Q. So you don't know whether there was one for
14 salaried and one for non-salaried?
15     A. Again, I don't remember. I've seen a lot of
16 handbooks; I just don't remember.
17     Q. On that same page I just referred you to,
18 the page that says About Your Employee Handbook,
19 with the date 8/1/95, the second paragraph down says
20 that you can use this handbook as a general overview
21 to find the answers about specific questions, right?
22     A. General overview or to find answers.
23     Q. And then after consulting it you can contact
24 your supervisor, manager, or Human Resources rep.,

213

1  right?
2      A. Yes.
3      Q. And if you have additional questions, you
4  can also refer to the Employee Practices Manual,
5  correct?
6      A. That is what it says.
7      Q. And that's the same manual that is Exhibit
8  32 we just talked about, right?
9      A. It appears to be the case.
10     Q. On page 24 it says at the bottom of the
11 page, last sentence, that they can also refer to the
12 Employee Practices Manual which is available from
13 your supervisor, correct?
14     A. It says, For more information on temporary
15 absences or leaves of absence contact your
16 supervisor or your local Human Resources or Benefits
17 Representative. You may also refer to the Employee
18 Practice Manual which is available from your
19 supervisor.
20     Q. That would be somebody like Vinnie Fiorilla,
21 right, the supervisor?
22     A. Yes, it would.
23     Q. Now on page 30, 31 they talk about Career
24 Development?

54 (Pages 210 to 213)

Mary Leonard

214

1    A. Yes.
2    Q. And it talks about job opportunities and at
3  the bottom talks about applying for a posted job,
4  correct?
5    A. Correct.
6    Q. And these are jobs within Bayer, correct?
7    A. From within the organization, correct.
8    Q. Page 31, the bottom, it talks about they can
9  put in transfer requests to another location or
10  site, correct?
11    A. It indicates that you may express interest
12  in transferring.
13    Q. That would be within Bayer, correct?
14    A. Within Bayer.
15    Q. Did you ever hear -- strike that. Did you
16  ever see at any of the meetings with all the
17  employees, the Board Shop employees, anybody taking
18  notes at the meetings?
19    A. I don't recall seeing anyone take notes.
20    Q. Do you know if anybody was assigned to take
21  notes?
22    A. I don't know of anyone that was assigned to
23  take notes.
24    Q. Did you ever hear anyone say that they would

215

1  like to time the announcement to the employees such
2  that they would have to make a fairly quick decision
3  but give Bayer and EFTC time to induce the Board
4  Shop employees to accept the job with EFTC?
5    A. Absolutely not.
6    Q. Do you think that -- assuming the
7  announcement, the first announcement to the
8  employees, was made in around July, June or July,
9  and the sale was at the end of August, would that
10  have been enough time, if someone did not want to
11  take the job with EFTC, to find another job
12  somewhere or comparable with another company, other
13  than EFTC?
14    ATTY. WELSH: Objection. You may answer
15  if you are able.
16    A. I don't know.
17    Q. You are the Human Resources person at Bayer,
18  correct, at that time?
19    A. Right.
20    ATTY. WELSH: No, she is not the
21  Human Resource Person; she is one of them.
22    Q. You were one of the Human Resources persons?
23    A. Yes, I was.
24    Q. And you were one of the people assigned to

216

1  assist with the sale of the Board Shop to EFTC,
2  correct?
3    ATTY. WELSH: Asked and answered.
4    A. Correct.
5    ATTY. WELSH: Please move on. How many
6  times do we have to ask the same question, Steve?
7  Do we need the same question 5 times in the
8  deposition?
9    Q. And based on your knowledge of the
10  employees, did you ever come to a view as to
11  whether, from the time you told the employees that
12  the sale was going to take place, until it actually
13  did take place the end of August -- that they would
14  have actually had time to go out and look for and
15  find another job before that sale took place?
16    A. I never reviewed whether or not they would
17  have time to look for another job during that time.
18    Q. I'm not asking you whether you ever reviewed
19  it; I'm asking you now, sitting here as the person
20  that was in Human Resources, whether, in your view,
21  that would have been a reasonable amount of time for
22  them to find a similar paying job.
23    ATTY. WELSH: Objection.
24    Q. If they didn't take the EFTC job.

217

1    A. I can't answer that. I don't know.
2    Q. You don't know?
3    A. No.
4    Q. You don't have a view one way or another?
5    A. I wouldn't know.
6    Q. I know you don't know whether they would,
7  but I just want to know whether your view was, as a
8  Human Resources person who has been working in the
9  field for many years and knowing these people,
10  whether, in your view, that was really a reasonable
11  enough time for them to make a decision.
12    ATTY. WELSH: Stephen, at the time?
13    Q. Or find another job?
14    ATTY. WELSH: At the time?
15    ATTY. ROACH: Yes.
16    A. I don't know. You know, that was back in
17  1998. You know, the marketplace, whatever those
18  conditions were at that time, whatever the skills
19  the individuals had, whatever companies, I have no
20  idea.
21    Q. Did you ever do an analysis in that regard?
22    A. You know, certainly the wages that the
23  employees were earning at Bayer were -- they were
24  well paid, and that we knew, and I understood that

55 (Pages 214 to 217)

Mary Leonard                                                          10/13/2006

218

1  from being a Human Resource person in terms of
2  comparing to other industries, so that I knew.
3       Certainly the benefits that Bayer
4  provided its employees compared to other companies
5  in the area were, at that time, as they are today at
6  Agfa Corporation, very rich benefits that it offers
7  its employees, so to the extent of the wages and
8  benefits that they were very good.
9       ATTY. WELSH: Wait, wait.
10      (Attorney and client confer.)
11      Q. How do you know they were very good? Did
12  you do a study?
13      A. I did not do a study, but certainly in
14  conversations with other HR professionals at
15  different meetings and such that I would attend as
16  an HR professional that those are things that we
17  generally discussed, talked about.
18      Q. These would be people, other HR
19  professionals like your peers, that you would meet
20  at conferences?
21      A. HR professionals that are peers at
22  conferences, to the extent that when employees left
23  the company during exit interviews they would so
24  indicate that their wages and benefits were very

219

1  good with the company, so certainly with those
2  employees, in terms of looking at how much money
3  they were earning at Bayer Corporation and the
4  benefits that they had, it would not necessarily be
5  easy for them to find that at other companies, you
6  know, particularly in the Board Shop, and given
7  their tenure with their long service and vacations,
8  those are always tough things to match up.
9      Q. What about their ages; was that a factor as
10  well?
11      A. They were a tenured work force, not to say
12  how other companies hired and their hiring patterns
13  relative to age, so I don't --
14      Q. No, I know that, but as a Human Resources
15  professional you know that when people get above 50
16  at least, it becomes more difficult for them to find
17  work; would you agree with that?
18      A. They are tenured employees, so they had been
19  with the company a long time, so their wages grew
20  with the company over a period of time, so coming
21  from -- on average, I think most of them probably
22  had at least 15 plus years of service, so to match
23  the type of wages that they had, you know, would be
24  difficult.

220

1      Q. Did Bayer consider that as a factor in
2  making the determination as to whether these people
3  would go to EFTC when offered a job there?
4      A. You know, the company is a very paternal
5  company. We always are looking out to take care of
6  our employees, and had really valued them, and that
7  was the culture at that time, as it is the culture
8  today in the organization in caring for its
9  employees, in wanting to make sure that they get the
10  very best, so to the extent that EFTC would offer
11  them wages at where they were at, offer them all
12  jobs, that they would be able to go to the same
13  place to go to work all the time, was an attractive
14  feature, yes.
15      Q. Was it an attractive feature that their
16  benefits were less and their severance package was
17  denied them?
18      ATTY. WELSH: Objection. You may
19  answer.
20      A. We knew that the benefits were different as
21  to the employees, but the benefits that EFTC
22  provided were solid benefits in terms of being able
23  to offer medical, dental, disability benefits, and
24  many of the benefits that EFTC provided, and, you

221

1  know, so that they offered a solid benefits package
2  to the employees.
3      Q. I'm sorry if I asked you this before, but
4  when you said that Bayer was paternal and you were
5  looking to take care of its employees, I have to ask
6  you, if people hadn't gone to EFTC, what would have
7  happened to them if they hadn't accepted that job.
8      ATTY. WELSH: Objection. Asked and
9  answered 4 times now. You can answer it for the 4th
10  time. If I get it a 5th time, I think we are going
11  to walk, because we only answer questions 4 times in
12  a deposition. That's the new rule.
13      Q. You can answer. Go ahead.
14      A. If they had not accepted the offer with
15  EFTC, then certainly they would not have a position
16  with Bayer.
17      Q. They would have been terminated?
18      A. They would have been terminated.
19      Q. Did you have any involvement in the
20  drafting, or the review of any drafts, of the
21  agreement between EFTC that was finally signed
22  between the 2 companies for the sale, and in that
23  regard I'll show you Ramsden Exhibit 25? Did you
24  have any involvement with that at all?

56 (Pages 218 to 221)

Mary Leonard                                                                10/13/2006

226

1   questions.
2   Q. Do you remember him, Robert Brown?
3   A. Yes, I do remember Robert.
4   Q. Anyone else that you remember asking any
5   questions from the Board Shop employees or
6   complaining saying why aren't we getting severance,
7   or will we get severance, anything of that nature?
8   A. I just don't remember what questions were
9   asked by employees at those meetings.
10  Q. I would like to show you Ramsden Exhibit 10,
11  and you can you tell me what that is?
12  A. It says, Your benefits, a significant part
13  of your total compensation, and this was sent to
14  Mary Corcoran.
15  Q. She was a Board Shop employee, right?
16  A. I don't recall.
17  Q. She is listed as a plaintiff on Exhibit 27,
18  do you see that?
19  A. All right, I see her name on the Board Shop,
20  yes.
21  Q. Does that refresh your memory that she was a
22  Board Shop employee?
23  A. Yes.
24  Q. In looking at Exhibit 10, what is that, if

227

1   you know?
2   A. It appears to be a document that Bayer sent
3   employees to tell them about their total
4   compensation.
5   Q. Is this something you are familiar with in
6   working as an HR person at Bayer?
7   A. At Bayer I'm familiar that they did this,
8   yes.
9   Q. Did you have any involvement in sending that
10  out?
11  A. No.
12  Q. Who would have been the person that would
13  have done that, if you know?
14  ATTY. WELSH: Objection. You may
15  answer.
16  Q. If you know.
17  A. I don't know.
18  Q. Do you know what the purpose of it is?
19  A. To indicate to employees their total
20  compensation with the company.
21  Q. Can you tell me whether severance was part
22  of that package, part of that document, Exhibit 10?
23  A. It's not listed here.
24  Q. Why not?

228

1   ATTY. WELSH: Objection.
2   Q. If you know.
3   A. I don't know. I didn't put this together.
4   Q. You don't know anything about it?
5   A. I don't know anything about why certain
6   things were there and certain thing weren't there.
7   Q. But you do recognize the document that was
8   sent to employees, correct?
9   A. Yes, I do.
10  Q. This document at the back is dated March of
11  1998; do you see that?
12  A. That is what the last page here indicates,
13  yes, March 1998.
14  Q. And do you have any memory of it being sent
15  out around March of 1998?
16  A. I don't remember.
17  Q. Let me ask you this, the last date that is
18  on there, would that be the date that would indicate
19  the date it was sent out, if you know?
20  A. I don't know.
21  Q. After the Board Shop sale took place, did
22  you have any discussions with any employees, Board
23  Shop employees, after they became EFTC employees
24  about their benefits, about severance, or any other

229

1   issues in that regard?
2   A. So they were employees of EFTC at this time?
3   Q. Yes, after they became employees.
4   A. Certainly we occupied the same building,
5   Bayer Corporation and EFTC, so I would continue to
6   see the employees of EFTC, and they would certainly
7   indicate to me that -- you know, their
8   disappointment in terms of benefits with EFTC, and I
9   would hear about severance, yes.
10  Q. What did they say about severance?
11  A. Again, they would indicate that they were
12  unhappy that they hadn't received severance
13  benefits.
14  Q. Did any of them ever mention to you that
15  other people had left and gotten severance, people
16  who had volunteered during a reduction in force
17  through the form that was called the Expression of
18  Interest Form, that those people had gotten benefits
19  and they didn't?
20  A. I don't recall.
21  Q. What do you remember anybody saying to you
22  after they were at EFTC about severance
23  specifically, if you can recall?
24  A. Again, you know, certainly as I walked by

58 (Pages 226 to 229)

Mary Leonard

10/13/2006

230

1  them they would still come into my office, and they
2  would still express their unhappiness about not
3  receiving severance benefits, as well as concerns
4  about the benefits that were offered at EFTC and
5  that they weren't as good as the Bayer benefits.
6      Q. What did they say about -- if you can
7  remember specifically, other than they weren't happy
8  they didn't get severance, can you remember anything
9  else that they said? Did they say anything like we
10  feel that we are entitled to them, or that the plan
11  provided that we should get them, or anything of
12  that nature?
13      ATTY. WELSH: Objection. You may
14  answer.
15      Q. That you can remember?
16      A. I can't remember the specifics of the
17  conversation. I had a number of conversations with
18  many different people about many different topics,
19  and I just can't remember.
20      Q. Do you remember who specifically came into
21  your office or that you spoke to in the hallway
22  among the plaintiffs?
23      A. Again, you know, I saw almost all these
24  folks on a regular basis, you know, because they

231

1  continued to work at the site, so I can say, yes, I
2  think, you know, Jeanne Skene, was in my office, you
3  know, others were in my office.
4      Q. Did Bayer ever send them some money, like a
5  thousand dollars each, or something like that, sort
6  of to say here's a makeup or something for the
7  benefits, or anything of that nature? Is there
8  anything like that that you remember?
9      A. I recall that as part of -- I don't know if
10  they sent it to them, but as part the agreement, we
11  talked -- there was a decision to provide them a
12  thousand dollars. I can't recall the specifics as
13  to why, but yes.
14      Q. Was it had to do with maybe the medical
15  insurance was not as good or something like that?
16      A. No, it wasn't anything to do with the
17  medical insurance, because EFTC had made up the
18  difference in the cost, so their wages were much
19  higher than they were with Bayer. I don't recall.
20      Q. Do you remember whether any other
21  departments or operations within Bayer were shut
22  down and people received severance?
23      ATTY. WELSH: Within Bayer?
24      ATTY. ROACH: Within Bayer, yes.

232

1      Q. Machine Shop, or the Paint Shop, or
2  assembly?
3      A. I can't recall within Bayer other
4  departments being shut down.
5      Q. Do you remember any -- let me ask you this,
6  What about shipping? Do you remember the people in
7  shipping being laid off and that operation being
8  either downsized and closed and those people getting
9  severance?
10      A. Those people in the Shipping Department at
11  80 Industrial Way are you talking about?
12      Q. Yes.
13      A. I remember that those folks were laid off.
14      Q. When was that? Is that before the EFTC
15  sale?
16      A. That was well after the EFTC sale.
17      Q. And did they receive severance benefits?
18      A. They received severance benefits.
19      Q. Did they receive them under the Agfa
20  Severance Pay Plan that we have marked as Leonard
21  Exhibit 47?
22      A. I can't recall when those employees were
23  laid off, so I can't say which severance plan, but
24  my recollection is it was not as part of Bayer, it

233

1  was within Agfa.
2      Q. Agfa Corporation?
3      A. Agfa Corporation, but at what time and what
4  plan was in effect at that time --
5      Q. You don't know?
6      A. I don't know.
7      Q. But you would have been part of that
8  process, correct?
9      A. Yes.
10      Q. And when you ceased to become a Bayer
11  employee, you then became an Agfa Corporation
12  employee at some point; is that correct?
13      ATTY. WELSH: Objection. You may
14  answer.
15      Q. I think you said you went from Bayer to Agfa
16  Corporation.
17      A. Yes, and I was a Bayer Corporation employee,
18  and I became an Agfa Corporation employee, yes.
19      Q. What about the Paint Shop; was that ever
20  reduced in force or people laid off when you were
21  with Bayer before you started with Agfa Corporation?
22      A. I don't recall the Paint Shop. I know we
23  had a Paint Shop, but I don't recall the details
24  behind the Paint Shop, so it's hard for me to answer

59 (Pages 230 to 233)

Mary Leonard                                                                    10/13/2006

234

1   that question.
2       Q. What about Inspection, an area called
3   Inspection?
4       A. I'm familiar with an Inspection area.
5       Q. Was that ever reduced in force or were the
6   people laid off and paid severance?
7       A. Again, I don't know.
8       Q. Don't know?
9       A. I don't know. I don't recall it.
10      Q. What about the Metal Fabrication area?
11      A. Again, I don't remember.
12      Q. What about the Calibration Shop?
13      A. I don't remember any.
14      Q. What about Assembly, the Assembly area?
15      A. Assembly, I'm not quite -- Assembly is
16  pretty generic.
17      Q. Do you remember any operation called
18  Assembly where there was a reduction in force,
19  people were laid off and received severance?
20      A. We had different Assembly areas; in
21  particular which ones, I don't know. Did we have
22  reduction in force in different areas within the
23  company, be it Bayer Corporation or Agfa
24  Corporation, yes, we have.

235

1       Q. Did those people get paid severance?
2       A. If there was a reduction in force as part of
3   a restructuring, yes.
4       Q. And would this have occurred when those
5   people were with Bayer?
6       A. I don't remember.
7       Q. What about the Machine Shop? Do you
8   remember the Machine Shop being closed and the
9   assets being sold to a company called Olympic?
10      A. I remember the Machine Shop being closed. I
11  think the assets were -- I don't know if the assets
12  were necessarily sold to Olympic. I don't know the
13  nature of the sale of the assets.
14      Q. Did those people get severance?
15      A. Those individuals received severance.
16      Q. Was that under the Agfa Severance Pay Plan
17  or the Bayer Severance Pay plan, if you know?
18      A. My recollection is it was with Agfa, not
19  Bayer.
20      Q. And did those people in the Machine Shop
21  take a job with the company that purchased the
22  assets?
23      A. Some of the employees were offered positions
24  with Olympic.

236

1       Q. Was that before the sale or after the sale?
2       A. I don't know, I wasn't involved.
3       Q. When did that happen?
4           ATTY. WELSH: What?
5       Q. When did the sale of the assets to Olympic
6   take place?
7       A. I don't remember.
8       Q. Who was involved in that from HR?
9           ATTY. WELSH: Objection. You may
10  answer.
11      Q. If you know.
12      A. I was the HR person on the premises, but I
13  wasn't involved in the sale of the assets.
14      Q. I'm not asking about the sale of the assets,
15  I'm asking about the severance benefits that were
16  paid, and the reduction in force, and the Human
17  Resources things you have to do; do you understand
18  that?
19      A. Yes, I do.
20      Q. So when I say involved, I understand that
21  you are not the person involved in selling assets,
22  you are the person who is involved as a Human
23  Resources professional dealing with employment
24  issues, correct?

237

1       A. Correct.
2       Q. So when I ask you a question about being
3   involved, that is what I'm talking about .
4           ATTY. WELSH: It depends on what the
5   question was, because the question that you asked
6   before that led to ambiguity, so if you want to ask
7   the witness a question without giving her a lecture,
8   I think you should.
9           ATTY. ROACH: I'm not lecturing her, I'm
10  asking --
11          ATTY. WELSH: It sounded like it from
12  this side of the table.
13          ATTY. ROACH: You can hear what you want
14  to hear.
15          ATTY. WELSH: I did, and that's why I
16  responded.
17          ATTY. ROACH: Thank you.
18      Q. Do you remember being involved in the Human
19  Resources aspect of the Machine Shop employees being
20  laid off when the assets of the Machine Shop were
21  sold to Olympic?
22      A. I was involved in preparing the severance
23  packages, yes.
24      Q. And as you were preparing the severance

60 (Pages 234 to 237)

Mary Leonard                                                                10/13/2006

242

1      Q. Did you ever do a study as to whether the
2    salaries of the Board Shop employees in '98 were
3    high in the industry in which they were in, higher
4    than the average?
5      A. I don't recall doing a study.
6      Q. So on what basis do you say they were at a
7    salary level which would have made it difficult for
8    them to find a different job at the same salary?
9      A. It's really just working within the industry
10   and understanding what folks were earning, and
11   talking with other HR professionals within companies
12   in the area.
13     Q. In the Printed Circuit Board?
14     A. In the local geographic area that we were in
15   in the Printed Circuit Board area.
16     Q. Who did you speak to to make a
17   determination -- in coming to your determination
18   that Board Shop employees were getting paid a higher
19   salary than others, their peers, for lack of a
20   better term, in the industry?
21     A. I can't point to any particular individuals.
22     Q. Can you point to any companies where people
23   were working that were earning less?
24     A. I can't point to any particular companies.

243

1      Q. Did you ever hear anybody say that we need
2    time to work on the employees to get them to agree
3    to go to EFTC?
4          ATTY. WELSH: Objection. Asked and
5    answered.
6      A. Absolutely not.
7      Q. Did you ever hear anybody say that if the
8    employees didn't go to EFTC, didn't agree to accept
9    a job, that the deal wouldn't go through?
10     A. Never heard that.
11     Q. If the employees, the vast majority of them,
12   hadn't gone to EFTC, hadn't agreed to accept the
13   job, would the sale have gone through, to your
14   knowledge?
15         ATTY. WELSH: Objection. You can
16   answer.
17     Q. You can answer.
18     A. If the employees, the majority, had decided
19   not to go to EFTC would the sale have gone through?
20     Q. Right.
21     A. I don't know.
22     Q. I show you what has been marked Fontaine
23   Exhibit 44, and it talks about a blackout period for
24   Bayer. Did you ever hear that expression being

244

1    used, blackout period?
2      A. It sounds familiar. I'm just trying to
3    recall as to what context. I can't recall the
4    context, but it does sound familiar.
5      Q. You don't recall what it applied to?
6      A. It would apply to benefits, but I don't
7    recall.
8      Q. Benefits with respect to the EFTC sale,
9    involving the?
10     A. It would apply to some blackout period
11   within Bayer, but I don't recall the specifics in
12   terms of what, why. I just don't recall.
13     Q. But I'm just asking the context in which it
14   came up was with regard to the sale of EFTC?
15     A. Regarding the sale to EFTC.
16         ATTY. WELSH: Do you know what it is?
17   Do you want to know or is it just asking her?
18         ATTY. ROACH: Sure, if you know.
19         ATTY. WELSH: I'm pretty sure it goes to
20   the benefits, and it is periods that they can not
21   trade, because they have to, you know, do certain
22   things with the benefits, like your 401(k), and
23   things like that, just periods -- I'm pretty sure
24   that's what it is.

245

1      Q. I'm going to show you a few exhibits. Do
2    you agree with Mr. Welsh's description?
3      A. Yes, that's true. I agree with his
4    description of 401(k).
5      Q. I want to show you Ramsden Exhibits 11
6    through 18, and do you recognize the handwriting on
7    any of these?
8      A. I don't recognize the handwriting on Exhibit
9    11, I don't recognize the handwriting on Exhibit 12,
10   I don't recognize the handwriting on Exhibit 13, I
11   don't recognize the handwriting on Exhibit 14, I
12   don't recognize the handwriting on Exhibit 15, I
13   don't recognize the handwriting on 16, I don't
14   recognize the handwriting on Exhibit 17, and I don't
15   recognize the handwriting on 18.
16     Q. Do you know if Bayer, in 1998, ever told the
17   Board Shop employees, in writing, that they were not
18   entitled to severance benefits?
19     A. Excuse me, what time frame are we speaking?
20     Q. In 1998, or any time soon thereafter.
21   Within 1998 or 1999, or any time after, did Bayer
22   ever tell the Board Shop employees, in writing, they
23   were not entitled to severance benefits?
24     A. I don't know.

62 (Pages 242 to 245)

10/13/2006

Mary Leonard

246

1    Q. You don't recall writing to them, do you?
2    A. I don't recall writing to them. I don't
3  remember writing to them.
4    Q. So you didn't remember seeing anything in
5  writing to them, did you?
6    A. From Bayer?
7    Q. From Bayer, anybody from Bayer.
8    A. 1998?
9    Q. 1998 or thereafter.
10    A. I don't recall.
11    Q. Do you recall seeing anything from anybody,
12  other than from yourself, saying that to the Bayer
13  shop employees -- the Board Shop employees, rather,
14  of Bayer, that they are not entitled to severance
15  benefits?
16    ATTY. WELSH: Objection. You may
17  answer.
18    A. I don't recall seeing any correspondence
19  from Bayer to Board Shop employees.
20    Q. What is the normal procedure, if you
21  understand it, in terms of informing people as to
22  whether or not they are entitled to severance
23  benefits when they are terminated from Bayer? This
24  would be in 1998 what would have been the procedure.

247

1    A. I'm not aware of any procedure that Bayer
2  would have to inform employees they wouldn't be
3  eligible.
4    Q. Eligible or not eligible?
5    A. Eligible or not eligible.
6    Q. So in either case you are not aware of
7  any --
8    A. There is no procedure. There is certainly
9  the document, and we have the Summary Plan
10  Description that defines what severance benefits is,
11  and defines how benefits are paid or not paid, when
12  benefits are paid, and when benefits are not paid.
13    Q. But my question is, in 1998 are you aware of
14  any procedure whereby Bayer would tell someone, in
15  writing, that they are being denied severance
16  benefits?
17    A. I'm not aware.
18    ATTY. ROACH: Nothing further.
19    ATTY. WELSH: No questions. Thank you.
20    (Whereupon, the deposition was concluded
21    at 4:39 p.m.)
22
23
24

248

1    CERTIFICATE
2    I, MARY LEONARD, do hereby certify that I have read
3  the foregoing transcript of my testimony, and
4  further certify that said transcript is a true and
5  accurate record of said testimony (with the
6  exception of the following corrections listed
7  below):
8    Page   Line      Correction/Reason
9    _____  _____   _____
10    _____  _____   _____
11    _____  _____   _____
12    _____  _____   _____
13    _____  _____   _____
14    _____  _____   _____
15    _____  _____   _____
16    _____  _____   _____
17
18
19    Signed under the pains and penalties of perjury
20  this _____ day of _____, 2006.
21
22
23    _____
24    MARY LEONARD

249

1  Commonwealth of Massachusetts
2  Suffolk, ss.
3    I, Carol A. Pagliaro, Registered Professional
4  Reporter and Notary Public in and for the
5  Commonwealth of Massachusetts, do hereby certify
6  that MARY LEONARD, the witness whose deposition is
7  hereinbefore set forth, was duly sworn by me and
8  that such deposition is a true record of the
9  testimony given by the witness to the best of my
10  skill and ability.
11    I further certify that I am neither related to,
12  nor employed by, any of the parties in or counsel to
13  this action, nor am I financially interested in the
14  outcome of this action.
15    In witness whereof, I have hereunto set my hand
16  and seal this 30th day of, 2006.
17
18
19    _____
20    Carol A. Pagliaro, RMR
21    Notary Public
22    CSR No. 123293
23  My commission expires
24  April 28, 2011

63 (Pages 246 to 249)