Page 2

1  DIANA PERREAULT, OUDOMPHONE PHOMMAHAXAY, RICHARD
2  PICARD, NORMAN PULIN, MARIA REIS, MARK ROBERT,
3  JOHN SABLOCK, BARBARA SANBORN, JOANNE SANZO, LINDA
4  SAULNIER, JEANNE SKENE, ROBERT STIER, CATHERINE
5  SWEENEY, PHAM VAN, DIANE WILLETTE, and EDWARD R.
6  WRIGHT,
7            Plaintiffs,
8     v.
9
10 BAYER CORPORATION, BAYER CORPORATION
11 SEVERANCE PLAN,
12          Defendant.
13 - - - - - - - - - - - - - - - - - - - - - - - x
14
15
16
17     DEPOSITION OF MICHAEL PAIGE
18        May 12, 2006
19          9:58 a.m.
20      ROACH & WISE, LLP
21        31 State Street
22     Boston, Massachusetts
23
24   Reporter:  Karen A. Interbartolo, RPR

Page 3

1  APPEARANCES:
2
3      ROACH & WISE, LLP
4      By Stephen A. Roach, Esquire
5      31 State Street
6      Boston, Massachusetts 02109
7      (617) 723-2800
8      Counsel for the Plaintiffs
9
10     BELLO, BLACK & WELSH, LLP
11     By John F. Welsh, Esquire
12     535 Boylston Street
13     Boston, Massachusetts 02116
14     (617) 247-4100
15     Counsel for the Defendant
16
17
18
19
20
21
22
23
24

Page 4

1          I N D E X
2  EXAMINATION OF:              PAGE
3  MICHAEL PAIGE
4
5   Direct Examination by Mr. Roach        5
6
7
8
9
10         E X H I B I T S
11 No.                    Page
12
13 30    Subpoena               20
14 31    Salaried Employee Handbook      37
15 32    Human Resources Department      51
16       Employee Practices
17 33    Section of Agreement       135
18 34    Seven-Page Document        136
19 35    Two-Page Memorandum dated 8/3/98   145
20
21
22
23
24 *Original exhibits retained by Mr. Roach.

Page 5

1          P R O C E E D I N G S
2
3      MR. ROACH:  The parties have agreed to
4  reserve all objections until the time of trial, except
5  as to form, and reserve motions to strike until the
6  time of trial.  The witness will read and sign after
7  receipt of this transcript.  We'll give him 45 days to
8  do so.  We'll waive requirement of doing so before a
9  notary and we'll waive the filing.
10     MR. WELSH:  So stipulated.
11
12       MICHAEL PAIGE
13
14 having been satisfactorily identified and duly sworn by
15 the notary public, was examined and testified as
16 follows:
17
18     DIRECT EXAMINATION
19 BY MR. ROACH:
20     Q.  Could you state your name, please?
21     A.  Can I make a comment?  I'm beginning to
22 suffer from hearing loss.  It's just marginalized.  I
23 should be wearing a hearing aid, but I'm vein, so I may
24 ask you to repeat.

Michael Paige

05/12/2006

Page 6

1    Q.  Absolutely.  And now that you've said that,
2  if there's any question that you can't hear or that you
3  don't understand, feel free at any time to ask me to
4  either repeat the question or to speak up.
5    A.  Just sometimes it fades on me, and I --
6    Q.  And just so it's clear, and I'm sure
7  Mr. Welsh has already advised you, we'd like your best
8  memory of the events I'm going to ask you about.  We
9  don't want you to guess or make assumptions.  You can
10  make estimates, however, based on information even if
11  partial that you have.  You can qualify your answer
12  with, I believe my memory is, based on partial facts,
13  but you don't have to guess or assume things.  If you
14  don't know, it's fine to say, "I don't know."  "I don't
15  recall."  Is that fair?
16    A.  I understand.
17    Q.  Could you state your name, please?
18    A.  Michael Paige, P-A-I-G-E.
19    Q.  Where do you live?
20    A.  4 Lobster Lane, Gloucester, Massachusetts.
21    Q.  How long have you lived there?
22    A.  About eight months.
23    Q.  Where did you live before that?
24    A.  At 30 University Lane in Manchester,

Page 7

1  Massachusetts.
2    Q.  How long did you live there?
3    A.  About 18 years.
4    Q.  What is your date of birth?
5    A.  January 11, 1946.
6    Q.  Is Mr. John Welsh, the attorney for the
7  defendants, representing you today, Dr. Paige?
8    A.  Yes.
9        MR. WELSH:  Just so the record is clear,
10  I am representing him as a former officer of the
11  company.  I do not represent him in his individual
12  capacity.
13        MR. ROACH:  Can you explain what that
14  means?  I'm not sure.
15        MR. WELSH:  I think it's self-evident,
16  so let's proceed.
17        MR. ROACH:  It probably is self-evident.
18  I just want to be clear.
19    Q.  What is your Social Security number, sir?
20    A.  ████████
21    Q.  Can you tell me whether you're married?
22    A.  Yes, I am.
23    Q.  And what's your spouse's name?
24    A.  Cathy with a C, so it's C-A-T-H-Y.

Page 8

1    Q.  How long have you been married, roughly?
2    A.  25 years.  I'm sorry.
3    Q.  I didn't mean to ask you a question that
4  might get you into trouble.
5    A.  No, I -- At least 25 years.  I'd have to
6  think about it exactly.
7    Q.  Fair enough.  Any children?
8    A.  Yes, I do.
9    Q.  How many?
10    A.  Two children, a son and a daughter.
11    Q.  How old?
12    A.  My daughter is 25.  Her name is Margot,
13  M-A-R-G-O-T.  My son is 20.  His name is Nathan,
14  N-A-T-H-A-N.
15    Q.  Have you ever been convicted of any crime in
16  the last ten years?
17    A.  No.
18    Q.  Ever been in the military?
19    A.  No.
20    Q.  Ever been a party to any lawsuit, either a
21  defendant or a plaintiff, either sued or been sued in a
22  lawsuit, you personally?
23    A.  No.
24    Q.  Can you tell us what your educational

Page 9

1  background is starting from after high school, please?
2    A.  Bachelor's degree from Worcester Polytech in
3  engineering, electrical engineering; a master's degree
4  from the University of Illinois in electrical
5  engineering, computer science; a Ph.D. from the
6  University of Illinois, electrical engineering,
7  computer science; master's in business administration
8  from Boston University.
9    Q.  And should I address you as Dr. Paige since
10  you have a Ph.D.?
11    A.  I have no preference.  Michael is fine with
12  me.
13    Q.  Well, just to be formal, I'll probably call
14  you Dr. Paige for the deposition because it's a formal
15  proceeding.
16        Can you tell me when you graduated from each
17  of those institutions, please, just the years, if you
18  can remember?
19    A.  I graduated -- Bachelor's degree in 1968, my
20  master's degree in 1969, my Ph.D. in 1972, my MBA in
21  1983.
22    Q.  Did you have any breaks in obtaining those
23  degrees in terms of working?  Were you working in
24  between?

3 (Pages 6 to 9)

Michael Paige

Page 22

1    Q.   And that would bring us up to what year
2  roughly, 2001, 2000?
3    A.   Before 2000.
4    Q.   Late 1990s?
5    A.   Yes.
6    Q.   I'm going to show you what we've marked as
7  Exhibit 3 in the Ramsden deposition.  Do you recognize
8  that chart?
9    A.   It's an organizational chart from AGFA -- I'm
10 sorry -- electronic pre-press systems.
11   Q.   And that's part of the AGFA division in
12 Wilmington, correct?
13   A.   Yes.
14   Q.   And you note this is dated April 1998,
15 correct?
16   A.   Yes, I do.
17   Q.   Now, if we extend the box further from the
18 top of the page, we have Mr. Ramsden at the top.  Do
19 you see that?
20   A.   Yes.
21   Q.   He was the head of the electronic pre-press
22 operations?
23   A.   Yes.
24   Q.   And did he serve under you directly?

Page 23

1    A.   Yes, he reported directly to me.  I would be
2  the box above him.
3    Q.   Now, this is the electronic pre-press systems
4  operations.  What other operations were in the
5  AGFA -- were within the AGFA division when you were
6  there?
7    A.   There was the type division.
8    Q.   T-Y-P-E?
9    A.   T-Y-P-E.
10   Q.   Is that a division or an operations or a
11 department?
12   A.   It's a division because they had their own
13 profit -- they had their own balance sheet.  They were
14 rolled into a different -- rolled up under me.
15   Q.   They were under you as well?
16   A.   Yes.
17   Q.   Were they part of the AGFA division of Bayer,
18 type division?
19   A.   They were part of the AGFA -- The reason I'm
20 hesitating, at some point there was a transition where
21 AGFA Corporation was created and thereby AGFA separated
22 its ties with Bayer, so I'm not sure of those dates.
23   Q.   Let's assume that was in late 1999 or 2000.
24        MR. WELSH:  I believe it's in early '99,

Page 24

1  if I'm not mistaken.
2    Q.   All right.  Let's assume for a moment that
3  was in early 1999.  Just focusing on 1998.  Before that
4  event occurred, whether it was in early '99 or
5  whenever, before that event occurred, can you tell me
6  what the AGFA division consisted of in the Bayer
7  Corporation?
8    A.   Electronic pre-press division consisted of
9  the type division, the main line division of the
10 company which would have been where this is a part,
11 this organizational chart is a part of.
12   Q.   Meaning Ramsden Exhibit 3 is a part of?
13   A.   Ramsden exhibit.  It would have been the --
14   Q.   You said Ramsden exhibit.  Listen to my
15 question, please.  Hesitate before you answer, then
16 answer the question.  So the main line division under
17 that, the electronic pre-press operations, which is
18 reflected in Ramsden Exhibit 3, was part of the main
19 line division; is that correct?
20   A.   Yes.
21   Q.   Okay.  You can continue.
22   A.   There was also a CAPS division, C-A-P-S,
23 division, which was -- I'm not sure of the
24 dates -- was -- had just been sold or was being sold

Page 25

1  to -- I'm not sure who they were sold to.  It might
2  have been Kodak, but I'm not sure.
3    Q.   And what does CAPS stand for?
4    A.   I believe it is computer automated publishing
5  systems.
6    Q.   Any other operations under the AGFA
7  division -- I'm sorry.  That was computer automated --
8    A.   Publishing systems.
9    Q.   Any other operations under the AGFA division
10 of Bayer at that time in the 1990 --
11   A.   Yes.  I had an operational group in Belgium.
12   Q.   And what was that group doing?
13   A.   Desk top products which included digital
14 cameras and software.
15   Q.   Any other operations under the AGFA division
16 of Bayer?
17   A.   I'm not sure of the dates.  There was an
18 operational group in England that worked on systems
19 that did automatic film development, but I'm not sure
20 of the dates.  It was a division acquired from Dupont.
21   Q.   Any other operations under the AGFA division
22 of Bayer that you were managing?  And, again, I'm
23 looking around 1998 as the year.
24   A.   I believe there's a toner plant, T-O-N-E-R,

7 (Pages 22 to 25)

Michael Paige

05/12/2006

Page 30

1  Bayer in 1998.
2        MR. WELSH:  Can you answer that?
3     A.  Yes.
4     Q.  What comprised the AGFA division of Bayer in
5  1998?  What operations were under the AGFA division of
6  Bayer in 1998, please?  Then we'll get to your specific
7  responsibilities beyond what we've already talked
8  about.
9     A.  All U.S. employees in plant facilities
10  located in Wilmington, Massachusetts, specifically
11  within Wilmington, the manufacturing plant, the CAPS
12  group, a portion of the type division that was resident
13  in Wilmington, and any headquarters, marketing,
14  finance, research and development, and service staff
15  located in Wilmington, Massachusetts.
16     Q.  So those entities you've just described
17  comprise the AGFA division of Bayer in the United
18  States; is that correct?
19     A.  That's correct.
20     Q.  And under that, where did the electronic
21  pre-press operations that is part of Ramsden Exhibit 3
22  fall?
23     A.  They put it to me as a senior vice president
24  of AGFA, of Bayer Corporation.

Page 31

1     Q.  And under which of these entities you've just
2  listed did the electronic pre-press operations fall?
3     A.  Under the headquarters operation.
4     Q.  Where were they physically located, the
5  address?
6        MR. WELSH:  Of who?
7     A.  This group?
8     Q.  Yes.  The electronic pre-press operational
9  system, Exhibit 3, Ramsden, where did they physically
10  operate out of, the address?
11     A.  At least three sites in the general
12  Wilmington area, one on Industrial Way, one on
13  Ballardvale Street, and there was also a warehouse, and
14  I do not know exactly where that was located.
15     Q.  So you were the senior vice -- you were the
16  general manager and senior vice president?
17     A.  No.  I was the general manager -- Sorry --
18  the senior vice president of Bayer Corporation, which
19  is my U.S. title, and I was the general manager or
20  German equivalent of the electronic pre-press division
21  worldwide.
22     Q.  So you would have been the general manager of
23  the electronic pre-press operations that's part of the
24  Ramsden Exhibit 3 as well as other pre-press divisions

Page 32

1  in other areas; is that correct?
2     A.  Yes.
3     Q.  Now, in Exhibit 3, do you see the printed
4  circuit manufacturing box?
5     A.  Yes, I do.
6     Q.  Who was the head of -- Who was the supervisor
7  of that --
8        MR. WELSH:  You're asking him if he
9  independently knows or do you want him to read the
10  document?  He can do either.
11     Q.  Both.
12     A.  On the document, it says Vin Fiorilla.
13     Q.  Does that refresh your memory as to whether
14  Vin Fiorilla was the supervisor of that area?
15     A.  I'm hesitating, because the word "supervisor"
16  has a very specific meaning as opposed to the word
17  "manager."
18     Q.  Who was the supervisor in 1998 of the printed
19  circuit manufacturing area under the electronic
20  pre-press operations in 1998?
21        MR. WELSH:  Objection.  You may answer.
22     A.  The person in charge of the area was Mr. Vin
23  Fiorilla.  I do not know whether he was a supervisor or
24  a manager at the time.

Page 33

1     Q.  What's the difference between a supervisor
2  and a manager at the time?
3     A.  Typically a supervisor is a first-line
4  manager, and the word "manager" refers to the next
5  level above that.  On an old chart like this, people
6  can be either supervisors or managers.  Their
7  compensation is different.
8     Q.  Is it fair to say Mr. Fiorilla was either a
9  supervisor or a manager?
10     A.  Yes.
11     Q.  Now, have you ever heard the term "board
12  shop"?
13     A.  Yes.
14     Q.  And can you tell us what -- how you came to
15  learn that term?
16     A.  I'm not sure of the question.
17     Q.  I just asked you whether you knew the -- Are
18  you familiar with the term "board shop"?
19     A.  Yes.
20     Q.  And are you familiar with that term with
21  respect to the electronic pre-press operations?
22     A.  Yes.
23     Q.  And which part of Exhibit 3, Ramsden
24  Exhibit 3, would consist of the board shop?

9 (Pages 30 to 33)

Michael Paige                                                                          05/12/2006

---

Page 34

1    A.   On this chart, that group that says, "Printed
2    circuit manufacturing."
3        Q.   And what about fabrication?
4        A.   Which would include the subsidiary box below
5    it which says, "Fabrication, test, and assembly, and
6    chemical lab water treatment."
7        Q.   And are you aware that those are the
8    employees from that area that are bringing a suit in
9    this case for the severance benefits?
10       A.   I'm aware that a group of employees from this
11   organization.
12       Q.   How long did you serve as the senior
13   vice president of the Bayer Corporation and the
14   general manager of the electronic pre-press
15   division -- pre-press operations rather?
16       A.   Approximately five or six years.
17       Q.   And then where did you go after that?
18       A.   I left AGFA and became the vice president of
19   research and development for Xerox Corporation located
20   in Palo Alto, California.
21       Q.   Is that where you are now?
22       A.   No.
23       Q.   How long were you there?
24       A.   Approximately two and a half years.

---

Page 35

1        Q.   And then where did you go?
2        A.   I became the CEO of a company called System
3    Detection, Inc., located in Manhattan, New York City.
4        Q.   How long did you serve in that capacity?
5        A.   Approximately six months.
6        Q.   And then where did you go?
7        A.   I became the -- I went to work at Endicott
8    College in Beverly, Massachusetts.
9        Q.   As what?
10       A.   I've had a series of titles with them.  My
11   initial title was professor and chair of the computer
12   science department.
13       Q.   What other titles have you had?
14       A.   I'm now the associate dean of the school of
15   business and technology, chair of the computer science
16   department, and professor in the undergraduate and
17   graduate college.
18       Q.   Is that what you do now?
19       A.   Yes.
20       Q.   And when did you first assume that position?
21           MR. WELSH:  Objection.  You may answer.
22       Q.   Let me ask you this:  When did you first go
23   to Endicott College?
24       A.   When I left System Detection.

---

Page 36

1        Q.   I know.  But can you give me a year?
2        A.   August of -- Approximately four years ago, so
3    it would have been August of 2001 or '2.  I'm not sure.
4    I'd have to think about it.  2002.
5        Q.   Now, you said you served for about five or
6    six years as a senior vice president of Bayer
7    Corporation and general manager of the electronic
8    pre-press system operation.  Did you work for a
9    different corporation other than Bayer by the time you
10   had left?  Were you working for Bayer at the time you
11   left or were you working for some other corporation at
12   the time you left?
13       A.   I was working for AGFA Corporation at the
14   time I left.
15       Q.   So at some point you switched -- doing the
16   same job but switched employers in terms of the
17   official employer for whom you were working, which was
18   then AGFA Corporation; is that correct?
19       A.   AGFA spun away from Bayer Corporation.
20       Q.   Again, do you remember roughly what year that
21   was?
22       A.   I actually don't.
23       Q.   Fair enough.
24       A.   Assuming late 1990s, but I don't know an

---

Page 37

1    exact date.
2        Q.   I'm going to show you a document --
3            MR. ROACH:  Actually, let me mark it as
4    Paige Exhibit 31, please.
5            (Exhibit 31 marked
6            for identification.)
7        Q.   In looking at what we've marked as Paige
8    Exhibit 31, are you familiar with this document,
9    salaried employee handbook?
10       A.   Certainly something like this.
11       Q.   And is this a Bayer handbook provided to its
12   employees?
13       A.   This appears to be the Bayer handbook.
14       Q.   Do you know who drafted it?
15       A.   Specifically, no.
16       Q.   Do you know generally who drafted it?
17       A.   The human resources department of Bayer
18   Corporation in Pittsburgh with assistance from the
19   human resources department at all the subsidiaries.
20       Q.   Would that include the AGFA division -- the
21   human resources at the AGFA division in Bayer?
22           MR. WELSH:  Objection.  You may testify.
23       Q.   Let me rephrase the question.  Did the AGFA
24   division of Bayer have a human resources department?

---

Michael Paige

05/12/2006

Page 38

1     A.  Yes.
2     Q.  And where were they located?
3     A.  They would be headquartered in Richfield
4  Park, New Jersey, at the AGFA corporate offices, and
5  have satellite operations in all the -- where the plant
6  facilities are, which in our case would be Wilmington,
7  Mass.
8     Q.  And who in 1998, roughly '97, '98, who was
9  staffing the human resources area in Wilmington,
10 Massachusetts?
11    A.  Who was staffing, you mean who was in charge
12 of the area?
13    Q.  Yes.
14    A.  I believe it would have to be Rod Willis.
15    Q.  What about Mary Leonard?
16    A.  Mary Leonard would be a subordinate to Rod
17 Willis.
18    Q.  And under which operations would they be
19 located within the AGFA division, the headquarters?
20    A.  They would be part of the headquarters
21 operation.
22    Q.  Where were they physically in terms of an
23 address in Wilmington, Massachusetts?
24    A.  Human resources people were located in all

Page 39

1  sites, so they -- Mary Leonard, as you mentioned, would
2  be in an office in the operations -- in the operations
3  building.  Rod Willis would have an operation in the
4  main building at Ballardvale Street.
5     Q.  What were the addresses in Wilmington in 1998
6  of the AGFA division?
7     A.  I don't remember the street addresses, but it
8  would be Ballardvale Street, Industrial Way.  There
9  would be two operations on Industrial Way, and a third
10 operation, another street.  I don't -- It would be a
11 service warehouse.  I'm not sure where it's located.
12    Q.  So there were three buildings basically?
13    A.  There were four buildings.
14    Q.  Two on Industrial Way, one on Ballardvale
15 Street --
16    A.  And then one, a service operation.  I don't
17 remember the name of the street.
18    Q.  Where was the electronic pre-press
19 operations, which street, Ballardvale Street?
20    A.  All four locations.
21    Q.  Okay.  Those were in all four -- different
22 parts of it or different buildings; is that correct?
23    A.  Yes.
24    Q.  And what we've noted before is commonly known

Page 40

1  as the board shop on Exhibit 3 from Ramsden that you've
2  noted.  The circuit --
3     A.  That's right.
4     Q.  -- the printed circuit and the fabrication,
5  that was known as the board shop?
6     A.  That was known as the board shop.
7     Q.  Where were they located?
8     A.  On Industrial Way in Wilmington,
9  Massachusetts.
10    Q.  Which other parts of the boxes on Exhibit 3,
11 Ramsden Exhibit 3, were located at Industrial Way where
12 the board shop was located, if you know?
13    A.  Ramsden's office and his immediate support
14 staff were located on Industrial Way.  The printed
15 circuit manufacturing would be located there.
16    Q.  That's the board shop, right?
17    A.  The board shop.  The model shop would be
18 located --
19    Q.  The same place?
20    A.  -- the same place.  And what is not shown
21 here is the actual manufacturing plant, which I assume
22 is this box here, 255 people.  The actual plant itself,
23 which is the assembly line would be located there.
24    Q.  And you're pointing to the one that has

Page 41

1  Norman Fontaine's name in it?
2     A.  That's correct.
3     Q.  And the other boxes were located in
4  Industrial Way, other than what you've said?
5     A.  To the best of my knowledge, they were
6  located -- these others would be located at Ballardvale
7  Street to be closer to the research and development
8  group.
9     Q.  So the technical engineering and the Avantra
10 Manufacturing were on Ballardvale Street, is that
11 correct, to the best of your memory?
12    A.  To the best of my knowledge.
13    Q.  Looking at Exhibit 31, Paige 31, do you know
14 if Rod Willis or Mary Leonard was involved in drafting
15 this salaried employee handbook?
16    A.  I do not know.
17    Q.  They would have been aware of it?
18        MR. WELSH:  Objection.  You may answer.
19    Q.  Let me rephrase the question.  Are you
20 familiar with the responsibilities and duties of the
21 human resources department at Bayer at that time?
22    A.  Yes, to some extent.
23    Q.  Did Mary Leonard or Rod Willis report to you?
24    A.  No.

11 (Pages 38 to 41)

Michael Paige

Page 90

1   Germany.
2       Q.   And who did Mr. Rittinghaus report to, if you
3   remember?
4       A.   Mr. Rittinghaus would report to the president
5   of Bayer Corporation in the United States and he would
6   report to the board of management of AGFA Gevaert in
7   Antwerp, Belgium.
8       Q.   I'm sorry.  There was another person between
9   Mr. Gevaert --
10      A.   Mr. Rittinghaus reported to -- reported to
11  the president of Bayer Corporation in the United
12  States.
13      Q.   Who was that?
14      A.   I'm sorry.  His name escapes me.
15      Q.   If you recall, how many people within Bayer
16  were at your level?
17      A.   At my level within Bayer, within Bayer
18  Corporation, 200, 250.
19      Q.   And they were also the head of different
20  business units; is that correct?
21      A.   Some were heads of different business units,
22  some were staff managers, some were operational
23  managers.  It was widely different.
24      Q.   At the Wilmington office area, the AGFA

Page 91

1   division, was there anybody above you that you reported
2   to that was located there?
3       A.   Within the Wilmington operation site, no, I
4   didn't report to anyone at that site.
5       Q.   You were the head of the site, correct?
6       A.   Yes.
7       Q.   You made a proposal to sell the board shop.
8   And when did you make that proposal?
9       A.   I do not know the exact date.
10      Q.   Generally can you tell me?
11      A.   Five years before the date of the sale.
12      Q.   Which was 1998?
13      A.   Five years before the date of the sale.
14          MR. WELSH:  He was telling you the date
15  of the sale was '98.
16      Q.   Was 1998 the date of the sale?
17      A.   Yes.  So certainly starting about five years
18  earlier, there was always a discussion about the board
19  operation.
20      Q.   And can you tell me your earliest memory of
21  discussing what to do with the employees of the board
22  shop?
23      A.   No, I can't, but it would be -- when the
24  decision was made regarding the assets, the decision

Page 92

1   was made regarding what should we do with the
2   employees.
3       Q.   And what was that decision regarding the
4   employees?
5       A.   The decision or discussion?
6       Q.   What was the decision with respect to the
7   employees?
8       A.   The decision was to create a package deal for
9   EFTC so that they would offer employment without
10  reduction in salary to all designated employees that we
11  designated who the employees were that were associated
12  with the operation of the board manufacturing and
13  refurbishing group in Wilmington.
14      Q.   That's what you agreed to with EFTC --
15      A.   Yes.
16      Q.   Let me finish the question.  So you decided
17  that you would have -- EFTC and Bayer would agree that
18  EFTC would offer a package to the employees, as you've
19  discussed, as you've described?
20      A.   At the final decision, yes.
21      Q.   And what was the final decision as to what to
22  tell the employees with respect to what their
23  employment status was within Bayer, would be within
24  Bayer?

Page 93

1       A.   That we were going to disband the operation
2   of the board facility and purchase our boards from a
3   third party, that third party being EFTC.
4       Q.   And I'm sorry.  And then what with a third
5   party?
6       A.   And that third party would be EFTC.
7       Q.   And you were going to purchase the boards
8   from EFTC?
9       A.   That's correct.
10      Q.   What was the final decision with respect to
11  the employment status of the employees of the board
12  shop?
13          MR. WELSH:  Objection.  You may answer.
14      A.   As part of the negotiation, I would accept a
15  higher price on the boards than market value -- than
16  street value so that all employees would be offered
17  equal salary that they were making within Bayer.
18      Q.   So you were -- Part of the deal with the EFTC
19  was that you -- Bayer got EFTC to agree to pay a higher
20  price for the board sales -- I'm sorry.  Strike that.
21          So the deal that you struck with EFTC was
22  that Bayer would pay a higher price for the board sales
23  in return for EFTC offering the board shop employees a
24  job at the same wage level, correct?

24 (Pages 90 to 93)

Michael Paige

Page 94

1      A.   That AGFA business group, because my
2  operations outside of the United States would be buying
3  its boards from EFTC at a recognized premium over
4  market to guarantee the employees would have employment
5  with them.
6      Q.   And this is -- I'm sorry.  Go ahead.
7      A.   That's it.
8      Q.   And EFTC agreed to this?
9      A.   EFTC agreed to accept all AGFA
10  employees -- all designated AGFA employees.
11      Q.   These were Bayer employees, not AGFA
12  employees, right?
13      A.   Bayer employees.
14      Q.   So that's incorrect.  They were not AGFA
15  employees.  They were Bayer employees?
16      A.   AGFA division, yes.
17      Q.   So the board shop were employees of Bayer
18  AGFA division; is that correct?
19      A.   Yes.
20      Q.   So just so I've got this right, so EFTC
21  agreed that for a period of time they would purchase
22  the boards produced by the board shop at a higher than
23  street value price, market price, and Bayer would pay
24  EFTC that price, and in return EFTC agreed to offer

Page 95

1  those employees a job at the same salary they had when
2  they were with Bayer; is that right?
3      A.   No.  You've misstated.
4      Q.   All right.
5      A.   AGFA would agree --
6      Q.   When you say AGFA, sir, is it -- the
7  agreement was between --
8           MR. WELSH:  Can we go off the record for
9  a second on this?
10           MR. ROACH:  Sure.
11           (Discussion off the record.)
12      A.   My position was a business group manager
13  worldwide for AGFA Gevaert.
14      Q.   How do you spell Gevaert?
15      A.   Oh, God.  G-E-V-A-E-R-T.
16      Q.   You can continue.
17      A.   And made decisions on a worldwide basis for
18  the best place to secure component parts, to build
19  product, to sell and distribute product.
20      Q.   And that was for AGFA Gevaert?
21      A.   AGFA Gevaert.
22      Q.   From whom did you get your paycheck, sir?
23      A.   My paycheck in U.S. currency was issued
24  through AGFA Corporation.  I'm a citizen of the United

Page 96

1  States and pay all taxes and abide by all laws in the
2  United States.  So my paycheck came from, was stamped
3  AGFA Corporation or Bayer Corporation.
4      Q.   Were you paid by Bayer Corporation as well as
5  AGFA Corporation?
6      A.   No.  I received one paycheck.
7      Q.   Were you employed by Bayer Corporation or
8  AGFA Corporation?
9           MR. WELSH:  Objection.  You may answer.
10      Q.   In 1998, who was your employer?
11      A.   Bayer Corporation.
12      Q.   But you got your paycheck from AGFA
13  Corporation?
14      A.   No.  I'm sorry.  I misspoke.  I got my
15  paycheck from Bayer Corporation.
16      Q.   Tell us more about your position, please,
17  with respect to AGFA Gevaert and what you did for them.
18      A.   Part of my operation was to -- we had to
19  purchase boards for our equipment.  I could purchase my
20  boards anyplace in the world that would give us the
21  right price with the right quality.  I happened to have
22  a capital board operation, a legacy operation in
23  Wilmington that had been producing boards for many
24  years versus Compugraphic later on as AGFA.  And so the

Page 97

1  decision I made was that this was not the most
2  effective way to acquire our boards.
3      Q.   I want to get back to the board shop
4  employees and the deal you struck with the EFTC.  And I
5  just want to understand what it is the deal that Bayer
6  struck with EFTC with respect to the wages.
7      A.   Right.  So, then, specifically within the
8  United States operation, because we're dealing with the
9  assets in the United States, Bayer Corporation, who
10  owns the assets on paper, and the -- and all the
11  employees were Bayer U.S. employees, the decision was
12  made what would be the best way and fairest way to
13  treat them as employees of Bayer and as individuals
14  because we were going to expand this operation.
15      Q.   I understand all that.  So what was the deal
16  you struck with EFTC?
17      A.   That -- My management agreed that I would not
18  get the lowest possible price, street price, that I
19  would -- that they'd be willing to pay a premium for my
20  boards with EFTC if EFTC would agree on their part to
21  offer and give employment at their current salary
22  levels to the designated group of employees associated
23  with the board shop.
24      Q.   And how long did -- was that commitment to

Michael Paige

05/12/2006

Page 98

1  purchase the boards at a higher than market price
2  price?
3      A.  It was a -- It's a decreasing ramp, so I
4  believe after three years or four years the price would
5  have to be at street value, so they had a four-year
6  window, three- or four-year window to -- you know,
7  which I would pay this premium.
8      Q.  Did that contract run its course for that
9  period of time?
10     A.  I don't know.  I ended up leaving AGFA
11 afterwards between -- you know, sometime thereafter.
12     Q.  I understand you've now described the
13 decision with respect to how you had structured the
14 deal with the EFTC and Bayer, correct?
15     A.  Yes.
16     Q.  I want to know what the decision was with
17 respect to what the employment status would be of the
18 board shop employees at Bayer.
19         MR. WELSH:  Objection.  You may answer.
20     A.  It was agreed as part of this structured deal
21 that EFTC would continue to operate within our building
22 in Wilmington, Massachusetts, so it actually would be
23 using leased space, our space, their equipment now
24 because the equipment would be sold, and operate

Page 99

1  directly within our operation.
2      Q.  What was the decision made with respect to
3  what the employment status would be of the board shop
4  employees as part of this deal with the EFTC
5  Corporation?
6      A.  EFTC would offer them salaries that were
7  positions that were equivalent to their current
8  salaries, although it was higher than what we'd
9  normally pay in the market for equivalent employees.
10     Q.  I understand that.  But what -- I don't think
11 you're answering the question I'm asking.  What was
12 their employment status to be with Bayer?  Were they to
13 be terminated?  Were they to be laid off?  What was
14 their decision -- What was the decision that Bayer made
15 with respect to these employees with respect to their
16 position at Bayer?
17     A.  Since we were offering them equal or
18 comparable positions, if they chose not to be part of
19 this, then they would be terminated.  They were not
20 offered the layoff situation, if that's what you're
21 asking.
22     Q.  And with respect to what actually happened,
23 were they terminated as Bayer employees and then
24 accepted a new job with the EFTC?

Page 100

1      A.  Yes, from the date of transition they were
2  terminated.
3      Q.  And do you remember what the date of
4  transition was?
5      A.  I believe it was September -- I believe it
6  was September of '98.  I think that --
7      Q.  Can you tell me --
8          MR. WELSH:  Steve, I'm going to need a
9  very quick break.  I understand it's frustrating,
10 but --
11         MR. ROACH:  I have no problem with --
12         MR. WELSH:  I'm not going to be talking
13 with him.
14         MR. ROACH:  I have no problem with you
15 taking breaks for your other case, which I've given you
16 latitude to do, and I have no problem with that as long
17 as you allow me to finish with Mr. Paige today, and if
18 I don't finish with him, that he can come back.
19         MR. WELSH:  That's fine.
20     (Recess taken.)
21 BY MR. ROACH:
22     Q.  So is it fair to say that the positions of
23 the board shop employees were eliminated within Bayer?
24     A.  The positions of the board shop employees

Page 101

1  within Bayer were eliminated, yes.
2      Q.  And is it fair to say that the business, the
3  board shop circuit printer board business was in
4  decline as part of the reason why they -- the sale was
5  made with EFTC?
6      A.  It was -- It required a massive amount of
7  capital investment for me to make -- keep that facility
8  state of the art, something we couldn't afford to do
9  for the volume of the boards.  The business had already
10 been taking in work from outside, from other companies,
11 in this case, it was another Bayer subsidiary, but we
12 had to bid that out at street prices, so it was keeping
13 the volume up, but I was still losing money.  So it was
14 a problem.
15     Q.  So it was in decline?
16     A.  It was in decline.
17     Q.  Can you tell me, if the business was in
18 decline in the board shop, why did EFTC purchase it?
19 Did you ever determine that or ask them that?
20     A.  Yes.  EFTC had already done a similar
21 transaction with Motorola Corporation of
22 Florida -- We'll use them as a reference -- where they
23 actually took over facilities in place with, in this
24 case, their Motorola employees who became EFTC

26 (Pages 98 to 101)

Michael Paige                                                        05/12/2006

Page 106

1    A.  Yes, I have.
2    Q.  Is it fair to say that transferred employees,
3  the term under section 6.1, refers to the board shop
4  employees?
5    A.  Yes.
6    Q.  And, to your knowledge, they're the same
7  employees that are the plaintiffs in this case,
8  correct?
9        MR. WELSH:  Do they include the
10  plaintiffs in this case?
11    Q.  They include the plaintiffs in this case?
12    A.  Yes, that's true.
13    Q.  How did the term "transferred employees"
14  get -- come into being?
15    A.  I actually don't know.  I'm assuming it's a
16  legal term created by the parties that -- the legal
17  group that actually created the documentation.
18    Q.  So it was a legal term for this document, as
19  far as you know?
20    A.  Yes.
21    Q.  In the last sentence of 6.1, it says,
22  "Nothing in this agreement shall be construed as a
23  guarantee to Bayer" --
24        MR. WELSH:  To buyer.

Page 107

1    Q.  Sorry.  Let me rephrase it.  "Nothing
2  contained in this agreement shall be construed as a
3  guarantee to buyer that any number of the employees
4  will accept offers of employment with buyer or as a
5  representation of warranty regarding the skill level or
6  performance of any of the transferred employees."  Did
7  I read that correctly?
8    A.  Yes, you did.
9    Q.  And the buyer is EFTC Corporation, correct?
10    A.  Yes.
11    Q.  As part of this agreement, was there a
12  requirement that a certain number of the board shop
13  employees would have to accept employment with EFTC to
14  make this deal work?
15    A.  Yes.  Otherwise, there would be no continuity
16  of practice and quality and we wouldn't be able to
17  guarantee that the day after transaction the same
18  number of boards required would be able to be produced.
19    Q.  Was there a particular number or percentage
20  of board shop employees that was the cut-off point that
21  would have had to have accepted employment with EFTC to
22  make it work?
23    A.  I don't remember.
24    Q.  Did you have any input into any of the

Page 108

1  negotiations concerning paragraph 6, any part of
2  paragraph 6 on Exhibit --
3        MR. WELSH:  Not just 6.1, but the whole
4  of 6?
5        MR. ROACH:  Yes.
6        MR. WELSH:  Look at all of 6 before you
7  answer.
8    Q.  Let me rephrase the question.  Did you have
9  any role in negotiating or drafting any part of
10  paragraph 6 of Ramsden Exhibit 25, the asset purchase
11  agreement?
12    A.  I need to understand the question.  The
13  question is this element six which is three or four
14  pages long?
15    Q.  Yes.
16    A.  I'd have to read it.
17    Q.  Let me start with 6.1.  We just talked about
18  that, right?
19    A.  Yes.
20    Q.  Did you engage personally in any of the
21  negotiations regarding the transfer of employees to
22  EFTC?
23    A.  By personally, you mean vis-a-vis a specific
24  employee?

Page 109

1    Q.  No.  You personally negotiating with
2  somebody --
3        MR. WELSH:  Listen to the question.
4    Q.  -- with somebody from EFTC.  Did you
5  personally negotiate with EFTC yourself, with anybody
6  at EFTC about --
7    A.  I was part of the negotiating team.  I did
8  not negotiate specifically with EFTC.
9    Q.  Who was part of the negotiating team from
10  Bayer?
11    A.  From Bayer?  The names would be extensive
12  because it would include not only my team but the
13  headquarters legal group, the headquarters human
14  resources group, the merger and acquisitions team from
15  Bayer Corporation.  We're talking about dozens of
16  people.
17    Q.  Who of the team on the Bayer side was
18  involved in negotiating with EFTC concerning the board
19  shop employees' benefits, salary, and transfer of those
20  employees?
21    A.  Restate the question again.
22        MR. ROACH:  Would you read it back,
23  please?
24        (Record read.)

28 (Pages 106 to 109)

Michael Paige                                                                    05/12/2006

Page 110

1    A.    We never negotiated their benefits because
2    the benefits are part of EFTC's package.  That's their
3    corporate -- That's their corporation, not our
4    corporation.  Statement of employee salaries and
5    expected treatment of employees would be discussed by
6    any number of our managers.
7        As I stated earlier, this operation is going
8    to be within the confines of my building in a very
9    gossipy environment.  If these people were mistreated
10   in any way, there would be an incredible black mark on
11   all of us.
12   Q.    What I would like to know is who on the Bayer
13   negotiating team worked on issues concerning the board
14   shop employees in terms of how many would be
15   transferred, whether they would transfer over to EFTC,
16   what they would be paid, who would be responsible for
17   what?
18   A.    The salaries were at that point a matter of
19   record.  And since no one took a cut in salary, human
20   resources can make those statements specifically about
21   their current level of compensation.  The actual
22   employees to be designated as to be needed by this
23   would be a combination of Mr. Ramsden's team who would
24   understand far better than I would the actual nature of

Page 111

1    each person's job and function.
2    Q.    What about compensation and benefits,
3    paragraph 6.3 on page 10 of Exhibit 25?
4        MR. WELSH:  Read it over.
5    A.    Am I just reading the 6.3.1?
6    Q.    Yes.
7    A.    I've read 6.3.1.
8    Q.    Who was responsible for that aspect on the
9    Bayer team?
10   A.    The human resources group within Bayer.
11   Q.    And who was that?
12   A.    It would certainly start with Mr. Willis and
13   then proceed to his management to make sure things are
14   consistent.
15   Q.    Who was his management?
16   A.    I do not remember specifically who his direct
17   manager was at this moment.
18   Q.    What about Mary Leonard; was she involved as
19   part of the team?
20   A.    She would be subordinate to Willis and she
21   would have input, but I don't know if she made a
22   decision.
23   Q.    Up in 6.2 of Exhibit 25 it says, "Buyer shall
24   offer employment to the transferred employees for

Page 112

1    positions comparable to the positions in which such
2    transferred employees are employed by seller
3    immediately prior to the closing date."  Did I read
4    that correctly?
5    A.    Yes, you did.
6    Q.    Do you have any understanding what was meant
7    by positions comparable?
8    A.    The word "position" has a very specific
9    meaning.  It refers to the salary and the nature of the
10   job function that the person was performing.
11   Q.    Anything else?
12   A.    I assume that it includes any other
13   consideration, if there were bonuses, but these people
14   normally would not --
15   Q.    Now, on 6.3.2 on page 11, paragraph 6.3.2 of
16   Exhibit 25, it says that the buyer agrees to credit and
17   continue to credit service for the transferred
18   employees.
19   A.    Yes.
20   Q.    And that includes for severance benefits,
21   right?
22   A.    To the extent that the buyer's benefits
23   package, whatever it includes, that isn't on the
24   buyer's side, so whatever the buyer's benefit package

Page 113

1    includes, that depends on length of term and duty, this
2    is referring to the fact that the employees from AGFA
3    would be given credit for their time already within
4    AGFA.
5    Q.    Bayer employees of AGFA division?
6    A.    Yes.  Thank you.
7    Q.    Do you know whether the benefits package
8    other than salaries and wages of EFTC were better, the
9    same, or not as good for the employees?
10   A.    There's an apples and oranges aspect of this.
11   Q.    What's that?
12   A.    EFTC is a young, growing, very dynamic
13   company where use of cash incentives and bonuses is
14   very typical for employees.  AGFA was a --
15   Q.    You mean Bayer?
16   A.    Bayer -- Thank you -- was more of a
17   traditional company, less aggressive, much more
18   conservative.  Bonuses and incentives were rarely used.
19   So there was a difference in the -- in what was
20   appropriate for each business regarding what, quote, is
21   benefits or not benefits.
22   Q.    What about the pension plan, the EFTC pension
23   plan; was that better or not as good or the same as the
24   Bayer plan?

29 (Pages 110 to 113)

Michael Paige

Page 114

1    A.   I do not know if the EFTC had a pension plan
2    or not.
3    Q.   What about the severance plan; was EFTC's
4    plan the same, better, or worse than the Bayer plan?
5    A.   I don't actually know the nature of the EFTC
6    severance plan.
7    Q.   Did you ever at any time know what the
8    benefit plan was for EFTC at the time of the sale?
9    MR. WELSH: Severance benefit?
10   A.   Severance benefit?
11   Q.   Well, let's start with all benefits.  Did you
12   at any time before the sale know what the benefits were
13   that EFTC offered to the board shop employees when they
14   came over?
15   A.   The human resources staff at AGFA certainly
16   would look at this issue.
17   Q.   AGFA meaning Bayer?
18   A.   Bayer.  Thank you.  I keep saying this.  And
19   all employees that were to be part of the transferred
20   employees would be made aware by the EFTC HR people
21   specifically what the benefit structure was that they
22   we would be acquiring in their new company.
23   Q.   My question is, though, did you ever come to
24   know whether the benefits package that EFTC offered and

Page 115

1    provided to the board shop employees was the same,
2    better, or worse than the Bayer?
3    A.   Just in general terms.
4    Q.   And what is your understanding in general
5    terms?
6    A.   That the EFTC package was more aggressive
7    than Bayer could offer.
8    Q.   More aggressive in terms of bonuses, right,
9    cash incentives?
10   A.   Net compensation, it would be better for
11   them.
12   Q.   And net compensation meaning what?
13   A.   Salary incentive bonuses.
14   Q.   I'm talking about other than salary and
15   bonuses.  I'm talking about the benefits plan.
16   MR. WELSH: Fringe benefits?
17   Q.   Fringe benefits.  Do you understand what the
18   term means, "fringe benefits"?
19   A.   Yes.
20   Q.   I'm talking about fringe benefits.  I'm not
21   talking about salary.  Did you ever have any
22   understanding as to whether the fringe benefits that
23   EFTC offered to the board shop employees was better,
24   the same, or not as good as the Bayer fringe benefits

Page 116

1    plan?
2    A.   I was aware they were different.  For
3    example, the aforementioned dental plan and medical
4    plan, which we know was slightly more expensive because
5    it was a smaller company, was compensated by increasing
6    all employees' salaries, I think you've already got
7    that in 6.3.1, to compensate them for the difference in
8    cash they would require for medical.
9    Q.   Anything else?
10   A.   So that was immediately figured into their
11   salaries.
12   Q.   Anything else in terms of differences?
13   A.   I don't know at this time.  I mean I don't
14   have --
15   Q.   Do you know whether EFTC offered a pension
16   plan to the board shop employees?
17   A.   I don't know.
18   Q.   Do you know whether they offered a severance
19   plan?
20   A.   I also don't know that.
21   Q.   Going over to page 12 of Exhibit 25,
22   paragraph 6.4 states that, "EFTC has to" -- "has agreed
23   to maintain these employees in their employ for at
24   least 12 months," correct?

Page 117

1    A.   That's correct.
2    Q.   And can you tell me what you know about why
3    that was part of the asset purchase agreement,
4    Exhibit 25?
5    A.   Why this statement was made?
6    Q.   Why EFTC agreed to keep the board shop
7    employees employed for one year, a minimum of one year.
8    A.   To give them a fair time to assess the
9    person's value as it contributed to their new company.
10   Q.   And then they have the right to lay them off,
11   right, or terminate them?
12   A.   They have the right to, using their policies
13   and procedures, you know, do what is appropriate to
14   maintain their business.
15   Q.   And what was your understanding, if any,
16   about whether these employees would be paid severance
17   after they joined EFTC?
18   A.   I don't know.
19   Q.   Well, if you look at section 6.4, it talks
20   about the fact that EFTC agreed to provide them six
21   months of severance, right, if they laid them off
22   within the first 12 months?
23   A.   Within the first 12 months, yes.
24   Q.   Do you remember negotiating or discussing

30 (Pages 114 to 117)

Michael Paige

05/12/2006

Page 118

1  that with EFTC at all?
2     A.  I do not personally negotiate that.
3     Q.  Do you remember anybody who did negotiate it?
4     A.  No, I can't answer that.  I don't know.
5     Q.  Do you have any knowledge as to whether Bayer
6  included this provision in this agreement as part of a
7  desire to avoid paying its -- the board shop employees
8  any severance under Bayer's severance plan?
9     A.  No, that's not what this would be used for.
10     Q.  Why do you say that?
11     A.  Because Bayer's a conscientious employer.  It
12  wouldn't do this kind of a thing.  We're not talking
13  about a lot of money here, so it would be worse in
14  publicity than it would be valuable in any monetary
15  value.  So they would not do it for the reason stated.
16     Q.  I'm going to ask you about the Bayer
17  severance package in a minute.  But looking at 6.5
18  while we're on this page, Exhibit 25, it says, "The
19  buyer shall be solely responsible for any and all
20  communications it makes to any employees of seller
21  during the process of making offers of employment
22  regardless of seller's involvement in such process or
23  receipt of documents and materials to be distributed to
24  any employees of seller."  Did I read that correctly?

Page 119

1     A.  Yes.
2     Q.  Do you have any memory as to what that -- why
3  that provision was placed in this agreement?
4     A.  Yes.
5     Q.  Can you tell me what you know?
6     A.  While these people -- While this process was
7  going on to keep things open, there would have to be
8  closed door meetings between Bayer employees and
9  members of another company they did not work for, so we
10  had to allow the buyer to come into the premises and
11  meet with these people without any AGFA people there.
12     Q.  You mean Bayer people?
13     A.  Bayer people there.  And allow them to talk.
14  Otherwise, the communication would be no communication.
15     Q.  Do you know whether Bayer made any statements
16  about what the benefits would be or the salary would be
17  if the employees chose to accept employment with EFTC?
18     A.  This was EFTC's responsibility.  As for their
19  own employees, who these people would be after a
20  certain date, to communicate all of that to them.
21     Q.  I'm talking about before the board shop
22  employees accepted the job with EFTC, do you know
23  whether Bayer made any statements, yourself or anybody
24  else, to the board shop employees about what their

Page 120

1  salary or benefits would be at EFTC?
2     A.  There were a number of employee meetings with
3  all members of the manufacturing operation since there
4  was a very, as I say, gossipy environment.  You
5  couldn't isolate one group and not everyone hear it.
6  And they were going to live in the same building, so
7  everybody had to know who their cohabitants -- what
8  their deal was to some extent.  And, on the other hand,
9  the representation of EFTC's benefits could only be
10  made by EFTC.  They have their own policies and
11  procedures manuals.
12     Q.  I understand that.  But what I'm asking you
13  is whether anybody from Bayer told the employees, the
14  board shop employees whether formally or informally
15  what the benefits or what the salary and fringe
16  benefits were going to be at EFTC.
17     A.  We certainly communicated the salary because
18  that was part of the consideration.  The benefits could
19  only be communicated by EFTC.
20     Q.  Let's go to page 13 of Exhibit 25.  And if
21  you look at 6.9.1, if you look at the second sentence,
22  it talks about, "The buyer agrees to indemnify the
23  seller from any obligation relating to the employees
24  which relates to the buyer's employment except as may

Page 121

1  arise from or relate to the seller's communication with
2  or treatment of the employees prior to the effective
3  time."  Do you see that?
4     A.  I see that sentence.
5     Q.  Do you know why the -- this provision was in
6  here that excepted out liability to EFTC from any
7  statements that Bayer might have made to the employees
8  before they left?
9        MR. WELSH:  Misstates the provision.  I
10  object.
11     Q.  Okay.  You can answer, sir.
12        MR. WELSH:  Read it before you answer.
13  Steve, I think you switched things around.
14        MR. ROACH:  I don't want to do that.
15        MR. WELSH:  It's a technical thing.
16     Q.  Let me rephrase the question.  Do you have
17  any knowledge as to whether Bayer agreed to take
18  responsibility for anything it said to the board shop
19  employees or any statements it made before they went
20  over to EFTC?
21     A.  I understand the question.  To my knowledge,
22  I can't answer that question.  I don't know or don't
23  remember specifically.
24        MR. WELSH:  Before you start --

31 (Pages 118 to 121)

Michael Paige

05/12/2006

1       (Witness conferred with counsel.)
2       Q.   Let's just read this sentence.  It says,
3   "Buyer agrees to indemnify and hold seller harmless
4   from any liability claim or obligation arising from or
5   relating to the transferred employees or beneficiaries
6   of the transferred employees which in any way arises
7   from or relates to buyer's employment of the
8   transferred employees, comma."  Are you with me so far?
9       A.   Yes.
10      Q.   Did I read that correctly?
11      A.   Yes, you did.
12      Q.   Do you have an understanding as to what that
13  means?
14      A.   I'm a little -- I need to read it myself
15  another time.  Can I reread it?
16      Q.   Sure.  Go ahead.
17      (Witness reviewed document.)
18      Q.   Do you understand it now that you've read it?
19      A.   Yes.
20      Q.   And what is your understanding?
21      A.   That once the transaction has occurred, that
22  the buyer is responsible for its -- wholly responsible
23  for its -- the way it manages and treats its own
24  employees.

1       Q.   And that's the buyer being EFTC, right?
2       A.   Yes.
3       Q.   And then after that comma there's an, "Except
4   as may arise from or relate to seller's communications
5   with or treatment of the employees prior to the
6   effective time."  Did I read that correctly?
7       A.   Yes.
8       Q.   Do you have an understanding of what that
9   means?
10      A.   Yes.
11      Q.   And what is your understanding?
12      A.   If in the course of this transaction Bayer
13  Corporation did something criminal, illegal, incorrect,
14  that as these employees were moved over to the next
15  corporation, that the fact these things were done would
16  be -- would fall back on the seller, Bayer.
17      Q.   And do you have any memory of discussing this
18  issue at all in the sale process with anybody within
19  Bayer or anybody in the EFTC?
20      A.   Nothing specific.
21      Q.   What about in general?
22      A.   It's a very broad statement.  Again, not to
23  my remembrance.
24      Q.   Did you ever within the negotiations with

1   EFTC say to them, you meaning you and other members of
2   the Bayer negotiating team say, Look, we're going to be
3   telling these people lots of things about what it's
4   going to be like when they move over to you.  We'll be
5   responsible for anything we misstate.  Do you remember
6   saying anything like that to them?
7       A.   No.
8       Q.   Do you remember saying anything to them that
9   this deal isn't going to work unless we make it sound
10  like this is going to be a good job, a win-win
11  situation for them, for the board shop employees?
12      A.   The term "win-win" has been used very
13  effectively in this particular deal meaning it was a
14  win-win, but we were not communicated that it had to
15  look like anything.  It wasn't looking like anything.
16  It was what it was.
17      Q.   How was the term "win-win" used in this deal?
18      A.   Had we taken the route of just stopping
19  operation and terminating the employees, the job market
20  was bad in the northeast and their salaries were quite
21  high compared to commensurate positions, so if we just
22  stopped operation, we would put them in a tremendous
23  disadvantage, and so we accepted the responsibility for
24  finding a new parent for them that would accept them at

1   the current compensation levels and offer them
2   employment doing the same thing that they had been
3   doing in the same place they had been doing it.
4       Q.   And that's what you meant by win-win?
5       A.   Yes.  And we would guarantee continuing to
6   buy boards with these people so they had years of
7   annuity coming in from our board purchases.
8       Q.   Well, there was a limit on that, right?
9       A.   Yes, there was a limited number of years
10  where they had to bring their cost structure to a point
11  where we would say they were competitive.
12      Q.   And there was only one year that EFTC was
13  guaranteeing employment for these people, correct?
14      A.   They had essentially one year of performance
15  review, yes.
16      Q.   Did you undertake to do a survey of
17  the -- you meaning you or anybody from the Bayer
18  management team undertake to do a survey of each of
19  these employees' qualifications to see if there were
20  other job opportunities out there for each of them
21  before you told them it was going to be a win-win
22  situation?
23      MR. WELSH:  Objection.  Out there?
24      Q.   Out on the job market.  Let me rephrase the

Michael Paige

05/12/2006

Page 126

1  question. Did you or anybody else in the Bayer
2  management team do an assessment of the job market
3  taking into account the qualifications, backgrounds,
4  training, education, and experience of the board shop
5  employees to see whether there were other job
6  opportunities out there for them before you undertook
7  to tell them this was a win-win situation?
8      A.  Yes, in the sense that we knew what sources
9  of boards were available to us in the geographic area
10 and what the price of those boards were and whether
11 there was over capacity and under capacity in the
12 industry locally that would tell us everything that we
13 needed to know about their potential employment
14 prospects.
15     Q.  That would be employment prospects in the
16 electronic pre-press printed circuit area?
17     A.  No, in the printed circuit area. Remember,
18 this group was also doing boards for the buyer
19 diagnostics group, which is not pre-press. It's
20 medical diagnostics. So a board is a board is a board.
21     Q.  So your analysis was limited to the board
22 area in the region, right?
23     A.  General circuitry boards, yes.
24     Q.  But did you undertake to do a more broad

Page 127

1  based analysis taking into account the training,
2  education and experience and background of each of the
3  board shop employees to see if there were other jobs
4  outside of the board area that they might be qualified
5  to do if they didn't go to EFTC that caused you to say
6  this is a win-win to them?
7          MR. WELSH: Objection. You may answer.
8      A.  I don't know.
9      Q.  So what you're saying is that somebody in
10 Bayer may very well have undertaken to look at the
11 individual training, education, and experience of each
12 of the employees, done an area market, job market
13 analysis, determined that for each of these employees
14 going to EFTC was the best available option for them,
15 and that they were unlikely to get a job of similar pay
16 or benefits and therefore made the decision to say to
17 them this is your best opportunity and that's why it's
18 a win-win?
19     A.  All of these employees are employees at will.
20 They're all willing to do any -- at all times assess
21 their viability in the market. They were informed
22 months before we were doing this what we were doing, so
23 if they found something that was terrific, they could
24 have always acted on it.

Page 128

1      Q.  That's not my question.
2      A.  So it was our responsibility to do their job
3  searching for them? No.
4      Q.  That's not my question either, sir.
5      A.  Okay.
6      Q.  This is my question: You stated that you
7  told -- Bayer undertook to tell the employees of the
8  board shop that going to EFTC was a win-win?
9      A.  Yes.
10     Q.  And the reason you made that decision was
11 because you determined that there were no other board
12 shop type jobs, board jobs out there that would be as
13 good as this job for EFTC, right?
14     A.  Yes.
15     Q.  My question is this: Do you know whether
16 anybody at Bayer looked at the individual training,
17 education, background, or experience of each of these
18 employees, then went out and did an analysis in the job
19 market to see if there was any other type of area or
20 job that they could get a similar paying job before you
21 told them it was a win-win situation and this was the
22 best for them?
23         MR. WELSH: Objection. You may answer.
24     Q.  You can answer.

Page 129

1      A.  I don't know. It's a human resources
2  function. I don't know.
3      Q.  So, as far as you know, human resources may
4  have done it, but you don't know?
5      A.  I do not know, right.
6      Q.  Did you ever say to the board shop employees
7  that it's a win-win situation?
8      A.  Yes, I've used those terms.
9      Q.  Did you confer with the human -- And when did
10 you do that?
11     A.  Any number of meetings we had both with all
12 of these -- everybody on site, with just the
13 manufacturing operation as a total group, and with the
14 board group individually, I mean as a collective group.
15     Q.  In a number of meetings with the board shop?
16     A.  Yes.
17     Q.  And this is with the board shop employees?
18     A.  Yes.
19     Q.  And before you made the statement this is a
20 win-win for them, did you confer with anybody from
21 human resources and say -- ask them, Did you go out and
22 do a job market analysis taking into account the
23 training, education, and experience of these employees
24 outside the board area to see if there was any other

33 (Pages 126 to 129)

Michael Paige

Page 130

1  job potential for them in the area before I go and tell
2  them this is a win-win situation for them?
3      A.  The problem is I can't recall saying that
4  specifically, but I assume that something like that
5  did -- I did say that or something of that nature.
6          MR. WELSH:  One second.
7      Q.  I don't want you to assume or guess, sir.
8          (Witness conferred with counsel.)
9      A.  Then I don't know.
10     Q.  I was not trying to listen, but he spoke loud
11 enough.  I just want to repeat.  I don't want you to
12 assume or guess, sir.
13     A.  I don't know.
14     Q.  My question is simple.  Did you ever go to
15 human resources, anybody at human resources,
16 Mr. Willis, Ms. Leonard, anybody above them, anybody
17 below them, and ask them, before I go and tell these
18 board shop employees this is a win-win situation for
19 them to go to EFTC, did you ever ask them whether they,
20 human resources, went and did a market analysis, job
21 market analysis, taking into account the training,
22 education, and experience of the board shop employees
23 for jobs other than the board area before you told them
24 it was a win-win situation?

Page 131

1      A.  I don't know.  I don't remember.
2      Q.  So you're saying you may have done that.  You
3  just don't remember?
4      A.  I may have done it.
5      Q.  In fact, isn't it true that nobody did that
6  for Bayer?
7          MR. WELSH:  Objection.
8      A.  I can't answer that.
9      Q.  Isn't it true that Bayer, yourself, and
10 others at Bayer told them it was a win-win situation so
11 that they would agree to go to EFTC so that then you
12 could make the sale to EFTC because you had to
13 guarantee to EFTC there would be a certain number of
14 them that would go before the sale would happen?
15     A.  Could you restate it?
16         MR. WELSH:  Please note my objection.
17         MR. ROACH:  Read it back, please.
18         (Record read.)
19     A.  No.
20     Q.  It didn't enter your mind at all?
21     A.  That we had to sell the -- No.  No.
22     Q.  Didn't the people within the Bayer management
23 team that was making this sale, trying to make the sale
24 happen to EFTC, have a conversation about, gee, we've

Page 132

1  got to convince the board shop employees to go to EFTC
2  or this sale is not going to take place?
3      A.  No.
4      Q.  Nothing like that was ever said?
5      A.  No.  We didn't have to.
6      Q.  Why not?
7      A.  The history of AGFA Corporation, Compugraphic
8  had already resulted in the layoffs of 3 or 4,000
9  people.  We're not talking about -- Every one of those
10 was dealt with properly.  And we're talking about a
11 function that we no longer needed and were bending over
12 backwards to make something different happen for these
13 people.
14     Q.  Could they have made that decision for
15 themselves?  Isn't this a bit paternalistic on your
16 part?
17     A.  They were informed before the event what was
18 happening and they could have voted.
19     Q.  For the layoffs of these 3 or 4,000 people
20 before the board shop employees' transfer over to EFTC
21 or -- Strike that.
22         With respect to the layoff of the 3 or 4,000
23 people before the board shop people were terminated and
24 went to EFTC, how were they treated?  Were they paid

Page 133

1  severance?
2          MR. WELSH:  Objection.  You may answer.
3      Q.  And I'm talking about the 3 or 4,000 people.
4          MR. WELSH:  I'm talking about -- I
5  object, and you can answer his question.
6      Q.  Let me rephrase the question.  If there's
7  something improper, I'd like to get it right.
8          You mentioned there were layoffs of 3 or
9  4,000 people prior to the sale, correct?
10     A.  Yes.
11     Q.  And you said you dealt with them properly,
12 correct?
13     A.  Yes.
14     Q.  Did you pay them severance?
15     A.  No, not all.
16     Q.  How many of them did you pay severance?
17     A.  I don't know the numbers.
18     Q.  Can you give me a rough approximation of the
19 percentage that you paid severance to?
20     A.  Because it's not a percentage situation.  It
21 depends on the circumstances.
22     Q.  Do you recall having any discussion with any
23 members of the Bayer management team that was
24 negotiating the sale of the EFTC about a concern about

34 (Pages 130 to 133)

Michael Paige

05/12/2006

---

Page 142

1  if anyone.
2         MR. WELSH:  Objection.  You may answer.
3     Q.  Let me rephrase the question.  You said there
4  was a Bayer negotiating team, correct?
5     A.  Dozens of people, yes.
6     Q.  Who of those dozens of people, if any, would
7  have negotiated severance benefits, potentially
8  negotiate severance benefits for the board shop
9  employees once they went to EFTC?
10        MR. WELSH:  Objection.  You may answer.
11    Q.  Do you understand the question?
12    A.  Yes, but you're asking -- Legal counsel or
13  human resources.
14    Q.  Okay.  And then under Exhibit 25 of Ramsden,
15  it talks about on 6.1, "Employees shall have until the
16  effective time to consider the offers made to them."
17  Do you see that?
18    A.  Yes.
19    Q.  And that means up until the date of this
20  sale, correct?
21    A.  Up until the date of -- yes, stated date of
22  sale.
23    Q.  And that was the time you had to make the
24  determination as to whether the sale would go through

---

Page 143

1  because a certain number of people had to accept a job
2  with EFTC, correct?
3     A.  I'm not clear, so I can't answer that, as to
4  whether there was a specified number of employees that
5  had to go, but the option would be given to the
6  specified group of employees if they wanted to go.
7  They could always say no and choose to terminate.
8     Q.  That wasn't my question.  My question was
9  Bayer had -- Bayer and EFTC had until the closing date
10  to determine how many people were going to go to EFTC,
11  correct?
12        MR. WELSH:  Objection.  You may answer.
13    A.  Bayer had until the closing date to provide a
14  list to EFTC of those employees that were to be
15  considered part of the transaction, yes.
16    Q.  So they had up until then to convince -- at
17  that time to convince the employees to go if they
18  wanted to go?
19        MR. WELSH:  Who's "they"?
20    Q.  Bayer.  Bayer had until the closing date to
21  try to convince the board shop employees to go to EFTC,
22  otherwise the deal wouldn't go through?
23    A.  No.
24    Q.  Is that right?

---

Page 144

1     A.  No, it's not right.  EFTC had up to that date
2  to make sure the employees knew everything they needed
3  to know to make this decision, and Bayer had up to this
4  date to make sure all the employees needed to know the
5  ramifications of not making this decision.  That had to
6  be done.
7     Q.  And that had to be done by the closing date,
8  right?
9     A.  Otherwise you couldn't close.
10    Q.  So that's correct?
11    A.  What is correct?
12    Q.  They had until the closing date?
13    A.  To?
14    Q.  To make the decision.
15        MR. WELSH:  The employees?
16    Q.  Yes.
17    A.  Yes.
18    Q.  Now, looking at Exhibit 34, on the back of it
19  there is a two-page document dated August 13, 1998.  Do
20  you see that?
21    A.  Daily note to Bob Serafian, yes.
22        MR. ROACH:  Actually, I'm going to mark
23  that as a separate document.  Let's make that
24  Exhibit 35, please.

---

Page 145

1         MR. WELSH:  Are we tearing this document
2  in half or are you going to give us another one?
3         MR. ROACH:  I'll give you another one.
4         (Exhibit 35 marked
5          for identification.)
6     Q.  Exhibit 35, do you know what this is?
7     A.  Well, I know what I read.
8     Q.  Well, do you recognize it, sir?
9     A.  No, I don't.
10    Q.  Do you remember seeing it at any time?
11    A.  My name is on the bottom copied, so at some
12  point it crossed my desk, yes.
13    Q.  What is it?
14    A.  It is a note from Lee Nute, who was the head
15  legal counsel to Bayer Corporation, from Bob Serafian
16  who was one of the legal counsels for AGFA Corporation
17  saying that a proposal was presented in front of the
18  executive committee meeting which would have been at
19  AGFA Corporation about the divestiture of the printed
20  circuit boards to EFTC, and that this was just a copy
21  of that proposal that was presented to the AGFA
22  Corporation's executive committee meeting.
23    Q.  Was it AGFA's executive committee or was it
24  Bayer's executive committee?

---

37 (Pages 142 to 145)

Michael Paige

05/12/2006

---

Page 146

1    A.    AGFA's -- This is a note from the -- AGFA's
2  executive committee meeting, which was at Richfield
3  Park, to Bayer's legal counsel letting them know this
4  proposal had been made.
5    Q.    That's not my question.  Let's look at the
6  executive committee meeting note of August 12, 1998.
7  Do you see that?
8    A.    Yes.
9    Q.    Part of Exhibit 34.  It's talking about the
10  company's AGFA division.  Do you see that?
11    A.    Yes.
12    Q.    What company are they talking about?
13    A.    Bayer's.
14    Q.    So this isn't an AGFA Corporation executive
15  committee meeting.  It's Bayer's, right?
16        MR. WELSH:  Objection.
17    A.    I misspoke.  It is AGFA's.  Yes, I'm sorry.
18  I stand corrected.  You're correct.  This is Bayer's
19  AGFA division.  The company refers to Bayer.  So this
20  is an executive committee meeting of Bayer, not AGFA,
21  regarding a Bayer --
22    A.    No, it's executive committee meeting of AGFA.
23    Q.    AGFA Corporation?
24    A.    Yes.  Passing it on to its parent, Bayer,

---

Page 147

1  letting them know what they want to do.
2    Q.    And Bayer, when they say the company's AGFA
3  division, they're talking about Bayer?
4    A.    Bayer, yes.
5    Q.    And so this is Bayer's subsidiary, AGFA
6  Corporation, telling Bayer what it, AGFA Corporation,
7  wants to do with the board shop?
8    A.    That's correct.
9    Q.    And it appears as though, under this, EFTC
10  will acquire the board shop assets and inventory,
11  right?
12    A.    That's correct.
13    Q.    And it says, "As well as the approximately
14  100 employees connected to the printed circuit board
15  business," correct?
16    A.    That's what it says here, yes.
17    Q.    And that's the board shop that we're talking
18  about, right?
19    A.    That's the board shop people.
20    Q.    So by August 12, 1998, it had been determined
21  that approximately 100 people from the board shop had
22  decided to go to EFTC; is that correct?
23    A.    No.
24        MR. WELSH:  Objection.

---

Page 148

1    A.    No.  It says that -- We're assuming that if
2  the approximate number would be something in the
3  neighborhood of 100, people can decide pretty much at
4  the last minute.
5    Q.    But they're making the assumption that these
6  people --
7    A.    The expectation is something in that order.
8    Q.    And the purchase price is 3 -- $2.35 million
9  plus 90 percent of the book value which is expected to
10  exceed $4 million, right?
11    A.    Yes.
12        MR. WELSH:  No, not expected.
13    Q.    I'm sorry.  I apologize.  So it's 3.5 -- Let
14  me rephrase it.  The purchase price is going to be
15  $2.35 million, correct?
16    A.    Right.
17    Q.    And in addition to that, it was going to be
18  about 90 percent of the aggregate book value of the
19  inventory?
20    A.    Inventory, correct.
21    Q.    And that was not expected to exceed $4
22  million, right?
23    A.    The whole deal was not expected to exceed $4
24  million.

---

Page 149

1    Q.    What was the whole deal?  What was the number
2  that was finally reached?
3    A.    I actually do not know.  Something in the
4  neighborhood of $4 million.
5    Q.    And, of that, how much profit did Bayer
6  receive?
7    A.    How much profit --
8        MR. WELSH:  Objection.  You can answer.
9    A.    I don't know the answer to that.
10    Q.    Was there any profit?
11    A.    I don't know.  I don't think there was any
12  profit.  In fact, there is no profit here.  It's not a
13  profit situation.
14    Q.    So was it a deal that was done to prevent
15  further losses; is that a fair statement?
16    A.    It was a deal to contain losses, yes.
17    Q.    Now, I'd like to ask you some questions about
18  the meetings that you've talked about that you've had
19  with the board shop employees.  When was your first
20  memory of a meeting with board shop employees?
21    A.    When you say with the board shop employees,
22  you mean as a unit or as part of a larger organization?
23    Q.    Both.  Let's start with the first one you
24  have for either of those.

---

Michael Paige                                                                                        05/12/2006

Page 150

1      MR. WELSH: On any particular topic?
2      Q.   On the topic of the impending sale of the
3   board shop assets from Bayer to EFTC. I would like you
4   to tell me your earliest memory of a meeting with any
5   of the board shop employees where you personally
6   participated either as a group, individually, or them
7   as part of a wider group of people at the AGFA
8   division.
9      A.   As I stated earlier, we had quarterly
10  employees meetings where we would take any and all
11  questions that employees would give us from the floor
12  unrehearsed and we'd just answer them. I can't tell
13  you the date or time, but the issue of the board shop
14  would be a fairly constant discussion and concern for
15  people in the -- at least the manufacturing operations
16  employees meeting.
17     Q.   When was your first meeting, sir, with any
18  member of the board shop?
19     A.   I don't remember.
20     Q.   When was the decision finally made to sell
21  the board shop to EFTC, if you can remember?
22     A.   Well, it would have to be the document you
23  just showed me. August 12th.
24     Q.   Well, that's when the document was signed,

Page 151

1   sir. But I -- There had to have been -- You didn't
2   just make the decision that day and sign the deal with
3   EFTC, right?
4      A.   I have management above me. I can only
5   propose and I can decide -- determine what I would
6   think is appropriate, but until they agree --
7      Q.   Let me show you a document that might refresh
8   your memory. Here's a document, Exhibit 4 of Ramsden,
9   April 20th, from the EFTC making a proposal to purchase
10  the board shop, right?
11     MR. WELSH: Read it.
12     A.   I have to read it, please.
13     (Witness reviewed document.)
14     A.   Would you rephrase your question or state
15  your question?
16     Q.   Well, that would be the first time there was
17  a proposal from EFTC?
18     A.   This would be a proposal from EFTC for our
19  consideration of what they could do if they acquired
20  the board shop.
21     Q.   And that was April 20, 1998, right?
22     A.   That was April 20, 1998.
23     Q.   Does that refresh your memory as to when
24  Bayer made the decision let's pursue negotiations with

Page 152

1   EFTC to sell the board shop to them?
2      A.   No, because that would be a proposal from
3   them. After my management team would consider it, we
4   would decide to talk to Mr. -- my manager, which is
5   Mr. Rittinghaus, who then would decide talking over the
6   people in Europe whether it was something to go forward
7   with, so maybe a month before this actually surfaced at
8   the Bayer level.
9      Q.   Before what surfaced, this memo?
10     A.   This is a tangible proposal and it's worth
11  considering.
12     Q.   But is it fair to say that sometime during
13  1998 Bayer made the decision to go ahead and sell the
14  board shop to EFTC?
15     A.   Yes, absolutely.
16     Q.   Now, when that decision was made to go
17  forward with negotiations, can you tell me when the
18  first meeting you had was, any meeting you had with any
19  of the board shop employees that you attended?
20     A.   I can't tell you when, what date and time.
21  Meetings were held, but I can't specify exactly when
22  they were.
23     Q.   Can you remember the first meeting that you
24  can recall saying anything to anybody at the board

Page 153

1   shop?
2      MR. WELSH: Objection. You may answer.
3      A.   I recall having meetings. I can't recall
4   when they were.
5      Q.   The meetings that you -- And we're talking
6   about meetings that you were attending where board shop
7   employees were there?
8      A.   Yes.
9      Q.   Let me finish the question. I'm talking
10  about meetings that you attended where board shop
11  employees were there. You understand that, right?
12     A.   Yes.
13     Q.   Do you remember approximately when the first
14  meeting was that you were -- where you were in
15  attendance where the board shop employees were there?
16     A.   No.
17     Q.   Do you remember the events of that meeting in
18  terms of what was said or done?
19     A.   Only in general terms.
20     Q.   Tell me what you can remember, please.
21     A.   The typical formula or form we would take was
22  to explain the situation to them from a corporate point
23  of view and talk about what we were engaged in doing
24  for them on a personal level.

39 (Pages 150 to 153)

Michael Paige                                                                    05/12/2006

Page 154

1    Q.   Can you tell me what you mean by that,
2    please?
3    A.   Corporations make decisions based on their
4    bottom line.  People make decisions based on their
5    lives and their livelihood and their families and their
6    life.  They're two different sets of --
7    Q.   Well, that's a nice --
8         MR. WELSH:  Are you finished?
9    Q.   We're going to be here all day, sir.
10        MR. WELSH:  No, we're leaving at 5
11   because the reporter has to leave.  We might have to
12   come back.
13   Q.   I'll have to bring you back, sir.  You can
14   tell me specifically what you remember you said to them
15   or you can give a general statement like we explained
16   the situation from a corporate point of view.  I want
17   to know what you said to them.
18        MR. WELSH:  If you recall.
19   A.   I don't know what I said to them, so I can
20   only tell you at a meeting of this nature we would
21   always cover two main areas, one of which is talk about
22   the larger corporate issue and talk about what
23   we -- what it may or may not mean to them as
24   individuals.  I can't remember the details.

Page 155

1    Q.   Can you remember anything about what you said
2    to them about explaining the situation as a corporate
3    point of view?  What did you say?
4    A.   I promise I cannot remember the details.
5    Q.   Well, let me see if I can jog your memory.
6    Did you say anything to them about what you talked
7    about earlier today, about the fact that the printed
8    circuit board business was in decline; it was not
9    profitable?  Did you say anything like that to them?
10   A.   I assume that I did, but, again, it's hard to
11   tell exactly.
12   Q.   Well, again, I don't want you to assume.  I
13   just want you to tell me if you can remember saying
14   something like that to them.
15   A.   I don't know how to answer that.  No, I can't
16   remember that.
17   Q.   Do you believe based on what you've told me
18   before that it is more likely than not that you would
19   have said that to the employees?
20   A.   It is more likely that I would cover such
21   a -- cover that with them.
22   Q.   Did you tell them at any time at any of the
23   meetings -- Well, actually, let's -- let me stay with
24   the first meeting.  We're talking about your first

Page 156

1    memory of a first meeting with them, right?
2    A.   Yes.
3    Q.   Anything else you can recall saying to them
4    about the corporate point of view about what you
5    intended to do with EFTC and the board shop in terms of
6    the sale of the board shop to EFTC?
7    A.   No.
8    Q.   Can you tell me what you said to them about
9    with regard to your talking to them as to what it meant
10   to them on a personal level?
11   A.   Yes, since we were likely to talk about
12   looking for employment for them as part of this
13   negotiation.
14   Q.   What do you mean by looking for employment
15   for them?
16   A.   Looking to secure employment for them with
17   this new potential parent.
18   Q.   So that doesn't mean you were going to act as
19   a human resource placement agency going out and trying
20   to place them in jobs in other businesses, correct?
21   A.   That's correct.
22   Q.   So what you meant was you were going to try
23   to get them a job at EFTC; is that correct?
24   A.   That's correct.

Page 157

1    Q.   Can you remember anything else you said to
2    them at this first meeting?
3    A.   No.
4    Q.   What about the next meeting you can recall;
5    what did you say to --
6    A.   I can't remember a specific meeting, so I
7    can't remember anything more than that.
8         MR. WELSH:  If I could have a break,
9    please.
10        MR. ROACH:  Sure.
11        (Recess taken.)
12   BY MR. ROACH:
13   Q.   Before we broke, we were talking about your
14   memory of what you said to the board shop employees
15   with respect to the sale of the board shop to EFTC,
16   correct?
17   A.   Yes.
18   Q.   And we talked about what you can remember
19   about the first meeting that you had with them.  Do you
20   remember who was at the first meeting other than
21   yourself?
22   A.   No.
23   Q.   Do you remember where it was held?
24   A.   It would certainly be held in the

LegaLink Boston, a Merrill Company
(617) 542-0039

Michael Paige                                                                05/12/2006

Page 158

1   manufacturing building. That's it. I can't tell
2   whether we used a separate conference room or whether
3   we used the main cafeteria. That's about as much as I
4   can remember.
5       Q.   And the main building was on which street,
6   Ballardvale?
7       A.   No, Industrial Way.
8       Q.   Were all the meetings held on Industrial Way
9   in the manufacturing building, if you remember?
10      A.   All what kind of meetings?
11      Q.   We're just talking about one thing right now.
12      A.   The EFTC meetings?
13      Q.   Let me go on the record here and tell
14  me -- This is what we're talking about right now.
15  We're talking about Dr. Michael Paige's meetings
16  individually or as a group with any members of the
17  board shop regarding the proposed sale of the board
18  shop by Bayer to EFTC. Do you understand that?
19      A.   Yes.
20      Q.   That's what we're talking about. And I just
21  asked you a series of questions about the first
22  recollection of the first meeting.
23      A.   Right.
24      Q.   You understand that?

Page 159

1       A.   Yes.
2       Q.   On that topic to those people. Are we on the
3   same page here?
4       A.   So far.
5       Q.   And I believe you told me that your first
6   meeting in that regard was in the Industrial Way?
7       A.   That's correct.
8       Q.   And probably was in the cafeteria?
9       A.   Yes, because it would be -- probably came up
10  first in an employee's meeting.
11      Q.   And who would have been present at the
12  employee's meeting?
13      A.   All employees of Industrial Way, which is
14  actually two buildings, so --
15      Q.   This wouldn't just have been the board shop
16  employees. It would have been all employees?
17      A.   All employees.
18      Q.   And who was at the meeting from Bayer other
19  than yourself, if you can recall?
20      A.   At those meetings there would always be
21  Erhard Rittinghaus, who would be my direct manager,
22  myself, and depending on the nature of discussion,
23  somebody else from my executive team on a rotating
24  basis.

Page 160

1       Q.   Who was on your executive team?
2       A.   Dick Ramsden, head of operations; Russ
3   Spencer, head of service; Mark Barrett, head of
4   research and development; +tienne von Damme, and that's
5   D-A-M-M-E, and he would be head of marketing; Don
6   Baribeau, head of finance; Bob Givens, head of the type
7   division. That would be it.
8       Q.   When you say those meetings, are you talking
9   about the --
10      A.   Employee meetings, general employee meetings.
11      Q.   Let me finish the question. When you're
12  talking about those meetings, are you talking about the
13  general employee meetings of all employees at the
14  facility in Wilmington, all of AGFA division facilities
15  in Wilmington?
16      A.   Yes.
17          MR. WELSH:   One second.
18          (Witness conferred with counsel.)
19      Q.   Did it include just Industrial Way or all the
20  employees in the Wilmington AGFA division area?
21      A.   Four buildings of employees. We would hold
22  two meetings in the same day, identical meetings, one
23  in the morning, one in the afternoon. In one meeting
24  we would just do the Ballardvale employees, people in

Page 161

1   that particular building, and the second meeting we
2   would have the people from the two Industrial Way
3   buildings plus the people from the third building,
4   which I believe is on Concord Road, but I -- that's
5   just a guess.
6       Q.   Do you remember whether any employees asked
7   any questions about the sale, Bayer board shop sale to
8   EFTC at the first meeting?
9       A.   Not specifically. I can't remember a
10  specific question.
11      Q.   How about a general question?
12      A.   I'm assuming that that came up as an issue.
13  I know assumptions aren't favored, but it was always a
14  topic.
15      Q.   What was always a topic?
16      A.   The status of the board shop.
17      Q.   I'm not talking about the status of the board
18  shop in general. I'm talking about the specific plan
19  for Bayer to negotiate with EFTC a sale of the board
20  shop. That's what we're talking about.
21      A.   I understand that.
22      Q.   We're not talking about years past about
23  what's going on with the board shop, its productivity
24  or whatever. I'm talking about the pending probable or

41 (Pages 158 to 161)

Michael Paige                                                                    05/12/2006

Page 162

1  potential sale of the board shop to EFTC.  That's what
2  we're talking about.
3      A.  Yes.
4      Q.  The question is, at the first meeting, did
5  any board shop employees ask any questions about it?
6      A.  Not that I remember.
7      Q.  Have you now told us everything you can
8  recall about what was said by anybody from Bayer or
9  anybody at the board shop at that meeting?
10     A.  Yes.
11     Q.  When was the next meeting?
12     A.  All I can tell you is sometime thereafter.
13     Q.  And at the second meeting, again this is a
14 meeting where the board shop employees were there,
15 where you were talking about the potential sale of the
16 board shop to EFTC, who was at the second meeting?
17     A.  From my executive team or from --
18     Q.  Anybody who was employed by Bayer other than
19 the board shop employees, for the management team I
20 guess we'll call it.
21     A.  Myself and Dick Ramsden for certain.
22     Q.  And where was that meeting held?
23     A.  I'm not sure.
24     Q.  Do you remember when it was roughly?

Page 163

1      A.  Other than sometime in the summer, I do not
2  know.
3      Q.  Sometime in the summer of 1998?
4      A.  Yes.
5      Q.  Is that a yes?
6      A.  Yes.
7      Q.  What was said at that meeting?
8      A.  I don't know the specifics.
9      Q.  Can you tell me in general what was -- what
10 you, Mr. Ramsden, or anybody from the Bayer management
11 said to the board shop employees about the sale or
12 possible sale?
13     A.  The only thing I can be certain of is that we
14 were looking at that as an alternative.
15     Q.  Alternative to what?
16     A.  As an alternative.  I don't think we would
17 have said closing it down.  I think we would have just
18 said as an alternative, a way of handling our board
19 flow.
20     Q.  Can you remember anything else you,
21 Mr. Ramsden, or anybody else who was a manager or the
22 management team that was part of the negotiating team,
23 I guess we should call them, on the EFTC sale --
24     A.  No.

Page 164

1      Q.  -- said to the board shop employees?
2      A.  No.
3      Q.  Can you remember whether there were any
4  questions from the board shop employees about it?
5      A.  I can't remember any specific question.
6      Q.  Can you remember anything in general?
7      A.  No.
8      Q.  Did you take any notes of any of these
9  meetings or at any of these meetings?
10     A.  No, I did not.
11     Q.  With respect to the management team that was
12 the team of people that was negotiating with EFTC, were
13 there e-mails back and forth among you?
14     A.  I don't know.
15     Q.  You don't remember any e-mails about this
16 sale with any other members, any other employees of
17 Bayer about a sale of the board shop to EFTC?
18     A.  No, I don't.
19     Q.  Did you ever use e-mail when you were working
20 there?
21     A.  It was not used regularly as a -- It was not
22 used regularly as a means of communication.
23     Q.  You mean you didn't use it regularly?
24     A.  I did not use it regularly.

Page 165

1      Q.  What about the others?
2      A.  I don't know.
3      Q.  Did you use it from time to time with regard
4  to this possible sale to the board shop to EFTC?
5      A.  I don't know.
6      Q.  You don't remember?
7      A.  I don't remember.
8      Q.  At either of these first two meetings, do you
9  remember any board shop employees expressing concern
10 about what's going to happen to us, are we going to
11 lose our jobs, are we going to get severance, anything
12 like that?
13     A.  I really don't remember.
14     Q.  The second meeting, where was that held, if
15 you remember?
16     A.  Other than being in Industrial Way, I do not
17 know where, whether it was the cafeteria or just a
18 large conference room.
19     Q.  When was the next meeting that you can recall
20 being at with members of the board shop concerning the
21 potential sale of the board shop from Bayer to EFTC?
22     A.  There were a number of meetings, but I can't
23 recall any specific one.
24     Q.  Well, you've told us in some detail about the

42 (Pages 162 to 165)

Michael Paige                                                          05/12/2006

<table>
<tr><td>

Page 166

1  first --
2      A.   I remember the first one.  There would be a
3  first --
4      Q.   Let me finish the question.  You told us in
5  some detail about the first one?
6      A.   Yes.
7      Q.   You told us at the second one you believe
8  that you and Mr. Ramsden at least were at the second
9  one?
10     A.   Yes.
11     Q.   You've told us what you can remember about
12 that.  Can you remember the next one after that or any
13 others after that?
14     A.   No, I can't.
15     Q.   Earlier you talked about using the term
16 "win-win" with the board shop employees?
17     A.   Yes.
18     Q.   And I believe you stated that at some or all
19 of these meetings or one of these meetings you told
20 them it was a win-win situation?
21     A.   Yes.
22     Q.   Do you know how many times you said that?
23     A.   No, I couldn't count them.
24     Q.   Can you tell me specifically what you said in

</td><td>

Page 168

1      A.   I remember questions.  I don't remember
2  specifically what they were or who asked them or when
3  they were asked, but I just remember being asked
4  questions.
5      Q.   Can you remember the topic of the questions?
6      A.   No.
7      Q.   Do you remember whether anybody specifically
8  asked you whether they would get severance if they
9  decided not to go to EFTC?
10     A.   No.
11     Q.   Do you remember anybody asking whether they
12 would get unemployment if they decided not to take a
13 job with the EFTC?
14     A.   No.
15     Q.   Do you remember telling them that if they
16 didn't take the job, them being the board shop
17 employees, do you remember -- Strike that.
18          Do you remember saying to the board shop
19 employees at any of these meetings that if they didn't
20 take the job with EFTC, they would be terminated and
21 would not get severance?
22     A.   The question you're asking me is whether I
23 was part of that discussion and remember that?  The
24 answer is no.

</td></tr>
<tr><td>

Page 167

1  that regard to the board shop employees at any of these
2  meetings?
3      A.   Other than it was my belief that this was a
4  very good deal for both sides.
5      Q.   Did you use the term "win-win"?
6      A.   Yes.
7      Q.   Now, you said you couldn't count how many
8  times you said it.  Can you tell me approximately how
9  many times you said it?
10     A.   No, I can't.
11     Q.   Less than ten?
12     A.   I really can't tell you.
13     Q.   More than once?
14     A.   More than once.
15     Q.   So you said it was a good deal for both
16 sides.  It was a win-win situation, right?
17     A.   Yes.
18     Q.   Can you remember any more detail you said
19 about that, about what you meant by win-win or it's a
20 good deal for both sides?
21     A.   No.
22     Q.   Do you remember any employees asking you any
23 questions when you said it was a win-win or it was a
24 good deal for both sides?

</td><td>

Page 169

1      Q.   Do you remember anybody else at any of these
2  meetings saying to any of the board shop employees that
3  they had to accept the job with EFTC, otherwise they
4  would be terminated and they would get no severance?
5      A.   No.
6      Q.   Do you remember having any discussions with
7  anybody within Bayer, the management team -- Can we use
8  that term, "management team"?
9      A.   Yes.
10     Q.   You understand what I mean by that?
11     A.   Yes.
12     Q.   The team that was negotiating with EFTC and
13 deciding how to handle this.  Can we agree to that?
14     A.   Yes.
15     Q.   Do you remember discussing anything with the
16 Bayer management team about what would be done with
17 those employees who decided not to go to EFTC with
18 regard to severance?
19     A.   Yes.
20     Q.   What do you remember?
21     A.   I remember that was a topic that came up
22 amongst every other topic that came up and that the
23 human resources people coupled with the direct
24 operations management, you know, was asked for -- to do

</td></tr>
</table>

43 (Pages 166 to 169)