Michael Paige                                                          05/12/2006

Page 170

1  a what if analysis.
2      Q.  And what was the result of that analysis?
3      A.  Exactly that, that we had some estimation of
4  what that would mean to us if that was the case.
5      Q.  And what was the determination of what that
6  would mean to us -- Us meaning Bayer?
7      A.  Us meaning Bayer, AGFA.
8      Q.  And what was the determination of what that
9  would mean to AGFA division of Bayer?
10     A.  The determination was there was some plan put
11 in place that if that was the circumstances, what we
12 would do in that -- what we would have to do to
13 continue operation.  It's a contingency plan.
14     Q.  What was the contingency plan?
15     A.  I don't know what it is, but I assumed -- in
16 fact I'm sure we had one to cover all possibilities
17 including some sort of earthquake.
18     Q.  I'm asking specifically about employees.
19     A.  Right.
20     Q.  The board shop employees.  You said that HR
21 and the directors of the operation management did a
22 what if analysis about what it would mean to Bayer AGFA
23 division if the employees, some or all of them said, I
24 don't want to go to EFTC, right?

Page 171

1      A.  Right.
2      Q.  And what I'm asking you is specifically what
3  was the result of that analysis as to what it would
4  mean to Bayer if any or all of the employees said, I
5  don't want to go to EFTC, I'd rather have severance?
6          MR. WELSH:  Objection.  You may answer.
7      A.  If the employees chose not to go, then we
8  would just close the shop down and sell off the assets
9  and that would be the end of the operation.
10     Q.  Sell off the assets to who?
11     A.  Highest bidder.
12     Q.  But it would also mean that you wouldn't be
13 able to sell to EFTC on the deal that you had because
14 you needed the employees, right?
15     A.  Right.  I'd get another vendor and compare
16 the prices.
17     Q.  What was the determination if you had enough
18 employees, board shop employees to make the sale go
19 forward with the EFTC but some of them said, I'm not
20 going?  What was the result of the analysis as to what
21 would be done with those employees?
22     A.  Since they were offered a comparable
23 position, then they would be terminated.
24     Q.  And would they be getting severance?

Page 172

1      A.  No.
2      Q.  Would they get unemployment?
3      A.  Would they get unemployment?
4      Q.  Right.  Benefits.
5      A.  I'm not sure of the question.  Unemployment
6  benefits from who?  From Mass. Government?
7      Q.  Yes.
8      A.  Mass. State?
9      Q.  Yes.
10     A.  I don't know the requirements or how that is
11 calculated.
12     Q.  Did you ever have any discussion about that,
13 though?
14     A.  No.
15     Q.  So the determination was that from the what
16 if analysis by human resources and the directors of
17 operations management, that if you had enough employees
18 to make the sale work, they were going to commit to go
19 to EFTC but some decided they didn't want the job, they
20 would be terminated and they wouldn't be given
21 severance; is that right?
22     A.  That's correct.
23     Q.  And on what basis was the determination made
24 that they would not be paid severance?

Page 173

1      A.  If we had enough employees to go forward, I
2  don't know the percentage, then for the greater good,
3  we would make that the resolution of the board shop's
4  situation, that is the sale to EFTC.
5      Q.  You used the word comparable job.  What did
6  you mean by comparable job at EFTC?
7      A.  Two parts of that, one of which is the actual
8  nature of the work they'd be doing, that is the
9  physical or mental exercise they had to perform, and
10 the second would be the consideration, the salary.
11     Q.  What about location; is that a factor at all?
12     A.  Yes, and location.
13     Q.  And what was that factor?
14     A.  Well, we were having it -- we were keeping
15 them in the same site in Wilmington, so location wasn't
16 an issue.
17     Q.  And did you make that determination based on
18 the severance plan, the Bayer severance plan that was
19 available to them as part of their employment with
20 Bayer?
21     A.  Did we make that consideration?
22     Q.  Did you make the determination regarding
23 severance based on the summary plan description that
24 was marked as Exhibit 7 in Ramsden Exhibit 5 and

Michael Paige                                                                    05/12/2006

Page 174

1  Fiorilla, which I showed you? And I'll direct your
2  attention to the specific pages of it.
3      A.  I know documents of this nature. I don't
4  know this document, or this was the document that was
5  used or --
6          MR. ROACH: I think we stipulated this
7  was dated 1995 and the one that was in effect at the
8  time.
9          MR. WELSH: I believe so.
10     A.  This is 8/95.
11         MR. ROACH: So I just want to make sure,
12 Mr. Welsh, we're clear this was the document that was
13 in effect at that time, right, in 1998?
14         MR. WELSH: With the subsequent
15 modifications which I don't believe are material.
16         MR. ROACH: Right. Okay.
17     Q.  So, with that stipulation, I'll direct you to
18 the severance section of Exhibit -- of the summary plan
19 description which is Ramsden 7, Fiorilla 5, and direct
20 your attention to page 4, SEV four, when benefits are
21 not paid. Is this the page that you were -- from which
22 you obtained your assumption that they would -- that
23 certain employees that didn't accept a job would not
24 get severance because they were going to get a

Page 175

1  comparable job?
2      A.  No. I would get my information from the head
3  of human resources who would be more familiar with this
4  book than I would each page and chapter.
5      Q.  But that's what human resources told you,
6  correct, about severance?
7      A.  Yes.
8      Q.  And they would be relying upon this plan
9  description as far as you know; is that right?
10         MR. WELSH: Objection.
11     A.  As far as I know.
12     Q.  Do you know when you spoke to human resources
13 whether they were relying upon the summary plan
14 description to make their determination to advise you,
15 if you know?
16     A.  I don't know.
17     Q.  You said that human resources and the
18 directors of operation management made a what if
19 analysis about severance either being available or not
20 available to those employees who didn't want to go to
21 the EFTC. Who in human resources did the analysis?
22     A.  I don't know exactly who. They were a team,
23 so anybody including the Bayer Corporation human
24 resource people would have gotten involved with this

Page 176

1  decision.
2      Q.  Do you know if Mr. Willis and Ms. Leonard
3  were involved in this?
4      A.  Involved with what?
5      Q.  Let's back up.
6      A.  What's the this? That's all I need to know.
7      Q.  I had asked you before if Bayer had come to a
8  determination as to what they would -- what Bayer would
9  do with board shop employees who decided that they did
10 not want to go to EFTC for the sale, during the sale,
11 but that EFTC and Bayer had enough employees so that
12 the sale would go through, what would be -- What would
13 happen to those employees who said they didn't want to
14 go with respect to severance. Do you remember that
15 question?
16     A.  Yes.
17     Q.  And I believe you said there was a what if
18 analysis about all different contingencies including
19 that one, correct?
20     A.  That's correct.
21     Q.  Now, my question is, who at human resources
22 was involved in making that what if analysis who
23 advised you about -- gave the advice that those
24 employees would not be entitled to severance who chose

Page 177

1  not to go to EFTC?
2      A.  Direct communication would be from Rod
3  Willis. Who he consulted with to get that is something
4  different.
5          MR. ROACH: Before I forget, I think we
6  talked about him before, John. I think I need to
7  depose him.
8          MR. WELSH: We've got to look at dates.
9  He's all over the country. He's already been
10 identified.
11     Q.  What about Mary Leonard; was she part of the
12 human resources team that was engaged in the what if
13 analysis we just described?
14     A.  Probably in the secondary role only.
15     Q.  What was the director --
16         MR. WELSH: Don't guess. You used the
17 word "probably." If I hear probably, it sends up
18 signals you don't know for sure.
19     A.  I don't know.
20     Q.  But in modification on what Mr. Welsh just
21 said, if you have some information, it's okay to say
22 probably if it's based on some memory that she may have
23 been involved. That's okay.
24     A.  Since Mary Leonard would be responsible for

45 (Pages 174 to 177)

Michael Paige                                                                    05/12/2006

Page 178

1  communicating this and she lived among -- I'm
2  sorry -- her office was in Industrial Way, she'd always
3  be the first line of communication, so she had to be
4  fully abreast of what was going on.
5      Q.   And first line of communication with the
6  board shop employees, is that what you meant?
7      A.   With anybody, yes.
8      Q.   Now, you said there was a direct -- So, on
9  that basis, you believe she was also involved in making
10 this what if analysis?
11     A.   Or aware of the what if analysis.
12     Q.   Okay.  Now, you said there was a director of
13 operations management that was also involved in the
14 what if analysis?
15     A.   I'm sorry.  That would be Dick -- My mind's
16 gone.
17     Q.   Dick Ramsden?
18     A.   Dick Ramsden.  Thank you.
19     Q.   Anyone else other than Mr. Ramsden, if you
20 remember?
21     A.   No.
22     Q.   Do you remember having any individual
23 conversations with any members of the board shop about
24 them obtaining severance or whether they would have a

Page 179

1  choice?
2      A.   No.
3      Q.   In the hallways or any other situation?
4      A.   No, I don't remember any individual
5  conversations.
6      Q.   The only time you remember addressing the
7  board shop employees was in these meetings you were
8  talking about?
9      A.   As a group, yes.
10     Q.   Do you remember how many meetings in total
11 there were that you attended?
12     A.   No.
13     Q.   Do you remember whether you were at any of
14 these meetings where the board shop employees were
15 present where somebody from EFTC was also present such
16 as Jack Calderone or anyone else?
17     A.   I do remember being in a meeting with the
18 board shop employees and with Jack Calderone certainly
19 as one person who was there, and in that particular
20 meeting that I remember, Jack Calderone then was
21 allowed to speak to the employees without AGFA
22 management in the room.
23     Q.   AGFA meaning division of Bayer, you mean?
24     A.   Yes.  So that he could be more personal.

Page 180

1  That's hence the -- some of the statements you made
2  earlier about he has to be free to talk with them even
3  though they're still AGFA employees.  Otherwise, he
4  can't tell them what's going on.
5      Q.   You mean Bayer employees?
6      A.   Bayer employees.
7      Q.   And do you remember any conversations with
8  the EFTC negotiating team and the Bayer negotiating
9  team that you've described as to how to best persuade
10 the board shop employees to go from Bayer to EFTC, to
11 accept a job with EFTC to make the sale work?
12          MR. WELSH:  Objection.  You may answer.
13     A.   No, not how best to.  It wasn't a best.  It
14 was just presenting it to them.
15     Q.   What do you remember about your discussions
16 with EFTC about how to best present it to them, to the
17 board shop employees?
18          MR. WELSH:  Objection.  He just denied
19 best.
20     A.   There is no best.
21     Q.   I'm sorry.
22          MR. ROACH:  Can you read back his last
23 answer?
24          (Record read.)

Page 181

1      Q.   Can you tell me what your discussions were
2  with EFTC about how to present it to the board shop
3  employees?
4      A.   We did not script how they should present
5  their material.  We left it up to them.
6      Q.   I'm not talking about how EFTC should script
7  the material for their presentation.  I'm talking about
8  something a little more general.  What I'm talking
9  about is any discussions Bayer and EFTC had about how
10 they would present the potential sale of the board shop
11 to EFTC, to the board shop employees in a way that
12 might best or might more favorably influence them to
13 take the job with EFTC as opposed to choose not to take
14 the job with EFTC?  Do you understand the question?
15     A.   Yes.  No, there was a -- We did not tell EFTC
16 how to present their material.  We didn't coach them
17 into how they should present it.
18          MR. WELSH:  Keep going until you're done
19 with your answer.
20     A.   That's my answer.
21     Q.   Dr. Paige, that's not my question.
22     A.   Okay.
23     Q.   In order for this sale to go forward, I
24 believe you testified a certain number of board shop

46 (Pages 178 to 181)

Michael Paige                                                      05/12/2006

Page 182

1  employees had to commit to go to EFTC, correct?
2      A.  Yes.
3      Q.  Were there any discussions, let's start with
4  Bayer, within Bayer, about how it would be presented in
5  a way to make it more likely that the board shop
6  employees might accept a job with EFTC?
7      A.  You are aware that certain employees of the
8  board shop are challenged, have mental capacity issues?
9  I can't describe it any other way.  And so certainly
10  these people would have to be discussed with at more
11  length than others to make sure it was communicated
12  well.  But, other than that, they're the only employees
13  that we went out of the way to make sure they
14  understood everything that was going on in much more
15  detail because they would get frightened sometimes.
16      Q.  And some of them had physical limitations,
17  too, correct?
18      A.  And some of them had physical limitations and
19  some of them were concerned they would be treated as
20  the law said they should be treated.
21      Q.  Who were those employees?
22      A.  I do not know their names.
23      Q.  Aside from those employees with limitations,
24  was there any discussion within Bayer as to how to

Page 183

1  present this sale of the board shop to EFTC in such a
2  way as to make it more likely that the board shop
3  employees would accept a job with EFTC?
4      A.  Yes.  EFTC would present its portion by
5  itself, let them do their job, which is as a separate
6  company how they attract and retain employees.
7      Q.  So you believe that EFTC would be responsible
8  for attempting to convince the board shop employees to
9  go to EFTC?
10      A.  It was in their own best interests, because
11  if it didn't happen, then there was no deal.
12      Q.  Wasn't it in Bayer's best interest too,
13  because if it didn't happen, there was no deal and
14  you'd be left with --
15      A.  It was less expensive to close the shop down
16  and sell off the assets than to guarantee inflated
17  prices for a four-year period.  That's just bad
18  business.
19      Q.  So how much business for those four years did
20  Bayer give EFTC in terms of the purchasing circuit
21  boards or board products from the board shop?
22      A.  I don't know the actual numbers.
23      Q.  Can you give me a rough idea what the numbers
24  would be let's say for the first year?

Page 184

1      A.  I couldn't tell you.
2      Q.  You don't have any idea?
3      A.  No, I don't.
4      Q.  Could it be north of a million dollars?
5      A.  I'm sure it was in excess of $1 million, and
6  the board shop would deliver boards to both the service
7  organization and replace all of our equipment in situ
8  worldwide and the manufacturing operation had to use
9  boards for all the new equipment.  So there was a
10  fairly strong demand.
11      Q.  And it would be north -- It would be more
12  than $1 million per year for each contract?
13      A.  Yes.
14      Q.  Do you know how much more than $1 million?
15      A.  I do not know.
16      Q.  Now, when you say -- when we use the term $1
17  million, that's $1 million out of Bayer's pocket for
18  the boards to purchase them, correct?
19      A.  Out of pocket, you mean cost of goods, yes.
20      Q.  Yes.  So is it your testimony, then, that
21  Bayer Corporation entered into this agreement with EFTC
22  because it was concerned about the board shop employees
23  not having work, not being able to be employed, and
24  therefore it took a loss and paid for these boards from

Page 185

1  EFTC in the agreement so these employees could continue
2  to be employed?
3      A.  Yes.
4      Q.  And so Bayer did it out of the goodness of
5  its heart; is that your position?
6      A.  Bayer did it because it was good for the
7  community that we have employees in, and it had been a
8  very long-standing problem, as I've said earlier,
9  dating back years, and --
10      Q.  The problem --
11          MR. WELSH:  He's not done.
12      Q.  I'm sorry.  Go ahead.
13      A.  -- and had been very, very visible to our
14  entire organization.
15      Q.  Anything else?
16      A.  No.
17      Q.  Long-standing problem dating back years
18  meaning the declining revenue and profitability?
19      A.  And the increasing requirement for capital to
20  keep the board shop state of the art.
21      Q.  And when you say it was very visible to the
22  entire organization, meaning does that mean everyone
23  within Bayer knew that it was a non-productive and
24  declining business operation, the board shop?

Michael Paige                                                                05/12/2006



Page 186

1    A.  It had been the subject of discussion for
2    years.
3        Q.  And the community, meaning the Bayer
4    community, knew that this was not a profitable area,
5    the board shop?
6        A.  Yes.
7        Q.  And so there was some internal morale PR
8    value to Bayer at a minimum to enter into this sale to
9    keep the board shop employees employed; is that a fair
10   statement?
11       A.  Yes.
12       Q.  But I think you testified earlier the
13   commitment to purchase at above market, the board's
14   above market from EFTC, extended out to three or maybe
15   four years, correct?
16       A.  Yes.
17       Q.  But the guarantee that EFTC would keep these
18   people employed was only one year, right?
19       A.  The final agreement was one year, yes.
20       Q.  So that doesn't square, does it, with what
21   you stated earlier, that Bayer was looking out of the
22   goodness of its heart to keep people employed when they
23   knew that these people could only be employed for one
24   year --

Page 187

1            MR. WELSH:  Objection.
2        Q.  -- minimum?
3        A.  That's EFTC's decision.
4        Q.  Well, I believe in the asset purchase
5    agreement it was a decision between Bayer and EFTC,
6    they agreed that it would only be one year that they
7    would be employed, right?
8            MR. WELSH:  Objection.
9        Q.  It said it right in the agreement, right?
10           MR. WELSH:  Objection.
11       Q.  You can answer.
12       A.  The agreement is about a source of supply of
13   boards, which is what we're talking about for the price
14   of boards.  You're confusing two things.
15           MR. WELSH:  There's nothing in this
16   agreement that says employment will be for only one
17   year.  It's a mischaracterization.  It says they get
18   severance benefits for a year.  It doesn't say
19   employment ends.
20       Q.  Well, let's look at it.
21           MR. WELSH:  Let's.
22       Q.  I believe you're right as you stated it, but
23   certainly that's not the question.
24           MR. WELSH:  That's my objection.

Page 188

1        Q.  It says -- Exhibit 25 of Ramsden says, "The
2    buyer shall not relocate any of the transferred
3    employees for a minimum of 12 months after the closing
4    date," correct?
5        A.  Yes.
6        Q.  Have I read that right so far?
7        A.  Right.
8        Q.  And it says, "Although buyer" -- That's EFTC,
9    right?
10       A.  Right.
11       Q.  "Although buyer does not currently anticipate
12   any reductions in force, if within 12 months after the
13   closing date they do have a reduction in force, they'll
14   pay severance:  Right?
15       A.  Correct.
16       Q.  So looking at that, that suggests to me, tell
17   me if I'm reading this wrong, that EFTC agreed that
18   they would keep the board shop employees employed for a
19   minimum of 12 months; is that right?
20       A.  Relocate.  They just said they'd keep that
21   facility where it is, give us plenty of notice, so they
22   had time to -- if they had to change their commute
23   patterns, this wouldn't be a catastrophic situation.
24       Q.  But in the second sentence they talked about

Page 189

1    if they had a RIF, a reduction in force, they would pay
2    them severance, right?
3        A.  Right.
4        Q.  And that would be six months of salary,
5    right?
6        A.  That's what it says there.
7        Q.  So it appears as though they were not
8    guaranteeing these employees any continued employment
9    beyond the closing date and, if they did, they'd have
10   to pay them severance, right?
11           MR. WELSH:  If they --
12       Q.  Did terminate them.  They'd have to pay
13   severance, right?
14       A.  Yes.  I wasn't acquiring EFTC.  I was
15   just -- They were acquiring the operation from me.  I
16   can't run their company after.
17           MR. ROACH:  I have more questions,
18   Mr. Welsh has another matter to attend to, so we're
19   going to suspend this early and we will resume at
20   another mutually convenient date for everyone.  Is that
21   acceptable, Mr. Welsh?
22           MR. WELSH:  I would like to go on the
23   record and thank you for your courtesy given this other
24   case allowing for breaks.  And, Mr. Paige, I want to

48 (Pages 186 to 189)

Page 198

1    A    Just vaguely now.  I remember that
2  discussion was going on.  I'm not sure exactly where
3  we left off.
4    Q    All right.  Did you have a chance to read
5  your prior deposition transcript of your first day?
6    A    No, I have not.
7    Q    You have not?
8    A    No, I have not.
9    Q    Okay.  And I believe I asked you about
10  whether there was any discussion within Bayer about
11  how to best present it to the board shop employees
12  to try to gain the maximum number of people to go to
13  EFTC.  Do you remember that discussion?
14    A    Yes.
15    Q    Okay.  And what I wanted to ask you was
16  EFTC, and I believe I asked you, and you stated that
17  you left it up to EFTC, about talking to the
18  employees.  What I would like to ask you now is, was
19  there any discussion within Bayer as to how Bayer
20  itself would present the sale to the board shop
21  employees, with the goal in mind of trying to
22  convince them to go, as many of them as possible, to
23  go, to EFTC?
24        MR. WELSH:  Objection.  You may answer.

Page 199

1    A    There were certainly discussions with
2  Bayer to leave as much up to EFTC as possible, since
3  they had to attract these people.  If they did not
4  attract a majority, then there was really no deal.
5    Q    Okay.  All right.  I understand that.  Was
6  there any discussion within Bayer about assisting
7  EFTC in trying to convince the board shop employees
8  to go to EFTC to make the sale possible?
9    A    Could you repeat the question?
10        MR. ROACH:  Could you read it back?
11        (Last question read)
12    A    Not in assisting EFTC.  We gave them time
13  to make their presentation, but we could not tell
14  them what to say, because they had to hold up their
15  part of the bargain and deliver.
16    Q    Okay.  Putting EFTC aside for the moment,
17  I believe we talked before about discussions and
18  meetings with Bayer management and the board shop
19  employees without EFTC there, correct?
20    A    Yes.
21    Q    Okay.  Was there any discussion within
22  Bayer management, for those meetings where EFTC was
23  not there, as to how to best spin it, or present it,
24  to the board shop employees, so as to try to

Page 200

1  convince a majority of them to go?
2    A    I'm not sure what the word "spin" means in
3  this case.
4        MR. WELSH:  Okay.  Do you have other
5  questions, or is that it?
6    Q    Is that a question to me?
7    A    Yes.
8    Q    You don't understand what I mean in this
9  context, in the year 2006, what the word "spin"
10  means, in the context of trying to convince somebody
11  of something?
12    A    "Spin" tends to have a negative concept.
13    Q    You can answer that question with that
14  negative concept in mind.  Was there any discussion
15  within Bayer management as to how to spin the sale
16  to the board shop employees to convince them to go
17  to EFTC?
18    A    No.
19    Q    Was there any discussion within Bayer
20  management as to how to present it to the board shop
21  employees, the sale, with a view in mind that the
22  goal was to try to convince as many board shop
23  employees as possible to go?
24    A    Yes.  Only to the extent that we decided

Page 201

1  who would be able to talk about which specific parts
2  of the deal.  Any employee benefit issues, or work
3  environmental issues, or reporting issues, or any of
4  those issues would have to be covered only by EFTC.
5  Bayer could only talk about its reasons why we had
6  to find a new way of dealing with the board shop.
7        MR. ROACH:  Could you read back his last
8  answer?
9        (Last answer read)
10    Q    What do you mean by "Bayer could only talk
11  about the reasons why it had to find a new way to
12  deal with the board shop"?
13    A    What I mean by that is how we were going
14  to acquire our boards for the product lines.
15    Q    And those are discussions within Bayer
16  management you are talking about?
17    A    Yes, because they were financial
18  discussions.
19        MR. WELSH:  Just for clarity.
20  Discussions -- in terms of "discussions" was
21  said twice in your question.  You are talking
22  about discussions in management about
23  discussions with employees?
24        MR. ROACH:  Correct.

3 (Pages 198 to 201)

Michael Paige, Vol. 2                                                  06/15/2006

Page 202

1     MR. WELSH:  So I don't know if you just
2   clarified it.
3     Q    Let me ask the question again:  Did Bayer
4   management discuss within itself, among themselves,
5   how to best present it to the board shop employees,
6   with the goal in mind to convince as many of them as
7   possible to move to EFTC?
8     MR. WELSH:  Objection.  You may answer.
9     A    I'm kind of unclear on the question.  Can
10   you rephrase it.
11     Q    No, I'm not going to rephrase it.  Tell me
12   what you are unclear about.
13     A    There was no rehearsal of what was going
14   to be said.  All we decided is who would talk about
15   which part of the transaction: employee managerial
16   relationships and their employment and their
17   position, would be discussed by EFTC; Bayer and
18   management would discuss why this decision was
19   necessary and what the future of the board shop
20   would be, if we did not go, if this did not occur.
21     Q    And was there some decision as to who
22   within Bayer would discuss the sale with the board
23   shop employees, which people?
24     MR. WELSH:  Objection.  You may answer.

Page 203

1     A    Yes.
2     Q    Which people were chosen?
3     A    I was the general manager of the division,
4   so I presented parts of it.  Erhard Rittinghaus, who
5   was the president of all U.S. operations, talked --
6   made a part of a presentation.  Richard Ramsden, the
7   senior vice-president of manufacturing and the
8   direct, obviously, manager of the board shop
9   operation, presented a part of it.
10     Q    Anyone else?
11     A    Human resources people were there on the
12   side to deal with any specific issues and questions,
13   either each individual person had because each
14   person had a different story, or general issues
15   concerning, you know, the difference, or the
16   transition from one company to another company.
17     Q    Okay.  And was there any discussion among
18   you, Rittinghaus, Ramsden, and human resources
19   people about how to put an emphasis that it's a good
20   thing, a "win-win" for the employees to go to EFTC,
21   so as to try to convince them that it was a good
22   thing for them?
23     A    We often used the term "win-win," with
24   respect to this transaction.  And we certainly

Page 204

1   explained why we, each in his own right, why we saw
2   this as a "win-win" for both AGFA, as well as the
3   board shop employees.
4     Q    How did the phrase "win-win" come up
5   within the meetings of Bayer management, before you
6   decided to use that term in talking to the board
7   shop employees?
8     MR. WELSH:  Objection.  You may answer.
9     A    I guess I'm not sure exactly why the term
10   came up.  I mean, if that was the question, who
11   proffered the term, who said we should use this
12   term?  It's just that we all mutually arrived at the
13   feeling that this situation was going to benefit
14   both sides.
15     Q    Okay.  So let me back up and ask a
16   question:  Was there a determination in the
17   meetings, Bayer management meetings, before the
18   board shop employees were told about this sale, that
19   it would be presented to them as a "win-win"?
20     A    This is a "chicken and egg" situation.  It
21   was a win-win.
22     Q    That's not my question.  My question is:
23   Was there a decision within the management of the
24   Bayer management in discussing it, before the

Page 205

1   discussions took place with the board shop
2   employees, to use the term "win-win"?
3     A    Yes.
4     Q    And were there any other phrases or types
5   of terminology or types of statements that were
6   considered, but discarded, as something that you
7   would not say to the board shop employees in
8   announcing the sale?
9     A    No.
10     Q    Okay.  Who were the HR people who were
11   involved on the side on specific issues?
12     A    The on-site head of human resources for
13   the Wilmington operation was Rodney Willis.
14     Q    Anyone else in HR?
15     A    Reporting to him was Mary Leonard, who was
16   the human resources person assigned specifically to
17   the manufacturing operations.
18     Q    Anyone else in HR involved in these
19   discussions about how to present it to the board
20   shop employees?
21     MR. WELSH:  Wait a second.  Would you
22   please repeat the entire question?  And listen
23   to the entire question, because I think it's
24   different from the prior one.

4 (Pages 202 to 205)

Michael Paige, Vol. 2                                                06/15/2006

Page 206

1    Q    Let me ask the question again. Was there
2 anyone else involved from HR, other than Mr. Willis
3 and Ms. Leonard, in these discussions among Bayer
4 management?
5    A    The head of human resources in Richfield
6 Park for U.S. operations.
7    Q    Who was that?
8    A    I do not remember at this moment who was
9 head of HR at that time.
10    Q    Anyone else?
11    A    Certain people from human resources
12 specialists in specific benefits transitions, but I
13 do not remember any names.
14    Q    These were people in Wilmington?
15    A    These are people in Wilmington or
16 Richfield Park.
17    Q    Was there anybody that was a specialist in
18 the severance area that was involved in these
19 discussions?
20    A    No. We have no specialists in severance.
21    Q    What specialists did you have, and in what
22 areas, involved in these meetings?
23        MR. WELSH:  You mean HR specialists?
24    A    I don't know who HR used as their

Page 207

1 resources to clarify their points.
2    Q    That is not my question. You said there
3 were other people involved who were specialists in
4 HR in certain areas. I want to know what those
5 areas are?
6    A    I assume we are talking about benefit
7 specialists.
8    Q    Right. And what benefit specialists --
9 what type of benefits did you have a specialist for?
10        MR. WELSH:  Objection. You may answer.
11    Q    Do you understand my question?
12    A    Yes. But there is no specific -- we have
13 individuals who have negotiated life insurance,
14 dental plans, and to the extent they understand the
15 particulars of those plans. There are people within
16 Richfield who concentrated in that area and didn't
17 do general HR-type of work.
18    Q    Anyone else, any other specialists in
19 certain areas in benefits involved in these
20 discussions?
21    A    Not to my knowledge.
22    Q    How many discussions were there before the
23 decision was made to announce to the employees the
24 proposed sale to EFTC?

Page 208

1        MR. WELSH:  Objection. You may answer.
2    A    I'm not sure I know what you're talking
3 about. Discussions on what? EFTC, with Bayer
4 management?
5        MR. ROACH:  Can we go off the record?
6            (Discussion off the record)
7    Q    The line of questioning I'm talking about,
8 sir, which is what we started with, was discussions
9 within Bayer management as to how to present the
10 sale to the board shop employees. That is what we
11 are talking about. Do you understand that?
12    A    Yes.
13    Q    How many such --
14        MR. WELSH:  I'm going to caution you to
15 please watch your tone with this witness. Your
16 condescending tone is not necessary. Please
17 lower the approach a bit, and we will get
18 through this, okay?
19        MR. ROACH:  I disagree with your --
20        MR. WELSH:  That's fine. I've noted my
21 concern.
22        MR. ROACH:  Can I finish a sentence, sir?
23        MR. WELSH:  If you want to start, Steve,
24 we will start. I am not trying to start with

Page 209

1 you. I'm just telling you that your tone was
2 inappropriate, you disagree, the record
3 reflects that. I just made that observation.
4 I'm hoping we can move on.
5        MR. ROACH:  I'm hoping we can, too.
6    Q    Do you understand that is the area of
7 questioning I am asking about, meetings?
8    A    Yes.
9    Q    Okay. How many such meetings were there,
10 sir?
11    A    I am not sure of the exact number.
12    Q    Can you give me an approximate number?
13    A    I couldn't tell you the approximate
14 number. I would only be able to estimate the length
15 of time.
16    Q    Can you estimate the time for me then,
17 please?
18    A    Between a three and six-month period.
19    Q    In 1998?
20    A    It may have started in late '97.
21    Q    So late '97 through 1998, up until the
22 time of the sale; is that a fair statement?
23    A    Yes.
24    Q    *Okay. Did you have ever a discussion

5 (Pages 206 to 209)

Michael Paige, Vol. 2                                                                06/15/2006

Page 218

1    Q    Did you at the time in 1998, before the
2    sale took place, have an understanding of what the
3    severance plan was for employees at the board shop
4    and for others under you?
5    A    I had a general understanding.
6    Q    What was your general understanding?
7    A    That employees at that time were receiving
8    two weeks of salary per week of -- sorry, per year
9    of service.
10   Q    Do you know, whether in any of these
11   management meetings, when the management was among
12   themselves just talking about the sale and how to
13   present it to the board shop employees, did that
14   group ever get a number as to how much it would cost
15   total, if all of the board shop employees were to
16   get severance?
17   A    Yes.
18   Q    And what was the number that you arrived
19   at?
20   A    I don't remember.  It was something in the
21   millions.
22   Q    Did somebody among the management group
23   make the decision that if board shop employees chose
24   not to go, some board shops employees chose not to

Page 219

1    go, but you had the 75 percent, that the people who
2    chose not to go would not get severance?
3    A    Could you rephrase the question?
4    Q    When you were having your management team
5    meetings, did anybody make a determination that if,
6    roughly, 75 percent or more of the board shop
7    employees chose to go to EFTC, what would happen
8    with the others who chose not to go, with regard to
9    severance?
10   A    I don't remember.
11   Q    Can you tell me whether there was a
12   decision made as to, if the board shop employees --
13   strike that.  Was there ever a decision made among
14   the management group, that we have talked about
15   earlier today, you, Mr. Rittinghaus, Mr. Ramsden,
16   Mr. Willis, and Ms. Leonard, and perhaps the person
17   from Richfield Park, the head of HR, make a decision
18   as to whether the board shop employees who did go to
19   EFTC, as part of the sale, whether they would get
20   severance?
21   A    You have to restate the question.
22        THE WITNESS:  Could you read it back to
23   me?
24            (Last question read)

Page 220

1    A    The employees who went to EFTC would not
2    get severance, they were not being severed.
3    Q    That was the decision that the Bayer
4    management made?
5    A    They were being given positions, offered
6    positions, and they were not -- we did not discuss
7    severance for them.
8    Q    Okay.  So is it fair to say that Bayer
9    management, Bayer decided not to pay these employees
10   severance; is that correct?
11   A    Bayer decided they were never eligible for
12   severance.
13   Q    Do you remember any discussions about that
14   within the Bayer management team?
15   A    I'm not sure what you mean by
16   "discussions."  It was not a lengthy discussion.  It
17   was policy.  It wasn't belabored.
18   Q    Okay.  Even if it wasn't lengthy or
19   belabored, I would like to know what was said.
20   A    I don't remember what was said, but since
21   we covered all bases, that was one of the bases that
22   we certainly covered.
23   Q    Can you tell me what was discussed, what
24   was talked about?

Page 221

1        MR. WELSH:  Specific?
2    Q    Verbally in the meetings, specifics, yes.
3    A    I don't remember any of the specifics.
4    Q    Can you tell me, generally, what was
5    talked about?
6    A    Whether they would be eligible for
7    separation, under these circumstances, and it was
8    determined that they would not be.
9    Q    Who made that determination, if anyone?
10   A    A combination of under -- with the
11   advisement of human resources and their counsel, who
12   I also assume was legal counsel, that there was no
13   eligibility.
14   Q    Who at human resources made this
15   advisement?
16   A    I don't know exactly who made this
17   announcement or advisement.
18   Q    Would it have been Mr. Willis and Ms.
19   Leonard?
20       MR. WELSH:  Objection.
21   Q    You can answer, go ahead.
22   A    No.  It would have -- they would only be a
23   part of that team.  It would have to go all the way
24   up through the human resources structure.

8 (Pages 218 to 221)



**Page 222**

1    Q   Okay. Well, I want to know specifically
2  the names of the people in the human resources
3  structure who made the decision, or part of the
4  decision, that the board shop employees were not
5  eligible for severance?
6         MR. WELSH: Objection. You may answer.
7    A   As I mentioned before, I do not know who
8  Willis reported to at this moment in time.
9    Q   How did it come your attention that human
10  resources structure and the people in human
11  resources decided that the board shop employees were
12  not entitled to severance?
13   A   Can I go off the record for a minute?
14        MR. WELSH: No.
15   A   I have a slight hearing problem.
16   Q   I apologize.
17   A   I told you in the first meeting, so I'm
18  trying to --
19   Q   I will speak up.
20   A   That's why I'm paying a lot of attention.
21   Q   I will speak up. I don't want Mr. Welsh
22  to state that I'm being condescending.
23        MR. WELSH: You mean my comments made an
24  impact on you?

**Page 223**

1         MR. ROACH: For a change, they may have.
2         (Discussion off the record)
3    Q   All right. I'm going to speak a little
4  louder. Who at Bayer communicated to you that the
5  determination was made that these board shop
6  employees were not entitled to severance?
7    A   Directly to me, would be Mr. Willis.
8    Q   And did he tell you his reasons why that
9  conclusion was reached?
10   A   Yes, he did.
11   Q   And what did he tell you?
12   A   I don't remember the exact details.
13   Q   Can you tell me what you remember?
14   A   That per the policy that we were selling
15  the operation to a third party, that the guidelines
16  indicated that severance was not appropriate, or was
17  not appropriate, I guess, is the best -- the only
18  word I can think of.
19   Q   Anything else that you can recall that he
20  said to you?
21   A   No.
22   Q   Okay. Do you remember when he said it to
23  you?
24   A   That decision would have to have been made

**Page 224**

1  very early in the senior management's discussions,
2  because it translates into financial responsibility.
3    Q   Was there a calculation made as to the
4  amount that would have been paid if these board shop
5  employees had been entitled to severance?
6         MR. WELSH: Objection. You may answer.
7    A   Yes.
8    Q   Who made the calculation?
9    A   Human resources.
10   Q   Mr. Willis?
11   A   Mr. Willis would have been the one who
12  gave it to me, yes.
13   Q   Do you know if he's the one who actually
14  made the calculations?
15   A   No.
16   Q   Okay. When you say he "gave it to" you,
17  was it in writing?
18   A   I assume so.
19        MR. ROACH: Okay. John, I don't think we
20  have seen that?
21        MR. WELSH: I have never seen one in such
22  writing.
23        MR. BRAUN: I'm sorry?
24        MR. WELSH: I haven't seen such writing.

**Page 225**

1         MR. ROACH: Could you just inquire?
2         MR. WELSH: I will inquire, but the
3  witness said "I assume," and, of course, the
4  witness knows not to assume, because you
5  make --
6    Q   Do you remember seeing a writing?
7    A   I don't remember.
8    Q   Okay. Well, Mr. Willis wouldn't have sat
9  down and done it just off the top of his head. He
10  would have probably put pen to paper to figure it
11  out; is that fair?
12   A   In his development of materials, yes. In
13  his presentation of materials to me, not
14  necessarily.
15   Q   Okay. Are you familiar with the severance
16  plan that is set forth here in the summary plan
17  description that is marked as Exhibit 5, Fiorilla;
18  Exhibit 7, Ramsden? I direct you to the severance
19  provisions, and it's 1995 printed. It's been marked
20  as an exhibit, and, I believe, stipulated to.
21   A   This is the 1995?
22   Q   Yes.
23        MR. WELSH: Yes, it is.
24   A   And the question is?

9 (Pages 222 to 225)

Page 226

1    Q   Are you familiar with that plan, the
2  severance part of it?
3    A   I am familiar with plans like this, yes.
4    Q   Okay.  And you stated it was two years --
5  severance would be two weeks of pay for every year
6  of employment, correct?
7    A   That's the best of my understanding of the
8  severance policy at that time.
9    Q   Did you ever review this document that is
10  Exhibit 7, Ramsden; Exhibit 5, Fiorilla?
11       MR. WELSH:  "Did you review this," do you
12    mean in preparation for the testimony?
13       MR. ROACH:  No, no.  Back in 1998, or any
14    other time.
15    Q   Had you ever reviewed this before, this
16  document?
17    A   I have certainly read it.
18    Q   You are familiar with it?
19    A   It was given to all employees.
20    Q   It applied to you?
21    A   It applied to all employees.
22    Q   Including you?
23    A   Yes.
24    Q   Okay.  And what about this document that

Page 227

1  is Exhibit 9 from the Fiorilla deposition, the Bayer
2  Severance Pay Plan, were you familiar with that
3  document in 1998?
4    A   (Looking at document)  This is a 1995
5  plan.
6    Q   It's a 1995 plan.  My question is:  Were
7  you familiar with this plan in 1998?  I believe we
8  have stipulated that this plan also was applicable
9  in 1998; is that correct?
10       MR. WELSH:  As amended.
11       MR. ROACH:  As amended.
12       MR. WELSH:  Right.  Can we go off the
13    record?
14          (Discussion off the record)
15    Q   The Bayer Severance Plan, Fiorilla Exhibit
16  9, and the summary plan description, Fiorilla
17  Exhibit 5; and Ramsden Exhibit 7, I just want you to
18  understand the parties have stipulated that these
19  plans were in effect in 1998, with the proviso that
20  there would have been some amendments prior to 1998.
21       MR. ROACH:  Correct, Mr. Welsh?
22       MR. WELSH:  Right.
23    Q   Looking at Fiorilla Exhibit 9 the Bayer
24  Corporation Severance Pay Plan, have you ever seen

Page 228

1  that before?
2    A   Yes.
3    Q   When?
4    A   All employees, certainly, management
5  employees would have copies of all of these --
6  access to all of these.
7    Q   Okay.  Management employees get a copy of
8  Exhibit 9, but what about board shop employees who
9  are not management employees?
10       MR. WELSH:  Objection.  You may answer.
11    A   (Looking through document) I'm not sure.
12    Q   Okay.  Are you sure that management
13  employees all get a copy of what we marked as
14  Exhibit 9?
15    A   No.  I'm sure that management employees
16  have access to such document.
17    Q   Have you yourself ever reviewed it up
18  until 1998?
19    A   I don't know.
20    Q   Okay.  Did you ever review the severance
21  provisions of Exhibit 9 in 1998 -- as of 1998?
22       MR. WELSH:  Excuse me, Steven, Exhibit 9
23    of Fiorilla, isn't the entire thing a Severance
24    Pay Plan?  You said "have you ever reviewed the

Page 229

1  severance provisions."  This has severance
2  provisions.
3       MR. ROACH:  I apologize.  Fair enough.
4    Strike that.
5    Q   Just for the record, this summary plan
6  description, which is Fiorilla 5 and Ramsden 7, have
7  benefits including severance.  Fiorilla 9 is just a
8  severance plan itself, is that correct, to your
9  understanding?
10    A   (Looking at document)  Yes.
11    Q   Had you ever read Fiorilla Exhibit 9, the
12  severance pay plan, up to -- let's put a limit on
13  it, up to the sale of the board shop in 1998, up to
14  that point, had you ever read the severance pay
15  plan, Fiorilla 9?
16    A   I don't know.  I was aware of its
17  existence.
18    Q   Do you know whether there were any
19  differences between the provisions of Exhibit 9 and
20  the summary plan description, Fiorilla 5 and Ramsden
21  7?
22    A   No.
23    Q   Did anybody ever bring any differences to
24  your attention?

10 (Pages 226 to 229)

Michael Paige, Vol. 2                                                06/15/2006

1     MR. WELSH:  If you don't make editorials
2   about my comments, I won't respond.
3     Q    Have you read the wording that Mr. Welsh
4   and I were just discussing?
5     A    Yes.
6     Q    Do you have any knowledge as to what that
7   means, "AGFA looking for," and then it has "two
8   million dollars" in a box, "premium to deal with
9   employee severance issues," and then from the box
10  there is an arrow down that says, "plus ten percent
11  inventory reduction."  Did I read that correctly?
12    A    Yes.
13    Q    Do you have any idea what that means?
14    A    No, I don't know the context of this.
15    Q    Does it refresh your memory as to whether
16  the people involved in the conference call were
17  discussing severance issues for the board shop
18  employees?
19    A    I don't know.  I don't know what this
20  document refers to.
21    Q    Well, in general, does this document refer
22  to the sale and pending sale between Bayer and EFTC?
23    A    Some of the particulars seem to refer to
24  the EFTC negotiation.

1     Q    Okay.  In looking at the wording we just
2   read, "AGFA looking for two million dollar," in box
3   "premium," et cetera, does that refresh your memory
4   as to any discussion you had in this conference call
5   about severance with respect to the board shop
6   employees?
7     A    No.
8     Q    Do you remember any discussion about a two
9   million dollar premium to deal with employee
10  severance issues?
11    A    No.
12    Q    The next page, page 3, of Exhibit 15 about
13  the third paragraph down, do you see the word "Kim
14  Collins"?
15    A    Yes.
16    Q    Do you know who Kim Collins is?
17    A    No.
18    Q    Okay.  And then next to her, to the right,
19  it looks like an arrow, and I believe it reads,
20  "Bayer going to buy out employees from
21  post-retirement, plus medical benefits, unused
22  vacation, severance payments, et cetera," and there
23  is another arrow "big bucks to employees."  Did I
24  read that correctly?

1     A    No.
2     Q    Okay.  What did I read that was incorrect?
3     A    I believe the word is "big checks to
4   employees."
5     Q    Oh, okay.  So I read that correctly except
6   the last line is big checks to employees, right?
7     A    I don't know if the word is "is."  Some
8   word, and then it says, "big checks to employees."
9     Q    Either an "is," or an arrow, perhaps?
10        MR. WELSH:  Or a symbol.
11        MR. ROACH:  Or a symbol of some sort.
12    Q    It appears to be an arrow, is that
13  correct, Dr. Paige?
14        MR. WELSH:  No, wait.  We have to be
15    specific.  He's talking about the entry before
16    "big.""  And he asked "does that appear to be
17    an arrow to you?"
18    Q    An arrow, or the word "is."
19    A    I don't know what it is.
20    Q    Okay.  Does this wording refresh your
21  memory as to any discussion you or anybody in Bayer
22  had, or anybody in this conference call, about
23  "Bayer is going to buy out employees"?
24    A    No.

1     Q    Do you have any knowledge what the meaning
2   is "big checks to employees" refers to?
3     A    Yes.
4     Q    What is your understanding?
5     A    At the time of the transition, to settle
6   issues of post-retirement and medical benefits and
7   unused vacations, that this would all monetized, and
8   the employees would receive a compensation check at
9   the time we transitioned them to the new company.
10    Q    Why not severance, because it's mentioned
11  here?
12    A    Again, I don't know what this document is,
13  or when it was generated or --
14    Q    I'm not asking you that question.  You
15  said this refreshed your memory, I believe, that
16  there was going to be a payout --
17        MR. WELSH:  No, I don't believe that he
18    said that at all.  I think you asked him "what
19    does this appear to mean," or "can you explain
20    to me what it means," I think is what you
21    asked.
22    Q    Assuming your lawyer is correct --
23        MR. WELSH:  We can read back the question.
24    Q    All right.  Assuming your lawyer is

14 (Pages 242 to 245)

Page 270

1    A   Yes.
2    Q   Were you involved in this discussion that
3  is concerning the information regarding the payroll
4  and what we were just talking about?
5    A   No, not necessarily.
6    Q   Any knowledge as to why your name would be
7  there?
8    A   There is a name under mine, it says, "John
9  Schultz."
10   Q   My question is:  Is there any idea why
11 your name was there?
12   A   Yes.  Because there, under mine, is John
13 Schultz, who was the head of -- one of the major
14 human resource managers at that time within Bayer
15 Corporation.
16   Q   Was he the person in New Jersey who was
17 involved in discussions, the HR person who was
18 involved in discussions, whose name you couldn't
19 recall earlier?
20   A   No.  He is in Bayer Corporation
21 headquarters in Pittsburgh.
22   Q   I show you Exhibit 13, just off the record
23 for a second, John.
24           (Discussion off the record)

Page 271

1    Q   Exhibit 13 of Ramsden, do you recognize
2  the handwriting?
3    A   No.
4    Q   It says, "July 7, T C" assuming that means
5  telephone call "with M. Paige."  Did I read that
6  correctly, as the title?
7    A   (Looking at document)  I can't tell if
8  it's "7/8, 7/9" something in that order.  And "T C."
9  And the letters "T C."
10   Q   Does that refer to "telephone call"?
11   A   I don't know.
12   Q   Do you remember having a telephone call on
13 July 7th regarding --
14       MR. WELSH:  The 7th?
15       MR. ROACH:  July 7th of 1998.
16   Q   -- with someone talking about -- I'm
17 sorry, strike that.  I apologize.  I was reading
18 from the wrong one.
19       MR. WELSH:  Okay.
20   Q   Okay.  Exhibit 13, it says, "7/8 T C with
21 M. Paige and R Serafian."  Do you recall a telephone
22 call on July 8th with somebody and yourself
23 regarding the sale?
24   A   No.

Page 272

1    Q   Down at the bottom it has got "Issue,"
2  it's got a "2.  Offer jobs to all employees."  Do
3  you see that?
4    A   Yes.
5    Q   Does that refresh your memory as to a
6  discussion you had at that time about offering jobs
7  to all employees, a telephone call with somebody?
8    A   (Looking at document)  No, no.
9    Q   I believe you have already testified to
10 that, about the decision to offer jobs to all
11 employees in this deposition, correct?
12       MR. WELSH:  Objection.  You may answer.
13   A   Offer jobs to all employees by EFTC.
14   Q   Right.  Is that correct?
15   A   Yes.
16   Q   Okay.  When was the decision made to offer
17 jobs to all board shop employees?
18       MR. WELSH:  Objection.
19   Q   Let me rephrase that.  When was the
20 decision made that 75 percent of the board shop
21 employees would have to go to EFTC in order to make
22 the sale work?
23       MR. WELSH:  Objection.  You may answer.
24   A   The 75 percent number is my estimate.

Page 273

1    Q   I understand that.
2    A   It could be much higher.
3    Q   I understand that.  When was the decision
4  made that 75 percent, or perhaps a higher number, of
5  board shop employees had to go to EFTC in order to
6  make the sale work, when was that decision made, if
7  you know?
8    A   It was an underlying assumption throughout
9  the entire negotiation.
10   Q   Why was it an underlying assumption, where
11 did that come from?
12   A   Otherwise it wouldn't be a win-win
13 situation.
14   Q   Did EFTC say to you -- "win-win" for Bayer
15 and for the employees, is that what you mean?
16   A   For both parties.
17   Q   What about EFTC?
18   A   All three parties.
19   Q   Okay.  Did EFTC need the expertise and the
20 labor of the board shop employees in order to
21 purchase the assets, or to go through with the sale?
22   A   To achieve the quality and the mix we
23 required, it was everyone's agreement that only the
24 AGFA employees could produce that.

Michael Paige, Vol. 2                                                    06/15/2006

Page 274

1  Q  "AGFA" being the Bayer employees, AGFA
2  division?
3  A  AGFA division employees.
4  Q  Of Bayer, so they are Bayer employees?
5  A  Right.
6  Q  Exhibit 12 of Ramsden, I started to read
7  this earlier to you.  I had the wrong document in
8  front of me.  It looks like July 7 there was a
9  telephone call with you and someone; is that
10  correct?
11  A  Yes, if "T C" means telephone call.
12  Q  Assuming it means that, do you recall
13  any -- does this refresh your memory as to whether
14  you had a call on July 7 with anyone about the sale?
15  A  No.
16  Q  No. 3, circle No. 3, says, "All employees"
17  and "all" is underlined, "of PCB division to EFTC,"
18  and then it looks like "EFT" and then the "C" looks
19  like it's cut off, "not pick and chose."  Did I read
20  that correctly?
21  A  Yes.
22  Q  And do you have any understanding of what
23  that means?
24  A  Yes.

Page 275

1  Q  What does it mean?
2  A  It implies that the issue that EFTC would
3  have to accept all AGFA employees, it could not just
4  cherry-pick the ones they wanted from that group.
5  Q  Okay.  And do you remember any decision
6  about how that was made or any discussion, rather,
7  about how that decision was made?
8  A  It was part of our win-win strategy.
9  Q  And that is the win-win strategy you
10  discussed earlier, right?
11  A  Yes.
12  Q  Was part of the win-win strategy -- a
13  factor of win-win strategy, is that Bayer wanted all
14  employees of the board shop to go, or there was no
15  deal?
16  MR. WELSH:  Objection.  Asked and
17  answered.  You may answer.
18  A  I'm not sure when you say, "Bayer,"
19  Certainly AGFA felt this was appropriate.
20  Q  The AGFA division of Bayer wanted all
21  board shop --
22  A  Employees to --
23  Q  Let me finish the question.  The AGFA
24  division of Bayer wanted all board shop employees to

Page 276

1  go to the EFTC, correct, or there would be no deal?
2  A  Yes.
3  Q  Okay.  And why did they want all -- strike
4  that.  And is the reason they wanted, the AGFA
5  division of Bayer wanted, all employees to go to
6  EFTC, was that to avoid having to pay severance to
7  any of them that chose not to go there?
8  A  It was to offer all employees employment
9  in this transition.
10  Q  I understand that.  But you didn't answer
11  my question.  Was part of the reason that the AGFA
12  division of Bayer wanted all employees to go to
13  EFTC, was so that there would have to be no
14  severance payments to the people who chose not to
15  go, or who EFTC did not pick?
16  A  No.
17  Q  So the reason that Bayer wanted all
18  employees to go was for win-win, to make sure they
19  had employment and make sure the deal worked, so all
20  three parties, the board shop employees, Bayer, and
21  EFTC, would all be in a win-win situation?
22  A  Yes.
23  Q  Okay.  Now, when you say the AGFA division
24  of Bayer wanted all employees to go, that's

Page 277

1  ultimately Bayer, right?
2  A  This is an operational issue within the
3  AGFA division, much like us having any service or
4  any function.  Bayer wanted to make sure that we
5  were a fully functional, profitable operation.
6  MR. WELSH:  Would this be nice way to
7  segue into my lunch?
8  MR. ROACH:  Yes.  Let's break for lunch.
9  (Break taken)
10  Q  I would like to show you another document
11  that we will have marked as the next exhibit, which
12  will be Exhibit 36.
13  (Document marked as Exhibit 36
14  for identification)
15  Q  We have marked this document as Exhibit
16  36; can you tell me what this is?
17  A  (Looking at Exhibit 36)  It's a cover
18  sheet from a fax that -- it looks like a cover sheet
19  from a fax that I sent to Seufert, Rottie,
20  Rittinghaus, and Van Gerven.
21  Q  Who is Rottie and Van Gerven?
22  A  Eddie Rottie, R O T T I E, is the head of
23  finance at this time for Werner Seufert.  He's the
24  equivalent of a senior vice president of finance for

22 (Pages 274 to 277)

Page 282

1    Q    Where?
2    A    There was one in Tarrytown, New York, as
3    part of the Bayer diagnostics division.
4    Q    Was that ever being considered for sale
5    when you were there?
6        MR. WELSH:  Objection.  You may answer.
7    A    I believe it was already sold.
8    Q    When was it sold?
9    A    I have no idea.
10    Q    Were those two, the one in, I think you
11    said, Germany, and the one in Tarrytown, New York,
12    were they not profitable?
13        MR. WELSH:  Objection.  You may answer, if
14        you are able.
15    A    Profitability does not refer to the
16    specific operations, since they were captive
17    operations, there were no P & L associated with
18    them, "P & L" meaning profit and loss statement.
19    Q    When Bayer chose the board shop that is at
20    issue in this case in Wilmington, Massachusetts, to
21    be sold, was there any analysis as to how much
22    revenue or profit that board shop was generating for
23    the AGFA division, was there any breakdown as to how
24    much revenue or profit it was generating?

Page 283

1    A    Bayer did not recommend it.  Something
2    happened to it.  It was recommended by the
3    management team in Wilmington -- of the division,
4    that we would not need it.
5    Q    Okay.  My question is different than what
6    you answer, I believe.  The question is:  Was there
7    ever any analysis at the time you were there, before
8    the board shop was sold, as to a breakdown, as to
9    whether the board shop itself was profitable, or how
10    much revenue it was generating?
11    A    Yes.
12    Q    And what was the determination?
13    A    That the price per board created by the
14    Wilmington operation was excessively high, compared
15    to fair market pricing.
16    Q    So, therefore, it was not profitable to
17    keep it?
18    A    Therefore, it was not profitable to keep
19    it.
20    Q    Where you getting less business for the
21    years you were there before it was sold, in other
22    words, were the sales down?
23        MR. WELSH:  Objection.
24    Q    Of the board shop.  Go ahead.  You can

Page 284

1    answer.
2        MR. WELSH:  Objection.  You can answer, if
3        you can.
4    A    The board shop is a captive operation.  It
5    doesn't sell boards.  It only builds what I am
6    required to build.
7    Q    I see.  In other words, it was building
8    boards for other items that Bayer was selling within
9    the division; is that correct?
10    A    No.  It would build boards for products
11    that AGFA was selling.
12    Q    AGFA Corporation?
13    A    AGFA Worldwide.
14    Q    Okay.  And were the profits of revenue
15    down from AGFA Worldwide?
16    A    The business unit which I was managing had
17    lower -- had no profit for a number of years --
18    Q    Okay.
19    A    -- on a worldwide basis.
20    Q    So that was part of the basis to sell the
21    board shop?
22    A    Yes.
23    Q    Okay.  What product for AGFA Worldwide did
24    the board shop produce, for any of its products, if

Page 285

1    any?
2        MR. WELSH:  Objection.  You may answer.
3    A    The board shop produced no final product.
4    They only built a component for other products I was
5    producing.
6    Q    Okay.  What were those products?
7    A    Broadly called "Electronic Pre-Press
8    Systems," typesetters, photo-typesetters, printing
9    systems.
10    Q    Who were the end-use customers that AGFA
11    Worldwide was selling or marketing those units to?
12    A    The pre-press industry, printing and
13    publishing.
14    Q    Newspapers and magazines?
15    A    Newspapers, graphic art studios, printers
16    of all sorts.
17    Q    Okay.  When you say, "AGFA Worldwide,"
18    again, I don't want to get into --
19        MR. ROACH:  John, I'm just trying to avoid
20        a corporate shell game.
21        MR. WELSH:  If I have a problem, I think I
22        have shown in the past that I'm more than
23        willing to share my concerns.
24        MR. ROACH:  Okay.

24 (Pages 282 to 285)

Page 306

1    Q    Okay. I don't want to rehash it, and I
2    believe I might have asked you this, but I'm not
3    sure I went into it. When Bayer finally decided
4    that the board shop employees were not entitled to
5    severance, if they were to go to EFTC, I believe you
6    said Mr. Willis communicated that to you, Rod
7    Willis?
8    A    Willis would be my main source of
9    communication for all human resources.
10   Q    And I'm sorry if I asked you this, but
11   what did he say to you in that regard?
12   A    Since I'm not an expert in human resources
13   information, any human resources information on my
14   summary sheets would come from my conversations with
15   him.
16   Q    My question is: What did he say to you --
17        MR. WELSH: Do you remember what he said?
18   Q    -- in his conversation with you?
19   A    No.
20   Q    Well, he must have said, "The board shop
21   employees are not entitled to severance." Did he
22   say that?
23   A    Yes, he would have said that to me.
24   Q    Okay. Did he tell you why?

Page 307

1    A    I don't remember.
2    Q    Did you ask him why?
3    A    I do not remember.
4    Q    Did he tell you that any of the board shop
5    employees were asking about severance?
6    A    I don't remember.
7    Q    The next bullet point down on Exhibit 37,
8    it says, "Buyout will be given for change in
9    benefits." What does that mean?
10   A    I'm sorry, where is that?
11   Q    Under 6.0, Exhibit 37, the last bullet
12   point, "Buyout will be given for change in
13   benefits." What does that mean, if you know?
14   A    (Looking at document) This refers to
15   those benefits, for example, medical, which were
16   slightly higher with EFTC, that AGFA would now
17   compensate the employees for.
18   Q    What was the estimate as to how much that
19   cost was, if you know?
20   A    The estimate stated above was half a
21   million dollars.
22   Q    Okay. So the estimated half a million
23   dollars included the difference in the medical costs
24   that we talked about earlier; is that correct?

Page 308

1    A    Yes. Amongst other things.
2    Q    And the "other things," I think you said
3    something about vacation and a few other items?
4    A    I am not sure how vacation was handled.
5    Q    What other things other than medical, I
6    guess, is my question?
7    A    That may be the extent of it.
8    Q    So the 1.5 to 2.5 million was what Bayer
9    would end up with after the sale net; is that
10   correct?
11   A    No. That is what the difference between
12   the offer for the inventory assets and the goodwill,
13   versus their current book values would be. It's an
14   accounting issue. It has nothing to do with the
15   actual board production. It has only to do with the
16   asset to asset structure.
17   Q    Okay. And does it include goodwill as an
18   asset?
19   A    It includes goodwill as an asset.
20   Q    Okay. So when it says, "This would give
21   us 1.5 to 2.5 million," what does that mean?
22   A    The difference between the current book
23   values of our inventory, our assets meaning
24   machinery, and, quote, their gesture toward

Page 309

1    goodwill, the difference between that and the book
2    value of those same items would yield $1.5 to $2.5
3    million.
4    Q    So that is what Bayer would end up with
5    net, after that difference, after that calculation?
6    A    No. Yes, it is only the difference
7    between those asset numbers and their book value.
8    Q    But my question is: This is what Bayer
9    would end up with, 1.5 to 2.5 million, after taking
10   into account the inventory and the goodwill, the
11   value of the book value, inventory, and goodwill,
12   correct?
13   A    No. It is not -- I wouldn't represent it
14   that way. It's what the difference of the asset
15   value on the book is and the asset value they are
16   willing to pay for it.
17   Q    Okay. So that difference is 1.5 to 2.5
18   million then, correct?
19   A    For the assets only, yes.
20   Q    What other items were there besides the
21   assets?
22   A    The cost of producing boards.
23   Q    That Bayer would have to pay EFTC?
24   A    Going forward.

30 (Pages 306 to 309)



Page 322

1   letter of intent of July 15, 1998, as part of that;
2   would that be the letter of intent that I am showing
3   to you?
4       A   (Looking at document) Yes.
5           MR. ROACH:  I would like to make a copy of
6   that and mark it as Exhibit 39.
7               (Document marked as Exhibit 39
8               for identification)
9       Q   Directing your attention to Exhibit 39;
10  did you sign this letter of intent?
11      A   Yes.
12      Q   Okay.  And that means that consummates
13  that the sale is going to go through, is that
14  correct, the letter of intent?
15      A   No.  It means that we have entered very
16  serious negotiations and things can still change.
17      Q   Okay.  What was the purpose of the letter
18  of intent?
19      A   To indicate that it is the best intention
20  of both parties to bring this to closure.
21      Q   Is it a true and complete copy of it,
22  Exhibit 39, that we just marked?
23      A   (Looking at Exhibit 39)  So your question
24  is:  Is this a true and complete copy?

Page 323

1       Q   Yes.  Is that a copy of the letter of
2   intent?
3       A   Yes.
4       Q   Okay.  Does that refresh your memory as to
5   when you then announced to the employees that the
6   sale was going to go through?
7       A   Yes.
8       Q   When was the announcement made?
9       A   After this.
10      Q   How long after?
11      A   I don't know.
12      Q   Was it in July or later in August?
13          MR. WELSH:  Objection.  You may answer.
14      A   It would be in July.
15      Q   Do you know when in July?
16      A   No.
17      Q   Do you remember who made the announcement?
18      A   It would have been myself, Mr. Rittinghaus
19  and Dick Ramsden.
20      Q   And where was it done?
21      A   In the cafeteria of 80 Industrial Way.
22      Q   Anyone from HR there?
23      A   Yes.
24      Q   Who?

Page 324

1       A   I do not know.
2       Q   Mr. Willis, Ms. Leonard?
3       A   I do not know.
4       Q   Okay.  Was any discussion of severance
5   brought up, any questions about whether they would
6   get severance brought up, by any of the board shop
7   employees?
8       A   I don't remember.
9       Q   What did you say to them at this meeting,
10  "you," meaning the people from Bayer, the management
11  team, when you made the announcement?
12      A   It's been so long ago, I don't know the
13  actual words.
14      Q   Can you tell me, generally, what you said
15  to them?
16      A   We would have reviewed the -- we would
17  have all reviewed the agreement in negotiating the
18  agreement with EFTC.  It says, the agreement depends
19  on their participation, so nothing was done until
20  they buy in as well.
21      Q   Did you tell them that the deal was
22  dependent upon them going to EFTC and accepting a
23  job at EFTC; otherwise, there would be no deal?
24      A   I don't remember.

Page 325

1       Q   Do you remember any of them asking what
2   would happen if they decided not to go to EFTC, what
3   would happen to them, whether they would get
4   unemployment or severance?
5       A   I don't know what they asked at that
6   meeting.
7       Q   Do you remember whether you said to them,
8   "this is a win-win situation," and "you" meaning you
9   or anybody else on the Bayer management team?
10      A   I don't remember.
11      Q   Do you remember talking to Jean Sanzo
12  about severance?
13      A   No.
14      Q   Do you know who she is?  I'm sorry, not
15  Jean, Joanne Sanzo, S A N Z O?
16      A   The question was:  Do I know who she is?
17      Q   Yes.
18      A   No.
19      Q   Do you remember speaking to any board shop
20  employees individually about the sale at any time?
21      A   No.
22      Q   Are you saying you didn't have any
23  conversations with them individually, or you just
24  can't remember whether you did?

34 (Pages 322 to 325)

Page 326

1    A    I can't remember if I did.
2    Q    Okay.  Do you remember any questions being
3  asked by the board shop employees at this
4  announcement sometime in July after the letter of
5  intent marked Exhibit 39 was sent?
6    A    I don't remember.
7    Q    Have you now told us everything that you
8  can recall what was said at the meeting, questions
9  and announcements and statement?
10   A    No.
11   Q    My question is:  Have you now told us
12 everything you can recall about everything that was
13 said at the meeting where you made the announcement?
14   A    I'm sorry I didn't hear you properly.
15 Yes, I told you everything I remember.
16   Q    Was there another meeting after that?
17   A    Yes.
18   Q    Where was that?
19   A    I do not know.
20   Q    Okay.  Would it have been at the AGFA
21 division, at Bayer's facilities in Wilmington?
22   A    Yes.
23   Q    Okay.  Where in that facility would it
24 have been, a cafeteria, or somewhere else?

Page 327

1    A    It would have been in the cafeteria of 80
2  Industrial Way.
3    Q    How long after the first meeting was the
4  second meeting held?
5    A    I couldn't tell you.
6    Q    Can you tell me what was said at the
7  second meeting?
8    A    No.  I cannot remember.
9    Q    Can you tell me why there was a second
10 meeting held?
11   A    To introduce the EFTC management staff to
12 the employees.
13   Q    And who were they?
14   A    It would have included Jack Calderon, but
15 I'm not sure who else on his team would have made
16 this particular trip.
17   Q    Do you remember anybody from EFTC saying
18 anything to the board shop employees?
19   A    No.
20   Q    Did you or the Bayer management say,
21 again, "this is a win-win situation" to the board
22 shop employees?
23   A    I don't remember.
24   Q    Were there any questions about severance

Page 328

1  or unemployment or what would happen if they decided
2  not to go to EFTC?
3    A    Again, I don't remember.
4    Q    Do you remember meeting just with the
5  Bayer management to decide what to say when you made
6  the first announcement that we just talked about to
7  the board shop employees about how to present it and
8  what to say?
9    A    We discussed what topics would be
10 appropriate to cover and which ones should be
11 deferred to EFTC.
12   Q    What topics did you arrive on that should
13 be discussed?
14   A    Why the board shop was, through no fault
15 of the employees, not as effective as it could have
16 been to AGFA, and why it would be more efficient and
17 effective within EFTC.
18   Q    What did you say to them in that regard?
19   A    Normally, we are very candid, and we
20 probably explained the financial situation and the
21 competitive board pricing.
22   Q    Did you explain anything about benefits
23 and their pay if they went to EFTC, in the first
24 meeting?

Page 329

1    A    No.
2    Q    Did you say anything about benefits or
3  their pay in the second meeting?
4    A    No.
5    Q    Okay.  Let me show you what's been marked
6  as Fiorilla Exhibit 2 and ask you if you recognize
7  that?
8        MR. ROACH:  For the record, it includes
9     several pages entitled "Benefits Highlights."
10   A    (Looking at document)  I don't know what
11 this document is.
12   Q    Do you remember whether there were any
13 slides shown to the board shop employees
14 highlighting their benefits as reflected on Exhibit
15 2?
16   A    I don't remember.
17       MR. ROACH:  I would like to mark this as
18    Exhibit 40, please.
19            (Document marked as Exhibit 40
20            for identification)
21   Q    I will show you what we have marked as
22 Exhibit 40.  Does this document look familiar to
23 you?
24       MR. ROACH:  Just for the record, it's

35 (Pages 326 to 329)

Page 330

1    dated August 21, 1998, and it's called,
2    "Retirement Healthcare Coverage Eligibility."
3    A    (Looking at Exhibit 40)  I don't recognize
4    the document.
5    Q    Do you remember anything like that being
6    shown to the employees at any of these meetings?
7    A    I couldn't answer that.  I don't remember.
8    Q    Okay.  Do you remember when the EFTC
9    people came to meet with the employees, was it in
10   August or was it in July?
11   A    It would have been in July, as I mentioned
12   before, shortly after, but I'm not sure exactly how
13   long after our letter of intent discussion
14   announcement.
15   Q    What was the plan after that second
16   meeting, if any, that Bayer management had with
17   respect to the sale, and how employees would be
18   informed of the options and what the benefits may be
19   --
20        MR. WELSH:  Objection.
21   Q    -- if they would go to EFTC.
22        THE WITNESS:  Could you read the question
23   again to me?
24   Q    Let me rephrase the question.  Strike

Page 331

1    that.  Did Bayer management have any discussions
2    either with itself, among itself, and with EFTC
3    people, about how employees would be informed about
4    their benefits and their pay if they chose to go to
5    EFTC, after the announcement was made?
6    A    There was no plan, other than EFTC meeting
7    directly with the employees and with closed doors,
8    without AGFA management, to discuss what the
9    benefits would be like, since they would be the
10   potential new employer.
11   Q    You mean "Bayer management?"  When you say
12   "AGFA," that means Bayer management, right?
13   A    AGFA, Bayer management.
14   Q    Why was it behind closed doors without
15   AGFA or Bayer there?
16   A    Because at that point, the discussion
17   would be between a new employer and potential
18   employees, and AGFA would only confuse the matter by
19   being in the room.
20   Q    Did you ever work in Bayer's human
21   resources department?
22   A    Did I?
23   Q    Yes.
24   A    No.

Page 332

1    Q    I just want to show you a document that I
2    received from Bayer.
3         MR. ROACH:  We will mark it as Exhibit 41.
4             (Document marked as Exhibit 41
5             for identification)
6    Q    Okay.  Looking at Exhibit 41, it says,
7    "AGFA Division of Bayer Human Resources" on this
8    memo, correct?
9    A    Correct.
10   Q    This is from you to all supervisors and
11   managers, an internal memo, right?
12   A    That's correct.
13   Q    And it has your signature on it?
14   A    It has my signature on it.
15   Q    It talks about workplace safety, right?
16   A    Yes.
17   Q    Why was it under the human resources
18   letterhead with your signature?
19   A    It's a legal requirement that I, as the
20   president or the highest ranking officer of the
21   company, subscribe to the law of the land, work
22   place safety, OSHA requirement being one of them, my
23   signature attests that I support 100 percent this
24   policy.

Page 333

1    Q    If you didn't work on human resources, why
2    does it have "Human Resources"?
3    A    Because I didn't write the document.  J.W.
4    wrote the document, but by my signing it means that
5    I 100 percent supported it.
6    Q    Okay.  But it's from you, right?
7         MR. WELSH:  I will stipulate he signed it
8         and it's from him.  I will stipulate he signed
9         it on human resources department stationery, if
10        that helps.
11   Q    You will accept that stipulation?
12   A    Yes.
13   Q    Were there any other meetings after the
14   second announcement to the employees that the sale
15   had been finalized, or was near finalization?
16        MR. WELSH:  That he attended?
17   Q    That you attended?
18        MR. ROACH:  Yes.
19   A    Yes.
20   Q    Okay.  Any other meetings that were with
21   the board shop employees and management that you
22   weren't there that you knew about?
23   A    Yes, many.
24   Q    And who were at those meeting from Bayer?

36 (Pages 330 to 333)

Page 334

1      MR. WELSH: Objection. You may answer to
2  your knowledge.
3      A    To the best of my knowledge, Mr. Ramsden,
4  Mr. Baribeau, various EFTC management and staff.
5      Q    What about Mr. Willis and Ms. Leonard,
6  were they there, too?
7      A    I can't remember. I don't know.
8      Q    So Ramsden, Baribeau, and who else from
9  Bayer, if you know?
10     A    Ms. Leonard.
11     Q    Yes. And did you have any discussions
12  with any of these people from Bayer before any of
13  the meetings with the board shop employees, after
14  the second announcement, with the EFTC people were
15  there that we just talked about?
16     A    We had discussions because they are
17  members of my team.
18     Q    Did you have any discussions about
19  severance, anybody asking about severance?
20     A    They would report back to me any issues
21  that came up. To the extent that an employee
22  mentioned severance, it would have come to my
23  attention.
24     Q    Can you recall any that came up or were

Page 335

1  discussed?
2      A    No.
3      Q    Do you remember saying, in any of the
4  meetings where you were present, to the board shop
5  employees that they are not entitled to severance
6  and if they don't accept the job with the EFTC they
7  will be terminated and will not receive severance or
8  unemployment?
9      MR. WELSH: Objection. Asked and
10  answered. You can answer again.
11     A    I would not have said that.
12     Q    Do you remember anybody else saying that
13  from Bayer?
14     A    No.
15     Q    Was there anything in writing to the board
16  shop employees about the fact they were not going to
17  get severance from Bayer, to the board shop
18  employees?
19     A    I don't know.
20     Q    Who would know, if you know?
21     A    Mr. Willis.
22     Q    Do you understand what the policy was with
23  respect to advising people about whether they would
24  receive severance when they were leaving Bayer?

Page 336

1      MR. WELSH:  Objection. You may answer.
2      A    I'm not sure of the question.
3      MR. ROACH: I will withdraw the question.
4      Q    Do you remember whether Doug Ashworth was
5  involved in any of those meetings with the board
6  shop employees?
7      A    I don't know who Doug Ashworth is.
8      Q    How about a Julie Haley?
9      A    Julie Haley, I know who Julie Haley is,
10  she does benefits work within AGFA.
11     Q    Was she at any of these meetings?
12     A    I do not know.
13     THE WITNESS:  Is there a point for a
14  biology break?
15          (Break taken)
16     Q    Have you now told us everything you can
17  remember about discussions with employees about the
18  sale of the board shop?
19     A    Yes, I have told you everything I
20  remember.
21     Q    I would like to show you what's been
22  marked Exhibit 23, Ramsden Exhibit 23, it appears to
23  be the same document we have marked as Exhibit 37,
24  after the top page. It's a fax from Ramsden to

Page 337

1  Debra Buxbaum, June 30, 1998, which attaches what we
2  have marked as Exhibit 37.
3      MR. WELSH: Can I look at that for a
4  second, please?
5      MR. ROACH:  Sure, you can confirm it for
6  yourself.
7      Q    Okay. So what's marked as Exhibit 23, the
8  memo that is attached to the top sheet the fax from
9  Ramsden to Buxbaum of June 30, 1998, is the same
10  document that we have marked as Exhibit 37, correct,
11  except it doesn't have some of the fax notations and
12  the "R R" at the top --
13     MR. WELSH: Or the confidential stamp.
14     Q    -- or the confidential stamp, is that
15  correct, sir?
16     A    Yes.
17     Q    Okay. Do you have any understanding as to
18  how that got to be transferred from Mr. Ramsden to
19  Debra Buxbaum?
20     A    In this particular case, I blind copied my
21  immediate direct reports, Ramsden being one of them.
22  Clearly, he was in discussion with Buxbaum about
23  looking at any one of these details. If you notice,
24  he has several line items here that have his name in

37 (Pages 334 to 337)

Page 342

1  summary plan description that is marked as Fiorilla
2  5 and Ramsden 7, that was given to them?
3      A   Only to the --
4          MR. WELSH: Objection.
5      A   -- extent that that applies to their
6  particular case at the particular time that
7  something happens.
8      Q   In other words, if they qualified?
9      A   If they had qualified for that particular
10 benefit.
11     Q   Okay. But there is a cumulative amount
12 that they are entitled to as time goes on, I believe
13 you testified it was two weeks for every year of
14 employment, correct?
15         MR. WELSH: Objection.
16     Q   That they would get for severance?
17         MR. WELSH: Objection.
18     A   That is an example. At one time that was
19 true. I have no idea if it's still true.
20     Q   I am not talking about now. I'm talking
21 about back in 1998.
22     A   In 1998, the general policy was two weeks
23 of compensation for every year of service.
24     Q   Okay. And that would accumulate over

Page 343

1  time, every year you would accumulate two additional
2  weeks of severance, assuming you were eligible for
3  it?
4          MR. WELSH: Objection.
5      Q   Correct?
6          MR. WELSH: Objection.
7      A   Yes.
8      Q   Okay. Was there any reason why that
9  wasn't in Exhibit 10, how much they have accumulated
10 in severance --
11         MR. WELSH: Objection.
12     Q   -- that you know of? Go ahead.
13     A   It's not a prescribed financial benefit in
14 the same category as medical, dental, IRAs, pension
15 plans.
16     Q   How is it different?
17     A   It's something that is --
18         MR. WELSH: Objection.
19     A   It's something that is granted by the
20 corporation, within its right to change dramatically
21 overnight, if they want or they see fit.
22     Q   What is your statement that it would be
23 "dramatically changed" based on?
24         MR. WELSH: Objection.

Page 344

1      Q   Go ahead.
2      A   The company could be in severe financial
3  problems and the severance would be -- and they
4  wouldn't have the money to pay severance to begin
5  with. There are many circumstances with severance,
6  things have to change.
7      Q   Can you think of another one other than
8  that?
9      A   Circumstances to the --
10         MR. WELSH: Objection to the extent that
11 you are asking him for a legal opinion. He may
12 answer.
13         MR. ROACH: No, I'm not asking for legal
14 opinion.
15     Q   Just your understanding, sir. Go ahead.
16     A   Change of ownership of the operational
17 entity with a job changing hands between the two
18 companies.
19     Q   I would like to show you what was marked
20 as Exhibit 19 Ramsden, and I ask you if you ever saw
21 that, sir, in 1998?
22     A   (Looking through document)
23     Q   The question is: Have you ever seen that
24 document Exhibit 19?

Page 345

1          MR. WELSH: When you say, "that document,"
2  you mean the entire -- all of the pages either
3  separately or combined?
4          MR. ROACH: Yes.
5      A   I'm not seeing this document as a
6  combination.
7      Q   Have you ever seen any of them separately?
8      A   I think I have seen pieces of these things
9  separately.
10     Q   Okay. Well, let me direct your
11 attention -- which ones have you seen? Strike that.
12 Which ones have you seen separately?
13     A   Correspondence of Bayer and EFTC
14 comparison.
15     Q   Oh, comparison -- where it says, "Company
16 Confidential," the second page in?
17     A   Yes.
18     Q   And who prepared that?
19     A   I don't know.
20     Q   Well, I see the name "Mary" down below,
21 would that be Mary Leonard?
22     A   It could be Mary Leonard.
23     Q   Somebody from Bayer prepared it though,
24 correct?

Page 350

1  refreshes your memory as to whether there was any
2  discussion within Bayer as to whether the board shop
3  employees would be paid severance by Bayer, under
4  the summary plan description, after they left Bayer
5  and joined EFTC?
6      A    In a prior question, you asked me if we
7  considered all scenarios.  At the very early parts
8  of it, in determining whether this was going to be a
9  deal or not, we look at all potential options, and
10 that question came up, and it was answered by our
11 human resources staff about eligibility or not.
12     Q    Okay.  And hence that is why you believe
13 the word "possibly" is in there?
14     A    I don't know what this document is.  I
15 don't even know what time it came from.  It does
16 have the word "EFTC" on it, so it seems to go along
17 with the discussion.  I don't know whether it
18 preceded it or what.  I don't know what it is.
19     Q    Okay.  So is it fair to say that in all
20 scenarios with respect to severance, do you recall
21 whether there was a discussion as to the fact that
22 Bayer -- the board shop employees might possibly be
23 entitled to severance, or potentially entitled to
24 severance?

Page 351

1      A    We never discussed the word "possibly."
2  We discussed whether they were or they weren't.
3  It's just an interpretation of our documents:  They
4  are or they are not.
5      Q    Okay.  All I'm trying to do is get your
6  memory as to everything that was discussed about
7  severance, and that's why I'm showing you this
8  document, whether you drafted it or not, I'm trying
9  to refresh your memory, as I'm entitled to do.
10     A    Okay.
11     Q    Where it says "possibly" next to
12 "severance" on Exhibit 19, on the next to last page.
13 I'm just asking you if it refreshes your memory,
14 sir, about any discussion within Bayer about board
15 shop employees possibly being entitled to severance,
16 and whether there was some discussion about that in
17 1998.
18     A    There was discussion about severance as
19 one alternative, and the question immediately went
20 to human resources legal counsel as to what the
21 ruling was whether this was appropriate or not.
22     Q    Okay.  And your memory is, the ruling came
23 back, or the decision came back, that they would not
24 be entitled to severance; is that correct?

Page 352

1      A    The fact is that is what they came back
2  with.
3      Q    Okay.  And do you remember, and, again,
4  I'm just trying to get your best memory, as to any
5  of the discussion in the interim, before the final
6  decision, or final ruling, or decision was made by
7  Bayer that the board shop employees would not get
8  severance if they went and joined EFTC?
9          MR. WELSH:  Objection.
10     Q    I'm just trying to exhaust your memory of
11 anything you remember.
12     A    There was no need for a discussion.  All I
13 had to do was ask human resources if they were going
14 to get it or not, and then it becomes a number and
15 we work with it.
16     Q    I want to show you another document.
17         MR. ROACH:  Which I would like to mark as
18 Exhibit 42.
19         (Document marked as Exhibit 42
20          for identification)
21     Q    The document is dated August 10, 1998, to
22 Gregory Jones from Richard Ramsden, and it's a fax
23 cover sheet, and it has a number of sheets attached
24 to it, pages one through nine.  Do you recall ever

Page 353

1  seeing this document, the fax or the document to
2  which it is attached?
3      A    (Looking through Exhibit 42)  No, I don't
4  remember seeing this document.
5      Q    Next to the last page -- I'm sorry.  The
6  fourth to the last page, page 6.
7          MR. WELSH:  There is a page number, Steve,
8  on the bottom of those pages, so you don't have
9  to count.
10     Q    Yes, it's page 6, "Employee Matters."
11         MR. WELSH:  Okay.  We have it.
12     Q    And it says, "Unicorn 8698."
13     A    Yes.
14     Q    What is a "Unicorn"?
15         MR. WELSH:  It looks like a horse and it
16 has a big horn.
17         MR. ROACH:  Wise guy.
18     A    It's some sort of code name, as is "X Y
19 Z."
20     Q    Where it says, "Employee Matters," it says
21 "No. 6. Policy manuals" and policies regarding
22 vacation, severance, and so on.  Do you see that?
23     A    Yes.
24     Q    Do you know what that refers to?  And just

Page 358

1   any of these names.
2       Q   Okay.  I would like to show you what has
3   been marked as Exhibit 28, and I ask you if you
4   recognize that?
5       A   (Looking at document)
6       Q   And for the record, it was addressed to
7   Linda Carter, KAWA, and the label was removed from
8   this.  This is Ramsden Exhibit 28, and the other one
9   was Ramsden Exhibit 26 that we just discussed, now
10  we are on Exhibit 28.
11      A   Okay.  What is the question?
12      Q   Do you recognize Ramsden Exhibit 28?
13          MR. WELSH:  Have you seen the form before?
14      A   Yes.
15      Q   And where have you seen it?
16      A   It's a separation agreement between AGFA
17  and a specific employee.
18      Q   Okay.  Was this the form that was used for
19  those who wished to participate in a voluntary
20  layoff program, or a voluntary layoff procedure
21  program that we discussed earlier in your
22  deposition?
23          MR. WELSH:  Objection.  You may answer.
24      A   I don't know.

Page 359

1       Q   If you look on page 2 of this document, if
2   you look at paragraph four and five, it talks about
3   paying them severance, correct, in exchange for
4   signing off some rights, correct?
5       A   Yes.
6       Q   Okay.  Now, I think you said you
7   recognized this before.  Do you remember where you
8   have seen it before or in what context?
9       A   I don't.  It looks like a general Bayer
10  separation agreement.  I notice it's signed by Grant
11  Morgan who was the vice-president of research and
12  development.
13      Q   He worked in your area in Wilmington?
14      A   He worked for me as vice-president of
15  research and development when I became general
16  manager of the division.
17      Q   You said you recognized it, do you recall
18  what it was used for, or how it was used?
19      A   No.
20      Q   Okay.  Do you recall any other groups of
21  employees, before the sale of the board shop in
22  1998, receiving severance after their area was
23  either closed down, sold, disbanded, or
24  discontinued?

Page 360

1       A   I mentioned this in our last discussion,
2   we had a group called the CAPS division, C A P S,
3   which was sold to a company in the Boston area, I
4   don't know whether it was a large company, and the
5   employees were offered positions within the new
6   company, there was no severance associated with
7   that, and they moved over.
8       Q   Those employees moved to the new company?
9       A   To the new company.
10      Q   What was the CAPS division?
11      A   It was computer aided publishing system
12  is, I believe, what the acronym stands for.
13      Q   How many employees were there under CAPS?
14      A   I'm estimating 30, 35.
15      Q   How long had they been with the company,
16  with Bayer?
17      A   I can't answer that.
18      Q   When was the CAPS division sold to a
19  company in Boston?
20      A   Sometime in the late '80s, early '90s.
21      Q   Can you remember any other groups of
22  employees or areas or shops within Bayer that were
23  discontinued, disbanded, sold, or whatever where
24  those people received severance, such as, for

Page 361

1   example, the paint shop or shipping?
2       A   The paint shop pre-dated my time, so I'm
3   not sure of the circumstances.
4       Q   How about shipping?
5       A   We always had a shipping function.
6       Q   Any people from shipping that were
7   provided severance because part or some of that
8   operation was closed down?
9           MR. WELSH:  Okay.  So you mean as part of
10  a closing of an operation, not a layoff?
11          MR. ROACH:  Right.
12      A   I don't know.
13      Q   What about inspection, metal fabrication,
14  calibration, or assembly, any of those areas?
15      A   I don't know.
16      Q   What about the machine shop?
17      A   I'm sorry, the machine shop situation
18  post-dates even my tenure at AGFA.
19      Q   Oh, okay.  So that occurred after you
20  left?
21      A   Anecdotally, that is all I can tell you,
22  if it's something with the machine shop, after I
23  left AGFA.
24      Q   So you don't have any knowledge of that?

43 (Pages 358 to 361)

Michael Paige, Vol. 2                                                06/15/2006

Page 362

1      A    No.
2      Q    And I'm sorry if I asked you this, I
3   believe I did, but I'm not sure. Can you think of
4   anybody who participated in the voluntary layoff
5   program, any specific individuals who received
6   severance?
7          MR. WELSH: Objection. You may answer.
8      Q    Other than what we talked about earlier?
9      A    No.
10         MR. WELSH: I still object.
11     Q    I show you two documents: Fiorilla
12  Exhibit 3, a letter to David Dolan from Augie
13  Bruehlman. Do you recognize that at all?
14     A    (Looking at document)
15         MR. ROACH: Just for the record, it's
16         dated August 14, 1998, offering Mr. Dolan a job
17         with the EFTC from Bayer.
18     Q    Do you remember seeing that document or a
19  document like it?
20     A    No.
21     Q    Okay. Do you know whether there was any
22  discussion within Bayer and between Bayer and
23  AGFA -- I'm sorry, between Bayer and the EFTC about
24  EFTC offering jobs to employees, writing letters to

Page 363

1   board shop employees offering them jobs, such as
2   Exhibit 3, Fiorilla Exhibit 3?
3          MR. WELSH: Objection. You may answer.
4      A    This would have been something in writing.
5      Q    I'm just asking if there was any
6   discussion with EFTC and Bayer about how EFTC would
7   approach the board shop employees, other than the
8   meetings we have talked about?
9      A    Other than to the extent that all
10  employees would like to see something in writing;
11  otherwise, how could they make a judgment prior
12  to --
13     Q    Did the employees ask for something in
14  writing, the board shop employees?
15     A    I'm only guessing.
16         MR. WELSH: Don't guess.
17     Q    I don't want you to guess. Do you recall
18  whether any decision was made to give something in
19  writing to the employees?
20     A    Yes. This is common business practice to
21  do this.
22     Q    When you say, "to do this," are you
23  talking about Fiorilla Exhibit 3?
24     A    Yes, to give an offer of employment, so

Page 364

1   they have something tangibly in writing.
2      Q    I would like to show you what's been
3   marked Fiorilla Exhibit 1, it's a letter to Richard
4   Guilmette, dated March 25, 1998. Can you tell me
5   whether you recognize that document?
6      A    (Looking at document) Yes.
7      Q    What is that?
8      A    This is a retention bonus document that
9   Richard Ramsden vice-president of operations sent to
10  employees, key employees, to -- it's a retention
11  bonus document.
12     Q    What was the decision about whether to
13  send key employees retention bonus documents, such
14  as Exhibit 1, Fiorilla Exhibit 1?
15     A    As I mentioned in my last deposition, AGFA
16  is a very gossipy, very collegial atmosphere, people
17  know about everything that is going on. As soon as
18  it became clear that we had some sort of thing going
19  on within the company, this is dated March 25, 1998,
20  so to ensure that our employees felt -- didn't get
21  the wrong message and immediately leave the company,
22  we offer them bonuses to stay on to ensure that we
23  had continuity of our workforce.
24     Q    And a similar letter was sent to

Page 365

1   Robert Brown, Exhibit 8 from the Ramsden deposition?
2      A    Dated the same day. Yes.
3      Q    Do you know how many of those types of
4   letters were sent to Bayer employees around this
5   time, if you know?
6      A    No.
7      Q    Did you get one yourself?
8      A    I wasn't a part of the board shop
9   operation.
10     Q    These people were part of -- so these
11  letters were sent to key people in the board shop
12  operation?
13     A    Right.
14     Q    Do you know if these people received
15  severance, Mr. Brown and Mr. Guilmette, Richard
16  Guilmette?
17     A    I don't know.
18     Q    Do you know whether they stayed with Bayer
19  as a result of getting these letters?
20         MR. WELSH: Are you saying following the
21         transaction with EFTC?
22         MR. ROACH: Yes.
23     A    Can you ask the question again?
24     Q    Yes. Do you know whether Mr. Richard

44 (Pages 362 to 365)