**Page 1**

```
                    Volume I
                 Pages 1 to 50
                 Exhibits 1-8
           UNITED STATES DISTRICT COURT
             DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - - - -x
                                    :
JOSEPH ATTARDI, et al.,             :
         Plaintiffs,                :
                                    :
     vs.                            : Civil Action
                                    : No. 04-10728-REK
BAYER CORPORATION, BAYER            :
CORPORATION SEVERANCE PAY           :
PLAN,                               :
         Defendants.                :
                                    :
- - - - - - - - - - - - - - - - - -x
       DEPOSITION OF EDMUND J. LASCELLES, JR., a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Anne H. Bohan, Registered Diplomate Reporter
and Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Bello Black & Welsh
LLP, One Exeter Plaza, 699 Boylston Street, Boston,
Massachusetts, on Monday, November 27, 2006,
commencing at 2:11 p.m.
PRESENT:
    Roach & Wise, LLP
        (by Stephen A. Roach, Esq.)
        31 State Street, Boston, MA 02109-2705,
        for the Plaintiffs.
    Bello Black & Welsh LLP
        (by John F. Welsh, Esq.)
        One Exeter Plaza, 10th Floor,
        699 Boylston Street, Boston, MA 02116,
        for the Defendants.
                  * * * * *
```

**Page 2**

```
                    I N D E X
WITNESS              DIRECT  CROSS  REDIRECT  RECROSS
EDMUND J. LASCELLES,
JR.
  BY MR. WELSH          4                       46
  BY MR. ROACH                        42
                    * * * *
                  E X H I B I T S
NO.    DESCRIPTION                              PAGE
 1     Rocky Mountain Life Insurance             27
       Company document entitled
       "Application for Group Insurance"
       for Edmund J. Lascelles, Jr.
 2     Principal Financial Group document        28
       entitled "Retirement Plan
       Beneficiary Designation" signed by
       Edmund J. Lascelles, Jr., dated
       8/24/98
 3     Rocky Mountain Life Insurance             29
       Company document entitled
       "Voluntary Group Life Enrollment
       Form" for Edmund J. Lascelles, Jr.,
       dated 8/24/98
 4     Great-West Life & Annuity Insurance       30
       Company document entitled
       "Application for Membership" for
       Edmund J. Lascelles, Jr., dated
       8/27/98
```

**Page 3**

```
               E X H I B I T S, Continued
NO.    DESCRIPTION                              PAGE
 5     EFTC Corporation document entitled        32
       "Enrollment Information" for Edmund
       J. Lascelles, Jr., dated 8/20/98
 6     EFTC Contract Manufacturing               34
       document entitled "Employment
       Application" for Edmund J.
       Lascelles, Jr.
 7     Document entitled "Personnel Action       35
       Notice" for Edmund Lascelles signed
       by Edmund J. Lascelles, Jr., on
       8/27/98
 8     Bayer AGFA Division document              36
       entitled "1998 Merit Review, April
       1, 1998" dated 3/17/98
                    * * * *
```

**Page 4**

[1]         PROCEEDINGS
[2]     MR. WELSH: The same stipulations as the
[3] previous deposition. Right, Steve?
[4]     MR. ROACH: Yes.
[5]         EDMUND J. LASCELLES, JR.
[6] a witness called for examination by counsel for the
[7] Defendants, having been satisfactorily identified by
[8] the production of his driver's license and being
[9] first duly sworn by the Notary Public, was examined
[10] and testified as follows:
[11]         **DIRECT EXAMINATION**
[12]     **BY MR. WELSH:**
[13]     Q. Good afternoon. I'm John Welsh, I
[14] represent Bayer Corporation, and I have just a
[15] couple of preliminaries.
[16]         This is not a formal setting, but it is a
[17] deposition where everything you say will be taken
[18] down under oath. But if you need a break, as long
[19] as a question is not pending, for the restroom, to
[20] stretch your legs or whatever, just let me know.
[21]     A. Okay.
[22]     Q. If you need a drink of water or something,
[23] just let me know. Sometimes people's mouths get a
[24] little dry. If you have any question about my

Case 1:04-cv-10728-WGY    Document 42-14    Filed 01/17/2007    Page 2 of 11

Edmund J. Lascelles, Jr.                                      Joseph Attardi, et al. v.
November 27, 2006                                             Bayer Corporation, et al.

Page 5

[1] questions, if you don't understand them, I'll be
[2] happy to repeat them or rephrase them, if you have
[3] any questions. Okay?
[4]  A. Um-hum.
[5]  Q. If you have any problems, you'll let me
[6] know so I can address them?
[7]  A. Sure thing.
[8]  Q. Would you please state your full name.
[9]  A. Edmund Joseph Lascelles, Jr.
[10] Q. Where do you live, sir?
[11] A. I live at One Arnold Road in Tewksbury,
[12] Mass.
[13] Q. How long have you been at that address?
[14] A. 54 years.
[15] Q. Are you currently employed?
[16] A. Yes, I am.
[17] Q. By whom?
[18] A. Department of Homeland Security.
[19] Q. What do you do for them?
[20] A. I'm a baggage screener.
[21] Q. See you tomorrow.
[22]     Sir, can you please summarize your
[23] educational background for me.
[24] A. Well, I'm a high school graduate. Then

Page 6

[1] from there I was going to start college, and I
[2] decided to go into the military.
[3]  Q. Were you in the military?
[4]  A. Yes. I was in from 1972 to '75.
[5]  Q. Navy?
[6]  A. Yes. SEABEES. Then I got out for 13
[7] years, I went back in in 1986. I just retired May
[8] 1st of last year.
[9]  Q. So when did you go back into the Navy?
[10] A. 1986.
[11] Q. To 1995 -- I'm sorry -- 2005?
[12] A. Yes.
[13] Q. Were you in active duty?
[14] A. No. Every time we were supposed to get
[15] sent someplace, we never did. I was lucky.
[16] Q. Were those reserves?
[17] A. Yes. The '72 to '75 was active duty.
[18] Q. When were you hired by one of the companies
[19] that ended up becoming the AGFA Division of Bayer:
[20] Compugraphic, Miles, et cetera?
[21] A. I was hired November 22, 1975.
[22] Q. Was that for Compugraphic?
[23] A. Compugraphic, yes.
[24] Q. On September 1, 1998, you went from the

Page 7

[1] AGFA Division of Bayer Corporation to EFTC; is that
[2] correct?
[3]  A. Yes.
[4]  Q. How long were you with EFTC?
[5]  A. Three years.
[6]  Q. Were you laid off?
[7]  A. Yes.
[8]  Q. Have you ever had your deposition taken
[9] before? Have you ever sat down for a deposition
[10] like this?
[11] A. No.
[12] Q. Have you ever been a party in a litigation
[13] either suing someone or being sued by anyone?
[14] A. No.
[15] Q. Did you do anything to prepare for today's
[16] deposition?
[17] A. I saw my lawyer.
[18] Q. Other than that?
[19] A. No.
[20] Q. Did you talk to anyone about the
[21] deposition?
[22] A. No.
[23] Q. Did you look over any notes or documents to
[24] prepare for the deposition?

Page 8

[1]  A. Just what I saw at my lawyer's office.
[2]  Q. Can you tell me the documents you looked at
[3] when you were there.
[4]  A. One of these (indicating).
[5]  Q. That's the Summary Plan Description?
[6]  A. Yes.
[7]  Q. Any other documents you looked at?
[8]  A. I just saw a couple of folders from Bayer
[9] that were there, I just saw them on the table.
[10] Q. Did you read any summaries or the memos or
[11] anything like that on the case?
[12] A. Yes.
[13] Q. What kind? What did you read?
[14] A. It was one of the memos to do with the
[15] sale of --
[16]     MR. ROACH: I just want to -- any memos I
[17] sent to you or the client, those are attorney-client
[18] privileged.
[19]     THE WITNESS: Yes.
[20]     MR. ROACH: So if that's what you mean.
[21]     THE WITNESS: That's what I'm talking
[22] about.
[23]     MR. ROACH: Okay.
[24] Q. Without telling me what the insides of it

Page 9

[1] say, can you describe the memo to me?
[2]    MR. ROACH: It was a memo from me to him.
[3]    MR. WELSH: He hasn't said that yet; you
[4] said that.
[5]    A. You're just telling me on the memo the
[6] dates when I was going to come here.
[7]    Q. So this memo basically told you when your
[8] deposition was going to be?
[9]    A. Yes.
[10]   Q. Without telling me the content, can you
[11] describe the memo? Did the memo talk about facts
[12] pertaining to EFTC, the acquisition of EFTC of this
[13] printed circuit board shop?
[14]   MR. ROACH: Objection.
[15]   A. No.
[16]   Q. Have you ever looked at any chronology, an
[17] outline showing by time how things happened?
[18]   A. No, I haven't.
[19]   Q. When did you first think that Bayer owed
[20] you severance pay?
[21]   MR. ROACH: Objection.
[22]   A. It was, I would say, about not quite a
[23] year. It was to do with right after the sale of the
[24] model shop. I was talking to one of the guys who

Page 10

[1] was involved.
[2]    Q. What guy was that?
[3]    A. I do believe it was Billy Freitas.
[4]    Q. What did he tell you when you had that
[5] conversation?
[6]    A. That they were sold to another company and
[7] they received a severance package.
[8]    Q. Did he say anything else to you at that
[9] time?
[10]   A. No. We just talked about old times.
[11]   Q. Did he indicate whether or not he had been
[12] unemployed for any period of time?
[13]   A. No, he didn't.
[14]   Q. Did he talk about how much he was getting
[15] paid by the new company?
[16]   A. No.
[17]   Q. Drawing your attention back to 1998, I want
[18] to represent to you that the sale to EFTC of the
[19] circuit board was September 1, 1998.
[20]   A. Um-hum.
[21]   Q. Given that, can you tell me when you first
[22] learned that the board shop was going to be sold to
[23] EFTC?
[24]   A. Well, they had rumors out, and usually when

Page 11

[1] there's rumors, it usually comes to effect. And
[2] these rumors were probably starting back in the
[3] April/May time frame.
[4]    Q. Did you talk to any managers from Bayer at
[5] that time to see if the rumors were correct?
[6]    A. No, I didn't.
[7]    Q. When is the first time you heard from any
[8] manager that there was going to be a sale to EFTC?
[9]    A. They brought us into the cafeteria, I do
[10] believe it was June.
[11]   Q. June/July time frame?
[12]   A. Yeah, right around there. Well, usually we
[13] have monthly meetings also, and that was kind of --
[14] the question was asked to dissolve the rumors: "Is
[15] there going to be a sell of the board shop, our
[16] division?" And they sat there and they said "No."
[17] So that was at one of -- I do believe that was -- it
[18] could have been right around April or May's monthly
[19] meeting that we had in the cafeteria.
[20]   Q. When is the next time you remember it being
[21] discussed with any manager at Bayer?
[22]   A. When they came out and basically told us it
[23] was going to happen.
[24]   Q. Was this a meeting at the cafeteria?

Page 12

[1]    A. Yes.
[2]    Q. Was Mr. Paige there?
[3]    A. That I can't remember.
[4]    Q. Do you remember any of the managers who
[5] were there?
[6]    A. Rodney Willis was there. I do remember
[7] Dick Ramsden was there. I'm not sure about Norm
[8] Fontaine.
[9]    Q. How about Mary Leonard?
[10]   A. I think she was, but I can't be for
[11] certain.
[12]   Q. You don't recall if Mr. Paige was there?
[13]   A. No.
[14]   Q. Can you tell me, to the best of your
[15] memory, what was said at that meeting?
[16]   A. What was said at the meeting was they were
[17] looking into a sale of the division towards EFTC.
[18] Then we had some folks raise their hands about
[19] asking about a severance package.
[20]   Q. Do you remember who raised their hands?
[21]   A. Robert Brown and I do believe Kathy
[22] Sweeney.
[23]   Q. Did both of those individuals actually ask
[24] about severance?

Page 13

[1] A. We were asked -- I remember Bobby asked,
[2] "Do we have to go to EFTC? Are we going to get a
[3] severance package? Take a volunteer layoff?" Which
[4] Bayer always had that.
[5] Q. Did someone respond to Mr. Brown?
[6] A. They said "No."
[7] And then Kathy asked, "Well, if we
[8] volunteer, can we voluntarily be laid off?" Because
[9] usually Bayer always gave that option to some of the
[10] people that were there for a while, the elderly.
[11] And Rodney Willis just basically out and out,
[12] because of all the questions that were being asked,
[13] turned around and told her to "Shut up, sit down,
[14] quit being a baby. You either go or you don't have
[15] a job."
[16] Q. That's what he said?
[17] A. That's basically what he said, yes.
[18] Q. Shut up, sit down?
[19] A. And just deal with it.
[20] Q. Now, is this a quote? Did Rodney actually
[21] use the words "deal with it"?
[22] MR. ROACH: Objection. Go ahead. You can
[23] answer.
[24] A. What his words were: "Sit down, quit being

Page 14

[1] a baby, shut up, and just deal with it. You either
[2] go or you don't have a job."
[3] Q. At the meeting did anyone talk about what
[4] the salaries would be at EFTC?
[5] A. We were told they were going to be
[6] comparable.
[7] Q. The salaries?
[8] A. Salaries would be comparable, yes.
[9] Q. Did anyone talk about where the jobs would
[10] be located?
[11] A. No. We were going to stay in our Building
[12] 80.
[13] Q. Did anyone talk about benefits?
[14] A. We were told the benefits would be
[15] comparable.
[16] Q. Did anyone talk about severance pay other
[17] than -- either from --
[18] A. That was one of the main topics was a
[19] severance package. Most people would have taken a
[20] layoff if there was a severance package.
[21] Q. Now, other than Mr. Brown and Kathy
[22] Sweeney, did anyone else say anything about
[23] severance during the meeting?
[24] MR. ROACH: Objection. You mean a question

Page 15

[1] from the --
[2] MR. WELSH: From any of the board shop
[3] employees. Thank you.
[4] A. There was quite a few, there was quite a
[5] few. People were more concerned, are we going to
[6] get a severance package.
[7] Q. Is it fair to say --
[8] MR. ROACH: Let him finish the answer.
[9] Q. I'm sorry, I thought you were done.
[10] A. They were concerned about: Are we going to
[11] get a severance package? Are we going to be able to
[12] take a voluntary layoff? Things like this. Because
[13] it just -- it was a shock.
[14] Q. But it was more than just Robert Brown and
[15] Kathy Sweeney who asked about voluntary layoffs and
[16] are we going to get a severance package?
[17] A. Yes. I do believe Jeanne Skene. What's
[18] his name. Vinnie.
[19] Q. Fiorilla?
[20] A. Yes.
[21] Q. Did he ask the question?
[22] A. He was asking questions also.
[23] Q. Do you remember any of the questions he
[24] asked?

Page 16

[1] A. That I couldn't -- I really don't remember.
[2] Q. Now, you said you talked about a sale of
[3] the division. Was it your understanding that the
[4] entire AGFA Division was being sold to EFTC?
[5] MR. ROACH: Objection.
[6] A. I was under the assumption it was a
[7] division.
[8] Q. At this meeting you attended where Bob
[9] Brown asked this question, did they indicate to you
[10] that it was the board shop that was being sold?
[11] A. It was said that it was our division that
[12] was going.
[13] Q. When you say "our division," are you making
[14] reference to the board shop?
[15] A. Yeah.
[16] MR. ROACH: Is that a "yes"?
[17] A. Yes.
[18] Q. Did you believe anything other than the
[19] board shop was going to EFTC at that time?
[20] A. It's the assembly area, stockroom, things
[21] like that.
[22] Q. When you talk about the assembly area and
[23] the stockroom, that would be parts of the board
[24] shop?

**Page 17**

[1] A. Yes.
[2] Q. It might sound repetitive, but I have to
[3] make it clear.
[4]     You didn't understand that other aspects of
[5] the AGFA Division were being sold other than the
[6] board shop were going to EFTC, did you?
[7]     MR. ROACH: Objection. You can answer.
[8] A. No.
[9] Q. Another way of asking is: It was your
[10] understanding at that time that while the board shop
[11] was going to EFTC, other aspects of the AGFA
[12] Division, Wilmington were not, they were going to
[13] remain in place; is that correct?
[14]     MR. ROACH: Objection. You can answer.
[15] A. No, I wasn't sure what they were going to
[16] do at this particular time.
[17] Q. Now, do you recall anything else being said
[18] at this meeting where they announced the transaction
[19] to EFTC?
[20] A. No.
[21] Q. When is the next time you were present for
[22] any conversation, either a small meeting, a big
[23] meeting or one-on-one-type conversation with any
[24] manager from Bayer at which time the EFTC

**Page 18**

[1] transaction or severance was discussed?
[2] A. We were at -- let's see -- July/August time
[3] frame. We had another group called into the
[4] cafeteria, everybody, and that's when it was asked
[5] again, "Can we volunteer?"
[6] Q. Do you recall who asked?
[7] A. No, I can't.
[8] Q. Do you remember who was at the meeting?
[9] A. I do want to say Norm Fontaine, but I can't
[10] be certain on him. Dick Ramsden was there. A
[11] gentleman from EFTC was there.
[12] Q. Jack Calderone?
[13] A. I do believe so, yes, he was there. This
[14] is close to the last meeting.
[15] Q. Rodney Willis?
[16] A. Rodney Willis was also there, I do believe.
[17] Q. Mary Leonard?
[18] A. I'm trying to remember what she looked
[19] like.
[20] Q. Dark haired, Asian?
[21]     MR. ROACH: Objection.
[22] A. No.
[23] Q. Okay.
[24] A. I can't say for certain.

**Page 19**

[1] Q. Was Mr. Paige there, do you know?
[2] A. I can't remember that.
[3] Q. Do you remember Mr. Calderone said anything
[4] to the employees during that meeting?
[5] A. We were told it was going to be basically a
[6] win/win situation.
[7] Q. Did Mr. Calderone use that term?
[8] A. That was always kind of like the term they
[9] used, it was going to be a win/win situation.
[10] Q. Do you remember if Mr. Calderone talked to
[11] the employees during that meeting?
[12] A. I do believe he did, yes.
[13] Q. Do you remember what he said?
[14] A. Something to do with looking forward to
[15] having the experienced people from the board shop
[16] working at EFTC.
[17] Q. Do you remember anything else?
[18] A. No.
[19] Q. Do you remember him talking about the fact
[20] that EFTC did not have a pension?
[21] A. No.
[22] Q. Now, you recall some employee, you don't
[23] remember who, asked, "Can we volunteer for
[24] layoff" --

**Page 20**

[1] A. Yes.
[2] Q. -- "and get severance?"
[3]     MR. ROACH: Is that a "yes"?
[4] A. Yes.
[5] Q. Do you remember any other employees asking
[6] questions at this meeting?
[7] A. There were a lot of questions being asked;
[8] I couldn't tell you basically offhand who the
[9] persons were.
[10] Q. Can you tell me the topics?
[11] A. A lot were to do with benefits, severance,
[12] comparability and pay scales. And another thing
[13] was, "Could we take a volunteer layoff?"
[14] Q. Were there any questions about what
[15] severance benefits EFTC provided their employees?
[16] A. They were just told they were comparable.
[17] Everything was always the word "comparable."
[18] Q. Did you at some point form an opinion as to
[19] whether or not the EFTC benefits were better than,
[20] equal to, or worse than Bayer's benefits?
[21] A. I didn't find that out until after.
[22]     MR. ROACH: Objection.
[23] A. After I was hired by EFTC.
[24] Q. Was it after you actually were working for

Page 21

[1] EFTC?
[2] A. Yes.
[3] Q. How long after?
[4] A. I would want to say when we did the renewal
[5] on the benefits, the out-of-pocket was unbelievable.
[6] Q. When you say you did the renewal, can you
[7] describe to me what you're referring to?
[8] A. We had our benefits, okay. You had to do a
[9] different benefit package. That's when we found
[10] out.
[11] Q. So it's when you signed up for EFTC
[12] benefits?
[13] MR. ROACH: Objection.
[14] A. Yes.
[15] Q. Did you complain to anyone when you found
[16] out that they were worse?
[17] MR. ROACH: Objection.
[18] Q. When you found out the benefits were worse?
[19] A. I think I went to Burt and Vinnie, I says,
[20] "These aren't the same. They're not what we were
[21] told."
[22] Q. What did they say?
[23] A. They were going to look into it.
[24] Q. Did he ever get back to you on it?

Page 22

[1] A. Um-hum.
[2] MR. ROACH: Is that a "yes"?
[3] A. Yes.
[4] Q. What did they say?
[5] A. This is just the way it was happening.
[6] Basically lied to.
[7] Q. Now, when you signed up for EFTC benefits,
[8] did you meet with anyone from EFTC?
[9] MR. ROACH: Objection.
[10] A. Yes. A human resource person, a young
[11] girl, I can't remember what her name is.
[12] Q. Staci Landress?
[13] A. I do believe so, yes.
[14] Q. Did you state anything to her about the
[15] benefits?
[16] A. I do remember stating to her that "They're
[17] not what we were told they were going to be."
[18] Because I have a disabled son, and they didn't cover
[19] him.
[20] Q. Is it because of preexisting illness?
[21] A. Yes.
[22] Q. Were you able to continue coverage under
[23] the Bayer plan for a while for your son?
[24] A. That I can't answer, I don't know, I can't

Page 23

[1] remember that far back. I know when we did go to
[2] the benefits that my son, Eddie, wasn't covered
[3] anymore on certain things.
[4] Q. On EFTC's?
[5] A. On EFTC's, yeah. I took a beating.
[6] Q. Did you once attend a meeting with AGFA
[7] Division HR where they went over with you what was
[8] going to happen to your AGFA benefits once you
[9] transferred to EFTC?
[10] MR. ROACH: Objection.
[11] A. No, I don't recall that.
[12] Q. I want to show you a document that's been
[13] marked Fiorilla 2. If you could look through that.
[14] Do you remember going to a meeting at which slides
[15] that are reflected on this exhibit were shown to
[16] employees?
[17] MR. ROACH: Objection.
[18] A. No.
[19] Q. You can put that aside now.
[20] I'm going to show you a document that's
[21] been marked for identification as Fiorilla 3. This
[22] is an offer letter that went to one of the board
[23] shop employees, David Dolan. Did you also receive
[24] an offer letter from EFTC?

Page 24

[1] MR. ROACH: Objection. You can answer.
[2] A. Yes, I did.
[3] Q. Do you have a copy of your offer letter
[4] from EFTC?
[5] A. No, I don't.
[6] Q. Do you have any documents from EFTC?
[7] A. Not anymore, no.
[8] Q. Do you have any documents from Bayer?
[9] A. I have a couple of old booklets.
[10] Q. Those old booklets like Exhibit 52, Summary
[11] Plan Description?
[12] A. No, I don't have that one. I just have
[13] what they sent me in the mail once in a while.
[14] Q. After you left Bayer?
[15] A. It has to do with my retirement.
[16] Q. You can put that aside.
[17] I pointed to it before, I'm going to point
[18] to this document again, it's Willis Exhibit 52, the
[19] Summary Plan Description, a thick booklet. Do you
[20] recall receiving a copy of this in the mail at home
[21] around 1995?
[22] A. I received a lot of books in the mail.
[23] Yes.
[24] Q. Did you every year or so get some kind of

Page 25

[1] publication, some kind of mailing from Bayer that
[2] had changes to the benefit programs as well?
[3]     MR. ROACH: Objection. You can answer.
[4]   A. Yes.
[5]   Q. Did you ever review, any time prior to
[6] September 1, 1998, did you ever review the Summary
[7] Plan Description to see what your severance pay
[8] rights were?
[9]   A. No, I didn't, because we were always told
[10] that there would be a severance package.
[11]   Q. At the time you were at meetings in 1998
[12] when you were told that there would be no voluntary
[13] layoffs offered, at that point in time did you
[14] review the Summary Plan Description to see what your
[15] rights were to severance pay?
[16]   A. No, I didn't.
[17]   Q. Do you recall, at that time did you talk to
[18] other people, other coworkers in the board shop,
[19] concerning whether or not employees had a right, an
[20] entitlement to severance pay?
[21]   A. We all thought we did, because of all the
[22] other times that they've had a voluntary layoff, and
[23] every time they've had a layoff, they've always had
[24] a severance package.

Page 26

[1]   Q. Did you talk to Vinnie Fiorilla about that?
[2]   A. I could have, but I can't be certain.
[3]   Q. Do you know, at that time did you talk to
[4] Bert Guilmette about that?
[5]   A. I asked Bert if we were going to get -- "Do
[6] you think that we would get a severance package?"
[7]   Q. What did he say to you?
[8]   A. I said, "Aren't we entitled to it?" And he
[9] turned around at the time and did not know.
[10]   Q. Did he ever come back to answer your
[11] question?
[12]   A. To be honest with you, I can't answer that,
[13] I don't know.
[14]   Q. Did you ever talk to anyone from HR about
[15] the severance benefits?
[16]     MR. ROACH: You mean in 1998 --
[17]     MR. WELSH: In 1998.
[18]   A. Only at the meetings.
[19]   Q. You had no one-on-one meetings with anyone?
[20]   A. Not that I can remember right now, no.
[21]   Q. Other than what you've testified to earlier
[22] today, did you have any one-on-one meetings with
[23] Bayer managers about the severance pay benefits?
[24]   A. No, never one-on-one.

Page 27

[1]   Q. Ever talk to Ramsden about it?
[2]   A. Not one-on-one, no. It was always with a
[3] group.
[4]   Q. We talked about two large group meetings in
[5] the cafeteria. Did you attend any other meetings at
[6] which severance benefits or the EFTC transaction was
[7] discussed, other than those two big meetings you've
[8] already talked about?
[9]     MR. ROACH: Objection. You're not
[10] including discussions among employees?
[11]     MR. WELSH: No. Talking about the
[12] meetings.
[13]     MR. ROACH: All right.
[14]   A. Not that I can remember, no.
[15]         (Document marked as Lascelles
[16]         Exhibit 1 for identification)
[17]   Q. Sir, I've placed in front of you a document
[18] that's been marked for identification as Exhibit 1.
[19] Is that your signature about two thirds of the way
[20] down the page?
[21]   A. Yes.
[22]   Q. Is this an application you submitted to
[23] EFTC for life and accidental death and
[24] dismemberment?

Page 28

[1]   A. Um-hum.
[2]   Q. Is that a "yes"?
[3]   A. Yes.
[4]   Q. When you submitted this to EFTC, did they
[5] give you a brochure which outlined the life
[6] insurance and the accidental death and dismemberment
[7] policies they had in place?
[8]   A. I do believe they did.
[9]   Q. You can put that aside.
[10]         (Document marked as Lascelles
[11]         Exhibit 2 for identification)
[12]   Q. Sir, I have placed in front of you a
[13] document that's been marked for identification as
[14] Exhibit 2. Is this a copy of a Retirement Plan
[15] Beneficiary Designation that you submitted to EFTC
[16] on or about August 24, 1998?
[17]     MR. ROACH: Objection. You can answer.
[18]   A. No. Principal I had with Bayer.
[19]   Q. Okay.
[20]   A. (Witness reviews document) Or did I? It
[21] has my signature on it, so it must be.
[22]   Q. Do you recall as you sit here today for
[23] sure whether or not the Principal Financial Group
[24] coverage was through Bayer or EFTC?

Page 29

[1]     MR. ROACH: Objection.
[2]   A. No.
[3]   Q. You can put that aside.
[4]     MR. WELSH: Can you please mark this as
[5] Exhibit 3.
[6]         (Document marked as Lascelles
[7]         Exhibit 3 for identification)
[8]   Q. Sir, I've placed in front of you Exhibit 3.
[9] Is this a Voluntary Group Life Enrollment Form that
[10] you submitted to EFTC?
[11]     MR. ROACH: Objection.
[12]   A. Yes.
[13]   Q. On the bottom, is that your signature on
[14] the bottom?
[15]   A. Yes.
[16]   Q. You signed this and submitted it on August
[17] 24, 1998?
[18]     MR. ROACH: Objection. You can answer. Go
[19] ahead.
[20]   A. Yes.
[21]   Q. Page 2, is that your signature? And let me
[22] start with that. Is that your signature on the
[23] bottom of the page?
[24]   A. Yes.

Page 30

[1]   Q. You signed that on August 24, 1998?
[2]   A. Um-hum.
[3]     MR. ROACH: Is that a "yes"?
[4]   A. Yes.
[5]         (Document marked as Lascelles
[6]         Exhibit 4 for identification)
[7]   Q. I've placed in front of you, sir, Exhibit
[8] 4. Is that an Application for Membership for One
[9] Health Plan that you submitted to EFTC on August 27,
[10] 1998?
[11]   A. Yes.
[12]   Q. At the time -- if I have this right, when
[13] you submitted this application, it was for One
[14] Health Plan HMO and Great-West Dental; is that
[15] correct?
[16]   A. Yes, I see it.
[17]   Q. When you filled this out, had you been
[18] given a copy of a medical plan brochure which
[19] outlined EFTC's medical benefits?
[20]   A. Yes, I do believe so.
[21]   Q. At the time that you filled this out, were
[22] you aware that EFTC's medical benefits were not as
[23] generous as those of Bayer's?
[24]   A. I can't remember that, but I don't believe

Page 31

[1] so, because that's one thing I asked, I says, "I
[2] have to have medical coverage to cover my son."
[3] They told me it was comparable.
[4]   Q. That was someone from EFTC?
[5]   A. Yes.
[6]   Q. Do you remember the name of that person?
[7]   A. I think that was Staci that I was with. I
[8] can't be sure.
[9]   Q. I may have asked you this earlier; if I
[10] did, I apologize. Do you have a copy of the
[11] brochure they gave you?
[12]   A. No, I don't.
[13]   Q. Did you read the brochure to see if it had
[14] coverage for your son's condition?
[15]   A. They covered some but not the rest, no.
[16]   Q. I guess my question to you is, did you
[17] review the literature when they handed it to you to
[18] see if it had full coverage for your son?
[19]     MR. ROACH: Objection. When?
[20]     MR. WELSH: At the time he filled this out,
[21] August 27.
[22]   A. No. They told me to take it home and read
[23] over it.
[24]   Q. Did you?

Page 32

[1]   A. Somewhat.
[2]   Q. You didn't read it fully?
[3]   A. No, I didn't read it fully.
[4]   Q. You can put that aside too, sir.
[5]     MR. ROACH: Off the record just for a
[6] second.
[7]         (Discussion off the record)
[8]     MR. WELSH: Can you mark this as the next
[9] exhibit.
[10]         (Document marked as Lascelles
[11]         Exhibit 5 for identification)
[12]   Q. Sir, I show you a document, at the top it
[13] says "EFTC Corporation Enrollment Information."
[14] Then on the bottom of this document, is that your
[15] signature?
[16]   A. Yes.
[17]   Q. Did you sign it on August 20, 1998?
[18]   A. Um-hum.
[19]   Q. Is that a "yes"?
[20]   A. Yes.
[21]   Q. Up where it says "Contributions" and
[22] "defer," did you put that 4 percent in there?
[23]   A. I don't have 4 percent.
[24]     MR. ROACH: Where is the 4 percent?

Page 33

[1]   MR. WELSH: Up under B, defer, and then
[2] there's a blank.
[3]   A. Yes.
[4]   Q. Did you attend a meeting at which the EFTC
[5] 401(k) plan was discussed prior to signing this
[6] document?
[7]   A. That I can't remember.
[8]   Q. Do you recall at the time you signed this
[9] document whether or not you had determined whether
[10] the EFTC 401(k) plan was better than, equal to, or
[11] worse than the Bayer 401(k) plan?
[12]   A. No, I thought it was going to be
[13] comparable.
[14]   Q. Do you recall having any discussion about
[15] matching contributions at the time you signed this
[16] document?
[17]   A. No, I don't, I don't recall.
[18]   Q. Do you recall at the time you signed this
[19] document if there was any discussion of pension
[20] plans?
[21]   A. When I was in the process of doing all
[22] this, I was told I was either going to go to EFTC or
[23] not have a job.
[24]   Q. Right.

Page 34

[1]   A. So having a disabled child, I had no
[2] choice.
[3]   Q. But I guess my question to you is, before
[4] you went to EFTC, were you aware that they did not
[5] have a pension plan?
[6]   A. No.
[7]   Q. So you thought they had a pension plan?
[8]   A. I thought they did, yes.
[9]   MR. WELSH: Mark this as the next exhibit,
[10] please.
[11]       (Document marked as Lascelles
[12]        Exhibit 6 for identification)
[13]   Q. Sir, I've placed in front of you a document
[14] marked for identification as Exhibit 6. Is this an
[15] application for employment that you submitted to
[16] EFTC on August 18, 1998?
[17]   MR. ROACH: Objection. You can answer.
[18]   A. Yes.
[19]   Q. Is that your signature on the bottom of the
[20] second page?
[21]   A. Yes, it is.
[22]   Q. When you went to EFTC, were you paid the
[23] same hourly wage as you'd been receiving at Bayer?
[24]   A. Actually, no, I wasn't.

Page 35

[1]   Q. How was it different?
[2]   A. I do believe I took a pay cut. I'm not
[3] sure.
[4]   Q. Do you recall how much you were making at
[5] Bayer before the transaction?
[6]   A. Somewhere right around $16, $17 or so. I
[7] can't remember. You're talking a lot of time ago.
[8]   Q. I know. When you said "or so," that's what
[9] I'm kind of drilling in on.
[10]   MR. WELSH: Please mark this.
[11]       (Document marked as Lascelles
[12]        Exhibit 7 for identification)
[13]   Q. I've placed in front of you, sir, a
[14] document that's been marked as Exhibit 7. Is that
[15] your signature on the bottom right-hand corner?
[16]   A. Yes, it is.
[17]   Q. You signed this on August 27, 1998?
[18]   A. Um-hum.
[19]   Q. Is that "yes"?
[20]   A. Yes.
[21]   MR. ROACH: Just off the record for a
[22] minute.
[23]       (Discussion off the record)
[24]   Q. This seems to indicate on it that effective

Page 36

[1] September 1, '98, you were to be paid $16 an hour.
[2] Do you see that?
[3]   A. Yes.
[4]   Q. Do you have any reason to believe that this
[5] is inaccurate?
[6]   A. No.
[7]   MR. WELSH: Let's take a short break. I
[8] have to go and see if I have some documents showing
[9] what your Bayer pay was. We'll take a break. You
[10] can walk around; it will be about three minutes.
[11]       (Recess from 2:57 to 3:02 p.m.)
[12]   BY MR. WELSH:
[13]   Q. Sir, do you recall whether or not at the
[14] time of the transaction with Bayer you were making
[15] $15.11 per hour?
[16]   A. (Witness shakes head)
[17]   MR. ROACH: You have to answer. Nods of
[18] the head don't work.
[19]   A. No. I thought it was more.
[20]       (Document marked as Lascelles
[21]        Exhibit 8 for identification)
[22]   Q. I understand. I'm going to show you a
[23] document, sir. I represent to you I took it from
[24] your personnel file; it was just sitting here in

Page 37

[1] front of me. And this is the last pay entry I find
[2] on it, and it shows a percentage increase of 2.72
[3] percent and a new hourly rate of $15.11 per hour,
[4] effective date, April 1, 1998.
[5]     Do you have any reason to believe this is
[6] not an accurate statement of what your hourly rate
[7] was for '98?
[8]  A. No, I don't.
[9]  MR. WELSH: Just for the record, Steve, I
[10] have the personnel file here, if you want. I'm not
[11] going to put anything else in from it, but it's
[12] here.
[13]  MR. ROACH: Thank you.
[14]  Q. Sir, you can put that aside. Thank you.
[15]     Up until September 1, 1998, did you ever
[16] hear any of your coworkers in the board shop
[17] complain that they do not believe that the benefits
[18] of EFTC were as good as the benefits of Bayer?
[19]  MR. ROACH: Objection.
[20]  A. No.
[21]  Q. Did you ever hear any -- up until September
[22] 1, 1998, did you ever hear any of your coworkers
[23] complain that they thought they should have been
[24] paid severance pay?

Page 38

[1]  A. Yes. We always thought we should have got
[2] a severance package.
[3]  Q. Do you recall --
[4]  A. It was just a thing that Bayer did.
[5]  Q. Do you recall any other time prior to 1998
[6] when Bayer sold a business operation to another
[7] company?
[8]  MR. ROACH: Objection.
[9]  A. No.
[10]  Q. Did you talk to anyone in August or
[11] September 1998 about filing a claim for severance
[12] benefits?
[13]  MR. ROACH: Objection.
[14]  A. No.
[15]  Q. Do I understand your testimony correctly,
[16] sir, that because you had a disabled child, you felt
[17] you had no choice but to accept employment with
[18] EFTC?
[19]  MR. ROACH: Objection.
[20]  A. Yes. I would have taken a layoff if...
[21]  MR. ROACH: Finish your answer.
[22]  A. They told us we had a severance package. I
[23] would have taken it, I wouldn't have went with EFTC.
[24]  Q. Why?

Page 39

[1]  A. At the time I just didn't want to go. I
[2] figured that they've always had -- Bayer always had
[3] a place for people in the other divisions that had
[4] backgrounds in it.
[5]  Q. Are you aware of any other printed
[6] circuit board operation in the Bayer divisions as of
[7] 1998, other than the one in Wilmington where you
[8] worked?
[9]  A. That's the only one that I knew of.
[10]  Q. Do you know of any vacancies at Bayer that
[11] you were qualified for but were not allowed to
[12] transfer into in August/September of 1998?
[13]  A. The assembly area and mechanics area.
[14]  Q. And the assembly area, was that in the
[15] board shop area?
[16]  A. No, it's not. It's another part of Bayer.
[17]  Q. Is there any other way you can describe it
[18] for me?
[19]  A. Also machine shop, model shop.
[20]  Q. Were there openings there?
[21]  A. At the time I don't believe there were.
[22]  Q. Were you aware of any openings in any of
[23] these other places?
[24]  A. No, no.

Page 40

[1]  Q. Is there any reason why you wanted to stay
[2] with Bayer as opposed to going to EFTC?
[3]  A. I had 25 years with the company, 24, 25
[4] years with the company. I figured I'd retire from
[5] there.
[6]  Q. No other reasons?
[7]  MR. ROACH: Objection.
[8]  A. The benefits were great.
[9]  Q. But you believed the benefits at EFTC were
[10] comparable, didn't you?
[11]  A. That's what we were told, yes.
[12]  Q. Did you believe it?
[13]  MR. ROACH: Objection.
[14]  A. At the time, yes, I did.
[15]  Q. Were you aware of any --
[16]  A. I had nothing to fear, because when we were
[17] told that they were comparable, we always believed
[18] the management staff. They never had reason -- you
[19] never had a reason to doubt them.
[20]  Q. Did you ever have any conversation with any
[21] coworkers about e-mails that had been received from
[22] EFTC employees in other locations?
[23]  A. No, no.
[24]  Q. Did you ever hear anyone saying that EFTC

Page 41

[1] was a bad place to work?
[2]  A.  No. We were told at a meeting that the
[3] reason why EFTC wanted us is because of the
[4] experience of the people that were there. I mean,
[5] you had an outstanding workforce.
[6]  Q.  Do you remember which meeting that was?
[7]  A.  I do believe that was the one in the
[8] July/August time frame.
[9]  Q.  Is that the one with Mr. Calderone there?
[10]  A.  Yes. That's another time it was brought up
[11] as a win/win situation. I knew -- I can't remember
[12] what the word was they used. I'm sorry, I can't
[13] remember the word he used.
[14]  Q.  How did you come to leave EFTC?
[15]  A.  I was laid off.
[16]      MR. WELSH:  Can you please mark this as the
[17] next exhibit.
[18]      (Discussion off the record)
[19]      MR. ROACH:  We should strike any reference
[20] to Exhibit 9.
[21]  Q.  I'm putting a document in front of you,
[22] sir. Is this the Release and Severance Agreement
[23] you signed at the time of your -- I'm sorry. Strike
[24] that. That's not yours. I'll probably have to go

Page 42

[1] back to my office to see if I can get the original
[2] one.
[3]      So at the time you left EFTC, did you seek
[4] further employment in the electronics area,
[5] electronics manufacturing area?
[6]  A.  No, I didn't.
[7]  Q.  Any reason why not?
[8]  A.  I have a welding background. I was a
[9] steelworker, ironworker. I have a welding
[10] background, and I preferred to go back into welding.
[11] That's basically how I ended up in the board shop.
[12]      MR. WELSH:  I have no further questions.
[13]            **CROSS EXAMINATION**
[14] BY MR. ROACH:
[15]  Q.  Mr. Lascelles, did you ever sit down
[16] before you left and went to EFTC and do a
[17] benefit-by-benefit comparison of Bayer and EFTC?
[18]  A.  No, I didn't. I was always told it was
[19] going to be comparable. So anybody tells you it's
[20] going to be comparable, you're thinking it's okay,
[21] it's going to be almost the same.
[22]  Q.  Did you have any reason to doubt what you
[23] were told in that regard?
[24]  A.  No.

Page 43

[1]  Q.  Why not?
[2]  A.  Because these people never lied to us. You
[3] always could trust Mr. Ramsden, Norm Fontaine and
[4] stuff like that, they always basically told you the
[5] truth. I mean, you never had a reason to doubt
[6] them. I was with them for 24 years.
[7]  Q.  Can you tell me, you mentioned the model
[8] shop. Was that also called the machine shop?
[9]  A.  That's what it was, it was the machine
[10] shop.
[11]  Q.  That was the shop that was laid off after
[12] you left EFTC?
[13]  A.  Yes.
[14]  Q.  When Mr. Calderone was at the meeting, the
[15] second meeting, which you had in the July/August
[16] time frame, did he use the words "win-win," do you
[17] remember?
[18]  A.  Yes.
[19]  Q.  What did he say, if you can remember?
[20]  A.  He was looking forward to our division
[21] going with him, due to the fact it was going to be a
[22] win/win situation, because everything was comparable
[23] to basically what Bayer had. And we had no reason
[24] to doubt anybody; we all thought, okay.

Page 44

[1]  Q.  Can you tell me -- you talk about the
[2] voluntary layoff, do you know, do you remember any
[3] people specifically that you knew who volunteered
[4] for a layoff and received severance?
[5]  A.  Yes.
[6]  Q.  Can you tell us who?
[7]  A.  It was November before this happened. We
[8] had a layoff.
[9]  Q.  November of '97?
[10]  A.  Of '97, just before Thanksgiving time.
[11]  Q.  What happened?
[12]  A.  They had a group of people that were
[13] outside our area and another area, and it was all
[14] through Bayer at the time, different buildings were
[15] getting hit. It was quite a few people that got
[16] laid off that day. It's always sad when you go
[17] through this anyways.
[18]      One of the gentlemen was fairly elderly
[19] himself, Jerry Landron, and we were all sitting
[20] in -- well, we weren't sitting, we were standing.
[21] The hallway comes down going past our area between
[22] the board shop -- between the plating room and the
[23] waste treatment area, there's a hallway. And they
[24] were leading -- if you volunteered ahead of time,