Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

---

**Page 1**

Volume I
Pages 1 to 77
Exhibits 1 and 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - -x
:
JOSEPH ATTARDI, et al.,          :
        Plaintiffs,              :
                                 :
    vs.                          :   Civil Action
                                 :   No. 04-10728-REK
BAYER CORPORATION, BAYER         :
CORPORATION SEVERANCE PAY        :
PLAN,                            :
        Defendants.              :
                                 :
- - - - - - - - - - - - - - - - -x

        DEPOSITION OF ROBERT D. BROWN, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before Anne
H. Bohan, Registered Diplomate Reporter and Notary
Public in and for the Commonwealth of Massachusetts,
at the Offices of Doris O. Wong Associates, 50
Franklin Street, Boston, Massachusetts, on Tuesday,
November 21, 2006, commencing at 10:04 a.m.
PRESENT:
    Roach & Wise, LLP
        (by Stephen A. Roach, Esq.)
        31 State Street, Boston, MA 02109-2705,
        for the Plaintiffs.
    Bello Black & Welsh LLP
        (by John F. Welsh, Esq.)
        One Exeter Plaza, 10th Floor,
        699 Boylston Street, Boston, MA 02116,
        for the Defendants.
ALSO PRESENT:  Teresa C. Ornelas
        * * * *

---

**Page 2**

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| ROBERT D. BROWN | | | | |
| BY MR. WELSH | 3 | | 74 | |
| BY MR. ROACH | | 72 | | |

        * * * *

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Compendium exhibit of documents contained in Mr. Brown's personnel file, the first of which is entitled "Release and Severance Agreement" and dated 4/18/01 | 52 |
| 2 | Photocopy of Bayer Benefits Center envelope with attached letter dated December 1999 to Mary J. Corcoran | 63 |

        * * * *

---

**Page 3**

[1]        P R O C E E D I N G S
[2]    MR. WELSH:  Steve, we'll continue the same
[3] stipulations as we've had throughout this matter?
[4]    MR. ROACH:  Correct.
[5]        ROBERT D. BROWN
[6] a witness called for examination by counsel for the
[7] Defendants, having been satisfactorily identified by
[8] the production of his driver's license and being
[9] first duly sworn by the Notary Public, was examined
[10] and testified as follows:
[11]        DIRECT EXAMINATION
[12]    BY MR. WELSH:
[13]    Q.  Sir, could you please state your full name.
[14]    A.  Robert Davis Brown.
[15]    Q.  Where do you live, Mr. Brown?
[16]    A.  In Methuen, Massachusetts.
[17]    Q.  Can you tell me the street address?
[18]    A.  80 Brown Street.
[19]    Q.  How long have you lived there?
[20]    A.  30 years.
[21]    Q.  Are you currently employed?
[22]    A.  Yes.
[23]    Q.  By whom?
[24]    A.  Sheehan's Towing Company.

---

**Page 4**

[1]    Q.  Where is that located?
[2]    A.  It's on Lawrence Street in Methuen.
[3]    Q.  How long have you worked for Sheehan's?
[4]    A.  Just over a year.
[5]    Q.  Taking you back a while, were you initially
[6] employed by Compugraphic Corporation?
[7]    A.  Yes.
[8]    Q.  Do you recall what the year of your hire
[9] was?
[10]    A.  1972.
[11]    Q.  Do you recall what job you were hired into
[12] by Compugraphic?
[13]    A.  Yes.  An electromechanical assembler.
[14]    Q.  Could you summarize for me your educational
[15] background.
[16]    A.  I have a degree, a B.S. in education, with
[17] a major in history and English and a minor in
[18] psychology.
[19]    Q.  Where is it from?
[20]    A.  This is from Athens College in Athens,
[21] Alabama, an extension of the University of Alabama.
[22]    Q.  And your year of graduation?
[23]    A.  1969.
[24]    Q.  Now, since your graduation in '69, have you

---

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

---

Page 5

[1] had any other formal education?
[2]    A.  No.
[3]    Q.  Have you ever been deposed before?
[4]    A.  No.
[5]    Q.  Did you talk with anyone to prepare for
[6] today's deposition?
[7]    A.  I spoke with Steve.
[8]    Q.  Other than Mr. Roach did you speak with
[9] anybody?
[10]    A.  No.
[11]    Q.  How many times did you speak with Mr. Roach
[12] to prepare for today's deposition?
[13]    A.  Once.
[14]    Q.  When was that?
[15]    A.  That was last Tuesday.
[16]    Q.  Sir, do you believe that you're entitled --
[17] strike that.  Do you believe you're entitled to
[18] severance benefits from Bayer Corporation?
[19]    A.  Yes.
[20]    Q.  Why?
[21]    A.  It was my experience through the 15 years
[22] that I was with them that...
[23]       MR. ROACH:  I'm going to object to the
[24] question.  Go ahead.  You can answer.

---

Page 6

[1]    A.  It was my experience that people who
[2] requested to leave and had seniority were entitled
[3] to severance.
[4]    Q.  Can you identify any particular person who
[5] you believe requested to leave and was paid
[6] severance?
[7]    A.  I know the names of some people who
[8] received severance, yes.  Lenny Fillipone, Suzanne
[9] Ouellette, Rosell Therriault, Kerry Emond, Peggy
[10] Shabot, Mary Hartman, Joe Oliveirio.  I remember a
[11] lot of faces, but I don't remember that many names.
[12]    Q.  Do you recall of the names you just listed,
[13] Lenny Fillipone, Suzanne Ouellette, Rosell
[14] Therriault, Kerry Emond, Peggy Shabot, Mary Hartman
[15] and Joe Oliveirio, to your knowledge, did they
[16] request to leave?
[17]    A.  Yes, for either medical reasons or in a
[18] layoff situation.
[19]    Q.  And each of those names I listed, each one
[20] of those people had, if you will, volunteered to
[21] leave?
[22]    A.  Yeah.
[23]       MR. ROACH:  Is that a "yes"?
[24]    A.  Yes.

---

Page 7

[1]    Q.  Now, you said your experience was 15 years.
[2] You started at Compugraphic the end of '72; is that
[3] right?
[4]    A.  Yes.
[5]    Q.  Were you continually employed by all
[6] Compugraphic's successors until the time of the EFTC
[7] transaction?
[8]    A.  Yes.
[9]    Q.  That was in 1998?
[10]    A.  Yes.
[11]    Q.  Drawing your attention to 1998, when did
[12] you first learn that EFTC was going to acquire the
[13] board shop?
[14]    A.  I believe late June or early July of '98,
[15] you know, I'm not exactly sure.  There were
[16] indications that they were trying to sell for some
[17] period of time, but the announcement of an actual
[18] transaction I don't believe occurred until July, I'm
[19] going to say July.
[20]    Q.  How did you actually learn of the sale
[21] itself?
[22]    A.  There was a large meeting in the cafeteria
[23] of all individuals who would be affected.
[24]    Q.  Do you recall who spoke at that meeting?

---

Page 8

[1]    A.  Michael Paige did most of the talking.  I
[2] believe Mr. Ramsden had a few words to say also.
[3]    Q.  Anyone else?
[4]    A.  I can't remember.  Mr. Rittenhaus I believe
[5] was there.
[6]    Q.  Are you sure of that?
[7]    A.  I'm not positive of that.
[8]    Q.  Anyone else from management you recall
[9] being at that meeting?
[10]    A.  I believe the majority of managers were
[11] there, but I don't think they spoke.
[12]    Q.  Do you remember whether or not Norm
[13] Fontaine was there?
[14]    A.  I'm pretty sure Norm Fontaine was there,
[15] yes.
[16]    Q.  During the meeting was anyone from EFTC
[17] introduced?
[18]    A.  At that meeting?
[19]    Q.  Yes.
[20]    A.  I don't believe so.
[21]    Q.  Now, I want to ask you -- I know it's been
[22] a long time, but to the best of your memory, can you
[23] tell me what was said at that meeting?
[24]    A.  Well, we were informed that an agreement

---

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

Page 9

[1] had been reached, and that it was a good deal for
[2] all of us, that it would be -- I believe the
[3] terminology was a win/win situation for everyone.
[4]    Q.  Who said win/win, do you recall?
[5]    A.  Michael Paige.
[6]    MR. ROACH:  Let him finish his answers.
[7] Did you finish your answer about what they said to
[8] you?
[9]    THE WITNESS:  Yes.
[10]    MR. ROACH:  Okay.
[11]    Q.  Other than Michael Paige, did anyone else
[12] use the term "win-win"?
[13]    A.  Not at that meeting that I can remember,
[14] but it was employed again afterwards.
[15]    Q.  I want to just focus on that meeting, I
[16] want to take you through, to the extent you
[17] remember, the later meetings.  But just this initial
[18] meeting where the sale was announced, a deal, an
[19] agreement had been reached, I think is the terms you
[20] used.  Do you remember anything else that was said
[21] at that meeting?
[22]    A.  No, sir.
[23]    Q.  Do you remember anything said about who
[24] EFTC was?  Again, that's at this first meeting where

Page 10

[1] the deal was announced.
[2]    A.  They told us it was an outfit that would
[3] specialize in a high-mix, high-yield environment.
[4]    Q.  Was anything said about where EFTC would
[5] conduct the printed circuit board business at this
[6] first meeting?
[7]    A.  Yes.
[8]    Q.  What did they say?
[9]    A.  That we would stay on location.
[10]    Q.  Was anything said about the wage rates that
[11] EFTC would offer?  Was anything said at this first
[12] meeting about the wages that they would offer?
[13]    A.  The wages would be comparable.
[14]    Q.  Is that the term they used?
[15]    A.  Yes.
[16]    Q.  Was anything said about a pension plan at
[17] the meeting?
[18]    A.  I don't recollect anything being said about
[19] a pension plan.
[20]    Q.  Did they tell you when they thought the
[21] transaction with EFTC would be completed at this
[22] first meeting?
[23]    A.  They gave a rough time frame, yes.  The
[24] transaction was to be completed within the month.

Page 11

[1] The move-in date wasn't specified, to the best of my
[2] knowledge, at that time, when they would actually
[3] take over.
[4]    Q.  Was anything said about EFTC offering
[5] employment to the board shop employees at this
[6] meeting?
[7]    A.  Yes.
[8]    Q.  What did they say on that?
[9]    A.  They said that they'd be interested in
[10] certain individuals, with their expertise.
[11]    Q.  Anything else?
[12]    A.  That would have been both for board
[13] fabrication, population and test.
[14]    Q.  So your recollection is, when they talked
[15] to the employees to announce the sale, they
[16] indicated they would be interested in certain
[17] individuals; is that the term they used?
[18]    A.  The best of my knowledge, yes.
[19]    Q.  Did they indicate who the individuals were?
[20]    A.  Not at that time specifically.
[21]    Q.  You said board fabrication, population.
[22] What's the third?
[23]    A.  Test.
[24]    Q.  Test.  Now, is it population assembly?

Page 12

[1]    A.  Yes.
[2]    Q.  During this first meeting were there any
[3] questions asked by anybody?
[4]    A.  I'm sure there were.
[5]    MR. ROACH:  Objection.  Go ahead.
[6]    A.  I don't recollect any specific questions at
[7] that initial meeting.
[8]    Q.  Is it fair to say you recall there were
[9] questions, but you don't remember them at this
[10] initial meeting?
[11]    A.  The questions concerned all the benefits
[12] and people were told everything would be comparable
[13] from vacation and sick --
[14]    Q.  Can you --
[15]    MR. ROACH:  Let him finish the answer.
[16] Anything else?
[17]    Q.  Are you finished?
[18]    MR. ROACH:  You said vacation, sick.
[19]    A.  All benefits, all benefits.
[20]    Q.  Now, who asked the question, "Would all
[21] benefits be equal?"
[22]    A.  At that meeting I'm not positive who asked
[23] that question, but that was the statement from
[24] Michael Paige, so someone asked it.

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 13

[1] Q. And he said all benefits would be
[2] "comparable"?
[3] A. Yes.
[4] Q. Did he say "equal or better"?
[5] A. Yes.
[6] Q. Did he use both "comparable" and "equal or
[7] better"?
[8] A. Yes.
[9] Q. You remember as you sit here today
[10] specifically at this first meeting Michael Paige
[11] used both the words "comparable" and "equal or
[12] better" with respect to benefits?
[13] A. That was the gist of his conversation.
[14] Q. I'm not asking the gist; I'm asking the
[15] precise words used.
[16] A. No, I can't say that he used both, although
[17] I can't see the difference between one and the
[18] other.
[19] Q. You don't understand the difference between
[20] "comparable" on the one hand and "equal or better"
[21] on the other?
[22] MR. ROACH: Objection.
[23] A. The term "equal" was used --
[24] MR. ROACH: Objection. You're arguing with

Page 14

[1] him.
[2] A. -- for sure.
[3] MR. WELSH: Are you coaching the witness,
[4] Steve?
[5] MR. ROACH: No.
[6] MR. WELSH: I would suggest you go back to
[7] the transcript and look at your depositions and look
[8] at your definition of coaching, because I think you
[9] violated your own rule.
[10] MR. ROACH: I said you're arguing with him.
[11] MR. WELSH: I'm not arguing with him.
[12] MR. ROACH: I didn't tell him not to say
[13] anything.
[14] MR. WELSH: That's coaching the witness.
[15] MR. ROACH: No. I said you're arguing with
[16] him, I'm objecting.
[17] MR. WELSH: That's coaching the witness,
[18] Steve --
[19] MR. ROACH: No, it's not --
[20] MR. WELSH: -- according to the rules.
[21] MR. ROACH: I'm stopping you from abusing
[22] him.
[23] MR. WELSH: Yeah, please, spare me.
[24] Q. Now, do you remember Mr. Paige standing up

Page 15

[1] in front of the employees at the first meeting and
[2] saying, "The benefits will be equal"?
[3] A. Yes.
[4] Q. He used that word?
[5] A. Yes.
[6] Q. You don't recall anything being said about
[7] pension?
[8] A. No, I don't.
[9] Q. Do you recall that in fact vacation was
[10] discussed?
[11] A. Yes.
[12] Q. Was there a separate question from the
[13] floor: "What's the vacation benefits?"
[14] A. My recollection is that he just said,
[15] "Everything will be equal to or better."
[16] Q. Was that in response to a question?
[17] A. I would imagine so, yes.
[18] Q. You used the term "I would imagine so."
[19] And in a deposition, what we have to do -- and you
[20] probably have already received instructions from Mr.
[21] Roach -- I can't have you guessing. If you remember
[22] for sure, tell me. If you don't remember, that's
[23] all right, just tell me you don't remember.
[24] MR. ROACH: Or if you remember partly, and

Page 16

[1] you believe from your memory that that's what
[2] happened, but you're not exactly sure, you can say
[3] that too.
[4] A. I can't remember who said it, but I'm sure
[5] the issue came up and was addressed.
[6] Q. Can you tell me what the precise question
[7] was that was put to Mr. Paige when he indicated that
[8] the benefits would be equal?
[9] A. No, sir. I don't remember whether it
[10] regarded pay or pension or vacation, but when the
[11] question was put forth, he went down the list and
[12] said, "Everything will be equal or better." That
[13] was part of his win-win approach.
[14] Q. That was Mr. Paige?
[15] A. Yes, sir.
[16] Q. Was there more than one question from the
[17] floor about benefits that would be offered by EFTC?
[18] A. I don't remember.
[19] Q. Was there any question about severance?
[20] A. I don't remember.
[21] Q. Did you have any questions during this
[22] meeting?
[23] A. Yes, sir.
[24] Q. What questions did you have?

Page 17

[1]    A.   I asked my questions after that meeting.

[2]    Q.   But at this meeting itself --

[3]    A.   No, sir.

[4]    Q.   -- did you have any questions?  Did you

[5] take any notes?

[6]    A.   No.

[7]    Q.   When is the next meeting, large or small,

[8] you recall participating in concerning the sale of

[9] the board business to EFTC?

[10]    A.   A small meeting.  I had a one-on-one with

[11] Mary Leonard that I requested immediately.

[12]    Q.   Why did you request that meeting?

[13]    A.   To request that I be laid off and receive

[14] severance, if I couldn't remain under the Bayer

[15] umbrella somehow, working in systems or somehow

[16] else.  I didn't want to go to EFTC.

[17]    Q.   Why?

[18]    A.   Nothing in it for me.

[19]    Q.   What do you mean?

[20]    A.   I mean that we found out shortly after the

[21] meeting that the pay would be comparable, but we

[22] would lose holidays, we would lose vacation time,

[23] the medical coverage wasn't as good, the 401(k) plan

[24] didn't offer as good matching contributions.  And

Page 18

[1] that's when I found out also there was no pension

[2] plan.

[3]    Q.   Do you recall how you found all these

[4] things out?

[5]    A.   Some things I found out in a one-on-one

[6] meeting with Mary Leonard and the others in a

[7] follow-up meeting with Mr. Ramsden shortly

[8] thereafter.

[9]    Q.   So the small meeting with Ms. Leonard, can

[10] you give me an estimation of how long it was after

[11] the group meeting where Paige made the

[12] announcements?

[13]    A.   Just as soon as they could arrange it.  It

[14] wasn't more than a day or two.

[15]    Q.   So at the meeting with Ms. Leonard -- was

[16] it in her office?

[17]    A.   Yes.

[18]    Q.   Can you tell me, to the best of your

[19] memory, what you said and what she said at that

[20] meeting.

[21]    A.   I asked her that I would like to request a

[22] layoff, that I would like to request my severance

[23] pay, if I couldn't be transferred to systems or stay

[24] under the Bayer umbrella somehow.

Page 19

[1]    Q.   Now, just because people who never worked

[2] with Bayer/AGFA, et cetera, are going to be reading

[3] this transcript, can you explain what "transferred

[4] to systems" means?

[5]    A.   Yes.  Systems was not part of the sales

[6] agreement, so if I could get a position working at a

[7] system level, I would still be working for Bayer.

[8]    Q.   Would that be in the AGFA Division?

[9]    A.   Yes.  Although I would have taken anything.

[10]    Q.   But you were looking -- is it fair to say,

[11] you were looking for a position that was going to

[12] remain with Bayer after the sale in the Wilmington

[13] area?

[14]    A.   Yes, sir.

[15]    Q.   What did Mary say to you in response, if

[16] anything?

[17]    A.   She said that I had no right to severance,

[18] and that I had to agree to take this position or I

[19] could walk out the door.  Those were my rights.

[20]    Q.   Did she indicate to you why you had no

[21] right to severance?

[22]    A.   She did not specifically indicate anything

[23] other than "We've saved your job and offered you a

[24] position with an equal pay rate, and you can take it

Page 20

[1] or you can leave."

[2]    Q.   Prior to this did you have a good

[3] relationship with Mary Leonard?

[4]         MR. ROACH:  Objection.  You can answer.

[5]    A.   I'm not sure I had a good relationship with

[6] her before the meeting, sir.

[7]    Q.   Why would you say that?

[8]    A.   I just hadn't had that much interaction

[9] with her.

[10]    Q.   Is it fair to say you didn't have a

[11] positive or negative interaction?

[12]    A.   Yes, yes.

[13]    Q.   Now, during the meeting you had with Ms.

[14] Leonard, did you give reasons why you wanted to stay

[15] with Bayer?

[16]    A.   Oh, sure.

[17]    Q.   What did you say?

[18]    A.   I just wanted to continue to accrue pension

[19] and savings and health insurance.  They had a better

[20] plan.

[21]    Q.   Did you say anything about holidays or

[22] vacation when you met with Ms. Leonard?

[23]    A.   Not to the best of my knowledge.

[24]    Q.   Did you indicate to her that you thought

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 21

[1]  that EFTC's benefits were not as good as Bayer's?
[2]      A.  I don't believe I did that.
[3]      Q.  Did you indicate to her -- what did you say
[4]  to her about the pension, savings and health
[5]  insurance, if anything?
[6]      A.  They were excellent, and that I wanted to
[7]  retain them, and if I couldn't, I wanted my
[8]  severance pay.
[9]      Q.  Did you have any discussion with her at all
[10]  about EFTC's benefits?
[11]      A.  I had no discussion with her about that,
[12]  no, except for the comparable pay scale.
[13]      Q.  Now, you indicated that right after the
[14]  group meeting, you had found out about the holidays,
[15]  vacation, medical, 401(k).  From whom did you find
[16]  that information out from?
[17]      MR. ROACH:  Objection.  Go ahead.
[18]      A.  Some from Mr. Ramsden in a follow-up
[19]  meeting that took place not too long after my
[20]  meeting with Mary Leonard, because everyone began to
[21]  have further questions, and they were addressed by
[22]  Mr. Ramsden.
[23]      Q.  Do you recall having any discussion between
[24]  the time Mr. Paige got up and made the announcement

Page 22

[1]  of the sale to the assembled employees until your
[2]  meeting with Ms. Leonard?  Do you recall learning
[3]  from anyone about the differences between EFTC and
[4]  Bayer's benefits?
[5]      A.  Not in that time span.
[6]      Q.  After your meeting with Ms. Leonard, did
[7]  you get any information concerning how EFTC's
[8]  benefits compared with Bayer's benefits?
[9]      A.  We received --
[10]      MR. ROACH:  Objection.  When?  Are you
[11]  saying before he went there or after?
[12]      MR. WELSH:  I said, after your meeting with
[13]  Ms. Leonard, did you receive any information
[14]  concerning how EFTC's benefits compared with those
[15]  of Bayer?
[16]      MR. ROACH:  Well, how long after?  Are you
[17]  talking about a day?
[18]      MR. WELSH:  I'm talking until the time the
[19]  transaction was completed September 1, 1998.
[20]      MR. ROACH:  Okay.
[21]      A.  Those issues were more thoroughly discussed
[22]  in the meeting with Mr. Ramsden.
[23]      Q.  How long after -- when did Mr. Ramsden hold
[24]  his meeting in connection with -- how long after the

Page 23

[1]  meeting you had with Ms. Leonard?
[2]      A.  I would say pretty quickly.
[3]      Q.  Within a week?
[4]      A.  Yes, I would say so.
[5]      Q.  What happened -- who was present at the
[6]  meeting with Mr. Ramsden?
[7]      A.  Members of board assembly and test.
[8]      Q.  The fabrication people were not there?
[9]      A.  Not to the best -- there weren't many of
[10]  them, so to tell you the truth, I couldn't be sure
[11]  at that point.
[12]      Q.  That's fair.  Were any managers present
[13]  other than Mr. Ramsden?
[14]      MR. ROACH:  Objection.
[15]      A.  Are you including group leaders as
[16]  managers?
[17]      Q.  Yes, I will.
[18]      A.  There were group leaders present.
[19]      Q.  Was Vinnie Fiorilla there?
[20]      A.  I believe so.
[21]      Q.  Was Norm Fontaine there?
[22]      A.  I don't believe so.
[23]      Q.  How about Mary Leonard?
[24]      A.  I don't believe so.

Page 24

[1]      Q.  Rod Willis?
[2]      A.  No.
[3]      Q.  Now, to the best of your memory, can you
[4]  tell me what Ramsden said at this meeting?
[5]      A.  He addressed the rest of those questions
[6]  you've been asking.
[7]      Q.  Could you be more specific.  What did he
[8]  say?
[9]      A.  At that point in time I reasserted the
[10]  question about severance hoping that he might say
[11]  something other than what Mary Leonard had said.
[12]      Q.  What did he say?
[13]      A.  That's the only question I asked.  He said,
[14]  "You have no right to severance."
[15]      Q.  Now, was there discussion during the
[16]  Ramsden meeting about how the benefits at EFTC
[17]  compared to the benefits at Bayer?
[18]      A.  Yes.
[19]      Q.  What was said?
[20]      A.  Holiday, vacation pay.  The type of
[21]  insurance and its costs were discussed that EFTC
[22]  could offer.  Pay scales.  Those are the things I
[23]  remember.
[24]      Q.  Now, do you recall any statement to the

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

Page 25

[1]  effect during this meeting that the holidays,
[2]  vacations and benefits were not as good as Bayer's?
[3]      A.  My recollection is at that meeting we were
[4]  told they would be as good.
[5]      Q.  Were you ever told up until September 1,
[6]  1998, that EFTC benefits would not be as good?
[7]          MR. ROACH:  Objection.
[8]      A.  No.
[9]      Q.  So is it fair to say, up until September 1,
[10] 1998, you thought all the benefits you were going to
[11] get from EFTC were going to be equal to or better
[12] than the benefits you had at Bayer?
[13]     A.  Yes.
[14]     Q.  You had no clue whatsoever -- that's your
[15] testimony here under oath, you had no clue
[16] whatsoever the benefits were going to be worse?
[17]         MR. ROACH:  Objection.  He's asked and
[18] answered that.
[19]         MR. WELSH:  Noted.
[20]     A.  No.
[21]         MR. WELSH:  I want to go back in the
[22] testimony, beginning with this round of testimony.
[23]         MR. ROACH:  While you're doing that I'm
[24] going to talk to him.

Page 26

[1]      (A pause)
[2]      (Attorney-client conference)
[3]      Q.  In the beginning of this deposition we were
[4]  talking about a meeting Mr. Paige had with
[5]  employees, and you said, words to the effect, that
[6]  shortly after the meeting with Mr. Paige, you found
[7]  out that you would lose holidays, vacation, 401(k)
[8]  is not as good, and things of that nature.  Do you
[9]  remember that testimony?
[10]         MR. ROACH:  Objection.  Go ahead.  You can
[11] answer.
[12]     A.  Yes.  But you didn't specify -- I think
[13] you're warping over some time frames here, but
[14] continue.
[15]     Q.  When you used the word "shortly after,"
[16] what did you mean?
[17]     A.  Within a few months.
[18]     Q.  Within a few months.  So did you go to
[19] one-on-one meetings with anyone from EFTC to sign
[20] documentation?
[21]         MR. ROACH:  Objection.  When?  Before he
[22] went to EFTC?
[23]     Q.  In 1998 prior to September 1st.
[24]     A.  What type of documentation?

Page 27

[1]      Q.  Tax forms, benefit sign-up forms, anything
[2]  of that nature.  Did you have a one-on-one meeting
[3]  with anyone from EFTC?
[4]      A.  Not to my knowledge, no.
[5]      Q.  Did you receive an offer letter from EFTC?
[6]          MR. ROACH:  Objection.  Go ahead.
[7]      A.  I don't specifically remember.  I may have.
[8]      Q.  You don't recall one way or another if you
[9]  got an offer letter from EFTC?
[10]     A.  No.
[11]         MR. ROACH:  Objection.
[12]     Q.  Did you attend any meeting with Bayer
[13] during which the Bayer benefits were reviewed with
[14] you in anticipation of the transfer to EFTC?
[15]     A.  No.
[16]         MR. ROACH:  John, I have from him, I don't
[17] know if it helps you or not, some pay stubs.  I just
[18] got them today.  I don't know if you want them.
[19] They're probably not relevant.
[20]         MR. WELSH:  I'll look at them.
[21]         MR. ROACH:  Go ahead.
[22]     Q.  So, as I understand it, there was a group
[23] meeting where Mr. Paige made the announcement of the
[24] sale.  Shortly thereafter you had a one-on-one

Page 28

[1]  meeting with Ms. Leonard.
[2]      A.  Yes.
[3]      Q.  Then you were at a small meeting within a
[4]  week with Ramsden, a member of the board shop?
[5]      A.  Yes.
[6]      Q.  Did you attend any other meetings
[7]  one-on-one, small or large, concerning the EFTC
[8]  transaction from that point up until the day it
[9]  closed on September 1, 1998?
[10]         MR. ROACH:  Objection.  You can answer.
[11]     A.  I don't remember any formal meetings after
[12] the meeting with Mr. Ramsden.  There were
[13] discussions, I believe, between individuals in the
[14] hallways.  I don't remember taking part in any of
[15] those.
[16]     Q.  Do you recall any discussions in the
[17] hallways with management?
[18]     A.  No.  Not after I was told I couldn't have
[19] severance, I kind of gave up.
[20]     Q.  So the last time you had any communication
[21] with management concerning the severance pay plan
[22] was when you asked the question in the small meeting
[23] with Ramsden?
[24]     A.  Yes.  Before the transaction took place, I

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 29

[1]   had another short discussion with Mr. Ramsden after
[2]   the transaction took place, but you didn't ask that
[3]   question.
[4]      Q.   I'll get to it after the transaction.
[5]         Now, if I understand it correctly, as of
[6]   September 1, 1998, you still thought you were going
[7]   to have a pension plan; is that right?
[8]      A.   Yes.
[9]      Q.   Did anyone from EFTC ever speak to you
[10]  about pension plans?
[11]     A.   Not that I remember.
[12]     Q.   You thought you were still going to have --
[13]  you thought as of September 1, 1998, your health
[14]  insurance was going to be better; is that correct?
[15]     A.   Equal to.
[16]     Q.   Equal to.  Did you ever see EFTC's plan?
[17]        MR. ROACH:  Objection.  You mean before he
[18]  left or after?
[19]        MR. WELSH:  Yes.
[20]     Q.   Any time prior to September 1, 1998.
[21]     A.   If I did, it was extremely just before
[22]  September 1, 1998.
[23]     Q.   Well, when you say --
[24]     A.   Not back in July.

Page 30

[1]      Q.   As of September 1, 1998, do you recall
[2]   specifically whether or not you had an opportunity
[3]   to see the EFTC health plan?
[4]        MR. ROACH:  Objection.
[5]      A.   May I answer?
[6]      Q.   You can.
[7]        MR. ROACH:  You can answer.
[8]      A.   I don't specifically remember, but I would
[9]   imagine by that time we had been given some
[10]  information regarding their health plan, and I
[11]  believe it was Great Western.
[12]     Q.   Your understanding at that time -- who gave
[13]  you the information?
[14]     A.   It was passed out.
[15]     Q.   By who?
[16]     A.   Probably my group leader, Diana Glassett.
[17]     Q.   Do you know for sure?
[18]     A.   No, sir.
[19]     Q.   Did you compare the health insurance plan
[20]  that was passed out with the one that was in effect
[21]  for Bayer?
[22]     A.   I would have.
[23]     Q.   Did you come to a conclusion whether it was
[24]  better, equal or less?

Page 31

[1]      A.   Not at that time.  You have to have actual
[2]   transactions with the insurance agency to find out
[3]   how they work and what they're going to do for you.
[4]      Q.   Well, they had certain procedures are
[5]   covered, and the coverage has certain deductibles,
[6]   does it not?
[7]      A.   Yes.
[8]        MR. ROACH:  Objection.
[9]      Q.   You can compare the deductibles, can't you?
[10]     A.   You could.
[11]        MR. ROACH:  Objection.
[12]     Q.   You could compare the coverage descriptions
[13]  in both plans, correct?
[14]     A.   I would have been able to do that.
[15]     Q.   Did you?
[16]     A.   I'm sure I did.
[17]     Q.   Did you come to a conclusion?
[18]        MR. ROACH:  Objection.  Go ahead.  You can
[19]  answer.
[20]     A.   Not at that time.  My conclusion about
[21]  their health plan and whether it was as good would
[22]  have been over a period of time after.
[23]     Q.   But so if I understand your testimony, you
[24]  would have been able to get the description of

Page 32

[1]   coverage side by side, Bayer and EFTC, but you would
[2]   not have been able to determine whether or not one
[3]   policy was better than the other; is that fair?
[4]        MR. ROACH:  Objection.  You can answer.
[5]      A.   No, not until the interactions took place
[6]   and you began to see how they worked.
[7]      Q.   So looking at the plans side by side, you
[8]   would not be able to draw a conclusion about which
[9]   is better; is that correct?
[10]        MR. ROACH:  Objection, John.  This is the
[11]  fourth time --
[12]        MR. WELSH:  Noted.
[13]        MR. ROACH:  No, no, wait.  He's not going
[14]  to --
[15]        MR. WELSH:  You're not going to be a
[16]  hypocrite with me, Steve.  You raised these
[17]  objections in your deposition.  Now you're going to
[18]  be a hypocrite with me?  I'm entitled for him to
[19]  answer my question.
[20]        MR. ROACH:  You've asked that question at
[21]  least four times.
[22]        MR. WELSH:  Wrong.  He didn't answer the
[23]  question.
[24]        MR. ROACH:  I'm going to object.

Min-U-Script®

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

Page 33

[1]    Q.  You can answer the question.
[2]    A.  I had a choice of insurance companies --
[3]        MR. ROACH:  Go ahead.  You can answer.
[4]    A.  -- with Bayer.  There was one company to
[5]  deal with with EFTC.
[6]    Q.  But by looking at the description of that
[7]  one insurance company's benefits, you were unable to
[8]  determine whether it was a better plan or a worse
[9]  plan, correct?
[10]   A.  It wouldn't have been as good.
[11]       MR. ROACH:  Objection.  You mean compared
[12]  to the four?
[13]   A.  It's relative what you want to pay for a
[14]  plan.  I could have had a better plan.  It was
[15]  offered to me if I wanted to buy it when I was with
[16]  Bayer.  There was one company to work with with
[17]  EFTC.
[18]   Q.  How did the coverage provided by that
[19]  company, based on the description given to you prior
[20]  to September 1, 1998, compare to the program that
[21]  you were on at Bayer?
[22]       MR. ROACH:  Objection.  Wait a minute.  Are
[23]  you asking him --
[24]   A.  How could I determine that --

Page 34

[1]        MR. ROACH:  Excuse me.
[2]    A.  -- when I hadn't dealt with them?
[3]        MR. ROACH:  When there's an objection, just
[4]  hold on.
[5]        MR. WELSH:  You object and object only, by
[6]  Mr. Roach's rules in his deposition.
[7]        MR. ROACH:  As you do, sir?
[8]        MR. WELSH:  Yes.
[9]    Q.  Next question.
[10]       MR. ROACH:  Fine.
[11]   Q.  Vacation.  Did you ever speak with anyone,
[12]  coworkers or managers or representatives of EFTC,
[13]  about EFTC's vacation prior to September 1, 1998?
[14]       MR. ROACH:  Objection.  Asked and answered.
[15]  Go ahead, Mr. Brown.
[16]   A.  I don't remember.  I was aware in that
[17]  immediate time frame that I was going to lose a
[18]  week's vacation pay.
[19]   Q.  Holidays, as of September 1, 1998, were you
[20]  aware that EFTC had less paid holidays than Bayer
[21]  offered?
[22]   A.  Again, if I was, it was within days of the
[23]  transaction.
[24]   Q.  Okay.

Page 35

[1]    A.  At which point in time I would have seen
[2]  that I lost three discretionary holidays and one
[3]  regular holiday.
[4]    Q.  How would you have found that out, or how
[5]  did you find that out?
[6]        MR. ROACH:  Objection.  He said if he did.
[7]  Go ahead.
[8]        MR. WELSH:  Strike it.
[9]    Q.  How did you find it out?
[10]       MR. ROACH:  Objection.  Go ahead.
[11]   A.  They sent out a form and on it it listed
[12]  what holidays would be in the next fiscal year.
[13]   Q.  EFTC did?
[14]   A.  Yes.
[15]   Q.  Prior to seeing that form, did you hear
[16]  from -- had you heard from anyone, managers,
[17]  coworkers, representatives of EFTC, that the
[18]  holidays EFTC offered were different?
[19]   A.  No.
[20]   Q.  401(k), did you as of September 1, 1998
[21]  determine that the 401(k) offered by EFTC was not as
[22]  good as the one offered by Bayer?
[23]   A.  Within that immediate short time frame, I
[24]  found out that EFTC matching funds were less.

Page 36

[1]    Q.  Did you at any time prior to September 1,
[2]  1998, learn that the employee premium payment for
[3]  medical insurance with EFTC was higher than the
[4]  employee premium payment required by Bayer?
[5]    A.  I don't specifically remember whether it
[6]  was higher, and if it was, where I don't remember,
[7]  it probably wasn't that much higher.
[8]    Q.  As of the first day of employment with
[9]  EFTC, did your hourly wage rate change?
[10]   A.  As of the first day, I'm going to say yes.
[11]   Q.  Was it higher or lower?
[12]   A.  Higher.
[13]   Q.  Do you remember how much?
[14]   A.  Not specifically.
[15]   Q.  Did you ever receive an explanation from
[16]  anybody as to why your pay rate was higher with EFTC
[17]  than it was with Bayer?
[18]   A.  Now, from anybody?
[19]   Q.  Yes.
[20]   A.  Prior to the sale there was an incentive
[21]  package that some or all individuals were offered to
[22]  stay on.  So that would have been Bayer, keeping us
[23]  on for that last month, to make sure that this X
[24]  amount of work was accomplished before the transfer

Page 37

[1] took place. That was an incentive to stay.
[2]     Q. My question to you, sir, did you ever
[3] receive any information from anybody as to why your
[4] hourly wage rate with EFTC immediately after the
[5] transaction was higher than what your wage rate had
[6] been with Bayer?
[7]     A. I probably did.
[8]     Q. Do you remember why that was? I said, did
[9] you ever receive an explanation; you said you
[10] probably did. I'm asking, do you remember what the
[11] explanation was for that discrepancy?
[12]     A. No, and I don't want to speculate. I'm
[13] sure it was just to keep us on and keep us happy.
[14]     Q. Now, is my understanding correct that other
[15] than the meeting with Paige when the sale was
[16] announced, your one-on-one meeting with Mary Leonard
[17] shortly thereafter, and then your meeting with Mr.
[18] Ramsden about a week after that, those were the only
[19] times prior to September 1, 1998, that you talked to
[20] any manager at Bayer concerning the benefits offered
[21] by EFTC?
[22]     MR. ROACH: Objection. Do you mean --
[23] by "management" you mean floor managers like
[24] Glassett --

Page 38

[1]     MR. WELSH: All managers.
[2]     A. I had conversations with Diana Glassett.
[3] She was my group supervisor, she was my supervisor.
[4]     Q. G-l-a-s-s-e-r?
[5]     A. e-t-t.
[6]     Q. What do you recall of your conversations
[7] you had with Ms. Glassett prior to September 1,
[8] 1998?
[9]     A. Nothing specific.
[10]     Q. Did you have conversations with her
[11] concerning EFTC's benefits?
[12]     A. I probably did, yes.
[13]     Q. Do you recall what those conversations
[14] were?
[15]     A. Not specifically.
[16]     MR. ROACH: Is this before the sale now?
[17]     MR. WELSH: Yes, I said before September
[18] 1st.
[19]     A. Before, no, I wouldn't have spoken with her
[20] before.
[21]     Q. So --
[22]     A. I'm sorry.
[23]     Q. Did you have any conversation with any
[24] coworkers about EFTC's benefits at any time prior to

Page 39

[1] the sale to actually September 1, 1998?
[2]     A. That occurred in such a rapid time frame
[3] that I am unable to answer that question. You must
[4] understand, we went on vacation, so there are two
[5] weeks lost right in between there. And then when we
[6] came back, discussions would have begun again.
[7]     Q. When was the vacation period?
[8]     A. The vacation in that year I believe was the
[9] last two weeks of July.
[10]     Q. For the month of August, did you have any
[11] conversations with any coworkers concerning EFTC
[12] benefits?
[13]     A. There were conversations. I'm a bit of an
[14] introvert, I sit by myself, so I wasn't involved in
[15] group conversations with people.
[16]     Q. Did you have any one-on-one conversations
[17] with any of your coworkers prior to September 1,
[18] 1998, concerning EFTC's benefits?
[19]     A. I talked with a few friends.
[20]     Q. Who?
[21]     A. I spoke with a Ronald Gildae.
[22]     Q. Anyone else?
[23]     A. He's the only one I can specifically
[24] remember.

Page 40

[1]     Q. Do you recall what you discussed with him
[2] concerning EFTC benefits?
[3]     A. The loss of severance and how I really just
[4] wanted my severance.
[5]     Q. Anything else?
[6]     A. No.
[7]     Q. At the time you talked with Mr. Gildae, did
[8] you understand as part of the deal that your salary
[9] was going to be equal to or better than Bayer?
[10]     A. Yes. And it was.
[11]     Q. It was your belief at the time you talked
[12] to Mr. Gildae that all of your benefits were going
[13] to be equal to or better than they were at Bayer; is
[14] that correct?
[15]     A. Yes, except all I wanted was severance.
[16]     Q. But your understanding was all the
[17] benefits?
[18]     A. Yes, it was.
[19]     Q. So you were happy to go to EFTC; is that
[20] right?
[21]     MR. ROACH: Objection.
[22]     A. I was never happy because I never wanted to
[23] go.
[24]     Q. Why?

Page 41

[1]     MR. ROACH:  Objection.
[2]     A.  Because I wanted my severance.
[3]     Q.  If you were not going to get laid off,
[4] wasn't EFTC a better deal?  They pay you an equal or
[5] higher salary and equal or better benefits?
[6]     MR. ROACH:  Objection.  Go ahead.  You can
[7] answer.
[8]     A.  In retrospect --
[9]     Q.  No, I'm asking you up until September 1,
[10] 1998.
[11]     MR. ROACH:  What's the question again?
[12]     Q.  Were you happy to be going to EFTC since
[13] you believed they were going to give you equal or
[14] better salary and benefits?
[15]     MR. ROACH:  Objection.  Asked and answered.
[16] Go ahead.
[17]     A.  No, I already said no, I wasn't happy to go
[18] with EFTC.
[19]     Q.  Other than the fact you would not get
[20] severance from Bayer, was there any other reason you
[21] did not want to go to EFTC?
[22]     MR. ROACH:  Objection.  Go ahead.
[23]     A.  I had apprehensions about the loss of
[24] matching funds, and I'm not sure when I knew there

Page 42

[1] was no pension plan, but it didn't -- it certainly
[2] didn't enhance my opinion of the entire transaction
[3] any.
[4]     Q.  Other than matching funds or 401(k) and the
[5] pension fund, was there anything else other than
[6] severance?
[7]     A.  I knew I was going to lose a week's
[8] vacation, that I knew before.
[9]     Q.  I may have already asked this, but just so
[10] I have it right here, is it true that when you
[11] joined EFTC, your salary was equal or higher than
[12] the salary rate you had at Bayer?
[13]     A.  Yes.
[14]     Q.  Is it true when you joined EFTC, you had
[15] the same commute, because you were working basically
[16] in the same facility?
[17]     A.  Yes.
[18]     Q.  Sir, I'm putting a document in front of
[19] you, it's marked Exhibit 4 in Fiorilla's deposition.
[20] I want to tell you, sir, these are excerpts from a
[21] book that's about an inch thick.
[22]     MR. ROACH:  Let's show him the book.
[23]     MR. WELSH:  This is Willis Exhibit 52.
[24]     Q.  With respect to Willis Exhibit 52, sir,

Page 43

[1] have you ever seen that book before?
[2]     A.  I was given something very similar to this.
[3] It was a pure white sheet cover.  But it was a
[4] benefits book similar to this.
[5]     Q.  When would that have been, sir?
[6]     A.  It was prior to '95, I believe.
[7]     Q.  Do you know if that was for Miles
[8] Corporation?
[9]     A.  Let's see.  It went Compugraphic, Bayer
[10] International, Bayer USA, Miles.  It would have said
[11] "Miles" on it, and I remember the Bayer.  This looks
[12] familiar.  Obviously I didn't read the whole thing.
[13]     Q.  You're looking at Willis Exhibit 52.  Do
[14] you remember whether or not a copy of this booklet
[15] was sent to your house?
[16]     A.  These were handed out in-house, made
[17] available to us.  I don't remember anything being
[18] sent to my house.
[19]     Q.  When you say "these," when you were
[20] touching, you were pointing to Willis Exhibit 52?
[21]     A.  The one I got --
[22]     MR. ROACH:  So stipulated.
[23]     A.  -- I received before Rod Willis had
[24] anything to do with personnel.

Page 44

[1]     Q.  Just so you know, sir, the sticker up here
[2] just means during this deposition he was shown this,
[3] and when we say Exhibit 52, it's just to identify
[4] the document itself.
[5]     A.  I did receive a package, explanation
[6] package.  Whether it was this, I can't.
[7]     Q.  When you got the explanation package, what
[8] did you do with it?
[9]     A.  Read a little bit of it and stuck it in a
[10] drawer.
[11]     Q.  Does it remain in that drawer until this
[12] day?
[13]     A.  It did up until a few years ago.
[14]     Q.  How many years ago?
[15]     A.  I'm going to say I cleared that drawer out
[16] two or three years ago.
[17]     Q.  Before this lawsuit started or after?
[18]     A.  It would have been after.
[19]     Q.  Were you aware of any documents being
[20] requested in this lawsuit from the plaintiffs, from
[21] the former Bayer employees?
[22]     MR. ROACH:  Objection.
[23]     A.  I was asked for those pay stubs somewhere
[24] along the line, and I gave a copy to Jean.  I

Page 53

[1]    A.  No, I think March is correct.

[2]    MR. ROACH:  March 14th, the first page, my

[3] apologies.  Go ahead.

[4]    Q.  Is that right?

[5]    A.  Yes.

[6]    Q.  Now, up here it says "By 4-28!"  Is that

[7] your handwriting?

[8]    A.  Yes.

[9]    Q.  On the front page, is that your

[10] handwriting?

[11]    A.  Yes.  It looks as though they passed this

[12] out in the meeting, and I jotted those notes on the

[13] top of it.

[14]    Q.  If you go after the signature page on this

[15] document, Page 4, the next document that was in your

[16] personnel file is entitled "Obligation Statement."

[17] Is that your signature on the bottom?

[18]    A.  Um-hum.

[19]    Q.  Is that "yes"?

[20]    A.  Yes.

[21]    Q.  Dated August 27, '98?

[22]    A.  Yes.

[23]    Q.  Do you recall where you were when you

[24] signed this document?

Page 54

[1]    A.  No.

[2]    Q.  Do you recall whether or not on or around

[3] August 27, 1998, you had a one-on-one meeting with

[4] an HR representative from EFTC at the Bayer facility

[5] near Ms. Leonard's office?

[6]    A.  If I did, it probably would have been with

[7] Staci Landress.

[8]    Q.  Do you have that -- when you say it

[9] probably would be, it's suggesting a guess.

[10]    A.  I don't specifically remember.

[11]    Q.  The next page, a "Non-Disclosure

[12] Agreement."  Again, is that your signature with the

[13] date August 27, 1998?

[14]    A.  Yes.

[15]    Q.  Do you recall where you were when you

[16] signed this?

[17]    A.  I don't even recall -- I don't recall what

[18] this is all about.  Is this --

[19]    Q.  All I can tell you, sir, these were

[20] documents found in your EFTC personnel file.

[21]    A.  Um-hum.

[22]    Q.  Do you recall signing this document?  Is it

[23] your practice when you date a document that you put

[24] the date of signature --

Page 55

[1]    A.  Yes.

[2]    Q.  -- down below?  So do you have any memory

[3] of the circumstances surrounding your signature of

[4] this document on August 27, 1998?

[5]    A.  It may have been, as you said, a one-on-one

[6] with Staci Landress.  This would have been something

[7] that was done in her office.

[8]    MR. ROACH:  Objection.  Just make sure you

[9] don't guess, Mr. Brown.

[10]    THE WITNESS:  I am guessing.

[11]    MR. ROACH:  I don't want you to guess.

[12]    Q.  I don't want you to guess either way.  If

[13] you don't know, you can say you don't know, but do

[14] you recall whether or not you did in fact meet with

[15] Staci Landress prior to September 1, 1998?

[16]    A.  No.

[17]    Q.  Do you recall hearing a talk from Jack

[18] Calderone, the president of EFTC?

[19]    A.  Yes.

[20]    Q.  Was that before September 1, 1998?

[21]    A.  Yes, I will say yes.

[22]    Q.  What do you remember him saying, if

[23] anything?

[24]    A.  Pretty much a restatement of everything

Page 56

[1] that had been said previously.

[2]    Q.  Did he say anything about EFTC's benefits?

[3]    A.  I'm sure he did.  I don't remember him

[4] saying anything specifically.

[5]    Q.  Do you recall him saying anything

[6] specifically about whether or not EFTC had a

[7] pension?

[8]    A.  At that point in time?

[9]    Q.  Yes.

[10]    A.  I do not specifically remember that.

[11]    Q.  Do you have any general recollection of

[12] that being discussed?

[13]    A.  Are you asking, when was I first aware that

[14] there was no pension plan?

[15]    Q.  I'll ask that question.  When were you

[16] first aware there was no pension plan?

[17]    A.  I don't know.

[18]    Q.  Do you recall Mr. Calderone making any

[19] reference to whether or not EFTC offered a pension

[20] plan?

[21]    A.  Not specifically.

[22]    MR. ROACH:  You're talking, again, about

[23] the meeting before the sale?

[24]    MR. WELSH:  Yes, before the sale.

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

Page 57

[1]    Q.  Do you remember anything else, other than
[2]  what you've testified to here this morning, about
[3]  what Mr. Calderone said to the board shop employees?
[4]    A.  No.  I was pretty depressed and just going
[5]  with the flow and going through the motions at that
[6]  stage.
[7]    Q.  Why?
[8]    A.  Just not happy with the whole thing.
[9]    Q.  Other than the fact that you wanted
[10]  severance pay, was there any other reason you were
[11]  unhappy?
[12]    A.  At that specific time, I'm going to say
[13]  that I was probably aware, although I can't remember
[14]  how, that the pension plan and the 401(k) matching
[15]  funds were not going to be equal.
[16]    Q.  When you say the pension plan --
[17]    A.  Nonexistent.
[18]    Q.  Nonexistent.
[19]    A.  Right.
[20]    Q.  Now, if you turn to the "Application for
[21]  Membership."  On the bottom of that page, is that
[22]  your signature?
[23]    A.  Yes.
[24]    Q.  Dated August 31, 1998?

Page 58

[1]    A.  Yes.
[2]    Q.  Do you recall whether you met with anyone
[3]  from EFTC on August 31, 1998, to fill out paperwork
[4]  for the medical plan?
[5]    A.  No.
[6]    Q.  Following that there seems to be a second
[7]  page of the medical plan application.  Do you see
[8]  that?
[9]    A.  Yes.
[10]    Q.  If you would turn to that, the next page we
[11]  have is "Application for Group Insurance" from Rocky
[12]  Mountain Life.  Is that your signature about two
[13]  thirds of the way down?
[14]    A.  Yes.
[15]    Q.  The date is August 27, 1998?
[16]    A.  Yes.
[17]    Q.  Do you recall whether you met with anyone
[18]  from EFTC's HR group on August 27, 1998 --
[19]    A.  I did not.
[20]    Q.  -- with respect to this form?
[21]    A.  I do not specifically remember that.
[22]    Q.  Do you remember whether or not you received
[23]  a benefit pamphlet at the time you filled out this
[24]  form?

Page 59

[1]    A.  Not specifically, but I do remember
[2]  receiving an explanation of the Great Western
[3]  benefit.
[4]    Q.  Do you still have that in your records?
[5]    A.  I don't know.  I may.
[6]    MR. ROACH:  I would be happy to look for
[7]  it.
[8]    MR. WELSH:  I ask that you do, please.
[9]    MR. ROACH:  Assuming when he said
[10]  "explanation," he meant a written rather than
[11]  verbal.
[12]    MR. WELSH:  I wouldn't ask you to look for
[13]  a verbal.
[14]    MR. ROACH:  But I'm not sure what he said.
[15]    THE WITNESS:  You gentlemen have to
[16]  understand, I don't sometimes have that much control
[17]  over what I get to keep and what gets tossed out.
[18]    MR. WELSH:  I understand that.
[19]    Q.  I just want to know, if you look to the
[20]  next page, it looks like a Form W-4.  Down at the
[21]  bottom, that's your signature dated August 28, 1998?
[22]    A.  Yes.
[23]    Q.  Again, as I asked with the other documents,
[24]  do you have any recollection of whether or not you

Page 60

[1]  met with an EFTC HR representative when you filled
[2]  out this document?
[3]    A.  No, I don't, but it certainly looks as
[4]  though I did.
[5]    Q.  Again, the next page is Page 2, it would
[6]  appear, the state tax form.  And that's your
[7]  signature on August 27, 1998, correct?
[8]    A.  Yes, it is.
[9]    Q.  Lastly, there's a document, it says
[10]  "Enrollment Information."  It looks like it's a
[11]  deferred compensation; it might be 401(k).  But
[12]  anyway, it says "EFTC Corporation" on the top.  On
[13]  the bottom there's a signature line above "Principal
[14]  Financial Group."  Do you see that?
[15]    A.  Yes.
[16]    Q.  Is that your signature?
[17]    A.  Yes.
[18]    Q.  This is August 31, 1998, correct?
[19]    A.  Yes.
[20]    Q.  And for the last time with this group of
[21]  documents, do you recall whether or not you met with
[22]  an EFTC HR representative at the time you filled out
[23]  this document?
[24]    A.  I vaguely remember a meeting in which this

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 61

[1] package was gone over, and there was a chance to ask
[2] questions about it, and that's all I can remember.
[3]    Q.   Were there more employees other than
[4] yourself at that meeting?
[5]    A.   I think so, yes, but I'm not going to swear
[6] to it.  I'll say no if --
[7]    Q.   Is it fair to say that you're not sure?
[8]    A.   No, I'm not sure.
[9]    Q.   Okay.  Now, do you recall whether or not
[10] any written information was passed out by EFTC
[11] concerning the selections you made here?
[12]    A.   There must have been, yes.
[13]       MR. WELSH:  Why don't we go off the record
[14] for a couple of minutes and I'll look over my
[15] documents.
[16]       MR. ROACH:  Sure.
[17]       (Recess from 11:18 to 11:28 a.m.)
[18]    BY MR. WELSH:
[19]    Q.   I'm going to show you a document that's
[20] been marked for identification as Fiorilla Exhibit
[21] 6.  Do you recall whether or not a copy of this
[22] document was sent to your home in 1996?
[23]    A.   No, I do not.
[24]    Q.   If a copy of this document had been sent to

Page 62

[1] your home, would you have maintained it in the area
[2] you kept the other Bayer documents?
[3]    A.   Yes, I would have.
[4]    Q.   Just so it's clear, you no longer have
[5] those Bayer documents that you had in your home; is
[6] that correct?
[7]    A.   That is correct.
[8]    Q.   You can put that aside, sir.
[9]       A very similar question.  I'm showing you a
[10] document that's been marked as Fiorilla Exhibit 7.
[11] Sir, do you recall whether or not you received a
[12] copy of this document mailed to your home in 1997?
[13]    A.   I vaguely remember this document.  As to
[14] whether it was handed out at work or sent to my
[15] home, I do not remember.
[16]    Q.   Do you recall receiving it sometime during
[17] 1997?
[18]    A.   Somewhere in that time frame, yes.
[19]    Q.   Put that aside, sir.
[20]       MR. WELSH:  Would you mark this as the next
[21] exhibit.
[22]    A.   I can't be sure, because all of the forms
[23] are so similar.  See, I don't specifically remember
[24] this.

Page 63

[1]    Q.   What is that?
[2]    A.   Evidently it changes from subdivision to
[3] subdivision under Bayer so --
[4]    Q.   So you don't --
[5]    A.   I wouldn't even look at most of this,
[6] because it doesn't, you know -- it wouldn't apply to
[7] me anyway.
[8]    Q.   Okay.  Thank you.
[9]       (Document marked as Brown
[10]       Exhibit 2 for identification)
[11]    Q.   Sir, I want to show you a document, it's
[12] been marked for identification as Brown Exhibit 2.
[13] The first page is an envelope; the second page is a
[14] letter, which was photocopied incorrectly, but it
[15] was sent to Mary J. Corcoran dated December 1999.
[16] Do you recall whether or not you received a similar
[17] letter addressed to you in December 1999?
[18]    A.   I remember that they sent these out
[19] periodically.  I don't specifically remember
[20] receiving one at the date you're stating.
[21]    Q.   Thank you.  You can put that aside.
[22]       Sir, during any conversations you had with
[23] anyone from Bayer prior to September 1, 1998, did
[24] anyone ever indicate to you that the entire AGFA

Page 64

[1] Division was being sold to EFTC?
[2]    A.   I recall no such indication.
[3]    Q.   I'm going to show you a document that's
[4] been marked for identification as Fiorilla Exhibit
[5] 2.  It looks like a slideshow.  You can look through
[6] this.  Do you recall whether or not you ever
[7] attended a meeting where these slides were shown to
[8] assembled board shop employees?
[9]    A.   I do vaguely remember.
[10]    Q.   Do you recall who conducted the meeting?
[11]    A.   No, sir.
[12]    Q.   Do you remember anything that was said
[13] during the meeting?
[14]    A.   Not specifically.
[15]    Q.   Do you recall whether or not anything was
[16] said at the meeting about EFTC's benefits?
[17]    A.   Well, in that that's what the meeting
[18] obviously was about, I'm sure there was.
[19]    Q.   Again, I don't want you to guess, if you
[20] remember, tell me, but if you look at these slides,
[21] these slides pertain to Bayer's benefits.  Now, do
[22] you recall whether at the meeting that these slides
[23] were shown whether they also discussed EFTC?  If you
[24] remember, fine.  If you don't, please say so.

Page 65

[1]    A.  I do not specifically remember a

[2]  comparison.

[3]    Q.  Did you ever talk to any coworkers who were

[4]  allowed to stay at Bayer rather than accept

[5]  employment with EFTC?

[6]    A.  Do I know of any or --

[7]    Q.  Did you speak with any of them?

[8]    A.  No.

[9]    Q.  Did you speak with any managers of Bayer as

[10]  to why certain employees were allowed to stay with

[11]  Bayer and not go to EFTC?

[12]    A.  Only Mary Leonard.

[13]    Q.  Is that the conversation you testified

[14]  about earlier?

[15]    A.  Yes.

[16]    Q.  Now, did anyone from EFTC ever tell you

[17]  that EFTC would not have entered into the contract

[18]  with Bayer to purchase the board shop if all the

[19]  employees had not indicated a willingness to join

[20]  EFTC?

[21]    A.  Not from EFTC.  I heard that from Mary

[22]  Leonard.

[23]    Q.  What did she tell you?

[24]    A.  When I wanted severance and I wanted to

Page 66

[1]  stay with Bayer, she said that this isn't an option,

[2]  that I have to go there or leave, I have to go to

[3]  EFTC or I have to walk out the door.

[4]    Q.  Okay.  Is that all?

[5]    A.  Would you reword that again?

[6]    Q.  Did anyone from Bayer management tell you

[7]  that a certain number of the board shop employees

[8]  had to accept jobs with EFTC for the sale to go

[9]  through?

[10]    A.  She indicated that, yes, that they wanted

[11]  the machines and the expertise of the individuals

[12]  that were going.

[13]    Q.  She indicated EFTC wanted the machines and

[14]  the expertise?

[15]    A.  Yes.

[16]    Q.  Did she say anything else other than they

[17]  wanted the machines and the expertise?

[18]    A.  Not that I remember.

[19]    Q.  Do you recall whether or not you had

[20]  accepted employment with EFTC prior to your last day

[21]  at Bayer?

[22]    MR. ROACH:  Objection.

[23]    A.  If I did, it was in a very short time

[24]  frame.

Page 67

[1]    Q.  Do you recall --

[2]    A.  Maybe a week or so.

[3]    Q.  You used the word "if."  Do you remember

[4]  specifically whether you did or not?

[5]    MR. ROACH:  Objection.

[6]    A.  Not specifically.

[7]    Q.  Now, you indicated that you told Mary

[8]  Leonard that you wanted severance; is that right?

[9]    A.  Yes.

[10]    Q.  Did you tell her that Bayer was required by

[11]  the severance pay plan to pay severance?

[12]    A.  I told her that I thought I was entitled to

[13]  it, that for my entire experience with the outfit,

[14]  that there had always been voluntary layoffs, and in

[15]  those layoffs the older people were the ones that

[16]  received the priority and were chosen first.  And I

[17]  remember telling her, "I'm over 50, and I just feel

[18]  I'm -- this is what I want.  Either I want my

[19]  severance or I want to stay within the company."

[20]    Q.  Had you read the severance pay plan or the

[21]  description in the severance pay plan in that

[22]  booklet we showed you prior to talking to Mary

[23]  Leonard about severance?

[24]    A.  No.

Page 68

[1]    Q.  At any time prior to September 1, 1998, did

[2]  you read the severance pay plan or the description

[3]  of the severance pay plan in the big book we showed

[4]  you?

[5]    A.  I remember going through a book similar to

[6]  -- I believe it was the '95 thing --

[7]    MR. ROACH:  Is that Willis 52?

[8]    THE WITNESS:  Yeah.

[9]    A.  -- and seeing something about the division,

[10]  unless the whole division were transferred that

[11]  you'd be entitled to severance pay.

[12]    Q.  When did you see that?

[13]    A.  I can't say exactly when.  This may be

[14]  something I saw years before; it's all part of my

[15]  impression of why I thought I was entitled to

[16]  severance right up until the last minute.  And she

[17]  told me I wasn't.  I was not aware of that.

[18]    Q.  So in 1998, during the time you knew that

[19]  the EFTC sale was pending, did you look at the

[20]  severance pay plan?

[21]    A.  No.

[22]    MR. ROACH:  Objection.  I think he just

[23]  answered that.

[24]    MR. WELSH:  I'm not sure.

Robert D. Brown
November 21, 2006

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 69

[1]  A.  Not -- that, no.
[2]  Q.  Thereafter did you?  After '98 did you?
[3]  MR. ROACH:  Outside of meeting with
[4]  counsel?
[5]  MR. WELSH:  At any time.
[6]  A.  Not until a meeting with counsel.
[7]  Q.  Do you know what the date of that was?
[8]  THE WITNESS:  Wasn't that last Tuesday?
[9]  MR. ROACH:  You can give him the answer,
[10]  not me.
[11]  A.  I believe it was last Tuesday.
[12]  Q.  Okay.  When do you believe that -- when do
[13]  you first believe that Bayer violated the severance
[14]  pay plan by not paying you severance?
[15]  MR. ROACH:  Objection.  You can answer.
[16]  You mean legally?
[17]  MR. WELSH:  When did he believe --
[18]  A.  This is the curve one now.
[19]  MR. ROACH:  Objection.  Go ahead.
[20]  A.  I started off firmly believing I was
[21]  entitled, and I went in and requested it --
[22]  MR. ROACH:  Let him answer the question.
[23]  A.  -- from all my experience.  Then she
[24]  convinced me or gave me the impression that I was

Page 70

[1]  wrong, that what we're doing is fine.  Then after
[2]  the sale, I heard that members from another shop had
[3]  received severance and that they were not going to
[4]  be transferred without it, that they had somehow
[5]  gotten together and decided, "We get our severance
[6]  or this deal is not going to go through."  It was a
[7]  smaller group of people.  And at that point in time
[8]  I again felt that I had been treated unfairly.
[9]  Q.  So when you met with Mary Leonard in 1998,
[10]  before the sale, you believed that you were owed
[11]  severance?
[12]  A.  Yes.
[13]  Q.  After she gave you the explanation as to
[14]  why you were not owed severance --
[15]  A.  I was uncertain.
[16]  Q.  You were uncertain?
[17]  A.  Yes.
[18]  Q.  You thought there was a possibility that
[19]  she was wrong?
[20]  MR. ROACH:  Objection.
[21]  A.  I hoped that she was wrong, and that's why
[22]  I brought up the discussion again at the Ramsden
[23]  meeting a short time later.  And he reaffirmed it,
[24]  that none of us could request or receive severance.

Page 71

[1]  Transfer or walk, either way, no severance.
[2]  Q.  When Mr. Ramsden told you what he told you
[3]  at that meeting, did you at that point believe that
[4]  you had no rights to severance?
[5]  MR. ROACH:  Objection.
[6]  A.  No, I felt that I did.
[7]  Q.  Now, did you ever have any discussion with
[8]  anyone prior to September 1, 1998, specifically
[9]  concerning the severance benefits that EFTC offered?
[10]  A.  Not that I recollect, no.
[11]  Q.  Have you now told me everything you wish to
[12]  talk about with respect to severance pay?
[13]  MR. ROACH:  Objection.
[14]  A.  Probably not, no.
[15]  Q.  What else would you like to talk about that
[16]  I haven't asked you a question about?
[17]  MR. ROACH:  Come on, John.  Objection.
[18]  MR. WELSH:  Noted.  I don't want the
[19]  witness to leave and say he didn't have a chance.
[20]  MR. ROACH:  What else do you want --
[21]  Q.  Is there anything else you'd like to tell
[22]  me about your claim for severance that I haven't
[23]  covered here today?
[24]  MR. ROACH:  Objection.

Page 72

[1]  A.  No, no.
[2]  MR. WELSH:  I have no further questions.
[3]  MR. ROACH:  I have a few.
[4]  CROSS EXAMINATION
[5]  BY MR. ROACH:
[6]  Q.  Mr. Brown, Mr. Welsh asked you two or three
[7]  times as to why you didn't want to go to EFTC.
[8]  Other than what you've stated, were there any other
[9]  reasons why you didn't want to go to EFTC in '98,
[10]  other than what you've testified to?
[11]  A.  Prior to that transfer -- and I have no
[12]  names, but some e-mail correspondence was going on
[13]  between some Florida members of an EFTC branch who
[14]  had a lot of negative stuff to say about EFTC.  And
[15]  this is the first rumor I heard of no pension was
[16]  one of the things.  Another accusation was that it
[17]  was basically a hatchet shop, you know.  Do you
[18]  understand what I'm saying?
[19]  Q.  Sure.
[20]  A.  And so I felt that I had no long-lasting
[21]  future with EFTC.
[22]  Q.  When you say "hatchet shop," why don't you
[23]  tell Mr. Welsh what you mean by that.
[24]  A.  They come in, they weed people out, you

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Robert D. Brown
November 21, 2006

Page 73

[1] know, bring in new people that would require fewer
[2] benefits. It's just business.
[3]    Q.   Now, with respect to Exhibit 1 that Mr.
[4] Welsh went through with you, the different forms you
[5] signed, Brown Exhibit 1 -- do you remember those
[6] that you went through?
[7]    A.   I don't remember filling out all of the
[8] doctor forms for an insurance company.
[9]    Q.   No. Do you remember he asked you some
[10] questions about the forms you signed that are part
[11] of Exhibit 1, Brown Exhibit 1, right, a few moments
[12] ago?
[13]    A.   Yes.
[14]    Q.   When you were meeting with a person --
[15] strike that. Did you meet with somebody when you
[16] filled these out, or were they given to you to fill
[17] out?
[18]    A.   From what I remember about this, these were
[19] handed out at a meeting and they were gone through.
[20] I don't remember who conducted it.
[21]    Q.   Did anybody in that meeting sit down and
[22] compare, benefit by benefit, what EFTC's benefits
[23] were and what Bayer's benefits were when you signed
[24] any of these documents?

Page 74

[1]    A.   I believe that there was some conversation
[2] about that. I don't remember specifics. I couldn't
[3] say, "Yes, this individual questioned this," I can't
[4] say that.
[5]    Q.   Was there any meeting where you had
[6] individually with anybody from EFTC, that EFTC
[7] individuals sat down and said, "This is what their
[8] offer is, this is what EFTC offers" and compare it
[9] for you?
[10]    A.   I don't remember that one-to-one
[11] comparison. I only remember someone saying that
[12] they were all going to be equal to or better.
[13]    MR. ROACH:   That's it. No further
[14] questions.
[15]    MR. WELSH:   I have a follow-up.
[16]    REDIRECT EXAMINATION
[17] BY MR. WELSH:
[18]    Q.   Do you recall meeting with EFTC
[19] individuals, maybe when they passed things out,
[20] where they described what their benefit policies
[21] were? Not that it was side by side with Bayer, but
[22] they explained, "EFTC provides the following
[23] benefits"?
[24]    MR. ROACH:   Objection. You can answer.

Page 75

[1]    A.   I remember regarding health benefits only.
[2]    Q.   How about vacation?
[3]    A.   I think I was shocked when I found out that
[4] I was going to lose a week's vacation.
[5]    Q.   Do you recall how you found that out?
[6]    A.   No, sir.
[7]    MR. WELSH:   I have no further questions.
[8] Thank you for coming in today, sir.
[9]    THE WITNESS:   My pleasure.
[10]    (Deposition concluded at 11:47 a.m.)
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 76

[1]    C E R T I F I C A T E
[2]    I, Robert D. Brown, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8]    Dated at _____, this _____ day of _____,
[9] 2006.
[10]
[11]    _____
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]