Page 6

```
 1        P R O C E E D I N G S
 2           RICHARD C. RAMSDEN,
 3   having been satisfactorily identified by the
 4   production of his driver's license, and duly sworn
 5   by the Notary Public, was examined and testified as
 6   follows:
 7       MR. ROACH: I assume we'll do the usual
 8   stipulations?
 9       MR. WELSH: Same stipulations as the
10   previous depositions.
11       MR. ROACH: Which are, the witness will
12   read and sign and has 45 days to do so.
13       MR. WELSH: Yes.
14       MR. ROACH: And we'll waive the notary,
15   waive the filing; reserve all objections till
16   the time of trial except motions as to form;
17   preserve motions to strike until the time of
18   trial. I think that's it.
19       MR. WELSH: Uh-huh.
20       MR. ROACH: Off the record for a moment.
21   (Off-the-record discussion held.)
22
23
24
```

Page 7

```
 1            EXAMINATION
 2   BY MR. ROACH:
 3       Q. Okay. Could you state your name, please.
 4       A. Sure. My name is Richard Ramsden.
 5       Q. And where do you live?
 6       A. 235 Hampshire Road in Methuen,
 7   Massachusetts.
 8       Q. I'm sorry? What? 235 --
 9       A. 235 Hampshire Road in Methuen,
10   Massachusetts.
11       Q. And the zip?
12       A. 01844.
13       Q. Date of birth?
14       A. 9/15/43.
15       Q. And you are here today with Mr. Welsh. Is
16   he representing you in this deposition?
17       MR. WELSH: I'm representing him as a
18   manager of the corporation, not in his
19   individual capacity.
20       MR. ROACH: As a manager and in an
21   individual capacity?
22       MR. WELSH: But not in his individual
23   capacity.
24       MR. ROACH: Okay. I'm not sure what that
```

Page 8

```
 1   means but --
 2       MR. WELSH: That means he's here as an
 3   agent of the company. And as an agent of the
 4   company, I'm representing him in that
 5   capacity. But as far as I know, I am not
 6   representing Mr. Ramsden individually in his
 7   individual capacity.
 8       MR. ROACH: Okay. The company being Bayer
 9   Corporation?
10       MR. WELSH: Yes.
11       MR. ROACH: And does that also include the
12   Bayer Corporation Severance Pay Plan?
13       MR. WELSH: Bayer Corporation.
14       MR. ROACH: But not the Plan?
15       MR. WELSH: I represent the Plan, but he
16   has no connection with the Plan. He was a
17   former manager of Bayer Corporation.
18       Q. Okay. Your social security number, sir?
19       A. ███-██-██9.
20       Q. How long have you lived in Methuen at your
21   present address?
22       A. 37 years.
23       Q. Can you tell us your educational
24   background, just starting from high school, just
```

Page 9

```
 1   briefly?
 2       A. High school, college courses, many
 3   management courses.
 4       Q. Okay. Where did you go to high school?
 5       A. North Andover High School.
 6       Q. When did you graduate?
 7       A. 1961, I believe.
 8       Q. College, where did you go?
 9       A. Courses at Northeastern, Phillips Academy.
10       Q. Okay. Did you graduate from college?
11       A. No.
12       Q. So you went to Northeastern for how long?
13       A. Always for courses. I don't recall how
14   long.
15       Q. Were you ever in a degree -- enrolled in a
16   degree program for college?
17       A. No.
18       Q. What kind of courses did you take at
19   Phillips and Northeastern?
20       A. Mostly management.
21       Q. What type of management; if you could
22   describe them briefly?
23       A. One at Phillips was tied into
24   Northeastern. It was just, I think, a general
```

Richard Ramsden 05/02/2006

Page 18

1   A. That area is responsible for manufacturing
2   the Bayer printed circuit boards that the
3   components get inserted into for Compugraphic.
4   Q. Okay. And what is the end user of these
5   printed circuit boards; what is the end use?
6       MR. WELSH: Objection. You may answer.
7       THE WITNESS: They are -- they are used
8   after the components are inserted to be placed
9   into the electronic devices at the time that
10  Compugraphics sold.
11  Q. What were those types of devices?
12  A. Typesetters, electronic typesetters used
13  in the printing business.
14  Q. Like newspapers?
15  A. Like newspapers.
16  Q. Okay. And how long did you work for
17  Compugraphics in that position?
18  A. Well, my position changed. It just got
19  added to.
20  Q. Okay. How many people were under you as a
21  supervisor of the preprinted circuit board
22  fabrication area?
23      MR. WELSH: Objection. When he first
24      started as a supervisor?

Page 19

1       MR. ROACH: Yes.
2   Q. I believe you said you started as a
3   supervisor in 1967 at Compugraphics.
4   A. Uh-huh.
5   Q. Is that right? Is that correct?
6   A. Yes.
7   Q. Okay. How many people worked under you?
8   A. I was the person.
9   Q. Just one person? So you supervised
10  yourself --
11  A. Yes.
12  Q. -- at that time?
13      All right. Were people then added to that
14  area and worked under your supervision?
15  A. Yes.
16  Q. Okay. How long did you hold that position
17  as supervisor for Compugraphics in the pre --
18      MR. WELSH: Printed.
19  Q. -- preprinted circuit board?
20  A. Printed circuit board.
21  Q. Preprinted circuit board fabrication --
22      MS. SKENE: No "pre."
23      THE WITNESS: No "pre."
24  Q. Oh, printed circuit board fabrication.

Page 20

1   A. Time-wise, I don't recall exactly how long
2   it was.
3   Q. Just give me a rough.
4   A. Couple of years.
5   Q. Okay. And then what did you do after you
6   had that position; what was your next position?
7   A. Well, at the time, the responsibility just
8   got added to; it never went away.
9   Q. What was your title; supervisor for the
10  first couple, three years?
11  A. Yes.
12  Q. Okay. Then what was your next title and
13  what was your job?
14  A. I think it progressed to manager,
15  director, vice-president.
16  Q. Okay. So you went from supervisor to
17  manager, director, and then vice-president?
18  A. Correct.
19  Q. All right. When did you become manager?
20  A. I don't recall the date.
21  Q. Can you tell me roughly?
22  A. At best, it's an estimate, would be
23  probably five years later, early '70s.
24  Q. Okay. And what was your -- did your

Page 21

1   positions change at all, your responsibilities
2   change at all when you became a manager in the
3   early '70s?
4   A. Changed, got added to.
5   Q. What added responsibilities did you have
6   as a manager?
7   A. I don't recall exactly as a manager. I
8   recall as time went by, the responsibilities that
9   were added.
10  Q. Can you tell us what some of the
11  responsibilities were?
12  A. Not only was it the fabrication of printed
13  circuit boards, it became the assembly and testing
14  of printed circuit boards. As time went on, it was
15  the cable and harness manufacturing area.
16      It then became multi-plant. So it became
17  a paint shop, a metal shop, a machine shop. And
18  then eventually -- and all the support functions.
19  Then it became the systems manufacturing area,
20  where we actually built and shipped revenue product
21  to end customers.
22  Q. So it grew over time?
23  A. Yes.
24  Q. And was the printed circuit board a

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                      05/02/2006

Page 46

1  stipulating that --
2       MR. WELSH: As of April --
3       MR. ROACH: Let me state --
4       MR. WELSH: -- 1999, Bayer had an Agfa
5  division which the electronic prepress systems
6  operation was part of.
7       MR. ROACH: You said April of 1999.
8       MR. WELSH: April of 1998. As of
9  April 1998, Bayer Corporation had an Agfa
10 division. Agfa division had among its
11 operations at that time electronic prepress
12 systems.
13      MR. ROACH: And that was in Wilmington,
14 Massachusetts?
15      MR. WELSH: Primarily in Wilmington.
16      MR. ROACH: And the Agfa division was also
17 in other areas of the United States and
18 Massachusetts, correct?
19      MR. WELSH: Agfa division was in other
20 areas and it had other operations in addition
21 to electronic prepress systems.
22      MR. ROACH: Okay. That will be so
23 stipulated.
24      MR. WELSH: Okay.

Page 47

1       MR. ROACH: And will you agree that the
2  stipulation continued through the sale that's
3  at issue in the case of the printed circuit
4  board --
5       MR. WELSH: I believe that occurred --
6       MR. ROACH: Let me finish.
7       MR. WELSH: -- until 1999, after the sale
8  of the printed circuit board area.
9       MR. ROACH: Okay. So stipulated.
10 BY MR. ROACH:
11   Q.  Okay. Now, sir, with your -- in your
12 position in the electronic prepress systems
13 operations, was Mr. Fontaine under you; did he work
14 under your direction?
15   A.  Yes, he did.
16   Q.  Okay. On this Exhibit 3, can you show us
17 where the other areas of the electronic prepress
18 systems operations were? You mentioned the printed
19 circuit board; you mentioned the machine and model
20 shop; and you've mentioned some others, such as
21 engineering, purchasing and so forth. Can you show
22 me where those are on here in the other boxes, if
23 at all?
24   A.  Well, some -- some support groups did not

Page 48

1  necessarily report into Norm Fontaine.
2    Q.  Okay.
3    A.  So they wouldn't be reflected here.
4    Q.  Okay. Are there any others reflected
5  there that you've mentioned, such as the technical
6  engineering, production and control, purchasing?
7    A.  Yeah. Where it says Avantra
8  manufacturing.
9    Q.  Okay. What's that?
10   A.  It says right here on the left-hand side,
11 second box in on the left, Avantra manufacturing.
12   Q.  What's that; which area is that?
13   A.  Avantra is a product, okay, that we
14 manufactured and shipped.
15   Q.  Okay. What I'm trying to get to is you
16 mentioned there were some other areas other than
17 what we called the board shop -- what you've called
18 the board shop --
19   A.  Right.
20   Q.  -- and the machine shop. You've mentioned
21 engineering, shipping and so forth.
22   A.  And I mentioned systems manufacturing, the
23 output devices.
24   Q.  Okay.

Page 49

1    A.  That's one of them, is the Avantra --
2    Q.  I see.
3    A.  -- okay, manufacturing.
4    Q.  Okay. What else is reflected on here
5  among the ones you've mentioned?
6    A.  We see engineering, technical engineering
7  is the engineering support.
8    Q.  And in April of 1998, do you know how many
9  people were working in the model and machine shop,
10 roughly?
11   A.  I can tell you that this chart, okay, is
12 supposed to reflect the number, okay, which is 73
13 in the printed circuit manufacturing and 12 in the
14 model machine shop.
15   Q.  Now, you've got 12 machinists; is that in
16 addition to the 12 in the model machine shop?
17   A.  Yes; that's total.
18   Q.  Okay. So the -- so in the board shop
19 area, we've got 73 people, right?
20   A.  Uh-huh, correct.
21   Q.  And then 18 in fabrication and 51 in
22 assembly and testing?
23   A.  That's a total of 73. 73 is the gross.
24 And it's broken down into 18 in fabrication, 51 in

13 (Pages 46 to 49)

Richard Ramsden                                                    05/02/2006

Page 50

1  assembly and test and 2 in chem, lab, water
2  treatment.
3      Q. Okay. Did you have any responsibility in
4  1998 over personnel issues, any decisions, any
5  decision-making authority?
6      A. In what way?
7      Q. Hiring, firing, placing people in
8  different positions?
9      A. Yes.
10     Q. Okay. What were your responsibilities?
11     A. We would recommend hiring, recommend
12 terminating, recommend promoting, changing job
13 functions.
14     Q. When you say "we," I'm asking about you,
15 sir; did you mean to say that's your job as well?
16     A. No, not -- not in total.
17     Q. I want to know what your job was in
18 terms --
19     MR. WELSH: Are you done with your answer?
20     THE WITNESS: Yes.
21     MR. WELSH: Okay.
22     Q. I want to know what your specific
23 responsibilities were in terms of managing, hiring,
24 firing, control of personnel in 1998 in the area

Page 51

1  that you were responsible for.
2      A. My responsibility was to define a person's
3  performance level. My responsibility was to make
4  recommendations on rate increases. My
5  responsibility was to make recommendations on
6  hiring and terminating. My responsibility was also
7  to change a person's job function, okay, as -- as
8  the need existed or as the person's performance
9  justified.
10     Q. Were you involved in evaluating people's
11 job functions?
12     A. Yes.
13     Q. Particularly, did that include the board
14 shop?
15     A. All of my organization.
16     Q. Are you familiar with the plaintiffs who
17 have filed suit in this case, the names of the
18 people that are named plaintiffs in this case?
19         And I'll show you Exhibit 1 where their
20 names are listed at the top.
21     A. For the most part, yes.
22     Q. Okay. Any that you don't know or don't
23 recall or recognize?
24     A. I know all the names. I can't necessarily

Page 52

1  put a face to all the names.
2      MR. ROACH: Just a moment.
3      Q. Okay.
4      A. I know Jeanne Skene.
5      MS. SKENE: Everybody knows Jeanne Skene.
6      Q. Okay. So I'm sorry. Who are the people
7  you don't recognize?
8      A. Like I said, I recognize the names; but to
9  put a face with the names, there's some here I
10 can't.
11     Q. Okay. Let me ask you this: In 1998, the
12 board shop was sold to EFT Corporation. Do you
13 remember that?
14     A. EFTC.
15     Q. EFTC, yes.
16         And you were involved in that sale
17 process, correct?
18     A. I was involved, yeah.
19     Q. Can you tell me why the board shop sale
20 took place between Bayer and EFTC Corporation?
21     A. Yes.
22     Q. Why?
23     A. We had determined we needed to focus,
24 first of all, on what was Agfa's core competencies,

Page 53

1  which was our main line of revenue. And in
2  assessing the board shop, we realized that there
3  were many, many dollars that we needed to invest in
4  order to bring it up to current technology
5  standards.
6          And based on that, we determined that we
7  should look at alternatives, you know, to our
8  printed circuit board manufacturing. We were not
9  in a position to make hundreds of thousands of
10 dollars, okay, worth of investments into the board
11 shop when we felt that there were other options to
12 us.
13     Q. With the people that you reviewed who are
14 on Exhibit 1, the plaintiffs in this case, do you
15 have a memory as to whether as a group they were
16 good workers?
17     A. That's a hard question to ask. You know,
18 I would say that some, yes, okay; you know, there
19 are all different levels of performance within that
20 group.
21     Q. Generally speaking, was it a good group in
22 terms of performance and dedication and
23 performance?
24     MR. WELSH: Objection. You may answer.

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                                       05/02/2006

Page 58

1    inquiring about the printed circuit board
2    area.
3        Q. Okay. So at some point, is it fair to say
4    that Bayer started looking for other ways to obtain
5    printed circuit boards, and one of the options was
6    to sell the board shop.
7        A. Yes.
8        Q. Is that a fair statement?
9        A. That's a fair statement.
10       Q. Okay. When did that process begin,
11   generally?
12       A. Well, I would say that it was in --
13   probably early in 1998; that's an estimate.
14       Q. Okay. Who had -- who initiated the
15   discussions?
16           MR. WELSH: Objection. You may answer.
17       Q. Let me rephrase the question.
18           Who do you remember first discussing it
19   with, if anyone, within Bayer?
20       A. Michael Paige.
21       Q. Did he come to you or did you go to him to
22   discuss it?
23           MR. WELSH: Objection. You may answer.
24           THE WITNESS: We had consultants in to

Page 59

1    look at our printed circuit board shop.
2        Q. Who decided to bring in the consultants?
3        A. It was a collective decision.
4        Q. And who was involved in the collective
5    decision?
6        A. Michael Paige, Dick Ramsden, Don Baribeau.
7        Q. Anyone else?
8        A. Those were the prime people.
9        Q. So Mr. Paige, Mr. Baribeau, yourself, and
10   who else?
11       A. Those were the -- those were the key
12   people from the -- from the get-go. I'm sure there
13   were more as time went by.
14       Q. And so your memory is, early in 1998 is
15   when you first began this discussion among the
16   three of you?
17       A. Yeah. I think late '97, early '98.
18       Q. Who, if any one of you, was the initiator
19   of the discussion?
20       A. I don't think it was any single
21   individual. I think we were constantly challenging
22   ourselves in terms of everything that we had within
23   the Agfa group. And we wanted to assess it, so we
24   had consultants come and it was our collective

Page 60

1    decision to do that.
2        Q. Was the board shop at this time, early
3    1998, productive in terms of a revenue producer,
4    profit center?
5        A. Didn't measure it that way.
6        Q. How did you measure it?
7        A. Quality, on time delivery, cost.
8        Q. And how was it in that regard; how was it
9    doing?
10       A. Acceptable.
11       Q. Okay. And can you tell me what your next
12   steps were after you and Mr. Paige and Mr. Baribeau
13   decided to look at different options with respect
14   to the board shop?
15       A. We had consultants assess the board shop
16   operation and compare it to the industry.
17       Q. And who were these consultants?
18       A. Don't recall the name specifically.
19       Q. Generally?
20       A. They were out of -- out of Idaho. I don't
21   know who they were.
22       Q. Did you consult with them regarding
23   employee benefits were you to sell the board shop?
24       A. Not that I recall, no.

Page 61

1        Q. All right. So who did you -- and I
2    believe you testified earlier that you discussed
3    perhaps selling the board shop to other companies
4    other than EFTC; is that correct?
5        A. This was after the consultants, correct.
6        Q. Okay. Did they recommend that it be sold,
7    the consultants?
8        A. Recommended that we not manufacture boards
9    as part of the Agfa division.
10       Q. And was there any recommendation that the
11   board shop be sold?
12       A. No. There was just -- no.
13       Q. How did that decision come to be made?
14       A. We had a task group that went out and
15   evaluated multiple printed circuit board
16   manufacturers.
17       Q. Other companies, you mean?
18       A. We evaluated other companies that
19   specialized in manufacturing printed circuit
20   boards.
21       Q. Who was in the task group?
22       A. It was Norm Fontaine, myself, John Hurley.
23       Q. How do you spell Hurley?
24       A. H-U-R-L-E-Y.

16 (Pages 58 to 61)

Richard Ramsden                                                    05/02/2006

Page 70

1  employees sign commitment agreements and letters to
2  stay with EFTC after they left Bayer, correct?
3      A. That's what it says.
4         MR. WELSH: Just so it's clear, it's a
5  commitment agreement letter. I think you may
6  have put the word "and" in the middle of that.
7         MR. ROACH: Okay. Fair enough.
8      Q. And then it says, in the last sentence of
9  that section, it says, "EFTC believes that people
10 are the key to success in all endeavors and will
11 spend considerable time and effort on the human
12 element."
13        Do you see that?
14     A. Yes, I do.
15     Q. Do you have any recollection of what they
16 meant by that?
17     A. No, I don't.
18     Q. Do you remember discussing with EFTC the
19 types of inducements or incentives that they might
20 offer to convince the board shop employees to
21 continue in the board shop after the sale to EFTC?
22     A. I don't -- I don't recall there was much
23 effort put into inducing the employees, you know,
24 to go to EFTC. I believe our discussions was --

Page 71

1  any that we had was with the higher management of
2  EFTC, and you know, the discussion was that in
3  generalities, as far as some of the positive things
4  that EFTC could probably offer the employees as
5  time went by.
6      Q. Can you remember what those positive
7  things you conveyed to the board shop employees?
8      A. Well, I didn't convey them. It was
9  something that was conveyed by EFTC.
10     Q. Who at EFTC conveyed them?
11     A. I believe it would be a gentleman by the
12 name of Jack Calderon.
13     Q. Okay. And did he convey them with your
14 permission?
15        MR. WELSH: Objection.
16        THE WITNESS: He didn't have to ask my
17 permission. I mean, he wasn't -- I mean, this
18 was something that he was saying as a matter
19 of fact, that this is what EFTC's intent --
20 intentions were.
21     Q. All right. Well, at some point -- Jack
22 Calderon worked for EFTC, correct?
23     A. Correct.
24     Q. And at some point, he spoke to the board

Page 72

1  shop employees, correct?
2      A. That's correct.
3      Q. And he couldn't have come on to Bayer
4  premises -- strike that.
5         Did he do it on Bayer's premises?
6      A. Yeah.
7      Q. And he wouldn't have been able to come on
8  to Bayer's premises to speak to the board shop
9  employees without Bayer's permission, correct?
10     A. That's correct.
11     Q. So do you remember discussing with
12 Mr. Calderon what he was going to say to the Bayer
13 employees before he came to speak to the board shop
14 employees?
15     A. Not specifically about what he was going
16 to say. Earlier conversations were made perhaps in
17 generalities in terms of, you know, what their
18 intention were.
19     Q. Okay. And what did they say in generality
20 what their intentions were?
21     A. Well, I think he discussed or talked
22 about, you know, pay for performance as far as, you
23 know, a bonus plan based on ability to achieve
24 certain revenue dollars; talked about continuation

Page 73

1  of seniority; talked about some vacation benefits;
2  you know, talked about maintaining employees'
3  salaries, those sorts of things.
4      Q. Did Mr. Calderon ever say to you that he
5  was more interested in the board shop employees
6  rather than the equipment?
7      A. No.
8      Q. Never said that to you?
9      A. No.
10     Q. Did you ever tell anybody else, like
11 Ms. Skene or anybody else, that Mr. Calderon had
12 said that to you?
13     A. No, not that I recall.
14     Q. Now, we're going to get into a little bit
15 more detail about your discussions with EFTC at
16 some of the meetings, but I'd just like to focus
17 again on Exhibit 5 here.
18     A. Yeah.
19     Q. You see where it says, "People are the key
20 to success." Do you see that in the exhibit,
21 Exhibit 5?
22     A. Yes.
23     Q. Did EFTC consider the transfer of the
24 board shop employees from Bayer to EFTC as a key to

19 (Pages 70 to 73)

**Page 82**

1  Q. Did I read that correctly?
2  A. Yes, you did.
3  Q. Did you believe that the transfer would
4  allow Bayer to save on severance costs if they
5  transferred the board shop people to EFTC?
6  A. Well, we knew that we would, but that
7  wasn't part of our final decision.
8  Q. Okay. Now, the CCC, could that stand for
9  circuit card assembly?
10 A. Yeah. That's what I meant -- that's what
11 I said before.
12 Q. Okay. And that's the board shop area?
13 A. Correct.
14 Q. Okay. And it appears from this proposal
15 that EFTC was looking for a trained workforce,
16 correct, as part of the deal?
17     MR. WELSH: Objection. You may answer.
18     THE WITNESS: I think we both were looking
19 for a trained workforce, not just EFTC.
20 Q. I'm not sure what you mean.
21 A. Well, in order for us to get our product
22 delivered in an uninterrupted way, you need to have
23 experienced people.
24 Q. I'm talking about the sale. I'm talking

**Page 83**

1  about the negotiation of the board shop sale from
2  Bayer to EFTC. They were looking for an initially
3  trained workforce, correct?
4  A. Yes.
5  Q. And the board shop employees that are part
6  of Exhibit 1 were a trained workforce in the board
7  shop area, correct?
8  A. Correct. You're correct.
9  Q. Okay. Now, on the next page of Exhibit 5,
10 1359, section 3.5.3, it says, "Critical skill
11 transfer." And it says in the first sentence that
12 Agfa and EFTC will identify all critical skills and
13 associated personnel; is that correct?
14 A. Yes.
15 Q. And that would include the people that
16 were working for the board shop that are on
17 Exhibit 1, correct?
18     MR. WELSH: Objection. Are you saying are
19 they all included there?
20     MR. ROACH: Let me rephrase the question.
21 Q. Part of the critical skills and associated
22 personnel that were evaluated were the people that
23 were on Exhibit 1, correct?
24 A. Can't say that it was exclusive to any of

**Page 84**

1  those people.
2  Q. Well -- but they were part of the group,
3  correct?
4     MR. WELSH: Objection. All of them?
5     MR. ROACH: Yes.
6     THE WITNESS: No, all of these are not
7  considered critical skills.
8  Q. Okay. What about associated personnel?
9  A. The definition of these folks is they were
10 part of the printed circuit board manufacturing
11 group.
12 Q. Okay. Well, do you understand what he
13 meant by critical skills and associated personnel
14 in this document?
15     MR. WELSH: Objection. You may answer.
16     THE WITNESS: Critical skills, you know,
17 would be those individuals, okay, that were --
18 had much knowledge, okay, of the processes. I
19 would say from a technical point of view and
20 from a nontechnical point of view, those who
21 were playing a very, very key role in the
22 printed circuit board area as it existed with
23 Bayer.
24 Q. Okay. And who other than people who are

**Page 85**

1  on Exhibit 1 were transferred over to EFTC as part
2  of the sale, if you know?
3  A. I don't recall.
4  Q. Do you recall any critical skill people
5  that were transferred?
6  A. Oh, sure. I'd have to look at it and
7  study it.
8  Q. Sure. Go ahead.
9  A. I would say John Sablock is one; say
10 Teresa Ornelas was one; Bert Guilmette; Vinnie
11 Fiorilla. Those are some of the key people.
12 Q. Okay. Any others you can recall in
13 looking at Exhibit 1?
14 A. Not on the same level.
15     MR. WELSH: One second.
16     (Off-the-record discussion held.)
17 Q. Okay. I'd like to show you -- mark the
18 next document as Exhibit 6.
19     (Exhibit No. 6, B01363 to 1376, marked for
20 identification.)
21     MR. ROACH: And showing you Exhibit 6. It
22 is, for the record again, similar to
23 Exhibit 5, Bates stamped number B01363 to 1376
24 produced by the defendants in this case and is

Richard Ramsden 05/02/2006

Page 86

1   part of the proposal that was submitted to Mr.
2   Ramsden as part of Exhibit 4.
3       Is that acceptable, Mr. Welsh?
4       MR. WELSH: I haven't reviewed the
5   proposal, but for purposes of this deposition,
6   I'll find it acceptable.
7       Q. Do you recognize what we've marked as
8   Exhibit Number 6, Mr. Ramsden, as part of the
9   proposal that was sent to you by Mr. Griffin?
10      A. That's correct.
11      Q. I'd like to show you page 1 -- I'd like to
12  direct you to page 1364, Bates stamped at the
13  bottom. And you see the section 6.0.6, labor and
14  burden rates?
15      A. Yes.
16      Q. In the second paragraph there, it says,
17  "EFTC's Wilmington's labor rate structure will
18  transcend to lower contract manufacturing rates,
19  which will help EFTC achieve both the guaranteed
20  and targeted cost savings for Bayer, Agfa
21  division." Do you see that?
22      A. I see it.
23      Q. Do you have any understanding of what that
24  means?

Page 87

1       A. My interpretation of that is as EFTC -- as
2   EFTC grows in the Wilmington area, additional
3   employees would be hired, okay, at a lower labor
4   rate than was currently being paid, okay, to the,
5   quote, former Agfa employees. And as a net result
6   of that, okay, the overall costs would be reduced.
7       Q. Okay. Is there anything in there that
8   suggests that that applies only to new people added
9   and not to the Bayer employees that would be
10  transferring over to EFTC?
11      A. Well, I think it says here, "Employees
12  will be hired at a labor rate which are more in
13  line with current EFTC practices"; that's not
14  specific, but I think that's what it implies.
15  Labor rates for our employees, okay, was -- was
16  high, was good.
17      Q. And was it contemplated that EFTC was
18  going to hire the board shop employees at the same
19  rate they were being paid when they were with
20  Bayer?
21      A. Yes.
22      Q. And do you know whether they were?
23      A. Yes, they were, and in some cases higher.
24      Q. And what are you basing that on, what

Page 88

1   facts?
2       A. Just because I was told that they were.
3       Q. Who told you?
4       A. Don't recall. I believe our human
5   resource folks, the Agfa human resource people.
6       Q. Would that include Mary Leonard?
7       A. Yes, it would.
8       Q. Who else worked with her in human
9   resources at this time who might have been involved
10  in the sale and transition of the transfer of the
11  employees from Bayer to EFTC?
12      A. The only person I can think of is Rod
13  Willis.
14      Q. Rod Willis?
15      A. I believe so. To some extent; I don't
16  know what extent.
17      Q. Now, do you know if a fellow by the name
18  of Dick DeFrancesco was transferred over to EFTC?
19      A. Yes, he was.
20      Q. Okay. Did he ever -- did you ever suggest
21  to Mr. DeFrancesco that he not go to EFTC and stay
22  with Bayer, move to another area in the building to
23  work?
24      A. I don't ever recall that discussion, no.

Page 89

1       Q. And where was Mr. DeFrancesco working,
2   which area within Bayer?
3       A. He was in the printed circuit board test
4   area, where they test printed circuit boards.
5       Q. Was he part of the board shop?
6       A. Yes.
7       Q. At the time you received this proposal
8   from Mr. Griffin from EFTC, did you have any
9   discussions with anyone at that time in April of --
10  March or April of 1998, about whether the employees
11  of the board shop would be paid severance if they
12  were to transfer to EFTC?
13      A. No. Because it wasn't our intent, because
14  the entire -- the entire board shop, okay, would
15  be -- if we went this direction -- this was not
16  anything that we had finalized -- but the entire
17  board shop would be transitioned in place to EFTC
18  and all the employees would be guaranteed positions
19  at the same rate.
20      Q. Okay. And so based on that, it was your
21  understanding and belief in March or April of 1998
22  that they would not be entitled to severance pay?
23      A. Yeah. Because --
24      Q. Is that a yes?

23 (Pages 86 to 89)

Richard Ramsden                                                05/02/2006

### Page 90

1   A. Yes.
2   Q. Okay. And in March or April of 1998, what
3   did you review or with whom did you consult to come
4   to that conclusion at that time?
5   A. I don't think anyone, because the
6   employees were not being laid off, okay? The --
7   the group was being transitioned from Agfa to EFTC.
8   Q. Okay. That wasn't my question. In March
9   or April of 1998, you had an understanding -- is it
10  fair to say you had an understanding of the
11  severance benefits that were part of the package of
12  benefits for the board shop employees of Bayer?
13      MR. WELSH: Objection.
14      THE WITNESS: I don't understand. We
15  hadn't -- we didn't talk about, you know,
16  laying off and severance with the people in
17  the board shop, that wasn't our discussion at
18  the time in 1998.
19  Q. Yeah, I'm just talking about March and
20  April of 1998 right now.
21  A. Uh-huh.
22  Q. Did you have an understanding at that time
23  as to what the severance benefit was for the board
24  shop employees at Bayer?

### Page 91

1   A. Not specifically for the board shop. We
2   had -- severance benefits for anyone, if they were
3   laid off, okay, were the same, whether they were in
4   the board shop or whether they were in other groups
5   within manufacturing or whether they were in a
6   non-operations group, it didn't matter.
7   Q. Okay. And is that based on some document
8   or --
9       MR. ROACH: Do you have the exhibits here,
10  John?
11      MR. WELSH: Don't mess them up, please.
12      MR. ROACH: That's fine.
13  Q. And is that understanding based upon the
14  summary plan description that's been marked as
15  Exhibit 5 in Mr. Fiorilla's deposition?
16      MR. WELSH: Was his understanding based on
17  the summary plan description?
18      MR. ROACH: Yes, yes.
19      THE WITNESS: I don't know if it was based
20  on this. I just knew what it was. I just
21  knew what it was. I don't know about that.
22  Q. Okay. Well, if you look at Exhibit 5 of
23  Mr. Fiorilla's deposition, there is a section
24  entitled Your Severance Pay Benefits, correct?

### Page 92

1   A. Yeah; that's what it says.
2   Q. Okay. And it's your understanding that
3   was in place at the time?
4   A. Well, I don't know what that is. I'm not
5   familiar with that.
6   Q. You're not familiar with it at all?
7   A. I'm sure I've seen it. But I mean, as far
8   as reading through it and so forth, as far as what
9   the severance benefits were is -- you know, we just
10  knew what the severance benefits were.
11  Q. When you say "we," who's we?
12  A. You know, we in management.
13  Q. Okay.
14  A. As probably the definition given to us by
15  the human resource group.
16  Q. Okay. And what was your understanding as
17  management -- I'm just talking about April or March
18  of 1998 -- as to what the severance benefits were?
19  A. I don't recall specifically.
20  Q. I just want to know your --
21  A. It was so many -- it was so many weeks'
22  pay for so many years of service. The details of
23  that, that was seven years ago or eight years ago,
24  I don't recall what it was.

### Page 93

1   Q. Okay. Well, you made a statement earlier
2   that you didn't believe that the Bayer board shop
3   employees would be entitled to severance because
4   they would be going from Bayer to EFTC, correct?
5   A. Uh-huh.
6   Q. Is that a yes?
7   A. Yes.
8   Q. Okay. So is it your understanding under
9   the severance plan that was available to all
10  employees, that in such a circumstance, they
11  wouldn't be entitled to severance?
12  A. My understanding was that the employees
13  were not being laid off. Therefore, okay, there
14  was no -- there was no eligibility for severance.
15      What we were doing is we were selling the
16  printed circuit board shop, okay, to EFTC, ensuring
17  their positions, ensuring their salaries, ensuring
18  some benefits and some incentives.
19      And so the fact of severance really didn't
20  get into the discussion of -- it was obvious that
21  it was something that Agfa was not going to have
22  to -- you know, to deal with, because employees
23  were continuing their employment.
24      MR. ROACH: I would like to double mark

Richard Ramsden                                                           05/02/2006

Page 110

1  third bullet point, that Bayer will decide this
2  year in 1998 about Agfa's future as part of the
3  Bayer Group.  Do you see that?
4     A.  Yes, I do.
5     Q.  Do you know what was meant by that?
6     A.  Well, you have to understand Agfa and
7  Bayer, and that is that what Agfa was producing as
8  product was not very similar to what Bayer was
9  producing as product.  It had nothing to do with
10 the printed circuit board area.  And it was a
11 decision that, I guess, would have to be made as
12 to, okay, whether the marriage would continue.
13    MR. WELSH:  Before you ask another
14    question --
15    (Off-the-record discussion held.)
16    Q.  Okay.  Now, with respect to Bayer's
17 product, what kind of product did they sell that
18 was different than the Agfa division?
19    A.  They're into medical; they're into animal
20 health; they're into crops.  Bayer aspirins.
21    Q.  And what was the Agfa division primarily
22 concerned with?
23    A.  Mostly involved in -- in electronic
24 devices, in films, digital photography, that sort

Page 111

1  of thing.
2     Q.  Okay.
3     A.  When they talk about Agfa, they talk about
4  all of Agfa, the big picture of Agfa, not the
5  printed circuit board here.
6     Q.  And in this third bullet, he quotes
7  Dr. Schneider as saying, "All possibilities are
8  under consideration, including selling Agfa"; is
9  that right?
10    A.  Yes.
11    Q.  All right.  Did this mean the entire
12 division of Agfa or just part of it or all
13 possibilities?
14    MR. WELCH:  You can testify as to your
15    understanding.
16    A.  My understanding is that it's all of Agfa.
17    Q.  Okay.  Now, when -- did the sale to EFTC
18 of the board shop actually take place later in
19 1998?
20    A.  It was first of September, I believe,
21 beginning of September.
22    Q.  And looking at Exhibit 3, that was the
23 flow chart.
24    A.  Yeah.

Page 112

1     Q.  The other -- the other parts of the
2  electronic prepress printing operation remained
3  with Bayer at that time, correct?
4     A.  Correct.
5     Q.  And it was just the printed circuit
6  manufacturing and the fabrication assembly test,
7  73 -- where you got the 73 people that was sold,
8  right?
9     A.  Correct.
10    Q.  Down at the bottom of the page of
11 Exhibit 9, looks like Mr. Rittinghaus says,
12 "There's nothing to be concerned about."  Do you
13 see that?
14    A.  Yes, I do.
15    Q.  Do you know what he meant by that?
16    A.  No.  You can assume, but assumptions
17 aren't always -- I think what he's saying here is,
18 you know, there's nothing to worry about relative
19 to the security of people's jobs and what they're
20 doing; that Agfa is a strong company and they'll be
21 successful.
22    Q.  Okay.
23    A.  That's my assumption.
24    (Exhibit No. 10, Bayer, Your Benefits, A

Page 113

1     Significant Part Of Your Total Compensation,
2     marked for identification.)
3     Q.  All right.  I'd like to show you another
4  document which I'll mark as Exhibit 10 and ask if
5  you can identify that, please.
6     A.  This is something that was sent out to all
7  employees once a year, and it provided them with a
8  summary of their overall benefits.
9     Q.  Okay.  And the one that we've marked as
10 Exhibit 10, that was sent out in March of 1998,
11 correct, if you look at the last page?
12    A.  It says March 1998.
13    Q.  Okay.  And what was the purpose of sending
14 out Exhibit 10?
15    MR. WELSH:  Objection.  If you know, you
16    can answer.
17    MR. ROACH:  Well, of course.  What's the
18    objection there?
19    MR. WELSH:  Well, because he didn't send
20    it out and there's no foundation that he sent
21    it out or was responsible for sending it out.
22    You're asking him to opine about what happened
23    in Pittsburgh.
24    Q.  Go ahead.  You can answer the question,

Richard Ramsden                                                                    05/02/2006

Page 130

1   A. No. I think the biggest concern that Agfa
2   had was to make sure that the employees were cared
3   for, okay, and at the same time, getting our
4   printed circuit boards requirements satisfied.
5   Q. Now, when you say Agfa, you're talking
6   about Bayer, right?
7   A. Bayer. Right. I apologize. Bayer.
8   Right. That was a very prime interest to us and
9   concern, and that was that, you know, that the
10  employees had jobs and that there were some
11  positive incentives, okay, that the company, in
12  this case, EFTC could provide; that there would be
13  some guarantees. And you know, it became, you
14  know, a positive thing for both, you know, Bayer,
15  and for the employees.
16  Q. Why didn't you discuss a three-year no
17  layoff as opposed to a one-year no layoff?
18      MR. WELSH: Objection. No foundation.
19  You may answer.
20      THE WITNESS: I don't know why we said one
21  year, so I don't know why we wouldn't say
22  three years.
23  Q. Okay. Was there any discussion, if you
24  recall, of more than one year of no layoff of the

Page 131

1   board shop employees?
2   A. I don't know.
3   Q. Okay. The next page of Exhibit 11, do you
4   see a square in the middle of the page?
5   A. Yes.
6   Q. It says, "Meet with Agfa and EFTC." Do
7   you see that?
8   A. Yes.
9   Q. Okay. And it's got Agfa people listed as
10  Michael, Dick, Bob, Kim and Rod.
11  A. Right.
12  Q. Does Dick mean you?
13  A. Yes, I'm quite sure it is.
14  Q. You were known as Dick Ramsden, right?
15  A. That's correct.
16  Q. Okay. And in notes and so forth and in
17  your signatures and things, you would call yourself
18  Dick, correct?
19  A. Correct.
20  Q. And is Michael, Michael Paige?
21  A. Correct.
22  Q. Who was Bob?
23  A. Bob? Who was Bob? Oh, Bob Sarafian.
24  That's who -- I believe that's who it is.

Page 132

1   Q. I'm sorry. Can you spell the last name?
2       MR. WELSH: S-A-R-A-F-I-A-N. You met him.
3       MR. ROACH: Oh, okay.
4   Q. And who's Kim?
5   A. Kim Nealy.
6   Q. And how do you spell that?
7   A. N-E-A-L-Y.
8   Q. And who was she?
9   A. She was the financial person at the time
10  for Agfa, for Bayer.
11  Q. Okay. And who was Mr. Sarafian, attorney
12  for Bayer?
13  A. Yes.
14  Q. In-house counsel?
15  A. Yes.
16  Q. And who was Rod? Rod Willis?
17  A. Rod Willis. Again, these are not my
18  notes, but I'm assuming that that's who these
19  people are.
20  Q. Okay. Was there somebody from Bayer
21  assigned to take notes at the meetings?
22      MR. WELSH: Objection. What meetings?
23  Q. Any meetings with Agfa and EFTC.
24  A. I can only speak for my meetings, and I

Page 133

1   took the notes.
2   Q. Okay. So is this your handwriting?
3   A. No.
4   Q. I'm sorry if I asked you this. But do you
5   recognize this handwriting?
6   A. I don't.
7   Q. And then EFTC present is Jack, Stu, Brien
8   White, Auggie and then looks like another name.
9       MR. WELSH: Objection. There's nothing on
10  the document that indicates present.
11  Q. Do you remember having a meeting, you,
12  Michael Paige, Bob Sarafian, Kim Nealy and Rod
13  Willis with people from EFTC with the names of
14  Jack, Stu, Brien White, Auggie and the last name I
15  can't make out?
16  A. I can -- I don't know if -- I can't verify
17  that all those people were there. We did have, you
18  know, a meeting or two with -- you know, I met once
19  or twice this gentleman Auggie. I think I met once
20  this Brien White, twice. Jack and Stu, we met with
21  them, okay, a number of times.
22  Q. Okay. Who's Jack?
23  A. Jack Calderon.
24  Q. Who is Stu?

34 (Pages 130 to 133)

Richard Ramsden                                                                05/02/2006

Page 138

1    with M. Paige, marked for identification.)
2        Q. Okay. Looking at Exhibit 12, do you
3    recognize the handwriting on here, sir?
4        A. No, I don't.
5        Q. Okay. Do you know anybody at Bayer by the
6    name of Paige, other than Michael Paige?
7        A. I don't know if that's Michael.
8        Q. I'm sorry?
9        A. Michael Paige.
10       Q. You believe that's Michael Paige?
11       A. Yes, I do.
12       Q. Okay. Looking at circle, number 3.
13       A. Yes.
14       Q. It says, "All employees of the PCB
15   division to EFTC" -- and then EFT and there doesn't
16   seem to be a C there -- "not pick and choose."
17          Did I read that correctly?
18       A. Yes, you did.
19       Q. Do you have an understanding of what that
20   means?
21       A. If I interpret this correctly, we stated
22   to EFTC that they would not pick and choose
23   employees, okay; that a printed circuit board
24   manufacturing area was a total group and that's

Page 139

1    what would be part of the transition.
2        Q. So it was an all or nothing?
3        A. It was all or nothing.
4        Q. Okay. And then do you know if EFTC agreed
5    to that?
6        A. Yes, they did.
7        Q. And do you know why EFTC agreed to that?
8           MR. WELSH: Objection. You may answer.
9           THE WITNESS: Why wouldn't they?
10       Q. Well, I'm asking you the question, sir.
11       A. I don't know why they wouldn't.
12       Q. Was it to avoid having to pay severance to
13   anyone?
14       A. No, I don't think so.
15       Q. Well, why was Bayer insisting that all
16   employees be transferred to EFTC as part of the
17   sale?
18       A. Well, I think we had some employees who
19   were special needs people, to be honest with you.
20       Q. Such as who?
21       A. Cliff Lloyd. There were three or four or
22   five on that list. And we wanted to make sure that
23   their needs were met, that they had employment.
24       Q. Cliff who?

Page 140

1        A. Cliff Lloyd.
2        Q. Who else?
3        A. If you can show me the list, I can tell
4    you.
5        Q. Sure. Look at Exhibit 1, it's right in
6    front of you.
7        A. And I might not be all-inclusive, but I
8    can -- this one.
9           MR. WELSH: You're telling him.
10          THE WITNESS: Yeah. Clarence Coupe. I
11   would suggest Mark Bowdidge, Phil Greene.
12   Those were a few.
13       Q. Okay. What were their disabilities or
14   special needs, I think as you called them?
15       A. Do you really want to get into that?
16       Q. I'd like to know just generally speaking.
17       A. Cliff Lloyd was very, very physically
18   impaired, okay, and was -- mentally, he was very
19   limited, very, very limited.
20       Q. Okay. What about Clarence Coupe?
21       A. Clarence was very slow, a very slow
22   individual.
23          I don't mean to take anything away from
24   these people.

Page 141

1        Q. Was this mentally?
2        A. Yes.
3        Q. Okay. What about Mr. Bowdidge?
4        A. He was deaf.
5        Q. What about Mr. Greene?
6        A. He was in a wheelchair.
7        Q. Were they good producers, valuable members
8    of the board shop?
9        A. Within their capabilities.
10       Q. Was there any concern that if they were
11   not chosen, there might be a complaint against -- a
12   lawsuit against Bayer for disability
13   discrimination, handicap discrimination?
14       A. No, not at all.
15       Q. Number 4 on Exhibit 12, it talks about a
16   pension plan. Do you see that?
17       A. Uh-huh. Yes, I do.
18       Q. And talks about potentially getting a
19   release. Do you see that?
20       A. Yes.
21       Q. Do you have any understanding of what this
22   means?
23       A. No, I don't.
24       Q. Do you remember any discussion of getting

36 (Pages 138 to 141)

Richard Ramsden                                                                05/02/2006

Page 154

1  was severance, as to what it would be. As I said
2  earlier, we never really talked about severance
3  because we were providing jobs for everybody.
4      Q. Well --
5      A. No, I don't. I don't recall.
6      Q. Okay. Did you determine what it would be
7  if you were to pay severance to the board shop
8  employees?
9      A. I'm sure at someplace, sometime along the
10 line, we estimated it.
11     Q. And what was your estimate?
12     A. Gees, I don't recall.
13     Q. Can you give me a general estimate as to
14 what it was?
15     A. No, I have no idea.
16     Q. More than a hundred dollars?
17     A. Yes.
18     Q. More than a million dollars?
19     A. I don't know.
20     Q. I know you don't know, but I'm entitled to
21 test your memory, sir.
22     A. Yes, I know you are.
23        It's more than a hundred dollars. I don't
24 know. It would be more than a million dollars.

Page 155

1  How much more, I don't know.
2      Q. Okay. Would it be more than a million and
3  a half dollars?
4      A. I don't know. I don't recall. I really
5  don't recall.
6      Q. But you said it would be more than a
7  million. I just want to test your memory.
8         MR. WELSH: Sounds like you're badgering
9      the witness to me. Doesn't sound like you're
10     testing his memory at all; you're badgering
11     him. Please get to the point.
12     Q. Would it be less than a million and a half
13 dollars?
14     A. You asked me not to guess, so I'm not
15 going to guess.
16     Q. Okay. No, I don't want you to guess.
17     A. So therefore, I don't know.
18     Q. Okay. That's the best you can recall
19 today as to what you've testified to?
20     A. Exactly, yes.
21     Q. All right. Now, looking at page 2.
22     A. Okay.
23     Q. It appears, though, that -- at least it
24 states, "Agfa looking for 2,000,000 premium to deal

Page 156

1  with employee severance issues." Do you have any
2  idea of what is meant by premium?
3      A. None at all.
4      Q. Okay. Next page, page 3 of Exhibit 15.
5  If you look down about halfway to the middle of the
6  page.
7      A. Uh-huh.
8      Q. It says, "Bayer going to buy out employees
9  from post-retirement and medical benefits, unused
10 vacation, severance payments, et cetera."
11        Did I read that correctly?
12     A. Yes, you did.
13     Q. Then underneath that, it says -- appears
14 to be an arrow pointing to the words "big checks to
15 employees."
16        Did I read that correctly?
17     A. Yes, you did.
18     Q. Do you know who wrote that?
19     A. No.
20     Q. Do you have an understanding of what that
21 means?
22     A. No, I don't.
23     Q. Do you remember any discussion involving
24 buying out employees from their benefits involving

Page 157

1  big bucks?
2      A. No. I'm talking about --
3      Q. Or big checks, rather, I meant to say.
4      A. No. I remember talking about, you know,
5  unused vacation and things of that sort, but
6  nothing about post-retirement or medical. And I
7  don't know how you'd buy somebody out from their
8  medical benefits.
9      Q. Did you ever give the employees a choice
10 to go to EFTC or to take severance?
11     A. No.
12     Q. You don't remember ever giving them a
13 choice?
14     A. No, I don't recall ever giving them a
15 choice.
16     Q. Did you ever recall saying to the
17 employees, any of the employees, meaning the board
18 shop -- the board shop employees that are the
19 plaintiffs in the case, that they either had to go
20 to EFTC or they'd be terminated and get nothing?
21     A. Well, I think we just said you had to go
22 to EFTC; it was part of our board shop, and EFTC
23 was taking over our board shop.
24     Q. Did they ever ask what the alternative

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                   05/02/2006

Page 162

1  Q. What about Bayer?
2  A. As far as consulting with Bayer, me
3  personally consulting with Bayer?
4  Q. No, no, no.
5  A. They might have, I don't know.
6  Q. My question is, do you know whether Bayer
7  ever consulted with an attorney for an opinion
8  about whether severance would be due to the board
9  shop employees?
10  A. I don't know personally whether they did
11  or not.
12  Q. Does this exhibit appear be in connection
13  with the potential sale of the board shop to EFTC?
14  A. Yes. Well, it talks about the board shop.
15  So you can draw the conclusion that it's tied into
16  it in one way or another.
17  Q. Okay. And you can see pages 1 and 2 go
18  through -- actually, pages 1 through 3 starting, at
19  least, from the bottom of 1 through 3 seem to be
20  talking about the various benefits, correct?
21  A. Correct.
22  Q. Now, looking at page 3, the paragraph
23  circled 9 talks about retention bonuses. And it
24  says, "Paid out at closing end plan." Do you see

Page 163

1  that?
2  A. Yes, I do.
3  Q. Do you have any understanding what that
4  means?
5  A. I believe it means that the retention
6  bonus would be paid out, you know, at the -- if the
7  business were sold, at closing, okay, and that
8  would end the plan for retention bonus.
9  Q. Okay. And that's the retention bonus we
10  were talking about in connection with Fiorilla
11  Exhibit 1 --
12  A. Right. And Guilmette was in --
13  Q. -- to Mr. Guilmette. Let me finish the
14  question.
15      And that's the retention bonus we were
16  talking about with respect to Richard Guilmette,
17  Fiorilla Exhibit 1, and then one to Mr. Brown, your
18  Exhibit 8, correct?
19  A. Yes.
20  Q. And I apologize if I asked you this
21  before. But there were other people who were
22  offered a retention bonus, too, I believe,
23  including some other people who are on Exhibit 1;
24  is that correct?

Page 164

1  A. I believe so.
2  Q. Can you tell me who they were?
3  A. I can't recollect at all who they were.
4  Q. What about David Dolan, was he offered
5  one?
6  A. I can't recall. I don't know.
7  Q. How about Norman Poulin, do you know if he
8  was offered one?
9  A. I don't recall.
10  Q. I'll just show you another document --
11  strike that.
12      You said you don't have a memory of
13  talking at all about severance. Do you remember
14  talking about benefits in general, any benefits for
15  the employees, what would happen with the benefits?
16  A. No. Benefits area was mostly taken care
17  of by human resources.
18  Q. And that would be who?
19  A. Mary Leonard, Rod Willis.
20  Q. Anyone else?
21  A. Those were the two key people as far as
22  Agfa.
23  Q. I'm talking about the board shop employees
24  and the pending sale to EFTC. You understand

Page 165

1  that's what we're talking about in this discussion
2  today, right?
3  A. Absolutely. Absolutely.
4  Q. All right. So other than Mr. Willis and
5  Ms. Leonard, was there anybody else in human
6  resources that dealt with the employee benefits?
7  A. Not that I'm aware of.
8      MR. WELSH: Objection. You mean -- can
9  you clarify what you mean by employee benefits
10  issue?
11  Q. Well, whether employees, meaning the board
12  shop employees, would be paid benefits, would have
13  to be paid benefits or whether the benefits would
14  be -- at EFTC would be the same as the benefits
15  with Bayer?
16  A. The only thing I can tell you there is
17  that any discussion on the benefits from the
18  Agfa/Bayer side would be coming from Mary Leonard
19  and Rod Willis.
20  Q. Okay. All right.
21      MR. ROACH: I'd like to mark the next
22  document as Exhibit 17, please.
23      (Exhibit No. 17, document dated 7/22/98,
24  marked for identification.)

42 (Pages 162 to 165)

Richard Ramsden                                                                05/02/2006

**Page 166**

1  Q. And it's -- just for the record, it's
2  dated 7/22/98. And some names at the top are
3  Auggie Bruehlman, B-R-U-E-H-L-M-A-N, Dick Ramsden,
4  Rod Willis, looks like Kim -- I'm sorry -- an N.
5  Beasley; is that right?
6  A. I don't know.
7  Q. Okay. And then an M. Paige and a D. Marr.
8  Do you see that?
9  A. Yes, I do.
10 Q. Now, is the Auggie Bruehlman, is that the
11 same Auggie we talked about before?
12 A. I believe so.
13 Q. And he's with EFTC?
14 A. Correct.
15 Q. And Dick Ramsden is yourself?
16 A. Correct.
17 Q. Rod Willis we've talked about before?
18 A. Correct.
19 Q. Michael Paige is the same, correct?
20 A. Correct.
21 Q. And who is D. Marr?
22 A. Dave Marr was a Agfa/Bayer representative
23 out of New York, Ridgefield Park, Agfa
24 headquarters.

**Page 167**

1  Q. Okay.
2  A. He was in a kind of a compensation
3  benefits role.
4  Q. Was he part of the Agfa division of Bayer?
5  A. Yes.
6  Q. That was headquartered in New York?
7  A. Yeah. Ridgefield Park.
8     MR. WELSH: One moment.
9     (Off-the-record discussion held.)
10 Q. Was it Ridgefield, New Jersey or
11 Ridgefield Park, New Jersey or was it Ridgefield
12 Park, New York, sir?
13 A. New Jersey.
14 Q. And do you know who N. Beasley is?
15 A. Can't -- no, I don't.
16 Q. Do you know -- recognize the handwriting
17 on Exhibit 17?
18 A. No, I don't.
19 Q. Does it appear to be a listing of people
20 who were in a meeting, and the meeting would be
21 July 22nd, 1998?
22 A. Appears to be.
23 Q. Okay. And if you read the first -- the
24 top third of the page, do they appear to be talking

**Page 168**

1  about benefits in connection with the EFTC/Bayer
2  sale?
3  A. Yes, it appears to be that way.
4  Q. So does that refresh your memory as to
5  whether you were, in fact, involved with discussing
6  benefits with respect to the board shop employees?
7  A. No. I wasn't necessarily involved in
8  discussing benefits with employees.
9  Q. I'm not saying with employees; I'm talking
10 about -- I said about the employees.
11 A. I probably heard what was being proposed.
12 I really didn't get involved in the benefits side
13 of it.
14 Q. What do you mean by didn't get involved?
15 A. Didn't get involved as far as what they
16 were, as far as what they were going to be. It was
17 mostly tied in between Rod Willis, you know,
18 Michael, and headquarters in Ridgefield Park.
19 Q. All right. Well, is there any reason why
20 you would have been at this -- strike that.
21    Is there any reason why you would have
22 been at this meeting --
23 A. Because I was a key person in the --
24    MR. WELSH: Let him finish.

**Page 169**

1  Q. Let me finish.
2     Is there any reason, sir, that you
3  would have been at this meeting on July 22nd, 1998
4  that's reflected on Exhibit 17 that virtually --
5  that discusses only, if you look at it, benefits of
6  the board shop employees?
7     MR. WELSH: Objection. You may answer if
8  you're able.
9     THE WITNESS: I don't know that it's only
10 benefits. We talk about due diligence on the
11 second page.
12 Q. Well, let's go through it page by page.
13 The first line talks about administration of
14 benefits. Do you see that?
15 A. Yes, I do.
16 Q. And it says, "Consolidate as much as
17 possible."
18    Did I read that correctly?
19 A. Yes, you did.
20 Q. Okay. So that's talking about benefits,
21 right?
22 A. Yes.
23 Q. And this is a meeting --
24    MR. WELSH: Objection. There's no

Richard Ramsden                                                                05/02/2006

Page 178

1   MR. WELSH: Objection. Asked and
2   answered. You may answer if you're able.
3   THE WITNESS: No.
4   Q. All right. Now, going to the second page
5   of this, 771, where the asterisk says "payroll" and
6   it says "advise close, 8/14, final list of
7   employees." Do you see that?
8   A. Yes, I do.
9   Q. Do you have any idea what that means?
10  A. No. I don't know who wrote this, so I
11  don't know.
12  Q. Well, I know you don't know who wrote it,
13  but I'm just wondering if from your memory of being
14  involved in this sale, whether you have any
15  knowledge as to what this means?
16  A. Well, we were looking for an August end
17  closure to this as far as a sale and needed to be a
18  final list of employees put together. You know, I
19  would think that that's probably what that note
20  meant.
21  Q. Okay. Does it mean that by August 14, you
22  wanted all employees to be committed to having --
23  to transfer to EFTC?
24  A. I wouldn't say that.

Page 179

1   MR. WELSH: Objection.
2   Q. I'm sorry?
3   A. I wouldn't say that. You can't take from
4   this note here that -- that conclusion, I don't
5   believe.
6   Q. Okay. Do you have any memory of talking
7   to anybody about making sure all employees as of
8   August 14 would have committed to transferring to
9   EFTC from Bayer?
10  A. No, not any specific date, no.
11  Q. Okay. I'm going to show you a document
12  that's Fiorilla Exhibit 3, a letter of August 14,
13  1998 to David J. Dolan from Auggie Bruehlman of
14  EFTC. Do you see that?
15  A. Uh-huh.
16  Q. Are you familiar with this letter?
17  A. No.
18  Q. Well, it appears that on August 14,
19  Mr. Bruehlman of EFTC was offering Mr. Dolan, who
20  was one of the board shop employees, a job offer
21  for EFTC; is that correct?
22  A. He was pleased to offer employment, right.
23  Q. And Dolan was a board shop employee at
24  that time, right?

Page 180

1   A. That's correct, yeah.
2   Q. And he says, "We anticipate being able to
3   hire you into a comparable position at a salary
4   level at your current position with Agfa
5   Corporation."
6   A. Correct.
7   Q. And did I read that correctly?
8   A. Correct.
9   Q. Do you have any understanding what he
10  meant by comparable position?
11  A. I think comparable means similar.
12  MR. WELSH: No. He asked you what
13  Mr. Bruehlman meant by the use of the word
14  "comparable."
15  THE WITNESS: Oh. I don't know what he
16  meant.
17  Q. Okay. What is your understanding of what
18  a comparable position is?
19  A. Similar type of position in terms of, you
20  know, function; that's my personal interpretation.
21  Q. Did you ever use those words in discussing
22  the sale of the board shop to the board shop
23  employees, plaintiffs in this case?
24  A. Not to my recollection, no, as far as

Page 181

1   comparable positions.
2   Q. You never used the words they'll be
3   transferring to a comparable position at EFTC if
4   the sale goes through?
5   A. I don't think I ever recall -- I don't
6   ever recall saying that, no.
7   Q. Okay. Now, looking back on Exhibit 17,
8   after having looked at Exhibit 3 from Fiorilla,
9   does that refresh your memory, looking at the two
10  of them, as to whether there was any discussion
11  about trying to make sure that the employees had
12  committed by August 14 or thereabouts to accepting
13  a job with EFTC?
14  A. No, not at all.
15  Q. Okay. Now, looking to the right of where
16  it says payroll, there's a slash; do you see that?
17  A. Uh-huh.
18  Q. Do you see it on Exhibit 17?
19  A. Right here (indicating).
20  Q. Yes. On page 771. And then it looks like
21  it says, "Pay adjustment ultimately is eroded over
22  time." Do you see that?
23  A. Yes, I do.
24  Q. Do you have any understanding as to what

46 (Pages 178 to 181)

Richard Ramsden                                                       05/02/2006

**Page 182**

1   that means?
2       A. No, I don't. I think it's related to the
3   401(k), I would assume. It's got a line down to
4   it. But, no, I don't.
5       Q. Okay. Did you ever have any discussion
6   with anybody from EFTC whereby they said that if we
7   purchase the board shop and the employees are
8   transferred, we can only guarantee or will commit
9   that they be paid the same salary they are at Bayer
10  for one year only?
11      A. No, not with the one-year only clause, no.
12      Q. Okay. Is it your understanding that the
13  one-year only clause that you were negotiating with
14  EFTC meant that they would only commit to keeping
15  them in place and employed at EFTC for one year?
16      A. No. I think we -- I think somewhere in
17  the -- in the agreement was that they would be
18  employed, would be kept for at least a year.
19      Q. Right.
20      A. As opposed to, okay, for a year.
21      Q. Okay. Well, I guess that was my question,
22  then.
23      A. Yeah.
24      Q. I think we're stating the same thing in a

**Page 183**

1   different way.
2           Is it your understanding that EFTC agreed
3   that they would keep the employees for at least a
4   year, but there was no guarantee they would keep
5   them for any longer than that?
6       A. Yes.
7       Q. Did you ever hear anybody from EFTC
8   indicate to you that after one year, the board shop
9   employees may very well be laid off or terminated?
10      A. No, absolutely not.
11      Q. I'd like to show you another document
12  marked as Exhibit 18, please.
13          (Exhibit No. 18, document with the word
14      "tax" and a box up above, marked for
15      identification.)
16      Q. And it's got the word "tax" and a box up
17  above.
18      A. Yes.
19      Q. And do you know who wrote this, drafted
20  this document?
21      A. No, I don't.
22      Q. And again, for the record, it's not Bates
23  stamped, but it is among the documents that the
24  defendants produced to me in this case pursuant to

**Page 184**

1   a document request.
2           And it says Lou Marrett (phonetic) at
3   the top. Do you see that on the left?
4       A. Yes, I do.
5       Q. Do you know who that is?
6       A. No, I don't.
7       Q. And then it's got down -- about halfway
8   down, Kim Collins and benefits. Do you see that?
9       A. Yes, I do.
10      Q. And I believe you identified Kim Collins
11  earlier as somebody that --
12      A. I don't think so.
13          MR. WELSH: No, he didn't.
14      Q. Oh, I'm sorry.
15      A. Kim Nealy.
16      Q. Oh, I apologize. It's a different Kim.
17          Do you have any idea who Kim Collins
18  is?
19      A. No, I don't.
20      Q. All right. Is this document in connection
21  with the impending sale between Bayer and EFTC?
22      A. I don't know. Let me read it.
23      Q. Sure.
24      A. In reading it, I would say that it ties

**Page 185**

1   into EFTC.
2       Q. The EFTC/Bayer sale?
3       A. It looks that way.
4       Q. All right. Now, looking at the box that
5   says benefits, it says, "Lists of all plans of
6   Agfa, what can be transferred over, what not." Do
7   you see that?
8       A. Yes, I do.
9       Q. Any information -- strike that.
10          Do you have any idea what that means?
11      A. No, I don't.
12      Q. Next line down says, "buy out employees
13  from, 1, post-retirement," and then an arrow, "2,
14  not transfer medical, to unused vacation, 3,
15  severance payments, 4, retention bonus due."
16      A. Uh-huh.
17      Q. Did I read that correctly?
18      A. Yes, you did.
19      Q. Does that refresh your memory as to any
20  discussion regarding buying out employees for any
21  of these benefits, including severance?
22      A. No, not at all.
23      Q. Do you know whether anybody in human
24  resources discussed these issues?

Richard Ramsden                                                                                  05/02/2006

Page 186

1  A. I don't know whether they discussed them
2  or not.
3  Q. And then down below, it has an asterisk
4  that says, "What about a pension plan? EFTC does
5  not have one." Do you see that?
6  A. Yes, I do.
7  Q. Did I read that correctly?
8  A. Yes.
9  Q. Did you understand that EFTC had no
10 pension plan?
11 A. I was told they had none.
12    MR. WELSH: Just so the record says, the
13 record -- the phrase is "EFTC not have."
14    MR. ROACH: Oh, okay. Fine.
15 Q. The asterisk says, "What about pension
16 plan - EFTC not have."
17    Did I read that correctly?
18 A. Yes, you did.
19 Q. And then there's an arrow from Bayer to
20 the words "not," which is underlined twice,
21 "transfer."
22    Did I read that correctly?
23 A. Yes, you did.
24 Q. How did you come to learn that EFTC did

Page 187

1  not have a pension plan?
2  A. I believe Jack Calderon told us.
3  Q. Did he tell you about any other benefits
4  that Bayer -- strike that.
5     Did Bayer at this time for its board
6  shop employees have a pension plan?
7  A. Yes.
8  Q. Did Mr. Calderon tell you about any other
9  benefits that EFTC did not have that Bayer did
10 have?
11 A. I don't believe there was any. He told us
12 about some that they had that we didn't have.
13 Q. He told you about some that --
14 A. That they had that we did not have.
15 Q. They had that Bayer did not have?
16 A. Yes.
17 Q. What were those?
18 A. There were some financial incentives based
19 on revenue generation. There was also some perfect
20 attendance awards that were, I recall, pretty
21 significant. Let's see, what else was there?
22 There was one other thing.
23 Q. I'm sorry. The first one was incentives.
24 What was the second thing?

Page 188

1  A. Financial performance of the group. The
2  other was, you know, from -- for extended perfect
3  attendance, there was some sort of recognition.
4  There was another one; I don't recall what it was.
5  Q. Okay. Do you know if these were
6  significant amounts of money or not?
7  A. I don't recall what they were.
8  Q. Do you ever recall Bayer paying each of
9  the board shop employees a thousand dollars at some
10 point around about the time or soon after the sale
11 of the board shop to EFTC?
12 A. I remember something about paying
13 employees. I don't remember the detail. I don't
14 recall. I don't recall the details of that.
15 Q. All right. But you remember something
16 about it?
17 A. Something about some of the employees were
18 given some money. I don't -- I'd be wrong to try
19 and interpret and recall because I don't know.
20 Q. Yeah. I mean, I don't want you to guess,
21 sir.
22 A. Okay. I'm not going to guess.
23 Q. I mean, your best -- your best memory.
24 A. I don't recall the details.

Page 189

1  Q. Do you remember who told you about it?
2  A. No, I don't.
3  Q. Do you remember when Mr. Calderon told you
4  about the EFTC benefits that you just testified
5  about, about the --
6  A. The pension?
7  Q. Let's start with the pension. Do you
8  remember when he told you about that?
9  A. Uh-huh.
10 Q. Is that a yes?
11 A. Yes, he told me about that.
12 Q. What did he say, and what did you say?
13 A. I think he just said that they didn't have
14 a pension benefits program. And that was it,
15 matter of fact.
16 Q. Is that in a conversation he had with you?
17 A. Yeah.
18 Q. Just one-on-one?
19 A. No. I don't recall all the details of the
20 conversation, but I think it was probably part of
21 some of us that were talking, going over stuff like
22 that.
23 Q. Okay. So you don't remember whether it
24 was a one-on-one conversation you had with

48 (Pages 186 to 189)

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                05/02/2006

Page 190

1  Mr. Calderon; is that correct?
2      A. No, I don't.
3      Q. Okay. How many times did he discuss that
4  pension with you and perhaps others in a meeting or
5  otherwise, if you know?
6      A. Not often. Once.
7      Q. Okay. And do you recall when -- strike
8  that.
9          How did you find out about the other
10 benefits from EFTC that Bayer didn't have, the
11 incentives, the financial performance and the
12 extended perfect attendance, if you recall?
13     A. I think he means mentioned them at a
14 meeting in the cafeteria, in which we were a part
15 of the first part of the meeting. So we heard it
16 from him, and then he continued on with his
17 meeting.
18     Q. Is this a meeting with all the board shop
19 employees there or at least --
20     A. A meeting --
21     Q. Let me finish the question. Let me finish
22 the question.
23         Was this a meeting into which all the
24 board shop employees were invited to attend?

Page 191

1      A. I believe they were all invited.
2      Q. Okay. And did he tell them at this
3  meeting that there was no pension plan at EFTC?
4      A. No, I don't think so. Why would he do
5  that? No, he didn't do it.
6      Q. Do you remember what else -- I'm going to
7  get to the meetings in a moment. Do you remember
8  how you found out about the other -- strike that.
9          Were there any other benefits you can
10 think of that Bayer provided that EFTC did not
11 provide?
12     A. No.
13     Q. Did you ever make a comparison as to
14 whether the benefits that would be provided by EFTC
15 would be better or worse than the Bayer benefits?
16     A. I personally didn't, no.
17     Q. Do you know if anybody did?
18     A. No, I don't.
19     Q. I'd like to show you another document,
20 Exhibit 19.
21         (Exhibit No. 19, group of six documents
22 produced by the defendants, marked for
23 identification.)
24     Q. And for the record, Exhibit 19 is a group

Page 192

1  of six documents produced by the defendants in this
2  case in response to a request for production. And
3  its top sheet is, looks like a form memo to Kim
4  Collins from Deb Buxbaum, dated 6/19/98. And have
5  you ever seen this document or the documents
6  attached to the top page, sir?
7      A. Yeah, I think I saw this first page. I
8  don't recall anything -- I don't recall these back
9  pages, though, at all.
10     Q. Okay. On Exhibit 19, you saw the --
11     A. I think I saw this here, where there was a
12 Bayer and EFTC.
13     Q. Okay. Now, this is the second document in
14 on Exhibit 19?
15     A. Yes.
16     Q. Where it says company confidential and
17 then there's a comparison, Bayer and EFTC?
18     A. Yes.
19     Q. And is this a comparison of the benefits
20 between Bayer and EFTC?
21     A. It appears to be. I believe so.
22     Q. Do you know who drafted it?
23     A. No, I don't.
24     Q. Well, down at the bottom, it's got a name

Page 193

1  Mary. Do you see that?
2      A. Yes.
3      Q. Does that refresh your memory as to who
4  drafted this?
5          MR. WELSH: Objection. If it refreshes
6  your memory, you may answer.
7          MR. ROACH: That's what I asked him, sir.
8          THE WITNESS: I think Mary Leonard.
9          (Off-the-record discussion held.)
10         MR. ROACH: Well, he hasn't finished his
11 answer, sir.
12         MR. WELSH: He had finished. Thank you.
13         THE WITNESS: It's Mary Leonard.
14         MR. ROACH: All right. Just note the
15 record that Mr. Welsh conferred with
16 Mr. Ramsden in the middle of a --
17         MR. WELSH: Wait until the next deposition
18 when you have 15 or 20 meetings out in the
19 hallway, and we'll go through this. Just
20 remember, reciprocity, Steve. You're building
21 a procedure which I'm going to follow; just
22 remember that.
23         MR. ROACH: You started the dialogue on
24 this, sir, and I'm just continuing that.

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                                  05/02/2006

Page 206

1  the time.
2     Q. Okay. You said you tried to keep the
3  employees up-to-date as to what was going on. What
4  do you mean by that?
5     A. We informed them periodically of the
6  assessment that we were doing of the board circuit
7  shop.
8     Q. You informed them periodically of what,
9  again?
10    A. Of the assessment that was going on with
11 the board shop and how it was progressing.
12    Q. Okay. What do you mean by assessment?
13    A. It was an informational type of a meeting.
14    Q. What kind of information did you give at
15 this meeting to constitute the assessment?
16       MR. WELSH: Objection.
17    Q. Go ahead.
18    A. We most likely told them things like we
19 had a consultant in and that they were taking a
20 look at cost, quality, those kind of assessments,
21 assess how we, meaning the Agfa board shop,
22 compared to the industry. And we -- again, I don't
23 remember all the details, but we most likely
24 indicated that we were doing comparative costing as

Page 207

1  well.
2     Q. Anything else you can recall you said?
3     A. Those were the most important things. I
4  don't recall anything else.
5     Q. So do you remember when you had the first
6  such meeting, roughly?
7     A. No.
8     Q. Well, would it have been after -- would it
9  have been after you received this letter of
10 April 20, 1998 from EFTC to you that we marked as
11 Exhibit 4?
12    A. I'm not sure. I'm not sure. I'm honestly
13 not sure.
14    Q. Might have been before that?
15    A. We started looking not only at EFTC, but
16 other -- other firms that were contract
17 manufacturers. And so the process began probably,
18 you know, in the 1998 time frame; exactly when, I'm
19 not sure.
20    Q. Okay. I'm not talking about the process
21 of evaluating the board shop.
22    A. But in terms of when we met with the
23 employees, okay, which was the question, I
24 believe --

Page 208

1     Q. The question --
2     A. I'm not sure exactly when, although we did
3  have consultants in, okay, around that same time to
4  take a look at our board shop in terms of how we
5  compared to the industry, okay, and I believe that
6  we informed our employees that we were, in fact,
7  having some consultants in or we had them in or
8  they were in taking, okay, a look at our processes.
9     Q. And is it your testimony -- if I
10 understood your testimony a moment ago, you're not
11 sure whether these -- the information to the
12 employees was before or after April 20, 1998, the
13 date of Exhibit 4?
14    A. No.
15       MR. WELSH: You mean the first meeting?
16       MR. ROACH: Yes.
17       THE WITNESS: I'm not sure. These were
18 not formal meetings. These were just
19 get-togethers with all the employees. What do
20 you want to talk about; we'll bring you
21 up-to-date on what was going on. I'm not sure
22 when they were. It wasn't just one, as I
23 mentioned earlier.
24    Q. How -- well, you say these were not formal

Page 209

1  meetings?
2     A. It wasn't slides and presentations.
3     Q. Was there any formal meetings that you had
4  with slides and presentations?
5     A. No, not me personally, not that I recall.
6     Q. Do you know whether Bayer was involved in
7  any formal meetings with slides and presentations?
8     A. No, not at all.
9     Q. Let me show you what was marked as
10 Exhibit 2 in the Fiorilla deposition; first page is
11 benefit highlights, which I believe was a copy of a
12 slide presented to the board shop employees. Does
13 that look familiar to you or refresh your memory in
14 any way?
15    A. Some of the material is familiar, but this
16 package itself, no.
17    Q. Okay. When's the first meeting you can
18 recall, formal or informal, that you were at that
19 you attended with any of the board shop employees?
20    A. I don't recall. I don't know when it was.
21    Q. It would have been in 1998?
22    A. I believe so. It was probably -- there
23 was probably some discussion, okay, earlier in the
24 year about, you know, what we were looking at.

53 (Pages 206 to 209)