Richard Ramsden                                                              05/02/2006

**Page 218**

1   changes, whether -- you know, it depends on who was
2   calling them. I mean, you know, so it would vary.
3   There's, you know, a number of different ways to
4   call a meeting.
5       Q. Okay. What other ways was a meeting
6   called at the Agfa division other than
7   word-of-mouth you've talked about?
8       MR. WELSH: For the entire division or
9   only the Wilmington operations that he was
10  present at?
11      Q. For the Wilmington operations you were
12  present at.
13      A. For what type of a meeting? I mean --
14      Q. Any, for any kind of meeting.
15      A. Oh, you know, we could spend an hour going
16  through all the different ways to call a meeting.
17  I mean, it could be over the telephone; could be
18  over the Internet; it could be via memos; it could
19  be word-of-mouth; it could be through the chain of
20  command.
21      Q. Chain of command is the one you were just
22  talking about for these board shop employees,
23  right?
24      A. These were kind of informal notifications;

**Page 219**

1   okay, let's get together and bring you up-to-date
2   on what's going on in the board shop.
3       Q. And that was the word-of-mouth starting
4   with Mr. Fontaine, you're talking about?
5       A. Most likely, yes.
6       Q. I'm sorry?
7       A. Most likely, yes.
8       Q. Any others you can think of in terms of
9   how people were notified of anything within the
10  Agfa division where you were?
11      A. Those generally were the mannerisms in
12  which meetings were called.
13      Q. And what about just disseminating
14  information about changes that were being made or
15  policies or procedures that were -- if there were
16  any changes in policies or procedures that were
17  being done, how was that communicated generally?
18      A. Depends on the scope of them. If it was
19  something that was a major, major change, then
20  there probably would be a formal get-together or a
21  formal meeting and there would be some formal
22  notification.
23      Q. In writing, you mean? When you say formal
24  notification --

**Page 220**

1       MR. WELSH: Were you done with your
2   answer?
3       THE WITNESS: Yes.
4       Q. I'm sorry. I didn't mean to cut you off.
5   Was there anything else?
6       A. No.
7       Q. Okay. When you say formal notification,
8   what do you mean by that?
9       A. Internet, memo.
10      Q. Now, in your conversations with other
11  people within Bayer during this sale, impending
12  sale to EFTC, did you send or receive any e-mail
13  correspondence to other people within Bayer?
14      A. Oh, I'm sure I did.
15      MR. ROACH: I don't think I've seen any
16  like that, John.
17      MR. WELSH: I gave you everything we had.
18      Q. Do you have anything like that?
19      A. I deleted everything I had when I retired.
20      Q. Did you send any e-mails back and forth
21  between yourself and EFTC?
22      A. I don't believe so.
23      Q. Okay. Okay. At the first meeting, then,
24  can you -- that you were at with the board shop

**Page 221**

1   employees regarding the sale of EFTC, I'm sorry --
2   to EFTC of the board shop, can you remember what
3   was stated?
4       A. No.
5       Q. Well, I think you talked earlier about
6   the -- informing the board shop employees of the
7   assessment of what was going on and how it was
8   progressing and that you were having consultants
9   and talking about costs, quality and so forth and
10  comparing the shop to the industry standards and
11  costing and so forth. Anything else you can recall
12  other than that?
13      A. No, that's it.
14      Q. Do you ever remember talking -- strike
15  that.
16          When's the next meeting you can recall
17  you were at?
18      A. Can't recall. I don't recall the dates.
19      Q. Okay. Do you ever remember discussing
20  with the board shop employees at any of these
21  meetings that you were in attendance, severance
22  benefits and whether they're entitled to them?
23      A. No.
24      Q. Do you ever remember anybody asking you at

56 (Pages 218 to 221)

Richard Ramsden                                                                  05/02/2006

Page 222

1  any of these meetings whether they'd be entitled to
2  severance benefits.
3      A. I don't believe so, no.
4      Q. Do you ever remember Robert Brown asking
5  whether they would be entitled to severance
6  benefits?
7      A. No, I don't.
8      Q. What about Bert Guilmette?
9      A. No.
10     Q. Do you ever remember him asking about
11 whether they'd be entitled to severance benefits
12 whether they went to EFTC or not?
13     A. I don't recall them asking those
14 questions, no.
15     Q. Did you ever have a meeting with -- strike
16 that.
17          Did you ever discuss severance benefits
18 in a hallway meeting with Bert Guilmette after the
19 sale?
20     A. Not that I recall.
21     Q. Okay. What about with Jeanne Skene, any
22 discussion with her?
23     A. Not that I recall.
24     Q. I'm just going to -- for the record, to

Page 223

1  make this move along, I'm just going to read a list
2  of names and I'd like you to tell me whether you
3  remember discussing with these people, either
4  individually or in a meeting, whether they might be
5  entitled to severance benefits pursuant to a
6  question they raised. Fair enough?
7      A. Sure.
8      Q. Okay. Vinnie Fiorilla?
9      A. No.
10     Q. Alberta Healey?
11     A. No.
12     Q. Joanne Sanzo?
13     A. No.
14     Q. Mary Bogdan?
15     A. No.
16     Q. Aroussiak Dakessain? And I'm going to
17 spell that. It's A-R-O-U-S-S-I-A-K, and the second
18 word is -- second name is D-A-K-E-S-S-I-A-N.
19     A. No.
20     Q. Mary Jo Cocoran?
21     A. No.
22     Q. Linda Paradis?
23     A. No.
24     Q. Maria Reis? That's R-E-I-S.

Page 224

1      A. No.
2      Q. Phillip Greene?
3      A. No.
4      Q. Frederick Glassett?
5      A. No.
6      Q. Carol Christianson?
7      A. No.
8      Q. Do you remember Joanne Sanzo asked at one
9  of these group meetings with the board shop
10 employees there whether they would be entitled to
11 severance benefits?
12     A. No, I don't.
13     Q. Do you remember any of these people asking
14 anybody else?
15     A. I don't recall them asking anybody else
16 while I was present, no.
17     Q. Do you remember anybody at Bayer telling
18 you before this litigation began whether -- strike
19 that.
20          Do you remember anybody else at Bayer
21 telling you -- and this would be people at Bayer
22 that were employed at Bayer in the management in
23 1998 -- telling you at any time that employees were
24 asking about whether they would get severance?

Page 225

1      A. Not that I recall, no.
2      Q. Did you ever have a conversation with
3  Linda Paradis where you told her it was too bad
4  that she wasn't going to get severance benefits?
5      A. No.
6      Q. Did you tell the group, the board shop
7  employees as a group at any of these meetings that
8  this was a win/win situation?
9      A. I probably did. I think I did.
10     Q. Okay. And what did you say in that
11 regard?
12     A. What did I say?
13     Q. Yes.
14     A. Well, I said that this was a win. It was
15 a win for the employees; it was a win for Agfa or
16 Bayer.
17     Q. And what did you mean by that, it's a
18 win/win situation?
19     A. Well, I meant to the employees meaning
20 that it continued, you know, their employment at
21 what we thought was a real good company with a
22 potential of growth, potential of -- the company
23 had a potential of growth; salary based on
24 performance had a potential of growth. There were

57 (Pages 222 to 225)

Richard Ramsden                                                                    05/02/2006

Page 226

1  benefits that came along. It was a lot better than
2  getting laid off and not having a job. Our
3  employees were paid very highly.
4        From an Agfa point of view or a Bayer
5  point of view, we had an established organization
6  that could provide a good product. And that would
7  continue. We were very pleased with that. That
8  was a much better option for us than going out and
9  taking risks on an unknown organization to supply
10 our product. So that's what I meant by win/win.
11    Q. And you said it was better than getting
12 laid off to them?
13    A. Well, that was my -- you asked what I
14 meant by win/win, okay, and that was my
15 interpretation in my mind about win/win, that it
16 was better to have a job with good pay, good
17 benefits than it was to be laid off.
18    Q. Did you tell any of them that if they
19 didn't go to EFTC, they would be laid off or
20 terminated?
21    A. No, I didn't say that; to the best of my
22 memory, I didn't do that.
23    Q. Did anybody from Bayer say that to them in
24 any of the meetings that you were in attendance?

Page 227

1     A. Not that I recall; meetings that I was in,
2  no.
3     Q. Is that what would have happened to them,
4  if they hadn't gone to EFTC, they would have gotten
5  laid off, would have been terminated?
6     A. Terminated in some way. I don't know
7  exactly how that would have worked. But the
8  business was the business. I mean, you know, they
9  were part of the business. Their skills were in
10 that particular group.
11    Q. When you say you didn't know how that
12 would work, I'm not sure what you mean by that.
13 What do you mean by that?
14    A. It wasn't an issue with us. It was a
15 matter of this is the business; the business is
16 getting sold to EFTC. And it wasn't a matter of
17 choice.
18    Q. Okay. Did you tell them that?
19    A. I don't think anybody asked, no.
20    Q. I'm sorry?
21    A. No. Because I don't think anybody asked.
22    Q. Okay. So isn't it true, then, though,
23 based on what you've just testified to -- and
24 correct me if I'm wrong -- that they didn't really

Page 228

1  have a choice; they either had to go to EFTC or
2  they were going to get terminated?
3        MR. WELSH: Objection. You may answer.
4        THE WITNESS: Yeah, we -- I would say yes,
5     although we -- yes. I won't elaborate on it.
6     Q. And if they had --
7     A. We are selling the business; you're going
8  to EFTC.
9     Q. And if they had said, if the majority of
10 them had said, we don't want to go to EFTC, you
11 would have told them they were terminated, right?
12       MR. WELSH: Objection.
13    Q. If that had happened?
14    A. Don't know.
15    Q. If they had --
16    A. Don't know.
17    Q. Okay. If they had said to you, we're not
18 going to EFTC would the -- and I'm talking about,
19 say, let's say a majority of them, say 60 percent
20 of them, would the sale then have been able to go
21 through?
22    A. Hypothetically, I don't know.
23    Q. Well, when you say it's hypothetical, why
24 are you saying that?

Page 229

1     A. Because all of the employees went.
2     Q. Well, respectfully, I think we've talked
3  about EFTC saying they wanted the employees, as
4  well as the assets?
5     A. That's correct.
6     Q. And based upon your -- and you were one of
7  the people negotiating with EFTC on the sale,
8  correct?
9     A. Correct.
10    Q. And part of that negotiation, as I
11 understand it from the documentation, and I believe
12 from your testimony, is that one of the key aspects
13 of this sale was that they needed the transfer of
14 the employees to make it work?
15       MR. WELSH: Objection. You can answer.
16       THE WITNESS: Well, a part of that was the
17    employees to make it work, yes, it was.
18    Q. And it was a significant part?
19    A. It was one of the key things, not the only
20 key, one of the key things.
21    Q. Okay. So if they had chosen not to go to
22 EFTC, in all likelihood, the sale would not have
23 gone through, correct?
24    A. This sale?

58 (Pages 226 to 229)

Page 230

1  Q. Yes.
2  A. This particular EFTC sale?
3  Q. Yes.
4  A. Yes.
5  Q. Is that correct?
6  A. That's correct. But I would remind you
7  there wasn't a lot of employees who came forward
8  and said, we don't want to go to EFTC.
9  Q. And the reason they said that is because
10 you told them they had -- it was a win/win
11 situation, and they had no choice, right?
12    MR. WELSH: Objection. Objection.
13 Q. You can answer.
14 A. We said that it was win/win, yes. And
15 that the printed circuit board area was being
16 transferred, sold, okay, to EFTC.
17 Q. Okay. Do you ever recall at any time in
18 1998 from any source anywhere where you heard that
19 the board shop employees were asking about whether
20 they would be paid severance?
21 A. No.
22 Q. Do you have any understanding as to
23 whether they would have been paid severance if they
24 had not gone to EFTC?

Page 231

1  A. Can't answer that. I don't know.
2  Q. Is that because it's not in your area of
3  expertise?
4  A. It wouldn't be my final decision.
5  Q. Well, I'm not asking whether it's your
6  final decision; I'm asking whether it's something
7  that you had knowledge about?
8  A. No.
9  Q. It wasn't in your area that you would have
10 knowledge?
11 A. No, it wasn't, no.
12 Q. Okay. When you first were talking to the
13 board shop employees at any of these meetings, did
14 you talk to them at all about finding a partner
15 rather than a sale of the board shop?
16 A. To find a partner?
17 Q. A partner rather than having a sale.
18 A. What do you mean by having a partner?
19 Q. Well, I'm just asking if you ever used
20 that expression to the board shop employees, that
21 Bayer may be looking for a partner with respect to
22 the board shop as --
23 A. Yeah, I think EFTC was a partner. It
24 wasn't just a sale; it was a partner. This was a

Page 232

1  win/win.
2  Q. And that's how you communicated it to the
3  employees?
4  A. Yes.
5  Q. Is that a yes?
6  A. Yes.
7  Q. Now, I want to show you Exhibit 8 from the
8  Fiorilla deposition. Are you familiar with that?
9  A. Yes, I'm familiar with this.
10 Q. And can you tell me how you're familiar
11 with it?
12 A. This was an announcement by EFTC of the
13 acquisition of our printed circuit board
14 manufacturing area.
15 Q. Exhibit 8 --
16    MR. WELSH: Off the record.
17    (Off-the-record discussion held.)
18 Q. Can you tell me, please, how you're
19 familiar with Exhibit 8?
20 A. We got a copy of it from EFTC.
21 Q. Did you have any input on drafting it?
22 A. No.
23 Q. Is it correct as stated?
24    MR. WELSH: Read it through.

Page 233

1  Q. You can read it.
2  A. I would say I can't necessarily say that
3  I'm that familiar with the numbers, as far as the
4  dollars are concerned. The hundred people is a
5  little bit overstated, as far as, you know, the
6  operation employed about a hundred people; it was
7  something less than that.
8  Q. Okay. Other than that, does it seem to be
9  correct?
10 A. Generally so.
11 Q. All right.
12 A. I don't see any major problems with it.
13 Q. All right. And to your knowledge, did all
14 the board shop employees go to EFTC as part of the
15 sale?
16 A. Those who were full-time assigned only to
17 the board shop, to the best of my knowledge, yes.
18 Q. And do you know what the number was,
19 approximately?
20 A. 75, approximately.
21 Q. And those were the people -- and that
22 included the people in Exhibit 1, correct, that are
23 parties in this case?
24 A. Correct.

Richard Ramsden                                                                    05/02/2006

**Page 234**

1   Q. Okay. Can you tell me what Bayer earned
2   as a result of this sale?
3   A. No, I don't know.
4   Q. In terms of a dollar figure?
5   A. I think they lost money.
6   Q. Lost money for the sale?
7   A. Yeah, I think so.
8   Q. Why did you do it if you lost money?
9   A. Well, I don't think it was our intent to
10  lose money.
11  Q. How did you -- can you tell me what the
12  cause was of losing money?
13  A. Well, we had a number of issues.
14  Q. Like what?
15  A. Like, we had some -- there was some
16  inventory that went obsolete. We wound up paying
17  more money for our board and our product than what
18  we anticipated. I think the performance as a group
19  overall was not what we expected it to be, so we
20  had some product issues in terms of being able to
21  ship. So I think when you take a look at the
22  entire picture, as we went further on down the
23  road, that there was a cost as opposed to a profit.
24  Q. When you say performance issues, are you

**Page 235**

1   talking about the board shop employees?
2   A. I don't know about the employees; I
3   wouldn't say the employees. I would say that it
4   was overall the board shop; whether it was parts
5   availability, whether it was management style or
6   direction, leadership, whatever.
7   Q. Well, wouldn't those all be issues that
8   would factor into EFTC's profit or loss and not
9   Bayer's?
10  A. Well, we couldn't get product; and if you
11  can't get product, you can't ship product. If you
12  have a car on an assembly line and you can't get a
13  fuel injector, you can't move it.
14  Q. I'm not talking about -- perhaps you
15  didn't understand the question I asked or maybe I
16  didn't ask it clearly enough. But I'm not talking
17  about profit after the sale in terms of the
18  contract that you had with EFTC to provide you with
19  the circuit board product. What I'm talking about
20  is at the time of the sale, did you realize a
21  profit in September from the sale of the assets?
22  A. I don't think we did. I think we probably
23  wound up probably in a break-even, when you
24  consider the inventory that we had paid for that we

**Page 236**

1   transferred, you know, some of the obsolescence
2   that we went through and when we factored in some
3   of the other dollars, I think we probably had a
4   little bit more to write off on some of our
5   equipment than we sold it for. So I think if there
6   was profit, it was very small.
7   Q. When you say "very small," what's very
8   small?
9   A. It was very small. I would not want to
10  guess.
11  Q. Do you know who would have that
12  information?
13  A. Don Baribeau. Kim Nealy would have that.
14  Q. What about Michael Paige?
15  A. Not directly, I don't think Michael would
16  have that.
17  Q. So you never heard -- did you ever hear a
18  number at any time?
19  A. I heard numbers. I don't recall what they
20  were.
21  Q. Can't give me a range?
22  A. No.
23  Q. Okay. At these meetings that we've talked
24  about with the board shop employees, did anybody

**Page 237**

1   from EFTC attend any of these meetings that we were
2   talking about with respect to the --
3   A. Not my meetings.
4   Q. Do you know if at any other meetings
5   whether an EFTC employee -- representative showed
6   up?
7   A. I know they had meetings. I don't think
8   we had joint meetings, other than maybe the one
9   near the end of the actual transfer of the
10  business.
11  Q. Did Jack Calderon come to any of these
12  meetings?
13  A. No. Just the meeting that he had, I
14  believe.
15  Q. He had a meeting with the board shop
16  employees?
17  A. Uh-huh, correct.
18  Q. Okay. And were you at that meeting?
19  A. The beginning of it.
20  Q. Okay. What was said at that meeting by
21  Mr. Calderon?
22  A. It was kind of an introduction to the
23  employees to the EFTC. It was right around the
24  time that we finalized the sale. It was very

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                                     05/02/2006

Page 238

1    upbeat, congratulations, looking forward to working
2    with everybody. Talked about a few of the
3    inventive programs, such as perfect attendance and,
4    you know, that sort of thing. And it was more of
5    an introduction meeting than anything at all.
6        Q. Did it tell them anything about the
7    benefits other than the incentive programs and the
8    perfect attendance?
9        A. I don't recall any -- any discussion about
10   this.
11       Q. Did Mr. Calderon say it was going to be a
12   win/win?
13       A. Those were my words.
14       Q. I know those were your words, but did
15   Mr. Calderon use those words?
16       A. I don't recall him using those words. He
17   may have, but I don't recall.
18       Q. And I apologize if I asked this before,
19   but did you ever tell the board shop employees at
20   any of these meetings that it would be a comparable
21   job?
22       A. Comparable job?
23       Q. Yeah.
24       A. It was a job.

Page 239

1        Q. Did you tell them that the salary would be
2    the same?
3        A. I might have. I might have because I was
4    told that it would be. So I probably did.
5        Q. Who told you it would be?
6        A. It was either probably Jack Calderon or a
7    fellow by the name of Stu who was a financial
8    person.
9        Q. Well, in fact, the agreement, the asset
10   purchase agreement you entered into between Bayer
11   and EFTC required that --
12       A. Well, that was -- that was when we
13   finalized the document at the end, yes, sir.
14       Q. But let me just finish the question. The
15   asset purchase agreement required that the wage of
16   the board shop employees be the same, correct?
17       A. Uh-huh.
18       Q. Is that a yes?
19       A. Yes.
20       MR. ROACH: I'd like to mark the next
21   document as Exhibit 22.
22       (Exhibit No. 22, June 30, 1998 fax cover
23   sheet and memo from Michael Paige dated
24   June 29, 1998, marked for identification.)

Page 240

1        MR. ROACH: We're going to take a break
2    while Mr. Ramsden reviews what was marked as
3    Exhibit 22.
4        (Proceedings interrupted at 3:09 p.m. and
5    reconvened at 3:14 p.m.)
6        Q. Okay. Looking at what we've marked as
7    Exhibit 22, it's a June 30, 1998 fax cover sheet,
8    and behind it is a memo from Michael Paige to three
9    people dated June 29, 1998. Have you ever seen --
10       MR. WELSH: Wait. Wait. Wrong exhibit.
11       MR. ROACH: Oh, I probably gave you the
12   wrong thing. Did I give you the wrong thing?
13       MR. WELSH: You gave me a real estate fax.
14       MR. ROACH: Oh, let me see here. Can I
15   see what I gave you?
16       MR. WELSH: Certainly.
17       Q. Well, since I've marked it Exhibit 22,
18   let's -- let me ask you about it. Okay. Looking
19   at Exhibit 22, then, it's a fax sheet from Deborah
20   Buxbaum -- to Deborah Buxbaum from Richard Ramsden,
21   June 30, 1998. Is this a fax that you sent to her?
22       A. Yes.
23       Q. With an attached note?
24       A. Yes.

Page 241

1        Q. Okay. And what was the purpose of this,
2    if you can recall?
3        A. I believe the question -- to the best of
4    my memory, the question was how much space did the
5    printed circuit board area occupy as part of the
6    entire building.
7        Q. Okay.
8        A. So it was in response to that question.
9        Q. Okay. And is that your signature on
10   page 2?
11       A. Yes, it is.
12       Q. Okay. And those are your initials, RR, on
13   page 3?
14       A. Yes.
15       Q. And did you tell her that it's 50,000
16   square feet out of 231,000 square feet in 80
17   Industrial Way?
18       A. Yes, I did.
19       Q. Okay. All right. Next document -- oh,
20   there it is, okay -- is Exhibit 23.
21       (Exhibit No. 23, fax sheet, June 30, 1998,
22   from Mr. Ramsden to Deborah Buxbaum, marked
23   for identification.)
24       Q. And for the record, it is a fax sheet,

Richard Ramsden                                                                  05/02/2006

Page 254

 1  say assets at 1.5 million, what does that mean?
 2      A. Means that some of the equipment for the
 3  most part that was used for testing, for
 4  assembling, for drilling, for different operations
 5  was assessed by this professional appraiser at
 6  $1.5 million.
 7      Q. Okay. Does that mean it could have been
 8  sold for that number, even though the book value
 9  was technically zero?
10      A. Well, that's what the professional
11  appraiser valued it at. So you have to draw your
12  own conclusions from that.
13      Q. Okay. And then you had a million dollars
14  goodwill for a fully functioning operation,
15  correct?
16      A. Correct.
17      Q. And that would include the need to have
18  the employees there, correct, from the board shop?
19      MR. WELSH: Objection. You may answer.
20      THE WITNESS: I don't know if -- we had
21      systems; we had processes. I think all of
22      that combined, okay, was, quote, goodwill.
23      Q. And that included the employees?
24      A. It could have included the employees as

Page 255

 1  well, that's correct.
 2      Q. And then the next bullet point says, "This
 3  would, in effect, give us between 1.5 to
 4  $2.5 million to handle employee transition costs
 5  which are estimated at a half a million dollars."
 6      Did I read that correctly?
 7      A. That's what it says.
 8      Q. What does that mean?
 9      A. It says here that the net, if it was sold
10  for between five and six mill -- if the business
11  was sold for between 5 and $6 million and those
12  other assumptions were accurate, okay, it would --
13  it would net Agfa/Bayer between one and a half and
14  two and a half million dollars, okay.
15      And it's stated here, you know, that this
16  could be used to handle employee transitions.
17  Somebody estimated those transition costs at half a
18  million dollars.
19      Q. And what would those transition costs
20  consist of; what did they consist of?
21      A. I don't know. We'd have to dig through
22  all sorts of paper to figure out what those were,
23  and I don't know what they were.
24      Q. You don't know; okay.

Page 256

 1      A. No. Nor do I know who put that number
 2  there.
 3      Q. Okay. Well, this was a memo from Michael
 4  Paige, correct?
 5      A. Uh-huh.
 6      Q. Is that right?
 7      A. Yes, it was.
 8      Q. And he was above you in the chain of
 9  command?
10      A. Yes.
11      Q. Was he the head of the Agfa division in
12  Wilmington?
13      A. Yes, he was, general manager.
14      Q. All right. And the next bullet point down
15  says, "No severance would be given employees." Do
16  you see that?
17      A. Yes.
18      Q. So was that factored into the assessment
19  of the working target with respect to the sale?
20      MR. WELSH: Objection. You may answer.
21      THE WITNESS: We never factored severance
22      because it was not part of our plan. You
23      know, it was continued employment for the
24      employees. And so, you know, severance was --

Page 257

 1  you know, we didn't adjust anything for
 2  severance.
 3      Q. Then why is it under 6.0, Agfa working
 4  target category?
 5      MR. WELSH: Objection. You may answer if
 6      you know.
 7      THE WITNESS: I don't know.
 8      Q. Because there's no other benefits
 9  specifically mentioned in here other than a buyout
10  for change in benefits, correct?
11      A. But there's other dollar factors. We had
12  retention bonuses. There was, you know, things of
13  that sort that all tie into that number.
14      Q. Did Don Baribeau go to EFTC with this
15  deal?
16      A. Yes, he did.
17      Q. Did he get severance?
18      A. No. I'm quite sure he did not.
19      Q. Where it says no severance will be given
20  to employees on Exhibit 23, do you have any
21  knowledge as to -- strike that.
22      Where it says no severance will be
23  given to employees on Exhibit 23, do you know who
24  made that entry in there?

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                    05/02/2006

### Page 262

1    was to prevent some heavy -- because we needed
2    to make heavy investments. I don't know
3    whether they did or not.
4       Q. But they saved from having to make heavy
5    investments?
6       A. Yes.
7       Q. And how much would those heavy investments
8    have been?
9       A. Roughly $300,000, probably.
10      Q. One-time investment?
11      A. Yes.
12      Q. And up until this time, had the board shop
13   turned a profit for Bayer?
14      A. I never measured profit.
15      Q. Never measured it?
16      A. We never measured profit.
17      Q. Was the Agfa division in general when the
18   board shop was there, the division profitable?
19          MR. WELSH: The entire division?
20      Q. No, the Wilmington division.
21      A. No.
22      Q. What about the entire division, was the
23   entire division profitable in 1998?
24      A. The worldwide division?

### Page 263

1       Q. Yes.
2       A. I believe so.
3       Q. Okay. Continuing on Exhibit 23 --
4       A. Can't be sure of that, though.
5       Q. Continuing on Exhibit 23, bullet point --
6    paragraph 7.0, third bullet point says the EFTC --
7    strike that. Never mind.
8           The next page over, the first bullet point
9    at the top of the, I believe this is the fifth
10   page. It says, willing to include, quote, no hire,
11   close quote, without mutual consent clause and
12   agreement. Do you have any idea what that means?
13      A. Yes.
14      Q. What does that mean?
15      A. Means that we agreed, you know, that we
16   wouldn't hire from each organization without mutual
17   consent on agreeing to it.
18      Q. In other words --
19      A. EFTC to Agfa or Agfa to EFTC.
20      Q. In other words, you would not try to hire
21   from each other's employees?
22      A. That's right.
23      Q. Next bullet point is, "Willing to include
24   six months' no layoff clause on Agfa employees in

### Page 264

1    agreement"; is that correct?
2       A. That's correct.
3       Q. And that's for the board shop employees?
4       A. Correct.
5       Q. And did Agfa have any -- I'm sorry. Did
6    EFTC have any concerns about committing to keeping
7    the employees on for six months?
8       A. No, not that I was aware of.
9       Q. But it actually turned out be a year,
10   correct?
11      A. Yes.
12      Q. Okay. Now, looking at 8.0 on Exhibit 23,
13   it's got a working schedule week stated as of
14   Mondays, based on no issues with sublease. And
15   it's got some dates in here, correct?
16      A. Correct.
17      Q. And this appears to be a timeline as to
18   expected future events; is that right?
19      A. That's right.
20      Q. And one of them is on July 16, Agfa/EFTC,
21   they're going to make an announcement to PCB
22   employees. And that would be the board shop
23   employees, correct?
24      A. That's correct.

### Page 265

1       Q. I read that correctly?
2       A. That's right.
3       Q. And then EFTC to remain on the site to
4    discuss issues, and the new EFTC general manager
5    was to be announced.
6           Did I read that correctly?
7       A. Yes, you did.
8       Q. Okay. So there was a plan here that they
9    were going to announce the sale to the board shop
10   employees on July 16, correct?
11      A. That's correct.
12      Q. And do you remember that taking place?
13          MR. WELSH: On that date?
14          MR. ROACH: Yes.
15          THE WITNESS: I don't remember the date.
16   I remember an event taking place. I'm not
17   sure of the date.
18      Q. Okay. Can you tell me about the event,
19   please?
20      A. I wasn't really there. I might have been
21   there at the beginning, just for the announcement
22   to show some support.
23      Q. Okay. Was this the one that you talked
24   about earlier where Mr. Calderon was there?

67 (Pages 262 to 265)

Richard Ramsden                                                    05/02/2006

Page 266

1   A. Yes, correct.
2   Q. Okay. Is that the first time that
3   formally the board shop employees were told that
4   there was going to be a sale?
5       MR. WELSH: Objection. You can answer.
6       THE WITNESS: Formally, okay, from EFTC,
7   yes. To the best of my memory, we had kept
8   them abreast of things periodically, as I
9   mentioned earlier.
10  Q. Okay. You had earlier used the words, I
11  believe, formally and informally, meetings and
12  telling people things. Did you ever formally,
13  however you define it, announce -- you meaning
14  Bayer or you individually -- ever formally announce
15  to the board shop employees that there was going to
16  be a sale of the board shop to EFTC?
17  A. My memory says that we did.
18  Q. Okay. And what does your memory tell you
19  about when you did it?
20  A. It doesn't. I don't recall exactly when
21  it was. It had to be around the time frame of
22  Calderon making an announcement.
23  Q. That would be on the --
24  A. The announcement on one of the earlier

Page 267

1   exhibits that you had with -- indicated there was
2   an announcement in August. This July one was
3   before that. It says also in here that -- if I can
4   find that -- EFTC will allow public announcement
5   after -- oh, I guess it doesn't have a date here.
6   Q. You're reading from Exhibit 23?
7   A. Yeah, I was reading from --
8   Q. Which bullet point?
9   A. Seven point -- let's see, seven, one, two,
10  three, fourth bullet point down.
11  Q. You mean the fourth bullet point from the
12  bottom?
13  A. Yeah. EFTC was going to allow a public
14  announcement after the letter of intent was signed.
15  Q. So it says, "EFTC is willing to allow
16  public announcement after LOI is signed," right?
17  A. Yes, correct.
18  Q. Okay. And is that July 16 that was talked
19  about on the next page?
20  A. Yes. We can put the two dates together;
21  we're pretty close to right around that time frame.
22  Q. All right. Now, do you remember whether
23  the Bayer formal announcement was made right about
24  this time as well?

Page 268

1   A. Don't recall the date. I don't. It would
2   have been right around there, though, but I don't
3   know the exact date. I don't recall.
4   Q. All right. Do you remember whether it was
5   before or after the July 16 date? I know you said
6   it's right around there, but I just want to know --
7   and I guess what I'm getting to is whether it was
8   before the EFTC/Agfa joint announcement or whether
9   it was after?
10  A. I don't recall at all.
11  Q. Then it says, "EFTC to remain on site to
12  discuss issues." Do you know -- who -- whether
13  somebody did remain on site to discuss issues?
14  A. My memory says that there was.
15  Q. Do you remember who was there?
16  A. Jack Calderon.
17  Q. Do you remember anybody else?
18  A. I think Don Baribeau was there.
19  Q. He was with Bayer, though, wasn't he?
20  A. No. The EFTC general manager was being
21  announced, and that was Don Baribeau.
22  Q. Did he become the EFTC general manager --
23  A. Yes.
24  Q. -- right away?

Page 269

1   A. Yes.
2   Q. Okay. When did he -- he used to be Bayer,
3   right?
4   A. Yes.
5   Q. When did he move to EFTC?
6   A. I think right after the transaction -- you
7   know, the whole transition took place, I think
8   officially, okay, but it was announced I believe at
9   that meeting that Don Baribeau was going to be the
10  new general manager.
11  Q. Okay. So he was around to discuss issues
12  with employees, but he was technically still on
13  Bayer's payroll, right?
14  A. That was to my knowledge. The
15  announcement tried to include as much as they
16  could.
17  Q. I understand that. My question is, was
18  Baribeau on the EFTC payroll or was he on the Bayer
19  payroll at that time?
20  A. I don't know. I can't answer that.
21  Q. Anybody else at the meeting that you can
22  recall?
23  A. Not that I can recall.
24  Q. And I think you've already told us what

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                                    05/02/2006

**Page 270**

1  you can recall about any employee questions about
2  severance or anything else?
3  A. That's right.
4  Q. Is there anything else about these
5  meetings, either questions from employees or
6  announcements, that you haven't told us about that
7  you can recall today?
8  A. Not of any significance. They were
9  general updates, try to keep employees advised as
10 things progressed. That was all.
11 Q. Okay. Well, when you say nothing of
12 significance, I just want to make sure I've covered
13 everything.
14 A. Nothing that we haven't covered.
15 Q. Okay. Is there anything you can recall
16 that you haven't talked about today that EFTC or
17 Bayer, through you or Calderon or anybody else,
18 said to any of these employees in any of these
19 meetings about termination of their job with Bayer
20 and going to EFTC, severance benefits, unemployment
21 benefits or anything else that you haven't told us
22 about?
23 A. No, not at all.
24 Q. Do you remember whether anybody asked

**Page 271**

1  whether they would get unemployment benefits if
2  they chose not to go to EFTC?
3  A. I don't recall that question to me.
4  Q. Okay. Then there's another date on here,
5  Exhibit 23, July 20. It says, "EFTC continued
6  discussion with employees." Do you know what that
7  refers to?
8  A. No, I don't.
9  Q. Do you know whether there was a continued
10 discussion on July 20 with EFTC?
11 A. I can speak for the date. I know there
12 was some meetings that took place.
13 Q. Between EFTC and the board shop employees?
14 A. Between EFTC and the board shop employees.
15 Q. Do you know who from EFTC participated?
16 A. No. I was not there.
17 Q. Was it a formally called meeting or an
18 informally called meeting?
19 A. It was not my meeting. I don't know.
20 Q. Okay. Now, I'd like to show you document
21 Exhibit 24.
22    (Exhibit No. 24, change form, marked for
23 identification.)
24 Q. And ask you if you can identify it,

**Page 272**

1  please.
2  A. Well, as it states, it's a change form.
3  Q. Are you familiar with this form?
4  A. Yes.
5  Q. And this is concerning Janet Lanoue, who
6  is a plaintiff in this case, board shop employee,
7  correct?
8  A. Correct.
9  Q. And it appears down at the bottom of the
10 page under leaves, termination, she was terminated
11 on 8/31/98, correct?
12 A. That's what it says.
13 Q. Okay. And so was she formally, then, as
14 far as you understand, terminated from Bayer as an
15 employee?
16    MR. WELSH: Objection. You may answer.
17    THE WITNESS: I don't know the
18 circumstances behind her termination.
19 Q. Well, she -- she was one of the people
20 that went to the -- to EFTC, right?
21 A. Oh, I misunderstood the question. I
22 interpreted that question that she left, okay, you
23 know, Agfa and not necessarily to go to EFTC. But
24 this change form is that Janet Lanoue is terminated

**Page 273**

1  from Agfa to go to EFTC. I guess I don't know what
2  the question is.
3  Q. Okay. The question is, do you know how --
4  strike that.
5     The question is, do you recognize this
6  change form?
7  A. Yes.
8  Q. Ever seen this before?
9  A. Yes.
10 Q. So you've been a manager -- you were a
11 manager at Bayer for how many years?
12 A. 35 years.
13 Q. Did you ever retire from Bayer?
14 A. Yes.
15 Q. When?
16 A. 2001.
17    MR. WELSH: Objection. One second. You
18 retired from Bayer?
19    THE WITNESS: From Agfa.
20    MR. WELSH: Well --
21    THE WITNESS: Oh, oh, I'm sorry. I get
22 the dates confused; it was not Bayer.
23 Q. All right. At some point -- let's finish
24 with your employment, sir.

Richard Ramsden                                                                      05/02/2006

Page 290

1  Q. I'm sorry. Strike that. You got it from
2  Agfa. I'm sorry.
3     Are you aware of any employees before
4  the board shop was sold to EFTC who got severance,
5  any Bayer employees?
6  A. Yes.
7  Q. Who?
8  A. I'm not sure who in specific. We did have
9  some layoffs.
10 Q. Can you remember who they were?
11 A. No, not off the top of my head.
12 Q. Can you tell me whether there was any
13 groups of employees in a particular area within the
14 Agfa division or elsewhere?
15 A. It was in the machine shop.
16 Q. And when were they given severance?
17 A. I'm not sure. Wait a minute. Was the
18 machine shop after or before? I don't recall when
19 we -- when we closed the machine shop; I don't know
20 if that was before or after the board shop. But we
21 did have some other groups that did get laid off.
22 Q. Okay. Other than the machine shop, can
23 you remember any other groups that were provided
24 severance as a result of a layoff?

Page 291

1  A. I believe they were provided severance. A
2  few years ago, we had a paint shop and a sheet
3  metal shop.
4  Q. And anybody else that you can remember?
5  A. Not groups, no.
6  Q. With respect to the paint shop, can you
7  remember when that layoff occurred?
8  A. No, not dates.
9  Q. Any idea how many years before the sale of
10 the board shop?
11    MR. WELSH: Objection.
12    THE WITNESS: My memory says that it was
13 at least ten years before we sold the board
14 shop.
15 Q. Okay.
16 A. Long time ago.
17 Q. How many people were in the paint shop?
18 A. Do not recall. Small number.
19 Q. Okay. And was the paint shop sold?
20 A. No.
21 Q. Were they just laid off as a group, the
22 paint shop?
23 A. Yes.
24 Q. Was there a voluntary layoff notice that

Page 292

1  went to them as to whether they -- if they chose
2  the voluntary layoff, they would get severance?
3  A. I don't believe so.
4  Q. Can you tell me -- when you said it was a
5  small number, can you tell me how many?
6  A. No.
7  Q. What about the sheet metal shop, what can
8  you tell me about severance for the sheet metal
9  shop?
10 A. I believe they -- if my memory serves me
11 right, they got severance. They were laid off; the
12 shop was closed.
13 Q. Okay. Was it verbal or anything in
14 writing?
15 A. As far as --
16 Q. Well, when -- okay. You said the sheet
17 metal shop was closed, and the employees received
18 severance. Was it a verbal notice to them that
19 they were getting severance, or was it written
20 notice?
21 A. I don't know.
22 Q. How many people were in the sheet metal
23 shop when it was closed?
24 A. I don't know what the number was.

Page 293

1  Q. Do you know whether it was sold to another
2  group?
3  A. It was not sold.
4  Q. Just closed?
5  A. Yes.
6  Q. And these were in the Agfa division,
7  correct?
8     MR. WELSH: Objection.
9     THE WITNESS: Yes.
10 Q. And were they in Wilmington, the sheet
11 metal and the paint shops?
12 A. Yes.
13    MR. WELSH: One second, please.
14    (Off-the-record discussion held.)
15 Q. Okay. And I'm sorry. You said the sheet
16 metal shop was how many -- I can't remember --
17 A. I don't know what the number was. It
18 was -- I don't want to guess.
19 Q. Okay. Now, you said the paint shop was
20 about ten years prior to the sale of the board shop
21 and in relation to the --
22 A. I said my memory says that it was --
23 Q. Right.
24 A. -- probably at least ten years before.

74 (Pages 290 to 293)

**Page 294**

1  Q. Right. And what does your memory tell you
2  in terms of the sheet metal shop; was it after or
3  before the paint shop?
4  A. My memory says that we closed the sheet
5  metal shop before we closed the paint shop.
6  Q. Okay. Now, who were the employees working
7  for the paint shop, which corporation; do you know?
8  A. Oh, I'm not sure. We had so many changes
9  along the way. I don't know the year, so
10 therefore, I wouldn't even want to estimate.
11 ' Q. Okay. But it would have been one of the
12 ones you told us about, either Compugraphic or
13 Miles, Inc. or Bayer, correct?
14 A. Correct.
15 Q. And same with the sheet metal shop, it
16 would have been one of the corporations you told
17 us; it would have been Compugraphic, maybe Agfa
18 Corporation, Miles, Inc. or Bayer, correct?
19 A. Correct.
20     MR. WELSH: Just so you know, there's one
21 missing.
22     MR. ROACH: Free to add it.
23     MR. WELSH: I'm just telling you because I
24 believe between Compugraphic and Miles, there

**Page 295**

1  may have been another corporation. I believe
2  Agfa, I believe that there was -- it was -- if
3  I'm not mistaken.
4  Q. Okay. Was there another corporation other
5  than the ones we've mentioned, as your attorney has
6  suggested, that you know of?
7  A. Not that I know of. Could be.
8  Q. Okay. Let me ask it to you this way: All
9  these corporations were the same ones you were
10 employed with throughout the years as you
11 discussed, right?
12 A. That's correct.
13 Q. And also, they would be the same
14 corporations that many of the board shop, if not
15 most of the board shop employees were employed
16 through the years when you were there; is that
17 correct?
18 A. That's correct.
19 Q. Okay. Do you remember the -- any times
20 where Bayer Corporation, let's say from January 1,
21 1995 forward, ever announced formally or informally
22 that they were looking for people to volunteer for
23 a layoff and then they would get severance; did you
24 ever hear of that happening?

**Page 296**

1  A. Yes.
2  Q. Okay. And can you tell me about that,
3  what happened?
4  A. There were -- there were infrequent times
5  that there were reduction in forces in various
6  different locations.
7  Q. Now -- okay. And these locations would be
8  within the Agfa division in Wilmington?
9  A. Yes.
10 Q. Okay. And can you --
11 A. Within -- within my organization.
12 Q. Okay. Can you --
13 A. Whether it was Bayer or Agfa, whatever it
14 was.
15 Q. Okay. Can you tell me how that happened,
16 the voluntary layoffs?
17 A. Not always, but on occasion, you know, if
18 we were forced to downsize, okay, then, you know --
19 and we would create an awareness ahead of time that
20 we were going to have to reduce a number of people
21 by some number, okay, was there anybody who, you
22 know, would like to volunteer. And if all things
23 were right, if we could afford, okay, to get them a
24 part of the reduction in force, if they weren't

**Page 297**

1  absolutely critical, okay, to the operations, then
2  on occasion, we would accept, okay, their voluntary
3  layoff.
4  Q. Okay. And they would get severance as
5  part of that?
6  A. To the best of my knowledge, as part of
7  the normal reduction in force.
8  Q. Okay. And how was this communicated to
9  the employees that they were looking for somebody
10 to participate in a volunteer layoff?
11 A. I think it was passed on through the
12 organization, through the managers, to the
13 supervisors, to the lead people. In a given area,
14 though; I mean, you couldn't -- it was not a
15 widespread thing.
16 Q. Okay. And would it have come through you
17 to Mr. Fontaine, for example, and then to the
18 people under Mr. Fontaine?
19 A. Yeah. We'd get everybody involved.
20 Q. Can you remember any specific names of any
21 people?
22 A. I have no idea.
23 Q. Okay. Now, I'm going to just show you a
24 list.

Richard Ramsden                                                   05/02/2006

Page 298

1  MR. ROACH: Mark this. And I just drafted
2  this yesterday, my secretary did, list of
3  people. I'd like to mark it as Exhibit 26
4  with the dates beside them.
5  Q. And I just want to ask you if that
6  refreshes your memory as to any specific
7  individuals you can remember participating in this
8  voluntary layoff program where they would get
9  severance?
10 A. Wouldn't know --
11 Q. Wait until she marks it.
12    (Exhibit No. 26, list of names, marked for
13 identification.)
14 Q. And here's Exhibit 26, sir. Any of them
15 look familiar to you, sir?
16 A. I'm familiar with some of the names, but
17 I'm not familiar with anyone who -- who was --
18 anybody who was a volunteer.
19 Q. Okay. Who are some of the names you're
20 familiar with?
21 A. I don't even know if all these people --
22 if they all left Agfa.
23 Q. How about a Linda Kawa, K-A-W-A?
24 A. Don't know her.

Page 299

1  Q. Okay.
2  A. I know a lot of people on here, though.
3  Q. Okay. Can you tell me who you know that's
4  on here?
5  A. Dawn Delgardo, Len Filliphone, Paul
6  Croteau, Joe Ducharme, Joe Oliverio, Rose-Marie
7  Larson, Phillis Beaudoin, Betty Murphy, Roselle
8  Terreault, Mary Ann Carouso.
9  Q. Anyone else? Is that it?
10 A. Yeah.
11 Q. Is that a yes?
12 A. Yes.
13 Q. Do you know whether, in fact, any of them
14 got severance?
15 A. No, I don't.
16 Q. Okay. Do you have any idea as to how many
17 people participated over the years you were there
18 in the volunteer layoff program where they would
19 get severance?
20    MR. WELSH: Objection. You may answer.
21    THE WITNESS: Don't know.
22 Q. Okay. Do you know whether anyone on the
23 board shop specifically had gotten -- received
24 severance as part of a voluntary layoff program as

Page 300

1  you've described it?
2  A. No, I don't.
3  Q. I'd like to show you a document that's
4  called Defendant's Objections and Response to
5  Plaintiff's First Set of Interrogatories.
6    MR. ROACH: Like to mark it as Exhibit 27,
7  please.
8    (Exhibit No. 27, Defendant's Objections
9  and Response to Plaintiff's First Set of
10 Interrogatories, marked for identification.)
11 Q. Are you familiar with this document at
12 all, sir; have you ever seen it?
13 A. Copy of --
14 Q. This document?
15 A. No. The cover sheet, I think. Oh, no. I
16 haven't, no.
17 Q. Okay. Did you participate in any way in
18 providing any of the responses that are set forth
19 in Exhibit 27?
20 A. The responses?
21    MR. WELSH: Can I describe to him what it
22 is he's looking at?
23    MR. ROACH: Sure.
24    MR. WELSH: They've asked us written

Page 301

1  questions, and we've responded. So when he
2  talks about not the objections, but where it
3  says later on in the document, response,
4  response, he's questioning did you participate
5  in providing the information to me for those
6  responses.
7    THE WITNESS: Oh, no.
8  Q. Okay. I've just got a few more questions
9  about the severance, other people with severance.
10 This voluntary layoff program associated with the
11 reduction of force, did these occur prior -- from
12 time to time prior to the sale of the board shop to
13 EFTC while you were there?
14 A. I'm not sure. Could have been both,
15 before and after. I'm not sure.
16 Q. But the groups you do remember are the
17 paint shop and the sheet metal shop, right?
18 A. No. I'm saying -- that's not correct.
19 I'm saying that the -- the reduction in force, the
20 layoffs we had were a sheet metal shop and the
21 paint shop because we closed those businesses, as
22 we did the machine shop.
23    Now, periodically, over the years, we
24 have had a reduction in force, including and

76 (Pages 298 to 301)

Richard Ramsden                                          05/02/2006

Page 302

1  excluding and in addition to those areas I
2  mentioned.
3      Q. Right.
4      A. Okay. And on occasion, not always, and
5  they weren't necessarily groups, okay, there were
6  people that would volunteer, saying if you have do
7  have reduction in force, then everything is okay
8  and I could be considered, I'd like to be
9  considered.
10     Q. And then they would be paid severance?
11     A. Well, they would be looked at, okay, and
12 in some cases, they were considered and in other
13 cases, they may not be considered, for some reason.
14     Q. And when you say "considered," considered
15 for payment of severance?
16     A. For a layoff. And part of the layoff
17 would be some sort of severance.
18     Q. Okay. And I just want to get the
19 timeline. Some of those occurred before the sale
20 of the board shop to EFTC, correct?
21     A. Yes.
22     Q. Okay. Did some occur after?
23     A. I believe so. Very small numbers.
24     Q. Okay. When you say "small numbers," can

Page 303

1  you tell me what those numbers are?
2      A. No, I can't.
3      Q. More than ten?
4      A. If it was, not many more than ten. My
5  memory doesn't serve me. I wasn't that close to
6  the details. So --
7      Q. Now, I didn't finish asking you about the
8  machine shop. What happened to the machine shop
9  employees?
10     A. We closed the machine shop. Didn't make
11 any sense to machine parts any more, so we sold the
12 equipment and laid the employees off.
13     Q. Okay. And was that machine shop part of
14 Exhibit 3 in the flow chart that you had that we
15 talked about earlier, part of Exhibit 3?
16        MR. ROACH: Look at Exhibit 3.
17     A. The Norm Fontaine chart?
18     Q. Yes.
19        MR. WELSH: Well, it should be Number 2.
20 I ordered them for you. There's one -- you
21 must have yanked it because I was putting it
22 in order. Yeah, can we just use this?
23        MR. ROACH: Yeah, sure.
24     Q. Exhibit 3, which I show you, is that --

Page 304

1  that was the machine shop?
2      A. This is right here.
3      Q. And that is model machine shop 12?
4      A. Uh-huh.
5      Q. With 12 people?
6      A. Yeah. Well, 12 people that reported into
7  Norm. This was really the machine shop. There was
8  a few people that aren't in these numbers that
9  reported to another organization that were part of
10 the model shop, okay, but it looks there like there
11 were 12 people that were in our machinists.
12     Q. Okay. And when that was closed, the --
13 those people got -- those people got severance
14 payments, right?
15     A. Because we closed the shop, they were laid
16 off.
17     Q. Okay. And do you -- was the machine shop
18 assets sold to anybody, such as Olympic
19 Engineering?
20     A. Yeah. We had a professional assessor come
21 in and assess the value and then brought it for
22 sale. The company came in, happened to be Olympic;
23 they bought the equipment. And then we went out
24 for bidding of all of our machine shop work, and we

Page 305

1  outsourced it accordingly.
2      Q. Okay. Did any of the employees from the
3  machine shop who were paid severance after the
4  machine shop was closed go work for Olympic?
5      A. I think there was one that was hired by
6  Olympic after the fact.
7      Q. You sure it was only one, or was it more
8  than one?
9      A. No, I don't remember how many it was.
10     Q. I'm sorry?
11     A. I don't know how many it was. I know of
12 one individual; there might have been others.
13     Q. Okay.
14     A. But that was on their own accord. They
15 could have gone to work anywhere.
16     Q. Okay. Was this sale to Olympic part of
17 some kind of a deal where they would, similar to
18 the board shop sale, where they were asked to hire
19 some of the employees?
20     A. No. This was all separate. It was all
21 independent. When we sold -- when we sold the
22 equipment to them at that time, there was no intent
23 of giving them Agfa work. They bid on Agfa work
24 like many other machine shops did. And I don't

77 (Pages 302 to 305)

Richard Ramsden                                                                05/02/2006

Page 306

1  believe they got it all; they got some of it. And
2  as a result of getting some of it, they needed some
3  additional machinists, and they went out and hired,
4  maybe not exclusively some Agfa people, but I know
5  of one Agfa person that they did hire.
6      Q. Where was Olympic located?
7      A. I don't know.
8      Q. Were you involved in the negotiation of
9  that sale?
10     A. No. It was only the equipment. Just
11 brought in a professional appraiser and got a
12 certified appraisal, and so we accepted that
13 appraisal and went from there.
14     Q. Okay. Back to Exhibit 27. If you look at
15 page 7, this is an answer to objections and
16 response to interrogatory number 6. Do you see
17 that, sir?
18     A. Yes.
19     Q. The last sentence there says, "Currently,
20 defendants are not aware of communications with
21 individual employees at which the inapplicability
22 of Bayer severance pay plan to the acquisition of
23 the printed circuit board business by EFTC
24 Corporation was discussed." Do you see that?

Page 307

1      A. Yes.
2      Q. Is that an accurate statement, as far as
3  you know?
4      A. Yes.
5      Q. Okay. And then the sentence above that
6  says, "The defendants never considered the Bayer
7  severance pay plan to be applicable in such
8  circumstances." Do you see that?
9      A. Yes, I do.
10     Q. And you understand we're talking about the
11 sale of the board shop to EFTC?
12     A. Yes, I do.
13     Q. Did you, yourself, ever consider the Bayer
14 severance plan to be applicable in the
15 circumstance?
16     A. No, I didn't.
17     Q. Okay. Next paragraph down, it says, "At
18 the time of the acquisition of the -- of the board
19 shop, local human resources officials would have
20 made the initial determination of severance pay
21 eligibility." Do you see that?
22     A. Yes, I do.
23     Q. And would that be Mary Leonard and Rodney
24 Willis?

Page 308

1      MR. WELSH: Objection. You may answer
2  within your knowledge.
3      THE WITNESS: Well, I think it's the human
4  resource group and not -- not just Mary
5  Leonard and Rod Willis.
6      Q. Okay. Who was the human resource group?
7      A. In the Agfa division -- in Ridgefield
8  Park, New Jersey was Tim Romps.
9      Q. Anyone else?
10     A. And they probably would confer with Bayer
11 human resources in Pittsburgh.
12     Q. And who was that?
13     A. I don't know.
14     Q. And when you say they would confer, who
15 are you --
16     MR. WELSH: He said they probably.
17     THE WITNESS: They probably; I didn't say
18 they did.
19     Q. When you said they probably would, who
20 would that be, sir?
21     A. Tim Romps, most likely. Mr. Romps.
22     MR. WELSH: I'm going to instruct you now,
23 when he asks you a question, tell him what you
24 know. But if you're guessing as to what might

Page 309

1  have happened with this, don't guess.
2      Q. And I would second Mr. Welsh's instruction
3  to you.
4      Well, it says here that "At the time of
5  the acquisition of the printed circuit board
6  business by EFTC, local human resource officials
7  would have made the initial determination of
8  severance pay eligibility." Do you see that?
9      A. Yes, I do.
10     Q. Now, it says local?
11     A. Uh-huh.
12     Q. I understand from local to be people at
13 the Agfa division in Wilmington?
14     A. Based on what that statement says, yes,
15 you're right.
16     Q. Okay. And who would that be?
17     A. That would be Rod Willis.
18     Q. Okay. How about Mary Leonard?
19     A. Mary reports to Rod Willis.
20     Q. Well, it says officials, local human
21 resource officials?
22     MR. WELSH: He didn't draft this. He
23 didn't review it.
24     MR. ROACH: Well, I understand. I'm just

78 (Pages 306 to 309)

Richard Ramsden                                                           05/02/2006

Page 310

1  trying to get his understanding as to what he
2  knows.
3      THE WITNESS: It would be Rodney Willis,
4  and I don't know if he did or not, but he
5  might have included his organization, but it
6  would have been at least Rod Willis.
7  Q. Okay.
8  A. That's the local human resource
9  organization.
10 Q. Okay.
11     MR. WELSH: Are you almost done? Your six
12 hours are fast approaching completion. Are
13 you just about done?
14     MR. ROACH: I'm pretty close. I think I
15 get seven or one day, right?
16     MR. WELSH: Oh, no. The Rule says six
17 hours.
18     MR. ROACH: I thought it was seven.
19     MR. WELSH: I'll be happy to get it for
20 you, if you want.
21     MR. ROACH: We don't need to argue about
22 it; I'm pretty close to being done.
23 Q. Okay. I'd like to show you another
24 exhibit, Exhibit 28, I guess it would be.

Page 311

1      (Exhibit No. 28, agreement with employees,
2  marked for identification.)
3  Q. Are you familiar with this document, sir?
4  A. It is an agreement with employees of the
5  company.
6  Q. Okay. Now, is this an agreement that
7  is -- that was the type of agreement that was
8  provided to employees under the voluntary layoff
9  program that we talked about earlier, if you know?
10 A. I guess it applies to anyone who is laid
11 off.
12     MR. WELSH: While we're on it, it appears
13 that this document has been redacted. Do you
14 have a copy of the unredacted document?
15     MR. ROACH: I don't. The only thing I
16 will tell you for the record that I redacted
17 was some handwriting by my own client that was
18 for me; nothing else.
19     MR. WELSH: Well, underneath the
20 handwriting, I mean, because I know on the
21 regular stationery, this line continues.
22     MR. ROACH: I did not redact it myself.
23     MR. WELSH: Well, does your client have a
24 copy of the unredacted version?

Page 312

1      MR. ROACH: Let me ask. Off the record
2  for a moment, not waiving the attorney/client
3  privilege.
4      MR. WELSH: Certainly.
5      (Off-the-record discussion held.)
6      MR. ROACH: For the record, if we have the
7  information as to the person's identification
8  on here, we'll provide it. Certainly.
9  Q. But is this the type of letter that was
10 provided to people when they were provided
11 severance on a voluntary layoff program as you had
12 described before where they would get severance if
13 the company chose to give it to them?
14 A. Yes.
15 Q. Now, do you know a woman by the name of
16 Pamela Neilon, N-E-I-L-O-N?
17 A. Yes.
18 Q. Who is she?
19 A. She was my secretary.
20 Q. Where does she live now?
21 A. Where does she live?
22 Q. Yes.
23 A. Lawrence.
24 Q. You have her street address?

Page 313

1  A. At home, I do.
2  Q. Okay. Is it N-E-I-L-O-N?
3  A. Yes.
4  Q. Do you know what her husband's name is? I
5  guess she's married?
6  A. I know she's married. Her husband's name
7  is Jack or John.
8  Q. Okay. And did you ever discuss with her
9  the sale of the board shop by Bayer to EFTC?
10 A. No, not discussed with her.
11 Q. Did you ever discuss with her the denial
12 of severance benefits to the board shop employees?
13 A. No.
14 Q. Did you ever examine the severance
15 provisions that are in exhibit -- Fiorilla
16 Exhibit 5, your Exhibit 7, at any time?
17 A. The book?
18 Q. Yes. In 1998, in connection with the sale
19 of the board shop to EFTC?
20 A. No.
21 Q. I'd like to show you another document,
22 Exhibit Number 29.
23     (Exhibit No. 29, 8/10 TC with R. Ramsden,
24 marked for identification.)

LegaLink Boston, A Merrill Company
(617) 542-0039

Richard Ramsden                                                                    05/02/2006

### Page 314

1  Q. And this is a handwritten page, one page;
2  it says, 8/10 TC with R. Ramsden. Do you recognize
3  this, sir?
4  A. No.
5  Q. Towards the bottom third of the page, it
6  says, "Employees: Dick to generate list with
7  employee names only." Do you recognize that
8  statement in terms of what it might mean?
9  A. Dick to generate a list of employees'
10 names. So I put together a list of names.
11 Q. Do you remember what this was concerning?
12 A. I don't know whose notes these are.
13 Q. Don't recognize the writing?
14 A. No.
15 Q. Is it fair to say these notes are in
16 connection with the contemplated sale of the board
17 shop to EFTC?
18 A. Let's see, August 10th. Yeah, it is.
19 Q. Okay. And just for the record, this was
20 produced to me again by the defendants. And when
21 it says Dick, that refers to you, right?
22     MR. WELSH: Objection.
23 Q. As far as you know?
24 A. Based on -- yes, based -- best -- to the

### Page 315

1  best of my knowledge.
2  Q. Do you have any knowledge as to why you'd
3  be generating employee -- a list with names only,
4  employee names only?
5  A. Yes.
6  Q. Why?
7  A. Because I knew the employees that would be
8  transitioning from Agfa to EFTC.
9  Q. Okay. And then underneath that, it says,
10 "Assumption of liabilities" and there's an arrow,
11 "Open POs, Dick working on." Do you know what that
12 refers to?
13 A. Would be open purchase orders.
14 Q. Okay. And those are the open purchase
15 orders that had already been in the system; is that
16 correct?
17 A. Inventory that's been ordered, anything
18 else that's been ordered.
19 Q. Why would you generate a list of employee
20 names and not human resources?
21 A. Because I was very close to all the
22 employees, and I knew who was moving from Agfa to
23 EFTC.
24 Q. When you say you were close to them, what

### Page 316

1  do you mean?
2  A. Close to them in terms of working
3  relationships. I knew what their technical skills
4  were and who would be moving over. So it's not
5  unusual for me to put a list like that together.
6     MR. WELSH: It's appears it's now
7  20 minutes before 5, and six hours under local
8  rules are up. Will you be concluding soon?
9     MR. ROACH: I will be. What did you
10 calculate that from?
11    MR. WELSH: 10:00 to 1:00; 1:35 to
12 present. Was my math wrong?
13    MR. ROACH: Well, we can discuss whether
14 your math is right or wrong later. I'd like
15 to use the time to ask questions if I have any
16 further questions. I prefer to not time each
17 other in these depositions.
18    MR. WELSH: Well, you know, there's a lot
19 of things I would prefer, too, but my
20 expectations have been shattered in this
21 deposition. So I guess I got to go back to
22 the Rules.
23    MR. ROACH: Well, we can agree to
24 disagree.

### Page 317

1  Q. In addition to the paint shop, the sheet
2  metal shop, can you remember whether any other
3  employees in any other areas such as shipping,
4  calibration or assembly received severance after
5  their areas were either closed down or sold?
6     MR. WELSH: Objection. You may answer.
7     THE WITNESS: If they were laid off, you
8  know, then they most likely received
9  severance.
10 Q. No. I want to know what --
11    MR. WELSH: One second. What do you
12 remember? Not most likely.
13    THE WITNESS: Yeah, they --
14    MR. WELSH: Not possibly, did they. What
15 do you remember?
16 Q. Yes, that's -- I agree with Mr. Welsh.
17 A. They received severance being laid off.
18 Q. Okay. Now, in those areas, do you
19 remember whether that was before or after the sale
20 of the board shop to EFTC, if you remember?
21 A. Don't recall.
22 Q. Okay. And those areas were under your
23 area?
24 A. In my organization.