## Page 1

```
                    Volume I
                    Pages 1 to 66
                    Exhibits 1 and 2
              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -x
JOSEPH ATTARDI, et al.,        :
          Plaintiffs,          :
                               :
    vs.                        :  Civil Action
                               :  No. 04-10728-REK
BAYER CORPORATION, BAYER       :
CORPORATION SEVERANCE PAY      :
PLAN,                          :
          Defendants.          :
                               :
- - - - - - - - - - - - - - - -x
       DEPOSITION OF TERESA C. ORNELAS, a witness
called on behalf of the Defendants, taken pursuant
to the Federal Rules of Civil Procedure, before
Anne H. Bohan, Registered Diplomate Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Doris O. Wong
Associates, 50 Franklin Street, Boston,
Massachusetts, on Tuesday, November 21, 2006,
commencing at 12:28 p.m.
PRESENT:
    Roach & Wise, LLP
         (by Stephen A. Roach, Esq.)
         31 State Street, Boston, MA 02109-2705,
         for the Plaintiffs.
    Bello Black & Welsh LLP
         (by John F. Welsh, Esq.)
         One Exeter Plaza, 10th Floor,
         699 Boylston Street, Boston, MA 02116,
         for the Defendants.
                    * * * * *
```

## Page 2

```
              I N D E X
WITNESS        DIRECT  CROSS  REDIRECT  RECROSS
TERESA C. ORNELAS
  BY MR. WELSH    4                       61
  BY MR. ROACH          55
                    * * * *
              E X H I B I T S
NO.    DESCRIPTION                        PAGE
 1     EFTC document entitled              27
       "Non-Disclosure Agreement" between
       EFTC Corporation and Teresa C.
       Ornelas dated 8/27/98 with
       attachments
 2     Compendium exhibit of documents     27
       contained in Ms. Ornelas' personnel
       file, the first being entitled
       "Electronic Funds Transfer (EFT)
       Enrollment Authorization"
                    * * * *
```

## Page 3

PROCEEDINGS

[1]
[2] MR. ROACH: Same stipulations?
[3] MR. WELSH: Yes.
[4] MR. ROACH: Whenever you're ready.
[5] MR. WELSH: Pursuant to the stipulations of
[6] prior depositions, the parties agree that all
[7] objections, except as to form, shall be waived until
[8] the time of trial. Motions to strike shall be
[9] waived until the time of trial.
[10] MR. ROACH: Reserved.
[11] MR. WELSH: Reserved, thank you.
[12] MR. ROACH: Both are reserved until the
[13] time of trial.
[14] MR. WELSH: Thank you. The witness, in
[15] lieu of appearing before a notary, may read and sign
[16] under the pains and penalties of perjury. Is that
[17] right?
[18] MR. ROACH: Yes.
[19]    TERESA C. ORNELAS
[20] a witness called for examination by counsel for the
[21] Defendants, having been satisfactorily identified by
[22] the production of her driver's license and being
[23] first duly sworn by the Notary Public, was examined
[24] and testified as follows:

## Page 4

**DIRECT EXAMINATION**

BY MR. WELSH:

[3] Q. Would you please state your full name.
[4] A. Teresa C. Ornelas.
[5] Q. What does the "C" stand for?
[6] A. Conceicao.
[7] Q. Could you spell that.
[8] A. C-o-n-c-e-i-c-a-o.
[9] Q. Where do you live?
[10] A. I live in Dracut, 7 Omega Circle.
[11] Q. How long have you lived there?
[12] A. For about two years.
[13] Q. Prior to that?
[14] A. 18 Ferncroft in Tewksbury.
[15] Q. Are you married?
[16] A. Yes.
[17] Q. Do you have any children?
[18] A. Yes. Two.
[19] Q. Are you currently employed?
[20] A. Yes, I am.
[21] Q. By whom?
[22] A. MACK Technology in Westford.
[23] Q. What's your job title there?
[24] A. Program manager.

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Teresa C. Ornelas
November 21, 2006

**Page 9**

[1] in the board shop?
[2]   A. In the cafeteria when everybody went in.
[3]   Q. This is in the April to May 1998 time
[4] frame?
[5]   A. April to May we would ask about Vinnie
[6] Fiorilla, because he was our supervisor. We didn't
[7] go all the way up the ladder; our ladder was Vinnie.
[8]   Q. Vinnie said no?
[9]   A. As far as he knew. He wasn't sure.
[10]   Q. When you were talking to Vinnie, were you
[11] aware that any employees of the board shop had had
[12] special retention agreements?
[13]   A. No.
[14]   Q. Prior to coming here today, you were at Mr.
[15] Brown's deposition. Prior to Mr. Brown's
[16] deposition, were you aware of any retention
[17] agreements employees may have had?
[18]   A. Yes. After I was already employed at EFTC,
[19] that that had happened.
[20]   Q. So while you were at Bayer Corporation, you
[21] did not know some people in the board shop had
[22] retention agreements?
[23]   A. Correct. I did not know.
[24]   Q. In July 1998, was there an announcement

**Page 10**

[1] that EFTC would be purchasing the board shop?
[2]   A. Yes.
[3]   Q. Was that in a meeting in the cafeteria?
[4]   A. Yes.
[5]   Q. Did you attend?
[6]   A. Yes, I did.
[7]   Q. How many other people attended?
[8]   A. The whole department, including the
[9] testing, the assembly and the PC board shop.
[10] Everybody that had part of the merge within that
[11] group.
[12]   Q. The PC board shop, is that otherwise known
[13] as fabrication?
[14]   A. PC board shop means everything; it means
[15] from the wet process to the dry process. Everybody
[16] has a different terminology, but fabrication you can
[17] just say, it's a fabricator board. Cut a board,
[18] it's fabricated. They used to call it PC board shop
[19] meaning everything.
[20]   Q. Everything, okay.
[21]   A. And it was divided into two different
[22] groups.
[23]   Q. Did you notice at this meeting who was
[24] there from management?

**Page 11**

[1]   A. Norman Fontaine, Dick Ramsden, Michael
[2] Paige. Of course the HR, Mary Hartman.
[3]   Q. Mary Leonard?
[4]   A. Leonard, yes, her. And of course Vinnie.
[5] I'm not sure now if there was anyone additional; I
[6] know these were there.
[7]   Q. Did you know a person named Rodney Willis?
[8]   A. Yes, I knew him.
[9]   Q. He was the head of HR in Wilmington?
[10]   A. Wilmington, yes, I knew who he was.
[11]   Q. Was he there?
[12]   A. I know he was in one of the meetings, but I
[13] can't say that he was in both.
[14]   Q. Now, did you take notes of this meeting?
[15]   A. No, I didn't.
[16]   Q. You don't keep a diary or anything like
[17] that, do you?
[18]   A. Honestly, I did, but the diary, it went
[19] hasta la vista. Because I moved, when I moved the
[20] house, I had it all in boxes, and with kids and
[21] everybody was helping me out, and I don't have it
[22] anymore.
[23]   Q. Back then did you have one, back in '98?
[24]   A. I did have one, yes.

**Page 12**

[1]   Q. Did you keep -- among the things you put in
[2] your diary were things happening at work, would that
[3] be in there?
[4]   A. It would just like say, today was a
[5] meeting, the announcement was... The announcement
[6] of a closing, who said it. Anything that was like
[7] interesting, the main points, I would just make a
[8] bullet.
[9]   Q. Did you have personal things in the diary
[10] as well?
[11]   A. I probably would.
[12]   Q. Things not related to work?
[13]   A. No.
[14]   Q. So this would be a diary of things that
[15] happened to you while at work?
[16]   A. Yes.
[17]   Q. Did you continue to keep it when you were
[18] at EFTC?
[19]   A. Yes.
[20]   Q. When did you move?
[21]   A. About two and a half years ago.
[22]   Q. In conjunction with the move, the diary got
[23] thrown away?
[24]   A. (The witness nods)

Page 13

[1]     MR. ROACH: Is that a "yes"?
[2]  A. Yes. Yes.
[3]  Q. Other than the diary, do you have any other
[4] records from when you worked at Bayer, any other
[5] documents or records?
[6]  A. Only my performance appraisals.
[7]  Q. Other than the performance appraisals?
[8]  A. No, not right at this moment. No, I don't
[9] have any.
[10]  Q. Any benefit pamphlet? You said right at
[11] this moment.
[12]  A. Because I used to keep just everything I
[13] got, I had a file that I would just stick there,
[14] because honestly, it's like they come in in the
[15] mail, and you don't read it. Just something if it's
[16] necessary, if you have the time, you would just grab
[17] it and do that. And I don't have that anymore.
[18]     MR. ROACH: Just for the record, I have the
[19] performance appraisals here. I just got them this
[20] morning.
[21]     MR. WELSH: I don't need to see those.
[22]  Q. So is it fair to say that you got certain
[23] things from Bayer in the mail, you'd keep it in a
[24] file, put it in a file without reading it, and if

Page 14

[1] you had questions later on, you could go back and
[2] search it?
[3]  A. Yeah, especially like health insurance, my
[4] concern was health.
[5]  Q. Now, do you still have those Bayer
[6] documents?
[7]  A. No, I don't.
[8]  Q. Were they thrown away at the time of the
[9] move as well?
[10]  A. (The witness nods)
[11]     MR. ROACH: Is that a "yes"?
[12]  A. Yes.
[13]  Q. That would have been -- was that in 2004?
[14]  A. 2004 that I moved?
[15]  Q. Yes.
[16]  A. Yeah, it was 2004, November 1st.
[17]  Q. Now, have you ever been directed to look
[18] for documents pertaining to your employment at Bayer
[19] during this lawsuit?
[20]  A. At one time. It was asked if I had
[21] anything, but I didn't. I looked but I couldn't
[22] find any.
[23]  Q. That was after the move?
[24]  A. Yes.

Page 15

[1]  Q. Did you talk to anyone -- please strike
[2] that. Did you talk to anyone about preparing for
[3] today's deposition?
[4]  A. I came to see Steve on Saturday.
[5]  Q. Was anyone else present other than you and
[6] Steve?
[7]  A. Yes. It was Ed, Ed Lascelles.
[8]     MR. ROACH: Ed Lascelles,
[9] L-a-s-c-e-l-l-e-s.
[10]  Q. So other than talking with Mr. Roach, did
[11] you talk with anyone else to prepare for the
[12] deposition?
[13]  A. No.
[14]  Q. Have you talked in the last three months
[15] with any of your coworkers concerning the severance
[16] pay issue and the sale of the board shop to EFTC?
[17]  A. Not since I left for my closing at Suntron.
[18] Where I moved there's nobody there employed from
[19] AGFA.
[20]  Q. When we talked about the first meeting when
[21] it was announced, when I asked who was at the
[22] meeting, you indicated that Mr. Fontaine, Mr.
[23] Ramsden, Ms. Leonard, Mr. Fiorilla were there.
[24] You're not sure about Ron Willis.

Page 16

[1]     MR. ROACH: I think she mentioned Michael
[2] Paige was there too.
[3]     THE WITNESS: Michael Paige, yes.
[4]     MR. WELSH: No, she hadn't, but I was about
[5] to ask her that.
[6]     THE WITNESS: I thought I had.
[7]     MR. ROACH: No, she did, John.
[8]     MR. WELSH: Okay.
[9]  Q. What do you remember being said at the
[10] meeting?
[11]  A. That they had sold the shop to this company
[12] EFTC, that it had offered exactly the same thing as
[13] Bayer, I mean, meaning like our work, like you were
[14] not going to lose your job, everybody would have a
[15] job, and everything was equal the same.
[16]  Q. Everything was equal?
[17]  A. The benefits, your work, your hourly rate.
[18]  Q. Who said that?
[19]  A. Michael Paige presented first, and then
[20] Dick Ramsden spoke second.
[21]  Q. With respect to the reference about
[22] benefits, hourly rates the same, do you recall
[23] specifically who said that?
[24]  A. Michael Paige.

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Teresa C. Ornelas
November 21, 2006

Page 17

[1] Q. Did he use the word, quote, "the same"?
[2] A. Hmm, let me see. That I'm not sure. It
[3] may be my interpretation; it meant "equal or the
[4] same."
[5] Q. But do you remember the precise words that
[6] he used?
[7] A. What I remember him saying was that for
[8] people not to worry about it, because nobody was
[9] going to lose their job, because everything was
[10] going to be the same. The work ways, the titles,
[11] everything, benefits, including insurance and
[12] everything else, was equal or the same.
[13] Q. Now, you remember him saying they were
[14] "equal or the same"?
[15]     MR. ROACH: Objection.
[16] A. Yes.
[17] Q. Did he use the word "comparable"?
[18] A. That I don't know if he used that word.
[19] Q. But you remember the words "equal or the
[20] same"?
[21] A. "Equal or the same."
[22] Q. He didn't say "equal or better"?
[23]     MR. ROACH: Objection. You can answer.
[24] A. He could have said that too, "equal or

Page 18

[1] better."
[2] Q. You said he could have.
[3] A. Yeah.
[4] Q. As you sit here today, do you remember him
[5] saying that?
[6] A. Not that way.
[7]     MR. ROACH: If I object, you just continue.
[8] Unless I say otherwise, just continue to answer.
[9] Just continue to answer the question. If I say
[10] objection, just for the record, you go ahead and
[11] just answer.
[12] Q. Was anything else said other than what
[13] you've just relayed at that meeting?
[14] A. That we were going to stay in the same
[15] building.
[16] Q. Anything else?
[17] A. And this was a very hard decision, and they
[18] were very thoughtful, very carefully just to make
[19] sure...
[20] Q. Anything else?
[21] A. Not that I recall.
[22] Q. Were there any questions from employees
[23] during the meeting?
[24] A. Yes, there were questions.

Page 19

[1] Q. Do you recall who asked the questions, what
[2] specific employees?
[3] A. If I tell you the name of a person, I'd
[4] have to be definitely sure that was the person and
[5] I --
[6]     MR. ROACH: You don't have to be definite.
[7] You can give him your best memory, even if you're
[8] not sure.
[9] A. My best memory was that Rich Brown, that he
[10] put his hand up and asked the question about the
[11] severance pay.
[12] Q. What do you recall him asking?
[13] A. He wanted to know if that includes
[14] severance pay also, do we keep our severance pay.
[15] Will we get the severance pay prior to being
[16] terminated, because termination for us at Bayer was
[17] anybody who got terminated would get their severance
[18] pay.
[19] Q. So he asked, "Will we get severance pay?"
[20] A. "Because we're being terminated." Michael
[21] Paige came forward and he said "No."
[22] Q. Did he give a reason?
[23] A. He says because we were going to -- we were
[24] going to keep the same jobs and we were going to

Page 20

[1] stay in that building.
[2] Q. Any other discussion of severance pay at
[3] that meeting?
[4] A. Not that I recall.
[5] Q. Did any other employees have any questions?
[6] A. There were other ones, but I don't remember
[7] exactly. They were all in the same kind of a type
[8] of a question. It was always asked about security
[9] about their benefits and severance pay and vacation
[10] and all that stuff.
[11] Q. Do you remember whether or not any
[12] questions were raised at this meeting about vacation
[13] pay?
[14] A. At that first meeting I don't think so.
[15] Q. Was anything said about pension plan at
[16] that first meeting?
[17] A. I don't recall.
[18] Q. Was there anything said about medical
[19] insurance?
[20] A. The question was asked about medical, and
[21] they said it was a different insurance, but we would
[22] get the same kind of coverage.
[23] Q. Who answered that, do you remember?
[24] A. I think that's when it came to my mind that

Page 21

[1] Rodney was there, because he was the one who
[2] answered the questions, because he was from HR.
[3] Yeah.
[4]     MR. ROACH: You might want to tell him who
[5] Rodney is, just for the record.
[6]     A. He is in charge of the HR.
[7]     Q. Rodney Willis?
[8]     A. Yeah, Rodney Willis.
[9]     Q. Did they pass out any documents at that
[10] meeting?
[11]     A. I don't recall.
[12]     Q. Did they tell you when they thought the
[13] sale would be completed?
[14]     A. No, not on the first meeting.
[15]     Q. Any employees indicate that they were upset
[16] at that meeting?
[17]     A. Oh, they were. There was a lot of
[18] conversation. Within the people that talked, asked
[19] questions, that same kind of questions back and
[20] forth, and everybody left very upset at that
[21] meeting.
[22]     Q. Did they indicate to you why they were
[23] upset or what upset them?
[24]     MR. ROACH: Objection. Are you talking

Page 22

[1] about after the meeting or during the meeting?
[2]     Q. During the meeting and immediately after,
[3] the next hour after the meeting.
[4]     A. It was right after. As we were walking out
[5] of the cafeteria, people were upset about the
[6] security, and they felt there was more to it that
[7] maybe management was not letting us know about it.
[8]     Q. They were upset about their job security?
[9]     A. It was job security, and also they felt
[10] that something else was going on that we were not
[11] being told.
[12]     Q. Do you recall anyone who was upset?
[13]     A. Maria Reis, Hannah Holt, Norman Parent,
[14] Pauline Guilmette.
[15]     Q. Do you remember anything else that they
[16] were upset about? You said job security and there
[17] may be something management is not telling us. Was
[18] there anything else they were upset about?
[19]     A. They were upset because on previous
[20] meetings, they had brought it up, and the answer was
[21] always, "Well, that's not true. That's just
[22] rumors." And all along there was something being
[23] worked behind us, because they had come back in July
[24] and tell us, "It is true now, the shop is being

Page 23

[1] sold."
[2]     Q. Now, when is the next time you had a
[3] conversation with anyone at Bayer management
[4] concerning the sale of the board shop?
[5]     A. I had daily conversations with Vinnie
[6] Fiorilla, because he was my supervisor.
[7]     Q. What were you talking to him about?
[8]     A. Talking about the same things. Why didn't
[9] they tell us this previous. Tell us, are they going
[10] to give us the same termination they have given to
[11] other employees previous? Will they ask for
[12] volunteers like they have done in the past? Because
[13] if they do so, there are people here that will like
[14] to volunteer, because they want to be able to go out
[15] with the same kind of package that they've done in
[16] the past.
[17]     Q. Did Mr. Fiorilla respond to these
[18] questions?
[19]     A. Vinnie said that he really didn't know
[20] much, and if he did, he didn't feel he was the one
[21] that was going to explain to us.
[22]     Q. Excuse me, I didn't understand that.
[23]     A. If he knew about anything else, that he
[24] wouldn't be the one who was going to be telling me

Page 24

[1] about it. If anybody had any issues, to please feel
[2] welcome to check with HR.
[3]     Q. Was there any one particular person in HR
[4] that used to be responsible for the board shop?
[5]     A. No, no.
[6]     Q. Was Mary Leonard assigned to the board
[7] shop, to your knowledge?
[8]     A. Yeah, she was, and there was another lady
[9] there.
[10]     Q. Julie Haley?
[11]     A. No.
[12]     MR. ROACH: Is that a "no"?
[13]     A. No. Brenda? I can't think of the name
[14] now.
[15]     Q. You asked Mr. Fiorilla whether or not the
[16] same severance benefits would be available to
[17] employees?
[18]     A. Yeah, because we were being terminated from
[19] Bayer and rehired on the EFTC.
[20]     Q. Did he respond to that?
[21]     A. He said, as far as he knows, he didn't
[22] think so, but for us to go check with -- feel
[23] welcome to go check with HR, because that's what
[24] exactly were the words given to them -- to him. If

Page 25

[1] anybody comes to see him or myself, for us to direct
[2] to the HR office.
[3]    Q.  Did you ever go to HR?
[4]    A.  A couple of times.
[5]    Q.  About the sale to EFTC?
[6]    A.  Yeah.
[7]       MR. ROACH:  Was that a "yes"?
[8]    A.  Yes.
[9]       MR. ROACH:  You have to say "yes," not
[10] "yeah." You have to say "yes."
[11]    A.  I'm sorry. Yes.
[12]    Q.  When you went to HR a couple of times, did
[13] anyone go with you?
[14]    A.  No, sir.
[15]    Q.  When you went to HR, who did you see?
[16]    A.  I keep thinking about that lady. I don't
[17] think it was Mary that was there. Brenda.
[18]       MR. ROACH:  Off the record.
[19]       (Discussion off the record)
[20]    Q.  Back on the record. Would it be Bonnie
[21] Harrington or Terri Mahoney?
[22]    A.  No.
[23]    Q.  It wasn't Dave Kourtz. Jane Wilner?
[24]    A.  Jane. She was -- he was there also. He

Page 26

[1] was there part of it. Somehow I envision it being a
[2] lady.
[3]    Q.  But it's not Terri Mahoney, Julie Haley or
[4] Bonnie Harrington?
[5]    A.  Not those three. Brenda I'm thinking.
[6] Anyway.
[7]    Q.  So you went there a couple of times; you
[8] don't --
[9]    A.  Yes, I went there a couple of times, just
[10] being concerned because too many questions was given
[11] to me, and I didn't know the answers.
[12]    Q.  What were the questions given to you you
[13] didn't know the answers?
[14]    A.  It was the same questions: Are we going to
[15] have -- if we go to EFTC, are we going to have the
[16] same kind of years of service, severances? If
[17] something happens to us, will they match our
[18] severance? Do you know for a fact that severance is
[19] going to be given to us because we're being
[20] terminated?
[21]    Q.  Any other questions?
[22]    A.  Do I think it's fair how they are treating
[23] us? These questions constantly. I came to a point
[24] that I said, "Don't ask me any more questions, just

Page 27

[1] go directly to the HR or Vinnie."
[2]    Q.  Did it come to your attention at any time
[3] prior to September 1, 1998 that the benefits being
[4] offered by EFTC were not as good as the benefits
[5] that had been offered by Bayer?
[6]       MR. ROACH:  Objection. Go ahead.
[7]    A.  By September 1st?
[8]    Q.  Yes.
[9]    A.  Yes. When we signed the papers showing
[10] what kind of insurance we were going to be covered.
[11]       MR. WELSH:  Could you make these Exhibits 1
[12] and 2.
[13]       (Documents marked as Ornelas
[14]       Exhibits 1 and 2 for identification)
[15]    Q.  Now, you said there were meetings. Was
[16] there more than one meeting with EFTC that you
[17] attended?
[18]       MR. ROACH:  Objection. Are you talking
[19] about a group meeting or individual?
[20]    Q.  Individual meetings where they gave out
[21] papers.
[22]    A.  Where they gave out papers. I know there
[23] were presentations, people presenting, like the
[24] insurance and the 401(k). There were people that

Page 28

[1] came that represent those companies.
[2]    Q.  So this is EFTC's insurance carriers?
[3]    A.  Exactly.
[4]    Q.  And they made presentations?
[5]    A.  Yes.
[6]    Q.  Do you know whether or not they passed out
[7] booklets or written information to employees as part
[8] of the presentation?
[9]    A.  The 401(k) I know they did, because they
[10] even have a little sample like for you to figure out
[11] yourself where you should be percentagewise for your
[12] retirement. I know they did that. Dental. I'm
[13] going to say they did.
[14]    Q.  Do you remember whether or not any persons
[15] employed by EFTC gave a presentation on their
[16] benefits?
[17]    A.  No, nobody from EFTC came to stand up.
[18]    Q.  Do you remember whether anyone came from
[19] EFTC and met individually with employees?
[20]    A.  Just when the time was for signatures to
[21] make it official.
[22]    Q.  That was prior to September 1, 1998?
[23]    A.  Yes. That was somewhere the end of August,
[24] they just wanted to make sure all the papers were

Page 29

[1] all set.
[2]  Q. As a group leader, were you required to
[3] give people, if you will, release time to go down
[4] and take care of the paperwork?
[5]  A. To release the people to go down there?
[6]  Q. Yes.
[7]  A. Yes. The people were scheduled.
[8]  Q. Was there an actual written schedule?
[9]  A. I'm sure there was.
[10]  Q. I'm going to show you a document that's
[11] been marked for identification as Exhibit 1, Ornelas
[12] Exhibit 1. The first page, is that your
[13] handwriting?
[14]  A. Yes, it is.
[15]  Q. This is a Non-Disclosure Agreement on
[16] August 27, 1998?
[17]  A. Yes.
[18]  Q. Is this about the time that people were
[19] being released per schedule to go and sign
[20] paperwork?
[21]  A. Yes.
[22]  Q. If you'd turn to the next page, this
[23] appears to be an employment contract with EFTC. Is
[24] this your handwriting on it?

Page 30

[1]   MR. ROACH: Objection.
[2]  A. Yes, it is.
[3]  Q. Will you agree with me, this is your
[4] employment contract -- your employment application
[5] with EFTC?
[6]   MR. ROACH: I'll stipulate that's what it
[7] says.
[8]  A. Yes.
[9]   MR. ROACH: She's not a lawyer. I'll
[10] object as to the word "contract."
[11]  Q. Right at the top, "Today's Date," the date
[12] you filled it out was August 19, 1998?
[13]  A. 1998.
[14]  Q. That was the date you did fill it out?
[15]  A. Yes.
[16]  Q. Then down under "Availability," the start
[17] date, 9/1/98. Do you see that?
[18]  A. Yes, I do.
[19]  Q. That's the date you were available to
[20] start?
[21]  A. Yes, I was.
[22]  Q. Is it fair to say when you filled out this
[23] form, it was your belief that EFTC would be taking
[24] over the board shop operation on September 1, '98?

Page 31

[1]   MR. ROACH: Objection.
[2]  A. Correct.
[3]  Q. For what position you're applying, it says
[4] "PC Dry Process Inspector (Specialist)." Do you see
[5] that?
[6]  A. Yes.
[7]  Q. Was that the job you had with Bayer at the
[8] time you filled this out?
[9]  A. Yes. Some people would use group leader;
[10] some people would use specialist then.
[11]  Q. A group leader and a specialist are the
[12] same thing?
[13]  A. Yeah.
[14]   MR. ROACH: Is that a "yes"?
[15]  A. Yes.
[16]  Q. Turning to the back page of the same
[17] exhibit, is that your signature on the bottom of the
[18] page under "Certification"?
[19]  A. Yes, it is.
[20]  Q. Let's look at the next document here.
[21] There's a "Personnel Action Notice." Have you ever
[22] seen that? Is that your signature on the bottom of
[23] the Personnel Action Notice?
[24]  A. Oh, yes.

Page 32

[1]  Q. Is the date August 27, '98?
[2]  A. Yes, that's me.
[3]  Q. That's the date you signed it?
[4]  A. Yes, it is.
[5]  Q. When you started with EFTC, was your pay
[6] rate higher than it had been for Bayer?
[7]   MR. ROACH: Objection.
[8]  A. The pay rate ended up being higher, because
[9] they compensated for the insurance. The insurance
[10] at AGFA was lower, so when you went to EFTC, the
[11] insurance was a lot of money, much more money, okay,
[12] for the insurance. So EFTC upgraded your hour rate
[13] so that the take home would be the same as the AGFA,
[14] as Bayer.
[15]  Q. So they increased your rate to make up for
[16] the increased employee payment necessary for the
[17] health insurance?
[18]  A. Yes, for health insurance.
[19]  Q. You worked in the same location for EFTC as
[20] of September 1998 as you had worked for Bayer in
[21] August '98?
[22]  A. Yeah, the same.
[23]   MR. ROACH: Is that a "yes"?
[24]  A. Yes.

Page 33

[1] MR. WELSH: Sorry.
[2] MR. ROACH: That's okay.
[3] Q. You can put Exhibit 1 aside.
[4] MR. ROACH: Off the record.
[5] (Recess from 1:03 to 1:06 p.m.)
[6] BY MR. WELSH:
[7] Q. I want to show you some documents that have
[8] been marked as Exhibit 2. I tell you that these
[9] came out of your EFTC file.
[10] A. Okay.
[11] Q. The first document, is that your signature
[12] on it?
[13] A. Yes, it is.
[14] Q. You filled this out on August 27, '98?
[15] A. Correct.
[16] Q. The next document has your signature on it
[17] from Rocky Mountain Life Insurance Company?
[18] A. Yes.
[19] Q. Application for Group Insurance?
[20] A. Yes.
[21] Q. At the time you filled this out, did you
[22] have any literature from them indicating what the
[23] benefit was?
[24] A. No.

Page 34

[1] Q. You signed this document on August 27,
[2] 1998?
[3] A. Yes.
[4] Q. The following document is a Stock Purchase
[5] Plan Order Form. Did you fill this out?
[6] A. Oh, yes.
[7] Q. You didn't sign it, did you?
[8] A. I guess not.
[9] Q. Do you know when you filled this document
[10] out?
[11] A. I still remember being the deductible of
[12] $20 per paycheck and then the shares went all the
[13] way down to three bucks, not even worth...
[14] Q. Okay.
[15] A. Without signing it, they took it off my
[16] paycheck, didn't they?
[17] Q. Yes, they did.
[18] The next document, on the top it says "EFTC
[19] Corporation." Do you see that?
[20] A. Yes.
[21] Q. It says "Enrollment Information"?
[22] A. My 401(k).
[23] Q. This has something to do with a 401(k)?
[24] A. Correct.

Page 35

[1] Q. Did you sign this document?
[2] A. Yes, I did.
[3] Q. It's on August 26, 1998; is that correct?
[4] A. Yes.
[5] Q. Do you know why this document was the day
[6] before those other documents were signed?
[7] A. Because --
[8] MR. ROACH: Objection. One of them wasn't
[9] signed.
[10] A. Yes.
[11] MR. ROACH: Go ahead.
[12] A. This here was given to us, the forms, on
[13] the meeting that we had with the 401(k), and
[14] everybody kept their forms back to their place until
[15] they were able to make the decision and to bring it
[16] back to the HR, so that they would pass it through.
[17] And that's the reason why there's a different date.
[18] Q. You can skip the "Basic Data" form.
[19] "Application for Membership," again, is
[20] this your signature on the bottom of the page? This
[21] is Great-West Life & Annuity Insurance Company?
[22] A. Yes.
[23] Q. One Health Plan?
[24] A. Yes.

Page 36

[1] Q. Now, you signed that on August 27th?
[2] A. 27th, yes, sir.
[3] MR. ROACH: Hang on for a second.
[4] MR. WELSH: Of course.
[5] (A pause)
[6] BY MR. WELSH:
[7] Q. Now, this enrollment form, I'm looking at
[8] the Great-West "Application for Membership." You
[9] enrolled in the health plan and HMO dental; is that
[10] right?
[11] A. Yes, sir.
[12] Q. Do you know, when you filled this out, did
[13] you have an opportunity to instead enroll in those
[14] other plans that are reflected in the enrollment
[15] boxes?
[16] A. Great-West was the ones that were more
[17] matching to what I had at Bayer, and I was just
[18] looking for the same kind of coverage.
[19] Q. But you notice on the medical, there's One
[20] Health Plan HMO, Great-West PPO and Great-West POS.
[21] A. Yes, but one of these here is more like for
[22] New Hampshire people, okay. And this HMO, like I
[23] said, it was more identical to what I had previous
[24] with Bayer.

**Page 37**

[1] **Q.** But did you meet with anyone concerning the
[2] health plan to find out what plans covered what,
[3] what procedures, for instance?
[4] **A.** We probably did.
[5] **Q.** If you'd turn the page.
[6]     **MR. ROACH:** Objection. Make sure you don't
[7] guess.
[8]     **THE WITNESS:** I understand, but I feel
[9] comfortable.
[10] **Q.** The next thing is Principal Financial
[11] Group.
[12] **A.** Um-hum.
[13] **Q.** Is this your signature on the bottom of the
[14] page?
[15] **A.** Yes, it is.
[16] **Q.** On August 27, '98.
[17] **A.** Um-hum.
[18] **Q.** Is that "yes"?
[19] **A.** Yes, it is. My beneficiaries.
[20] **Q.** The next-to-last document appears to be a
[21] Personnel Action Notice. Down the bottom right-hand
[22] corner, is that your signature, and the date, it
[23] appears to be 10/20/98?
[24] **A.** Yes, that is my signature, and that's the

**Page 38**

[1] date, 10/20.
[2] **Q.** Were you promoted by EFTC about a month
[3] after -- two months after you joined them?
[4] **A.** Oh, yeah. Believe me, it wasn't a very
[5] thrilled promotion on my side.
[6] **Q.** Why is that?
[7] **A.** Because I really didn't want the promotion.
[8] Mr. Don Baribeau put me in a position that he told
[9] me that if I didn't take the responsibility of
[10] taking this promotion, that sometime later on when
[11] those people would be out there on the street laid
[12] off without having a job, that I should thank myself
[13] for it.
[14] **Q.** Did you get more money as a result of this
[15] promotion?
[16] **A.** Very little, if any. I was told I was
[17] going to get it later on, and I waited and waited
[18] and had to fight for it. So I think I got some but
[19] it wasn't --
[20] **Q.** It was not as much as you would have liked?
[21]     **MR. ROACH:** Objection.
[22] **A.** Not for the amount of people that I was
[23] responsible for.
[24] **Q.** If you'd turn the page to the last page,

**Page 39**

[1] "EFTC Obligation Statement," did you fill this
[2] document out and sign it on August 27, 1998?
[3] **A.** Yes, I did.
[4] **Q.** You can put that back. Thank you.
[5]     After the meeting, the first meeting that
[6] you attended with the board shop employees at which
[7] the EFTC transaction was announced, did you attend
[8] any other meetings with Bayer management concerning
[9] the EFTC transaction?
[10] **A.** Yeah. There was another one sometime in
[11] August. For everybody going to the cafeteria, I
[12] believe it was one more in August.
[13] **Q.** So you remember a total of two in the
[14] cafeteria?
[15] **A.** Yes.
[16] **Q.** One was when the transaction was announced?
[17] **A.** Yes.
[18] **Q.** We talked about that already.
[19] **A.** Yes.
[20] **Q.** Then there was a second one in August?
[21] **A.** Yes, when they brought the people from EFTC
[22] to represent us.
[23] **Q.** Other than these two, were there any other
[24] meetings in the cafeteria, large group meetings?

**Page 40**

[1] **A.** Not that I know of.
[2] **Q.** The one that happened in August in the
[3] cafeteria, can you describe to me what happened, to
[4] the best of your memory?
[5] **A.** It was Jack -- I can't spell his name.
[6] **Q.** Calderone?
[7] **A.** Yes, Calderone. He came in, and everybody
[8] from Bayer, Dick Ramsden, Norman Fontaine, Michael
[9] Paige. Ronnie was on that one. There was another
[10] person who came also from EFTC; it wasn't just only
[11] Jack, there was somebody else.
[12] **Q.** Was there a person named Augie, Augie
[13] Bruehlman?
[14] **A.** That sounds more like it. I knew it was a
[15] weird name. Sorry.
[16]     And they were just coming in to present
[17] themselves, and so for us all to feel comfortable,
[18] there was going to be -- it was a wonderful merge, a
[19] good merge.
[20] **Q.** Do you remember anything that Mr. Calderone
[21] said about pension plans?
[22] **A.** No, I don't remember him mentioning at all
[23] about pension.
[24] **Q.** Do you remember anyone during this meeting

Page 41

[1] in August saying that EFTC does not have a pension
[2] plan?
[3]   A. No, because at the time in August we really
[4] did not know if we had a pension plan or not until
[5] maybe two weeks later or something.
[6]   Q. I want to focus, at this meeting where
[7] Calderone was addressing the employees, do you
[8] remember him saying something to the effect that
[9] EFTC does not have a pension plan?
[10]   MR. ROACH: Objection. Go ahead, you can
[11] answer.
[12]   A. No, I don't recall saying that.
[13]   Q. Do you remember, did Mr. Calderone talk
[14] about what EFTC's benefits were?
[15]   A. No. It was more like, who is the
[16] president of the company, it's like you have -- how
[17] you say it -- like it's a share company, like people
[18] from outside can buy shares, you know. More like
[19] the management part of it, of the company. Where is
[20] the main office of the company, things more of that
[21] nature, more representing the EFTC, top level.
[22]   Q. Do you remember anything else that Mr.
[23] Calderone said to employees at that meeting?
[24]   A. Just if anybody has any questions that they

Page 42

[1] can come forward to see him.
[2]   Q. Did anyone ask any questions in the group?
[3]   MR. ROACH: Objection. You mean of Mr.
[4] Calderone or anybody?
[5]   MR. WELSH: Yes.
[6]   Q. Did anyone, any employees ask any questions
[7] during the meeting?
[8]   A. I know that they asked questions, but
[9] exactly the questions, word by word, I don't
[10] remember. But they asked questions, more into the
[11] fact that everybody wanted to be secure to find out
[12] if we have the benefits and a job, they were not
[13] going to come in and replace people from EFTC to the
[14] Bayer people. All in that kind of nature, the
[15] questions.
[16]   Q. So you remember questions about job
[17] security?
[18]   A. Yes, job security.
[19]   Q. And you remember questions about whether
[20] are we simply going to get replaced by other
[21] employees from EFTC?
[22]   A. From EFTC, yes.
[23]   Q. And were there questions about benefits?
[24]   A. Benefits, no, not that I know, I don't

Page 43

[1] recall that. I think everybody was so much in
[2] shock.
[3]   Q. Can you estimate how much after the first
[4] meeting where they say, "We're selling to EFTC," was
[5] the second meeting when Mr. Calderone was there?
[6]   A. I would say maybe three to four weeks,
[7] somewhere in that time frame.
[8]   Q. I'm going to show you a document that was
[9] put out in this morning's deposition, Fiorilla No.
[10] 3. It's an offer letter to Mr. Dolan; it's dated
[11] August 14, 1998. Did you receive an offer letter
[12] from EFTC?
[13]   A. No.
[14]   Q. You never received an offer letter?
[15]   A. I don't have no recall, because offer
[16] letters come with money, right?
[17]   Q. No.
[18]   A. No? Okay.
[19]   Q. An offer letter might come by itself; it
[20] might come with an employment application. I don't
[21] know if you had a letter or not. I could tell you I
[22] looked in your personnel file they had at EFTC, and
[23] they didn't have an offer letter there.
[24]   A. That's why I say, I don't recall.

Page 44

[1]   Q. You don't recall.
[2]   A. No.
[3]   Q. At any time prior to September 1, 1998, did
[4] you learn that EFTC did not have a pension plan?
[5]   MR. ROACH: Objection.
[6]   A. September 1st?
[7]   Q. Yes.
[8]   A. I really don't recall, but I would think --
[9] maybe I shouldn't think. Yes or no, I guess.
[10]   MR. ROACH: You can give him your best
[11] memory.
[12]   Q. What's your best memory?
[13]   A. My best memory would be like when the
[14] people came in from the insurance, they came in
[15] representing like health and different kinds, that
[16] somehow that might have been presented about not
[17] having a pension at that time.
[18]   Q. Do you recall any complaints from your
[19] coworkers prior to September 1, 1998 --
[20]   A. Complaints?
[21]   Q. You did?
[22]   A. Of course.
[23]   MR. ROACH: Let him finish the question.
[24]   THE WITNESS: I'm sorry.

Page 45

[1] MR. ROACH: He wasn't finished with the
[2] question.
[3] MR. WELSH: I'll ask another.
[4] MR. ROACH: I'm going to object. I don't
[5] think that was a question. She answered and I don't
[6] think --
[7] THE WITNESS: I'm sorry.
[8] MR. ROACH: Wait until he finishes the
[9] question. Go ahead. Sorry.
[10] Q. Prior to September 1, 1998, do you recall
[11] any complaints from your coworkers concerning EFTC's
[12] benefits?
[13] MR. ROACH: Objection. Go ahead.
[14] A. I'm not quite sure. It could be a week
[15] before or after, we all sit down with these
[16] benefits.
[17] Q. Around September 1st, a week before, a week
[18] after, you recall there were complaints from
[19] coworkers concerning EFTC's benefits?
[20] MR. ROACH: Objection.
[21] A. I believe, in general, there were
[22] complaints in general, security. It was the biggest
[23] thing, security. Knowing that a lot of them had a
[24] lot of years in service at Bayer, and they really

Page 46

[1] were pushing the fact that they considered
[2] themselves being terminated. I'm being terminated
[3] from Bayer, and I'm going to be rehired at EFTC.
[4] Why can't they give us the same kind of package they
[5] have given in the past?
[6] Q. Okay.
[7] A. Termination means severance pay, and I'm
[8] not getting anything.
[9] Q. You heard that was common among your
[10] coworkers?
[11] A. Oh, yeah. It was a concern from every
[12] single person, I would say 98 percent of the people
[13] there, everybody talked about that. They had a lot
[14] of years in service, and Bayer was a very good
[15] company.
[16] Q. Now, that would strike me as a complaint
[17] concerning Bayer's failure to pay severance pay
[18] benefits. Would you agree with that?
[19] A. Yeah.
[20] MR. ROACH: Is that a "yes"?
[21] A. Yes.
[22] Q. Would you recall any complaints from
[23] coworkers during that same period of time that
[24] EFTC's benefits are not as good as Bayer's?

Page 47

[1] MR. ROACH: Objection.
[2] A. Yes, some of the people came in. I mean,
[3] the groups talking with each other, like in the
[4] cafeteria at lunchtime, break time. Even where we
[5] sit, my office was right here, and the people sat
[6] right there, so I could hear the conversations going
[7] on. And because some of them, they had gone through
[8] already, through the insurance seminars or whatever
[9] you want to call them, and they knew the benefits,
[10] they were not the same. At least they felt it was
[11] not the same, even though at meeting after meeting,
[12] it was discussed that it was equal or the same, and
[13] there was no loss from going from one to the next
[14] company.
[15] Not only that, we had a -- what is the
[16] word -- we respect Dick Ramsden. Dick Ramsden was a
[17] very -- like a nice figure for the whole department.
[18] He worked there before for many years, that's how he
[19] started. He was always there, we always felt
[20] comfortable talking to him. And we knew that he
[21] would never make any decision, him and the upper
[22] level, that would hurt any of us, because that's how
[23] we trust him.
[24] Q. Do you recall any employees on or around

Page 48

[1] September 1, 1998, complaining that they have less
[2] vacation with EFTC than they had when they were at
[3] Bayer?
[4] MR. ROACH: Objection. You can answer.
[5] A. When they looked at the vacation, the most
[6] they could give you was four weeks' vacation. And
[7] they also had mentioned, we had kept our seniority
[8] going in. So a lot of people already had six weeks'
[9] vacation, other ones were going right into the fifth
[10] week vacation, and the most you could get was four
[11] weeks' vacation. And holidays, AGFA had
[12] discretionary days, three, three days, and plus all
[13] the holidays you can think of, we had them. It was
[14] awesome. Okay. With this company we didn't have
[15] that, so right there we lost three or four days'
[16] vacation.
[17] Q. Was that a subject of discussion amongst
[18] employees around September 1, 1998?
[19] MR. ROACH: Objection. You can answer.
[20] A. Yes, it was around there.
[21] Q. Now, did you ever have a conversation
[22] one-on-one with Dick Ramsden concerning severance
[23] pay?
[24] A. Severance package, I had it with Vinnie

Page 49

Fiorilla.

Q. Is that what you testified to earlier today?

A. Yes. Vinnie is my supervisor, manager.

Q. Now, did you ever have a conversation with Vinnie Fiorilla concerning EFTC's benefits not being as good as Bayer's?

A. I've asked, and other people have asked, but I've asked, and at the time he wasn't really sure.

Q. This was before December -- strike that -- that was before September 1, 1998?

A. Yes, because we're all waiting for, to find out, I guess.

Q. In 1998 did you ever go back and read the severance pay policy of Bayer?

A. No, I didn't.

Q. Did any of your coworkers ever tell you that they had read the severance pay policy?

A. I don't recall. We just knew from past history, from everybody having it when they got terminated, that there was no need for us to go look for a book to read it.

MR. WELSH: Would you hand me that book.

Page 50

MR. ROACH: Did you finish your answer?

A. No, I was just trying to say, for all the layoffs that we had in the company, termination, everybody walked out with a severance pay. So nothing ever led us to believe it was not written, some kind of a document, saying that we were not entitled for it.

Q. I'm going to show you a document that's been marked Willis Exhibit 52, a Summary Plan Description. Have you seen that booklet prior to today?

A. Yeah, I've seen it on Vinnie's desk somewhere.

Q. Do you know whether or not you received a copy of it at your home? Was it mailed to you in 1995?

A. It well could have.

Q. Have you ever read this document or any aspect of this document?

A. I don't think so. I mean, if the announcement was made prior to receiving this book saying that there's going to be benefits changing like your vacation, then I would go look just at that, right there, vacation, and that's it. I

Page 51

wouldn't look at it, it's just too much to read.

Q. Do you notice in this booklet they have a section called "Your Severance Pay Benefits"? Have you ever read that?

A. Not that I recall, no.

Q. I'm going to show you a document that's been marked earlier Fiorilla Exhibit 7. Do you recall receiving a copy of this document at your home in 1997? You can look at it if you like.

A. I can?

Q. Absolutely.

A. Not that I know of, because I don't remember seeing these pluses and dashes and dollar figures. Sorry.

Q. I'm going to show you another document that's been marked Fiorilla Exhibit 6. Do you know whether or not you received a copy of this document at your home in 1996?

A. This one I remember.

Q. Do you remember getting a copy at your home?

A. I believe it was at home, it was mailed to home.

Q. I want to show you Brown Exhibit 2. It's

Page 52

an envelope and portions of a letter that went in the envelope. That one is to Mary --

A. Mary Jo.

Q. Mary Jo. Do you recall receiving a similar document at your home in 1999?

A. (Witness reviews document) This one here, let's see, I would say yes.

Q. Now, up until September 1, 1998, did you ever approach Mr. Ramsden on a one-on-one basis and ask to stay at Bayer?

A. Not to stay. I don't remember going to see him to ask him.

Q. Do you remember having a one-on-one conversation with him?

MR. ROACH: Let her finish her answer. She was still thinking.

A. I remember asking him about staying at Bayer, because I felt that, because the way it was presented, there was no choice to it. Because there was a question that was -- now you present -- there was a question raised at one of the meetings, something about -- one of the ladies had asked a question.

I don't know if it was him or if it was

**Page 53**

[1] Ronnie had said like, "You're an adult" -- oh, about
[2] the chance of staying with Bayer, he had mentioned
[3] something about in the nature like, "No one will be
[4] staying with Bayer, everybody has to go through
[5] EFTC. This is what is going to happen, just grow up
[6] or something and sit down." Not specifically word
[7] by word but something like that nature.
[8]     So I knew that there was no sense to go see
[9] Dick Ramsden and ask him if there was a job at Bayer
[10] for me to stay, because, first of all, I don't like
[11] to be slapped on the face with remarks like that; it
[12] hurts me. Some people can deal with phrases and not
[13] bother them, but to me, it would. And I have --
[14] like I said, I respect Dick Ramsden, I don't think
[15] he would ever say that to me, but I didn't want to
[16] take the chance. So I didn't even ask the question
[17] if I could stay with Bayer. Of course I would love
[18] to.
[19]     Q. Did you ever have any conversations with
[20] him on a one-on-one basis about the EFTC
[21] transaction?
[22]     A. A couple of times I saw him in the office,
[23] and I just told him about -- that understanding the
[24] way he was presenting saying, there was a

**Page 54**

[1] winning/winning situation, but so far I couldn't see
[2] the winning/winning situation, because there were so
[3] many different things that were different.
[4]     Q. What did he say to that?
[5]     A. He says that he did the best he could with
[6] the transition.
[7]     Q. When you had that conversation with him, it
[8] was before September 1, '98?
[9]     A. It could have been around it, I don't know
[10] if it was right before. I would think it was
[11] probably before than after, because then he kind of
[12] didn't stick around too much after the initial
[13] transition of September 1st.
[14]     MR. WELSH: I want to take a break now and
[15] look through my notes. I'm pretty close to done; I
[16] might surprise myself. But if you have to use the
[17] restroom or if you want to walk around or something,
[18] be my guest. It will take me about ten minutes.
[19]     (Recess from 1:34 to 1:43 p.m.)
[20] BY MR. WELSH:
[21]     Q. Do you recall a conversation with anyone at
[22] Bayer or at EFTC prior to September 1, 1998 about
[23] the severance pay benefits EFTC offered its
[24] employees?

**Page 55**

[1]     A. So your question is, if anybody brought to
[2] my attention, mentioned about if there was any
[3] severance pay on the EFTC?
[4]     Q. Did anyone make any statements to you of
[5] what severance pay benefits, if any, EFTC gave to
[6] its employees?
[7]     A. I'm going to say the EFTC severance pay at
[8] the time was not in question.
[9]     Q. You don't remember it being discussed at
[10] all?
[11]     A. I always remember being discussed with the
[12] Bayer side, because we were saying good-bye to
[13] Bayer, and that's what everybody was looking for was
[14] for the severance pay because of what happened all
[15] these years in the past.
[16]     Q. Did you ever submit a written claim for
[17] severance pay to Bayer?
[18]     A. No, I haven't.
[19]     MR. WELSH: I have no further questions.
[20]     MR. ROACH: I have a few.
[21]         CROSS EXAMINATION
[22] BY MR. ROACH:
[23]     Q. When Mr. Welsh just asked you if you had
[24] ever submitted a written claim for severance, did

**Page 56**

[1] you understand that to mean you personally or
[2] through your lawyer?
[3]     A. Not me personally.
[4]     Q. So when you said no, it was not you
[5] personally?
[6]     A. I personally did not submit any, no, I
[7] didn't.
[8]     Q. You didn't mean that your lawyer hadn't,
[9] you just meant that you hadn't, right?
[10]     A. That's right.
[11]     MR. WELSH: Objection. You may answer.
[12]     A. Yes.
[13]     Q. A couple of questions about the August '98
[14] meeting. At the August '98 meeting, did any of the
[15] board shop employees who were at that meeting ask
[16] the Bayer management people who were present, Mr.
[17] Ramsden, Mr. Paige or others, whether they would be
[18] getting their severance if they chose to go to EFTC?
[19] Did anybody ask the question?
[20]     A. I think I mentioned before, didn't I, it
[21] was Reggie Brown, the guy that was sitting here a
[22] minute ago.
[23]     Q. Reggie or Bob?
[24]     A. Oh, Bob Brown. We used to call him Reggie,

Page 57

[1] maybe a nickname or something. It's Bob Brown.
[2] Q. I wanted to make sure.
[3] A. I thought maybe I said it wrong.
[4] Q. So Mr. Brown asked whether you would be
[5] getting severance?
[6] A. Getting severance, yeah.
[7] Q. And in Bayer's response, what did they say?
[8] A. "Going to EFTC, you are not going to get
[9] severance." And that's when everybody kind of got
[10] upset, because everybody started looking at each
[11] other wondering, "Is this I'm hearing right? We're
[12] being terminated."
[13]     And after that meeting everybody kind of
[14] approached me and said, "Teresa, if it's terminated,
[15] doesn't it mean we're getting our severance pay?
[16] But it's not what he's saying at the meeting."
[17] That's when I said, "Well, I keep telling you guys,
[18] don't ask me, because I'm not God. Go check with HR
[19] or your supervisor, I'm just a group leader."
[20] Q. Did anybody ask whether, if you chose not
[21] to go to EFTC, what would happen with your
[22] severance?
[23] A. With the severance?
[24] Q. Yes. At the meeting.

Page 58

[1] A. At the meeting, if you don't go, you're let
[2] go with no severance, because your decision was not
[3] to go with EFTC.
[4] Q. Did you want your severance? In other
[5] words, if you had a choice, would you have taken
[6] severance and not taken the EFTC job?
[7] A. Yes.
[8] Q. Why?
[9] A. Well, like I had mentioned before, I went
[10] to school, I got my GED because I wanted to show my
[11] daughter, and my daughter was going to college, and
[12] I always had in my mind that I would like to go
[13] ahead and take some classes, be a nurse or
[14] something, for a different kind of degree, so that
[15] my children would be proud of me someday. And that
[16] money would help me out, because then I would --
[17] then I would have a choice, if I didn't want to go
[18] to EFTC, with my severance, put the money aside and
[19] still pay for school.
[20] Q. What about -- do you know how many weeks'
[21] pay you had coming in severance, to your
[22] understanding?
[23] A. Well, I had 19 years, so I would say I
[24] would have my 38 weeks' pay.

Page 59

[1] Q. Did you want to work for EFTC rather than
[2] for Bayer?
[3] A. No, I would stay with Bayer. EFTC, I
[4] wanted them to give me the chance -- for them to
[5] offer me the job, make me an offer and see what I
[6] was going to get. Because there were so many
[7] rumors, there were some nasty people writing e-mails
[8] on the Internet about EFTC, how bad EFTC was, how
[9] they treat the people bad, and don't think you're
[10] going to keep your job for too long, because they're
[11] known to let people go when they transition, they
[12] just keep you for a little while.
[13]     And to be honest with you, that happened,
[14] you know. After a year, they had one layoff after
[15] another. They even came around and took $8,000 out
[16] of my pay, just because they went out and -- can I
[17] continue?
[18] Q. Go ahead.
[19] A. Okay. They went out and did a survey about
[20] our level of performance within the industries, and
[21] they said the pay they were paying their employees,
[22] we were very high paid, so they couldn't keep us on
[23] the books, so they would have to take a cut pay on
[24] our paycheck.

Page 60

[1]     And I said to them, "Well, you have to
[2] realize, the reason why it shows we get paid $2 or
[3] whatever more is because EFTC brought it to match
[4] our pay that we had from Bayer." So then this is
[5] not a match situation, if you're taking it now off
[6] what when we got hired you gave us in the first
[7] place.
[8] Q. Showing you -- anything else?
[9] A. No, it's okay.
[10] Q. Have you finished your answer?
[11] A. Yes.
[12] Q. Looking at Brown Exhibit 2, the letter to
[13] Mary Corcoran, do you see the last sentence there,
[14] it says, "Therefore, these 1998 SARs reference Bayer
[15] Corporation and not Agfa Corporation." Do you see
[16] that?
[17] A. Yes.
[18] Q. Do you see that?
[19] A. Yes, I see "Agfa" and "Bayer."
[20] Q. Whenever you received anything during your
[21] employment with Bayer, did it usually have the AGFA
[22] name on it, paychecks and other documents?
[23] A. I believe so. I took that AGFA and Bayer
[24] was the same company.