### Page 1

```
                   Volume I
                 Pages 1 to 59
                 Exhibits 1-8
         UNITED STATES DISTRICT COURT
           DISTRICT OF MASSACHUSETTS
- - - - - - - - - - - - - - - -x
JOSEPH ATTARDI, et al.,          :
          Plaintiffs,            :
                                 :
     vs.                         :  Civil Action
                                 :  No. 04-10728-REK
BAYER CORPORATION, BAYER         :
CORPORATION SEVERANCE PAY        :
PLAN,                            :
          Defendants.            :
                                 :
- - - - - - - - - - - - - - - -x
```

   DEPOSITION OF JANICE C. PARADIS, a witness called on behalf of the Defendants, taken pursuant to the Federal Rules of Civil Procedure, before Anne H. Bohan, Registered Diplomate Reporter and Notary Public in and for the Commonwealth of Massachusetts, at the Offices of Bello Black & Welsh LLP, One Exeter Plaza, 699 Boylston Street, Boston, Massachusetts, on Monday, November 27, 2006, commencing at 10:18 a.m.

PRESENT:
   Roach & Wise, LLP
      (by Stephen A. Roach, Esq.)
      31 State Street, Boston, MA 02109-2705,
      for the Plaintiffs.
   Bello Black & Welsh LLP
      (by John F. Welsh, Esq.)
      One Exeter Plaza, 10th Floor,
      699 Boylston Street, Boston, MA 02116,
      for the Defendants.
                * * * * *

### Page 2

```
              I N D E X
WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
JANICE C. PARADIS
BY MR. WELSH       4                57
BY MR. ROACH              55
                 * * * *
           E X H I B I T S
NO.   DESCRIPTION                              PAGE
 1    Rocky Mountain Life Insurance              35
      Company document entitled
      "Application for Group Insurance"
      for Janice C. Paradis
 2    Great-West Life & Annuity Insurance        36
      Company document entitled
      "Application for Membership" for
      Janice Paradis
 3    Document entitled "Electronic Funds        37
      Transfer (EFT) Enrollment
      Authorization" for J.C. Paradis
 4    Rocky Mountain Life Insurance              38
      Company document entitled
      "Voluntary Group Life Enrollment
      Form" for Janice Paradis
 5    EFTC Corporation document entitled         44
      "Enrollment Information" signed by
      Janice C. Paradis
```

### Page 3

```
         E X H I B I T S, Continued
NO.   DESCRIPTION                              PAGE
 6    EFTC Contract Manufacturing                45
      document entitled "Employment
      Application" for Janice C. Paradis
 7    Photocopy of Bayer Benefits Center         46
      envelope with attached letter dated
      December 1999 to Mary J. Corcoran
 8    EFTC document entitled "Release and        47
      Severance Agreement" between Janice
      Paradis and EFTC signed by Janice
      Paradis May 1, 2001
                * * * *
```

### Page 4

PROCEEDINGS

[1] MR. WELSH: The parties will waive all --
[2] MR. ROACH: Reserve.
[3] MR. WELSH: Reserve, thank you. The
[4] parties will reserve all objections, except as to
[5] form, and all motions to strike until the time of
[6] trial. The witness may read and sign under the
[7] pains and penalties of perjury, and it need not be
[8] signed before a notary public.
[9] Okay, Steve?
[10] MR. ROACH: Fine.
[11] JANICE C. PARADIS
[12] a witness called for examination by counsel for the
[13] Defendant, having been satisfactorily identified by
[14] the production of her driver's license and being
[15] first duly sworn by the Notary Public, was examined
[16] and testified as follows:
[17] DIRECT EXAMINATION
[18] BY MR. WELSH:
[19] Q. Good morning.
[20] A. Good morning.
[21] Q. Could you please state your full name.
[22] MR. ROACH: Motions to strike reserved too.
[23] MR. WELSH: Yes, I had that in there.

Page 5

[1] A. My name is Janice Paradis. J-a-n-i-c-e.
[2] Q. Where do you live?
[3] A. I live at 56 Railroad Street, Lawrence,
[4] Mass.
[5] Q. How long have you been there?
[6] A. 29 years.
[7] Q. Are you currently employed?
[8] A. Yes, I am.
[9] Q. By whom?
[10] A. Kira Medspa and Wellness Center on Turnpike
[11] Street in North Andover, Mass. I'm an independent
[12] contractor; I'm a massage therapist.
[13] Q. How long have you been doing that?
[14] A. Massage therapy work or employed at this --
[15] Q. Both. Massage therapy.
[16] A. I graduated in May of this year.
[17] Q. Prior to graduating and getting your
[18] certification in massage therapy, what did you do?
[19] A. Electronics, PC boards, electromechanical
[20] assembly.
[21] Q. Let me put it this way: Did you work for a
[22] period of time for EFTC?
[23] A. Yes, I did.
[24] Q. After EFTC who did you work for?

Page 6

[1] A. I worked for Kaiser's as a temp.
[2] Q. What kind of organization is Kaiser's?
[3] A. PC boards, electronics.
[4] Q. Do you recall the dates you worked for
[5] Kaiser's?
[6] A. I believe it was 2002. I'm not sure about
[7] that, the dates.
[8] Q. When did you stop working for them?
[9] A. It was a six-month temporary job.
[10] Q. After Kaiser who did you work with?
[11] A. I tried to change careers, I went to school
[12] for nurse's aide. That was a one-month course, and
[13] I believe it was in 2002 also.
[14] Q. Then after that course?
[15] A. Electronics jobs. I worked at Proxy
[16] Manufacturing in Methuen, Mass. I believe that's
[17] it.
[18] Q. The companies that started as Compugraphic
[19] and ended at Agfa Corporation, that chain of
[20] companies, when did you first start working for
[21] them?
[22] A. 1984.
[23] Q. Do you recall the name of the company when
[24] you joined?

Page 7

[1] A. Compugraphic.
[2] Q. When did you first learn that the circuit
[3] printed board shop was going to be sold?
[4] A. What year?
[5] Q. Yes. To help you, I think the sale was
[6] final on September 1, 1998.
[7] A. Yes. It was the year of 1998, I believe.
[8] Q. Do you know if it was in the beginning of
[9] the year, the middle of the year, just before the
[10] sale?
[11] A. I have no recollection as to when I
[12] actually learned.
[13] Q. Did you attend any meetings, group meetings
[14] in the cafeteria of 80 Industrial Way where the sale
[15] of the board shop was discussed?
[16] A. Yes. I believe that was around September
[17] or August of 1998.
[18] Q. Did you attend more than one meeting in the
[19] cafeteria?
[20] A. Yes, I did.
[21] Q. How many?
[22] A. Offhand, I can't recollect how many.
[23] Q. But it was more than one?
[24] A. More than one, yes.

Page 8

[1] Q. Did you ever take any notes of what was
[2] said at any of those meetings?
[3] A. No, I didn't.
[4] Q. Let me just ask you, what did you do, if
[5] anything, to prepare for today's deposition?
[6] A. I didn't do anything.
[7] Q. Did you talk with anybody?
[8] A. No.
[9]   MR. ROACH: Other than your lawyer.
[10] A. Other than my lawyer, yes.
[11] Q. You talked with Mr. Roach?
[12] A. Yes.
[13] Q. And you met with him prior to today about
[14] the deposition?
[15] A. Yes.
[16] Q. How many times?
[17] A. Only once.
[18] Q. Other than you and Mr. Roach, was anyone
[19] present at that meeting?
[20] A. No.
[21] Q. How long did that meeting go for?
[22] A. One hour.
[23] Q. Have you ever looked at any documents to
[24] prepare?

Page 9

[1] A. No.
[2] Q. Do you have any documents back in your
[3] home, in your file cabinet, wherever else in your
[4] home, pertaining to your employment at Bayer?
[5] A. Not at this time, no.
[6] Q. Did you at one time have those documents?
[7] A. Yes.
[8] Q. What happened to the documents?
[9] A. Over the years I just moved on, and those
[10] things didn't seem too important anymore.
[11] MR. WELSH: I'll be right back, I have to
[12] grab a document.
[13] (A pause)
[14] BY MR. WELSH:
[15] Q. I'm going to show you a document marked
[16] Fiorilla 5 and Ramsden Exhibit 7. Have you ever
[17] seen that document before? I'm going to represent
[18] to you it's a Summary Plan Description about almost
[19] an inch thick.
[20] A. Yes, I've seen it.
[21] MR. ROACH: Off the record.
[22] (Discussion off the record)
[23] Q. I'm going to show you the same document,
[24] Willis Exhibit 52. That's been used on these

Page 10

[1] depositions. If you'd ignore the flags, et cetera,
[2] on it. Have you seen that document, the Summary
[3] Plan Description, before?
[4] A. Yes.
[5] Q. Did you have a copy mailed to your house
[6] from there?
[7] A. Yes.
[8] Q. When you received the copy of the Summary
[9] Plan Description in your house, did you keep it in
[10] your records?
[11] A. Yes.
[12] Q. Do you know, did you throw this out?
[13] A. Actually, I didn't throw it out. When we
[14] were gathering -- I did throw it out, let me
[15] rephrase that. I did throw it out, but I did go
[16] over it, and I did research, and I asked if anybody
[17] needed it or wanted it. And at the time everybody
[18] had theirs, so nobody needed it, so I discarded
[19] mine.
[20] Q. At the time you discarded it, can you tell
[21] me when it was approximately, the year?
[22] A. No.
[23] Q. Was it after the lawsuit started?
[24] A. It was before that.

Page 11

[1] Q. When you said you did research, what were
[2] you referring to?
[3] A. Well, what I meant was I just asked anybody
[4] if they needed this for anything, and nobody needed
[5] it, everybody had their own, so I just threw mine
[6] away.
[7] Q. At the time you threw it away, did you
[8] believe that you had a claim against Bayer for
[9] severance pay benefits?
[10] MR. ROACH: Objection. You can answer. Go
[11] ahead.
[12] A. Yes.
[13] Q. Now, when you said you asked anyone if they
[14] needed it, who are the people you asked if they
[15] needed it?
[16] A. Well, my coworkers and people that I used
[17] to work with.
[18] Q. Can you name any of them specifically?
[19] A. Well, Jeanne Skene. I believe she was the
[20] only one that I did, and I asked her to ask other
[21] people if they needed it or if it was needed.
[22] Q. I'm sorry, I forgot to write down your
[23] answer as you said it. When you threw it away, was
[24] it before or after the lawsuit started, to your

Page 12

[1] knowledge?
[2] MR. ROACH: Objection. Asked and answered.
[3] Go ahead, answer it again.
[4] A. I said after.
[5] Q. Thanks. Now, other than the Summary Plan
[6] Description, did you have any other documents at
[7] that time that you thought might have any relevance
[8] to the lawsuit?
[9] MR. ROACH: Objection. You can answer.
[10] When I say "objection," you can still answer.
[11] A. No.
[12] Q. Do you have any notes?
[13] A. No.
[14] Q. Do you have any other booklets or pamphlets
[15] from there?
[16] A. No.
[17] Q. You said you did research. What were you
[18] referring to?
[19] A. When I said research, it was asking Jeanne
[20] Skene if she needed the book.
[21] Q. But beyond asking Jeanne?
[22] A. That's it.
[23] Q. Now, in 1998 at the time that EFTC acquired
[24] the board shop, did you have an opportunity to

Page 13

[1] review the Summary Plan Description concerning  
[2] severance benefits?  
[3]     MR. ROACH: Objection. Go ahead.  
[4]     A. When I received it, I looked at it and  
[5] skimmed through it. I didn't go into depth with it,  
[6] but I did skim over it.  
[7]     Q. Did you get it approximately in 1995?  
[8]     A. Approximately.  
[9]     Q. When you got it, you skimmed through it,  
[10] but you didn't read it in detail; is that fair?  
[11]     A. That's a fair assumption.  
[12]     Q. After the first time you received it and  
[13] you skimmed through it and read it briefly, did you  
[14] have an opportunity to go back and review its terms  
[15] at any time thereafter?  
[16]     A. I did review it but not in-depth.  
[17]     Q. Can you tell me, when did you review it?  
[18] Near the time that you went to EFTC?  
[19]     A. Yes, that would be the time that I would  
[20] review it.  
[21]     Q. Why did you review it at that time?  
[22]     A. To make sure that we were going to get what  
[23] we thought we were supposed to get, to make sure  
[24] that it said it in there.

Page 14

[1]     Q. Did you find anything in there that  
[2] indicated to you you were going to get something?  
[3]     MR. ROACH: Objection. You can answer.  
[4]     A. I thought the way I read it that I was  
[5] entitled to severance.  
[6]     Q. After reading it did you have a  
[7] conversation with anyone at Bayer about your belief  
[8] that you were entitled to severance?  
[9]     A. At Bayer, what do you mean? Human  
[10] resources? Coworkers?  
[11]     Q. Anyone. If there are a number of people,  
[12] then I'll break it down into categories.  
[13]     MR. ROACH: Objection. Go ahead. You can  
[14] answer.  
[15]     A. I probably discussed it with coworkers.  
[16]     Q. Can you tell me who the coworkers were you  
[17] discussed it with?  
[18]     A. Probably Jeanne Skene.  
[19]     Q. Do you recall telling Jeanne why you  
[20] thought you were entitled to severance benefits?  
[21]     A. The way I read it, the way I understood it.  
[22]     Q. Other than Jeanne Skene did you talk to any  
[23] other coworkers about your belief that you were  
[24] entitled to severance benefits?

Page 15

[1]     A. No.  
[2]     Q. Did you talk to any managers at Bayer in  
[3] 1998 concerning your belief that you were entitled  
[4] to severance benefits?  
[5]     A. Yes.  
[6]     Q. Who?  
[7]     A. I spoke to Norm Fontaine.  
[8]     Q. More than once?  
[9]     A. More than once.  
[10]     Q. Can you tell me, do you remember the first  
[11] time you talked with him?  
[12]     A. It was after one of the meetings. No, I  
[13] don't know the date. I don't know in what order the  
[14] meeting was, the first, third, fourth, I'm not sure.  
[15] But I did talk to him, and it was in reference to  
[16] maybe I could stay with AGFA, and he said no.  
[17]     Then another time after one of the  
[18] meetings, after the meeting Norm Fontaine and Mary  
[19] Leonard came out on the floor. Can I just state  
[20] that it was very hard to approach them? Because  
[21] when they seen us coming, they acted like we had --  
[22] they didn't want to talk to us, they avoided us,  
[23] they tried not to have discussions with us at all.  
[24] And all we wanted was answers, we were all scared,

Page 16

[1] and we didn't know our future, and we just wanted  
[2] answers.  
[3]     But anyway, I approached Norm Fontaine, and  
[4] I said, "We're not having severance pay?" And he  
[5] said "No." And I said, you know, "I'm single," and  
[6] I said, "I don't have somebody at home to back me  
[7] financially to go look for another job." And he  
[8] said, "Well, you have to" -- he says, "You're taking  
[9] along your vacation pay -- your vacation time and  
[10] your hourly rate, and if you go somewhere else to  
[11] work, you're going to have to start at the bottom,  
[12] the very bottom."  
[13]     And at this point I was very upset, I felt  
[14] very trapped. So I got upset, and he said, "Come  
[15] walk with me." So we walked down the aisle, and he  
[16] says, "You people should feel very fortunate,  
[17] because they didn't buy this broken-down equipment,  
[18] they bought you people and all your skills."  
[19]     And I asked him, "Is that supposed to make  
[20] me feel better?" And he said, "Well, you should  
[21] feel privileged." He couldn't really say any more  
[22] than that.  
[23]     Q. Did you say anything to him about why you  
[24] thought you were entitled to severance during this

Page 17

[1] conversation?
[2]   A. I did mention I thought we were all along.
[3] People had gotten laid off, and people volunteered
[4] for layoff, and they all got their severance
[5] packages, and I just couldn't figure out why we
[6] weren't.
[7]   Q. Did he talk about -- did he respond when
[8] you talked about people volunteering for layoff,
[9] getting severance packages?
[10]  A. There was not much he could say. They
[11] didn't want to offer any information. They just
[12] basically said what they had to say and moved on.
[13]  Q. Was there any other conversation with Norm
[14] Fontaine?
[15]  A. No, that was it.
[16]  Q. So I have it the first time you met with
[17] him and you said, "Can I stay at AGFA?", he said
[18] "No." Did you discuss severance pay at that time
[19] with him?
[20]  A. No.
[21]  Q. Now, the second time it was he and Mary
[22] Leonard were on the floor. When you had that
[23] conversation, was Mary Leonard with Norm?
[24]  A. Yes, she was. She didn't come down the

Page 18

[1] walk down the aisle, but she was there. But she
[2] kept her head down, she didn't say too much, Mary
[3] Leonard. She didn't want to speak to any of us.
[4]   Q. Have you ever gone to Mary Leonard's office
[5] to speak with her at any time?
[6]   A. Oh, yes, in the past. She was human
[7] resources, I knew who she was.
[8]   Q. Did you ever have a private conversation
[9] with Mary Leonard at all about severance pay?
[10]  A. No, not about severance pay.
[11]  Q. Did you ever have a private conversation
[12] with --
[13]     MR. ROACH: Wait. She didn't finish.
[14]  Q. I'm sorry.
[15]  A. I did. That day on the floor with Norm
[16] Fontaine, they both said no severance. But that was
[17] it, it wasn't --
[18]  Q. Was that in a group meeting?
[19]     MR. ROACH: Let her finish. It wasn't
[20] what?
[21]  A. It wasn't a long conversation or anything;
[22] it was just they made that point and that was it.
[23] And that's when I got upset, and Norm walked me down
[24] the aisle and tried to cheer me up.

Page 19

[1]   Q. So at this time before the EFTC sale, you
[2] saw Norm and Mary.
[3]   A. Yes.
[4]   Q. When they said, "No severance pay," were
[5] there other employees around?
[6]   A. There could have been; I don't remember.
[7]   Q. Was this near your workstation?
[8]   A. Yes, yes.
[9]   Q. When you made the comment along the lines
[10] of "I'm single, I don't have someone home to back me
[11] up" or words to that effect, was Mary Leonard
[12] present for that?
[13]  A. I believe so, yes.
[14]  Q. When Norm said, "Come walk with me," it was
[15] just you and he?
[16]  A. Correct.
[17]  Q. Other than those two conversations, any
[18] other conversations with Norm Fontaine about the
[19] EFTC transaction?
[20]     MR. ROACH: Before September 1, 1998?
[21]     MR. WELSH: I'm just asking generally.
[22]  A. Not that I recollect.
[23]  Q. Other than the conversation with Norm and
[24] Mary together that you've told me about, any

Page 20

[1] conversation with Mary Leonard concerning the EFTC
[2] transaction?
[3]   A. No, because Mary Leonard didn't want to
[4] face any of us, and she walked around with her head
[5] down.
[6]      This doesn't pertain to this, but I had
[7] asked her -- I was two or three weeks short of
[8] making my 15 years, and I asked if they could
[9] somehow give me my 15 years, and she said no.
[10] That's a personal conversation I had with her, and
[11] she didn't even want that conversation.
[12]  Q. This was about the time of the EFTC
[13] transaction?
[14]  A. Yes.
[15]  Q. You were looking for her to give you a
[16] couple, two to three extra weeks of seniority?
[17]  A. Well, if they could just put it down or
[18] give me my 15 years, I just asked the question. I
[19] didn't think it was possible, but I just asked.
[20]  Q. That was a one-on-one conversation with
[21] her?
[22]  A. Yeah. It was very brief, very, very brief.
[23]  Q. Where was the conversation?
[24]  A. It was in the hall.

Page 21

Q. Any other conversations with Mary Leonard pertaining to the EFTC transaction or severance pay?
A. With her and I, no.
Q. Were you present at any time when you heard Mary Leonard talk about the EFTC transaction or severance pay to other employees where you were in the audience?
MR. ROACH: Talking about going to the meetings?
MR. WELSH: Yes. She just said her and I, so I wanted to see if there was a bigger group.
A. I can't recollect if she spoke up at any of the meetings.
Q. Do you recall any meeting at which Michael Paige attended and said anything concerning the EFTC transaction?
A. Yes.
Q. What do you remember?
A. I remember Michael saying this would be a good transaction and the benefits are similar to AGFA.
Q. Did he say anything about pay rates?
A. At the meeting I can't remember if it was him or somebody else.

Page 22

MR. ROACH: Can I just interject here, John. When she says "AGFA," can we stipulate that means Bayer?
THE WITNESS: Bayer AGFA.
MR. ROACH: Is that a "yes"?
MR. WELSH: She was never employed by Agfa Corporation. When she says that, I assume she's talking AGFA, a division of Bayer.
THE WITNESS: Bayer, yes.
MR. ROACH: Fine. Sorry.
Q. Do you remember anything else Mr. Paige said at that meeting?
A. What I remember -- now, this is a while ago, and I moved on, so I don't remember verbatim. But I do remember them saying that the benefits were going to be the same, and it was a good move, and they had interviewed a lot of companies, and they decided to go with this one, because it was very similar to what Bayer believed in.
Q. Do you remember anything else he said?
A. I remember a lot of anger and hostility, but I don't remember -- people were asking questions and some weren't getting answers.
Q. Do you recall what the questions were?

Page 23

MR. ROACH: Let her finish the answer.
A. Some were asking about severance and exactly what are the benefits. That's all I remember.
Q. Do you recall anything specifically about what was said about severance at the meeting?
A. The question was asked, "Are we going to receive severance?"
Q. Was a response given?
A. To tell you the truth, I'm not sure.
Q. Do you recall who asked the question?
A. Yeah, I know who asked the questions.
Q. Who was it?
A. Joanne Sanzo and Robert Brown.
Q. You recall someone asking, "What are the benefits?"
A. Yes.
Q. Do you recall who asked that question?
A. For some reason Joanne asked a lot of questions. I know there were a lot of questions asked, being thrown out, but as to who else, what, when, where, I don't remember.
Q. Do you recall what the response was to the question, "What were the benefits?"

Page 24

A. Similar to what we have. That's why they chose EFTC, because they interviewed other companies.
Q. Do you remember anything else being said at this meeting?
A. Actually, no, I don't remember. I know there were a lot of things. It was our future, we were nervous, we were scared. So there were more questions, but I just can't --
Q. It's been eight years.
A. I can't remember it all --
Q. I understand.
A. -- you know.
Q. Do you recall how you learned that there was going to be a meeting in the cafeteria that day?
A. I'm not sure. They used to do it different ways: send around a memo or the supervisor would come by and tell you there's a meeting at eight o'clock in the caf. It could have been handled either way, I'm not sure exactly.
Q. After the big meeting, what's the next thing you remember as to the EFTC transaction? Meetings, group meetings, anything?
A. You mean before the transaction?

Page 25

[1] Q. Up to the transaction. I guess Mr. Paige
[2] got up and announced, "We're having a meeting with
[3] EFTC." What's the next event along the line that
[4] led to the transaction?
[5] A. They introduced us to the new -- to Don
[6] Baribeau, the people that would be running EFTC,
[7] they brought them in.
[8] Q. Do you remember any meeting where Jack
[9] Calderone from EFTC was present, the president of
[10] EFTC?
[11] A. I don't remember him. I'm sure he was
[12] there, but like I said, I've moved on, and there are
[13] some things I just don't remember.
[14] Q. Do you remember any of the details of any
[15] other group meetings in the cafeteria that were held
[16] about the EFTC transaction?
[17] A. Basically, I think the meetings that we
[18] had, they all consisted of the same subject, which
[19] was our benefits and our severance and when this was
[20] going to happen. Questions similar to that.
[21] Q. Do you recall on more than one meeting the
[22] issue of whether we were entitled to severance pay
[23] being raised?
[24] A. I would say we had at least two meetings,

Page 26

[1] but I can't say for sure. There might have been
[2] more; there might have been less.
[3] Q. When you said there are at least two
[4] meetings, there were at least two meetings at which
[5] the subject of whether or not you're entitled to
[6] severance pay was discussed?
[7] A. That was more or less toward the end,
[8] before the transaction, I believe, closer to the
[9] transaction.
[10] Q. Do you remember Mr. Paige ever saying
[11] anything about severance pay?
[12] A. I know they were asked, but I cannot
[13] recall.
[14] Q. Do you remember if Mr. Ramsden ever said
[15] anything about severance pay?
[16] A. I can't recall.
[17] Q. How about Mr. Willis; did you know Rodney
[18] Willis at that time?
[19] A. No, I didn't know him.
[20] Q. Do you remember anyone from HR, other than
[21] Ms. Leonard, saying anything at these meetings?
[22] MR. ROACH: Objection. You can answer.
[23] A. I honestly don't remember. I know it was a
[24] big subject for everybody, but I can't -- to put the

Page 27

[1] words coming out of a particular mouth, I can't do
[2] that.
[3] Q. Did any of your coworkers ever express to
[4] you an opinion that they thought they were entitled
[5] to severance pay? And just prior to the sale to
[6] EFTC, so that would be a period of time July through
[7] September 1, 1998.
[8] MR. ROACH: Objection. You can answer.
[9] A. We were all buzzing about it, all of us
[10] through the board shop. It was one of the benefits
[11] we depended on. So when we found out, which I can't
[12] give you an exact date and time and way, they all
[13] found out at the same time. But we were all buzzing
[14] about it, because we thought it was our right, our
[15] given.
[16] Q. When you say you thought it was a right or
[17] given, what do you mean by that?
[18] A. We all talked about severance packages,
[19] that was what kept us at Bayer. We even knew of
[20] people that had gotten laid off and gotten
[21] severance, and we just thought it was a given, when
[22] they let you go, you were going to get your
[23] severance package.
[24] Q. That was a general topic of discussion

Page 28

[1] among all your coworkers?
[2] A. Yes.
[3] MR. ROACH: Is that "yes"?
[4] A. Yes.
[5] Q. With respect to benefits, did you learn at
[6] some point in time that the benefits of EFTC were
[7] not as good as the benefits that had been offered at
[8] Bayer?
[9] A. After the transaction.
[10] Q. You didn't know before the transaction?
[11] A. We were always told they were the same,
[12] similar to Bayer's benefits.
[13] Q. Was there any discussion among the
[14] employees about the benefits that EFTC was going to
[15] offer you prior to September 1st?
[16] A. No, I don't recollect prior to.
[17] Q. Prior to. Prior to September 1st, the day
[18] it was finalized, September 1, 1998, were there any
[19] discussions concerning the fact that EFTC did not
[20] offer a pension plan?
[21] MR. ROACH: Objection. Go ahead.
[22] A. I believe I found this out after.
[23] Q. So if I understand your testimony
[24] correctly, there was no discussion among employees

Page 29

[1] that you were witness to up to September 1, 1998
[2] about the fact that EFTC did not offer a pension?
[3]   A.  To the best of my knowledge, I do not
[4] remember.
[5]   Q.  How about vacation; did you conclude that
[6] the vacation benefits offered by EFTC were less than
[7] offered by Bayer?
[8]   A.  They made that point clear; in fact, that's
[9] something I do remember.  They pointed out that we
[10] were very fortunate, because we were going -- moving
[11] to another company with the same vacation time that
[12] we accrued from Bayer.  It was like their selling
[13] point.
[14]   Q.  The same vacation time?
[15]   A.  Correct.
[16]   Q.  Did you get a payout of your accrued
[17] vacation at the time of the transaction?
[18]   A.  Yes.
[19]   Q.  When you say "vacation time," are you
[20] talking about the number of years of seniority you
[21] had for vacation pay?
[22]   A.  Correct.
[23]   Q.  Did you ever understand if the amount of
[24] vacation offered for years of service at EFTC were

Page 30

[1] different than the amount of vacation offered for
[2] years of service at Bayer?
[3]   A.  All I know is that AGFA -- maybe I'm not
[4] understanding.  Maybe you should repeat the
[5] question.
[6]   Q.  Did you ever understand there was a cap at
[7] EFTC on the number of weeks of vacation you could
[8] earn based on your years of service?
[9]   A.  Yes, I believe there was a cap, but I can't
[10] swear to that.
[11]   Q.  Can you tell me when you learned there was
[12] a cap?
[13]   A.  After.
[14]   Q.  You're sure of that?
[15]   A.  No, I'm not, I'm not exactly positive.
[16]   Q.  Sick pay, was sick pay different at EFTC
[17] than it was at Bayer?
[18]   A.  Yes, it was, it was different.
[19]   Q.  How was it different?
[20]   A.  At Bayer they had sick pay and they had
[21] vacation pay; it was two separate entities.  At EFTC
[22] it was vacation/personal.  Your vacation time was
[23] more or less your sick time.
[24]   Q.  When did you find that out?

Page 31

[1]   A.  After.
[2]   Q.  So if I understand, there was no discussion
[3] among employees about the difference in sick pay up
[4] to the time of the transaction that you were witness
[5] to; is that your testimony?
[6]   A.  I can't be positive.
[7]   MR. ROACH:  Go off the record for a minute.
[8]   (Discussion off the record)
[9]   Q.  Did you ever attend any meetings with
[10] representatives of Bayer's HR department during
[11] which benefits were reviewed in anticipation of the
[12] EFTC transaction?
[13]   A.  Yes, we did meet with human resources in a
[14] meeting.
[15]   Q.  Do you know who from human resources was
[16] there?
[17]   A.  No, I don't remember the names.
[18]   Q.  Julie Haley?
[19]   A.  That name sounds familiar, but I
[20] couldn't...
[21]   MR. ROACH:  Did you finish your answer?
[22]   A.  I couldn't be sure.  Some of these people,
[23] I've had no incidence to meet with them, so some of
[24] them I'm not familiar with.

Page 32

[1]   Q.  I understand.
[2]   A.  They came out after this happened, but I
[3] don't know them.
[4]   Q.  Did you ever attend any meetings with EFTC
[5] officials from HR prior to September 1, 1998?
[6]   A.  Prior to.  I remember meeting with them,
[7] but I don't remember if it was prior or after.
[8] Because we had to go over the 401(k) and all the
[9] benefits, but I don't remember if it was prior or
[10] after.
[11]   Q.  What do you remember of the meeting?  Can
[12] you give me more specifics about when you met with
[13] them?  What was discussed?
[14]   A.  Well, I remember the 401(k) plan and the
[15] medical benefits.  The 401(k) changed from Vanguard
[16] to Principal, I remember that.  And we also learned
[17] at the meeting that our health insurance was a lot
[18] different, I believe it was Great-West, and we had
[19] to pay for our own short-term disability and our own
[20] life insurance, and everything was broken up, and it
[21] was very different than what we were used to.
[22]   Q.  Was the 401(k) meeting a meeting that was
[23] separate?
[24]   A.  The 401(k) might have been different.  It

Page 33

[1] was different, yes, because it was specifically a
[2] 401(k) meeting.
[3]   Q.  Do you remember, was there anything else
[4] that made the 401(k) plan that EFTC was offering
[5] better or worse than Bayer's?
[6]   A.  To me, it was worse. I know they held up
[7] our money for a long period of time, for the
[8] transaction, they froze our money.
[9]   Q.  Did you have any memory of how the match --
[10] if there was a match, how the match compared to
[11] Bayer's?
[12]   A.  There were some that were similar. There
[13] were similar plans.
[14]   Q.  Now, at the meeting you had with the other
[15] benefits, the medical, STD, life, was that a group
[16] meeting?
[17]       MR. ROACH: Objection. Go ahead.
[18]   A.  I believe for the basics it was group and
[19] then they brought us one-on-one.
[20]   Q.  When they had the one-on-one meeting, was
[21] that in the HR department?
[22]   A.  Probably with the HR department.
[23]   Q.  When you say with the HR department, was
[24] that the EFTC HR department?

Page 34

[1]   A.  Yes.
[2]   Q.  Were there any Bayer representatives
[3] present for those one-on-one meetings?
[4]   A.  I don't recall.
[5]   Q.  Do you recall who it was from EFTC you met
[6] with?
[7]   A.  No.
[8]   Q.  Other than the group meetings in the
[9] cafeteria you talked about and the meetings with
[10] Norm Fontaine and Mary Leonard you spoke about, did
[11] you have any other conversations with anyone from
[12] Bayer concerning severance pay?
[13]       MR. ROACH: Objection. You mean
[14] management?
[15]       MR. WELSH: Yes.
[16]   A.  No.
[17]   Q.  Up to September 1, 1998, did you ever tell
[18] any of your coworkers that you believed that you
[19] were entitled to severance pay?
[20]   A.  Yes.
[21]   Q.  Did you ever submit any written document to
[22] Bayer indicating that you believed that you were
[23] entitled to severance pay?
[24]   A.  No.

Page 35

[1]   Q.  When you started with EFTC on or about
[2] September 1, 1998, was your pay rate equal to or
[3] greater than what your pay rate had been at Bayer?
[4]   A.  At the time that the transaction took
[5] place, it was. I crossed over with the same pay
[6] that I was making at Bayer to EFTC, at that time it
[7] was the same.
[8]   Q.  At the time it crossed over to EFTC, were
[9] you working physically in the same location that you
[10] had been working at for Bayer?
[11]   A.  Yes.
[12]       MR. WELSH: Can we please identify this as
[13] the first exhibit.
[14]           (Document marked as Paradis
[15]            Exhibit 1 for identification)
[16]   Q.  I've placed in front of you a document
[17] that's been marked for identification as Exhibit 1.
[18] Is that your signature on the bottom third of the
[19] document?
[20]   A.  Yes.
[21]   Q.  It's dated August 23, '98. Did you put
[22] that date on?
[23]   A.  Yes, I did.
[24]   Q.  Did you fill this document out when you

Page 36

[1] were meeting with someone from EFTC?
[2]   A.  I must have, but I have no memory of it.
[3]   Q.  When you filled out this document, were you
[4] aware that the life insurance -- this is a life
[5] insurance application --
[6]   A.  Yes.
[7]   Q.  Were you aware the life insurance benefit
[8] offered by EFTC was different than the one offered
[9] by Bayer?
[10]   A.  Yes.
[11]   Q.  Put that aside.
[12]       MR. WELSH: Please mark this.
[13]           (Document marked as Paradis
[14]            Exhibit 2 for identification)
[15]   Q.  I've placed in front of you a document
[16] marked as Exhibit No. 2. It appears to be an
[17] Application for Membership in One Health Plan. On
[18] the bottom is that your signature?
[19]   A.  Yes.
[20]   Q.  The date August 23, 1998, is that the date
[21] you signed it?
[22]   A.  Yes.
[23]   Q.  Did you sign this document as a result of a
[24] meeting you had with an EFTC human resources

Page 37

[1] official which concerned, among other things, their
[2] health plan?
[3]   A.  Correct.
[4]   Q.  At the time you signed this document, were
[5] you aware that their health plan was different than
[6] Bayer's?
[7]      MR. ROACH:  Objection.
[8]   A.  Yes.
[9]   Q.  At the time you signed this document, did
[10] you think that their health plan was not as good as
[11] Bayer's?  Strike that, please.  Let me restate it.
[12]      At the time you signed Exhibit 2, did you
[13] believe that the EFTC health plan that it was going
[14] to offer employees was not as good as the health
[15] plan that you were under while employed by Bayer?
[16]      MR. ROACH:  Objection.  Go ahead.
[17]   A.  Yes.
[18]      MR. WELSH:  No. 3, please.
[19]      (Document marked as Paradis
[20]      Exhibit 3 for identification)
[21]   Q.  I've placed in front of you a document
[22] marked Exhibit No. 3, which appears to be an
[23] Electronic Funds Transfer Enrollment Authorization.
[24] At the bottom right-hand column, is that your

Page 38

[1] signature?
[2]   A.  Yes.
[3]   Q.  It appears this was filled out on August
[4] 25, 1998.  Do you see that, the date, down below
[5] your signature?
[6]   A.  Yes.
[7]   Q.  Do you know whether or not you were meeting
[8] with an EFTC official when you filled this out?
[9]   A.  Yes.
[10]   Q.  Were you?  The way I asked the question, I
[11] have to ask the follow-up:  Were you meeting with an
[12] EFTC official when you filled this out?
[13]   A.  Yes.
[14]   Q.  Do you know the name of that person?
[15]   A.  No, I don't.
[16]   Q.  If you could put that aside.
[17]      (Document marked as Paradis
[18]      Exhibit 4 for identification)
[19]   Q.  I've placed in front of you a document
[20] that's been marked for identification as Exhibit 4.
[21] Let me ask you, is that your signature on the bottom
[22] of the page?
[23]   A.  Yes.
[24]   Q.  August 19, 1998?

Page 39

[1]   A.  Yes.
[2]   Q.  I have to look to see --
[3]      MR. ROACH:  John, just for the record,
[4] there's something cut off at the top in the title of
[5] this form.
[6]      MR. WELSH:  That's right.  I'm trying to
[7] ascertain what it is right now.
[8]      MR. ROACH:  Go off the record for a minute.
[9]      (Recess from 11:05 to 11:17 a.m.)
[10]      MR. WELSH:  Back on the record.
[11] BY MR. WELSH:
[12]   Q.  I have the complete document here, I'll
[13] just show you.  It appears to be a Voluntary Group
[14] Life Enrollment Form, those are the words that have
[15] been deleted from Exhibit 4 in the top right-hand
[16] column.
[17]      MR. ROACH:  There also is something cut off
[18] at the bottom.
[19]      MR. WELSH:  Some of the language on the
[20] bottom is cut off as well.  That is also the case on
[21] Page 2.
[22]      MR. ROACH:  If at some point we believe
[23] it's relevant, we can remark this or stipulate to
[24] it, unless you want to mark it.

Page 40

[1]      MR. WELSH:  No, I want to keep it this way.
[2] We don't have any legal paper here.
[3]   Q.  On Exhibit 4, is that your signature on the
[4] bottom of the first page?
[5]   A.  That's my signature.
[6]   Q.  You signed it around August 19, 1998?
[7]   A.  Yes.
[8]   Q.  On the second page, is that your signature
[9] also?
[10]   A.  Yes.
[11]   Q.  On August 23, 1998?
[12]   A.  Correct.
[13]      Can I also say that a lot of these
[14] benefits, even though I signed, it was like a period
[15] of mourning, if you will.  Even though we signed
[16] these, we probably didn't get -- realize what they
[17] meant or what we were getting into.  We were all
[18] afraid for our jobs, we were all afraid for our
[19] careers, we were going from one company to the
[20] other.  And even though they were explained, I think
[21] we more or less just signed the papers -- I signed
[22] the papers, speak for myself -- I signed the papers,
[23] just so I wouldn't lose my job, so that I could move
[24] on and be in the new company, because I had no other

Page 41

[1] choice.
[2] Q. We have just taken about a ten-minute
[3] break, haven't we?
[4] A. Um-hum.
[5] Q. Is that "yes"?
[6] A. Yes.
[7] Q. And during that time you were meeting with
[8] your attorney; is that right?
[9]     MR. ROACH: We met, yes.
[10]    MR. WELSH: I didn't ask you, Steve, I
[11] asked her.
[12]    MR. ROACH: Go ahead.
[13] Q. Is that correct?
[14] A. Correct.
[15]    MR. ROACH: Objection.
[16] Q. What other than what happened at that
[17] meeting caused you to just volunteer that
[18] information right now?
[19]    MR. ROACH: Objection. Go ahead. You can
[20] answer.
[21] A. I wanted to say that, but I didn't know if
[22] it was appropriate. Because a lot of this stuff we
[23] went over, but it didn't mean anything, because we
[24] were all so scared. I say "we," but I'll speak for

Page 42

[1] myself. I was so scared to lose the job that I
[2] would have signed just about anything at that point.
[3] Whether I knew whether it was good for me, bad for
[4] me, lousy for me, I probably would have just signed
[5] it anyway because I needed a job.
[6] Q. Did anyone threaten you with job loss?
[7] A. We were told if we didn't go with this
[8] company, we would be terminated, our job would end
[9] and that would be it, and we'd have to start
[10] somewhere else.
[11] Q. At the time you signed these documents, did
[12] you receive an offer letter from this company?
[13] A. An offer letter?
[14] Q. When I say "this company," I mean EFTC.
[15] A. I believe we had to sign something similar
[16] saying that we were going to move from Bayer to
[17] EFTC.
[18] Q. Do you recall receiving a letter from EFTC
[19] offering you a job?
[20] A. Yes.
[21] Q. That was before September 1, 1998?
[22] A. But in the meeting -- before.
[23] Q. Thank you. If you want to add something,
[24] please do.

Page 43

[1] A. Yes. Because after we had the meetings and
[2] we were told that we were going over with our same
[3] vacation pay and our same pay rate, a lot of us
[4] asked if we could go to AGFA, and we were told that
[5] we couldn't go, that EFTC wanted the employees. I'm
[6] trying to recollect exactly.
[7]     And we were told that if we didn't cross
[8] over to EFTC that we would be terminated, and we
[9] would have to start at the bottom somewhere else,
[10] but at least we were crossing over with our vacation
[11] pay, our vacation time, and our pay rate. So I know
[12] myself, I needed the job, and even if I didn't
[13] understand or like it, I had to sign, because I
[14] needed that job.
[15] Q. But at the time you signed it, there was
[16] someone there that you could have asked about the
[17] EFTC benefits; is that right?
[18] A. There was somebody I could have asked, but
[19] it was irrelevant, because I had to take that job
[20] regardless of what the benefits were.
[21] Q. Okay. Thank you.
[22]    MR. WELSH: Could you mark this as the next
[23] exhibit.
[24]

Page 44

[1]     (Document marked as Paradis
[2]     Exhibit 5 for identification)
[3] Q. I'm going to show you a document that's
[4] been marked for identification as Exhibit 5. Is
[5] this a personal information sheet for Principal
[6] Financial Group that you signed on August 23, 1998?
[7] A. Correct.
[8]     MR. ROACH: Objection. Principal Financial
[9] Group? Principal Financial Life Insurance Company?
[10]    MR. WELSH: It says "Principal Financial
[11] Group." I'm just reading from the document itself.
[12] Under her signature on the bottom left-hand column.
[13]    MR. ROACH: I see it. All right. Sorry.
[14] Go ahead.
[15] Q. Are you the one that made the determination
[16] of deferrals, "Selective Investment" in the middle
[17] part of this document?
[18] A. Yes, I did. I had to make a choice, and I
[19] made the best choice that I could at that time.
[20] Q. Up in the first, under B, there's a blank,
[21] and it looks like there's a 6. Is that 6 percent?
[22] Did you make that determination?
[23] A. Yes. But they were changing the plan, we
[24] had to make a decision. Whether we liked it or not,

Page 49

[1] Corporation incident to Employee's termination of
[2] employment with Agfa/Bayer Corporation."
[3]     Do you see that?
[4] A. Yes.
[5] Q. Did you have any discussion about that
[6] paragraph with Ms. Landress when you went to sign
[7] this document?
[8] A. No, I did not.
[9] Q. At the time you signed this document, did
[10] you believe you had a claim against AGFA/Bayer
[11] Corporation arising out of the severance?
[12]     MR. ROACH: Objection. You can answer.
[13] A. No. I don't understand why they would put
[14] that in there. I didn't discuss anything with them,
[15] and they didn't discuss it with me either.
[16] Q. So here, the next line it says, "Employee
[17] represents and warrants that s/he has no claims
[18] against EFTC in conjunction with her" --
[19]     MR. ROACH: "In connection," thank you.
[20] Q. -- "in connection with her Agfa/Bayer
[21] Corporation severance package." Do you see that?
[22] A. (The witness nods)
[23] Q. Is that "yes"?
[24] A. I'm sorry. Yes. Yes.

Page 50

[1] Q. At the time you signed this, did you
[2] believe that EFTC had done anything improper with
[3] respect to the acquisition of the board shop?
[4]     MR. ROACH: Objection. You can answer.
[5] A. I didn't think it was EFTC. You're asking
[6] my personal? I believe it was not EFTC, it was
[7] AGFA/Bayer. I don't even know why this is in there,
[8] I have no clue. But again, it was just one of the
[9] releases and paperwork we had to sign. This is when
[10] we were leaving when I actually got laid off.
[11] Q. It's your testimony that you signed this
[12] without reading it?
[13]     MR. ROACH: Objection. You can answer.
[14] A. I didn't say I didn't read it. I said I
[15] have no idea why they put that in there, because I
[16] did not speak to her or have any personal
[17] conversation with her about such matter. I have no
[18] idea where that came from. That's all I'm stating.
[19] Q. Is it your belief that EFTC tried to hide
[20] its benefit program from the board shop employees
[21] prior to September 1, 1998?
[22]     MR. ROACH: Objection.
[23] A. I don't think all was disclosed. Yes,
[24] that's my belief.

Page 51

[1] Q. By EFTC?
[2]     MR. ROACH: Objection. Go ahead.
[3] A. I think a lot of it came -- more of it
[4] came out as time went on. I think at the time we
[5] were shellshocked, and maybe it was all explained
[6] in depth, in detail, but I think where we wanted to
[7] hang onto our jobs, we didn't really know fully what
[8] it meant until we actually got in and had everything
[9] explained in depth more and until the forms and
[10] everything was in front of us. That's what I
[11] remember.
[12] Q. Did you save any of the benefit booklets or
[13] summaries you may have gotten from EFTC concerning
[14] your benefits there?
[15] A. I probably hung onto them for a while, but
[16] I probably don't have them at this time.
[17] Q. Have you ever looked for them?
[18] A. Yes, I did.
[19] Q. When?
[20] A. When I was looking for some information on
[21] severance and different things, and I had my package
[22] of Bayer, some Bayer information and some EFTC
[23] information together, but it wasn't anything, it
[24] wasn't... It was memos that were sent about

Page 52

[1] different things, it wasn't about anything in
[2] particular.
[3] Q. What happened to those documents?
[4] A. I got rid of them.
[5] Q. Do you know when? Was it before or after
[6] the lawsuit started?
[7] A. It was probably a few years ago, I just...
[8] Q. Is it fair to say you can't recall whether
[9] it was before or after the lawsuit started?
[10] A. It was after.
[11] Q. You had memos. What was the nature of the
[12] memos you had?
[13] A. It would be different functions going on
[14] or different things or different things with EFTC
[15] that were not anything that was relevant to this at
[16] all.
[17] Q. Did you have booklets of EFTC benefits?
[18] A. No, I don't, not at this time.
[19] Q. Back two years ago did you have them?
[20] A. I had information. They gave us a package.
[21] Q. It was at the time you sat down and filled
[22] out the forms?
[23] A. Yeah, they gave us the information, but
[24] like I said, I wanted my job, so it was kind of