**Page 2**

```
 1    APPEARANCES:
 2    ***  ROACH & WISE
 3         (BY STEPHEN A. ROACH, ESQ.)
 4         31 State Street - 8th Floor
 5         Boston, Massachusetts 02109
 6         (617) 723-2800
 7         Counsel for the Plaintiffs
 8
 9    ***  BELLO, BLACK & WELSH, LLP
10         (BY JOHN F. WELSH, ESQ.)
11         535 Boylston Street - Suite 1102
12         Boston, Massachusetts 02116
13         (617) 247-4100
14         Counsel for the Defendants
```

**Page 3**

```
          I N D E X
KIM COLLINS
BY MR. ROACH            4


          E X H I B I T S
Exhibit 68, Subpoena................ 11


*Original exhibit retained by Attorney Roach.
```

**Page 4**

```
              PROCEEDINGS
              STIPULATIONS
        It is stipulated and agreed by and
between attorneys for the respective parties that
the deponent will read and sign the deposition
transcript within 30 days, but filing of the
deposition is waived. If not signed within 30 days,
the deposition transcript will be deemed waived:
        That all objections, except as to form,
and motions to strike are reserved to the time of
trial.
        KIM COLLINS, having been satisfactorily
identified by the production of her Massachusetts
driver's license, and duly sworn by the Notary
Public, was examined and testified as follows:
          DIRECT EXAMINATION
BY MR. ROACH:
   Q.  Could you state your name, please?
   A.  Kimberly Collins.
   Q.  Where do you live?
   A.  6 Azalea Road, Sharon, Mass.
   Q.  And date of birth.
   A.  1/18/59.
   Q.  And Mr. Welsh is representing you today,
```

**Page 5**

```
today's deposition?
        MR. WELSH: I'm representing her in her
role as agent for Bayer only.
   Q.  Do you agree with that, Ms. Collins?
   A.  Um-hmm.
   Q.  Is that a yes?
   A.  Yes.
   Q.  Have you ever been deposed before?
   A.  No.
   Q.  Just by way of instruction. Nods of the
head, uh-uhs don't work. It's not a normal
conversation. You have to say yes or no. Wait
until I finish the question and then answer it.
        MR. WELSH: That's the one big thing,
Kim. Sometimes I might want to put an objection on
the record. So the court reporter doesn't have two
people talking at the same time, we usually make
sure Steve is done, then two seconds so I can say
anything I need to and then you can go.
        THE WITNESS: Okay. Sounds good.
        MR. ROACH: And again, if your objection
comes after her answer, she blurts it out before you
have time to object, it will stand for that.
        MR. WELSH: Thank you.
```

**6**

1  Q. Can you tell us, are you married?
2  A. Yes.
3  Q. And to whom?
4  A. Joshua Adelson.
5  Q. For how long?
6  A. Twenty-two years.
7  Q. Congratulations. Any children?
8  A. Yes.
9  Q. How many?
10 A. Two.
11 Q. How old?
12 A. 15 and 18.
13 Q. Congratulations. Can you tell us your
14 educational background, please, just starting with
15 high school?
16 A. I went to Norwood High School, then I went
17 to Brown University, graduated in '81, went to
18 Boston Law School, graduated in '85.
19 Q. Boston College or --
20 A. Boston College, yes.
21 Q. Graduated in 1985?
22 A. Um-hmm.
23 Q. Is that a yes?
24 A. Yes. Sorry.

**7**

1  Q. That's all right. And then did you have any
2  other formal education beyond that?
3  A. No.
4  Q. What's your employment history since you
5  graduated in '85 from Boston College Law School?
6  A. I worked for Gaston Snow and Ely Bartlett.
7  And then in 1991 I went to work for Testa Hurwitz &
8  Thibeault. And in January 2004 I left and started
9  employment in February at Massachusetts Financial
10 Services Company which is where I work now.
11    MR. WELSH: Just so the record is clear.
12 Is it January '04 or January '05?
13    MR. ROACH: She can correct it later if
14 it's incorrect. It's not material I don't think.
15    MR. WELSH: I'd just like to fix it now
16 so she doesn't have to.
17 A. You're right, it's two years in 2007. So
18 that would have been 2005.
19 Q. So you worked at Testa Hurwitz until 2005?
20 A. Right.
21 Q. And what does Mass. Financial do, what kind
22 of work do you do there?
23 A. I work in the law department.
24 Q. And what does Mass. Financial do?

**8**

1  A. They have investment advisory services and
2  mutual funds and retirement services.
3  Q. Did you have any area of concentration at
4  Gaston Snow when you were there?
5  A. I was in the Tax Department. In the
6  beginning I did mutual funds, and retirement plans,
7  and employee benefits, and at the latter part of
8  that I was only doing employee benefits.
9  Q. Advising clients as to employee benefits?
10 A. Right.
11 Q. Mostly employers?
12 A. Right.
13 Q. Did you work in the severance area at all,
14 in that area?
15 A. No.
16 Q. In 1991 you joined Testa Hurwitz. What did
17 you do at Testa Hurwitz until you left there in
18 January of '05?
19 A. I was a member of the Tax Department, and I
20 concentrated in employee benefits.
21 Q. Did that include ERISA, the area of ERISA?
22 A. Yes.
23 Q. Is that a yes?
24 A. Yes.

**9**

1  Q. Did it include severance?
2  A. To a limited degree.
3  Q. Involving mostly your clients, mostly
4  corporate employers?
5  A. Yes.
6  Q. Ever been sued in a case as either or
7  brought a suit either as a plaintiff or a defendant?
8  A. No.
9  Q. Ever been convicted of a crime?
10 A. No.
11 Q. Did you read anything for today's
12 deposition?
13 A. I couldn't hear your question.
14 Q. Did you read anything for today's
15 deposition, any documents?
16 A. Yes.
17 Q. What did you read?
18 A. I saw a page from the Summary Plan
19 Description and a plan from a planning document.
20 Q. I'm going to show you what's been marked in
21 this case as -- strike that. Anything else that
22 you've read for today's deposition?
23 A. No.
24 Q. I'm going to show you a document that's been

Kim Collins                                                                                    12/15/2006

### Page 26

1 comparison, can you tell from looking at it which
2 company's benefits are better?
3  A. For some of the benefits you can tell which
4 would be more favorable to the employees.
5  Q. Which ones are more favorable to the
6 employees?
7  A. You have to go benefit by benefit. For
8 example, the 401K plan at Bayer seems to offer a 4%
9 match while the plan at EFTC offers a 2% match. So
10 Bayer's would be a better match.
11  Q. I notice that Bayer has a pension and EFTC
12 does not, correct?
13  A. Correct.
14  Q. So the Bayer plan would be better, correct?
15  A. Correct.
16  Q. Did you in looking at this come to a
17 conclusion as to which plans were better, which
18 company had more favorable plans for the employees?
19   MR. WELSH: In 1998?
20   MR. ROACH: Yes.
21  A. I don't remember 1998.
22  Q. I understand you don't remember.
23  A. I can't remember what conclusion I had.
24  Q. Let me ask it a different way. What would

### Page 27

1 be the purpose -- let's assume for a moment that
2 Bayer was selling some of its assets to EFTC and the
3 plan was they envisioned that some of the employees
4 from Bayer would be terminated and then be employed
5 by EFTC. Assuming that was the case, what would be
6 the purpose of you advising Bayer, the seller here
7 of the difference in the plans?
8   MR. WELSH: Objection. You can answer
9 if able.
10  A. My experience, usually the employer liked to
11 understand what the differences would be for the
12 employees who are transferred.
13  Q. Why?
14   MR. WELSH: Objection. If you know, you
15 can answer.
16  A. I've always assumed it was to communicate to
17 the employees.
18  Q. So they would come to you, ask you to
19 analyze them, and then you would impart that to the
20 employer, the selling employer, for example, so the
21 selling employer to your understanding would then be
22 able to advise the employees as to the nature and
23 the differences in the plans, is that a fair
24 statement?

### Page 28

1   MR. WELSH: Objection. Lack of
2 foundation. You may answer.
3  A. Yes.
4  Q. The next page -- strike that. We're still
5 on the same page Company Confidential. You see some
6 of these, some highlighting on here, the document
7 lines through some of the words?
8  A. Um-hmm. Yes, I do.
9  Q. Did you do those or do you know?
10  A. I don't know.
11  Q. That's something you would normally do in
12 the course of your analysis, highlight wording on a
13 page like this?
14   MR. WELSH: Objection. You may answer.
15  Q. In the course of doing your job.
16  A. I might.
17  Q. The next page over and I believe the next
18 page in, the third page in of Exhibit 19, Benefit
19 Eligibility SEV 4 at the bottom. Do you see that?
20  A. Yes.
21  Q. You said this is one of the pages you looked
22 at before you came today?
23  A. Right, just before.
24  Q. In looking at that, does that refresh your

### Page 29

1 memory as to whether you advised Bayer with respect
2 to its severance plan back in 1998?
3  A. No, it does not.
4  Q. Do you see the asterisk in the middle column
5 on the third bullet point from the bottom?
6  A. Yes.
7  Q. Do you know who would have made that
8 asterisk?
9  A. No.
10  Q. Is that an asterisk in the manner that you
11 would have made it? Do you recognize that as an
12 asterisk that you might have made?
13   MR. WELSH: Objection.
14  A. I'm not sure.
15  Q. It's tough to recognize an asterisk. What
16 about the asterisk on the right-hand column, the top
17 bullet point where it says a comparable position?
18  A. I don't know who made that.
19  Q. The next page over. It looks like a chart
20 that says Cash Needed At Closing with a question
21 mark in the upper left-hand column. Do you see
22 that?
23  A. Yes.
24  Q. Do you know who prepared this document?

8 (Pages 26 to 29)

**Page 38**

1   A. Well, since I don't have the plan here, I'm
2   not sure. But I would say that the severance plan
3   probably mentioned that vacation would be paid out
4   when people were terminated.
5       Q. Now, in the third box, I'm sorry, the far
6   right-hand box under that same category of vacation.
7           MR. WELSH: The handwritten word "yes"
8   in it?
9       A. I don't know what box you're talking about.
10      Q. Let me just make sure we're clear on the
11  record. The boxes running down the left-hand side
12  are the categories for each of the boxes running
13  from the left to the right, correct?
14      A. No.
15          MR. WELSH: No.
16      A. No, that's not correct.
17          MR. WELSH: The second --
18      A. Each row has a different category.
19      Q. Well, that's what I'm asking. Each row is a
20  different category reading from the left to the
21  right, correct? In other words --
22      A. Each row is a different benefit, yes.
23      Q. This row starting with the word "yes" --
24      A. Um-hmm.

**Page 39**

1   Q. -- concerns vacation, correct?
2   A. That's correct.
3   Q. So when you read from the left of the page
4   to the right on each row, the category is for the
5   title of the second box in? In other words, the
6   bottom row all is about vacation, correct?
7   A. The bottom row is all about vacation.
8   Q. And the row, the category about which each
9   row is covering is in the second box in, correct?
10  A. The second column of the chart gives you the
11  benefit. I think that's what you mean.
12  Q. Reading from left to right?
13      MR. WELSH: No.
14  A. No. The second column of the chart from --
15  second from the left of the entire chart is a column
16  with a list of benefits.
17  Q. Okay. Good. So this bottom row is about
18  vacation?
19  A. Yes, I think I said that.
20  Q. Reading over to the right-hand box, the far
21  right on vacation, there's a note that says,
22  "Summary of severance policy indicates vacation
23  benefit will be paid in a lump sum on termination.
24  If company wants to have EFTC assume the benefit, it

**Page 40**

1   should amend the severance plan." Did I read that
2   correctly?
3       A. Yes, you did.
4       Q. What does that mean?
5       A. It means that the severance policy says that
6   accrued benefits should be paid out on termination.
7   If the company wants to change that plan, it should
8   amend it.
9       Q. Why would it amend -- strike that. What
10  does that mean?
11      A. What does what mean?
12      Q. What you just said. What does that mean,
13  amend the severance plan?
14      A. Assuming -- if the plan says that vacation
15  benefit will be paid out in a lump sum on
16  termination, if the company wanted to instead have
17  EFTC as is written here assume the benefit, then it
18  would amend its severance plan to say that was a
19  possible alternative or maybe they want to
20  substitute that for all deals.
21      Q. Why would Bayer or the selling company have
22  to amend the severance plan to do that?
23          MR. WELSH: Objection. You can answer
24  if you are able.

**Page 41**

1   A. If you've got a written plan and it's
2   subject to ERISA which some severance plans are,
3   some aren't, then you should amend it so that you
4   are following the proper, following the terms of the
5   plan when you do your action.
6       Q. They'd have to amend it first, correct?
7       A. You would amend it before the -- right, you
8   would amend it and then follow it after that.
9       Q. What would be the procedure for amending it?
10          MR. WELSH: The Bayer plan?
11      Q. In a situation like this where there's a
12  sale envisioned and you want to do something that's
13  different than what the plan says, you want to amend
14  it, how do you go about doing that?
15      A. It would depend on the company's practices.
16  But basically the employer just has to make a
17  written record that it changed the plan.
18      Q. Would they have to give notice to the
19  employees that they did that in writing?
20      A. I believe ERISA says you have to give notice
21  within a certain number of months afterwards.
22      Q. Afterwards or before?
23      A. Afterwards. I haven't looked at that
24  provision in a while though.

**42**

1  Q. Then there's some handwriting, "yes-will
2  cash out." What does that mean, if you know?
3  A. It says to me that there was a decision made
4  that they will pay the vacation benefits or at least
5  at the time that I was writing this that's what
6  people thought they were doing.
7  Q. Meaning pay it out on lump sum on
8  termination?
9  A. Right.
10 Q. Before we move off page one, there's some
11 handwriting in the third column down under Pension.
12 Can you read what that handwriting is? It looks
13 like "100% vest" something.
14 A. "100% vest corp." I don't know what the
15 last word is. Maybe "graded." I'm not really sure.
16 Q. And then what does the other handwriting --
17 looks like 22,000?
18 A. It says 22K which would mean 22,000 it says
19 employments.
20 Q. Do you know what that means?
21 A. No, I don't.
22 Q. Do you know what the other indication means
23 100% vest, et cetera?
24 A. No, because I can't make out the last word.

**43**

1  Q. And what's the handwriting on the next
2  column down about with the 401K savings plan?
3  A. It says "100% vest corporate" or "corp.
4  group due."
5  Q. What does that mean?
6  A. I don't know.
7  Q. I'd like you to turn to the next page.
8  Under the column, the second column down. This will
9  be page 5 of Ramsden Exhibit 19. Do you see the
10 column that talks about severance?
11 A. The row?
12 Q. Yes.
13 A. Yes.
14 Q. And to the left of that it says "possibly"?
15 A. Correct.
16 Q. Does that indicate that possibly cash will
17 be needed at closing for severance?
18 A. Yes.
19 Q. Why did you say that?
20 A. Usually I didn't know whether they were
21 going to have continued employment or terminations.
22 I wouldn't have the details. So if someone was
23 entitled to severance under the plan because they
24 didn't have a job -- it says, "Based on the Summary

**44**

1  Plan Description of the Severance Policy, it appears
2  severance need not be paid to employees that either
3  become employed by EFTC or OFFERED a comparable
4  position by EFTC." I wouldn't have had the details
5  whether every person that was affected would meet
6  those criteria.
7  Q. When you say meets the criteria, what do you
8  mean by that?
9  A. The criteria that they become employed by
10 EFTC or offered a comparable position by EFTC.
11 Q. So was it your understanding that -- strike
12 that. Reading that then, you wrote this after you
13 read the Summary Plan Description of the --
14 A. It appears so, yes.
15 Q. And that was the Bayer plan, correct, the
16 Summary Plan Description from Bayer?
17 A. Yes.
18 Q. And would that be the document that is part
19 of Exhibit 19 which you looked at before you came
20 today which this will be the third page in?
21 A. I'm told that that is the Summary Plan
22 Description, yes.
23 Q. So having read that, it was your opinion
24 that if the employees are either employed by EFTC or

**45**

1  offered a comparable position by EFTC, severance
2  need not be paid, is that a fair statement?
3  A. Right. That assumes that they're terminated
4  from Bayer and then become employed, again offered
5  employment.
6  Q. So it was your opinion that if they're
7  either offered employment even if they choose not to
8  take it or if they take the job, whichever occurs,
9  they're not entitled to severance under either
10 scenario, correct?
11    MR. WELSH: Objection. You may answer.
12 A. If they were offered employment that was
13 comparable, then they would not get severance.
14 Q. Whether they took the job or not as long as
15 they were offered it?
16 A. That's correct.
17 Q. And then the other scenario you have here is
18 that they're employed by EFTC?
19 A. Excuse me?
20 Q. It looks like you have two scenarios here,
21 that you advised Bayer that they need not be paid
22 severance. The first one was they either become
23 employed by EFTC?
24 A. Right.

Page 50

1  A. Yes.
2  Q. Can you read what that says?
3  A. "Qualify-yes no-windows."
4  Q. And what does that mean?
5  A. I don't know.
6  Q. Back under the box, the severance category.
7  You said on the first line, "Based on the Summary
8  Plan Description of the Severance Policy, it appears
9  severance need not be paid. "When you said
10 "appears," does that mean you weren't sure?
11     MR. WELSH: Objection. You may answer.
12 A. I would say that it meant that I only looked
13 at the Summary Plan not the plan or it just was a
14 phrase that I used. I really don't know.
15 Q. When you said "possibly," did you remember
16 saying to anybody at Bayer or anybody within Testa
17 Hurwitz that severance might possibly be payable?
18 A. I don't remember anything about this
19 transaction.
20 Q. Who, if anyone, would you have given this
21 document to after you drafted it?
22     MR. WELSH: Objection. You may answer
23 if you have any knowledge.
24 Q. In the normal course of your doing this kind

Page 51

1  of work.
2  A. In the normal course it would go to a
3  corporate lawyer that was working on the
4  transaction.
5  Q. Assuming it was Ms. Buxbaum, it would go to
6  her?
7  A. It might have or she might have had
8  corporate associates working with her. I didn't
9  always send it to the lead person if she was the
10 lead person.
11 Q. Now, when you said in your own handwriting
12 here "make sure agreement says right stuff," I know
13 you don't know exactly what happened in this
14 particular transaction, but normally would that have
15 meant in the course of your doing your work?
16 A. I really don't know why I wrote that, and
17 I'm not sure which agreement it's referring to. So
18 I don't know.
19 Q. Did you not look at the plan document itself
20 in addition to the Summary Plan Description?
21     MR. WELSH: Objection. You can answer
22 if you have a memory.
23 A. I don't remember.
24 Q. In the course of your advising clients on

Page 52

1  severance or any other benefits, would you have
2  looked -- it would have been your practice, normal
3  practice to look at the plan documents itself in
4  addition to the Summary Plan Description?
5  A. Not always.
6  Q. Why not?
7  A. Sometimes they just weren't available to me.
8  Q. When you said they weren't available,
9  meaning the client wouldn't give them to you?
10     MR. WELSH: Objection. You may answer.
11 A. When I say they weren't available to me, I
12 didn't have them.
13 Q. Would it have been your practice normally to
14 have asked for a copy of them?
15 A. Not always.
16 Q. Would it have been your practice if you
17 weren't sure what the Summary Plan Description said
18 and if benefits possibly might be payable or
19 possibly might not be payable, would it have been
20 your practice to then ask for these plan documents
21 to further educate yourself before you advised the
22 client?
23 A. I might have. It depends whether there was
24 time. I really don't -- I don't remember what I did

Page 53

1  in this particular transaction.
2  Q. No, I'm not talking about this particular
3  transaction. I'm talking about any transaction.
4  A. It would depend upon the time involved, if
5  there was time to go get more information. If
6  people had it available, I might have asked if they
7  had it available.
8  Q. When you say depends on the time involved,
9  what do you mean by that?
10 A. Sometimes some transactions have a deadline.
11 Q. Let's look at what's been marked as Willis
12 Exhibit 51 Marr 59. And just for the record that's
13 the same document. That's the third page in on
14 Ramsden Exhibit 19, the document that you reviewed.
15 the Summary Plan Description page, correct?
16 A. That's the same page. yes.
17     MR. WELSH: But with different
18 handwritten marks.
19 Q. Yeah. It has some handwritten -- Exhibit 51
20 from Willis have some handwritten marks that are not
21 yours, correct?
22 A. I don't know whose they are.
23 Q. But they're not yours, right?
24 A. I don't recognize it as my handwriting or

14 (Pages 50 to 53)

Page 54

1  not as my handwriting.
2      MR. WELSH: I'm going to tell you that
3  those marks were put on during the deposition, and
4  there's no suggestion that that was your
5  handwriting.
6      THE WITNESS: Okay.
7      Q. That's correct. Let's look back to exhibit
8  Ramsden 19 the third page in, the Summary Plan
9  Description, the document that you did look at. Can
10 you tell me in looking at that how you came to the
11 conclusion that you put in the chart that you
12 drafted, that's the fourth, fifth and sixth pages of
13 Ramsden Exhibit 19, that it appears that severance
14 need not be paid -- it appears that severance need
15 not be paid to employees that either become employed
16 by EFTC or offered a comparable position by EFTC?
17     MR. WELSH: Objection. You're asking
18 her thought process in 1998 or an independent
19 assessment now?
20     MR. ROACH: I'm asking both.
21     MR. WELSH: Both? Well, I ask you to
22 break them into two because she's testified at
23 nauseam that she doesn't have any specific memory.
24 I think this has to be clear. Is it her memory of

Page 55

1  what she did back then or is it an independent
2  review now you're asking her? You might want to pay
3  her a fee if it's an independent review.
4      Q. Do you have a memory now of --
5      A. No, I do not.
6      Q. Let me ask you the second question then. In
7  looking at that, what language on there would
8  support the conclusion that you came to on Exhibit
9  19?
10     A. The middle column lists events in which --
11 well, it's not the only place. This page lists
12 events in which you don't get severance. And the
13 fourth bullet talks about a sale, and says that if
14 you are offered a comparable position, you would not
15 get severance. I don't remember the transaction.
16 So if this transaction were a division, then the
17 bullet above that would apply. The fourth bullet
18 applies to any sale.
19     Q. And the bullet any sale is the one where the
20 asterisk is next to it, correct?
21     A. Yes, it is.
22     Q. Let's just because the pages are the same
23 maybe just for sake of clarity let's look at Willis
24 Exhibit 51 and Marr 59 the same page. So you're

Page 56

1  saying that the one circled No. 2 which was the same
2  one that had the asterisk next to it would apply,
3  could apply or the one that's circled with No. 5
4  could apply depending; is that right?
5      A. Depending on what the transaction was, which
6  you haven't told me what it was.
7      Q. Well, assuming that the company, meaning
8  Bayer, sold part of the company not a division and
9  the employees became employed at EFTC in the same
10 location.
11     A. Is that a fact, that they were employed at
12 the same location?
13     Q. Yes.
14     A. Okay.
15     Q. Assuming that that's the case -- I'm not
16 admitting anything here by my questions. I'm just
17 suggesting to you that this is some of the facts
18 that we'd like you to assume. And assuming that
19 they were paid the same wage or salary, assuming
20 that's true, we haven't conceded that but assuming
21 that's true, which one would apply?
22     A. Under that hypothetical or the one you've
23 numbered No. 2 circled on this exhibit.
24     Q. Would apply?

Page 57

1      A. Would apply.
2      Q. Do you see above on No. 5 it talks about a
3  division of the company?
4      A. Yes.
5      Q. And then underneath that bullet point that
6  we circled No. 5, there's a hash mark and it talks
7  about getting a new offer from an owner. Do you see
8  that?
9      A. Excuse me? Sorry.
10     Q. They're offered a job with the new owner?
11     A. Become employee of the new owner, yes.
12     Q. Right. Or they're offered continued
13 employment with the new owner?
14     A. Yes.
15     Q. And you notice that there's no mention of a
16 new owner in No. 2, circled No. 2, right?
17     A. That's right.
18     Q. So wouldn't No. 2 apply to where they're
19 offered a job or actually employed within Bayer
20 where it doesn't mention a new owner at all?
21     A. No.
22     Q. Why?
23     A. Well, that's already covered in No. 1, the
24 company offers you a comparable position. So I

**Page 58**

1  would mean this to mean another employer.
2  Q. So you think No. 1 only applies to Bayer and
3  No. 2 only applies to another company not Bayer?
4  A. I think No. 1 already tells you that if you
5  get a position with Bayer, you don't get severance.
6  Q. Right.
7  A. So this is -- if I were the person drafting
8  it, which I wasn't, I would say this was a position
9  since we already covered company, it must mean a
10 position with someone else.
11 Q. No. 2 would mean a position with someone
12 else?
13 A. That's my reading.
14 Q. Shouldn't it say a position with someone
15 else to make it clear?
16     MR. WELSH: Objection.
17 Q. Rather than within Bayer?
18     MR. WELSH: Objection.
19 A. No.
20 Q. Why not?
21 A. Because you've already covered company
22 above. So it's just telling you if you get a
23 position in connection with that transaction,
24 there's no need to say that.

**Page 59**

1  Q. When you advise clients on severance, do you
2  have a full understanding generally as to what the
3  underlying facts are before you give the advice in
4  terms of whether the severance is paid or not such
5  as when you drafted what we looked at in Ramsden
6  Exhibit 19?
7      MR. WELSH: Objection. You may answer
8  if you are able.
9  A. A full -- excuse me? A full what of the --
10 Q. You had stated that you drafted the last
11 three pages of Exhibit 19, Ramsden Exhibit 19?
12 A. Um-hmm.
13 Q. Is that right?
14 A. That's correct.
15 Q. Before you provide this to anyone or come to
16 a conclusion, is it your practice, was it your
17 practice at the time you worked at Testa Hurwitz to
18 have an understanding of the underlying transaction
19 that was occurring before you entered any
20 information?
21 A. I would usually try to find out whether it
22 was an asset sale or a stock sale, to that level at
23 least.
24 Q. And would you try to find out whether the

**Page 60**

1  employees were offered new jobs or --
2  A. Not necessarily.
3  Q. But you would give advice as to what would
4  happen in those sales if they were offered a job
5  otherwise there would be no reason for you to do
6  this, right?
7  A. I think I was giving advice about what the
8  severance plan said when employees terminate. And
9  in this case it does say the -- in this case I was
10 focusing on people who don't get severance, why they
11 don't, that if you get another job you don't get
12 severance.
13 Q. If you were fairly certain back then about
14 -- strike that. If you are certain in your view as
15 to what you just told me today on Exhibit 51 1, 5
16 and 2, the circled numbers, why would you have put
17 possibly --
18     MR. WELSH: Objection.
19 Q. -- on the --
20     MR. WELSH: Asked and answered. Answer
21 again.
22 Q. You can answer. Go ahead.
23 A. The answer is as I said, I wouldn't know
24 whether all employees were going to meet the

**Page 61**

1  criteria that I set forth.
2  Q. Is that something that you would have tried
3  to determine before you --
4  A. No, it's not.
5  Q. -- draft it? Why wouldn't you do that?
6  A. I was not always that close to the
7  transaction. I wouldn't know the nitty-gritty of
8  every person's certain situation.
9  Q. I'm going to show you the Bayer Corporation
10 Severance Pay Plan Fiorilla Exhibit 9. Do you
11 recognize that at all?
12 A. No. Well, I saw it earlier if but I don't
13 remember it from before.
14 Q. You saw it before you met with us today?
15 A. Yes.
16 Q. Any other documents that you looked at other
17 than what we've talked about and this plan that I
18 just showed you?
19 A. No. We talked about everything.
20 Q. I'd like to turn you to pages 6 and 7 in the
21 document. And I believe we stipulated, John, that
22 Willis Exhibit 63 are those pages?
23     MR. WELSH: Yes.
24 A. Okay.

**Page 66**

1  A. Well, I assume you're asking me just for
2  that page because I haven't read this plan.
3  Q. I understand. Just that page, that's fine.
4  A. And I haven't looked at any other page
5  besides page 7.
6  Q. No, I understand. The bottom of page 6 over
7  to 7 and the Summary Plan Description Willis 51, if
8  you can tell me where it's incorporated.
9  A. Section 3.06 of the plan is ineligible
10 terminations of employment. Page 7 lists the
11 ineligible terminations of employment.
12 Q. Let me ask you about No. 8 on page 7.
13 A. I can't read that because it's too marked
14 up.
15 Q. So we'll look at Fiorilla 9. Starting with
16 page 6 it says, "A Severed Employee will not be
17 eligible for severance benefit under this Plan if
18 his or her employment with an employer terminates
19 for one of the following reasons." Right?
20 A. Um-hmm. That's correct.
21 Q. Then it lists ten of them on the next page,
22 correct?
23 A. Yes.
24 Q. And going to No. 8 it says, "In connection

**Page 67**

1  with the divestiture that all or part of the assets
2  of an employer," correct?
3  A. Correct.
4  Q. And then it goes to "or," right?
5  A. Yes.
6  Q. So those are two separate events, right?
7  A. Yes, I agree there's an "or" statement
8  there.
9  Q. Just up into the "or" where it gets to the
10 word "employer." What is your understanding of what
11 that means in connection with the divestiture of all
12 or part of the assets of an employer?
13    MR. WELSH: Objection. You may answer.
14 A. I believe divestiture means sale. So it
15 means a sale of all or part of the assets of an
16 employer.
17 Q. You believe divestiture and sale are
18 synonymous in terms of your understanding?
19 A. That's my understanding of the word. I
20 haven't looked at it in the dictionary.
21 Q. I'm going to show you a document which is a
22 case.
23    MR. WELSH: And if you do this, we will
24 suspend the deposition and we'll go see Judge Young

**Page 68**

1  because this is getting ridiculous. We're not
2  giving her case law to have her do a brief here.
3  You're asking for her opinion.
4  Q. In that case I'll reserve my rights and I
5  won't show you the case.
6     MR. WELSH: Thank you.
7  Q. So continuing on with that paragraph. It
8  says "of all or part of the assets of employer or
9  the sale of all or part of the stock of an
10 employer."
11 A. That's what it says.
12 Q. And then it goes on and talks about as a
13 result of which the date of the sale the Severed
14 Employee is employed by the entity or is offered
15 employment which does not require them to locate and
16 at the same wage. I'm paraphrasing the rest of it.
17 Correct?
18    MR. WELSH: It's not entity. I think
19 you left out the word acquiring.
20 Q. Acquiring entity.
21 A. Yeah, that's basically what it says.
22 Q. So when it talks about the sale of all or
23 part of the stock as a result of which the date of
24 the sale, do you see --

**Page 69**

1  A. The whole piece, the whole -- it's in
2  connection with the sale of assets or the sale of
3  stock as a result of which blah blah blah.
4  Q. So assuming that divestiture means sale, is
5  synonymous with the word sale, correct, to your
6  understanding?
7     MR. WELSH: Does it appear from here
8  because of the word sale that divestiture meant
9  sale.
10    MR. ROACH: Yes, that's what I'm asking.
11 A. Yeah, to me that means sale.
12 Q. Can you tell me looking at this page where
13 on the Summary Plan Description, Willis 51 Marr 59,
14 this plan document sub 8 that we were just reading
15 is included?
16 A. The Summary Plan Description has two bullets
17 that talk about sales. One is the sale of a
18 division of a company, and the other is a more
19 general sale, the sale of premises, products,
20 processes or other activities of the division you
21 work for.
22 Q. And so would it be your understanding then
23 that sub 8 on Fiorilla Exhibit 9, the plan, would be
24 incorporated into what was circled as No. 2 on