Normand Fontaine

1

Volume: 1

Pages: 1 - 255

Exhibits: 43 to 44

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

Civil Action No. 04-10728-REK

-----------------------------------------------------x

JOSEPH ATTARDI, MICHELINE AUGUSTA, FARAHILDA

BET-EIVAZI, MARY B. BOGDAN, MARK BOWDIDGE,

KAREN BROWN, MARIE BROWN, ROBERT BROWN, LARRY

CELLAMARE, WAI NGAN CHAN, CAROL CHRISTIANSON,

MARY JO CORCORAN, RICHARD COTE, CORRIE COTTRELL,

CLARENCE COUPE, AROUSSIAK DAKESSAIN, RICHARD DEFRANCESCO,

MARIA DEFRANCESCO, DAVID J. DOLAN,

LISE DUPUIS, SANDRA COMEAU DUTCHER, KATHY ELY,

VINNIE FIORILLA, STEVE FOURNIER, JEAN FRASER, GARY

FRIZZELL, DIANA GLASSETT, FRED GLASSETT, BOONCHOO

GRASSO, PHILLIP GREENE, BERTRAND GUILMETTE, PAULINE

GUILMETTE, ALBERTA HEALEY, JEANNE HUFF, RICK JAKLE,

ANITA KOPACZ, ALFRED LANGUIRAND, JANET E. LANOUE,

JUDITH LA ROSA, EDMUND J. LASCELLES, JR., CLIFF LORD,

III, PAT MABEY, TERESA C. ORNELAS, JANICE PARADIS,

LINDA PARADIS, NORMAN PARENT, LONG T. PECK, DIANA

(Caption Continued.)

```
 1  PERREAULT, OUDOMPHONE PHOMMAHAXAY, RICHARD PICARD,
 2  NORMAN PULIN, MARIA REIS, MARK ROBERT, JOHN SABLOCK,
 3  BARBARA SANBORN, JOANNE SANZO, LINDA SAULNIER, JEANNE
 4  SKENE, ROBERT STIER, CATHERINE SWEENEY, PHAM VAN, DIANE
 5  WILLETTE, and EDWARD R. WRIGHT,
 6               Plaintiffs,
 7
 8         v.
 9
10  BAYER CORPORATION, BAYER CORPORATION SEVERANCE PLAN,
11               Defendant.
12  -----------------------------------------------x
13
14
15
16
17        DEPOSITION OF NORMAND FONTAINE
18             October 11, 2006
19               10:00 a.m.
20             ROACH & WISE, LLP
21              31 State Street
22            Boston, Massachusetts
23
24      Reporter:  Ruth Day-Rabadjija, CSR
                                                  2
```

```
 1  APPEARANCES:
 2
 3  ROACH & WISE, LLP
    By Stephen A. Roach, Esquire
 4  31 State Street
    Boston, Massachusetts 02109
 5  (617) 723-2800
    roach@roachwise.com
 6  Counsel for the Plaintiffs
 7
 8  BELLO, BLACK & WELSH, LLP
    By John F. Welsh, Esquire
 9  535 Boylston Street
    Boston, Massachusetts 02116
10  (617) 247-4100
    Counsel for the Defendant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                  3
```

```
 1              I N D E X
 2  EXAMINATION OF:                    PAGE
 3  NORMAND FONTAINE,
 4  Direct Examination by Mr. Roach       5
 5
 6           E X H I B I T S
 7  No.                          Page
 8  43  Document                     10
 9
10  44  Bates stamped document No. B00728   242
11
12
13
14
15
16
17
18
19
20
21
22
23
24
                                                  4
```

```
 1            P R O C E E D I N G S
 2              NORMAND FONTAINE,
 3  a witness called for examination by counsel for the
 4  Plaintiffs, being first duly sworn, was examined and
 5  Testified as follows:
 6          DIRECT EXAMINATION
 7  BY MR. ROACH:
 8      Q   Could you state your name, please?
 9      A   My name is Normand Fontaine.
10        MR. ROACH:  And I just want the record to
11      state that the parties have stipulated and
12      agreed that all objections, except as to form,
13      will be reserved until the time of trial;
14      motions to strike will be reserved until the
15      time of trial.  The witness will read and sign;
16      we are waiving the notary, he does not need to
17      do so before a notary; and he will do so within
18      thirty days of receipt of the transcript.
19      Q   What that means, Mr. Fontaine, is that you
20  will have an opportunity to review the transcript of
21  today's deposition and if there is anything in there
22  that you think is in error, that was transcribed
23  wrongly by the stenographer, or you want to change,
24  you can set it down, but you have to put the reasons
                                                  5
```

Normand Fontaine                                              10/11/2006

1    A   (Reading document)  No.
2    Q   No. 14?
3    A   (Reading document)  No.
4    Q   Okay.  With respect to No. 1, which is, I
5  believe you said you either did have or may have
6  had, can you tell me what those notes were?
7        MR. WELSH:  Objection.  You may answer.
8    A   I don't remember.
9    Q   Do you remember taking any notes of any
10 meetings concerning severance benefits to the
11 Plaintiffs?
12   A   Not specifically, no, about severance
13 benefits, no.
14   Q   Can you remember anything, in general?
15   A   For the most part, my involvement in the
16 print circuit board shop was relative to the
17 transfer of the assets and the inventory, those
18 types of things.
19   Q   Okay.  I understand that, but can you
20 recall any discussions regarding severance benefits
21 in any meetings with any people other than the
22 Plaintiffs?
23   A   In general?
24   Q   Yes.

                                                        14

1    A   I can remember that we discussed how we
2  were going to transfer the board shop and what our
3  objectives were in transferring the board shop.  But
4  relative specifically to the severance benefits, no.
5    Q   Okay.  What were your objectives?
6    A   Our objectives were to find someone who
7  could continue building the printed circuit boards
8  for us at a reasonable price, and then at the same
9  time to provide jobs for our employees at a similar
10 wage rate.
11   Q   Anything else?
12   A   No, that was it.
13   Q   When you said, "Our objectives," that was
14 Bayer's objectives?
15   A   Michael Paige, the people on his staff,
16 yes.
17   Q   And he worked for Bayer, as well as you at
18 the time, correct?
19   A   Yes.
20   Q   Who was on Mr. Paige's staff?
21   A   Oh, let's see.  At the time it would be
22 Dick Ramsden, Russ Spencer.
23   Q   Spencer?
24   A   Russ Spencer.  Don Baribeau.  Joe

                                                        15

1  Costanzo.  I'm just trying to go through the
2  functions in my head, the functional management in
3  my head, to try and understand, and try to remember
4  who.  John Hurley.  The human resource manager was
5  Rodney --
6    Q   Willis?
7    A   Willis.  Thank you.  That's all I can
8  remember.
9    Q   Okay.  What made you believe that you
10 might have had notes from meetings concerning the
11 severance benefits to the Plaintiffs that's No. 1 in
12 Exhibit 43?
13   A   We, in general, when we started
14 discussions about transfer of the print circuit
15 board shop, we talked about what would be the ideal
16 situation for AGFA and the employees.  And in that
17 context, we described that ideal situation, or the
18 ideal buyer for the board shop to be a White Knight.
19 So that's -- if there was any conversation at the
20 time, it would have been in regards to the best of
21 all worlds for both the employees and for AGFA.
22       MR. ROACH:  Okay.  John, are we going to
23 continue to stipulate that when he says,
24 "AGFA," we stipulate that, that also means

                                                        16

1  Bayer, Bayer Corporation?
2        MR. WELSH:  During the period of time that
3  Bayer was the parent, but not during the period
4  of time when they were no longer the parent.
5  So if he's talking about AGFA, if he uses the
6  word "AGFA," talking about the time frame, for
7  instance, '95 through '98, I have no problem
8  with that.  If he starts talking about AGFA
9  post-January '99, then I think that's a
10 separate company.
11       MR. ROACH:  All right.  Can we assume he
12 is talking '95 to '98, unless the context -- I
13 don't want to keep having to clarify it like
14 that.
15       MR. WELSH:  And, you know, for instance
16 the conversations you just had with him
17 concerning spring of '98 -- yes, I have no
18 problem with that.
19   Q   Okay.  All right.  So that when you say,
20 "AGFA," you were all Bayer employees at that time,
21 correct?
22   A   Uh-huh.
23   Q   Is that a yes?
24   A   I believe so, yes.

                                                        17

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

Normand Fontaine                                                    10/11/2006

1    MR. WELSH: 1998.
2    A    I don't have the chronological order in my
3    head, but I believe we were Bayer employees at the
4    time.
5    Q    Okay. When you say that the ideal
6    situation would be a "White Knight," what did you
7    mean by that?
8    A    Well, the discussion we had with Michael
9    Paige was, the ideal situation would be to guarantee
10   jobs for all of the employees at their current wage
11   rates, which was important to us, because we
12   recognized that, because of the length of service of
13   the employees, they had -- they were being paid
14   higher than what the market would support. So that
15   would be the ideal situation from an employee point
16   of view. And from our point of view, would be to be
17   able to have a knowledge base to build the print
18   circuit plates.
19   Q    I'm sorry. To what?
20   A    To have a knowledge base that could build
21   our product. So, basically, a tribal knowledge that
22   existed would be transferred with the product.
23   Q    So it would make it more palatable to the
24   -- more likeable or feasible that you could find
                                                        18

1    somebody that would purchase the board shop, because
2    these people had the knowledge to run it?
3    A    Yes.
4    Q    Do you remember any discussion in the
5    meetings with Mr. Paige and his staff, remembering
6    the people that you just mentioned, about keeping
7    the wages the same, so they wouldn't have to pay
8    severance, and that it would save Bayer money?
9    A    No.
10   Q    Did you speak to Mr. Paige or Mr. Ramsden
11   before you came to today's deposition?
12   A    No.
13   Q    Did you speak to anyone, other than
14   Mr. Welsh, before you came to today's deposition?
15   A    No.
16   MR. WELSH: You mean in preparation, or
17   about these topics?
18   MR. ROACH: Yes. In preparation.
19   Q    I meant to say in preparation for today?
20   A    No.
21   Q    Now, for No. 1, again, where would you
22   have left these notes in your office, on top of your
23   desk, in a file cabinet, in a folder of some sort?
24   MR. WELSH: Objection.
                                                        19

1    A    It could have been in any one of those.
2    Q    Where did you usually keep your notes in
3    your normal course of doing business?
4    A    If it's working -- if it's working notes
5    that I'm working with, I keep them on the desk. If
6    it's historical data, I would put it in the desk
7    somewhere.
8    Q    And what about No. 7 on Exhibit 43, any
9    notes from meetings with the EFTC regarding the sale
10   of the board shop to the EFTC, you said you might
11   have had some notes from that?
12   A    The only notes I would have had in that
13   regard were notes about asset transfers, inventory,
14   the process that we would go through to be able to
15   identify what the inventory was, how much we had,
16   verification process, those types of things.
17   Q    Who at EFTC was the person you dealt with
18   most regularly, if anyone?
19   A    I don't remember the name.
20   Q    Was it Jack Calderon?
21   A    No, not Jack. If I remember, Jack was
22   either the president or vice-president of that
23   organization, so I would not be doing business with
24   him.
                                                        20

1    Q    What about Augie Bruehlman, do you
2    remember him?
3    A    No, not at all. That name should stick.
4    Q    Who was the person on Mr. Paige's staff
5    that was the most concerned with severance benefits
6    for the board shop employees?
7    MR. WELSH: Objection. You may answer.
8    A    I don't think there was anybody at the
9    time that was concerned about severance benefits.
10   Q    Well, let me ask you this: Who among
11   Mr. Paige's staff that you listed for me earlier
12   would have been most involved with employee
13   benefits?
14   MR. WELSH: Objection.
15   MR. ROACH: Let me finish the question.
16   Q    Who of Mr. Paige's staff of the people you
17   just listed earlier would be most involved or most
18   responsible for dealing with any employee benefits?
19   A    Well, I think by functional responsibility
20   it would be human resources.
21   Q    That would be Mr. Willis?
22   A    Yes.
23   Q    I just want to go back to some background
24   questions. Can you tell us what your educational
                                                        21

6 (Pages 18 to 21)

Legalink Boston, Merrill Legal Solutions
(617) 542-0039

Normand Fontaine                                                    10/11/2006

1  have identified on Exhibit 43 as the Plaintiffs in
2  this case, the board shop employees, which boxes
3  would they have been in, located on Exhibit 3?
4      A   They would have been located in the print
5  circuit board manufacturing boxes.
6      Q   Okay.  What about the other box,
7  "Fabrication Assembly Test"?
8      A   They would be in that location also.
9      Q   All right.  Any other boxes?
10     A   No.
11     Q   Okay.  When you said, in 2002 the Bayer
12  closed its operations at 80 Industrial Way, did the
13  people underneath all of these boxes in Exhibit 3
14  also lose their jobs?
15     MR. WELSH:  Objection.
16     A   (Looking at document)  Not necessarily.
17     Q   Okay.  What happened to the people who
18  were employed in those different areas?
19     A   Some of them may have lost their jobs.  I
20  don't know specifically which ones did or didn't.
21  Some of them transferred to different positions.  So
22  I would say, at the time we transferred, the machine
23  shop was no longer with this organization.
24     Q   Okay.  And for the people who were

34

1      Q   Okay.  What about the people where the
2  operation closed and were not given another position
3  within Bayer, would they be given severance, to your
4  knowledge?
5      MR. WELSH:  Objection.  Again, within your
6  personal knowledge.
7      A   To my knowledge, yes.
8      Q   Okay.  What is your knowledge based on?
9      A   Personal experience, because I was one of
10  the people that was impacted.  My knowledge is based
11  on the -- when we had layoffs, we had to lay off
12  people, I was involved in the decisions on who, and
13  I had to give them their envelopes with the
14  severance information in it, and other information,
15  so that would be the base of my knowledge.
16     Q   Okay.  And this includes since you were
17  the plant manager from '95 forward --
18     MR. WELSH:  Objection.
19     Q   -- of the board shop area?
20     A   Yes.
21     Q   Okay.  And when I say, "plant manager of
22  the board shop," you were also a plant manager over
23  other shops and operations, as well as the board
24  shop?

36

1  transferred to different positions within Bayer, did
2  they get severance pay?
3      A   If they got transferred to positions -- to
4  different positions in Bayer, the answer is, no.
5      Q   Why not?
6      A   They had equivalent jobs.
7      Q   Would they be considered people who were
8  reassigned?
9      MR. WELSH:  Objection.
10     A   The answer is, yes.  Or they could be in
11  the same position.  The position could have -- the
12  function could have moved to another building.
13     Q   Okay.  But if they had gone to a different
14  department within Bayer, or a different operation,
15  they wouldn't get their severance, because they
16  would have been reassigned to another position; is
17  that correct?
18     MR. WELSH:  Objection.  You can answer
19  based on your personal knowledge.
20     A   They would not have been given any
21  severance pay if they were transferred to another
22  position.
23     Q   Okay.  Within Bayer?
24     A   Within Bayer.

35

1      A   That's correct, yes.
2      Q   Now, what was in the envelopes for the
3  people who were laid off who got the severance?
4      A   My recollection is that what was in the
5  envelope was a letter explaining the reason why the
6  layoff was occurring; the date, the effective date
7  of their layoff; contact information, if they had
8  any questions about benefits; a letter requesting
9  that the -- asking or telling the employees that
10  they needed to sign this letter to, basically -- I'm
11  trying to think what is the best way to term the
12  letter.  It was, basically, a waiver of liability
13  towards AGFA.
14     Q   AGFA or Bayer?
15     A   I'm sorry, Bayer.  It could be AGFA or
16  Bayer, depending on what time frame it was in.  The
17  employees were given two copies:  One for them to
18  sign and return; and one for them to keep a copy of
19  for their file.  There was an explanation of their
20  severance benefits, which included how many weeks
21  pay they would get, based on their service.  And
22  that's all I can remember the details of.
23     Q   Between 1995 and 1998, what was your
24  understanding, if any, of what the severance pay

37

10 (Pages 34 to 37)

Normand Fontaine                                    10/11/2006

1    A   Machine Shop.
2    Q   Okay.  So together, those two boxes, the
3  "Model/Machine Shop" and the "Machinist" box,
4  together were called the "Model/Machine Shop"; is
5  that correct?
6    A   Yes.
7    Q   Okay.  Now, we have also got "Team
8  Managers" in the middle; who were the team managers?
9    A   They were -- there was a function that we
10 created to train the manufacturing group to operate
11 within a team environment.
12   Q   So they were part of the manufacturing
13 group?
14   A   Yes, they were.
15   Q   Why wasn't their box over the
16 "Manufacturing" boxes, why was it in middle?
17       MR. WELSH:  Objection. You can answer if
18   you know.
19   A   They reported to me directly.  So they
20 were segmented.  Their function was not to
21 manufacture or to engineer.  Their function was to
22 provide specific process training for employees in a
23 team environment.
24   Q   When, if ever, did the box, the two boxes
                                                    46

1    manufacturing group did receive severance pay, yes.
2    Q   That was in 2002?
3    A   Yes.
4    Q   Now, what about the "Model/Machine Shop,"
5  those two boxes, that we have called the
6  "Model/Machine Shop," did that group ever terminate,
7  or close?
8    A   Yes, they did.
9    Q   When was that?
10   A   I don't know the exact date of it.  I
11 believe it was prior to the closing of building 80,
12 so it would put it in the time frame around
13 2001/2000, somewhere around there.  That's the best
14 of my recollection.
15   Q   Okay.  And did those people receive
16 severance benefits?
17   A   People that got laid off did receive
18 severance benefits.
19   Q   Okay.  Do you know if any of those people
20 were rehired, or hired, to do that same work in the
21 same location where the machine shop was located?
22   A   I don't understand the question.
23   Q   Do you remember a company called the
24 "Olympic"?
                                                    48

1    in the left, called the "Engineering Shop," or area,
2  close?
3    A   When we closed 80 Industrial Way, which
4  would be -- I believe it was the 2002 time frame.
5    Q   Okay.  Did those people, some or all of
6  those people, receive severance, if you know?
7    A   I don't know.
8    Q   What about the manufacturing, the two
9  boxes that we've called the "Manufacturing Group,"
10 or the "Manufacturing Shop," when did that close, if
11 ever?
12   A   That would be the same time frame.
13   Q   2002?
14   A   Yep.
15   Q   Is that a yes?
16   A   Yes.
17   Q   Did those people receive severance, do you
18 know?
19       MR. WELSH:  You mean, the people who were
20   laid off?
21       MR. ROACH:  Yes.
22   Q   The people who were laid off in the
23 manufacturing group?
24   A   People who were laid off in the
                                                    47

1    A   Yes, I do.
2    Q   What do you remember about it?
3    A   They took part of the product, bought some
4  of the equipment that was used at the machine shop.
5    Q   And where did Olympic operate?
6    A   Out of a building in Haverhill, Mass., I
7  believe, if I remember correctly.
8    Q   Was that Bayer or AGFA division facility?
9    A   No.
10   Q   Okay.  Did the company called "Olympic,"
11 retain any of the people from the Machine Model Shop
12 as employees?
13       MR. WELSH:  Objection. Objection. You
14   may answer.
15   A   They hired some of them, after we laid
16 them off, yes.
17   Q   After you laid them off, they rehired
18 them?
19       MR. WELSH:  Objection.
20   Q   Strike that.  After Bayer laid off the
21 people from the Machine Model Shop, Olympic then
22 hired them?
23       MR. WELSH:  Objection.
24   Q   As far as you know?
                                                    49

13 (Pages 46 to 49)

Normand Fontaine                                    10/11/2006

| | |
|---|---|
| 1      MR. WELSH: Objection. | 1      Q   Do you remember any discussions with |
| 2      Q   Not all of them, but -- | 2   anybody at human resources, Mary Leonard, or Rodney |
| 3      MR. WELSH: Bayer was not in existence, | 3   Willis, or anyone, about paying severance to the |
| 4   was not the employer at that time. | 4   Model Machine Shop employees? |
| 5      MR. ROACH: Oh, all right. | 5      A   At the time the layoff was occurring, the |
| 6      Q   Did AGFA succeed to Bayer as the owner of | 6   discussion was around the severance, the effect that |
| 7   the electronic pre-press systems operations under | 7   we were laying these employees off and there would |
| 8   Mr. Ramsden, on Exhibit 3, at some point, if you | 8   be severance. That's all. The severance package |
| 9   know? | 9   had not changed, so there was not a lot of |
| 10      A   (Looking as Exhibit 3) Your question is: | 10   discussion about it. |
| 11   Did AGFA buy or own the company after Bayer let it | 11      Q   Okay. Can you think of any other groups |
| 12   go? | 12   or shops that were closed, in the time you worked |
| 13      Q   Yes. | 13   for AGFA/Bayer, CompuGraphics, any of these |
| 14      A   Yes. | 14   companies, where a shop or group was closed and |
| 15      Q   Okay. When was that roughly? | 15   people received severance? |
| 16      A   I have no idea. | 16      A   No. |
| 17      Q   All right. Assuming, as Mr. Welsh says, | 17      Q   What about the paint shop? |
| 18   AGFA rather than Bayer owned the shops that are -- | 18      A   I don't have any of the details on what |
| 19   some or all of the shops that are listed on Exhibit | 19   happened in the paint shop. I wasn't involved in |
| 20   3? | 20   it. |
| 21      MR. WELSH: Post-January '99. | 21      Q   How about the shipping area? |
| 22      Q   Post-January '99. | 22      A   I wasn't involved in it. |
| 23      A   Yes. | 23      Q   What about the metal fabrication area? |
| 24      Q   And after the machine shop was -- the | 24      A   That would be the machine shop. |
| 50 | 52 |

| | |
|---|---|
| 1   Model Machine Shop was closed, do you know the | 1      Q   Okay. What about the inspection area? |
| 2   number of people that Olympic hired? | 2      A   I don't recall any inspection area being |
| 3      A   No, I don't. | 3   closed up. |
| 4      Q   Do you know how long it was before they | 4      Q   Okay. What about an assembly area? |
| 5   were hired after they were laid off and got their | 5      MR. WELSH: Do you have any more specifics |
| 6   severance? | 6   on that? |
| 7      A   No, I don't. | 7      Q   Yes. Do you know anybody, any employees |
| 8      Q   Were you involved in any of the | 8   in an area generally called an "Assembly Area," or |
| 9   negotiations of that? | 9   shop, where people were laid off? |
| 10      A   Of what, the sale? | 10      MR. WELSH: Just a generic assembly? |
| 11      MR. WELSH: Objection. | 11      MR. ROACH: Yes. |
| 12      Q   Yes, of the sale to Olympic. | 12      A   The only thing I can think of would be the |
| 13      A   I was involved in finding different | 13   Avontra Manufacturing, that is an assembly area, if |
| 14   machine shops to do our business. I was involved in | 14   that is the definition you are using. |
| 15   the various part numbers being allocated out to | 15      Q   Now, that's the Avontra Manufacturing |
| 16   different companies to be built, so we went through | 16   area? |
| 17   a quoting process. | 17      A   That's correct. |
| 18      Q   And do you know -- | 18      Q   And when did that close again? |
| 19      MR. WELSH: Objection. | 19      A   Parts of it were traded. It was just |
| 20      MR. ROACH: I'm sorry? | 20   downsized. It wasn't really closed until the last |
| 21      MR. WELSH: I just want to mark on the | 21   product was built. |
| 22   record on that answer that I am bringing an | 22      Q   And when was that? |
| 23   objection and intend to move to strike. Go | 23      A   That would be the 2002 time frame, I |
| 24   ahead. | 24   believe. |
| 51 | 53 |

14 (Pages 50 to 53)

Normand Fontaine

10/11/2006

1    A    Dick Ramsden.
2    Q    **Okay. Were you part of the management**
3  **team at Bayer?**
4         MR. WELSH: Objection. You may answer.
5    Q    **In the plant?**
6    A    In terms of the plant level, yes.
7    Q    **Who was above Mr. Ramsden?**
8    A    In that time frame, it would be Michael
9  Paige, I believe.
10   Q    **Who was above Mr. Paige, if you know?**
11   A    I don't know.
12   Q    **Yourself, Mr. Ramsden, and the other**
13 **people that are on Exhibit 3, were located at 80**
14 **Industrial Way in Wilmington; is that correct?**
15   A    Depending on the time frame, Dick Ramsden
16 was located either at 80 Industrial Way or at 200
17 Ballardvale, but I don't remember the time frame
18 that he --
19   Q    **Okay. I'm just talking about 1998?**
20   A    I'm not sure if that's the time he moved,
21 or if he was still at 80. I don't know. I'm not
22 really sure.
23   Q    **Okay. But other than him, the rest of you**
24 **would have been at 80 Industrial Way?**

66

1    A    Lyn Levesque would be a part of the
2  meeting. She would be there for the same reason the
3  other employees are there. Steve Maddox would be
4  there.
5    Q    **What was Lyn Levesque's role?**
6    A    She was my administrative assistant.
7    Q    **Okay. What about Steve Maddox, what was**
8  **his job?**
9    A    He, basically, worked inventory related
10 issues for me. He was part of my inventory
11 expertise. He was on my staff because of his
12 inventory expertise.
13   Q    **Did he have any supervisory function over**
14 **any of the folks in the boxes on Exhibit 3?**
15   A    No.
16   Q    **So he and Lyn reported to you; is that**
17 **correct?**
18   A    That's correct.
19   Q    **Did he go to these meetings in the**
20 **cafeteria, these monthly meetings?**
21   A    Yes.
22   Q    **Why was Mary Leonard there?**
23   A    It was typical policy at AGFA to have a
24 human resource member there to answer any questions,

68

1    A    That's correct, yes.
2    Q    **That would be in 1998?**
3    A    Yes.
4    Q    **Okay. Did you ever meet with any of the**
5  **people above you, Mr.Ramsden, Mr. Paige, or anyone**
6  **else, such as Mr. Willis or Ms. Leonard, before you**
7  **had these regular meetings, once a month meetings,**
8  **in the cafeteria?**
9    A    Mary Leonard would attend the meetings.
10   Q    **Okay. Anyone else from the human --**
11        MR. WELSH: I think the question was: Did
12 you meet with them before?
13        MR. ROACH: That's right.
14   Q    **Did you meet with them before?**
15   A    It wasn't typical that we would, so the
16 answer would be, no.
17   Q    **Okay. Who else, other than Mary Leonard,**
18 **would meet to talk to the employees?**
19        MR. WELSH: Objection.
20   Q    **In these once-a-month meetings in the**
21 **cafeteria?**
22   A    My organization; that would be it.
23   Q    **Okay. Would that be Mr. Maddox and Lyn**
24 **Levesque, as well as you?**

67

1  specific questions, about human resource related
2  issues, policies, benefits, that kind of thing.
3    Q    **Okay. Is that because in these meetings,**
4  **talking about performance, solving problems, and so**
5  **forth, questions would come up from people from**
6  **time-to-time about benefits and employment issues?**
7    A    We had a question and answer period at the
8  end of every session, and some of the questions
9  would be focused around those questions, yes. Some
10 of the questions would be focused around those
11 subjects.
12   Q    **Do you ever remember severance coming up,**
13 **any questions about severance coming up, in any of**
14 **these meetings?**
15   A    No.
16   Q    **When do you recall the first time you**
17 **learned that the board shop, maybe, was perhaps**
18 **going to be sold, that Bayer was thinking about**
19 **selling the board shop?**
20   A    I don't remember the exact time frame. I
21 just remember that it was -- it was focused around
22 the need for some investment in capital equipment,
23 so myself and Vinnie Fiorilla identified that we
24 needed to upgrade our equipment in order to remain

69

18 (Pages 66 to 69)

Normand Fontaine

**Page 74**

1    Q   Okay. Can you tell me what you said when
2    you found out that the board shop was going to be
3    sold by Bayer?
4        A   I had nothing to say. I recognized that
5    the decision was always hanging on the horizon. And
6    it would be a business -- because we were very
7    vertically integrated. It was a business that was
8    always being checked to see if it was part of our
9    core competency. Up to that point, we had been able
10   as a business to convince ourselves it was a core
11   competency.
12       Q   Core competency, is that what you're
13   saying?
14       A   Yes.
15       Q   Okay. And what does that mean, "core
16   competency"?
17       A   It means that we have the technical skill,
18   and we can provide added value to the process better
19   than anyone else would do it.
20       Q   Now, you said, "you knew it was on the
21   horizon." Before this March meeting in 1998, when
22   is the first time you heard that it might be a
23   possibility that the board shop could be sold?
24       A   The first time I heard that was even a

**Page 75**

1    possibility was at that meeting.
2        Q   Oh, okay.
3        A   Before that, it was always a question of,
4    "Are we competitive?" And as a manager, my
5    responsibility was to do the surveys, do the quotes,
6    compare our processes to other people's processes,
7    and to provide the details as to whether or not we
8    were competitive.
9        Q   And when you say, "other people," you are
10   talking about other companies who are competitors?
11       A   Yes.
12       Q   Okay. What was said at the meeting about
13   the board shop being sold in March of 1998?
14       A   "We were outsourcing the business." Were
15   the key phrases that were used. So we were
16   outsourcing the business, and that we had to find
17   companies that would be able to take this business.
18   And at the time, it was a very general statement.
19   The intent was to sell off part-by-part of it, if
20   necessary, but Michael did say that in the best
21   of -- the best thing for us and the employees would
22   be to find the "White Knight." And he described the
23   "White Knight" as someone who would take the
24   employees at their current salaries.

**Page 76**

1    Q   And that's the "White Knight" that you
2    talked about earlier in this deposition?
3        A   Yes. So they would take the board shop as
4    a whole.
5        Q   Were there any "White Knights," or
6    companies that were discussed at that meeting as
7    possible people, or companies, that would perhaps
8    purchase the board shop?
9        A   No. As a matter of fact, that's why I
10   made the original statement that it seemed like it
11   may be the first time it was being discussed in
12   detail, because we put together a process for
13   identifying who the companies were that we wanted to
14   approach, and we segmented those companies.
15   Actually, what we did was we went into the -- I'm
16   not sure what it's called, the government has four
17   digits that they use to identify which business
18   segment you are in, whatever that terminology is, we
19   went to identify all of the print circuit board
20   companies that were in that category. We took that
21   list, and we broke it up into, I believe, four or
22   six manageable groups. "Manageable" meaning that
23   there was 20 in each group as opposed to 100. And
24   each one of us took a segment and went off and made

**Page 77**

1    phone calls.
2        Q   Okay. And who made the phone calls to
3    EFTC, if you know?
4        A   I did.
5        Q   Okay. And who did you call from EFTC?
6        A   I went into the register that we had
7    pulled the segmented business from, and they had
8    names and numbers on it. I don't remember the
9    person's name. It was a salesperson.
10       Q   Tye Griffin?
11       A   Yes. Thank you.
12       Q   Is that right?
13       A   Yes.
14       Q   Okay. And what did you say to Mr. Griffin
15   and what did he say to you?
16       A   I explained what we were trying to do.
17   Where we were in the process relative to finding
18   somebody to do this. The time frames we were
19   looking to do it in. I told him the approximate
20   size of our business, because that was one of the
21   decisions we made, based on volume and dollars,
22   which kind of company did we think would best suit
23   our needs, so we picked mid-range, I guess, is the
24   best way to put it. There were some very large

20 (Pages 74 to 77)

Normand Fontaine

1  contract manufacturers; there were mid-range
2  contract manufacturers; and there were pro-type
3  shops. And when you think of them in that segment,
4  we were going after mid-range. The EFTC fell within
5  that category, amongst many, many others.
6      Q  Do you know if any proposals were
7  submitted to Bayer from companies other than EFTC
8  regarding the sale of the board shop, written
9  proposals?
10     A  I don't know.
11     Q  Did you see any proposals from companies
12  other than the EFTC?
13     A  I did not.
14     Q  I'm going to show you what has been marked
15  as Exhibit 9 in the deposition of Mr. Calderon.
16     A  Sure.
17     Q  Do you recognize that document, please?
18  (Passing document) I'm sorry, it's Exhibit 5 of
19  Mr. Calderon. Do you recognize that document?
20     A  (Looking at Exhibit 5) I don't believe I
21  have ever seen it.
22     Q  I'm sorry?
23     A  I don't believe I have ever seen it.
24     Q  And notice on the second page in, there is

78

1  responsibilities change?
2      A  I don't recall whether they -- there was
3  nothing specific that changed on it.
4      Q  Did you have any role, after the board
5  shop was sold, in managing the board shop employees
6  in any way?
7      A  No.
8      Q  Who managed the board shop employees after
9  it was sold to the EFTC, if you know?
10     A  I believe it was Earle Christensen.
11     Q  Okay. And he used to be with Bayer?
12     A  At one time, yes.
13     Q  Okay. Did he go as part of this sale to
14  EFTC?
15     A  I believe so.
16     Q  Did he receive severance?
17     A  I don't know the details.
18     Q  Was he still located right there at 80
19  Industrial Way after he switched over to the EFTC?
20     A  Yes.
21         MR. ROACH: Okay. John, I think that is
22  one personnel file that I would like to see, is
23  Earle Christensen, in terms of whether he
24  received severance.

80

1  a letter dated, April 20, I believe, 1998 from Mr.
2  Griffin to Mr. Ramsden. Do you see that?
3      A  Yes.
4      Q  Did it ever come to your attention that
5  Mr. Griffin had sent a proposal to Mr. Ramsden?
6      A  No.
7      Q  Okay. Did you ever see anything in
8  writing at all from EFTC, other than what we have
9  marked as Exhibit 5 of Mr. Calderon's deposition?
10     A  Not that I can remember. My
11  responsibilities quickly switched, once we
12  identified who -- quickly switched to the details of
13  managing the inventory, the asset transfers, and
14  those types of things, so I don't remember ever
15  seeing anything from the EFTC.
16     Q  After the board shop was sold to EFTC in
17  1998, did your job position change that year?
18     A  Where was I that year?
19     Q  Or soon thereafter.
20     A  My title changed to director of
21  operations. So it went from plant manager to
22  director, but I'm not sure what the time frame was
23  relative to the sale of this business.
24     Q  Okay. And did your job position

79

1         MR. WELSH: Okay.
2      Q  What about Don Baribeau, did he go to
3  EFTC?
4      A  Yes.
5      Q  Okay. What was his job with EFTC?
6      A  The best way to describe his position
7  would be, general manager of the Wilmington site.
8      Q  Of the board shop?
9      A  Yes.
10     Q  Okay. Do you know if he received
11  severance when he left?
12     A  I do not know.
13         MR. ROACH: Okay. Again, John, that's
14  somebody's whose personnel file I would like to
15  see with respect to whether either of those
16  individuals received severance.
17         MR. WELSH: Okay. I will look at it.
18         MR. ROACH: Thank you.
19     Q  Do you recall talking to Mr. Griffin about
20  the employees of the board shop in the initial
21  conversation?
22     A  In the initial conversation, what we
23  talked about was the size of the business, time
24  frames, what we were trying to accomplish. And what

81

21 (Pages 78 to 81)

Normand Fontaine

10/11/2006

1  Tye said, sometime during the conversation was, "We
2  have done this before, and we've, actually, got in
3  and moved -- gone into your plant and taken it over
4  in your facility, and taken the employees with it."
5  And my response to him was, "I will pass that
6  message on to Michael Paige, and give me a phone
7  number to have him call you if that's what he was
8  interested in doing." Because we still had -- we
9  were talking about, potentially, 20 possible
10  suppliers that I had to call. So I had to make my
11  40-minute speech to get it through employee minutes
12  and move to the next one, so that's what I did. So
13  when I finished that conversation, I passed that
14  detail on to Michael Paige and to Dick Ramsden.
15      Q   When EFTC said, "They had gone into a
16  plant and taken it over with the employees," did
17  that mean a Bayer plant, or some other company?
18      A   Some other company.
19      Q   Did you discuss with Griffin anything
20  about payment of severance, or did he bring it up?
21      A   No.
22      Q   Did you talk about pay for the employees
23  in that conversation?
24      A   No.

82

1      Q   When is the next time you spoke to Mr.
2  Griffin, if you remember?
3      A   It would be the following time that they
4  came into the plant to meet with us and see what we
5  were talking about relative to seeing the business,
6  seeing what it looked like.
7      Q   Okay. Now, I just want to finish up on
8  that initial meeting in March when you found out
9  from Mr. Paige that the board shop was going to be
10  closed?
11      A   Yes.
12      Q   Can you tell me whether anything was said
13  about severance in that meeting?
14      A   No.
15      Q   Was there anything said about selling the
16  equipment along with the employees to make the deal
17  work?
18      A   No.
19          MR. WELSH: Objection.
20      A   It was one of -- the White Knight concept
21  was discussed, but that was it, in general. So we
22  had no specific direction at the time.
23      Q   Okay. Other than what you have just
24  testified earlier about the White Knight --

83

1      A   The White Knight.
2      Q   -- the employees having their expertise
3  and the assets together would make it a -- perhaps,
4  a feasible shop to sell to someone; is that correct?
5      A   Yes. I think the whole concept around the
6  White Knight was that everybody wins in that
7  situation.
8      Q   A "win-win"?
9      A   Yeah.
10      Q   Is that a yes?
11      A   Yes.
12      Q   Is that how it was communicated to the
13  employees at the board shop later, a "win-win"
14  situation?
15      A   I don't remember. I don't remember those
16  details.
17      Q   How did the employees win? How was it --
18  strike that.
19          MR. WELSH: Objection. Asked and
20      answered.
21          MR. ROACH: He answered in general. I
22      have a few more questions about it, if I may.
23      Q   With respect to the, "everybody wins,"
24  what, specifically, was said about the employees and

84

1  how they would win?
2      A   In the ideal situation, the White Knight
3  situation, we talked about the fact that they would
4  have jobs. They would not have to go out into the
5  labor market. I don't remember at the time if the
6  labor market was poor, or good, or wonderful, or
7  whatever the case may be. We knew that their salary
8  was relatively high compared to the industry. We
9  knew that through multiple surveys that we had done
10  in looking at a competitive position.
11      Q   Was there any discussion about some of the
12  employees being disabled or having limitations in
13  ability to find a job?
14      A   No.
15      Q   Okay. Can you tell me whether there was
16  any -- Have you now told me everything you recall
17  about what was said in that meeting, about the
18  employees and the sale of the board shop, in that
19  meeting in March?
20          MR. WELSH: This is the meeting with
21      Mr. Paige's group?
22          MR. ROACH: Right.
23      A   Yes, right now that's what I can remember,
24  yes.

85

22 (Pages 82 to 85)

Normand Fontaine

1 conversations that you had with any of them?
2    A    No.
3    Q    Did any of them ever ask you about whether
4 they were going to get paid severance?
5    A    No.
6    Q    Okay.  Do you remember talking to any of
7 them at any time other than in August of '98?
8        MR. WELSH:  Up to the present?
9        MR. ROACH:  Yes, sure.
10   Q    Up to the present?
11   A    No.
12   Q    Did you tell Diana Glassett that she had
13 no choice, that she had to go to EFTC or she would
14 be fired?
15   A    I don't remember any conversation with
16 Diana about that subject, no.
17   Q    Did you tell her, then, a minimum number
18 of board shop employees had to go, to make the sale
19 work?
20   A    No.
21   Q    What about with Mr. Fiorilla, did you tell
22 him, in any conversation that you had with him at
23 any time, let's focus on the summer of 1998,
24 specifically, but at any time that he --

102

1    A    No.
2    Q    Did you talk to any of them at any time
3 about the sale and what was going to happen to them
4 in 1998 before the sale?
5    A    Before the sale?
6    Q    Yes.
7    A    No.
8    Q    Did you talk to any of them after the sale
9 in 1998 about the sale and what happened to them and
10 their benefits, and their salaries, and so forth?
11   A    Not specifically about those subjects.
12   Q    Did you talk to them about anything?
13   A    I listened mostly.  After the announcement
14 was made, there were comments, and conversations,
15 general conversations, as you walk the floor, and
16 part of my responsibility is to listen to them.
17   Q    Okay.  Was this after the meetings took
18 place?
19   A    Yes.
20   Q    Okay.  So your job was to listen to them,
21 and do what?
22   A    And if they had any specific questions,
23 focus them towards the people who could answer those
24 questions.

104

1        MR. WELSH:  Wait a second, what's the
2 question?
3        MR. ROACH:  Okay.  Let's start over.
4        MR. WELSH:  Because you are focusing on a
5 date and then you say "anytime."  I just want
6 it to be clear.
7        MR. ROACH:  Okay.
8    Q    Did you tell Mr. Fiorilla any time in 1998
9 that he couldn't stay with Bayer, that he had to go
10 with EFTC, that he had no choice?
11   A    I don't remember any conversation with
12 Vinnie about that, no.
13   Q    Did you tell him it was a "win-win"
14 situation?
15   A    I don't remember having that conversation
16 with Vinnie.
17   Q    Okay.  How about Teresa Ornelas, did you
18 tell her anything about severance, that she wouldn't
19 get severance, she had to go to EFTC?
20   A    No.
21   Q    Did you talk to anybody in 1998 before the
22 board shop was sold, anybody that is listed on
23 Exhibit 43, the board shop employees, that they had
24 to go to EFTC, they had no choice?

103

1    Q    And who were the people who could answer
2 the questions?
3    A    It would be EFTC, if it was about the
4 future business.  It would be Mary Leonard, if it
5 was about the current business.
6    Q    When you say, "current business," what do
7 you mean?
8    A    Where we were at today at the time.  So at
9 the time it would be, you know, if they had any
10 questions about performance appraisals, "I have one
11 due next week, will I still get it?"  Those types of
12 things would be focused towards Mary.
13   Q    Okay.  What about severance?
14   A    If it was a benefit that was being
15 provided by EFTC, we'd focus them towards EFTC.
16   Q    Okay.  What if it was about whether they
17 would get severance when they went to EFTC from
18 Bayer, would they get -- in other words, would they
19 be paid severance by Bayer if they went to EFTC, or
20 if they didn't go to EFTC?
21   A    We would turn them to Mary.
22   Q    Were there questions posed to you from any
23 of the individuals on Exhibit 43, the board shop
24 employees, about whether they were going to get

105

27 (Pages 102 to 105)

Normand Fontaine

10/11/2006

1  severance?
2    A   I don't remember any specifics of the
3  conversations we had, so the answer would be, no.
4    Q   Okay.  Do you remember in general whether
5  any questions about severance were ever posed to you
6  on an individual basis by any of the employees, the
7  board shop employees?
8    A   No.
9    Q   You don't remember any question about
10 severance?
11   A   Right.
12   Q   Do you remember anybody asking you what
13 would happen if they didn't go to EFTC?
14   A   No, I don't remember any questions around
15 that.
16   Q   Did you ever have any questions from any
17 of the board shop employees as to whether they had a
18 choice not to go to EFTC?
19   A   I don't remember any questions or
20 conversations about whether they had a choice.
21   Q   Okay.  Other than questions about
22 performance appraisals for which you referred them
23 to Mary Leonard, can you remember any other
24 categories that any of the employees had, the board

106

1  shop employees had of you?
2    MR. WELSH:  Objection.  I believe the
3  witness used that as an example, but I don't
4  believe he testified that he did, in fact.
5    MR. ROACH:  Oh, all right.  Let me
6  clarify.
7    Q   You used as an example, performance
8  appraisals, or performance reviews, this was before
9  the sale to EFTC?
10   A   This was not before the sale to the EFTC.
11 The conversation about EFTC and what was happening,
12 and whether we focused them towards Mary or EFTC
13 happened after they were told that the business was
14 being sold, so it would be after the meeting.
15   Q   Yes.  Okay.  When was the meeting, in July
16 of '98?
17   A   Yes.
18   Q   Okay.  Now, this was a group meeting, it
19 was held in the cafeteria?
20   A   Yes.
21   Q   Okay.  And that is at 80 Industrial Way?
22   A   Yes.
23   Q   So after the meeting, is it fair to say
24 that the board shop employees that we have

107

1  identified in Exhibit 43, came up to you either that
2  day or later before the actual sale took place and
3  asked you questions?
4    A   There were not a lot of questions.  I
5  think there was a shock factor after the meeting.  I
6  don't think, for the most part, there were a lot of
7  questions.  I don't remember a lot of questions.  I
8  remember people walking out and staying grouped
9  together and talking amongst themselves.  At the
10 meeting, I recall that if there were any questions,
11 specific, they were to see Mary.  And this was still
12 under development, so there were a lot of questions
13 that hadn't been answered yet, and we would not be
14 able to answer.  There were also scheduled at that
15 meeting regular meetings with the employees with
16 Dick Ramsden and Mary Leonard to keep them updated
17 as to what is going on and when it's happening.  So
18 I think that when people, at least, when I walked
19 out of the cafeteria that day, I knew that there
20 were a lot of unanswered questions.  And it didn't
21 make sense for me to ask any.  As a general
22 employee, I wouldn't say, "Okay.  The answer I'm
23 going to get is" -- we haven't talked about that
24 yet, we haven't worked out the details of that yet."

108

1  So that was my sense.  And I think the employees,
2  based on the conversations that were going on, felt
3  the same way.
4    Q   Okay.  What were some of the unanswered
5  questions?
6    A   I don't know what they were.  But my point
7  is that they were told "there were many details that
8  haven't been worked out yet."  So there would still
9  be a lot of unanswered questions that we couldn't
10 answer, and Dick Ramsden couldn't answer, and Mary
11 Leonard couldn't answer.  So we gave them the time
12 frame of what was happening, we set up regular
13 meetings with them.  As we developed answers, or
14 details to the transfer, and how people were
15 impacted, we would provide those details to them.
16 So that was -- the scope of the first meeting was
17 selling the business to EFTC, in this time frame we
18 are looking at.
19   Q   Okay.  So after that first meeting -- I
20 guess, I'm just trying to probe your memory here, as
21 best as I can, and as best as you can recall, do you
22 remember having -- strike that.  After that meeting
23 in July, that you just testified to where it was
24 announced that the sale of the board shop would be

109

28 (Pages 106 to 109)

Normand Fontaine

1  made to the EFTC, can you recall from that point to
2  the time of the sale to EFTC anybody coming up to
3  you and making any comments about it?
4      A   Nothing specific.
5      Q   Can you remember anything, in general,
6  that was said to you?
7      A   I had conversations with employees every
8  day about various parts of the business, so the
9  conversation I would have with an employee would be
10  about part numbers, about products, about -- this is
11  very difficult to separate those two in my head.  I
12  don't have a clear picture as to what conversations
13  I had with whom, and whether it was about the EFTC
14  sale, or it was about something else.
15     Q   Okay.  That's what I'm trying to focus on.
16  I'm not asking you about comments they made to you
17  about ongoing business and parts and doing the
18  regular job.  I'm talking to you about the sale to
19  the EFTC?
20     A   I don't have any specific memories about
21  the conversation with employees about the sale to
22  the EFTC.
23     Q   Okay.  Do you remember any comments being
24  made by any employees?

110

1      A   No.
2      Q   Because, I believe, you said you can't
3  remember any questions being asked, but you do
4  remember hearing -- that your job was to listen to
5  comments and then refer them to Mary Leonard,
6  correct?
7      A   Yes.
8      Q   Okay.  Do you remember referring anybody
9  to Mary Leonard?
10     A   No.
11     Q   So it's your testimony that from July,
12  when they had the meeting to announce to the board
13  shop employees that the sale would take place of the
14  board shop, until the sale took place, you can't
15  remember any questions, or any comments, by any
16  employees to you individually; is that correct?
17     A   No, that is correct.
18     Q   Is it fair to say that people did come up
19  to you with comments and questions, however,
20  individually?
21     A   I don't have any recollection of it.  It
22  was a long time ago.
23     Q   Okay.  Let's go back to where we were
24  going through the meetings that Mr. Fontaine had

111

1  with his staff?
2          MR. WELSH:  He is Mr. Fontaine.
3          MR. ROACH:  I'm sorry.
4      Q   Mr. Paige.  We were going through the
5  meetings that Mr. Paige had with his staff that you
6  have identified.  We have now identified two.  When
7  was the next meeting of Mr. Paige and his staff that
8  you can recall having, if any, after the second one
9  that you have testified to?
10     A   I attended a once a month, approximately,
11  a meeting with Michael's staff to do updates with,
12  "Where are we with the transfer?  What else has to
13  happen?  Who is responsible for it?"  Those types of
14  details.
15     Q   Okay.  We have talked about the March
16  meeting already, when you first found out, correct?
17         MR. WELSH:  Well, he said his best
18  estimation was March, but he wasn't sure.
19         MR. ROACH:  Okay.
20     Q   Assuming it was March, the next meeting
21  would have been sometime in April, I assume; is that
22  correct?
23     A   That would be correct.
24     Q   And did you already talk about that

112

1  meeting in terms of what you remember was being
2  said, or not said, at that meeting?
3      A   Yes.  I believe my comment was that it was
4  all details about what we have to do next, and where
5  are we in the process.
6      Q   Okay.  And you have already told me
7  everything that you can recall about that; is that
8  right?
9      A   Yes, I have.
10     Q   Okay.  What about the next meeting, which
11  would have, presumably, been in May of '98, what
12  happened at that meeting?
13         MR. WELSH:  This is a meeting between that
14  he attended with Mr. Paige's staff; is that
15  right?
16         MR. ROACH:  Correct.  The regular monthly
17  meetings that he's already identified.  I want
18  to go through each of them.
19         MR. WELSH:  Well, no.  You are blending
20  things here, and that's why I'm asking for
21  clarity.
22         MR. ROACH:  All right.
23         MR. WELSH:  He talked about regular
24  meetings.  There were meetings with the staff.

113

29 (Pages 110 to 113)

Normand Fontaine                                                    10/11/2006

1   document?
2       MR. ROACH:  Let's go off the record for a
3   second.
4               (Discussion off the record)
5       Q   I would like to show you a document that's
6   been marked as Ramsden Exhibit 28, and ask you, is
7   that the type of form that went to people when they
8   received severance that you were talking about
9   earlier?  (Passing document)
10      A   (Reading document) Yes.
11      Q   Okay.  And how was it that you came to be
12  involved with, for lack of a better term, the
13  payment of severance in these letters, such as
14  Ramsden Exhibit 28, going to people?
15      A   In many occasions, I had to sit down with
16  them and lay them off.
17      Q   Okay.
18      A   So I would gather, I would have all of the
19  packages, and have to review them with each
20  employee.  In other cases, I would give those
21  packages to the supervisor or manager and review
22  with the supervisor or manager what they needed to
23  do for the next step and when they needed to do it.
24      Q   Okay.  And would Vinnie Fiorilla be one of
                                                    130

1   those supervisors or managers?
2       A   Yes, he would be.
3       Q   Okay.  Do you remember, before the sale of
4   the board shop took place in 1998, do you remember
5   laying off anybody in the board shop and giving them
6   such a letter, such as Exhibit 28, Ramsden Exhibit
7   28, and providing them with severance?
8       A   I don't remember specifically doing it
9   with the board shop, no.
10      Q   Okay.  Do you remember whether you did it
11  at all?
12      A   I believe I did.
13      Q   Okay.  Do you remember, roughly, how many
14  people from the board shop you would have given
15  severance, or provide a package for severance, in
16  laying them off?
17      A   I don't.  I really don't know.
18      Q   Okay.  Do you recall a process, or a
19  practice within Bayer, called sort of an
20  "involuntary layoff," where people could volunteer
21  to be laid off and receive severance?
22      MR. WELSH:  Objection.  Do you want to
23  restate the question?  You asked him about
24  involuntary layoff.
                                                    131

1       MR. ROACH:  Oh, okay.  Thank you.  That's
2   one time I don't mind you interrupting.
3       MR. WELSH:  Well, every so often you are
4   civil.
5       MR. ROACH:  Off the record.
6               (Discussion off the record)
7       Q   Okay.  Can you recall any kind of
8   practice, or process, or procedure, within Bayer
9   during the time you were there where people could
10  volunteer for a layoff and receive severance?
11      A   Yes.
12      Q   Okay.  How did that work?
13      A   As we approached the time of the layoff,
14  basically, we went through our business plan.  It
15  says that we need to reduce our head count, because
16  we don't have work for the employees.  We would look
17  at approximate numbers of how many people, and then
18  we would ask the question: "Are we going to accept
19  volunteers for this, for purposes of this layoff?"
20  We would ask ourselves the question.  And if the
21  answer was "yes," we would look on file for those
22  employees who have already volunteered independent
23  of the layoffs, so basically --
24      Q   People who had been what?
                                                    132

1       A   Had already volunteered independent.  So
2   they weren't looking for the event.  They just
3   wanted us to know that if there was ever a layoff
4   they would be willing to volunteer for it.
5       Q   How often did you see people taking
6   voluntary layoffs and being paid severance?
7       A   It's hard for me to quantify that.  I
8   don't know.  I just know what the process was.
9       Q   How was it communicated to employees?
10  Now, I'm just talking about the AGFA division,
11  that's the only place you worked when you were with
12  Bayer, is that correct, in the AGFA division up in
13  Wilmington?
14      MR. WELSH:  Well, just so the record is
15  clear.
16      Q   While you were in Haverhill, I know, for a
17  while that --
18      MR. WELSH:  If you want to say, the AGFA
19  division focused on the Wilmington business
20  unit, that might be accurate.  There are other
21  parts to AGFA division in New Jersey, and et
22  cetera, which are different.
23      MR. ROACH:  Okay.
24      Q   When you were with the Wilmington business
                                                    133

34 (Pages 130 to 133)

1    Q   And you think your first supervisor was
2  Mr. Costa, you said?
3    A   Yes.
4    Q   Now, was this the first person you laid
5  off, was that somebody that was participating in the
6  voluntary layoff program?
7    A   I don't remember.
8    Q   What did Mr. Costa tell you about the
9  voluntary layoff program?
10    A   Actually, he told me nothing. I think at
11  some point during the process of laying off
12  an employee, he said, "Don't be nervous. I
13  volunteered."
14    Q   An employee said, "Don't be nervous. I
15  volunteered"?
16    A   Yes.
17    Q   When did you first hear that?
18    A   That's my recollection of it. It's,
19  basically -- I didn't know, because I wasn't part of
20  the selection process initially.
21    Q   I see.
22    A   I didn't know how the selection process
23  was done. I assumed everyone that I was talking to
24  was as surprised as I was.
                                                    138

1    Q   Okay. So sometime in the early 1990's,
2  when you were lying someone off, someone told you,
3  "Don't be nervous. I've volunteered for the
4  layoff." Is that right?
5    A   Yes.
6    Q   And they got severance?
7    A   Yes.
8    Q   Okay. How many people can you remember
9  laying off, total, with the voluntary severance, if
10  you remember?
11    A   I have no idea.
12    Q   Can you give me a rough estimate?
13    A   I really can't. I don't know how many
14  people were laid off. I wouldn't be able to tell
15  you how many people volunteered.
16    Q   25? More than 25?
17    A   I would have to be able to bounce that
18  against how many people were laid off. I really
19  don't have an idea. I don't -- I have never tracked
20  the number. I never counted.
21    Q   How often did you lay someone off under
22  the voluntary program, if you remember?
23    MR. WELSH:  Objection.
24    A   I don't know.
                                                    139

1    Q   How was it communicated to employees that
2  they could volunteer for a layoff and receive
3  severance?
4    A   I believe it was grassroots. We never had
5  a meeting that I was ever involved in where we
6  talked to employees about what their options were,
7  but if an employee approached me and asked me, "What
8  was the process to volunteer?" I told them, "Go see
9  human resources."
10    Q   "Go see human resources"?
11    A   Right, yes.
12    Q   Okay. And when you say, "it was
13  grassroots," what did you mean by that?
14    A   It means that the word was passed around
15  to most of the employees that you could do this. So
16  those who were not familiar on how to do it, would
17  ask the question, "How do I do this?" And I had no
18  process to go through, so I forwarded them to human
19  resources.
20    Q   So your understanding is that people, if
21  they wished to find out about it, would go to human
22  resources, and then their name would go on a list,
23  and then if there was going to be a reduction in
24  force, those names would come up as possible people
                                                    140

1  who volunteered for the severance and the layoff?
2    MR. WELSH:  Objection. You may answer.
3    A   The details -- as I matured in the
4  positions along the way, I started to understand
5  more of what the process was. The process -- as I
6  matured through the process, as I got started was --
7    Q   That's what I want. What was the process?
8    A   The process was that they would go see
9  human resources. They would file a formal letter
10  that if they chose to -- if there was ever a layoff,
11  they would be willing to volunteer for it. And
12  human resources would tell them at that time that
13  "This is no guarantee that you would get laid off,
14  because of your position, or for other reasons we
15  may not be able to do this."
16    Q   Okay. And what did the formal letter say
17  that the employee who wished to volunteer provided
18  to human resources?
19    A   It said exactly that. "If there is ever a
20  layoff, I wish to volunteer to be considered as
21  being laid off."
22    Q   To get severance; is that right?
23    A   The letter, itself, I don't know if it
24  said that, but, basically, what they said was, we
                                                    141

36 (Pages 138 to 141)

1    A    At this point in time, I think the
2    employees expected the meeting to happen, so there
3    wasn't a lot of communication about when the meeting
4    was going to happen.
5    Q    Okay.  What did Mr. Ramsden say at this
6    next meeting?
7    A    I don't remember the details.
8    Q    Do you remember in general what he said?
9    A    It was more about what we have
10   accomplished since the last meeting.  Answers to
11   some questions the employees may have had.  How we
12   are doing relative to transferring the print circuit
13   board shop to the plan.
14   Q    To the where?
15   A    To the plan, to the original plan.  So if
16   he talked, "It was going to happen at the end of
17   September," then, "How are we progressing towards
18   that?"  So he was -- he told the employees
19   where we were relative to the transfer.
20   Q    Okay.  And meaning, where you were in
21   terms of how close the sale was about to take place?
22   A    Yes.  And how many more details needed to
23   be worked out, and those types of things.
24   Q    Can you remember any specific details that
                                                       178

1    he communicated to them that had to be worked out?
2    A    No.
3    Q    Did you say anything at the meetings?
4    A    No.
5    Q    Did you answer any questions at any of
6    these first three meetings?
7    A    No.
8    Q    How was the cafeteria set up for these
9    meetings?  Was there a platform that you and Mr.
10   Ramsden and the management people would stand up on
11   that would be a little higher than where everybody
12   sat, or was it all on the same floor?
13   A    The same floor.
14   Q    Were any of these meetings posted on the
15   bulletin board?
16   A    I don't believe we did, no.
17   Q    Before I forget it, on the voluntary
18   layoff procedure that we spoke about earlier, were
19   any impending layoffs announced on bulletin boards,
20   or was it all word of mouth?
21   A    There was never an impending layoff
22   announced.  It was all kept quiet until the actual
23   date that it happened.
24   Q    Okay.  So in other words, if somebody
                                                       179

1    submitted the form you mentioned, saying they were
2    interested in participating, then at that some point
3    if somebody had to be laid off, if they were looking
4    to reduce personnel, they would then go to one or
5    more of those individuals?
6         MR. WELSH:  Objection.
7    Q    And Bayer would then tell them they were
8    eligible if they wished to participate, is that how
9    it happened?
10        MR. WELSH:  Objection.
11   A    No.
12   Q    How did it happen?
13        MR. WELSH:  Objection.
14   A    At any time during the course of any day,
15   any day of the month, any month of the year, an
16   employee would put their name in if they wished to
17   volunteer for a layoff if there ever was one, that's
18   how they would do it.  So either their name was on
19   the file or it wasn't on the file at the time it
20   happened.
21   Q    So Bayer had a pool of names and they
22   would chose from those names if they wanted to
23   reduce personnel, reduce force, and then they would
24   inform the people who had put their names in that
                                                       180

1    they were now selected for the layoff and the
2    severance; is that right?
3         MR. WELSH:  Objection.
4    A    Consideration towards the layoff was,
5    basically, we worked with head counts.  We needed to
6    get X amount of people because of the costs involved
7    with that.  We would then select names, some of them
8    would be volunteers, many of them would not be, but
9    not all of the volunteers were chosen.
10   Q    Now, other people who were chosen to be
11   laid off that had not volunteered, would they be
12   paid severance?
13   A    Yes.
14   Q    Do you know of anyone who left, other than
15   Mr. Christensen and Mr. Baribeau, or yourself, do
16   you know of anybody who left Bayer and received
17   severance when they had another job waiting for
18   them?
19        MR. WELSH:  Objection.  You may answer.
20   A    Specifically, no.
21   Q    Did anybody that had participated in the
22   voluntary layoff program up until, and we are
23   talking up until the sale of the EFTC, of the board
24   shop to the EFTC, do you know of anybody who was in
                                                       181

46 (Pages 178 to 181)

1    A    I don't know.
2    Q    Okay.  How was it communicated to you that
3    EFTC was going to be present, was this through Mr.
4    Ramsden, again, to you, to Mr. Fiorilla?
5    A    I believe this one was from Mary Leonard
6    to me, to Mr. Fiorilla, to Vinnie.
7    Q    Do you know, from anyone else, discussions
8    with anyone else, or any other way, what happened at
9    the meeting?
10    A    No, I don't.
11    Q    What was the purpose of the meeting, if
12    you know?
13    A    From what I recall it was to introduce the
14    employees, the print circuit board employees, to
15    EFTC as a company, what they do, how they go through
16    this process, this transitional process, what their
17    typical pay rates are, what they are -- how they
18    position themselves against other competitors in the
19    industry.  Information that would be beneficial to
20    the employees going to EFTC, basically.
21    Q    Do you know if the EFTC representatives
22    informed the board shop employees what their salary
23    and benefits were going to be at this meeting?
24    A    I don't know that.  I don't know exactly
                                                                186

1    what went on at the meeting.
2    Q    Where did you get your understanding as to
3    what was stated at the meeting that you just told
4    us?
5    A    From Mary Leonard.
6    Q    Okay.  Did you ever have any discussions
7    with Mary Leonard about severance pay for the board
8    shop employees, whether they were entitled to it or
9    not?
10    A    I don't believe so.  I don't recall any
11    discussion about severance pay, in general, relative
12    to the board shop employees.
13    Q    Did you have any discussions with Mary
14    Leonard about the benefits that they would be
15    receiving at EFTC?
16    A    No.
17    Q    Did you have any discussions with her at
18    all, other than what you have told us about, about
19    the meetings and what was said of the EFTC?
20    A    Discussions we had centered around
21    employees performance appraisals, vacation time as a
22    Bayer employee or an AGFA employee.  If people
23    needed to see her, how to set it up, so that she
24    would be able not to put them on a general waiting
                                                                187

1    list, but to make sure they would have priority to
2    talk with her, and those types of things.
3    Q    Okay.  And these were people who were due
4    vacation, or sick time, or other benefits, before
5    they left?
6    A    Yes.  Or the Bayer policy was, basically,
7    you accumulated your vacation time over a period of
8    time, so, basically, you had, depending on what your
9    length of service was, the first month you have so
10    much time, and the second month you have so much
11    time.  So the question that would come up would be
12    that typically the employee wanted to take two weeks
13    off and they hadn't quite accumulated, so we might
14    let them take two weeks off, because we assumed they
15    were going to be here two more months.  So those
16    types of questions.  "Can they still take their
17    scheduled time off, and what are the issues
18    surrounding that?"
19    Q    Did she have any discussions with you
20    about severance and the demand that the board shop
21    employees may have demanded, or asked for, or
22    inquired, about severance payment?
23    A    No.
24    Q    Did you hear anybody, board shop
                                                                188

1    employees, management, anybody, say that the board
2    shop employees didn't like what was going on, or had
3    any problem with it at all?
4    A    No.  You know, except for the fact that it
5    was a change, a major change, in their life style,
6    my sense was that we felt, we, including the
7    employees of the board shop, felt very good about
8    what was going on.  They didn't have to change
9    location, so they didn't have to drive to a
10    different place to work.  They were doing the same
11    job they'd been doing over the last X years,
12    whatever the case may be.  So my sense was that they
13    felt comfortable with the transition.
14    Q    What is your sense based on?
15    A    The lack of people screaming, hollering,
16    feeling -- pushing questions about:  "Why do I have
17    to do this?"  It just didn't seem to be any of that
18    around.  It just seemed to be -- seemed to be more
19    comfortable than anyone would have expected or
20    anticipated in this major change in the employees
21    life or lifestyle.
22    Q    Did you hear any of them say positive
23    things about it?  Like, "Gee, we are very pleased
24    that this is happening and this is going to be great
                                                                189

48 (Pages 186 to 189)

Normand Fontaine

1    A    No.
2    **Q    No?**
3    A    No.
4    **Q    Why not?**
5    A    Because they were given equivalent
6    positions, which is one of the bases for what we
7    believe severance is, whether there is a position
8    available for you. We ensured that they got the pay
9    rate for a period of time that they were getting at
10   AGFA, so that's what my foundation of belief is, I
11   believe that they didn't warrant severance.
12   **Q    Okay. But what if somebody from the**
13   **voluntary layoff program had gotten a job, even a**
14   **better job, at the time they were laid off from**
15   **Bayer, would they have been entitled to severance?**
16   MR. WELSH: Objection.
17   A    Ask the question again?
18   **Q    What if somebody who had been involved in**
19   **the voluntary layoff program that you described had**
20   **gotten a job that was the same, or even better pay,**
21   **at the time they got their severance from Bayer when**
22   **they were laid off?**
23   MR. WELSH: Objection.
24   **Q    Do you think they would have been entitled**

202

1    A    In my mind, at least from the point of
2    view of the people I do know in the board shop,
3    there were no volunteers prior to the transfer. It
4    wasn't a layoff. It was, basically, a transfer.
5    And they were guaranteed jobs. That's the
6    difference to me.
7    **Q    But they were terminated, right?**
8    A    They were terminated at the time of the
9    transfer, yes.
10   **Q    *And, in fact, they had a choice when they**
11   **were terminated to either accept the job at EFTC or**
12   **stay terminated; is that correct?**
13   MR. WELSH: Objection. Misstates the
14   record.
15   MR. ROACH: I'm just asking him.
16   MR. WELSH: No. You're misstating the
17   record. They all accepted employment at the
18   time of termination. You know, you are
19   misstating the record to the witness. You're
20   quibbling with him about an interpretation of
21   the Plaintiffs. He's not in HR. He's not in
22   the Bayer benefit program. And now you are
23   misstating the record to him. If you are going
24   to state the record to him, state it correctly,

204

1    to severance?
2    A    The people who volunteered for layoffs did
3    so at their own risk. It could have happen at any
4    time at any place, so if they did, that's the luck
5    of the draw. It's not a part of the process, or
6    part of the plan. It's, basically, they were lucky
7    enough to get a job the day of, or the day after, or
8    the day before they got laid off, whatever the case
9    may be.
10   **Q    Okay. But that's not my question. My**
11   **question is: Whether you believe they were entitled**
12   **to it, based on what you just said about the board**
13   **shop employees?**
14   A    If they volunteered for a layoff, and the
15   layoff did occur, and they were chosen, yes, they
16   did deserve the severance. If they volunteered for
17   a layoff, and there was a layoff that did include
18   them, then, yes, they did deserve severance.
19   **Q    Okay. So what would be the difference**
20   **between that group of people and the board shop**
21   **people, in your mind?**
22   MR. WELSH: Objection.
23   **Q    In terms of fairness, in terms of either**
24   **of them were entitled to severance?**

203

1    please.
2    MR. ROACH: I'm going to rephrase my
3    question. I, respectfully, disagree with
4    Mr. Welsh.
5    MR. WELSH: You disagree that all of your
6    Plaintiffs had accepted employment at the time
7    of their termination, is that where you
8    disagree?
9    MR. ROACH: Sir, I'm asking your client
10   questions.
11   MR. WELSH: Yes, well --
12   MR. ROACH: I'm not here to answer yours.
13   MR. WELSH: You are saying you disagree.
14   I'm listening to what you are saying, it
15   doesn't seem to make much sense. And then you
16   disavow with what you say, so I don't what to
17   take.
18   MR. ROACH: Can you go back to my original
19   question, before Mr. Welsh interrupted? Thank
20   you.
21   (Question with * read)
22   **Q    You can answer.**
23   MR. WELSH: Subject to my objection.
24   **Q    Notwithstanding his statement to you,**

205

52 (Pages 202 to 205)

Normand Fontaine

1  where I believe he's trying to suggest an answer to
2  you, but --
3      MR. WELSH:  No.  I'm just trying to make
4    sure you are truthful on the record, Steve.
5    I'm very tired of you misstating the record.
6    Q  You can answer, Mr. Fontaine?
7    A  The employees had a choice between
8  accepting the job at EFTC or not accepting the job
9  at EFTC.
10   Q  Okay.  And if they didn't accept the job
11 at EFTC, they would be terminated and out of a job,
12 right?
13   A  Yes.
14   Q  Okay.  So the only choices they had was to
15 be terminated or to go to EFTC, correct?
16      MR. WELSH:  Objection.
17   A  I believe that is true, yes.
18   Q  And if they had chosen to be terminated,
19 would they have gotten severance, rather than going
20 to EFTC, would they have gotten severance?
21   A  I don't know that answer.
22   Q  You don't know?
23   A  No.
24   Q  Based on your understanding of the Bayer

206

1    Q  The question is:  They had a choice, they
2  could go to EFTC, correct?
3    A  Yes.
4    Q  What was the other option that they faced,
5  if they didn't go to EFTC?
6      MR. WELSH:  Objection.  Asked and
7    answered.
8    Q  Go ahead.  You can answer.
9    A  To not go to EFTC, there was no position
10 for them.
11   Q  So then what would happen to them?
12   A  They would end up quitting or terminating.
13   Q  They would be terminated, right?
14      MR. WELSH:  Objection.
15   A  As far as I can tell, that would be a
16 correct statement.  I don't know what the
17 definition, or the specific definition of terminated
18 is, but they would not have a job, yes.
19   Q  Okay.  So if they did not have a job and
20 were terminated, with your understanding of the
21 Bayer severance plan, would they have been, then,
22 entitled to severance?
23      MR. WELSH:  Objection.
24   Q  Based on your understanding of it?

208

1  severance plan as you understand it from the Summary
2  Plan Description, what is your understanding, would
3  they have been entitled to severance if they had
4  stayed terminated --
5      MR. WELSH:  Objection.
6    Q  -- rather than go to EFTC, chose to be
7  terminated, rather than go to EFTC?
8    A  I don't know.  My interpretation of the
9  plan is that if we laid them off, they would receive
10 severance.  This was not the case, so I have to --
11   Q  Well -- I'm sorry, go ahead.  Please,
12 finish.
13   A  The case was either they transfer to EFTC,
14 that was one of the options they had, or quit.  They
15 could either accept the position at the EFTC or
16 quit.
17   Q  On what basis are you saying they had the
18 choice to either go to EFTC or quit?
19   A  I'm just repeating, I think, what you just
20 said.  They had two choices:  To go to EFTC and
21 accept the position at EFTC, or quit.
22   Q  I don't believe that is what I said.  If I
23 did, that wasn't my question.
24   A  Okay.

207

1    A  I believe the answer is, no, to that.
2    Q  You believe the answer is they would not
3  have been entitled to severance?
4    A  They would not be entitled to severance.
5    Q  Why not?
6    A  Because they were offered an equivalent
7  job.
8    Q  An equivalent job within Bayer, or an
9  equivalent job outside of Bayer?
10   A  An equivalent job.  The way I look at it
11 is it's an equivalent job.  So the equivalent job
12 means that they are being paid the same amount of
13 money.
14   Q  But they were not offered a job within
15 Bayer.  They were offered a job somewhere else,
16 right?
17   A  Yes, that is correct.
18   Q  And they were terminated from Bayer?
19   A  As part of the transfer over to the EFTC,
20 yes.
21   Q  And your understanding, again, is that if
22 they were -- strike that.  Let's get another
23 question.
24   A  Okay.

209

53 (Pages 206 to 209)

Normand Fontaine                                                    10/11/2006

1   this document to Section 3.5, "Transition of Bayer,
2   AGFA Division Employees," do you see that?
3        A   (Looking at document)  Yes.
4        Q   Okay.  Now, in looking at that, it says in
5   the second paragraph -- strike that.  In the first
6   paragraph, it says, "Is the intention of EFTC to
7   extend offers to all current-full-time AGFA
8   employees associated with the CCAs to EFTC's
9   payroll."  Did I read that correctly?
10       A   Yes.
11       Q   And the CCAs, that refers to the circuit
12  -- that is the board shop employees?
13       A   Circuit Card Assemblies, yes.
14       Q   And then it says, "This transfer will
15  allow Bayer, AGFA division to avoid any severance
16  costs and provide EFTC an initially trained work
17  force."  Did I read that correctly?
18       A   Yes, you did.
19       Q   Does that refresh your memory as to
20  whether there was any discussions within Bayer
21  management, or between Bayer and the EFTC, about
22  trying to avoid paying severance by transitioning
23  people from Bayer to EFTC?
24       MR. WELSH:  Objection.  You may answer.
                                                   222

1        A   I am not aware of any discussion of that
2   being the reason why.
3        Q   Do you have any reason why Mr. Griffin
4   would have said that in there?
5        A   I don't know why he would have said that,
6   no.
7        Q   Did you ever hear any discussion that that
8   was one of the goals of Bayer in selling the board
9   shop to EFTC and convincing everybody to go there,
10  so as to avoid having to pay severance?
11       MR. WELSH:  Objection.  Asked and
12  answered.
13       A   No.
14       Q   Did you ever have any understanding as to
15  how much the severance payments would be in total if
16  the board shop employees had to be paid severance?
17       A   No.
18       Q   Okay.  Do you ever remember any discussion
19  with Mr. Paige, Mr. Ramsden, or anybody at Bayer,
20  about how to time the notice to the employees of the
21  sale to the EFTC?
22       A   No.
23       Q   Do you know if Mr. Hurley, Mr. Spencer,
24  Mr. Baribeau, Mr. Costanzo, came to any of the
                                                   223

1   meetings, group meetings, in the cafeteria with the
2   employees?
3        A   I don't remember them being at any of
4   them, no.
5        Q   In looking at Exhibit 3, Ramsden Exhibit
6   3, where would Mr. Hurley be, if anywhere, on that
7   exhibit?
8        A   He would be in the same line as I am.  He
9   would be reporting to Dick Ramsden.
10       Q   Okay.  And where was his office located?
11       A   200 Ballardvale St.
12       Q   Okay.  And what about Mr. Costanzo?
13       A   He would be in the same line as I am, and
14  his location was 200 Ballardvale Street.
15       Q   What about Mr. Spencer?
16       A   He would be at the same level as Dick
17  Ramsden, so he would be reporting directly to
18  Michael, and his office was at -- I'm not really
19  sure if it was at 200 -- we had another facility at
20  35 Congress Street, so I am not sure if he was there
21  at the time or at Ballardvale.
22       Q   Do you know where Mr. Hurley, Mr.
23  Costanzo, and Mr. Spencer are today?
24       A   Let's see.  Costanzo is retired.
                                                   224

1        Q   Do you know where he lives?
2        A   I believe it's in Salisbury.  He had two
3   houses:  One in Salisbury and one in Haverhill, so
4   I'm not sure where he is.
5        Q   What about Mr. Hurley, do you know where
6   he is?
7        A   I have no idea.
8        Q   What about Mr. Spencer, do you know where
9   he is today?
10       A   I have no idea.
11       Q   Were they all with Bayer at the time you
12  left, or AGFA Corporation, I guess, at the time?
13       A   Joe Costanzo retired just before I left.
14  John Hurley was laid off probably a year before I
15  left, maybe a little less than that.
16       Q   Did Mr. Hurley get severance?
17       A   I don't know.
18       Q   When you stated that you received
19  severance, were you terminated?
20       A   I was laid off, so, yes, I was
21  terminated.
22       Q   Okay.  Involuntarily?
23       A   I picked my own date. Does that make it
24  voluntary?
                                                   225

                                    57 (Pages 222 to 225)

Normand Fontaine

1    A    I don't remember any specifics for the
2  contract. To be honest with you, I don't remember.
3    Q    Do you remember whether there was such an
4  arrangement that Bayer would continue to purchase
5  the printed circuit boards from EFTC after the board
6  shop employees went over to EFTC?
7    A    No.
8    Q    Were you involved in that in any way?
9    A    No.
10    Q    Whose area was that, purchasing the
11  printed circuit boards from EFTC?
12    A    It would be, basically, the contract that
13  was negotiated at the time of the sale.
14    Q    No. But who in Bayer management would be
15  responsible for dealing with that, or handling that
16  aspect of it?
17    A    The physical purchasing of it? It would
18  be the purchasing department, John Hurley.
19    Q    Exhibit 14 from Ramsden's deposition, it
20  says at the bottom third, do you see where it says,
21  "Announce 7/13"?
22    A    Yes. That's announce? Okay.
23    Q    Well, assuming that says, "Announce"?
24    A    Okay.

250

1    Q    7/13?
2    A    Yes.
3    Q    Is that about the date when the first
4  meeting was with the employees that you talked about
5  to advise the employees?
6    A    Yes. It was a Wednesday, 7/13. I was on
7  vacation at the Cape and had to come back for that.
8    Q    Okay. So your understanding is that
9  Wednesday, July 13, was the first meeting in the
10  cafeteria where Bayer announced to the employees,
11  the board shop employees, that there was going to be
12  a sale to EFTC of the board shop?
13    A    Yes.
14    Q    Okay. And you are not aware of any
15  meetings, either with individual members of the
16  board shop, or group meetings, where anybody was
17  told that the sale was going to take place; is that
18  correct?
19    A    I'm not aware of any.
20    Q    Okay. Then underneath that it says,
21  "Gives two weeks to work on employees." Assuming it
22  says that -- do you see that?
23    A    "Gives two weeks to work on E's." Yes,
24  it's got an "E."

251

1    Q    "E S," right?
2    A    Yes.
3    Q    Okay. Is it your understanding that that
4  means "employees"?
5    A    I have no idea.
6    Q    Do you remember anybody saying anything
7  about having two weeks to work on the employees to
8  convince them to take the job with the EFTC?
9    A    No.
10    MR. ROACH: Okay. I don't have anything
11  further.
12    MR. WELSH: I have no questions. Thank
13  you.
14    MR. ROACH: Are you sure?
15    MR. WELSH: I'm sure.
16      (Whereupon the deposition
17      concluded at 3:44 p.m.)
18
19
20
21
22
23
24

252

1      C E R T I F I C A T E
2  COMMONWEALTH OF MASSACHUSETTS)
3  SUFFOLK, SS.        )
4    I Ruth Day, Certified Shorthand Reporter and Notary
5  Public in and for the Commonwealth of Massachusetts, do
6  hereby certify that there came before me on the 11th day
7  of October 2006 at 10:00 a.m., the person hereinbefore
8  named, who was previously duly sworn to testify to the
9  truth and nothing but the truth of his knowledge touching
10  and concerning the matters in controversy in this cause;
11  that he was thereupon examined upon his oath, and his
12  examination reduced to typewriting under my direction;
13  and that the deposition is a true record of the testimony
14  given by the witness.
15    I further certify that I am neither attorney nor
16  nor related to or employed by any attorney or counsel
17  employed by the parties hereto or financially interested
18  in the action.
19    In witness whereof, I have hereunto set my hand and
20  affixed my notarial seal this October 24, 2006.
21
22
23        Ruth Day-Rabadjija, CSR
          Notary Public
24        My commission expires 7/6/12

253

64 (Pages 250 to 253)