Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

---

00001

Volume I

Pages 1 to 246

Exhibits 1 - 3

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JOSEPH ATTARDI, et al.,                :

Plaintiffs,              :

vs.                            : Civil Action

: No. 04-10728-REK

BAYER CORPORATION, BAYER  :

CORPORATION SEVERANCE PAY  :

PLAN,                             :

Defendants.               :

DEPOSITION OF JEANNE M. SKENE, a witness

called on behalf of the Defendants, taken pursuant

to the Federal Rules of Civil Procedure, before

Linda A. Walsh, Registered Professional Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Doris O. Wong

Associates, Inc., 50 Franklin Street, Boston,

Massachusetts, on Monday, June 19, 2006, commencing

at 10:01 a.m.

PRESENT:

Roach & Wise, LLP

(by Stephen A. Roach, Esq.)

31 State Street, Boston, MA 02109,

for the Plaintiffs.

Bello, Black & Welsh LLP

(by John F. Welsh, Esq.)

535 Boylston Street, Suite 1102, Boston, MA

02116, for the Defendants.

---

Page 2

[1]                 INDEX
[2]
WITNESS     DIRECT  CROSS  REDIRECT  RECROSS
[3]
[4] JEANNE M. SKENE
[5] BY MR. WELSH        3        227, 243
[6] BY MR. ROACH      213              243
[7]
[8]
[9]
               EXHIBITS
[10]
NO.     DESCRIPTION            PAGE
[11]
1  Document entitled "Plaintiffs'   83
[12]    Answers to Interrogatories"
[13] 2  Document entitled "15096 Skene,  101
       Jeanne Employment"
[14]
3  Document entitled "15096 Skene,  101
[15]    Jeanne Personal"
[16]
[17]
[18]
       Record requested to be marked by
[19]    Mr. Welsh at Page 78, Line 5
[20]
[21]
[22]
[23]
[24]

---

Page 3

[1]                 PROCEEDINGS
[2]     MR. ROACH: This is to confirm that the
[3] attorney for the Plaintiffs in this case and I
[4] personally know Jeanne Skene, and I will attest to
[5] her identification as being the same Jeanne Skene
[6] that is a Plaintiff in this case, as her attorney.
[7]     MR. WELSH: And I'll stipulate to that as
[8] well.
[9]     This is the deposition of Plaintiff Jeanne
[10] Skene in the matter of Joseph Attardi, et al.,
[11] versus Bayer Corporation and Bayer Corporation
[12] Severance Pay Plan.
[13]               JEANNE M. SKENE
[14] a witness called for examination by counsel for the
[15] Defendants, whose identity was attested to by
[16] Stephen A. Roach, Esq., and being first duly sworn
[17] by the Notary Public, was examined and testified as
[18] follows:
[19]             DIRECT EXAMINATION
[20]             BY MR. WELSH:
[21]     Q: Ms. Skene for the record could you state
[22] and spell your full name.
[23]     A: Jeanne M. Skene. Do you want my middle
[24] name, too?

---

Page 4

[1]     Q: Yes, please.
[2]     A: Marie. J-e-a-n-n-e S-k — oh, Marie,
[3] M-a-i-r-e S-k-e-n-e.
[4]     MR. ROACH: Marie, M-a-r-i-e?
[5]     A: Marie, M-a-i-r-e. No. Wait a minute.
[6] That's my last name, my maiden name.
[7]     Q: Okay. Let's try again. Marie?
[8]     A: M-a-r-i-e. Thank you.
[9]     MR. ROACH: You are doing well so far.
[10]     A: That's how they used to make the mistake
[11] with my maiden name. They always put the R before
[12] the I. Go ahead.
[13]     MR. WELSH: Off the record for a second.
[14]     (Discussion off the record)
[15]     MR. WELSH: Back on the record.
[16]     Q: Will you please give me your residential
[17] address?
[18]     A: 6 Faith, F-a-i-t-h, Road in Windham,
[19] W-i-n-d-h-a-m.
[20]     Q: How long have you been at that address?
[21]     A: 21 years.
[22]     Q: Are you currently employed?
[23]     A: Yes, I am.
[24]     Q: By whom?

---

Jeanne M. Skene
Vol. 1, June 19, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 5

[1]   A: Suntron.
[2]   Q: Where is the location of your employment?
[3]   A: 103 or — 103 or 104. 104 Glen Street.
[4]   Q: In what town?
[5]   A: Lawrence, Mass.
[6]   Q: How long have you been working at a Suntron
[7] facility in Lawrence, Mass.?
[8]   A: Five years.
[9]   Q: Prior to that where did you work?
[10]   A: I worked for Bayer-Agfa Division.
[11]   Q: Was there a time — I guess I wasn't clear.
[12] Was there a time that you worked for Suntron or
[13] someone other than — from the time you left Bayer
[14] to the current did you work at a location other than
[15] the Lawrence, Massachusetts, site?
[16]   A: Yes. We worked at 80 Industrial Way as the
[17] EFTC.
[18]   Q: Did EFTC get acquired by Suntron?
[19]   A: They changed their name. It was just a
[20] name change, I believe.
[21]   MR. ROACH: Can we just go off the record
[22] for a moment.
[23]   (Discussion off the record)
[24]   MR. WELSH: I'll go on the record. For

Page 6

[1] purpose of clarity the parties have agreed to use
[2] the same stipulations in this deposition that they
[3] have used in the past depositions; namely, we will
[4] waive all objections, except objections as to form,
[5] until the time of trial.
[6]   MR. ROACH: Reserve rather than waive.
[7]   MR. WELSH: I mean, we will reserve. Thank
[8] you. We will reserve all objections, except
[9] objections as to form, until time of trial. We will
[10] also reserve motions to strike.
[11]   MR. ROACH: That's fine. And I would like
[12] to have her give her 45 days to read and sign.
[13]   MR. WELSH: Okay. Fine.
[14]   MR. ROACH: And she can waive the notary.
[15] I'm sorry. Go ahead.
[16]   MR. WELSH: Okay.
[17]         BY MR. WELSH:
[18]   Q: Now, your understanding is that the name
[19] EFTC simply changed to Suntron?
[20]   A: My understanding is it just changed to
[21] Suntron.
[22]   Q: And did you change locations from 80
[23] Industrial Way at the same time the name changed or
[24] was it before or after?

Page 7

[1]   A: It was shortly after we moved to Glen
[2] Street that they changed the name to Suntron.
[3]   Q: What is your occupation? What do you do
[4] there?
[5]   A: I'm a printed circuit board technician.
[6]   Q: Could you describe for a layperson what a
[7] printed circuit board technician does.
[8]   A: It's a component that is — it's a board
[9] that has a bunch of components on it. And I put it
[10] through a tester, and I make sure that it functions
[11] correctly before I ship it to a customer.
[12]   Q: So you don't assemble the board; you test
[13] it?
[14]   A: Correct.
[15]   Q: Have you — how long have you performed
[16] that function?
[17]   A: As a technician?
[18]   Q: Yes.
[19]   A: About 25 years.
[20]   Q: So when you were working for Bayer is that
[21] the type of job function you had?
[22]   A: Yes.
[23]   Q: When you were working with Bayer were you
[24] first or second shift?

Page 8

[1]   A: In the middle. I was basically 7:00 in the
[2] evening till 11:00 in the morning.
[3]   Q: So you did the night shift?
[4]   A: Yes. Basically I did like a split
[5] shift-type thing.
[6]   Q: Till 11:00 in the morning?
[7]   A: Yes. Isn't that right? Yes. I left at
[8] 7:00. 8, 9, 10, 11, 12, 1, 2. That would be 2:00.
[9] It had to be — it must be 7:00 to 2:00. 7:00 to
[10] 2:00 I worked.
[11]   Q: 7:00 p.m. to 2:00 a.m.?
[12]   A: Yes. Yeah.
[13]   MR. ROACH: Is that a yes?
[14]   A: 3:00. 3:00 would be eight hours.
[15]   Q: 3:00 a.m.?
[16]   A: Right? 7, 8, 9, 10, 11, 12, 1, 2, 3.
[17]   MR. ROACH: That's eight hours.
[18]   A: So you have to add the half hour for lunch,
[19] so that's 3:30. I think I left at 3:00. I think
[20] they paid for our lunch.
[21]   Q: When you were at Bayer you worked
[22] approximately 7:00 at night till 3:00 in the
[23] morning?
[24]   A: Yep.

Page 13

[1] **A:** Yes. I'm sorry.

[2] **Q:** When was that?

[3] **A:** The last one or the prior or any of them?

[4] **Q:** There you go. Any of them.

[5] **A:** We had a meeting sometime in 2001 where we

[6] talked, and that was kind of an informal one. And

[7] then we had another one in, was it, 2004-ish and

[8] then we had another one just not too long ago,

[9] beginning of maybe 2006, right, the beginning of

[10] 2006.

[11] **Q:** At the 2001 meeting was any attorney

[12] present?

[13] **A:** No.

[14] **Q:** What was the purpose of that meeting?

[15] **A:** To decide whether or not we wanted to try

[16] and push to see if we could get a lawyer to do all

[17] of the legwork for us.

[18] **Q:** Did anyone call that meeting? Was anyone

[19] responsible for organizing that meeting?

[20] **A:** I was the one that pushed the whole thing

[21] trying to get people to think about what we were

[22] losing.

[23] **Q:** Where was this meeting in 2001?

[24] **A:** It was an informal talk in the area in

Page 14

[1] where we were, in our work area.

[2] **Q:** So the 2001 was — at that time was it at

[3] Suntron?

[4] **A:** We were still Suntron.

[5] **Q:** You say "still"?

[6] **A:** We were EFTC. Don't confuse yourself.

[7] **Q:** I'll try not. EFTC, and it was at the shop

[8] itself?

[9] **A:** Right. We just — a bunch of us

[10] together — during our break time we got together,

[11] and we were chitchatting about what we were going to

[12] do, do we want to do it, do we don't want to do it.

[13] And then we passed around a note and had everybody

[14] sign yes or no, do they want it or do they not want

[15] it, and those who wanted to go on that's what we

[16] did.

[17] **Q:** Do you have that note in your possession?

[18] **A:** Not with me today.

[19] **Q:** Do you have that note in your records back

[20] at home?

[21] **A:** I do.

[22] **Q:** Now, is this like a petition when you say

[23] passed around a note?

[24] **A:** We had everybody's names listed on a sheet

Page 15

[1] telling what our intentions were. Those who wanted

[2] to jump on board did. Those who didn't wrote they

[3] didn't want to. They signed a paper saying they

[4] didn't want to.

[5] **Q:** And this was before you hired an attorney,

[6] right?

[7] **A:** Oh, yeah.

[8] **MR. ROACH:** Is that a yes?

[9] **A:** Yes, yes.

[10] **Q:** Now, at this meeting did anyone — anyone

[11] speak, anyone give a presentation?

[12] **A:** No. Just my little note.

[13] **Q:** Now, the note, was it one sheet — one

[14] piece of paper?

[15] **A:** Well, it had to be several pieces of paper

[16] because they had all 63 — it was 105, I think,

[17] original names.

[18] **Q:** During the meeting was there any discussion

[19] as to why it was believed that you were entitled to

[20] severance pay?

[21] **A:** The discussion came up, and I showed them

[22] the little piece of paper that came out of the book

[23] which I have here. This is what we talked about

[24] (indicating). This piece of paper came out of the

Page 16

[1] book which is that Benefits Eligibility.

[2] **Q:** Just so I can — I guess we keep this —

[3] **A:** Severance Page 3, yes, in the book.

[4] **Q:** I show you —

[5] **MR. ROACH:** "The book" meaning Summary Plan

[6] Description.

[7] **Q:** I am going to show you a book that's marked

[8] Ramsden 7/Fiorilla —

[9] **A:** Fiorilla.

[10] **Q:** I am never going to get that name right —

[11] Fiorilla Exhibit 5 and ask you is this the book you

[12] are making reference to? If you look at the

[13] severance page you'll find it.

[14] **A:** I am sure it is. Is this my book? Page 3.

[15] Yes, it must be. It's identical.

[16] **Q:** So —

[17] **MR. ROACH:** It's SEV3 just for the record.

[18] I just want to make sure because there is several

[19] page 3s in this. So it's SEV3, right?

[20] **THE WITNESS:** Yes.

[21] **MR. ROACH:** Sorry.

[22] **MR. WELSH:** That's all right.

[23] **Q:** On SEV3, if I have it right, you have in

[24] red the second paragraph, "To be eligible to receive

Joseph Attardi, et al.  v.
Bayer Corporation, et al.

---

[1] benefits the plan administrator must determine that
[2] your termination is involuntary and due to one of
[3] the following." You have that bracketed in red; is
[4] that right?
[5]    A: Yes, I do.
[6]    Q: Then you have three entries below it
[7] bracketed in black ink. What do they say?
[8]    A: "Decline in business conditions,
[9] elimination of your position at the company and
[10] discontinuance or relocation of your operations."
[11]    Q: You had this document that's in front of
[12] you now with those marks on it with you when you had
[13] the first meeting in —
[14]    A: There were no marks on it when I brought
[15] it.
[16]    Q: It was plain without marks?
[17]    A: It was plain. I added the marks to come
[18] here.
[19]    Q: Now, when you had your meeting in 2001 did
[20] you have the other pages of this booklet on
[21] severance?
[22]    A: I had the whole book with me.
[23]    Q: You had the whole booklet with you?
[24]    A: But we were concerned with just this one

---

[1] page. That's what we were looking at.
[2]    Q: Did you review at that time other pages
[3] under the severance discussion?
[4]    A: No. I wanted the lawyer to do it. It's
[5] too much crosstalk on the book. So I let the lawyer
[6] handle it.
[7]    Q: And just so it's clear, as of this time you
[8] had not retained a lawyer; is that right?
[9]    A: No.
[10]    Q: Now, when did you first come to believe
[11] that you were deprived of severance benefits
[12] improperly?
[13]    MR. ROACH: Objection. Go ahead. You can
[14] answer.
[15]    A: From the very beginning we all thought we
[16] were getting our severance benefits because it was
[17] always given to everybody so time went on and
[18] declining business. So everybody thought we were
[19] getting it. It wasn't till sometime the end of
[20] July, the beginning of August that we were hit that
[21] we weren't getting our severance, and that's when
[22] the can of worms opened up and everybody started
[23] talking.
[24]    Q: Now, you say it was not till July or

---

[1] August, are you talking about '98?
[2]    A: '98.
[3]    Q: Just before the sale became official?
[4]    A: Right.
[5]    Q: And —
[6]    A: But then — I didn't finish my
[7] conversation.
[8]    MR. ROACH: She hadn't finished her answer.
[9]    A: See, Ramsden and them told us that we
[10] weren't eligible, so people trusted Ramsden so much
[11] because we had been with him so long that we just
[12] kind of like let it go, and then we started
[13] questioning it over and over again. And it wasn't
[14] till the machine shop was sold and they got their
[15] benefits that people really started questioning it.
[16]    Q: So if I have — if I understood that — if I
[17] understand you, as of July '98 you thought you were
[18] entitled to severance and then you learned that you
[19] would not be paid severance?
[20]    A: It wasn't until the end of July, the
[21] beginning of August meeting that we had at work that
[22] people found out that we were not going to get
[23] severance.
[24]    Q: You said you found this out at a meeting.

---

[1] Where was the meeting held?
[2]    A: In the cafeteria I believe at 80 Industrial
[3] Way in Wilmington.
[4]    Q: Do you recall what managers from Bayer
[5] attended that meeting?
[6]    A: Ramsden was there, Paige was there — not
[7] on all of the meetings but Paige was there.
[8]    Q: But for this particular one when you
[9] learned that severance would not be paid, are you
[10] sure Page was there?
[11]    A: No. I wasn't at the meeting. I was on
[12] medical leave, but I only go by what the people told
[13] from notes.
[14]    Q: You were on medical leave —
[15]    MR. ROACH: Hold on. She hasn't finished
[16] about who was there.
[17]    A: Ramsden was there, Fontaine was there,
[18] Vinny was there.
[19]    MR. ROACH: Vinny who?
[20]    A: Vinny Fiorilla.
[21]    MR. ROACH: Sorry. I just want to make it
[22] clear.
[23]    A: Mary Leonard was there. That's head of
[24] Human Resources.

---

Jeanne M. Skene
Vol. 1, June 19, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

Page 21

[1]    **Q:** And this is — your knowledge about who was
[2] at the meeting is based on the notes you reviewed
[3] from other employees?
[4]    **A:** That's right.
[5]    **Q:** Now, you said you yourself were on a leave
[6] of absence?
[7]    **A:** I was on a medical, yes.
[8]    **Q:** How long did that leave of absence — can
[9] you tell me when it started and it stopped?
[10]    **A:** I want to say it started just before the
[11] end of the year.
[12]    **Q:** End of '97?
[13]    **A:** End of '97, December of '97, I believe, and
[14] it — I wasn't allowed to come back till August. I
[15] wonder why. I'm getting the feeling I understand
[16] why now.
[17]    **Q:** Why do you think you were not allowed to
[18] come back until August?
[19]    **A:** Because I would have asked questions, and
[20] they don't want the questionable person to be there
[21] all the time.
[22]    **Q:** Do you remember the day you came back? Was
[23] it the beginning of August, the end of August?
[24]    **A:** It was the beginning of August.

---

Page 22

[1]    **Q:** When you returned in the beginning of
[2] August were you aware of the pending sale of the
[3] business to EFTC?
[4]    **A:** Yes, I did.
[5]    **Q:** How did you learn about that?
[6]    **A:** Many phone calls to my house. But when I
[7] did get back the bosses were talking about it, and
[8] I'm not even sure which one that was. I think it
[9] was — I know that I saw Dick Ramsden in the hall,
[10] and he told me that everything looked good and it
[11] was like a win-win situation.
[12]    **Q:** You come back in —
[13]    **MR. ROACH:** Let her finish her answer.
[14] Anything else on your conversation?
[15]    **MR. WELSH:** I think she did finish it,
[16] Steve.
[17]    **MR. ROACH:** I think she started to add
[18] something. Did you finish your answer?
[19]    **A:** Yes. Dick Ramsden just told me everything
[20] looked really good for us and we weren't going to
[21] have any issues, everything looked great and it was
[22] win-win so people just assumed what he was saying
[23] was the truth.
[24]    **Q:** You assumed what he was saying was the

---

Page 23

[1] truth?
[2]    **A:** Well, according to my conversations with
[3] other people, they also had those same conversations
[4] at meetings with those same comments which I just
[5] repeated to you.
[6]    **Q:** Let me just focus. Now, you have a meeting
[7] with Dick Ramsden. Is this your first day back?
[8]    **A:** It's not a meeting. It was just a casual
[9] talk in the hallway.
[10]    **Q:** You have a conversation with Dick Ramsden?
[11]    **A:** Yes.
[12]    **Q:** Was it your first day back?
[13]    **A:** Within the first two days I was talking
[14] with Dick Ramsden and Norm Fontaine because of the
[15] project that I was working on, yes.
[16]    **Q:** I'm focusing now specifically on the
[17] conversation you had with Dick Ramsden when he
[18] talked about win-win. Was that within the first two
[19] days?
[20]    **A:** Yes, it was.
[21]    **Q:** Where did that transpire?
[22]    **A:** That was in the hall where I worked while I
[23] worked and talked at the same time.
[24]    **Q:** So you were working as he spoke?

---

Page 24

[1]    **A:** Yeah.
[2]    **MR. ROACH:** Is that a yes?
[3]    **A:** Yes.
[4]    **Q:** What did he say to you?
[5]    **A:** I've already told you.
[6]    **Q:** I know, but that was part — I'm breaking
[7] it down because that was in response to another
[8] question, and I'm asking it specifically now.
[9]    **A:** Okay. What did we talk about?
[10]    **Q:** Yes.
[11]    **A:** He asked me how I was doing, if I was
[12] feeling better. I said, "Yes." And I asked him how
[13] the sale was going, and he said it was going great,
[14] everything looked great. It was a win-win
[15] situation. And we proceeded to talk about what my
[16] role was going to be to clean up the boards that I
[17] was left to fix.
[18]    **Q:** Can you be — was he more specific about
[19] that? What did he tell you about what your role
[20] would be about cleaning up the boards?
[21]    **A:** Okay. I test a specific board for
[22] Bayer-Agfa Division, what was called a 205 — 208495
[23] board and 20849 — I can't remember the other
[24] number. But no one else wanted to fix them except

---

Page 25

[1] for me, and I was left with about 100 boards sitting
[2] there at over $3,200 apiece sitting there waiting
[3] for me to fix them when I got back. And my job was,
[4] between August 1st and August 31st, was to get that
[5] 100 boards fixed and out of the shop so that they
[6] wouldn't be pushed over to EFTC. That was my job.
[7]    Q: That's what he told you during this
[8] conversation?
[9]    A: Yes, he did, him and Fontaine. So then —
[10]    Q: You say "him and Fontaine." Was Fontaine
[11] present during this conversation?
[12]    A: The second conversation Norm Fontaine was
[13] with me.
[14]    Q: Right now I am just breaking it down to the
[15] first conversation.
[16]    A: Okay.
[17]    Q: Ramsden talks about your role as you were
[18] clearing 100 boards, et cetera, getting them fixed?
[19]    A: He just pointed to the pile and said,
[20] "Jeanne, I would like you to get that cleaned up."
[21] I said, "No problem. I'll take care of it." But
[22] then within the next couple of days him and I and
[23] Norm Fontaine had the discussion.
[24]    Q: I just want to close out one conversation.

Page 26

[1]    MR. ROACH: Let her finish.
[2]    MR. WELSH: No, I am not going to, Steve,
[3] because I have got to control the questioning here.
[4]    A: I understand what you're saying. Go ahead.
[5]    Q: Was anything else said?
[6]    MR. ROACH: I don't mind just as long as
[7] you let her finish the answer.
[8]    MR. WELSH: I will let her finish the
[9] answer.
[10]    Q: During the first conversation anything else
[11] said between you and Ramsden?
[12]    A: Not that I can recall at this point.
[13]    Q: Was this the first conversation you had
[14] with any managers concerning the pending transaction
[15] with EFTC?
[16]    A: (No verbal response)
[17]    MR. ROACH: Is that a yes?
[18]    A: Yes, it was. Yes, the first time that I
[19] spoke to anybody.
[20]    Q: When you came back to work did you have to
[21] meet with HR to go through some clearance?
[22]    A: I did.
[23]    Q: Who did you meet with?
[24]    A: I don't remember that person's name. I had

Page 27

[1] to meet with the nurse. I didn't go through HR. It
[2] was through only the nurse, and I don't remember her
[3] name. It was a tall lady.
[4]    Q: How long were you with the nurse? Was it a
[5] long process you had to go through?
[6]    A: No, not a long process.
[7]    Q: You didn't meet with anyone from the HR
[8] department?
[9]    A: No.
[10]    Q: So you had a conversation with Ramsden the
[11] first or second day back when he talked about a
[12] win-win and he pointed to the pile and said, "I
[13] would like you to clean that up"?
[14]    A: Uh-huh, yes.
[15]    Q: What's the next conversation you had with
[16] any Bayer managers concerning the potential — the
[17] EFTC transaction?
[18]    A: Okay. Norm Fontaine and I and Dick Ramsden
[19] had a conversation, and I'm not sure exactly where
[20] we were in the hall or where we were as far as
[21] location, except that I went in and I said, "You
[22] just made an announcement that all of us are going
[23] to lose our floating holidays," and I asked if they
[24] wanted me to take the week off since I just got

Page 28

[1] back. And they looked at me and said, "No." And I
[2] said, "Well, I have all these floating days." I
[3] think there were four or five floating days that I
[4] hadn't used yet, and they said, "We'll pay you for
[5] the five days. We need you to work." And I stayed
[6] and I did all of the work. Did I confuse you?
[7]    Q: So prior to meeting with Norm Fontaine and
[8] Ramsden had you been at a meeting whereby you
[9] learned that you would be losing your floating
[10] holidays?
[11]    A: There was an announcement that came over
[12] to — I would assume it had to be at a meeting that
[13] they went to, but I being on — starting at 7:00 at
[14] night never saw any of the meetings.
[15]    Q: Whenever I hear you "assume" I am going to
[16] cut you off because that suggests you are guessing.
[17] What I'm asking is what you know. If someone told
[18] you, you can tell me so.
[19]    So on this date when Norm Fontaine and
[20] Ramsden were there, you had a conversation about
[21] floating holidays. Did you learn from some source
[22] that EFTC would not be offering floating holidays?
[23]    A: That's incorrect the way you said it. What
[24] I was telling you was that the floating holidays

Page 29

[1] were a Bayer benefit, and if you didn't use the
[2] benefits you would lose them. They didn't carry
[3] over from year to year. And in order for me not to
[4] lose those days I would have had to use them between
[5] August 1 and August 31 before the sale happened.
[6] They didn't want me to take the days off. So,
[7] therefore, they agreed to pay me the floating
[8] holidays so I wouldn't lose — they wouldn't lose me
[9] fixing their boards.
[10]    Q: How did you — what did you base your
[11] belief on that the floating holidays that you had
[12] accumulated from Bayer would not carry over to EFTC?
[13]    A: I believe it was — one of the group
[14] leaders came to me and said, and I'm not even sure
[15] which one it was, but I have a feeling it might have
[16] been Hanna that came over and said, "Jeanne, if you
[17] have floating holidays you have to use them before
[18] August 31 or you are going to lose the money," and I
[19] said, "Well, I'm not going to lose the money," and I
[20] proceeded to ask questions.
[21]    Q: The questions you asked, were those
[22] directed to Norm Fontaine and Ramsden?
[23]    A: Yes.
[24]    Q: Had you talked to anyone before you talked

Page 30

[1] to them, HR or anyone of that nature?
[2]    A: I didn't talk to them about that, no.
[3]    Q: So you went to Ramsden and Fontaine and you
[4] said to them, "You just announced that we have to
[5] use our floating holidays. Do you want me to use
[6] mine? Do you want me to take a week off to use
[7] them"?
[8]    A: I did.
[9]    Q: What did they say?
[10]    A: They said, "No."
[11]    Q: Was there any other discussion at that time
[12] concerning anything to do with the EFTC transaction?
[13]    A: I asked if I could stay with Bayer. I told
[14] them I would be better suited to stay with Bayer,
[15] and they agreed but they said they couldn't do it
[16] because they were locked in sending everybody over.
[17] They had no choice. I had no choice. I had to go
[18] with the board shop.
[19]    Q: Anything else said on that topic?
[20]    A: I asked if I could just leave and have my
[21] severance benefits, and they told me I couldn't. I
[22] said, "Well, I don't really want to go to EFTC," and
[23] they asked me to give it time. I'd understand —
[24] because I wasn't at meetings, I'd understand that it

Page 31

[1] was a win-win. So I said, "All right. I'll give it
[2] a shot and see what happens."
[3]    Q: When you said, "Can I leave and have
[4] severance," what did they say to you?
[5]    MR. ROACH: Objection. Go ahead. You can
[6] answer.
[7]    A: "Can I leave and have severance," they said
[8] no. I can't because that's not how it works. You
[9] don't have severance — you don't get severance if
[10] you leave or quit.
[11]    Q: Who said that?
[12]    A: I would assume — I think in my beliefs and
[13] I remember Dick Ramsden telling me that personally.
[14]    Q: And Fontaine was with him?
[15]    A: And Fontaine, I believe, was there.
[16]    Q: Did you argue with them at that time?
[17]    A: I always argue.
[18]    Q: At that time?
[19]    A: No, I don't believe so. I just took what
[20] they said and went and did what I had to do because
[21] there was too much work that had to be done.
[22]    Q: Now, this conversation would have been
[23] sometime after 7 p.m. at night?
[24]    A: I might have gone in early because I used

Page 32

[1] to go — when they told me they needed to get all
[2] this work out they asked me to come in early. It
[3] might have been earlier, but I would have to look at
[4] my time card to really tell you what time I came in.
[5] But I know Ramsden and Fontaine were in the building
[6] until 8:00, 9:00 at night a lot of times especially
[7] when the transition was happening. They were in
[8] there late.
[9]    Q: When you had the conversation with Ramsden
[10] did you yourself take any action to see whether or
[11] not this severance policy provided benefits in
[12] circumstances like this?
[13]    MR. ROACH: Objection, other than what
[14] she's already testified to. Go ahead.
[15]    A: Just the book — the book is what we always
[16] went by. I always call it "The Book," but it's the
[17] plan I guess what that book is called.
[18]    Q: You are referring to the document that's
[19] been marked Ramsden 7/Fiorilla 5?
[20]    A: What's this?
[21]    Q: The Summary Plan Description.
[22]    A: That's the book that we used.
[23]    Q: Did you have it at home?
[24]    A: Yes, I do.

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

---

Page 33

[1]　Q: Did you also have a copy at work?

[2]　A: I have a page copy. That's all I did was
[3]　make a page copy, the one page that I was concerned
[4]　with.

[5]　Q: When did you make that copy?

[6]　A: This particular one is different than the
[7]　one that I had when I was still working for Bayer at
[8]　the time.

[9]　Q: The one you had at Bayer — I am going
[10]　to — I am going to hand you Ramsden Exhibit No. 7.
[11]　Can you show me —

[12]　A: It came out of this book (indicating).

[13]　Q: I am going to represent to you that the
[14]　severance pay discussion is towards the very end,
[15]　and can you show me the page you had photocopied
[16]　with you during the time you were at Bayer?

[17]　A: I am going to tell you I don't remember
[18]　having this page until after the sale (indicating).
[19]　It was after the sale that I brought this paper in
[20]　(indicating). It was just too hectic for me the
[21]　first month that I was back to try and put all this
[22]　puzzle together.

[23]　Q: When you say "after the sale," the sale
[24]　occurred in beginning of September 1998. Can you

---

Page 34

[1]　estimate for me when you brought a page in from the
[2]　severance page — SPD, the severance policy?

[3]　A: I would say within the first couple of
[4]　months that I spoke to Ramsden, but I'm not sure
[5]　what exact date it was.

[6]　Q: I'm just looking for an estimation. Are we
[7]　talking about end of September, October '98, in and
[8]　around that time frame?

[9]　A: It would be sometime the beginning of
[10]　October, maybe November-ish time frame that I
[11]　started asking questions.

[12]　MR. ROACH: Just off the record for a
[13]　minute.

[14]　　(Discussion off the record)

[15]　A: SEV3.

[16]　Q: So that's the same page you have in front
[17]　of you now with the highlights?

[18]　A: Yes, the same exact one.

[19]　Q: I might have misunderstood you, but I
[20]　thought you indicated you had a different page with
[21]　you?

[22]　A: No.

[23]　MR. ROACH: What she is saying is the one
[24]　she had —

---

Page 35

[1]　MR. WELSH: Steve, Steve.

[2]　MR. ROACH: Go ahead.

[3]　A: The one that I had prior had no marking on
[4]　it. This isn't the one that —

[5]　Q: The only difference between it — it was
[6]　the same SEV3, but the one you had back in October
[7]　'98 did not have any markings on it?

[8]　A: Right. Correct.

[9]　Q: Okay. At that time did you feel that you
[10]　had been deprived severance benefits improperly?

[11]　MR. ROACH: Objection. Go ahead. You can
[12]　answer.

[13]　A: Personally I was confused, and I thought we
[14]　should have gotten our benefits, personally. The
[15]　other people thought Ramsden was telling them the
[16]　truth and said — they were just confused, too. It
[17]　wasn't until I spoke to the lawyer, and they looked
[18]　at the terminology that was on the sheets that —

[19]　MR. ROACH: Go ahead.

[20]　THE WITNESS: Stop?

[21]　MR. ROACH: Go ahead. You just can't say
[22]　what we talked about, but go ahead. Your thinking
[23]　is fine.

[24]　Q: When did you see the lawyer?

---

Page 36

[1]　A: 2001.

[2]　MR. ROACH: You can answer to the best of
[3]　your memory.

[4]　Q: He can't help you.

[5]　A: I think it's 2001. July I think is when I
[6]　spoke on the phone and then I met with him and let
[7]　him look at the paperwork and help me out to see if
[8]　I even had a leg to stand on.

[9]　Q: In October when you brought the page into
[10]　work did you talk to any managers at EFTC?

[11]　MR. ROACH: Objection. Go ahead. You can
[12]　answer.

[13]　A: No, I did not.

[14]　Q: Did you talk to Baribeau about it at all?

[15]　A: No, I did not.

[16]　Q: Did you talk to anyone at Bayer about it in
[17]　October 1998?

[18]　MR. ROACH: Objection. You mean the
[19]　specific page we are talking about?

[20]　MR. WELSH: About the severance pay.

[21]　Q: Whether you were entitled to severance pay.

[22]　A: I did talk to Ramsden, Fontaine, and I
[23]　spoke with Human Resources which was Mary Leonard
[24]　before I signed over to be EFTC.

---

Page 37

[1] **Q:** I have Mary Leonard.

[2] **A:** Norm Fontaine.

[3] **Q:** Norm Fontaine.

[4] **A:** And Dick Ramsden.

[5] **Q:** I am going to do what I did before. With

[6] Dick Ramsden we have —

[7] **A:** I spoke to him before.

[8] **Q:** We had two discussions we talked about, one

[9] was when you just got back and he asked you to clear

[10] out the boards?

[11] **A:** Right.

[12] **Q:** Then there was another conversation with

[13] him where Fontaine was present and during which you

[14] asked "Can I stay with Bayer," and "Can I leave and

[15] have severance," and "That's not how it works" were

[16] the words they used to you —

[17] **MR. ROACH:** Objection.

[18] **Q:** — is that right?

[19] **A:** That's correct. I would say maybe Dick

[20] used finesse words, but that's my terminology.

[21] **Q:** Can you remember the finessed words he

[22] used?

[23] **A:** No, I can't remember the finesse words he

[24] used.

Page 38

[1] **Q:** Do you remember anything else he said

[2] during that second meeting and discussion you had

[3] with him?

[4] **A:** No. I think that was the bulk of what we

[5] talked about other than the board part which is

[6] irrelevant.

[7] **Q:** Again, this was — this was prompted over

[8] the announcement that you heard from whatever source

[9] that you'd have to use or lose your accumulated

[10] floating holidays?

[11] **A:** Correct.

[12] **Q:** So other than the two conversations with

[13] Ramsden you have testified about earlier today did

[14] you have any other conversations with Ramsden

[15] concerning whether or not severance pay should be

[16] paid to board shop employees?

[17] **A:** Before or after?

[18] **Q:** Both.

[19] **A:** Well, I already talked about Ramsden. I

[20] already talked about Fontaine.

[21] **Q:** I am going to ask you — I want to bounce

[22] to the other players, but right now I am very

[23] focused on Ramsden. And I have two conversations

[24] with Ramsden both witnessed by Fontaine, when you

Page 39

[1] first came back and then you had a conversation —

[2] **A:** Fontaine wasn't there at the very first one

[3] that I talked with Ramsden. Only the second one.

[4] **Q:** Okay. Sorry.

[5] **A:** I spoke to Fontaine individually before I

[6] spoke to the two of them together.

[7] **Q:** With just Ramsden, you have the one-on-one

[8] when you just get back, and then you talked to him

[9] with Fontaine present when you talked about the

[10] floating holidays. Any other conversations with

[11] Ramsden concerning severance?

[12] **A:** Many times in the hall. Many, many

[13] times —

[14] **Q:** About severance?

[15] **A:** — trying to get him — to convince him to

[16] let me go back to Bayer.

[17] **Q:** Was this prior to the transaction?

[18] **A:** Nope. Even after the transaction I spoke

[19] to him.

[20] **Q:** I am going to break it down. Prior to the

[21] transaction I have two conversations with Ramsden.

[22] Any other conversations with Ramsden?

[23] **A:** Right up until the day that we were told we

[24] were gone I spoke to Ramsden. Now, how many times a

Page 40

[1] day I can't tell you because I don't always see him

[2] all the time because of the shift that I had. So

[3] there is at least twice that I spoke with him.

[4] **Q:** Do you remember any other occasions other

[5] than those two occasions where the question of

[6] severance payment eligibility was discussed?

[7] **A:** Severance came up in all conversations, and

[8] I don't remember any other ones that I had with him.

[9] I am sure there were slight ones but not that big of

[10] a deal.

[11] **Q:** Was there any change in his stated

[12] statements concerning whether or not you would be

[13] eligible for severance?

[14] **A:** No. He stood his ground. That's why we

[15] believed him.

[16] **Q:** At this time did you take any notes of your

[17] conversations with Ramsden?

[18] **A:** Only what my head would hold. I didn't

[19] take any written notes.

[20] **Q:** Have you ever taken notes?

[21] **MR. ROACH:** Objection.

[22] **A:** I wasn't at any of the meetings to take the

[23] notes.

[24] **Q:** The only notes you have pertaining to this

Joseph Attardi, et al.   v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 41

[1] whole case are the notes you have of your
[2] conversations with other people who joined you in
[3] the lawsuit?
[4]   A: Correct.
[5]   Q: When did you start acquiring —
[6] accumulating those notes?
[7]   A: I'd have to look in the computer to see,
[8] but I don't even know if that would tell me. Within
[9] the first couple of months we started talking, and I
[10] started writing down different information that
[11] people were telling me and none of it was jibing.
[12] So I started writing things down and then — then we
[13] dropped it because we figured it was a waste of
[14] time, and then when the whole thing happened with
[15] the machine shop it opened up a whole new can of
[16] worms, and people started asking questions again.
[17] But exact time frame I don't have an exact date.
[18]   Q: But at least prior to the machine shop
[19] layoff you had taken notes of conversations you had
[20] with co-workers pertaining to the severance pay
[21] issue?
[22]   A: Just for my own personal issues, my own
[23] personal understanding of what was going on. At the
[24] time it was only for my own benefit.

Page 42

[1]   Q: So it wasn't in anticipation of litigation?
[2]   MR. ROACH: Objection. Go ahead. You can
[3] answer.
[4]   A: You want the truth?
[5]   MR. ROACH: She doesn't know what that
[6] means.
[7]   Q: I want that throughout this deposition.
[8]   A: The truth was is that my brother told me I
[9] had a leg to stand on but fight it and —
[10]   MR. ROACH: Wait a minute. Is your brother
[11] an attorney?
[12]   THE WITNESS: No. My brother owns his own
[13] company.
[14]   A: So I started compiling information to do it
[15] on my own, and then I realized that I was doing the
[16] same thing Ramsden was doing, and that's screwing
[17] all my friends, and I couldn't do it. And that's
[18] the reason why I did what I did.
[19]   Q: "You did what you did" was?
[20]   A: Start pursuing this and looking for a
[21] lawyer that would look at the case itself.
[22]   Q: And that was what calendar year?
[23]   A: What was that?
[24]   Q: What calendar year was that?

Page 43

[1]   MR. ROACH: I think she already answered
[2] that.
[3]   A: 2001, I believe.
[4]   Q: You were acquiring notes for yourself in
[5] conversation with people in '98 and '99; is that
[6] right?
[7]   A: I was compiling my own notes, yes, for
[8] myself.
[9]   Q: Now, when you say you were compiling, I
[10] have a vision of you actually typing into a
[11] computer. Is that what you were doing?
[12]   A: No. Well, I typed it in my computer at
[13] home, but I didn't type it at work. I just listened
[14] to people talking and then when I went home I'd sit
[15] there and type up the information that people gave
[16] me or I would write myself a little note, and I
[17] would throw it in the bucket — an envelope and then
[18] I started looking at it all and I realized what
[19] people were saying.
[20]   Q: When is the last time did you review these
[21] notes?
[22]   A: Those notes those people gave me at the
[23] time, those were all individualized. Those are
[24] different than the notes that we have here.

Page 44

[1]   Q: I guess my question is when is the last
[2] time you reviewed the individualized notes?
[3]   A: The newest notes that I have —
[4]   MR. ROACH: No. He is talking about the
[5] notes that you compiled way back is what he's
[6] talking about.
[7]   Q: For instance, let's take the notes from —
[8]   MR. ROACH: Sorry to interrupt.
[9]   A: I do know what you are saying now. In
[10] other words, where did I get my —
[11]   Q: Don't try to guess where I'm going.
[12]   A: Go ahead.
[13]   Q: My question right now is my understanding
[14] is right around end of '98, early '99 you talk with
[15] people, you compiled some notes, you may have put it
[16] in your computer —
[17]   A: And we dropped it.
[18]   Q: — and you dropped it. Those notes?
[19]   A: They are gone.
[20]   Q: Where did they go?
[21]   A: They are gone. We weren't going to do
[22] anything with the case. So those notes don't even
[23] exist anymore. The new notes exist.
[24]   Q: What happened to them to cause them not to

Page 45

[1] exist anymore?

[2]   **A:** Because we talked with Ramsden and we

[3] talked to Fontaine, and they all told us the same

[4] thing over and over again, that we did not — how do

[5] you say that?

[6]   **Q:** Qualify.

[7]   **A:** We did not qualify for severance. So

[8] people agreed to that, and I just couldn't grasp it.

[9] I just didn't understand it.

[10]   **Q:** But what did you do to the notes, the first

[11] group of notes you have?

[12]   **A:** The first group of notes? Most of those

[13] notes that people gave me are gone. I don't have

[14] any of that information in my computer. First of

[15] all, the computer crashed. That's a whole other

[16] issue.

[17]   **Q:** When did it crash?

[18]   **A:** When did it crash?

[19]   **Q:** Yes.

[20]   **A:** Well, I have a new computer. So it would

[21] be the notes that I got — constantly changing. I

[22] would say 2000 because that's — I think that was

[23] Windows 95 was on there.

[24]   **Q:** Were you able to successfully transfer any

Page 46

[1] files from the old computer that crashed to your new

[2] computer?

[3]   **A:** Not from that old segment, no.

[4]   **Q:** You used the word "segment"?

[5]   **A:** The old computer hard drive crashed. The

[6] hard drive wouldn't spin anymore. So you can't

[7] salvage anything off something that doesn't spin.

[8]   **Q:** So you were unable to salvage any documents

[9] from that old computer whatsoever. When it went

[10] down you lost everything?

[11]   **A:** Right.

[12]   **Q:** Now, at that time, at 2000 when the

[13] computer crashed, had you also compiled handwritten

[14] copies of notes?

[15]   **A:** I believe those all got thrown away after

[16] they were put in the computer.

[17]   **Q:** You never looked for those?

[18]   **A:** No. Aren't you interested in how I know

[19] all this new information? Because that's the

[20] important one.

[21]   **MR. ROACH:** No. Let him — just answer the

[22] questions he asks.

[23]   **Q:** I assure you that we'll get there.

[24]   **A:** You are getting there. Go ahead.

Page 47

[1]   **Q:** We are going to take —

[2]   **A:** The long road.

[3]   **Q:** — the long detailed road.

[4]   **A:** I like people that get to the point.

[5]   **Q:** The problem is finding the point. Now, so

[6] if I understand, around 2000 when your computer

[7] crashed all notes you had about this matter were

[8] lost, and you had no hard copy? It wiped out your

[9] total — your total collection of notes?

[10]   **A:** Other than memory.

[11]   **Q:** Other than memory; is that correct?

[12]   **A:** Correct.

[13]   **Q:** Now, when do you recall that machine shop

[14] layoff occurred?

[15]   **A:** I want to say it was 2000.

[16]   **Q:** At the time the machine shop —

[17]   **A:** I'm not sure. 2000 or 2001. It might have

[18] been 2000.

[19]   **Q:** That's your best memory at this time?

[20]   **A:** At this point, yes.

[21]   **Q:** At the time the machine shop layoff

[22] occurred had your laptop crashed?

[23]   **A:** It wasn't a laptop.

[24]   **Q:** Desktop. Had the desktop crashed?

Page 48

[1]   **A:** I believe by that time it had already

[2] crashed before that.

[3]   **Q:** So let's go to the time your computer

[4] crashes. From that point on did you take any notes

[5] of conversations you may have had with your fellow

[6] or former co-workers at Bayer?

[7]   **A:** No. Because we kind of like didn't —

[8] first we didn't know that the machine shop was being

[9] sold or so-called disembarked, but we kind of

[10] resigned to the fact that we weren't going to get

[11] severance so I kind of put it all on the back

[12] burner, and then when the computer crashed I thought

[13] everything was gone so I didn't do anything about

[14] it.

[15]   **Q:** And then the machine shop has its layoff?

[16]   **A:** And everybody started buzzing again,

[17] talking about what happened.

[18]   **Q:** What did you do?

[19]   **A:** I started asking questions again.

[20]   **Q:** To who?

[21]   **A:** Everybody that was on our list, the

[22] 63 — well, actually it was 105 people that were

[23] involved. If they were still working with us then

[24] we talked about it.

Joseph Attardi, et al.   v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 49

[1]  Q: Did you keep records of those discussions?
[2]  A: Not as individual — as every individual
[3] talked to me I didn't write down individual notes,
[4] but I did have them fill in a sheet with answering
[5] the questions that I wanted, what they want, what
[6] their thoughts were.
[7]  Q: Who prepared the sheet?
[8]  A: I did.
[9]  Q: Any assistant?
[10]  A: Assistant? You mean who helped me?
[11]  Q: Yes.
[12]  A: No. Myself.
[13]  Q: Did you circulate these in hard copy?
[14]  A: I did in fact do it in hard copy.
[15]  Q: Did you also do it electronically?
[16]  A: I did do it electronically.
[17]  Q: And electronically, did you send them to
[18] people via e-mail?
[19]  A: Yes, I did.
[20]  Q: Do you have a collection of these sheets
[21] that you got back?
[22]  A: Yes, I do.
[23]  Q: How many sheets did you get back?
[24]  A: I think 45 out of the 63 are back.

Page 50

[1]  Q: Now, did you circulate these sheets before
[2] the 63 individuals who are Plaintiffs in this case
[3] told you they were going to go forward with the
[4] lawsuit?
[5]  A: No. Those were done —
[6]  Q: After?
[7]  A: — after.
[8]  Q: Can you tell me when they were done?
[9]  A: I think it was in January or February-ish
[10] that I had them compile the notes.
[11]  Q: Of what year?
[12]  A: 2006.
[13]  Q: Prior to January or February of 2006 when
[14] you circulated this questionnaire for people did you
[15] compile any note — okay.
[16]     From the period of time your computer
[17] crashed to your circulation of the hard copy and
[18] electronic copies of the questionnaire in January
[19] and February of 2006, did you make any notes of
[20] conversations of any of your former co-workers at
[21] Bayer in between time?
[22]  A: We did have conversations, and when I get
[23] home I'd sit at the computer and I would type in a
[24] few little things here and there. But exactly what

Page 51

[1] time frame that was, I don't remember.
[2]  Q: On your computer is there a file that is
[3] basically "Bayer Severance"?
[4]  A: There is — it's called "Agfa" because
[5] that's what we always called it is Agfa even though
[6] it was Bayer-Agfa Division.
[7]  Q: And can you tell me what is contained in
[8] that file? Is it notes of conversations?
[9]  A: It could say — right off the top of my
[10] head it could say that Joanne Sanzo asked this
[11] question and was told this. I don't have a copy of
[12] it to tell you. It could be that Norman told me
[13] this. It's just blurbs for me that these
[14] individuals told me this information. That's all it
[15] is.
[16]  Q: When is the last time you looked at these
[17] blurbs?
[18]  A: I haven't looked at them at all recently.
[19]  Q: Did you review them to prepare for today's
[20] deposition?
[21]  A: No, I didn't.
[22]  Q: Any reason why not?
[23]  A: Because at this point I thought my other
[24] notes were more sufficient for what I was trying to

Page 52

[1] accomplish.
[2]  Q: Now, when you say "other notes," what are
[3] you referring to?
[4]  A: The questionnaire that I sent out that had
[5] people — I asked specific questions, and I wanted
[6] their honest answer. And I made them sign them.
[7]  Q: Why did you make them sign them?
[8]  A: Because I have to represent them, and I
[9] want them to represent themselves. So when I get
[10] here what I say is what they wrote.
[11]  Q: Is your testimony today based on the
[12] questionnaires you sent to people?
[13]  MR. ROACH: Objection. Go ahead. You mean
[14] her testimony of everything she says?
[15]  Q: Do you plan to testify today concerning
[16] what happened at Agfa based on the representations
[17] you received from these people?
[18]  A: Yes, this collective summary of what
[19] everybody gave me for information.
[20]  Q: Did you ever take the questionnaire forms
[21] that you received from everyone and compare it to
[22] the earlier notes you had from them to see if they
[23] had missed anything?
[24]  A: I don't recall doing that.

Page 53

[1] **Q:** Now, the questionnaires — you didn't send
[2] that questionnaire out until prior to the filing of
[3] the lawsuit in this case?
[4] **A:** Oh, we didn't send that questionnaire out
[5] before the lawsuit started, no.
[6] **MR. ROACH:** I think she said it was in this
[7] year.
[8] **A:** Yes, 2006.
[9] **Q:** Do you remember seeing a document that was
[10] Defendants' interrogatories directed towards the
[11] Plaintiffs —
[12] **A:** I did see that.
[13] **Q:** Did you sign that?
[14] **A:** I did sign it.
[15] **Q:** At the time you signed it did you have
[16] access to these forms, the questionnaires you sent
[17] out to Plaintiffs?
[18] **A:** Did I have access to —
[19] **Q:** Had they already been sent out and received
[20] back from the Plaintiffs?
[21] **A:** I'm not quite sure if the dates coincide.
[22] **MR. ROACH:** Just for the record, John,
[23] that's in anticipation of litigation. I am giving
[24] you some latitude in terms of asking her about the

Page 54

[1] notes and the records, but in terms of the contents
[2] of them and what was said I am going to object to
[3] that.
[4] **MR. WELSH:** Okay. We'll engage on that.
[5] **A:** December 8, no. I just found it. December
[6] 8.
[7] **Q:** So at the time you signed interrogatories
[8] you hadn't had returned questionnaires from the
[9] Plaintiffs; is that right?
[10] **A:** On specific questions, yes. That doesn't
[11] mean we didn't talk.
[12] **Q:** But when you prepared the interrogatories
[13] did you look at the notes you had on your computer
[14] to see if your answers were full and complete?
[15] **MR. ROACH:** Objection. Go ahead. You can
[16] answer.
[17] **A:** No. I answered the interrogatories the
[18] best we could. That's all I did.
[19] **Q:** Did you ever refer back — now, this is
[20] your new computer. I know the old one has crashed
[21] and you don't have access to those records. Did you
[22] ever review the records you had on the new computer
[23] at any time during this litigation?
[24] **A:** The new notes were taken in January or

Page 55

[1] February time frame. So the interrogatories were in
[2] December. They don't even match.
[3] **MR. ROACH:** He's asking you about the old
[4] notes, not the —
[5] **A:** Those would be by memory.
[6] **Q:** Let me be clear. I believe there was one
[7] set of notes you lost when your computer crashed?
[8] **A:** Correct.
[9] **Q:** Then I understand there is a second group
[10] of notes you took from the time you got a new
[11] computer —
[12] **A:** Right.
[13] **Q:** — until let's say January '06, and then
[14] there is a third group of notes that resulted from
[15] your mailing the questionnaires to former workers
[16] and getting them back?
[17] **A:** Correct.
[18] **Q:** I am focused on the second group.
[19] **A:** Second.
[20] **Q:** Have you ever reviewed the notes you have
[21] on your computer?
[22] **A:** Yes, the second set.
[23] **Q:** When did you do that?
[24] **A:** I don't have a definite answer what date it

Page 56

[1] was.
[2] **Q:** Can you tell me why you reviewed them?
[3] **A:** Because I have to represent 63 people.
[4] **Q:** Was there any event in the litigation that
[5] you reviewed them in anticipation for?
[6] **A:** No, just to make sure I represented them
[7] properly.
[8] **Q:** When you say you did it to represent them,
[9] were you being called upon to make factual
[10] assertions, that you wanted to review these notes to
[11] make sure the factual assertions that you made on
[12] their behalf were correct?
[13] **MR. ROACH:** Objection. Go ahead.
[14] **A:** I base everything I do on facts, yes.
[15] **Q:** Can you tell me specifically what caused
[16] you or when — please, strike that.
[17] How many times have you reviewed the notes
[18] on your computer?
[19] **A:** I don't remember how many times.
[20] **Q:** More than once?
[21] **A:** I would assume I had to more than once,
[22] yes.
[23] **Q:** Have you ever shared those notes on your
[24] computer with anybody?

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 57

[1]   THE WITNESS: Did I give you a copy?
[2]   Q: Other than your attorney?
[3]   MR. ROACH: Objection. Other than your
[4] attorney did you ever share them?
[5]   A: I don't believe I gave anybody the notes
[6] that I recall. It doesn't mean I didn't, but I
[7] don't remember ever doing it.
[8]   Q: In signing your interrogatories at or about
[9] that time in December 2005 did you have any
[10] opportunity to review the notes on your computer to
[11] ascertain whether the interrogatory answers were
[12] accurate?
[13]   A: I think I read through them, and I didn't
[14] open up the computer — I didn't look at the notes.
[15] I think I was just sitting there reading them, and I
[16] did not look at the computer.
[17]   Q: Now, from the time your old computer
[18] crashed to the present, putting aside the
[19] questionnaires you sent out, do you have other
[20] memos, letters, documents, et cetera, received from
[21] your former co-workers at Bayer?
[22]   A: I don't recall if there are any other notes
[23] other than that I told you already. I'd have
[24] to look.

Page 58

[1]   Q: Where would you look?
[2]   A: I have all the notes and every piece of
[3] paper that has to do with this case in one place.
[4] It's in a — it looks like a milk crate, but it's
[5] actually a storage container.
[6]   Q: You didn't look through that storage
[7] container to prepare for today's deposition?
[8]   A: No. I didn't need anything to boggle my
[9] brain. I just wanted to be here to answer the
[10] questions you were going to ask. Is there a
[11] relevance to the questions?
[12]   MR. ROACH: Just let him ask the question
[13] the way he wants to ask the questions. I'll object
[14] if I have to object.
[15]   Q: Now, do you recall there being a request
[16] for production of documents sent by the Defendants
[17] to the Plaintiffs in this case, the 63 named
[18] Plaintiffs?
[19]   A: Say the question again.
[20]   Q: Do you remember there being a request for
[21] document production being sent by Bayer to the
[22] various former Bayer employees who are the
[23] Plaintiffs in this case?
[24]   A: Sent by Bayer to us?

Page 59

[1]   Q: Yes, asking for documents from you guys.
[2]   A: I don't remember them asking me for any of
[3] my stuff.
[4]   Q: Have you ever gone through the documents in
[5] the storage container you just talked about where
[6] all the Agfa documents are to see if there were
[7] documents there that were relevant to a request for
[8] documents made by Bayer?
[9]   A: No. I don't remember seeing anything from
[10] Bayer at all.
[11]   Q: I want to show you a document which has
[12] been marked for identification in the previous
[13] deposition as Fiorilla Exhibit 11.
[14]   MR. ROACH: Close enough.
[15]   MR. WELSH: I try. That's all I can do.
[16]   Q: Have you ever seen that document before?
[17]   A: I believe this was sent to me by
[18] Vinny — by you, right? Was this sent to us by you?
[19]   MR. ROACH: I will stipulate that we
[20] received from the Defendants Exhibit 11 Fiorilla.
[21]   MR. WELSH: I am wondering — I understood
[22] you received it.
[23]   Q: I guess what I ask of Ms. Skene is did you
[24] receive it?

Page 60

[1]   A: I didn't receive it from you, but I did get
[2] it from him.
[3]   Q: And —
[4]   MR. ROACH: "Him" being who?
[5]   A: Being Steve. I got this from Steve.
[6]   Q: Mr. Roach?
[7]   A: Mr. Roach.
[8]   Q: And when you received that did you go
[9] searching to see if you had any documents that
[10] responded to any of those inquiries or requests?
[11]   A: Nope. No, I did not.
[12]   Q: Is there any reason why not?
[13]   A: Because I thought what we wrote was
[14] truthful.
[15]   MR. ROACH: Objection. I'm not sure she
[16] understood. I think she might be confused between
[17] the interrogatories and the document request.
[18]   Q: You have never gone through your storage
[19] crate with all the Agfa documents to see if there
[20] are documents in there that Agfa or Bayer had
[21] requested that you produce?
[22]   A: I don't have anything — well, first of
[23] all, I guess maybe my confusion is that the
[24] information I have is personal information. Why

Case 1:04-cv-10728-WGY    Document 42-22    Filed 01/17/2007    Page 15 of 31

Jeanne M. Skene                                                    Joseph Attardi, et al.   v.
VoL 1, June 19, 2006                                         Bayer Corporation, et al.

Page 61

[1] would I have to give my personal information to you?
[2] I guess that's where my question is. That's why I
[3] don't understand what —
[4]     Q: But my question is very narrow, and I think
[5] you have answered it, but just to make sure that I
[6] have your answer. Is it fair to say that you have
[7] never gone through the storage box where you keep
[8] your Agfa documents to look for documents that may
[9] have been requested of you from Bayer?
[10]     MR. ROACH: Objection. If you
[11] understand — do you understand the question?
[12]     A: The information that I thought you were
[13] looking for is everything that I gave to Steve.
[14]     Q: What I'm asking you is at some point in
[15] this —
[16]     A: I did not go through the box.
[17]     Q: You did not go through the box?
[18]     A: That's what you are asking me?
[19]     Q: Yes.
[20]     A: I did not go through the box.
[21]     MR. WELSH: I am going to make a request
[22] for a supplementation, please.
[23]     MR. ROACH: Absolutely. This is the first
[24] time I knew about any box of documents. We'd be

Page 62

[1] happy to look for any documents that are responsive
[2] to the request, and if I believe they are not
[3] privileged or otherwise protected I'd be happy to
[4] produce copies. This is the first time I knew about
[5] it myself.
[6]     MR. WELSH: Okay.
[7]     MR. ROACH: I thought, just for the record,
[8] I have produced everything that Ms. Skene and the
[9] other Plaintiffs in this case have given me which I
[10] believe were not privileged and were subject to the
[11] request and Rule 26, but we will supplement after I
[12] review the documents she says she has.
[13]     MR. WELSH: Okay.
[14]     Q: Let's move on to the third group of
[15] documents for lack of a better term. The
[16] questionnaires you sent out in January and February,
[17] what was the purpose of sending those out?
[18]     MR. ROACH: I am going to object to any
[19] questions about purpose or any content of those
[20] documents. They were done at my request to my
[21] client. I participated in some of those questions
[22] that were — she said she didn't have an assistant.
[23] She probably meant someone by the Plaintiff. I
[24] actually drafted some of those questions to the

Page 63

[1] Plaintiffs. Ms. Skene added some questions to it as
[2] well. We worked together on some of the questions.
[3] We did it jointly. So they are attorney-client
[4] privilege, but I did want you to know that they were
[5] sent and responses were received. But as to the
[6] contents, how they were done, what they said I am
[7] going to instruct her not to answer. That I believe
[8] is privilege.
[9]     MR. WELSH: Then we'll take it slow, and
[10] I'll give you an opportunity to mark the questions
[11] that you think are off sides.
[12]     Q: What was the purpose of sending out the
[13] questionnaire?
[14]     MR. ROACH: Again, John, I am going to
[15] object because the purpose was pursuant to an
[16] attorney-client conversation done at my direction to
[17] the clients. They were communications from me
[18] through Ms. Skene as a representative to all
[19] Plaintiffs. So the purpose, content, anything that
[20] was done other than it was done I believe is
[21] protected, and she doesn't have to answer that.
[22]     MR. WELSH: I understand. We are just
[23] going to have to go forward and you are going to
[24] have to instruct her because I think you are being a

Page 64

[1] little overly inclusive of your assertion of
[2] privilege. So I have acknowledged what you have
[3] said. I am going ask questions, and you can direct
[4] her not to answer if you think that is appropriate.
[5]     MR. ROACH: Okay. Fair enough.
[6]     Q: Ms. Skene, what was the purpose of sending
[7] these sheets?
[8]     MR. ROACH: I am going to object and
[9] instruct her not to answer. It's attorney-client
[10] privilege in anticipation of litigation and attorney
[11] work product. I assume you will reserve your rights
[12] on that, and we will go to the next question.
[13]     MR. WELSH: I want to reserve my rights on
[14] it and go to the next question.
[15]     Q: Ms. Skene, did you collect completed forms
[16] from other Plaintiffs?
[17]     MR. ROACH: You can answer that one.
[18]     A: Yes, I did.
[19]     Q: How many Plaintiffs returned to you
[20] completed forms?
[21]     MR. ROACH: I believe I'm going to, again,
[22] instruct her not to answer that question for the
[23] same privileges I asserted before, attorney-client,
[24] anticipation of litigation, work product and part of

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 65

[1] the objection of course is that they were verbal as
[2] well as written communications through these people
[3] through meetings and telephone calls and so forth.
[4] I don't believe that's — I believe that's
[5] protected.
[6]    MR. WELSH: I'll reserve my right.
[7]    MR. ROACH: You can reserve your right.
[8]    MR. WELSH: I'll reserve my right.
[9]    Q: Ms. Skene, what became of the forms that
[10] you received back from Plaintiffs?
[11]    MR. ROACH: You can answer that one.
[12]    A: I compiled the information to make sure
[13] that when I answered your questions I had the right
[14] information.
[15]    Q: When you say you compiled the information,
[16] can you be more descriptive of what you actually
[17] did?
[18]    A: Then I would be telling you what the
[19] questions were if I did that.
[20]    Q: Is there a way you can tell me what you did
[21] without telling me the specific contents of the
[22] forms?
[23]    A: I was making sure that everybody agreed to
[24] the same exact reasonings.

Page 66

[1]    Q: Is it fair to say you compared the forms
[2] that you received from various people to see if
[3] there was consistency?
[4]    A: Almost unanimously the same answers.
[5]    Q: Did you do anything in response — did you
[6] compile a summary document or something along those
[7] lines as part of this process?
[8]    MR. ROACH: You can answer that one. Just
[9] as long as you don't say what the content is you can
[10] answer that question. It's a yes or no question.
[11]    A: I compiled — yes, I have a sheet that
[12] tells me the answers, yes.
[13]    Q: How many page sheet is it? Without telling
[14] me what's on it, how many page sheet is it?
[15]    MR. ROACH: You can answer that question.
[16]    A: Probably three sheets long, just a
[17] person with a name.
[18]    Q: Now, the original documents you got back
[19] from various coPlaintiffs, what happened to those
[20] original documents?
[21]    MR. ROACH: They are in my possession.
[22]    MR. WELSH: She has to testify. When you
[23] raise your hand we'll ask you questions.
[24]    MR. ROACH: I'm not going to let her

Page 67

[1] answer.
[2]    A: I gave him the originals.
[3]    MR. WELSH: You are not going to.
[4]    MR. ROACH: I am just trying to shorthand
[5] it.
[6]    A: I gave him the originals. I gave him all
[7] the originals.
[8]    Q: Did you retain copies?
[9]    MR. ROACH: You can answer that one. It's
[10] a yes or no question.
[11]    A: Of course I did. Yes.
[12]    Q: You compiled an approximately three-page
[13] sheet which summarized the documents and the
[14] conversations you had with Plaintiffs?
[15]    A: Yes.
[16]    MR. ROACH: Can we go off the record just a
[17] second, John.
[18]    MR. WELSH: Yes, of course.
[19]    (Discussion off the record)
[20]    MR. WELSH: We'll take a break from the
[21] deposition right now. So the record is clear,
[22] counsel had thought they had come to a stipulation
[23] with respect to a matter, but it seems that an
[24] aspect of that stipulation may have not been agreed

Page 68

[1] upon based on confusion between counsel. And at
[2] this time we are going to take a break so Mr. Roach
[3] can talk to his client, and we can decide how to go
[4] forward. Take a break.
[5]    MR. ROACH: Before we go off the record my
[6] position is we did agree to something. I don't
[7] believe there should have been any confusion or was,
[8] but we'll take a break.
[9]    (Recess taken from 11:12 to 11:21 a.m.)
[10]    MR. WELSH: Let's go on the record.
[11]    MR. ROACH: My position was that Ms. Skene,
[12] in representing along with Bert Guilmette and Vinny
[13] Fiorilla, was going to be able to have in front of
[14] her notes to help jog her memory as a representative
[15] of all 63 people if she needed to. She has not so
[16] far in this deposition, but if she needed to I
[17] believe on at least three occasions Mr. Welsh and I
[18] had agreed she could bring such notes if she needed
[19] them to jog her memory. And it was my understanding
[20] that Mr. Welsh had agreed that she could do that
[21] without having him obtain a copy if she refers to
[22] them. In this way we would perhaps foreclose
[23] additional depositions of numerous — several or
[24] numerous or even a few other Plaintiffs if she could

Page 69

[1] get the collective understanding and memory of
[2] everyone. I had thought we had agreed to that so
[3] that we could forego taking numerous more
[4] depositions of the Plaintiffs, and therefore
[5] Ms. Skene compiled some notes just to have in front
[6] of her in case she needed to refer to them. And if
[7] she did refer to them Mr. Welsh would not receive a
[8] copy; that's what I understood we had agreed to.
[9]    MR. WELSH: Just so the record is clear,
[10] from my perspective this dispute starts with
[11] response to Defendants' interrogatories where we
[12] asked specific interrogatories about what said what
[13] to whom and when, and in response we had what I
[14] would characterize as conclusory responses that did
[15] not provide me the specific detail on the actual
[16] allegations of statements made to Plaintiffs or
[17] misrepresentations made to Plaintiffs. I understood
[18] going in that these three representatives of the
[19] Plaintiffs would have that information. So in lieu
[20] of pushing for supplementation of interrogatory
[21] answers I was going to achieve that through
[22] deposition of Mr. Guilmette, Mr. Fiorilla and
[23] Ms. Skene.
[24]    I did agree that Ms. Skene could come in

Page 70

[1] with a "cheat sheet" or a note to look at and
[2] reference. I do not recall any discussion or
[3] agreement on whether or not I would get to see the
[4] document, and I thought it was clearly understood
[5] that if the witness was referring to a document
[6] during the deposition under standard rules I would
[7] get to review that document.
[8]    So we have a confusion between counsel that
[9] resulted in no agreement concerning the way we would
[10] go forward. What I will do is I will go forward and
[11] ask questions of Ms. Skene. I had always assumed
[12] that since she's answering for others in her
[13] representational capacity that based on that I would
[14] get to see this information, but we'll go forward
[15] and we'll ask Ms. Skene a number of questions for
[16] her to answer both individually and, if you will, as
[17] a representative of the 63. If she could do so
[18] without looking at her notes, that's fine. If she
[19] needs to look at her notes what is our understanding
[20] about that?
[21]    MR. ROACH: Our understanding is that I
[22] disagree with your position that there was confusion
[23] between counsel. I thought it was clear. But with
[24] that agreement to disagree, if she needs to refer to

Page 71

[1] the notes I will give you a copy and mark it as an
[2] exhibit.
[3]    MR. WELSH: Let's put it this way: So my
[4] attempts of courtesy are not misconstrued, I am
[5] absolutely confident beyond a shadow of a doubt that
[6] I didn't agree that I wouldn't see these notes.
[7] Maybe if I misunderstood the nature of our
[8] disagreement it is fully captured.
[9]    MR. ROACH: Fair enough. And I've agreed
[10] that you can see a copy of the notes should she in
[11] the future of this deposition need to refer to them.
[12]          BY MR. WELSH:
[13]    Q: Ms. Skene, so you don't have the attorneys
[14] arguing about whether or not you looked at them or
[15] not, I am going to ask you to please give them to
[16] Mr. Roach so we'll know when you are looking at them
[17] so we won't have that disagreement.
[18]    MR. ROACH: Fair enough. You can have them
[19] any time you wish to see them.
[20]    A: Oh, my Lord. Okay.
[21]    Q: In preparation for today's deposition did
[22] you look over the actual sheets that you received
[23] back from Plaintiffs?
[24]    A: Not in the last couple of weeks, no.

Page 72

[1]    Q: When did you prepare your summary or your
[2] report?
[3]    MR. ROACH: Are you talking about the notes
[4] we just talked about just now?
[5]    MR. WELSH: Yes, yes.
[6]    MR. ROACH: You can answer that.
[7]    THE WITNESS: These notes here
[8] (indicating)?
[9]    MR. ROACH: Yes.
[10]    A: This was done last night.
[11]    Q: Did you reference any other documents to
[12] prepare the notes you have with you today?
[13]    A: No. I just used bullet words to make sure
[14] I didn't make mistakes.
[15]    Q: On the thing you did last night, the
[16] document you prepared last night did you look at any
[17] of the forms that you had from any Plaintiffs?
[18]    A: (No verbal response)
[19]    MR. ROACH: You have to answer verbally.
[20]    A: No, I didn't look at any other notes. I
[21] just sat there writing down what I thought was
[22] important.
[23]    Q: So you did it off the top of your head?
[24]    A: (No verbal response)

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 73

[1]  Q: You have to say yes.
[2]  A: Yes, it was off the top of my head with the
[3]  exception of one thing.
[4]  Q: Without telling me what that one thing was,
[5]  what did you do with that one thing?
[6]  A: I can tell you what it was. It doesn't
[7]  matter. It was a number of employees and how long
[8]  they have been with the company is the only thing
[9]  that I looked at.
[10]  Q: Other than what you prepared last night
[11]  have you ever prepared any other summary?
[12]  A: Not to come here, no.
[13]  Q: But for any other purpose?
[14]  A: I prepared the questions that were —
[15]  Q: Okay. I understand you and perhaps
[16]  Mr. Roach prepared some questions and sent them out?
[17]  A: Yes.
[18]  Q: We'll call those the questionnaires.
[19]  A: Thank you.
[20]  Q: The questionnaires came back both
[21]  electronically and hard copy, and you may have had
[22]  conversations; is that right?
[23]  A: Yes.
[24]  Q: Now, from those questionnaires and that

Page 74

[1]  information did you prepare any summary document?
[2]  I'm not going to ask you the contents of it.
[3]  MR. ROACH: I'm going to instruct her not
[4]  to answer. I mean, to ask her what she did to
[5]  prepare for today's deposition is fine in terms of
[6]  generally. But I mean, to get into — you know,
[7]  there has been communications back and forth between
[8]  her and I, and I don't think I am going to let her
[9]  answer that. Because we took into account meetings
[10]  that were had with all the people in person, also
[11]  telephone calls, these questionnaires that we have
[12]  talked about. So for her to go into what she
[13]  exactly did I think gets into attorney-client work
[14]  product in anticipation of litigation so I am going
[15]  to instruct her not to answer.
[16]  MR. WELSH: I am pretty sure that the
[17]  contents of the document may be protected but the
[18]  document itself is not. Whether she prepared a
[19]  summary, I can ask if she prepared a summary. If I
[20]  ask her to say what is the contents of that summary,
[21]  I then may cross the line. So what I'm asking for
[22]  is did she prepare a summary of these
[23]  questionnaires.
[24]  MR. ROACH: I think that's anticipation of

Page 75

[1]  litigation, John. I prepared a summary and showed
[2]  it to her.
[3]  A: Right.
[4]  MR. ROACH: I worked together with her with
[5]  the summary. She worked on it. We worked on it
[6]  together. So I think — I mean —
[7]  MR. WELSH: If she testifies to that, I
[8]  don't see that as a waiver of the privilege of work
[9]  product. The existence of a summary is not
[10]  disclosure of its content.
[11]  MR. ROACH: Well, you know, what I did, no,
[12]  I think it's privileged, John, the fact that I did
[13]  it. I don't know where you are going with it if you
[14]  can't see the content of it. What I did and what
[15]  she did to prepare for any part of the case for
[16]  today I don't think you are entitled to. It would
[17]  be like me asking your client, what did you do —
[18]  Mr. Wells do in his office with his client.
[19]  MR. WELSH: No, because if you asked him
[20]  "Did you meet with Mr. Welsh," the answer would be
[21]  yes. Again, "Did you look at documents," the answer
[22]  would be yes.
[23]  MR. ROACH: Are you going to let me ask
[24]  your client "Did you ever receive some summaries

Page 76

[1]  from Mr. Welsh about the case?"
[2]  MR. WELSH: You should feel free to.
[3]  MR. ROACH: I think it's —
[4]  MR. WELSH: You should feel free to.
[5]  MR. ROACH: I think we are shading into
[6]  privileged area here so let's reserve our rights on
[7]  that.
[8]  MR. WELSH: Let's make it clear on the
[9]  record.
[10]  BY MR. WELSH:
[11]  Q: Did you ever compile a summary?
[12]  A: I did not.
[13]  Q: Have you ever reviewed a summary of the
[14]  contents — without telling me the content of it,
[15]  did you ever review a summary of the questionnaires?
[16]  A: I reviewed part of it, not the whole thing.
[17]  Q: When is the last time you reviewed it?
[18]  A: It must have been Saturday.
[19]  Q: That was two days ago?
[20]  A: Saturday would be the 17th.
[21]  Q: Of June?
[22]  A: June.
[23]  Q: On Saturday why did you review it?
[24]  MR. ROACH: Objection. Let's move on to

Page 77

[1] another line of questioning, John. I am not going
[2] to let her answer that question. I think you are
[3] getting into too much —
[4]   **MR. WELSH:** On what basis?
[5]   **MR. ROACH:** Attorney-client privilege,
[6] attorney work product.
[7]   **MR. WELSH:** She reviewed this document on
[8] Saturday for a Monday deposition.
[9]   **MR. ROACH:** The document I prepared.
[10]   **MR. WELSH:** That doesn't matter.
[11]   **Q:** Did you review the document that Mr. Roach
[12] prepared on Saturday to prepare for today's
[13] deposition?
[14]   **MR. ROACH:** Go ahead. You can answer that.
[15]   **A:** Yes, I did look at it.
[16]   **Q:** And was the purpose you looked at it to
[17] refresh your memory?
[18]   **MR. ROACH:** Objection.
[19]   **Q:** Was the purpose you looked at it to refresh
[20] you memory?
[21]   **MR. ROACH:** I am going to object. Go
[22] ahead. You can answer.
[23]   **A:** No.
[24]   **Q:** Why did you look at it?

Page 78

[1]   **MR. ROACH:** Objection. No, that's
[2] attorney-client privilege. "Why" is — we are
[3] getting too far, John. She is not going to answer
[4] that question. You can reserve your rights.
[5]   **MR. WELSH:** I am going to request that the
[6] documents that she reviewed on Saturday be presented
[7] to me, and please mark the deposition here. I
[8] object to the assertion of attorney-client
[9] privilege. I don't think it's — I think it's not
[10] accurate to assert it on these grounds. I don't
[11] think I have asked a question yet that has intruded
[12] on either the work product protection or the
[13] attorney-client privilege.
[14]   **MR. ROACH:** A document I prepared to show
[15] to my client you think is not attorney-client
[16] privilege?
[17]   **MR. WELSH:** When it is reviewed on the eve
[18] of a deposition in this manner, no.
[19]   **MR. ROACH:** But it wasn't to refresh her
[20] memory.
[21]   **MR. WELSH:** How do I know that?
[22]   **A:** I just told you.
[23]   **MR. ROACH:** She just said it was.
[24]   **MR. WELSH:** I don't know the reason.

Page 79

[1]   **MR. ROACH:** The reason would be
[2] attorney-client privilege, sir. I am going to
[3] object. We can reserve the rights. Let's move on.
[4] Go ahead.
[5]   **BY MR. WELSH:**
[6]   **Q:** How many pages was the document you
[7] reviewed?
[8]   **MR. ROACH:** No more questions on the
[9] document, sir.
[10]   **MR. WELSH:** You are not allowing me to
[11] flesh this out at all?
[12]   **MR. ROACH:** No, not a document that I
[13] prepared and she reviewed. I'm not going to have
[14] her answer any more questions in that regard. You
[15] can reserve your rights. You have reserved your
[16] rights on the record. Let's move on.
[17]   **Q:** Other than that any other documents that
[18] you reviewed on Saturday?
[19]   **A:** No, no.
[20]   **Q:** So in the last week is it fair to say the
[21] only document you reviewed was this document on
[22] Saturday?
[23]   **A:** Is that the only thing — no, because I
[24] looked at the interrogatories that you sent.

Page 80

[1]   **Q:** You looked at the answers to
[2] interrogatories?
[3]   **A:** I looked at the one that I have.
[4]   **Q:** When you say "interrogatories," did they
[5] have questions and answers?
[6]   **A:** No. They were just strictly the paper that
[7] we originally sent out that — I didn't look at the
[8] one that you wrote, you sent back to us.
[9]   **Q:** So I have it clear, these were questions
[10] that the Plaintiffs asked —
[11]   **A:** December 8th, December 8th is the date.
[12]   **MR. ROACH:** Let him show it to you. I have
[13] it here if you want.
[14]   **MR. WELSH:** I have it, Steve. Thank you.
[15] I have it, Exhibit 27. I am just going to mark a
[16] new exhibit. I am just going to mark it Exhibit 1
[17] because now it's getting too confusing. I am pretty
[18] sure I have it photocopied.
[19]   **MR. ROACH:** Here you go (indicating). Is
[20] that what you are looking for?
[21]   **MR. WELSH:** Yes, it is. Would you please
[22] mark this as Exhibit 1. Do you want another one?
[23] It's the same thing.
[24]   **MR. ROACH:** Why are we remarking it? It's

Joseph Attardi, et al.   v.
Bayer Corporation, et al.

Page 81

[1] a waste of time.

[2]    **MR. WELSH:** We can get over that, though.

[3]    **Q:** Here you go. Here is Exhibit 1. I am

[4] going to ask you to turn to the last page prior to

[5] the exhibits. On Page 17 of the document —

[6]    **A:** That's my signature.

[7]    **Q:** Is that a document that you reviewed within

[8] the last — wait a second.

[9]    **MR. WELSH:** Can I have that back, please.

[10] Steve, could I have that back, please. Could I have

[11] it back, please.

[12]    **MR. ROACH:** We have already marked it.

[13]    **MR. WELSH:** Could I have it back, please,

[14] Steve.

[15]    **MR. ROACH:** No. We've marked it as an

[16] exhibit.

[17]    **MR. WELSH:** I am asking you to give me the

[18] original exhibit back, please.

[19]    **MR. ROACH:** John, you have marked it.

[20]    **MR. WELSH:** I am asking could I have the

[21] exhibit back, please. I obviously marked one of my

[22] work copies, and now you are not letting me have it

[23] back.

[24]    **MR. ROACH:** I am going to make a statement

Page 82

[1] on the record. I offered for Mr. Welsh to just show

[2] her Exhibit 10 of Fiorilla which is the same answers

[3] to interrogatories that were previously marked and

[4] he showed Ms. Skene. He refused to do it. He has

[5] remarked as Skene No. 1 Plaintiffs' Answers to

[6] Interrogatories. He now has asked for this document

[7] back because it appears as though there is some

[8] markings on here that reflect comments, statements

[9] and highlights. I am going to reserve my rights

[10] with respect to this document to ask for it again,

[11] but with that on the record I am going to give

[12] it —

[13]    **MR. WELSH:** Will you give me the document.

[14] Christ sakes.

[15]    **MR. ROACH:** I am going to give it back to

[16] Mr. Welsh.

[17]    **MR. WELSH:** Don't act like a jerk. Let the

[18] record reflect that we put the sticker on a copy

[19] that had my personal marks. I am going to ask the

[20] reporter to mark a new document as Exhibit 1, and

[21] we'll put that in front of the witness.

[22]    **MR. ROACH:** Why don't we just use Exhibit

[23] 10, John?

[24]    **MR. WELSH:** Because I don't want to, Steve.

Page 83

[1]    **MR. ROACH:** That's a reasonable request.

[2]    **MR. WELSH:** Well, you can take it to the

[3] judge.

[4]    (Document marked as Skene

[5] Exhibit 1 for identification.)

[6]       **BY MR. WELSH:**

[7]    **Q:** Ms. Skene, I have placed a —

[8]    **MR. ROACH:** Let me say something, please.

[9]    **MR. WELSH:** Please say it quick. I only

[10] have a day for this deposition so please move

[11] quickly.

[12]    **MR. ROACH:** I take exception to your

[13] remarks.

[14]    **MR. WELSH:** Noted.

[15]    **MR. ROACH:** Okay. Go ahead.

[16]    **Q:** Ms. Skene, I have put a document in front

[17] of you. It's a substituted Exhibit 1. Is that your

[18] signature on Page 17?

[19]    **A:** Yes, it is.

[20]    **Q:** Is that the document you reviewed on

[21] Saturday?

[22]    **A:** The front page is different than mine.

[23]    **Q:** It is?

[24]    **A:** It is.

Page 84

[1]    **Q:** How is it different? Before you look at

[2] any documents, talk to your counsel, please.

[3]    **A:** It's no big deal. This says December 8th,

[4] 2005.

[5]    **MR. ROACH:** Well, she is just pointing to a

[6] cover letter to Mr. Welsh from me where I sent it to

[7] Mr. Welsh. That's all.

[8]    **A:** Oh, okay. All right. So that's the

[9] difference.

[10]    **Q:** Other than that is there any — other than

[11] the cover letter, ma'am, is there any other

[12] difference between Exhibit 1 and what you looked at

[13] Saturday?

[14]    **A:** Not unless I've read it. I mean, I don't

[15] have time to sit here and read the whole thing.

[16]    **Q:** To your best understanding it's the same

[17] document?

[18]    **A:** I would assume this one is going to be

[19] accurate the same as the one I have here.

[20]    **Q:** Thank you. So as I understand it, on

[21] Saturday you looked through the summary prepared by

[22] your counsel and you looked at a version of Exhibit

[23] 1. Is there anything else you looked at on

[24] Saturday?

Page 85

[1] A: I looked at Vinny's — not all of it, but I
[2] looked at some of the wording on Vinny's questions
[3] that you did.
[4] Q: You skimmed his transcript?
[5] A: Yes, I did, just to get an idea of what
[6] kind of questions you would ask.
[7] Q: Anything else?
[8] A: I don't recall anything else.
[9] Q: Mrs. Skene, at the time EFTC took over just
[10] prior to that do you recall what your annual salary
[11] was for Bayer?
[12] A: I don't recall exactly what it was because
[13] it was a differential in between there.
[14] Q: When you joined EFTC did your salary
[15] increase, decrease or stay the same?
[16] A: Mine I believe they — I think they all
[17] went up a little tiny bit, a minute amount.
[18] Q: Just prior to the EFTC transaction you were
[19] working at 80 Industrial Way?
[20] A: Correct.
[21] Q: And after the EFTC — immediately after the
[22] EFTC transaction did you continue to work at 80
[23] Industrial Way?
[24] A: Correct.

Page 86

[1] Q: How long did you work at 80 Industrial Way
[2] for EFTC?
[3] A: I believe it was about a year and a half.
[4] It might have been about a year and a half, almost
[5] two years when they moved to Lawrence.
[6] Q: So I have it right, you were on a medical
[7] leave of absence till early August 1998?
[8] A: Yes, I was.
[9] Q: Is it fair to say prior to August 1998 —
[10] please strike that. Is it fair to say prior to
[11] August 1st, 1998, you had no conversations with any
[12] Agfa managers about the EFTC transaction?
[13] MR. ROACH: Objection. You can answer.
[14] A: I didn't talk to any managers.
[15] Q: Had you had any conversations prior to
[16] August 1st, 1998, with co-workers —
[17] A: Yes.
[18] Q: — that informed you of a potential
[19] transaction with EFTC?
[20] A: Yes.
[21] Q: Who would the co-workers be that you spoke
[22] to?
[23] A: Oh, my word. Who called? I know that
[24] Linda Saulnier — do you want the spelling, too?

Page 87

[1] Q: I don't need the spelling, but you can —
[2] at the end of the deposition you can provide it.
[3] A: I need to look at the spelling on my paper.
[4] That's why I brought it.
[5] Q: Is it on this?
[6] A: It has to be, right? Yes, it is.
[7] MR. WELSH: Let the record reflect that I
[8] put Exhibit 1 before the witness.
[9] MR. ROACH: Skene Exhibit 1, second Skene
[10] Exhibit 1.
[11] A: S-a-u-l —
[12] MR. WELSH: To be clear, it's the only
[13] Skene Exhibit 1. Go ahead.
[14] A: You two are worse than — S-a-u-l-n-i-e-r,
[15] Saulnier, Linda.
[16] Q: Thank you. Anyone else?
[17] A: Who else talked to me? I would think that
[18] Diana Glassett had spoke to me. I don't remember
[19] all the people that talked to me.
[20] Q: Is it fair to say that shortly —
[21] A: There were several.
[22] Q: — shortly before your resumption of work
[23] at Agfa you were aware of a pending negotiation
[24] concerning the sale of the printed circuit board —

Page 88

[1] A: Correct.
[2] Q: Now, we talked about Ramsden. Norm
[3] Fontaine, I understand that he witnessed one of your
[4] conversations with Ramsden when you talked about the
[5] floating holidays?
[6] A: Correct.
[7] Q: Did you ever have any other conversations
[8] with Norm Fontaine, prior to the EFTC transaction,
[9] in which severance pay was discussed?
[10] A: Yes.
[11] Q: Can you tell me when that was?
[12] A: It was sometime in the August time frame,
[13] not exactly what day it was.
[14] Q: Was anyone else present?
[15] A: No. Just him and I.
[16] Q: What did he say? What did you say?
[17] A: I asked him if there was a possibility of
[18] me being terminated and become — and having my
[19] severance package instead of going to EFTC.
[20] Q: Did he respond?
[21] A: He said, "No."
[22] Q: Anything else said?
[23] A: I always started my conversations off about
[24] work whenever I spoke to someone, and then I threw

Page 89

[1] in my words after, so yes. We talked about work.
[2] **Q:** So there was general conversation about
[3] work items?
[4] **A:** First off, yes.
[5] **Q:** And then you threw in "Can I be terminated
[6] and take the severance?"
[7] **A:** Correct. I always started my conversations
[8] off with what they wanted to hear and then I asked
[9] if I could stay with Bayer, get transferred into the
[10] other area or could I just take the termination and
[11] have my severance, and he said, no, I couldn't do
[12] that.
[13] **Q:** Now, on this particular conversation,
[14] though, did you — in addition to asking whether you
[15] could be terminated and take your severance did you
[16] also ask him if you could be transferred within
[17] Bayer?
[18] **A:** Yes, I did.
[19] **Q:** So, again, just to see if I could have it
[20] all, you talked about some work items and then at
[21] that time you moved on to questions about whether or
[22] not you could be transferred within Bayer and not be
[23] transferred to EFTC?
[24] **A:** Right.

Page 90

[1] **Q:** And you also asked him whether or not you
[2] could just be terminated and take severance pay?
[3] **A:** Correct.
[4] **Q:** He answered no to those two inquiries?
[5] **A:** Yes, he did.
[6] **Q:** Do you remember anything else being
[7] discussed between you and he at this time?
[8] **A:** In relevance to this case or work?
[9] **Q:** With respect to severance pay or taking a
[10] job with EFTC?
[11] **A:** No, I don't think I had any more
[12] conversations on that.
[13] **Q:** Now, other than this meeting and the
[14] earlier meeting when Ramsden was present, any other
[15] conversations with Mr. Fontaine, up to the time of
[16] the EFTC transaction, in which you discussed
[17] severance pay or employment with EFTC?
[18] **A:** I know personally those were my
[19] conversations, but I know that there are many people
[20] that spoke to these people because they worked
[21] during the day. They all spoke to Ramsden or
[22] Fontaine or Leonard, and then I'd have — to tell
[23] you I would have to look at my notes.
[24] **Q:** Now, based on your memory without looking

Page 91

[1] at your notes do you recall — now, did these people
[2] report their conversations with Ramsden, Fontaine
[3] and Leonard to you in and around August 1998?
[4] **A:** There are several people, and I don't know
[5] how many of them, told me that they spoke to upper
[6] management. They were all told the same thing, that
[7] they could not — personally spoke, not just at a
[8] general meeting, but personally spoke to Mary
[9] Leonard, Norm Fontaine or Dick Ramsden, and they all
[10] were told the same thing, that there were no
[11] severance packages going to be available, and that
[12] was in the August time frame.
[13] **Q:** So you don't know how many precisely told
[14] you in and around August that they also had spoken
[15] with Mary Leonard, Norm Fontaine and Dick Ramsden
[16] and they were told they can't have a severance
[17] package and they can't transfer within Bayer; is
[18] that fair?
[19] **A:** They were more than half the people that
[20] told me that they spoke to one of those three. But
[21] exactly the number, I can't tell you.
[22] **Q:** Now, you may have answered this, but just
[23] for clarity, I'm just talking about you personally
[24] now, not what other people told you, but you

Page 92

[1] personally, you have had two conversations with
[2] Norm, one was about the holidays when Ramsden was
[3] there and the other one was the conversation you
[4] just talked about, about can I be transferred
[5] someplace else in Bayer or be terminated and get
[6] severance; is that right?
[7] **A:** Yes.
[8] **Q:** Any other conversations between you and
[9] Norm Fontaine concerning the EFTC transaction or
[10] your entitlement to severance pay?
[11] **MR. ROACH:** Is this before the transfer
[12] now?
[13] **MR. WELSH:** Yes, this is before.
[14] **A:** I don't recall any other conversations.
[15] **Q:** How about Mary Leonard; did you have any
[16] conversations, you personally, with Mary Leonard?
[17] **A:** Only once.
[18] **Q:** This is prior to the transaction?
[19] **A:** Just prior to the transaction when we found
[20] out we were not getting our severance packages.
[21] **Q:** So the conversation you had with Norm
[22] Fontaine, was that after you had found out you
[23] weren't getting severance packages?
[24] **A:** Yes, it was after the fact, after I found

Case 1:04-cv-10728-WGY    Document 42-22    Filed 01/17/2007    Page 23 of 31

eanne M. Skene                                          Joseph Allard, et al.    v.
Vol. 1, June 19, 2006                                   Bayer Corporation, et al.

Page 93

[1] out, and I didn't want to go knowing that I was
[2] leaving all that behind.
[3]    **Q:** Now, with Mary Leonard it was after you
[4] found out no severance you had a conversation with
[5] her?
[6]    **MR. ROACH:** Objection. Go ahead.
[7]    **A:** All of those people that I spoke to in
[8] August was after they told us we were not getting
[9] severance packages.
[10]    **Q:** Okay.
[11]    **A:** Because I was not there at any of the
[12] meetings that — before we were told we weren't
[13] getting it. So my conversations, personal
[14] conversations were done after we were told.
[15]    **Q:** So your personal conversation with Mary
[16] Leonard, was there more than one of them?
[17]    **A:** Just one that I recall.
[18]    **Q:** Anyone else present?
[19]    **A:** Just her and I.
[20]    **Q:** Where did it take place?
[21]    **A:** In her office.
[22]    **Q:** What led to you being in her office?
[23]    **A:** I had to sign some paper, and I don't know
[24] what it was. I think it was the termination paper.

Page 94

[1] We had to sign a paper saying that we were
[2] terminated from Agfa — from Bayer-Agfa Division.
[3]    **Q:** Did you have a 401(k) loan with Bayer at
[4] the time of the transition to EFTC?
[5]    **A:** Of course. Everybody did.
[6]    **Q:** Did you have to sign a paper pertaining to
[7] that; do you know?
[8]    **A:** I didn't — no, I don't remember. I don't
[9] recall signing anything about that with Mary
[10] Leonard. I only remember signing something that had
[11] to do with termination.
[12]    **Q:** Now, to the best of your memory what did
[13] she say and what did you say concerning the
[14] severance package?
[15]    **A:** I said, "If I'm being terminated does that
[16] mean I qualify to get my severance package," and she
[17] looked at me and laughed and said, "No." And I got
[18] a little ticked off at her.
[19]    **Q:** What did you say?
[20]    **A:** I said, "Well, I don't think that was
[21] appropriate," and I told her that after 26 years in
[22] the company that I felt as though we were being
[23] screwed. Those were my words to her.
[24]    **Q:** Did she respond to you?

Page 95

[1]    **A:** She said, "Deal with it." So that was the
[2] end of my conversation with Mary Leonard.
[3]    **Q:** She said "Deal with it"?
[4]    **A:** Well, I'm sure those weren't exactly her
[5] words, but they were on those ideas. So it
[6] meant —
[7]    **Q:** In other words, the spirit of what she
[8] said. Those aren't her precise words?
[9]    **A:** After all these years I'm going to say that
[10] those were my words, but that's how she implied.
[11] How is that?
[12]    **Q:** Okay. Anything else said?
[13]    **A:** No. I was upset enough. I didn't want to
[14] hear any more.
[15]    **Q:** Were you upset because she laughed?
[16]    **A:** I was pissed that she laughed.
[17]    **Q:** Were you upset going in before that?
[18]    **A:** No, no.
[19]    **Q:** So it was her reaction that caused you
[20] to —
[21]    **A:** To get angry. Oh, I got angry at her.
[22]    **Q:** Did you discuss her reaction with anybody?
[23]    **A:** No, because I don't think anybody cared at
[24] that point.

Page 96

[1]    **Q:** That's the only conversation you had with
[2] Mary Leonard on severance?
[3]    **A:** I have never spoken to the lady since.
[4]    **Q:** And that was the first time you talked to
[5] her about severance, that time?
[6]    **A:** Correct.
[7]    **Q:** Any other manager at Bayer — did you talk
[8] with any other manager at Bayer about severance at
[9] any time up until the date of the transaction with
[10] EFTC?
[11]    **A:** I don't recall any others.
[12]    **Q:** Now, there were — I am told that there
[13] were some group meetings in the cafeteria with
[14] representatives of Bayer making presentations about
[15] the transaction. Did you ever attend any of those?
[16]    **A:** I did not go to any of those meetings.
[17] There was one in August, but it was at the time
[18] frame that I wasn't in work and I wasn't told about
[19] it till after the meeting was done. So I couldn't
[20] even attend it. So I wasn't told about any of the
[21] meetings that were in the cafeteria because I was
[22] out on medical. So I couldn't even go in to attend
[23] any of the meetings because I was never told about
[24] them.

Page 97

[1] Q: Did anyone ever send you any e-mails or
[2] anything updating you what was happening?
[3] A: What do you mean by "anyone"?
[4] Q: Co-workers.
[5] A: Co-workers, I don't know. One lady always
[6] e-mailed me, but I can't tell you all the stuff that
[7] she told me. I don't remember it.
[8] Q: Do you know which woman that was?
[9] A: Linda Saulnier. Linda Saulnier would tell
[10] me what was going on because she worked third shift.
[11] Q: So she worked — overlapped your shift to
[12] some extent?
[13] A: Yes.
[14] Q: Now, prior to becoming an EFTC employee did
[15] you ever meet with anyone from EFTC?
[16] A: I never met with anyone, personally. Now,
[17] remember we are going to get a little confused. You
[18] are asking me personal questions and I'm assuming
[19] I'm still representing 63 people.
[20] Q: I am going to ask you the personal
[21] questions and then I'll swing back to the
[22] representation question.
[23] A: Thank you.
[24] Q: On a personal basis had you ever met with

Page 98

[1] anyone from EFTC prior to?
[2] A: I did not. I never met them.
[3] Q: Did you fill out any paperwork?
[4] A: We filled out paperwork on the 27th. And I
[5] don't think it was an EFTC employee that I filled
[6] out the paperwork, but the person that was going to
[7] be the EFTC representative, at least I think that
[8] might be the case. I think Staci Landress is the
[9] one that sat with me and went through the paperwork
[10] because she was the one that was going to be the
[11] Human Resource person for EFTC that was a temp for
[12] Bayer-Agfa Division at the time. I believe that's
[13] how that all worked, but I could be a little fuzzy.
[14] Q: You thought she might be a temp for Bayer?
[15] A: She was a temp. She was a temp in the
[16] Human Resources department for Bayer and then they
[17] made her permanent to become the Human Resource
[18] person for EFTC.
[19] Q: Now, when you met — you filled out
[20] paperwork with her. Where did that happen? Was it
[21] near your work?
[22] A: It was in an office. I'm not sure exactly
[23] what part of the building we were in, but it was in
[24] an office.

Page 99

[1] Q: Describe what happened.
[2] A: It was a bunch of paperwork they gave us
[3] and they told us, "This is your benefits. This is
[4] it." We just signed our life away. We didn't even
[5] know what we were signing, half of us.
[6] Q: I am just talking about you yourself.
[7] A: To be honest with you, it was a done deal.
[8] I just put my Hancock on there, and I didn't really
[9] read it.
[10] Q: You didn't ask any questions?
[11] A: She didn't have any answers.
[12] Q: Did you ask questions?
[13] A: I asked her if — what did I ask her? I
[14] have to think. I don't remember. I don't think I
[15] asked her any questions, to be honest with you, now
[16] that I think of it. I may not have. I just was so
[17] discouraged. I think I just signed the paperwork
[18] and left the office.
[19] Q: Did they pass out any paperwork at that
[20] time?
[21] A: They gave — there was paperwork that was
[22] given to us for our health benefits, but I don't
[23] remember anything else being handed out to us prior
[24] to the sale. I think after the sale there was a

Page 100

[1] bunch of paperwork that we got including a handbook
[2] and stuff like that, but I don't think we got it
[3] prior to the actual sale.
[4] Q: Do you still have the handbook?
[5] THE WITNESS: Steve, did I give you a
[6] handbook?
[7] MR. ROACH: Let's not get into
[8] attorney-client. Are you asking if she had an Agfa
[9] handbook?
[10] MR. WELSH: No. At EFTC — she indicated
[11] that shortly after she joined EFTC she got the
[12] paperwork and got a handbook.
[13] MR. ROACH: If I have it I'll give it to
[14] you.
[15] MR. WELSH: I ask that you look.
[16] MR. ROACH: I'll look. I don't know.
[17] MR. WELSH: I just say for the record we
[18] went to Suntron. At least at the initial pass they
[19] indicated they didn't have any copies.
[20] MR. ROACH: We'd be happy to look for it.
[21] My clients would be happy to look for it including
[22] Jeanne and I'll look for it to see if they have
[23] given it to me. If they have given to it me I am
[24] happy to give it to you as will they.

Jeanne M. Skene
Vol. 1, June 19, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

Page 101

[1]    **MR. WELSH:** Thank you.

[2]    **MR. ROACH:** I would think that EFTC had it

[3] from the subpoena, too, John. I don't know.

[4]    **MR. WELSH:** The subpoena went there, but it

[5] was rotated back. They didn't have one.

[6]    **MR. ROACH:** If we have one we'll give it to

[7] you.

[8]    **MR. WELSH:** It's unclear from their lawyer

[9] whether they had one at one time and can't find it

[10] or they are indicating that they never had it.

[11]    **A:** But we had gotten them after the fact. We

[12] had gotten them after we had already signed up.

[13]    **MR. ROACH:** We'll look to see if we have

[14] any, and if we do we'll produce them. Now, just to

[15] be clear, you want the one that — not the recent

[16] ones. You want the one that was at the time?

[17]    **MR. WELSH:** I don't want anything

[18] subsequent to 2000.

[19]    **MR. ROACH:** Okay. Fair enough.

[20]    **MR. WELSH:** Give me a moment.

[21]    **MR. ROACH:** Off the record.

[22]        (Discussion off the record)

[23]        (Documents marked as Skene

[24] Exhibits 2 and 3 for identification)

---

Page 102

[1]    **MR. ROACH:** What is this?

[2]    **MR. WELSH:** This is —

[3]    **MR. ROACH:** This is what you got from

[4] Suntron?

[5]    **MR. WELSH:** Yes.

[6]    **MR. ROACH:** For the record I haven't had a

[7] chance to see these yet.

[8]    **MR. WELSH:** If you want to take a break and

[9] go to the bathroom and read them over.

[10]    **MR. ROACH:** No. Let's keep moving. Wait

[11] till he asks you a question.

[12]    **THE WITNESS:** I can laugh.

[13]    **MR. WELSH:** What's this? Skene Exhibit 2?

[14]    **MR. ROACH:** I don't know which one she has

[15] in front of her.

[16]    **MR. ROACH:** Oh, there is two documents.

[17]    **MR. WELSH:** One is an employment file and

[18] the other one is personal. They had two different

[19] files.

[20]    **MR. ROACH:** Just for the record the

[21] personnel — the group of documents called

[22] employment file for Jeanne Skene is Exhibit 2, and

[23] personal file for Jeanne Skene is Exhibit 3; is that

[24] right?

---

Page 103

[1]    **MR. WELSH:** Right.

[2]    **THE WITNESS:** Do you want to see this?

[3]    **MR. ROACH:** I have a copy.

[4]            BY MR. WELSH:

[5]    **Q:** On this document — I am just going

[6] through. On Page — I think it's Page 4 of the

[7] document. I have a little pen up there on your

[8] copy. I don't have it on mine.

[9]    **MR. ROACH:** Is this Exhibit 2?

[10]    **MR. WELSH:** Yes.

[11]    **Q:** "Employee Conduct and Work Rules." Was

[12] there — did you get a list, like an employee's

[13] policy and procedure manual from EFTC, if you would

[14] know?

[15]    **A:** An employee's what?

[16]    **Q:** Policy and procedure manual.

[17]    **MR. ROACH:** Objection. But go ahead.

[18]    **A:** I don't know. If it was in the handbook

[19] that they handed us. I don't know if it was in

[20] there.

[21]    **Q:** I am looking at the document on Page 4. It

[22] says "Policy," and it says, "Employee Conduct and

[23] Work Rules"?

[24]    **A:** Yes.

---

Page 104

[1]    **Q:** And it seems to be something from EFTC.

[2] Have you ever seen this during your employment by

[3] EFTC?

[4]    **A:** After the fact, yes.

[5]    **Q:** When you say "after the fact," I know there

[6] is a written warning from 2003 that this one is

[7] attached to.

[8]    **A:** That's the only time I saw it. That was

[9] first time I had seen that paper.

[10]    **Q:** But do you know this one attachment, does

[11] it come out of a book or something that EFTC had?

[12]    **A:** What you see is what I got.

[13]    **Q:** You can turn — now I'm going to a document

[14] that says "Personal Action Notice." It's right

[15] after the 2002 review it appears. Do you have the

[16] 2002 performance review?

[17]        Yes, that will be it.

[18]    **A:** No. 10.

[19]    **MR. ROACH:** What you have handwritten No.

[20] 10 at the top.

[21]    **MR. WELSH:** Steve, some of these documents

[22] are dual sided just as you count through.

[23]    **MR. ROACH:** Since I haven't seen these

[24] before today, may I have a moment to talk to my

---

Joseph Attardi, et al.  v.
Bayer Corporation, et al.

---

Page 105

[1] client about them because I don't know what they
[2] are?
[3]    MR. WELSH: Sure.
[4]    MR. ROACH: Do you want to talk for just a
[5] second?
[6]    MR. WELSH: Grab the other one, too, so you
[7] can take care of both.
[8]    (Recess taken from 12:06 to 12:14 p.m.)
[9]              BY MR. WELSH:
[10]    Q: Ms. Skene, in front of you is a personal
[11] action notice on June 9th, '01. Does this reflect a
[12] reduction in your pay rate from $20.63 to $18 an
[13] hour?
[14]    MR. ROACH: Just I think it's May 9, '01,
[15] rather than June.
[16]    MR. WELSH: I'm sorry. That's correct.
[17]    MR. ROACH: Go ahead. Sorry.
[18]    A: Yes, it does.
[19]    Q: Can you tell me what explanation you were
[20] given for this change?
[21]    A: EFTC had just had a 50-percent cut in the
[22] people that were transferred from Bayer to EFTC.
[23] They just released 50 percent of the work force, and
[24] I was not one that was cut or laid off. And they

---

Page 106

[1] turned around and they told me "Congratulations.
[2] You have made the layoff. However, I am taking away
[3] all that money out of your paycheck," basically
[4] $6,200 a year.
[5]    Q: In the "Comment" box this was your
[6] response?
[7]    A: That was my comment, yes, it was.
[8]    Q: Did other employees have their wages
[9] reduced?
[10]    A: Yes. Anybody that was from the original
[11] Bayer-Agfa Division that was left, a majority of the
[12] people got their paychecks cut.
[13]    Q: There is — the last line says, "I would
[14] rather have been laid off than to be as depressed as
[15] I am." Do you know whether or not the people who
[16] were laid off by EFTC received severance pay?
[17]    A: Four weeks maximum.
[18]    Q: So you know a number of people received a
[19] reduction in salary similar to what you received at
[20] this time from EFTC?
[21]    A: This also — yes. This also doesn't
[22] reflect it, but I also lost my shift differential
[23] that you don't see there.
[24]    Q: If you turn the page, I guess this next

---

Page 107

[1] page there is a memo from Don Baribeau to Staci
[2] Landress. Is this Staci Landress, is that the
[3] person you recall sitting with and filling out
[4] paperwork for EFTC while you were still with Bayer?
[5] Is that the same person?
[6]    A: Right.
[7]    MR. ROACH: Objection to form.
[8]    Q: Okay. So this was a — do I have this
[9] right that this is — in May 2000 it was a
[10] recalculation of your pay rate?
[11]    MR. ROACH: Objection. Go ahead.
[12]    A: According to what I'm reading, they
[13] realized that the increase — the number they gave
[14] me was four cents cheaper. So they gave me four
[15] extra cents in my paycheck.
[16]    Q: Now, if you turn the page, there is a
[17] nondisclosure agreement on the next page. Is that
[18] your signature?
[19]    A: Yes, it is.
[20]    Q: And the date on that, August 27th, 1998, is
[21] correct?
[22]    A: Absolutely.
[23]    Q: And you signed this before you started with
[24] EFTC?

---

Page 108

[1]    A: This was the day that they sent us in to
[2] sign all our life away.
[3]    Q: Now, the next page, there is an obligation
[4] statement. Again, is that your signature?
[5]    A: Yes, it is.
[6]    Q: And you signed that on August 27th, 1998?
[7]    A: Yes, I did. You didn't ask me if I read
[8] them. I didn't read any of them. I just signed my
[9] life away.
[10]    Q: What was available — I mean, the documents
[11] itself, you signed the documents without reading
[12] them?
[13]    A: I just signed my life away. I didn't even
[14] read them.
[15]    Q: I don't know — let me see if this
[16] is — the next page looks like a copy of the same
[17] nondisclosure. The next document in this pile seems
[18] to be an employment application. Did you fill this
[19] application out?
[20]    A: Yes, I did.
[21]    Q: So that's your handwriting?
[22]    A: Oh, yes, it is.
[23]    Q: And today's date is August 27th?
[24]    MR. ROACH: Not today's date.

---

Jeanne M. Skene
Vol. 1, June 19, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

Page 109

[1] **Q:** I mean, the date on this document is August
[2] 27th, 1998?
[3] **A:** Yes.
[4] **Q:** Did you read the fine print on this
[5] document before signing it?
[6] **A:** No. No, I did not. We didn't have a
[7] choice.
[8] **Q:** Turning on to the next page, is that your
[9] signature on the bottom?
[10] **A:** Are you talking about the back side of this
[11] one? Yes. Oh, yes.
[12] **Q:** The next document is a personnel action
[13] notice. Do you have that in front of you?
[14] **A:** Yes.
[15] **Q:** If I have the date right, is that 10/29 —
[16] is that '98?
[17] **A:** 10/26/98.
[18] **Q:** That's today's date?
[19] **A:** That's up top. I'm looking at the one down
[20] the bottom that's "effective."
[21] **Q:** The effective date is 10/26/98?
[22] **A:** Yes.
[23] **Q:** And you went from second shift to first
[24] shift?

Page 110

[1] **A:** Correct.
[2] **Q:** Now, when you moved from second shift to
[3] first shift did you lose any differential?
[4] **A:** Yes, I did.
[5] **Q:** Did that loss of differential occur
[6] contemporaneous with the change from first
[7] shift — from second shift to first shift?
[8] **A:** Yes. They forced me to go to first shift.
[9] **Q:** You didn't want to go to first shift?
[10] **A:** No, I did not.
[11] **Q:** Did they have a second shift?
[12] **A:** Yes, they did.
[13] **Q:** Did they tell you why you were being forced
[14] to go to first shift?
[15] **A:** You know what? Yes, we had a second shift.
[16] Because they wanted the technicians to all
[17] be on the same shift.
[18] **Q:** The next document, personnel action notice,
[19] do you have that in front of you?
[20] **A:** Yes.
[21] **Q:** Today's date up in the upper right-hand
[22] corner, August 26th, '98?
[23] **MR. ROACH:** Just for the record it's
[24] handwritten Page 18 at the top.

Page 111

[1] **MR. WELSH:** Yes.
[2] **A:** Today's date, 26th, yes.
[3] **Q:** And you see in the middle of the page to
[4] the left-hand column it has pay rate $19.87?
[5] **A:** Correct.
[6] **Q:** Was that your pay rate when you were at
[7] Bayer?
[8] **A:** Close to that, yes. I'd have to look at a
[9] document. I could find my old paycheck stub and
[10] tell you but not off the top of my head. It was
[11] close to this, I know that.
[12] **Q:** Do you know if it was less than that or
[13] more than that?
[14] **A:** It probably was less than that slightly.
[15] **Q:** The Bayer rate was less than that?
[16] **A:** Yes.
[17] **Q:** You can put that exhibit aside, Exhibit 2.
[18] If you could grab No. 3, Exhibit 3. I am getting
[19] sloppy.
[20]     Skip the first page. If you look at the
[21] document, it's 2002 EFTC paycheck benefit selection
[22] form. So about four pages in. One more page.
[23] **MR. ROACH:** Page handwritten No. 7?
[24] **MR. WELSH:** Right.

Page 112

[1] **Q:** Did you used to get forms such as this from
[2] EFTC on an annual basis?
[3] **MR. ROACH:** Objection. Starting —
[4] **A:** I don't think this —
[5] **MR. ROACH:** Starting when?
[6] **Q:** While you were working with EFTC.
[7] **MR. ROACH:** Objection. Go ahead.
[8] **A:** This is the final paper that tells you what
[9] you signed up for. This isn't what we did when we
[10] got in there. We got into — a guy came in with a
[11] computer, and we would sit there and go through what
[12] we wanted for our information, and this would be the
[13] final outcome.
[14] **Q:** Now, EFTC, did that happen annually?
[15] **A:** Once a year.
[16] **Q:** Did that happen when you were just going to
[17] join EFTC?
[18] **A:** They gave us a whole stack of stuff to do
[19] with benefits, but one of the big issues that we had
[20] was we couldn't get the life insurance because we
[21] all had pre-existing conditions. None of us had
[22] life insurance, none of us. That was one of the
[23] biggest things that everybody was starting to get
[24] nervous about when we went over to EFTC because

---

**Min-U-Script®**    Doris O. Wong Associates    (617) 426-2432

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

Page 113

[1] there was so many elderly people with pre-existing
[2] conditions, and none of us had life insurance. When
[3] we were with Bayer we had everything.
[4]    Q: You just described the process where
[5] someone came in with a laptop, sat down and asked
[6] you what do you want and what you don't want and put
[7] it on the laptop, and you suggested, at least in
[8] 2002, this was the final; is that right?
[9]    A: That's the printout, yes.
[10]    Q: In prior years, in 2000, 2001, 1999, did
[11] EFTC follow a similar procedure where someone came,
[12] they asked you about what benefits you wanted to
[13] sign up on and put it into a computer and then
[14] kicked out a sheet similar to this 2002 list?
[15]    A: Yes. Did we have that in 1998? I don't
[16] remember anybody telling me about the insurance
[17] until the very last time — minute.
[18]    Q: Let me focus when you met with Ms. Landress
[19] when you said you filled out a lot of papers in I
[20] believe it was August 1998. Did she also have a
[21] laptop computer?
[22]    A: No.
[23]    Q: Do you remember filling out — making
[24] choices about whether you accept or waive various

---

Page 114

[1] benefit coverages with her?
[2]    MR. ROACH: Objection. Go ahead.
[3]    A: There was a guy that came in, but I don't
[4] know when, that talked about what we could and
[5] couldn't have, and that was just prior to the 27th
[6] when I signed this (indicating).
[7]    Q: Do you remember what was his name?
[8]    A: No.
[9]    Q: Was it Augie?
[10]    A: No, I do not remember. All I know is the
[11] guy told me that we had pre-existing conditions and
[12] we couldn't have life insurance.
[13]    Q: They knew that before —
[14]    A: That had to do with — I would assume had
[15] to do with the insurance company.
[16]    Q: But you learned about the pre-existing
[17] thing before you went to EFTC?
[18]    A: Well, the 27th of August. It's kind of
[19] like right at the last minute.
[20]    Q: Right. Agreed. But did he indicate how he
[21] knew that you had a pre-existing condition?
[22]    A: They asked us. They asked us questions.
[23] We didn't lie.
[24]    Q: No, I'm not suggesting. So now you

---

Page 115

[1] remember — did the guy have anyone with him? Did
[2] he have a sidekick? Was there two people?
[3]    A: All I remember is talking to one man, and I
[4] don't even remember his name.
[5]    Q: Did he have an accent; do you remember?
[6]    A: No. But I bet if we dug out the old
[7] paperwork his signature has got to be on it. Find a
[8] '98 one. He's got to have his signature on it.
[9]    Q: On this one, this is 2002, and that's your
[10] signature under "Employee," second page?
[11]    A: Yes.
[12]    Q: Now, there is a G. — underneath your
[13] signature there is this G. Pratt. Do you know
[14] someone named G. Pratt who worked for EFTC?
[15]    A: I don't believe the G. Pratt represents the
[16] company. I think that these guys — EFTC has
[17] somebody from outside come in and do all of their
[18] paperwork. I don't believe that they are EFTC
[19] employees.
[20]    Q: Okay.
[21]    A: I know just recently we did ours over
[22] again, and it was someone outside that comes in and
[23] talks to us and tells us what would be best for us,
[24] someone that handles all of their benefits stuff.

---

Page 116

[1]    Q: All right. Put the loan papers away. Now,
[2] there is a document here Great-West. I think it's
[3] after this — before that. Right here (indicating).
[4] This is No. 13 on the exhibit.
[5]    MR. ROACH: Handwritten 13.
[6]    MR. WELSH: Handwritten Page 13.
[7]    Q: Did you fill this out? Is that your
[8] handwriting?
[9]    A: Yes, it's my handwriting.
[10]    Q: So all the handwriting — other than the
[11] handwritten "Page 13" in the upper right-hand corner
[12] is that all yours?
[13]    A: No.
[14]    Q: What is not yours?
[15]    A: The date says "10/1/98 to 12/31/98." I did
[16] not write that up there.
[17]    Q: All right. Anything else?
[18]    A: It looks like it might be all right.
[19]    Q: Is that your signature on the bottom of the
[20] page?
[21]    A: Yes, it is.
[22]    Q: Did you sign it on August 27th, 1998?
[23]    A: Yes, I did.
[24]    Q: Now, the next page appears to be

---

Jeanne M. Skene
Vol. 1, June 19, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

**Page 117**

[1] entitled — it's a handwritten 14 on your exhibit,
[2] handwritten Page 14. It seems to be highlights of
[3] Colonial's disability plans?
[4]  A: Okay.
[5]  Q: First, there seems to be some handwriting
[6] with a dark pen on the form itself. It looks like a
[7] magic marker or rolling ball pen. Did you fill
[8] those out?
[9]  A: No. That's not my handwriting.
[10]  Q: Is the word "Jeanne Skene" up in the right
[11] hand, is that yours?
[12]  A: No.
[13]  Q: Do you recall canceling the disability plan
[14] at any time while working for EFTC?
[15]  MR. ROACH: Objection. You can answer.
[16]  A: Yep. Yes, I do remember canceling
[17] something, but I don't remember right exactly other
[18] than it was going to be a lot of money and I thought
[19] it was stupid.
[20]  Q: Was this something you cancelled prior to
[21] you starting at EFTC?
[22]  A: No, I don't think so. I think this
[23] was — this was — is there a date on it?
[24]  Q: I am giving you what they had.

---

**Page 118**

[1]  A: This was after they cut my paycheck, and I
[2] said "I can't afford to buy all this insurance on
[3] top of losing all that money." I know that's what
[4] it was all about.
[5]  Q: So it would have been —
[6]  A: In the 2001 frame.
[7]  Q: Thank you. You can turn that. Now, the
[8] next page is an enrollment form. Again, maybe there
[9] is something on it, but I don't see a date in the
[10] 1990s on this. Do you remember if and when you
[11] applied for Colonial Life and Accident Insurance?
[12]  MR. ROACH: Just for the record, it has a
[13] hire date of January 1, '72.
[14]  MR. WELSH: Right, which would have been
[15] consistent with I think her hire date with the
[16] Agfa-related companies.
[17]  A: June 26th, 1972. That was when I was hired
[18] at Compugraphic.
[19]  Q: So the 1/1/72, that would be the year of
[20] your hire by Compugraphic, but it was not — it
[21] wouldn't be the month of your hire?
[22]  A: Correct.
[23]  Q: Is that your signature on the document?
[24]  A: Yes, it is. I'm not quite sure where this

---

**Page 119**

[1] fit into the picture, what date, what time frame
[2] this was, but I think it has to do with that same
[3] paper that we talked about just a minute ago, right,
[4] this same Colonial.
[5]  Q: I don't know that. You know, they are in
[6] the file, but it's not my file so I can't give you
[7] any representation as to what is linked with what.
[8]  A: I couldn't afford to be paying for that,
[9] lose my differential plus lose part of my paycheck.
[10] So I had to cut something, and I was hoping that
[11] nothing would happen that I cut that.
[12]  Q: Now, before you go any further, this shows
[13] alterations, if you will, after taxes of $22 and the
[14] deductions going from $29 to $22.13. If you look at
[15] the page before, that has a line through — it said
[16] "Cancel." Did there come a time that you cancelled
[17] your life and accident insurance completely?
[18]  MR. ROACH: Objection.
[19]  Q: You can answer if you are able.
[20]  MR. ROACH: You can answer. I'm sorry.
[21]  A: I'm not sure. This was — I don't have a
[22] date on it so I can't tell you for sure. If it had
[23] a date on it I could tell you if it was because I
[24] had lost so much money in my paycheck, but there

---

**Page 120**

[1] isn't a date.
[2]  Q: Do you recall whether if you made two
[3] alterations, if you cut back on benefits and then
[4] subsequently cancelled coverage completely?
[5]  MR. ROACH: Do you understand the question?
[6]  THE WITNESS: Yes. And I am trying to
[7] think.
[8]  A: I did drop — you know what this is? I
[9] know it now. There was — I bet you that's what it
[10] was. There was a place where you could buy extra
[11] insurance, and I dropped — so you see it says,
[12] "1,500" and then it's crossed out $2,000?
[13]  Q: Yes.
[14]  A: That has to be where the difference came
[15] in. That's why it dropped in price because it
[16] dropped down to $1,500 if I were out sick versus
[17] $2,000 if I was out sick. That may be what that is.
[18] I dropped it down.
[19]  Q: Do you remember whether you cancelled it
[20] completely, though, at a subsequent date?
[21]  A: No, I do not recall.
[22]  Q: Okay. You can turn to the following page.
[23] I have a W-4 form. On the bottom, is that your
[24] signature with the date of August 27th, '98?

---

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

---

Page 121

[1] A: Yes, it is.
[2] Q: And the next page I have Massachusetts
[3] employees withholding exemption August 27th, 1998,
[4] with your signature, correct?
[5] A: Yes.
[6] Q: The next document is entitled "EFTC
[7] Corporation." It says, "Enrollment Information" on
[8] the top. It appears to be something to do with a
[9] 401(k). Do you know if this is a 401(k) form you
[10] filled out?
[11] A: Yes, it is. They were asking us where to
[12] put our money.
[13] Q: And the actual designation of where to put
[14] your money, did you make those designations?
[15] A: I did.
[16] Q: In fact in the column where it says
[17] "Employee" it has, it looks like, EFT —
[18] A: "Agfa money."
[19] Q: Is that your handwriting, too?
[20] A: Yes, it is.
[21] Q: And that's your signature on August 27th,
[22] 1998?
[23] A: Yes.
[24] MR. WELSH: Is it okay, Steve? We are

---

Page 122

[1] going to flip the page.
[2] MR. ROACH: Yes.
[3] Q: The next page, application for membership,
[4] Great-West Life and Annuity Insurance Company. Is
[5] that your signature on the bottom, August 27th,
[6] 1998?
[7] A: Yes, it is.
[8] Q: Did you fill out this form?
[9] A: I did.
[10] Q: Okay. So this was your enrollment in
[11] medical and dental?
[12] A: We didn't have dental through Great-West, I
[13] don't believe. It's medical anyways.
[14] Q: I am just referring you to the top box in
[15] the middle. The membership choices, it appears, at
[16] least on this form —
[17] A: I guess we might have had Great-West for a
[18] little while, but it switched over real quick out of
[19] that. So yes, it appears that it's both.
[20] Q: But you don't have any independent
[21] recollection of that?
[22] MR. ROACH: Objection.
[23] Q: Is that true?
[24] A: No, it's there. So it's right.

---

Page 123

[1] Q: Other than looking at the document you
[2] don't have any memory yourself?
[3] A: No, I have memory. It's just I didn't
[4] recall that it was through Great-West. Because
[5] we've switched insurances so many times that we no
[6] longer have Great-West. We have many
[7] different — so that's why I had to think because
[8] right now we have a different one.
[9] Q: You can turn that page. The following
[10] document is signed by you on August 27th, 1998, is
[11] that right, the Principal Financial Group, Principal
[12] Life Insurance Company?
[13] A: It's not life insurance. Principal
[14] Financial is my 401(k).
[15] Q: This is a 401(k)?
[16] A: Yes, it is.
[17] Q: The following page, Rocky Mountain Life
[18] Insurance Company?
[19] A: Declined.
[20] Q: This is your signature — this is
[21] applicant's signature, your signature dated August
[22] 27th, 1998?
[23] A: It's my signature, yes.
[24] Q: Now, do I understand that you declined this

---

Page 124

[1] coverage?
[2] A: I did not decline it. They declined me
[3] because I had what they called a pre-existing
[4] condition. Therefore, none of us could have health
[5] insurance — this life insurance.
[6] Q: This was the application for the life
[7] insurance; is that right?
[8] A: Yes, and it was declined.
[9] Q: And you filled this out?
[10] A: Yes, I did.
[11] Q: On the 27th?
[12] A: That lovely day, yes.
[13] Q: Now, the next two pages don't concern me.
[14] MR. WELSH: So at this point in time we'll
[15] take a lunch break.
[16] (Luncheon recess taken
[17] at 12:38 to 1:14 p.m.)
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Case 1:04-cv-10728-WGY    Document 42-22    Filed 01/17/2007    Page 31 of 31

Jeanne M. Skene                                              Joseph Bariholo, et al.  v.
Vol. 1, June 19, 2006                                        Bayer Corporation, et al.

Page 125

**AFTERNOON SESSION**
**BY MR. WELSH:**

[3] **Q:** Ms. Skene, did you ever receive an offer
[4] letter from EFTC?

[5] **A:** They gave us something, but whether it was
[6] called an offer letter I'm not quite sure.

[7] **Q:** I am going to show you a document that was
[8] marked as Vinny 3.

[9] **MR. ROACH:** Vinny Fiorilla.

[10] **MR. WELSH:** Fiorilla 3.

[11] **Q:** And this was a letter to Mr. Dolan. Have
[12] you ever seen that document — never mind
[13] Mr. Dolan — but that document before?

[14] **A:** I had to have. I think every one of us got
[15] that document.

[16] **Q:** Do you still have a copy of yours?

[17] **A:** I'm sure I do.

[18] **MR. WELSH:** If you could add that to my
[19] request, please.

[20] **MR. ROACH:** Yes. In other words, the
[21] document that went specifically to Jeanne Skene —

[22] **MR. WELSH:** Yes.

[23] **MR. ROACH:** — August 14th, '98, Fiorilla
[24] 3? We will look for it.

Page 126

[1] **MR. WELSH:** Thank you.

[2] **Q:** Now, I want to go through to confirm. We
[3] have already talked about conversations you had with
[4] Ramsden and Norm Fontaine and Mary Leonard. Did you
[5] have any conversations with Rod Willis concerning
[6] the severance pay or a job position at EFTC?

[7] **A:** I have never met him.

[8] **Q:** Mr. Baribeau, did you ever have a
[9] conversation with him on those topics?

[10] **A:** No, I did not.

[11] **Q:** I am going to put in front of you what has
[12] been marked as Skene Exhibit 1 which is Plaintiffs'
[13] answers to interrogatories. Again, I believe on
[14] Page 17 of the document you signed these?

[15] **A:** Yes, I did.

[16] **Q:** Did you read through them carefully before
[17] signing them?

[18] **MR. ROACH:** Objection. You can answer.

[19] **A:** I read through it — I skimmed through it.
[20] So yes, I did read it, but read it really carefully
[21] to nitpick it I did not.

[22] **Q:** You knew that you were signing these under
[23] oath; is that right?

[24] **A:** Yes, I did.

Page 127

[1] **Q:** If you will turn to the second page of the
[2] document. I think you might be there. The second
[3] full paragraph begins, "Until or about mid-September
[4] 1998 Bayer Corporation (Bayer) employed the 63
[5] Plaintiffs in the printed circuit board area in the
[6] board shop," and it goes on. Are you aware of the
[7] precise date in which your employment changed from
[8] Bayer to EFTC?

[9] **MR. ROACH:** Objection. You can answer. Go
[10] ahead.

[11] **A:** The exact date I am not sure. I know that
[12] there was some little glitch in the process, but as
[13] of September 1st we were employed by EFTC subject to
[14] the crossover, but — that's how that worked.

[15] **Q:** All right. Four lines down there is a term
[16] "vested," and it's used in the sentence as follows:

[17] "At that time each Plaintiff was a planned
[18] participant vested in the severance plan under
[19] Defendant Bayer Corporation Severance Pay Plan ('the
[20] plan') which included payment of severance benefits
[21] by Bayer to each Plaintiff based on years of service
[22] for which Bayer Corporation was a plan
[23] administrator." Do you see that sentence?

[24] **A:** Yes, I do.

Page 128

[1] **Q:** The word "vested," what's your
[2] understanding of what is meant by the word "vested"?

[3] **MR. ROACH:** I am going to object, but she
[4] can answer. Go ahead.

[5] **A:** "Vested" to us was the fact that we had
[6] been employees for an extended period of time with
[7] the company, and we were rightly duly the severance
[8] plan as was written. I guess the terminology
[9] is — it depends on who is doing the terminology.

[10] **Q:** Do you understand "vested" meaning a
[11] benefit which cannot be taken away from you? Is
[12] that your understanding of what the word "vested"
[13] means?

[14] **MR. ROACH:** Objection. You can answer. Go
[15] ahead.

[16] **A:** "Vested" to me means that — yes. I would
[17] say yes.

[18] **Q:** Did anyone — up to September 1st, 1998,
[19] did anyone ever tell you that Bayer was unable to
[20] discontinue their severance plan if they wanted to?

[21] **A:** I think you have to repeat the way you said
[22] that.

[23] **Q:** At any time prior to September 1st, 1998,
[24] did anyone ever tell you that Bayer could