Joseph Attardi, et al.   v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

---

Page 129

[1] discontinue or stop their Severance Pay Plan if they
[2] so chose?
[3]     A: No.
[4]     Q: Was it your understanding in September 1998
[5] that Bayer was unable to change the terms of the
[6] Severance Pay Plan?
[7]     MR. ROACH: Objection. Go ahead.
[8]     A: I don't know if they were unable, but why
[9] would they change it just for us? It would have
[10] been that way all along. Everybody was terminated
[11] and received severance. That's the way they worked
[12] it. They even volunteered.
[13]     Q: Are you aware of any circumstances in Bayer
[14] Corporation —
[15]     MR. ROACH: Did you finish your last
[16] answer?
[17]     THE WITNESS: Let him finish. I'll go.
[18]     Q: I'm sorry if I interrupted you. I'll let
[19] you finish.
[20]     A: It's all right. Go ahead.
[21]     Q: Are you aware of any circumstances in which
[22] Bayer Corporation other than what happened with EFTC
[23] sold an operation to a third party and did not pay
[24] severance?

---

Page 130

[1]     MR. ROACH: Objection. Go ahead.
[2]     A: And did not pay severance?
[3]     Q: Yes.
[4]     A: No, I'm not aware of anything that they did
[5] that they didn't get severance. Everybody that we
[6] know of got severance which is what sparked this
[7] whole thing.
[8]     Q: When you talk about "we know of," are you
[9] aware of any sales of any Bayer operations other
[10] than those which emanated out of the Wilmington
[11] location?
[12]     MR. ROACH: Objection.
[13]     A: No. It was strictly the printed press
[14] area. Other than that we didn't know what was going
[15] on outside of those walls.
[16]     Q: When you say that, are you speaking for
[17] yourself —
[18]     A: That was for me.
[19]     Q: Are you aware of whether any of the
[20] Plaintiffs that have joined you in this suit know of
[21] any other circumstances in which operations were
[22] sold but severance was not paid to the affected
[23] employees?
[24]     A: Well, when — if you go back in time where

---

Page 131

[1] Compugraphic was bought by Agfa, we did not receive
[2] our benefits. No package you might call it, but
[3] they also told us there was — the plan was better,
[4] your insurance would be, everything would be better,
[5] and indeed it was. Then we went from Agfa
[6] Compugraphic to just Agfa to Miles and then we went
[7] to Bayer. We went down a whole road and every time
[8] they said something to us it was always for the
[9] better.
[10]     So when it came to go into EFTC we didn't
[11] think anything of it, that it would be any worse,
[12] but we also didn't know — at the time we knew we
[13] were severing the ties with Bayer so we thought we
[14] were getting our severance packages knowing we were
[15] being terminated so we would get our severance
[16] package.
[17]     Q: You thought you were getting your severance
[18] package?
[19]     A: We did. Up until August everybody thought
[20] they were getting their severance package.
[21]     Q: Every Plaintiff?
[22]     A: (No verbal response)
[23]     MR. ROACH: You have to answer verbally.
[24]     A: Yes, every Plaintiff thought they were

---

Page 132

[1] getting their severance package right up until
[2] August or the end of July, whenever that landed —
[3] that meeting that they threw that in in the meeting
[4] and everybody flipped out.
[5]     Q: Now, you are talking about this meeting.
[6] You didn't attend the meeting?
[7]     A: I did not.
[8]     Q: So you were relying on what you have been
[9] told by others; is that right?
[10]     A: Yes.
[11]     Q: What did they tell you about this meeting?
[12] First, did they say who spoke?
[13]     A: Dick Ramsden, Norm Fontaine, Mary Leonard
[14] were all at the meeting.
[15]     Q: Now, did they indicate to you who told the
[16] employees that they would not receive their
[17] severance?
[18]     A: Dick Ramsden.
[19]     Q: Did they relay to you what Mr. Ramsden
[20] said?
[21]     A: If you don't go to EFTC then you will not
[22] get your severance package. You will be — you
[23] don't stay with Bayer. You can't stay with Bayer,
[24] and that you are leaving on your free will.

---

**Page 133**

[1] Q: During this meeting did any of the
[2] Plaintiffs take notes?
[3] A: Verbal.
[4] Q: You are not aware anyone taking notes?
[5] A: No, just verbal notes.
[6] Q: When you say verbal notes, they just —
[7] A: They memorized what they were saying and
[8] repeating it back to me.
[9] Q: At that meeting was there any discussion of
[10] EFTC's benefits?
[11] A: Dick Ramsden's comments were that they were
[12] of equal or better and that it was a win-win
[13] situation and don't worry. So people just assumed
[14] knowing that Dick has been through all of the
[15] transfers that Dick was telling us what was true.
[16] Q: Now, with respect to the no severance
[17] comment by Dick Ramsden at this meeting, was it made
[18] in response to a question from the audience?
[19] A: Yes. There was a lady named Joanne Sanzo
[20] that made the comment about not wanting to go to
[21] EFTC, "Could we get our severance packages." Most
[22] people wanted to stay with Bayer. If we couldn't
[23] stay with Bayer could we be terminated and get our
[24] severance package at the same time. And the answer

**Page 134**

[1] was no.
[2] Q: So this Joanne Sanzo?
[3] A: Sanzo.
[4] Q: Asked — said she didn't want to go to
[5] EFTC. "Could we stay with Bayer or could we get our
[6] severance package?"
[7] A: And that's the answer, yes.
[8] Q: And Dick Ramsden gave the answer, "No. If
[9] you don't go to EFTC you can't have your severance,
[10] and you can't stay with Bayer"?
[11] A: Correct.
[12] Q: Did Ms. Sanzo explain why she didn't want
[13] to go with EFTC?
[14] A: Because a lot of people were interested in
[15] taking their package and going to school and
[16] changing job statuses. A lot of people were tired
[17] of the declining business. They were just tired
[18] of — the whole format was just getting weaker and
[19] weaker, and we felt as though it wasn't going to be
[20] beneficial for us to be going to EFTC. We felt as
[21] though business was declining so much we would end
[22] up getting the short end of the stick and indeed we
[23] did.
[24] Q: So there was no dissatisfaction with EFTC

**Page 135**

[1] itself at this time?
[2] MR. ROACH: Objection. I think she just
[3] answered that, but go ahead.
[4] MR. WELSH: I am getting clarification.
[5] A: It was not that we were dissatisfied with
[6] EFTC. It's just that the people didn't feel the
[7] security that they had with a company that was
[8] coming out of Colorado, they preferred — with
[9] the declining business they felt as though it would
[10] be best to go to school, get your severance package.
[11] You are talking about people having on the average
[12] over 15 years. There is 53 people that had over 15
[13] years in the company. So those people had over 32
[14] weeks of severance pay coming to them if they had
[15] gotten their severance packages which is what we
[16] thought we were getting. They could have gone to
[17] school, learned a new trade and gone into the market
[18] in a different respect. But we were forced to go to
[19] EFTC because they were telling us we couldn't
[20] collect unemployment. Had we been able to at least
[21] collect unemployment we would have left.
[22] Q: Who told them they couldn't collect
[23] unemployment?
[24] A: Everybody. It came from Mary Leonard.

**Page 136**

[1] Q: Who else?
[2] A: It came from Dick Ramsden, and it came from
[3] Norm Fontaine; and that's the only three that I can
[4] tell you.
[5] Q: Now, I'll come back to that. But now, you
[6] talked about — at the meeting you didn't attend,
[7] but the reports back to you — were there reports
[8] about what Ramsden said about EFTC's benefit
[9] package?
[10] MR. ROACH: Objection. Go ahead.
[11] A: I don't know too much about the benefits
[12] package being talked about except that once we got
[13] the paperwork the comparisons didn't even compare,
[14] the benefits — it cost us more money for our
[15] insurance. It had a deductible that we didn't have
[16] before. It had — the dental was totally different.
[17] There was just too many numerous things that were
[18] totally different. We did have a sheet —
[19] THE WITNESS: Did you give him a copy of
[20] that?
[21] MR. ROACH: It's part of the answers.
[22] MR. WELSH: I think there is a sheet
[23] attached.
[24] A: Yes, that was the sheet that was

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 137

[1] totally — the total differences. It was just
[2] amazing how many differences there were.
[3]     MR. ROACH: That's attached to Exhibit —
[4]     A: And to talk about the severance package it
[5] only has four weeks maximum where we had 32 weeks
[6] with Bayer.
[7]     Q: Do you know if Agfa's Severance Pay Plan
[8] has been changed since you left?
[9]     MR. ROACH: Objection.
[10]     A: Whether it changed drastically I don't
[11] know.
[12]     Q: Do you know —
[13]     A: What it is right now I don't know.
[14]     Q: You don't know whether or not the benefits
[15] in the Agfa plan have been decreased since you left?
[16]     MR. ROACH: Objection.
[17]     A: All the people that were laid of in 2005 as
[18] far as I know all got the two weeks for every year
[19] that they were in the company.
[20]     Q: Did they get capped?
[21]     A: I do not have that answer.
[22]     MR. ROACH: Just for the record, the sheet
[23] you are talking about with the benefits is attached
[24] to Skene Exhibit 1, and I believe it's Attachment 3.

Page 138

[1]     A: There you go. There are the differences.
[2] No sick time; that was a big issue. People — all
[3] elderly people — I mean, they were talking 53
[4] people out of the 63 that are in here are over 45
[5] years old. That's a big number.
[6]     Q: Well, let me just turn to that. What
[7] attachment was that?
[8]     MR. ROACH: Attachment 3 to Skene Exhibit
[9] 1.
[10]     A: Attachment 3.
[11]     MR. ROACH: It's also attached to —
[12]     MR. WELSH: I have this exhibit in front of
[13] her, Steve, and I just have to find it and we can go
[14] from there. There it is.
[15]     Q: Did you complete this? Is this your
[16] handiwork?
[17]     A: It was — I think it was Bert's — no. It
[18] might be me. I'm not sure. It was either me or if
[19] it was — one of us. It was one of the 63 of us
[20] that compiled this.
[21]     Q: It was after you had been at EFTC for a
[22] while?
[23]     A: Yes, it was.
[24]     Q: This wasn't done about the time you went

Page 139

[1] over to EFTC?
[2]     A: You have got to remember that the people —
[3]     MR. ROACH: He asked you a question.
[4]     A: Yes, it was not done when we were in Bayer.
[5]     Q: Were you hourly?
[6]     A: Yes.
[7]     Q: Now, with respect to 1 on the 401(k) match.
[8] At the time you started with EFTC you knew, did you
[9] not, that there was a different 401(k) plan?
[10]     MR. ROACH: Objection. Go ahead. You can
[11] answer.
[12]     A: When we all found out there was a
[13] difference between Bayer and Agfa — between Bayer
[14] and EFTC it was at the last minute. Everything was
[15] done the last week, and people just signed these
[16] papers off and just said, "We have" — "We can't
[17] control it. Let's just sign it and get rid of it."
[18]     Q: Is it fair to say at the 11th hour the week
[19] before you transferred over to EFTC you discovered
[20] the difference in various benefits?
[21]     MR. ROACH: Objection.
[22]     A: No, because we didn't — we didn't compile
[23] this data to see how many differences there were
[24] until the very end.

Page 140

[1]     Q: I didn't say that. But —
[2]     A: But you asked me if I knew prior.
[3]     Q: Let me break it down. Just prior — you
[4] know, the day prior to your joining EFTC were you
[5] personally aware that some of the benefits offered
[6] by EFTC were less than the benefits offered by
[7] Bayer?
[8]     MR. ROACH: Objection.
[9]     A: There were a few. That was it, but not as
[10] drastic a difference that we see here.
[11]     Q: I'm not asking all of them. Let's just
[12] talk about the 401(k). On the day before you joined
[13] EFTC were you aware that there was 401(k) plan
[14] offered by EFTC was different than that offered by
[15] Bayer?
[16]     A: I personally didn't even inquire about it.
[17]     Q: You didn't inquire. Did you know?
[18]     A: No.
[19]     Q: Did you know that EFTC did not have a
[20] pension plan?
[21]     A: I think I found that out after the fact,
[22] about a month later that we didn't have a pension,
[23] and I couldn't believe it.
[24]     Q: Were you aware of limits on sick time for

**Page 141**

[1] EFTC?

[2]  **A:** I knew that one. That one hit the fan.

[3] Everybody talked about that, and that's why people

[4] got upset.

[5]  **Q:** You knew about that prior to the first day

[6] of employment by EFTC?

[7]  **A:** I'm not going to say yes because I

[8] personally didn't know 90 percent of this stuff

[9] that's on this page other than the — I don't even

[10] know. I knew about the sick time because people

[11] were buzzing about it. Other than that I don't

[12] recall anything else.

[13]  **Q:** What I'm focusing on is the date. Did you

[14] know about the sick time prior to September 1st,

[15] 1998?

[16]  **A:** That — it could possibly be that I knew

[17] about the sick time but the rest of it was after the

[18] fact.

[19]  **MR. ROACH:** Again, I don't want you to

[20] guess. I don't want you to tell possibilities or

[21] assumptions. Your best estimate, your best memory.

[22] It doesn't have to be perfect but your best memory,

[23] but don't guess, don't give possibility.

[24]  **A:** I think they were talking about the sick

**Page 142**

[1] time. That was something that stood out in

[2] everybody's mind. That's the only one that I know

[3] of other than after the fact we started realizing

[4] it.

[5]  **Q:** No. 3 there is a cap on this document.

[6] After 20 years you get five weeks, after 30 years

[7] six weeks, and EFTC four weeks max. Were you aware

[8] of the cap on your vacation prior to September 1st,

[9] 1998?

[10]  **A:** No.

[11]  **Q:** Down on No. 7 it talks about holidays,

[12] three paid — please, strike that. Agfa, nine paid

[13] and three discretionary holidays, these three to be

[14] used at the employee's discretion. EFTC, ten

[15] holidays all chosen by EFTC?

[16]  **A:** They told us that we had ten holiday

[17] pays — ten holidays.

[18]  **Q:** So you knew that prior to September 1st?

[19]  **A:** I think they told us that at one of these

[20] things, yes.

[21]  **Q:** When you — prior to going to EFTC did you

[22] know that their Severance Pay Plan was different

[23] than Agfa's?

[24]  **A:** I do not. I don't recall knowing that

**Page 143**

[1] there was a difference in that category.

[2]  **Q:** Now, did EFTC have an incentive program for

[3] bonuses?

[4]  **A:** They claim to have an incentive bonus.

[5]  **Q:** Do you remember what they claimed its terms

[6] and conditions were?

[7]  **A:** If the division that you were working

[8] in — EFTC had different plants around the country.

[9] So that particular division that you worked in, if

[10] they made a profit margin above a certain number,

[11] but I don't know the number, you would — they would

[12] take 5 percent of that profit and give it to the

[13] employees. But it had to be a certain amount. It

[14] had to break a barrier for us to get a percentage.

[15]  **Q:** Did you ever receive any incentive bonus

[16] payment from them?

[17]  **A:** In how many years are you talking about?

[18]  **Q:** From EFTC, when you joined them until the

[19] present.

[20]  **A:** As EFTC we never got a bonus.

[21]  **Q:** As Suntron?

[22]  **A:** As Suntron we got two months — two

[23] quarters we got a bonus, and that's it.

[24]  **Q:** Do you recall how much any of those bonuses

**Page 144**

[1] were?

[2]  **A:** One was I think like $56, but I could be

[3] wrong. I don't think it was over $100.

[4]  **Q:** Now, did they have other incentive programs

[5] at EFTC during the first three years you worked for

[6] them?

[7]  **A:** They did have — no. I don't remember any

[8] incentive bonuses. They did have something to do

[9] with not taking any days off. If you didn't take

[10] any days off in X amount of time — I think it was

[11] 25 months, but I think that's wrong. It had to do

[12] with staying in the company for X amount of time and

[13] then they would give you — those people that never

[14] took a day off would be in a lottery and a person's

[15] name would be drawn and get $25,000, but the lottery

[16] was never done in front of anybody so the people

[17] whose names were supposed to be in the bucket don't

[18] know if their name was really in the bucket. So we

[19] don't know what happened with that. It's just an

[20] individual who was very chummy with them won. So we

[21] don't know how it happened. But the people that

[22] didn't take time off never got that severance

[23] unlike with Bayer who used to do everything in the

[24] open. Everything with Bayer was in the open.

Page 145

[1] **Q:** I'm looking at No. 1, 401(k) match. Now,
[2] if I remember going through your employment file or
[3] maybe your personnel file, there was a document
[4] there that you filled out and you talked about how
[5] to allocate the various 401(k) sums into various
[6] money market or mutual funds?
[7] **A:** Uh-huh.
[8] **Q:** During that time were you also advised that
[9] there was no match, that EFTC would not be providing
[10] a match?
[11] **A:** I do not know if they told me they were not
[12] matching. There was some kind of a match. Doesn't
[13] that say that EFTC 401 — that it was 50 cents per
[14] dollar match?
[15] **Q:** Did that remain; do you know?
[16] **A:** It wasn't in effect for a long time, and
[17] they just brought it back last year, I think. They
[18] just brought it back as a match, but not — I don't
[19] know what the number is.
[20] **Q:** Now, here it says —
[21] **A:** Do you know this 401(k), they locked our
[22] 401(k)'s up for over four months when they
[23] transferred from Bayer to EFTC, too, and no one had
[24] any control over their money.

Page 146

[1] **Q:** Do you know whether that's typical in a
[2] transaction —
[3] **A:** I do not.
[4] **Q:** — to make sure they have all the finances
[5] and tax implications down?
[6] **A:** But why didn't we control our own money?
[7] They were terminating us from Bayer. Why didn't we
[8] control our 401(k)?
[9] **Q:** Do you know whether or not the law
[10] basically requires them to do that during a
[11] transitionary period?
[12] **MR. ROACH:** Objection. Go ahead. You can
[13] answer.
[14] **A:** I'm not a lawyer.
[15] **Q:** Right.
[16] **A:** But we still wanted to control it.
[17] **Q:** No. 5 you have "Yearly review." Did EFTC
[18] have a policy of yearly reviews?
[19] **A:** If it was a written policy -- I don't know
[20] if they had a written policy. I would assume they
[21] had an annual review, but we didn't get one
[22] annually.
[23] **Q:** It says in the same entry, "Many employees
[24] also received a reduction in salary." When was that

Page 147

[1] reduction in salary?
[2] **A:** It's on that paper that I showed you.
[3] **Q:** Did that happen at the same time as yours?
[4] **A:** 2001, yes. Everybody got that reduction
[5] that was left. Remember 50 percent of them were
[6] gone by the time that happened.
[7] **Q:** Is it fair to say that this document was
[8] done sometime after the reduction of salary?
[9] **A:** It probably was added to, yes.
[10] **Q:** Do you think it was started prior to that?
[11] **A:** Well, the knowledge might have been started
[12] prior to that.
[13] **Q:** I'm wondering. You — I talked about the
[14] document and you said it was added to, suggesting
[15] that there may have been a pre-existing document?
[16] **A:** No. I don't think anybody did it in format
[17] like this until this was made.
[18] **Q:** Did you participate in making this sheet?
[19] **MR. WELSH:** Again, it's — so we know what
[20] we are talking about it's Exhibit 1 to Ms. Skene's
[21] deposition, Attachment 3.
[22] **MR. ROACH:** Objection. Asked and answered.
[23] I think she and others collaborated on it. You can
[24] ask her again, if you wish.

Page 148

[1] **MR. WELSH:** I'm going to start doing that
[2] during your depositions, if you want.
[3] **MR. ROACH:** No, no.
[4] **A:** I think it's a collective summary of
[5] everybody's information.
[6] **Q:** You participated in that; is that right?
[7] **A:** Yes.
[8] **Q:** Did you do this on your computer?
[9] **A:** No.
[10] **Q:** Do you know who typed it?
[11] **A:** I think it was Bert.
[12] **Q:** Do you know — did you have — were any
[13] documents from EFTC referenced as this was prepared?
[14] **A:** I would have to ask that question. They
[15] must have had a document of some sort because it's
[16] really specific.
[17] **Q:** That's what I'm wondering.
[18] **A:** So they would've had to have the document.
[19] We did get paperwork from EFTC. After we were
[20] already in the program we got a whole bunch of
[21] paperwork. This may come from that paperwork.
[22] **Q:** Do you still have your paperwork you got
[23] from them?
[24] **A:** I'm a pack rat. I have it all, I bet.

Case 1:04-cv-10728-WGY    Document 42-23    Filed 01/17/2007    Page 6 of 32

Jeanne M. Skene                                                                    Joseph Ragland, et al. v.
Vol. 1, June 19, 2006                                                              Bayer Corporation, et al.

Page 149

[1] MR. WELSH: Steve, could you add that to my
[2] requests.
[3] MR. ROACH: Absolutely.
[4] THE WITNESS: Jeepers.
[5] MR. ROACH: You want EFTC paperwork that
[6] she received after she had joined EFTC.
[7] MR. WELSH: Yes, on benefits.
[8] MR. ROACH: Again, I believe I have given
[9] you everything I have gotten from my clients.
[10] MR. WELSH: I'm not suggesting that you
[11] withheld anything that's in your file.
[12] MR. ROACH: We'll look for it. Thank you.
[13] I appreciate that. We'll look.
[14] A: That may be my fault.
[15] MR. ROACH: I'll have Ms. Skene look for it
[16] and give it to me.
[17] MR. WELSH: I haven't made any accusations.
[18] I just told him I wasn't accusing him of a specific
[19] crime.
[20] Q: Your memory is that as of September 1st,
[21] 1998, you did not know that EFTC didn't have a
[22] pension plan?
[23] A: I didn't know, no. There is a lot of
[24] information that we didn't know right at the front.

Page 150

[1] I was just telling you that. There was information
[2] we got after the fact.
[3] Q: I think you can turn to this document.
[4] MR. ROACH: You were on Page 2 before.
[5] MR. WELSH: I'm on Page 2.
[6] Q: And now I'm going to ask you to turn to
[7] Page 3, if you would — Page 4. Make that Page 4.
[8] Now, up in the first full paragraph it
[9] starts, quote, "'Comparable position' under the
[10] plan, definition of such means the new job is no
[11] further than 35 miles away from the prior location
[12] and the wage/salary is the same." The next sentence
[13] I am going to read it again, "The Plaintiffs claim
[14] also that Bayer made misrepresentations about the
[15] new positions as described below." What
[16] misrepresentations do you believe Bayer made about
[17] the new positions with EFTC?
[18] MR. ROACH: Objection. Go ahead. You can
[19] answer.
[20] A: Well, first they told us it was a win-win
[21] situation. They told us that it was comparable
[22] benefits, and they misrepresented us. Do you want
[23] me to keep going?
[24] Q: Yes.

Page 151

[1] A: Once we saw all the documents as we were
[2] doing this whole thing there was even more stuff
[3] that we got frustrated with because we realized just
[4] how much under-the-table stuff happened that we
[5] didn't know about at the time, little notes that
[6] were written on about how to get around things.
[7] Q: Have you concluded?
[8] A: Yes.
[9] Q: Now, win-win, what was it about win-win
[10] that you believe was a misrepresentation by Bayer?
[11] A: Because he told us that there was going to
[12] be comparable benefits and comparable — the
[13] salaries would stay the same, that we wouldn't lose
[14] the salaries, but in turn we looked at the whole
[15] picture there was — for me personally you are
[16] talking a year's worth of salary had I been on
[17] severance versus only four weeks maximum with EFTC.
[18] That's a big difference.
[19] Q: But — okay. Comparable benefits, who told
[20] you there would be comparable benefits?
[21] A: It was said at the meeting.
[22] Q: This is a meeting you did not attend?
[23] A: This is a meeting I did not. But that was
[24] said to me outside.

Page 152

[1] Q: You said it was said at the meeting. Is
[2] this the meeting that employees were told that they
[3] would not get severance?
[4] A: That was another meeting.
[5] Q: Can you help me identify this particular
[6] meeting in which the term "comparable benefits" was
[7] used?
[8] A: How can I identify the meeting?
[9] Q: Yes. You said there was one meeting where
[10] Mr. Ramsden told people that they would not get
[11] severance and that caused a big brouhaha and that
[12] was in the beginning of August. So I have that
[13] meeting. I asked you questions about that meeting.
[14] The phrase about comparable benefits, if I
[15] understand you right, was not said at the meeting
[16] where Ramsden told people they wouldn't get
[17] severance. It was a different meeting?
[18] MR. ROACH: Objection.
[19] A: It was a different meeting.
[20] Q: Was it before or after the meeting when
[21] they were told they wouldn't get severance?
[22] MR. ROACH: Objection.
[23] A: Before.
[24] Q: What is the basis of your information about

Joseph Attardi, et al.  v.
Bayer Corporation, et al.

Page 153

[1] what happened at that meeting?
[2]  A: It was given to me by several people that
[3] said the same information.
[4]  Q: Who are they?
[5]  A: There was Robert Brown that was involved
[6] with that. Did you want me to list all the people
[7] or just people that spoke to me?
[8]  Q: The ones that spoke to you.
[9]  A: Well, eventually they all told me the same
[10] information as we compiled the data.
[11]  Q: Now — then, aside from the sheets that you
[12] and Mr. Roach circulated in 2006 to people, did you
[13] get any information in 1998 or 1999 from people
[14] about this meeting?
[15]  A: There was information that these people
[16] talked about, yes. That's how I got the information
[17] about if I wanted to proceed and fight this whole
[18] thing. So I got information from quite a few
[19] people. Exactly who they are right now off the top
[20] of my head, that's the notes that I was telling you
[21] that are no longer — they don't exist.
[22]  Q: They are on the crashed hard drive?
[23]  A: Yeah.
[24]  MR. ROACH: Is that a yes?

Page 154

[1]  A: Yes. That's a yes.
[2]  Q: But you remember Robert Brown coming to
[3] you?
[4]  A: Reggie yes. His nickname is Reggie.
[5]  Q: And what do you remember him telling you?
[6]  A: That he spoke about how Ramsden said
[7] everything was going to be okay and that we are
[8] going to have comparable benefits and that we'd
[9] still have the same positions and that we didn't
[10] have to worry about anything.
[11]  Q: Did he say anything else about what Ramsden
[12] said about the benefits?
[13]  A: Everybody gave me little pieces of
[14] information. But that sticks out as far as —
[15]  Q: Do you remember any specifics that anyone
[16] gave you other than what you just told me Mr. Brown
[17] told you?
[18]  A: Specifics, as far as what other topics were
[19] at the meeting?
[20]  Q: What else was said about benefits at the
[21] meeting with Mr. Ramsden?
[22]  MR. ROACH: What other people said to
[23] you — what things other people told you other than
[24] what Brown told you, a rendition; is that right,

Page 155

[1] John?
[2]  MR. WELSH: Yes.
[3]  A: That's really the biggest thing that
[4] everybody talked about, that it was win-win. That's
[5] the big topic everybody was coming out with. "Don't
[6] worry".
[7]  Q: Did people break down anything beyond
[8] win-win? Did they indicate to you that management
[9] gave them any further explanation of what was meant
[10] by "win-win"?
[11]  MR. ROACH: Objection. Go ahead. I think
[12] she's answered it already. Go ahead.
[13]  A: That we still have jobs. That was the big
[14] topic. "Don't worry about it. You still have a
[15] job." And people said that they wanted to
[16] take — they would prefer — because we at Bayer
[17] always had this voluntary — even though it was
[18] supposed to be involuntary layoffs, they always had
[19] these voluntary layoffs, and people were going up
[20] and saying they wanted to volunteer to be laid off,
[21] get their severances — be terminated, get their
[22] severance packages and just leave because they
[23] didn't want to go to EFTC, and they were told no.
[24]  Q: Now, in the past voluntary layoffs — are

Page 156

[1] you aware of a voluntary layoff being conducted —
[2] being allowed when a regular layoff wasn't already
[3] planned?
[4]  MR. ROACH: Objection. Go ahead.
[5]  A: I'm only aware of the voluntary layoffs
[6] because they came out through word of mouth. Dick
[7] Ramsden would make sure that everybody would be
[8] told. Whether it was a reduction in force, that's
[9] what it came down to.
[10]  Q: And are those voluntary layoffs that you
[11] experienced, did the word go out that in fact the
[12] layoff was going to happen?
[13]  A: Well, they didn't tell us the layoff was
[14] going to happen. There were just rumors that came
[15] out and said they are looking for a reduction in
[16] force, and that's when people just said, "Okay. I'm
[17] volunteering, and let's get it over with." It was a
[18] very declining business, very rapidly declining
[19] business.
[20]  Q: Other than Ramsden's statement at a group
[21] meeting about comparable benefits did you have any
[22] conversations with any managers about the benefit
[23] level at EFTC compared to Agfa?
[24]  MR. ROACH: Objection. Other than her

**Page 157**

[1] conversations already with Ramsden and Fontaine and
[2] what she has talked about before the sale?
[3]    A: Before or after?
[4]    MR. WELSH: I don't believe those
[5] conversations she just talked about had anything to
[6] do with this. It was a different one.
[7]    Q: You talked about comparable benefits?
[8]    A: Yes.
[9]    Q: You said that the word "comparable
[10] benefits" was used in a group meeting by Ramsden
[11] reported to you by Mr. Brown. I think you also made
[12] reference in preface to that question saying "I had
[13] some meetings myself with people" talking about
[14] comparable benefits, and it's those meetings prior
[15] to September 1st, 1998, conversations you had with
[16] individuals about comparable benefits?
[17]    MR. ROACH: Objection.
[18]    A: It's not meetings at that point. It was
[19] just conversations.
[20]    MR. ROACH: With individual management
[21] people, you mean?
[22]    MR. WELSH: Yes
[23]    A: I only had conversations with individual
[24] people on the floor, not management people other

**Page 158**

[1] than the ones we have already talked about.
[2]    Q: Okay. So other than the conversations you
[3] have already outlined you didn't have any
[4] conversations one on one with Bayer management to
[5] talk about whether — the EFTC benefits being
[6] comparable as to those from Bayer?
[7]    MR. ROACH: Objection. Go ahead. You can
[8] answer.
[9]    A: No, because I really didn't match off what
[10] EFTC had to Bayer had because I was only there a
[11] short period of time when this whole thing happened.
[12]    Q: Now, you say you talked to some people on
[13] the floor. I take this as nonmanagers?
[14]    A: Nonmanagement people, yes.
[15]    Q: When you say said Vinny Fiorilla was —
[16]    A: He was a manager.
[17]    Q: Who would the nonmanagers be that you
[18] talked to on the floor?
[19]    A: Well, Linda Saulnier I spoke to. Hanna
[20] Holt I spoke to. I don't remember all the names.
[21] What have her name? Sheila Shandonay, she was
[22] there. I mean, there were several. I mean, there
[23] were a lot of people there. I can't give you all
[24] the names and be specific.

**Page 159**

[1]    Q: I'm just really looking for the people you
[2] talked just prior to the sale that you talked to,
[3] co-workers, about the benefits at EFTC being
[4] comparable or not being comparable to Agfa.
[5]    A: So in other words when we went in to sign
[6] all our paperwork, it was after the fact that we
[7] found out a lot of the differences. We didn't find
[8] out the differences until after the fact. So by
[9] that time we were already in EFTC's employment when
[10] we realized just how many differences there were.
[11]    Q: Is it your testimony that you had no
[12] conversation with any co-workers about the fact that
[13] EFTC didn't have a pension plan until after you
[14] started with EFTC?
[15]    A: I don't recall having a conversation with
[16] anybody about pension, to be honest with you.
[17]    Q: Okay. If you turn to Page 5, please. In
[18] the top paragraph, one, two, three, four lines down
[19] there is a sentence that states, "Representatives of
[20] EFTC advised the Plaintiffs that EFTC would not have
[21] entered into the contract with Bayer to purchase
[22] certain of Bayer's assets if the Plaintiffs had not
[23] indicated a willingness to be employed by EFTC after
[24] Bayer terminated their employment." Who are the

**Page 160**

[1] representatives of EFTC referenced there?
[2]    A: I have to read it again.
[3]    Q: Okay. Go ahead.
[4]    A: (Witness reviews document) You see it
[5] starts "The representative EFTC advised" —
[6]    Q: "Representatives of EFTC advised the
[7] Plaintiffs that EFTC would not have entered into the
[8] contract with Bayer to purchase certain of Bayer's
[9] assets if the Plaintiffs had not indicated a
[10] willingness to be employed by EFTC after Bayer
[11] terminated their employment."
[12]    A: I was not at the meeting. Norm Poulin
[13] calls him the suspender guy. Jack Calderone stated
[14] at the meeting that they were buying the board shop
[15] because of the expertise of the individuals,
[16] employees, not for the equipment.
[17]    Q: Is that his quote as you understood it?
[18]    A: That's how it was repeated by Norman, and
[19] he's pretty good.
[20]    Q: Did Norman indicate the EFTC person stated
[21] "We would not have entered into a contract with
[22] Bayer"?
[23]    A: I believe that is the — these words that
[24] you are seeing right here are words that were

Joseph Attardi, et al.   v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

---

Page 161

[1] collectively collected from all of the people, and
[2] those were the words that people came back and said.
[3] Otherwise it wouldn't be there.
[4] It says "representatives" plural. See
[5] where it says "representatives" with an S on it? It
[6] suggests — was there more than one person at EFTC
[7] who made this statement?
[8]   A: Maybe the way it's stated there is because
[9] the Human Resources person was also there.
[10]   Q: From EFTC?
[11]   A: From EFTC, I believe.
[12]   Q: Who was that? A man or woman?
[13]   A: I wasn't at the meeting. All I know is
[14] everybody talked about the suspender guy. That's
[15] what they called him all the time.
[16]   Q: If you look down the same page under
[17] Paragraph 2A — that would be there (indicating) —
[18] if you go one, two, three, four lines down there is
[19] a sentence "Bayer advised the Plaintiffs that they
[20] were terminated and were told that a job with EFTC
[21] would be available." When you say "Bayer advised
[22] the Plaintiffs that they were terminated," are you
[23] referring to any specific Bayer manager?
[24]   MR. ROACH: Objection. Go ahead.

---

Page 162

[1]   A: Most of the people that did the talking was
[2] Dick Ramsden. He did most of the talking. And then
[3] Norm Fontaine was standing side by side with him.
[4] That's my understanding.
[5]   Q: But this thing about advising the
[6] Plaintiffs that they were terminated, did someone at
[7] Bayer tell you that you had been terminated?
[8]   A: Yes, I signed the paper. That was the day
[9] they signed the paper. They told us we were
[10] terminated so we signed a piece of paper, a document
[11] saying that we were terminated.
[12]   Q: With Bayer?
[13]   A: With Bayer.
[14]   Q: Had you already accepted employment with
[15] EFTC prior to signing that document?
[16]   A: I'd have to look at it.
[17]   THE WITNESS: Do you have Janet Lanoue's?
[18]   MR. ROACH: You have to answer his
[19] question.
[20]   A: I'm sorry. Did I know prior? I don't have
[21] an answer for you unless I look at a document that
[22] states whether it was before or after.
[23]   Q: This document would be a Bayer document?
[24]   A: Yes. It's the termination paperwork that

---

Page 163

[1] all of us had to sign.
[2]   Q: Now, on the bottom of Page 5, the last four
[3] words — on Page 5 it states, "As part of their
[4] negotiations leading up to the sale Bayer and EFTC
[5] agreed that Bayer would falsely advise the
[6] Plaintiffs that Plaintiffs' compensation and
[7] benefits, including severance benefits, would remain
[8] the same if Plaintiffs agreed to work for EFTC."
[9] What's the basis for your understanding that Bayer
[10] and EFTC agreed that Bayer would falsely advertise
[11] the benefits?
[12]   A: If you were to look —
[13]   MR. ROACH: Objection. Go ahead.
[14]   A: If you were to look at the documentation
[15] that we have from the sale of EFTC to EFTC, you see
[16] all the hand scribbles back and forth trying to
[17] figure out how to manipulate the paperwork so they
[18] didn't have to give us severance packages. It's
[19] right in black and white.
[20]   Q: What was the manipulation that you saw?
[21]   A: Well, I'd have to have the document in
[22] front of me so I could give you the legal words.
[23]   Q: Were these documents that you would have
[24] received from Bayer during discovery in this matter?

---

Page 164

[1]   A: It was during this —
[2]   MR. ROACH: Objection. You can answer.
[3]   A: I don't recall the date when we got the
[4] paperwork.
[5]   Q: What manipulations did you see that led you
[6] to conclude that there was an agreement of this
[7] type? What were the nature of the manipulations you
[8] saw?
[9]   MR. ROACH: Objection. Go ahead.
[10]   A: The fact that they put a clause in it to
[11] tell EFTC that they had to take all the employees —
[12] not selectively take who they wanted, but they had
[13] to take 100 percent of the employees over to EFTC is
[14] manipulation.
[15]   Q: Manipulation?
[16]   A: Yes, it is.
[17]   Q: What do you mean by "manipulation"?
[18]   A: Because there is some people that weren't
[19] worthy of staying within the company, and EFTC
[20] carried them over because Agfa mandated them to.
[21]   Q: Why do you find that objectionable?
[22]   MR. ROACH: Objection. I object to the
[23] question. It's argumentative. I think you are
[24] asking her for the basis of —

---

Page 165

[1] MR. WELSH: I want to know what she finds
[2] objectionable about that.
[3] MR. ROACH: Objection. Go ahead. You can
[4] answer.
[5] A: He based — the person who made the
[6] decision to make them take 100 percent of the people
[7] basically was playing with our welfare of being with
[8] EFTC. They took people who basically couldn't do
[9] their job, and Agfa just had them sitting there
[10] occupying a space on the chart that had to have 75
[11] percent of the numbers. That's what it came down
[12] to. We knew that they were just being carried over.
[13] If EFTC had looked at their employee records they
[14] would have never have taken those people.
[15] Q: Were these people special needs
[16] individuals?
[17] A: Some of them were just plain old lazy.
[18] Some of them were special needs, but there were a
[19] couple of the special needs people that were
[20] terrific workers. It had nothing to do with whether
[21] they were handicapped or not.
[22] Q: Do you think this impacted you or any of
[23] the other Plaintiffs?
[24] A: I think it ultimately impacted the outcome

Page 166

[1] of EFTC because the dollar value — the worth of the
[2] company was very high. You asked me.
[3] Q: I'm not following you.
[4] MR. ROACH: Objection. I don't think there
[5] is any relevance to this. I think your questioning
[6] was whether —
[7] MR. WELSH: I know my questions, and I am
[8] going to pursue the line of questioning if you'll
[9] allow me to.
[10] MR. ROACH: I don't think it's relevant.
[11] MR. WELSH: I mean, I could have cut out of
[12] pages at 2:00 in the afternoon if that was the
[13] basis.
[14] Q: So it was a high value company?
[15] A: All right.
[16] MR. ROACH: Objection to the line of
[17] questioning. Go ahead. Objection to that question.
[18] A: The production that we were getting out of
[19] Bayer-Agfa Corporation that was being transferred
[20] over to EFTC, that didn't pay the amount of
[21] employment that was also transferred. There was a
[22] lot of people that were being paid good money that
[23] were all put into EFTC's payroll, and the amount of
[24] work coming didn't balance out. That's why they cut

Page 167

[1] back so many people within the first year. There
[2] was a clause in the document that stated they
[3] couldn't cut anybody out of the company for at least
[4] a year. Once the year was passed then they could
[5] cut the people out and they wouldn't be able to go
[6] back and get Bayer's benefits. It was right in the
[7] paperwork.
[8] Q: What did that lead you to conclude?
[9] A: What do you mean what did it lead me to
[10] conclude?
[11] Q: You think that was manipulation by Bayer?
[12] A: If we had been laid off right away —
[13] MR. ROACH: You mean terminated?
[14] A: — terminated right away from EFTC we would
[15] have fell under the Bayer umbrella and been able to
[16] get the Bayer benefits of 32 or 40, whatever weeks
[17] you were owed. We would have had to fall under that
[18] umbrella, so we didn't fall under that umbrella
[19] because they let them go after the year.
[20] Q: In fact under the severance pay policy, if
[21] they gave you a comparable salary and your job was
[22] not more than 35 miles from your place of
[23] employment, was it your understanding that you would
[24] not be entitled to severance?

Page 168

[1] MR. ROACH: Objection.
[2] A: I left the terminology up to Steve to help
[3] me with.
[4] Q: At the time you had your book, did you not?
[5] A: Well, the only thing I went by was that one
[6] page that I showed you that I had, and that's the
[7] eligibility.
[8] Q: But there were more than one pages to that
[9] discussion. Did you only look at one page?
[10] MR. ROACH: Objection. I think she's
[11] already testified to this, John.
[12] A: This is the most critical that we were
[13] looking at.
[14] Q: Did you look — in 1998 did you look at the
[15] other pages in the SPD, in the Summary Plan
[16] Description, that pertained to severance?
[17] A: The other page that isn't here — I guess I
[18] didn't take it with me. The other one that says the
[19] benefits not paid is when they sell the division,
[20] but we didn't sell a division.
[21] Q: Was there something underneath that as
[22] well?
[23] A: Not off the top of my head, but the book is
[24] right there (indicating).

Page 169

[1] Q: I know the book is there. And you didn't
[2] take your SPD description and talk to anyone about
[3] it at that time, did you?
[4] MR. ROACH: Objection.
[5] A: I talked about this sheet with Mr. Ramsden.
[6] Q: When you looked at that sheet you thought
[7] you qualified for severance benefits, did you not?
[8] MR. ROACH: Let's identify what we are
[9] talking about, "This sheet," SEV3.
[10] MR. WELSH: SEV3 from Fiorilla Exhibit 7.
[11] MR. ROACH: No. It's not Fiorilla 7. I
[12] think it's —
[13] MR. WELSH: Ramsden 7.
[14] MR. ROACH: — Ramsden 7/Fiorilla 5.
[15] A: Can you repeat the question again?
[16] Q: Did you look at sheets other than SEV3 when
[17] you look at the SPD for severance pay in 1998?
[18] A: I was reading the other one that says not
[19] paid, and I didn't think it pertained to us.
[20] Q: So in 1998 you looked over the severance
[21] pay policy and concluded it didn't apply to you; is
[22] that right?
[23] MR. ROACH: Objection.
[24] A: What do you mean by — I felt as though

Page 170

[1] this (indicating) entitled me to my severance. We
[2] all thought we were getting severance.
[3] Q: Fair to say that in 1998 you looked at
[4] Ramsden Exhibit 7, Summary Plan Description, the
[5] severance area, you looked at SEV 3, that would be
[6] Page 3 of the severance discussion, as well as other
[7] pages in that section, and thought that you were
[8] eligible for severance pay?
[9] A: Yes.
[10] Q: And that Mr. Ramsden announced at a group
[11] meeting which you didn't attend but was reported to
[12] you that you would not be getting severance pay?
[13] A: The end of July, beginning of August, yes.
[14] Q: Was a reason reported to you that
[15] Mr. Ramsden gave as to why you would not be getting
[16] severance pay?
[17] A: He stated that it was because we were going
[18] to work for EFTC, and they were taking over — they
[19] were taking over the board shop.
[20] Q: You didn't think that was right because
[21] they weren't selling the whole division. They were
[22] just selling the part —
[23] A: Correct, correct.
[24] MR. ROACH: Objection.

Page 171

[1] Q: You can put that aside now.
[2] A: If you look here, this is what the biggest
[3] thing was is that it says you are eligible to
[4] receive benefits. The plan administrator must
[5] determine that the termination of involuntary is due
[6] to one of the following reasons. Well, we had
[7] involuntary, we had voluntary, and everybody got
[8] their termination and everybody got their severance
[9] packages. So what was different between us 63
[10] people and all the other people before us that got
[11] laid off? They all got severance packages. They
[12] all got terminated but we didn't.
[13] Q: Did any of those people have a job the day
[14] after they left with the person who acquired the
[15] assets from Bayer?
[16] A: Yes.
[17] MR. ROACH: Objection.
[18] Q: Who?
[19] A: Jerry Gendron left Agfa and went
[20] immediately and started working for Olympic Metals
[21] and so didn't five other guys that worked with him.
[22] Q: But that was for Agfa, correct, Agfa
[23] Corporation?
[24] A: I guess that would be a distinction,

Page 172

[1] difference between.
[2] Q: Agfa spun out in January 1st, 1999, right?
[3] Correct?
[4] A: I believe you are correct as far as them
[5] breaking off from Bayer, yes.
[6] Q: Anyone prior to January 1st, 1999, who left
[7] Agfa Division or any of its predecessors, went to
[8] work the day after they were terminated for a
[9] company who acquired the assets from Agfa and got
[10] severance pay?
[11] MR. ROACH: Objection.
[12] THE WITNESS: Am I allowed to still talk?
[13] MR. ROACH: Yes, you can talk.
[14] A: There is a man that worked in the shipping
[15] department — and I don't believe this was after the
[16] spin. I think this was prior to the spin — that
[17] worked in the shipping department. Bayer wanted to
[18] liquidate the shipping area, and he went to work for
[19] Allied who in turn had him working for Bayer doing
[20] the shipping. And he got his severance package. He
[21] got every bit of benefits that he was given,
[22] termination, everything, and he ended up getting an
[23] increase in his pay working for Allied.
[24] Q: Did Allied buy any assets from Bayer?

Jeanne M. Skene
Vol. 1, June 19, 2006

Case 1:04-cv-10728-WGY    Document 42-23    Filed 01/17/2007    Page 12 of 32.

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

**Page 173**

[1] **A:** Other than the rights to ship Bayer's
[2] property, no.
[3] **Q:** You talk about the rights to ship Bayer's
[4] property, do you know — was that part of a
[5] transaction in which this individual in the shipping
[6] department changed employers?
[7] **MR. ROACH:** Objection.
[8] **A:** I wouldn't be able to answer all of the
[9] terminology to that. All I know is that Bayer
[10] stopped the shipping, had him terminated. He went
[11] to work for Allied. Allied had the contract.
[12] **MR. ROACH:** Sorry. I want to take a quick
[13] break.
[14] **Q:** Have you ever talked to any managers at
[15] Bayer about what happened with respect to the
[16] shipping department?
[17] **A:** I personally didn't talk to them because I
[18] was on a different time frame.
[19] *Q. Are you aware of any of the Plaintiffs who
[20] discussed the circumstances concerning the shipping
[21] department with any Bayer managers?
[22] *A. I'm not privy to that one because that's
[23] not a question that I asked anybody.
[24] **MR. WELSH:** Take your break.

**Page 174**

[1] (Recess taken from 2:15 to 2:22 p.m.)
[2] **MR. WELSH:** Would you read the last
[3] question and answer, please.
[4] *(Record read)
[5] **BY MR. WELSH:**
[6] **Q:** If you have Exhibit 1 in front of you,
[7] please. Just on that paragraph (indicating) under
[8] B, the first sentence says, "Shortly before Bayer
[9] terminated the Plaintiffs' employment, Plaintiffs
[10] claimed to Bayer that if Bayer terminated them then
[11] Bayer was required by the Bayer plan to pay them
[12] severance benefits." Do you see that sentence?
[13] **A:** Yes, I do.
[14] **Q:** What specific Plaintiffs claimed to Bayer
[15] that they were entitled to severance pay if
[16] terminated?
[17] **MR. ROACH:** Objection. Other than what she
[18] has already testified to?
[19] **MR. WELSH:** Yes.
[20] **MR. ROACH:** Go ahead.
[21] **A:** I'm not quite sure I understand what you
[22] are asking to change other than what I have already
[23] stated, that under the plan for not getting paid
[24] means that they were to divest or sell the division

**Page 175**

[1] in which we were sold. It was only a segment of it.
[2] **Q:** This is my question: Do you see this
[3] sentence? It says, "Shortly before Bayer terminated
[4] Plaintiffs' employment, Plaintiffs claimed to Bayer
[5] that if Bayer terminated them that Bayer was
[6] required by the Bayer plan to pay them severance
[7] benefits." You've spoken earlier about a meeting
[8] with Dick Ramsden in response to an employee's
[9] question that you are not going to get severance pay
[10] and if you don't take the job with EFTC you will get
[11] no severance pay; is that right?
[12] **A:** No severance, no unemployment, yes.
[13] **Q:** So that was a meeting. Other than
[14] Ramsden's comment at that meeting in response to an
[15] employee's question are you aware of any other
[16] employees who went to any manager at Bayer prior to
[17] the sale and claimed to be entitled to severance
[18] pay?
[19] **A:** There are quite a few people that asked
[20] that question of Dick Ramsden. It could be — I
[21] couldn't give you all the specifics off the top of
[22] my head, but it was one of the things that I had
[23] written down in my notes.
[24] **Q:** Now, you said "they had the question." I'm

**Page 176**

[1] not asking the question "Are we entitled to
[2] severance pay." I'm rather asking did they say that
[3] we are — instead of a question, did they make a
[4] statement in the claim, "We are entitled to
[5] severance pay"?
[6] **A:** They did say that they thought they were
[7] entitled to severance, and they were told no.
[8] **Q:** Can you tell me who they are, to the best
[9] of your memory?
[10] **A:** Well, I know specifically I asked
[11] specifically that I thought I still should get it.
[12] I know that — I know Vinny — after talking to him,
[13] Vinny spoke to someone.
[14] **Q:** You believe Vinny spoke to someone about
[15] him getting severance?
[16] **A:** Because he didn't want to go to EFTC. He
[17] wanted to stay with Bayer.
[18] **Q:** Did Vinny make the claim that he's entitled
[19] to severance whether or not he went to EFTC?
[20] **MR. ROACH:** Objection. I'm not sure
[21] you're — do you understand the question?
[22] **THE WITNESS:** No. I'm getting confused
[23] now.
[24] **Q:** Let me ask this question again. I'm trying

Page 177

[1] to differentiate between people asking "are we
[2] eligible" or making a claim stating "we are
[3] eligible." So one is asking for information, the
[4] other one is asserting a position. So with Vinny do
[5] you know — you said you had asked "Can I get
[6] severance," and you were given the answer. Do you
[7] know any of the Plaintiffs — did any of the
[8] Plaintiffs make the statement that "I or we are
[9] entitled to get severance"?
[10]    MR. ROACH: Objection. I think that's been
[11] asked and answered, but go ahead. Go ahead.
[12]    A: To come right out and say to Dick Ramsden
[13] that we're entitled would be ignorant, and we never
[14] did that. We always treated him with respect. So
[15] to state to him that we felt as though we were
[16] entitled to it but not demanding that we were
[17] entitled to it, I guess that's where the
[18] terminology — that's where I'm getting confused.
[19]    Q: Again, if you look at Exhibit 1 under B,
[20] the first sentence, it says, "Shortly before Bayer
[21] terminated the Plaintiffs' employment, Plaintiffs
[22] claimed to Bayer that if Bayer terminated them then
[23] Bayer was required by the Bayer plan to pay them
[24] severance benefits." See that sentence?

Page 178

[1]    A: Yes, I do.
[2]    Q: Who are the people who made that claim?
[3]    MR. ROACH: Objection.
[4]    A: I think it would be a collective decision,
[5] a collective summary of people. I don't know if it
[6] was one specific person.
[7]    Q: As you sit down here today can you identify
[8] any specific Plaintiff who made a claim to Bayer
[9] that if Bayer terminated them then Bayer was
[10] required by the Bayer plan to pay them severance
[11] benefits?
[12]    MR. ROACH: Objection. She's already
[13] answered this.
[14]    MR. WELSH: No, she hasn't, Steve, and you
[15] know it. Steve, stop it, please.
[16]    MR. ROACH: I may object if I wish.
[17]    MR. WELSH: You are not going to coach.
[18]    MR. ROACH: I'm not going to coach. You
[19] can answer the question.
[20]    Q: So who were the Plaintiffs?
[21]    MR. ROACH: Objection. Go ahead.
[22]    A: To run off the top of my head without
[23] looking at information that was given to me that I
[24] wrote down, I wouldn't want to throw out anybody's

Page 179

[1] name out there without referring to my notes.
[2]    Q: You see the second — so as you sit here
[3] today you can't tell me off the top of your head any
[4] of the Plaintiffs that claimed to Bayer that if
[5] Bayer terminated then Bayer was required by the
[6] Bayer Plan to pay severance?
[7]    MR. ROACH: Now you are putting words in
[8] her mouth, John. I am going to object to that.
[9]    MR. WELSH: Noted.
[10]    MR. ROACH: She's already talked about
[11] Vinny. She already talked about herself, and she
[12] said there were others.
[13]    MR. WELSH: She talked about it in a
[14] different context with respect to different answers.
[15] Trying to be deceptive in this way does not work,
[16] Steve. I asked her that question. She just
[17] answered she didn't know. I just summarized it to
[18] make sure I understood her answer, and now you've
[19] tried to play with it. I am going to ask the
[20] witness again.
[21]    MR. ROACH: I don't think a summary —
[22]    MR. WELSH: I'll be here all day and into
[23] tomorrow if I have to.
[24]    MR. ROACH: That's fine.

Page 180

[1]    MR. WELSH: We'll get this answer, and you
[2] will stop coaching the witness.
[3]    MR. ROACH: We'll come back.
[4]    MR. WELSH: Stop coaching the witness.
[5]    MR. ROACH: Stop trying to put words in her
[6] mouth after she answered the question.
[7]    MR. WELSH: I'm not putting words in her
[8] mouth.
[9]    BY MR. WELSH:
[10]    Q: Can you name for me, Ms. Skene, any
[11] Plaintiff who claimed to Bayer that if Bayer
[12] terminated them then Bayer was required by the Bayer
[13] plan to pay them severance benefits?
[14]    MR. ROACH: Objection. Asked and answered.
[15] Go ahead.
[16]    A: Off the top of my head I don't have the
[17] answer to your question. I would have to look in my
[18] notes.
[19]    Q: Now, you have the second sentence here. It
[20] says, "Bayer responded by orally denying Plaintiffs'
[21] claims for severance benefits." When you say "Bayer
[22] responded," who specifically responded?
[23]    A: Well, I spoke to you earlier that when I
[24] asked about my benefits and being terminated and

---

Page 181

[1] getting my severance that Dick Ramsden told me that
[2] I could not.
[3]    Q: Right.
[4]    A: Now I know —
[5]    Q: Anyone —
[6]    MR. ROACH: Let her finish the answer,
[7] please.
[8]    Q: Did you make a claim for benefits at that
[9] time?
[10]    MR. ROACH: Objection. That's a legal
[11] term, John. This is a fair summary prepared by the
[12] lawyer, reviewed and signed by the clients.
[13]    MR. WELSH: Maybe it's a nonsense summary
[14] prepared by a lawyer that has no factual dispute.
[15] We've tap-danced through this through two people
[16] signed it. This is the third person who signed it
[17] under oath. I am just asking her whether or not
[18] what she signed under oath is true or not.
[19]    MR. ROACH: You are raising your voice and
[20] asking the same questions over and over again.
[21]    MR. WELSH: And you are interfering with
[22] her answer.
[23]    MR. ROACH: No, I'm not. Go ahead.
[24]    Q: Did you claim to Bayer that if Bayer

---

Page 182

[1] terminated you then Bayer was required to pay you
[2] severance?
[3]    MR. ROACH: Objection. Go ahead.
[4]    A: This was the collective information that we
[5] got from all the individuals. As far as specific as
[6] far as who, I can't give you that answer.
[7]    Q: But I just asked you with respect to
[8] yourself personally. Because you talked about Dick
[9] Ramsden responding to you, and I'm asking you about
[10] what he responded to. And I'm asking you when you
[11] spoke to Dick Ramsden did you claim that if Bayer
[12] terminated you Bayer was required to by the Bayer
[13] plan to pay you severance?
[14]    A: I would say that these words are more
[15] specific, but in my terminology asking him if I
[16] could get my severance and be terminated is
[17] sufficient for me. This is legality wording here,
[18] not necessarily a layman's words. I told him they
[19] thought I should have gotten my benefits, and that I
[20] was being terminated. I should be able to get my
[21] benefits. However, he said differently.
[22]    Q: Okay. All right. Now, you notice in the
[23] sentence — the first sentence was "Shortly before
[24] Bayer terminated the employment." It said Bayer

---

Page 183

[1] responded by denying Plaintiffs' claim for benefits.
[2] In so doing Bayer first falsely represented what the
[3] Bayer plan provided, then falsely stated and then
[4] finally. Did you have any conversation with any
[5] representative of Bayer which went through in detail
[6] the "First," "Then" and "Finally" language that's
[7] reflected on Page 7 of Exhibit 1?
[8]    MR. ROACH: Objection. Go ahead.
[9]    THE WITNESS: I think I'm confused with his
[10] question.
[11]    Q: Okay. Let me ask it again. On the
[12] beginning — on Page 6 on B, "Oral Representations
[13] and Notice to the Plaintiffs," it says, "Shortly
[14] before Bayer terminated the employment," so I guess
[15] that's prior to September 1st, "Plaintiffs claimed
[16] that if Bayer terminated them then Bayer was
[17] required to pay them severance." It says, "Bayer
[18] responded orally," and in responding orally made the
[19] statements that appear on the top half of Page 7.
[20] Did you ever have a conversation with any manager of
[21] Bayer when the comments reflected in the first three
[22] paragraphs on Page 7, the first one starts — is
[23] entitled "First", the next one "Then" and then
[24] "Finally." Did you ever have a discussion with any

---

Page 184

[1] manager of Bayer concerning those remarks?
[2]    MR. ROACH: Objection. Were they said —
[3] all those things in one conversation; is that your
[4] question?
[5]    MR. WELSH: Yes.
[6]    MR. ROACH: Just to her or to everybody?
[7]    MR. WELSH: First to her and then I'll ask
[8] everybody.
[9]    MR. ROACH: Okay. Objection. Go ahead.
[10]    A: I don't remember getting into a
[11] conversation about this personally.
[12]    Q: Can you tell me any Plaintiffs who did?
[13]    A: If anybody got into a conversation like
[14] this more than anybody it would definitely be Robert
[15] Brown.
[16]    Q: Do you know for a fact whether or not
[17] Mr. Brown got in this conversation?
[18]    A: Not unless I look at my notes.
[19]    Q: Based on your recollection did Mr. Brown
[20] indicate that he had a one-on-one meeting with
[21] someone along these line?
[22]    A: Off of the top of my head I don't have that
[23] answer right now.
[24]    Q: Then the next paragraph, it starts, "When."

---

Page 185

[1] It says, "When the Plaintiffs questioned Bayer's
[2] claim that EFTC was offering each Plaintiff words to
[3] the effect of a comparable or same position." When
[4] did the Plaintiffs question Bayer's claim that EFTC
[5] was offering each Plaintiff a comparable or same
[6] position?
[7]    MR. ROACH: Objection. Asked and answered.
[8] Go ahead.
[9]    A: When did the Plaintiffs question Bayer?
[10]    Q: It says, "When the Plaintiffs questioned
[11] Bayer's claim that EFTC was offering each Plaintiff
[12] words to the effect of a comparable or same
[13] position," and I'm asking you first did you ever
[14] question that EFTC was offering a
[15] comparable or same position?
[16]    A: They stated at the meeting that they were
[17] giving you comparable positions.
[18]    Q: Now, did you question that?
[19]    MR. ROACH: You meaning her personally?
[20]    MR. WELSH: I'm asking her first and then
[21] I'll go broader.
[22]    A: I never questioned the position of the
[23] company.
[24]    Q: Can you tell me what Plaintiffs questioned

Page 186

[1] Bayer's claim that EFTC was offering each Plaintiff
[2] a comparable or same position?
[3]    A: Off the top of my head I can't tell you
[4] who, but I know that this is collective information
[5] from all of the individuals involved in this case.
[6]    Q: Shortly before the transaction went through
[7] did the Plaintiffs question whether or not the
[8] positions they were being offered were comparable?
[9]    MR. ROACH: Objection. Go ahead.
[10]    A: At the meetings they were informational
[11] meetings that told them that they were comparable
[12] positions.
[13]    Q: Did any of the Plaintiffs ever challenge
[14] Bayer's statements on that regard —
[15]    MR. ROACH: Objection. Go ahead.
[16]    Q: — to that regard?
[17]    A: Whether they questioned it before or after
[18] the fact is a big issue because we didn't really
[19] know all of the details beforehand.
[20]    Q: Okay. But you see in this sentence it
[21] says, "When Plaintiffs questioned Bayer's claim
[22] Bayer specifically promised." That's in the second
[23] phrase. Do you see that?
[24]    A: Yes.

Page 187

[1]    Q: That would suggest to me at least that this
[2] is referring to prior to the transaction. So my
[3] question to you is, did any of the Plaintiffs ever
[4] question Bayer's claim that the positions being
[5] offered by EFTC were comparable?
[6]    MR. ROACH: Objection. Go ahead.
[7]    A: If it's on here it had to have been
[8] claimed. It had to be talked about.
[9]    Q: And it talked about Bayer specifically
[10] promising Plaintiffs that benefits would be at least
[11] as good, in many cases better, than Bayer's benefits
[12] including severance benefits. What specific Bayer
[13] manager talked about EFTC's severance benefits prior
[14] to the transaction?
[15]    A: I don't have an answer for you.
[16]    Q: Okay. The next paragraph you see it
[17] starts, "When the Plaintiffs questioned Bayer's
[18] basis for making the promise." Again, do you know
[19] who the Plaintiffs are being referenced there?
[20]    A: If I didn't remember up at the top I'm not
[21] going to remember them down the bottom.
[22]    MR. ROACH: Sorry. Which one was that?
[23]    MR. WELSH: It's right here, Steve, the
[24] next paragraph (indicating). Right there

Page 188

[1] (indicating).
[2]    MR. ROACH: You are asking which Plaintiffs
[3] at the meetings or individually?
[4]    MR. WELSH: No. In the beginning of the
[5] paragraph I just asked — she's answered it, but it
[6] says, "When the Plaintiffs questioned Bayer's basis
[7] for making the promise," and I said which Plaintiffs
[8] questioned Bayer's basis for making the promise and
[9] she says she doesn't know.
[10]    MR. ROACH: I am going to object. All
[11] right.
[12]    A: I would have to look at my notes. If I
[13] didn't have the answer up above I'm not going to
[14] have it below.
[15]    Q: Now, on Page 8, halfway down the page,
[16] right above the last paragraph, the last paragraph
[17] starts with "Moreover"?
[18]    A: Uh-huh.
[19]    Q: Above it, the last line, it says, "All of
[20] the Plaintiffs accepted employment with EFTC under
[21] the impression that among the comparable benefits
[22] with EFTC would be the severance benefits"?
[23]    MR. ROACH: See it right there
[24] (indicating).

Jeanne M. Skerik
Vol. 1, June 19, 2006

Case 1:04-cv-10728-WGY    Document 42-23    Filed 01/17/2007    Joseph Rettano, et al.    v.
Bayer Corporation, et al.

Page 189

[1] THE WITNESS: It's right here (indicating).
[2] MR. ROACH: Yes.
[3] A: With —
[4] Q: Were you aware —
[5] MR. ROACH: Let her answer the question.
[6] A: With this information here if you weren't
[7] told that the benefits were different before you
[8] signed on to EFTC, I would think that we assumed
[9] they were all going to be the same. However, we
[10] didn't get the paperwork till after the fact. If
[11] you don't get the information to compare, and you
[12] have someone on one end saying everything is going
[13] to be the same, it's a win-win situation, don't
[14] worry about it, you assume that that person that you
[15] trusted over the last 20 years is telling you the
[16] truth. However, when you get to the other side of
[17] the wall and they start handing you all the
[18] paperwork after you have already signed up with
[19] EFTC, you now start to realize that it wasn't quite
[20] the same as they thought it would be.
[21] Q: Did any Bayer manager tell you prior to
[22] September 1st, 1998, what the EFTC severance
[23] benefits would be?
[24] A: Personally, no.

Page 190

[1] Q: Did any Bayer manager tell any of the
[2] Plaintiffs in this case prior to September 1st,
[3] 1998, what the EFTC severance benefits would be?
[4] A: I would have to ask all of them because I
[5] don't have that answer.
[6] Q: As you sit here today do you know
[7] whether — do you have any knowledge whether any
[8] Bayer manager told any of them what the EFTC
[9] severance benefits would be?
[10] MR. ROACH: Objection. Go ahead. You can
[11] answer.
[12] A: There is an answer that I don't have. When
[13] Ramsden whom we trusted so much kept saying win-win,
[14] we assumed that he was telling us the truth.
[15] Q: Two other sentences on that page. Now, if
[16] you look at the last full paragraph, it starts,
[17] "Moreover the Plaintiffs came to learn that Bayer
[18] misrepresented the terms of the sale of the Agfa
[19] Division in that, under the plan, all the assets of
[20] the division were not sold"? Did you ever think
[21] that the sale to EFTC involved the entire Agfa
[22] Division of Bayer?
[23] MR. ROACH: Objection. You can answer.
[24] A: Did we think EFTC was buying the whole

Page 191

[1] division?
[2] Q: Yes.
[3] A: No.
[4] Q: Did anyone from Agfa ever tell you that
[5] EFTC was buying the whole division?
[6] A: No. But if you look at the paperwork it
[7] tells you if you didn't sell the whole division then
[8] you are entitled. The whole division wasn't sold
[9] so —
[10] MR. ROACH: Let her finish.
[11] Q: You knew in 1998 —
[12] MR. ROACH: Wait a minute. Let her finish
[13] the answer.
[14] A: Did I know that in '98. It's in the
[15] benefit book. It said that if the division was
[16] sold — the premises, processes and whatever the
[17] other word is is sold, then you are not entitled to
[18] it. But the whole division wasn't sold. It was
[19] just one little piece of the pie. That's why we
[20] thought we were going to get our benefits.
[21] Q: In 1998?
[22] A: In 1998, yes.
[23] Q: Okay. If you look at the top sentence
[24] here, this is the beginning of —

Page 192

[1] MR. ROACH: Where are we?
[2] Q: No. 3. It says, "In reliance on Bayer's
[3] statements Plaintiffs accepted employment with
[4] EFTC." What statements are you making reference to
[5] there?
[6] A: "In reliance to Bayer's statements
[7] Plaintiffs accepted employment," is that what you
[8] are talking about?
[9] MR. ROACH: Objection.
[10] *Q. Yes. I'm asking you personally what
[11] statements of Bayer's did you rely on in accepting
[12] employment?
[13] MR. ROACH: Objection. Are you talking
[14] about in addition to what she's already talked about
[15] in this deposition? You want her to repeat
[16] everything.
[17] MR. WELSH: I am asking a very specific
[18] question.
[19] MR. ROACH: It's a very general question,
[20] John. We have gone through a lot of it.
[21] MR. WELSH: That's fine. I'm asking the
[22] question. Please repeat the question to the
[23] witness.
[24] MR. ROACH: Objection. Go ahead.

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 193

[1] *(Question read)
[2]   MR. ROACH: Objection. Go ahead.
[3]   A: We relied on the fact that Bayer told us
[4] that it was a win-win situation and everything was
[5] going to be okay.
[6]   Q: If you turn the page, please. Now, if you
[7] look at on No. 4, the second sentence says,
[8] "Attached is Attachment 5 collectively at Pages 6 to
[9] 11 of the Bayer plan which the Plaintiffs did not
[10] receive from the Defendants until after this lawsuit
[11] was filed. Accordingly the Bayer Defendants
[12] deliberately concealed the Bayer plan from the
[13] Plaintiffs." Now, first I'm going to ask you to
[14] look at Attachment 5.
[15]   MR. ROACH: Got it.
[16]   THE WITNESS: Yes.
[17]   Q: I'll represent to you that this is portions
[18] of the Bayer Severance Pay Plan. Have you — did
[19] you during your employment with Bayer ever request a
[20] copy of the Bayer Severance Pay Plan?
[21]   MR. ROACH: Objection. Go ahead.
[22]   A: I did not ask for a copy of this Bayer plan
[23] because I had the book which they sent to my house.
[24] Everything that Bayer does they send everything to

Page 194

[1] your house. So we were always informed up front to
[2] our house so we didn't have to go looking for
[3] anything.
[4]   Q: Then are you aware of any of the Plaintiffs
[5] making a request for the Bayer severance pay plan
[6] during the time that they worked for Bayer?
[7]   MR. ROACH: Just for the record, John,
[8] let's make sure we understand what exhibits we are
[9] talking about.
[10]   MR. WELSH: Do you want me to make it an
[11] exhibit?
[12]   MR. ROACH: You don't have to. We have
[13] already got it marked.
[14]   MR. WELSH: The problem, Steve, is I don't
[15] have all the exhibits. Here it is.
[16]   MR. ROACH: I have mine.
[17]   MR. WELSH: Here it is.
[18]   MR. ROACH: Wait. I have got it marked as
[19] an exhibit. Let's not remark it.
[20]   MR. WELSH: What's wrong with paperwork?
[21] You are the only lawyer that I ever met who was
[22] worried about killing trees.
[23]   MR. ROACH: This is Bayer's severance plan,
[24] Fiorilla Exhibit 9 that you asked about.

Page 195

[1]   Q: I am going to represent to you that's a
[2] copy of the Bayer Corporation Severance Pay Plan in
[3] its total. You have it in front of you. And
[4] attached to the interrogatories are excerpts
[5] therefrom. My question is did you or any of the
[6] Plaintiffs ever request a copy of this Bayer
[7] Severance Pay Plan, Fiorilla Exhibit 9, during the
[8] period you were employed by Bayer?
[9]   MR. ROACH: Objection. She's already
[10] answered that, but go ahead.
[11]   MR. WELSH: I don't believe she has.
[12]   MR. ROACH: Go ahead. He is not asking you
[13] about those. He's asking you about this
[14] (indicating).
[15]   THE WITNESS: I know he's asking me about
[16] that. He's asking me if we asked for a copy of
[17] that.
[18]   A: And my question is — my theory is if it's
[19] written here that means somebody collectively must
[20] have given us the information that they asked for
[21] it. Right?
[22]   MR. ROACH: He's asking you if you've
[23] ever — I think you said the Summary Plan
[24] Description was already given to you.

Page 196

[1]   A: I didn't ask for a copy of this personally
[2] because I had the book.
[3]   Q: Do you know if any of the other Plaintiffs
[4] asked for it personally?
[5]   MR. ROACH: Let's be careful we know what
[6] "the book" is. That's Fiorilla No. 4, the Summary
[7] Plan Description?
[8]   THE WITNESS: That's what everybody goes
[9] by, the Summary Plan Description. That's the one
[10] that was sent to our house.
[11]   Q: The question we haven't asked, did any of
[12] the Plaintiffs request and not receive a copy of
[13] Fiorilla 9, the Bayer Corporation Severance Pay
[14] Plan?
[15]   A: I don't have an answer for you.
[16]   Q: Okay. I guess when you say you don't have
[17] the answers, the answer is you don't know; is that
[18] right —
[19]   MR. ROACH: Objection.
[20]   Q: — to clarify when you say you don't have
[21] an answer for me?
[22]   A: Well, if we put it in here then it would be
[23] on my notes that someone asked for it.
[24]   MR. ROACH: Fiorilla 9.

Page 197

[1] **Q:** But — I'm going to ask you to turn to Page
[2] 9 of that document, please. That's Exhibit 1, your
[3] interrogatory, Page 9, please.
[4] **A:** I am on 9.
[5] **Q:** Okay. Now, you see about two lines below
[6] Attachment 5 there is a sentence, "Accordingly the
[7] Bayer Defendants deliberately concealed the Bayer
[8] plan from the Plaintiffs." What is the basis for
[9] your belief that the Bayer Defendants deliberately
[10] concealed the Bayer plan from the Plaintiffs?
[11] **MR. ROACH:** Objection. I think she just
[12] answered that twice, John.
[13] **MR. WELSH:** No, she hasn't.
[14] **MR. ROACH:** Go ahead.
[15] **A:** I didn't know that one existed. The bible
[16] is the book that came to my house. I wouldn't have
[17] asked for something I didn't know existed.
[18] **Q:** I understand you didn't ask for it, but I'm
[19] asking you for the sworn statement that you signed
[20] there is a statement that Bayer Defendants
[21] deliberately concealed the plan. That's not simply
[22] that they didn't give it to you, but they
[23] deliberately concealed it. And I'm wondering and
[24] asking you what is the basis — the basis for your

Page 198

[1] assertion that Bayer Defendants deliberately
[2] concealed the plan?
[3] **A:** This was collective information that we
[4] received from everybody. It doesn't mean that I had
[5] the information for that particular thing. It could
[6] have been Vinny, it could have been Bert that got
[7] this information.
[8] **Q:** As you sit here today can you tell me the
[9] basis, the source, who led the Plaintiffs
[10] collectively to submit an interrogatory answer that
[11] said that Bayer Defendants deliberately concealed
[12] the plan from the Plaintiffs?
[13] **MR. ROACH:** Objection. Go ahead.
[14] **A:** Not as I sit here when I cannot.
[15] **MR. WELSH:** Steve, I'm giving you back
[16] Fiorilla 9. This is part of your collection. I
[17] don't want to —
[18] **MR. ROACH:** Thank you. I appreciate it.
[19] **Q:** If you please turn to Page 14, Ms. Skene.
[20] **MR. WELSH:** Steve, we have that issue which
[21] has remained open since the Fiorilla deposition. I
[22] might have pronounced it right for the first time.
[23] **MR. ROACH:** Page 14?
[24] **MR. WELSH:** Yes, about emotional distress

Page 199

[1] which you were going to reflect on.
[2] **MR. ROACH:** Let me chat with her on that.
[3] **MR. WELSH:** At some point in time we kind
[4] of have to make a call whether they are in or out.
[5] It's not like a class action opted.
[6] **MR. ROACH:** You are right. Have you got a
[7] minute?
[8] (Recess taken from 2:53 to 3:09 p.m.)
[9] **MR. WELSH:** Back on the record. Is it my
[10] understanding that the Plaintiffs are not going to
[11] pursue the emotional distress aspect of the claim.
[12] **MR. ROACH:** That's correct.
[13] **MR. WELSH:** Thank you.
[14] **BY MR. WELSH:**
[15] **Q:** Ms. Skene, do I understand that you have
[16] compiled in assistance of and/or at the direction of
[17] Mr. Roach documents that would list the various
[18] communications that Plaintiffs had with individual
[19] Bayer managers concerning Severance Pay Plan —
[20] concerning the claim for severance pay benefits?
[21] **MR. ROACH:** You can answer. Go ahead.
[22] **A:** I do have a list of people and their
[23] information.
[24] **Q:** Is it fair to say that you don't have the

Page 200

[1] information that's on that list in your head that
[2] you can testify to. You would have to look at the
[3] document you have to refresh your memory?
[4] **A:** To give you specifics for each individual I
[5] would have to look at the paper to be accurate.
[6] **Q:** Okay. Other than looking at the paper now
[7] is there any of these communications that various
[8] Plaintiffs may have had with Bayer managers that are
[9] in your memory that you can testify to without
[10] looking at your paper and that you haven't talked
[11] about already today? Don't look at the paper.
[12] **A:** You mean the names? I don't want to look
[13] at names?
[14] **MR. WELSH:** Mr. Roach and I have an
[15] evidentiary issue that at this point precludes me
[16] from looking at the document. So I am trying to
[17] find out what you have in your head.
[18] **A:** People who spoke with management about the
[19] severance.
[20] **Q:** What was said?
[21] **A:** All of them talked about — they wanted to
[22] stay with Bayer; I know that. And if they couldn't,
[23] could they be terminated and get their severance.
[24] Now, all of the individuals I don't have all their

Page 201

[1] names, but I can cheat. I know that Mary —
[2] **MR. ROACH:** Let the record reflect that she
[3] is looking at Skene Exhibit 1.
[4] **A:** Just the names.
[5] **Q:** The answer to interrogatory cover sheet.
[6] **A:** Is that okay?
[7] **Q:** That's fine.
[8] **MR. ROACH:** Sure.
[9] **Q:** I'm not the one that will be stopping you.
[10] It will be Mr. Roach.
[11] **A:** Mary Bogdan, B-o-g-d-a-n, spoke with — can
[12] I just give you the name — the three of them per se
[13] or do I have to tell you the specific that person
[14] spoke to?
[15] **Q:** I want to know the specific person. I
[16] think it's going to be Ramsden or Fontaine or
[17] Leonard?
[18] **A:** It is those three that people spoke to.
[19] **Q:** If you don't remember, tell me you don't
[20] remember.
[21] **A:** I know they spoke to people, but knowing
[22] which specific one they spoke to would be hard
[23] pressed for me to remember all 63 people.
[24] **Q:** Agreed. So if you just tell me who spoke,

Page 202

[1] and if you know the specific person they spoke to
[2] you can tell me.
[3] **A:** Okay. Well, I know — I just told you
[4] Mary. I know Robert Brown, Carol Christianson, Mary
[5] Jo Corcoran, Aroussiak Dakessain, Vinny Fiorilla,
[6] Steve Fournier, Diana Glassett, Phillip Greene,
[7] Edmund Lascelles, Teresa Ornelas, Long Peck, Linda
[8] Paradis and Janice Paradis both, I believe, talked
[9] to individuals. The specific ones, mostly everybody
[10] spoke with Ramsden and Fontaine. I know that for a
[11] fact. But exactly which ones I'd have to give that
[12] to you.
[13] **Q:** Are you all done?
[14] **A:** No. There is more names, but I don't have
[15] to give them all to you, do I?
[16] **MR. ROACH:** He wants all of them that you
[17] remember.
[18] **Q:** The ones you remember.
[19] **A:** Dick Picard, Maria Reis, Joanne Sanzo, me,
[20] and I think that's about all I can remember off the
[21] top of my head without looking.
[22] **Q:** Now, of the people you named are you aware
[23] of any of them going to managers and saying that, in
[24] essence, "We have been wrongfully denied our

Page 203

[1] severance pay"?
[2] **MR. ROACH:** Objection. In those words?
[3] **MR. WELSH:** In that substance.
[4] **Q:** Again, we talked earlier about questioning,
[5] the reverse of demand. Of the people did any of
[6] them ever go to management and say, "We have been
[7] wrongfully denied severance"?
[8] **MR. ROACH:** Objection. Go ahead. You can
[9] answer.
[10] **A:** I know people spoke to Dick Ramsden and
[11] said that we felt as though we should have gotten
[12] severance, but use the word "wrongly denied," the
[13] respect for Dick Ramsden for him to say, "I'm sorry
[14] you feel that way, but that's how it goes." And we
[15] weren't going to get it. This was after the fact.
[16] **Q:** So some of the people you mentioned, you
[17] don't recall, went to Ramsden after the sale and
[18] said, "We feel we should have gotten severance"?
[19] **A:** Yes.
[20] **Q:** And that would have been in the end of '98,
[21] '99 time frame?
[22] **MR. ROACH:** Objection.
[23] **A:** No. It was when the — the more the people
[24] started questioning it the more it pushed towards

Page 204

[1] the date when the machine shop was sold.
[2] **Q:** Olympic?
[3] **A:** That really started to really blossom at
[4] that point.
[5] **Q:** Prior to the Olympic matter are you aware
[6] of anyone going to Ramsden and saying, "We feel we
[7] should have gotten severance"?
[8] **A:** I know personally I did.
[9] **Q:** When was that? Was it after the —
[10] **A:** After the sale, yes.
[11] **Q:** Do you know of anyone —
[12] **A:** I talked to him before the sale, too.
[13] **Q:** Right now I'm focusing September 1st, '98,
[14] through the end of '99. Other than yourself do you
[15] know anyone else who went to Ramsden and said words
[16] to the effect of "We feel we should have gotten
[17] severance"?
[18] **A:** Specific names of after the fact I do not
[19] have that, but I am sure that I have been told many
[20] times people questioned Dick Ramsden in the hall
[21] about feeling as though they were wrongfully denied
[22] and they wanted their severance.
[23] **Q:** Are you aware of any Plaintiff including
[24] yourself to ever put those feelings in writing and

Page 205

[1] submit them to Bayer?
[2]    **MR. ROACH:** Objection.
[3]    **A:** I am not aware of anybody that put anything
[4] in writing. It was all verbal conference.
[5]    **Q:** Okay.
[6]    **A:** I could be wrong, but that's all I know of.
[7]    **Q:** I'm only asking you what you know.
[8]    **A:** I will ask, though.
[9]    **Q:** With the exhibit you have in front of you,
[10] if you will —
[11]    **A:** One thing, as I'm sitting here writing this
[12] down, I do recall, not me specifically, but when we
[13] had Stephen Roach go chasing down paperwork we had
[14] him ask about that for us.
[15]    **Q:** Then, if you will — the documents in front
[16] of you, if you will look at Attachment —
[17]    **MR. ROACH:** I mean, your initial question
[18] was just the Plaintiffs themselves personally, not
[19] through a lawyer, right?
[20]    **MR. WELSH:** Right, that's true.
[21]    **MR. ROACH:** She is talking now about me.
[22]    **MR. WELSH:** She is talking about your
[23] letter to Bayer, I believe.
[24]    **A:** I take it it's in this package

Page 206

[1] (indicating).
[2]    **Q:** I thought it was.
[3]    **MR. ROACH:** I believe it is. It's one of
[4] the attachments, Skene Exhibit 1.
[5]    **MR. WELSH:** Here it is. It's Attachment 4.
[6]    **A:** Boy, it's a big one. Okay.
[7]    **Q:** There it is right there (indicating).
[8]    **A:** Yes.
[9]    **Q:** Now, on Attachment 4 to Exhibit 1 there is
[10] a letter to the president of Agfa Corporation from
[11] Mr. Roach. Do you see that?
[12]    **A:** Yes, I do.
[13]    **Q:** And is this the first writing, to your
[14] knowledge, that the Plaintiffs themselves or by
[15] their representative submitted to Agfa or Bayer
[16] concerning the denial of their severance pay?
[17]    **MR. ROACH:** Objection.
[18]    **A:** I didn't ask anybody if they wrote to them,
[19] but I will ask them. I did not ask.
[20]    **Q:** Okay. But as you sit here today are you
[21] aware of any written communication from any of the
[22] Plaintiffs or their representatives to Bayer or Agfa
[23] other than the letter by Mr. Roach that's attached
[24] as Attachment 4 to Exhibit 1?

Page 207

[1]    **A:** I do not know anything other than this
[2] letter.
[3]    **Q:** Okay. Look at this letter, if you turn to
[4] page — one second. On the first page on numbered
[5] Paragraph 2 the line reads, "When Agfa sold the
[6] board shop to a third party Agfa denied my clients'
[7] claims for severance benefits." As you sit here
[8] today the claims for severance benefits that you're
[9] aware of are those that you previously testified to
[10] that you went up to Ramsden, for instance, said
[11] "I feel like we should have gotten severance," and
[12] other people may have had similar communications?
[13]    **A:** Yes. We were terminated; therefore, we
[14] felt as though we deserved to have severance.
[15]    **Q:** Any claims for severance benefits are you
[16] aware of other than those you've testified to
[17] earlier here today?
[18]    **A:** Any other claims?
[19]    **Q:** Yes. Right now you testified about you and
[20] others going to Ramsden after the transaction saying
[21] "We feel we should have severance benefits." There
[22] is also some testimony individually and in group
[23] meetings before the transaction where employees
[24] asked "Do we get severance," but that would have

Page 208

[1] been the way, if I understand your testimony, you
[2] would have phrased it then. You wouldn't have been
[3] confrontational. You would have just raised the
[4] topic. You just testified about that.
[5]    **A:** We wouldn't be confrontational.
[6]    **Q:** Other than those two instances before the
[7] transaction, you know, "Do we get severance
[8] benefits" type of inquiries and after going up to
[9] Ramsden and the like and saying "We feel we should
[10] have gotten severance," are you aware of any other
[11] claims made by the Plaintiffs or their
[12] representatives other than this letter by Attorney
[13] Roach?
[14]    **MR. ROACH:** Are you talking about in
[15] addition to when the machine shop was sold,
[16] conversations then, too?
[17]    **MR. WELSH:** We can talk about that, too.
[18]    **Q:** Are there conversations with the machine
[19] shop?
[20]    **A:** That spurred a lot of the conversation when
[21] the machine shop — because this is what was sent to
[22] us. The machine shop told — where they were
[23] selling and liquidating the machine shop and Olympic
[24] was buying it up and taking the guys and the guys

Page 209

[1] said no, they are not going. So they gave them all
[2] their severance packages.
[3]    Q: At that time did any of the Plaintiffs go
[4] to any Bayer or Agfa managers and say, "Well, we
[5] should now receive severance pay as well"?
[6]    A: A lot of people spoke to Ramsden and
[7] others. I'm not sure to whom they were talking to,
[8] but I would have to look at the notes. They asked
[9] if the machine shop got their benefits why can't we
[10] have ours. They thought they were entitled to them.
[11]    Q: Do you know what they were told?
[12]    A: They were told that they were given
[13] employment by EFTC; therefore, they were not
[14] entitled to it.
[15]    Q: Do you know at this time after the machine
[16] shop other than Mr. Roach's letter was any
[17] correspondence in writing?
[18]    A: I told you I'd have to ask that question.
[19]    Q: Okay.
[20]    A: I wrote a bullet here for myself to ask. I
[21] add it to my list that you are asking me to do.
[22]    Q: Now, when the machine shop was sold did you
[23] ever talk to any of the employees that were in the
[24] machine shop?

Page 210

[1]    A: I spoke — well, we did talk to some of the
[2] guys that were still in the model shop that knew the
[3] boys from the machine shop, and they are the ones
[4] that told us what happened.
[5]    Q: What did they tell you?
[6]    A: That the guys in the machine shop didn't
[7] want to get — didn't want to go work for Olympic.
[8] They wanted to get their severance packages. They
[9] didn't think it was fair; that they — so Agfa said
[10] let's not make that mistake again, and they said,
[11] "Give them all their packages" and they all left.
[12] And then six, I believe, guys all went to work for
[13] Olympic anyway.
[14]    Q: Do you know what their wages were for
[15] Olympic?
[16]    A: I do not, but I heard only through the
[17] grapevine that they started at the same rate that
[18] they were making at Agfa.
[19]    Q: Did they get the same benefits?
[20]    A: I didn't get into that detail.
[21]    Q: Were they at the same location?
[22]    A: No. They were only about 12 miles up the
[23] road though.
[24]    Q: Where were they up the road?

Page 211

[1]    A: Haverhill.
[2]    Q: Haverhill. Now, if you turn to Attachment
[3] 1 of Exhibit 1, please.
[4]    A: You mean Attachment 1?
[5]    Q: Attachment 1.
[6]    A: I'm coming. All right.
[7]    Q: Attachment 1, these are pages that were
[8] copied from the Summary Plan Description, the SPD,
[9] Ramsden Exhibit 7?
[10]    MR. ROACH: And Fiorilla Exhibit 5, I
[11] believe.
[12]    Q: Are you familiar with that page?
[13]    A: Yes. It comes out of my bible.
[14]    Q: And the bible is the book we are talking
[15] about, Exhibit 7 Ramsden?
[16]    A: The Summary Plan, yes.
[17]    MR. ROACH: Fiorilla 5.
[18]    MR. WELSH: Okay.
[19]    Q: Now, if you turn to the second page of
[20] Attachment 1. On the bottom it says "SEV4"?
[21]    A: Okay.
[22]    Q: Now, did you place the underline — is
[23] yours underlined at all?
[24]    MR. ROACH: There is a square.

Page 212

[1]    Q: Other than the square is anything else
[2] underlined in yours or highlighted?
[3]    MR. ROACH: Not on ours.
[4]    MR. WELSH: Okay.
[5]    MR. ROACH: I think what happened, John,
[6] was that the — I don't know. That's it. I don't
[7] know what happened. Somebody might have put some
[8] marks on it after.
[9]    Q: If you turn the page to the next page of
[10] Attachment 1 on Exhibit 1. So if you turn to —
[11]    MR. ROACH: Is this SEV4?
[12]    MR. WELSH: It goes to from SEV to ADM6.
[13]    MR. ROACH: ADM6.
[14]    A: Wow. I never saw this one. "If claims is
[15] denied."
[16]    Q: Have you ever seen that page before?
[17]    A: No.
[18]    Q: I am going to give you a copy of the
[19] Summary Plan Description, Ramsden 7/Fiorilla 5. I
[20] am going to turn to the end, and you can see there
[21] is a provision that says "Administrative
[22] Information." Do you see that?
[23]    A: Yes.
[24]    Q: The next page there is an index with pages

Page 213

[1] of the "Admin" section, and on 6 it tells you, does
[2] it not, the procedure to follow if your claim is
[3] denied. Do you see that?
[4]   **A:** I see it now, yes.
[5]   **Q:** Until today have ever read this?
[6]   **A:** No, sir.
[7]   **Q:** Are you aware of any Plaintiff that pursued
[8] the appeal process set forth on Page Admin 6 of
[9] Fiorilla 5/Ramsden 7?
[10]   **MR. ROACH:** Objection.
[11]   **A:** Not to my knowledge. I didn't even know
[12] that page existed.
[13]   **Q:** Okay.
[14]   **MR. WELSH:** I have no further questions,
[15] Steve.
[16]   **MR. ROACH:** I actually have a few.
[17]                **CROSS EXAMINATION**
[18]                     **BY MR. ROACH:**
[19]   **Q:** Going back to Page 2 of Exhibit — Skene
[20] Exhibit 1, it talks about — you see the word
[21] "vested" that Mr. Welsh was asking you about in the
[22] second paragraph, fourth line down (indicating)?
[23]   **A:** Yes, I see it. Right here (indicating).
[24]   **Q:** Right. You said at that time each

Page 215

[1] when you were there at Bayer, a Bayer layoff, a
[2] voluntary layoff program or procedure?
[3]   **A:** Yes. If you wanted to pursue a different
[4] career or you wanted to go back to school people
[5] would go over and tell the supervisor and in turn it
[6] would get to the managers and tell them that they
[7] wanted to volunteer to be laid off so they could
[8] pursue a different career.
[9]   **Q:** Was this understanding that you have
[10] testified to in the last few questions about
[11] severance — Bayer severance plan a reason why any
[12] of the people stayed with Bayer for as long a time
[13] as they did?
[14]   **A:** Absolutely. There was a big, big issue
[15] about whether people were going to stay or not, and
[16] the deciding factor was the fact that everybody
[17] until August thought they were getting their
[18] severance packages because everybody before us that
[19] volunteered got their severance packages. So if we
[20] were volunteering to go to EFTC we thought we were
[21] still going to get our severance packages.
[22]   **Q:** Was this true for the people who had been
[23] there for many years, like 15 plus years as well as
[24] the people who had been there eight to ten years?

Page 214

[1] Plaintiff was a plan participant vested in the
[2] severance plan. Can you tell me what your
[3] understanding of what the — of what you and the
[4] others' understanding was of whether you considered
[5] the severance plan as something you would get if you
[6] were terminated from Bayer?
[7]   **A:** We all assumed that the severance benefit
[8] was once we were terminated from the company or
[9] Bayer-Agfa Division, that it was pretty much a given
[10] that we would have all gotten our severance package.
[11] It was kind of — it was one of those things that
[12] everybody got when they were terminated. And we
[13] were being terminated, and that's why we thought we
[14] were eligible for it.
[15]   **Q:** Okay. Was the severance plan as you
[16] understood it based upon what Bayer had done with
[17] other people before you, before the sale to the
[18] EFTC?
[19]   **A:** Yes. The people prior to us, they had
[20] involuntary layoffs, they had voluntary layoffs.
[21] They all got it. They didn't discriminate. They
[22] gave everybody their severance packages.
[23]   **Q:** Was there a plan or a program or something
[24] that was called the voluntary layoff that you heard

Page 216

[1]   **A:** Everybody, everybody across the board.
[2] There was no discrimination. If you wanted to
[3] volunteer they would take you and you would get the
[4] package and you would get your severance.
[5]   **Q:** And so my question is is that one of the
[6] reasons people stayed with Bayer rather than leave
[7] Bayer over the period of years you were there?
[8]   **A:** People stayed there because of the
[9] declining business and figured that they would end
[10] up with 32-plus weeks of severance to carry them
[11] over into a new career.
[12]   **Q:** Had you spoken to each of the Plaintiffs
[13] about this reason for staying with Bayer, in other
[14] words, the severance plan being —
[15]   **A:** I actually did ask that question.
[16]   **Q:** Of all people?
[17]   **A:** Everybody, yes.
[18]   **Q:** Okay. Is that in meetings as well as in
[19] paperwork?
[20]   **A:** We had meetings and we also had — just
[21] verbal discussions, and we also had written
[22] discussions about it.
[23]   **Q:** I am going to show you what's been marked
[24] as Ramsden Exhibit 26. Do you recognize any of the

Joseph Attardi, et al.
Bayer Corporation, et al.

Case 1:04-cv-10728-WGY    Document 42-23    Filed 01/17/2007    Page 23 of 32

Jeanne M. Skene
Vol. 1, June 19, 2006

Page 217

[1] names on there? It's entitled "Bayer Severance
[2] Employee Payees"?
[3]    A: Yes, I see it.
[4]    Q: Do you know any of the names on there such
[5] as Peggy Shabot, Carrie Emond or any of the others?
[6]    A: Yes, I do recognize quite a few of them.
[7]    Q: Do you know if any of those people received
[8] severance when they left?
[9]    A: Yes. Everybody on that list got severance
[10] when they left.
[11]    Q: Do you know if any of these people had a
[12] job as soon as they left when they got severance?
[13] In other words, they went from Bayer right to the
[14] next day getting a paycheck from another employer?
[15]    A: To my knowledge Peggie Chabot left
[16] Bayer-Agfa Division and went right into the another
[17] job the following week.
[18]    Q: And did she got severance from Bayer?
[19]    A: She got severance from Bayer.
[20]    Q: Was this under the Bayer Severance Pay
[21] Plan, the Summary Plan Description that we have
[22] marked as Fiorilla 5 and Ramsden 7?
[23]    A: Yes, under that plan. That's the plan that
[24] we all followed, and then Carrie Emond — Carrie

Page 218

[1] Emond volunteered for it because she wanted to
[2] pursue a career in veterinarian school. So she took
[3] the voluntary layoff. She collected
[4] unemployment — after all her severance was gone
[5] collected unemployment and continued to be trained
[6] as a veterinarian, and now she is a veterinarian.
[7]    Q: Was she being trained as a veterinarian
[8] when she was at Bayer before she left and took the
[9] severance plan?
[10]    A: I believe she was going to school nights,
[11] taking night classes.
[12]    Q: Other than people on this list that's
[13] Ramsden 27 do you know of any departments that were
[14] either sold or terminated where people received
[15] their severance plan, any particular departments?
[16] This was before the sale to EFTC in August or
[17] September of '98.
[18]    A: We discussed that — I am not sure if
[19] the — I'm not sure if the — the shipping
[20] department, I'm not sure if it was before or after
[21] us. I am stuck on that one. Because everything is
[22] kind of running all together because you are asking
[23] me ten thousand questions.
[24]    Q: What about Cable Harness?

Page 219

[1]    A: Cable Harness, some people volunteered to
[2] be laid off, other people were transferred into
[3] other departments.
[4]    Q: Did that department disband?
[5]    A: It totally disbanded, yes.
[6]    Q: Did they sell all the assets off?
[7]    A: I believe they sold all the assets off, and
[8] someone else made all the cables for them.
[9]    Q: Do you know anyone in that department, any
[10] employees?
[11]    A: I don't remember off the top of my head
[12] now.
[13]    Q: What about Assembly or Inspection; do you
[14] remember if those departments were disbanded or sold
[15] and if anybody got severance from those departments?
[16]    A: The Inspection department — the QC
[17] in-house inspection, they sent a lot of the people
[18] to different departments which is why a lot of us
[19] were asking to go to a different department. Seeing
[20] as how they were liquidating areas we thought —
[21] seeing how they were liquidating the board shop we
[22] could go out to the back of the building and work,
[23] and that's when they told us we couldn't. So that
[24] was another whole issue that we thought if we

Page 220

[1] couldn't stay with the board shop can we go to the
[2] back of the building, and they said no.
[3]    Q: Were there any other departments or areas
[4] within Bayer-Agfa Division where the department was
[5] either disbanded, gone out of business or assets
[6] sold where people got their severance were laid off,
[7] paint shop, any other areas that you can think of?
[8]    A: The paint shop — originally we thought
[9] some of the paint shop was people were given
[10] severance. There may be a couple of guys that took
[11] their severance but other people asked to be
[12] transferred up into the other areas which is why we
[13] kept asking to go to other areas because when they
[14] liquidated some of them, they didn't go.
[15]    Q: What I am asking you about is severance.
[16] Were there people in that area that left and got
[17] severance?
[18]    A: Right. I'm not sure of their names. There
[19] may have been a couple of guys that were in the
[20] paint shop that took the voluntary layoff, took
[21] their severance packages and left.
[22]    Q: What about Linda Kawa, K-a-w-a?
[23]    A: Linda Kawa, she worked in the computer lab,
[24] and she was terminated from Bayer-Agfa Division, and

Page 221

[1] six weeks later I believe it was she was brought
[2] back. She gave back X amount of the money, but she
[3] kept X amount of the money. I'm not privy of all
[4] the details of it, but she in turn started working
[5] again for Bayer and then later on was terminated.
[6]    **Q:** When she was terminated again did she get
[7] severance?
[8]    **A:** She got severance, yes.
[9]    **Q:** I would like to show you on Page 9 of
[10] Exhibit 1, Mr. Welsh asked you some questions about
[11] concealment of the Bayer plan. I'm not sure if it's
[12] clear. I just wanted to make sure. He was talking
[13] about the Bayer Defendants deliberately concealed
[14] their plan. Do you see that (indicating)?
[15]    **A:** If I read this now, I may have
[16] misunderstood the original way it was said because
[17] if — originally I thought maybe we had had this
[18] information, but I'm reading this a second time
[19] here. It could be that we thought it was being
[20] concealed because we never even knew it existed.
[21] All we ever had was that one book.
[22]    **Q:** The "one book" meaning the Summary Plan?
[23]    **A:** The Summary Plan is what we called the
[24] bible. That's what everybody lived by is the bible.

Page 222

[1]    **Q:** Did Bayer ever say to you in any of the
[2] meetings or any of the individual discussions with
[3] you or anybody else that you know of that the Bayer
[4] plan is what controls, and bring it to your
[5] attention in any way, shape or form in any of the
[6] meetings, individual meetings or group meetings that
[7] you are aware of?
[8]    **A:** No. I don't know of it to be said to
[9] anybody unless it was in my notes, and I don't
[10] believe I knew anything about that plan.
[11]    **Q:** Okay. Now, on Page 7, the bottom
[12] of — towards the bottom of Page 7 Mr. Welsh asked
[13] you — this is on Skene Exhibit 1. He asked you
[14] about the phrase — I'm sorry — the paragraph when
[15] the Plaintiffs questioned Bayer's claim that EFTC
[16] was offering each Plaintiff words to the effect of a
[17] comparable or same position. Bayer specifically
[18] promised that EFTC's benefits would be the same,
[19] would be — strike that — that EFTC's benefits
[20] would be at least as good and in many cases better
[21] than Bayer's benefit, including severance benefits,
[22] and that it would be a win-win situation for both
[23] Bayer and the Plaintiffs. Do you remember him
[24] questioning you about that paragraph?

Page 223

[1]    **A:** Yes, I remember him talking.
[2]    **Q:** Let me just ask you. He segmented out the
[3] question did any of the — do you remember Bayer
[4] saying that the severance specifically would be as
[5] good? And I just wanted to ask you again in the
[6] discussions with Bayer about the benefits at EFTC
[7] did — what did they say to you in general about the
[8] benefits?
[9]    **MR. WELSH:** Objection. You may answer.
[10]    **A:** Dick said that it was a win-win situation
[11] and not to worry. Everything was going to be fine.
[12] You'd have better — comparable benefits. So people
[13] only assumed that everything was going to be
[14] comparable.
[15]    **Q:** Including the severance?
[16]    **A:** Including the severance, yes. It wasn't
[17] until after we got the paperwork that we found out
[18] that severance was totally different. That's why
[19] people were asking about severance and why we
[20] couldn't get it.
[21]    **Q:** He also asked you about Pages 6 and 7,
[22] beginning of 6. "In so doing," do you see that? It
[23] starts on 6 and then it goes through "First," "Then"
[24] and "Finally." Do you see that on Page 7?

Page 224

[1]    **A:** Yes, I see it.
[2]    **Q:** When Mr. Welsh asked you that, did you
[3] understand him to be asking you whether all of those
[4] things were said at one time by one Bayer person in
[5] one meeting or with one individual?
[6]    **A:** Well, it wasn't said. But — I don't
[7] believe anything was said all at one time. It was
[8] like all piecemeal.
[9]    **Q:** So is it your understanding in this
[10] statement that was made in Exhibit 1, "In so doing
[11] Bayer," and then it goes "First," "Then" and
[12] "Finally," gave you that impression in general with
[13] all the meetings, individual and group meetings,
[14] that were held at Bayer before the sale and after
[15] the sale?
[16]    **A:** Before the sale everybody felt as though
[17] they were telling us the truth. It wasn't till
[18] after the sale that we saw the paperwork that we
[19] realized that it was so much different.
[20]    **Q:** Okay. But what I'm asking you is this
[21] "First," "Then" and "Finally." I think Mr. Welsh
[22] asked you, I think, a question to the effect, and
[23] the record will show I may be somewhat not totally
[24] verbatim with what Mr. Welsh asked you, but he asked

Page 225

[1] you if you can recall any Bayer persons saying those
[2] three things at one time. Do you remember whether
[3] it was at one time or was it over a period of time
[4] that these things were said to you, and that's why
[5] you said it here?
[6]    A: This is a — this is a list of multiple
[7] times that we spoke to individuals, not just one
[8] particular time.
[9]    Q: Okay. And that also includes group
[10] meetings that you had with Bayer?
[11]    A: Yes.
[12]    Q: And I think he also asked you a question
[13] on Attachment 1 to Exhibit 1 and he also asked
[14] you about Page SEV4.
[15]    A: Uh-huh.
[16]    Q: And looking at the bullet point that starts
[17] "The premises, products" and so forth which is below
[18] the bullet point that's got a square around it when
[19] it talks about the provision, looking at that, do
[20] you have an understanding — I know you are not an
[21] attorney, but do you have an understanding of just
[22] looking at that what that exception is for times
[23] that people don't get severance benefits?
[24]    A: I would in my layman's talk would think

Page 226

[1] that they were talking about moving over or
[2] relocating within the Agfa Division. That's not
[3] what we did.
[4]    Q: A job within Bayer?
[5]    A: We didn't stay within Bayer.
[6]    Q: Another question I have is Page 8. He
[7] asked you about reliance upon Bayer's statements,
[8] Plaintiffs accepting employment with the EFTC. Do
[9] you see that?
[10]    A: Yes.
[11]    Q: With respect to those statements, were you
[12] talking about any one particular statement or were
[13] you talking about collectively all the statements
[14] that were made individually and at meetings where
[15] Bayer representatives spoke to the Plaintiffs?
[16]    MR. WELSH: Objection. You may answer.
[17]    Q: You can answer.
[18]    A: It was collective information. It was
[19] never anything that was all said at one meeting. It
[20] was all collective meetings and talk.
[21]    Q: Did you trust Bayer's statements that it
[22] was a win-win situation at that time?
[23]    A: Yes. We trusted them from Compugraphic
[24] days all the way up. There was no need to distrust.

Page 227

[1]    MR. ROACH: I have nothing further.
[2]    MR. WELSH: Okay. I have a few follow-ups
[3] based on cross.
[4]                REDIRECT EXAMINATION
[5]                  BY MR. WELSH:
[6]    Q: If you will turn to Attachment 1 of Exhibit
[7] 1. There is a page on the bottom which says "SEV4."
[8]    A: Yes, I'm there.
[9]    Q: Now, I believe, if I'm not mistaken, on the
[10] second column there is one, two, three, four, five,
[11] six paragraphs with a bullet mark. Do you see
[12] those —
[13]    A: Yes.
[14]    Q: — going down the column right here
[15] (indicating)?
[16]    A: Right.
[17]    Q: The third one has a box around it.
[18] It's "The division or the company you work for or
[19] the company itself is sold or divested," correct?
[20]    A: Yes.
[21]    Q: The next bullet point is "The premises,
[22] products, processes or other activities of the
[23] division you work for are relocated, assigned, sold,
[24] leased or subcontracted and you are offered a

Page 228

[1] comparable position (even if you choose not to
[2] accept it)," correct?
[3]    A: Correct.
[4]    Q: Now, this portion, the fourth bullet point,
[5] is that the one you said based on your lay
[6] interpretation would only apply to an intercompany
[7] transfer?
[8]    A: I believe that's what it means.
[9]    MR. ROACH: I think she meant intracompany.
[10]    A: Within Bayer.
[11]    Q: Why do you believe that?
[12]    MR. ROACH: Objection. Again, she is not
[13] an attorney. I am going to object.
[14]    MR. WELSH: That's all right.
[15]    MR. ROACH: Go ahead. You can answer.
[16]    A: Because it said "The premises, products,
[17] processes, or other activities of the division you
[18] work for are relocated"; that I worked for Bayer. I
[19] worked for Bayer so I didn't get relocated into
[20] another unit for Bayer. I was sold to EFTC. So
[21] this, to me, implied being in a division within
[22] Bayer.
[23]    Q: Okay. Now, if you look at the second
[24] bullet point.

Page 229

[1] **A:** "Company offers you"?

[2] **Q:** Yes. Would that second bullet point apply

[3] to intracompany transfers?

[4] **MR. ROACH:** Objection.

[5] **A:** It doesn't say that. It just says the

[6] company offers you a comparable position.

[7] **Q:** Do you not read it that way?

[8] **MR. ROACH:** Objection.

[9] **A:** Well, I see what you are saying. It sounds

[10] like that's what they are talking about, a

[11] comparable position within company, but they

[12] doubletalk so often I assumed they are talking about

[13] the same thing.

[14] **Q:** Okay.

[15] **A:** Down the bottom under —

[16] **Q:** So far as you are aware Paragraph 2

[17] and — both Paragraph 2 on the second column on SEV4

[18] and bullet Paragraph 4 on the second column SEV4 are

[19] redundant? They are talking about the same thing?

[20] **MR. ROACH:** Objection.

[21] **Q:** Is that your testimony?

[22] **A:** It sounds like they are talking about the

[23] same information. If you go to the division of the

[24] company that is boxed in —

Page 230

[1] **Q:** That's Bullet Point No. 3. No. I'm

[2] looking at Bullet Points 2 and 4.

[3] **A:** Down underneath it says, "The new owner

[4] offers you" —

[5] **Q:** Uh-huh. Again, what I'm asking you is the

[6] difference in your mind between the second bullet

[7] point on the second column and the fourth.

[8] **MR. ROACH:** Objection.

[9] **A:** I still think that they were within the

[10] company, within Bayer.

[11] **Q:** Okay. When — did you believe that back in

[12] 1998?

[13] **MR. ROACH:** Objection. I think she's

[14] already talked about what she looked at. Go ahead.

[15] **MR. WELSH:** Objection noted.

[16] **A:** The one that's boxed in is the original one

[17] that I went to Steve about, and that was the

[18] fact —

[19] **MR. ROACH:** Hold on. You don't want to

[20] talk about what you talked to me about.

[21] **THE WITNESS:** He already knows.

[22] **MR. ROACH:** You don't want to get into what

[23] you and I discussed.

[24] **THE WITNESS:** Oh.

Page 231

[1] **MR. ROACH:** He just wants to know —

[2] **Q:** I am talking in 1998 did you read this

[3] page, SEV4?

[4] **MR. ROACH:** Did you read that page in 1998?

[5] **A:** I did read.

[6] **Q:** Did you — in fact on the second column,

[7] fourth bullet point down, did you read that language

[8] in 1998?

[9] **A:** I did, thinking that they were talking

[10] about a position within Bayer, yes.

[11] **Q:** Okay. And in 1998 you were aware that the

[12] whole Agfa Division wasn't being sold to EFTC,

[13] correct?

[14] **A:** Correct. It was only a portion of it which

[15] is why it brings me to the thought that we were

[16] going to get benefits because they only sold a

[17] portion of it.

[18] **Q:** Now, in 1998 were you aware of the

[19] definition in the third column of SEV3, Attachment 1

[20] to Exhibit 1, a defined comparable position?

[21] **MR. ROACH:** SEV3?

[22] **MR. WELSH:** SEV4.

[23] **MR. ROACH:** I think you said 3.

[24] **MR. WELSH:** I'm sorry. I'll restate it.

Page 232

[1] **A:** I'm on 3. That's why.

[2] **Q:** Looking — again, looking at Page SEV4 on

[3] Attachment 1 on Exhibit 1, the third column, the

[4] first line is — states "A comparable position is

[5] defined as employment that: 1, does not require you

[6] to commute 35 or more miles farther than you did

[7] prior to your termination; and is it a wage or

[8] salary level (determined without regard to employee

[9] benefits) equal to or greater than your wage or

[10] salary level on the date of your termination."

[11] **MR. ROACH:** I'm going to object. She is

[12] not an attorney, John.

[13] **MR. WELSH:** Noted.

[14] **MR. ROACH:** If she has some understanding,

[15] go ahead, but I'm going to object.

[16] **A:** To be honest with you I thought they were

[17] talking about Bayer when I was reading this stuff,

[18] that they were asking me if I wanted a comparable

[19] position within Bayer. Everything was Bayer.

[20] That's the way I looked at it.

[21] **Q:** But in the second column, in the bullet

[22] point the third — that is in a box, the third, one

[23] two, three.

[24] **A:** Right, the division.

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 233

[1] **Q:** You knew that wasn't talking about Bayer?

[2] **A:** Because it said it was sold.

[3] **Q:** And —

[4] **MR. ROACH:** He's talking about a new

[5] employer.

[6] **Q:** Underneath it there is the word "comparable

[7] position," correct? The third bullet point there is

[8] the term "comparable position"?

[9] **MR. ROACH:** Objection. Let's read the

[10] whole thing. She talks about a former new owner.

[11] **MR. WELSH:** Right.

[12] **MR. ROACH:** Let's read it in the context.

[13] **MR. WELSH:** No. I'm asking her about the

[14] term "comparable position" is what I'm asking her.

[15] **A:** Yes, I understand that.

[16] **MR. ROACH:** Objection. Go ahead.

[17] **A:** It comes down to — this bullet point that

[18] I have marked off is the division was not sold, and

[19] that's why I didn't look in regards to it being

[20] anything other than the division wasn't sold. It

[21] was a part of a group that was sold.

[22] **Q:** And this was back in 1998. That's the way

[23] you looked at it?

[24] **A:** Right.

Page 234

[1] **Q:** Okay. We went over the list of employees

[2] who you believed got severance, and Ms. Chabot was

[3] one of the persons?

[4] **A:** Yes, Peggie. Yes.

[5] **Q:** Did she volunteer for layoff?

[6] **MR. WELSH:** Thank you, Steve.

[7] **Q:** I'm looking at Ramsden Exhibit 26. Now,

[8] Ms. Chabot —

[9] **A:** Yes, she did volunteer to be laid off.

[10] **Q:** What position was she in at the time of the

[11] layoff?

[12] **A:** She was in the back of the building, I

[13] believe.

[14] **Q:** I have never been in the back of the

[15] building. Is that manufacturing?

[16] **A:** She was in manufacturing in the Bayer-Agfa

[17] Division and wanted to leave the company to go work

[18] somewhere else, found that there was a layoff coming

[19] so she volunteered for the layoff and coincided her

[20] leaving the company and starting that job the

[21] following week, and they gave her the severance

[22] package, everything.

[23] **Q:** And she started the job the next week.

[24] Now, there was a reduction in force going on; is

Page 235

[1] that correct?

[2] **MR. ROACH:** Objection.

[3] **Q:** At Agfa?

[4] **MR. ROACH:** Don't guess or assume. Only if

[5] you know.

[6] **MR. WELSH:** She just testified.

[7] **A:** If they volunteered to have layoffs that

[8] means they were doing a reduction in force.

[9] **Q:** Did she leave pursuant to the sale of any

[10] products, processes or other activities of the

[11] division?

[12] **MR. ROACH:** Objection.

[13] **A:** Did she leave?

[14] **Q:** Yes. At the time she left had Agfa spun

[15] out the products that she was working on to a

[16] subcontractor?

[17] **A:** No.

[18] **Q:** Did they sell the portion of the business

[19] she worked in at the time she left?

[20] **A:** No.

[21] **MR. ROACH:** Objection.

[22] **Q:** It was ongoing? That area she worked on

[23] continued to go on after her leaving?

[24] **A:** Yes.

Page 236

[1] **Q:** And how much was she — her new job, who

[2] was it with?

[3] **A:** I'd have to check into who it was with. I

[4] don't have that off the top of my head.

[5] **Q:** Do you know what her salary was?

[6] **A:** No. I don't get into personal issues.

[7] **Q:** Do you know where the location of that job

[8] was?

[9] **A:** No, not off the top of my head.

[10] **Q:** Okay. Carrie Emond, where did she work?

[11] **A:** She worked in the manufacturing.

[12] She — she was in the manufacturing area.

[13] **Q:** And she volunteered for layoff?

[14] **A:** Yes, she did.

[15] **Q:** Was there a reduction in force going on at

[16] the time she volunteered?

[17] **A:** Yes.

[18] **Q:** When she left she went back to school; is

[19] that correct?

[20] **A:** She was attending school while she was

[21] working, and that allowed her to go full time to

[22] school.

[23] **Q:** When she went full time to school did she

[24] have any side employment, to your knowledge?

Page 237

[1] **A:** I didn't ask that question.
[2] **Q:** She was not involved — the area where she
[3] worked in manufacturing, at the time she left that
[4] had not been sold to any third party, had it?
[5] **A:** No.
[6] **Q:** Okay. Now, Cable Harness I think you
[7] testified, if I have it correctly, that they sold
[8] off the assets?
[9] **A:** I'm pretty sure they sold off all the
[10] assets.
[11] **Q:** Did they auction them off do; you know?
[12] **MR. ROACH:** Objection.
[13] **A:** All I know is that —
[14] **MR. ROACH:** Go ahead.
[15] **A:** All I know is that they liquidated the
[16] whole area. Some people took voluntary layoffs,
[17] other people were transferred into other areas.
[18] **Q:** Now, you said some people took voluntary
[19] layoffs. Do you know if any people were laid off
[20] involuntarily?
[21] **A:** No.
[22] **Q:** When you say — you don't know either way?
[23] **A:** No. I'm pretty sure that was one that was
[24] done just voluntary, and anybody who wanted to stay

Page 238

[1] within Bayer was sent into other areas.
[2] **Q:** So the Cable Harness did not involve a
[3] situation where people — the Cable Harness
[4] operation was not sold to an outside party by that
[5] people transitioning over to employment by that
[6] acquiring company?
[7] **MR. ROACH:** Objection.
[8] **A:** Not to my knowledge.
[9] **Q:** I think you might have testified about
[10] Quality Control, QC?
[11] **A:** Yes.
[12] **Q:** Now, you believe that — did they shut down
[13] the QC operation?
[14] **A:** Incoming QC. There was some areas of the
[15] QC area that was shut down because they had
[16] Dr. Stock-type thing.
[17] **Q:** I'm sorry. I thought it was a Star Wars
[18] character.
[19] **A:** Dr. Stock. What happens is material comes
[20] in from a qualified vendor and is put directly into
[21] stock without having a QC person look at it before
[22] it goes into stock. They eliminated those
[23] positions.
[24] **Q:** So they didn't sell the incoming QC

Page 239

[1] operation to any third party, did they?
[2] **A:** They stopped it.
[3] **Q:** And there they transferred employees to
[4] different departments?
[5] **A:** Yes.
[6] **Q:** And they didn't receive any severance?
[7] **A:** No.
[8] **Q:** Paint shop, did they close the paint shop?
[9] **A:** Yes, they did.
[10] **Q:** Did they sell the paint shop operation, to
[11] your knowledge?
[12] **A:** As far as I know they sold.
[13] (Interruption)
[14] **MR. ROACH:** Go ahead. Let her finish.
[15] **Q:** Did they sell the point shop operation?
[16] **A:** Yes, I believe they did.
[17] **Q:** Did any of the employees go with it?
[18] **A:** I don't recall if they went with it. I
[19] know some of them went up with other product lines
[20] which just brings me back to that same thing where
[21] some volunteered to be laid off, some people asked
[22] to stay within Bayer and they went up to another
[23] area.
[24] **Q:** Now, with respect to Fiorilla

Page 240

[1] Exhibit 5/Ramsden 7, the bible or otherwise known as
[2] SPD, do you know is there any reference to the
[3] Severance Pay Plan in this document? I'm talking
[4] about this document right here (indicating).
[5] **A:** Severance Pay Plan?
[6] **Q:** Yes. We showed you earlier — we talked
[7] about a Severance Pay Plan.
[8] **MR. ROACH:** You are talking about Exhibit
[9] 9?
[10] **MR. WELSH:** Exhibit 9. That's the one that
[11] you used from a different deposition.
[12] **MR. ROACH:** Well, this is Fiorilla Exhibit
[13] 9.
[14] **MR. WELSH:** Yes.
[15] **A:** Is that the one I said I didn't know
[16] anything about?
[17] **MR. ROACH:** Right.
[18] **Q:** This is the Bayer Severance Pay Plan.
[19] **A:** This is the one I said I never saw?
[20] **Q:** Right.
[21] **A:** Okay.
[22] **Q:** Do you know if there is any reference to
[23] that document contained in the Summary Plan
[24] Description?

Page 241

[1] **MR. ROACH:** Objection. It speaks for
[2] itself. Go ahead. You can answer.
[3] **A:** If I didn't know it existed then I wouldn't
[4] have known where to look.
[5] **Q:** Did you — back when you looked at the
[6] bible did you read the severance benefit pages from
[7] beginning to end?
[8] **A:** No. I read the part that meant something
[9] to me. I didn't read the entire thing.
[10] **Q:** Did you know — when you read the severance
[11] pay benefits did you see any language discussing, in
[12] the Summary Plan Description, did you see any
[13] description — any statement by the board — please
[14] strike all this.
[15]     I am going to show you on Page SEV11 from
[16] Ramsden Exhibit 7, on this you'll see there is a
[17] text that says, "The company has the right to end,
[18] suspend or amend the Severance Pay Plan." Did you
[19] read that?
[20] **A:** No, I did not.
[21] **Q:** Were you aware of that?
[22] **A:** No, I did not see that.
[23] **MR. ROACH:** Can I just interrupt for a
[24] second. I just need to make a quick call.

Page 243

[1] Mr. Roach.
[2] **MR. ROACH:** I do have one
[3] recross-examination.
[4]             **RECROSS EXAMINATION**
[5]             **BY MR. ROACH:**
[6] **Q:** Did Bayer ever tell you, "you" meaning you
[7] and the other Plaintiffs, that if you all together
[8] decided that you weren't going to go to EFTC, that
[9] they would then terminate you and pay your
[10] severance?
[11] **A:** No. At the meetings they told us
[12] point-blank if we didn't go to EFTC then we would be
[13] terminated with no severance and no unemployment.
[14] Nobody would get anything. So everybody panicked.
[15] **MR. ROACH:** Okay.
[16] **MR. WELSH:** Are you done?
[17] **MR. ROACH:** Yes.
[18]         **FURTHER REDIRECT EXAMINATION**
[19]             **BY MR. WELSH:**
[20] **Q:** Were you aware under the terms of the plan
[21] if you were offered a comparable position and didn't
[22] accept it that you would forfeit severance
[23] eligibility? Were you aware of that?
[24] **MR. ROACH:** Objection.

Page 242

[1] **MR. WELSH:** Certainly. I have like 3
[2] minutes left, but go ahead.
[3]     (Recess taken from 4:03 to 4:05 p.m.)
[4]             **BY MR. WELSH:**
[5] **Q:** Now, this Linda Kawa, she said she was let
[6] go and got severance pay?
[7] **A:** Yes, she did.
[8] **Q:** And then she was called back and repaid
[9] some of it?
[10] **A:** Repaid some of it, yes.
[11] **Q:** Do you know whether or not the severance
[12] pay plan itself has provisions which indicates what
[13] happens if you are called back to work?
[14] **A:** I didn't look.
[15] **Q:** Are you aware of the exact amounts of
[16] calculations used with respect to her pension pay?
[17] **A:** I didn't talk dollar value.
[18] **MR. ROACH:** You mean severance pay, not
[19] pension.
[20] **MR. WELSH:** Severance plan. I'm sorry.
[21] **A:** No, I didn't. I didn't ask her specifics,
[22] but I could find out the specifics if I had to.
[23] **Q:** Okay.
[24] **MR. WELSH:** I have no further questions,

Page 244

[1] **A:** That was mentioned at the meeting, and if
[2] we didn't take the job with EFTC that we would be
[3] forfeiting our rights to any severance and
[4] unemployment. That's what was said to us.
[5] **Q:** Said to the people as reported to you
[6] because you didn't attend the meeting?
[7] **A:** Correct.
[8] **MR. WELSH:** Thank you. I have no further
[9] questions.
[10] **MR. ROACH:** I have nothing further.
[11]     (Whereupon, the deposition was
[12] concluded at 4:07 p.m.)
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

245

```
 1              C E R T I F I C A T E
 2       I, JEANNE M. SKENE, do hereby certify that I
 3   have read the foregoing transcript of my testimony,
 4   and further certify under the pains and penalties of
 5   perjury that said transcript ~~with/without~~ with
 6   suggested corrections is a true and accurate record
 7   of said testimony.
 8       Dated at  Boston  , this  9th  day of  August ,
 9   2006.
10
11                           _Jeanne M Skene_____
12
13
14
15              See attached ERRATA SHEET
16
17
18
19
20
21
22
23
24
```

ERRATA SHEET OF JEANNE SKENE

RE:   Joseph Attardi, et als. v. Bayer Corporation, et al.,
      U.S. District Court Civil Action No. 04-CV-10728-WGY

Deposition of: Jeanne Skene

Taken on: June 19, 2006

| Page | Line | As Transcribed | Correction | Reason |
|---|---|---|---|---|
| 20 | 10 | "Page." | "Paige." | Spelling error |
| 24 | 22-23 | "205 - 208495 board and 20849 - I can't remember the other number." | "208945 board and 208947." | Correct numbers. |
| 132 | 22 | "You will be -" | "You will be terminated." | Completion of sentence. |
| 139 | 24 | "until the very end" | "until after we saw an attorney." | Accuracy and what I meant. |
| 144 | 24 | "open." | "open until Bayer decided to sell the Board Shop to EFTC." | Accuracy and what I meant. |
| 171 | 12 | "but we didn't." | "but we didn't get our severance after Bayer terminated us." | Completes the thought and is what I meant. |
| 177 | 18 | "-that's where I am getting confused." | "We did ask for our severance benefits." | Clarification and consistent with pages 180-182 |
| 182 | 18 | "they" | "I" | What I meant and what I thought I said. |
| 184 | 15 | "Brown" | "Brown as well as as Joanne Sanzo, Ed Lascelles, Gary | Added others who spoke to Bayer represen- |

|  |  |  | Frizzell, Diana<br>Glassett, Kathy Ely,<br>Teresa Orenalas,<br>Mary Bogdan, Aroussiak<br>Dakessian, Mary Jo<br>Corcoran, Linda Paradis,<br>Janice Paradis,<br>Richard Picard,<br>Richard DeFrancesco,<br>Vincent Fiorilla,<br>Mark Bowdidge,<br>Bertrand Guilmette,<br>Stephen Fournier,<br>and Phillip Greene." | tatives individu-<br>ally. |
| 187 | 20-21 | "If I didn't<br>remember up at<br>the top I'm not<br>going to remember<br>them down at the<br>bottom." | "Robert Brown,<br>Joanne Sanzo,<br>Ed Lascelles, Gary<br>Frizzell, Diana<br>Glassett, Kathy Ely,<br>Teresa Orenalas,<br>Mary Bogdan, Aroussiak<br>Dakessian, Mary Jo<br>Corcoran, Linda Paradis,<br>Janice Paradis,<br>Richard Picard,<br>Richard DeFrancesco,<br>Vincent Fiorilla,<br>Mark Bowdidge,<br>Bertrand Guilmette,<br>Stephen Fournier,<br>and Phillip Greene." | Added others<br>who spoke to<br>Bayer. |

2