Page 1

Volume I
Pages 1 to 157
Exhibits 1 - 11
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH ATTARDI, et al.,      :
        Plaintiffs,          :
vs.                          : Civil Action
                             : No. 04-10728-REK
BAYER CORPORATION, BAYER     :
CORPORATION SEVERANCE PAY    :
PLAN,                        :
        Defendants.          :

DEPOSITION OF VINCENT S. FIORILLA, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Daniel P. Wolfe, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Bello, Black & Welsh, LLP, 535 Boylston Street,
Boston, Massachusetts, on Friday, April 21, 2006,
commencing at 9:15 a.m.

PRESENT:
    Roach & Wise, LLP
        (by Stephen A. Roach, Esq.)
    31 State Street, Boston, MA 02109,
        for the Plaintiffs.
    Bello, Black & Welsh LLP
        (by John F. Welsh, Esq., and
        Kevin R. Powers, Esq.)
    535 Boylston Street, Suite 1102, Boston, MA
        02116, for the Defendants.
    Also present: Bertrand Guilmette

Page 2

INDEX

WITNESS      DIRECT   CROSS   REDIRECT   RECROSS
VINCENT S. FIORILLA
BY MR. WELSH       5

EXHIBITS
NO.   DESCRIPTION          PAGE
1  Letter from Dick Ramsden to Richard     12
   Guilmette dated 3/25/98
2  Document entitled "Benefits      26
   Highlights," Bates Nos. B01752
   through 1763
3  Letter from Augie Brouhiman to David    37
   Dolan dated 8/14/98
4  Copies of pages from booklet     49
   entitled "Your Benefits, Summary
   Plan Description"
5  Booklet entitled "Your Benefits,    52
   Summary Plan Description"
6  Document entitled "Your Benefits,    54
   Summary of Material Modification -
   1996"
7  Document entitled "Your Benefits,    54
   Summary of Material Modification -
   1997"
8  Web printout regarding EFTC      55
   acquisition of Agfa Circuit Card
   Manufacturing Operation

Page 3

EXHIBITS, Continued
NO.   DESCRIPTION          PAGE
9  Document entitled "Bayer Corporation    67
   Severance Pay Plan (Restated
   Effective as of January 1, 1995)"
10  Plaintiffs' Answers to      68
   Interrogatories
11  Plaintiffs' Responses to First      68
   Request for Production of Documents
   from Defendants

Page 4

PROCEEDINGS

[1]
[2]   MR. WELSH: Steve, for stipulations, can we
[3] stipulate that we will waive all objections, except
[4] those as to form, until time of trial?
[5]   MR. ROACH: Reserve them till time of trial.
[6]   MR. WELSH: Reserve them. And we also
[7] reserve motions to strike till that time. With
[8] respect to signing, do you have any particular way
[9] you want to go forward with that?
[10]   MR. ROACH: Why don't you give me 45 days.
[11]   MR. WELSH: Okay. What I suggest is he
[12] could sign under pains and penalties without the
[13] need of a notary.
[14]   MR. ROACH: That's fine. After 45 days of
[15] receipt, he will read and sign.
[16]   MR. WELSH: Any other preliminaries?
[17]   MR. ROACH: Motions to strike reserved till
[18] the time of trial. I think that's it.
[19]   VINCENT S. FIORILLA
[20] a witness called for examination by counsel for the
[21] Defendants, having been satisfactorily identified by
[22] the production of his driver's license and being
[23] first duly sworn by the Notary Public, was examined
[24] and testified as follows:

Page 5

DIRECT EXAMINATION
BY MR. WELSH:

[1]
[2]
[3]   Q: Could you please state your full name.
[4]   A: Vincent Salvatore Fiorilla.
[5]   Q: Is that "Fiorilla"?
[6]   A: "Fiorilla."
[7]   Q: Where do you live, sir?
[8]   A: I live at 13 Maple Ave., Atkinson, New
[9] Hampshire.
[10]   Q: How long have you lived there?
[11]   A: Approximately 20 years.
[12]   Q: Are you currently employed?
[13]   A: Yes.
[14]   Q: By whom are you employed?
[15]   A: Suntron Corporation.
[16]   Q: Could you spell that for the court
[17] reporter.
[18]   A: S-u-n-t-r-o-n.
[19]   Q: Where is that located?
[20]   A: The facility I work in is in Lawrence,
[21] Massachusetts.
[22]   Q: How long have you worked for them?
[23]   A: About eight years, I believe.
[24]   Q: When were you hired by Agfa or any of its

Page 6

[1] predecessors, Miles, Compugraphics, Bayer?
[2]   A: I believe it was 1969.
[3]   Q: What was the company at that time?
[4]   A: Compugraphics.
[5]   Q: What was your job?
[6]   A: I started as a plater.
[7]   Q: Did you hold successive positions with the
[8] company?
[9]   A: That is correct.
[10]   Q: You started with Compugraphics. Do you
[11] remember what the company's successor was?
[12]   A: I believe it was Agfa and then Miles.
[13]   Q: Was it Agfa Corporation Compugraphics
[14] Division?
[15]   A: I don't recall.
[16]   Q: Do you recall after Agfa it was Miles?
[17]   A: I believe so.
[18]   Q: And then Bayer?
[19]   A: And then Bayer.
[20]   Q: On or about January 1998, what was your
[21] position with Bayer?
[22]   A: '98, that was after the —
[23]   A: My understanding is — let me double-check.
[24]   A: I believe that was after the transaction.

Page 7

[1]   MR. ROACH: January '98?
[2]   THE WITNESS: January '98. It was before.
[3]   MR. ROACH: That was before EFTC.
[4]   Q: My understanding is the transaction was
[5] around September of '98.
[6]   A: Right.
[7]   Q: So I am asking you maybe nine months.
[8]   A: Oh, January. I'm thinking June. Okay. I
[9] was a manager.
[10]   Q: Do you recall what your title was?
[11]   A: Production manager.
[12]   Q: What were your duties and responsibilities?
[13]   A: My main duties and responsibilities were
[14] for the assembly, test in the printed circuit board
[15] shop.
[16]   Q: Is it fair to say you were the manager of
[17] the circuit board shop?
[18]   A: Yes.
[19]   Q: How many employees were under your
[20] supervision at that time?
[21]   A: Approximately 100.
[22]   Q: Who were your direct reports?
[23]   A: Norm Fontaine.
[24]   Q: Anyone else?

Page 8

[1]   A: I reported directly to Norm.
[2]   Q: You reported directly to Norm. What was
[3] his title, do you remember?
[4]   A: I believe he was director, but I'm not
[5] positive.
[6]   Q: Who reported directly to you?
[7]   A: Bert, Teresa Ornelas, I believe Roselle
[8] Theriault, Ed Wright. I think that was it. There
[9] was a lot of changes that occurred that last year,
[10] so I am not 100 percent positive.
[11]   Q: When you say there were a lot of changes,
[12] could you summarize what changes you recall
[13] occurring in the year immediately prior to the
[14] transaction?
[15]   A: There were a lot of actions that were
[16] taking place to reduce the board shop and there were
[17] consultants that were brought in to evaluate what to
[18] do with the board shop, what Bayer would do with the
[19] operation. So there were a lot of changes that were
[20] occurring.
[21]   Q: When you say "actions to reduce the board
[22] shop," were there layoffs?
[23]   A: I am not 100 percent sure whether it was
[24] that timeframe or not.

Page 9

[1]   Q: Do you recall any operational changes
[2] within Bayer which directed different work to the
[3] board shop?
[4]   A: What do you mean by that?
[5]   Q: Were there any operations in Bayer that
[6] started sending — obtaining printed circuit boards
[7] from the board shop that hadn't done so previously?
[8]   A: You mean sending it to another corporation?
[9]   Q: No. Sending it to you.
[10]   A: Yes. At that point we were building some
[11] boards for Bayer, Bayer-Ireland, I believe, and
[12] Bayer-Tarrytown.
[13]   Q: At this time, at or around '98, Bayer was
[14] the employer; is that right?
[15]   A: Yes.
[16]   Q: Did there come a time when you were advised
[17] that Bayer was looking to sell or divest the printed
[18] board shop, the printed circuit board shop?
[19]   A: Yes.
[20]   Q: When did that happen? If the transaction
[21] happened around September 1998, can you tell me when
[22] you learned that Bayer was looking to divest the
[23] printed circuit board shop?
[24]   A: I know there was a consultant that was

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 10

[1] brought in to look at the operation, and the
[2] objective of the consultant was to find out would it
[3] be better to, again from my recollection, to close
[4] the shop, send the business to another outside firm,
[5] or was it feasible to upgrade the operation where we
[6] existed, spend the money, and buy new equipment.
[7] That was what was going on in that timeframe.
[8]    *Q. Were you privy to what the consultant's
[9] recommendation was? Did you ever learn what it was?
[10]    MR. ROACH: Objection. By the way, on the
[11] stipulations, I don't know if we mentioned
[12] objections as to form. You can object as to form?
[13]    MR. WELSH: Yes.
[14]    MR. ROACH: Go ahead. You can answer.
[15]    Q: What you are going to find out as we go on,
[16] sometimes if Mr. Roach doesn't like the way I
[17] phrased the question, he will say "objection" for
[18] the record. You can answer the question.
[19]    MR. WELSH: Can you repeat the last
[20] question to the witness.
[21]    *(Question read)
[22]    A: Yes, I did.
[23]    Q: What was it?
[24]    A: It was to bring in —

Page 11

[1]    MR. ROACH: By the way, there was an
[2] objection to the question. Go ahead.
[3]    A: The recommendation was that there was a
[4] company that could provide the same type of service
[5] that we were able to provide as an in-house
[6] operation and that they were looking very seriously
[7] at this particular company, which I believe at that
[8] time was EFTC.
[9]    Q: Now, at the time the consultant was doing
[10] the analysis, was your operation suffering a
[11] heightened amount of attrition, people leaving?
[12]    A: To the best of my knowledge, no.
[13]    Q: Do you recall a retention program that
[14] Bayer instituted about that time towards employees
[15] in the printed circuit board shop?
[16]    A: Yes.
[17]    Q: Describe what you remember.
[18]    A: What I can remember was there were a
[19] certain amount of people, I don't remember how many,
[20] but a certain group of people that upper management
[21] deemed were critical to keep the operation
[22] functional. Those people were chosen and they were
[23] given a stay — I think the term was a "stay bonus."
[24] I don't remember exactly what the terminology was,

Page 12

[1] but it was to keep the operation functional.
[2]    Q: Do you recall what the amount of the bonus
[3] was?
[4]    A: No, I do not.
[5]    Q: Do you recall how many people were afforded
[6] this bonus, were granted the bonus?
[7]    A: An exact number, no, I do not.
[8]    Q: Approximation?
[9]    A: I would approximate maybe half.
[10]    MR. WELSH: Would you mark this as Exhibit
[11] 1, please.
[12]    (Document marked as Fiorilla
[13] Exhibit 1 for identification)
[14]    Q: I am going to show you a document that's
[15] been marked for identification as Exhibit 1. It is
[16] a letter to Mr. Guilmette. Have you ever seen this
[17] letter before?
[18]    A: Yes.
[19]    Q: And to your knowledge, was this form letter
[20] sent to a number of people under your supervision in
[21] the printed circuit board shop?
[22]    A: Yes.
[23]    MR. ROACH: I just want the record to show
[24] it is Richard Guilmette rather than Bert Guilmette.

Page 13

[1]    MR. WELSH: I'm sorry.
[2]    MR. GUILMETTE: There was a Richard
[3] Guilmette.
[4]    A: He did not work for me.
[5]    Q: Richard Guilmette did not?
[6]    A: No, not that I — no. I would have to
[7] double-check, but I do not believe he worked for me.
[8]    Q: You see in the first sentence it talks
[9] about — first sentence, it says, "As you know, we
[10] are currently assessing the future direction of our
[11] printed circuit board business." Do you have any
[12] idea where Richard Guilmette worked?
[13]    A: He was in engineering.
[14]    Q: Did he work with respect to the — on any
[15] operations that involved printed circuit board
[16] business?
[17]    A: Yes. He was an engineer.
[18]    Q: To your knowledge, was this form given to a
[19] number of people who did work under your supervision
[20] in the printed circuit board business?
[21]    A: Yes.
[22]    Q: Did you receive one?
[23]    A: Yes.
[24]    Q: When is the first you learned of a

Page 14

[1] potential purchase of the printed circuit board
[2] business by EFTC?
[3]    MR. ROACH: Objection. You can answer.
[4]    A: To the best of my recollection, it was
[5] probably, I would say, late spring.
[6]    Q: How did it come to your attention?
[7]    A: I believe, again, the best I can remember,
[8] that Norm Fontaine informed me before it was
[9] announced.
[10]    Q: And what did Mr. Fontaine tell you, if you
[11] recall?
[12]    A: Again, to the best that I remember, Norm
[13] informed me that the printed circuit board operation
[14] would be sold, that the analysis came back that this
[15] company, EFTC, specialized in quick-turn small-lot
[16] business, which was very similar to the business
[17] that we were doing, and providing Bayer with quick
[18] turn on their boards, and that this company could do
[19] basically the same thing, that in the final analysis
[20] this was a very, very good deal for both parties, it
[21] was a win-win situation for both Bayer and for the
[22] employees. And again he reiterated the fact that
[23] Bayer was unable to invest heavily in us but that
[24] EFTC, because that was their forte, would be able to

Page 15

[1] invest in us, buy new equipment.
[2]    They liked the way we operated the
[3] business. They liked the fact that we had vertical
[4] integration with the printed circuit board shop and
[5] the assembly shop. They liked the idea that we had
[6] a well-rounded, well-trained employee work force,
[7] that the work force — we worked on a team basis.
[8] We had certain teams, and that's the way we
[9] operated. It was always the philosophy of the
[10] company that people were important to the operation.
[11] So, in essence, what he was saying was that this was
[12] going to be an excellent opportunity for us to grow.
[13]    Q: The conversation you had with Mr. Fontaine
[14] when you first learned about the EFTC transaction,
[15] do you recall if it was before or after the letters
[16] represented here by Exhibit 1 went out to employees?
[17]    A: I believe it was, like I said, sometime
[18] probably late spring. So it might have been in June
[19] or something like that.
[20]    *Q. Did you ever have any conversation with Mr.
[21] Fontaine or anyone else at Bayer concerning the
[22] wages and benefits that EFTC would offer the
[23] employees in the printed circuit board business?
[24]    MR. ROACH: Objection. Go ahead.

Page 16

[1]    A: Can you repeat that, please.
[2]    MR. WELSH: Would you repeat it.
[3] *(Question read)
[4]    A: Yes.
[5]    Q: How many conversations did you have with
[6] him?
[7]    A: I don't recall exactly.
[8]    Q: Can you give me an estimate?
[9]    A: Probably two or three.
[10]    Q: What is the first one you remember?
[11]    A: I think it was —
[12]    MR. ROACH: Other than Mr. Fontaine, you
[13] mean?
[14]    MR. WELSH: No.
[15]    Q: When you say "two or three," was this with
[16] Mr. Fontaine?
[17]    A: I had, I think, I don't know, two or three
[18] with Norm and I think I had maybe one with Mary
[19] Leonard.
[20]    Q: Let's talk about Norm. What do you recall
[21] discussing with Norm prior to the transaction
[22] concerning the wages and benefits that would be
[23] offered by EFTC?
[24]    A: Prior to the transaction?

Page 17

[1]    Q: Yes, before EFTC took over.
[2]    A: You mean officially?
[3]    Q: Yes.
[4]    A: Basically, getting some of the information
[5] that I just said here, was that everything — it was
[6] going to be a win-win situation for us, that the
[7] benefits and everything would be comparable and in
[8] some cases better. We didn't get into exact
[9] specifics. At this point it was general.
[10]    Q: Do you recall anything else he said at that
[11] time?
[12]    A: No, other than what I said earlier about
[13] the operational piece of it and —
[14]    Q: Okay. I am just focusing on EFTC wages and
[15] benefits. Did you ever have a conversation with Mr.
[16] Fontaine concerning pension plans?
[17]    A: I don't recollect that.
[18]    Q: Do you recall having a conversation with
[19] Mr. Fontaine concerning health insurance benefits?
[20]    A: I don't recollect.
[21]    Q: You are going to find during the day I am
[22] going to ask you a series of questions and you are
[23] going to say, "I don't recollect this other stuff.
[24] Why are you pestering me?" I want to make sure I

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 18

[1] covered the map. I am just letting you know.
[2]    Did you have any conversations with Mr.
[3] Fontaine concerning disability benefits, short-term
[4] or long-term disability?
[5]    **A:** I don't remember.
[6]    **MR. ROACH:** These are short-term that EFTC
[7] would be offering?
[8]    **MR. WELSH:** Yes.
[9]    **MR. ROACH:** Okay. Go ahead.
[10]    **Q:** You said you had a conversation where you
[11] said benefits would be comparable, in some cases
[12] better. Did you have any later conversations with
[13] Mr. Fontaine concerning the wages or benefits that
[14] EFTC would be offering printed circuit board
[15] employees?
[16]    **A:** I may have had one other conversation with
[17] him.
[18]    **Q:** And when you used the word "may," is that
[19] an indication that you are not sure?
[20]    **A:** I believe I had one other conversation with
[21] him.
[22]    **Q:** And when was that conversation?
[23]    **A:** I don't remember exactly. I think it was
[24] after the transaction occurred.

Page 19

[1]    **Q:** So this conversation you are about to
[2] reference was after you had become an EFTC employee?
[3]    **A:** Approximately. I'm not exactly sure when.
[4]    **Q:** Tell me what he said and you said, to the
[5] best of your recollection.
[6]    **A:** I believe at that time I had asked about
[7] the possibility of retaining my position or some
[8] position with Bayer.
[9]    **Q:** And what did he say?
[10]    **A:** He said there wasn't a possibility at this
[11] time.
[12]    **Q:** Anything else said during that conversation
[13] between you and him about EFTC or the benefits or
[14] wages?
[15]    **A:** Not that I remember.
[16]    **Q:** I am going to sum up your testimony. Tell
[17] me if it's accurate. Sometime prior to the
[18] transaction, you had a conversation with Mr.
[19] Fontaine during which, among other things, he
[20] indicated that he thought the benefits would be
[21] comparable and sometimes better but Mr. Fontaine
[22] didn't give you any specifics, he spoke in
[23] generalities.
[24]    **MR. ROACH:** Objection.

Page 20

[1]    **Q:** Is that a fair summary?
[2]    **MR. ROACH:** Objection.
[3]    **Q:** You may answer.
[4]    **MR. ROACH:** You can answer.
[5]    **A:** Yes.
[6]    **Q:** Then later, near the time of the
[7] transaction, you don't recall if it was just before
[8] or just after it was official, you asked Mr.
[9] Fontaine about the possibility of keeping a job with
[10] Bayer, and he told you that that was not available?
[11]    **MR. ROACH:** Objection.
[12]    **Q:** Is that fair?
[13]    **MR. ROACH:** You can answer. Objection. Go
[14] ahead.
[15]    **A:** Yes.
[16]    **Q:** And other than the two conversations I
[17] summarized, you didn't have any other conversations
[18] with Mr. Fontaine concerning EFTC's wages or
[19] benefits?
[20]    **A:** I don't believe so.
[21]    **Q:** You indicated you had a conversation with
[22] Mary Leonard?
[23]    **A:** Yes.
[24]    **Q:** And Ms. Leonard worked in the human

Page 21

[1] resources department?
[2]    **A:** That's correct.
[3]    **Q:** Do you recall when the conversation was
[4] that you had with Ms. Leonard?
[5]    **A:** Again, I don't remember exactly when.
[6]    **Q:** And was anyone other than yourself present
[7] for that conversation?
[8]    **A:** No.
[9]    **Q:** Can you tell me to the best of your
[10] recollection what you said and what she said?
[11]    **A:** I was, again, looking at the possibility of
[12] maintaining a position with Bayer.
[13]    **Q:** Did you ask if one was available?
[14]    **A:** Yes.
[15]    **Q:** Did she respond?
[16]    **A:** Yes.
[17]    **Q:** What did she say?
[18]    **A:** "Not at this time, but there could be a
[19] possibility."
[20]    **Q:** In the future?
[21]    **A:** Yes. Possibly a team manager.
[22]    **Q:** At the time you had the conversation, she
[23] didn't have an opening?
[24]    **A:** Correct.

Vincent S. Fiorilla
Vol. 1, April 21, 2006

Joseph Attardi, et al.   v.
Bayer Corporation, et al.

---

Page 22

[1]   **Q:** During your conversation —
[2]   **A:** I may have also —
[3]   **Q:** Go ahead.
[4]   **A:** Can I, just for the record?
[5]   **MR. ROACH:** Sure.
[6]   **A:** I believe that might have been part of the
[7]   conversation with Norm also, was the possibility of
[8]   a team manager.
[9]   **Q:** Sometime in the future?
[10]  **A:** Right. And then I kind of followed through
[11]  with that with Mary.
[12]  **Q:** When you spoke with Ms. Leonard, did you
[13]  have any conversation with her about EFTC's wages or
[14]  benefits?
[15]  **A:** No.
[16]  **Q:** Did you have any conversation with Ms.
[17]  Leonard about your eligibility for severance pay?
[18]  **A:** No.
[19]  **Q:** Did you have any conversations with Norm
[20]  Fontaine about your eligibility for severance pay?
[21]  **A:** No.
[22]  **Q:** Other than Norm Fontaine and Mary Leonard,
[23]  were there any other officials at Bayer that you
[24]  spoke with prior to the transaction concerning

Page 23

[1]   EFTC's salary or benefits?
[2]   **MR. ROACH:** Objection. Does this exclude
[3]   group — this is one-on-one meetings you are talking
[4]   about, private meetings, right?
[5]   **MR. WELSH:** I will break it down.
[6]   **Q:** Private meetings. Did you have any
[7]   conversation with any other official at Bayer
[8]   concerning EFTC wages or benefits?
[9]   **A:** I don't believe — not one-on-one.
[10]  **Q:** Not one-on-one. Okay. I will get to the
[11]  group. Just to be clear, other than — you had no
[12]  conversation with anyone, any official at Bayer, on
[13]  a one-on-one basis concerning whether or not you
[14]  were eligible for severance pay?
[15]  **A:** Not that I remember.
[16]  **Q:** Did you participate in any group meetings
[17]  with anyone at Bayer prior to the transaction
[18]  concerning EFTC's wages or benefits?
[19]  **A:** Yes.
[20]  **Q:** How many?
[21]  **A:** I believe one or two.
[22]  **Q:** Where do you recall the meetings taking
[23]  place?
[24]  **A:** In the cafeteria, general meeting in the

Page 24

[1]   cafeteria with everyone.
[2]   **Q:** When you say "everyone," was it the
[3]   employees of the board shop?
[4]   **A:** Yes.
[5]   **Q:** You understand if I make a reference to the
[6]   board shop, we are talking about the printed circuit
[7]   board business; is that right?
[8]   **A:** Yes.
[9]   **Q:** Was anyone there, any employees there in
[10]  addition to the employees of the board shop in the
[11]  cafeteria?
[12]  **A:** There could have been. I don't know.
[13]  **Q:** Who was there from management?
[14]  **A:** I remember going to one meeting that had
[15]  Norm Fontaine, Dick Ramsden, Michael Paige, Rodney
[16]  Willis and I believe Mary Leonard. There could have
[17]  been other people, but those are the ones that I —
[18]  **Q:** You remember one meeting that had this cast
[19]  of characters that you just outlined, correct?
[20]  **A:** That's correct.
[21]  **Q:** Do you recall any other meetings that —
[22]  **A:** There was one other meeting that I
[23]  remember, and that included Jack Calderon from EFTC.
[24]  **Q:** The one with Jack Calderon from EFTC, were

Page 25

[1]   there any managers from Bayer present at that
[2]   meeting?
[3]   **A:** Yes.
[4]   **Q:** Who?
[5]   **A:** Again to the best of my recollection, I
[6]   believe all of the same players were there.
[7]   **Q:** Are those the only two group meetings you
[8]   recall attending?
[9]   **A:** I personally?
[10]  **Q:** Yes.
[11]  **A:** That I can remember, yes. There may have
[12]  been others that I had other obligations that I
[13]  might have missed.
[14]  **Q:** Did you keep any notes of what was said at
[15]  either of these meetings?
[16]  **A:** Not that I know of.
[17]  **Q:** Are you aware whether any of the Plaintiffs
[18]  that have joined you in this suit have notes about
[19]  what was said at this meeting?
[20]  **A:** Some may. I'm not sure.
[21]  **Q:** You don't know one way or another?
[22]  **A:** I don't know.
[23]  **Q:** The meeting you described that had all the
[24]  managers, Norm Fontaine, Dick Ramsden, Michael

---

Page 26

[1] Paige, Rodney Willis, Mary Leonard, but did not have
[2] Mr. Calderon from EFTC, can you describe to me what
[3] occurred at that meeting?
[4]   A: Basically they went over the transaction
[5] that was going to occur, and then they also had
[6] basically a question and answer period afterward.
[7]   Q: How long did the meeting last?
[8]   A: Approximately half hour to an hour.
[9]   Q: Were there any slides shown during the
[10] meeting?
[11]   A: I don't remember.
[12]   (Document marked as Fiorilla
[13] Exhibit 2 for identification)
[14]   Q: I want to show you a document that's been
[15] marked as Exhibit 2. Have you ever seen that
[16] document before?
[17]   A: I don't remember.
[18]   Q: Did you ever see a slide show at Bayer in
[19] which the entries to this printout were exhibited on
[20] the slide show up on a board?
[21]   A: It's possible, but I honestly don't
[22] remember.
[23]   Q: Fair to say you don't recall one way or
[24] another?

Page 27

[1]   A: No, I don't.
[2]   Q: Were there any handouts given in the group
[3] meeting you described? This is the one without the
[4] representative with EFTC. Were there any handouts?
[5]   A: I honestly don't remember.
[6]   Q: To the best of your memory, who spoke at
[7] the meeting? What management official from Bayer
[8] spoke at the meeting?
[9]   A: That I remember for sure, Dick Ramsden.
[10] Dick Ramsden spoke, Michael Paige. Those are the
[11] two that I remember distinctly.
[12]   Q: With respect to the others, you don't
[13] recall one way or another whether they spoke or not?
[14]   A: I believe they did, but I don't recall
[15] exactly what they said.
[16]   Q: What is your recollection about what Mr.
[17] Ramsden said at that group meeting?
[18]   A: He went over an outline of what he thought
[19] was a win-win situation for Bayer and for the
[20] employees, again highlighting some of the things
[21] that Norm had told me. He reiterated those.
[22]   Q: Do you recall which ones he reiterated?
[23]   A: Again, he talked about the win-win. He
[24] talked about that EFTC specialized in small lots,

Page 28

[1] quick turns. That was their core business. They
[2] were going to revitalize the fab shop, put money
[3] into the fab shop. Again, they liked the idea that
[4] we had vertical integration, that we had a team base
[5] environment, we had a skilled work force. That,
[6] again, I think was reiterated by Mr. Paige.
[7]   Q: Do you recall anything else Mr. Ramsden or
[8] Mr. Paige discussed with the employees during the
[9] group meeting?
[10]   MR. ROACH: I think he was just telling you
[11] about Ramsden.
[12]   MR. WELSH: He also said Mr. Paige.
[13]   MR. ROACH: I apologize.
[14]   MR. WELSH: That's why.
[15]   Q: Anything else that either of those
[16] individuals spoke about?
[17]   A: That, again, as part of the win-win
[18] situation, that we would have comparable benefits,
[19] wages, positions, and that in some cases we would
[20] actually be better off and that it was an
[21] opportunity for us to grow.
[22]   Q: Do you recall precisely what Mr. Ramsden
[23] said concerning benefits?
[24]   A: That they were comparable.

Page 29

[1]   Q: Is that the term he used?
[2]   A: To the best of my —
[3]   Q: Did —
[4]   MR. ROACH: Let him finish his answer,
[5] please. Go ahead.
[6]   A: That they were comparable — that's, I
[7] believe, the word that he used — and that in some
[8] cases it would be better.
[9]   Q: Did he indicate in some cases they were
[10] less?
[11]   A: No.
[12]   Q: Did he indicate to you that they were
[13] different?
[14]   A: I distinctly remember "comparable." I
[15] don't remember the word "different" being used.
[16]   Q: He didn't use the word "identical," did he?
[17]   A: No.
[18]   Q: Did he discuss salary levels?
[19]   A: Yes.
[20]   Q: What did he say about salary?
[21]   A: That they would be the same.
[22]   Q: Did he talk about any salary adjustments
[23] upwards or downwards?
[24]   A: I don't remember if that was stated at a

Page 30

[1] meeting or not, that there would be adjustments.
[2] There may have been some later on.
[3]    Q: You don't recall whether there were any
[4] handouts; is that right?
[5]    A: No, I don't remember.
[6]    Q: Did he talk about specific EFTC benefits?
[7] Did he go over — for instance, did he compare
[8] vacation at Bayer versus vacation at EFTC?
[9]    A: Not that I remember.
[10]    Q: Did he give any specifics whatsoever
[11] concerning any EFTC benefits during this group
[12] meeting?
[13]    A: The only one that I remember was bonuses.
[14] That was the only thing that I —
[15]    Q: What do you recall about bonuses?
[16]    A: That we would be getting bonuses.
[17]    Q: That EFTC paid bonuses?
[18]    A: Yes.
[19]    Q: Anything else? Do you remember any
[20] specifics on benefits other than what you have
[21] already testified to?
[22]    A: Not that I can distinctly remember.
[23]    Q: Did Mr. Willis say anything during the
[24] meeting concerning EFTC's benefits?

Page 31

[1]    A: I don't remember distinctly.
[2]    Q: Do you recall whether Mary Leonard said
[3] anything at that meeting?
[4]    A: No, I do not.
[5]    Q: Do you recall anything else that was said
[6] at that meeting other than what you have testified
[7] here to today?
[8]    MR. ROACH: Objection. Do you mean
[9] statements they made or the question and answers?
[10]    MR. WELSH: I will go over the question and
[11] answer specifically.
[12]    Q: Do you recall anything else that managers
[13] or officials at Bayer said in their presentations at
[14] that group meeting other than what you have already
[15] testified to?
[16]    A: No, I do not.
[17]    Q: Do you remember any of the questions and
[18] answers in the group meeting?
[19]    A: I do remember something being said about
[20] could we, since we were being terminated and going
[21] to another company, could we receive a severance and
[22] move on to whatever.
[23]    Q: Do you recall who asked that question?
[24]    A: No, I do not.

Page 32

[1]    Q: Was there an answer to the question
[2] provided?
[3]    A: Yes.
[4]    Q: By whom?
[5]    A: I believe the answer was from Rodney
[6] Willis, but I am not 100 percent sure.
[7]    Q: What do you recall the answer as being?
[8]    A: That we would not be eligible.
[9]    Q: Was there any explanation given?
[10]    A: That we were given jobs.
[11]    Q: Do you remember anything else being said
[12] about severance pay during the group meeting, at any
[13] time during the group meeting, other than this
[14] question and answer?
[15]    A: It may have been brought up another time,
[16] but I don't remember distinctly.
[17]    Q: Other than what you have now testified to,
[18] do you remember anything else that was said during
[19] the group meeting by Bayer officials or by employees
[20] asking questions other than what you have already
[21] testified to?
[22]    A: You mean if I talked to another person or
[23] another person talked to me?
[24]    Q: At the group meeting itself.

Page 33

[1]    A: Oh, at the group meeting itself.
[2]    MR. ROACH: This doesn't include, in other
[3] words, people telling him or refreshing his memory
[4] about what was said? It's just what he can
[5] remember?
[6]    MR. WELSH: I am asking what he can
[7] remember. I will get to the representational
[8] status.
[9]    MR. ROACH: Okay.
[10]    MR. WELSH: You will hear that loudly and
[11] clearly when I get there.
[12]    Q: Do you remember anything else at that
[13] meeting other than what you have testified to by
[14] anybody being spoken?
[15]    A: No, I don't.
[16]    Q: You recall that there may have been a
[17] second group meeting with other Bayer officials, but
[18] this time it was Mr. Guilmette?
[19]    A: No. Mr. Calderon.
[20]    Q: Mr. Calderon. My apologies. Mr. Calderon.
[21] What do you recall happening at that meeting?
[22]    A: At that meeting Mr. Calderon basically
[23] introduced himself and talked a little bit about
[24] EFTC.

Page 34

[1] Q: What do you recall him saying?
[2] A: Some of the things that we had heard
[3] before.
[4] Q: I am going to ask you — I understand some
[5] of the things you heard before. But if you could
[6] describe the things you remember him saying.
[7] A: Again, that their specialty was in
[8] quick-turn small-lot manufacturing, that they were
[9] looking at this as a great opportunity to break into
[10] the Northeast, that they were thrilled to have the
[11] vertical integration of the printed circuit — of
[12] the actual making of the printed circuit boards as
[13] well as the assembly and test operation. Those were
[14] the highlights.
[15] Q: Did he say anything about wages?
[16] A: I believe he said that nobody would lose
[17] salary.
[18] Q: Did he say anything about benefits?
[19] A: Not that I remember.
[20] Q: Did he say anything at the meeting about
[21] future contacts by EFTC with employees?
[22] A: What does that mean?
[23] Q: Did he say, "You will get further
[24] information from us" or "We will be scheduling

Page 35

[1] meetings with you" or things of that nature?
[2] A: I believe so.
[3] Q: What do you believe he said?
[4] A: I believe he said that they would have
[5] meetings with representative from EFTC going over
[6] each person.
[7] Q: Do you remember whether at this meeting the
[8] Bayer officials, Mr. Paige, Ramsden, Fontaine,
[9] Leonard, Willis, whether they said anything at the
[10] meeting with Mr. Calderon?
[11] A: The main focus was with Mr. Calderon, that
[12] I remember.
[13] Q: The Bayer people I just mentioned, do you
[14] recall them saying anything at that meeting?
[15] A: No, I don't remember that.
[16] Q: Were there any questions and answers at
[17] that meeting with Mr. Calderon?
[18] A: Yes.
[19] Q: Do you remember any of the questions or
[20] answers?
[21] A: No, I don't.
[22] Q: Following the meeting with Mr. Calderon,
[23] were you contacted by EFTC?
[24] A: Yes.

Page 36

[1] Q: How were you contacted? Letter?
[2] A: I don't remember exactly.
[3] Q: Did you meet with anyone from EFTC?
[4] A: Yes.
[5] Q: Do you recall who you met with?
[6] A: Stacy Landress.
[7] Q: Did she identify what her title was or what
[8] her job was?
[9] A: Yes. She was the HR representative, HR
[10] manager. I'm not sure what the title is.
[11] Q: She was with HR?
[12] A: HR. It's easy.
[13] Q: Was this a one-on-one meeting you had with
[14] her?
[15] A: Yes.
[16] Q: And was it at the Bayer facility?
[17] A: Yes.
[18] Q: Before the transaction was completed?
[19] A: I believe it was after the transaction.
[20] Q: At the time you met with her, were you
[21] already an EFTC employee?
[22] A: I believe so.
[23] Q: Did you meet with anyone at EFTC before you
[24] became an EFTC employee?

Page 37

[1] A: Not that I remember.
[2] Q: Did you receive any letters or any
[3] correspondence with EFTC before you became an
[4] EFTC —
[5] A: I don't remember. I'm sure —
[6] Q: Do you know what the date was that you met
[7] with Stacy Landress?
[8] MR. ROACH: Did you finish your answer to
[9] the last question?
[10] A: Yeah, I just — I'm sure I got
[11] correspondence. I just don't remember exactly what
[12] it was. I probably got some correspondence. I
[13] can't exactly say what I got. It was a long time
[14] ago and I don't have those records.
[15] Q: Do you have any diary or any calendar or
[16] anything where you can specify the exact date that
[17] you met with Stacy Landress?
[18] A: I don't think so.
[19] Q: Do you know whether or not you may have met
[20] with Ms. Landress before you became an EFTC
[21] employee?
[22] A: The best that I can remember, it was after.
[23] (Document marked as Fiorilla
[24] Exhibit 3 for identification)

Page 38

[1] **Q:** I provide you a document marked as Exhibit
[2] 3. It is a letter to Mr. Dolan. Do you know Mr.
[3] Dolan?
[4] **A:** Yes, I do.
[5] **Q:** Did he work for you?
[6] **A:** Yes, he did.
[7] **Q:** Now, did you receive a letter similar to
[8] the one that went to Mr. Dolan on or about August
[9] 14, 1998? Take your time. Please read it over.
[10] **A:** It looks familiar.
[11] **Q:** You say it looks familiar, but can you say
[12] clearly, yes or no, whether or not you received a
[13] letter, this letter?
[14] **A:** I know I received correspondence, but I'm
[15] not exactly sure that this was it. But I remember
[16] receiving something similar to this.
[17] **Q:** Do you know the date upon which the close
[18] of the EFTC transaction occurred?
[19] **A:** I remember sometime in September.
[20] **Q:** If you look at the second paragraph, the
[21] first sentence, you note it states, "We will explain
[22] all of EFTC's benefits during the orientation
[23] meetings the week of August 17, 1998." Do you see
[24] that sentence?

Page 39

[1] **A:** Yes, I do.
[2] **Q:** Were there orientation meetings with EFTC
[3] and printed circuit board shop employees during the
[4] week of August 17, 1998?
[5] **A:** I don't remember.
[6] **Q:** Just so I am clear, you are saying you
[7] don't remember either way, you don't remember yes or
[8] no?
[9] **A:** I know we had meetings, but I don't know
[10] the exact date of those meetings.
[11] **Q:** Do you recall that you had meetings before
[12] EFTC took over the printed circuit board operation?
[13] **MR. ROACH:** Objection, asked and answered,
[14] but go ahead.
[15] **A:** But I can't remember exactly when. I
[16] believe it was after, but I couldn't swear to it.
[17] **Q:** Is it fair to say you are not sure?
[18] **A:** Yes.
[19] **Q:** The meeting you had was with Stacy
[20] Landress?
[21] **A:** Yes.
[22] **Q:** Do you know whether or not there were any
[23] other EFTC representatives that met with printed
[24] circuit board shop employees other than Ms.

Page 40

[1] Landress?
[2] **A:** Repeat that, please.
[3] **Q:** Do you know if there was anyone else from
[4] EFTC who met with employees other than Ms. Landress?
[5] **A:** Not that I know of. As far as I know, she
[6] was the main. That's who I met with.
[7] **Q:** When you met with her, was it your
[8] understanding she was meeting with other employees
[9] under your supervision at about the same time?
[10] **A:** Yes.
[11] **Q:** Did Ms. Landress give you any documents
[12] when you met with her?
[13] **A:** She gave me something, yes.
[14] **Q:** Do you recall what it was she gave you?
[15] **A:** I believe it was a form, like an
[16] employee-at-will form or something like that, to
[17] sign.
[18] **Q:** Any other forms? Let me ask you, do you
[19] recall an enrollment form for health insurance?
[20] **A:** There were a bunch of different things that
[21] we had to fill out.
[22] **Q:** Tax forms?
[23] **MR. ROACH:** Finish.
[24] **A:** There were documents we had to fill out.

Page 41

[1] I'm not sure exactly which documents we filled out.
[2] **Q:** Do you remember an "at will" statement?
[3] **A:** That I remember, because it was kind of
[4] like a little bit of signing at will thing.
[5] **Q:** Do you remember if there were tax
[6] documents?
[7] **A:** I'm not sure. Like I said, I don't
[8] remember the exact documents. I think there was a
[9] document in terms of what my position would be and I
[10] think the pay. Like I remember something of that
[11] nature.
[12] **Q:** If you look at the last line of the letter,
[13] "Please be advised enrollment forms must be
[14] completed and submitted to us by Thursday, August
[15] 26, 1998."
[16] **A:** I see it.
[17] **Q:** Do you recall any enrollment forms for
[18] benefits that you filled out when you met with Ms.
[19] Landress?
[20] **A:** The only one that I remember was the
[21] employee-at-will. I believe there might have been a
[22] waiver for insurance, I think, because I didn't sign
[23] up for insurance. But there were certain forms.
[24] **Q:** Do you remember an immigration form, what

Page 42

[1] is called an "I-9"? I am trying to trigger memories
[2] here.
[3]    A: I understand. It's been a while. I am
[4] trying to say that I exactly remember a certain
[5] form. I remember forms. I remember the
[6] employee-at-will. I remember something about
[7] waiving my medical, because I didn't take the
[8] medical because I had medical through my wife. So I
[9] am trying, as we speak, to jog my memory on that.
[10]    Q: When you met with Stacy, do you recall
[11] whether or not she had office hours and had a number
[12] of employees scheduled for successive meetings, you
[13] and someone else and someone else?
[14]    A: There were meetings scheduled.
[15]    Q: Again, was it one of these situations where
[16] a number of employees were scheduled through the day
[17] to meet with her?
[18]    A: Through the day.
[19]    Q: Huh?
[20]    A: Yes.
[21]    Q: Did you say "to" or "through"?
[22]    A: No. I was just trying to answer your
[23] question.
[24]    MR. ROACH: I think he said "through the

Page 43

[1] day."
[2]    Q: I wanted to make sure there weren't just
[3] two meetings a day.
[4]    A: No, no.
[5]    Q: Where did the meeting with Ms. Landress
[6] take place that you attended?
[7]    A: It was at 80 Industrial Way.
[8]    Q: Do you recall what office?
[9]    A: No, I don't.
[10]    Q: Other than Ms. Landress, was anyone else
[11] present other than you and her?
[12]    A: Not that I remember.
[13]    Q: And lastly — I may have already asked
[14] you — did she provide you any documents, booklets,
[15] schedules, anything like that, any handouts during
[16] that meeting?
[17]    A: There were some. I don't remember exactly
[18] what they were. They were paperwork, things to
[19] sign. And that's what I remember.
[20]    Q: Did you at any time before, at, or after
[21] your meeting with Ms. Landress, did you ever sign
[22] any document indicating that you were accepting
[23] employment with EFTC?
[24]    A: To the best of my knowledge, I think I did.

Page 44

[1]    Q: When did you sign that document, to the
[2] best of your knowledge?
[3]    A: Shortly after we were moved over to EFTC.
[4]    Q: So your memory was that you signed a
[5] document accepting employment after you became an
[6] EFTC employee?
[7]    A: That's what I remember, but I am not 100
[8] percent positive.
[9]    Q: Who was your immediate supervisor when you
[10] started to work for EFTC?
[11]    A: Earle Christianson.
[12]    Q: Had he been one of your managers at Agfa?
[13]    A: No.
[14]    Q: Do you know, is EFTC still in business?
[15]    A: Yes. It's Suntron.
[16]    Q: What is the name?
[17]    A: Suntron.
[18]    Q: How do you spell that?
[19]    A: S-u-n-t-r-o-n.
[20]    Q: What is the name of your current employer?
[21]    A: Suntron.
[22]    Q: So you are still with them?
[23]    A: Yes.
[24]    Q: I'm sorry. They are in Lawrence. What is

Page 45

[1] their address in Lawrence?
[2]    A: It's Glenn Street.
[3]    Q: You don't recall the actual street number.
[4] That's all right. Who is your immediate supervisor
[5] there now?
[6]    A: Steve Yu.
[7]    Q: Is there an HR person out there?
[8]    A: Yes.
[9]    Q: Who would that be?
[10]    A: I don't know — Jodi. She just came on
[11] board two weeks ago, something like that. The last
[12] HR person left.
[13]    Q: HR people do that.
[14]    A: Yes.
[15]    MR. ROACH: Could we take a two-minute
[16] break?
[17]    MR. WELSH: Of course.
[18]    (Recess taken)
[19]                   BY MR. WELSH:
[20]    Q: When you sat down with Ms. Landress, did
[21] she during that meeting discuss with you EFTC's
[22] benefit policies?
[23]    A: She did go over some policies.
[24]    Q: Did she indicate to you during that meeting

Page 46

[1] how the policies differed from those at Bayer?
[2]    **MR. ROACH:** Objection.
[3]    **A:** I know she said some things about benefits,
[4] but I don't distinctly remember at that time what
[5] was said in that meeting.
[6]    **Q:** As of the conclusion of that meeting, did
[7] you know — please strike that. At the conclusion
[8] of that meeting, did you believe that EFTC's
[9] benefits were less than those offered by Bayer?
[10]    **A:** I believe at that point I suspected that
[11] there may be differences in the benefits.
[12]    **Q:** When did you come to understand that there
[13] were differences in the benefits?
[14]    **MR. ROACH:** Objection. Go ahead.
[15]    **THE WITNESS:** I'm sorry?
[16]    **MR. ROACH:** Go ahead. You can answer. I
[17] am just objecting for the record. You can answer.
[18]    **A:** It was a process, basically. I didn't come
[19] to that conclusion like two days ago, three days ago
[20] type of thing. It happened over a period of time
[21] during October, November, December and so forth. I
[22] started to understand the ramifications of some of
[23] the differences in the benefits.
[24]    **Q:** Is it fair to say as of December 31, 1998,

Page 47

[1] you were aware of the differences between the
[2] benefits that Bayer had offered and the benefits
[3] that EFTC was offering?
[4]    **MR. ROACH:** Objection. You can answer.
[5]    **A:** I had a substantial knowledge at that
[6] point.
[7]    **Q:** Did you personally ever have a conversation
[8] with any Bayer official concerning your eligibility
[9] for severance pay as a result of the EFTC
[10] transaction?
[11]    **A:** You mean personally?
[12]    **Q:** You personally.
[13]    **A:** Not that I remember. Other than the
[14] meeting?
[15]    **Q:** Other than the meeting.
[16]    **A:** One-on-one.
[17]    **Q:** My understanding is at the meeting there
[18] was a question asked by someone else about whether
[19] or not they were eligible for severance and they
[20] were told "no"; is that right?
[21]    **A:** I heard that.
[22]    **Q:** Other than that, did you have any
[23] conversation with anyone at Bayer at any time
[24] concerning severance?

Page 48

[1]    **A:** Not that I remember.
[2]    **Q:** While you were a Bayer employee, did you
[3] ever receive any mail from Bayer which included in
[4] the mail were descriptions of their benefit
[5] policies?
[6]    **A:** Yes.
[7]    **Q:** I am not going to put this into evidence.
[8] I am going to show you a summary plan description
[9] and let you look at it. It is from Bayer.
[10]    **A:** It looks familiar.
[11]    **Q:** Do you recall a time in the mid-1990s, I
[12] believe it was '95 or '96, that copies of this book
[13] were delivered to your house and all the other Bayer
[14] employees' houses?
[15]    **A:** Yes, I remember this book.
[16]    **Q:** Did you maintain a copy of this book at
[17] your house when you received it?
[18]    **A:** Yes.
[19]    **Q:** Did you also have a copy of this book
[20] available to you at the work site?
[21]    **A:** Yes.
[22]    **Q:** Where at the work site was it available to
[23] you?
[24]    **A:** I believe this was at HR. I may have had a

Page 49

[1] copy. I don't remember.
[2]    **Q:** In addition to this book, did you also
[3] receive additional mailings from Bayer to your home
[4] with documents in it pertaining to your benefits?
[5]    **A:** Yes.
[6]    (Document marked as Fiorilla
[7] Exhibit 4 for identification)
[8]    **Q:** I place before you Exhibit 4.
[9]    **MR. ROACH:** I don't remember seeing this
[10] before.
[11]    **MR. WELSH:** Follow me. We will get there.
[12]    **Q:** The booklet I put in front of you, is the
[13] first page of Exhibit 4 similar to the cover of the
[14] booklet?
[15]    **A:** It is similar.
[16]    **Q:** In fact it is a photocopy of it, is it not,
[17] without the exhibit tag?
[18]    **A:** Yes.
[19]    **Q:** The second page of Exhibit 4, that's a
[20] photocopy of the inside cover of the booklet; is
[21] that right?
[22]    **A:** It looks that way.
[23]    **Q:** And the third page is the first page — the
[24] third page of Exhibit 4 is the first page of the

Joseph Attardi, et al.
Bayer Corporation, et al.

Case 1:04-cv-10728-WGY    Document 42-24    Filed 01/17/2007    Page 1 of 21

Vincent S. Fiorilla
Vol. 1, April 21, 2006

Page 50

[1] booklet?
[2]   A: It looks that way.
[3]   Q: And the next page of Exhibit 4 is the
[4] second page of the booklet, correct?
[5]   A: Correct.
[6]   Q: The following page, "Introduction," on
[7] Exhibit 4 —
[8]   A: Looks the same.
[9]   Q: — is the same as the introduction of the
[10] booklet?
[11]   MR. ROACH: Except I just want to note that
[12] it is missing a page number at the bottom on the
[13] booklet that is not into evidence. It says "INT-1."
[14]   MR. WELSH: You are right.
[15]   Q: If you go to the page that says "Your
[16] Severance Pay Benefits" —
[17]   MR. ROACH: This is on Exhibit 4?
[18]   MR. WELSH: Yes.
[19]   A: Severance benefits.
[20]   Q: Do you see a similar page in the booklet?
[21]   A: Yes, I do.
[22]   Q: When is the first time you read in the
[23] booklet "Your Severance Pay Benefits"? Did you ever
[24] have a chance to read that section while you were an

Page 51

[1] employee of Bayer?
[2]   MR. ROACH: Objection. Go ahead.
[3]   A: I guess it depends on your definition of
[4] "reading it." I mean, I scanned it, I looked at it,
[5] but I did not study it or anything like that.
[6]   Q: Did you look at it in the six months prior
[7] to the transaction with EFTC?
[8]   A: I don't remember.
[9]   Q: Did you look at it in the six months
[10] immediately after the time you became an employee of
[11] EFTC?
[12]   A: It was sometime after that.
[13]   Q: It was more than six months after you
[14] became an EFTC employee?
[15]   A: I believe so.
[16]   Q: When you looked at it, did you consult the
[17] booklet you had in your possession?
[18]   A: No.
[19]   Q: Where did you get the information?
[20]   A: From another employee.
[21]   Q: Who was that?
[22]   A: Jeanne Skene.
[23]   Q: Do you remember when that was?
[24]   A: Not exactly. Maybe a year or so later.

Page 52

[1]   Q: Is it fair to say at the time of the EFTC
[2] transaction, you did not consult this booklet to see
[3] whether it provided for severance pay benefits in
[4] these circumstances?
[5]   MR. ROACH: Objection. I think he said he
[6] didn't remember.
[7]   MR. WELSH: I will get clarity.
[8]   A: Can you repeat that again?
[9]   Q: At the time of the transaction itself, did
[10] you review this severance pay portion of the booklet
[11] to see for yourself whether or not you were entitled
[12] to severance pay benefits?
[13]   MR. ROACH: Objection.
[14]   A: Not that I remember.
[15]   Q: You can put Exhibit 4 aside.
[16]   MR. ROACH: Just off the record for a
[17] minute.
[18]     (Discussion off the record)
[19]     (Document marked as Fiorilla
[20] Exhibit 5 for identification)
[21]   Q: I am going to show you a document marked as
[22] Exhibit 5. Is this the booklet that we had talked
[23] about earlier that you received at your home?
[24]   A: Yes.

Page 53

[1]   MR. ROACH: You can take a minute and look
[2] at it if you'd like.
[3]   A: I assume this is the book that I received.
[4]   Q: Please tell me if there's anything in it
[5] that suggests to you it is not the booklet you
[6] received.
[7]   A: I will just take a quick review here.
[8] (Reviewing document) It looks similar.
[9]   Q: Do you still have the book you had at home?
[10] Have you retained that book?
[11]   A: I don't know.
[12]   Q: Did you ever look through your records to
[13] see if it was still there?
[14]   A: No.
[15]   MR. WELSH: Steve, I am going to request a
[16] copy of the booklet. Just look to see if he still
[17] has the one he had in his home.
[18]   MR. ROACH: Sure. I think the one we
[19] produced was the one that Jeanne Skene had in her
[20] possession.
[21]   THE WITNESS: I could have it or I might
[22] not have it. I really don't know.
[23]   MR. ROACH: I will ask him to look through
[24] his records.

[1]    THE WITNESS: I will check and see if I
[2] have it.
[3]    Q: When you had a problem at Bayer with your
[4] benefits or employees who reported to you had
[5] problems with their benefits, was there any
[6] particular contact person you had available to you
[7] to answer those questions?
[8]    A: Either Norm or Mary Leonard.
[9]    (Document marked as Fiorilla
[10] Exhibit 6 for identification)
[11]    Q: I show you a document that's been marked as
[12] Exhibit 6. Is this a copy of a benefit summary that
[13] was mailed to your house in 1996?
[14]    A: Most likely, yes.
[15]    Q: Do you know whether or not a similar
[16] summary had been mailed to the homes of the other
[17] employees of the board shop in 1996?
[18]    A: I would make that assumption.
[19]    (Document marked as Fiorilla
[20] Exhibit 7 for identification)
[21]    Q: I show you a document that's been marked as
[22] Exhibit 7. Is this a copy of a benefit summary that
[23] was mailed to your house and the house of other
[24] board employees in 1997 by Bayer?

[1] circuit card assembly operation of the Agfa
[2] Division, Bayer Corporation."
[3]    Does this trigger your memory at all
[4] whether or not the actual closing date and the date
[5] you became an EFTC employee was September 1, 1998?
[6]    A: I'm not sure.
[7]    Q: Okay. That's fair. In 1998 did you
[8] personally ever make a claim for severance pay
[9] benefits?
[10]    MR. ROACH: Objection.
[11]    A: Not that I remember.
[12]    Q: In 1998 did you believe that you were
[13] entitled to severance pay benefits as a result of
[14] the transaction between Bayer Corporation Agfa
[15] Division and EFTC?
[16]    A: I wasn't sure.
[17]    Q: Is it fair to say in 1998 you thought there
[18] was a possibility that you might be entitled to
[19] severance pay benefits?
[20]    A: I just wasn't sure at that time.
[21]    Q: When you say you weren't sure, is it fair
[22] to say that you thought there was a possibility that
[23] you might?
[24]    A: Yes.

[1]    A: I would make that assumption.
[2]    Q: When you say you'd make that assumption —
[3]    A: Well, they sent a lot of correspondence.
[4] Bayer was always sending us something, so I am just
[5] making an assumption that this was sent to the
[6] house.
[7]    Q: You don't have any memory that this was not
[8] sent to the house, do you?
[9]    A: That is correct.
[10]    Q: Do you have a memory of when EFTC became
[11] your employer, what date?
[12]    A: To the best of my knowledge, it was
[13] September.
[14]    Q: Do you know if it was September 1st?
[15]    A: I think it was a little later than that,
[16] but I'm not positive. I thought there was a little
[17] delay or something involved in it, but I'm not sure.
[18]    (Document marked as Fiorilla
[19] Exhibit 8 for identification)
[20]    Q: I show you a Web page printout. I believe
[21] it is EFTC's Web page. The first text line
[22] indicates, "Denver, Colorado, December 1, 1998.
[23] EFTC Corporation announces today it has closed a
[24] previously announced transaction to acquire the

[1]    Q: Did you consult the severance pay book you
[2] had at home to ascertain whether or not you might
[3] have an entitlement to severance pay benefits?
[4]    A: I don't remember if I did that exactly.
[5] But my recollection at the time was that — I just
[6] had a suspicion because everybody before had
[7] received — everybody that I knew of that was in a
[8] situation where the business was going down and that
[9] kind of stuff would receive a severance package from
[10] Bayer. But the way it was explained, it sounded as
[11] if we probably wouldn't be eligible.
[12]    Q: When you say "it was explained" —
[13]    A: They said because we were going to this new
[14] company, "It's a win-win situation, you are going to
[15] have comparable benefits, you are going to actually
[16] be better off because this company is going to
[17] invest in you and you are going to have
[18] opportunities." And again, my history with Bayer,
[19] Compugraphics, Agfa, Bayer, however you want to put
[20] it, was exceptional. I can only say good things
[21] that happened. Every time there was a transaction
[22] from Compugraphics to, I believe it was, Agfa at
[23] that time, Miles, every time something happened, we
[24] as a group benefited from that transaction. So it

Page 58

[1] would seem logical to me that if we are going to
[2] move to this next operation, why would I question
[3] Bayer's — Dick Ramsden hired me. Almost 30 years I
[4] was with the company. So I trusted what was said to
[5] me. So I just, "Wow, boy, we are going to make out
[6] in the deal."
[7]     Q: At any time prior to the transaction with
[8] EFTC were you told that Bayer's severance plan —
[9] the terms of the Bayer severance plan would continue
[10] to apply to you for the first year of your
[11] employment with EFTC?
[12]     A: No, not that I know of.
[13]     Q: Did you ever hear from anyone that
[14] severance pay obligations similar to those in place
[15] at Bayer would apply to you as an EFTC employee for
[16] the first year of your employment there?
[17]     A: No recollection of that.
[18]     Q: Were you ever told prior to the transaction
[19] that your salary would be adjusted upward to
[20] accommodate the difference in medical insurance
[21] benefits between Bayer and EFTC?
[22]     A: Not me personally.
[23]     Q: Did you learn that others were told that?
[24]     A: Yes.

Page 59

[1]     Q: Did you learn that before or after the date
[2] you became an EFTC employee?
[3]     A: I don't remember exactly when.
[4]     Q: So your salary wasn't adjusted at all; is
[5] that right?
[6]     A: Actually, I lost a little bit.
[7]     Q: How did you lose?
[8]     A: Because what Bayer would provide if you
[9] didn't take insurance with them, they gave you $750.
[10] I believe that was what — and again, best of my
[11] recollection, going over to EFTC, my salary was not
[12] adjusted upward, to the best of my knowledge.
[13]     Q: You are not sure — you said best of your
[14] knowledge twice.
[15]     A: Best of my knowledge.
[16]     Q: Is that an indication you are not sure?
[17]     MR. ROACH: Objection. Go ahead.
[18]     A: Not 100 percent sure. My memory tells me
[19] that I didn't.
[20]     Q: Do you have any payroll records reflecting
[21] what your pay was in your first couple of months at
[22] EFTC?
[23]     A: I don't believe so.
[24]     Q: As part of this case, did you ever go back

Page 60

[1] and look to see if you have those records?
[2]     A: No. Just when you asked me that question,
[3] it triggered in me that I had that $750, and that's
[4] what —
[5]     MR. WELSH: Steve, I am going to request of
[6] the witness look to see if he has any payroll stubs
[7] for the three-month period or from the time he
[8] started at EFTC to the end of the year, just so we
[9] can follow —
[10]     MR. ROACH: No problem. With that, I will
[11] probably subpoena the records from EFTC in terms of
[12] the few months of the employees' —
[13]     MR. WELSH: We are both going to do that,
[14] so I will show you my attachment and maybe I can
[15] save you some effort.
[16]     MR. ROACH: That sounds fine.
[17]     Q: Sir, can you please describe for me what
[18] you did to prepare for today's deposition.
[19]     MR. ROACH: Objection as to attorney-client
[20] privilege.
[21]     Q: I am not going to ask you the contents of
[22] anything you said with Mr. Roach. But did you meet
[23] with Mr. Roach?
[24]     A: Yes.

Page 61

[1]     Q: When you met with Mr. Roach, who else was
[2] present?
[3]     A: Bert.
[4]     Q: Anyone else?
[5]     A: Jeanne Skene.
[6]     Q: Anyone else?
[7]     A: No.
[8]     Q: How long did you meet with him?
[9]     A: A couple of hours, maybe.
[10]     Q: When you met with him, did you review any
[11] documents?
[12]     A: We went over —
[13]     MR. ROACH: I am just going to object as
[14] to, again, attorney-client privilege. But as long
[15] as I am accorded the same privilege with your
[16] clients, I will let him answer the question.
[17]     Q: Did you review any documents?
[18]     MR. ROACH: Will you agree to that?
[19]     MR. WELSH: Yes.
[20]     A: Yes.
[21]     Q: Other than the documents you reviewed in
[22] the presence of Mr. Roach, did you review any other
[23] documents to prepare for today's deposition?
[24]     A: I know there was something Steve gave us.

Page 62

[1] I just looked at it. Something about how to answer
[2] truthfully.
[3]    **Q:** He gave you instructions on how to conduct
[4] yourself in a deposition, correct?
[5]    **A:** Yes.
[6]    **Q:** Put that aside. Did you ever look at any
[7] summaries or outlines?
[8]    **A:** Outside of —
[9]    **Q:** No. In preparing for this deposition
[10] either with Mr. Roach or by yourself, did you look
[11] at any summaries or outlines?
[12]    **A:** Nothing that wasn't in our — when we sat
[13] down together.
[14]    **Q:** When you sat down together, you had various
[15] documents in the case, Bayer documents, EFTC
[16] documents, personnel documents. Did you look at any
[17] summaries or synopsis of these documents?
[18]    **A:** With Mr. Roach.
[19]    **Q:** So you did look at a summary, but it was
[20] with Mr. Roach?
[21]    **A:** Yes.
[22]    **MR. ROACH:** Objection.
[23]    **MR. WELSH:** You want to take a break?
[24]    **MR. ROACH:** Yes.

Page 63

[1]    **MR. WELSH:** You are making faces.
[2]    **MR. ROACH:** I'm not sure what you mean by
[3] "summary." You are talking about something I might
[4] have prepared to give him?
[5]    **MR. WELSH:** Or someone else. I want to
[6] know if there was any documents he reviewed other
[7] than Bayer documents or EFTC documents, summaries,
[8] chronologies, outlines. He has already talked about
[9] the instructions for deposition, and I am not asking
[10] any further on that. If you want to take a break —
[11]    **THE WITNESS:** Yes. I'm not sure.
[12]    **MR. ROACH:** We will go off the record.
[13]    (Recess taken)
[14]    **BY MR. WELSH:**
[15]    **A:** I guess I was confused. I was not coached
[16] to say anything.
[17]    **Q:** I am not saying you were. I am asking
[18] documents. Did you see any documents, outline of
[19] events, for instance, where things were set down in
[20] outline form?
[21]    **A:** I don't think so.
[22]    **Q:** Did you see any summaries, a summary of
[23] important things to remember?
[24]    **MR. ROACH:** Objection. Go ahead.

Page 64

[1]    **A:** The only thing that I remember was we
[2] looked at some of these things. I didn't have notes
[3] or any kind of plan, if you will, to say anything.
[4] It was basically kind of look over what we had here,
[5] and that was basically —
[6]    **Q:** What I am asking is — we have pleadings,
[7] we have complaints and interrogatories and all those
[8] things. But sometimes witnesses will look at
[9] summaries or compilations put together to highlight
[10] important facts. Did you look at anything like
[11] that?
[12]    **A:** No.
[13]    **Q:** Outside of your meeting with Mr. Roach and
[14] the other two individuals, did you talk with anyone
[15] to prepare yourself for today's deposition?
[16]    **MR. ROACH:** Objection.
[17]    **A:** Can you be more specific? You mean prepare
[18] in how I am supposed to say something?
[19]    **Q:** No. When I say "prepare," I don't mean how
[20] you are supposed to say something. I am talking
[21] about to refresh your memory to make sure you
[22] remembered everything. Did you talk to anyone on
[23] what happened with respect to going from Bayer to
[24] EFTC to make sure that you remembered everything

Page 65

[1] that happened?
[2]    **A:** Just in general conversations or at
[3] meetings that we may have had where comments and
[4] things were made at that time, but not specifically
[5] sitting down in a room or someplace and saying,
[6] "Okay, these are certain things that occurred." It
[7] was more of a general type of thing during these
[8] meetings or there might have been some e-mails and
[9] such that were —
[10]    **Q:** The meetings, are these meetings with Mr.
[11] Roach?
[12]    **A:** I believe there was one with Mr. Roach and
[13] then there was another attorney.
[14]    **Q:** But these were meetings with an attorney?
[15]    **A:** Yes.
[16]    **Q:** Do you remember conversations with people
[17] outside meetings with attorneys concerning the facts
[18] of the case?
[19]    **A:** Please repeat that.
[20]    **Q:** Do you remember having any conversations
[21] with people outside of meetings with attorneys?
[22]    **A:** Right.
[23]    **Q:** I am not going to ask you about what
[24] happened in meetings with your attorneys. Aside

Page 66

[1] from meetings with attorneys, do you recall having
[2] discussions with people about the facts of the case?
[3]    A: About the facts of the case? Can you
[4] rephrase that?
[5]    MR. ROACH: Can we go off the record?
[6]    MR. WELSH: Yes.
[7]    (Discussion off the record)
[8]    Q: Outside of meetings where your attorney was
[9] present, did you have any chats or conversations
[10] with —
[11]    A: With people that were involved in the case.
[12]    Q: Yeah. With whom?
[13]    A: I talked with Bert. I talked with Jeanne.
[14] I talked with several other people.
[15]    Q: Do you have records of your conversation
[16] with them?
[17]    A: Do you mean written records?
[18]    Q: Yes. E-mails.
[19]    A: I don't, no.
[20]    Q: Do you know if someone does?
[21]    A: Someone may.
[22]    Q: Were some of these communications by
[23] e-mail?
[24]    A: Yes. Not with me, but there are

Page 67

[1] communications with e-mails.
[2]    (Document marked as Fiorilla
[3] Exhibit 9 for identification)
[4]    Q: I am going to show you a document marked as
[5] Exhibit 9, the Bayer Corporation Severance Pay Plan.
[6] Prior to today have you ever seen that document
[7] before?
[8]    A: I believe so.
[9]    Q: When is the first time you saw it?
[10]    A: I'm not exactly sure when. This was
[11] something that was in — can I have a moment?
[12]    MR. ROACH: Sure.
[13]    (Recess taken)
[14]          BY MR. WELSH:
[15]    A: Yes, I have seen this.
[16]    Q: When is the first time?
[17]    A: I'm not exactly sure. It was when we met
[18] with Mr. Roach.
[19]    Q: Is it fair to say — did you ever see a
[20] copy of this document in 1998?
[21]    A: I do not believe so.
[22]    Q: Had you ever seen a copy of this document
[23] prior to 1998?
[24]    A: I do not believe so.

Page 68

[1]    Q: In 1999 did you see a copy of that
[2] document?
[3]    A: The only time I remember seeing this
[4] document is with Steve, that I actually looked at
[5] it, read it and had some — not understand it but —
[6] I know what it is.
[7]    Q: Outside of any inquiry that may have been
[8] made by Mr. Roach, did you personally ever request a
[9] copy of the Severance Pay Plan from Bayer?
[10]    A: Not that I can remember.
[11]    (Documents marked as Fiorilla
[12] Exhibits 10 and 11 for
[13] identification)
[14]    Q: I am placing in front of you a document
[15] marked as Exhibit 10, Plaintiffs' answers to
[16] interrogatories. I am going to ask, if you will, to
[17] turn to the last page of the document before the
[18] attachments start. I ask you to turn to Page 17.
[19] On the last signature line on Page 17, is that your
[20] signature?
[21]    A: Yes.
[22]    Q: And did you review this document carefully
[23] before signing it?
[24]    MR. ROACH: Objection.

Page 69

[1]    A: As best as I could understand it.
[2]    Q: When you signed it, did you believe that it
[3] was true to the best of your knowledge and belief?
[4]    A: To the best of my knowledge, what I
[5] understood.
[6]    Q: It says right above the signature line, "By
[7] the authorized representative for the Plaintiffs."
[8] Do you see that?
[9]    A: Yes.
[10]    Q: Are you an authorized representative of the
[11] Plaintiffs?
[12]    A: Yes.
[13]    Q: What do you understand that means?
[14]    MR. ROACH: Objection. Go ahead.
[15]    A: I understand that to mean that in terms of
[16] decision-making, that myself and the other two would
[17] be able to make that decision to facilitate the
[18] process; rather than having 63 people doing this,
[19] that three of us would try to help facilitate the
[20] process.
[21]    Q: Did you understand, as being an authorized
[22] representative of the Plaintiffs, that part of your
[23] obligation was to help gather facts to make sure
[24] that these interrogatories were accurate?

Vincent S. Fiorilla
Vol. 1, April 21, 2006

Joseph Attardi, et al.    v.
Bayer Corporation, et al.

---

Page 70

[1]  A: Yes.

[2]  *Q. And did you in fact gather facts to make

[3]  sure that these interrogatories are accurate?

[4]  *A. The best that I could.

[5]  *Q. Please describe what you did.

[6]  MR. ROACH: I am going to object to the

[7]  extent that it is in anticipation of litigation.

[8]  But I will allow him to answer in general. Go

[9]  ahead.

[10]  A: Can you repeat the question?

[11]  MR. WELSH: Please repeat the question.

[12]  *(Record read)

[13]  MR. ROACH: As long as you will accept his

[14]  answer without waiving any privileges, I will allow

[15]  him to summarize what he did.

[16]  A: The best that I could was sitting with

[17]  my attorney and going over some of the documents

[18]  that we had obtained either through the book and so

[19]  forth, and then that was basically —

[20]  Q: Did you talk to any of the individuals

[21]  listed on the front page as Plaintiffs to see

[22]  whether they had any information responsive to the

[23]  interrogatory questions?

[24]  MR. ROACH: Do you mean individually or

---

Page 71

[1]  otherwise?

[2]  Q: First let's take it individually.

[3]  A: I don't have these memorized, so I am not

[4]  clear how I would answer that.

[5]  Q: I am going to go through parts of the

[6]  interrogatory in a little bit. But what I am asking

[7]  is when you signed as an authorized representative,

[8]  did you understand that you were providing

[9]  information not only that you had personally but

[10]  other people in the lawsuit had as well?

[11]  A: That I would help to gather that

[12]  information.

[13]  Q: How did you do that? When you say you

[14]  helped to gather it, what did you do to help gather

[15]  it?

[16]  MR. ROACH: Same objection. Go ahead.

[17]  A: Basically got together with Jeanne and with

[18]  Bert and with Steve and gathered as much information

[19]  as we could.

[20]  Q: Did you contact anyone other than Bert,

[21]  Jeanne and Steve concerning any of the questions

[22]  asked in this document?

[23]  A: I don't believe so. You mean "contact"

[24]  meaning just one-on-one?

---

Page 72

[1]  Q: Calling them on the phone. Did you have

[2]  any — for instance —

[3]  A: The only conversations that I would have

[4]  had were at general meetings with people. I did not

[5]  have any e-mail correspondence or phone

[6]  conversations.

[7]  Q: Was there a general meeting with people

[8]  to go over the questions that had been asked in the

[9]  interrogatories?

[10]  MR. ROACH: I am going to instruct him not

[11]  to answer that specific question. I will state for

[12]  the record — he already stated there were some

[13]  general meetings, at least one general meeting that

[14]  was had with everybody which were part of the

[15]  process. But I don't want to get into specifically

[16]  what he did beyond what he said.

[17]  Q: Okay. If you turn to Page 15, the

[18]  interrogatory asked that you identify each and every

[19]  verbal, written or electronic communication any of

[20]  the Plaintiffs had with Bayer Corporation, the Bayer

[21]  Severance Pay Plan, or any of their representatives,

[22]  agents or attorneys concerning the terms of the

[23]  Bayer Severance Pay Plan.

[24]  A: You are talking No. 8?

---

Page 73

[1]  *Q. Yes, I am. There's an answer provided.

[2]  The first paragraph are objections, and then the

[3]  second paragraph talks about incorporating answers

[4]  to interrogatories. As a representative of the

[5]  Plaintiffs, are you sure that this interrogatory

[6]  summarizes all of the communications any of the

[7]  Plaintiffs had with the Bayer Severance Plan, Bayer

[8]  or their agents and representatives concerning the

[9]  Severance Pay Plan?

[10]  MR. ROACH: Objection.

[11]  A: Please repeat.

[12]  MR. WELSH: Please read the question back.

[13]  *(Question read)

[14]  MR. ROACH: Objection.

[15]  A: I'm really not sure.

[16]  Q: Let me put it this way...

[17]  MR. ROACH: Let him finish his answer.

[18]  A: I'm not exactly sure what you are asking me

[19]  in terms of "communications." We had meetings, we

[20]  had e-mails. I don't know.

[21]  Q: David Dolan is one of the Plaintiffs, is he

[22]  not?

[23]  A: Yes, he is.

[24]  Q: Did David Dolan have any communications,

---

Min-U-Script®    Doris O. Wong Associates  (617) 426-2432

Page 74

[1] verbal communications, with anyone at Bayer
[2] concerning the Bayer Severance Pay Plan?
[3]    A: There were several individuals, I believe,
[4] that did. I don't know exactly who.
[5]    Q: As you sit here today, you can't tell me
[6] who had those conversations?
[7]    A: I can't remember exactly who had the —
[8] there were conversations, but I don't remember
[9] exactly who.
[10]    Q: Do you remember whether or not there were
[11] people listed in the 63 Plaintiffs here who did not
[12] have any conversations?
[13]    A: I couldn't tell you exactly.
[14]    Q: Keep this in front of you, sir. I am going
[15] to come back to this document in a second. I am
[16] going to show you Exhibit 11. These I am going to
[17] represent to you are Plaintiffs' responses to the
[18] first request for production of documents. Have you
[19] ever seen this document before?
[20]    A: It looks familiar.
[21]    Q: Do you recall receiving a request for
[22] documents from Bayer directed towards the Plaintiffs
[23] in this case?
[24]    A: Please repeat.

Page 75

[1]    Q: Do you recall receiving a request of
[2] documents from Bayer directed to the Plaintiffs in
[3] this case asking the Plaintiffs to produce various
[4] types of documents?
[5]    A: Yes.
[6]    Q: To your knowledge, did each Plaintiff
[7] obtain a copy of that request?
[8]    A: I'm not sure.
[9]    Q: Did you receive a copy of the request?
[10]    A: I believe so.
[11]    Q: And upon receipt of the copy of the
[12] request, what, if anything, did you do to comply
[13] with the request?
[14]    A: I'm really confused.
[15]    Q: Let me see if I can break it down. Do you
[16] remember Bayer sending a document asking that
[17] certain documents be produced by the Plaintiffs to
[18] Bayer?
[19]    A: Yes. I think those were things that
[20] Steve —
[21]    Q: When —
[22]    MR. ROACH: Let him answer.
[23]    "That Steve" what?
[24]    A: That my lawyer would be asking for certain

Page 76

[1] documents. And I was aware that he was requesting
[2] certain documents from Bayer. That I am well aware
[3] of.
[4]    Q: You are aware that your attorney asked
[5] Bayer to give documents to him?
[6]    A: Right.
[7]    Q: Are you also aware that Bayer asked the
[8] Plaintiffs to provide documents to Bayer?
[9]    A: Yes.
[10]    Q: And when you became aware of that request,
[11] did you undertake a search for documents?
[12]    MR. ROACH: Him personally?
[13]    MR. WELSH: I am asking him personally now.
[14]    A: I didn't find anything.
[15]    Q: Did you look for things?
[16]    A: Yes.
[17]    Q: Tell me what you looked for.
[18]    MR. ROACH: Objection. Go ahead.
[19]    A: I just looked for any old correspondence
[20] and things like that that I might have had, that I
[21] thought I might have.
[22]    Q: In the search, did you come across a copy
[23] of Exhibit 5, the benefit booklet?
[24]    A: I really found very little, because I

Page 77

[1] looked through some of my stuff and I either
[2] misplaced it or I threw it out. But I was not able
[3] to produce that.
[4]    Q: Did you look at home?
[5]    A: Yes. I had some boxes of junk, and I tried
[6] to see if I had anything. But I've got stuff in the
[7] attic. I just looked. I didn't —
[8]    Q: Did you look through every place at home
[9] where you thought it possibly could be?
[10]    A: I looked in as many places as I thought it
[11] could be. But I've got a garage, I've got an attic,
[12] I've got a basement.
[13]    Q: Did you look in all of those places?
[14]    A: No.
[15]    Q: Are you aware of what actions, if any,
[16] other employees undertook to see if they had any
[17] documents?
[18]    A: Other employees did, yes.
[19]    Q: All of them?
[20]    A: I'm not sure if all. Some employees did
[21] present —
[22]    Q: For example, Exhibit 5, the booklet, do you
[23] know how many employees had a copy of that?
[24]    A: No, I do not.

Page 78

[1]   **Q:** Do you know if any employees have a copy of
[2] that other than Jeanne?
[3]   **A:** Not that I know of.
[4]   **Q:** I showed you a copy earlier of a letter
[5] from EFTC, I think Mr. Dolan's letter.
[6]   **A:** I believe I saw that at one of the
[7] meetings. I do remember I sat next to Dave.
[8]   **Q:** Did you have a copy of a similar letter at
[9] your home?
[10]   **A:** Not to my knowledge.
[11]   **Q:** Do you know if any other employees other
[12] than Dave had found copies of this letter?
[13]   **A:** Dave had it, and we did not pursue it any
[14] further.
[15]   **Q:** What do you mean by that?
[16]   **A:** Well, Dave — I know Dave had a letter
[17] similar.
[18]   **Q:** Do you know of any other employees, 63
[19] Plaintiffs, that had a copy of the letter?
[20]   **A:** Not that I can attest to.
[21]   **MR. WELSH:** You want to take a break? It
[22] is going to take me about three minutes to move on
[23] to my next topic, so this is a good time.
[24]     (Recess taken)

Page 79

[1]                  **BY MR. WELSH:**
[2]   **Q:** I am going to ask you, sir — I am going to
[3] spend most of my time for now on Exhibit 10, answers
[4] to interrogatories. On Page 2, the second paragraph
[5] down, this paragraph begins, "Until about
[6] mid-September 1998." Sir, do you know whether or
[7] not the transformation from Bayer employment to EFTC
[8] employment actually happened on September 1, 1998?
[9]   **MR. ROACH:** Objection. That's been asked
[10] and answered, but go ahead.
[11]   **A:** For whatever reason, I thought it was after
[12] September 1st. I thought there was some sort of
[13] glitch. I can't remember exactly, but I thought it
[14] was later than September 1st.
[15]   **Q:** The second sentence of that paragraph, it
[16] says, "At that time, each Plaintiff was a plan
[17] participant vested in the Severance Pay Plan." What
[18] is your understanding of what the word "vested"
[19] means in that sentence?
[20]   **A:** Again, to the best of what I can remember,
[21] it meant that each individual had enough years
[22] service that they would be able to get some sort of
[23] a severance pay.
[24]   **Q:** Have you ever understood "vested" to mean

Page 80

[1] that you had a right that could not be changed?
[2]   **MR. ROACH:** Objection. That's a legal
[3] question, I believe.
[4]   **MR. WELSH:** Well —
[5]   **MR. ROACH:** He gave you his understanding
[6] of what he thought he meant.
[7]   **MR. WELSH:** And I am probing that
[8] understanding, Steve.
[9]   **A:** My understanding is the word "vested" means
[10] that that's something you have coming to you. Like
[11] if I am in a pension plan, I am vested in that, or I
[12] have a 401(k) — again, I am not an attorney, but
[13] that's my understanding of the meaning of the word.
[14]   **Q:** When do you believe that you became vested
[15] in the severance plan?
[16]   **A:** I believe sometime in the '80s.
[17]   **Q:** Now, when your job — when you left Bayer's
[18] employment and started with EFTC employment, was
[19] that in the same location that you had worked in at
[20] Bayer?
[21]   **A:** Yes.
[22]   **Q:** So the new job with EFTC was within 35
[23] miles of your Bayer job?
[24]   **A:** Say that again.

Page 81

[1]   **Q:** If you turn to Page 4, the first full
[2] paragraph starting, "A 'comparable position' under
[3] the plan definition of such means the new job is no
[4] further than 35 miles away from the prior location."
[5] Do you see that much?
[6]   **A:** Yes.
[7]   **Q:** Your job with EFTC, was it within 35 miles
[8] of where your Bayer job was?
[9]   **A:** I'm not sure how to answer that because I
[10] believe that this applies to if I was transferred
[11] within the —
[12]   **Q:** I am just asking you, when you went to work
[13] for EFTC, was it in the same location —
[14]   **A:** Yes.
[15]   **Q:** — as Bayer?
[16]   **A:** Yes.
[17]   **Q:** That's all I needed to know.
[18] During your tenure with Bayer prior to the
[19] EFTC deal, how many times had Bayer sold an
[20] operation to another company?
[21]   **MR. ROACH:** Objection.
[22]   **A:** I don't know.
[23]   **Q:** Do you know any time they sold an operation
[24] to another company?

Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 82

[1] **A:** I don't know exactly. I remember something
[2] happening with — again, I can't attest to it
[3] because I'm not sure. There was something, I think
[4] the paint shop, but I'm not sure.
[5] **Q:** Now, for instance, with Compugraphics, are
[6] you aware of Compugraphics ever selling an operation
[7] or business function to another company?
[8] **MR. ROACH:** Objection.
[9] **A:** I don't know.
[10] **Q:** Until the EFTC deal, do you know of any
[11] circumstances during which employees were let go
[12] from Bayer and hired by a company who had acquired
[13] assets from Bayer and received severance pay?
[14] **MR. ROACH:** Objection.
[15] **A:** I don't know.
[16] **Q:** Other than the model shop, which I
[17] understand is something which happened after the
[18] EFTC sale, other than the model shop are you aware
[19] of any circumstance under Bayer or any of its
[20] predecessors whereby employees received severance
[21] pay when part of the business was sold?
[22] **MR. ROACH:** Objection. I think it was the
[23] machine shop.
[24] **A:** It was the machine shop.

Page 83

[1] **Q:** The machine shop.
[2] **A:** I think the model shop was sold after, but
[3] I'm not sure. Were there any other operations —
[4] **Q:** Yes.
[5] **A:** — that were —
[6] **MR. ROACH:** Objection.
[7] **A:** To the best, I believe the incoming
[8] inspection. There were several other departments.
[9] And I think — again, I believe it's where they did
[10] the tools and stuff like that. It was some sort of
[11] inspection shop. I believe something to do with
[12] shipping, receiving. And there may have been others
[13] that I can't recollect.
[14] **Q:** With respect to the inspection shop, what
[15] is your understanding of what happened there?
[16] **A:** Again, my understanding was that they — I
[17] don't remember exactly the details of that. I know
[18] they all received benefits. They all received their
[19] severance package.
[20] **Q:** Do you know if they were hired by the
[21] incoming company?
[22] **A:** I thought so.
[23] **Q:** Can you name a couple of employees who
[24] would have been in that situation?

Page 84

[1] **A:** I'm sure I will remember. I know there
[2] was — I can't remember the guy's name.
[3] **Q:** When —
[4] **MR. ROACH:** Give him a second.
[5] **A:** Let me think if I can remember his name. I
[6] have just drawn a blank on that. I will have to try
[7] to remember.
[8] **Q:** When did this occur?
[9] **A:** Sometime after ours.
[10] **Q:** Do you recall any circumstances prior to
[11] yours where certain business operations were sold to
[12] a different company, employees were hired by that
[13] company but they received severance pay from Bayer?
[14] **MR. ROACH:** Objection. Go ahead.
[15] **A:** Not to my recollection.
[16] **Q:** Prior to your accepting employment with
[17] EFTC, are you aware of any circumstance where Bayer
[18] paid severance pay to employees who were not laid
[19] off?
[20] **MR. ROACH:** Objection. Go ahead.
[21] **A:** That were not laid off? I believe that
[22] everybody was laid off. I believe — well,
[23] actually, there were periods of time where Bayer
[24] knew the business conditions were changing, they

Page 85

[1] might let people know that there might be an
[2] impending RIF, and volunteers were taken.
[3] **Q:** There were circumstances —
[4] **MR. ROACH:** Let him finish.
[5] **Q:** Let me cut it here. There were
[6] circumstances where people volunteered for layoff
[7] and received severance pay; is that right?
[8] **A:** Yes.
[9] **Q:** And there were times when people were laid
[10] off and received severance pay?
[11] **A:** Yes.
[12] **Q:** Do you remember any circumstances during
[13] your tenure at Bayer where employees had secured
[14] jobs with another company and experienced no period
[15] of unemployment but nevertheless got severance pay
[16] from Bayer?
[17] **A:** Not exactly. I do know that there were
[18] people that would try to — knew that there was
[19] going to be a RIF or something like that coming up.
[20] They would volunteer or have something that was a
[21] pending job or they might have something they were
[22] pursuing or they might be going into their own —
[23] not necessarily their own business but something on
[24] the side and they would take that as an opportunity.