Case 1:04-cv-10728-WGY   Document 42-25   Filed 01/17/2007   Page 1 of 21

Vincent S. Fiorilla                                    Joseph Pagano, et al.   v.
Vol. 1, April 21, 2006                                      Bayer Corporation, et al.

Page 86

[1] And there was no discrimination, if you will, in
[2] terms of, "Well, you can't do this" or "You can't do
[3] that." You could just volunteer. And it was
[4] basically a benefit that you could take if the
[5] company was in that situation.
[6]   Q: Could you name one person that had a job
[7] starting immediately the day after their last day at
[8] Bayer who received severance pay?
[9]   A: I probably couldn't name a person. But if
[10] given the time, I could probably produce it.
[11]   Q: Are you aware of any circumstances in which
[12] employees, while they were at Bayer, were offered
[13] jobs by a company acquiring Bayer assets and
[14] received severance pay?
[15]   A: You mean prior to —
[16]   Q: Prior to the EFTC.
[17]   A: Not to my knowledge.
[18]   Q: You talked about shipping and receiving.
[19]   A: That was after — I think the paint shop,
[20] I'm not sure of the circumstances of the paint shop,
[21] but that could be a question that might be asked of
[22] people in the know. That was before — the paint
[23] shop — Ed Hogan. I remember Ed Hogan was in charge
[24] of — I can't remember. It was just down the street

Page 88

[1]   A: I'm not sure who the representatives were.
[2]   Q: It says "advised the Plaintiffs." Can you
[3] tell me which of the Plaintiffs this refers to?
[4]   A: Again, the only thing I remember of this
[5] was that there was a document that indicated that it
[6] was important to have the people, plus the fact
[7] that — (Reviewing document).
[8]   MR. ROACH: Read silently.
[9]   A: I guess it was pretty much implied in the
[10] meetings about the importance of having the people
[11] and that it was also stipulated, I believe, by
[12] Norm — I can't be 100 percent sure, but I believe
[13] Norm said it to me, and it might have even been Dick
[14] Ramsden who might have mentioned it, that this whole
[15] deal was hinging upon the importance of having the
[16] people and the skills of people going over.
[17]   Q: But, again, this talks of representatives
[18] of EFTC. Neither Norm nor Ramsden were
[19] representatives of EFTC. You don't know who this
[20] refers to?
[21]   A: Not exactly.
[22]   Q: If you look down on the same page in
[23] Section 2(a), four lines down, there's a sentence
[24] that states, "Bayer advised the Plaintiffs that they

Page 87

[1] from us, and it was a paint shop in there and
[2] something else. I think it was a machine shop. And
[3] I believe Ed Hogan bought the — again, someone else
[4] in the know would have that information.
[5]   MR. ROACH: Tell him what happened.
[6]   A: And I believe they received severance and
[7] then went with Ed Hogan.
[8]   Q: When Ed Hogan did this, what was the name
[9] of the company who employed you? Was it Bayer,
[10] Miles, Agfa, Compugraphics?
[11]   A: I don't remember exactly.
[12]   Q: Can you tell me roughly the calendar year
[13] that that happened?
[14]   A: I just can't remember. That was a while
[15] ago. I do know that.
[16]   Q: Will you turn to Page 5. Four lines down
[17] there's a sentence that begins, "Representatives of
[18] EFTC advised the Plaintiffs that EFTC would not have
[19] entered into the contract with Bayer to purchase
[20] certain of Bayer's assets if the Plaintiffs had not
[21] indicated a willingness to be employed by EFTC after
[22] Bayer terminated their employment."
[23]   Can you tell me who the representatives of
[24] EFTC are that are referenced in this sentence?

Page 89

[1] were terminated and were told that a job with EFTC
[2] would be available." Who at Bayer advised employees
[3] that they were terminated?
[4]   A: I believe it was Norm, Dick Ramsden. It
[5] may have been Mary Leonard also.
[6]   Q: Did these people say, "You are terminated"?
[7]   A: That's what I understood.
[8]   Q: They didn't say, "You will be terminated"?
[9]   MR. ROACH: Objection. You mean at the
[10] meeting?
[11]   MR. WELSH: No.
[12]   Q: I am saying Bayer advised the Plaintiffs
[13] that they were terminated. It seems that the tense
[14] of that means — was it a prediction that you will
[15] be terminated, or did they tell you "You are
[16] terminated"?
[17]   A: I don't remember exact words.
[18]   Q: And you were told that a job with EFTC
[19] would be available?
[20]   A: Yes.
[21]   Q: The next line says, "Bayer needed the
[22] Plaintiffs to accept the job with EFTC to make the
[23] asset sale work." Do you see that?
[24]   A: Yes.

Joseph Attardi, et al. v.
Bayer Corporation, et al.
Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2007    Page 2 of 21
Vincent S. Fiorilla
Vol. 1, April 21, 2006

Page 90

[1]    **Q:** So your understanding is that the
[2] Plaintiffs had accepted a job with EFTC prior to the
[3] transaction being culminated?
[4]    **MR. ROACH:** Objection.
[5]    **A:** Can you repeat that, please?
[6]    **Q:** Yes. Is it your understanding that the
[7] Plaintiffs had accepted a job with EFTC before the
[8] transaction with Bayer was finalized?
[9]    **MR. ROACH:** Objection.
[10]    **A:** I am not 100 percent sure. I think the
[11] actual —
[12]    **MR. ROACH:** Go ahead.
[13]    **A:** I think the acceptance was when we actually
[14] signed. That's what I recollect, when we actually
[15] physically signed the papers.
[16]    **Q:** Do you know for certain whether you signed
[17] the papers before or after the transaction
[18] concluded?
[19]    **A:** Again, the best I can remember, it was
[20] after, but I am not 100 percent sure.
[21]    **Q:** If I showed you the papers and the papers
[22] indicated it was before, would the papers be the
[23] best indication?
[24]    **MR. ROACH:** I am going to object.

Page 91

[1]    **MR. WELSH:** Noted.
[2]    **Q:** Please answer.
[3]    **MR. WELSH:** That's fine. He can answer it.
[4]    **A:** Again, I am just going on my memory.
[5]    **Q:** If I were to present to you your personnel
[6] file at EFTC and the signed documents were there and
[7] the signed documents indicated a date prior to the
[8] transaction closing, would those documents be the
[9] best indication of when you —
[10]    **MR. ROACH:** I am going to instruct him not
[11] to answer that question unless you show him the
[12] documents.
[13]    **MR. WELSH:** That's an improper instruction.
[14] You know it is an improper instruction. You only
[15] get to instruct him not to answer privileged
[16] questions.
[17]    **MR. ROACH:** That's not true. I'll tell you
[18] what I will do. I am going to object. Go ahead and
[19] answer the question.
[20]    **A:** To the best of my knowledge, it was after.
[21] If someone showed me that, then I'd have to take a
[22] good hard look at that, verify it was my signature.
[23] If it was my signature, then I would have to
[24] conclude that it was.

Page 92

[1]    **Q:** When you signed those papers, you didn't
[2] put an incorrect date on them purposefully, did you?
[3]    **MR. ROACH:** I object.
[4]    **A:** Purposefully?
[5]    **Q:** Yes, purposefully.
[6]    **A:** No.
[7]    **Q:** On the bottom of — the last sentence on
[8] Page 5 going onto Page 6, "As part of their
[9] negotiations leading up to the sale, Bayer and EFTC
[10] agreed that Bayer would falsely advise the
[11] Plaintiffs that the Plaintiffs' compensation and
[12] benefits, including the severance benefits, would
[13] remain the same if the Plaintiffs agreed to work for
[14] EFTC."
[15]    What is the basis of your belief that Bayer
[16] and EFTC agreed that Bayer would falsely advise
[17] Plaintiffs that compensation and benefits, including
[18] severance benefits, would remain the same?
[19]    **A:** I guess it is implied.
[20]    **Q:** Implied from what, sir?
[21]    **A:** Because of the meetings that we had that
[22] told us that this was going to be such a great deal
[23] for us, that the benefits would be comparable and in
[24] some cases better, that the history has told us that

Page 93

[1] Bayer had never, or anybody, whether it be
[2] Compugraphics or whoever the owner was, no one had
[3] ever lied to us, no one had falsely represented what
[4] benefits would be or that we would be in a better
[5] situation. So it seems to me that when you sit down
[6] and you look at what the Bayer plan was in terms of
[7] what was available and what the EFTC plan was, I
[8] mean, you can't even say that they are in the same
[9] league. They are totally different to the negative
[10] to the employees.
[11]    **Q:** No one ever used the word "same" in
[12] describing the benefits between the two companies,
[13] did they?
[14]    **MR. ROACH:** Objection.
[15]    **A:** I don't remember if "the same." I don't
[16] remember if the word "exactly same" was said. I do
[17] remember that it was implied that "You are going to
[18] have at least what you had before." And I am
[19] talking now about a package. I am saying to you,
[20] "Here's your compensation package. This is what you
[21] are going to have. There may be a little here, a
[22] little there. But you, as an individual, are going
[23] to be better off because we are going to offer you a
[24] better job, you are going to have a chance to grow."

Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2007    Page 3 of 21

Vincent S. Fiorilla                                    Joseph Award et al.    v.
Vol. 1, April 21, 2006                                 Bayer Corporation, et al.

Page 94

[1] So you look at things in total. So that's my
[2] understanding.
[3]    Q: Earlier you used the word "comparable,"
[4] that when people talked to you, they said they were
[5] going to be comparable; is that right?
[6]    A: Or in some cases better.
[7]    Q: In your mind, is the word "comparable"
[8] equal to the word "same"?
[9]    MR. ROACH: Objection.
[10]    A: Again, when I looked at it in a total
[11] package, I thought, again, with opportunities and
[12] everything else, that we would probably be better
[13] off.
[14]    Q: Other than what you have just described, do
[15] you have any other basis whatsoever for the sworn
[16] statement in this interrogatory answer that Bayer
[17] and EFTC agreed that Bayer would falsely advise
[18] Plaintiffs that the Plaintiffs' compensation
[19] benefits, including severance benefits, would remain
[20] the same?
[21]    A: Again, I just — they said all of these
[22] things to us. They talked about the win-win. They
[23] talked about how you were going to be better off,
[24] how your career was going to be better off, how your

Page 95

[1] job position was going to be better off. To me,
[2] that means that someone told you something that was
[3] untrue.
[4]    Q: Who at Bayer and who at EFTC reached this
[5] agreement during negotiations?
[6]    MR. ROACH: Objection.
[7]    A: I don't know. All I know is from what was
[8] said —
[9]    Q: What —
[10]    MR. ROACH: Let him finish the answer.
[11]    A: All I know is what was said in the meetings
[12] and implying the importance of us and all of that,
[13] that we would be better off.
[14]    Q: You knew that medical insurance was
[15] different, didn't you?
[16]    MR. ROACH: Objection. When?
[17]    A: Again, we looked at — at least from me, we
[18] looked at things as a general. We looked at it as a
[19] package. We looked at what we had before. We
[20] looked at the track record. So you make the
[21] assumption that — again, you start it over here.
[22] Everything was on a progression. Everything was
[23] better. Someone who you trust tells you that you
[24] are going to be better off, it's a win-win

Page 96

[1] situation. I don't know how you could think of it
[2] any other way. Maybe I am naive, which is probably
[3] true, but that's what I honestly thought, me
[4] personally and me with the group, because I had to
[5] sell this to the group.
[6]    Q: What discussion was there of the EFTC
[7] severance benefits before the transaction?
[8]    A: None that I know of.
[9]    Q: Fair to say that no one told you that the
[10] EFTC severance benefits would be the same as the
[11] Bayer severance benefits?
[12]    MR. ROACH: Objection.
[13]    A: Not exactly.
[14]    Q: Did anyone tell you?
[15]    A: No one sat down specifically and said, "You
[16] are going to have this benefit, you are going to
[17] have this benefit and you are going to have this
[18] benefit." Again, it was a package deal which you
[19] believe that everything in there is going to be
[20] better, that you are going to be in a better
[21] position. Maybe everything isn't going to be exact,
[22] but overall it is going to be better.
[23]    *Q. Did anyone talk to you at the time of the
[24] EFTC transaction about how the salaries of the Bayer

Page 97

[1] printed circuit board operation employees compared
[2] generally with people performing those functions in
[3] the industry?
[4]    MR. ROACH: Objection. Go ahead.
[5]    A: Say that again, please.
[6]    MR. WELSH: Please repeat that.
[7]    *(Question read)
[8]    A: Do you mean before or after the transition?
[9]    Q: Immediately before the transaction, in the
[10] three to six months immediately prior to the
[11] transaction.
[12]    A: Not that I remember.
[13]    Q: Did anyone ever tell you in fact compared
[14] to your peers in the industry your salaries were
[15] higher?
[16]    MR. ROACH: Objection. You can answer.
[17]    A: That information was definitely indicated
[18] to us — that I remember, okay. I remember that
[19] being said or implied after the transition occurred,
[20] again, as I said before, about the process of
[21] learning things, that we learned that our salaries
[22] or our — the rates were really up higher so that
[23] there wouldn't be any growth versus when we were at
[24] Bayer. Bayer was very honest before, and they would

Joseph Attardi, et al.
Bayer Corporation, et al.

Case 1:04-cv-10728-WGY     Document 42-25     Filed 01/17/2007     Page 4 of 21

Vincent S. Florida
Vol. 1, April 21, 2006

Page 98

[1] indicate to us what the salary ranges were, what the
[2] both hourly and salary so you knew what quadrant you
[3] were in, what raises you would be eligible for. And
[4] most of the people still had room to get raises.
[5]     *Q. At the time immediately prior to the
[6] transaction, did anyone tell you that Bayer was
[7] pleased with this because it was able to secure jobs
[8] for its employees in the printed circuit board
[9] operation?
[10]    A: Say that again, please.
[11]    MR. WELSH: Please repeat it.
[12] *(Question read)
[13]    A: Again, to the best of my knowledge, I
[14] believe that that statement is true, that they — it
[15] was told to us that this was a good deal, it was a
[16] good deal for EFTC, it was a good deal for the
[17] employees and everybody was going to have a win-win
[18] situation. So we definitely were high on the idea
[19] of this transaction being very good for everybody.
[20]    Q: If you look at the footnote on the bottom
[21] of Page 6, it says, "Bayer sold the 'Model/Machine
[22] Shop' part of its EPS Operations to another company,
[23] Olympic." Do you see that?
[24]    A: Yes, I do.

Page 99

[1]    Q: Was it Bayer who sold the model machine
[2] shop operation?
[3]    A: I thought so.
[4]    Q: In fact was it Agfa Corporation?
[5]    A: I'm not sure.
[6]    Q: Do you know when Agfa took over from Bayer?
[7]    A: No, I don't, not exactly when.
[8]    Q: Do you know any of the details of the
[9] transaction between Agfa and Olympic?
[10]    MR. ROACH: Objection. What do you mean by
[11] "details"?
[12]    Q: Any of the terms —
[13]    MR. ROACH: Objection.
[14]    Q: — of the transaction.
[15]    MR. ROACH: Objection. Go ahead.
[16]    A: All I know, again from my knowledge, is
[17] that the machine shop was sold to Olympic and that
[18] the employees were given a severance and that they
[19] received the job with the new company.
[20]    Q: Do you know whether or not the employees
[21] had been offered a job at the new company as part of
[22] the transaction with Olympic?
[23]    A: I believe it was.
[24]    Q: What is the basis for your information?

Page 100

[1]    THE WITNESS: Can I have one second?
[2]    MR. ROACH: If you don't mind. There's a
[3] question pending.
[4]    MR. WELSH: I am giving wide latitude with
[5] respect to this. Go ahead.
[6]    THE WITNESS: Thank you.
[7]    (Recess taken)
[8]                   BY MR. WELSH:
[9]    A: It was Bert.
[10]    Q: Bert who?
[11]    A: Bert Guilmette.
[12]    MR. GUILMETTE: Not Richard.
[13]    Q: Any other source for that information?
[14]    A: Primarily Bert was the primary source.
[15]    Q: If you go to the bottom of Page 6 under
[16] (b), "Oral representations," it says, "Shortly
[17] before Bayer terminated the Plaintiffs' employment,
[18] Plaintiffs claimed to Bayer that, if Bayer
[19] terminated them, then Plaintiff was required by the
[20] Bayer Plan to pay them severance benefits." Is that
[21] true?
[22]    A: To the best of my knowledge, yes.
[23]    Q: When you say "Plaintiffs," specifically
[24] which Plaintiffs?

Page 101

[1]    A: Again, I can't recollect the names, but
[2] there were several of the employees at the meetings
[3] that indicated that they had asked that question and
[4] were given that answer.
[5]    Q: And as you sit here today, can you identify
[6] any of these employees?
[7]    A: I can't.
[8]    Q: Now, when you say — did these employees
[9] indicate that they asked the question in the group
[10] meeting you described earlier?
[11]    A: Again, to the best of my recollection, a
[12] question was asked at the group meeting, and I
[13] believe Rodney Willis answered it. And I think
[14] there were a couple of employees that asked
[15] different management team people, I think primarily
[16] either Norm or Dick Ramsden.
[17]    Q: You used the word "asked." You notice that
[18] this sentence says, "Plaintiffs claimed to Bayer
[19] that, if Bayer terminated them, that Bayer was
[20] required." You notice this is not as a question but
[21] as a statement of fact, at least as stated in the
[22] first paragraph here on Page 6, first sentence under
[23] (b). Are you aware of any Plaintiffs who stated a
[24] belief to management in 1998 that they were entitled

Page 102

[1] to severance pay?

[2] **MR. ROACH:** Objection. Go ahead.

[3] **A:** Again, to the best of my recollection, they

[4] asked but they felt they were entitled to that

[5] benefit.

[6] **Q:** And as you sit here today, you can't

[7] specifically identify any individual Plaintiff who

[8] asked?

[9] **A:** No. But I'm sure we could produce that for

[10] you.

[11] **Q:** It says, "Bayer responded by orally denying

[12] Plaintiffs' claim for severance benefits." Who

[13] specifically for Bayer responded?

[14] **A:** Rodney Willis was one.

[15] **Q:** That was at the group meeting?

[16] **A:** Yes.

[17] **Q:** Other than Rodney's response to the

[18] question at the group meeting, anyone else?

[19] **A:** To the best of my recollection, I believe

[20] Dick Ramsden and Mary Leonard.

[21] **Q:** But as you sit here today, you cannot

[22] identify the individuals who Mr. Ramsden or Ms.

[23] Leonard spoke with on this topic?

[24] **MR. ROACH:** Objection.

Page 103

[1] **A:** That is correct. But I would say that we

[2] could produce that.

[3] **Q:** You see here it says, "In doing so," if you

[4] turn the page, "Bayer," it says first, second and

[5] third. Is it your testimony that Rodney Willis went

[6] through all the statements listed in "First," "Then"

[7] and "Finally" in responding to the question at the

[8] group meeting?

[9] **A:** I cannot remember that.

[10] *Q. Can you tell me when in 1998 anyone from

[11] Bayer made the statements reflected in "First,"

[12]    "Then," and "Finally"?

[13] **MR. ROACH:** Objection. You mean right at

[14] the same meeting, in the same sentence?

[15] *Q. In 1998 when anyone at Bayer made these

[16] statements.

[17] **MR. ROACH:** I think he already testified to

[18] that. But go ahead.

[19] **MR. WELSH:** I don't believe so.

[20] **A:** This is out of the — (Reviewing document)

[21] **MR. ROACH:** I am going to object. Go

[22] ahead.

[23] **A:** Again, this is out of the summary. Can you

[24] repeat that, please?

Page 104

[1] *(Question read)

[2] **A:** All I can remember distinctly is that we

[3] would not be eligible to the severance. I don't

[4] remember anybody specifically verbatim saying this.

[5] **Q:** Okay. Let's look under "Then." All right?

[6] It states, "falsely stated that the Bayer/EFTC

[7] transaction involved (a) Bayer selling the Board

[8] Shop department to EFTC, with, (b) EFTC offering

[9] each Plaintiff continuing employment in a comparable

[10] (i.e. the same) position and comparable (i.e. the

[11] same) employment benefits, including severance

[12] benefits."

[13] What was meant here by "comparable (i.e.

[14] the same)"?

[15] **A:** Again, as I had spoken before, we all

[16] thought that this was a package that we would be in

[17] a much better state or situation. So I guess we

[18] implied we'd be at least where we were and hopefully

[19] we would actually be better off.

[20] *Q. Again, no one from Bayer told you that you

[21] were going to — expressly, specifically no one from

[22] Bayer prior to this transaction told you you would

[23] receive the same employment benefits, including

[24] severance benefits?

Page 105

[1] **MR. ROACH:** Objection. Are you talking

[2] about him one-on-one?

[3] **MR. WELSH:** Yes, first.

[4] *Q. You one-on-one.

[5] **A:** Fine.

[6] **MR. ROACH:** Go ahead. Objection. I think

[7] we have gone through this.

[8] **A:** Please repeat.

[9] *(Question read)

[10] **MR. ROACH:** Objection. Go ahead.

[11] **A:** Nobody sat down and said, "You are going to

[12] get everything exactly the same." But it was

[13] clearly implied in the meetings that we were going

[14] to be better off than we were today, that as a

[15] package, and that was expressly said by Mr. Ramsden,

[16] that you were going to be better off, that this was

[17] a win-win situation. So I guess nobody said

[18] verbatim it was going to be like this. But when you

[19] looked at everything you were going to get, you

[20] would be better off than you are today.

[21] **Q:** After the "First," "Then," and "Finally,"

[22] you see it says, "When the Plaintiffs questioned

[23] Bayer's claim that EFTC was offering each Plaintiff

[24] words, to the effect, of a comparable or same

Page 106

[1] position," what Plaintiffs are you referring to
[2] there?
[3]     MR. ROACH: Objection, asked and answered,
[4] but go ahead.
[5]     MR. WELSH: It is the first time I am on
[6] this paragraph. I don't see how it could be asked
[7] and answered.
[8]     MR. ROACH: I think you asked the same
[9] question, not this paragraph, but it was basically
[10] the same question. Go ahead. He can answer.
[11]     THE WITNESS: Let me answer the question.
[12]     MR. ROACH: I am going to object, but go
[13] ahead.
[14]     A: Basically this is part and parcel of all
[15] that has been said before with the meetings, that it
[16] would be a win-win. This came from Dick Ramsden and
[17] from Michael Paige.
[18]     Q: But here it says, "employees questioned
[19] Bayer's claim that EFTC was offering each Plaintiff
[20] words, to the effect, of a comparable or same
[21] position." What Plaintiffs challenged Bayer as to
[22] whether or not the position being offered was
[23] comparable?
[24]     MR. ROACH: Objection. I don't think the

Page 107

[1] word "challenged" was in there.
[2]     MR. WELSH: "Questioned." Please strike
[3] that. I am going to ask another question.
[4]     Q: What Plaintiffs specifically questioned
[5] Bayer's claim that EFTC was offering each Plaintiff
[6] a comparable or same position?
[7]     A: Again, this was brought up at the meeting.
[8]     Q: I believe at the meeting you said a
[9] question was asked "whether we get severance pay."
[10]     A: That was one of the questions. And to make
[11] people feel more comfortable with the situation, it
[12] was brought up again that this was going to be a
[13] win-win situation. This was drummed in like a
[14] drumbeat.
[15]     Q: Plaintiffs —
[16]     MR. ROACH: Let him finish the answer.
[17]     Q: Finish the answer.
[18]     A: And again, this was just something that was
[19] kind of drumbeat into us, that it was going to be
[20] this win-win situation and that we would be in a
[21] better position. And a couple of people, when they
[22] asked question, the answer was, "Hey, we can't say
[23] this and this. But as in general, you are going to
[24] get comparable things, some better. It's a win-win

Page 108

[1] situation." It really was kind of like a drumbeat
[2] that we were told at these meetings. Maybe I am
[3] misunderstanding you.
[4]     Q: This is talking about questioning whether
[5] employees would get a comparable or same position.
[6] Do you see that? It says "a comparable or same
[7] position." Did any Plaintiffs question Bayer as to
[8] whether or not they would receive the same or
[9] comparable position at EFTC, not benefits, position?
[10]     MR. ROACH: Objection.
[11]     A: But I believe that was asked at the meeting
[12] and it was told that we would receive comparable
[13] or we'd have — the job? You are talking
[14] specifically jobs, right?
[15]     Q: Comparable or same position?
[16]     A: Yes.
[17]     Q: Was it more than one person who asked at
[18] the meeting?
[19]     A: I can't recollect that.
[20]     Q: Other than the group meeting, did any
[21] individual Plaintiffs make that inquiry of Bayer?
[22]     A: I'm not sure.
[23]     Q: The next line says —
[24]     MR. ROACH: When you say "individual," you

Page 109

[1] are talking about an individual one-on-one meeting?
[2]     MR. WELSH: Plaintiff. He is a class
[3] representative. Instead of dragging every one of
[4] the Plaintiffs in, I am taking the deposition of the
[5] representatives with the hope and expectation that
[6] they can tell me if there are other people that they
[7] were referring to, first, when they signed this
[8] interrogatory, and second, whether there are other
[9] witnesses to the case that had conversations that I
[10] need to depose. That's my issue here.
[11]     MR. ROACH: I understand.
[12]     Q: Part of the same sentence, it goes on,
[13] "Bayer specifically promised Plaintiffs that EFTC's
[14] benefits would be at least as good and in many cases
[15] better than Bayer's benefits." When you say "Bayer
[16] specifically promised," what specific Bayer
[17] representative made that promise?
[18]     MR. ROACH: Objection. Go ahead.
[19]     A: Again, to the best of my remembrance, it
[20] was Dick Ramsden and I believe Michael Paige.
[21]     Q: You believe both?
[22]     A: I believe both.
[23]     Q: And the term that they used was "at least
[24] as good and in many cases better"?

Vincent S. Fiorilla
Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2006    Joseph Attardi, et al.  v.
Vol. 1, April 21, 2006                                              Bayer Corporation, et al.

Page 110

[1] **A:** I don't remember exactly. I do remember
[2] "better."
[3] **Q:** But do you recall either Ramsden or Paige
[4] making specific reference to severance benefits?
[5] **A:** Other than the denial? Do you mean in
[6] terms of comparing it to —
[7] **Q:** Again, when Ramsden and Paige made
[8] statements about win-win situation, the benefits
[9] were comparable and in many cases better, was there
[10] specific mention by either Ramsden or Paige to
[11] severance benefits?
[12] **A:** No, not that I remember. They did not talk
[13] specifics of any of the benefits generally. It was
[14] more of a general statement.
[15] **Q:** The next paragraph says, "When the
[16] Plaintiffs questioned Bayer's basis for making the
[17] promise, Bayer told Plaintiffs that, in essence, the
[18] Plaintiffs had two choices, either accept employment
[19] with EFTC or they would be deemed to be voluntarily
[20] leaving their employments and not be eligible for
[21] unemployment insurance benefits. Either way, the
[22] Defendants told Plaintiffs the Plaintiffs wouldn't
[23] receive any benefits."
[24] It makes reference to "the Defendants."

Page 111

[1] Who are you referring to there?
[2] **MR. ROACH:** I think you left out a couple
[3] of words, "unemployment" and "severance."
[4] **MR. WELSH:** Okay. Please strike my entire
[5] question.
[6] **Q:** The paragraph reads, "When the Plaintiffs
[7] questioned Bayer's basis for making the promise,
[8] Bayer told the Plaintiffs that, in essence, the
[9] Plaintiffs had two choices, (1) either accept
[10] employment with EFTC or (2) they would be deemed to
[11] be voluntarily leaving their employment and then not
[12] be eligible for unemployment insurance benefits.
[13] Either way, the Defendants told the Plaintiffs the
[14] Plaintiffs won't receive severance benefits."
[15] Who are the Defendants referenced here?
[16] **A:** I believe this statement was made by Rodney
[17] Willis. And I remember the statement that we
[18] wouldn't receive unemployment and/or severance.
[19] That was at one of the meetings.
[20] **Q:** So you recall that he said you will not
[21] receive unemployment or severance?
[22] **A:** That is correct.
[23] **Q:** That was at a group meeting?
[24] **A:** I believe that to be true.

Page 112

[1] **Q:** Was the statement made by any other Bayer
[2] representative at any other time?
[3] **A:** I'm not sure of that.
[4] **Q:** Numbered Paragraph 3 on Page 8, it says,
[5] "In reliance on Bayer's statements, Plaintiffs
[6] accepted employment with EFTC." Is it your
[7] testimony that prior to the acceptance of employment
[8] with EFTC you never met and spoke with anyone at
[9] EFTC about their benefit package?
[10] **MR. ROACH:** Objection. Go ahead.
[11] **A:** You mean someone from EFTC?
[12] **Q:** Yes.
[13] **A:** To the best of my recollection, no.
[14] **Q:** When you first sat with EFTC, whenever that
[15] may have been, did they go over their benefits with
[16] you?
[17] **A:** I believe they went over some of the
[18] benefits. I don't remember exactly what benefits
[19] they went over. My thought process was not
[20] necessarily on the benefits but on moving over into
[21] this new job and the excitement of possibly maybe
[22] being in a better situation, so it was not something
[23] that I remembered.
[24] **Q:** On Page 8, first paragraph under Section 3,

Page 113

[1] last line states, "All of the Plaintiffs accepted
[2] employment with EFTC under the impression that among
[3] the comparable benefits with EFTC would be the
[4] severance benefits." Have you talked to all of the
[5] Plaintiffs?
[6] **A:** Have I talked to all of them personally?
[7] **Q:** Yes.
[8] **A:** No.
[9] **Q:** What is the basis for your belief that all
[10] of the Plaintiffs accepted employment under this
[11] impression?
[12] **A:** Through e-mails, correspondence and
[13] meetings.
[14] **Q:** But it says "all of the Plaintiffs." Did
[15] you receive information from all of the Plaintiffs
[16] that this was true, that each and every one of them?
[17] **MR. ROACH:** Objection. You can answer.
[18] **A:** To the best of my knowledge, all of the
[19] people that were at the meetings and that responded
[20] with e-mails and such did state that, but I cannot
[21] attest to all 63 categorically.
[22] **Q:** What were the severance benefits at EFTC
[23] for your first year of employment with that company?
[24] **A:** I really don't know.

Page 114

[1]  Q: Do you know whether they were comparable to
[2] Agfa for that first year?
[3]     MR. ROACH: Objection.
[4]  A: I didn't know at that time.
[5]  Q: Do you know now?
[6]  A: Yes, I do know now.
[7]  Q: For the first year of employment with EFTC,
[8] were they comparable to Agfa's?
[9]  A: No.
[10]  Q: How did they differ for that first year?
[11]  A: Again, to the best of my recollection, and
[12] again I just took a quick look at what the contract
[13] was, that I believe it was six months. If people
[14] were RIF within the first year, that they would
[15] receive six months. I believe that's what it was.
[16] I'm not sure. With Bayer, me personally, I would
[17] have received over 60 weeks severance.
[18]  Q: Was there a cap ever placed by Bayer on the
[19] amount of severance you could receive?
[20]  A: At the time of this transaction, I don't
[21] believe so.
[22]  Q: Do you know if there subsequently was?
[23]  A: No, I am not sure.
[24]  Q: Next sentence, paragraph beginning,

Page 115

[1] "Moreover, the Plaintiffs came to learn that Bayer
[2] misrepresented the terms of the sale of Agfa
[3] Division in that, under the Plan, all of the assets
[4] of the Division were not sold." Was it your
[5] understanding at the time of the EFTC transaction
[6] that EFTC was buying the entire Agfa division of
[7] Bayer?
[8]     MR. ROACH: Objection. Go ahead.
[9]  A: At the time, no. It was the operation. It
[10] was the printed circuit board assembly.
[11]  Q: So can you explain to me — did Bayer ever
[12] tell you prior to the sale that the entire Agfa
[13] Division was being sold to EFTC?
[14]  A: No.
[15]  Q: So can you explain to me what this sentence
[16] means, "Moreover, the Plaintiffs came to learn that
[17] Bayer misrepresented the terms of the sale of the
[18] Agfa Division in that, under the Plan, all of the
[19] assets of the Division were not sold"? What does
[20] that mean?
[21]  A: I guess what that means is that when we
[22] started to read about this particularly in a summary
[23] plan, that in terms of — let me rephrase that.
[24] When we were starting to compare what were the

Page 116

[1] reasons why we wouldn't have paid — wouldn't have
[2] received the severance, we read in the book that if
[3] the whole division was sold and that if it went
[4] under the new owner, that you wouldn't get — you
[5] may not be eligible for severance. And that's when
[6] we came to that understanding, that we were
[7] misrepresented here.
[8]  Q: But here it says, "Bayer misrepresented the
[9] terms of the sale." Did Bayer ever tell you that
[10] the sale was for anything other than the printed
[11] circuit board operation?
[12]  A: No.
[13]  *Q. So there was no misrepresentation about
[14] Bayer concerning the terms of the sale; is that
[15] correct?
[16]     MR. ROACH: Objection.
[17]     MR. WELSH: Noted.
[18]     Would you read the question back to him.
[19]  *(Question read)
[20]  A: I'm really not sure what this — —
[21] (Reviewing document) Again, the only thing I
[22] remember out of this from my memory is this was in
[23] regards to not receiving the severance. That's my
[24] understanding of this.

Page 117

[1]  Q: Okay. Now if you turn to Page 9 under
[2] Subsection 4 — one, two, three, four five, six —
[3] there's the following sentence: "Accordingly, the
[4] Bayer Defendants deliberately concealed the Bayer
[5] Plan from Plaintiffs because Bayer knew that the
[6] Summary Plan Description applied and provides a more
[7] favorable wording to the Plaintiffs." What is the
[8] basis of your sworn statement here that Bayer
[9] Defendants deliberately concealed the Bayer plan
[10] from the Plaintiffs?
[11]  A: Again, in reading and conferring with Mr.
[12] Roach, it seemed to us that that was the case.
[13]  Q: Based on what?
[14]     MR. ROACH: Objection with respect to
[15] attorney-client privilege. Also, again, as you
[16] know, as you did, I drafted these answers to
[17] interrogatories. My clients reviewed them. There
[18] were objections. They signed them with that
[19] objection.
[20]     MR. WELSH: Fine. But I am looking at the
[21] words here "deliberately concealed." There's an
[22] accusation that my clients deliberately concealed
[23] something, and I would like to know the basis for
[24] that accusation.

Vincent S. Fiorilla
Vol. 1, April 21, 2006

Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2007    Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 118

[1] **MR. ROACH:** Sure. Objection. Go ahead.

[2] **A:** Again, all I can say is that when we

[3] reviewed this, it seemed clear that the summary plan

[4] was different from the Master Plan which seemed to

[5] be more specific on the terms. That's basically —

[6] **Q:** When was the first time any of the

[7] Plaintiffs asked for what you call the "Master

[8] Plan"?

[9] **A:** It was sometime after with Mr. Roach.

[10] **Q:** Can you tell me the calendar year?

[11] **A:** My earliest recollection was probably about

[12] a year or so ago.

[13] **Q:** So prior to Mr. Roach, none of the

[14] Plaintiffs ever requested a copy of the Master Plan

[15] from Bayer, to your knowledge?

[16] **A:** I really didn't know it existed.

[17] **Q:** The Summary Plan Description, at all times

[18] during your employment with Bayer and subsequent,

[19] the Plaintiffs had copies of the Summary Plan

[20] Description, correct?

[21] **A:** Repeat that, please.

[22] **Q:** At all times relevant to this case — since

[23] 1995 on, Plaintiffs had copies of the Summary Plan

[24] Description?

Page 119

[1] **A:** That is correct.

[2] **Q:** And Plaintiffs had copy of Exhibit 5, your

[3] benefits, correct?

[4] **A:** That is correct.

[5] **Q:** And in the back of Exhibit 5, they give you

[6] information on how to contact Bayer if you have any

[7] questions and want to take any appeals, right? Feel

[8] free to look.

[9] **A:** Yes. That's fine.

[10] **Q:** Until contact with Mr. Roach, did any of

[11] the Plaintiffs ever contact Bayer pursuant to the

[12] terms of the Summary Plan Description?

[13] **A:** Not to my knowledge.

[14] **MR. ROACH:** Objection.

[15] **Q:** Why?

[16] **MR. ROACH:** You mean in writing?

[17] **MR. WELSH:** Writing or orally.

[18] **A:** Orally, yes. At the meetings and —

[19] **Q:** At the meetings, you indicated to me that

[20] questions were asked, "Do we qualify for

[21] severance?", correct?

[22] **A:** Correct.

[23] **Q:** And the answer from Mr. Willis was "no,"

[24] correct?

Page 120

[1] **MR. ROACH:** Objection.

[2] **A:** Correct.

[3] **MR. ROACH:** Among others.

[4] **Q:** And that interaction with Mr. Willis at the

[5] meeting, at any other time did the Plaintiffs ask

[6] for information concerning their rights under their

[7] plan prior to contacting Mr. Roach?

[8] **A:** We will get you the names, but there were

[9] several employees that went to Mr. Ramsden and Mary

[10] Leonard in pursuit of why they weren't eligible for

[11] severance.

[12] **Q:** And these inquiries were made prior to the

[13] transaction?

[14] **A:** To the best of my knowledge, it was after.

[15] **Q:** It was after?

[16] **A:** To the best of my knowledge.

[17] **Q:** To your knowledge, did any Plaintiffs ever

[18] follow the appeals process outlined in the back of

[19] the Summary Plan Description?

[20] **MR. ROACH:** Objection. That's a legal

[21] question. I am going to object.

[22] **A:** Not to my knowledge. Again, people

[23] depended on the word of management, basically. I

[24] don't know of anyone that has gone through that book

Page 121

[1] and read that book. And I apologize, but I don't

[2] know that book verbatim, I really don't.

[3] **Q:** Okay. How about some of the modifications

[4] that came in after? Did you or any of the

[5] Plaintiffs, to your knowledge, review the Summary of

[6] Material Modification - 97, Exhibit 7, or Summary of

[7] Material Modification - 1996, Exhibit 6?

[8] **A:** To be frank, probably not.

[9] **Q:** When you say "probably," with respect to

[10] yourself, did you?

[11] **A:** Did I review it? I might have. I wouldn't

[12] even remember what was in there, to tell you the

[13] truth, at that time, because, again, most of the

[14] communications were done by the management, and this

[15] was backup information. We had meetings with HR and

[16] so forth that would explain things to us. And this

[17] would be backup information that we would get. And

[18] most people, unfortunately — I am probably one of

[19] them — don't go through all that stuff and read it

[20] verbatim unless it applies specifically to something

[21] that you need, i.e., a medical or something of that

[22] nature.

[23] **Q:** Other than what you have testified to

[24] earlier today, are you aware of any other facts that

Joseph Attardo, et al. v. Document 42-25 Filed 01/17/2007 Page 10 of 21
Bayer Corporation, et al.

Vincent S. Fiorilla
Vol. 1, April 21, 2006

---

Page 122

[1] indicate to you that Bayer consciously tried to keep
[2] the Master Plan from you so that you or the other
[3] Plaintiffs could not read its terms?
[4] **MR. ROACH:** Objection. Go ahead.
[5] **A:** Again, it seems to me that — I did not
[6] learn about the ambiguity between the two until
[7] later on when we sat down with Mr. Roach to see that
[8] there was a difference. And it seemed to me, again
[9] from my reading of this, because I am not a lawyer,
[10] the benefits, that we would have been eligible for
[11] that benefit, looking at the first couple of pages
[12] in there that talks about severance.
[13] **Q:** If I understand your beliefs correctly, is
[14] it your belief that the Summary Plan Description has
[15] better language supporting your claim than the
[16] Master Plan?
[17] **MR. ROACH:** Objection.
[18] **A:** It's much easier to read and to understand.
[19] **Q:** But is it your belief that the terms of the
[20] Summary Plan Description appear on their face to be
[21] broader than the terms of the Master Plan?
[22] **MR. ROACH:** Objection. Getting into legal
[23] questions. I am going to let him answer. Go ahead.
[24] Objection.

---

Page 123

[1] **A:** I have looked basically at the Summary
[2] Plan, because that was, again from all the years
[3] that I can recollect and through all of the RIFs
[4] that occurred, that's what was used.
[5] **Q:** I am referring, sir, to No. 9, Page 9. And
[6] it says —
[7] **MR. ROACH:** This is Exhibit 10, right?
[8] **MR. WELSH:** Yes, Exhibit 10, the answers to
[9] interrogatories.
[10] **Q:** It says in here, "If there is any ambiguity
[11] arising from an inconsistency between the Bayer Plan
[12] and Summary Plan Description, the provisions most
[13] favorable to employees, the Plaintiffs here,
[14] controls." I am asking you what document do you
[15] believe controls your claim? Is it the Master
[16] Severance Pay Plan or is it the Summary Plan
[17] Description?
[18] **MR. ROACH:** Objection. You can answer.
[19] **A:** Again, to the best of my understanding, it
[20] would be the Summary Plan.
[21] **Q:** If the Summary Plan Description had the
[22] language which was most favorable to your claim, why
[23] are you claiming here that Bayer deliberately
[24] concealed the Master Plan which was more favorable

---

Page 124

[1] to Bayer's claim or position?
[2] **MR. ROACH:** Objection.
[3] **A:** Because that's what the basis — again,
[4] from my understanding and talking with my lawyer,
[5] that's the basis for denying our claim.
[6] **Q:** Here I am talking about this interrogatory
[7] that you signed under oath.
[8] **MR. ROACH:** He answered the question.
[9] **MR. WELSH:** I don't think it is responsive.
[10] We have waived motions —
[11] **MR. ROACH:** I didn't waive any
[12] attorney-client privilege.
[13] **MR. WELSH:** Motions to strike.
[14] **MR. ROACH:** I am not moving to strike.
[15] **MR. WELSH:** I have reserved my motion to
[16] strike because you are saying "asked and answered."
[17] I am saying "nonresponsive."
[18] **Q:** But, again, my client is alleged here under
[19] oath to have deliberately concealed a plan from the
[20] Plaintiffs which, based on your testimony, would
[21] have been beneficial to Bayer's position; isn't that
[22] correct?
[23] **MR. ROACH:** Objection.
[24] **A:** I am not clear what you are saying.

---

Page 125

[1] **MR. ROACH:** He is not an attorney.
[2] **MR. WELSH:** This is a factual allegation,
[3] Steve. If you get to "deliberately concealed" — I
[4] go with you about attorney and stuff, but this is a
[5] deliberate concealment. It accuses my client of
[6] misconduct. I would like to know what the
[7] misconduct was.
[8] **MR. ROACH:** But it is tied in with a legal
[9] interpretation of the plans and the law that flows
[10] from that.
[11] **MR. WELSH:** That legal interpretation is
[12] fine. But when it goes and states that the Bayer
[13] Defendants deliberately concealed the plan from the
[14] Plaintiffs — these are fiduciaries. I have the
[15] right to know what the basis for the sworn
[16] allegation that the fiduciary acted illegally.
[17] **MR. ROACH:** I think he already answered
[18] that in the context of everything that was said to
[19] them verbally. Didn't bring the two plans to their
[20] attention, didn't discuss it with them. The
[21] documentation between EFTC and Bayer clearly shows
[22] that they were trying to —
[23] **A:** You can see it in the contract.
[24] **Q:** You could see what in the contract?

---

Page 126

[1] MR. ROACH: Go ahead.

[2] A: You were talking about — in the contract
[3] there were certain things that, up in 2, that there
[4] were things that were I think — I have just gone on
[5] what we talked about, what we went over.

[6] Q: I know. I understand. The Bayer
[7] Defendants here are fiduciaries. It is one thing to
[8] say they misinterpreted their plan or their plan is
[9] not the way they perceive it. It is something quite
[10] different to say they deliberately concealed
[11] information from you. When the allegation is made
[12] that a fiduciary deliberately concealed information,
[13] I want to know what the basis of that is.

[14] MR. ROACH: Objection. I think when the
[15] context of the case becomes clear, when we finish
[16] with the depositions of your clients and we put all
[17] the documentation and what he has already said
[18] together, I think that's a fair statement. I don't
[19] know why you are arguing with him.

[20] MR. WELSH: This is sworn under oath. So
[21] what are the facts?

[22] Q: What are the facts?

[23] MR. ROACH: He already explained them, but
[24] go ahead. Objection. You can ask him once more.

Page 127

[1] Go ahead.

[2] Q: When did they deliberately conceal the
[3] plan?

[4] MR. ROACH: Objection.

[5] A: I guess my reading on that, again from my
[6] perspective, is that we had all of this information
[7] about everything being better, everything being a
[8] win-win, and then to find out that everything that
[9] was said was not true, that the benefits were not
[10] even close to what was said, that that's our view.

[11] Q: So based on your belief that Bayer
[12] officials did not accurately describe the
[13] differences of benefits between Bayer benefits and
[14] EFTC, you concluded that Bayer Defendants also
[15] deliberately concealed the Bayer plan from you?

[16] MR. ROACH: Objection.

[17] A: They deliberately did not provide
[18] information to us to make an informed decision
[19] whether we should go with this company or not go
[20] with the company. That is the basis of it. If
[21] there was information available to us that we were
[22] sat down with like all of the other times with us,
[23] gave us the information, gave us A against A, B
[24] against B, "This is what you are going to get, this

Page 128

[1] is what it looks like," then we could have made a
[2] much better informed decision whether we wanted to
[3] go with the company or not. All of the information
[4] that was given to us was given to us with the
[5] understanding that we were going to be better off
[6] when we went with the new company.

[7] Q: You say "all of the other times." When you
[8] said "all of the other times," what were you
[9] referring to?

[10] A: I am talking to prior to this deal, that
[11] whenever there was a change within the company, the
[12] employees were better off than they were before,
[13] either with benefit package, with salaries, with
[14] retirement, whatever the situation was. I am just
[15] trying to relay that there was a dependance on Bayer
[16] doing all these good things for us and telling us
[17] all these good things and then finding out that this
[18] one time when we — we are going to go someplace
[19] else, we are going to be better off than we are
[20] today, you find out that that's not the case. So
[21] that to me is where the issue lies.

[22] Q: Okay. But my question here — I
[23] understand. My question here is Bayer's alleged
[24] deliberate concealment of the Master Severance Plan.

Page 129

[1] MR. ROACH: Let's move on. He is not going
[2] to answer again. He already answered the question.

[3] A: I am answering to the best that I can
[4] answer it.

[5] *Q. Is it fair to say you have no evidence
[6] whatsoever that Bayer deliberately concealed the
[7] Bayer Master Severance Plan from you? Is that fair?

[8] MR. ROACH: Objection.

[9] MR. WELSH: Noted.

[10] MR. ROACH: Let's —

[11] MR. WELSH: Noted.

[12] MR. ROACH: You can answer again if you
[13] want.

[14] A: I cannot answer to that specifically. All
[15] I can tell you is all of these other things that
[16] were told to us.

[17] MR. WELSH: Please repeat the question.

[18] MR. ROACH: You cut him off. He is not
[19] going to answer the question.

[20] MR. WELSH: Why?

[21] MR. ROACH: Because it's been asked and
[22] answered.

[23] MR. WELSH: It has not been answered. It
[24] is evasive, and I move to strike all of the prior

Page 130

[1] answers because they are evasive.

[2]    Please ask the question.

[3]    MR. ROACH: We reserved motions to strike

[4] till the time of trial. If you want to file a

[5] motion in court to have him answer it yet again, you

[6] can do so, but he is not going to answer it again.

[7]    MR. WELSH: Please repeat the question.

[8]    MR. ROACH: He is not going to answer the

[9] question.

[10]    MR. WELSH: He will repeat the question,

[11] you will put your instruction on, and then we will

[12] take it to Judge Keeton.

[13]    MR. ROACH: That's fine.

[14]    MR. WELSH: Please ask the question.

[15] *(Question read)

[16]    MR. ROACH: I have asked that we move on.

[17] I instruct the witness not to answer the question.

[18] I think it's already been answered, and I think

[19] we've beaten it to death. You have gone around and

[20] around and around on it. I think he has given the

[21] knowledge that he knows, and you are free to reserve

[22] your rights to move to compel.

[23]    MR. WELSH: So it is clear, I don't believe

[24] my question has been answered. I believe attempts

Page 131

[1] to answer it have been nonresponsive, and I believe

[2] an instruction to the witness not to answer the

[3] question is wholly improper under the rules. I will

[4] move on and we will present this as necessary before

[5] the court.

[6]    MR. ROACH: Fair enough.

[7]       BY MR. WELSH:

[8]    Q: If you will please turn to Page 10. Since

[9] September 1, 1998, have you or any of the Plaintiffs

[10] had any conversation with Don Baribeau concerning

[11] severance pay?

[12]    MR. ROACH: Since when?

[13]    MR. WELSH: Since September 1, 1998.

[14]    A: Don Baribeau?

[15]    Q: Yes.

[16]    A: Not to my recollection.

[17]    Q: Mr. Baribeau is listed as one of the people

[18] who Plaintiffs' agents or attorneys contacted or

[19] attempted to contact in order to request or obtain

[20] information, testimony or evidence. Do you know

[21] what efforts, if any, were made to contact Mr.

[22] Baribeau?

[23]    A: I do not.

[24]    Q: What information do you believe Mr.

Page 132

[1] Baribeau would have, information that would be

[2] relevant to the Plaintiffs' claim in this matter?

[3]    A: Mr. Baribeau was the director of the

[4] operations. He was the head of EFTC at the time.

[5] And I believe he was involved with the deal or he

[6] was going to be brought over as the director or

[7] whatever, general manager.

[8]    Q: Fair to say he was a Bayer employee who

[9] went over to EFTC as part of the deal?

[10]    A: Yes.

[11]    Q: And have you ever had — you or any of the

[12] Plaintiffs ever had a conversation with him

[13] concerning your belief that you were entitled to

[14] severance from Agfa — from Bayer?

[15]    MR. ROACH: Objection.

[16]    A: Not that I can remember.

[17]    Q: Mr. Ramsden. Have you or any of the

[18] Plaintiffs had any conversations with Mr. Ramsden

[19] since September 1998 concerning your belief that you

[20] are entitled to severance pay from Bayer?

[21]    A: I'm sorry. It was after?

[22]    Q: Yes. I am using September 1st here because

[23] that's the day I believe the transaction —

[24]    A: That's fine. I believe there may have been

Page 133

[1] some conversations with Mr. Ramsden after that time.

[2]    Q: Who had those conversations?

[3]    A: Again I apologize, but we can get names for

[4] you.

[5]    Q: Do you know the substance of those

[6] communications?

[7]    A: Basically that they were ineligible for

[8] severance.

[9]    Q: Did anyone talk to Mr. Ramsden concerning

[10] whether or not he had stated that the benefits were

[11] going to be the same?

[12]    A: Again, Mr. Ramsden's statements were

[13] "comparable, in many cases better" and, again, that

[14] it was a win-win situation.

[15]    Q: Mohammed Hosseini, who is he?

[16]    A: He is an electrical engineer.

[17]    Q: He was an individual that was allowed an

[18] opportunity to remain with Bayer?

[19]    A: That's correct.

[20]    Q: Other than that, are you aware of any facts

[21] that he has that are relevant to this case?

[22]    A: I don't know.

[23]    Q: The president of Agfa Corporation, do you

[24] believe he has facts that are relevant to this case?

Vincent S. Fiorella
Vol. 1, April 21, 2006

Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2006    Joseph Attardi, et al.    v.
Bayer Corporation, et al.
Page 14 of 21

Page 134

[1]  **A:** The president?

[2]  **Q:** Yes. That would be No. 6.

[3]  **MR. ROACH:** Objection.

[4]  **A:** It's a different president, actually.

[5]  Helga Wehmeyer was Bayer. There was a different

[6]  president at that time.

[7]  **Q:** Do you have any understanding that Mr.

[8]  Koskimies has any knowledge concerning what occurred

[9]  with respect to the printed circuit board operation

[10]  and its transfer to EFTC?

[11]  **MR. ROACH:** Objection.

[12]  **A:** The only thing I can assume is that he has

[13]  some of the records involved with it and may have

[14]  had prior knowledge. Erhard Rittenhaus was the

[15]  president at that time, and he may have had

[16]  conversations with Mr. Rittenhaus. I do not know

[17]  that.

[18]  **Q:** Michael Paige. My understanding is Michael

[19]  Paige attended the employee meetings, the two that

[20]  you recall. One was with Bayer officials and one

[21]  was with the man from EFTC. Did any of the

[22]  Plaintiffs ever have one-on-one conversations with

[23]  Mr. Paige concerning whether they were entitled to

[24]  severance pay?

Page 135

[1]  **A:** I do not believe so.

[2]  **Q:** Did any of the Plaintiffs ever have

[3]  one-on-one conversation with Mr. Paige concerning

[4]  whether the benefits of EFTC were comparable to

[5]  those of Bayer?

[6]  **A:** You mean outside of the meeting?

[7]  **Q:** Mm-hmm.

[8]  **A:** Not that I know of.

[9]  **Q:** Mr. Fontaine. Did you ever have any

[10]  conversations with Mr. Fontaine concerning the

[11]  comparability of benefits between Bayer and EFTC?

[12]  **MR. ROACH:** Other than the one he already

[13]  testified to?

[14]  **Q:** Other than the one you testified to.

[15]  **MR. ROACH:** I object.

[16]  **A:** No.

[17]  **Q:** Are you aware of any of the Plaintiffs

[18]  having conversation with Mr. Fontaine concerning

[19]  whether the benefits were comparable between EFTC

[20]  and Bayer?

[21]  **A:** I know some individuals had conversations

[22]  with him, but I can't remember exactly.

[23]  **Q:** Do you remember what individuals?

[24]  **A:** I believe we have all of that. I will have

Page 136

[1]  to get it.

[2]  **MR. ROACH:** I think he has testified to

[3]  that.

[4]  **MR. WELSH:** Yes, he has testified that

[5]  there's other people, but I am trying to find out

[6]  who.

[7]  **MR. ROACH:** Right. I think he —

[8]  **MR. WELSH:** I am just trying to be clear on

[9]  it.

[10]  **Q:** Mary Leonard. Mary Leonard attended the

[11]  two group meetings?

[12]  **A:** Correct.

[13]  **MR. ROACH:** By the way, just on that point,

[14]  if you want to bring him back and quiz him again

[15]  just to streamline this — I understand you want to

[16]  streamline it.

[17]  **MR. WELSH:** You and I are going to have to

[18]  talk about streamlining it because this process

[19]  hasn't been quite as streamlined as I had hoped.

[20]  You and I can revisit that after the deposition. We

[21]  need not do it on the record.

[22]  **Q:** Mary Leonard. Other than her attendance at

[23]  the two group meetings, are you aware of any

[24]  one-on-one meetings with Mary Leonard and any of the

Page 137

[1]  Plaintiffs during which their entitlement to

[2]  severance pay was discussed?

[3]  **A:** Again the same answer.

[4]  **MR. ROACH:** Which is what?

[5]  **A:** We will provide the information.

[6]  **Q:** Is it fair to say that you believe there

[7]  were some —

[8]  **A:** Yes.

[9]  **Q:** — meetings but you don't recall the

[10]  participants?

[11]  **A:** Exactly. Right. I know in general,

[12]  looking at the information, that there were people.

[13]  **Q:** Mr. Willis, I understood that he spoke at

[14]  least at one of the meetings —

[15]  **A:** At least one.

[16]  **Q:** — and he attended both of the meetings.

[17]  Other than the group meetings, are you aware of any

[18]  conversations between any of the Plaintiffs and Mr.

[19]  Willis concerning either comparability of benefits

[20]  between the corporations or entitlement to

[21]  severance?

[22]  **A:** I do not believe so.

[23]  **Q:** Steve Maddox, who is he?

[24]  **A:** He was — I think he was in production,

Page 138

[1] production control or something like that, and he
[2] came over with the sale.
[3]    Q: So he went to EFTC?
[4]    A: Yes.
[5]    Q: Do you believe that he has any information
[6] that is relevant to your claim for severance pay
[7] benefits?
[8]    MR. ROACH: Objection.
[9]    A: His name was brought up in the group
[10] meeting as a possible between the three of us, four
[11] of us, actually.
[12]    Q: As a possible what?
[13]    A: He may have information regarding the case.
[14]    Q: Do you have any idea what information he
[15] has?
[16]    A: I can't recollect.
[17]    Q: Lyn Levesque?
[18]    A: She was Dick Ramsden's secretary.
[19]    Q: What information do you believe that
[20] individual has?
[21]    A: She may have knowledge of some of the
[22] correspondence and what was occurring.
[23]    Q: Do you have any information about specific
[24] knowledge she has that is relevant to your severance

Page 139

[1] pay claim?
[2]    A: Not specifically.
[3]    Q: Steve Kalucki, is he one of those
[4] individuals that was offered a position at Bayer?
[5]    A: Yes.
[6]    Q: Other than that, do you believe he has any
[7] information that is relevant to your severance pay
[8] claim?
[9]    A: Well, he was allowed to stay with Bayer and
[10] other people were refused.
[11]    Q: Do you think that's relevant to your
[12] severance pay claim?
[13]    MR. ROACH: Objection. He is not an
[14] attorney.
[15]    MR. WELSH: I am not asking for a legal
[16] opinion. I am asking his own personal opinion.
[17]    MR. ROACH: Go ahead.
[18]    A: It seemed to me, when they talked about
[19] this, that the whole operation was going to be
[20] transferred over to EFTC and all of a sudden certain
[21] people were plucked out.
[22]    Q: And you think that has relevance to your
[23] personal claim?
[24]    A: Yes.

Page 140

[1]    MR. ROACH: Objection.
[2]    Q: Can you give me an explanation why you
[3] think it is relevant?
[4]    MR. ROACH: Objection. Go ahead. You can
[5] answer.
[6]    A: Again, part of the — again, I am not a
[7] lawyer, but part of my understanding was that if a
[8] division was sold, that you would not be eligible
[9] for severance. It seemed to me that a division
[10] wasn't sold, that he was — I can talk about that
[11] because he was part of the operation and the whole
[12] operation, pieces of it were kept. Certain parts of
[13] it were kept. So it seems to me they were telling
[14] us in the meetings, "We are going to sell the whole
[15] thing, all the operations." Certain people weren't.
[16]    Q: Paul Jutras, can you tell me who he is?
[17]    A: Paul Jutras was a manager for the back end
[18] of the building.
[19]    Q: Is it your belief that he has information
[20] that would be relevant to the severance pay claim?
[21]    MR. ROACH: Objection. Go ahead.
[22]    A: Again, he was involved with and was aware
[23] of what was going on at that specific time in terms
[24] of the transfer of people and so forth.

Page 141

[1]    Q: To your knowledge, have any Plaintiffs had
[2] any communication with him from September 1, 1998,
[3] to the present?
[4]    A: Not to my knowledge.
[5]    Q: Bob Stocks, who is he?
[6]    A: Bob Stocks was the supervisor or manager of
[7] the machine shop/model shop.
[8]    Q: Rick Loszewski?
[9]    A: He was another engineer.
[10]    Q: Is he one of these people who were given
[11] the option of remaining with Bayer?
[12]    A: I believe Rick was part of Steve Kalucki's
[13] organization, but he may have worked in the back of
[14] the building. But he still worked with Steve.
[15]    Q: Donna, is it Rhynd, R-h-y-n-d?
[16]    A: Yes. She was, again, one of those
[17] employees who was allowed to stay with Bayer.
[18]    Q: Fran Mistretta?
[19]    A: She was another one of the administrative
[20] assistants.
[21]    Q: To who?
[22]    A: I believe that was to Norm Fontaine, but
[23] I'm not sure. I can't remember who went to whom.
[24]    Q: Augie Breuhlman?

Vincent S. Fiorella, et al. v. Bayer Corporation, et al.
Vol. 1, April 21, 2006

Case 1:04-cv-10728-WGY   Document 42-25   Filed 01/17/2007   Page 1 of 5

---

Page 142

[1] **A:** Augie was — Augie Breuhlman? I'm not sure
[2] about Augie.
[3] **MR. ROACH:** Can we go off the record for a
[4] minute?
[5] **MR. WELSH:** Certainly.
[6]   (Discussion off the record)
[7]   (Lunch recess taken at 12:42 p.m.)
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

---

Page 143

[1]   AFTERNOON SESSION, 1:40 p.m.
[2]     **BY MR. WELSH:**
[3]   **Q:** If you will, sir, in front of you are
[4] answers to interrogatories. I think it is Exhibit
[5] 10. It is Exhibit 10. If you could turn to Page 15
[6] and 16. On Interrogatory 8 on Page 15 you were
[7] asked to "identify each and every verbal, written or
[8] electronic communication any of the Plaintiffs had
[9] with Bayer Corporation, the Bayer Severance Pay
[10] Plan, or any of their representatives, agents or
[11] attorneys concerning the terms of the Bayer
[12] Severance Pay Plan."
[13]   You note that your answer, after the
[14] objection on Page 16, says, "As to verbal
[15] communications, the Plaintiffs incorporate by
[16] reference their Answers to Interrogatories 1 and 2.
[17] The verbal communications were made by, among
[18] others, the following individuals as their employee,
[19] servant, agent or representative: Richard Ramsden,
[20] Michael Paige, and Normand Fontaine."
[21]   Are you aware of any communications by Mr.
[22] Ramsden, other than what you have testified to
[23] earlier today, concerning the terms of the pension
[24] plan?

---

Page 144

[1]   **A:** Not to my recollection.
[2]   **MR. ROACH:** You mean the Severance Plan?
[3]   **MR. WELSH:** The Severance Plan. Thank you.
[4]   **Q:** Are you aware of any communications other
[5] than those made at the group meeting by Mr. Paige
[6] concerning the Severance Pay Plan?
[7]   **A:** Not to my recollection.
[8]   **Q:** Mr. Fontaine. What communications are you
[9] aware of Mr. Fontaine concerning the Severance
[10] Pay Plan?
[11]   **A:** Basically what we have already discussed.
[12]   **Q:** Anything else?
[13]   **A:** Not at this time.
[14]   **Q:** Other than the letter from your attorney to
[15] Agfa Corporation — I believe it might be attached.
[16] I believe it is attached as Attachment 4. Other
[17] than this letter, are you aware of any communication
[18] between any of the Plaintiffs and Bayer Corporation
[19] or the Bayer Severance Pay Plan in which any of the
[20] Plaintiffs demanded payment of severance pay?
[21]   **A:** You mean in regards to, like, in the back
[22] of the book where it said that?
[23]   **Q:** Any written communication at all from the
[24] Plaintiffs to Bayer Corporation or the Bayer

---

Page 145

[1] Severance Pay Plan in which one of the Plaintiffs
[2] demanded payment of severance pay.
[3]   **A:** Written, I do not know.
[4]   **Q:** Oral? You said "written." Are you aware
[5] of oral communications between any of the Plaintiffs
[6] and any representative of Bayer in which the
[7] Plaintiffs stated that they felt that they were
[8] requesting or entitled to severance pay?
[9]   **MR. ROACH:** Objection. Go ahead. Other
[10] than what he already testified to.
[11]   **A:** Yes.
[12]   **Q:** As I understand it, at a group meeting
[13] someone asked a question, "Do we have severance?"
[14] and they were told "no" by Mr. Willis?
[15]   **A:** Correct.
[16]   **Q:** And there was some follow-up discussions
[17] thereafter with Mr. Ramsden and Mr. Fontaine?
[18]   **A:** And possibly Mary Leonard. I think we
[19] talked about that.
[20]   **Q:** They were asked, "Do we get severance?"
[21]   **A:** That is correct.
[22]   **Q:** And the answer was "no"?
[23]   **A:** That is correct.
[24]   **Q:** Any communications beyond that?

---

Joseph Attardi, et al.
Bayer Corporation, et al.

Case 1:04-cv-10728-WGY    Document 42-25    Filed 01/17/2007    Page 16 of 21

Vincent S. Fiorilla
Vol. 1, April 21, 2006

Page 146

[1] **MR. ROACH:** Objection. Go ahead. You can
[2] answer.
[3] **Q:** Other than this letter?
[4] **MR. ROACH:** And what he testified to before
[5] about the group meetings.
[6] **A:** Just whatever we talked about. Whatever we
[7] discussed.
[8] **Q:** During this deposition?
[9] **A:** During this deposition.
[10] **MR. WELSH:** Off the record.
[11] (Discussion off the record)
[12] **Q:** If you will please, sir, turn to Page 14 of
[13] the interrogatory answers. Is it your belief that
[14] you have been emotionally harmed as a result of
[15] Bayer's failure to pay you severance pay?
[16] **A:** Me personally?
[17] **Q:** You personally.
[18] **A:** Yes.
[19] **Q:** Will you describe how that has manifested
[20] itself.
[21] **A:** Basically I have had issues with sleeping
[22] and nervousness and things of that nature. Within a
[23] short period, maybe a month or six weeks after I
[24] went over to EFTC, I was relieved of my duties as a

Page 147

[1] manager and basically that was it. I still retained
[2] a job. And eventually I was transferred into an
[3] individual contributor role. It was a very, very
[4] traumatic experience for me.
[5] **THE WITNESS:** Do you have one second?
[6] **MR. ROACH:** If he agrees. You are in the
[7] middle of a question.
[8] **THE WITNESS:** I'm sorry. I apologize.
[9] **MR. WELSH:** I will allow you to go talk
[10] with your attorney despite the fact we are in the
[11] middle of the question, given the nature of the
[12] subject matter. Talk to him, because I am going to
[13] have to get into it further. So have the
[14] conversation.
[15] (Recess taken)
[16] **MR. WELSH:** Based on an off-the-record
[17] conversation, counsel has agreed that we will defer
[18] questioning concerning Interrogatory No. 6, and
[19] specifically the emotional distress component of the
[20] case, while Plaintiffs' counsel confers with his
[21] clients and decides whether to go forward with it.
[22] If it is decided that claim for damage on this basis
[23] is to be presented in the case, this witness will be
[24] re-presented for deposition for follow-up on this

Page 148

[1] topic. But based on that representation,
[2] understanding, we will forego questioning in this
[3] area at this time.
[4] **MR. ROACH:** Fair enough.
[5] **BY MR. WELSH:**
[6] **Q:** When you sat down to work on this document,
[7] these interrogatory answers, did you work off any
[8] documents, summaries, or lists of information,
[9] things of that nature?
[10] **A:** Basically the documents that we had in
[11] front of us, like the Summary Plan and so forth.
[12] **Q:** Is there any document that you have seen
[13] that has, if you will, a list of the Plaintiffs and
[14] statements they may have had with any — please
[15] strike that. Have you seen any documents that
[16] basically would have a Plaintiff's name and a
[17] summary of any communication they had with anyone at
[18] Bayer concerning the severance pay? Is there
[19] anything like that?
[20] **A:** Not that I know of.
[21] **MR. ROACH:** Are you talking about
[22] correspondence he had with people in the litigation?
[23] **MR. WELSH:** I am just talking about as he
[24] sits down and prepared these interrogatories, if

Page 149

[1] there was a document they used, for instance.
[2] **MR. ROACH:** At the time. Okay. Go ahead.
[3] **Q:** Just before we broke on the emotional
[4] distress, you indicated that you suffered a
[5] significant degree of emotional distress immediately
[6] after the transaction?
[7] **A:** No, no. It was about a month or so after,
[8] six weeks, whatever it was.
[9] **Q:** Did that emotional distress have anything
[10] to do with your severance pay?
[11] **MR. ROACH:** Objection: I thought we
[12] weren't going to get into that.
[13] **MR. WELSH:** We are not. This is a lead-in
[14] into a different area.
[15] **A:** In my opinion, yes.
[16] **Q:** About a month or so you had emotional
[17] distress, and part of it was due to the denial of
[18] severance pay?
[19] **MR. ROACH:** Objection. Go ahead. Let's
[20] move off that because —
[21] **Q:** I am not digging any more into the nature
[22] of it, but was part of the emotional distress you
[23] suffered based on the fact that you had not been
[24] paid severance pay?

Page 150

[1] **MR. ROACH:** Objection.

[2] **THE WITNESS:** Answer it?

[3] **MR. ROACH:** I think we should move on
[4] because we have deferred that area.

[5] **Q:** As of a month after your termination, did
[6] you believe that Bayer had wrongfully denied you
[7] payment of severance pay benefits?

[8] **A:** I was certainly thinking about it. I
[9] didn't necessarily come to that conclusion 100
[10] percent, but I was definitely thinking about it.

[11] **Q:** If you will turn to, I think it is,
[12] Attachment 3.

[13] **A:** Okay.

[14] **Q:** Who created this document, if you are
[15] aware?

[16] **A:** Who actually typed it?

[17] **Q:** Yes.

[18] **A:** I believe Bert actually typed it.

[19] **Q:** If you will turn to a letter dated June 3,
[20] 2002, to Mr. Roach from Mr. Salek.

[21] **MR. ROACH:** Which attachment is that?

[22] **MR. WELSH:** It is in with another
[23] attachment.

[24] **MR. ROACH:** Okay. I got it. Part of

Page 151

[1] Attachment 4.

[2] **MR. WELSH:** Okay. It is part of Attachment
[3] 4.

[4] **Q:** You will see in the third paragraph of this
[5] letter it states, "You may find the following
[6] information to be helpful. The facts set forth in
[7] your April 5th letter are incorrect in that the
[8] Machine Shop operation was not sold. Rather, that
[9] operation was discontinued and its assets were
[10] offered for sale to the highest bidder."

[11] Do you have any facts to indicate that that
[12] is false, the statement here by Mr. Salek that the
[13] operation was discontinued and its assets were
[14] offered for sale to the highest bidder?

[15] **A:** At the time, my understanding was that they
[16] sold it and that the other company picked up the
[17] assets.

[18] **Q:** What is the basis of that understanding?

[19] **A:** I believe I saw something that Olympic
[20] picked up all the assets, bought all the assets.

[21] **Q:** Do you know whether or not Olympic acquired
[22] the assets by placing bids on them?

[23] **A:** I think so.

[24] **Q:** Do you understand — where it says here

Page 152

[1] that "Olympic may have hired five of the twelve
[2] employees who had been in the machine shop," do you
[3] know whether or not that is accurate?

[4] **A:** I believe they hired five, but I'm not sure
[5] whether twelve was the right number, because I
[6] believe part of that was the model shop.

[7] **Q:** Do you know whether or not the model shop
[8] is part of this?

[9] **A:** No. That I don't know.

[10] **Q:** You said when you joined the company after
[11] a month, EFTC, you were removed from your
[12] supervisory position?

[13] **A:** That is correct.

[14] **Q:** Did you continue to be paid the same pay
[15] that you started with them with?

[16] **A:** Yes.

[17] **Q:** Was there any change in your pay for the
[18] first year there?

[19] **A:** No.

[20] **Q:** The location of your job during the first
[21] year you were there, were you still working in the
[22] same location?

[23] **A:** That is correct.

[24] **Q:** With respect to Attachment No. 6, do you

Page 153

[1] know who prepared that?

[2] **A:** I believe it was Jeanne Skene.

[3] **Q:** At the conclusion of your employment by
[4] Bayer, were you paid out all your vacation pay?

[5] **A:** Yes.

[6] **Q:** Did you receive any payment in addition to
[7] accrued wages and vacation pay?

[8] **A:** At that time?

[9] **Q:** Yes.

[10] **A:** I don't believe so.

[11] **Q:** Did you receive any extra vacation pay?

[12] **A:** I don't remember if I did. I don't believe
[13] so.

[14] **Q:** For a week or two, if you know?

[15] **A:** I really don't.

[16] **Q:** Did you have any 401(k) loans at the time
[17] of the transaction between Bayer and EFTC?

[18] **A:** No, I didn't have any loans.

[19] **MR. ROACH:** Could I just talk to him for
[20] another second?

[21] **MR. WELSH:** Certainly.

[22] (Recess taken)

[23] **BY MR. WELSH:**

[24] **Q:** Do you know if any of the Plaintiffs were

Page 154

[1] terminated by EFTC during the first year of their
[2] employment with EFTC?
[3] **A:** No, I do not.
[4] **Q:** You don't know one way or another?
[5] **A:** I don't believe anybody was.
[6] **Q:** Just because maybe the question might be a
[7] little unclear, is it fair to say to the best of
[8] your knowledge all of the Plaintiffs remained
[9] employed with EFTC for at least a year?
[10] **A:** Can I rephrase that?
[11] **Q:** Certainly.
[12] **A:** I do not believe anybody was let go during
[13] that period of time. I don't know if anybody left,
[14] you know.
[15] **Q:** You don't know of anyone involuntarily
[16] terminated during that period of time?
[17] **A:** Not that I know of.
[18] **MR. WELSH:** Subject to the reservation that
[19] we made earlier concerning emotional distress, I
[20] have no further questions of this witness.
[21] **MR. ROACH:** Okay. Take a quick break.
[22] **MR. WELSH:** Are you going to ask questions,
[23] or are you done with him?
[24] **MR. ROACH:** Quick break. Let me ask him a

Page 155

[1] couple of things. I don't think I have any
[2] questions.
[3] (Recess taken)
[4] **MR. ROACH:** I have no questions.
[5] (Whereupon, the deposition was
[6] suspended at 2:05 p.m.)
[7]
[8]
[9]
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 156

**CERTIFICATE**

[1]
[2] I, Vincent S. Fiorilla, do hereby certify that I
[3] have read the foregoing transcript of my testimony,
[4] and further certify under the pains and penalties of
[5] perjury that said transcript (with/without)
[6] suggested corrections is a true and accurate record
[7] of said testimony.
[8] Dated at __, this day of ,
[9] 2006.
[10]
[11]
[12]
[13]
[14]
[15]
[16]
[17]
[18]
[19]
[20]
[21]
[22]
[23]
[24]

Page 157

[1] COMMONWEALTH OF MASSACHUSETTS)
[2] SUFFOLK, SS.                    )
[3]   I, Daniel P. Wolfe, Registered Professional
[4] Reporter and Notary Public in and for the
[5] Commonwealth of Massachusetts, do hereby certify
[6] that there came before me on the 21st day of April,
[7] 2006, at 9:15 a.m., the person hereinbefore named,
[8] who was by me duly sworn to testify to the truth and
[9] nothing but the truth of his knowledge touching and
[10] concerning the matters in controversy in this cause;
[11] that he was thereupon examined upon his oath, and
[12] his examination reduced to typewriting under my
[13] direction; and that the deposition is a true record
[14] of the testimony given by the witness.
[15]   I further certify that I am neither attorney or
[16] counsel for, nor related to or employed by, any
[17] attorney or counsel employed by the parties hereto
[18] or financially interested in the action.
[19]   In witness whereof, I have hereunto set my hand
[20] and affixed my notarial seal this 28th day of April,
[21] 2006.
[22]
[23]         Notary Public
[24]     My commission expires 9/18/09

156

C E R T I F I C A T E

1

2     I, Vincent S. Fiorilla, do hereby certify that I

3   have read the foregoing transcript of my testimony,

4   and further certify under the pains and penalties of

5   perjury that said transcript (with~~xxxxxxxxxx~~

6   suggested corrections is a true and accurate record

7   of said testimony.

8     Dated at _BosTon___, this _9th_ day of _Aug 06_,

9   2006.

10

11                    _Vincent S. Fiorilla_

12

13

14

15

16        See attached ERRATA SHEET

17

18

19

20

21

22

23

24

ERRATA SHEET OF VINCENT FIORILLA

RE:  Joseph Attardi, et als. v. Bayer Corporation, et al.,
     U.S. District Court Civil Action No. 04-CV-10728-WGY

Deposition of: Vincent S. Fiorilla

Taken on: April 21, 2006

| Page | Line | As Transcribed | Correction | Reason |
|------|------|----------------|------------|--------|
| 22 | 21 | "No." | "Yes." | Correct answer. I did speak Mr. Fontaine regarding severance. |
| 35 | 5 | "representative" | "a representative" | Grammar and what I believe I said |
| 36 | 6 | "Staci Landress" | "Staci Landress or possibly another" | Not certain it was Ms. Landress |
| 47 | 16 | "One-on-one" | "One-on-one meeting with Mr. Fontaine" | Completes the sentence, the thought and my meaning as to the events |
| 48 | 1 | "Not that I remember." | "Not that I remember other than the conversa- with Mr. Fontaine." | Completes the thought and my meaning as to the events |
| 81 | 11 | "within the -" | "within the company." | Completes my thought, the sentence, and my meaning |
| 88 | 1 | "I am not sure who the representa- tives were." | "Jack Calderon." | Recalled Mr. Calderon. |
| 95 | 8 | "said -" | "said in the meetings and the records from Bayer I reviewed in this case." | Completes my thought and the sentence |

| 135 | 24 | "I believe we have all of that. I will have | "Other than those I mentioned, Jeanne Skene and Diana | Completes the information requested |
| 136 | 1 | to get it." | Glassett." | |