Page 1

Volume I
Pages 1 to 79
Exhibits: None
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JOSEPH ATTARDI, et al.,    :
    Plaintiffs,    :
vs.    : Civil Action
    : No. 04-10728-REK
BAYER CORPORATION, BAYER    :
CORPORATION SEVERANCE PAY    :
PLAN,    :
    Defendants.    :

DEPOSITION OF BERTRAND R. GUILMETTE, a
witness called on behalf of the Defendants, taken
pursuant to the Federal Rules of Civil Procedure,
before Daniel P. Wolfe, Registered Professional
Reporter and Notary Public in and for the
Commonwealth of Massachusetts, at the Offices of
Bello, Black & Welsh, LLP, 535 Boylston Street,
Boston, Massachusetts, on Friday, April 21, 2006,
commencing at 2:10 p.m.

PRESENT:
    Roach & Wise, LLP
        (by Stephen A. Roach, Esq.)
    31 State Street, Boston, MA 02109,
        for the Plaintiffs.
    Bello, Black & Welsh LLP
        (by John F. Welsh, Esq., and
        Kevin R. Powers, Esq.)
    535 Boylston Street, Suite 1102, Boston, MA
        02116, for the Defendants.
    Also present: Vincent S. Fiorilla

Page 2

INDEX
WITNESS    DIRECT    CROSS    REDIRECT    RECROSS
BERTRAND R. GUILMETTE
BY MR. WELSH        3        58
                76
BY MR. ROACH        51        74
            EXHIBITS
NO.    DESCRIPTION        PAGE
        None

Page 3

[1]                PROCEEDINGS
[2]            BERTRAND R. GUILMETTE
[3] a witness called for examination by counsel for the
[4] Defendants, having been satisfactorily identified by
[5] the production of his driver's license and being
[6] first duly sworn by the Notary Public, was examined
[7] and testified as follows:
[8]            DIRECT EXAMINATION
[9]            BY MR. WELSH:
[10]    Q: Sir, will you please state and spell your
[11] full name.
[12]    A: Bertrand R. Guilmette. B-e-r-t-r-a-n-d
[13] G-u-i-l-m-e-t-t-e.
[14]    Q: Sir, where do you live?
[15]    A: I live in Methuen, Massachusetts.
[16]    Q: What street address?
[17]    A: 26 Sandra Lane.
[18]    Q: How long have you been there?
[19]    A: 15 years.
[20]    Q: By whom are you employed?
[21]    A: Suntron.
[22]    Q: Do you know the street address?
[23]    A: 104 Glenn Street.
[24]    Q: In Lawrence?

Page 4

[1]    A: Yes.
[2]    Q: Who is your immediate supervisor?
[3]    A: Jerry Griffin.
[4]    Q: To your knowledge, did Suntron operate the
[5] 104 Glenn Street facility at the time EFTC took over
[6] the printed circuit board operation from Bayer?
[7]    A: No, no. They were not at 104 Glenn.
[8]    Q: When did you go to 104 Glenn?
[9]    A: I believe it was in 2001.
[10]    Q: What was your job there?
[11]    A: Manufacturing engineer.
[12]    Q: What was your job at Bayer?
[13]    A: Wet processing specialist.
[14]    Q: What is that?
[15]    A: Chemical plating. Plating to print circuit
[16] boards.
[17]    Q: Drawing your attention to 1998, were you
[18] one of the employees that were involved in a bonus
[19] plan that Bayer offered to employees to retain their
[20] employment while they looked for purchasers for the
[21] printed circuit board business?
[22]    A: Yes, I was.
[23]    Q: I am not going to identify separate
[24] documents, but I am going to show you Exhibit 1 at

Page 5

[1] Mr. Fiorilla's deposition. Did you receive a letter
[2] similar to that?
[3]    A: Yes, I did.
[4]    Q: Was it your understanding when you received
[5] this letter that Bayer was looking to perhaps
[6] dispose or sell its printed circuit board business
[7] and they were looking to retain key employees in
[8] their job until they knew what they were going to
[9] do?
[10]    A: Yes, it was my understanding.
[11]    Q: When is the first time you heard that EFTC
[12] was in a contention for purchasing the printed
[13] circuit board business for Bayer?
[14]    A: I believe late spring, early summer of
[15] 1998.
[16]    Q: Did you attend any meetings, either
[17] individually or in a group, with any officials of
[18] Bayer Corporation prior to this sale during which
[19] the transaction was discussed?
[20]    A: Yes, I did.
[21]    Q: How many meetings can you recall?
[22]    A: I think I attended two.
[23]    Q: Were these group meetings?
[24]    A: Yes.

Page 6

[1]    Q: In addition to the group meetings, did you
[2] have any one-on-one meetings with any Bayer managers
[3] concerning the transaction?
[4]    A: No.
[5]    Q: Do you recall where these group meetings
[6] took place?
[7]    A: In the cafeteria at 80 Industrial Way in
[8] Wilmington.
[9]    Q: Both group meetings?
[10]    A: Yes.
[11]    Q: Do you recall when you became an EFTC
[12] employee?
[13]    A: Middle of September of 1998.
[14]    Q: Are you sure of that date?
[15]    A: Yes.
[16]    Q: If I were to represent to you that I
[17] believe it was September 1st, would you disagree
[18] with that?
[19]    A: Yes.
[20]    Q: Is there any particular thing you base your
[21] belief on that it was middle of September 1998?
[22]    A: I believe it was supposed to be September
[23] 1st. But there was a few more things they had to
[24] iron out and they weren't quite ready to do the

Page 7

[1] whole transfer, and it was closer to two weeks into
[2] September.
[3]    Q: Prior to becoming an EFTC employee, did you
[4] ever have opportunity to meet with any EFTC
[5] representative concerning your employment?
[6]    A: Yes.
[7]    Q: When?
[8]    A: It would be just prior to going to EFTC.
[9]    Q: Within a week of going to EFTC?
[10]    A: A week or two, yes.
[11]    MR. ROACH: Are you talking one-on-one
[12] meetings or group meetings?
[13]    MR. WELSH: One-on-one meetings. I will
[14] come back to the group meetings.
[15]    Q: Do you recall who you met with from EFTC at
[16] that time?
[17]    A: It was a representative from their main
[18] facility from Denver, Colorado. I don't remember
[19] her name. It was a female name. It was all
[20] scheduled meetings.
[21]    Q: And at the time you attended a meeting, did
[22] you complete any paperwork?
[23]    A: I believe so.
[24]    Q: What paperwork do you recall completing?

Page 8

[1]    A: I believe I completed an application for
[2] employment.
[3]    Q: Any other paperwork?
[4]    A: I'm not sure on benefits, but I know
[5] something to do with the insurance benefits.
[6]    Q: Do you recall whether you filled out any
[7] documentation for medical benefits?
[8]    A: I believe we had one, yes.
[9]    Q: Do you recall whether or not you filled out
[10] any tax documents?
[11]    A: I don't remember, but probably did. I'd be
[12] guessing.
[13]    Q: Do you recall immigration, what is called
[14] "I-9" forms?
[15]    A: I don't recall it.
[16]    Q: At the time you met with the
[17] representative, do you recall whether or not they
[18] had any brochures for you?
[19]    A: I don't remember.
[20]    Q: At your home do you have a file or other
[21] place where you keep records, where you keep
[22] employment documents?
[23]    A: I have a file cabinet, but I don't keep
[24] much of the stuff that I get because it would be too

Joseph Attardi, et al. v. 1:04-cv-10728-WGY    Document 42-26    Filed 01/17/2007    Page 1 of 22
Bayer Corporation, et al.

Bertrand R. Guilmette
Vol. 1, April 21, 2006

Page 9

[1] much to keep.
[2]    Q: During the course of this litigation have
[3] you ever gone through the file cabinet to see if you
[4] have any documents pertaining to your initial
[5] employment by EFTC?
[6]    A: Yes, I did.
[7]    Q: Do you have any documents at all?
[8]    A: No. I couldn't find anything.
[9]    Q: There is a letter I am going to show you.
[10] It is Exhibit 3 for Mr. Fiorilla. Did you receive a
[11] letter similar to that?
[12]    A: I believe I did.
[13]    Q: Did you find a copy of that letter in your
[14] file cabinet?
[15]    A: No.
[16]    Q: How long was your meeting with the
[17] representative from EFTC?
[18]    A: I wouldn't think it would be more than half
[19] an hour.
[20]    Q: Were you aware whether there were any other
[21] representatives meeting with employees at the same
[22] time? Were there two or more?
[23]    A: I believe there was more than one, but I
[24] wouldn't know how many because there was many people

Page 10

[1] they had to go through.
[2]    Q: Do you have a specific recollection of what
[3] was discussed during your meeting with the
[4] representative from EFTC?
[5]    A: I believe they explained the benefits that
[6] we had, the medical, the dental, what our rate of
[7] pay would be, because due to the fact that the
[8] medical was going to be more expensive, I was the
[9] one that received the difference to offset the
[10] medical cost.
[11]    Q: Is it fair to say that you received your
[12] old salary plus a differential to reimburse you for
[13] the difference in cost of medical benefits?
[14]    A: That's correct.
[15]    Q: Okay.
[16]    A: Not everybody got that because not
[17] everybody needed the medical.
[18]    Q: Do you recall anything else that was
[19] discussed?
[20]    A: Not that I can remember.
[21]    Q: Do you recall vacation pay being discussed?
[22]    A: I don't believe I even brought it up, no.
[23]    Q: As you sit here today, do you recall
[24] whether or not any checklist or anything was filled

Page 11

[1] out by the representative while you were there
[2] discussing the various — outlining the various
[3] benefits?
[4]    A: I don't remember, no.
[5]    Q: Other than this meeting with the
[6] representative from EFTC, did you have any other
[7] meetings — I am not talking about the group
[8] meeting. I will get to the group meeting in a
[9] second — any other individual meetings with
[10] representatives of EFTC?
[11]    A: No.
[12]    Q: Do you recall whether or not your meeting
[13] with the representative for the EFTC was after your
[14] receipt of the letter, Exhibit 3, letter similar to
[15] Exhibit 3?
[16]    A: I wouldn't know. It's so close to a
[17] timeframe that everything could have happened.
[18]    Q: I may have asked you, again, but let me
[19] just be clear. Other than this one-on-one meeting
[20] with the representative of EFTC where you talked
[21] about medical differential being put onto your
[22] salary, did you have any other one-on-one meetings
[23] with anyone from EFTC prior to you joining them?
[24]    A: No.

Page 12

[1]    Q: When you went to EFTC, were you paid the
[2] same salary that you had been paid at Bayer plus the
[3] medical differential?
[4]    A: Yes, like we just discussed.
[5]    Q: Did you keep that salary for at least a
[6] year after you joined EFTC?
[7]    A: Yes.
[8]    Q: Where was your job located when you worked
[9] for Bayer? Was it 80 Industrial Way?
[10]    A: That's correct.
[11]    Q: Wilmington?
[12]    A: Yes.
[13]    Q: Is that the location for your job for the
[14] first year of your employment for EFTC?
[15]    A: Yes, it was.
[16]    Q: We talked earlier about a group meeting.
[17] You recall attending two group meetings?
[18]    A: Yes.
[19]    Q: Do you recall the first group meeting, who
[20] was present?
[21]    A: Dick Ramsden, Norm Fontaine, Mary Leonard,
[22] Rodney Willis, Michael Paige, Jack Calderon from
[23] EFTC.
[24]    Q: He was at the first one?

Case 1:04-cv-10728-WGY    Document 42-26    Filed 01/17/2007    Page 4 of 22

Bertrand R. Guillette                                                    Joseph Attardi, et al.    v.
Vol. 1, April 21, 2006                                                   Bayer Corporation, et al.

Page 13

[1]    A: Because I don't remember making all of
[2] them. But I believe the two I made, he was at both
[3] of them.
[4]    Q: Do you know, was there more than two
[5] meetings held?
[6]    A: Yes.
[7]    Q: What is your best memory of how many
[8] meetings in fact were held?
[9]    A: I would be guessing if I picked a number,
[10] but I know there was more than two.
[11]    Q: Was there more than three?
[12]    A: Possibly, yes.
[13]    Q: How were employees alerted that the meeting
[14] was going to take place?
[15]    A: I believe the supervisors would funnel it
[16] down or they would schedule the meetings and let the
[17] areas know.
[18]    Q: Was it advertised for you, posted on the
[19] bulletin board?
[20]    A: I don't think it was really posted because
[21] there were other people that worked in the same
[22] building to us that it had no meaning to them and
[23] they probably didn't want other areas coming into
[24] the meeting.

Page 14

[1]    Q: Do you remember whether or not a notice
[2] went up by e-mail?
[3]    A: I wouldn't remember.
[4]    Q: Did you take any notes at this meeting?
[5]    A: No.
[6]    Q: Best of your recollection, this is the
[7] first meeting you say Mr. Calderon was present. For
[8] the first meeting, what happened?
[9]    A: They explained to us that they were in the
[10] process of selling off the board shop per se to
[11] another company called "EFTC," which included the
[12] fab shop and the assembly areas. They elaborated on
[13] how it was going to be very good for everybody, like
[14] the win-win situation, and everything was going to
[15] be good for everybody. And Mr. Calderon also
[16] emphasized how excited he was about getting a per se
[17] fabrication shop where you make the printed circuit
[18] board as opposed to buying it, because that would
[19] have been the first one that EFTC would have owned.
[20]    They have done all the assembly, but they
[21] have always purchased the printed circuit board, and
[22] this was going to give them the flexibility of
[23] building their own circuit boards. They were very
[24] high on investing in processes and bringing

Page 15

[1] everything up to speed. And new equipment was not
[2] going to be an object. It was going to come our
[3] way.
[4]    Q: They would be investing new equipment?
[5]    A: They would be investing in not only the fab
[6] shop but the assembly area.
[7]    Q: Do you remember anything else Mr. Calderon
[8] said?
[9]    A: He talked about bonuses and different
[10] things. I'm not sure to what extent he said on
[11] them, but they like doing certain things like
[12] incentives for the people.
[13]    Q: When you got there, did they have incentive
[14] bonuses?
[15]    A: They had perfect attendance bonuses. If
[16] the areas did very well, like if the company did
[17] well, there would be quarterly bonuses or monthly
[18] bonuses.
[19]    Q: Was it quarterly, was it monthly, do you
[20] recall?
[21]    A: I don't recall if it was quarterly or
[22] monthly.
[23]    Q: When you got there, was the bonus policies
[24] they had spelled out on paper?

Page 16

[1]    A: I don't think so, no.
[2]    Q: You talked about perfect attendance bonus
[3] and quarterly or monthly bonus. You are not sure.
[4] Any other bonuses?
[5]    A: Not that I know of.
[6]    Q: Stock options or anything like that?
[7]    A: You could buy stocks.
[8]    Q: Was it a public company?
[9]    A: Yes.
[10]    Q: You had a stock purchase plan?
[11]    A: You could buy it through your payroll, yes.
[12]    Q: Do you remember anything else Mr. Calderon
[13] said at this first group meeting?
[14]    A: No.
[15]    Q: Were any slides shown during that meeting?
[16]    A: I don't remember.
[17]    Q: Any handouts at that meeting?
[18]    A: I don't keep everything, so I just —
[19]    Q: Just so the transcript is clear, when I
[20] asked were there handouts during the meeting, is it
[21] fair to say you don't recall?
[22]    A: I don't recall.
[23]    Q: Do you recall whether attendance was taken
[24] by anyone at the meeting?

Page 17

[1] A: No.
[2] Q: Is it fair to say you can't tell me whether
[3] the meeting with Mr. Calderon was before or after
[4] the letter to you from EFTC offering you employment?
[5] A: The meeting with Calderon was possibly
[6] before this letter.
[7] Q: You used the word "possibly."
[8] A: It was before this.
[9] Q: The second meeting with Calderon, was that
[10] before or after the letter?
[11] A: I believe the two times I seen Mr. Calderon
[12] was both before the letter, that they were in the
[13] process of everything.
[14] MR. ROACH: The letter is Exhibit 3, just
[15] for the record.
[16] MR. WELSH: Yes, sir, dated August 14,
[17] 1998. Off the record.
[18] (Discussion off the record)
[19] Q: At this first meeting when Mr. Calderon was
[20] present, do you recall who else spoke other than Mr.
[21] Calderon at the meeting?
[22] A: He spoke. I don't recall any — I know
[23] there was other people there from EFTC, but I don't
[24] believe they spoke at the time. But Norm Fontaine,

Page 18

[1] Michael Paige, Dick Ramsden may have all made some
[2] comments along the way.
[3] Q: Do you remember any specific comments any
[4] of the three made at that first meeting?
[5] A: They all emphasized the win-win situation,
[6] how it was a great thing for everybody, great for
[7] Agfa.
[8] Q: Other than that, do you recall anything
[9] else that any of the three individuals said at that
[10] first meeting?
[11] A: No.
[12] Q: Mary Leonard didn't say anything at the
[13] first meeting?
[14] A: I don't recall if she talked at that one.
[15] Q: Were there questions and answers — there
[16] was a question and answer period during that first
[17] meeting?
[18] A: Yes.
[19] Q: Do you remember any of the questions asked
[20] or answered during that session?
[21] A: I don't remember any of the questions at
[22] that time, no, on the first meeting.
[23] Q: The second group meeting. I believe the
[24] first group meeting, we have Mr. Calderon, Mr.

Page 19

[1] Ramsden, Mr. Fontaine, Mary Leonard, Rod Willis,
[2] Michael Paige. Were all of those people at the
[3] second meeting?
[4] A: I would say the majority of them were
[5] there. I'm not sure if Rodney was at the second one
[6] I'm not positive. But the majority of the ones I
[7] went to, the two I went to, Michael Paige, Mary
[8] Leonard, the HR rep, Dick Ramsden, Norm Fontaine and
[9] Jack Calderon were at the ones I went to.
[10] Q: Tell me what happened at the second
[11] meeting.
[12] A: It was basically a meeting to show the
[13] progress of where they were and how things were
[14] going.
[15] Q: When they showed the progress, again I am
[16] going to ask you if there were slides.
[17] A: They spoke of the progress at the meeting.
[18] Q: Do you remember any slides going up?
[19] A: No, I don't.
[20] Q: Do you remember any handouts?
[21] A: No, I don't.
[22] Q: Is it fair to say you don't recall one way
[23] or another whether or not there were handouts?
[24] A: That would be fair to say.

Page 20

[1] Q: They were talking about the progress of the
[2] transaction during the second meeting?
[3] A: Yes.
[4] Q: Do you remember anything specifically that
[5] Mr. Calderon said at that second meeting?
[6] A: It was all similar to what I stated before,
[7] that they were excited and it was getting close, the
[8] partnership with Bayer, Agfa division of Bayer.
[9] They were really getting excited about everything
[10] coming into play.
[11] Q: Other than that, do you remember anything
[12] else specifically that was said during that second
[13] group meeting?
[14] A: I think in the question and answer of the
[15] second one I was there, that an employee asked about
[16] severance.
[17] Q: What do you recall the employee's comment
[18] to be?
[19] A: "Can we get severance as opposed to
[20] going" — "Do we have to go to this company? Can we
[21] get severance?"
[22] Q: You recall the employee said, "Do we have
[23] to go here or can we get severance?" It was
[24] presented in that way?

Page 21

[1] **A:** Yes. "Can we get our severance even if we
[2] are going to the company?", like either/or.
[3] **Q:** Do you have a specific memory exactly what
[4] the employee asked?
[5] **A:** First of all, it was, "Are we getting our
[6] severance?" And the answer was "no." And they
[7] said, "If we choose not to go to this company, will
[8] we get our severance?" And the answer was also
[9] "no."
[10] **Q:** Who answered the question?
[11] **A:** I believe Michael Paige answered that one.
[12] **Q:** Do you remember who the employee was?
[13] **A:** I think it was Robert Brown.
[14] **Q:** Were there any follow-up questions by Mr.
[15] Brown and others on the severance pay topic at that
[16] second group meeting?
[17] **A:** Other people might have asked why.
[18] **Q:** When you use the word —
[19] **MR. ROACH:** Let him finish the answer.
[20] **Q:** When you use the word "might," what I want
[21] to know is what you remember. I don't want you to
[22] guess. I hear the word "might." Do you have a
[23] distinct memory of other people asking?
[24] **A:** Other questions were asked.

Page 22

[1] **Q:** On severance?
[2] **A:** Yes.
[3] **Q:** Can you remember who asked them?
[4] **A:** No, I don't.
[5] **Q:** Do you remember the questions themselves?
[6] **A:** No, I don't.
[7] **Q:** Do you remember the answers?
[8] **A:** No.
[9] **Q:** Anything else you recall at that second
[10] meeting?
[11] **A:** No.
[12] **Q:** From the time you heard of EFTC coming in
[13] until the time you became an EFTC employee, did you
[14] ever on an individual basis have a discussion with
[15] any Bayer manager concerning severance pay?
[16] **A:** I did at one time ask, hallway conversation
[17] with Mr. Ramsden.
[18] **Q:** Tell me what you said and he said.
[19] **A:** I asked him why we weren't eligible for
[20] severance.
[21] **Q:** What did Dick say?
[22] **A:** And the answer was because we were not
[23] getting a break in employment, we were not losing
[24] any time, we were going right from one company to

Page 23

[1] another, there would be no stop in employment.
[2] **Q:** Any follow-up questions you had?
[3] **A:** All I asked him was, "Well, we are not
[4] going to be employed by Bayer so Bayer is, in all
[5] essence, terminating us. Why wouldn't we be
[6] eligible?"
[7] **Q:** What did he say?
[8] **A:** He said the same answer, because we are not
[9] losing any employment.
[10] **Q:** Anything else?
[11] **A:** No. That was the only question I had for
[12] him.
[13] **Q:** Other than this hallway conversation with
[14] Mr. Ramsden, did you have conversation with any
[15] other Bayer official concerning severance pay?
[16] **A:** No.
[17] **Q:** Prior to the time of the conversation, did
[18] you have any conversation with any Bayer official
[19] concerning the benefit package that EFTC was
[20] offering employees?
[21] **MR. ROACH:** You are talking about him
[22] individually or group meeting?
[23] **Q:** I am asking you individually.
[24] **A:** No.

Page 24

[1] **Q:** Did you ever attend any group meeting in
[2] which the EFTC benefit package was discussed?
[3] **A:** I don't believe I was at that meeting if
[4] they had one.
[5] **Q:** You don't recall whether there was one?
[6] **A:** No.
[7] **Q:** Was there ever a meeting held by employees
[8] at Bayer at which the status of Bayer benefits were
[9] reviewed with employees?
[10] **A:** I don't remember. I don't think I was at
[11] that one if they had one. I don't think there was.
[12] **Q:** I am going to show you a slide presentation
[13] from Mr. Fiorilla.
[14] **MR. ROACH:** Exhibit 2?
[15] **MR. WELSH:** Yes, Exhibit 2.
[16] **Q:** Did you ever see a slide show consisting of
[17] those slides?
[18] **A:** I don't remember seeing the slide show, no.
[19] **Q:** Is it fair to say it could have happened;
[20] you simply don't have a memory one way or another?
[21] **A:** Right. And it could have been at one of
[22] the meetings I wasn't at.
[23] **Q:** When you were at work — when you worked at
[24] 80 Industrial Way for Bayer, was there a human

Page 25

[1] resources person assigned to your operation?
[2]    A: Yes.
[3]    Q: Who was that?
[4]    A: Mary Leonard.
[5]    Q: At any time up until the time you became an
[6] EFTC employee, did you ever have an opportunity to
[7] talk to Mary Leonard about your benefits?
[8]    MR. ROACH: Objection. Go ahead.
[9]    A: No. I never really talked to her.
[10]    Q: During your employment with Bayer did you
[11] ever talk to her?
[12]    A: No. I wasn't on a one-on-one basis with
[13] her. Everything was fine. I never had an issue to
[14] really discuss anything with her.
[15]    Q: Did she have an office there?
[16]    A: Yes.
[17]    Q: And office hours?
[18]    MR. ROACH: Objection.
[19]    A: I don't know what her hours were.
[20]    Q: While you were at Bayer, if you wanted to
[21] talk with Mary Leonard, did you know how to go about
[22] doing so?
[23]    A: Yes, I would. I imagine I would have just
[24] walked up to her office and asked if I could talk to

Page 26

[1] her.
[2]    Q: Now showing you Exhibit 5, the Summary Plan
[3] Description, did you have a copy of that mailed to
[4] your house in about 1995?
[5]    A: I believe so, yes.
[6]    Q: Do you still have a copy?
[7]    A: No, I don't.
[8]    Q: What happened to the copy that was sent to
[9] your house?
[10]    A: I don't save a lot of stuff.
[11]    Q: Fair to say you discarded it?
[12]    A: Yes.
[13]    Q: With respect to 1996, I am going to show
[14] you Exhibit 6, Summary of Material Modifications -
[15] 1996. Was this sent to your house by Bayer?
[16]    A: I would only be guessing if I said yes.
[17]    Q: You don't recall one way or another?
[18]    A: I don't recall.
[19]    Q: I want to show you Exhibit 7, Summary of
[20] Material Modifications - 1997. Was that sent to
[21] your house?
[22]    A: Same situation. I wouldn't recall because
[23] we got so much stuff.
[24]    Q: Okay. When document requests were issued

Page 27

[1] by Bayer in this case asking Plaintiffs for various
[2] documents, you did look in whatever documents you do
[3] keep to see if there are any documents there, right?
[4]    A: Yes.
[5]    Q: I am going to show you Exhibit 9, Bayer
[6] Severance Pay Plan. When is the first time you saw
[7] that document?
[8]    A: This document here, I don't know if I had
[9] ever seen it until I started getting involved with
[10] this case.
[11]    Q: Any time prior to 2000, did you ever ask
[12] anyone for it?
[13]    A: No.
[14]    Q: Are you aware of any other Plaintiffs who
[15] asked for a copy of that document prior to 2000?
[16]    A: Prior to 2000, I don't think so, no.
[17]    Q: I place in front of you Exhibit 10. This
[18] would be Plaintiffs' answers to Defendants'
[19] interrogatories. Let me ask you this before we get
[20] started: At the time you started EFTC employment,
[21] did you believe that you should have been paid
[22] severance pay by Bayer at the time you started with
[23] EFTC?
[24]    A: Right away, no.

Page 28

[1]    Q: When did you come to the belief that you
[2] should have been paid severance pay?
[3]    A: Later on, when I was starting to get aware
[4] of what was happening throughout the company,
[5] especially what happened to the machine shop.
[6]    Q: The machine shop. Do you recall when that
[7] was?
[8]    A: I believe it was around the end of '99 or
[9] early 2000.
[10]    Q: Is that roughly the period where you came
[11] to the belief that you should have received
[12] severance pay?
[13]    MR. ROACH: Objection. You can answer.
[14]    A: Yes. I mean, it's in your mind, but until
[15] you saw what happened with them.
[16]    Q: Were you aware that Bayer spun off its Agfa
[17] division to a separate corporation sometime after
[18] you became an employee of EFTC?
[19]    A: Yes.
[20]    Q: And the machine shop, to your knowledge,
[21] was that sold or done away with by the company after
[22] it had become Agfa Corporation?
[23]    A: I believe, to the best of my knowledge,
[24] that's what it is now. I was under the assumption

Page 29

[1] it was Bayer at the time.

[2] **Q:** At the time you started with EFTC, had you

[3] talked with anyone concerning the benefits that they

[4] offered their employees?

[5] **A:** Any of the benefits?

[6] **Q:** Any of the benefits.

[7] **A:** I talked — she was an EFTC person. It was

[8] Stacy Landress. I had asked her about a few of the

[9] benefits that were there.

[10] **Q:** Was that before or after you joined?

[11] **A:** Mostly after I joined.

[12] **Q:** Did you speak with her before you joined

[13] about the benefits?

[14] **A:** I don't think she was really into that part

[15] of it before we joined.

[16] **Q:** The person you met with who came from

[17] headquarters, did you discuss benefits at all with

[18] that person?

[19] **A:** I think when we sat in on the one-on-ones,

[20] I think they kind of gave you an overview of what

[21] they were, not all the details and everything but

[22] kind of an overview as you went along.

[23] **Q:** You don't recall at that meeting whether

[24] there were any handouts?

Page 30

[1] **A:** No.

[2] **Q:** Landress, she was not the person you spoke

[3] with before the transaction —

[4] **A:** No.

[5] **Q:** — is that right? Is she still with EFTC?

[6] **A:** Stacy, no.

[7] **Q:** To your knowledge, did she quit?

[8] **A:** Yes.

[9] **Q:** Do you know where she lives?

[10] **A:** I'm not sure.

[11] **Q:** Do you know, did she leave for another job?

[12] **A:** She left EFTC — well, Suntron. She went

[13] on to Suntron. She's been gone about a year and a

[14] half or two years.

[15] **Q:** Any idea where she is at now —

[16] **A:** No.

[17] **Q:** — if I wanted to find her?

[18] **A:** I wouldn't know where to start. I know her

[19] from being the HR rep, but that's all I know her

[20] from.

[21] **Q:** What conversations do you remember having

[22] with Bayer officials concerning how Bayer benefits

[23] compare to EFTC benefits?

[24] **A:** I personally?

Page 31

[1] **Q:** Yes, you personally.

[2] **A:** I don't believe I ever discussed them with

[3] anybody with Bayer.

[4] **Q:** Do you remember conversations at any of the

[5] group meetings that you attended at which Bayer

[6] representatives discussed how Bayer benefits

[7] compared to EFTC benefits?

[8] **A:** No. Like I said before, I don't know if

[9] that could have been discussed at one of the

[10] meetings I might not have been at.

[11] **Q:** Do you ever recall any conversations about

[12] severance pay that would apply to former Bayer

[13] employees if they were fired from EFTC during the

[14] first year of their employment?

[15] **A:** Did I ever have a conversation?

[16] **Q:** Did you ever hear anyone talk about that

[17] prior to the transaction?

[18] **A:** No.

[19] **Q:** I might have asked this to you. If I did,

[20] my apologies. Individually did you ever have a

[21] conversation with any Bayer managers during which

[22] that person discussed Bayer benefits as opposed

[23] to — please strike the whole question.

[24]      Did you ever have an individual

Page 32

[1] conversation with any Bayer manager where they ever

[2] discussed how EFTC benefits compared to the Bayer

[3] benefits?

[4] **A:** No.

[5] **Q:** Were you ever an audience to any

[6] communication from Bayer Corporation in which it

[7] went through the Severance Pay Plan and described in

[8] detail why the Severance Pay Plan did not apply to

[9] this transaction?

[10] **MR. ROACH:** Objection. You are talking

[11] about '98, before —

[12] **MR. WELSH:** Yes, before the transaction.

[13] **A:** No.

[14] **Q:** Did EFTC have any document that you had to

[15] sign or initial indicating that you accepted

[16] employment with them?

[17] **A:** I believe, as I stated earlier, there was

[18] an employee application.

[19] **Q:** Do you remember whether or not on that

[20] document or any other document there was "at

[21] will" language suggesting that your employment with

[22] EFTC was at will?

[23] **A:** I'm not sure if it is stated, but I believe

[24] it might have because usually that's what they say

Page 33

[1] on applications.
[2]    Q: At the time the transaction concluded, did
[3] you understand that you had been hired by EFTC?
[4]    A: Yes.
[5]    Q: I am going to ask you to turn to the bottom
[6] of Page 5 onto Page 6. And starting with the last
[7] four lines — last words on Page 5 stating, "As part
[8] of their negotiations leading up to the sale, Bayer
[9] and EFTC agreed that Bayer would falsely advise the
[10] Plaintiffs that the Plaintiffs' compensation
[11] benefits, including severance benefits, would remain
[12] the same if the Plaintiffs agreed to work for EFTC."
[13] Do you see that sentence?
[14]    A: Yes.
[15]    Q: Before we go any further on this, let me
[16] just make sure, on Page 17, is that your signature?
[17]    A: Yes, it is.
[18]    Q: Do you believe that as part of the
[19] negotiations leading to sale, Bayer and EFTC agreed
[20] that Bayer would falsely advise the Plaintiffs that
[21] Plaintiffs' compensation and benefits, including
[22] severance benefits, would remain the same?
[23]    A: I believe, following back to the statement,
[24] that benefits comparable, and sometimes exceeding,

Page 34

[1] would have been part of that.
[2]    Q: When was that statement made?
[3]    A: That was made at the two meetings I was at.
[4]    Q: And the term you recall was the benefits
[5] were "comparable"?
[6]    A: "Comparable and in some cases even better."
[7]    Q: "Some cases." Did they say "equal to or
[8] better"?
[9]    A: "Comparable or better" is the way that I
[10] heard it.
[11]    Q: Who made that statement?
[12]    A: Michael Paige made that statement.
[13]    Q: Anyone else?
[14]    A: I believe Norm Fontaine made the statement.
[15]    Q: When you met with EFTC representatives
[16] prior to your employment by EFTC, did you have an
[17] opportunity to ask about what the benefit levels
[18] were?
[19]    MR. ROACH: Objection.
[20]    A: I don't believe I ever brought it up.
[21]    Q: But did you have an opportunity to bring it
[22] up?
[23]    A: I probably would have, yes. There would
[24] have been time while you are in there. We trusted

Page 35

[1] in Bayer to do the right thing for us.
[2]    Q: Other than the statement by Michael Paige
[3] and Norm Fontaine — by Paige and Fontaine, this
[4] would have been in the group meeting?
[5]    A: Yes.
[6]    Q: Is that the only two times you heard anyone
[7] from — is that the only time you heard anyone from
[8] Bayer talk about how the benefits of Bayer would
[9] compare to those of EFTC?
[10]    A: In the meetings, yes.
[11]    Q: Other than those, was there any other facts
[12] which leads you to believe that Bayer and EFTC had
[13] an agreement that Bayer would falsely advise
[14] employees that the benefits would remain the same?
[15]    MR. ROACH: Objection.
[16]    A: I don't know. There was no other document,
[17] no other conversation, no. Just going by what they
[18] say.
[19]    Q: Here it says "remain the same," doesn't it?
[20]    A: (Reviewing document) Yes.
[21]    Q: Mr. Paige did not tell the employees at the
[22] meeting you attended that the benefits would remain
[23] the same, did he?
[24]    A: No. He said "comparable."

Page 36

[1]    Q: But he didn't use the word "the same"?
[2]    A: Correct.
[3]    Q: The way you use the terms, do you use the
[4] word the "same" interchangeably with "comparable"?
[5]    MR. ROACH: Objection.
[6]    A: In my mind, you could say that. That would
[7] be only my way of thinking of it.
[8]    Q: Did you ever look at the Summary Plan
[9] Descriptions to see if the term "comparable" was
[10] discussed in there at all with respect to severance
[11] pay benefits?
[12]    A: I never looked at it that way, no, but it
[13] was after when we were starting to go through this.
[14]    Q: You mean after you started with EFTC and
[15] you started to consult with Mr. Roach about whether
[16] or not you might have a case?
[17]    A: That's correct.
[18]    Q: Did anyone at these group meetings ever
[19] tell you that Bayer was going to sell the Agfa
[20] Wilmington division of Bayer to EFTC?
[21]    A: No.
[22]    Q: Was it always clear at these meetings that
[23] what was being sold is the printed circuit board
[24] shop?

Page 37

[1] **A:** The board shop, yes.

[2] **Q:** If you look at the bottom of Page 6, you

[3] indicated that at the group meeting, that you

[4] individually with Mr. Ramsden — people asked, "Are

[5] we eligible for severance?" They were told "no."

[6] Then you asked Mr. Ramsden. Are you aware of any

[7] Plaintiffs who claimed to Bayer that if Bayer

[8] terminated them, Bayer was required to pay

[9] severance? Anyone make a claim that "we are

[10] entitled to severance"?

[11] **MR. ROACH:** Objection. You are talking

[12] about before?

[13] **MR. WELSH:** Before the transaction.

[14] **A:** Can you just rephrase that?

[15] **Q:** Look at the first sentence under (b), if

[16] you will. I will read it out loud. "Shortly before

[17] Bayer terminated the Plaintiffs' employment,

[18] Plaintiffs claimed to Bayer that, if Bayer

[19] terminated them, then Bayer was required by the

[20] Bayer Plan to pay them severance benefits." Can you

[21] tell me who those Plaintiffs are?

[22] **A:** I believe one of them would be me asking

[23] Mr. Ramsden, like I stated before, like "We are not

[24] leaving Bayer. Bayer is terminating us."

Page 38

[1] **Q:** So one would be you asking Mr. Ramsden?

[2] **A:** Yes.

[3] **Q:** Any others?

[4] **A:** And I believe when Robert Brown asked a

[5] question why you can't get severance. "We are not

[6] leaving the company. The company is leaving us."

[7] **Q:** That was at the group meeting?

[8] **A:** At the group meetings, I don't know if he

[9] asked Mr. Ramsden or Mr. Paige, but I believe it was

[10] either one of them.

[11] **Q:** Other than you and Mr. Brown, are there any

[12] other people who are being referred to here by the

[13] term "Plaintiffs"?

[14] **A:** No, I wouldn't —

[15] **Q:** In your conversation — it says, again,

[16] "Shortly before Bayer terminated the Plaintiffs'

[17] employment, Plaintiffs claimed to Bayer that, if

[18] Bayer terminated them, then Bayer was required by

[19] the Bayer Plan to pay them severance benefits.

[20] Bayer responded by orally denying Plaintiffs' claim

[21] for severance benefits. In doing so, Bayer", and it

[22] has "First," "Then" and "Finally."

[23] Did you have any conversation with any

[24] Bayer representative where they went through the

Page 39

[1] statements listed here as "First," "Then" and

[2] "Finally"?

[3] **A:** No, I didn't have any conversation with

[4] them.

[5] **Q:** You see there's another paragraph that

[6] starts, "When the Plaintiffs questioned Bayer's

[7] claim that EFTC was offering each Plaintiff words,

[8] to the effect, of a comparable or same position"?

[9] Do you see that?

[10] **A:** Yes.

[11] **Q:** Do you recall any employees prior to the

[12] transaction telling Bayer that they did not believe

[13] EFTC was offering comparable positions?

[14] **A:** No.

[15] **Q:** To your knowledge, did all Plaintiffs

[16] believe they were being offered comparable positions

[17] at the time they accepted employment with EFTC?

[18] **A:** Yes.

[19] **Q:** In the next paragraph down it says, "When

[20] Plaintiffs questioned Bayer's basis for making the

[21] promise." Do you recall what Plaintiffs those were?

[22] **A:** I believe that's Robert Brown, again, asked

[23] the question, the questions of —

[24] **Q:** Other than Robert Brown —

Page 40

[1] **MR. ROACH:** Let him answer the question.

[2] **A:** And he asked the two questions, like I

[3] said, "Can I get severance?" And he said "no."

[4] "What if I choose not to go with EFTC?" Then he

[5] said, "Then you'd be terminating your own

[6] employment."

[7] **Q:** Did they also discuss at that time

[8] unemployment insurance?

[9] **A:** I believe they said, "You wouldn't be

[10] eligible for unemployment because you would be

[11] leaving your job. You'd be quitting your job if you

[12] don't take the job with EFTC."

[13] **Q:** Other than that conversation, the group

[14] meeting by Mr. Brown and a speaker from Bayer, do

[15] you recall any other circumstances where Plaintiffs

[16] questioned Bayer about what would happen if they

[17] didn't join EFTC?

[18] **MR. ROACH:** Objection. Are you asking his

[19] recollection or people he has also spoken to?

[20] **MR. WELSH:** Both.

[21] **A:** In the group, when they were having

[22] meetings, the couple that I was at, the question did

[23] come up by other employees that were part of this.

[24] **Q:** Which employees?

Joseph Adams, et al. 1:04-cv-10728-WGY  Document 42-26  Filed 01/17/2007  Page 11 of 22
Bertrand R. Guilmette
Bayer Corporation, et al.
Vol. 1, April 21, 2006

Page 41

[1] A: I wouldn't remember. The only reason I
[2] remember Reggie — I call him "Reggie," Robert
[3] Brown — is because he was very vocal.
[4] Q: You believe the others raised questions too
[5] at the group meetings?
[6] A: Other questions were asked about the same
[7] situation.
[8] Q: Can you remember the specifics about those
[9] questions?
[10] A: Like why —
[11] Q: Who spoke, what they said.
[12] A: Like "Why can't we get this benefit?" He
[13] said, going back to the reasoning, that "You are not
[14] going to lose any employment, you are going to go
[15] right into a job, so we are not going to offer any
[16] severance benefits." Other employees asked the
[17] question like at that time, "But what if we don't
[18] want to take this job?" They were told, "If you
[19] don't take the job, you don't have a job, you are
[20] leaving."
[21] Q: Did any employees at any time up until you
[22] became an EFTC employee share with you why they
[23] didn't want to take the job?
[24] A: Not really. I think they were more

Page 42

[1] concerned about not getting their benefit, the
[2] severance.
[3] Q: Other than the severance benefits, to your
[4] knowledge, everyone was willing to take the job?
[5] A: I believe they were willing to take it
[6] because there was no other — they felt there was no
[7] other option and that's what Bayer was offering us
[8] and thinking that we are going into something that
[9] could be as good or better.
[10] Q: Did any employee ever come to you and say,
[11] "I don't want to work for EFTC. I want to stay with
[12] Bayer"?
[13] A: They didn't come to me, no.
[14] Q: You didn't have those conversations with
[15] anyone?
[16] A: No. I don't know why they would come to me
[17] personally.
[18] Q: Do you know of any employees who went to
[19] Bayer and asked, "Can we stay with the company?"
[20] A: I believe there were several employees.
[21] Q: Did those employees ever talk to you why
[22] they wanted to stay with Bayer?
[23] A: Yes.
[24] Q: What did they tell you?

Page 43

[1] A: Because they liked Bayer, they thought it
[2] was a great company, and they trusted in it.
[3] Q: Anything else?
[4] A: The benefits they had to offer, it was far
[5] superior to what we got. That's what they said.
[6] They liked what they saw in Bayer.
[7] Q: But at the time this transaction was going
[8] down, just before its consummation, is it fair to
[9] say several employees indicated they wanted to stay
[10] with Bayer because Bayer's benefits were superior?
[11] A: They didn't tell me before this, no. It
[12] was after the fact.
[13] Q: After the fact they told you the reason
[14] they had wanted to stay with Bayer is because they
[15] were aware the benefits of Bayer were superior?
[16] A: Correct. And they said they asked at the
[17] time, they had asked Mr. Ramsden or Mr. Fontaine or
[18] Mary Leonard if they could stay with the company.
[19] Q: When you accepted employment with EFTC, did
[20] you believe that their severance benefits were
[21] comparable to Bayer's?
[22] A: Yes.
[23] Q: Did you do anything to research that to see
[24] if that was true?

Page 44

[1] A: No.
[2] Q: Were you aware at that time of a deal
[3] between Bayer and EFTC which provided former Bayer
[4] employees with special severance benefits for the
[5] first year of the EFTC employment?
[6] A: I wasn't aware of it then, no.
[7] Q: Are you aware of any employee of Bayer's
[8] who went to EFTC who was involuntarily terminated
[9] during the first year of their employment?
[10] A: No.
[11] Q: I am going to ask you to turn to Page 8.
[12] Will you look at the paragraph that starts with
[13] "Moreover" on the bottom. "Moreover, the Plaintiffs
[14] came to learn that Bayer misrepresented the terms of
[15] the sale of the Agfa Division in that, under the
[16] Plan, all the assets of the Division were not sold."
[17] In 1998 did you ever believe that the sale to EFTC
[18] involved all the assets of the Agfa Division?
[19] MR. ROACH: Objection. You can answer.
[20] A: No. They were selling just the board shop,
[21] the assembly and fab areas.
[22] Q: You see it talks about a misrepresentation
[23] here. In your view, is that an error?
[24] MR. ROACH: Objection. Again, his lawyer,

Bertrand R. Guinnetic
Vol. 1, April 21, 2006

Case 1:04-cv-10728-WGY    Document 42-26    Filed 01/17/2007    Page 12 of 22
Joseph Attardi, et al.    v.
Bayer Corporation, et al.

Page 45

[1] meaning me, drafted this answer to interrogatory
[2] fully and fairly, unlike the ones we got from the
[3] Defendants, and includes some legal conclusions
[4] based on facts. If you are asking him to interpret
[5] something, that is asking him a legal opinion. I
[6] object.
[7]    MR. WELSH: I am asking factually. It says
[8] here, "Bayer misrepresented the terms of the sale."
[9] I want to know what the misrepresentation is.
[10]    MR. ROACH: I am going to object. You can
[11] go ahead and answer the question.
[12]    Q: What was the misrepresentation of the term
[13] of the sale?
[14]    A: When we found out, by looking at the plan,
[15] the summary plan, that if a division is sold, you
[16] are not entitled to a benefit. The whole division
[17] wasn't sold. So it was like a misrepresentation
[18] because the whole division was not sold.
[19]    Q: Did anyone at Bayer ever tell you that the
[20] whole division was sold —
[21]    MR. ROACH: Objection.
[22]    Q: — or was going to be sold?
[23]    MR. ROACH: You can answer.
[24]    A: No.

Page 46

[1]    Q: Sir, had you ever made a request for a copy
[2] of the Bayer Severance Pay Plan No. 9 prior to
[3] retaining a lawyer?
[4]    A: No.
[5]    MR. ROACH: Can we take a quick break?
[6]    (Recess taken)
[7]                    BY MR. WELSH:
[8]    Q: Sir, about seven lines down, you see the
[9] words in the left margin "deliberately concealed."
[10]    A: Yes, I do.
[11]    Q: The sentence, "Accordingly, the Bayer
[12] Defendants deliberately concealed the Bayer Plan
[13] from Plaintiffs." Do you have any information
[14] whatsoever that would suggest that Bayer
[15] deliberately concealed the Severance Pay Plan from
[16] the Plaintiffs?
[17]    A: I know in going over some documents with
[18] Steve, Mr. Roach, there are some documents that they
[19] talk about the differences from one company to
[20] other with Michael Paige, being the heading on it.
[21] It's all notes that I believe that Bayer had that
[22] Steve was able to get, that it does state in there
[23] something about the severance plan and trying to
[24] avoid them paying the severance plan.

Page 47

[1]    Q: Right. But do you have any basis to
[2] believe that Bayer deliberately tried to hide this
[3] document, Exhibit 9, from any of the Plaintiffs?
[4]    MR. ROACH: Objection. You mean that paper
[5] or the benefits in general?
[6]    MR. WELSH: The Bayer Severance Pay Plan
[7] restated effective as of January 1, 1995.
[8]    MR. ROACH: Objection.
[9]    Q: Any basis that Bayer tried to hide this
[10] Master Severance Pay Plan from any of the
[11] Plaintiffs?
[12]    MR. ROACH: I think he answered that, but
[13] go ahead.
[14]    A: That document per se, no. But like I just
[15] said, Mr. Roach does have documents in his office
[16] that we reviewed, other documents which relates to
[17] the plans and everything that says that Mr. Paige
[18] was working on something to try and avoid paying the
[19] severance.
[20]    Q: Right. Under the terms, Mr. Paige secured
[21] an arrangement by which EFTC would pay each of the
[22] Plaintiffs their Bayer salary, correct?
[23]    MR. ROACH: Objection.
[24]    A: Their Bayer salary?

Page 48

[1]    Q: The same salary they received at Bayer at
[2] the time that they stopped being employed by Bayer.
[3]    A: But I am talking about —
[4]    Q: It is your understanding that Mr. Paige was
[5] able to arrive at an arrangement with EFTC whereby
[6] each of the employees of the board shop would be
[7] offered employment by EFTC at a salary equivalent to
[8] what they had been paid by Bayer, correct?
[9]    MR. ROACH: Objection.
[10]    A: Correct. I think there would have been a
[11] totally different situation if they didn't become
[12] comparable with it because then it would get into
[13] other parts of the plan that they would probably
[14] have to pay the severance if they didn't go.
[15]    Q: Did you ever see whether or not the pension
[16] plan defined what "comparable" was for purposes of
[17] severance pay payments?
[18]    A: Pension plan or —
[19]    Q: Please strike that. The Severance Pay
[20] Plan.
[21]    MR. ROACH: Are you talking in 1998 or
[22] subsequently?
[23]    MR. WELSH: 1998.
[24]    MR. ROACH: Objection. Go ahead.

Page 49

[1] **A:** No. I didn't see the one for 1998, no.

[2] **Q:** I am going to show you on Page 4 of the

[3] severance pay portion of Exhibit 5, there's a

[4] definition of "comparable position." Have you seen

[5] that before?

[6] **A:** Yes.

[7] **Q:** On No. 1, it is true, is it not, that your

[8] employment with EFTC was within 35 miles of where

[9] the location of your employment at Bayer was?

[10] **A:** It was in the same building, so it was the

[11] same thing.

[12] **Q:** Your wage and salary level, without

[13] reference to employee benefits, was equal to or

[14] greater than your wage or salary level on the date

[15] of your termination with Bayer?

[16] **MR. ROACH:** I am just going to object. He

[17] is not an attorney. But to the extent he can

[18] understand the language that you are showing to him,

[19] fine. But I object.

[20] **A:** You are saying it's at a salary level,

[21] without regard to the benefits, but equal to or

[22] greater than the wage?

[23] **Q:** Right. That was true with you?

[24] **A:** Yes. But you were saying Michael Paige

Page 50

[1] also negotiated salary, but —

[2] **Q:** So are you aware whether or not Michael

[3] Paige negotiated with EFTC to ensure that the wage

[4] offer they made to you was equivalent to the wages

[5] you were receiving at Bayer?

[6] **A:** I believe he had to, yes. Other than that,

[7] the people probably would have chose not to go

[8] because they would have wanted to stay with the

[9] better company.

[10] **Q:** What do you think would have happened then?

[11] **A:** I think the people would have chose to

[12] stay — if the people chose not to go to EFTC, I

[13] don't think EFTC wanted — they wanted the people.

[14] They wanted the expertise.

[15] **Q:** Was it your understanding that Bayer would

[16] have simply continued to operate the board shop if

[17] people did not go to EFTC?

[18] **MR. ROACH:** Objection.

[19] **A:** I wouldn't know what they would do in that

[20] situation.

[21] **Q:** Is there any information you have that you

[22] have not testified to here today during your

[23] deposition which you think is relevant to your claim

[24] for severance pay benefits?

Page 51

[1] **A:** No.

[2] **MR. ROACH:** Objection.

[3] **MR. WELSH:** We will take a break now. I

[4] will go through my notes. We might be finished with

[5] you.

[6] (Recess taken)

[7] **MR. WELSH:** I have no further questions.

[8] **MR. ROACH:** I just have a few questions.

[9] **CROSS EXAMINATION**

[10] **BY MR. ROACH:**

[11] **Q:** Directing your attention to Exhibit 10,

[12] Page 6, top of Page 6, where it talks about "Bayer

[13] and EFTC agreed that Bayer would falsely advise the

[14] Plaintiffs that the Plaintiffs' compensation and

[15] benefits, including the severance benefits, would

[16] remain the same." Do you see that?

[17] **A:** Yes.

[18] **Q:** Is there anything further on that, other

[19] than what you have testified to, with respect to any

[20] other basis for that statement in Exhibit 10?

[21] **A:** What do you mean? Like about some of the

[22] documents we saw with Michael Paige?

[23] **Q:** Yes. Anything else?

[24] **A:** Going back and forth, you can see the

Page 52

[1] listing of how EFTC wanted all the people, they

[2] wanted the expertise. And Michael Paige was

[3] meeting — I don't know if it was secretly or

[4] without us knowing that he was meeting with them —

[5] to come up with something to make sure the people

[6] go.

[7] **Q:** Did the documentation say anything about

[8] comparison of benefits between EFTC and Bayer?

[9] **A:** I believe Michael Paige had some things

[10] listed, like Bayer's benefits, EFTC's benefits.

[11] **Q:** Looking at that, what did the comparison

[12] show, if you recall?

[13] **A:** It showed Bayer's benefits were far better

[14] than any of EFTC's benefits, including severance and

[15] all the benefits they offer.

[16] **Q:** Did you see any documentation talking about

[17] whether Bayer believes it had to pay severance to

[18] any of the Plaintiffs in this case?

[19] **A:** I don't think they believed they had to pay

[20] any severance, but they were trying to make sure

[21] that they didn't pay any, so they were — I don't

[22] know what you mean by that. If you could kind of

[23] rephrase that a little.

[24] **Q:** Or anything talking about severance and

Bertrand R. Guibette v. Bayer Corporation, et al.
Joseph Guibette, et al. v.
Bayer Corporation, et al.
Vol. 1, April 21, 2006

Page 53

[1] what they would do with severance. Did you see any
[2] documentation on that?
[3]  **A:** Yes. There was one that if you went to
[4] EFTC and if anything happened within the first year,
[5] Bayer would pay the benefit of the severance which
[6] is equal to six months, I believe it said in the
[7] document. It wasn't what Bayer offered as their own
[8] benefit, but it was better than what EFTC would
[9] offer.
[10]  **Q:** I would like to show you Exhibit —
[11] Attachment 3 of Exhibit 10. You said six months. I
[12] would just like to show you No. 11.
[13]  **A:** Yes.
[14]  **Q:** Do you see that?
[15]  **A:** Yes.
[16]  **Q:** It says, "EFTC - severance package four
[17] weeks maximum"?
[18]  **A:** That's correct.
[19]  **Q:** That's not six months. That's four weeks
[20] maximum, correct?
[21]  **A:** Correct.
[22]  **Q:** So when you said "six months," what did you
[23] mean by that?
[24]  **A:** I believe Michael Paige and EFTC worked

Page 54

[1] something out that if, looking at that document,
[2] that if EFTC were to let any employees go within the
[3] first year, they would have to pay the severance up
[4] to six months as the new benefit.
[5]  **Q:** So within six months they would have to pay
[6] four weeks maximum?
[7]  **A:** No. This is what EFTC's benefit is. Bayer
[8] would have to pick up and then pay the difference.
[9]  **Q:** Now with respect to the — I'm not sure the
[10] question was asked, but do you have any evidence —
[11] strike that. I'm not sure the question was asked,
[12] but do you have any knowledge of any specific other
[13] Plaintiffs — and I will show you the Exhibit 10,
[14] the list of people at the top — who went
[15] specifically and talked to anybody at Bayer about
[16] the severance?
[17]  **A:** I believe there were several people that
[18] did it, that asked if they could either stay with
[19] Bayer or could they get their severance if they left
[20] the company.
[21]  **Q:** These people were people that asked the
[22] question of Bayer, people individually as opposed to
[23] at the meeting with Robert Brown where Robert Brown
[24] and some other people made some statements, correct?

Page 55

[1]  **A:** Correct. They were personal questions to
[2] Rodney Willis, Dick Ramsden, Norm Fontaine, Mary
[3] Leonard. Some of the ones that expressed that were
[4] like Mary Bogdan, Robert Brown, Carol Christianson,
[5] Gary Frizzell, Linda Paradis, Janice Paradis, Ed
[6] Wright, Anita Kopacz, Phil Green.
[7]  **Q:** These people you just listed, is it your
[8] testimony that those are people who specifically
[9] went to some of those Bayer officials and asked them
[10] about severance in addition to the meetings?
[11]  **A:** Yes.
[12]  **Q:** Do you know what they were told by the
[13] Bayer individuals?
[14]  **A:** They were told a similar thing that
[15] everybody else, that "You won't get severance. We
[16] are offering you a job with EFTC. And if you take
[17] the job, you go to work there. If you don't take
[18] the job, you have no job, you have no severance, you
[19] have no eligibility for unemployment."
[20]  **Q:** With respect to before the sale to EFTC was
[21] made, did you know of anybody else that received
[22] severance pay, whether they had a job or not?
[23]  **A:** I believe they had layoffs throughout the
[24] years and people received severance, some people I

Page 56

[1] knew. They also had times when upper management
[2] would like leak out declining business conditions
[3] and offer if people want to volunteer to take a
[4] layoff, they'd be available and have that option to
[5] put their name on the list and when they got the
[6] right amount of people they would have a layoff, I
[7] mean they would lay them off.
[8]  **Q:** Do you remember the names of any of the
[9] people that got severance benefits?
[10]  **A:** I know two. There was a Roselle Theriault
[11] and a Jerry Languirand.
[12]  **Q:** How about Thomas Andrews?
[13]  **A:** I'm not sure. I think his situation was a
[14] little different. There was a layoff for him. When
[15] it all came about, he had only a few more months to
[16] go to reach per se the magic number for his
[17] benefits, and they took him back and let him
[18] complete that service prior to laying him off.
[19]  **Q:** Other than the people that you have
[20] mentioned, were there other people that you know
[21] that the management would circulate that they are
[22] going to have a layoff and do people want to
[23] volunteer to take severance?
[24]  **A:** Other than those other few?

[1] Q: Yes. Other than these people, were there
[2] other people that you know?
[3] A: That I would know? No. I wouldn't know
[4] personally. But it is what they would say, is if
[5] they get the people to volunteer, it makes it a lot
[6] easier for them than it is to have to go out to
[7] someone and take them off the job.
[8] Q: How would word get circulated by management
[9] through the departments?
[10] A: I think it would just leak out through the
[11] department, through one person to another.
[12] Q: And with respect to these group meetings
[13] that Bayer had in announcing the purchase, the
[14] impending purchase, did Bayer say to the employees
[15] in both of the meetings you were at, anybody from
[16] Bayer, that it would be a win-win situation?
[17] A: That's all we heard. And you'd hear
[18] employees talking about it after, after meetings,
[19] the ones that I wasn't there, that the same
[20] situation, win-win, it's a perfect fit, EFTC is
[21] excited about taking these people on and taking on
[22] this area, and it is going to be comparable, if not
[23] better, benefits. It's almost like, "If you don't
[24] go, you're crazy." They should have said, "It's too

[1] MR. ROACH: Objection. Go ahead.
[2] A: No. I believe they were just — people
[3] would go in to their supervisors or managers and
[4] say, "I hear there's a layoff coming up and I would
[5] like to put my name on the list."
[6] Q: Are you aware of any time when they had a
[7] voluntary layoff program where they had an exception
[8] to the severance pay policy and they went out and
[9] solicited volunteers for layoff?
[10] MR. ROACH: Objection.
[11] A: No, I wouldn't know that.
[12] Q: Have you ever talked to HR to see whether
[13] or not such a program existed?
[14] MR. ROACH: Objection.
[15] A: No, because I wasn't in a situation to take
[16] a layoff.
[17] Q: Were you ever asked to take a layoff?
[18] A: No.
[19] Q: Are you aware of any voluntary layoffs in
[20] the board shop?
[21] A: Not in — excuse me. In the assembly area,
[22] yes.
[23] Q: Who were you aware of in the assembly area?
[24] A: That was — this is prior to when we were

[1] good to be true."
[2] Q: Had Bayer ever said anything to you before
[3] in your time there, Bayer or any of its
[4] predecessors, where you were lied to or
[5] misrepresented in anything?
[6] A: No. It was always, from Compugraphics to
[7] Agfa to Miles to Bayer, it was always a great
[8] company. Things always got better. And we were
[9] always informed of any upcoming things, like "You
[10] are going to be moving into this, this company is
[11] going to be taking over the name and these are your
[12] new benefits." And everything always looked better.
[13] Q: Did you trust them?
[14] A: Yes, I did.
[15] MR. ROACH: Nothing further.
[16] MR. WELSH: I have a few.
[17] REDIRECT EXAMINATION
[18] BY MR. WELSH:
[19] Q: With respect to these times when employees
[20] volunteered for layoff, do you know whether or not
[21] the company ever adopted a special voluntary layoff
[22] program for those people?
[23] A: No, I don't.
[24] Q: You don't know one way or another?

[1] just Bayer, when we weren't EFTC, and it was Roselle
[2] Theriault and Jerry Languirand. Those two both were
[3] assembly personnel.
[4] Q: Were there other layoffs going on at the
[5] company at that time?
[6] A: I believe so, yes.
[7] Q: Did you ever talk to anyone at HR as to
[8] whether or not there was a special policy adopted
[9] for those voluntary layoffs?
[10] A: No.
[11] Q: You talked, on cross-examination by your
[12] counsel, about Exhibit 10, Attachment 3. It's
[13] entitled "Benefits Agfa vs. EFTC."
[14] A: Yes.
[15] Q: Did you create that document? Are you the
[16] author?
[17] A: I am the typist. And part of them were
[18] from me asking questions of people that are on the
[19] case. We asked them if they had anything that they
[20] would like to share as we were going forward with
[21] this, and people gave their input.
[22] Q: Did you look at any EFTC documents to get
[23] your information here?
[24] A: This was created after this — was like two

Bertrand R. Guillmette
Vol. 1, April 21, 2006

Case 1:04-cv-10728-WGY    Document 42-26    Filed 01/17/2007    Page 16 of 22    Joseph Girard, et al. v.
Bayer Corporation, et al.

[1] years later into our employment.

[2]   **Q:** Was this before or after you contacted Mr.
[3] Roach?

[4]   **A:** This was after we contacted Mr. Roach. We
[5] were putting this together.

[6]   **Q:** Let me just show you a letter. If you look
[7] to the next attachment, Attachment 4, there's an
[8] April 5, 2002, letter from Mr. Roach to Agfa
[9] Corporation. Is it about the time of this letter
[10] that Attachment 3, the benefits comparison, was
[11] compiled?

[12]   **A:** I think it could be around there or later
[13] or sooner. I wouldn't know the exact date when we
[14] put it together.

[15]   **Q:** It wasn't during 1998?

[16]   **A:** No.

[17]   **Q:** It wasn't during 1999?

[18]   **A:** Correct.

[19]   **Q:** When you put this together, did you have in
[20] front of you any documentation from EFTC?

[21]   **A:** No.

[22]   **Q:** So this was done off employee memory?

[23]   **A:** From what we could remember back to that
[24] time, correct.

[1]   **Q:** Did you ever seek any documentation from
[2] EFTC to assure that the terms stated on this
[3] Attachment 3 were in fact correct?

[4]   **A:** I believe once we all went over to the
[5] company, when we went to EFTC and we learned about
[6] all the benefits through all the people in the suit
[7] itself, in the case here, all the knowledge that
[8] they picked up as they were going once we were part
[9] of the company, all agreed that this is what it was.
[10] In fact, the majority are still about the same.

[11]   **Q:** My question is did you have any documents
[12] from EFTC to verify this?

[13]   **A:** No. Just what my benefits were, my own.

[14]   **Q:** Does EFTC have a handbook or something
[15] which sets forth all their benefits?

[16]   **A:** I believe so.

[17]   **Q:** Do any of the employees have a copy of that
[18] document?

[19]   **A:** I would have to ask.

[20]   **Q:** Was that question ever asked when we made
[21] our request for production of documents to the
[22] Plaintiffs?

[23]   **MR. ROACH:** I don't know if he would know
[24] that, Mr. Welsh.

[1]   **MR. WELSH:** He is a representative. I can
[2] only ask what he knows.

[3]   **MR. ROACH:** All I can say is we gave you
[4] what we had.

[5]   **MR. WELSH:** I don't recall anything like
[6] that.

[7]   **MR. ROACH:** You can obtain it from EFTC if
[8] you wish.

[9]   **MR. WELSH:** I guess we can.

[10]       **BY MR. WELSH:**

[11]   **Q:** I am just looking to understand the basis
[12] from which this document was compiled. If I have it
[13] right, it was based on employee memory.

[14]   **A:** Yes.

[15]   **Q:** Now, you have a list of employees who you
[16] said that individually went to Bayer and asked if
[17] they could stay or they could get severance. Who
[18] were those people, again?

[19]   **A:** I believe there was Mary Bogdan.

[20]   **Q:** Let's start with Ms. Bogdan. Who did she
[21] speak with?

[22]   **A:** I wouldn't know exactly who she spoke with.
[23] But the four representatives that I listed, being
[24] Rodney Willis, Dick Ramsden, Norm Fontaine or Mary

[1] Leonard, these employees, one or the other. Some
[2] talked to three of them.

[3]   **Q:** What I want to do now — I understand. I
[4] want to take you through the employees and ask you
[5] what you know about each. If you know, please tell
[6] me. If you don't know, tell me. Ms. Bogdan, do you
[7] know who she spoke with?

[8]   **A:** I couldn't tell you. One of the four or
[9] three of the four.

[10]   **Q:** Did she have more than one conversation?

[11]   **A:** I believe if she talked to more than one,
[12] she would have to. But to give you the names, I
[13] couldn't give you the names of them.

[14]   **Q:** And that's fair. And I expected most of
[15] the questions I am about to ask you, you are going
[16] to tell me, "I don't know" or "I don't remember."
[17] Okay? But I am trying to be exhaustive here.

[18]   With Ms. Bogdan, do you know if she had one
[19] or more than one conversation?

[20]   **A:** I don't know.

[21]   **Q:** Do you know, of the four people you
[22] mentioned, if she talked to more than one of them?

[23]   **A:** I don't know.

[24]   **Q:** Did Ms. Bogdan ask if she could stay at

Page 65

[1] Bayer?

[2]  **A:** I believe that was part of her question, if

[3] she could stay at Bayer or could she get severance.

[4]  **Q:** Did Ms. Bogdan indicate to you if she told

[5] the representatives at Bayer why she wanted to stay

[6] at Bayer?

[7]  **A:** No, she didn't. She didn't state it.

[8]  **Q:** Did she ever indicate to you that she

[9] wanted to stay at Bayer rather than go to EFTC?

[10]  **A:** She said to me that the reason why she — I

[11] don't know if she stated to them. But she stated to

[12] me that she trusted the company, she always had

[13] trust in Bayer.

[14]  **Q:** Did she tell you that is the reason she

[15] wanted to stay at Bayer?

[16]  **A:** She wanted to stay at Bayer because it was

[17] a good company to work for.

[18]  **Q:** Any other reason?

[19]  **A:** No, she didn't.

[20]  **Q:** The second one, is it Mr. Brown?

[21]  **A:** Robert Brown.

[22]  **Q:** He is the person who spoke during the group

[23] meeting?

[24]  **A:** He spoke during the group meeting. I

Page 66

[1] believe he also asked one of them personally.

[2]  **Q:** Do you know who he asked personally?

[3]  **A:** No, I don't.

[4]  **Q:** Do you know if it was more than once?

[5]  **A:** No, I don't.

[6]  **Q:** Do you know what it was he asked them?

[7]  **A:** If he could stay with the company to get a

[8] severance package.

[9]  **Q:** Are you sure that he asked, "Can I stay

[10] with the company or get a severance package?"

[11]  **A:** Yes.

[12]  **Q:** As you sit here, you are sure he didn't

[13] just ask for one or the other?

[14]  **MR. ROACH:** Objection.

[15]  **A:** He asked both, like "Could I stay?"

[16]  **Q:** Do you have any notes — are you aware of

[17] any notes which record what he asked and who he

[18] asked?

[19]  **MR. ROACH:** Other than communications in

[20] anticipation of litigation?

[21]  **MR. WELSH:** I just wanted to know if there

[22] are notes. I am not asking for the contents now.

[23]  **MR. ROACH:** I will state for the record

[24] that there's been communications from the

Page 67

[1] representatives to the individuals about some of

[2] these issues that have come back.

[3]  **MR. WELSH:** Communication from them back?

[4]  **MR. ROACH:** Right.

[5]  **MR. WELSH:** Are those electronic?

[6]  **MR. ROACH:** I think they probably were sent

[7] by e-mail and written responses came back.

[8]  **MR. WELSH:** Just so the record is clear,

[9] pursuant to my document request and my need to

[10] update the interrogatories, I am going to ask for

[11] those communications. I am also going to ask that

[12] the interrogatories be supplemented so I can decide

[13] whether or not I have to go through ten people and

[14] take their deposition.

[15]  **MR. ROACH:** As to the interrogatories, I

[16] have no objection to supplementing. Those requests

[17] went out after the interrogatories. But I have no

[18] objection to supplementing the answers to

[19] interrogatories. As to the documents, I object to

[20] those. They will not be produced because they are

[21] in anticipation of litigation and trial. It is

[22] between the Plaintiffs. It is communications

[23] between the Plaintiffs with respect to anticipation

[24] of litigation or trial at my direction.

Page 68

[1]                       **BY MR. WELSH:**

[2]  **Q:** Did you ever sign any joint participation

[3] agreement among the Plaintiffs?

[4]  **MR. ROACH:** Objection. What do you mean by

[5] that?

[6]  **MR. WELSH:** Joint defense agreement.

[7]  **Q:** Did you ever sign any written agreement

[8] among and between Plaintiffs indicating that you

[9] were going to share confidences and keep those

[10] confidences?

[11]  **MR. ROACH:** I don't think he needs to

[12] answer that. I am representing all the Plaintiffs

[13] individually. They have agreed that these are the

[14] designated representatives. I am not going to get

[15] into him interpreting legal significance of

[16] documents and legal interpretation of documents.

[17]  **MR. WELSH:** Are you telling him not to

[18] answer?

[19]  **MR. ROACH:** That's right.

[20]  **Q:** Is there any document that you have seen

[21] signed by the Plaintiffs authorizing you to act on

[22] their behalf?

[23]  **MR. ROACH:** I am going to object, but I am

[24] going to let him answer. Go ahead.

Page 69

[1] **A:** I believe they all agreed.

[2] **Q:** Is there any document you have seen signed
[3] by the Plaintiffs authorizing you to act on their
[4] behalf?

[5] **A:** I believe there is.

[6] **MR. ROACH:** And that's privileged.

[7] **MR. WELSH:** On what basis?

[8] **MR. ROACH:** It was at my direction. I
[9] drafted it. It was an agreement among all the
[10] Plaintiffs.

[11] **MR. WELSH:** My question is how is it
[12] privileged?

[13] **MR. ROACH:** It is privileged because it is
[14] in anticipation of litigation and trial.

[15] **MR. WELSH:** In anticipation of litigation?

[16] **MR. ROACH:** Attorney-client privilege
[17] communication.

[18] **MR. WELSH:** If it is an agreement among and
[19] between them, it can't be an attorney-client
[20] communication.

[21] **MR. ROACH:** It's part of litigation.

[22] **MR. WELSH:** That is not a privilege.

[23] **MR. ROACH:** I think it is. We can argue
[24] about it if you want.

Page 70

[1] **MR. WELSH:** I am going to request that
[2] document be produced.

[3] **MR. ROACH:** It will not be produced absent
[4] a court order.

[5] **MR. WELSH:** Let's consider this our
[6] conference on that topic, and we will move forward.

[7] **MR. ROACH:** And I will ask for similar
[8] documents among the Defendants.

[9] **MR. WELSH:** That's fine. I think you have
[10] been given them.

[11] **BY MR. WELSH:**

[12] **Q:** I guess the next person after, is it Carol
[13] Christianson?

[14] **A:** Yes.

[15] **Q:** What is your understanding concerning
[16] communications she had?

[17] **A:** I believe the same. I wouldn't know who
[18] she talked to or how many she talked to.

[19] **Q:** Do you know precisely what she asked?

[20] **A:** Same. "Can I stay with the company? Can I
[21] get severance?"

[22] **Q:** Each of the people we have talked about so
[23] far asked both whether they could stay and whether
[24] they could get severance?

Page 71

[1] **A:** I believe all of them did. All the same
[2] situation.

[3] **Q:** All the people asked the same question?

[4] **A:** Yes, at one time or another to any one of
[5] those representatives. I'm not sure how many or
[6] which ones.

[7] **Q:** Gary, is it —

[8] **Q:** Frizzell.

[9] **Q:** Frizzell. You don't know who he spoke
[10] with?

[11] **A:** No, I don't.

[12] **Q:** You don't know how many conversations he
[13] had?

[14] **A:** No.

[15] **Q:** Is it your understanding that he asked,
[16] "Can I stay with the company or get severance?"

[17] **A:** Yes.

[18] **Q:** Do you know why he wanted to stay with the
[19] company?

[20] **A:** All similar. Like they were happy with the
[21] company. You had a good job, you were comfortable
[22] there, you were working for a company that did
[23] everything for the employees, always bettered you.
[24] They just wanted to stay.

Page 72

[1] **Q:** And you had no reason to believe that EFTC
[2] would be any different?

[3] **A:** They made us believe in the beginning that
[4] they would be the same. We found out later on that
[5] they weren't.

[6] **Q:** You found out after you had been working
[7] for them for some time?

[8] **A:** Yes.

[9] **Q:** Linda — what is the last name?

[10] **A:** Linda Paradis.

[11] **Q:** And Janice Paridis?

[12] **A:** Yes.

[13] **Q:** Are they sisters?

[14] **A:** No, they are not.

[15] **Q:** With Linda, do you know who she spoke with?

[16] **A:** No, I don't.

[17] **Q:** Do you know how many times she spoke with
[18] anyone?

[19] **A:** No.

[20] **Q:** Is it your understanding she asked both
[21] "Can I stay?" and "Can I get severance?"

[22] **A:** Yes.

[23] **Q:** And Janice, the same?

[24] **A:** Same thing.

Page 73

[1]  **Q:** Ed Wright?

[2]  **A:** Same.

[3]  **Q:** Lopez?

[4]  **A:** I think that was Anita Kopacz.

[5]  **Q:** Kopacz. That's a "C"?

[6]  **A:** Kopacz? C-o-p-e-k or something, or K-o-p-e-k.

[8]  **Q:** And Ms. Kopacz, you don't know who she

[9]  spoke with?

[10]  **A:** No.

[11]  **Q:** You don't know how many times?

[12]  **A:** No.

[13]  **Q:** But she asked, "Can I stay or can I get

[14]  severance?"

[15]  **A:** Yes.

[16]  **Q:** Is it Phil Green?

[17]  **A:** Phil Green, yes.

[18]  **Q:** Again, you don't know who he spoke with?

[19]  **A:** No.

[20]  **Q:** You don't know how many times he spoke?

[21]  **A:** Correct.

[22]  **Q:** He asked, "Can I stay or get severance?"

[23]  **A:** Yes.

[24]  **Q:** Did any of these individuals put their

Page 74

[1]  questions to the company in writing, to your

[2]  knowledge?

[3]  **A:** I wouldn't know if they put it in writing.

[4]  **Q:** Would you know whether they did it

[5]  electronically, through e-mail?

[6]  **A:** No. I think it might have been just verbal

[7]  asking.

[8]  **Q:** Are you aware of the existence of any

[9]  contemporaneous notes that any of these people may

[10]  have taken documenting their conversation?

[11]  **A:** No.

[12]  **MR. WELSH:** No further questions.

[13]  **MR. ROACH:** I've got a few more.

[14]  **RECROSS EXAMINATION**

[15]  **BY MR. ROACH:**

[16]  **Q:** Do you know of any departments or shops

[17]  within Bayer before the sale to EFTC where people

[18]  were laid off and got severance as a group?

[19]  **A:** Any other shops?

[20]  **Q:** Like the paint shop.

[21]  **A:** Yes. They had a place called the "Ling

[22]  Building" which was the paint shop, metal fab shop

[23]  and machine shop. I know the machine shop and model

[24]  shop came to our building. We absorbed a few of the

Page 75

[1]  employees in our department as we were going

[2]  forward, and I believe all the other ones got laid

[3]  off.

[4]  **Q:** This is before the sale to EFTC?

[5]  **A:** Yes.

[6]  **Q:** Did they get severance?

[7]  **A:** I believe they all got severance.

[8]  **Q:** On what are you basing that statement?

[9]  **A:** Because Agfa, Bayer and Miles all — they

[10]  had the severance package. I believe they had a

[11]  severance since — when Agfa took us over in

[12]  probably the early '80s, they had a plan.

[13]  **Q:** Did some of those people from those shops

[14]  tell you they had gotten a severance?

[15]  **A:** No. I would only be assuming that they got

[16]  it, but I imagine that's how it went, because their

[17]  area was shutting down.

[18]  **Q:** Did anybody — strike that. Was this

[19]  something that was filtered down by management,

[20]  again, before they were shut down, that this is

[21]  going to happen?

[22]  **A:** No. I believe this was a total get out of

[23]  that building. They were getting out of that

[24]  building, getting out of that type of business.

Page 76

[1]  **Q:** When was that, again, paint shop?

[2]  **A:** It's in the early 1990s.

[3]  **Q:** What about inspection? Is that a separate

[4]  shop?

[5]  **A:** Inspection, I'm not sure on that one. I

[6]  would only be guessing on that one.

[7]  **MR. ROACH:** Okay. Nothing further.

[8]  **FURTHER REDIRECT EXAMINATION**

[9]  **BY MR. WELSH:**

[10]  **Q:** Did some company buy the paint shop?

[11]  **A:** I don't know.

[12]  **Q:** Were these employees offered employment by

[13]  a successor operation at the same wage rate without

[14]  a break in employment?

[15]  **A:** I don't know. I wasn't involved with that.

[16]  All I know is some of the employees came into our

[17]  department, in the machine shop and, say, model shop

[18]  and moved into our building at the time.

[19]  **Q:** So you are assuming that employees who were

[20]  laid off from these operations got severance pay

[21]  because Agfa, Bayer, whoever the company was at that

[22]  time, had a Severance Pay Plan?

[23]  **A:** Correct.

[24]  **Q:** Beyond that, you have no specific knowledge

Bertrand R. Guilmette
Vol. 1, April 21, 2006

04-cv-10728-WGY     Document 42-26     Filed 01/17/2007   Joseph Attardi, et al. v.
Bayer Corporation, et al.

Page 77

[1] of what happened to individual employees?

[2]     A: Correct.

[3]     MR. WELSH: No further questions.

[4]     MR. ROACH: I've got nothing further.

[5]     MR. WELSH: We are concluded. Thank you

[6] very much for coming in, both of you.

[7]     (Whereupon, the deposition was

[8] concluded at 3:55 p.m.)

Page 78

                    **CERTIFICATE**

[2] I, Bertrand R. Guilmette, do hereby certify that

[3] I have read the foregoing transcript of my

[4] testimony, and further certify under the pains and

[5] penalties of perjury that said transcript

[6] (with/without) suggested corrections is a true and

[7] accurate record of said testimony.

[8]     Dated at __, this ____ day of ,

[9] 2006.

Page 79

[1] COMMONWEALTH OF MASSACHUSETTS)

[2] SUFFOLK, SS.                    )

[3]   I, Daniel P. Wolfe, Registered Professional

[4] Reporter and Notary Public in and for the

[5] Commonwealth of Massachusetts, do hereby certify

[6] that there came before me on the 21st day of April,

[7] 2006, at 2:10 p.m., the person hereinbefore named,

[8] who was by me duly sworn to testify to the truth and

[9] nothing but the truth of his knowledge touching and

[10] concerning the matters in controversy in this cause;

[11] that he was thereupon examined upon his oath, and

[12] his examination reduced to typewriting under my

[13] direction; and that the deposition is a true record

[14] of the testimony given by the witness.

[15]   I further certify that I am neither attorney or

[16] counsel for, nor related to or employed by, any

[17] attorney or counsel employed by the parties hereto

[18] or financially interested in the action.

[19]   In witness whereof, I have hereunto set my hand

[20] and affixed my notarial seal this 28th day of April,

[21] 2006.

[22]

[23]             Notary Public

[24]         My commission expires  9/18/09

78

1                    C E R T I F I C A T E

2        I, Bertrand R. Guilmette, do hereby certify that

3   I have read the foregoing transcript of my

4   testimony, and further certify under the pains and

5   penalties of perjury that said transcript

6   (with/~~without~~ suggested corrections is a true and

7   accurate record of said testimony.

8        Dated at _Boston___, this _9th_ day of _August_,

9   2006.

10

11                        _Bertrand R. Guilmette_

12

13                  See attached ERRATA SHEET

14

15

16

17

18

19

20

21

22

23

24

ERRATA SHEET OF BERTRAND R. GUILMETTE

RE:   Joseph Attardi, et als. v. Bayer Corporation, et al.,
      U.S. District Court Civil Action No. 04-CV-10728-WGY

Deposition of: Bertrand R. Guilmette

Taken on: April 21, 2006

| Page | Line | As Transcribed | Correction | Reason |
|------|------|----------------|------------|--------|
| 31 | 10 | "meetings I might not have been at." | Add "See my answer as well, however, on page 14, lines 9-15." | Completes the information I heard at the meetings. |
| 39 | 3-4 | "No, I didn't have any conversation with them." | Add "other than what I previously stated." | Accuracy and what I meant. |
| 47 | 19 | "severance" | Add "I did not know about the Bayer Severance Pay Plan document until it was obtained by my attorney after this case was filed" | What I meant and consistent with prior statement. |
| 55 | 5-6 | "Ed Wright" | Omit Ed Wright | Mistaken as to Ed Wright |
| 73 | 2 | "Yes" | "No" | Mistaken as to Ed Wright |