**CONDENSED VERSION OF TRANSCRIPT**
Deposition of Jack Calderon - 9/06/06

VICTORIA COURT REPORTING SERVICE, INC. (312) 443-1025

1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3   JOSEPH ATTARDI, et al.,        )

 4            Plaintiffs,           )

 5       vs.                        ) No. 04-10728-REK

 6   BAYER CORPORATION, BAYER,      )

 7   CORPORATION SEVERANCE PAY PLAN,)

 8            Defendants.           )

 9            Deposition of JACK CALDERON, called for

10   examination, taken pursuant to notice, agreement

11   and by the provisions of the Rules of Civil

12   Procedure for the United States District Courts

13   pertaining to the taking of depositions, taken

14   before PATRICIA A. ARMSTRONG, a Notary Public

15   within and for the County of DuPage, State of

16   Illinois, and a Certified Shorthand Reporter,

17   No. 084-1766, of said state, at law offices of

18   Lincoln International, LLC, 500 West Madison

19   Street, Chicago, Illinois, on the 6th day of

20   September, 2006 at 10:00 a.m.

21

22

23

24
```

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

### Page 10

talked to the management team there.
    Do I recall specifically which location they visited, I do not recall.
    Q. Who on behalf of EFTC Corporation was responsible for negotiating with Bayer Corporation concerning the AGFA Division's printed circuit board operation?
    A. Obviously there was a team, but the principal people involved in the negotiations were myself, Stu Fuhlendorf, tangentially Augie Bruehlman, and a gentleman named Fran Wheeler, who was our attorney, and he is still a practicing attorney in Denver.
    Q. Now, do you recall ever visiting the Bayer Corporation AGFA Division's facility in Wilmington as part of the negotiations for this transaction?
    A. Yes, I did visit.
    Q. More than once?
    A. Yes.
    Q. During those visits, did you ever have an opportunity to address the Bayer Corporation AGFA Division printed circuit board employees?

### Page 11

    A. Yes, at one occasion prior to the transaction.
    Q. If you would, could you please tell me your full recollection of what you said to the employees when you addressed them?
    A. Yes. What I said to the employees was I gave them a briefing about EFTC, what our company culture, vision, business location was.
        It was primarily to let them know about what our company's -- what our company was all about, to let them know that they would be receiving offers of employment, to let them know that we were hopeful that they would accept those offers of employment.
        I also at that meeting clearly told the employees that our company is different than Bayer. I clearly told them that we do not have a defined benefit plan, but we did have a 401 plan.
        I also told the employees that our medical plan was different, but that we would compensate the employees for the increased employee contribution.
        The amount the employee would have to contribute to their medical plan was greater, and

### Page 12

did he tell them that we would make an adjustment in their pay for that.
    I told them a little bit about our incentive programs that we had at EFTC at that time. We had several programs to incentivize employees in terms of performance and also attendance.
    Q. When you say "incentivize," do you mean are these bonus plans?
    A. These are bonus plans. I don't recall -- well, the measurements at different quarters were different.
        We also had an attendance program, where every quarter, any hourly employee that had complete attendance was eligible for a raffle that we used to do.
        We also had incentive programs in each division for the management teams.
    Q. Now, during the meeting when you addressed the employees, did you say anything to them along the lines that EFTC benefits would be the same or better than Bayer Corporation?
    A. To the contrary, I made it extremely clear that we do not have a defined benefit plan.

### Page 13

I made it extremely clear that our medical program required a greater employee contribution than was the case at Bayer, but that in terms of that amount of money, we would make a bump up in pay.
    Q. Do you recall anything else you said to the employees when you addressed them?
    A. Most of the presentation really had to do with getting them familiar with EFTC and what we were trying to create and what we were doing in the marketplace, because we were going to offer these employees offers of employment, and we wanted them to have a sense of who our company was and what we were trying to accomplish and where we had been. So most of it was more of a business overview, if you will, of EFTC.
    Q. Do you recall whether or not any of the Bayer officials spoke during the period of time that you were there meeting with employees?
    A. Yes. Michael Paige was at that meeting, and he also made some remarks.
    Q. Do you recall the remarks that he made?
    A. Not specifically, I don't recall. I do remember that he did talk about why Bayer is

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

Page 14

1  going to outsource the manufacturing, but I don't
2  recall the specific remarks.
3      Q.   Do you recall Mr. Paige saying
4  anything to the effect that EFTC would offer the
5  employees equal or better benefits?
6      A.   No, he did not, sir.
7      Q.   Do you recall the term "win win"
8  being used at all during the meeting with
9  employees where you spoke?
10     A.   I don't recall.
11     Q.   Now, did EFTC or Bayer contemplate
12 completion of the deal upon acceptance by a
13 certain percentage or number of printed circuit
14 board employees of offers of employment?
15     A.   No. That was a risk that we took
16 when we acquired these companies and these assets
17 and that's -- you know, we understood and the
18 other side understood that if the employees
19 decided not to accept the employment, you know,
20 that's a risk in these transactions.
21     Q.   Sir, I'm going to read you a line
22 from what is called Interrogatories. This is a
23 statement submitted by the Plaintiffs in case
24 under oath. And it's on the bottom of Page 5,

Page 15

1  going on Page 6. It says, quote: "As part of
2  their negotiations" --
3      MR. ROACH:   Can you hang on just a second,
4  John?
5      MR. WELSH:   Yes, sure, Steve.
6          Please strike the last statement.
7  I'm going to go into it again.
8  BY MR. WELSH:
9      Q.   Sir, I'm going to read to you from
10 Interrogatories, which are statements signed under
11 oath by the Plaintiffs in this case. And
12 specifically on Page 5, the bottom of the page,
13 quote: "As part of their negotiations leading up
14 to the sale, Bayer and EFTC agreed that Bayer
15 would falsely advise the Plaintiffs that the
16 Plaintiffs' compensation and benefits, including
17 severance benefits, would remain the same if the
18 Plaintiffs agreed to work with EFTC."
19     Sir, to your knowledge, did EFTC ever have
20 any agreement with Bayer to falsely advise
21 employees that their compensation and benefits
22 would be the same with EFTC?
23     MR. ROACH:   Objection.
24         You can answer.

Page 16

1  BY THE WITNESS:
2      A.   Absolutely not. That's an
3  interesting comment from somebody who wasn't at
4  the negotiations.
5  BY MR. WELSH:
6      Q.   Are you aware of any discussion
7  between Bayer and EFTC in which it was suggested
8  that employees be given false representations
9  concerning their benefits?
10     A.   Absolutely not.
11     Q.   Now, I'm going -- from the same
12 Interrogatory, sir, I'm going to read the next
13 line.
14         "As part of the negotiations for the
15 sale, EFTC required all or most of the Plaintiffs
16 to agree or at least to apparently likely agree to
17 accept continued employment at the board shop
18 location with EFTC once Bayer terminated the
19 Plaintiffs' employment with Bayer."
20         Sir, did EFTC require by the deal
21 that all or most of the employees agreed to accept
22 employment?
23     A.   Absolutely not.
24     Q.   Sir, did EFTC have a standard

Page 17

1  procedure or approach it used in acquiring
2  operations from manufacturers in 1998 with respect
3  to how it went about it?
4      A.   Yes.
5      Q.   Can you describe what it was?
6      A.   Basically, we would negotiate a
7  purchase sale agreement. And then once it became
8  certain that the parties were going to proceed
9  with a transaction after the purchase sale
10 agreement was negotiated, we had employee meetings
11 to let the employees know about the contemplated
12 transaction.
13         We held one of these employee
14 meetings that we previously described, where we
15 would tell them about our company, tell them about
16 the differences in their benefit programs, assured
17 them that their base pay would remain the same and
18 that the years of service would be recognized.
19         And most of the meeting was really
20 just talking with them about EFTC and contract
21 manufacturing and that whole thing.
22         After those meetings, employees
23 received offer letters and were free to accept or
24 decline employment.

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

**Page 22**

and will reindemnify buyer from and against any and all liabilities and claims relating to the employment of any such persons by seller prior to the closing."
    Did I read that correctly?
A.  Yes, you read that correctly.
Q.  Does that refresh your memory as to whether you had any discussions with anybody at Bayer regarding payment of severance to the --
    MR. WELSH: Objection -- sorry.
BY MR. ROACH:
Q.  Does that refresh your memory as to whether you had any discussions with anybody from Bayer regarding a payment of severance to the Plaintiffs in this case?
    MR. WELSH: Objection.
    You may answer.
BY THE WITNESS:
A.  This letter that you are referring to is to set forth the principal terms under which we would enter into a transaction.
    This letter, as you can see, is obviously a legal, drafted by lawyers, with my signature on it. And when we entered into any

**Page 23**

transaction with any company of this sort, we did not take responsibility for any obligations that the seller may or may not have with their employees.
    So we made it very clear in these letters of how we would enter into a transaction, that the seller is going to be responsible for whatever obligations he may or may not have. We did not enter into discussions about what a seller's obligations may or may not be.
    We just basically wanted to make it very clear in our proposal letter that we are not going to discuss that, it's not part of the discussion.
BY MR. ROACH:
Q.  So you made it clear that severance payments, for example, was not going to be part of the discussion between EFTC and Bayer; is that right?
A.  That's correct.
Q.  What about any other benefits, were any other benefits part of the discussion?
A.  Yes, they were. Other benefits were part of the discussion because it was very -- when

**Page 24**

we entered into these transactions, we entered into them at risk that employees would accept our offers. And so we wanted to give employees comfort that their base pay would remain the same.
    We also wanted to give them comfort because our medical plans were not as robust as a big company, and typically we were buying these assets from big companies.
    We also wanted to give the employees the comfort of knowing that even though we required a bigger deductible for their medical care, that we would adjust their compensation, so that basically we wanted the employees' take-home pay to remain the same, so that they're not affected by differences in benefits.
Q.  So base pay and medical are two areas that you carved out in terms of not discussing with the seller, the benefits or the pay of the employees; is that a fair statement?
    MR. WELSH: Objection.
BY THE WITNESS:
A.  What we discussed, we always let the seller know what our benefit plans were.
    So we always informed the seller of

**Page 25**

our 401 plan, what our contributions were, what our stock option plans for management were, what our medical plans were. We always let them know we didn't have a defined benefit program.
    We made sure the seller understood what our benefit plans were. And we also let the seller know that we would be good custodians of their employees and that we would, you know, offer them packages that at least protected their take-home pay.
BY MR. ROACH:
Q.  I thought you just said a few moments ago that benefits would not be something that you would get involved with in discussing with the seller what the benefits were?
A.  No, what I said was --
Q.  Maybe I misunderstood you.
A.  Yes, you did.
    What I said and I said very clearly is that in this letter, we did not get involved with what a seller's benefit programs were, we wanted to be very clear with the seller what our benefit programs were. We did not ask for their documents, you know, what their programs were. We

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

## Page 26

1  never asked them for any of that stuff.
2      Q.   And this letter would be Exhibit 1
3  that we have marked as Exhibit 1 you are talking
4  about when you say this letter; right?
5      A.   Yes, this letter, whatever you are --
6      Q.   Is there anything in this letter
7  where you tell Bayer what all your EFTC fringe
8  benefits are?
9      A.   I guess I would have to read the
10 whole letter, but I don't know the answer to that.
11     Q.   Go ahead.
12     A.   So what is the question?
13     Q.   Was there anything in this letter
14 where you told Bayer what EFTC's benefits were,
15 medical benefits, stock options, health insurance,
16 disability, severance, any fringe benefits?
17     A.   "Cash compensation offered to such
18 persons shall be equal to their current
19 compensation paid by seller with an appropriate
20 adjustment on a per-employee basis to compensate
21 for increased cost to the employee of medical
22 insurance."
23     Q.   Now, that's on Page 3, Paragraph 4;
24 correct?

## Page 27

1      A.   Right.
2           "Benefit provided shall be those
3  currently provided to buyer's employees generally.
4  Buyer," that's us, "agrees to credit each person
5  who accepts employment with the service credited
6  with seller for all purposes, including health
7  care enrollment, seniority, applicable vesting,
8  waiting periods under benefit plans."
9      Q.   Is that it?
10     A.   In this letter?
11     Q.   Yes.
12     A.   I believe so.
13     Q.   Was there anything in here that
14 talked about what your 401-K plan was?
15     A.   No.  This is a letter that generally
16 outlines, as the first sentence, I think, clearly
17 says, "The purpose of this letter is to set forth
18 the principal terms pursuant to which EFTC
19 Corporation proposes to acquire the AGFA Division
20 of Bayer Corporation."
21     Q.   I understand that --
22     A.   So the purpose of this is not to set
23 forth the benefit terms, the purpose is to set
24 forth the principal terms.

## Page 28

1      Q.   Did you tell Bayer -- or I believe --
2  strike the question.
3           I believe you told -- testified,
4  rather, a moment ago that you told the seller of
5  what EFTC's benefits were for its employees; in
6  other words, EFTC told Bayer what its benefits
7  were?
8      A.   Yes.  These negotiations are not done
9  in a day.  These discussions go on over a very
10 long period of time.  There are numerous meetings,
11 and so during those meetings we -- and I can't
12 recall at which one, we did generally describe our
13 benefits that we offered to our employees.
14     Q.   Did you tell Bayer what your
15 severance plan was?
16     A.   I don't recall talking about
17 severance.  I do recall, and I believe it's in our
18 purchase sale agreement -- we generally wanted the
19 seller to believe we would be good custodians of
20 their employees.  And one of the things that we
21 also typically put in most of our purchase sale
22 agreements was an agreement not to terminate
23 employees for some period of time.
24     Q.   Mr. Welsh asked you a series of

## Page 29

1  questions about benefits and you answered them.  I
2  would just like to focus on benefits.
3      A.   Okay.
4      Q.   I would like you to tell me what you
5  can recall, I would like you to tell me if you can
6  recall specifically what you told Bayer about what
7  EFTC's benefits were for the employees that they
8  anticipated might come to EFTC.
9           MR. WELSH:  Objection.
10          You may answer.
11 BY THE WITNESS:
12     A.   I don't recall that I personally told
13 them, but certainly in the process of the
14 negotiation, we made -- and whether we brought it
15 up at one of the negotiation sessions or we
16 generally described or our HR guy generally
17 described, but we made Bayer aware generally of
18 our 401 plan, the difference in our medical, that
19 there is a difference in terms of employee
20 contributions.  We clearly let them know we do not
21 have a defined benefit plan of any sort.
22     Q.   Pension plan, you mean?
23     A.   Yes.
24     Q.   Is that a yes?

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

**Page 30**

 1  A.  Yes.
 2  Q.  Did you tell them that EFTC's
 3  severance plan was not as good as Bayer's?
 4  A.  See, I don't recall discussions
 5  around severance plans. Most of the purchase sale
 6  agreement having to do with employee issues were
 7  handled by the ERISA attorneys on both sides.
 8      I don't recall in our discussions me
 9  focusing on benefit plans or severance plans. I
10  mean, we were focused on, you know, economic terms
11  of the deal and, you know, T's and C's were more
12  lawyer issues.
13  Q.  T's and C's?
14  A.  Terms and conditions.
15  Q.  Well, Mr. Welsh asked you questions
16  about meeting with the employees in the board
17  shop; do you remember those?
18  A.  Yes, I definitely did that.
19  Q.  And you had said that you made it
20  very, very clear what your benefits were at that
21  meeting with the employees?
22  A.  No, I made it absolutely clear we do
23  not have a defined benefit plan. I made it
24  absolutely clear that our medical employee

**Page 31**

 1  contribution was different, but that we would
 2  adjust pay for that difference.
 3      But I did not stand up and describe
 4  our benefit plans in any detail. I did not stand
 5  up and talk about severance at all. I basically
 6  focused -- and our biggest focus here was that we
 7  do not have a defined benefit plan. We wanted
 8  employees to understand that if they come to work
 9  for EFTC, they are not getting a defined benefit
10  plan.
11  Q.  So you didn't mention anything to
12  them about severance plan; is that correct?
13  A.  No.
14  Q.  That's correct?
15  A.  That's correct.
16  Q.  Did you say anything to them about
17  disability?
18  A.  No.
19  Q.  Did you say anything to them about
20  the life insurance?
21  A.  No.
22  Q.  Did you say anything to them about
23  any other benefits other than the pension and the
24  401-K and the medical?

**Page 32**

 1  A.  In the general employee meeting
 2  that -- as CEO, that's what I generally focused on
 3  at those meetings.
 4  Q.  The medical and the pension?
 5  A.  The medical and the pension; correct.
 6  Q.  I'm going to show you the same
 7  document that Mr. Welsh just showed you. It's the
 8  Fiorilla Exhibit 10. And attached to that is
 9  Attachment 3, and it talks about benefits AGFA
10  versus EFTC. Do you see that?
11  A.  Yes.
12  Q.  In looking at this list, it starts
13  with the 401-K.
14      Do you see that at the top?
15  A.  Yes.
16  Q.  Did you mention anything to the
17  employees about the 401-K, the differences in the
18  401-K?
19  A.  Not to my recollection.
20  Q.  Did you mention anything to the --
21  item No. 2, did you mention anything to the
22  employees at this meeting that you had, that
23  Mr. Welsh asked you about, the meeting with the
24  Bayer, AGFA board shop employees, anything about

**Page 33**

 1  sick time, the differences in sick time?
 2  A.  No. Just to save a lot of time here,
 3  at the general meeting that I conducted as CEO
 4  with the employees, it was not to drill down to
 5  this level of detail at that meeting.
 6  Q.  Okay. So none of the --
 7  A.  My main purpose at that meeting was
 8  to the let them know about the contemplated
 9  transaction, that they would receive offers of
10  employment, that we do not have a defined benefit
11  plan, which I viewed as a big difference, that we
12  had a 401 plan and that they would receive
13  information about it, and that the medical
14  deductible is different but we would make them
15  whole.
16      So, as CEO at that level meeting,
17  that's what my remarks related to be with respect
18  to benefits.
19  Q.  Okay. I understand that. I think
20  you have testified to that.
21      So is it fair to say on this list
22  that I have shown you, Attachment 3 to Fiorilla
23  Exhibit 10, that you didn't discuss any of these
24  14 items, other than the medical insurance, which

9 (Pages 30 to 33)

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

### Page 34

1  is No. 9, and the pension, which No. 10; is that
2  correct?
3  A. **At that meeting, my comments were**
4  **limited to the big picture issues.**
5  Q. Well, my question is -- I'm not
6  talking about big picture, we are just talking now
7  about benefits.
8  Is it fair to say that of these 14
9  items, the only two you spoke about at the
10  meeting --
11  A. I --
12  Q. Let me finish the question, please.
13  Is it fair to say that at that
14  meeting with the employees, the only two items you
15  talked about with respect to benefits of EFTC were
16  No. 9, the medical insurance, and No. 10, the
17  pension plan?
18  A. **To my recollection, that's correct,**
19  **yes.**
20  Q. I would like to show you what has
21  been marked as -- this is Exhibit No. 5 of
22  Ramsden's deposition.
23  This is a document, again, I showed
24  you I think before we started today when Mr. Welsh

### Page 35

1  was here; correct?
2  A. **Correct.**
3  Q. You had a chance to look at this
4  before for a few minutes?
5  A. **I didn't read it.**
6  Q. Having looked at it briefly, can you
7  tell me what it is?
8  A. **It's titled Transition Management. I**
9  **can't say I was personally involved in this**
10  **document.**
11  Q. Do you recognize what the document
12  is?
13  A. **I recognize that it's a transition**
14  **management.**
15  Do I remember seeing this document
16  before, I don't recall.
17  Q. No, my question is a little different
18  than that: Is this a type of document that you
19  have seen before in your work at EFTC?
20  A. **Yes.**
21  Q. And is it the kind of document that
22  EFTC generates when it's negotiating some kind of
23  deal, either purchasing or selling assets?
24  A. **Yes.**

### Page 36

1  Q. Who typically drafts this document.
2  MR. WELSH: Objection.
3  You may answer.
4  BY THE WITNESS:
5  A. **I don't recall specifically who**
6  **drafted these, but typically, it would be people**
7  **from different parts of the organization.**
8  BY MR. ROACH:
9  Q. Any particular part of the
10  organization?
11  A. **As you can see from the document, I**
12  **mean, there are things in here about materials,**
13  **that would come from the materials people, MRP**
14  **would come from the IT people. So it would come**
15  **from different groups.**
16  Q. Different groups within EFTC?
17  A. **Correct.**
18  Q. Okay. I would like to direct your
19  attention to page -- and it's Bates stamped at the
20  bottom, BO1358. Do you see that? I believe it's
21  the third page in.
22  A. **Uh-huh.**
23  Q. Do you see that? Is that a yes?
24  A. **Yes.**

### Page 37

1  Q. I would like to show you Paragraph
2  3.5, transaction of Bayer, AGFA Division
3  employees. Do you see that?
4  A. **Yes.**
5  Q. What department would have drafted
6  this part of this document for EFTC?
7  MR. WELSH: Objection.
8  BY THE WITNESS:
9  A. **I really don't recall.**
10  BY MR. ROACH:
11  Q. Well, would this have been human
12  resources?
13  A. **I would guess it would be human**
14  **resources.**
15  Q. I don't want you to guess. I just
16  want you to give us your best memory.
17  MR. WELSH: Objection.
18  BY THE WITNESS:
19  A. **I don't recall. I don't recall who**
20  **specifically drafted this.**
21  BY MR. ROACH:
22  Q. I don't want to know who
23  specifically. What I want to know is --
24  A. **I don't recall. I just don't recall.**

**Page 70**

Q. I would like to show you what has been marked as Fiorilla Exhibit 3, and ask if you can recognize that?
A. Yes.
Q. Do you recognize that letter?
A. I see the letter.
I can't say that I have seen -- you know, I did not review all these letters during these processes, so I cannot tell you that I reviewed this letter previously.
Q. Is that a letter written by Mr. Bruehlman?
A. Yes, it is.
MR. ROACH: I would like to mark it as Calderon Exhibit 4, please.
This is a copy of Fiorilla Exhibit 3, we are going to double-mark the copy as Calderon Exhibit 4, please.
(WHEREUPON, a certain document was marked Calderon Deposition Exhibit No. 4 for identification as of September 6, 2006.)
BY MR. ROACH:
Q. Exhibit 4 that I have just shown you,

**Page 71**

Calderon Exhibit No. 4, is a letter by Mr. Bruehlman, I believe.
Did you see a copy of this letter before it went out; do you know?
A. I don't recall whether I saw this specific letter or not.
Q. It says in the second sentence -- third sentence: "We anticipate being able to hire you into a comparable position and salary level as your current position with AGFA Corporation."
Did I read that correctly?
A. Yes.
Q. What was meant there by comparable position?
MR. WELSH: Objection.
BY THE WITNESS:
A. Hire you into a comparable.
BY MR. ROACH:
Q. Comparable, the word is c-o-m-p-a-r-a-b-l-e.
A. Right.
Q. What do you mean by that?
A. The purpose of this letter was to clearly tell the employee, No. 1, you are going to

**Page 72**

be offered a job. No. 2, you are going be an employee at will. No. 3, the company is going to do what we can to give you the same or similar job at your current pay level. No. 4, this is well in advance of closing the transaction, so that employees clearly have the option to think about this and decide whether they want to come or not come, and to let them know that there will be an orientation process.
So it's a general HR letter that is given to employees to let them know kind of heads up what is going to happen.
Q. I just asked you specifically what you meant by comparable position. And is that your answer?
A. These letters, as you know, are drafted by Counsel and are general HR letters.
As you can see in our purchase agreement, our not only intent, but what we actually did, is give people the exact same pay and even bump it up for their take-home.
The letter says comparable. It doesn't exactly say exactly that they are going to get the exact same pay, because the letter is

**Page 73**

drafted in a more general sense.
So what we meant is that we are going to give employees the same pay and the same work.
Now, the letter is drafted comparable because, as you know, we might organize our work flow slightly different than AGFA, Bayer, and maybe Individual A used to move this product from Point A to Point B, and we would think it would be more efficient for him to move it from Point A to Point C, so we would say that is comparable.
Q. Did Bayer or its lawyers or anybody in its HR department have any input into the wording of this letter, if you know?
A. To my knowledge, no.
Q. The last sentence of the second paragraph, it looks like you gave them by August 26th to make a decision; correct?
A. According to this letter. I don't recall it, but according to this letter.
Q. And then in the meantime, between this letter and August 26th, you said there was going to be some orientation meetings; is that correct?
A. Correct. That is what the letter

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

Page 82

1   A.   I don't recall these people.
2   Q.   How about Kim MacNeally?
3   A.   I really don't recall.
4   Q.   So Mr. Paige is the only one you
5   really recall --
6   A.   I recall Mr. Paige, yes.
7   Q.   Looking at Ramsden Exhibit 15, the
8   second page, it's page numbered two, handwritten
9   No. 2 at the top, about the third line down, it
10  says: "AGFA looking for $2 million premium to
11  deal with employee severance issues," and then
12  it's got an arrow from the 2 million down plus 10
13  percent inventory reduction.
14       Do you see that?
15  A.   Yes, I see that note.
16  Q.   Does that refresh your memory of any
17  discussion you had about talking to Bayer about a
18  severance issue with the board shop employees
19  before the sale?
20  A.   I don't recall having severance
21  discussions with AGFA. I do recall having
22  economic discussions with AGFA. I don't recall --
23  you know, we like to do these deals at book value,
24  and typically the sellers usually wanted premiums

Page 83

1   over book. And those typically were part of the
2   negotiations.
3        The other part of the negotiations
4   was product pricing and certain operating kind of
5   things.
6   Q.   Do you recall the price EFTC paid for
7   that?
8   A.   I really don't know.
9   Q.   Would the severance be part of the
10  factoring in of the negotiation of price for the
11  sale?
12  A.   From an EFTC point of view?
13  Q.   Yes.
14  A.   We weren't involved with employee
15  severance, we were offering employment.
16  Q.   I understand you weren't involved in
17  employee severance and whether it was going to be
18  paid or not. But were you involved in any
19  discussions with Bayer as to whether Bayer might
20  have to pay severance as a factor in negotiating
21  the price or the way this deal was done?
22  A.   I am trying to recall. I mean, these
23  discussions were a long time ago and, you know,
24  what the discussions were -- you know, from our

Page 84

1   point of view what we were concerned about was
2   what are we paying for this business.
3        And, you know, our goal going into
4   these things were to buy at book value.
5   Sometimes, we did, sometimes, we didn't. But
6   those were typically price negotiations. And what
7   we usually focused on was -- there was two
8   elements to this. There was product pricing and
9   what you bought the assets for.
10       If we could negotiate more on product
11  pricing, we were willing to pay more for the
12  assets.
13       You know, if on the product pricing
14  side, people wanted lower product pricing, we
15  would have to pay less for the assets to get the
16  same return on investment.
17       So, usually, my personal involvement
18  was focusing on the economics of the deal
19  vis-a-vis product pricing versus what are we
20  paying for the assets and how that was coming
21  along.
22  Q.   I am not versed on what you are
23  saying in terms of product pricing.
24       Can you tell me what you mean as it

Page 85

1   relates to this deal, what you mean by product
2   pricing?
3   A.   Yes. After one of these
4   transactions, we, EFTC, became a supplier to
5   whoever we bought the CCA facility from, we would
6   now be selling them CC.
7   Q.   This would be Bayer?
8   A.   In this case Bayer. So after the
9   transaction, they become our customer. And what
10  they used to do internally, they are now buying
11  from EFTC.
12       So the two things that you negotiate
13  in these deals is the asset purchase agreement,
14  which is what you are paying for the assets, and
15  then you negotiate the supply agreement of what
16  you are going to sell these pieces from.
17       So you have different products,
18  different circuit boards, circuit board
19  assemblies, and you basically negotiate a price
20  that you are now going to charge Bayer to buy that
21  from you.
22       So we used to, internally, on the
23  EFTC side, we used to shoot for certain IRR
24  hurdles, internal rate of return, it's a financial

22 (Pages 82 to 85)

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

**Page 86**

modeling term.

So, basically, the way it would work is depending what the product pricing was, would drive what we would pay for the assets.

So if the potential future customer was willing to pay more for the product, we could pay more for the assets and still get the same IRR.

If they wanted the product less and less and less, then our ability to pay for the assets would have to come down so we could achieve the same internal rate of return.

So that is where -- you know, as CEO, in terms of where did I focus my time on these transactions, it had to do with what is the economics in terms of what are we going to sell these products for and how much do we have to pay for the assets. So I was very involved with the economic nature of the transaction.

Q. And in this transaction that we saw in Calderon Exhibit 3, do you remember whether the product pricing was lower so that you paid more for the assets or was the asset purchase price lower and you paid more for the product; do you

**Page 87**

remember?

A. I just don't recall. But it takes a long time to negotiate these, as you can imagine.

Q. Would it be reflected in the document we have marked as Exhibit 3, Calderon Exhibit 3, Ramsden Exhibit 25? And I would like to direct your attention to to Page 4, Bates stamped B00906, the purchase price.

Looking at that, can you tell me whether in this particular deal, your product pricing was higher or lower relative to the asset pricing?

A. Well, it's not higher or lower relative to the asset pricing. We basically took a look at what are they forecasting to buy. And those forecasts change all the time, so it's kind of a little bit of estimate. But we would get an estimate from Bayer in terms of what they expected to buy and what mix of products.

And separate from this, you are negotiating a supply agreement, and then you are trying to match those things up.

So looking at this, I guess you want me to look at purchase price?

**Page 88**

Q. Yes.
A. I can't tell.
Q. All right. Looking back to Ramsden Exhibit 15, I would like to go to Page 3, handwritten No. 3. About halfway down, it looks like it says: "Bayer is going to buy out employees." Do you see that?
A. Yes.
Q. And then it says: "From post retirement, medical benefits, unused vacation, severance payments," et cetera.
    Do you see that?
A. Yes.
Q. Is that a yes?
A. Yes.
Q. Do you remember any discussion in that regard with Bayer when you were discussing this deal with them?
A. We never collaborated with respect to what a seller's obligations are to his employees under his own plans. We certainly wanted to make sure that whatever a seller is supposed to do, he is going to do.
Q. All I am asking you is whether this

**Page 89**

refreshes your memory as to whether you had any discussions in a telephone conference call on July 7th of '98 or any other time about Bayer and what they were going to do with severance with their employees?

A. I mean, I am sure Bayer had a lot of discussions about what Bayer is going to do with their own employees. I am sure they certainly talked a lot about that.

Q. Why do you say that?
A. Pardon?
Q. Why do you say that?
A. Well, because all things big companies have whatever programs they have. And our expectation is that, you know, the seller is going to do whatever they are obligated to do.

We, as a buyer, were not -- you know, like we never diligence somebody's internal matters.

Our expectation was that our sellers would do what they are required to do to their employees with whatever programs they have.

We didn't try to like finagle their own programs, if that is what you are trying to

23 (Pages 86 to 89)

**Page 90**

insinuate.

Q. I am not trying to insinuate anything.

I am just trying to exhaust your memory as to whether you remember any discussions with Bayer concerning severance payments with its employees, showing you just some different documents, including Ramsden Exhibit 15?

A. No. I did not get involved, other than expecting that my seller would do what they are required to do under whatever programs they have.

I did not get involved with trying to finagle or scheme or whatever you are trying to insinuate.

You know, we were just a buyer and we were going to offer employment, and we wanted the company to know what we were going to do. Our clear expectation was that they would do what they are required to do.

Q. Sir, all I am asking you to tell me is whether you remember any discussions with them?

A. I didn't get involved in severance discussions.

**Page 91**

Q. I would like to show you another document.

MR. ROACH: Go off the record for just a moment.

(WHEREUPON, discussion was had off the record.)

MR. ROACH: Back on the record.

BY MR. ROACH:

Q. I show you a document, proposal April '98 EFTC, it's dated on the outside, and then inside is a letter April 20, '98, from Ty Griffin to Dick Ramsden.

And then the next series of documents includes an introduction and then, I believe, the pages we were talking about earlier, which we marked as Calderon Exhibit 2.

Do you see that?

A. Yes. Right.

Q. Do you recognize this document?

A. This is a marketing proposal. Ty Griffin is a marketing manager, so he is basically a sales guy. And obviously, he is the one who uncovered this opportunity and obviously had some communications back in the spring of 1998 and he

**Page 92**

has put this proposal together and cobblestone is what a transition plan would be, so this was put together by Ty.

MR. ROACH: I would like to mark this document, which is dated April '98 proposal, providing leadership and high mix electronic manufacturing services, EFTC, as Exhibit 5, please.

MR. WELSH: Maybe during the break I will get a copy.

MR. ROACH: Absolutely.

(WHEREUPON, a recess was had.)
(WHEREUPON, a certain document was marked Calderon Deposition Exhibit No. 5 for identification as of September 6, 2006.)

BY THE WITNESS:

A. I would like to, as we are recalling things from 10 years ago, you had earlier asked about this document called transition plan.

BY MR. ROACH:

Q. Transition management, it's Calderon Exhibit 2?

A. Yes. And who put this together.

**Page 93**

Q. Right.

A. This is clearly not the official transition plan. But what this document is was a document put together by our marketing person, Ty Griffin.

He probably looked at other transactions of similar nature and he put together to his best abilities what a transition might look like.

So this was clearly a selling document, not an action document, that was sent to Bayer as part of a marketing proposal, not an operational execution transitional or anything else, it was basically a selling document.

And so it's clear to me now, that as I look at these documents, that Ty Griffin looked in other transition deals that might have been true with Allied Signal or someone, and he pieced together to the best of his ability what he thought a transition might look like if AGFA was even interested in talking to us.

So this is just -- this is not a transition plan, this is clearly a marketing document.

### Page 134

    MR. WELSH:  He is not done with his answer.
    MR. ROACH:  Please don't interrupt, John.
    MR. WELSH:  You are interrupting him, Steve.
    MR. ROACH:  Go ahead, sir.
    MR. WELSH:  Sir, you have a right to finish your answer.
         If you are done, you can tell him you are done, but if you want to finish your answer; feel free to do so.
BY THE WITNESS:
    A.  Okay.  I cannot recall the specific language in any purchase sale agreement signed many years ago.  I cannot recall.  You can look at those documents.  I cannot recall it.
         I can recall in discussions with OEM sellers of facilities, that we told those sellers that we want stability, we want to be good custodians, we are willing to include contractually an obligation for continuous employment.
         So I definitely recall saying that to everybody.  Whether OEMs decided to put that in a contract or not, you would have to look at those

### Page 135

specific contracts, and I can't recall specific paragraphs of specific contracts.
BY MR. ROACH:
    Q.  I am not asking you about all specific paragraphs of all contracts, I am just asking you this one question, and that is:  Can you think of any contract where --
    A.  Yes.
    Q.  Let me finish the question -- where EFTC said we will pay six months of severance if we don't keep somebody employed for 12 months?
    MR. WELSH:  Objection; asked and answered.
BY THE WITNESS:
    A.  Again, you have got to look at each of those contracts.  It would not surprise me to find that in other contracts.  We definitely wanted stability.
BY MR. ROACH:
    Q.  You said it wouldn't surprise you, can you think of anyone where you did that?
    A.  Most of the Honeywell contracts, we -- I know we talked to Honeywell, and whether that is specific language made into the contract or not, you would have to look, but it would not

### Page 136

surprise me if you would find that in the Honeywell agreements.
    Q.  But you don't recall for sure?
    A.  I can't recall specific paragraphs in contracts signed years ago.
    Q.  Now, in Paragraph 6.4, it talks about transferred employees.
         Do you see that?
    A.  We are in the --
    Q.  This is Calderon Exhibit 3.
    A.  Okay.
    Q.  Where did the term "transferred employees" come from?
    A.  That is lawyers did it.
    Q.  Did it have any particular meaning to you one way or the other in terms of what it meant?
    A.  As a CEO, it would mean the employees would have accepted offers of employment.
    Q.  Now, with respect to the next page, I think we showed you this before today, before we started.
         It talks about how the buyer agrees to indemnify seller, buyer, being EFTC, agrees to

### Page 137

indemnify Bayer for any claims and so forth.  And then it says, "except as may arise from or relate to the seller's communications with or treatment of the employees prior to the effective date."  Do you see?
    A.  Uh-huh.
    Q.  Is that a yes?
    A.  Yes.
    Q.  Do you remember any conversations about that?
    A.  I can certainly tell you that indemnification paragraphs in our agreements were lawyer to lawyer issues, they were not considered business issues.
    Q.  So you don't remember any conversations?
    A.  It's lawyer to lawyer.
    Q.  On the first page -- it's actually the second page, it's Bates stamped B00904, it talks about excluded -- I am sorry, it talks about -- I am sorry, Page 3, B00905, it talks about excluded assets --
    MR. WELSH:  Exhibit 3, because you said Page 3?  I just want to be sure.

**Page 138**

MR. ROACH: Page 3 of Exhibit 3.
MR. WELSH: Thank you.
BY MR. ROACH:
Q. It talks about excluded assets. Do you see that?
A. Yes.
Q. Do you remember what, if anything, was excluded from the asset purchase?
A. All of the stuff was scheduled. And again, I don't recall specifically, but there is typically things that aren't, you know, being sold in this transaction. They are usually scheduled in the agreement by the lawyers.
Q. On Page 10 of Exhibit 3, Ramsden Exhibit 25, the last sentence of Paragraph 6.1 talks about that the seller was not guaranteeing any number of people coming to EFTC; is that correct?
A. Correct. They did not guarantee that anybody would accept employment.
Q. And this was signed or dated at least as of August 13th; correct?
A. Correct. I don't know what the signature dates are but --

**Page 139**

Q. Do you know whether --
A. That is the date of the agreement, it's not the date of the signatures.
Q. Do you know what date it was actually signed?
A. Probably on or about August 13th.
Q. Do you remember whether -- or know whether, about that time, whether you had a sense as to whether people would come and be joining EFTC from anything that Bayer said to you?
A. No, I never bothered to ask. I can tell you as a CEO and as my personal experience, I rarely lost sleep over whether people would accept offers of employment.
Q. All I am asking you is whether you remember Bayer saying anything to you about it?
A. I didn't ask them to guarantee it. I specifically put in the contract they don't have to guarantee it, and it's something I never worried about in any of these transactions.
Granted, there is always an individual who may not accept, but the vast majority of the people usually accept.
Q. And on that same page, and I

**Page 140**

apologize if I asked you this before, under 6.3.1, it talks about, starting with --
A. Buyer?
Q. Yes, starting with buyer, the last line, "Buyer agrees to provide the transfer employees employee benefits and policies comparable to the employee benefits and policies provided to other employees of the buyer, except as additionally required in Section 6.3 or elsewhere in this agreement."
Did I read that correctly?
A. Uh-huh.
Q. Is that yes?
A. Yes.
Q. Do you remember discussing that at all with Bayer before this became part of this agreement?
A. No, not specifically.
I mean, I may have said generally that, you know, these people would become employees of EFTC and receive the same benefits as every other employee, but whether I said that specifically or not, I don't know.
Q. What was meant by policies

**Page 141**

comparable?
MR. WELSH: Objection.
BY MR. ROACH:
Q. Benefits and policies.
BY THE WITNESS:
A. You know, obviously, these are lawyer drafted agreements.
But if you want me to interpret what this means, is that we are going to treat the transferred employees no differently than we treated other employees of EFTC.
So, if we had certain -- like, for example, we had drug testing for new employees. That was a policy of EFTC. So whatever the policies were at EFTC, we would not treat the transferred employees any differently.
So, you know, whatever our rules were, they were our rules, and that is going to be the same rules applied to the transferred employees.
BY MR. ROACH:
Q. Do you -- you probably don't, but I need to ask you this anyway, do you have any records or anything regarding this transaction

CONDENSED VERSION OF TRANSCRIPT
Deposition of Jack Calderon - 9/06/06

146

1  So my main concern was would we
2  achieve the IRR and positively affect our income
3  statement.
4  We were a public company, you know,
5  so we were certainly concerned about our
6  profitability.
7  Q. And that would include the book value
8  and also the supply agreement that you talked
9  about before; right?
10  A. Correct.
11  Q. Can you remember what your main
12  concerns were in that regard in this particular
13  deal?
14  Can you remember anything in
15  particular that struck you as might not have
16  worked, made the deal work?
17  A. As I recall, they had a raw board
18  shop that we weren't going to continue to operate.
19  You know, I think we told our attorneys to be
20  careful about environmental issues related to that
21  board shop, because that board shop was being
22  discontinued and it was -- and raw board shops
23  used chemicals and whatnot. And we don't, so we
24  didn't want to -- we wanted to make sure we

147

1  were -- we did instruct our attorneys, to my
2  recollection, to make sure we are well protected
3  environmentally.
4  I think that was my biggest kind of
5  noneconomic concerns was environmental liabilities
6  that could arise from that board shop that they
7  had -- the raw board shop, not the circuit
8  assembly.
9  Q. When you say the raw board shop, you
10  mean they were using raw materials?
11  A. No. Prior to our acquisition, they
12  had, to my recollection, just so you guys can
13  understand what this is, if you open up a
14  computer, for example, you will see a board, and
15  on that board, it's usually a green board, and on
16  that board, you will see components.
17  The manufacturer of that raw board,
18  just that green thing, that is something EFTC did
19  not do.
20  What we did is we took components and
21  we put it on the board. We bought the board from
22  outside suppliers.
23  It's my recollection that AGFA for a
24  period of time before our acquisition was

148

1  operating a raw board shop, making that green
2  board prior to our acquisition.
3  I did have a concern, my recollection
4  was I did have a concern about any environmental
5  issues that might have arisen from that operation,
6  and I just wanted to make sure our attorneys were
7  diligent in protecting us from environmental
8  liability.
9  Q. Do you remember any major issues on
10  Bayer's side in terms of what might have made the
11  deal not go through, anything --
12  A. No, I mean, that is something they
13  discussed among themselves. They usually don't
14  tell me.
15  Q. This document that we have marked as
16  Calderon Exhibit 1, is this what is commonly
17  called a letter of intent, LOI?
18  A. You know, it's funny, I am in the
19  mergers and acquisitions business now.
20  I would call this more an indication
21  of interest in terms of the trade, which is sort
22  of setting forth that you are interested, setting
23  forth the general terms -- an LOI is another step,
24  it gets much more specific than a letter of this

149

1  nature.
2  Q. In this letter that we have marked as
3  Exhibit 1, Calderon, I know I have talked about it
4  a little bit already, but it does talk in here
5  about the seller will be responsible for all costs
6  associated with employment or termination of
7  employment of such persons by seller, including
8  the payment of accrued vacation and any severance
9  payments. Do you see that?
10  A. Yes.
11  Q. I am ending in the middle of a
12  sentence.
13  Do you remember any discussion about
14  that issue in terms of unpaid severance when this
15  was drafted?
16  A. No, what this letter is, this is a
17  letter generated by us that is an indication of
18  interest, we are interested, laying out general
19  terms. And one of the terms, you know, that we
20  lay out is -- our general rule in these things,
21  what was before closing is your problem and what
22  is after closing is our problem, as a general
23  matter.
24  And so, basically, all we are saying

38 (Pages 146 to 149)

150

1  here is that the seller, not us, but the seller is
2  responsible for any costs associated with the
3  employees.
4      Q.  I understand that.
5          I am just asking you whether this
6  refreshed your memory as to whether there was any
7  concern about payment of severance to the Bayer
8  employees that prompted you to include this in
9  your letter?
10     MR. WELSH:  Objection.
11 BY THE WITNESS:
12     A.  This would be in all of our letters.
13 You know, we just want to be very clear that, you
14 know, we are not responsible for their program.
15 BY MR. ROACH:
16     Q.  Did you ever hear in any of your
17 discussions with Bayer employees, management
18 employees with whom you were negotiating, that it
19 would be presented, this deal would be presented
20 to the board shop employees as a win-win
21 situation?
22     A.  No, I don't recall.
23     Q.  Did you ever see anybody, Mr. Paige
24 or anyone else, say to the employees it's a

151

1  win-win situation?
2      A.  I don't recall that.
3      MR. WELSH:  Can we take a five-minute
4  break.
5          (WHEREUPON, a recess was had.)
6  BY MR. ROACH:
7      Q.  Did you ever talk to a person, Erhard
8  Rittinghaus, of Bayer about the deal?
9      A.  I don't recall the name. It doesn't
10 mean I didn't.
11     Q.  What about a fellow Werner Seufert,
12 S-e-u-f-e-r-t?
13     A.  I don't recall that.
14     Q.  I show you what has been marked as
15 Fiorilla Exhibit 2. It says Benefit Highlights on
16 the first page, and it's Bates stamped 1752 to
17 1763.
18         Do you recognize that as something
19 that was shown -- strike that.
20         Looking at Fiorilla Exhibit 2, do you
21 recognize that document or any of the information
22 that is on it?
23     A.  No, I don't, but based on the
24 previous page you showed me, it looks like the

152

1  same ones.
2      Q.  I am sorry, same ones as what?
3      A.  You showed me another page here with
4  a bunch of small slides.
5      Q.  Oh, I see, yes.
6      A.  My recollection is they look very
7  similar.
8      Q.  And that would have been, I
9  believe -- that was the benefits --
10     A.  Yes, it was on one sheet of paper. I
11 don't know, maybe these are different. I don't
12 know.
13     Q.  Well, my question is whether in
14 looking at Fiorilla Exhibit 2, do you recognize
15 any of the information on there as something that
16 was presented at any of the meetings with the
17 Bayer employees, the board shop employees in any
18 of your meetings?
19     A.  No, I don't recall these slides. It
20 looks like something AGFA would have done. I
21 don't recall.
22     Q.  Do you know where Mr. Griffin is
23 today, Ty Griffin?
24     A.  I knew where he was a few months ago.

153

1  So, I can't tell you he is still there, but he is
2  working in Seattle, Washington at a company called
3  Icelon, which is also where Stu Fuhlendorf, our
4  former CFO, is at. But that is where Stu works.
5  Stu is the CFO at Icelon. And Ty was there
6  several months back, I don't know if he is still
7  there.
8      MR. ROACH:  Off the record.
9          (WHEREUPON, discussion was had
10          off the record.)
11     MR. ROACH:  Back on the record.
12 BY MR. ROACH:
13     Q.  Did you ever meet personally with any
14 of the board shop employees, other than the
15 meeting that you spoke about, did you ever sit
16 down and talk to any of them personally?
17     A.  Before or after the transaction?
18     Q.  Well, let's start with before.
19     A.  Before the transaction, no, with the
20 exception of the management team there. And I did
21 talk with Don Baribeau, who was -- you know, I did
22 interview him for the general manager's job. And
23 so I definitely talked with Don.
24         I may have been at meetings with some of

**CONDENSED VERSION OF TRANSCRIPT**
Deposition of Jack Calderon - 9/06/06

Page 162

1 EFTC's successor, is still operating the board
2 shop?
3   MR. WELSH: Objection.
4 BY THE WITNESS:
5   A. I don't know specifically.
6 BY MR. ROACH:
7   Q. Was the board shop profitable?
8   A. I don't recall -- in certain
9 quarters, for sure. I don't recall every quarter.
10   Q. Do you recall in general for the two
11 years you were there after the purchase in
12 September of '98, whether the board shop was
13 profitable?
14   A. I don't recall whether it was
15 profitable. I do recall that AGFA had a lot of
16 changes in their business, there was a lot of
17 changes in forecasts. There were a lot of issues
18 at that facility related to -- you know, I guess
19 whether you are the supplier or the customer, but
20 from our perspective, a lot of changes in product
21 mix and forecasts and things that were -- you
22 know, as that one letter indicated, changed
23 business circumstances. So it was a challenging
24 operation.

Page 163

1   Q. Do you remember what changes took
2 place within Bayer, AGFA that was causing some
3 issues?
4   MR. WELSH: Objection.
5 BY THE WITNESS:
6   A. I don't know. I mean, forecasts are
7 usually driven by their demands, so it's usually
8 what products are they selling to their customers
9 and how does that float down to their supply base.
10 BY MR. ROACH:
11   Q. When you met with the board shop
12 employees that one time that you met with them,
13 did you tell them in that meeting that you wanted
14 the people, not the equipment, you were more
15 interested in people than the equipment?
16   A. Yes.
17   Q. Why did you say that?
18   A. Because I believed that in any
19 business, the people are the most important asset.
20 Equipment is something I can go buy anywhere off
21 the shovel, if you will.
22        In this particular case, this group
23 of people were building these products for many
24 years, they knew how to build those products. I

Page 164

1 did view them as a valuable asset.
2        I viewed all of our employees at all of
3 our locations as valuable assets, and we tried to
4 run our company in a way that was employee
5 friendly, if you will.
6        You know, and I did believe that
7 people in any organization is what really makes
8 the difference, it's the people, it's not
9 machines.
10   Q. Can you remember anything else you
11 said to the employees at that meeting, other than
12 what you told us today?
13   A. I definitely recall telling them they
14 don't have a defined benefit plan. I was
15 always -- that was always high on my agenda.
16 Because in all of these deals, they come from big
17 companies where they have defined benefit plans
18 and we don't.
19        I definitely remember giving them a
20 description of our business, our mission, what our
21 strategy was, where our locations were. I
22 definitely recall talking to them about that.
23        And we had a whole strategy revolving
24 around what is called high mix electronics.

Page 165

1   Q. Can you just tell us generally what
2 you said about that?
3   A. Well, our company strategy was to
4 become, and in fact, it's our tag line, the
5 undisputed leader in high mix manufacturing.
6        And what that refers to is the early
7 days of the electronic manufacturing services
8 industry came really from the personal computer.
9 And IBM really started this business. In fact, I
10 was personally involved as an employee with that
11 whole thing.
12        But when you are building computers,
13 you are building what is called low mix, high
14 volume. So you are building a lot of the same
15 thing because, you know, computers are a mass
16 product.
17        What our strategy was was to focus on
18 products that are not built in high volume, they
19 are generally more complex and there is more
20 variety.
21        And so the business that we built up,
22 we actually became the leaders in building circuit
23 cards that end up on airplanes, so your ground
24 proximity systems, your auto pilot systems, you

### Page 182

```
 1  recollection, New Hampshire was operating before
 2  Boston and the pay in New Hampshire was less than
 3  in Boston.
 4       Q.  My second question, because I believe
 5  this was your answer to me in direct, I am not
 6  sure what your answers were to Steve during his
 7  examination, but during the meeting that you
 8  addressed the employees and you talked about the
 9  fact you don't have a defined benefit plan, did
10  you make reference in broad general terms to your
11  incentive programs?
12       A.  Yes, I did.
13       MR. ROACH:  Objection.
14       MR. WELSH:  No further questions.
15            FURTHER EXAMINATION
16  BY MR. ROACH:
17       Q.  I have just one.  I don't see the
18  word New Hampshire on Calderon Exhibit 8.
19            It's probably printed, but your
20  memory is it says New Hampshire along this margin
21  to the left?  (Indicating.)
22       A.  Yes.
23       MR. WELSH:  I show you Exhibit No. 4, as
24  well, and EFTC expressed New Hampshire.
```

### Page 183

```
 1       MR. ROACH:  Okay.
 2       THE WITNESS:  That was already existing,
 3  yes.
 4       MR. ROACH:  Okay.
 5       MR. WELSH:  Thank you.
 6            So you know, after the stenographer
 7  is done, you will get a copy of the transcript and
 8  there will be attached an errata sheet.
 9            Usually you have 30 days, if you so
10  desire, you don't have to, no one is going to come
11  and arrest you if you don't, but you can read
12  through the transcript.
13            If there is anything in there that is
14  wrong, either you think that she didn't get it
15  down exactly what you said or you might have said
16  something which you now believe is inaccurate upon
17  reflection, you are free to point it on the errata
18  sheet and send it to us.
19            Thank you very much for your time.
20       MR. ROACH:  You have to put your reasons on
21  the errata sheet.
22            And I just want to go on the record
23  that the parties agreed that all stipulations
24  except as to form will reserve to time of trial.
```

### Page 184

```
 1       MR. WELSH:  And motions to strike.
 2       MR. ROACH:  And motions to strike will
 3  reserve to the time of trial in this deposition.
 4       MR. WELSH:  Okay.  And with respect to the
 5  errata sheet, the witness need not sign it in
 6  front of a notary.
 7            You can just sign under the penalty
 8  of perjury, and that way, you don't have to go
 9  find a notary.
10       MR. ROACH:  And don't write on the
11  transcript, just on the errata sheet.
12       MR. WELSH:  And now we have made the
13  witness very happy that we are concluded.
14            FURTHER DEPONENT SAITH NOT.
```

### Page 185

```
 1            UNITED STATES DISTRICT COURT
 2              DISTRICT OF MASSACHUSETTS
 3  JOSEPH ATTARDI, et al.,     )
 4       Plaintiffs,            )
 5  vs.                         ) No. 04-10728-REK
 6  BAYER CORPORATION, BAYER,   )
 7  CORPORATION SEVERANCE PAY PLAN, )
 8       Defendants.            )
 9            I, JACK CALDERON, state that I have
10  read the foregoing transcript of the testimony
11  given by me at my deposition on the 6th day of
12  September 2006, and that said transcript
13  constitutes a true and correct record of the
14  testimony given by me at said deposition as I have
15  so indicated on the errata sheets provided herein.
16
17            _____
                   JACK CALDERON
18  corrections (Please initial) _____
19  Number of errata sheets submitted _____(pgs)
20  SUBSCRIBED AND SWORN BY
21  before me _____ day
22  of _____, 2006.
```