**Page 2**

```
 1
 2  APPEARANCES:
 3
 4  ROACH & WISE
 5  By Stephen A. Roach, Esquire
 6  31 State Street
 7  Boston, Massachusetts 02109
 8  (617) 723-2800
 9  On behalf of the Plaintiffs.
10
11  BELLO, BLACK & WELSH, LLP
12  By John F. Welsh, Esquire
13  699 Boylston Street, Suite 1102
14  Boston, Massachusetts 02116
15  617) 247-4100
16  On behalf of the Defendants.
```

**Page 3**

```
               INDEX
EXAMINATION OF:                    PAGE
NORMAN LEWIS BEESLEY
By Mr. Roach                         4




             EXHIBITS
NO.                                PAGE
64  Summary Plan Description Excerpt  129
65  Document, Re: Code System         186
66  Summary Annual Reports 12/99      188
67  Agfa Division Document            191
    Re: Paige Exhibit 31




*Original exhibits retained by Mr. Roach.
```

**Page 4**

```
               PROCEEDINGS
        NORMAN LEWIS BEESLEY, having been
satisfactorily identified by production of a
Pennsylvania Driver's License was duly sworn by the
Notary Public that his testimony would be the truth,
the whole truth, and nothing but the truth.
        MR. ROACH: Usual stipulations, John?
        MR. WELSH: Yeah.
        MR. ROACH: The parties have agreed
to reserve all objections to the time of trial.
        MR. WELSH: I just wanted to say you
sent me an e-mail, I was in union negotiations till
very late last night, so the numbers are -- some are
right, some are wrong.
        MR. ROACH: Let's do the stipulations
and then we'll get to that.
        MR. WELSH: Okay.
        MR. ROACH: The parties have agreed
to reserve all objections to the time of trial
except as to form, to reserve motions to strike to
the time of trial, the witness will read and sign
within 30 days of receipt by Mr. Welsh of the
deposition transcript. He need not sign before a
notary.
```

**Page 5**

```
EXAMINATION BY MR. ROACH:
    Q.  Mr. Beesley, can you state your name,
please?
    A.  Norman Beesley.
    Q.  Mr. Beesley, what that means is that
you'll have 30 days after Mr. Welsh receives the
transcript to make any changes or corrections you
think need to be made.
    A.  Okay.
        MR. ROACH: You wanted to say
something?
        MR. WELSH: Yes, you sent me an
e-mail last night verifying what he would be
testifying on today. There were some mistakes on it
so I wanted to get back to you.
        MR. ROACH: Okay.
        MR. WELSH: Anyway, my understanding
with respect to your subpoena -- do you want to
wait, take a break and find it?
        MR. ROACH: We're looking at Exhibit
58, the notice of deposition?
        MR. WELSH: Yes. Okay. I have it in
my note so I just -- it would be No. 1 and No. 2.
        MR. ROACH: Okay. No. 1 and No. 2 of
```

Page 30

1  divestitures as it relates to pension health and
2  welfare plan what does that mean?
3       MR. WELSH: Objection, misstates your
4  testimony. You may answer.
5   Q. Did that misstate your testimony, sir?
6   A. The strategic planning had to do with the
7  direction that the plans themselves were going to
8  go. There wasn't any strategic planning to the
9  acquisitions and divestitures so if you're --
10  Q. Okay, let me break down the questions
11  then, I apologize. When you say strategic
12  planning --
13  A. Perhaps a better word is "long range."
14  Q. Okay. What did that involve?
15  A. Most of the thrust was determining how
16  much employees -- how much of the cost employees
17  would pay with regard to the plans. In particular
18  health plans and how the plans would be structured
19  such as HMO versus self-insured versus insured
20  plans; that type of thing.
21  Q. Your long-range planning or strategic
22  planning involve the balance between how much the
23  company is going to pay in terms of the cost and how
24  much the employee's going to pay relative to the

Page 31

1  market and so forth?
2   A. Yes, it did.
3   Q. And when you said you were involved in
4  acquisitions and divestitures as it relates to
5  pension and health and welfare plans, what does that
6  mean?
7   A. On an acquisition I would participate in
8  the due diligence process which meant reviewing the
9  target benefit plans to see how they compared to
10  Bayer's plans and to see how they might be
11  ultimately integrated with our programs. And on
12  divestitures it was a similar process, to see how an
13  acquiring company -- how their plans measured up to
14  ours to know if this was an equitable transition for
15  employees.
16  Q. Would that include severance?
17       MR. WELSH: Objection. You may
18  answer.
19  A. No.
20  Q. What kind of benefits would that include
21  in a divestiture?
22  A. Pension, profit sharing or 401K plan,
23  medical, dental, life insurance, disability, post
24  retirement medical, accidental death. I think that

Page 32

1  covers it.
2   Q. Why wouldn't that include severance?
3       MR. WELSH: Objection. You may
4  answer.
5   A. We didn't really consider severance an
6  employee benefit for an active employee.
7   Q. Why not?
8   A. In the case of an acquiring -- if we were
9  to acquire a company, people would come under the
10  Bayer Severance Plan and there was no equity needed
11  because nobody would be terminated. And the vice --
12  and the opposite applied. In our --
13  Q. The opposite applied in what way?
14  A. In our divestitures typically it was a --
15  built into the sales agreement that the acquiring
16  company would take employees and severance wouldn't
17  be paid. So there was no need to compare severance
18  pay plans.
19  Q. What about seniority? For example, you've
20  read this case, in this case I believe you read the
21  Asset Purchase Plan, correct?
22  A. Uh-huh.
23  Q. Ramsden Exhibit 25; is that "yes"? Is
24  that a "yes"?

Page 33

1   A. Yes.
2   Q. And in this case in the Asset Purchase
3  Plan Bayer required that if EFTC terminate the
4  employees within a year after the sale, that they
5  would have to pay six months of severance, correct?
6   A. Yes, I believe that's correct.
7   Q. But EFTC's severance plan was four weeks
8  total otherwise for the employees; you understand
9  that?
10  A. Yes.
11  Q. And --
12  A. Let me back up on that. I guess I don't
13  recall that, frankly.
14  Q. Okay. Assuming that's true, that it was
15  not as good as the Bayer plan, severance plan; is
16  that a fair statement?
17       MR. WELSH: Objection. You may
18  answer.
19  A. That would be true except for a very
20  short-term employee because the Bayer plan started
21  off at four weeks, I believe.
22  Q. Okay, and you understand that the
23  employees in this case all had at least 9 to 10 up
24  to 25 to 30 years?

**34**

1  A. I don't know that.
2      MR. WELSH: Objection, outside the
3  scope.
4  Q. Okay, assuming that they did, the Bayer
5  plan would be better, correct?
6      MR. WELSH: Objection. You may
7  answer.
8  A. If I knew for a fact that the Bayer plan
9  was only four weeks and that people had long lengths
10 of service, which I'm sure they did, it would be
11 correct.
12 Q. So why wouldn't severance be a factor in
13 your job in analyzing divestitures and how it would
14 impact employees?
15     MR. WELSH: Objection. You may
16 answer.
17 A. We were interested in ensuring that
18 employees continued to be employed after a sale of
19 this nature and that they continued to be employed
20 in a like fashion with respect to their pay and
21 employment benefits. Severance was an unemployment
22 benefit, if you want to call it that, and I think we
23 never considered it had a bearing on being an
24 employee, an active employees.

**35**

1  Q. When you became the director of employee
2  benefits and planning in 1992, who became your
3  direct report?
4      MR. WELSH: Objection. I think you
5  might be injecting a word in the title. I'm not
6  sure. I might be wrong but --
7      MR. ROACH: You mean in his title?
8      MR. WELSH: Yes.
9      MR. ROACH: I understood it to be
10 director of employee benefits and planning.
11     MR. WELSH: "And" planning.
12 A. Benefits planning.
13 Q. Oh, I'm sorry, so take out the word "and"?
14 A. Yeah.
15     MR. WELSH: So you were saying, just
16 so there would be consistent --
17 Q. So you became in 1992 director of employee
18 benefits planning?
19 A. Planning.
20 Q. Who was your direct report at that time?
21 A. John Schulz.
22 Q. And he was your direct report up until the
23 time you retired?
24 A. No, in 1998 Joyce Fleischer.

**36**

1  F-l-e-i-s-c-h-e-r.
2  Q. F-l-e-i-s-c-h-e-r?
3  A. Correct, replaced John.
4  Q. Some time in 1998?
5  A. Yes.
6  Q. Okay.
7  A. Her name is now -- let me think a
8  minute -- Burgess, B-u-r-g-e-s-s.
9  Q. Where does she live?
10 A. Pittsburgh.
11 Q. Is she still with Bayer?
12 A. Yes.
13 Q. What was her title when she took over from
14 Mr. Schulz in 1998?
15 A. I can't even quote it. It was the vice
16 president -- it was vice president and it was -- I
17 don't know exactly. Long string of...
18 Q. Well, Mr. Schulz, looking at Willis
19 Exhibit 52, that's the summary plan description in
20 this case, correct?
21 A. Uh-huh.
22 Q. Is that right?
23 A. That's correct.
24 Q. Okay, and that's one of the documents you

**37**

1  looked at today?
2      MR. WELSH: Today?
3  Q. I mean to prepare for today?
4  A. Yes.
5  Q. And Mr. Schulz's title is on page INT 1,
6  do you see that, vice president of benefits,
7  compensation and so forth?
8  A. That's probably the same title but I can't
9  say precisely. They might have slipped something
10 else in there.
11 Q. Okay. Getting back to the question of
12 divestiture and how it would impact upon an
13 employee's benefits, you said severance was an
14 unemployment benefit?
15 A. Well, it only takes place when you lose
16 your job.
17 Q. But it is a benefit that you're entitled
18 to as an employee of the company when you were
19 there, correct?
20     MR. WELSH: Objection.
21 A. I don't think so. I mean, you're not
22 entitled to it until you're not there.
23 Q. Okay, but it is something you're entitled
24 to assuming certain conditions are met under the

10 (Pages 34 to 37)

Page 42

Q. Well, I believe you said earlier severance was not considered a benefit, right?
MR. WELSH: Objection.
A. Yes. It's not a benefit for an active employee and you're saying --
Q. Let me ask you a question. But it is a benefit after you leave your employment with Bayer, correct?
A. Only if you leave involuntarily under circumstances such as layoff; that type of thing.
Q. All right, so let me show you Willis Exhibit 52, the summary plan description. In fact, the Bayer summary plan description refers to severance?
A. Under certain circumstances.
Q. Let me finish. Let me finish. As severance benefits, correct (indicating)?
A. Okay.
Q. You agree with that?
A. Uh-huh.
Q. Is that a, "yes"?
A. Yes.
Q. In fact, the title of the section on severance is, "Your Severance Pay Benefits,"

Page 43

correct? Looking at the page two pages before SEV 1 and before the table of contents for severance, correct?
A. Correct.
Q. So when you in your position as the director of benefits planning are reviewing the benefits of an acquiring company such as in this instance EFTC, why would you not be looking to see what the benefit plan of the acquiring company is as compared to what Bayer's was?
MR. WELSH: Objection, the term "benefit plan." You may answer.
A. The objective of selling a company or as a part of the company would be to have the acquiring business continue the employees in employment. It certainly would not contemplate their termination as a rule after they were employed.
Q. I'm not sure what you mean by that?
A. We were interested in looking at their ongoing employee benefits that they would receive on a day-to-day basis.
Q. Did you make a comparison?
A. No.
Q. Did you make a comparison of what EFTC's

Page 44

benefits were as opposed to what Bayer's benefits were at the time of the sale?
MR. WELSH: Objection, beyond the scope. You may answer.
A. I did not.
Q. Do you know if anyone did?
A. I don't know.
Q. If you were the director of benefits planning for divestitures and acquisitions, why wouldn't you have been involved in this one?
A. I wasn't the director of benefit planning for acquisitions and divestitures. I became involved in acquisitions and divestitures as an adjunct activity. So don't string that together as a longer title.
Q. Okay. Well, I -- I didn't mean to do that and I'm not intending to do that. I understand that your testimony was that you were the director of employee benefits planning. And if I understood your testimony, you would get involved in divestitures and acquisitions?
A. That's correct.
Q. And part of your job was to see how an acquisition would affect employee benefits and how a

Page 45

divestiture would affect employee benefits; is that correct?
A. That's correct.
Q. Why didn't you get involved in comparison of the benefits plans of EFTC and Bayer in 1998?
MR. WELSH: Objection. You may answer. Outside the scope.
A. It was never considered relevant -- I shouldn't say "never." But it was not something that we considered in the comparison.
Q. Why not, wasn't that your job?
MR. WELSH: Objection, are you being argumentative with the witness?
MR. ROACH: No, it's --
MR. WELSH: Sounds like it.
*Q. Why weren't you, sir, involved in doing the comparison if you were the director of employee benefits planning and one of your jobs was to do a comparison of the acquiring company's benefits to Bayer's?
*MR. WELSH: Objection. You may answer.
*A. I think I -- as I stated before my focus was comparing the benefits as an ongoing employee

12 (Pages 42 to 45)

Page 54

1  that he had put together.
2       MR. ROACH: Can I have a copy of
3  that, John? I don't think I've seen that.
4       MR. WELSH: I think you have.
5  Whatever he has we have.
6    Q. Okay, what did it look like, sir?
7    A. I don't recall.
8    Q. Do you remember what the comparison was as
9  to whether EFTC was more favorable or less favorable
10 in terms of benefits than Bayer?
11   A. Well, I know from the sales agreement that
12 it was less favorable because we made an adjustment
13 in pay for the employees because they were going
14 to -- because of the discrepancies in the medical
15 plans.
16   Q. What about the other plans other than
17 medical; was it more favorable or less favorable?
18      MR. WELSH: Objection, beyond the
19 scope. You can answer within your personal
20 knowledge.
21   A. I don't recall but I do recall we made a
22 salary adjustment for them. It could have
23 included -- it might have been for more than just
24 the medical. I don't recall.

Page 55

1    Q. Did the EFTC have a pension plan?
2    A. I don't recall.
3    Q. What did you and Mr. Marr -- can you tell
4  me what you and Mr. Marr discussed?
5       Actually, strike that. Before we get
6  to that I'm going to show you what's been marked as
7  Leonard Exhibit 48; is that the document you looked
8  at that Mr. Marr gave you?
9       MR. WELSH: Objection, beyond the
10 scope. You may answer within your personal
11 knowledge.
12   A. I would say that this is what -- this is
13 the document.
14   Q. And looking at Exhibit 48, let's start
15 with life insurance -- strike that. Why don't you
16 just take a moment and look at Exhibit 48 and tell
17 me whether the benefit plans of EFTC were more or
18 less favorable than those of Bayer?
19      MR. WELSH: Objection, beyond the
20 scope of the subpoena. You can answer.
21   A. Overall I would say that the Bayer plans
22 were superior.
23   Q. Now, when you looked at Exhibit 48,
24 Leonard Exhibit 48, did you have any comment or any

Page 56

1  input to those involved in crafting the sale?
2    A. I don't recall.
3    Q. What do you recall you said to Mr. Marr
4  and Mr. Marr said to you in your telephone
5  conversation that you had?
6       MR. WELSH: Objection. You may
7  answer.
8    A. I can't -- I can't say.
9    Q. Can't remember?
10   A. No, I don't recall.
11   Q. What was the purpose of your position as
12 the director of employee benefits planning in
13 comparing the benefits of Bayer to the acquiring
14 company during a divestiture?
15      MR. WELSH: Objection. You may
16 answer.
17   A. I was to develop comparison similar to
18 that (indicating) so that -- so that in the
19 divestiture document or the acquisition document
20 concessions could be made to try and bring things
21 closer together.
22   Q. For the employees?
23   A. For the employees.
24   Q. When you say similar to that, you're

Page 57

1  talking about Leonard Exhibit 48?
2    A. Uh-huh.
3    Q. Is that a, "yes"?
4    A. Yes.
5    Q. Now, you had stated earlier that severance
6  was, if I heard you correctly, an unemployment
7  benefit; is that correct?
8    A. It occurs when you lose your job, yes.
9    Q. What happens if you have a job, let's say,
10 with Bayer, and you qualify under the Summary Plan
11 Description for the Bayer plan but you happen to get
12 a job before you actually leave Bayer with another
13 company; does severance still come into play there
14 even though you've never missed a beat in terms of a
15 day's pay?
16      MR. WELSH: Objection. You may
17 answer.
18   A. Yes, I would say that that -- that would
19 be true. You're saying that I know I'm going to be
20 fired or laid off or whatever and just so happens I
21 get a job someplace else?
22   Q. Right.
23   A. That would become an unintended windfall.
24   Q. An unintended windfall?

15 (Pages 54 to 57)

**Page 58**

1   A. Well, I mean, yes, not many people have
2   that happen, I think.
3   Q. On what basis do you say that it's an
4   unintended windfall?
5   A. Well, I think the severance pay plan is
6   intended to provide a transition for employees who
7   lose their job -- lose their job and have to go find
8   one.
9   Q. But it can, if I understood your
10  testimony, be paid also and it doesn't exclude
11  people who may be fortunate enough to have a job
12  waiting for them when they otherwise qualify for the
13  plan and they're terminated, correct?
14  A. That's correct.
15        MR. WELSH: Objection.
16  *Q. So in this situation if the employees, the
17  Board Shop employees, the plaintiffs in this case
18  who I represent, otherwise qualified for the plan
19  just because they had a job waiting for them when
20  they were terminated doesn't mean they're not
21  entitled to the severance; isn't that true?
22        MR. WELSH: Objection.
23  A. Say that again?
24  Q. You can answer.

**Page 59**

1         MR. ROACH: You can read it back to
2   him.
3         (*Record read as requested)
4         MR. WELSH: Objection.
5   A. I think it does mean that they're not
6   entitled to. Their jobs continued under the new
7   employer.
8   Q. But not with Bayer, correct?
9   A. Not with Bayer; that's correct.
10  Q. And they were terminated from Bayer,
11  correct?
12  A. That's correct.
13  Q. And it was declining business conditions
14  and a reduction in force that lead to that, correct?
15        MR. WELSH: Objection, beyond the
16  scope of the subpoena.
17  Q. You can answer if you know.
18  A. I don't know anything about the business
19  situation.
20  Q. Assuming they qualified in terms of
21  reduction in force and/or discontinuation of their
22  operations and they were terminated, just because
23  they got a job with EFTC doesn't mean they're not
24  entitled to severance; isn't that true?

**Page 60**

1         MR. WELSH: Objection. You may
2   answer.
3   A. This was not a reduction in force.
4   Q. Didn't Bayer lay off -- I'm sorry, go
5   ahead. I didn't mean to cut you off.
6   A. I mean, sir, I think your assumption is
7   wrong. You're calling this a reduction in force and
8   it was a -- it was a sale.
9   Q. It was a discontinuation of the Board Shop
10  under Bayer's operations though, correct?
11  A. It was not a discontinuation of the Board
12  Shop. Bayer no longer controlled it; that's true.
13  Q. Okay.
14  A. Or Agfa.
15  Q. So what happened to it?
16        MR. WELSH: Objection, beyond the
17  scope of the subpoena.
18  Q. I tell you what, I'm going to withdraw the
19  question. Let me ask another question.
20        MR. WELSH: One second.
21        (Attorney-client conversation)
22  Q. Now, you said that it's not very often
23  that a per -- it doesn't happen very often --
24  A. I can't say that for a fact.

**Page 61**

1   Q. Can't say what for a fact?
2   A. That it's not very often.
3   Q. Let me finish the question, sir. I
4   believe you testified earlier that it's not very
5   often that it happens that someone receives
6   severance benefits and qualifies for it but has a
7   job waiting for them, correct?
8   A. I said that but I can't -- in retrospect I
9   don't have anything to back that up. It just seems
10  like most people have a period of time when they're
11  looking for a job and those that don't are very
12  fortunate.
13  Q. Okay, when you say it seems like, on what
14  are you basing that?
15  A. Speculation.
16  Q. When you say it would be a windfall in
17  that situation, what did you mean by that?
18  A. Person would have two paychecks coming in.
19  Q. One for severance and one for the new job?
20  A. That's correct.
21  Q. What if the benefits in the new job were
22  different, much worse?
23  A. Which new job are you talking about?
24  Q. Any new job?

**Page 62**

1      MR. WELSH: Objection.
2    A. If we paid -- if the corporation paid
3  severance pay to somebody and then they got a new
4  job, I think there's no relationship between --
5  there's certainly no obligation to Bayer as to what
6  kind of job the person has after they have been
7  terminated from the company and paid severance.
8    Q. Okay. So Bayer -- it's none of Bayer's
9  concern, correct, it's up to the employee?
10   A. I believe that would be correct.
11   Q. Okay, so I'm just trying to get back to
12  the statement you made that it would be a windfall
13  if somebody got a job right away or even before they
14  actually stepped out the door from Bayer. On what
15  basis do you say it would be a windfall?
16      MR. WELSH: Objection, asked and
17  answered.
18   A. "Windfall" to me just means extra money
19  that you would not be accustomed to having.
20   Q. Okay, so that's just your speculative
21  opinion, correct?
22   A. That's correct.
23   Q. Because, in fact, if someone qualified
24  under the Bayer Severance Pay Plan, didn't have a

**Page 63**

1  job waiting for them right away --
2    A. Uh-huh.
3    Q. -- but got a job within two days they'd
4  still be entitled to their severance, correct?
5    A. That's correct.
6    Q. Would that be a windfall?
7    A. For the individual it would.
8  *Q. Why if they're entitled to the severance
9  pay under the plan for which they have earned from
10 years of service, isn't that something that they
11 have earned?
12      MR. WELSH: Objection.
13   A. The intent is to provide a transition
14 period. Some people don't need a transition period.
15   Q. Does it say that anywhere under Willis
16 Exhibit 52?
17   A. No, it doesn't --
18      MR. WELSH: No, before you answer the
19 question go ahead and read it.
20   Q. Go ahead and read it, sir.
21   A. Where is that?
22   Q. I direct you to the severance provision,
23 there's a title page called, "Your Severance Pay
24 Benefits" and there's a table of contents and

**Page 64**

1  there's a SEV 1.
2      MR. WELSH: Please repeat the
3  question so he has a question in front of him as he
4  does that?
5      (*Record read as requested)
6      (Witness reading)
7    A. Well, it states here the Severance Pay
8  Plan is designed to provide income to you if your
9  employment with the company ends under certain
10 circumstances and you are eligible for severance
11 benefits. Okay, now your question?
12   Q. That's SEV 1, right, of Exhibit 52?
13   A. That's correct.
14   Q. It doesn't say anything about
15 transitioning or periods of employment in there;
16 does it?
17   A. Well, it says if your employment ends.
18   Q. It doesn't say about if your employment
19 ends whether you have another job or not, it doesn't
20 talk about that, does it?
21   A. No.
22   Q. With respect to the Exhibit 52, Willis,
23 the Summary Plan Description, did you draft the
24 plan?

**Page 65**

1    A. (Pause)
2    Q. Did you draft this?
3    A. That's not the plan; that's the Summary
4  Plan Description.
5    Q. Did you draft the Summary Plan
6  Description?
7    A. I was -- I participated in drafting it,
8  yes.
9    Q. Which parts of it did you participate in,
10 the whole thing or just parts of it?
11   A. I would say that I -- I had some input.
12      MR. WELSH: You can use this without
13 the flags if it's easier.
14      (Document presented to witness)
15   A. I had input in the entire document but...
16   Q. I'm sorry, go ahead.
17   A. Only for -- in some cases it was just a
18 matter of cleaning up wording and proofing it. But
19 I touched it all.
20   Q. When you say cleaning up wording and
21 proofing it, is it fair to say that that means --
22 strike that. What does that mean, cleaning it up
23 and proofing it?
24      MR. WELSH: Objection. You may

**82**

1    MR. WELSH: Mr. Marr, was the person.
2    If you want to ask him if he has a personal
3    understanding it is not as a representative of
4    Bayer.
5    MR. ROACH: Okay, so we've already
6    got Mr. Marr's testimony on that topic. I just
7    wanted to make that clear.
8    MR. WELSH: Yes, you do.
9    MR. ROACH: All right, that's fine.
10   Q. Sir, can you tell me then, before we move
11   off from that, is there anything else you can recall
12   that I haven't -- okay, well, let me ask you this.
13   Let me strike that question. I may get back to
14   that. Beginning with Nos. 1 and 2 of Exhibit 58 for
15   which you are designated I have some more questions.
16   If you look at Exhibit No. 51 can you tell me -- and
17   Willis 52, if you wish, the Summary Plan
18   Description?
19   A. This is 51?
20   MR. WELSH: No, this is the Summary
21   Plan Description; this is one page out of it,
22   severance --
23   A. I was looking down here (indicating).
24   Q. Willis Exhibit 52 which you have a copy

**83**

1    here?
2    A. Okay, now I see what's going on.
3    Q. Willis 51 and Marr 59 is another document
4    and as your counsel just said, Willis 51 and Marr 59
5    are an excerpt of the Summary Plan Description,
6    okay?
7    A. Uh-huh.
8    MR. WELSH: So would you give me one
9    second? I'm going to open up to that severance
10   page.
11   MR. ROACH: Sure, that's fine. Just
12   let me take a quick break.
13   (A brief recess was taken.)
14   Q. Okay, with those documents in front of
15   you, I'd like to ask you what is the intention on
16   Marr Exhibit 59, Willis Exhibit 51, the page SEV 4
17   from the Summary Plan Description, what was the
18   purpose of the circled No. 2 on that page
19   (indicating)?
20   MR. WELSH: Objection. You may
21   answer. You may answer.
22   A. It's to -- and from reading it it's to
23   spell out one of the situations in which you would
24   not receive severance pay.

**84**

1    Q. Okay. And what are the situations where
2    an employee, Bayer employee, would not receive
3    severance pay under that provision, that Bullet
4    Point No. 2?
5    MR. WELSH: Objection. You may
6    answer if you're able.
7    A. What I see here -- what I read says: "The
8    premises, products, processes or other activities of
9    the division you work for are relocated, assigned,
10   sold, leased, licensed or subcontracted, and you are
11   offered a comparable position (even if you choose
12   not to accept it);" I mean, I think that suggests
13   that you are -- you're offered your same job.
14   Q. Where?
15   A. It goes with the premises, products, and
16   processes that are assigned, sold or leased. You go
17   with the sale.
18   Q. You mean an employee can be sold?
19   MR. WELSH: Objection; that's not
20   what he testified to.
21   A. No, I said the employee goes with that
22   which is sold, assigned, leased and so on.
23   Q. When you say the employee goes with, what
24   does that mean?

**85**

1    MR. WELSH: Objection.
2    A. Continues in his or her employment.
3    Q. With whom?
4    A. With whoever bought it, leased it.
5    Q. Does it say that, that they go with
6    whoever bought it, leased it?
7    A. Well, by being offered a position I
8    believe it implies that you would go. It says if
9    you don't accept it, then you won't get it either
10   so...
11   Q. But it doesn't talk about with whom in
12   this particular paragraph, bullet point, does it?
13   It just says a comparable position that you were
14   offered?
15   A. That's true.
16   Q. So it could include either a job with the
17   company that purchased the activities or the
18   products or it could mean once the premises,
19   processes or other activities of the defendants you
20   work for are relocated, assigned, sold, that you
21   could be offered a comparable position inside Bayer,
22   that you wouldn't get severance, right?
23   A. That's correct.
24   Q. So it could be right either way, correct?

**Page 86**

1      MR. WELSH: Objection.
2    A. I think it would -- I think it would cover
3 both.
4    Q. Okay, so let's look at No. 5, bullet point
5 right above that; do you see that?
6    A. Uh-huh.
7    Q. Is that a, "yes"?
8    A. Yes.
9    Q. What does that cover?
10    A. This covers -- says that you will not be
11 eligible for benefits if the division of the company
12 you work for or the company itself is sold or
13 divested and you become an employee of the new
14 owner, the new owner offers you continuing
15 employment.
16         So that appears to be thinking of an
17 entire division that's sold off, I guess, although
18 that's -- I don't know if I would always interpret
19 it that way but I think that's -- that sounds like
20 that's talking about an entire division.
21    Q. Why wouldn't you always interpret it that
22 way?
23    A. Only from experience that it wasn't often
24 that we ever sold an entire division of the company.

**Page 87**

1    Q. So this cover -- would this 5 cover where
2 you sold an entire division or where you didn't sell
3 an entire division?
4         MR. WELSH: Objection. You may
5 answer.
6    A. I don't know but I guess as I'm looking at
7 it I don't really see that it's much different than
8 2. I don't know that it's any different than 2
9 really.
10    Q. Okay. Well, let me ask you about a
11 difference I will suggest to you may be there. In
12 No. 5 it talks about a new employer -- I'm sorry,
13 No. 5 it talks about a new owner, right?
14    A. Uh-huh.
15    Q. Is that right?
16    A. That's correct.
17    Q. And that's not the case in No. 2, correct?
18    A. "Offered a comparable position": I think
19 that implies the same thing. I disagree. I think
20 it implies the same thing.
21    Q. It implies it but it doesn't say in No. 2
22 anything about a new owner, correct?
23    A. It does not specifically talk about a new
24 owner.

**Page 88**

1    Q. So in that instance couldn't it also be
2 reasonably implied that No. 5 covers situations
3 where there is a new owner and No. 2 covers new
4 jobs, comparable jobs within Bayer?
5    A. No.
6    Q. Why do you say, "no"?
7    A. You mean new jobs only within Bayer?
8    Q. Right.
9    A. No.
10    Q. Why?
11    A. This talks about the process of spinning
12 off some unit of work. I think if we intended it to
13 be just something with respect to Bayer, we would
14 have just said that. This goes to great extent
15 talking about how he might spin off a part of the
16 company. This covers more than just a new owner; it
17 covers assignment, subcontracting. It's not just
18 Bayer.
19    Q. Okay, but my question is why wouldn't it
20 say just like No. 5 new owner; whereas in No. 2 why
21 wouldn't it say offered a comparable position with a
22 new owner or within Bayer? Why wouldn't it say that
23 to make it clear that there's a difference? That
24 No. 5 only applies to a new owner and No. 2, as you

**Page 89**

1 say, could apply to either a new owner or to Bayer?
2         MR. WELSH: Objection.
3         (Witness perusing document)
4    A. Talking about Bayer. I don't even see how
5 anyone would contemplate severance benefits if they
6 were offered a position within Bayer.
7         MR. WELSH: One second. Are you done
8 with your answer?
9         THE WITNESS: Yes.
10         (Attorney-client conversation)
11    Q. What's the practical difference between 5
12 where it talks about sale of the division when you
13 become an employee of a new owner and No. 2 where
14 you're offered a comparable position?
15         MR. WELSH: Objection. You may
16 answer.
17    A. I think No. 2 addresses -- really
18 addresses both of the 1 and 5 in that.
19    Q. You mean 2 and 5?
20    A. No, 1 and 5. But it doesn't really
21 address 5. If you look at "division" as a big
22 specific division of the corporation such as Agfa
23 Division might be. But it has the same concept
24 which says that if you are offered a comparable

Page 90

1  position, whether the company offers you that
2  position and it doesn't say it here.
3      But I think the concept -- I know
4  what the concept is and that is that if you continue
5  to have a comparable job then you're not going to
6  get benefits under this program.
7      Q. That's the concept of what, No. 2 and 5?
8      A. Of 2, I would say. 5 tries to draw a box
9  around the size of the divestiture, a bigger box.
10     Q. I'm sorry, No. 5 does or No. 2?
11     A. Well, I think -- well, it could be a
12  bigger box or it could actually be a smaller box.
13  No. 2 could, I suppose, theoretically even be bigger
14  than 5.
15     Q. So why is there a distinction between two
16  and 5 if 5 specifically excepts out a new owner, you
17  have to become an employee of a new owner, and No.
18  2; why didn't they just make them together?
19     A. I think -- I think No. 2 was trying to
20  contemplate a smaller -- I think it was intending to
21  contemplate something less than a division.
22     Q. But I think your testimony was that in
23  either instance sometimes the division can be
24  smaller -- strike that. I guess what my question is

Page 91

1  is why differentiate that between a larger and a
2  smaller in this plan?
3      A. I don't think it would have necessarily
4  been required to do that. I think you could have
5  said everything you wanted to say under 2. We try
6  to cover every base on these things that we can
7  think of. I think -- I think 2 encompasses both 1
8  and 5 even though it doesn't have the exact same
9  words.
10     Q. Well, on what basis do you say No. 2
11  encompasses both 1 and 5?
12     A. Because it contemplates the person
13  continuing with a job at a comparable level.
14     Q. But No. 2 differentiates -- it has very
15  specific requirements. Benefits are not eligible in
16  the premises, products, or processes or other
17  activities of the division you work for are
18  relocated, assigned, sold, leased, licensed or
19  subcontracted, right?
20         MR. WELSH: Objection.
21     Q. And No. 1 just says the company offers you
22  a comparable position for any reason, right?
23         MR. WELSH: Objection. You may
24  answer.

Page 92

1      A. No. 1 says the company offers you another
2  job.
3      Q. Well, comparable position, correct?
4      A. Comparable position.
5      Q. And comparable position is defined, if you
6  look at 3 and 4, as something that doesn't require
7  more than 35 miles?
8      A. That's right.
9      Q. And same wage or salary?
10     A. That's correct.
11     Q. So No. 1 doesn't contemplate anything
12  being sold or relocated; it's just you have a new
13  job, a comparable job offered, correct?
14         MR. WELSH: Objection.
15     Q. You can answer.
16     A. That's correct.
17     Q. So then why do you need No. 2 to cover
18  something No. 1 already covers; to make it if
19  something is relocated or sold if Bayer offers you a
20  job?
21         MR. WELSH: Precisely.
22     A. This isn't -- this paragraph is not
23  intended to talk about Bayer offering you a
24  comparable position, No. 2. No. 2 is not, although

Page 93

1  you seem to want it to, but this -- this is intended
2  to address the comparable position coming from your
3  continued activity under the new situation.
4      Q. No. 2?
5      A. No. 2, yes. You suggested that it might
6  be a Bayer job but --
7      Q. So No. 1 and No. 2 are synonymous?
8         MR. WELSH: Objection.
9      A. No, they're not synonymous. Not at all.
10        MR. WELSH: Is it lunch time?
11        MR. ROACH: Let me just finish the
12  question, then we'll go to lunch.
13     Q. If No. 5 says specifically that's when
14  you're not entitled to benefits; if your whole
15  division is sold and a new owner acquires it you're
16  not entitled to benefits, right?
17     A. And.
18     Q. And you become employed in a comparable
19  job, right; is that right?
20     A. Right, correct. If you're -- well, it
21  says if you become an employee of the new owner.
22     Q. Right?
23     A. Or the new owner offers you continuing
24  employment in a comparable position.

Page 94

1    Q. Right. And so but No. 2 doesn't say that
2  at all. It just talks about the premises being sold
3  and you're offered a comparable job, right?
4        MR. WELSH: Objection.
5    A. I agree it says, "and you're offered a
6  comparable job."
7    Q. So anybody looking -- and this is a
8  Summary Plan Description which is supposed to be in
9  layman's terms so people can understand it, correct?
10   A. Yes.
11   Q. So is it your testimony then that anybody
12 looking at 5 and 2 together --
13       MR. WELSH: Excluding 1?
14       MR. ROACH: I'll get to 1.
15       MR. WELSH: Well, I'm asking.
16       MR. ROACH: Let me ask the questions,
17 John. You're coaching the witness and you're
18 interrupting my questioning.
19       MR. WELSH: I'm not coaching the
20 witness. I'm just trying to get you to play fair by
21 the rules.
22       MR. ROACH: I am playing fair and by
23 the rules and you can cross-examine and right now
24 it's my question. You're jumping in and it's

Page 95

1  inappropriate.
2        MR. WELSH: Do it fairly.
3        MR. ROACH: Sir, I can ask the
4  questions any way I want. If you want to
5  cross-examine -- if you think it's unfair, you can
6  object or you can cross-examine but let me ask the
7  questions, please.
8    Q. Comparing No. 2 and 5, sir, together, a
9  layman looking at No. 2 and 5, looking at those
10 together, isn't it fair to say that looking at those
11 they would say, oh, if I get a new job with a new
12 company, if the company division, the division of
13 the company is sold, and I get a comparable job with
14 a new owner I'm not entitled to benefits; and No. 2
15 meaning if Bayer offers me a new job under No. 2,
16 where the activities I'm involved in or the process
17 I'm involved in gets sold and Bayer offers me a new
18 job, couldn't a layperson reading this take it to
19 mean that?
20       MR. WELSH: Objection.
21   A. I don't think so.
22   Q. Why not?
23   A. (Pause)
24   Q. No. 5 talks about a new owner, No. 2 does

Page 96

1  not?
2        MR. WELSH: Objection, asked and
3  answered three times, Steve.
4    Q. Go ahead, you can answer.
5    A. No. 1 specifically talks about the company
6  offering a position. No. 2 -- and No. 1 doesn't
7  address a sale. No. 2 approaches it addressing a
8  sale and other situations similar to a sale.
9    Q. So --
10       MR. WELSH: Wait. Are you finished?
11   Q. I'm sorry, go ahead?
12   A. And you're offered a comparable position.
13   Q. Okay, but couldn't somebody looking at
14 this, couldn't they look at No. 1 as saying, oh, if
15 I'm in the company and they want to move me
16 somewhere, so long as I don't go anywhere more than
17 35 miles away and I'm offered the same job, wage, or
18 salary I'm not entitled to benefits and then -- for
19 any reason, whether a division is sold or relocated
20 or whatever, but then No. 2 they could take to mean
21 even if I lose -- strike that, even if Bayer's
22 activities that I'm involved in are sold and get
23 discontinued for any reason and Bayer offers me a
24 job somewhere else in another department and I don't

Page 97

1  have to go more than 35 miles and I get the same
2  wage, I'm not entitled to benefits there either;
3  couldn't they read it that way?
4        MR. WELSH: Objection.
5    Q. As a difference between 1 and 2?
6    A. If you were offered another job by Bayer
7  then you'd fall under 1 it seems to me.
8    Q. So why is 2 necessary if it's not intended
9  to mean another job within Bayer?
10   A. Because it contemplates something less
11 than a division.
12   Q. I understand that but if No. 1 covers
13 everything, why do you need No. 2 for jobs within
14 Bayer?
15       MR. WELSH: Objection.
16   A. No. 2. doesn't address the company. It
17 just says you are offered a comparable position. I
18 think No. 1 talks about the company, "the company"
19 meaning Bayer.
20   Q. Okay, but if No. 2 is designed as you
21 state it is, to cover both the company meaning Bayer
22 and a new employer, I would think --
23   A. You would --
24   Q. Let me finish my question. Isn't it fair

Page 98

1  to say that No. 2 covers those situations where
2  people see their division being -- or part of their
3  shop, not a whole division, but the products or the
4  area they're working in gets sold or discontinued
5  and Bayer offers them another job within the
6  company, a comparable job, they still have a job and
7  they're not entitled to severance?
8     MR. WELSH: Objection.
9  Q. Whereas No. 1 none of those things happen
10 and they just get another job?
11 A. (Witness nods head)
12    MR. WELSH: Objection. Let the
13 record reflect the witness said, "no."
14 A. No.
15 Q. On what basis do you say, no, sir?
16 A. I see this as three scenarios. One, the
17 company offers you another comparable position;
18 that's box number -- circle No. 1. Circle No. 5
19 talks about an entire division being divested, you
20 don't get it. No. 2 doesn't really address Bayer
21 offering a comparable position to the person. It
22 talks about your job being sold off and you are
23 offered a comparable position to maintain that job.
24 It doesn't say "to maintain that job" but that's the

Page 99

1  intent.
2  Q. Okay, but it doesn't talk about your job
3  being sold off in here, does it, No. 2?
4  A. Well, your work activities; that's that
5  job, I think.
6  Q. What about premises and products,
7  processes; is that a job?
8  A. You have to go someplace to work.
9  Q. That could be within Bayer or outside of
10 Bayer, right?
11 A. Not if they no longer belong to Bayer.
12 Q. But it could if Bayer offers them another
13 job?
14 A. We already covered that up in 1.
15 Q. It doesn't also talk about a new employer
16 or new owner under No. 2, does it?
17    MR. WELSH: Objection, asked and
18 answered; this is the third time on this one. He
19 keeps on answering your question, you keep asking
20 the same question. It's lunch time. I'm hungry.
21    MR. ROACH: Let's go to lunch.
22    MR. WELSH: Okay, it's a deal.
23    (Luncheon recess)
24 Q. I think we were on Exhibit Willis 51, Marr

Page 100

1  59?
2  A. Uh-huh.
3  Q. Looking at Box No. 2, is there anything in
4  there to indicate how much or how little or how
5  large or how small the premises, products, processes
6  or activities must be?
7  A. No.
8  Q. Why not?
9     MR. WELSH: Objection.
10 A. I don't know how you would be able to
11 describe it. I think it covers any size.
12 Q. But it doesn't say that, right?
13 A. How big is a premise, I mean -- or a
14 premises, I mean?
15 Q. What about activities?
16    MR. WELSH: Objection.
17 Q. What about activities, could that mean one
18 person and one job?
19 A. I imagine you could have a situation where
20 one person and one job would go somewhere.
21 Q. How do you sell an activity?
22 A. You would enter some kind of a sales
23 agreement just -- that's not my job to do that but
24 I -- I think you would draw up some kind of a

Page 101

1  contract.
2  Q. Well, when this was drafted what kind of
3  activities were contemplated that could be sold?
4  A. I think it was intended to cover any
5  portion of the business or businesses.
6  Q. I understand that but when you say
7  activities, what do you mean by "activities"; what
8  does that contemplate?
9     MR. WELSH: Objection. You may
10 answer.
11 A. That covers everything. All aspects of
12 work.
13 Q. Can you give me an example?
14 A. I think in the instance we're talking
15 about here it has to do with building these printed
16 circuit boards, I think. In some other case it
17 might be somebody working on a -- a pharmaceutical.
18 I really don't know.
19 Q. You agree you can't sell people, correct?
20    MR. WELSH: Objection, asked and
21 answered. You may answer again.
22 A. You don't sell people; that's correct.
23 Q. And if EFTC wasn't going to engage in the
24 activities, EFTC's engaging in the activities using

26 (Pages 98 to 101)

**Page 122**

1  A. Bayer or its affiliates, yes.
2  Q. Other than that is it any different
3  substantively?
4  A. Substantively, no, it's not. It's --
5  that's the big difference between the two.
6  Q. Okay, so where the word "Bayer" and an
7  employer is missing in Exhibit 51, Sub 2, couldn't a
8  fair interpretation be in that it's a Summary Plan
9  Description and the Sub No. 9 in Exhibit 53 could
10 also be summarized here under paragraph circled 2 of
11 Exhibit 51?
12     MR. WELSH: Objection.
13 A. No.
14 Q. Why not?
15 A. Because this addresses, specifically
16 paragraph 9, specifically talks about being offered
17 a job by the employer. This talks about being
18 offered a job which is a comparable position which
19 could mean you were being offered a job by the
20 employer or you could be offered a job by the
21 acquiring employer.
22 Q. Or you could be offered a job by Bayer in
23 No. 2, Willis Exhibit 51, right?
24 A. You could.

**Page 123**

1  Q. And the purpose of Willis Exhibit 51 is
2  for an employee to look at it as a Summary Plan
3  Description giving them a summary of what their
4  rights are, correct, that's the purpose of it?
5  A. That's correct.
6  Q. And so with that in mind that precludes or
7  contemplates precluding or not necessitating their
8  having to go and figure out what the Bayer plan
9  means, correct?
10 A. That's correct.
11 Q. I'd like to point you to subparagraph 10
12 of Exhibit 53, Willis, and ask you if you can tell
13 me what that contemplates?
14 A. This sounds like a type of a reduction in
15 force wherein -- or some kind of termination on the
16 part of the company and then instead of terminating
17 the employee the company offers him another job at a
18 comparable wage or salary.
19 Q. That's within Bayer, correct?
20 A. With the employer, yes.
21 Q. And does it say anything in there about
22 why there's an involuntary termination?
23 A. Does it -- in 10 does it say: is that what
24 you're asking?

**Page 124**

1  Q. Strike that. I believe you said it's
2  where there's a reduction in force or an involuntary
3  termination is its intent, correct?
4  A. I don't know that it sounds like that kind
5  of thing. I don't -- it could be any reason that
6  the company just -- they might eliminate a job.
7  Q. Could it contemplate a situation where
8  part or all of the premises, products or activities
9  of the division and when where someone works is sold
10 and they are involuntarily laid off?
11     MR. WELSH: Objection. You may
12 answer.
13 A. (Pause)
14 Q. Involuntarily terminated?
15     MR. WELSH: Objection.
16 A. No, I don't -- I mean, that would be
17 taking somebody out of a deal, giving them a job. I
18 don't think that would be --
19 Q. Okay, I'm sorry --
20     MR. WELSH: Are you done?
21 Q. I'm sorry, go ahead.
22 A. I don't think that's what it's intended
23 for.
24 Q. So I believe you said when I asked you

**Page 125**

1  what Bayer's -- you're speaking on behalf of Bayer
2  now. I just want Bayer's position on this.
3      MR. WELSH: Is that an announcement
4  or is that part of the question?
5      MR. ROACH: I'm just reminding him.
6      MR. WELSH: He knows why he's here.
7  Q. Okay, so with respect to sub 10 I believe
8  you said that was intended to cover where somebody's
9  involuntarily terminated through a reduction in
10 force or otherwise; is that a fair statement of what
11 you said before?
12 A. That's what I said before. I -- let me --
13 I don't know that reduction in force is necessarily
14 a defined term. It could be a reduction of one
15 person.
16 Q. When you say a reduction of force is not a
17 defined term, what do you mean by that?
18 A. I think when you use the most generally --
19 when the word "reduction in force" is used, it's
20 thinking of a large number of people and I don't
21 think that that necessarily -- I don't think 10
22 necessarily addresses just that.
23 Q. Okay, looking at sub 10 of the Bayer plan,
24 Willis Exhibit 53, Fiorilla Exhibit 9, where under

**162**

1  pull the numbers from savings which were in one
2  place, pension which was in another system. All
3  those things had to be put together from -- it was
4  computer time that was costly and it was -- it was
5  difficult.
6      Q. I believe you've also been designated
7  under Exhibit 58, the notice of deposition which
8  would be Marr Exhibit 58 under No. 23?
9      MR. WELSH: Yes, to the extent he has
10 anything, go ahead.
11     Q. Look at No. 23 of Exhibit 58.
12     A. Yes.
13     Q. Can you tell me whether you're familiar
14 with any indemnification agreements between Agfa
15 Corporation and Bayer regarding the Bayer
16 Corporation Severance Pay Plan and the Board Shop
17 employee plaintiffs came in this case for severance?
18     A. That's in the -- in the asset purchase
19 agreement, I believe, and indemnification clause;
20 that the idea being that the sale of that board
21 business was Agfa's ultimate responsibility and not
22 Bayer's.
23     Q. That's Exhibit 25?
24     A. Yes.

**163**

1      Q. Ramsden 25, Calderon 3, can you show me
2  where it says that in there?
3      A. That's not where this is.
4      MR. WELSH: I think you have to read
5  it very carefully because you're assuming it's
6  something else.
7      Q. Are you confusing EFTC with Agfa
8  Corporation?
9      A. Oh, you're talking about --
10     Q. Agfa Corporation.
11     A. You're talking about the Agfa spinoff?
12     Q. Yes.
13     A. Oh, I'm sorry. I was thinking that --
14 yeah, I'm sorry.
15     Q. Okay. Can you tell me what you --
16     A. No, I mean, I don't have --
17     Q. Let me just ask a question. Can you tell
18 me what you know about any indemnification
19 agreements between Agfa Corporation and Bayer?
20     A. All I know is that when we spun off Agfa
21 we wanted to spin off the whole kitten caboodle. I
22 mean, everything that was Agfa's we wanted to
23 basically send off with Agfa. We did keep some
24 pension liabilities, and post retirement medical

**164**

1  liabilities for the employees that were already
2  retired and I think there were some executive deals
3  that were excluded.
4      Other than that we wanted
5  everything -- everything to go with Agfa and I was
6  not any part of that. I just -- I know that that
7  indemnification thing existed and I was I think --
8  I -- that would have been part of the agreement to
9  spin off.
10     Q. Between Agfa and Bayer?
11     A. Right.
12     MR. ROACH: I don't think I've seen
13 that, John. Have you withheld that?
14     MR. WELSH: I withheld that. I don't
15 know if it was requested but I'll get you a copy.
16     MR. ROACH: Okay.
17     Q. Why did Bayer agree to indemnify Agfa with
18 respect to severance?
19     A. (Pause)
20     Q. I'm sorry, I got that backwards. Why did
21 Agfa Corporation agree to indemnify Bayer with
22 respect to the severance?
23     MR. WELSH: Objection, no foundation.
24 You can answer.

**165**

1      A. No, it didn't seem like a good idea.
2      Q. Did Agfa Corporation agree to indemnify
3  Bayer Corporation with respect to any severance
4  claims?
5      A. I believe so.
6      Q. Okay, why?
7      A. I don't know, I mean other than Bayer
8  wanted to get rid of as much of -- of everything
9  that they could.
10     Q. Rid of it in what way?
11     A. Not be responsible for any parts of Agfa
12 after they spun it off.
13     Q. Now, when you say they spun it off, what
14 does that mean, they spun it off?
15     A. They made a separate -- separate
16 corporation out of it.
17     Q. Out of what the Agfa Division?
18     A. Yes, that's what I understand. I'm not
19 familiar if a familiar with how that stuff works.
20     Q. And that included the people in
21 Wilmington, Massachusetts, were part of the Agfa
22 Division, correct?
23     A. Those that were still part of the Agfa
24 Division would have, yes.

**Page 166**

1  Q. So is it fair to say that the Agfa
2  Division was spun off and became a new
3  corporation?
4  A. That's correct.
5  Q. Agfa Corporation, okay. And then the
6  employees of the Agfa Division became an employee of
7  Agfa Corporation, not Bayer Corporation, correct?
8  A. That's correct.
9  Q. And under Willis Exhibit 51, Marr 59, were
10 the people who were working for the Agfa Division
11 who got spun off and became employees of the Agfa
12 Corporation, were they entitled to severance?
13 A. No.
14 Q. Why not?
15 A. It was a sale -- there was a divestiture
16 of the business, of the division.
17 Q. Okay, and that would be No. 5 on Willis
18 Exhibit 51?
19 A. Yes.
20 Q. It would be covered under that?
21 A. (Pause)
22 Q. Is that right?
23 A. Yes.
24 Q. And the new owner under No. 5 of Willis

**Page 167**

1  Exhibit 51 will be Agfa Corporation, correct?
2  A. Correct, if that's what they called
3  themselves. I'm not even 100 percent sure that was
4  their -- was that their name after they --
5  Q. Well, we do have the Agfa Corporation
6  Severance Pay Plan.
7  A. Okay, all right; that's all.
8  MR. WELSH: Steve?
9  MR. ROACH: Yes.
10 MR. WELSH: I believe there was a
11 holding company. I think that's what he -- you're
12 looking, trying to figure out what the answer is.
13 I'm just trying to --
14 MR. ROACH: Go ahead.
15 MR. WELSH: I believe that there is a
16 holding company that they used to effect the
17 transaction. So, yes, the Agfa Division became Agfa
18 Corporation but it was through the transfer of
19 assets to a holding company which -- some initials.
20 I'll get that for you.
21 Q. And do you adopt Mr. Welsh's testimony on
22 that, sir?
23 A. Yes.
24 Q. All right, I'm going to reserve my rights

**Page 168**

1  on that, to ask more questions once I get the
2  documents from you. I probably won't have any but
3  to the extent that I do, I just want to reserve my
4  rights on that.
5  MR. WELSH: I note that you're
6  reserving your rights. Without agreeing in any way
7  to such reservation.
8  MR. ROACH: Understood.
9  Q. Were you involved in any way in the spin
10 off of Agfa Division from Bayer into Agfa
11 Corporation through a holding company or otherwise?
12 A. I would say only with respect to the
13 pension when we were retaining liability for pension
14 benefits that were accrued. Other than that I would
15 say not really, no.
16 Q. Do you know whether anyone made a claim
17 for severance?
18 A. Not to my knowledge.
19 Q. Do you know whether the entire division,
20 Agfa Division, was spun off or was only part of it
21 spun off into Agfa Corporation?
22 A. I'm certain the entire division was spun
23 off.
24 Q. I'm sorry?

**Page 169**

1  A. I'm certain it was the entire division.
2  Q. And where was the division located, could
3  you tell me where?
4  A. Ridgefield Park, how about that one? And
5  Wilmington and I don't know where else they had -- I
6  really don't know if they -- they probably had other
7  small locations but I'm not familiar with them.
8  Q. So, for example, people like Mr. Romos
9  became an employee of Agfa Corporation; is that
10 correct?
11 A. I think soon -- some where before the spin
12 off Romos came back to Bayer Corporation.
13 Q. But other people --
14 A. Was transferred back and was -- worked
15 there until he retired.
16 Q. Did he receive severance?
17 A. I'm sure he did not.
18 Q. What about the other people up in the
19 Wilmington Division?
20 MR. WELSH: Wilmington location?
21 MR. ROACH: I'm sorry?
22 MR. WELSH: The Wilmington location?
23 Q. Yes, the Wilmington location of Agfa
24 Division, did they become all Agfa Corporation

**170**

1  employees?
2  A. To my knowledge. There may have been
3  somebody else that was transferred.
4  Q. And I believe you testified that Bayer --
5  I may misstate what you said -- but I believe you
6  said that they wanted to get rid of any
7  responsibility with respect to severance which is
8  why --
9  A. No, not just with respect to severance.
10 Q. In addition to other things?
11 A. Everything that -- everything that was
12 Agfa's -- went with Agfa as best they could with the
13 few exceptions.
14 Q. Okay, and that included severance; they
15 wanted to dispense with their responsibility for
16 that, you said, right?
17     MR. WELSH: Objection.
18 A. Well, I don't know if that's -- severance
19 wasn't contemplated so I don't think severance was
20 triggered.
21 Q. Okay, that's not my question. My question
22 is -- well, when you say severance wasn't
23 contemplated, wasn't triggered, on what basis, what
24 facts do you state that?

**171**

1  A. All these people had employment under
2  their new ag -- their new Agfa employer.
3  Q. Okay, and did anybody discuss severance at
4  that time, any concern with severance?
5  A. I don't know if anybody discussed it or
6  not. It was standard practice that we operated that
7  way.
8  Q. The spinoff occurred on or about January
9  1, 1999?
10 A. Correct.
11 Q. And you understand that the Board Shop
12 employees were terminated from Bayer before then,
13 correct, and with the EFTC?
14     MR. WELSH: Objection. You may
15 answer.
16 A. They were transferred to the new owner,
17 that's correct, prior to the -- prior to the Agfa
18 spinoff.
19 Q. So why was there an indemnification
20 agreement covering them if they were no longer
21 working for Bayer and were working for EFTC?
22     MR. WELSH: Objection. You may
23 answer.
24 A. Say that again?

**172**

1  Q. Why would the indemnification agreement
2  between Bayer and Agfa cover them if they no longer
3  were working for Bayer at the time of the spinoff?
4  A. Well, they were working for Agfa at the
5  time that they were sold. So it would seem to me
6  that if we were selling Agfa or spinning off Agfa
7  that it would be natural that -- that that's the
8  approach that would be taken. But that's a business
9  decision, certainly not a -- not a benefits
10 decision.
11 Q. As of January 1, 1999 the plaintiffs in
12 this case, the Board Shop employees, were not
13 employed with the Agfa Division of Bayer; they were
14 EFTC employees, correct?
15 A. That's correct.
16 Q. And it was Bayer's position that they were
17 not entitled to severance, correct?
18 A. (Pause)
19 Q. In 1998?
20 A. It was Bayer's position because they had
21 been sold from the Agfa Division under those
22 particular terms, okay.
23 Q. To EFTC, correct?
24 A. Correct.

**173**

1  Q. So if those employees were no longer
2  working for Bayer, Agfa Division, they were working
3  for EFTC, why did Bayer concern itself with having
4  Agfa Corporation indemnify it with respect to those
5  people?
6      MR. WELSH: Objection.
7  Q. They were no longer with Bayer but were
8  working now for EFTC?
9      MR. WELSH: Objection, foundation.
10 But you can answer.
11 Q. You can answer.
12 A. I guess I'm a little confused as to
13 exactly where it is that you -- that they
14 specifically addressed the EFTC employees; that was
15 in the -- I'm confused.
16 Q. Well, what are you confused about, sir?
17 A. I'm confused as to where it is that --
18 where Agfa indemnified Bayer after the spinoff for
19 EFTC employees. I think that's what you're trying to
20 tell me.
21 Q. Right, and I believe it's been established
22 in this case, or if it's not we can get documents to
23 that effect, that that's the case?
24     MR. WELSH: No, what happened was

**Page 174**

1  that they indemnified them for all employment claims
2  arising out of the business unit. There was no
3  document that said for EFTC employees specifically.
4     A. It was Agfa.
5        MR. WELSH: All employment claims
6  arise hereafter that come out of the Agfa
7  business -- the business unit, will be indemnified
8  by the Agfa Corporation.
9     A. That's correct, and that's how I
10 understand it.
11    Q. Do you adopt your lawyer's testimony on
12 that?
13    A. Yes, I believe that.
14       MR. ROACH: Okay, I'd like to see
15 those documents, John. I haven't seen them.
16       MR. WELSH: Okay.
17       MR. ROACH: Okay, and I'm reserving
18 my rights on that as well.
19       MR. WELSH: I note that on that topic
20 I'm admitting that you have that right.
21    Q. So can you tell me why Bayer sought to
22 indemnify -- where Bayer sought an indemnification
23 from Agfa Corporation with respect to employment
24 issues of former Bayer employees such as the Board

**Page 175**

1  Shop employees that went to the EFTC?
2     A. Former Agfa employees who were a
3  subdivision or a division of Bayer?
4     Q. Right.
5     A. I can't tell you as a benefits person, but
6  all the records went with Agfa, everything went to
7  Agfa. In fact, they didn't even -- I say they went
8  to Agfa, they never even came to Bayer. So what
9  happened in Wilmington and what happened in
10 Ridgefield Park stayed in Wilmington and stayed in
11 Ridgefield Park and -- so if a claim were to come up
12 later on about some employment thing.
13       I don't care what it's about. All of
14 the data and the knowledge resided with Agfa
15 employees, certainly not with Bayer Corporation. So
16 it is only naturally -- it's a natural thing to do
17 from a -- from the standpoint of being able to
18 discuss the issue. And the second thing is that
19 Bayer was the big bear in this thing and pretty much
20 could dictate the terms of the spinoff.
21    Q. When you say "big bear," you mean B-E-A-R,
22 not Bayer, B-a-y-e-r, meaning the big bear, B-E-A-R;
23 is that what you meant to say?
24    A. Yes, and they were the...

**Page 176**

1     Q. Now, when you said that the employees, the
2  EFTC employees or the Board Shop plaintiffs, were
3  transferred to EFTC what did you mean by that?
4     A. Oh, I think that was a word that we used
5  in all of our -- our sales agreements. We referred
6  to them as transferred employees and that's probably
7  why I said that.
8     Q. What is a transferred employee?
9     A. We'd have to look in the -- in the sales
10 document to read the exact definition.
11    Q. Well, let's assume that the -- let's
12 assume that they were referred to as transferred
13 employee's in the sales document?
14    A. Okay.
15    Q. Do you know of any human resources
16 procedure that would call someone who has --
17    A. No, no.
18    Q. -- been terminated by Bayer a transferred
19 employee?
20    A. No. I just used that term because that
21 popped in my mind as I think about sales and
22 spinoffs.
23       MR. WELSH: Are you almost done,
24 Steve?

**Page 177**

1        MR. ROACH: Just about.
2        MR. WELSH: We're over the six hours
3  but I'll give you a little latitude because I'm a
4  nice person.
5        MR. ROACH: I greatly appreciate it.
6        MR. WELSH: Please note that on the
7  record with an asterisk.
8        MR. ROACH: "Greatly appreciated,"
9  I'm saying, with some sincerity and some
10 facetiousness.
11    Q. I show you Exhibit 31, Paige Exhibit 31.
12 You've been designated as the person for this
13 document under No. 30 of Exhibit 58, Marr Exhibit
14 58.
15       MR. WELSH: This is the human
16 resource one. He can testify to what he knows about
17 it but I have not been able to find someone who has
18 been responsible for drafting and putting the
19 contents in the plan so subject to the same caveat
20 as No. 29 you can answer the questions to your
21 knowledge.
22    Q. Are you familiar with this document, sir?
23    A. Only vaguely.
24    Q. I turn you to page 31, please. They use