UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10728-WGY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

JOSEPH ATTARDI, ET ALS,               *
Plaintiffs,                           *
v.                                    *
BAYER CORPORATION and                 *
BAYER CORPORATION SEVERANCE PAY PLAN, *
Defendants.                           *

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**PLAINTIFFS' CONCISE STATEMENT OF DISPUTED AND UNDISPUTED
MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1
IN  OPPOSITION TO DEFENDANTS'  MOTION FOR SUMMARY JUDGMENT
AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs submit this Local 56.1 Statement of Disputed and Undisputed Material Facts

in Opposition to Defendants's Motion for Summary and in Support of Plaintiffs' Cross-Motion

for Summary Judgment.  Plaintiffs address the Statement of Defendants Bayer Corporation

"(Bayer") and Bayer Corporation Severance Pay Plan ("Bayer Plan") and add further facts as

follows: [1]

1.  Admitted.

2.  Admitted except the employees numbered closer to 100. **D. Ex Y.** All but one Plaintiff

had 10-30 years with Bayer and had accumulated $2 Million in potential severance benefits. **P

Ex 2 at 8 & Attachment 6.** [2]  Bayer employed 24,000 people and had sales of $9.3 Billion. **D

Ex Y; P Ex 42.** Bayer admits the total principal severance amount for the Plaintiffs came to at

---

[1]References are to the deposition transcripts and exhibits to depositions in this case as well as
Answers to Interrogatories of the parties. **"D Ex"** means a reference to the Defendants' exhibits
and **"PEx"** refers to Plaitniffs' exhibits.

[2]For the Court's convenience some wording on exhibits is highlighted.

least $1.7 Million, and maybe more.  **P Ex 1 at 196-208, 249-256; P Ex. 8 (Dep Ex 56).**
Plaintiffs claim it is about $2 Million. **P Ex. 2, Attachment 6.**

3.  Admitted that capital improvements were a reason Bayer looked for a purchaser, but
denied as it being the only reason. Bayer also experienced declining business in the printed
circuit board manufacturing and assembly unit (the "Board Shop").  Bayer also sold the Board
Shop assets for $8.1 Million and, as  part of the sale, had a 3 year supply agreement whereby
Electronic Fabrication Technology Corporation ("EFTC")  using the Board Shop Plaintiff's
expertise and training, would provide the circuit printed boards to Bayer to sell to Bayer's
customers. Bayer leased back part of its space to EFTC for this purpose. **P Ex 15 at 137, 155-56,
158-59, 145; P Exs 28-29; P Ex 23.**  The quality of work from the board shop employees was a
factor in Bayer's ability to sell the shop. **P Ex 6 at 54 (Ramsden Dep)**.   Bayer also contends the
<u>only</u> reason Bayer and EFTC entered into this transaction was to ensure employment for the
Plaintiffs.  Bayer admits that from the start of its negotiation it was looking for a buyer to
employ the Plaintiffs.  **P Ex. 1 at 101-02 (Marr Dep.), P Ex. 5 at 7 (Ans. Int. 6).**   EFTC
submitted a proposal to Bayer which included avoidance of severance to the Plaintiffs.  **P Ex. 10
- See Section 3.5**.  If the EFTC-Bayer sale had not gone through and no new buyer developed
and Bayer closed the business, the Plaintiffs would have been terminated and paid severance. **P
Ex 15, 148** Bayer said that a lot of money ("many, many dollars") would have been needed to be
invested in Board Shop technology to bring it up to date; this was one of the reasons for the sale.
**P Ex 6 at 52-53 (Ramsden Dep**.)

4-7.  Admitted.

8.  Admitted. Also, Section 6.4 required EFTC to employ Plaintiffs a minimum of one
year under penalty of six months severance pay to them.  Section 6.9.2 required Bayer to

indemnify EFTC for any of Plaintiffs' employment rights. **D Ex C at 11-12.** Bayer tried to get

EFTC to guarantee employment for 2 years. **P Ex 36 (at Bates Stamped Page B00811), P Ex 7**

**at 157 (Sarafian Dep.)**

      9-11.  Admitted.

      12.  Admitted, except Plaintiffs contend that the 1995 Bay Corporation Severance Pay

Plan ("Bayer Plan") was vested in the sense that Plaintiffs were entitled to severance under the

Bayer Plan and Summary Plan Description ("SPD") under the terms of those documents and

Bayer's voluntary layoff program discussed below.

      13-15. Admitted but Defendants omit reference to Article I, Sections 3.06(9) and (10).

Under Section 3.06(9) a severed employee is not eligible for severance when he/she is offered a

comparable job within Bayer (within 35 miles and at the same pay) "in connection with a

relocation, assignment, sale, lease, license or subcontracting of [Bayer's] premises, products,

processes or other activities" is not eligible for severance. Under Section 3.06(10) a severed

employee is not eligible for severance when he/she is offered a comparable job within Bayer for

any <u>other</u> reason. **D Ex A at 7.**  Sections 3.06(8)(9) and (10) do not apply because there the

Bayer sale of the Board Shop assets to EFTC was not a divestiture.   Also, Article I Section 1.08

of the Bayer Plan defines Bayer as an "Employer" under Sections 3.06(9) and (10).  **D Ex A** at 2.

      16.  Admitted that the Bayer Plan so states, but Plaintiffs deny its terms are applicable.

Bayer never provided a copy of the Bayer Plan to the Plaintiffs. **P Ex 2 at 9, P Ex 3 at 6-7.**

Bayer admits its does not know if it provided the Bayer Plan to the Plaintiffs  The Plaintiffs did

not even know the Bayer Plan existed, Bayer's local Human Resources person who was

designed to and did deal with the Plaintiffs in 1998, Mary Leonard, also did not know it existed

nor did she have a copy. No one at Bayer management or in HR ever told the Plaintiffs about it

at any time. Nowhere in the SPD did it provide the name of the Bayer Plan, state the address and/or telephone number of where to obtain it; it only gives the main Bayer company number in Pittsburgh. **D Ex B, Adm 1.** Bayer so admits**. P Ex 1 at 106-120 (Marr Dep).**   Bayer admits there was no claim form or any information on how to "file" a claim for severance, under either the Bayer Plan or the SPD.  **P Ex 13 at 128-129, 130 (Beesley Dep) & P Exs 18 at 10 & 19.** Bayer admits a claim can be made verbally. **P Ex 13 at 128-129.**  Bayer admits it does not know how to make a claim for severance benefits. **P Ex 13 at 143.**  Bayer admits that it must put a denial of a claim in writing but there are no forms for it**. Id. at 130.**  Bayer admits that it violates its own plan where a verbal request is made and Bayer does not put the denial of severance in writing, and it did not do so here. **Id. at 130-131; P Ex 15 at 128-129, 210.**   Bayer's Senior Human Resources Manager was not aware of any procedure on how an employee would make a claim for severance benefits. **P Ex 4 at 246-247.** Bayer has never had an administrative appeal for severance in 15 years on the appeals committee.  **P Ex 13 at 143-145.**  Bayer's Senior Human Resources Manager did not advise Plaintiffs of the appeal process for the severance when she met with them. **P Ex 4  at 75.** Plaintiffs were not told how to appeal and were not advised or assisted with it. **P Ex 15 78-85 .**  Leonard was not familiar with the appeal process other than there was one the SPD. **Id. at 75-76.**  Bayer admitted "most" Board Shop-Plaintiffs had high school educations and were "not highly educated. **P Ex 15 at 81-82**. The complete SPD is not attached as Exhibit B to the Defendants' Exhibits. Severance is within the SPD, along with other benefits, and the SPD is about an inch thick in total. **P Ex 15 at  83; P Ex 12.**   The Manager of HR, Mr. Willis, did have a copy of the Bayer Plan but did not provide it to the Plaintiffs when the severance issue arose. **P Ex 15 at 87-88; P Ex 18.**  It was Bayer's "practice" to only provide the SPD. **P Ex 15 at 88-89.**

4

17-18.  Admitted in part. But Plaintiffs deny that the Bayer properly exercised its stated discretion in accordance with its fiduciary duties under Bayer Plan and under the law.  Plaintiffs did not have, did not have notice of, and not know about the Bayer Plan. See paragraph 16 above.  Severance was to be paid from Bayer's assets. **D Ex B at Adm 3.**

19.     Plaintiffs deny paragraph 19 of the Defendants' Statement**.**  Plaintiffs admit that EFTC offered them, and they accepted, jobs at the same pay and at the same location, Bayer's premises at 80 Industrial Way in Wilmington, MA, the site of the Board Shop.  Plaintiffs deny such facts preclude them from severance under the Bayer Plan and/or the SPD. First, Bayer voluntarily sold some of the Board Shop assets to EFTC $8.1 million, a supply agreement with EFTC for below market prices for printed circuit boards for Bayer's customers, and a lease whereby EFTC paid Bayer for use of the Board Shop premises.  Therefore, the Bayer-EFTC asset sale was not a divestiture and so Section 3.60(8) of the Bayer Plan does not apply.  Third, the Plaintiffs were not offered a comparable job within Bayer, i.e. at the same pay and at the same location. Second, the Agfa Division of Bayer, which included the Board Shop, was not sold.  Third, Bayer involuntarily terminated the Plaintiffs' employment without cause. Fourth, the Plaintiffs are entitled to severance because (1) there was a declining business condition affecting their area,  and/or (2) their positions were eliminated, and/or (3) there was a "discontinuation of operations."  Accordingly, under the Bayer Plan and the SPD the Plaintiffs are entitled to severance.  Bayer told the Plaintiff, when they asked for severance in meetings, that they would be terminated and not paid severance whether or not they accepted a job with EFTC. **P Ex 15 at 150-152, 168-172; P Ex. 2 at 1-8; D Ex U at 41.**  Bayer admits but for the exceptions of the SPD and Bayer Plan the Plaintiffs otherwise qualified for severance in that their positions were eliminated, the Board Shop was discontinued, they were involuntarily

terminated, and their business unit was sold due to declining business and the need to invest about $300,000 for new equipment.  **(P Ex. 1 at 92-93, 228 (Marr Dep); P Ex 15 at 200-201 (Willis Dep.)**; **P Ex 6 at 262, 277-78 (Ramsden Dep); P Ex 35.**

20-22.   Admitted.  Plaintiffs further state, however, that the SPD is one inch thick and severance is mixed within other benefits.  **P Ex 15 at  83; P Ex 12.**

23.   Admitted that the SPD contains this plus other language.  Plaintiffs deny, however, that the SPD language stated, advises an employee how or where to submit a claim. **D Ex B.**  As for an appeal of benefits denial,  Bayer admitted that the SPD (**D Ex B, Adm. 6-last page of SPD)** does not say where an appeal is to be filed, to whom it is to be sent and makes no mention of the Bayer "ERISA Committee" which Bayer says handles  appeals. See paragraph 16 above. In fact, Bayer inconsistently called it a "Benefit Administrative Committee" and admits that the SPD makes no mention of any Committee's address to which to file an appeal.  **P Ex 1, at 192-193 (Marr Dep);  D. Ex. B Adm. 6.** It does not state whether an initial claim has to be in writing.  The only hint that an employee must make an <u>initial</u> claim in writing comes  within a vague reference to Bayer's obligation to provide "a written notification of the denial with 90 days after <u>filing.</u>" (emphasis added). But nowhere in the SPD does it explain what a "filing" is, where or how it is to be made, to whom it must be made, on what forms, if any it must be made on, or when it must be made.   It also is under the generic "Administrative Information"of the SPD, on the last page of the SPD. **D Ex B, Adm 6.**

24.  Denied.  The SPD does <u>not</u> expressly, or in any reasonable way, explain to employees how to obtain the Bayer Plan from Bayer, the U.S. Government, or any other source. **D Ex B** , **Adm 1-4.** The Bayer telephone number is only a generic main company number, not a number for any human resource person.  Bayer admits that it did not send the Bayer Plan to the

6

Plaintiff-employees. **P Ex. 1, at 81-82 (Marr Dep.).**  Bayer's Director of Compensation and

Benefits in its Pittsburgh Headquarters testified that nowhere in the SPD is the Bayer Plan listed

by name. **P Ex 1, at 83-84, 107-122 (Marr Dep.)**  He further states that a non-HR professional

could not have figured it out. **P Ex 1 at 119.**  He admits that he was not aware of anyone at

Bayer who told the Plaintiffs of the existence of the Bayer Plan. **P Ex 1 at 126-129.** The

Plaintiffs never received it or were told about it.  In 1998, when the Plaintiffs asked for payment

of severance, Bayer did not bring the existence of the Bayer Plan to the attention of the Plaintiffs

or explain to the Plaintiffs in writing of the reasons for the denial of the severance benefits.    **P**

**Ex 2 at 9, P Ex 3 at 6-7 (Answers to Interrogatories).**  Mary Leonard, Bayer's Senior Human

Resources Manager and main contact with the Plaintiffs did not even know the Bayer Plan

existed. **(P Ex. 4 at 58 Leonard Dep**).

25. Admitted that the SPD states the language quoted but Plaintiffs deny that this in any

way means that the Defendants had the right to deny severance or could change its terms after

the Plaintiffs requested severance, that Bayer brought this language to the Plaintiffs' attorney or

that Bayer is entitled to deny severance.  **See Paragraphs 16 & 24above**

26.  Admitted that the SPD states the language quoted but Plaintiffs deny that this in any

way means that the Defendants had the right to deny severance or could change its terms after

the Plaintiffs requested severance, that Bayer brought this language to the Plaintiffs' attorney or

that Bayer is entitled to deny severance.    **See Paragraphs 16 & 24 above**.

27.   Admitted that the SPD states the language quoted but Plaintiffs deny that the plan

administrator denied severance in writing, as the SPD requires.  **See Paragraphs 16 & 24**

**above;  D Ex. B, adm 6.**  Plaintiffs further state that they were not informed in righting of the

denial, or informed verbally or in writing of their right to appeal, which is not clear in the SPD.

7

**Id.**; **P Ex 2 at 9, P Ex 3 at 6-7;P Ex 1 at 104-105, 132, 188 (Marr Dep).** Bayer admits because there was no written denial, the Plaintiffs had no obligation to administratively appeal**. P Ex 1 at 188 (Marr Dep).**

      28-29.  Denied. Despite the SPD language quoted,  the SPD does <u>not</u> expressly, or in any reasonable way, explain to employees how to obtain the Bayer Plan from Bayer, the U.S. Government, or any other source. **D Ex B**, **Adm 1-4.** The Bayer telephone number is only a generic main company number, not a number for any human resources person.  Bayer admits that it did not send the Bayer Plan to the Plaintiff-employees. **P Ex. 1, at 81-82 (Marr Dep.).** Bayer's Director of Compensation and Benefits in its Pittsburgh Headquarters testified that nowhere in the SPD is the Bayer Plan listed by name. **P Ex 1, at 83-84, 107-122 (Marr Dep.)** He further states that a non-HR professional could not have figured it out. **P Ex 1 at 119.**  He admits that he was not aware of anyone at Bayer who told the Plaintiffs of the existence of the Bayer Plan. **P Ex 1 at 126-129.** The Plaintiffs never received it or were told about it.  In 1998, when the Plaintiffs asked for payment of severance, Bayer did not bring the existence of the Bayer Plan to the attention of the Plaintiffs or explain to the Plaintiffs in writing of the reasons for the denial of the severance benefits.    **P Ex 2 at 9, P Ex 3 at 6-7 (Ans. to Interrogatories).** Mary Leonard, Bayer's Senior Human Resources Manager and main contact with the Plaintiffs did not even know the Bayer Plan existed. **(P Ex. 4 at 58 Leonard Dep.)**. **See Paragraphs 16 & 24 above.** Even in Bayer's Interrogatory Answers Bayer still failed to set down the detailed reasons in writing for the denial other than the following cursory, vague single sentence: "EFTC Corporation transaction was the type of even expressly excluded from eligibility under the terms of the Severance Pay Plan." **P Ex 5, at p. 8.**

      30. Denied. The SPD Plaintiffs incorporate their statements in paragraphs 16 & 29.

31.  Plaintiffs deny that there is any evidence that anyone in Pittsburgh reviewed the Plaintiffs' claim for severance.  **P Ex 1 at 180-185.**  It was completely a local Bayer decision by those acting for Bayer at its Wilmington, MA site which was made by Mr. Richard Ramsden, Mr. Rodney Willis and in-house Attorney Rob Sarafian with Mary Leonard involved as well.  **P Ex 1 at 132-35 (Marr Dep); P Ex 15 at 44, 100-104.**  Bayer admits that a claim for benefits is made locally. **P Ex 13 at 154-156 (Beesley Dep.); P Ex 5  at 7 .**  Plaintiffs admit that Bayer now takes the position that solely because EFTC offered them jobs at the same pay and location then they are not entitled to severance. Plaintiffs deny that Bayer is correct under the terms of either the Bayer Plan or SPD. **D Exs A & B.**  The EFTC asset sale was not a "divestiture" under Section 3.06(8) of the Bayer Plan (See paragraphs 15 & 19), and, as Bayer admitted, only a transfer within Bayer precludes the Plaintiffs severance under the SPD (See paragraph 67). **P Ex 1, at 214-217 (Marr Dep); P Ex. 9**.

32. Plaintiffs deny that they had not "submitted a claim to severance based on the SPD" if the Defendants mean to imply that lack of a written claim in 1998 or 1999 precludes them. The Plaintiffs all repeatedly verbally asked for severance, both in group meetings and in individual meetings with Bayer supervisors and human resource personnel and were incorrectly advised verbally that Bayer was denying severance. **P Ex 2, at 6-8; D Ex S at 18-20, 36-37.** Bayer did not give the reasons other than they were offered a job with EFTC at the same locale at the same pay.  **D Ex T at 119**; **see Paragraphs 16 & 24 above.**  Bayer's outside lawyer was not sure whether  severance was due.  **(Collins Dep & Dep Ex 19).**   See also paragraphs 16 and 29.

33.  Admitted in part, denied in part. Bayer admits that the Plaintiffs made a verbal claim for severance and Bayer verbally, through Richard Ramsden, denied severance. **P Ex. 1 at 129-**

**130, 132 (Marr Dep**.)  In 1998 no Plaintiffs submitted a claim for severance in <u>writing</u>. But Bayer's Director of Compensation and Benefits in its Pittsburgh Headquarters testified that the Plaintiffs were not required to do so if they were eligible and  nowhere in the SPD or Bayer Plan is such required. **P Ex 1, at 105-106 (Marr Dep.); D Ex. B Adm. 6; D Ex A Section 4.08(c) at 11.**  In 2002 Plaintiffs' counsel wrote to Agfa Corporation seeking benefits and the letter went to the same area and people who had handled Bayer's benefits for the Plaintiffs. **(P Ex 1 at 29-30 (Marr Dep).  See Paragraphs 16 & 24.**

34.  Denied. Bayer's Senior HR Manager, Mary Leonard, was to provide human resources information to the Board Shop employee-Plaintiffs. **P EX 12 at 49-51.** She says she had no recollection of any questions the Plaintiffs asked her or the conversations. She has very little or no recollection of meeting with any individuals other than "in the hallways." **P Ex 4 at 23, 47-48, 51-3 (Leonard Dep).**  However, Plaintiff Janice Paradis, testified that Leonard deliberately avoided the Plaintiffs; Leonard would walk by with her head down and "didn't want to face any of us." **D Ex P at 17-20**.  In fact, Leonard was present with Paradis had a conversation with another supervisor about wanting severance and Leonard avoided her.  **Id.** Leonard, and others, told Plaintiffs that there would be no severance because you have a job offer with EFTC. **D Ex U at 55.**  Plaintiff Robert Brown, initially thought he was entitled to severance but was dissuaded by Leonard that he was not because he was offered a new job with EFTC at the same pay and location.  **D. Ex. 69-70.**  Ramsden of Bayer also told Brown the same thing to dissuade him.  He was given no choice - go to EFTC or "walk" and no severance in either instance. **Id.** **at 70-71.**  Leonard was the HR person assigned to the Board Shop.  **P Ex O at 24.** Leonard was at the group meetings when Bayer told the Plaintiffs that the Board Shop was being sold to EFTC, everything would be the same, benefits and pay, and that they would get no

severance. **Id. at 15-19; P Ex 4 at 120.**  All Plaintiffs were terminated and offered EFTC jobs. **P Ex 4 at 123, 129.**  Leonard brushed off questions from Plaintiff Jeanne Skene, summarily told Jeanne Skene (who became later the Plaintiffs' representative) that there would be no severance and said in effect to "deal with it." **D Ex S at 92-95**.  In another meeting she told Plaintiffs they could not stay with Bayer and did not mention severance. **D Ex. T at 20-21.**  Leonard did not even have a copy of the Bayer Plan. **D Ex J at 58; P Ex. 18.**  She did not know it existed.  **D Ex J at 58-59; P Ex 4 at 58-59, 173 (Leonard Dep).**  Leonard was in the group meetings with other managers when the Plaintiffs were told about the sale and no severance. **P Ex 4 at 49-50 (Leonard Dep.).**  Leonard does recall being asked by the Plaintiffs for severance and telling the Plaintiffs no severance is due them under the SPD. **Id. at 54-57.**  Leonard never showed the Plaintiffs the language of the SPD which disqualified them. **Id. at 61**  Leonard testified that she showed the Plaintiffs bullet point [8] - as to the sale of a division - and stated that because of that and the comparable job offer to EFTC, they are not eligible for severance. The bullet point she directed them too, however, is not applicable, and Bayer so admits in that no division was sold. **Id. at 61-63; P Ex. 14.**  Leonard does not know the difference among bullet points [8] and [9]. **P Ex 4 at 149-150.**  Leonard and her superior were the ones Bayer designated to determine whether the Plaintiffs qualified for severance. **P Ex 4 at 183; P Ex 5 at Int. Ans. 7.** Leonard says the Plaintiffs expressed unhappiness and disappointment about no severance. **P Ex 4 at 73-74, 105-106.**  Leonard did not speak to the Plaintiffs about an appeal process for the severance. **Id.**  at 75**.**

    35.  Admitted but because they didn't know it existed and Bayer never told them about it. **See Paragraphs 16 & 19.**

    36. Plaintiffs admit that Bayer terminated them and advised them verbally of the denial

of severance but deny that Bayer made any reference the existence of the Bayer Corporation Severance Pay Plan. **P Ex 2 at 9, P Ex 3 at 6-7**. Bayer admitted that the severance denial was not in writing. **P Ex 1 at 104-105, 132.** Bayer's Senior Human Resources Manager at the site, Mary Leonard, testified that she showed the Plaintiffs bullet point [8] - as to the sale of a division - and stated that because of that and the comparable job offer to EFTC, they are not eligible for severance. The bullet point she directed them too, however, is not applicable, and Bayer so admits in that no division was sold. **Id. at 61-63; P Ex. 14.** Leonard does not know the difference among bullet points [8] and [9]. **P Ex 4 at 149-150.** Leonard and her superior, Rodney Willis, were the people Bayer designated to determine initially whether the Plaintiffs qualified for severance. **P Ex 4 at 183; P Ex 5 at Int. Ans. 7.** Leonard recalls no discussion about severance eligibility with Willis or those in Pittsburgh with overview authority. **P Ex 4 at 189.** Leonard says the Plaintiffs expressed unhappiness and disappointment about no severance. **P Ex 4 at 73-74, 105-106.**

37. Admitted. And further stating Bayer told the Plaintiffs that whether they accepted the job or not with EFTC they would be terminated with no severance. **P Ex 4 at 145, 220-21; P Ex 2 at 6-8.** One Plaintiff recalls at a group meeting that Mr. Willis of Bayer HR said to Plaintiff Cathy Sweeney, who asked for a volunteer layoff and severance to "deal with it" and "quit being a baby" - " you either go or you don't have a job." **D Ex L at 13-14.**

38. Denied in that there is nothing in either the Bayer Plan or the SPD entitled the Bayer "ERISA Review Committee" or even refers to such a Committee. **(D Exs. A-B)**. In fact, Bayer does not consistently call its "Committee" by the same official name. A Bayer Rule 30(b)(6) witness called it an "Administrative Review Committee." **P Ex 13 at 142.** Plaintiffs dispute a "Committee" even exists. Accordingly, the Plaintiffs cannot be expected to appeal to a

12

Committee that Bayer now says once existed.  Further Bayer admits that the Plaintiffs had an obligation to appeal only after Bayer denied their claim for severance in writing. **P Ex. 1 at 188 (Marr Dep).** Bayer admits that neither the Bayer "ERISA Review Committee" nor any other Committee made a decision as to the Plaintiffs' verbal claim for severance, that  it is even sure who was even on such "Committee" and that there is no procedure for the local HR people to report a denial to any "Committee." **P Ex 1 at 180-187.**  Bayer admitted that the severance denial was not in writing (**P Ex 1 at 104-105, 132**) and the appeal would only come after such written denial (**P Ex 1 at 188**), as the SPD says.  **D Ex B at Adm 6 and A at Section 4.08(c)) at 11.**

39.  Admitted, except as to the use of the word "divested" as that is a self-proclaimed term Bayer used and Plaintiff objects in that it is a legal conclusion and may not be legally applicable given the issues in this case. **See paragraphs 19 & 31.**

40.  Objection as to the word "had decided" and "pursue" which Plaintiffs deny in the context as implied. Plaintiffs admit in July 2000 or 2001 they sought a legal opinion from their undersigned counsel as to whether Bayer had misled them about severance. There is no specific date upon which the Plaintiffs all formed a belief that they had been wrongfully denied severance pay by the Defendants. It was an evolving process involving review of the law, and advice of their attorney.  It was not until after the Machine Shop was sold and the Plaintiffs learned through word of mouth that the Machine Shop employees received their severance that the Plaintiffs first began to question whether Bayer actually had been untruthful with the Plaintiffs about whether the Plaintiffs should have been paid severance when the Plaintiffs asked for it in 1998.  Previously, the Plaintiffs did not know or suspect that the Defendants lied to them, misled them, misrepresented the facts to them or failed to adequately address the question.

13

Case 1:04-cv-10728-WGY    Document 46    Filed 02/02/2007    Page 14 of 27

Based on their prior experience with Bayer management over the approximately10 to 30 years of employment with Bayer and its predecessor companies, the Plaintiffs found that Bayer had been honest with them.  Eventually, however, the Plaintiffs in this case, coordinated by Plaintiff Jeanne Skene, decided to have Ms. Skene, on their behalf, seek the advice of an attorney who had employment law experience and who would review the matter for them.  Even then, the Plaintiffs, not being attorneys, did not know if Bayer's position was correct.   Over time, after the Plaintiffs' undersigned attorney agreed to review the matter for the Plaintiffs, did the Plaintiffs, after consultation with their attorney, eventually came to believe that the Defendants had likely wrongfully denied them severance under the applicable law. After review of the law and limited paperwork available to our attorney, which did not include the Bayer Plan (which was not provided until suit was filed in  2004), the Plaintiffs attorney wrote a letter dated April 5, 2002 **(P Ex 2, Attachment 4 to the Answers to Interrogatories; D Ex D )** to AFGA Corporation ("AGFA") under the initial impression, later corrected after suit was filed in 2004, that AGFA Corporation had been the Plaintiffs' employer in 1998.  AGFA then wrote to the Plaintiffs' attorney by a letter dated June 3, 2002 (**D Ex. E; P Ex 2, Attachment 4 to the Answers to Interrogatories**) advising the Plaintiffs' attorney that the Plaintiffs' attorney was mistaken as to the underlying facts as to the nature of the sale of the Machine Shop assets and the subsequent employment by the asset purchaser of the Machine Shop employees.  After further analysis and review of the law and facts by their attorney, and after consultation with the attorney, the Plaintiffs, on advice of their attorney, filed suit on April 9, 2004.  **P Ex. 3 at 8-9. See Paragraph 58 below.**  Bayer was well on notice of the claim in 2002.  **See paragraph 49 below.**

14

41-45.  Admitted. And further stating, because Agfa appeared on the Plaintiffs'
paychecks and both Plaintiff and Bayer witnesses still refer to Bayer as Afga, Plaintiffs' counsel
believed erroneously, prior to suit in 2002, that the employer of the Plaintiffs was Afga. Afga did
not tell Plaintiffs' attorney otherwise, even though it knew, as of  Jan. 1999, that  Bayer was the
correct entity. Afga's written response was such that it further misled Plaintiffs' counsel.

**Roach Decl. ¶3.    See also Paragraph 48.**

46.   Denied.  The record to which the Defendants cite does not state 2000. Sometime
after the Plaintiffs learned that the Machine Shop employees had been paid severance, they
began to question whether Bayer had been misleading about the reasons it denied the Plaintiffs
severance and the Plaintiffs then agreed to get together and seek a legal opinion on their own.

The date is not cleaer. **P Ex. 3 at 8-9; D Ex S at 13, 15, 18, 36, 41, 47.  See also Paragraph 58**

47.   Admitted.

48.   Admitted. And Plaintiffs further state the following. With the current Defendants'
<u>assent</u>, the Plaintiffs filed a Joint Motion with Bayer's counsel (who represented Afga at the
time) on August 23, 2004 under Rule 15 and Local Rule 15.1, to amend the Complaint and
substitute the Bayer Defendants for originally named Defendants AGFA Corporation and AGFA
Plan.  As the Joint Motion states, the  Plaintiffs' undersigned counsel mistakenly believed that
Agfa, not Bayer, was the employer at the time this matter was initially filed. After conversation
with counsel for Bayer (also including in-house Bayer counsel) and Afga, the mistake was
revealed and the Joint Motion was filed on August 23, 2004. **Docket Sheet No. 12**  The
Amended Complaint is based on the same underlying facts and claims.  As an Associate for
Bayer's current attorney was advised by Plaintiffs' attorney it made more sense to simply
substitute Bayer for Agfa Defendants rather than file yet another suit to be overly cautious about

15

the statute of limitations defense for any time after April 9, 2004. Thus, the parties so agreed because otherwise the Plaintiffs would simply have filed another lawsuit against Bayer in mid-August 2004.   The Defendants' undersigned counsel and the Plaintiffs' counsel also signed a Stipulation, Substitution and Standstill Agreement as to Agfa whereby  the Plaintiffs would amend the original Complaint to <u>substitute</u> the current Bayer Defendants for Agfa. **Roach Decl. ¶6 & P Exs. 40, 41.** On January 1, 1999, soon after the Plaintiffs' termination by Bayer, Afga spun out of Bayer and became the owner of the Agfa Division where the Plaintiffs had worked. Afga Division employees became employees of Afga Corporation.   The two corporations were intertwined.  In fact, Bayer paid its employees with Afga Division checks. **P Ex. 15 at 30-31; P Ex 1 at 46.** Agfa was on the Bayer paychecks in 1998. **P Ex 15 at 30-31; P Ex 1 at 46.** Even in depositions, Agfa and Bayer were referred to interchangeably by witnesses and, thus, Plaintiffs' counsel was initially confused in discussions with his clients on this point. **P Ex 15 at 48, 61; P Ex 4 at 130; P Ex 13 at 49, 151; P Ex 6 at 225-226 (Ramsden Dep).** In fact, there were many corporate  changeovers in employers during the Plaintiffs' employment, including an ownership and/or employment relationship with an "AGFA" company. **P Ex 7, at 14-25 (Sarafian Dep.); P Ex 42**. This confusion led Plaintiffs' attorney to write to Agfa, not  Bayer, in 2002 as to the Plaintiffs' severance claim.  Agfa's response said nothing of the error and denied the claim. **Roach Decl. ¶3.** At the time of the substitution no discovery had commenced and Bayer's current and then Agfa counsel brought the issue to the attention of the Court at the initial Scheduling Conference on July 20, 2004. **Roach Decl. ¶¶4-6.**

49. Denied. Plaintiffs made a verbal claim in 1998 and Bayer denied the claim verbally. See paragraphs **16, 27, 29, 32; P Ex 2 at 5-8.**   Plaintiffs also sent to Agfa Corporation a 2002 letter claiming benefits, by their lawyer, to which Agfa responded and did reveal the difference

between Agfa and Bayer. **D Exs. D & E.**  After Afga Division of Bayer was assumed by Agfa

Corporation (**D Statement of Facts 39**) the Agfa Division Bayer employees became Agfa

Corporation employees and knew the author of, and worked with the responding party for Agfa,

Mr. Salek. **P Ex 15 at 221 & D Ex E.**  These people also included Bayer, then later Agfa Corp.,

in-house counsel Mr. Sarafian who worked directly under Mr. Salek in New Jersey.  **P Ex  7 at**

**26**. Sarafian previously had been with Bayer in NJ and MA, then with Agfa Corp. when Afga

acquired the Agfa Division of Bayer.  **Id. at 14-28**.  Sarafian, being under Salek, saw the

Plaintiffs' claim letter in 2002. **Id. at 36-37**.  Bayer and Agfa Corporation entered into an

indemnification agreement which would have included any Bayer employee claims as part of the

transaction where by Agfa Division of Bayer was "carved out" of Bayer and came under Agfa

Corporation in 1999.  **D Statement Paragraph 39; P Ex 7 at 109-110; P Ex 2  Attachment 4,**

**letter of Aug. 11, 2004 from Bayer to Roach.**  Accordingly, Mr. Sarafian worked with Bayer's

present counsel as the in-house corporate attorney liaison handling this case.  **P Ex 7 at 109-110.**

Accordingly, Bayer was well on written notice of the Plaintiffs' 2002 claim for severance in

2002.  Bayer's in-house counsel advised Plaintiffs' attorney that Afga was under an

indemnification obligation to Bayer for the severance claim.   **Roach Decl. ¶4; P Ex. 2,**

**Attachment 4, letter of Aug. 11, 2004 from Bayer to Roach.**    Bayer's in-house counsel and

Bayer's present counsel, through his former Associate, agreed to substitute Bayer for the Agfa

Defendants and to not raise the statute of limitations as a defense. In this way, Plaintiffs avoided

filing a new lawsuit against Bayer before September 1998.  The Amended Complaint asserts the

same basic claims as it did against Agfa, and not discovery had been conducted at the time of the

joint motion to substitute Bayer for Agfa.  In fact, Plaintiffs' counsel sent a draft of the Amended

Complaint to Bayer's counsel for approval as to the Joint Motion before the Joint Motion was

filed appending a copy of the Amended Complaint to it. **Roach Decl. ¶¶4-6; P Exs 40-47 (correspondence and notes of telephone calls regarding the substitution of Bayer).**

50. Plaintiffs deny that the sale to EFTC was a "divestiture." Plaintiffs admit that Bayer's in-house counsel, in preparing a resolution termed it a "divestiture" but the word is not an accurate description. The Bayer-EFTC transaction was a voluntary sale of assets for $8.1 Million which also involved, a supply agreement with EFTC for below market prices for printed circuit boards for Bayer's customers, and a lease whereby EFTC paid Bayer for use of the Board Shop premises. The transaction was a sale for gain by Bayer. **D Ex C; P Ex. 28. See Paragraphs 19 & 31.**

51. Admitted in part and denied in part. Plaintiffs admit the statement so far as it goes, but Bayer omits additional facts. First, anytime there was a reduction in force without cause employees were paid severance. **P Ex 15 at 128.** Second, there was within Bayer and its predecessors for many years prior to 1995, and at least through 1998, a voluntary layoff program whereby people could volunteer to be laid off in lieu of those in an area designated to be laid off and the volunteers would be paid severance; there was an expression of interest form and an agreement form for it. **P Ex 4 at 83-90 (Leonard Dep)**; **P Ex 25, P Ex 1 at 231-232 (Marr Dep.); P Ex 15 at 195-199.** In fact, such an agreement form is attached to and is part of the Bayer Plan. **See D Ex A, the first page after Appendix B entitled "Separation Agreement and Release Form; P Ex 25.** For this reason, Plaintiffs, all of whom (except one) were Bayer employees ranging from ten to about thirty years, hoped to participate in, and relied on, the voluntary layoff system because they believed they would receive severance benefits. **D Ex S, at 213-215 (Skene Dep.).** Bayer, in accepting the individual's voluntary layoff, considered that employee involuntarily terminated, and awarded severance benefits. **P Ex 4 at 83-90 (Leonard**

**Dep).** Bayer implemented a voluntary layoff program, or process, in which employees, upon hearing that Bayer intended to reduce its workforce, could express their interest in volunteering to resign. These employees would then complete a form, sometimes referred to as an Expression of Interest Form. Bayer would then determine whether or not to accept the employee's voluntary resignation. If Bayer did accept, Bayer would deem the employee as involuntarily terminated. Thus, the employee would receive severance benefits after signing an agreement form. **P Ex 4 at 83-90 (Leonard Dep)**; **P Ex 25, P Ex 1 at 231-232 (Marr Dep.).** It was only offered to the Agfa Division employees of Bayer. **P Ex 1 at 233-34 (Marr Dep).** Bayer said it involved payment of severance. **P Ex 13 at 192-193 (Beesley Dep)**. Bayer admits, and the Plaintiffs knew, that when other shops were closed people were given severance when they were terminated. **P Ex 6 at 290-1 (Ramsden Dep); P Ex 4 at 232-234;P Ex 15 at 129-131; D Ex U at 74-75.** The Plaintiffs also know of some who didn't volunteer and got terminated by Bayer and received severance. **P Ex 22, at 56**. Severance was a benefit the Plaintiffs depended on and which kept them at Bayer. **D Ex. P at 27.** Despite repeated requests, Bayer has refused to provide in discovery records of those paid severance under the voluntary layoff process or program. **Roach Decl. ¶7; P Ex 48.**

52. Disputed. **See paragraph 51.**

53. Disputed as the Defendants have cited no factual support. **Also, see paragraph 51**

54. Disputed. Brown testified that asked further about benefits and was told by Bayer that the EFTC benefits were "as good" and believed up to the time he went to EFTC on Sept. 1, 1998 that the benefits were equal to or better than Bayer's benefits. **D Ex M at 25-26.** After the sale he still thought he would have a pension, even though EFTC did not have one. **D Ex M at 29; P Ex 48; P Ex 2, Attachment 3.** He thought health insurance would be the same and it was not.

19

**Id.** Brown also asked for severance and Bayer told him it was not due to him and he would be terminated without a job if he chose not to go to EFTC. In either event he would not be paid severance. **D Ex M at 19-21, 24.** Brown, and many others, also asked Bayer at the general group and individual meetings for severance when the Plaintiffs were told by Bayer of their impending termination. **D Ex U at 21, 54-55, 65-66; D Ex S at 184; D Ex L at 12-14.**

55. Disputed. Most of the record cited concerns the claim for severance benefits which the Plaintiff claim in this case. Also disputed as to the implication and as to materiality. Plaintiffs made inquiries, as the record shows, but were led to believe that the benefits were the same or better. **P Ex 2, at 8; see paragraph 54.**

56. Disputed. The record cited does not support the statement and its implications. The record shows that the Plaintiffs had individual meetings with a temporary Bayer employee, Staci Landress, who worked for Bayer's HR area assisted an EFTC staff member who gave out forms for Plaintiffs to sign up for benefits, tax withholdings, and other documents in preparation for employment with EFTC up to Sept. 1998, when she then joined EFTC. **P Ex 31 at 27-29, 104-105; D Ex S at 98-99.** The record does not support a detailed pre-September 1, 1998 explanation of benefits comparison. In fact, according to Landress, who joined EFTC at the same time as the Plaintiffs, she first heard from the Plaintiffs many complaints about the benefits of EFTC being worse <u>after</u> September 1, 1998. **P Ex 31 at 70-71.** The Plaintiffs and Landress continued as EFTC employees on the same Bayer premises, and Landress' office was near the Plaintiffs' Board Shop area. **P Ex 31 at 44-64; P Ex 32.** The Plaintiffs learned of the difference in Bayer-EFTC benefits after the sale of the Board Shop. **D Ex P at 28.** Bayer admits that it had meetings with the Plaintiffs and showed them a chart of their benefits before they accepted the EFTC jobs, but it did not include anything about severance. **P Ex 4 at 34-35, P**

**Ex 24.** Senior HR Manager Leonard told the person presenting the benefit charts that no severance is due. **P Ex 4 at 71, 76, 92-93.** Leonard did not discuss unemployment options-benefits with the Plaintiffs. **P Ex 4 at 81-82**. Bayer did not discuss with or explain to the Plaintiffs the difference between the EFTC and Bayer benefits even though Bayer did a comparison and concluded that the Bayer benefits were "richer." **P Ex 4 at 158-164, P EX 26.** o Bayer considered the Plaintiffs a "tenured workforce." **P Ex 4 at 219.**

57. Admitted, except Plaintiffs dispute the word "some." All volunteers were accepted. **D Ex S at 216-217; P Ex 33**; **see paragraph 51**.

58. Admitted that such was Skene's initial impression, as she made a note on the SPD in her possession on bullet [8], the section regarding division. **D Ex S at 17, P Ex. 12.** She and the other Plaintiffs did not understand the SPD terms and were confused. **D Ex S at 17-18.** She was repeatedly advised by Bayer, however, that no severance was due, especially Ramsden, who she and the others trusted and had worked with for many years. **D Ex S, at 19-21, 31; D Ex T at 57-58; D Ex U at 34-35, 42-43, 65.** So she "let it go" until they learned that the Machine Shop employees received severance in 2000 or 2001. **P Ex. 3 at 8-9; D Ex S at 13, 15, 18-21, 36, 41, 47, 208-209.** She trusted and the others relied on Bayer that it was a "win-win" situation and no severance was due. **Id. at 189-193; D Ex T at 57-58; D Ex U at 18-23, 38, 57.** She did not understand the wording of the SPD. At the July - August group meetings Bayer said the Board Shop "division" being sold. **P Ex. 22 at 53 (Paradis Dep); P Ex. 23 at 16; D Ex. L at 16.** Skene was not at those meetings; Bayer delayed her return from a sick leave because it knew she asked a lot of questions. **D Ex. S at 21.** Skene didn't know about the Bayer Plan's existence. **D Ex S at 197, 221-222.** The Plaintiffs wanted be terminated and be paid severance rather than go to EFTC. **Id. at 200.** After the Machine Shop sale in 2000 or 2001, it "spurred" a lot of talk

again about severance among the Plaintiffs and  Skene again asked Ramsden of Bayer about

severance. **D Ex S at 208-210**.    The Plaintiffs came to the undersigned lawyer for a review and

opinion. **P Ex 3, Ans. to Int. 9.**    Ramsden, Norm Fontaine and Michael Paige, high ranking

non-human resources Bayer managers all were involved in group and individual meetings

advising the Plaintiffs that no severance is due to them under the SPD and otherwise advising

them about benefits.  **D Ex S, at  20, 132, 134, 201; D Ex T at 27-31, 145; D ex U at 21.**

59. Denied as misstating the record. Skene stated that she and the others realized at the

 "last minute" <u>some</u> of the benefits were worse but not to the extent she later realized including

finding out after she went to EFTC that EFTC had no pension plan**.    D Ex S at 139-143; D Ex P**

**at 50-51; P Ex 2, at 8 and Attachment 3**. Plaintiffs were mostly shellshocked at scared at the

suddenness of it and just wanted to hang onto their jobs, and they signed the EFTC paperwork. **D**

**Ex P at 43, 50-51.**

60-62. Admitted that it recites the partial testimony of those Plaintiffs.

63.   Denied.  Plaintiffs recall no meeting of only EFTC personnel and themselves as a

group. In fact, Calderon of EFTC was with Bayer supervisors such as Dick Ramsden, Norm

Fontaine, Mary Leonard, Rodney Willis, and Michael Paige at two meetings. **D Ex U at 12, 18-**

**19; D Ex T at 24-25.**  Bayer management admits that Jack Calderon from EFTC conveyed the

"positive things that EFTC could probably offer the employees." **P Ex 6 at 71 (Ramsden Dep)**.

64. Denied. Plaintiffs recall the opposite, i.e. that it was a win-win situation and that

EFTC were comparable to Bayer's and that the Plaintiffs would be "better off" and have a

chance to grow. **D Ex T at 27-28; D Ex U at 24-28.** Ramsden of Bayer told the Plaintiffs it was

"win-win". **P Ex 6 at 238 (Ramsden Dep).**  Bayer managers also told certain Plaintiffs the same

in private meetings. **E.g., D Ex U at 14-19**  Calderon admitted that EFTC wanted the Plaintiff-

22

employees more than the equipment it purchased and that he and EFTC took a chance that the Plaintiffs would accept a job offer. **P Ex 34 at 115-116, 163-164 (Calderon Dep).**  Ramsden of Bayer said that it was one of the "key things" that the Plaintiff Board Shop employees went to EFTC as a part of the transfer. **P Ex 6 at 229 (Ramsden Dep).** Ramsden of Bayer admitted that he  knew the transfer would allow Bayer to save on severance costs. **P Ex 6 at 82 (Ramsden Dep).**  Ramsden admitted not ever giving employees a choice to go to EFTC or to take severance and that he remembered telling the Plaintiffs that they had to go to EFTC. **P Ex 6 at 157 (Ramsden Dep)**. Ramsden admits that he said that it was a "win-win" situation for the Plaintiffs and Bayer. **P Ex 6 at 225-226 (Ramsden Dep).** Ramsden said that EFTC was a partner: "It wasn't just a sale; it was a partner." **P Ex 6 at 231 (Ramsden Dep).**

65.  Admitted as to Mr. Calderon's statement but denied s to its truth. **See paragraph 64** Bayer said that transfer of "at least the majority of the board shop Employees to EFTC from Bayer" was one of the "key factors" of the sale. **P Ex 6 at 74 (Ramsden Dep).**

66.  Admitted that such was but denied as to its truth as to what Bayer was thinking and as to what occurred.  Bayer admitted that the Plaintiffs' employment was involuntary terminated. **P Ex 6 at 272, 276-278 (Ramsden Dep).**  Leonard admitted that all Board Shop employees were terminated and accepted the job with EFTC. **P Ex 4 at 134.**

## PLAINTIFFS' ADDITIONAL FACTS

67.   Bayer admits that Section 8.3, bullet point [5] (top right hand side of page), of its "Human Resources Department Employees Practices" manual, "quotes" the same SPD section on which Bayer relies, provision [9]. Section 8.3 of the manual applies <u>only</u> to when an employee is terminated and reassigned a new position <u>within</u> Bayer.  Under Section 8.3, if an employee is not reassigned <u>within</u> Bayer the employee does not receive severance.  Otherwise,

the employee _does_ receive severance. There is no mention of a "new owner" or "Acquiring Entity" or the like in the manual.  **P Ex 1, at 214-217 (Marr Dep); P Ex.  9**.  **P. Ex. 15 at 122-124.** Section 8.3  would not include the Bayer-EFTC transaction for the Board Shop sale.  **P Ex. 15 at 122-124; P Ex. 9.** The manual was distributed to Plaintiffs' supervisors and managers as a guideline in managing and advising employees, and mandates that Bayer must explain benefits to terminated employees.  **P Ex 1, at 214; P Ex 4 at 201-202, 213; P Ex 9.**   It was not distributed to other employees and they did not have access to it. **P Ex 15 at 125-126**

68.    Bayer officials contradict each other on the interpretation of the Bayer Plan as it applies to the SPD.  First, Bayer's Rule 30(b) (6) witness, Lewis Beesley on the plan interpretations **(P Ex 13 at 5, P Ex 17, categories 1 & 2 at 3)**, says that Section 3.06 (8) of the Bayer Plan is summarized in bullet [9] (see Defendant's facts paragraph 22 where one of the SPD bullet points at issue is designated as [9]) and means that an employee is not eligible for benefits when a company _other_ than Bayer offers a comparable job. What Bayer now calls bullet [9] on the SPD was circled on Willis Ex 51 (double marked as Marr Ex 59) as "circled 2." **P Ex 13 at 114-116 (Beesley Dep)**; **P. Ex. 14; D Ex A at 7 (Section 3.06(8) & P Ex. 16, at 7.** Rodney Willis, however, the Director of Human Resources in the Agfa Division of Bayer in Wilmington, MA who made the determination severance is not due, said the opposite. **P Ex 1 at 47 (Marr Dep).**  Willis said that [9] applied to _either_ a job within Bayer or with a new owner or company other than Bayer.  **P. Ex. 15 at 98-99 (Willis Dep); P Ex 14.**   Second, Beesley testified that there is a difference between bullet [8], as applying only when an entire Division (like the Afga Division) seldom is sold to a new owner, and bullet [9] where only part of a Division is sold.  **P Ex 13 at 85-86; P. Ex. 14.**  Willis, however, says that he sees no difference between the two. **P Ex 15 at 67 (Willis Dep.) .**   Both of them had difficulty understanding and explaining

the language of the Bayer Plan and SPD. **P Ex 13 at 85-101; see P Ex 15 at 67 (Willis Dep) ("I didn't draft this").**  In fact, Beesley even contradicted himself where, at one point he said bullet [9] of the SPD could mean a new job with either a new owner or Bayer, whereas later in the deposition, as was pointed out to him, he said it meant only a job with a new employer where he proceeded to further get confused trying to explain himself.  **P Ex 13 at 85-86, 116-118 (Willis Dep); P Ex. 14 (Circled "2" is the same as [9]).**  He does it yet again in another area.  **P Ex 13 at 123-125.**

69.  Beesley of Bayer management, also says, unlike what Bayer's counsel is now arguing in its **(D Memo at 16)**, that bullet [9] of the SPD (again circled as No. 2 on **P Ex 14**), does <u>not</u> include or summarize the Section 3.06(9) exclusion of the Bayer Plan. **P Ex 13 at 122 (Beesley); P Exs 51 & 53, at 7; D Ex A at 7 & D Ex B at SEV 4 (3d bullet point from bottom the parties are calling [9]).**

70.  Bayer admits that the SPD and the Bayer Plan do <u>not</u> require a period of unemployment Plaintiffs to qualify for benefits so long as the other plan conditions are satisfied. **P Ex 1 at 225-226**.

71.  Bayer management admits that it received a written proposal from EFTC whereby it was proposed to keep a trained force, the Plaintiffs, for EFTC and avoid severance to the Plaintiffs. **P Ex 1, at 224, Ex. 10 at p B01358, Sec 3.5; Ex 11 at Sec. 35.  P Ex 6 at 55**. EFTC admits submitting it to Bayer and even suggested the idea on severance avoidance came from Bayer. **P Ex 34 at 43-48**; **Ex. 10 at p B01358, Sec 3.5; Ex 11 at Sec. 35.** The proposal was solicited by Bayer after meeting with EFTC, who had requested the board shop employees to be included in the sale. **P Ex 6 at 56, 67**.  Bayer admits "that as part of the proposal, EFTC is saying that they will provide appropriate inducements and incentives for board shop employees

to continue employment with EFTC." **P Ex 6 at 69 (Ramsden Dep)**. Bayer admits that Jack

Calderon from EFTC conveyed the "positive things that EFTC could probably offer the

employees." **P Ex 6 at 71 (Ramsden Dep)**. Bayer met with EFTC to compare Benefits of the

two**. P Ex 1 at 167 (Marr Dep); D Ex U at 51-52.**

      72. Beesley of Bayer management, also says, unlike what Bayer's counsel is now arguing

in its **(D Memo at 16)**, that bullet [9] of the SPD (again circled as No. 2 on **P Ex 14**), does <u>not</u>

include or summarize the Section 3.06(9) exclusion of the Bayer Plan. **P Ex 13 at 122 (Beesley);**

**P Exs 51 & 53, at 7; D Ex A at 7 & D Ex B at SEV 4 (3d bullet point from bottom the**

**parties are calling [9]).**

      73.  Bayer knows of no term where an employee who has been terminated has been

called a "transferred" employee even though that term was used in the EFTC-Bayer sale. **P Ex**

**13, at 178; D Ex. C at 10 Section 6.1** Bayer's own Senior and Human Resources Managers,

internal handbooks and manuals, however, refer to transfers as meaning transfers within Bayer

areas or units, not to another company.  **P Ex 13 at 177-178; P Ex. 21 at 31; P Ex 4 at 174, 201;**

**P Ex 9 at 1-1, 8-5; P Ex 15 at 54-56, 125.**  Bayer HR personnel on site is to meet and advise

involuntarily terminated employees of the status of their benefits**. P Ex 9 at Section 8.2.**

      74.  In March 1998 Bayer sent to the Plaintiffs a pamphlet with a summery of a

"significant part" of their "total compensation" but with <u>no</u> mention of severance.  Bayer called

it a "feel good piece" pamphlet, but it makes no mention of severance. **P Ex 13, at 159-60; P Ex**

**20; P Ex 4 at 226-228.**

      75.  EFTC and Bayer had joint working groups that discussed employee issues. **P Ex 15**

**at 190-91; P Ex 30.**  Bayer discussed timing the announcement to give them two weeks to work

on employees. **<u>Id.</u> at 192-193; PEx 30 (Dep. Ex 14).** "Big checks to employees" were discussed

in Bayer notes. **Id. at 140-42; PEx 30 (Dep. Ex 15)** . One note mentioned "Agfa looking for

$2,000,000 premium to deal with employee severance issues." **PEx 30 (Dep. Ex 15, at p. "2/" -**

**handwritten)** .

    76.   Agfa Corporation agreed to indemnify Bayer for the Plaintiffs' claims in this case. **P**

**Ex 1 at 229 (Marr Dep.); P Ex 13 at 162-164(Beesley Dep).**    In Jan. 1999, after the Plaintiffs

were terminated, the Agfa Division of Bayer spun off, was divested, from Bayer and the

employees of the Agfa Division were not entitled to severance under the SPD and Bayer Plan. **P**

**Ex. 13, at 164-174.**

    77.   The 63 Plaintiffs chose three of their group (Skene, Fiorilla and Guilmette) to make

representations and decisions on their behalf. **P Exs 2-3; Roach Decl. ¶2**

                    PLAINTIFFS,
                    By their attorney,


                    /s/Stephen A. Roach
                    Stephen A. Roach, BBO No. 542138
                    ROACH & WISE, LLP
                    50 Congress Street, Suite 400
Dated: Feb. 2, 2007        Boston, MA 02109-4061
                    (617) 723-2800


## CERTIFICATE OF SERVICE

    I, Stephen A. Roach, Attorney for the Plaintiffs, hereby certify that on Feb. 2, 2007 I served the Defendants with the within document, the Declaration of Stephen A. Roach of this date and the Plaintiffs' Exhibits by causing copies of same to be hand delivered to their counsel of record and, as to this document, by e-filing.

                    /s/Stephen A. Roach
                    Stephen A. Roach