UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10728-WGY

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| JOSEPH ATTARDI, ET ALS, | * **PLAINTIFFS' SUPPLEMENTAL** |
| Plaintiffs, | * **SUMMARY JUDGMENT** |
| v. | * **MEMORANDUM** |
| BAYER CORPORATION and | * |
| BAYER CORPORATION SEVERANCE PAY PLAN, | * |
| Defendants. | * |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES ISSUE IS MOOT

As directed by the Court's Remand, and as agreed to by the parties in their "Joint Motion to Remand for Administrative Review with the Court Retaining Jurisdiction" dated February 23, 2007, the Bayer Corporate and Business Services ERISA Review Committee ("Bayer Review Committee") reviewed the written request dated April 2, 2007 for administrative review and appeal of the denial of severance benefits on behalf of the Plaintiffs to Defendants Bayer Corporation and the Bayer Corporation Severance Pay Plan (collectively "Bayer"). On June 25, 2007, the Bayer Review Committee denied the Plaintiffs' claims for severance. The Bayer Review Committee also reviewed the entire discovery files. **See 3d Roach Decl. Ex. 1.** Accordingly, by agreement of the parties in the "Joint Motion for Remand," all Plaintiffs have now exhausted any alleged administrative remedies which may have been required of them.

## II. EVEN UNDER ARBITRARY AND CAPRICIOUS REVIEW THE PLAINTIFFS SHOULD STILL PREVAIL.

As discussed in Section III below, in <u>Denmark v. Liberty Life Assurance Co. of Boston</u>, 481 F.3d 16, 31 (1st Cir. 2007) the First Circuit recently called for a reexamination of its application of the arbitrary and capricious standard to a lower standard where a structural conflict of interest exists. An en banc decision in that regard may soon be made. Bayer operates under a structural conflict of interest because Bayer is the plan administrator of the

Bayer Corporation Severance Pay Plan ("Bayer Plan") and Summary Plan Description ("SPD") at issue **D St**[1] **¶ 17**, and Bayer also pays the severance benefits out of Bayer's own assets. **D Ex. B at Sev. 2;** see Denmark, 481 F.3d at 29-31.

As for the arbitrary and capricious standard, a court may overturn an administrator's decision if the court finds the administrator's decision unreasonable, arbitrary, capricious or an abuse of discretion. See Janeiro v. Urological Surgery Professional Ass'n, 457 F.3d 130 (1st 2006); Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005); Leahy v. Raytheon Co., 315 F.3d 11, 15 (1st Cir. 2002). "Under arbitrary and capricious review, this court will uphold an administrator's decision to deny benefits to a beneficiary if the decision was reasoned and supported by substantial evidence." Denmark, 481 F.3d at 33; Wright, 402 F.3d at 74. For several reasons, under any standard of review, Bayer's decision to deny the Plaintiffs severance violates their rights under 29 USC §1132(a)(1)(B). Bayer's recent June 25, 2007 denial letter on Remand contradicts its earlier positions, misstates and misconstrues the record and fails to follow a principled reasoning process supported by the evidence or the language of the SPD and Bayer Plan, whether read separately or together.**[2]**

1. **Bayer on Remand now contradicts its earlier position and stipulation with the Plaintiffs that the Board Shop is not a "division" of Bayer.**

One of the original main points the Plaintiffs raised in this case was that Bullet point [8] of the SPD (**P St 22, P Ex 14, P Memo at 14**)[3] does not preclude severance because the Board

---

[1] "D St" refers to Defendants' Local Rule 56.1 Statement of Facts.

[2] These arguments are in addition to, and not in place, of those set forth in the Plaintiffs' Opposition Memorandum to Defendants' Summary Judgment Motion (cited as **P Memo**).

[3] "P St" refers to Plaintiffs' Local Rule 56.1 Statement of Facts and "P Ex" refers to Plaintiffs' Exhibits filed with the Court.

Shop was not a <u>division</u> of Bayer, but only a comparatively small operation within the larger Afga Division of Bayer, a large corporation. Plaintiffs contend that Bullet point [8] only precludes severance if an entire division is sold or divested, which did not occur here. **(See D Memo at 15 & P Memo at 14).** To expedite and narrow this issue, therefore, Bayer's attorney and the Plaintiffs' undersigned attorney stipulated that the Board Shop was <u>not</u> a division of Bayer. The clear record reads that parties' lawyers stipulated on November 14, 2006 that Bayer did not sell an entire division to EFTC but rather sold "a small operation within a large division" (i.e. the Board Shop within the Agfa Division of Bayer) and that, according to Bayer's attorney, "Bayer is <u>not</u> claiming this was a sale of a division." **P Ex. 1 at 35-36** (Emphasis added). The above stipulation was made just as the Plaintiffs' attorney began questioning on that Rule 30(b)(6) topic with the designated Bayer representative, and so, with the stipulation, the Plaintiffs' attorney did not address this topic further and moved on. **Id.**

The stipulation is consistent with an earlier statement in a letter dated September 19, 2006 from Bayer's attorney to Plaintiffs' attorney that "the business unit sold did not constitute a corporate division." **(3d Roach Decl. Ex. 3).**

The stipulation is consistent with Bayer's counsel's further treatment of the Board Shop being only a small operation of a larger division in his deposition questioning. For example, Bayer's attorney asked Plaintiff Bertrand R. Guilmette "Were you aware that Bayer spun off its Agfa division to a separate corporation sometime after you became an employee of EFTC?" **D Ex. U at 28.** Bayer's attorney also read a press release from the EFTC website during the deposition of Plaintiff Vincent S. Fiorilla. "The first text line indicates ... 'EFTC corporation announces today it has closed a previously announced transaction to acquire the circuit card assembly <u>operation</u> of the Agfa Division, Bayer Corporation." **D. Ex. T at 55-56** (Emphasis

added).   Also, Bayer's Summary Judgment filings state that "the entire Agfa division" was spun off from Bayer into an independent corporation in 1999. **D Memo 5, D St. ¶39.** The Board Shop was consistently referred to as a "department" within Bayer's Agfa Division. **P Supp St 80.**[4] For example, for Plaintiff Janet Lanoue who worked in the Board Shop, Bayer's internal "Change Form" shows that Lanoue was terminated on 8/31/98 and that she was with "Dept. # 1001" within the Agfa Division of Bayer. **P Ex. 35; P Ex 15 at 68-71.** This Change Form was marked as an Exhibit (Ex. 24) at the deposition of Bayer Manager Richard Ramsden who was a Bayer manager for 35 years overseeing the Board Shop and who acknowledged the form as a Bayer document. **P Ex 6 at 271-273.** Bayer's Human Resources Director also acknowledged and identified it as to her termination. **P Ex 15 at 68-71**. Ramsden also admitted that the printed circuit board area where the Plaintiffs worked was known as the "board shop" which he managed. **P Ex 6, at 20-22.**[5]

In its June 25, 2007 Remand denial letter, however, the Bayer Review Committee now has reneged on that stipulation.  The Bayer Review Committee relies now, in part, on the language of Bullet [8] of the SPD to deny severance. The Bayer Review Committee's June 25, 2007 denial letter states  "the word 'division' was used as a short hand reference to 'all or part of the assets of an employer.'" Further, the Bayer Review Committee interpreted the word "division" in the context of "'all or part of the assets of any employer' rather than as referring to a literal Division of Bayer, such as the entire Agfa Division.**"  P Supp St 78 (3d Roach Decl.**

---

[4]"P Supp St" refers to Plaintiffs' Supplemental Rule 56.1 Statement of Facts filed on August 31, 2007.

[5]A review of any of the depositions by witnesses on both sides consistently refer to the area where the Plaintiffs worked as the Board Shop.

4

**Ex. 2).**   In so doing, Bayer contradicts its earlier stipulated position in that it now equates the Board Shop with the Agfa Division. It concludes by stating that "... employees are ineligible for severance in both cases (*i.e.,* sale of an entire Division and sale of a smaller functional unit)." **Id.**

Moreover, the SPD lists the Agfa Division as a division of Bayer.  **P Ex. 21 at (numbered page 2).**  Other Divisions listed in the SPD include Agriculture, Consumer Care, Diagnostics, Fibers, Organics and Rubber, Industrial Chemicals, Pharmaceutical, and Polymers. **Id.**  The SPD further states that "Bayer Corporation employs 22,000 people at over 50 sites and consists of <u>eight</u> <u>operating</u> <u>divisions</u> and two service groups."  **Id.**  (Emphasis added). Also note that "division" is used in the foregoing quoted sentence with a small "d" just as it is within the severance section of the SPD where "division" is listed under Bullet point [8].   Bayer's letterhead refers to "Bayer, Agfa Division." **See P Ex 25**. The Board Shop, as Bayer agreed and to which it stipulated, was one small unit within the Agfa Division, not a division.  Bayer's own brochure shows the nature and size of Bayer, its name changes over the years, its assets, its various divisions and products, and locations throughout the world.  **P Ex 42**.

For Bayer to now reverse course on this point is, in and of itself, arbitrary, capricious, unreasoned, and not supported by substantial evidence.   The plan administrator "cannot be a moving target...."<u>Dabertin v. HCR Manor Care, Inc.</u>, 373 F.3d 822, 831 (7th Cir. 2004). A written denial must be clear and provide sufficient information to comply with 29 U.S.C. §1133. <u>McLean Hosp. Corp. v. Lasher</u>, 819 F.Supp. 110, 119 (D.Mass. 1993); see <u>Lopes v. Metropolitan Life Ins. Co.</u>, 332 F.3d 1, 5 (1st Cir. 2003) (court's review is not a "rubber stamp").

    2.   **<u>Bayer now on Remand contradicts its earlier summary judgment argument that Bullet point [8] of the SPD is inapplicable.</u>**

In denying severance, Bayer Review Committee now says that the Board Shop sale was

5

"the sale of a division." **P Supp 78 (3d Roach Decl. Ex. 2, at 2).** The Bayer Review Committee's reliance on the interpretation of the word "division" which appears <u>only</u> in Bullet [8] of the SPD ("The division of the company you work for or the company itself is sold or divested ...")**(P St 68, 80; P Ex 14)** as grounds, even in part, for denial of severance directly contradicts Bayer's position in Bayer's Summary Judgment argument where Bayer stated that Bullet [8] was <u>not</u> applicable to the Plaintiffs and that, instead, Bullet [9] applies in this case. **D Memo at 16.** In fact, Bayer argued that "Bullet point 8 <u>only</u> references acquiring companies because, when a whole division is sold, typically all of the division's employees transfer to the acquiror [sic] and cross-over within Bayer would be rare." **D Memo at 16, footnote 19**(Emphasis added).[6] Bayer further said "Bullet point 9 addresses situations, like the EFTC transaction, where only part of a business is sold ..." **Id.** Bayer added that "bullet point 9 applies to all comparable job offers, both from a new owner and Bayer" (**Bayer Memo at 16**), which was in response to the Plaintiffs' position that Bullet [9] applies only to a new job <u>within</u> Bayer, which did not occur here. **P Memo at 14-17.** The Bayer Review Committee makes <u>no</u> reference to the wording of Bullet point [9].

Furthermore, Lewis Beesley, Bayer's Rule 30(b) (6) witness on the plan interpretations **(P Ex 13 at 5, P Ex 17, categories 1 & 2 at 3) (P St 68-69),** testified that division refers to an entire division, like the Afga Division, which he said is seldom sold to a new owner. He distinguishes it from only part of a division. **P Ex 13 at 85-93; P Ex. 14.** [7] In fact, he says that

---

[6]Again, the word "division" only appears on the SPD **(P St 22, P Ex 14)** and does not appear anywhere in the Bayer Plan. **P St 13-15, D Ex. A.** .

[7]Bullet [8] coincides with "No. 5 bullet point" which is was referred to in the Deposition Exhibit under discussion in the Beesley Deposition. **P Ex 14**

Bullet [9] refers to only part of a division. **P Ex 13 at 80; P Ex. 14.**

"A plan administrator's conduct might be found arbitrary if, for instance, the plan administrator `impose[s] a standard not required by the plan's provisions,' `interprets the plan in a manner inconsistent with its plain words,' or by its interpretation`render[s] some of the plan superfluous." Joyce v. John Hancock Financial Services, Inc., 462 F. Supp.2d 192, 205 (D. Mass. 2006), quoting Bouchard v. Crystal Coin Shop, Inc., 843 F2d 10, 13-14 (1st Cir. 1988). In its inconsistent and strained interpretation, Bayer did all the above, and more.

Moreover, although the word "division" appears in Bullet [8] of the SPD (**P St. 22, 68; P Ex 14),** the Bayer Plan does not use the word "division" anywhere. **D Ex. A at 7**. Bayer offers no explanation why "division" appears in the SPD but not the Bayer Plan, and the SPD offers no definition of what constitutes a "division" although the Bayer Review Committee now attempts to rely on an after the fact dictionary definition from the internet. **P Supp St 78 (3d Roach Decl. Ex. 2 at p. 2).**

> 3. **Bayer's Remand denial fails to support its position that sale of the Board Shop to EFTC constituted a "divestiture."**

The Bayer Review Committee attempts to rebut the Plaintiffs' position in their Memorandum of Law **(P Memo at 12-14)** and Plaintiffs' April 2, 2007 Remand letter that the Board Shop sale to EFTC was a sale, and was not an asset divestiture which, unlike a sale, could preclude severance benefits. On page 1 of its June 25, 2007 denial letter, the Committee contends that "divestiture" under Section 3.06 of the Bayer Plan includes "a sale or other similar disposition of assets."[8] The Committee then says "The Plan has been consistently administered

---

[8]The term "divestiture" does not appear anywhere in the SPD. The term "divested" appears under Bullet [8] which, as stated above, Bayer originally said did not apply but now says does apply. **P Ex 14**.

7

by interpreting divestiture to mean the sale or other disposition." **P Supp St 78** (**3d Roach Decl. Ex. 2, at 1**).  The record shows that Bayer's position is spurious.  First,  in Bayer's 30(b)(6) Deposition through Lewis Beesley,  Beesley said that he did not remember a claim for severance pay ever coming before the Review Committee. **P Supp St 78;  P Ex. 13, at 143-144.**

Second, to the extent that if what Bayer means by how the Bayer Plan "has been consistently administered" in  interpreting divestiture means its local human resources departments or others apart from the Bayer Review Committee, it did not so specify, and it is estopped in any event from relying on such background.   Bayer has failed and refused to provide the Plaintiffs, despite discovery requests, of any records for severance decisions from 1990 to 1998, the year the Plaintiffs were terminated.  In fact, Bayer's attorney stated "I have considered your request for all Bayer Corporation records of any severance payments to departing employees on or after 1990" and that "I must reject your request." In denying the request, Bayer's attorney states that the records themselves are not relevant. **3d Roach Decl. Ex. 3.**  Bayer cannot have it both ways.

Third, after the Remand decision, Plaintiffs' attorney accepted the Bayer Review Committee's June 25, 2007 denial letter offer for "records and other information relevant to your claim."  By a letter dated August 6, 2007, Plaintiffs' attorney asked for "documents relative to the Bayer Committee's statement on page 1 of its letter to me that `The Plan has been consistently administered by interpreting divestiture to mean the sale or other disposition.'" Bayer has yet to provide the records. **3d Roach Decl. ¶2 & Ex. 4.** In Krodel v. Bayer Corporation, 345 F.Supp.2d 110, 114-116 (D. Mass. 2004), the Court found that Bayer committed multiple violations of ERISA in failing to provide access to documents and a considered fact-based reason for its denial of benefits. See Blau v. Del Monte Corp., 748 F.2d

8

1348, 1355 (9th Cir. 1984)(employer can't resort to secret intentions in severance).

Fourth, the Bayer Review Committee stated the Board Shop "sale constituted both the sale of a division and, in the parlance of the Plan document, a divestiture of part of the assets of an employer." **P Supp St 78 (3d Roach Decl. Ex. 2, at 1).** But the Bayer Plan does not contain any "parlance" at all, and no definition as to the meaning of "divestiture." **D Ex A.** Bayer is randomly picking and choosing multiple unsupported and inconsistent positions.

**4. Bayer's Remand denial fails to address many points the Plaintiffs raised in the Plaintiffs' April 2, 2007 appeal/review request letter and in Plaintiffs' Summary Judgment Memorandum.**

The Bayer Review Committee failed to address, let alone attempt to rebut, the many arguments and logic set forth in Plaintiffs' Summary Judgment arguments as to the language of the Bayer Plan and SPD and the facts, especially as to the SPD.[9] **(P Memo at 14-16).** Plaintiffs will not repeat them all here but they do wish to emphasize that the Committee failed to address the point, among others, that Bayer had argued earlier that Bullet point [9] applies to both situations **(D Memo 16)**, i.e. where either a new owner or Bayer offers the employee a comparable position, even though neither the SPD nor the Bayer Plan so states but suggests the opposite**.** The Committee apparently switched back to relying on Bullet point [8] after recognizing the weakness of Bayer's summary judgment arguments.

The Committee neglects to explain where provision [9] is expressly covered in the Bayer Plan to include both instances (i.e. new owner or Bayer offers different job). The Plaintiffs contend that it covers only instances where an employee is terminated and offered a new position within Bayer. Section 3.06(8) of the Bayer Plan expressly specifies only a new employer, i.e.

---

[9]Plaintiffs wish to remind the Court that a corrected page 16 of the Plaintiffs' Memo was filed and accepted by an assented Motion.

9

the "Acquiring Entity" which is defined as a company other than Bayer. Section 3.06(8) is not synonymous, therefore, with Bullet [9]. Bayer admits that Sections 3.06(9) and 3.06(10) of the Bayer Plan relate to new comparable jobs <u>within</u> Bayer. An entity other than Bayer, called an "Acquiring Entity," appears only under Section 3.06(8). Sections 3.06(9) and 3.06(10) of the Bayer Plan expressly cover only new comparable jobs within Bayer, as opposed to an Acquiring Entity of 3.06(8) which is defined in Article I of the Bayer Plan as an entity other than Bayer. The Committee's denial letter does <u>not</u> discuss any of the above, and only mentions Section 3.06 in general. **3d Roach Decl. Ex. 2.**

Furthermore, applying Bullet [9] to a company other than Bayer does not make sense. If an employee who is about to be or is terminated under one of the many qualifying provisions of the SPD is fortunate enough to find a job with a different company which just happens to be within 35 miles of the Bayer location and at the same pay (making it a "comparable job" under the SPD), he/she would then be ineligible for severance benefits. Bayer's reading would provide an incentive for people <u>not</u> to look for work so they could collect severance.

In discovery, Bayer admitted that Section 8.3, bullet point [5] (top right hand side of page), of its "Human Resources Department Employees Practices" manual, quotes different parts of the SPD and the Bayer Plan. **P Ex 1 at 214-217, P Ex 9, P St 67.** Bayer admits that Section 8.3 of the manual applies only when an employee is about to lose his/her job and could be reassigned a new position <u>within</u> Bayer. Under Section 8.3, if an employee is not reassigned within Bayer and is terminated the employee <u>does</u> receive severance. If the employee is not terminated, the employee obviously does <u>not</u> receive severance because the employee still has a job within Bayer. **P St 67**, **P Ex 1, at 214-217, P Ex 9.** Bayer's Rule 30(b)(6) representative testified that there is no mention of a "new owner" or "Acquiring Entity" or the like in the

10

manual.[10]  **P St 67.**  This of course, supports the Plaintiffs' contention that Bullet [9] of the SPD covers only situations where there is a new job offered <u>within</u> Bayer. **D & P St 12, D Ex B & P Ex. 12 at Sev 4, P Ex 14[11]; P Memo 14-15.**

As for the Plaintiffs' and Bayer's arguments concerning Bullet point [7] of the SPD (**P Memo 16, D Memo 15**), the Committee ignored them.  Similarly, other than a discussion of "divestiture" the Committee did not address the parties' arguments as to the wording of the Bayer Plan.  The Plaintiff raised them as well in its April 2, 2007 request for review/appeal letter to Bayer.   Bayer's inconsistent, close to the vest, obfuscating behavior is further evidence that Bayer's process has been "infected with conflict."  <u>Denmark</u>, 481 F.3d at 31.

As for Bayer's statute of limitations argument on the Plaintiffs' claim for severance benefits, the Plaintiffs add that every Plaintiff has filed a Declaration stating that it was not until the Machine Shop sale in 2000 or 2001, where other employees were terminated and received benefits, that the Plaintiffs first began to question whether Bayer had misled them or was inaccurate about the denial of the Plaintiffs' severance benefits. At that time, with Plaintiff Jeanne Skene organizing them, they sought out together to obtain legal advice. **P Supp St 81.** [12]

### III. THE STANDARD OF REVIEW SHOULD BE  LOWER THAN ARBITRARY AND CAPRICIOUS OR ABUSE OF DISCRETION.

**1.  There exists a structural conflict of interest with Bayer.**

As the result of a recent First Circuit decision after this case was remanded, and for the

---

[10]Bayer's Human Resources Department Employee Practices manual is distributed to supervisors and managers to guide them in answering questions from employees and otherwise managing the company.  **P St 67**

[11] Bullet [9] is circled and listed as No. 2 on **P Ex 14.**

[12] This includes Plaintiff Robert Brown who Bayer had singled out. **Brown Decl. dated August 16, 2007, ¶9.**

11

reasons already discussed in the "Plaintiffs' Memorandum in Opposition to Defendants' Summary Judgment Motion" dated February 2, 2007, the standard of review in this case should be lower than arbitrary and capricious.  In Denmark v. Liberty Life Assurance Co. of Boston, 481 F.3d 16, 31 (1st Cir. 2007) the First Circuit called for a reexamination of the arbitrary and capricious standard where a structural conflict of interest exists.  A structural conflict of interest arises when the plan administrator who makes the payment decisions under a plan also is the party that potentially must pay the employees under the plan out of its "own pocket" from its own assets.  Id. at 29.  A First Circuit Judge noted that arbitrary and capricious is a standard that is "increasingly difficult to defend" where "an insurer also makes benefits determinations."  Id. at 31 (emphasis added).   Here, with Bayer, there is not even a  third-party insurer involved.  The First Circuit is the only Circuit which utilizes an  arbitrary and capricious standard when a structural conflict of interest exists.  Id. at 30-31.[13]  A petition for en banc review on Denmark was filed April 11, 2007.

Bayer operates under a structural conflict of interest because Bayer is the plan administrator of the Bayer Corporation Severance Pay Plan ("Bayer Plan") and Summary Plan Description ("SPD") at issue **(D St ¶ 17)**, and Bayer could also pay nearly $2 Million in severance benefits out of Bayer's own assets.  **D Ex. B at Sev. 2** (Summary Plan Description), **P St 2, 75, P Ex 8**; **P Ex 2, Attachment 6;** see Denmark, 481 F.3d at 29-31.

Because a structural conflict of interest exists with Bayer the Court may wish to consider waiting for a potential First Circuit en banc decision in Denmark, as the First Circuit considered doing in Kansky v. Coca-Cola Bottling Co. of New England, --- F.3d ---, 2007 WL 1866752  (1st

---

[13]The Seventh and Second Circuit indicate that the structural conflict of interest must affect the benefits decision. Denmark, 481 F.3d at 30. But this is still lower than the separate "improper motivation" proof required by the First Circuit, as discussed below in subsection 2.

12

Cir., June 29, 2007). In <u>Kansky</u>, the First Circuit decided not to wait because the plaintiff could not have prevailed, even under *de novo* review.[14] The Plaintiffs suggest that the time is ripe to apply a lower standard of review where a structural conflict of interest exists.

The First Circuit has relied upon a "market forces" rationale in applying arbitrary and capricious review because the "market presents competing incentives to the <u>insurer</u> that substantially minimize the apparent conflict." <u>Id</u>. at 30 (emphasis added); <u>see also</u>, <u>Doe v. Travelers Ins. Co.</u>, 167 F.3d 57 (1st Cir. 1999); <u>Doyle v. Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 184 (1st Cir. 1998). Most decisions considering arbitrary and capricious review involve third-party insurers. Insurers are the driving motivation behind the market theory because the third-party insurer theoretically will act in a manner that protects its business and financial relationship with an employer. If an insurance company becomes "tight-fisted" and employees become unhappy, an employer may be inclined to team with a new insurance company. <u>See</u> <u>Doyle</u>, 144 F.3d at 184. Therefore, the First Circuit has reasoned that potential conflicts of interest are muted. <u>See</u> <u>Denmark</u>, 481 F.3d at 30.

Here there is no insurer. Bayer is <u>both</u> the plan administrator and the potential payor, as well as the employer. Accordingly, the market theory is even less tenable. Seven other Circuits have explicitly rejected the market theory approach in cases involving insurers.[15] <u>See</u> <u>Denmark</u>, 481 F.3d at 30-31. The potential for egregious behavior by a conflicted party (Bayer) is much greater than if an insurer was involved. There is no "buffer" or other protective measures which

---

[14] For reasons which are obvious from the facts of both cases, the present matter is distinguishable from <u>Kansky</u>.

[15] The D.C. Circuit is the only other Federal Circuit not currently utilizing a standard lower than arbitrary and capricious, but this is because the D.C. Circuit has not had the opportunity to decide such a matter. <u>See</u> <u>Denmark</u>, 481 F.3d at 30.

employees can rely upon. Bayer and the Board Shop purchaser, Electronic Fabrication Technology Corporation ("EFTC"), admit that employees may also feel forced to stay employed in order to ensure steady income. **See P Ex. 15 at 61-64.** An insurer, on the other hand, can only attract and keep clients (employers) by providing good service, decent premiums, and quality products to employees.

Many Circuits apply a "sliding scale" where a structural conflict of interest exists, and courts may allow for less deference to the administrator as the severity of the conflict rises. Denmark, 481 F.3d at 30-31; see also, Abatie v. Alta Health & Life Ins. Co., 458 F.3d 955, 969 (9th Cir. 2006)(As much or as little deference as appropriate under the circumstances to force administrators to introduce evidence showing no abuse of discretion). A lower standard of review should apply where Bayer is wearing three hats – employer, administrator, and payor. A central goal of ERISA is to protect employees. See 29 U.S.C. § 1001.

**2. Bayer's improper motivation warrants a less deferential review.**

"We have recognized that the financial self-interest of a plan administrator may warrant arbitrary and capricious review with `more bite.'" Fenton v. John Hancock Mutul Life Ins. Co., 400 F.3d 83, 90 (1st Cir. 2005).[16] A review with "more bite...may apply where plan participants show that an adverse determination was "'improperly motivated.'" Joyce v. John Hancock Financial Services, Inc., 462 F. Supp.2d 192, 201-202 (D. Mass. 2006); see Fenton, 400 F.3d at 90. The burden of proof is with the former employees. Id.; see Wright v. R.R. Donnelly & Sons Co. Group Benefits Plan, 402 F.3d 67, 74 (1st Cir. 2005).

Here, Bayer's improper motivation is apparent as Bayer set out with EFTC to meet a

---

[16] More bite originally meant that a conflict of interest "will cause us to give the arbitrary and capricious standard more bite .... The more serious the conflict, the less deferential our review becomes." Chojnacki v. Georgia Pacific Corp., 108 F.3d 810, 815 (7th Cir. 1997).

14

number objectives to benefit themselves to the Plaintiffs' detriment.  <u>First,</u> in a letter dated April 20, 1998 by Ty Griffin, a Marketing Manager at EFTC, to Richard Ramsden, Bayer's Vice President of Operations of the Agfa Division,  EFTC submitted a proposal to purchase the Board Shop.  **P St 71 (P Ex. 10 at 4 (Bates Stamp B01335)).**  In an attachment to that letter titled "Section III Transition Management," Griffin writes that EFTC intended to offer Board shop employees full time positions at EFTC.  "This transfer will allow <u>Bayer</u>, <u>AGFA</u> <u>Division</u> <u>to</u> <u>avoid</u> <u>any</u> <u>severance</u> <u>costs</u> and provide EFTC an initially trained workforce."  **Id. at Bates Stamp B01358** (emphasis added).  <u>Second</u>, EFTC suggested that the avoidance of the severance idea came from Bayer.  Bayer solicited the proposal. **P St 71.**  <u>Third</u>, Ramsden admitted that he believed that if the Plaintiffs accepted a job with EFTC it could allow Bayer to save on severance costs.  **P St 64 (P Ex 6 at 82).**  Ramsden admitted not ever giving employees a choice to go to EFTC or to take severance and that he remembered telling the Plaintiffs that they had to go to EFTC. **P St 64 (P Ex 6 at 157)**.

<u>Fourth</u>, Ramsden admits that he told the Plaintiffs that it was a "win-win" situation for the Plaintiffs and Bayer. **P St 64 (P Ex 6 at 225-226).**  Ramsden said that EFTC was a partner. **P St 64.**  Bayer managers falsely told the Plaintiffs, who had been with Bayer from 10-30 years, that it was a win-win situation because the benefits at EFTC were the same or better then those at Bayer.  In reliance on those statements, and in need of a paycheck on short notice, the Plaintiffs accepted the EFTC job. In the past, with each prior transaction when a new company took over after the Plaintiffs started with Bayer's predecessors (Compugraphic, Miles Inc., Agfa Corp, etc.) the benefits improved.  **P Supp St 79.**  <u>Fifth</u>, Before the announcement of their termination to the Plaintiffs, Bayer did not discuss with or explain to the Plaintiffs the difference between the EFTC and Bayer benefits even though Bayer had done a comparison and concluded that the

15

Bayer benefits were "richer."  **P St 56.**  In fact, Mary Leonard of Bayer Human Resources analyzed the benefits and found that EFTC offered no pension plan, no post-retirement medical benefits, fewer vacation days, and less long term disability benefits so that the Plaintiffs paid more into it to equal Bayer's plan.  **P Ex. 26**.  Leonard was present at the meetings where Bayer told the Plaintiffs that EFTC had comparable or better benefits than Bayer.  **P St. 34.**

Sixth, Bayer admitted that there was a very short period between the announcement of the sale agreement and the actual closing (i.e. late July to August announcement with a September employment date), leaving the Plaintiffs little time to decide.  **P Ex. 34 at 114**. Seventh, Bayer Human Resources Director Rodney Willis admitted that most of the Board Shop workers had "high school degrees or diplomas" and "were not highly educated."  **P St 16 (P Ex. 15 at 80).**  This is confirmed by the Declarations of the Plaintiffs, and for many English is not their first language and two are deaf (and for whom Bayer made no effort).  **P Supp St at 79.**

Eighth, Bayer admits that the Board Shop was a financial drain upon Bayer and that Bayer would have had to invest "many, many dollars" to modernize it, meaning "hundreds of thousands of dollars."  **P St 3 (P Ex 6 at 52-53).**  Bayer was looking to get out of the printed circuit board business and focus on its "core competencies" and "main line of revenue." **Id.** Bayer sold the Board Shop assets for $8.1 Million. **P St 3.**  Ninth,  EFTC's President and Chief Executive Officer who met with the Plaintiffs, Jack Calderon, admitted that EFTC wanted the Plaintiff-employees more than the equipment it purchased. **P St 64 (P Ex 34 at 6, 115-116, 163-164).** Bayer said that it was one of the "key things" that the Plaintiff Board Shop employees went to EFTC as a part of the sale; Bayer needed "at least a majority" to accept the EFTC job offers. **P St 64-65 (P Ex 6 at 74, 229).**    Bayer considered the Plaintiffs a "tenured workforce." **P St 56.** Tenth, Bayer admits that from the start of its negotiation it was looking for a buyer to employ the

Plaintiffs. **P St 3.** Calderon admitted that if the Board Shop employees had not agreed to work for EFTC it would have posed a large problem for EFTC. **P Ex. 34 at 115-16.** Calderon stated that he believed that the Board Shop-Plaintiff employees would accept the EFTC employment offers because of personal financial constraints and the need for a job and steady stream of income. **Id. at 61-64.**[17] Finally, Bayer falsely advised the Plaintiffs that the Plaintiffs were not entitled to severance or unemployment benefits, whether they accepted the job or not with EFTC. **P St 2, 75**, **P Supp St 79**. Plaintiffs have already argued their points about Bayer's failure to reveal the existence of the Bayer Plan and other violations with regard to its responsibilities as to the severance. **P Memo at 1-7.**

### IV. BAYER SHOULD BE EQUITABLY ESTOPPED FROM DENYING THE PLAINTIFFS SEVERANCE.

Bayer argues that the Plaintiffs cannot equitably estop Bayer from denying the Plaintiffs severance benefits under 29 U.S.C. §§ 1132(a)(3), which authorizes equitable relief. **(D Memo 17).** The First Circuit has recognized that equitable estoppel claims may, in the appropriate case, give rise to relief under 29 U.S.C. §§ 1132(a) (3) on situations other than reliance on an inadequate plan summary. See Mauser v. Raytheon Co. Pension Plan for Salaried Employees, 239 F.3d 51, 57 (1st Cir. 2001).

Unlike Mauser, the Plaintiffs significantly and reasonably relied upon statements made by Bayer management regarding Bayer's sale of the Board Shop. In Mauser, the plaintiff could not show that he turned down a lucrative job offer because of the benefits he was to receive from

---

[17] In March 1998 Bayer sent to the Plaintiffs a pamphlet with a summery of a "significant part" of their "total compensation" but with no mention of severance. Bayer called it a "feel good piece" pamphlet, but it makes no mention of severance. **P St 74.**

Raytheon; he was not working for Raytheon when he declined the offer. 239 F.3d at 56.   Here, the time between the sale of the Board Shop and the closing was extremely short, and the Plaintiffs, who believed that they had always been treated well by Bayer, relied on Bayer management. Bayer management and human resources told the Plaintiffs in meetings that the sale of the Board Shop was a "win-win" situation.  **P St. 64**, **P Supp St 79.**   The Plaintiffs would "win" because EFTC's benefits were comparable to Bayer's and the Plaintiffs would be "better off" and have a chance to grow.  **Id.; P St. 54, P Supp St 79.**

    Leonard admitted that Bayer's benefit package was "richer" than EFTC's.  **P Ex. 4 at 161.** Leonard had analyzed the benefits of both.  **P Ex. 26, 34**. The Plaintiffs learned that the EFTC benefits were worse after the sale of the Board Shop.  **P St. 56, P Supp St 79**.  They learned that they would no longer have a pension, and that EFTC's severance, vacation and other benefits were not as good as Bayer's.  **P St. 54.**  The Plaintiffs were told that they would not receive severance from Bayer, even if they did not accept EFTC's offer of employment.  **Id.**

    The Plaintiffs also relied upon Bayer's voluntary layoff process, which Bayer has admitted exists.  **P St. 51**. When Bayer was about to lay off employees, Bayer would spread by word of mouth that it was looking for volunteers who wished to be leave their jobs and take severance, thereby saving the jobs of those pegged for termination.  Bayer paid severance to those who volunteered.  Leonard admitted that some employees volunteered for termination, and Bayer "provided them with severance benefits."  **Id. at 84, 87-90**.   The Plaintiffs relied on this program, as well as the severance under the SPD, as an inducement to remain with Bayer. **P Supp St 79**. The Plaintiffs have seen a number of coworkers during their careers at Bayer request, and receive, a voluntary termination with severance benefits. **Id.**    In fact, one of the reasons that the Plaintiffs worked for such a long time at Bayer was because of the reasonable anticipation of severance pay

at the end of their working careers. Several Plaintiffs expressly asked about the voluntary program when raising the question about severance. For example, Plaintiff Cathy Sweeney requested a voluntary termination in one of the group meetings run by Willis, who denied it. **P St. 37.** Plaintiff Robert Brown raised it in meetings with managers. The Plaintiff who was with Bayer the longest, since 1969, Vincent Fiorilla (who supervised about 100 Board Shop employees), states that with economy changing in the 1970s, with economic uncertainty in manufacturing and outsourcing, he learned that severance was a very important benefit that he possessed with Bayer. Accordingly, he stayed with his job in the Board Shop due, in part, to the availability of severance benefits. **Fiorilla Decl. ¶5.** Virtually all the Plaintiffs were aware of it and relied on it, in part, in staying with Bayer over the years. **P Supp St 79**.   The Plaintiffs knew many people who participated in this long-standing Bayer program.  Nearly all of the Plaintiffs had been with Bayer between 10 to 30 years. **P Supp St 79**.

The Plaintiffs reasonably relied upon Bayer's statements because Bayer had always treated them well and because each time a new company had taken over the in past (Compugrahic to Miles, Inc., etc.) benefits were better. **P Supp St 79**. Even though Bayer involuntarily terminated them, Bayer falsely told the Plaintiffs that the Plaintiffs were not eligible for unemployment benefits. Bayer falsely told the Plaintiffs that they were required to move their Bayer 401k plans to the less lucrative and less flexible EFTC 401k plan. **P Supp St 79.** Bayer and EFTC relied on the fact that the Plaintiffs would be forced to choose a continuing paycheck with such short notice. Bayer wrongfully squeezed the Plaintiffs, i.e. either a job with EFTC with pay or no job, no pay, no unemployment and,  no severance in either event.

### V.  ALL PLAINTIFFS HAVE NOW MADE A CLAIM BEFORE THIS COURT

All Plaintffs have now made a claim before this Court for severance under the SPD and

Bayer Plan and for equitable relief.  In Bayer's "Defendants' Reply to Plaintiffs' Opposition Memorandum to Defendants' Motion for Summary Judgment" dated February 15, 2007, Bayer stated that only seven (7) of the Plaintiffs had, at that point, submitted sworn testimony in response to the Defendants' Summary Judgment Motion.[18]  A Declaration under oath from every Plaintiff has now been filed signed for all their claims in this case.[19] **P Supp St 79.**  Furthermore, the Plaintiffs' claims for severance under 29 U.S.C. § 1132(a)(1)(B) in any event are before the Court by agreement in the Remand process where Bayer accepted their claims and has now denied them.  **P Supp St 78, 3d Roach Decl. Exs. 1 & 2.**

|  |  |
|---|---|
|  | PLAINTIFFS,<br>By their Attorney, |
|  |  |
|  | _____<br>Stephen A. Roach, BBO No. 542138<br>ROACH & WISE, LLP<br>50 Congress Street, Suite 400 |
| August 31, 2007 | Boston, MA 02109-4061<br>(617) 723-2800 |

CERTIFICATE OF SERVICE

I, Stephen A.Roach, Attorney for the Plaintiffs, hereby certify that on August 31, 2007, I served the Defendants with this document by causing copies of the same to be mailed by first class mail to their counsel of record and by e-filing.

_____
Stephen A. Roach

---

[18] The seven Plaintiffs are: Jeanne Skene, Vincent Fiorilla, Bertrand Guilmette, Teresa Ornelas, Robert Brown, Edmund Lascelles, Jr., and Janice Paradis.

[19] Plaintiffs' counsel discussed the contents of each Declaration with each Plaintiff before they were signed and filed. While substantially the same or similar in all material respects, they are not identical on many facts and issues. **3d Roach Decl. ¶3; 63 Declarations by Plfs.**  As reported at pre-trial conference, one Plaintiff, Jeanne Huff, is now deceased.  Another, Sandra Comeau Dutcher, Plaintiffs' counsel has recently been informed, also has died.